## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

_____

|  |  |  |
|---|---|---|
| BLAIR IMANI, AKEEM MUHAMMAD, | ) | |
| RAAE POLLARD, SAMANTHA NICHOLS, | ) | |
| TAMMY CHENEY, ALEXUS CHENEY, | ) | |
| VICTOR ONUOHA, KAREN SAVAGE, | ) | |
| CHERRI FOYTLIN, ALISHA FELDMAN, | ) | |
| ANTONIO CASTANON LUNA, NADIA | ) | |
| SALAZAR SANDI, DANIEL LIEBESKIND, | ) | |
| FINN PHOENIX, LEAH FISHBEIN, | ) | |
|  | ) | |
| Plaintiffs, | ) | Docket No. 17-cv-00439-JWD-EWD |
| v. | ) | |
|  | ) | |
| CITY OF BATON ROUGE; PARISH OF | ) | |
| EAST BATON ROUGE; MELVIN LEE "KIP") | | |
| HOLDEN; SID J. GAUTREAUX III; | ) | |
| CARL DABADIE, JR.; JONNY DUNNAM; | ) | |
| LOUISIANA STATE POLICE; | ) | |
| MICHAEL EDMONSON; KEVIN REEVES; | ) | |
| OFFICER LAPEYROUSE; BILLY WALKER;) | | |
| JONATHAN ABADIE; REAB SIMONEAUX,) | | |
| JR.; WILLIAM ALEXANDER; OFFICER | ) | |
| THOMAS; DERRICK WILLIAMS; CURTIS | ) | |
| WILSON; TAYLOR GIROIR; ALEX BELL; | ) | |
| TRAVIS NORMAN; WILLIE WILLIAMS; | ) | |
| DARREN HUNT; EARL LAPEYROUSE; | ) | |
| ALAINA MANCUSO; BEAU COMEAUX; | ) | |
| HERMAN NEWELL; WILLIAM SEYMOUR;) | | |
| JOE DESSENS; MARK DENNIS; | ) | |
| JONATHAN JAMES; GERALD VARNADO;) | | |
| SAMUEL CAPACI; KEVIN CURLEE; | ) | |
| KEVIN CANNATELLA; JOHN CLARY; | ) | |
| JEFF PITTMAN; JASON DOHM; KENNY | ) | |
| BREWER; RICHARD MCCLOSKY; JAMES ) | | |
| THOMAS; EARNEST JONES; KIRK | ) | |
| GLOVER; KEITH WILSON; MARSHALL | ) | |
| MENOU; JAMES JAMISON; TROY BANKS ) | | |
| CALVIN PRATER; BRANDON MCCALL | ) | |
| JASON JONES; HARRY HOWARD; JUSTIN) | | |
| WALKER; ALAN HAMILTON; BRANDON | ) | |
| BLUST; JAMES CROCKETT; RANDALL | ) | |
| WIEDEMAN; DAVID WALLACE; MIKE | ) | |
| WALKER; CHRISTOPHER BRYAN | ) | |
| TAYLOR; MYRON DANIELS; AIX GROUP;) | | |
| LAW ENFORCEMENT DOES 1 – 100; | ) | |

INSURANCE COMPANY DOES 1 – 500          )
                                        )
                    Defendants.          )
_____)

## **SECOND AMENDED COMPLAINT**

Plaintiffs, through undersigned counsel, hereby file this Second Amended Complaint.

### **INTRODUCTION**

1.      On July 5, 2016, Baton Rouge police officers shot Alton Sterling to death.

2.      Mr. Sterling was a resident of Baton Rouge and the father of five children. His death was a tragedy, but not an aberration: in America in 2016, police killed at least one black man every forty hours.[1]

3.      In the days following Mr. Sterling's homicide, people gathered in Baton Rouge to speak out about the pattern of police misconduct in Baton Rouge and the United States. Some of them were Baton Rouge residents; others came from around Louisiana or other states to support the community and to participate in the demonstrations. Reporters from all over the country and world arrived to document the events.

4.      On July 10, 2016, a peaceful, youth-led protest marched to the State Capitol building, where participants spoke, sang, and prayed. Afterwards, the participants marched back down Government Street. Where Government Street hits East Boulevard, law enforcement had set up a roadblock. Officers directed the marchers to get off of Government Street. The marchers complied and turned right onto East Blvd. A block down, the protesters stopped at the intersection of East Blvd. and France Street. The protesters gathered there and peacefully exercised their First Amendment rights to sing, pray, and hold up signs.

5.      Law enforcement officers by the score gathered across from the protesters,

---

[1] *Fatal Force,* The Washington Post. 2017.

wielding automatic weapons, body armor and gas masks, and an acoustic weapon mounted on an armored vehicle.[2] Officers blocked off the streets around the protesters.

6.    Law enforcement ordered the protesters out of the streets, and most of the protesters – including Plaintiffs – complied, stepping back onto the sidewalks.

7.    Law enforcement then ordered the protesters off the sidewalks, and most of the protesters – including Plaintiffs – complied. They stepped back into the yard of Lisa Batiste, a woman who had given them permission to use her property.

8.    But law enforcement said "where you are standing isn't good enough." They ordered the protesters to disperse – an impossible order to comply with, since the police blocked off most of the surrounding streets, had already ordered the protesters to stay off the sidewalks, and were arresting people who stepped into the streets to leave.

---

[2] The acoustic weapon is called an LRAD (Long Range Acoustic Device). LRADs were first developed for the military as a tool for ships to amplify and project noise to ward off other ships.  LRADs are marketed to law enforcement for crowd control by creating discomfort when used at close range. Close-range exposure to an LRAD can result in migraines, sinus pain, dizziness, facial pressure, ringing in ears, sensitivity to noise, as well as tinnitus and hearing loss.

 

**Figure 1**:     Plaintiff Raae Pollard peacefully protesting (left) and then lifted off the ground by her throat by Defendants (right).

9.     Shortly thereafter, the officers swept in *en masse*, violently grabbing people and throwing to the ground, pinning them, and binding their wrists painfully with plastic zipties. In their frenzy, the officers arrested a mix of protesters, reporters, and legal observers. The arrestees, including Plaintiffs, were assembled into groups. Other officers wrote Affidavits of Probable Cause using pre-fabricated forms, most of which were written with facts from a different event entirely. Plaintiffs were charged with "Obstructing a Public Passageway" or "Obstruction of a Highway" and "Resisting Arrest."

10.     Plaintiffs are thirteen protesters and two reporters arrested and jailed during this police frenzy, even though they continuously complied with police orders and had done nothing wrong. Many Plaintiffs were injured. One Plaintiff was a 17-year-old girl put in an adult prison with male inmates. One Plaintiff was separated from her children, including a five-year-old who

was taken from her and put into child protective services.

11.     Defendants' arrest of peaceful protesters in Baton Rouge is not a new invention. In 1961, the same story happened: Protesters gathered in Baton Rouge to speak out against racial inequality and law enforcement misconduct. They marched and then gathered on the sidewalks to make their voices heard. Baton Rouge police monitored the protest and then swept in to break up the protest. They arrested a man for alleged legal violations including "Obstructing a Public Passageway."

12.     The man took his case all the way to the U.S. Supreme Court. The Court told the City of Baton Rouge that its actions had violated the Constitution. It held in *Cox v. Louisiana,* 379 U.S. 536, 558 (1965) ("*Cox I*") that it was "clear" that Baton Rouge law enforcement committed a "unwarranted abridgment of [the protester's] freedom of speech and assembly secured to him by the First Amendment."

13.     But Defendants did not learn from the Supreme Court's clear and unequivocal admonishment. In 2016, they committed the same constitutional violations, using the same tactics, with some of the same criminal allegations. But this time, things are far worse: in 1961, Defendants arrested a single protester; in 2016, Defendants arrested approximately two hundred protesters, reporters, and legal observers.




**Figure 2:**

An officer watches protesters in Baton Rouge in 1961. (Source: It Happened in Baton Rouge, U.S.A.) The Unite̶ States Supreme Court decided that the arrest of a Baton Rouge protester that year was a "clear" violation of First Amendment rights. *Cox v. Louisiana*, 379 U.S. 536 (1965).

Officers watch protesters in 2016, shortly before illegally arresting them. The pictured protesters include Plaintiffs Blair Imani, Raae Pollard, and Akeem Mohammad.

14.     This lawsuit focuses on three connected events that occurred on July 10, 2016. The first is the peaceful protest at France Blvd. and East St., in which most of the Plaintiffs were arrested while standing on private property after clearing the streets and sidewalks in compliance with law enforcement orders. The second is the arrest of Tammy Cheney and her 17-year-old daughter Alexus Cheney, and their separation from Tammy Cheney's five-year-old son A.J. and their dog Kelso. The third is the violent takedown and arrest of Antonio Castanon Luna and his wife Nadia Salazar Sandi, who were standing at a street corner a few blocks from the protest. Defendants' actions that day were so violent that no more large protests or marches occurred after July 10, 2016.

15.     Regarding the massive violation of constitutional rights that occurred on that day, Baton Rouge Police Department spokesman Sgt. L'Jean McKneely said that "[a]nyone who feels that something was unjustly done, they need to file a formal complaint."[3]

---

[3] Maya Lau, *Identical arrest reports for many Alton Sterling protesters a red flag, legal experts say*. The Advocate. Sept. 18, 2016.

16.    Plaintiffs know "that something was unjustly done." Here, they accept

McKneely's invitation "to file a formal complaint."

## II.    JURISDICTION AND VENUE

17.    Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1985(3), to vindicate

their rights guaranteed by the First, Fourth, and Fourteenth Amendments to the United States

Constitution. Plaintiffs also bring supplemental state-law claims. This Court has jurisdiction

pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

18.    This case seeks remedies under 28 U.S.C. §§ 2201, 2202 and 42 U.S.C. §§ 1983,

and 1988.

19.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391 as a substantial part of

the events giving rise to Plaintiffs' claims arose in the Middle District of Louisiana.

## III.    PARTIES

### A.    Plaintiffs

**Table 1: Summary of Plaintiff Information**

| Name | Charged With Resisting Arrest (14:108) plus: | Location of Arrest | Role |
|---|---|---|---|
| Blair Imani | 14:97 | Ms. Batiste's lawn | Protester |
| Akeem Muhammad | 14:100.1 | Ms. Batiste's lawn | Protester |
| Raae Pollard | 14:100.1 | Ms. Batiste's lawn | Protester |
| Sami Nichols | 14:97 | Ms. Batiste's lawn | Protester |
| Tammy Cheney | 14:100.1 | Next to her car at East Blvd. and Gov. St. | Protester |
| Alexus Cheney | 14:97 | Next to her car at East Blvd. and Gov. St. | Protester |
| Victor Onuoha | 14:97 | Ms. Batiste's lawn | Protester |
| Antonio Castanon Luna | 14:100.1 | Sidewalk at corner of Gov. St. & Maximillian | Protester |
| Nadia Salazar Sandi | 14:97 | Sidewalk at corner of Gov. St. & Maximillian | Protester |
| Karen Savage | 14:100.1 | In the shrubbery at the McDonald's | **Reporter** |
| Cherri Foytlin | 14:97 | On grass between sidewalk and Ms. Batiste's fence | **Reporter** |
| Dr. Daniel Liebeskind | 14:100.1 | Ms. Batiste's lawn | Protester |
| Alisha Feldman | 14:97 | Ms. Batiste's lawn | Protester |
| Finn Phoenix | 14:97 | Ms. Batiste's lawn | Protester |
| Leah Fishbein | 14:97 | Ms. Batiste's lawn | Protester |

20. Plaintiff BLAIR IMANI. Blair attended the July 10, 2016, events as a protester. Blair's full name is Blair Elizabeth Brown; she goes by Blair Imani. Blair uses the pronoun "she."

21. Plaintiff AKEEM MUHAMMAD attended the July 10, 2016, events as a peaceful protester. Akeem uses the pronoun "he."

22. Plaintiff RAAE POLLARD attended the July 10, 2016, events as a peaceful protester. Raae uses the pronoun "she."

23. Plaintiff SAMANTHA NICHOLS goes by "Sami" and uses the pronoun "they."[4] Sami attended the July 10, 2016, events as a peaceful protester.

24. Plaintiff TAMMY CHENEY attended the July 10, 2016, events as a peaceful protester. Tammy uses the pronoun "she."

25. Plaintiff ALEXUS CHENEY attended the July 10, 2016, events as a peaceful protester. She was seventeen at the time. Alexus uses the pronoun "she."

26. Plaintiff VICTOR ONUOHA attended the July 10, 2016, events as a peaceful protester. Victor uses the pronoun "he."

27. Plaintiff KAREN SAVAGE attended the July 10, 2016, events as a reporter and a member of the press. Karen uses the pronoun "she."

28. Plaintiff CHERRI FOYTLIN attended the July 10, 2016, events as a reporter and a member of the press. Cherri uses the pronoun "she."

29. Plaintiff ALISHA FELDMAN attended the July 10, 2016, events as a peaceful protester. Alisha uses the pronoun "she."

30. Plaintiff ANTONIO CASTANON LUNA attended the July 10, 2016, events as a

---

[4] "They" is generally used as a pronoun for people who identify as neither male nor female. *See*, *e.g*.,: Avinash Chak, *Beyond 'he' and 'she': The rise of non-binary pronouns*, BBC News. December 7, 2015.

peaceful protester. "Castanon Luna" is Antonio's last name, and he uses the pronoun "he."

31.   Plaintiff NADIA SALAZAR SANDI attended the July 10, 2016, events as a

peaceful protester. "Salazar Sandi" is Nadia's last name, and she uses the pronoun "she."

32.   Plaintiff Dr. DANIEL LIEBESKIND attended the July 10, 2016, events as a

peaceful protester. Daniel uses the pronoun "he."

33.   Plaintiff FINN PHOENIX attended the July 10, 2016, events as a peaceful

protester. In July 2016, Finn's legal name was Caitlin Gaffney. Subsequently, it was changed to

Finn Phoenix. Finn uses the pronoun "they."

34.   Plaintiff LEAH FISHBEIN attended the July 10, 2016, events as a peaceful

protester. Leah uses the pronoun "she."

**B.    Defendants**

**Table 2: Summary of Defendant Information**

| Rank | Name | Agency | Notes |
|---|---|---|---|
| | City of Baton Rouge | BR | |
| | Parish of Baton Rouge | BR | |
| Mayor | Melvin Lee Holden | BR | Former Mayor-President of the City/Parish |
| Sheriff | Sid J. Gautreaux III | EBRSO | Sheriff of East Baton Rouge |
| Chief | Carl Dabadie, Jr. | BRPD | Was the Chief of BRPD |
| Int. Chief | Jonny Dunnam | BRPD | Is the Interim Chief of BRPD |
| | Louisiana State Police | LSP | |
| Supr. | Michael Edmondson | LSP | Was the Superintendent of the Louisiana State Police |
| Supr. | Kevin Reeves | LSP | Is the Superintendent of the Louisiana State Police |
| | Lapeyrouse | BRPD | Seized Tammy Cheney; attempted to destroy evidence |
| Officer | Billy Walker P10177 | BRPD | Signed Aff. of PC for Raae Pollard |
| Officer | Jonathan Abadie P10439 | BRPD | Signed Aff. of PC for Sami Nichols and Sandi Salazar. Wrote report for Karen Savage |
| Officer | Reab Simoneaux, Jr. P10121 | BRPD | Signed report and Aff. of PC for Tammy Cheney and Alexus Cheney. |
| Officer | William Alexander P10539 | BRPD | Signed report and Aff. of PC for Blair Imani. |
| | Thomas | BRPD | Signed Aff. of PC for Karen Savage. |
| Sgt. | Derrick Williams P7021 | BRPD | Signed Aff. of PC for Cherri Foytlin |
| Officer | Curtis Wilson | BRPD | Signed report and Aff. of PC of Leah Fishbein and Alisha Feldman. |
| Officer | Taylor Giroir P10410 | BRPD | Signed report and Aff. of PC of Finn Phoenix. |

| | | | |
|---|---|---|---|
| Officer | Alex Bell P10508 | BRPD | Signed report and Aff. of PC of D. Liebeskind. |
| Officer | Travis Norman P10420 | BRPD | Signed report and Aff. of PC for Akeem Muhammad. |
| Cpl. | Willie Williams P10178 | BRPD | Signed report and Aff. of PC of Victor Onuoha and Antonio Castanon. |
| Officer | Darren Hunt | BRPD | Approved incident report of D. Liebeskind |
| Officer | Earl Lapeyrouse | BRPD | Approved incident report for Finn Phoenix. |
| Cpl. | Alaina Mancuso | BRPD | The "purple-shirted officer." Signed incident report of Ms. Foytlin. |
| Sgt. | Jeff Pittman | BRPD | Involved in the arrest of plaintiffs. |
| Cpl. | Jason Dohm | BRPD | *Id.* |
| Lt. | Kenny Brewer | BRPD | *Id.* |
| Cpl. | Richard McCloskey | BRPD | *Id.* |
| Ofc. | James Thomas | BRPD | *Id.* |
| Ofc. | Earnest Jones | BRPD | *Id.* |
| Sgt. | Kirk Glover | BRPD | *Id.* |
| Cpt. | Keith Wilson | BRPD | *Id.* |
| Lt. | Beau Comeaux | LSP | Head of the LSP Mobile Field Force |
| Master Tpr. | Herman Newell | LSP | The LSP officer who seized Raae Pollard by the neck. (See Fig. 1.) Also a Squad Leader and a "team leader" (*i.e.*, those personnel who were identifying or ordering persons for detention and/or arrest). |
| Tpr. | William Seymour | LSP | The LSP officer who seized Raae Pollard by the arms. (See Fig. 1.) |
| Sr. Tpr. | Joe Dessens | LSP | A Squad Leader and a "team leader." |
| Sgt. | Mark Dennis | LSP | *Id.* |
| Tpr. | Jonathan James | LSP | *Id.* |
| Sgt. | Gerald Varnado | LSP | *Id.* |
| Master Tpr. | Samuel Capaci | LSP | *Id.* |
| Sgt. | Kevin Curlee | LSP | *Id.* |
| Sgt. | Kevin Cannatella | LSP | A Platoon Leader and a "team leader." |
| Sgt. | John Clary | LSP | *Id.* |
| | Marshall Menou | EBRSO | Present at the intersection of Government and Maximillian during the takedown and arrest of Plaintiffs Antonio Castanon Luna and Nadia Salazar Sandi. |
| | James Jamison | EBRSO | *Id.* |
| | Troy Banks | EBRSO | *Id.* |
| | Calvin Prater | EBRSO | *Id.* |
| | Brandon McCall | EBRSO | *Id.* |
| | Jason Jones | EBRSO | *Id.* |
| | Harry Howard | EBRSO | Present at the intersection of East and France during mass arrests. |
| | Justin Walker | EBRSO | *Id.* |
| | Alan Hamilton | BRPD | Tackled and arrested Plaintiffs Antonio Castanon Luna and Nadia Salazar Sandi. |
| Cpl. | Brandon Blust | BRPD | *Id.* |
| | James Crockett | BRPD | *Id.* |
| Capt. | Randall Wiedeman | BRPD | Monitored BRPD perimeter. |
| | David Wallace | BRPD | Gave order to start effectuating arrests. |
| | Mike Walker | BRPD | *Id.* |

| | Christopher Bryan Taylor | BRPD | *Id.* |
|---|---|---|---|
| | Myron Daniels | BRPD | *Id.* |
| | AIX Group | EBRSO | D/B/A Nova Casualty Company. Insurer for Sheriff. |

35. Defendant CITY OF BATON ROUGE is a political subdivision of the State of Louisiana. The city's governing authority is consolidated with the government of EAST BATON ROUGE PARISH. ("CITY/PARISH.")

36. Defendant PARISH OF EAST BATON ROUGE is a political subdivision of the State of Louisiana. The Parish's governing authority is consolidated with the government of the CITY OF BATON ROUGE. ("CITY/PARISH.")

37. Defendant MELVIN LEE "KIP" HOLDEN is an adult resident of the Middle District of Louisiana. Defendant HOLDEN was, at all relevant times, the duly elected Mayor-President of the CITY/PARISH. Defendant HOLDEN was responsible for the supervision, administration, policies, practices, procedures, and customs for the CITY/PARISH and the City's police department. He was responsible for the hiring, training, discipline, supervision, and control of the BRPD officers who are defendants herein, including Defendant CARL DABADIE. He is sued in his individual capacity as former Mayor-President of the City/Parish.

38. Defendant SID J. GAUTREAUX III is the Sheriff of East Baton Rouge Parish and is an adult resident of the Middle District of Louisiana. The office of Sheriff is an autonomous political subdivision of the State of Louisiana. Defendant GAUTREAUX is responsible for the supervision, administration, policies, practices, procedures, and customs of the East Baton Rouge Sheriff's Office ("EBRSO"). He was responsible for the hiring, training, discipline, supervision, and control of the EBRSO command staff, supervisors, and deputies. He is sued in his individual and official capacities.

39. Defendant CARL DABADIE, JR. is an adult resident of the Middle District of

Louisiana. He is the Chief of the Baton Rouge Police Department. Defendant DABADIE was responsible for the supervision, administration, policies, practices, customs, and procedures of the BRPD, as well as the hiring, training, supervision, discipline, and control of police personnel under his command, including the BRPD defendants named herein. He is sued in his individual capacity.

40. Defendant JONNY DUNNAM is an adult resident of the Middle District of Louisiana. He is the Interim Chief of the Baton Rouge Police Department. Defendant Dunnam is responsible for the supervision, administration, policies, practices, customs, and procedures of the BRPD, as well as the hiring, training, supervision, discipline, and control of police personnel under his command, including the BRPD defendants named herein. He is sued in his official capacity.

41. Defendant LOUISIANA STATE POLICE is a law enforcement agency, which upon information and belief was cooperating and working with the Baton Rouge Police Department and other local law enforcement agencies and sharing responsibility and control over monitoring protests and effectuating arrests in Baton Rouge.

42. Defendant Colonel MICHAEL EDMONSON is an adult resident of the Middle District of Louisiana. On July 10, 2016, Defendant EDMONSON was the Superintendent of the Louisiana State Police ("LSP"). Defendant EDMONSON was responsible for the supervision, administration, policies, practices, customs, operations, training, staff, and operation of the LSP. He is sued in his individual capacity only.

43. Defendant KEVIN REEVES is an adult resident of the Middle District of Louisiana. Defendant REEVES is the Superintendent of the Louisiana State Police ("LSP"). Defendant REEVES is responsible for the supervision, administration, policies, practices, customs, operations, training, staff, and operation of the LSP. He is sued in his official capacity

only.

44.  Defendant OFFICER LAPEYROUSE is an officer who seized, arrested, used force on, or wrote up one or more Plaintiffs' affidavit of probable cause, or otherwise illegally interacted with one or more Plaintiffs. He also attempted to destroy evidence.

45.  Defendant BILLY WALKER P10177 is an officer who seized, arrested, used force on, or wrote up one or more Plaintiffs' affidavit of probable cause, or otherwise illegally interacted with one or more Plaintiffs.

46.  Defendant Officer JONATHAN ABADIE P10439 is an officer who seized, arrested, used force on, or wrote up one or more Plaintiffs' affidavit of probable cause, or otherwise illegally interacted with one or more Plaintiffs.

47.  Defendant OFFICER REAB SIMONEAUX, JR. P10121 is an officer who seized, arrested, used force on, or wrote up one or more Plaintiffs' affidavit of probable cause, or otherwise illegally interacted with one or more Plaintiffs.

48.  Defendant OFFICER WILLIAM ALEXANDER P10539 is an officer who seized, arrested, used force on, or wrote up one or more Plaintiffs' affidavit of probable cause, or otherwise illegally interacted with one or more Plaintiffs.

49.  Defendant OFFICER THOMAS is an officer who seized, arrested, used force on, or wrote up one or more Plaintiffs' affidavit of probable cause, or otherwise illegally interacted with one or more Plaintiffs. The officer's signature is thus:

_Thomas_
Affiant

50.  Sgt. DERRICK WILLIAMS P7021, Officer CURTIS WILSON P1057, Officer TAYLOR GIROIR P10410 , Officer ALEX BELL P10508, Officer TRAVIS NORMAN P10420 , Corporal WILLIE WILLIAMS P10178, Officer DARREN HUNT, Officer EARL

LAPEYROUSE are officers who seized, arrested, used force on, or wrote up or approved one or more Plaintiffs' reports or affidavits of probable cause, or otherwise illegally interacted with one or more Plaintiffs.

51.    Sgt. JEFF PITTMAN, Cpl. JASON DOHM, Lt. KENNY BREWER, Cpl. RICHARD MCCLOSKEY, Ofc. JAMES THOMAS, Ofc. EARNEST JONES, Sgt. KIRK GLOVER, and Cpt. KEITH WILSON are BRPD officers who seized, arrested, used force on, or otherwise illegally interacted with one or more Plaintiffs.

52.    Corporal ALAINA MANCUSO is an officer who seized, arrested, used force on, or wrote up or approved one or more Plaintiffs' reports or affidavits of probable cause, or otherwise illegally interacted with one or more Plaintiffs. She is also identified herein as "The Purple-Shirted Officer."

53.    Lt. BEAU COMEAUX is the head of LSP's Mobile Field Force, and was in command of LSP forces at the time of Plaintiffs' arrests.

54.    LSP Sgt. HERMAN NEWELL and Trooper WILLIAM SEYMOUR are the two LSP officers who seized Raae Pollard, and are visible in Figure 1.

55.    LSP Sgts. KEVIN CANNATELLA and JOHN CLARY were Platoon leaders at the time of Plaintiffs' arrests. They were acting "team leaders" (*i.e.*, those LSP personnel who were identifying or ordering persons for detention and/or arrest).

56.    LSP Sr. Tpr. JOE DESSENS, Sgt. MARK DENNIS, Sgt. MICHAEL DOWDEN, Tpr. JONATHAN JAMES, Sgt. GERALD VARNADO, Master Tpr. SAMUEL CAPACI, Master Tpr. HERMAN NEWELL, Sgt. KEVIN CURLEE, were Squad leaders at the time of Plaintiffs' arrests. They were acting "team leaders" (*i.e.*, those LSP personnel who were identifying or ordering persons for detention and/or arrest).

56a.   EBRSO officers MARSHALL MENOU, JAMES JAMISON, TROY BANKS,

CALVIN PRATER, BRANDON MCCALL, and JASON JONES were present at the intersection of Government and Maximillian during the takedown and arrest of Plaintiffs Antonio Castanon Luna and Nadia Salazar Sandi.

56b.  EBRSO officers HARRY HOWARD and JUSTIN WALKER were present at the intersection of East and France during the mass arrest of protesters.

56c.  BRPD officer RANDALL WIEDEMAN was assigned to monitor the BRPD perimeter during the protests and helped receive and transport arrested protesters.

56d.  BRPD officers DAVID WALLACE, MIKE WALKER, CHRISTOPHER BRYAN TAYLOR, and MYRON DANIELS gave orders over the radio to start effectuating arrests of protesters.

57.  LAW ENFORCEMENT DOES 1 – 500 are persons presently unknown to Plaintiffs after diligent search and inquiry. OFFICER DOES 1–500 serve as Officers of the BRPD, EBRSO, LSP, and other law enforcement agencies who were involved in the suppression of dissent through the use of excessive force, intimidation, and illegal arrest of protesters in Baton Rouge in July 2016. DOES include the officers who seized and used force on Plaintiffs, as well as the officers who wrote up Plaintiffs' false affidavits of probable cause. After diligent search and inquiry, Plaintiffs are currently unaware of the extent of the policy-making authority held by specific law enforcement officers who were physically present for the arrests and incarceration of the Plaintiffs. For this reason, Plaintiffs sue the DOES above in both their individual and official capacities.

58.  Defendant AIX GROUP, doing business as NOVA CASUALTY COMPANY is a an insurance company that, on information and belief, provides insurance to the Louisiana Sheriff's Association and some of its members, including the East Baton Rouge Sheriff's Office. AIX Group is domiciled in Connecticut. Its principal business establishment in Louisiana is in

Baton Rouge.

59.    INSURANCE COMPANY DOES 1 – 100 are as yet unknown insurance companies, who, upon information and belief, have issued and currently have in effect one or more policies of insurance covering one or more of the Defendants named herein.

60.    All of the Defendants (aside from the insurance companies) named in this complaint acted under color of state law at all relevant times. Except as otherwise indicated, each defendant is a joint tortfeasor with every other defendant under Louisiana Civil Code Art. 2324.

## IV.    STATEMENT OF FACTS

### A Brief History of Defendants' Law Enforcement Misconduct

61.    Baton Rouge law enforcement has a long history of misconduct and suppression of civil liberties. As described above, BRPD's 1961 suppression of a peaceful protest and arrest of Reverend Elton Cox resulted in a U.S. Supreme Court opinion holding that it was "clear" that Rev. Cox's First Amendment rights had been violated. *Cox v. Louisiana,* 379 U.S. 536 (1965).

62.    A year later, tensions between law enforcement and the Baton Rouge community escalated after the alleged killings of two Black students by EBRSO deputies at a protest on the campus of Southern University in 1972.

63.    In 1980, the City of Baton Rouge and several dozen other municipal defendants were placed under a federal consent decree intended to remedy racially discriminatory hiring practices of a class of Louisiana police and fire departments, including the BRPD. In the decades since, nearly every municipal defendant reached compliance with the consent decree and was dismissed from the case – but not the City of Baton Rouge.

64.    In September of 2005, the population of Baton Rouge swelled as many residents of New Orleans, a majority Black city, sought refuge from Hurricane Katrina and the resultant flood. The Michigan State Police and New Mexico State Police both sent troopers to assist the

BRPD in policing the city's rapidly growing population.

65.    Within three days of the troopers' arrival, both state police agencies had ordered their troopers to cease operations with BRPD after the troopers witnessed and complained of egregious misconduct and potentially criminal actions by BRPD officers.  One state trooper from Michigan said Baton Rouge police attempted to thank him for his help by letting him "beat down" a prisoner.[5] A spokeswoman for the Michigan State Police told a reporter that "troopers observed Baton Rouge police officers engage in actions that were an affront to their sense of dignity and respect."

66.    Members of both the Michigan State Police and the New Mexico State Police shared observations and concerns that were compiled in a formal letter of complaint to the BRPD.[6] One Trooper reported that "I personally believe that most of the Baton Rouge Police Department are good officers that are being directed by their supervisors to crack down on the public. I don't know if they have been given any type of direction as to what is right or wrong."[7]

67.    As writer Jarvis DeBerry put it: "So that's what we're dealing with: a police department whose behavior worried other law enforcement officials and whose leadership has been more defensive than responsive to the claims of racist policing."[8]

68.    Examples of reported BRPD misconduct included multiple instances of excessive force, including force directed at minors, through the use of tasering, hitting, choking, and pepper spraying of residents, without warning or threat to the safety of officers or civilians; searches of individuals and their vehicles without reasonable suspicion or probable cause; and possibly falsifying information in police reports.

---

[5] Jarvis DeBerry, *Before killing Alton Sterling, Baton Rouge police had a history of brutality complaints,* The Times-Picayune, July 6, 2016.
[6] The report is attached here as **Exhibit A**.
[7] *Id.* at 9.
[8] DeBerry, *supra.*

69.    The Baton Rouge Police Department, under the direction of Defendant Holden and predecessors in office of Defendant Dabadie, also resisted efforts of media and public interest advocates to gain information regarding these post-Katrina abuses, as part of an ongoing effort to cover up and conceal officer misconduct, and to promote the police code of silence.

70.    In 2006, as part of the effort to cover up and conceal allegations of race-based officer misconduct and to promote the police code of silence, the City/Parish and the BRPD actively resisted public records requests and a Public Records Law enforcement action filed by The Advocate newspaper seeking access to the Internal Affairs Division investigative report. Defendant Dabadie's predecessor in office authorized a meritless countersuit to delay and thereby shield investigation records from public view, while imposing high costs on the newspaper.

71.    Also in 2006, Defendant Mayor Kip Holden denied the NAACP's suggestion of a civilian oversight board for police.

72.    In 2011, then-BRPD Chief Dewayne White publicly stated that ten percent of the department's officers failed to exercise basic levels of professionalism, and that "it's become so ingrained" in the minds of some officers that they "believe that everybody they come across or most people they come across with that color of skin is probably a criminal." Defendant Mayor Holden fired Chief White in 2013 and hired Defendant Dabadie in his place.

73.    In September 2014, a series of racist text messages sent by a BRPD officer to a civilian were published.  In the messages, the officer, a fifteen-year veteran of the department, referred both to Black colleagues and civilians with racial epithets, and stated, *inter alia*, "I wish someone would pull a Ferguson on them and take them out. I hate looking at those African monkeys at work . . . I enjoy arresting those thugs with their saggy pants."

74.    The officer was placed on administrative leave by BRPD and resigned before any

disciplinary action was taken against him by the Department. On information and belief, no action was taken by Holden, Dabadie or the City/Parish to determine the extent of similar attitudes among other BRPD officers. Defendant Dabadie stated publicly that there was no need to do so, because the issue was confined to the lone officer. Defendant Dabadie's conclusion is belied by more recent stories, including reporting that a White BRPD officer texted his colleagues a picture of a chimpanzee and the phrase "chimp out" in the context of the Alton Sterling protests.[9]

75.    BRPD has also had a policy, practice, or custom of excessive use of force. Recent allegations include:

(a) a 2007 arrest on a complaint of "loud music" with pepper spray and force that caused the rupture of the arrestee's bladder;

(b) a 2008 arrest for smoking marijuana that fractured the skull of the arrestee causing internal bleeding and permanent brain damage;

(c) a 2011 incident in which an officer instructed a man, who advised the officer he was intoxicated, to move a vehicle away from the scene of the arrest; when the drunk driver crashed the car, the officer shot him to death and shot a bystander in the arm;

(d) a 2014 incident in which BRPD officers strip-searched a visitor to a home which was being searched by the officers, then kicked the visitor with such force that his head slammed into the floor, knocking several teeth out of his mouth;

(e) a 2015 incident in which two members of the news media were handcuffed, and one arrested, for taking pictures of an arrest;

(f) a 2016 incident caught on video in which a sixteen-year-old was held down by multiple officers while one officer repeatedly punched him in the head;[10] and

(g) the shooting death of Alton Sterling in July 2016.[11]

76.    In recent years, suits against the City/Parish for BRPD's excessive uses of force

[9] Jim Mustian, *Baton Rouge Officer suspended after alleged racial message about Alton Sterling protests*, The Advocate, May 22, 2017.
[10] DeBerry, *supra.*
[11] *See Andricka Williams v. The City of Baton Rouge*, 19th Judicial District Court.

and unconstitutional arrests have resulted in sizeable yearly settlements by the Parish Attorney. For example, the City/Parish paid $372,434 to settle such cases in 2015, $581,286 in 2014, and $437,112 in 2011.

77.     Similar to BRPD, the East Baton Rouge Sheriff's Office has its own history, extending decades before the July 2016 protests, of excessive force and unconstitutional arrests. More recently, allegations of excessive force and unconstitutional arrest leveled against EBRSO and Defendant Gautreaux have included multiple instances of excessive force through the inappropriate use of tasers, unconstitutional use of mace, and punching and kicking arrestees without justification.   Some of these allegations are documented in the following cases: *Davis v. East Baton Rouge Sheriff's Office*, Civil Case No. 08-00708 (M.D. La.) (resolved in private settlement); *Martinez v. Gautreaux*, Civil Case No. 10-00847 (M.D. La.) (resolved in a private settlement); *Plaisance v. East Baton Rouge Sheriff's Office*, Civil Case No. 16-00365 (M.D. La.) (ongoing).

78.     During Defendant Edmonson's tenure, the Louisiana State Police have also exhibited excessive force and unconstitutional arrest. While LSP does not typically patrol municipalities, a pattern of unconstitutional excessive force and illegal arrest has rapidly emerged in the brief time that Defendant Edmonson has directed LSP in the provision of policing services in the City of New Orleans.  Suits filed against the LSP since early 2013 allege that members of LSP, under the direction of Defendant Edmonson, have:

(a) physically and verbally abused two Black teenagers without provocation or lawful justification, desisting only when one of the teen's mother, a New Orleans Police officer, arrived and intervened;

(b) pulled over, shoved to the ground, kicked, and threatened with firearms internationally renowned musician Shamarr Allen while searching for a Black drug dealer – apparently based solely on Allen's race;

(c) manhandled, tased, and verbally and physically assaulted Michael Baugh, a Black barber, causing significant injury, apparently based on his being of the same race as four

suspects (Baugh matched no other part of the suspects' description).

79.     On information and belief, Defendant EDMONSON chose not to order a thorough investigation into these practices when they came to light; his inaction condones the falsification of information and the intimidation of witnesses to LSP troopers' unconstitutional conduct. The LSP internal investigation into the LSP attack on the teenagers concluded that all of the troopers involved in the incident had acted appropriately, a conclusion that both the Mayor of New Orleans and the Superintendent of the New Orleans Police Department publicly criticized based on publicly available video of the incident. According to news reports, LSP went on to file a disciplinary complaint with the NOPD against the mother of one of the teens for intervening on behalf of her son and his friend. On information and belief, Defendant EDMONSON personally wrote a letter to the Superintendent of the NOPD requesting an investigation into the mother's actions.

80.     Some LSP arrest reports involving officer uses of force show that the LSP troopers write up the arrest report and then later rewrite the report to add allegations of resisting arrest.

### BRPD Shot and Killed Alton Sterling, the Community Began to Make Its Voice Heard, and Law Enforcement Implemented a Plan to Silence Them

81.     The July 5, 2016 killing of Alton Sterling was documented on video. The video showed Mr. Sterling being forcibly restrained on the ground and then shot. Mr. Sterling's death provoked local, national, and international outrage.

82.     By the evening of July 6, 2016, Baton Rouge residents gathered for daily and nightly vigils and peaceful protests at various locations throughout the city.  Some paid their respects in front of the Triple S Food Mart where Mr. Sterling was killed. Many protested on a sizeable grassy lot on Airline Highway, across the street from the headquarters of the BRPD.



**Figure 3**:    Community members gather at the Triple S.
(Photo by Marco Poggio, a photographer working with Plaintiff Karen Savage.)

GAUTREAUX, in combination with Defendant CAZES, the Southern District Coordinator of

LSA's Emergency Task Force, and Defendant HURST, Director of the LSA's Task Force and

Homeland Security services, arranged for the presence of approximately 200 additional deputies

from surrounding sheriffs' offices to supplement local law enforcement's response to the

protests.

      84.   In response to the large and growing protests and the national spotlight on

protesters' nonviolent, lawful resistance, Defendants, led by Defendants Holden, Dabadie,

Edmonson, Gautreaux and Cazes, developed and implemented a strategy. Their strategy was to

silence this peaceful and lawful exercise of First Amendment rights through intimidation,

excessive force, and illegal arrests and detention. Other law enforcement agencies not currently

known to Plaintiffs joined Defendants in this endeavor.

85.    Between July 8 and 10, 2016, Baton Rouge area law enforcement officers and their agents – including BRPD, EBRSO, LSP, deputy sheriffs of surrounding parishes, and including but not limited to the currently unknown Law Enforcement DOES  - put this plan into action. In furtherance of the above objectives, the Defendants unlawfully arrested approximately 200 protesters as they engaged in peaceful protest protected by the First Amendment.

86.    At the same time, Defendants were downplaying their response to protesters. "We do not want to appear to have a military-style response," Defendant Dabadie said during a news conference early on July 9th, 2016. "We're there, we're around, and we're keeping everything safe, but we've tried to be respectful and reduce our presence at these events."[12] As the arrests of peaceful protesters were occurring, Defendant Col. Mike Edmonson said he thought his troopers "did well."[13]



**Figure 4**: Protester Javier Dunn was beaten so badly by Defendants on July 9, 2016 that his eye socket was fractured. A sheriff's employee told him "'that's what y'all get when you protest."[1]

87.    But by the evening of Saturday, July 9th, Defendants had escalated their actions towards the peaceful protesters. Huffington Post senior crime reporter David Lohr stated that "one thing I noticed today as opposed to yesterday is that [officers] were certainly more willing to pull their firearms out." He also reported that "[a]n officer just pointed a machine gun at me . . . I'm not quite sure what that female officer was doing; she pointed an assault rifle at us."[14]

88.    One witness reported that she heard "an order over the police radio: 'I don't care

[12] Amy Wold, Bryn Stole, and Maya Lau. *See photos, video as Baton Rouge police officer draws gun, tensions rise at Alton Sterling protest Friday night,* The Advocate, July 9, 2016.
[13] *Id.*
[14] Lilly Workneh  & David Lohr, *Baton Rouge Cop Points Assault Weapon At HuffPost Reporter, Protesters*, Huffington Post, July 10, 2016.

what they're doing… grab as many as you can. I don't care if they're on the grass or not.'"[15]

89.    Protester Javier Dunn was arrested by Defendants and beaten so badly that they fractured his eye socket – although his Affidavit of Probable Cause stated that he was arrested "without incident." One of Defendants' employees said "'that's what y'all get when you protest."[16]



**Figure 5**:    On July 9, 2016, Defendant Officer Cat points her assault rifle at protesters and a reporter. (Photo by Plaintiff Karen Savage.)

90.    By that night, the jail was so full of protesters that the wardens had run out of blankets and handcuffs.[17]

91.    On Sunday, July 10, 2016, the human rights group Amnesty International sent an open letter to the Baton Rouge police department, urging it to use more restraint and respect the

---

[15] Affidavit of Yakeista Hughes. *North Baton Rouge Matters v. City of Baton Rouge*, M.D. La. 16-cv-00463-JWD-RLB ("NRBM") R. Doc. 2-6 at 16.
[16] Bryn Stole, *Protester claims he was beaten by Baton Rouge police during Alton Sterling demonstration.* The Advocate, July 14, 2016.
[17] Abigail Hauslohner, Robert Samuels & Ashley Cusick, *As arrests mount in Baton Rouge, protesters question police tactics,* Wash. Post, July 10, 2016.

rule of law in dealing with protesters. "We would remind you that police authorities are required to act in accordance with international human rights standards and the U.S. Constitution," the letter read. "Specifically, law enforcement must ensure that any decision to disperse an assembly is taken only as a last resort and carefully in line with the principles of necessity and proportionality."[18] But Defendants did not heed Amnesty International's reminder of their constitutional duties.

92. Three primary incidents occurred that Sunday that give rise to Plaintiffs' claims. The first is the peaceful protest at France Blvd. and East St., in which most of the Plaintiffs were arrested while standing on private property after clearing the streets and sidewalks in compliance with law enforcement orders. The second is the separation and arrest of Tammy Cheney and her 17-year-old daughter Alexus Cheney, and the seizure of Tammy Cheney's five-year-old son. The third is the violent takedown and arrest of Antonio Castanon Luna and his wife Nadia Salazar Sandi, who were standing at a street corner a few blocks from the protest. Defendants' actions that day were so violent that no more large protests or marches occurred after July 10, 2016.

**Plaintiffs Were Arrested at the Peaceful Protest at France Blvd. and East St.,**
**Even Though They Continuously Complied With Law Enforcement Orders**

93. On July 10, 2016, a peaceful, youth-led march to the State Capitol was organized. Participants marched from a church to the Capitol, and then gave speeches on the steps of the Capitol building.

---

[18] *Id.*



**Figure 6**:     Heads are bowed at the prayerful protest on the steps of the state capitol building.

94.    Afterwards, the participants marched back down Government Street. When they reached the intersection of Government Street and East Boulevard, they had to stop because law enforcement had set up a roadblock. The officers directed the marchers to get off of Government Street.

95.    At about 5:40 p.m., the marchers complied and turned right onto East Blvd. A block down, the protesters stopped and gathered at East Blvd. and France Street. The protesters there peacefully exercised their First Amendment rights to sing, pray, and hold up signs.



**Figure 7**:    Plaintiffs Raae Pollard, Blair Imani, and Akeem Muhammad make their voices heard at East & France.



**Figure 8**:    Plaintiff Blair Imani stops to pray.

96.    Present at the protest was a corps of legal observers, trained by the National

Lawyers Guild to observe and document the protest and law enforcement's response. The legal

observers can be identified in photos and videos by their fluorescent green hats.

97.     Around 6:00 p.m., legal observers saw police staging at the end of Europe
Street.[19]  Shortly thereafter they saw approximately 40 to 50 police officers form a military-like
formation on France Street, including an armored vehicle operated by an officer with a rifle.[20]



**Figure 9**:      A still image from a video shows Defendants in tactical gear blocking France Street. The
armored vehicle with a mounted LRAD acoustic weapon is behind the officers.

98.     Professor Bill Quigley, an attorney and law professor at Loyola University New
Orleans, was present as a legal observer.  He introduced himself to an officer and was directed to
talk with the officer in charge.[21]  When Professor Quigley asked the officer how he could help,
he was told to tell people they had to clear the street in ten minutes or law enforcement was
going to start arresting people. Professor Quigley and another legal observer relayed this
information to the protestors. Most of the protesters complied and began leave the street.

99.     Lisa Batiste, whose yard was right at the corner of East and France, gave her

---

[19] Affidavit of Hannah Adams, *NRBM,* R. Doc. 2-3 ¶ 5.
[20] *Id.* at ¶ 6.
[21] Affidavit of Professor Bill Quigley, *NRBM,* R. Doc. 2-8 ¶ 4.

permission to the protesters to stand in her yard.[22] Law enforcement was informed of this fact.[23] Ms. Batiste later explained: "I just wanted them to have a safe place to voice their opinions."

100.  All of the Plaintiffs who were present[24] complied with the police order to clear the streets. They stepped back onto the sidewalks, Ms. Batiste's yard, and the grassy strips between the sidewalk and street. [25]



**Figure 10**:     The Protesters – including Plaintiffs – comply with Defendants' orders to stand clear of the streets.

101.  Some protesters remained in the streets and linked arms in opposition to the police. No Plaintiff was among this group.

---

[22] Affidavit of Adina Marx-Arpadi, *NRBM*, R. Doc. 2-3 at 10,  ¶ 11; Affidavit of Jenna Finkle, *NRBM,* R. Doc. 2-5 at 14, ¶ 4; Aff. of Hannah Adams, *supra*, ¶ 8; Affidavit of Shaena Johnson, *NRBM*, ¶ 8; Video of Ms. Batiste available on Dropbox and incorporated into this complaint. .
[23]  Affidavit of Alissa Luis, *NRBM,* R. Doc. 2-7 at 9, ¶ 11.
[24] Raae Pollard, Sami Nichols, Victor Onuoha, Blair Imani, Akeem Muhammad, Karen Savage, Cherri Foytlin, Daniel Liebeskind, Alisha Feldman, Finn Phoenix, and Leah Fishbein.
[25] A video by the Associated Press shows this. The video can be downloaded from Dropbox here and is incorporated into this complaint.



**Figure 11**:
The protesters, including Plaintiffs Raae Pollard, Sami Nichols, and Blair Imani, stand well back from the street.

(Photo by Patrick Melon, Antigravity Magazine.)

102. Law enforcement then ordered the protesters off the sidewalks.[26] Plaintiffs complied, stepping back into Ms. Batiste's yard.

103. The police proceeded down France Street towards East Boulevard in line formation with an armored vehicle, assault rifles, rubber bullet guns, gas masks, shields, and a vehicle-mounted Long-Range Acoustic Device" ("LRAD"). An LRAD is a weapon which creates a painfully loud sound.[27]

104. The protestors were now surrounded by law enforcement in three directions.



**Figure 12**: Diagram of protesters surrounded by lines of police in riot gear, as shown in a video taken by Victor Onuoha. The video can be downloaded from Dropbox here and is incorporated into this complaint.

---

[26] Aff. of Jenna Finkle, *NRBM*, R. Doc. 2-5 at 14.

[27] Aff. of Hannah Adams, *supra*, at ¶ 6.

105.  On video, Plaintiff Victor Onuoha pointed out how they are surrounded – he said there are police "left, right, and dead in front of us."

106.  Defendants then gave conflicting instructions, telling protestors both to (1) disperse because their assembly was now unlawful and (2) that people in the street and on sidewalks would be arrested.[28] (This is conflicting because use of the streets and sidewalks would be necessary to disperse.) On video, Defendants can be heard to order the protesters on private property that "you must leave now."[29] But they also told the protesters: "[Y]ou cannot leave. If you try to step into the street, we will arrest you."[30] Some protesters who attempted to leave the area were chased, tackled, tasered, and arrested.[31]

107.  On video, the police can be heard to say: "we understand you want to protest, but this is not the time or place."[32] They did not, however, give any indication what the proper time or place to protest was, or why this time and place was not permitted.

108.  Although the character of the protest had not changed,[33] law enforcement announced via megaphone: "THIS IS NO LONGER A PEACEFUL PROTEST."[34]

109.  One protester, Crystal Williams, described the situation:

> Many protesters froze when the police started arresting folks. That is when people went into the lady's yard and froze in place because they didn't know where to go. People were afraid to move or even walk by police arresting others.[35]

---

[28] Aff. of Hannah Adams, *supra*, R. Doc. 2-3 at 7; Aff. of Lily Ann Ritter, R. Doc. 2-9 at 13; Aff of Colette Tippy, R. Doc. 2-9 at 17. See also a video entitled BRPD Terrorizes Nonviolent Protestors -- 07.10.16 at 1:34. The video is available for download on Dropbox and is incorporated into this complaint.
[29] Video of Victor Onuoha Arrest at :50. The video is available for download on Dropbox and is incorporated into this complaint.
[30] Aff. of Crystal Williams, *NRBM,* R. Doc. 2-3 at 3; R. Doc. 2-10 at 3.
[31] Aff. of Sarah Marcello, *NRBM,* ¶ 8.
[32] BRPD Terrorizes Nonviolent Protestors -- 07.10.16 at 3:07.
[33] Legal observers testified to the consistently peaceful nature of the protest. Aff. of Legal Observer Alissa Luis, *NRBM,* R. Doc. 2-7 at 10 ("I observed the protesters acting in a peaceful and non-violent manner"); Aff. of Legal Observer Andrew McDaniel, *NRBM,* R. Doc. 2-8 at 3 ("The protests were completely peaceful.").
[34] Aff. of Caressa Chester, *NRBM,* R. Doc. 2-5 at 3; Aff. of  Marquita Christy, *NRBM,* R. Doc. 2-5 at 8.
[35] *NRBM,* R. Doc. 2-10.

110.  Sister Alison McCrary, a Catholic nun with the Sisters for Christian Community and a certified mediator and community-police mediator trainer, tried to meet with the ranking officers and explain that the warnings could not be heard on the sound system. Her attempts at dialogue were rejected.[36] According to Sister McCrary, "I asked Major Cain and Sergeant D. Coppola of the Baton Rouge Police Department five times each if they would be willing to negotiate a compromise. They repeatedly said no. I also asked other ranking officers if they would be willing to negotiate a compromise. They repeatedly said no."[37]

111.  The protesters did not understand how to comply with Defendants' conflicting orders. According to legal observer Lilly Ann Ritter, "I also heard police officers tell people that they needed to disperse several times. However, police were blocking all surrounding intersections and there was nowhere for people to go. Protesters who wanted to leave were not able to do so."[38] According to witness Adina Arpadi, "Protesters were not sure what the police wanted them to do. It was clear to me that they wanted people to clear the street, but I think some people couldn't hear the instructions. Also, people were not sure where to go, and orders concerning how long people had to clear the street were conflicting."[39] According to another protester, the "police kept saying that we weren't allowed to be in the street and we weren't allowed to block public passages, though they did not indicate what 'public passage' meant."[40] As one protester explained, "Some of the police instructions were vague and confusing. We were told to get out of the street, then after complying we were told to back up on the sidewalk, after complying with that, when people were in the yard it was stated over the PA "that's not good enough."[41] (Video confirms this. Over a megaphone, an officer says "You must leave now or

---

[36] Aff. of Legal Observer Sister Alison McCrary, *NRBM,* R. Doc. 2-7 at 14,  ¶¶ 28-37.
[37] *NRBM,*  R. Doc. 2-7 at 17.
[38] Aff. of Legal Observer Lily Ann Ritter, *NRBM*, R. Doc. 2-9 at 13.
[39] Aff. of Adina Arpadi, *NRBM,* R. Doc. 2-3 at 10.)
[40] Aff. of Sophie Kosofsky, *NRBM*, R. Doc. 2-7 at 2.
[41] Aff. of Marquita D. Christy, *NRBM,* R. Doc. 2-5 at 8.

you will be arrested. Where you are standing is not good enough.")[42]

112.   Others could not hear the orders at all.   One legal observer said, "The officers were speaking through their gas masks, so it was very difficult to understand what they were saying. I frequently turned to people around me to ask if they had heard what the officers said."[43]



**Figure 13:** A mass of officers in riot gear threaten Sami and Raae, who have complied with police orders to clear the street and sidewalk.

113.   There was no way for the protesters to comply with law enforcement's shifting demands. As Sister McCrary put it, "There was no place for the protesters to disperse to."[44]

114.   Demonstrators who did leave the sidewalk to go to their cars in an attempt to comply with the dispersal order were "tackled to the ground and violently arrested."[45] On video, a woman can be heard saying "they have us blocked in… we can't go anywhere. We can't leave this yard, we're

---

[42] The video is incorporated into this Complaint and is <u>available to download on Dropbox here</u>.
[43] Aff. of Legal Observer Lily Ann Ritter, *NRBM,* R. Doc. 2-9 at 13.
[44] Aff. of Legal Observer McCrary, *supra,* R. Doc. 2-7 at 16.
[45] *Id*. at 19.

**Figure 14:** A still image from a video taken by Plaintiff Victor Onuoha moments before his arrest shows Defendants sweeping into Ms. Batiste's yard. It also shows that Victor was standing well back from the street and sidewalk, in compliance with Defendants' orders.

blocked in."[46]

115.  One protester attempted to leave, and told an officer "that he needed to get to his car to go to work. As he walked to his car, police officers arrested him."[47]

116.  Defendants, with no additional provocation, then took action. They swept onto Ms. Batiste's property *en masse*, violently grabbing people and throwing them to the ground, pinning them, and binding their wrists painfully with plastic zipties. Video shows them pushing screaming protesters off of Ms. Batiste's lawn, ordering "go back, just go back."[48] Another video shows police charging Ms. Bastiste's lawn and ordering

"you must leave now." A woman screams, confused "and go where? And go where?"[49]



**Figure 15**:     A still image from a video of Defendants swarming Ms. Batiste's yard. In the foreground, officers can be seen dragging Plaintiff Blair Imani off of the grass.

---

[46] Video of Victor Onuoha Arrest, *supra,* at :19.
[47] Aff, of Legal Observer McDaniel. R. Doc. 2-8 at 3.
[48] Video entitled 2016.7.10 - Video of Protest from @lizzkatherine_ at 1:28, incorporated into this Complaint.
[49] Video of Victor Onuoha Arrest, *supra.*

117.  At one point, at least a dozen police crowded onto Ms. Batiste's porch, where they grabbed and pulled protestors standing inside the home's open doorway and forced them out of the house and off the porch.[50] Ms. Batiste explained to the police that the protesters had her consent to be there, but they ignored her.[51]

118.  During all this, Defendants refused to identify themselves to protesters. A legal observer reported that "Many officers were wearing riot gear and had their names taped over, so I could not identify who they were."[52] One protester reported that "Police would laugh and mock when we would ask for their names and badge numbers… They'd say 'you're so stupid, that's not how this works.'"[53]

119.  It was during this police frenzy that Plaintiffs Raae Pollard, Sami Nichols, Victor Onuoha, Blair Imani, Akeem Muhammad, Cherri Foytlin, Daniel Liebeskind, Alisha Feldman, Finn Phoenix, and Leah Fishbein were arrested. Plaintiff Karen Savage was arrested a block away, as she attempted to comply with the dispersal order.

---

[50] Aff. of Legal Observer McCrary, R. Doc. 2-7 at 16, ¶ 53.
[51] Video entitled 2016.7.10 - Interview with Ms. Batiste - Protesters had her consent, police did not, incorporated into this Complaint.
[52] Aff. of Legal Observer Luis, *supra,* R. Doc. 2-7 at 9.
[53] Sophie Kosofsky, protester arrested on July 10. R. Doc. 2-7 at 3.



**Figure 16**:  Plaintiff Raae Pollard is seized by the throat by Defendant and surrounded by officers in tactical gear. Raae's feet are off the ground in this picture. (Photo by the Times-Picayune.)

120.  A witness, seeing what was happening, cried "This is insane! These were all the people who were keeping us out of the streets!"[54]

121.  A beat-by-beat photographic timeline of these events is attached to and incorporated into this Complaint as **Exhibit B**.

---

[54] See Video from the Facebook Page of Kelly Orians at 2:52. The video can be downloaded from Dropbox here and is incorporated into this complaint.



**Figure 17**:     Plaintiff Blair Imani is arrested and dragged off of Ms. Batiste's lawn. She is afraid she will be taken out of sight of cameras and observers and beaten. (Photo by The Advocate.)

### Defendants Used Violence on the Protesters and Press

122.  In their frenzy, the officers arrested a mix of protesters, reporters, and legal observers. The arrests were extremely violent, as indicated by the following contemporaneous, sworn descriptions by protester-witnesses and legal observers:

123. "At some point the police began lunging and arresting people seemingly at random. The people arrested were violently pushed to the ground and restrained." Aff. of Hannah Adams, *NRBM,* R. Doc 2-3 at 7.

124. "We were slammed to the ground. One man got a concussion. Another got a twisted ankle. The police had their batons out." Aff. of Octavio Hingle-Webster, *NRBM*, R. Doc. 2-6 at 6.

125. "I watched as the cops brutally tackled, shoved, and arrested protesters. I saw a cop grab someone and throw them on the ground; I saw a cop throw someone and let them go. The first thing I saw was a cop literally tackling someone to the ground and handcuffing them; they were being extremely aggressive." Aff. of Caressa Chester, *NRBM*, R. Doc. 2-5 at 4.

126. "Some of the people being arrested would have four to five cops attacking that one person. Also some of the people arrested in the yard and on the outside of the

fence were thrown to the ground very aggressively." Aff. of Marquita D. Christy, *NRBM,* R. Doc. 2-5 at 8.

127. "I was moving backwards, not running, when I was tackled from the side by a police officer. I did not see him coming. He tackled me with excessive force, ripped my backpack off and threw it on the ground." Aff. of Jenna Finkle, *NRBM,* R. Doc. 2-5 at 15.

128. "I looked back, and the police had knocked down a white woman who was behind us trying to get into the McDonald's parking lot. They choked her and threw her into a police vehicle. It all happened very quickly, and there was a group of police who snatched her." Aff. of Sandra Harris, *NRBM,* R. Doc. 2-6 at 2.

129. "In this group [of 12 arrestees] one of the arrestees was bleeding profusely from the left side of his head. I was able to discern the bleeding from my post on the corner of Government St and East Blvd., approximately 100 feet away." Aff. of Alissa Luis, *NRBM,* R. Doc. 2-7 at 11.

130. "I observed multiple officers tackle, hit and hold down one protester… I observed several officers tackle and hold down two protesters on the corner of Government St. and Maximillian St., approximately five officers per person. I observed hordes of officers tackle, grab, pull and throw down several protesters on East Blvd. I witnessed several officers sitting and kneeling on protesters backs, necks, and heads… I witnessed many with hands high in the air being thrown to the ground." Aff. of Alissa Luis, *NRBM,* R. Doc. 2-7 at 12."



131. "I saw officers use tear gas, batons, and rubber bullets on demonstrators . . . There were clear injuries to demonstrators and I did not see anyone treated by a medic. Some people were limping and others had visible scratches. I saw excessive use of force as officers used their fists to beat people down, jump on top of demonstrators, and hit demonstrators with their weapons. I saw multiple police officers tackle individuals by simultaneously jumping on top of one person at a time… Military-grade assault rifles or AK-47s were pointed at demonstrators heads as officers had their fingers on the trigger." Aff. of Sister Alison McCrary, a Catholic nun with the Sisters for Christian Community and a certified mediator and community-police mediator trainer, *NRBM,* R. Doc. 2-7 at 18.

**Figure 18**: Plaintiff Victor Onuoha is arrested as another protester is thrown to the ground.

132. "I observed a police officer tackle a light-skinned Black man wearing light colored suit pants and a formal button-down shirt and force him down on the

ground… The force they used seemed very excessive. I did not see him try to resist arrest in any way and was unsure why he was pushed to the ground. It seemed that he had been targeted." Aff. of Lily Ann Ritter, legal observer, *NRBM*, R. Doc. 2-9 at 12.

**The Arrest of Tammy and Alexus: A Family Torn Apart**

133.  When she heard about the death of Alton Sterling in July 2016, Tammy was traveling through Louisiana with her seventeen-year-old daughter Alexus, her five-year-old son A.J., and their dog Kelso. They had been exploring the country, seeing historic landmarks and natural sights, and were on their way back home to North Carolina.

134.  Partly because of her personal experience, Tammy's heart went out to the Sterling family when she heard of Alton's death. She wanted to stand with them. She also wanted to give her children a way to understand what was happening.

135.  So on July 8, 2016, Tammy, Alexus, and A.J. attended a peaceful protest in New Orleans about the shooting.  It was the first protest any of them had ever been to. Hundreds of people gathered in Lee Circle to make their voices heard. NOPD monitored the situation, but allowed the protesters to exercise their First Amendment rights without interference or arrests.[55]

136.  The New Orleans protest was so moving that the family decided to attend the children-led march planned for that Sunday in Baton Rouge.

137.  On July 10, 2016, Tammy, Alexus, and A.J. attended the peaceful protest at the state capitol building in Baton Rouge. Alexus described it later as being "surrounded by so much love and peace." After the protest, they marched back to the church where they had begun, ate some food, and then got back in their car intending to continue their trip to North Carolina.

138.  They followed the route Google Maps told them to take, but when they got to East Blvd. and Government St., the police had blocked off the road. So they pulled into a parking lot

---

[55] Wilborn P. Nobles III, *Hundreds gather at Lee Circle rally*. New Orleans Times-Picayune, July 8, 2016.

to wait until the road reopened and the traffic lessened.

139.  Alexus decided to go around the corner to videotape what was happening. Tammy stayed at the car with A.J., standing on her car and holding up a sign with a political quote on it.

140.  Alexus joined the protest at East and France. When she heard the police tell everyone to get on the sidewalk, she moved to the sidewalk. Then she heard the police say if they were on the sidewalk, they would be arrested, so Alexus moved into Ms. Batiste's yard. Then she heard the police order the protest to disperse, so she left and returned to the car and joined her mother.



**Figure 19:** Alexus is dragged away from the car where she was watching her five-year-old brother A.J. and her dog Kelso.

141.  Tammy began to see officers with gas masks and shields going down the road. She told A.J. to get in the car and lock the doors. Alexus returned to the car. Tammy told her "Alexus, get in the car and I'll be right back – I'm going to take a couple more pictures and then we'll leave." She walked a short distance from the car to videotape the scene. According to a witness, Tammy stepped away from the car for no more than a "minute, minute and a half."[56]

142.  As soon as Tammy stepped away, three police officers walked up to Alexus. They told her that they had seen her "on the front lines" and that they had seen her flicking them off. They said that Alexus "owed them" for not arresting her and that they could arrest her if they wanted to. Then they did arrest her.



**Figure 20:** Tammy runs back when she hears her daughter screaming.

143.  As she was being taken away, Alexus screamed

---

[56] Karen Savage, *Family Torn Apart By Police During Baton Rouge Protests*, Juvenile Justice Information Exchange, August 2, 2016.

"MOM" and told the people around her mother's name. The crowd began to shout "Tammy!" and "Let her go! Let her go!" repeatedly.[57]

**144.** Tammy ran back to the car. A line of officers stopped her and said "No, you can't go this way. Go back." A woman there was telling the officers, "She didn't do anything. She didn't do anything. They took her . . . that's a minor." Tammy said, "They took who? They took who? They took my kid? My seventeen-year-old?" She asked the police officer, "Did they take my daughter?" An officer responded, "If that's your daughter, she's going to be there quite a while."



**Figure 21:** Tammy complies with the officer's order to stay in place, while asking about her daughter.

**145.** The woman told the officers, "She didn't do anything. I was with her." Tammy told the officers, "I have a kid in the car. You guys just took my seventeen-year-old away and left my kid in the car." The officer said "Stay here with me." Tammy complied. Desperate, she said quietly, "You guys weren't born this way. You can change, you do know that?"

**146.** The officers walked her to her car. She told the officers: "You guys just took my daughter away and she was watching my son." The officers said "Calm down, now we're watching you. Go over there- you're under arrest too. We're gonna take your child."

**147.** Doe Defendant Officer Lapeyrouse told her, "You're going away for a felony. You abandoned your son." Tammy told him, "This is exactly why we're here, we're standing for justice." He responded, "Do you want me to throw another felony charge at you?" Officer

---

[57] From this point through paragraph 148, the incident was captured on video by a camera in Tammy's hand. It can be downloaded from Dropbox here, and is incorporated into this complaint. Another video posted by the Rouge Collection captures Alexus being dragged away and Tammy trying to reach her while complying with police orders. It can be downloaded from Dropbox here and is incorporated into this complaint.

Lapeyrouse tried to dispose of her phone in the bushes; another officer put it into Tammy's bag. The officers handled Tammy roughly, bruising her upper arms.

**148.** A few minutes later, Tammy and Alexus were seated on a curb together, along with other women waiting to be taken to the prison. With her hands cuffed behind her back, Tammy tried to console her sobbing daughter.[58]

**149.** Tammy and Alexus and the other arrested protesters asked the officers to look into the car to make sure A.J. was okay. One of the officers asked Tammy and Alexus, "did you learn your lesson" and refused to investigate to see if A.J. was okay until Tammy and Alexus said "yes" they had learned their lesson.[59]

**150.** Tammy's son A.J. was seized by child protective services.

**151.** Tammy's dog Kelso was seized by animal control.

**152.** Tammy and Alexus were taken to a holding cell, where they were held for approximately eight hours. Then they were split up and put into general population of the East Baton Rouge Prison. The prison was cold, and they were given no blankets. In Tammy's cell, the women huddled together under a mattress for warmth. They were given no toilet paper.

153. Despite Alexus being a juvenile, she was held in an adult facility. She was strip-searched and forced to squat and cough. The cell near hers contained adult men. She was exposed to pepper spray, and heard a male inmate being tasered because the male inmates had been clapping when women were released. She witnessed a woman inmate having her insulin pump taken away from her.

**154.** While in prison, Tammy was distraught. Based on Doe Defendant Officer Lapeyrouse's statements, she thought she was going to be charged with felony child

---

[58] Savage, *supra.*
[59] *NRBM*, R. Doc. 2-8 at 20.

abandonment and that her children would be taken from her. She imagined them growing up and not being a part of their lives. Tammy considered committing suicide in her cell.

**155.** Alexus was released at about 5:00 p.m. on July 11. Her mother had not been released yet, and Alexus was terrified. She was seventeen, abandoned in a strange city, and separated from her mother, her brother, her dog, and their car. She told Defendants "I'm only seventeen – you can't just put me outside and leave me!" They said to be quiet and that it wasn't their problem. She had to wait seven hours until her mother was released at around midnight.

**156.** Although Tammy and Alexus got out of prison on July 11, they could not get A.J. back immediately. Defendants interfered with the process of them getting A.J. back. While Tammy and Alexus were in the prison, Defendants barred the Child Protective Services worker assigned to A.J.'s case from visiting Tammy and Alexus. Defendant Lapeyrous untruthfully told the Child Protective Services worker that A.J. had been "found locked in his mother's car at Government St. and East Blvd. while the parents went to the demonstration. Both parents are being arrested."

**157.** It was not until July 13, 2016 that Tammy got A.J. back with the help of a *pro bono* attorney. On that day, Tammy's attorney showed video of the incident to the Assistant District Attorney in family court. Immediately after seeing the video, the ADA said the case would be thrown out. Within fifteen minutes, Judge Pamela Taylor-Johnson ordered the state to immediately return A.J. to Tammy.[60]



**Figure 22:** On July 13, 2016, the family is finally reunited: Alexus, A.J., Tammy, and their attorney Adrian Ross.

**158.** A.J., being only five, did not understand what had happened. He had heard on the radio about the killing of Alton

---

[60] Savage, *supra.*

Sterling. And so when he saw police taking his mother and sister away, he thought that the police were going to kill them.[61] When Tammy and her son were finally reunited, the first thing she told him was "I told you momma would never leave you, I would always be back to get you if something happened."[62] Seeing the fear that A.J. had been through was traumatizing to Tammy and Alexus.

**159.** Even their dog Kelso was traumatized. He is now skittish around strangers or loud noises.[63]

### The Take-Down of Antonio and Nadia

**160.** On July 10, 2016, Antonio and Nadia drove from New Orleans to Baton Rouge to peacefully protest and show support for other people of color. They participated in the youth-organized march to the state capitol building, and then stayed afterwards to help clean up the area and provide water and snacks to community members. Then they returned to the office of the Baton Rouge Youth Coalition to reflect on the day's events.



**Figure 23:** Plaintiff Antonio Castanon Luna (left) poses at the Capitol protest with two youth leaders.

---

[61] *Id.*
[62] *Id.*
[63] *Id.*

**161.** Someone gave Antonio and Nadia a ride back to their car, near the interstate on Government Street. Because law enforcement had closed several streets in the area, they had to be dropped off several blocks away. As they were walking back to their car, they encountered the militarized police unit at the intersection of East Blvd and France Street.

162. They watched as the police escalated their activities against the protesters, and Antonio and Nadia joined the protesters in retreating to Ms. Batiste's yard. They watched as officers in full riot gear charged at the demonstrators, violently throwing them on the ground and dragging them away towards militarized vehicles. At this point, Antonio and Nadia feared for their lives, and rushed away towards safety, exiting Ms. Batiste's property through the back gate. They made their way to the sidewalk at the corner of Government Street and Maximillian St. Officers there were blocking off Maximillian Street Southbound and then Government Street Eastbound and Westbound.

**163.** Antonio and Nadia stopped to look for a friend so that they could get in their car and leave. While waiting for their friend, they led chants. For example, Antonio chanted "you can't serve and protect with war weapons." Nadia was holding onto the pole of a stop sign, because she believed that by standing there they were complying with the officers' orders and were safe from arrest.

**164.** All of a sudden, several officers in riot gear, including Defendants Alan Hamilton, Brandon Blust, and James Crockett, tackled Nadia and Antonio to the ground, hard. Officers piled onto



**Figure 24:** Nadia and Antonio (red circle) holding onto the street sign post as an officer (right) tackles Nadia from behind. The video, from MSNBC, can be downloaded here and is incorporated into this complaint.

them, held them down, and ziptied their hands. During this tackle, the officers wrenched Antonio's ankle and knee.

**165.** Bystanders asked the officers why Antonio and Nadia were being arrested, since they hadn't been in the street. It seemed that they were targeted because they had been leading chants. Bystanders can be heard on video asking "what did he do?"[64]

**166.** Only *after* Antonio and Nadia were tackled to the ground can officers be heard on video ordering bystanders to "clear the sidewalk."[65] A witness can be heard to say that Antonio "was just standing there. He was just standing there."[66] A dozen or more people continued to stand on the sidewalk right by where Antonio and Nadia were standing; none of them are arrested.[67] A witness says "it was clear, it was very clear. [Antonio] was specifically targeted."[68]

**167.** The zipties were so tight that Nadia's hands began to turn purple[69] and



**Figure 25:** Five officers tackle Antonio and Nadia to the ground.



video shows, at no point do Nadia or Antonio make any move to resist arrest.

---

[64] A video taken by a witness and incorporated into this complaint shows the event. It can be <u>downloaded from Dropbox here</u>.

[65] *Id.*

[66] *Id.* at 7:21.

[67] *Id.*

[68] *Id.* at 9:10.

[69] *NRBM*, R. Doc. 2-8 at 11.

Antonio's hands began to tingle and go numb.

**168.**  As the officers walked Nadia and Antonio to some large vehicles, Antonio asked why they were being arrested. An officer responded, "I don't know."[70] An officer bent Nadia's arms and said "Alton Sterling was a murderer."

**169.**  As Nadia and Antonio were separated, Nadia was terrified, but told Antonio, "baby, I love you, I'm fine." But privately she thought that this was perhaps the last time she would see her husband.

**170.**  As she was being walked away, Nadia heard an officer say "take her the long way." She didn't know what this meant, but it caused her to fear for her life – and so she began yelling her name and birth date to ensure that she was not disappeared.

**171.**  Antonio heard an officer tell a protester to "shut your mouth, or get your head bashed in." Antonio's ankle began to swell so much that his shoe was cutting off blood flow. He asked for medical attention but was ignored by the officers.

172.  They were loaded into vans and transported to the jail, but not seat-belted.

173.  At the jail, an officer asked Antonio for his information to write him up. The officer said that he was really confused and didn't know how to properly proceed since he wasn't there for Antonio's arrest, did not know the place or time of arrest, and didn't know how the situation unfolded. Antonio pointed out his ankle injury again, but was not treated.

**174.**  Nadia was strip-searched twice at the prison, and required to remove her bra. A white woman asked to keep her bra, and the guard said yes. Nadia asked to keep her bra, and the guard said no. Nadia was given no blanket in the cold jail cells. She was exposed to mace when officers maced a nearby cell .

**175.**  At the prison, law enforcement officers spelled her name differently on different

---

[70] *Id.*

forms. She recalls the following variations: Madye Salvar, Nadye Salva, Nadia Salvar, and the correct Nadia Salazar Sandi.

**176.** At one point at the prison, a guard came and requested volunteers. Antonio had no idea what would happen next, but stood up and requested medical attention. The guard told him to shut up and get in the volunteer line. Another protester told the guard that Antonio needed to get my ankle looked at and the guard replied "yes, I heard him already."

**177.** According to the sworn statement of protester Julien Bond, "I noticed at this time that one other arrestee – Antonio – requested medical care because his ankle was swollen from being dragged but his request was ignored."[71]

**178.** At approximately midnight, Antonio was taken to the doctor's station. He told nurses what happened to his ankle, and they gave him a leaky bag of ice. A doctor swung by but said he couldn't help because he didn't have the time. Antonio was given some anti-inflammatories. The doctor came by again later, looked at the ankle, and said "this is not good." After the ice melted, Antonio was made to sign a medical form and was taken back to the area with the holding cell.

**179.** Nadia is originally from Bolivia, a country with a history of violence and injustice. But she says that "even with all the oppression in Bolivia, I don't remember anything like what I experienced in Baton Rouge."

### Plaintiffs Were Arrested with Perjurious Affidavits of Probable Cause That are Facially False and Contradictory

180. After being seized by Defendants, Plaintiffs were assembled into groups with other arrestees. Other officers – not the ones that had grabbed them – wrote Plaintiffs up using pre-printed affidavits. Each Plaintiff was written up for two crimes – "Resisting Arrest" (R.S.

---

[71] *NRBM v. BR*, R. Doc. 2-4 at 7.

14:108) and either "Obstruction of a Highway" (R.S. 14:97) or "Obstruction of a Public Passageway" (R.S. 14:100.1).[72]

181. The primary difference between the two obstruction statutes is that 14:100.1 criminalizes blocking roads and sidewalks, while 14:97 only applies to roads. There is no correlation, however, between where the Plaintiff was standing when arrested and which crime they were charged with.

182. According to The Advocate, for "132 of the 176 incident reports of protesters provided by the Baton Rouge Police Department, police used one of two versions of boilerplate language."[73] This was a red flag for LSU law professor Scott Sullivan, who reviewed the affidavits obtained by The Advocate:

> Probable cause requires not just the sense that a defendant may have committed a crime, but that this particular defendant at a particular time and place committed a particular crime . . .What seems to be missing is a careful consideration of this particular defendant's actions . . . That sense [that a crime was committed] is undermined when you just see a repeated narrative over and over again without much deviation.[74]

183. Thirteen of Plaintiffs' affidavits of arrest have been obtained from the Clerk of Court. (The clerk has no affidavit for Plaintiffs Victor Onuoha and Nadia Salazar Sandi.) The affidavits are facially false and contradictory for reasons including the following:

   a. **False Location.** The affidavits were pre-written with facts that described an incorrect location. Eleven of the thirteen affidavits say that the protests were "in the vicinity of Baton Rouge Police Department's Headquarters at 9000 Airline Highway." Plaintiffs were actually arrested nearly six miles away, in the vicinity of East Blvd. and France St.

---

[72] See **Exhibit C** to this Complaint.
[73] Maya Lau, *Identical arrest reports for many Alton Sterling protesters a red flag, legal experts say*. The Advocate. Sept. 18, 2016.
[74] *Id.*

> To Wit: On the above listed date numerous Baton Rouge Police Department Officers were assigned to provide security for peaceful protests at and in the vicinity of Baton Rouge Police Department's Headquarters located at 9000 Airline Highway. Protesters assembled at provided parking areas and in

**Figure 27:**     Excerpt from Affidavit of Raae Pollard.



**Figure 28:**     Map of distance – 5.8 miles – from location identified in Affidavit to actual location of arrest.

b. **No Parking Lots.** All thirteen affidavits say "Protesters assembled at provided parking areas and in surrounding parking lots." There is no parking lot at East and France.

c. **Wrong Address for BRPD HQ.** Four of the affidavits have "9000 Airline Highway" crossed out and replaced with "500 East Blvd." This renders these affidavits even more contradictory, because the affidavits then read "in the vicinity of Baton Rouge Police Department's Headquarters located at 500 East Blvd." – which is not the BRPD Headquarters' location.

> To Wit: On the above listed date numerous Baton Rouge Police Department Officers were assigned to provide security for peaceful protests at and in the vicinity of Baton Rouge Police Department's Headquarters located at 9000 Airline Highway. Protesters assembled at provided parking areas and in surrounding parking lots. Protesters were advised by loud speaker to remain on private property and the on

**Figure 29:** Excerpt from Affidavit for Blair Imani, showing address crossed out. The resulting affidavit is false – BRPD's headquarters is not at 500 East Blvd.

d. **Felonious Misdemeanors?** Each of the affidavits says the "Defendant did knowingly and feloniously" violate R.S. 14:97 or 14:100.1. Both those statutes, however, describe misdemeanors.

e. **False Description of Plaintiff's Conduct.** Each of the affidavits says: "During the protest, the Defendant entered the roadway and was provided another verbal order to

exit the lanes of travel. Moments later the Defendant entered the roadway again and was

taken into custody by Officers on the scene." This is not a true description of the seizure

of any Plaintiff.

f. **Contradictory Statutes.** Two of the affidavits are contradictory as to what crime is

being alleged. In the synopsis, they say the Plaintiff violated "LRS 14:97," but

elsewhere 14:97 is crossed out and replaced with 14:100.1.



    **Figure 30:**    For two of the Affidavits, the officer was inconsistent
                        about what crime was being alleged.

g. **False Statements About Miranda Rights.** Each affidavit says the defendant was

"verbally advised of their rights per the Miranda ruling." This is false – Plaintiffs were

not all read their *Miranda* rights. Some Plaintiffs even *asked* to be read their rights, but

were refused.

h. **One Consistent Truth: Affidavits Say The Protests Were Peaceful.** One thing is true

about every affidavit: every single one of them describes the protests as "peaceful."

To Wit: On the above-listed date numerous Baton Rouge Police Department Officers were assigned to
provide security for peaceful protests at and in the vicinity of Baton Rouge Police Department's
Headquarters located at 9000 Airline Highway. Protesters assembled at provided parking areas and in

    **Figure 31:** Excerpt from Affidavit for Raae Pollard

**The Aftermath**

184.  Defendants' illegal plan to silence the community's voice was disturbingly

successful. There were no more major protests following the dozens of seizures, beatings, and arrests of protesters on Sunday, July 10. Defendants' efforts had the actual effect of chilling the community's exercise of its First Amendment rights. This is clear from contemporaneous statements by protesters:

    a.  "Since the protest, I have not been able to shake a feeling of fear and sadness. To be immediately in front of a police force that wields so much power and to know that they do not respect the law, makes it feel impossible to protest."[75]

    b.  "I am too afraid to return to Baton Rouge. I was so scared the entire time. We didn't come to get arrested. We didn't come to get killed. We just came to protest and to get justice for Eric. They treated us so badly."[76]

    c.  "After all this, I am now aware of the incredibly high risk of protesting. I was definitely afraid."[77]

    d.  "I had planned to protest in upcoming marches, though will likely not do so in the future. I have been dissuaded by the reports of arrested protestors…"[78]

185. Even the trained Legal Observers' activities were chilled: "Because of the actions of the police I was very afraid someone would get shot or that they would tear gas us. The police were arresting Legal Observers as well as civilians. It is frightening to think about Legal Observing in the aftermath of what I witnessed."[79] Sister McCrary reported that "I am terrified to try to negotiate with the police again in Baton Rouge. I am scared to serve as a Legal Observer in Baton Rouge. I do not feel comfortable training Legal Observers and



**Figure 32:** The constitutionality of Defendants treatment of Plaintiffs is front page news on July 12, 2016.

---

[75]Aff. of Caressa Chester, *NRBM,* R. Doc. 2-5 at 4.
[76] Aff. of Sandra Harris, *NRBM*, R. Doc. 2-6 at 3.
[77] Aff. of Sophie Kosofsky, *NRBM*, R. Doc. 2-7 at 4.
[78] Aff. of Alissa Luis, *NRBM,* R. Doc. 2-7 at 12.
[79] Aff. of Hannah Adams, *NRBM,* R. Doc. 2-3 at 8.

placing them in harm's way in Baton Rouge."[80]

186.  Shortly after the protests, the United Nations Special Rapporteur On The Rights To Freedom Of Peaceful Assembly And Of Association made a visit to Baton Rouge. On July 27, 2016, he spoke out against the law enforcement practices in Baton Rouge: "It is manifestly unwise to respond to a largely peaceful, grieving crowd with riot gear, random arrests, flimsy charges, rough physical handling, verbal insults and so forth. This is not only a violation of the right to peaceful assembly, it also dangerous for participants, the general public and police officers.

187.  By July 31, 2016, the East Baton Rouge District Attorney had posted an ACLU guide entitled "Know Your Rights:  Demonstrations and Protests" to the District Attorney's website.[81] The guide emphasized that "Generally, all types of expression are constitutionally protected in traditional 'public forums' such as streets, sidewalks and parks." It added that "the First Amendment prohibits [advance notice permit requirements] from being used to prevent rallies or demonstrations that are rapid responses to unforeseeable and recent events." The guide explained:



**Figure 33:** The District Attorney posts on his website the ACLU guide to peaceful protesting, which says "If marchers stay on the sidewalks and obey traffic and pedestrian signals, their activity is constitutionally protected even without a permit."

> **If organizers have not obtained a permit, where can a march take place?**
> If marchers stay on the sidewalks and obey traffic and pedestrian signals, their activity is constitutionally protected even without a permit.

188.  A government spokesperson even admitted that protesters had been targeted for arrest based on their speech: "I think the law enforcement folks have a strategy of identifying

---

[80] Aff. of Alison McCrary, *NRBM,* R. Doc. 2-7 at 19.
[81] **Exhibit D** to this Complaint.

these folks and while they might not move in to actively arrest the agitators at the moment that they're causing problems, it might be a delayed arrest," said Richard Carbo, the spokesperson for the Governor.[82]

189.  Despite the widespread consensus that there was a problem with law enforcement's handling of the protesters, Defendant Louisiana State Police Col. Mike Edmonson denied that his troopers had done anything wrong. He said that they "used incredible restraint" in their response to protesters[83] and said "I was certainly pleased with what I saw here."[84]

190.  But Lt. General Russel L. Honore, the retired U.S. Army leader who coordinated military response efforts after Hurricane Katrina, felt differently. After reviewing hours of videos, imagery and other coverage of protests in Baton Rouge, he said:

> The gas masks themselves were pretty intimidating . . . My concern is, with those homes there and all the people in the houses, that would not have been a good place to do (show that weaponry), particularly when the protesters weren't being violent. . . . Something is not right in that department in terms of amount of equipment and amount of training.[85]

191.  A year after the protests, Defendant Dabadie acknowledged problems with the July 2016 handling of protests. He said "We were not perfect in the first round of the protests, and we had some things that we needed to correct."[86] But Defendants have said they will respond to future protests in much same way,[87] albeit with some "tactical" changes.[88]

**192.**  Shortly after the July 10 protests, a tragedy occurred.  Three Baton Rouge law

---

[82] Maya Lau, *Helping or hurting? Police deploy military-style gear at Alton Sterling protests in Baton Rouge*, The Advocate, July 11, 2017.
[83] Claire Taylor, *Acadiana resident describes terrifying protest arrest*. The Advertiser, July 13, 2016.
[84] Karen Savage, *Reporter Recounts Arrest, Prison Stay After Baton Rouge Protest*. Juvenile Justice Information Exchange, July 22, 2016.
[85] Maya Lau, *Helping or hurting?, supra.*
[86] Staff Report, *Baton Rouge police chief, sheriff say officers better prepared for any protests related to Alton Sterling decision,* The Advocate, May 2, 2017.
[87] Bryn Stole, *Baton Rouge law enforcement discussing how to respond to possible protests after Justice Department Finishes Alton Sterling investigation*. The Advocate. Nov. 21, 2016.
[88] Sam Karlin, *Law enforcement eyeing 'tactical' changes to protest responses, East Baton Rouge sheriff says*. Business Report. Dec. 7, 2016.

enforcement officers – Brad Garafola, Montrell Jackson and Matthew Gerald – were killed by a Kansas City man. Plaintiff Blair Imani organized a One Baton Rouge Vigil for Fallen Officers. "All violence is wrong," she said. "Yes, I've always been against police brutality but violence is wrong and this is not the right way."[89]



**Figure 34:** On national television, Representative John Lewis praises the actions of Plaintiff Blair Imani – that within one week she was arrested by Baton Rouge police and also organized a vigil in their honor.

**193.** It is now a year later. Defendants continue their practice of arresting and using force on protesters. On July 5, 2017, the anniversary of Alton Sterling's death, Baton Rouge police used stun guns and PepperBall guns on protesters and arrested seven.[90]

**Plaintiff-Specific Facts**

**194.** **<u>Blair Imani and Akeem Muhammad</u>.** Blair and Akeem both went to Louisiana State University. During the protest, they attempted to forestall confrontation between police and protesters. Blair explained that "We were trying to quell antagonism — instead of shouting 'F the Police,' we were trying to get people to shout Alton Sterling's name."[91] They worked together to help other protesters comply with the police orders to clear the streets. But when the crowd chanted "The whole world is watching," they observed the police get angry and begin to escalate the situation.

**195.** Blair and Akeem heard the police announce that being on private property is not good enough and you have to leave the area – but they were surrounded by police and had no

---

[89] Rebekah Allen, *Woman arrested in Alton Sterling protests is key organizer of fallen officers vigil*. The Advocate, July 18, 2016.

[90] Emma Discher, *Small crowds, prayers, seven arrests as Baton Rouge marks one year since Alton Sterling's death*, The Advocate. July 5, 2017.

[91] Robert Mackey, *Baton Rouge Police Sued Over Arrest of Peaceful Protesters*. The Intercept, July 14, 2016.

way to leave. When the police rushed Ms. Batiste's yard, Blair and Akeem were grabbed and

thrown to the ground. Sister Alison McCrary witnessed

a "group of officers tackle [Blair], pull off her hijab

head scarf, and arrest her."[92] Blair and Akeem were

trampled by officers as they lay on the ground.



**Figure 35:** Yellow circles show Akeem and Blair underneath Defendants.

196.  Defendants knelt on Akeem's neck and

back to hold him down, even though he was compliant

with his fingers splayed open.[93]

197.  Blair heard an officer shout "Really give it

to her," so she became terrified that she was going to be

beaten out of view of the cameras and other observers. "I started screaming, and that was

because I was fearing for my life," she said. The zip ties on her hands were so tight that her

hands turned purple.

198.  Blair has had to seek the services of a trauma therapist after these events. Akeem

has experienced recurring neck problems.

199.  Less than a week after her arrest, Blair helped organize a vigil with the Louisiana

State University Student Body Association in response to murder of three Baton Rouge police

officers. Representative John Lewis spoke of Blair's actions on TV, and drew a direct

comparison between the civil rights movement of the 1960s and what Blair and other young

people are doing in the present.

200.  **<u>Raae Pollard and Sami Nichols.</u>** Raae and Sami came from New Orleans to

---

[92] *NRBM,* R. Doc. 2-7, at 15.
[93] Maya Lau, *Identical arrest reports for many Alton Sterling protesters a red flag, legal experts say*. The Advocate. Sept. 18, 2016.

Baton Rouge for the protest. The two of them complied with police orders to clear the streets and sidewalks. Raae was especially concerned about following their orders, because she is a green card holder from Australia.

201.  When Raae was on the yard, police said "where you're standing is not good enough." But Raae didn't understand what she was supposed to do – she was on private property and surrounded by police.  She waited to get more specific directions from the officers. Raae and Sami were standing on Ms. Batiste's lawn when they were grabbed by Defendants. When she was grabbed, Raae let her body go limp, like a ragdoll, to put up no resistance to the officers. Raae turned and saw Sami's head smashed into the road.  A witness wrote that she "saw Raae thrown to the ground, then Sami smashed on to pavement, tackled with the force of a linebacker."

202.  Raae saw a female officer in a purple shirt and bulletproof vest (later identified as Cpl. Alaina Mancuso) push Sami's face into the concrete and say "trashy bitch . . . go back to California."

203.  Another witness, Jessica Pinkham, witnessed the officer stomp on Sami's head. She wrote: "[Sami] sustained a concussion due to a female police officer, who had brandished her assault rifle at peaceful protestors, stomping on her face on the ground." She said that the officer she saw was wearing a purple shirt and had a photo in The Advocate on July 11, 2016.



**Figure 36:** Sami being arrested Cpl. Mancuso, who stomped on Sami's head and said "trashy bitch . . . go back to California."

204.  The officers who seized Raae and Sami did not write them up. The officers had forgotten who grabbed who, and so they split up the arrestees at

random. Raae's zip ties were so tight that she almost fainted. They had to be removed by officers.

**205.** As a result of Defendants' violence Sami suffered a head injury, and was passing in and out of consciousness. Once they were detained at the prison, a witness said that "sometime around 10:30 pm, a medic in blue scrubs came by, poked him head into the cell, and said 'everyone's fine.'" Blair Imani, who had EMT training, was concerned that Sami might have a concussion. When the medic returned she asked him to look at Sami and do a state of consciousness test. Blair specifically told the medic that she thought Sami might have a concussion. The medic said "'I'm not the hospital' and walked away."[94]

**206.** The day after they were released, Sami and Raae went to University Medical Center's emergency room. They gave Sami pain medicine and muscle relaxers. Raae's father in Australia had a panic attack when he saw the news, which terrified Raae.

**207. _Tammy Cheney_**. Tammy was mistreated by Defendants as described above.

**208.** Two days after her arrest, Tammy said "This experience scared the daylights out of me, and I will never go to a protest again."[95] She has been diagnosed with Post-Traumatic Stress Disorder, Complex and Major Depressive, Recurrent, Severe Without Psychosis. She has been prescribed bi-weekly individual therapy. As of November 2016, her licensed clinical social worker assessed that she could not work at all "due to the severity of emotional and cognitive impairments." The social worker estimated that the impact of the condition on Tammy's ability to work would be expect to last "[m]ore than 12 months."

**209.** On October 9, 2016, Tammy shared the following description of her feelings with her friends:

> Every day is a mental struggle. I convince myself daily that im ok and am

---

[94] Aff. of Marina Sparagana, _NRBM,_ R. Doc. 2-8 at 21
[95] _NRBM,_ R. Doc. 2-4 at 19.

releaved at the end of the day i made it. I cant watch anything that reminds me of that time, without feel the devastation that i went through all that crap. I dont trust anyone. Walking in fear constantly, got robbed for 350$ the other day trying to move into new place and it was a scam on Craigslist and couldn't call cops to report it, because im scared to death of police and what they are capable of doing. Sorry to through all this on you. But it is all i have on my mind

**210.** **Alexus Cheney.** Alexus was mistreated by Defendants as described above. Alexus, though only seventeen, was housed in an adult prison with both male and female inmates**.** She was required to take off all her clothes, squat and cough, during a strip-search.

**211.** As a result of everything that happened to her, Alexus has struggled with post-traumatic stress. She has suffered from depression and anxiety, and says that she has "lost a lot of competence." She has been asking herself, "What is wrong with us? What did we do to deserve this?" As a result of these impacts, she dropped out of school. She tried to get a GED but couldn't. The incident has affected her relationship with her mother.

**212.** **Victor Onuoha.** Victor was a thirteen-year resident of Baton Rouge, and had just moved to Gretna before Alton Sterling was shot. On July 10, Victor drove with his girlfriend to be a part of the march to the capitol. Afterwards, they parked and then joined the protest at the point when people were retreating to Ms. Batiste's yard. He was standing in Ms. Batiste's yard when he was arrested by Defendants.

**213.** **Antonio Castanon Luna and Nadia Salazar Sandi**. Antonio and Nadia's arrests have caused lasting problems for them. Due to her trauma of being in a cold jail cell, Nadia now becomes afraid when she gets cold, and shakes at night. Nadia has had trouble sleeping and has had nightmares. Because her arrest was televised, it causes Nadia a great deal of stress to know that the cousin she raised saw her getting arrested.

**214.** Nadia is originally from Bolivia, a country that has historically used police force to stop peaceful protesters. She did not expect to experience the same thing in "the land of the

free." As a result, she has found herself more cautious about speaking out about things after her arrest, even on social media. She says "I feel like my first amendment right was stripped from me from that day on."

**215.** Antonio has had lasting problems with his knee and ankle, and has had to seek medical treatment repeatedly. He has felt anxiety, especially when reflecting on his arrest or when participating in public demonstrations.

216. Due to the traumatic events of July 10 and 11, Antonio and Nadia decided to move back to Maryland to be closer to family. This was expensive and difficult as they had been building a life in New Orleans.

217. Despite the way they were treated in Baton Rouge, Antonio and Nadia returned to help the communities afflicted by the August 2016 floods. They helped prepare flood-damaged homes for rebuilding. They passed out clothes and other essential items.

**218. <u>Karen Savage</u>.** Karen Savage is a reporter with the Juvenile Justice Information Exchange ("JJIE"). In July 2016, Karen and her photographer Marco Poggio were on assignment for JJIE, covering youth reactions to the killing of Alton Sterling by Baton Rouge police officers Blane Salamoni and Howie Lake II.[96] She had a press pass from the CUNY Graduate School of Journalism.

**219.** On July 9, she and her team reported from the Triple S market where Mr. Sterling had been killed. That evening, she observed the protest at Airline Highway. She observed a short, white female officer with an assault rifle. She observed that the female officer "had it up and was aiming it at the protesters and waving it back and forth."

**220.** On July 10, while Marco edited video, Karen spent the morning and early

---

[96] Karen Savage, *Reporter Recounts Arrest, Prison Stay After Baton Rouge Protest*. Juvenile Justice Information Exchange, July 22, 2016.

afternoon emailing back and forth with a police communications person. They missed the capitol

protest due to traffic, and arrived to observe the protestors once they had assembled at East Blvd.

and France Street. She saw officers wearing combat gear with a tank-like vehicle. Despite having

reported on and attended dozens of protests, Karen had never seen a police response anywhere

close in kind to what she saw in Baton Rouge. She wrote:

> I'd been to protests in New York, Boston and elsewhere and have encountered
> heavily armed police. I'd seen armored vehicles and heard LRADs before. But never
> before had I witnessed officers risking the safety of so many, including themselves
> — not on the Mass Turnpike in Boston, not in Times Square and not more recently
> on Fifth Avenue in New York City, where I had covered anti-police brutality protests
> before being sent down to Louisiana. In Baton Rouge, it seem as if the police came
> ready for war.[97]

**221.** She watched the protesters mostly comply with police orders to clear the streets

and sidewalks. Once the police ordered the protesters to disperse and started making arrests,

Karen moved away towards the McDonalds a few blocks away, taking pictures as she went.[98]

**222.** She was walking towards the door of the McDonald's when an officer grabbed

her from behind and shoved her to the ground. "Are you resisting?" he asked. "I'm a journalist,

my credentials are in my right pocket, you can take them out," Karen said, using the calmest

voice she could muster. She feared to put her hands into her pockets herself.  "Fuck you,

journalist," he shouted from behind Karen's ear. "You don't listen."  Eventually, Karen stopped

saying she was a journalist because this seemed to make the officer angrier.

**223.** The officers ziptied her hands together – so tight that her hands hurt, then went

numb, and then began to change color. "Could you loosen it a little? Please," Karen asked.

"Which one hurts?" he replied. She nodded silently toward her left hand, then puffy and bluish

red. He grabbed the plastic cuff on her right hand, grunted, and pulled it tighter.

---

[97] *Id.*
[98] *NRBM,* R. Doc. 2-8.

**224.** Another officer showed her a large serrated knife and jokingly offered to use it on her. Karen heard someone yell her name and she turned to see a friend up the block. She tried to shout her editor's email address to the friend, but the pain made it hard to remember. "Shut up, or we'll arrest her, too," said the officer with the knife. The officer who first grabbed her said again, "Fuck you, journalist."

**225.** Karen was handed off to another officer. The pain in her hands had become so intense that Karen began to get dizzy. Another officer said "What the hell did they do to you?" and got an officer to bring clippers to cut the zipties. The officer told her she had to hold still and then rammed the tool under the plastic tie. The edges of Karen's vision grew dim and she could hear herself scream. Finally, the left cuff popped off, then the right. Karen could breath again. The officer quickly pulled back Karen's hands and put on more ties. They were still painful, but not excruciating like the last pair.

**226.** While waiting for police transport, Karen met Tammy and Alexus. Tammy said police told her she would be charged with abandonment of her son, who would be turned over to Louisiana's Department of Social Services. Karen turned her head to hide the tears she felt rolling down her face.

**227.** As she talked, Karen noticed the curb felt oddly smooth and cold in the heat. Then she realized she wasn't feeling the curb at all – her hand had gone numb.

228. Karen and thirteen other people were transported to East Baton Rouge Police Parish in an over-filled van without being seat-belted. Karen thought of Freddie Gray, who died in the back of an unpadded police wagon.

229. At the jail, she was packed into cells, with up to 24 people in her cell. There was not even enough room for everyone to sit down. She was strip searched and exposed to pepper spray. Karen noticed that even seventeen-year-old Alexus was strip-searched and required to

squat and cough. Only once she was in jail did Karen notice that her knees were scraped and bleeding. When one of Karen's non-protester cellmates found out that Karen was a journalist, she went back to her bunk and returned with a piece of paper and a pencil. "Write," she said. "Please write about us."



**Figure 37:** One of Karen's bloodied knees.

230.  Karen's children were frightened. Karen's daughter Aiesha had been texting with her mother when Karen was arrested. She became worried when her mother stopped responding. "I'm definitely shaken by this," Aiesha said. "I don't know what's going to happen now. I don't know when she's going get out. I don't know what they're going to do to her."[99]

231.  Karen was released the next day when her photographer, Marco Poggio, posted bond for her.

232.  A neurologist later confirmed that Karen had suffered nerve damage in her left wrist and left hand.

233.  In reporting on the event, she said that the protest that day "made me wonder what happens in Baton Rouge when the world isn't watching."[100]

[99] Daryl Khan, *JJIE Reporter Arrested in Baton Rouge While Covering Protest*. Juvenile Justice Information Exchange, July 11, 2016.
[100] Karen Savage, *Reporter Recounts Arrest, Prison Stay After Baton Rouge Protest*. Juvenile Justice Information Exchange, July 22, 2016.

234.  **<u>Cherri Foytlin.</u>** Cherri is a journalist and activist from Rayne, Louisiana. On July 10, 2016, she missed the youth-led march to the state capitol because she was stuck in traffic.

She was there to report for the Bridge the Gulf Project. She joined the protesters when they had been diverted off of Government Street. When police arrived in riot gear, Cherri joined the protesters standing in Ms. Batiste's yard because "that's where people would need the most documentation."" Cherri was in that



**Figure 38:** Cherri is told to "get back bitch" by the purple-shirted officer who had pointed a gun at protesters and reporters the night before. (Photo by Cherri Foytlin)

yard shooting photos when Defendants grabbed a person next to her, pushing her into a fence. Cherri stepped back to avoid getting in the way of the arrest, and she heard someone say heard someone say, "Cat, grab her." Cherri was then pushed by a female officer wearing a purple shirt who said "get back, bitch." Cherri recognized her from video as the officer who had been pointing her assault rifle at protesters and reporters the night before. The officer was later identified as Cpl. Mancuso.

235.  At the order of a male officer, two male officers pushed Cherri to the ground and painfully ziptied her hands together. Cherri dropped her phone and an officer took it. The officers who were ziptying her said "that phone is gone now!"

236.  Once Cherri was ziptied, Cpl. Mancuso came towards her. She told the two officers that she "want[ed] this one," meaning Cherri. Cherri thought the woman wanted revenge for Cherri photographing her earlier. Cherri says "[t]hat's when I knew I was in trouble." Cpl. Mancuso grabbed Cherri and pulled her backwards through the street. Cherri told her, "I can't walk backwards as fast as you can walk forwards." She responded, "you are going to have to," and sped up. Twice Cherri fell and the officer kept walking,



**Figure 39:** Defendants pull Cherri's (white shirt) ziptied-arms up painfully as an officer hands her off to the purple-shirted officer. A witness cries: "That's a journalist!
(Video by Kelly Orians at 3:29.)

dragging Cherri until she could get her feet back under her. Cherri told her that she was with the press and had a press pass in her car. Cpl. Mancuso told Cherri that she was not the press and to "shut the fuck up."

237.  As Cherri is walked to the van, a witness cries "That's a journalist! That is a journalist! You're arresting journalists!"[101]

238.  When Cherri said that the zipties were too tight and hurt her, Cpl. Mancuso said "a person can go six hours without circulation to their hands" and tightened them even more.

239.  As they were loading Cherri into the police van, an officer returned her phone. Cherri told him, "I want you to know I don't hate you." She later described it as a "very human moment."

240.  Cherri had to spend a night in a cold jail cell with no blanket, and was strip-searched twice. Pepper spray was used on her when some protesters sang civil rights songs in

---

[101] Video by Kelly Orians at 3:14. This video is incorporated into this complaint.

jail.

241.  **Dr. Daniel Liebeskind**. In July 2016, Daniel was a obtaining his Doctorate of
Musical Arts at LSU.

242.  On July 10, Dr. Liebeskind complied with the police orders. When the officers
told the protesters to move back to the sidewalks and then back further than the sidewalk, Dr.
Liebeskind complied. Indeed, he went further than compliance – he told other protesters to "get
off the sidewalk, get on the grass" to encourage their compliance
too.

243.  When he heard Defendants announce, "This is no
longer a peaceful protest," Dr. Liebeskind was standing on the
grass by Lisa Batiste's porch. He could see lines of officers
marching as a unit with shields up, and heard from other
protesters that they were approaching from the other
direction as well. The officers surrounded him and then



**Figure 40:** A photo taken by Dr. Liebeskind
moments before his seizure shows that
he was standing well back from the
street and sidewalk.

charged. Dr. Liebeskind froze and put his hands into the air. All he knew was that he didn't want
to antagonize the officers.  He was tackled to the ground by an arresting officer. On the ground,
Dr. Liebeskind said, "I am not resisting. I am not resisting." When directed to put his hands
behind his back, he tried, telling the officer "I'm trying, sir." But he couldn't because one officer
was stepping on his right arm and shoulder, immobilizing it. An officer put a knee into Daniel's
back and ziptied his hands. An officer then tried to pull Daniel's bicycle helmet off his head with
brute force, rather than undoing the clasp. One of the officers kicked Daniel's phone out of his
hand, where it was permanently lost.

244.  While waiting to be transported to the jail, Dr. Liebeskind had another protester
email his family with a phone. An officer came over and said a statement similar to: "What the

HELL do you think you're doing? Put that damn phone away or else I WILL come over there and break your face. I'm a nice guy but you do NOT want to aggravate me!"

245.  Later Daniel shared with his friends that:

> Being rushed by police in riot gear may be the scariest thing I've ever experienced. That experience – that fear – had an enormous influence on my thinking while in jail. I knew that I *should* go out again to stand up and speak out, but I was afraid. I kept on thinking of the Kent State shootings and [whether I] can help without putting my life at risk. . . .  it was the fear of police that had me telling myself to stay home and not protest in the future. That fear is very real, and for someone like me it is a STRONG deterrent.

246.  Ultimately, Dr. Liebeskind decided to protest again in the future. He said that "I will be back out there non-violently protesting to live in an America where a dead black person is NOT presumed guilty until proven innocent." As a result of the protest, Dr. Liebeskind had to buy a new phone, new helmet, and new shirt.

247.  **Alisha Feldman, Finn Phoenix, and Leah Fishbein**. On July 10, 2016, Alisha, Finn, and Leah drove from New Orleans to Baton Rouge to join the youth-led march at the capitol building, and then followed the march back to East Blvd. and France Street. They heard the police say "get out of the street" and "this is no longer a peaceful protest." So they got out of the street and stood on the strip of grass between the sidewalk and the street.  Then they heard the police order protesters to get off of the sidewalk, so they retreated back to Ms. Batiste's yard. It was there that they were seized by the police.

248.  Defendants lifted Finn off the ground by their neck, and then put them on the ground with a knee in the back. Finn couldn't breathe. Finn is a diabetic, and their insulin pump fell out of their pocket.  It took repeated pleas to get an officer to return the insulin pump to their pocket. At the prison, after a long time a medic took Finn's blood sugar and said they were fine. But Finn received no further care for their diabetes, even though they asked several times for a snack to help them regulate blood sugar. A



**Figure 41:** Red circle shows Defendants putting Plaintiff Finn Phoenix face-down in the street.

medic finally came back and said "we don't provide medical care until you are booked, and you haven't been booked yet." Finn's throat was injured so badly that they could not swallow solid food. Finn's neck and back were so sore that a doctor later diagnosed them with muscle bruising, and prescribed a course of muscle relaxers and physical therapy.

249.  When Leah was seized by Defendants, she told them "I'm not resisting!" The zipties binding her hands were so tight that her hands began to turn purple. At that point, she felt like she was blacking out or disassociating as a result of the pain and fear.

250.  In the days and weeks subsequent to her arrest, Leah felt very heightened levels of anxiety.  She saw a doctor about one week after the arrest for the pelvic injury she sustained, during which her pelvic bone hit the ground so hard when Defendants tackled her that she was bruised from mid thigh to mid abdomen. She also saw a podiatrist about a month afterwards for foot pain, because immediately after her arrest she began to suffer from toe and foot pain that worsened over time.  Her physical therapist diagnosed her with cervical/lumbar/thoracic spine instability and postural dysfunction, which has resulted in neck pain, hip flexor pain, foot and

back pain.

251. When Alisha was seized, one Defendant was bending her hands in a way that caused her pain. She cried out, and he bent it harder – and said "this wouldn't happen if you weren't crying so loud." She has been having wrist problems since her arrest.

252. Subsequent to their treatment, Finn, Alisha, and Leah attended a group therapy session to relieve their collective trauma/anxiety.



**Figure 42:** Original artwork by Alisha Feldman. The image is an excerpt from a piece is entitled "No Cops," and shows her arrest with depictions of the law enforcement officers omitted so that only their effects are visible. (Alisha Feldman, *No Cops,* August 2016.)

**The Municipal Policies and Practices of the City/Parish, the Baton Rouge Police Department and the East Baton Rouge Sheriff's Office Caused the Violations of Plaintiffs' Constitutional Rights.**

253. The policies and practices of the City/Parish, the BRPD, the East Baton Rouge Sheriff's Office, and the other Agency Defendants were a motivating force behind and a contributing cause of the constitutional violations that Plaintiffs suffered.

254. Defendants employed well-settled, inter-related *de facto* and explicit policies and

practices to suppress the Plaintiffs' exercise of their First Amendment rights and to otherwise violate Plaintiffs' constitutional rights, including:

a.  Criminalizing individuals who criticize law enforcement;

b.  the control and termination of protest and dissent through the targeting for arrest, detention, abuse, and denigration of perceived protest "leaders" and, in particular, individuals who criticize the police;

c.  failing to create and implement clear, understandable policies for the benefit of sworn police personnel regarding how to respond constitutionally to mass demonstrations and spontaneous protest;

d.   failing to train sworn personnel on the importance of protecting and respecting the exercise of First Amendment rights through assembly and protest;

e.  Directing the creation of pre-printed forms of affidavits of arrest, with facts already pre-written.

f.  the use of riot gear—*i.e.*, military armaments—such as shields, helmets with facemasks, body armor, batons, rifles, and military vehicles without just cause and in order to frighten and intimidate those who wish to peacefully assemble to voice their concerns on issue of public importance, thereby creating an atmosphere of tension;

g.  failing to discipline sworn personnel who use excessive force, engage in racist policing, prepare false reports, falsely arrest citizens, and/or violate First Amendment rights, thereby creating a culture of impunity in which officers who commit such misconduct learn that they will suffer no adverse consequences;

h. allowing a widespread practice of excessive force to continue unabated, despite notice of the pattern and the full knowledge of policymakers;

i. failing to create and implement a "street closure" permitting process to enable those who wish to engage in demonstrations on matters of immediate public importance to obtain a permit on an emergency basis (*i.e.*, with waiver of the 45 day notice requirement);

j. imposing onerous financial conditions on those who seek to engage in protest—i.e., requiring proof of $1 million in liability insurance coverage and a receipt for rental of barricades.

255. The individual Defendants, including but not limited to the currently unknown Law Enforcement DOES, acting on the instructions and with the approval of Defendants Holden, Dabadie, Gautreaux, and Edmonson arrested Plaintiffs pursuant to one or more of the policies listed in the preceding paragraph

256. At all pertinent times herein, Defendants Holden, Dabadie, and Gautreaux were aware that the policies, procedures, practices, customs, and usages they established for the CITY/PARISH, BRPD, and EBRSO would result in violations of constitutional rights. These defendants ignored that risk and acted unreasonably, intentionally, and with knowing disregard for Plaintiffs' constitutional rights as described above.

257. The policies and practices of the CITY/PARISH, BRPD, and EBRSO listed above were implemented and applied intentionally with knowing disregard for the rights of Plaintiffs. The policies and practices of the CITY/PARISH, BRPD, and EBRSO listed in were implemented by the Defendants, working in concert to suppress the right of community members to petition the government for redress of grievances.

# IV. CAUSES OF ACTION

## One - Violation of First Amendment Rights to Speech and Assembly
### (All Plaintiffs against All Defendants[102])

258.  Plaintiffs incorporate the allegations in each preceding and following paragraph.

259.  In *Cox v. Louisiana,* 379 US 559 (1965) ("*Cox II*") a group of peaceful civil rights protestors were told by the Baton Rouge Police Chief that they must confine their demonstration to "to the west side of the street." The protesters complied. Law enforcement then ordered them to disperse, saying ""Now, you have been allowed to demonstrate. Up until now your demonstration has been more or less peaceful, but what you are doing now is a direct violation of the law, a disturbance of the peace, and it has got to be broken up immediately." Law enforcement then swept in and arrested Rev. Elton Cox. The Supreme Court held that this violated Rev. Cox's First Amendment rights.

260.  History repeated itself in 2016. A group of peaceful civil rights protesters were told by Baton Rouge law enforcement that they must move their demonstration out of the streets, and then off of the sidewalks. Each time, Plaintiffs complied. Defendants then told them to disperse, declaring that it was "no longer a peaceful protest." Defendants then swept in and arrested Plaintiffs.

261.  Just as Rev. Cox's First Amendment rights were violated by Baton Rouge law enforcement in 1961, so too were Plaintiffs' rights violated in 2016.

262.  The protests in Baton Rouge are subject to heightened protection for the additional reason that they are peaceful and conducted on public streets and sidewalks. "Consistent with the traditionally open character of public streets and sidewalks, [the Supreme

---

[102] Instances of "All Plaintiffs against All Defendants" stated herein does not include Plaintiff Tammy Cheney against City of Baton Rouge defendants, as those claims have been dismissed. Ms. Cheney's claims against all other Defendants remain intact.

Court] ha[s] held that the government's ability to restrict speech in such locations is 'very limited.'" *McCullen v. Coakley*, 134 S. Ct. 2518, 2529 (2014). The government is "sharply circumscribed" in its authority to restrain expressive activity in "places which by long tradition or by government fiat have been devoted to assembly and debate." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). Public places, such as streets and sidewalks, that are associated with the free exercise of expressive activities "are considered, without more, to be 'public forums.'" *United States v. Grace*, 461 U.S. 171, 177 (1983); see also *Snyder*, 131 S. Ct. at 1218 (observing that the Supreme Court has "repeatedly referred to public streets as the archetype of a traditional public forum"); *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009) (noting "government entities are strictly limited in their ability to regulate private speech" in "such 'traditional public fora'" as public streets and parks); *Frisby v. Schultz*, 487 U.S. 474, 481 (1988) (finding that courts need not make any "particularized inquiry into the precise nature of a specific street" because "all public streets are held in the public trust and are properly considered traditional public fora"). Any government act to silence speech may not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward v. Rock Against Racism*, 491 U.S 781, 798-99 (1989).

263. Plaintiffs, and others like them, have since attempted to engage in peaceful protest on the streets and sidewalks of Baton Rouge—the very places which the Supreme Court has described as having "immemorially been held in trust for the use of the public and [which], time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939).

264. In some of Plaintiff's arrests, the arresting officers explicitly linked the Plaintiff's expression to the reason why they were being arrested. For example, just before they arrested

her, Defendants told Alexus they had seen her "flicking them off."

## Two - Violation of First Amendment Freedom of Press
### (Plaintiffs Karen Savage and Cherri Foytlin Against All Defendants)

265.  Plaintiffs incorporate the allegations in each preceding and following paragraph.

266.  Defendants violated Karen and Cherri's rights under the First Amendment to freedom of the press by interfering with their ability to gather information and cover a matter of public interest as members of the media. When told that Karen was a member of the press and offered credentials, Defendant said "fuck you, journalist" several times.

267.  Observing and recording public protests, and the police response to those protests, is a legitimate means of gathering information for public dissemination that is protected by the freedom of speech and freedom of the press clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution. Defendants engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Plaintiffs' First Amendment rights.

268.  This was part of a pattern by Defendants. That weekend Defendants arrested Lee Stranahan, a conservative journalist from the news site Breitbart, a self-professed critic of Black Lives Matter critic, and a strong supporter of law enforcement. He reported "I did nothing to break the law. I was not obstructing traffic because with the road closed and police blocking the lane, there was no traffic. At no point did I hear the police give any order for me or anyone else to stay back. I was given no warning whatsoever; I was simply approached and forced to stop recording."[103]

269.  Ryan Kailath, an Indian American reporter for a New Orleans NPR affiliate, was

---

[103] Bill Quigley, *Baton Rouge: 'Put Those Damn Weapons Down!'*, Huffingtonpost.com, July 12, 2016, *citing* Lee Stranahan, *My Weekend Incarceration in a Baton Rouge Prison*, Breitbart.com, July 12, 2016.

arrested while he was on the grass by the highway across from the police station. Trying to move away from an interaction with the police, he found himself surrounded by police who did not let people leave. He was charged with simple obstruction of a roadway despite having camera footage showing he was never in the road.[104] WAFB Assistant News Director Chris Slaughter was arrested when he put one foot on the highway to get a better angle for a video shoot.[105]

270. As a direct and proximate result of Defendants unlawful actions, Plaintiffs were damaged.



**Figure 43**: A Defendant ordering Plaintiff and Reporter Karen Savage to stop taking pictures of a group of officers handling a protester.
(Photo by Karen Savage.)

**Three - First Amendment Retaliation**
**(All Plaintiffs against All Defendants)**

---

[104] *Id., citing* Ryan Kailath & Eve Troeh, *WWNO Reporter Describes Arrest While Covering Baton Rouge Protests*, WWNO, July 11, 2016.
[105] Amy Wold and Maya Lau, *Alton Sterling protesters arrested in Baton Rouge to be prosecuted? DA Hillar Moore explains...*, The Advocate, July 10, 2016.

271.  Plaintiffs incorporate the allegations in each preceding and following paragraph.

272.  Plaintiffs' assembly, speech, and newsgathering are protected activities under the First Amendment.

273.  Defendants' arrest, use of force, and searches of Plaintiffs were intended to deter and chill their exercise of First Amendment Rights.

274.  For example, it seemed that Nadia and Antonio were targeted because they were leading chants.

275.  As a direct and proximate result of Defendants' actions, Plaintiffs were damaged and chilled.

### Four - False Arrest and Imprisonment
### (All Plaintiffs against All Defendants)

276.  Plaintiffs incorporate the allegations in each preceding and following paragraph.

277.  Plaintiffs were arrested without probable cause or due process of law.

278.  The Affidavits of Probable Cause signed by Defendants were perjured, fabricated, boilerplate affidavits that lacked specifics or even basic indicia of truthfulness. Arrest locations on most were inaccurate by more than five miles.  The arresting officers were not the officers who wrote up the affidavits.

279.  The officers could not have reasonably believed that they had probable cause to arrest the Plaintiffs for any crime, considering that Plaintiffs had complied with their orders. This is especially so considering the United States Supreme Court had issued its rulings in *Cox I* and *Cox II*.

280.  Furthermore, a necessary element of both 14:97 and 14:100.1 is that the suspect actually blocks traffic. This was impossible, as Defendants had blocked off both East Blvd. and France Street with lines of officers several rows deep.

**Figure 44**:     Three frames from a video taken by Plaintiff Victor Onuoha show lines of police officers blocking off East Blvd. (left and right) and France St. (middle). The irregular shapes are due to the fact that the phone was tilted at an angle.

  

281.  Furthermore, no Plaintiff actually resisted arrest. But even if they had, one of the elements of RS 14:108 (resisting an officer) is that the underlying arrest must be "lawful." Thus, if Plaintiffs weren't lawfully arrested for violation of 14:97 or 14:100.1, then they couldn't have been guilty of violating 14:108.  *See State v. Ceaser*, 859 So. 2d 639, 643 (2003) ("An individual in Louisiana has a time-honored right to resist an illegal arrest.").

### Five - Violation of Fourth Amendment Rights to be Free from Unlawful Search and Seizure
### (All Plaintiffs against All Defendants)

282.  Plaintiffs incorporate the allegations in each preceding and following paragraph.

283.  Plaintiffs have a right under the Fourth Amendment to be free from unreasonable searches and seizures.

284.  Defendants violated these rights when they arrested them, detained them, and used force on them without probable cause.

285.  Defendants engaged in these actions willfully and knowingly, acting with deliberate indifference to Plaintiffs' Fourth Amendment Rights.

286.  Additionally, when Tammy Cheney returned to her car, she found that Defendants had gone through all the belongings in her car, damaged her trunk, and broken off her side mirror. This was an illegal search as there was no lawful justification for the search. It was not a

search incident to arrest, because Ms. Cheney was not arrested in her car. It was not a search incident to impoundment, because the car was not impounded. It was not a search for evidence relevant to the crime, because Tammy was arrested for Obstruction of a Public Passageway and Resisting Arrest, two crimes that did not involve anything plausibly in a car.

287. Plaintiffs' phones were searched and their property seized unlawfully.

**Six - Excessive Force**
**(All Plaintiffs against All Defendants)**

288. Plaintiffs incorporate the allegations in each preceding and following paragraph.

289. The Defendants employed excessive and unreasonable force, or caused excessive and unreasonable force to be employed, in effectuating the arrests of Plaintiffs, as specifically alleged above, in violation of Plaintiffs' rights under the Fourth Amendment.

290. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiffs' clearly established constitutional rights. Defendants' misconduct was the cause of Plaintiffs' injuries.

291. In addition to the actions described above, the use of the acoustic LRAD weapon on Plaintiffs constituted excessive force. LRAD devices were first developed around 2000, initially for the military as a tool for ships to amplify and project noise to ward off other ships. In addition to amplifying sound, LRAD devices can possess a high-pitched, volume adjustable "deterrent tone" that is marketed to law enforcement as useful for crowd control by creating audible discomfort when used at close range. Close-range exposure to an LRAD can result in migraines, sinus pain, dizziness, facial pressure, ringing in ears, sensitivity to noise, as well as tinnitus and hearing loss.[106]

292. For a Model 3300 LRAD, the space within 320 feet of the device is a zone labeled

---

[106] *EDREI v. City of New York*, 16-cv-1652 (S.D.N.Y. May 31, 2017) (Denying motion to dismiss regarding LRAD use as excessive force.)

a "potential danger area."[107] Here, Defendants used the LRAD on Plaintiffs at a range of approximately 60 to 80 feet.

293. The level of sound produced by these devices exceeds both the threshold for human discomfort (between 85 and 95 dB) and the normal human pain threshold (between 120 and 140 dB).

294. According to the National Institute for Occupational Safety and Health, "exposures [greater than] 85 dB may cause hearing loss."

295. According to the National Institute on Deafness and Other Communication Disorders, "any sound over 90 dB can damage a person's hearing. So the LRAD can threaten the hearing of anyone in its path, regardless of whether there is any wrongdoing."

### Seven - Failure to Intervene
### (All Plaintiffs Against All Defendants.)

296. Plaintiffs incorporate the allegations in each preceding and following paragraph.

297. The actions of the Defendants were the direct and proximate cause of the violations of Plaintiffs' Fourth Amendment rights, bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of income, and legal expenses, as set forth more fully above.

298. During the events described above, the Defendants stood by without intervening to prevent the violation of Plaintiffs' constitutional rights under the First, Fourth and Fourteenth Amendments, even though they had the opportunity and duty to do so.

299. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiffs' clearly established constitutional rights.

---

[107] *Id.*

300. As a direct and proximate result of the Defendants' failure to intervene, Plaintiffs suffered damages, including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of income, and legal expenses, as set forth more fully above.

### Eight - Civil Conspiracy to Violate Civil Rights
### (All Plaintiffs Against All Individual Defendants)

301. Plaintiffs incorporate the allegations in each preceding and following paragraph.

302. Each of the individual Defendants, acting in concert with one another and other yet-unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means. Each of the individual Defendants took concrete steps to enter into an agreement in July 2016 to unlawfully detain, arrest, and imprison the Plaintiffs, knowing they lacked probable cause to do so, and for the purpose of impeding Plaintiffs from exercising their First Amendment rights to protest by engaging in non-disruptive speech in support of an issue of pressing public importance.

303. In furtherance of this conspiracy, each of the Defendants committed specific overt acts, misusing their police powers for the purpose of unlawfully silencing the Plaintiffs. They accomplished this goal by using excessive force to unlawfully effect the Plaintiffs' arrests, fabricating evidence against the Plaintiffs, and approving trumped up charges against them, which resulted in their unlawful imprisonment.

304. In the implementation of the conspiracy, the officers, deputies and troopers of each of the law enforcement agencies led by Defendants HOLDEN, DABADIE, GEAUTREAUX and EDMONSON employed the customs and policies set forth above.

305. As a direct and proximate result of the Defendants' conspiracy, Plaintiffs suffered damages, including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of income, and legal expenses, as set forth more fully above.

306. Each individual Defendant is therefore liable for the violation of Plaintiffs' rights

by any other individual Defendant.

## Nine - *Monell* Claim
### (All Plaintiffs Against Policymaker Defendants)

307. Plaintiffs incorporate the allegations in each preceding and following paragraph.

308. The misconduct described above was caused by the policies, practices, and customs of Policymaker Defendants.

309. The above-described widespread practices, which were so well settled as to constitute the *de facto* policy of the Defendants, were allowed to exist because policymakers with authority over these acts exhibited deliberate indifference to the problem, thereby effectively ratifying it.

310. This is clear both from the history of Defendant agencies described above, and more specifically from the >100 wrongful arrests of protesters in the two days prior to Plaintiff's arrest. See the list of arrestees attached as **Exhibit E**.

311. The policies, practices, and customs set forth above were the driving force behind the numerous constitutional violations in this case that directly and proximately caused Plaintiffs to suffer the grievous and permanent injuries and damages set forth above.

312. Defendants named in this Count, acting individually and together, under color of law, acted to violate Plaintiffs' rights as set forth in the preceding claims. Policymaker Defendants have developed and maintained policies, practices, procedures, customs, and usages exhibiting deliberate indifference to the constitutional rights of citizens and residents of the City/Parish, including but not limited to those policies, practices, procedures, customs, and usages described above, which caused the violation of Plaintiffs' rights as described herein and the resultant damages suffered.

313. Policymaker Defendants had the power to prevent or aid in the prevention of the wrongs done and conspired to be done as described herein, yet failed or refused to do so, in

violation of 42 U.S.C. § 1983.

314. The actions of the Defendants were the direct and proximate cause of the violations of Plaintiffs' First, Fourth, and Fourteenth Amendment rights, bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of income, and legal expenses, as set forth more fully above.

315. Moreover, the actions of all Defendants were directed, condoned, and/or ratified by Policymaker Defendants.

### Ten - Violation of the Louisiana Constitution
### (All Plaintiffs Against All Defendants)

316. Plaintiffs incorporate the allegations in each preceding and following paragraph.

317. Defendants' actions in arresting, detaining, and using force on Plaintiffs as described above interfered with their exercise of fundamental rights to speech, assembly and press, as guaranteed by Louisiana's Constitution. It also interfered with their state constitutional rights of privacy, freedom from false arrest and unlawful search and seizure.

### Eleven - Intentional and Negligence State Torts - Infliction of Emotional Distress, Negligent Infliction of Emotional Distress, Assault, Battery, False Imprisonment, Malicious Prosecution, and Negligence
### (All Plaintiffs Against All Defendants)

318. Plaintiffs incorporate the allegations in each preceding and following paragraph.

319. Defendants' conduct was extreme and outrageous; knowing that the emotional distress suffered by the Plaintiffs was severe; and Defendants desired or acted with recklessness to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from their conduct. They maliciously commenced criminal proceedings against Plaintiffs using perjured and fabricated boilerplate Affidavits of Probable Cause. They falsely told Tammy Cheney that she would be charged with child endangerment, and that her children would be taken away.

320.  Defendants committed intentional offensive contact with Plaintiffs without right, and put the Plaintiffs in apprehension of such contact.

321.  They imprisoned and detained Plaintiffs without probable cause or justification, and breached their duty of care with regards to Plaintiffs.

322.  Defendants' actions were the cause-in-fact of Plaintiffs' injuries.

**Twelve- Vicarious Liability**
**(All Plaintiffs Against All Supervisor Defendants)**

323.  Plaintiffs incorporate the allegations in each preceding and following paragraph.

324.  All supervisor Defendants are liable to Plaintiffs for the negligent and intentional acts and omissions of those under their direction and control pursuant to Louisiana Civil Code article 2320 and the doctrine of *respondeat superior*.

**Thirteen - Indemnity**
**(All Plaintiffs Against All Agency Defendants)**

325.  Plaintiffs incorporate the allegations in each preceding and following paragraph.

326.  Louisiana law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable for actions taken in the discharge of their duties that are within the scope of their employment activities.

327.  While committing the misconduct alleged in the preceding paragraphs, some Defendants were employees, members, and agents of agency Defendants within the scope of their employment.

328.  Agency Defendants are therefore obligated by Louisiana statute to pay any judgment entered against their employees.

**Fourteen - State Law Direct Action Claim**
**(Against Defendant Insurance Companies)**

329.  Plaintiffs incorporate the allegations in each preceding and following paragraph.

330.  Defendant Insurance Companies, upon information and belief, have issued and/or

currently have in effect one or more policies of insurance covering one or more of the Defendants named herein. For valuable consideration received, these policies obligated Defendant Insurance Companies, jointly and/or severally, to pay on behalf of their insured Defendant(s) any sums the insured Defendant(s) may become obligated to pay to Plaintiffs or to indemnify their insured Defendant(s) for any sums the insured Defendant(s) may become obligated to pay to Plaintiffs.

331.  By reason of their illegal and unconstitutional acts, Defendants are liable to Plaintiffs for all damages and injuries Plaintiffs has suffered as a result. Upon information and belief, Defendant Insurance Companies are contractually obligated to pay these sums on behalf of the insured Defendant(s).

332.  Upon information and belief, Defendant Insurance Companies are liable to Plaintiffs for any and all damages incurred by reason of the insured Defendant(s)' acts, up to their policy limits, notwithstanding the fact that the insured Defendant(s) may themselves be able to assert claims of privilege or immunity from liability.

333.  Under Louisiana Revised Statute § 22:655(B), Plaintiffs bring a direct action against Defendant Insurance Companies to recover any and all sums they are obligated to pay Plaintiffs on behalf of their insureds or to indemnify their insureds.

## VII.    PRAYER FOR RELIEF

THEREFORE, Plaintiffs respectfully request a trial by jury. They request that this Court enter the following relief:

A. Issue a permanent injunction requiring Defendants to end their practices and policies as described above, as some Plaintiffs wish to participate in future protests in Baton Rouge;

B. Issue a permanent injunction to (1) require Defendants to obtain the expungement of Plaintiffs' arrests at Defendants' cost; (2) bar Defendants from reporting Plaintiff's arrests to any

law enforcement agency, database, employer, or credit agency; (3) end their practices and policies as described above;

C. Enter a declaratory judgment, specifying Defendants' constitutional and statutory violations and declaring the rights of the Plaintiffs;

D. Award nominal damages;

E. Award special damages;

F. Award compensatory damages;

G. Award Plaintiffs their costs and reasonable attorneys' fees incurred in this action, pursuant to 42 U.S.C. § 12205, 28 C.F.R. § 35.175, and 29 U.S.C. § 794a(b);

H. Order such other and further relief, at law or in equity, to which Plaintiffs may be justly entitled.

Respectfully submitted,
 */s/ John Adcock*
JOHN ADCOCK
Louisiana Bar No. 30372
P.O. Box 750621
New Orleans, LA 70175
Tel: (504) 233-3125
Fax: (504) 308-1266
Email: jnadcock@gmail.com

*/s/ William Most*
WILLIAM MOST
Louisiana Bar No. 36914
DAVID LANSER
Louisiana Bar No. 37764
201 St. Charles Ave., Ste. 114 #101
New Orleans, LA 70170
Tel: (650) 465-5023
Email: williammost@gmail.com

*/s/ Jack M. Rutherford*
JACK M. RUTHERFORD
Louisiana Bar No. 34968
1700 S. Rampart St.
New Orleans, LA 70113
T: (415) 794-5639
F: (504) 407-2131
Email: jack@rfordlaw.com