# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

**BLAIR IMANI, ET AL**                          **CIVIL ACTION**

**VERSUS**                                      **NO.: 3:17-CV-439-JWD-EWD**

**CITY OF BATON ROUGE, ET AL**

### MEMORANDUM IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

**MAY IT PLEASE THE COURT:**

### *Table of Contents*

1.  Factual Basis                                                Pg. 1

2.  Law & Argument                                               Pg. 2

    a.  Summary Judgment                                        Pg. 2

    b.  Municipality and officials in official capacity         Pg. 2

    c.  Individual liability of defendants                      Pg. 4

    d.  Qualified immunity                                      Pg. 4

    e.  Individual defendants                                   Pg. 5

    f.  Individual plaintiffs                                   Pg. 5

    g.  Individual counts                                       Pg. 9

3.  Conclusion

## *1.  Factual Basis*

As set forth in the statement of uncontested facts, this was less a protest and more an effort to take over the interstate as a means of disrupting the ordinary lives of citizens attempting to travel through Baton Rouge. This extraordinarily dangerous activity required a swift response from law enforcement, which succeeded in blocking the protesters from endangering themselves and other

by attempting to take the interstate. If this response was not perfect, it was good enough, and whatever mistakes were made were the sort that reasonable people can make during split-second high-pressure decisions.

### 2. *Law & Argument*

#### a. *Summary Judgment*

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Rule 56). If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial. Id. A factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Beck v. Somerset Technologies, Inc.*, 822 F.2d 993, 996 (5th Cir. 1989) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986)).


#### b. *Municipality and officials in official capacity*

Section 1983 authorizes the assertion of a claim for relief against a person who, acting under the color of state law, allegedly violated the claimant's rights under federal law. See 42 U.S.C. § 1983. In § 1983 suits, government officials may be sued in either their individual or official capacities. A claim against a state or municipal official in his official capacity "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).

Individual or personal capacity suits "seek to impose personal liability upon a government official for actions he takes under color of state law." Id.

In the Third Amended Complaint (Record Doc. 189-1), Jonny Dunnam is named as a defendant, as the interim BRPD Chief of police, and is sued in his official capacity. At paragraphs 36 and 36 of the complaint, the City of Baton Rouge and Parish of East Baton Rouge are named as party defendants. The claim against former Chief Dunnam is therefore redundant, and must be dismissed. First, because a suit against a public official in his official capacity is simply a suit against the local governmental entity itself, the proper official to sue in his official capacity to impose liability upon a local governmental entity is the official with final policymaking authority for the entity under state or local law. See *Burge v. Parish of St. Tammany*, 187 F.3d 452, 468–70 (5th Cir. 1999), citing, inter alia, *St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion). Second, municipal entities cannot be held liable under a theory of respondeat superior, but rather can only be held liable for an unconstitutional policy or custom that causes the deprivation of the plaintiff's constitutional rights under the framework set forth in *Monell v. Dept. of Social Serv.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Thus, any claims against these officers, even if they were the correct officers to sue as the final policymaking authorities for the SPD, would be subsumed into plaintiffs' *Monell* claim (Count 9, Paragraphs 309-315)

Accordingly, the claims against Jonny Dunnam are void, and warrant dismissal as a matter of law.

### c. *Individual liability of defendants*

On the merits, to establish personal liability in a §1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right.[1]  However, attorneys' fees under 42 USC 1988 cannot be awarded in an individual liability suit under 42 USC 1983.[2]  Furthermore, in a personal capacity-suit, qualified immunity is still applicable to governmental actors.[3]

Thirty-one current and former BRPD Officers are named as defendants, including former interim Chief Jonny Dunnam, who was sued solely in his official capacity, and is resolved above. Of the thirty remaining officers, twenty-three (23) have been deposed (though three transcripts have not been completed as of the filing of this motion).

### d. *Qualified Immunity*

Qualified immunity protects government officials—from suit under 42 U.S.C. § 1983 and related statues, including § 1985—performing "discretionary duties" when their actions are reasonable as to the rights that the officials allegedly violated.[4] Essentially, it is a defense available to "all but the plainly incompetent or those who knowingly violate the law."[5] The Fifth Circuit uses a two-part test to evaluate qualified immunity defenses: first, the Court determines whether the defendant's alleged action constitutes a violation of the plaintiff's constitutional rights, and second, the Court determines "whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question."[6] The Court may address the

---

[1] *Kentucky v. Graham,* 473 U.S. 139, 105 S.Ct. 3099 (1985) at 166.
[2] *Kentucky v. Graham,* 473 U.S. 139, 105 S.Ct. 3099 (1985) at 167-168.
[3] *Kentucky v. Graham,* 473 U.S. 139, 105 S.Ct. 3099 (1985) at 166-167.
[4] *Good v. Curtis*, 601 F.3d 393, 400 (5th Cir.2010).
[5] *Id.* (Internal Citations Omitted).
[6] *Freeman v. Gore*, 483 F.3d 404, 410–11 (5th Cir.2007).

prongs of the qualified immunity test in any order.[7] Defendants have asserted their defense of qualified immunity through their answer, and respectfully suggest that the evidence presented demonstrates their eligibility for qualified immunity.

### e. Individual Defendants

The allegations as to individual officer defendants include claims against officers who had minimal or momentary contact with defendants,[8] or who were incorrectly identified as having signed affidavits of probable cause which they had not.[9] Many of these defendants have no significant allegations against them, and are named defendants improperly.

### f. Individual Plaintiffs

Interrogatories and requests for production of documents were propounded to all plaintiffs, who responded in or about December, 2019. Only Cherri Foytlin supplemented her responses, in or about March, 2020. Interrogatories 11 and 12, directed to each plaintiff request the following information:

> **INTERROGATORY NO. 11:**
> With regard to the injuries alleged in your petition, please state the names, addresses, and phone numbers of all medical doctors, psychologists, chiropractors and/or healthcare providers that you have consulted and the dates on which you were examined or received physiotherapy or other treatment including the last date you saw each such medical doctor, psychologist, chiropractor, and/or any medical care provider.
> **INTERROGATORY NO. 12:**
> Please provide an itemized listing of any and all medical expenses, and/or any other items of special damages for which you seek recovery.

---

[7] *Manis v. Lawson*, 583 F.3d 839, 843 (5th Cir.2009).
[8] Deposition of Kenneth Brewer, Pg. 44:18-47:5; Deposition of Jason Dohm, Pg. 24:16-35:19; Deposition of Jeff Pittman, Pg. 64:25-70:14; Deposition of Randall Wiedeman, Pg. 76:14-80:15.
[9] Deposition of Billy Walker Pg. 46:15-48:9; Deposition of Joe (Reab) Simoneaux, Pg. 39:13-42:5; 43:20-45:6.

Leah Fishbein reported visits to various healthcare providers between July and August, 2016. She does not claim any itemized medical damages beyond those articulated in the Complaint. Ms. Fishbein likewise claims that her damages, expressed in the complaint "include emotional distress and trauma damages that are not itemizable."

Finn Phoenix reported visits to two providers in July, 2016, and a third, with no dates for services provided. They, like Ms. Fishbein, do not claim any itemized medical damages outside of the complaint, and claims that emotional distress and trauma damages cannot be itemized.

Blair Imani did not seek medical care for any injuries alleged. Ms. Imani gave the same response as Ms. Fishbein, that she does not claim any itemized medical damages beyond those articulated in the Complaint, which include emotional distress and trauma damages that are not itemizable.

Akeem Muhammad states that he has not received treatment for any injuries alleged in the petition. Mr. Muhammad repeats the claim that he does not claim any itemized medical damages beyond those articulated in the Complaint, which include emotional distress and trauma damages that are not itemizable.

Raae Pollard responded that she did not receive medical assistance related to the relevant injuries. Ms. Pollard repeats the claim that she does not claim any itemized medical damages beyond those articulated in the Complaint, which include emotional distress and trauma damages that are not itemizable. In her deposition, Ms. Pollard stated that she has not gone to any doctor for treatment of any injury relating to her arrest at the protest on July 10, 2016.[10] She did say that she has received informal therapy treatment from a friend, called Tallulah, whose full name Ms.

---

[10] Deposition of Raae Pollard, 32:4-11.

Pollard doesn't know.[11] She also claimed to have suffered depression, loss of appetite, weight loss, and social isolation.[12]

Sami Nichols stated that they received medical attention on July 12, 2016, but could not recall the name of the doctor, and paid approximately $200.00 for medical assistance, not including the cost of transportation to and from the doctor's office.  Sami Nichols claims to have missed work due to an injury, but does not state their rate of pay or number of days or hours lost. Like the other plaintiffs, they repeat the claim that they do not claim any itemized medical damages beyond those articulated in the Complaint, which include emotional distress and trauma damages that are not itemizable.

Alexus Cheney did not receive medical treatment related to the injuries alleged. Further, the pleadings do not show that she received any injury at the hands of the BRPD. Like the other plaintiffs, she repeats the claim that she does not claim any itemized medical damages beyond those articulated in the Complaint, which include emotional distress and trauma damages that are not itemizable.

Victor Onuoha did not seek medical attention for injuries sustained due to a lack of medical insurance. Like the other plaintiffs, he repeats the claim that he does not claim any itemized medical damages beyond those articulated in the Complaint, which include emotional distress and trauma damages that are not itemizable.

Karen Savage claims to have seen various providers for counseling (July 13, 2016; July 2017-April 2018; August 2019 to present), physical therapy (three sessions, April 2017), and neurology (March 2017-April 2017), but provides no evidence that these treatment providers were treating conditions related to her arrest on July 10, 2016. She had medical insurance which covered

---

[11] Deposition of Raae Pollard 32:12-34:10.
[12] Deposition of Raae Pollard 38:19-25.

the majority of costs, and claims that she cannot access the itemized damages. She does claim to have paid $600.00 out of pocket for eight counseling session. Like the other plaintiffs, Ms. Savage claims to have suffered emotional distress and trauma damages that are not itemizable.

Cherri Foytlin provided a letter from her counselor from February 2020, alleging that she suffers from various emotional problems due to her encounter in July of 2016. Like the other plaintiffs, she repeats the claim that she does not claim any itemized medical damages beyond those articulated in the Complaint, which include emotional distress and trauma damages that are not itemizable.

Alisha Feldman reports that she saw three providers in July, 2016, and that she paid $200.00 for massage therapy related to injuries allegedly sustained during her arrest or incarceration. In addition, Ms. Feldman claims that her emotional distress and trauma damages are not itemizable.

Antonio Castanon Luna alleges that he received treatment at Tulane Medical Center in July 2016, but does not provide any sums paid for that treatment. In addition, Mr. Castanon Luna claims emotional distress and trauma damages that are not itemizable.

Nadia Salazar Sandi alleges that she is receiving treatment through counseling and a psychiatrist, but does not allege any physical injury beyond the allegations of the petition. She further does not claim any itemized medical damages beyond those articulated in the Complaint, which include emotional distress and trauma damages that are not itemizable. Ms. Salazar Sandi likewise claims a loss of income and economic opportunity due to her arrest appearing on background checks, but gives no estimate or quantification of what those damages would be, and has not supplemented her responses.

Daniel Liebeskind did not incur any medical expenses, but did have to replace his cell phone. In addition, Plaintiff suffered emotional distress and trauma damages that are not itemizable.

### g. *Individual Counts*

Plaintiffs herein allege a variety of state and federal constitutional torts, state law torts, vicarious liability, and claims for indemnity, in their Third Amended Complaint (ECF Doc. 189-1), based on participation in protests in downtown Baton Rouge, on or about July 10, 2016. Specifically, plaintiffs allege:

1. Violation of First Amendment Rights to Speech and Assembly (All Plaintiffs against All Defendants)

Plaintiffs cite *Cox v. Louisiana*, 379 U.S. 536, 558, 85 S.Ct. 453 (1965), for the proposition that a peaceful assembly which is broken up by police is "an unwarranted abridgment of appellant's freedom of speech and assembly secured to him by the First Amendment, as applied to the States by the Fourteenth Amendment." Justice Goldberg, in evaluating the claims, noted that "There is, moreover, no indication that the mood of the students was ever hostile, aggressive, or unfriendly. Our conclusion that the entire meeting from the beginning until its dispersal by tear gas was orderly and not riotous is confirmed by a film of the events taken by a television news photographer, which was offered in evidence as a state exhibit. We have viewed the film, and it reveals that the students, though they undoubtedly cheered and clapped, were well-behaved throughout." *Cox*, at 547, internal footnote omitted.

The films taken at this protest show a very different presentation and protest. Having conducted their scheduled protest, the good people went home, and the protesters who wanted to

shut down the interstate continued east on Government Street, to the easy access to I-110 at 10th Street. As Justice Goldberg explained:

> The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection. One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest. Nor could one, contrary to traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech or assembly. Governmental authorities have the duty and responsibility to keep their streets open and available for movement. A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations. (*Cox*, at 554-555, citations omitted.)

The exhibits presented show an unruly mob, with the intent to disrupt local and interstate travel, who engaged in violent acts against law enforcement, not a gentle procession of students led by a pastor. Indeed, this situation is substantially similar to *Adderley v. State of Florida*, 385 U.S. 39, 87 S.Ct. 242 (1966), in which civil rights protesters were arrested after blocking the driveway to a jail entrance and who failed to disperse after being warned, such that the Supreme Court affirmed their convictions, and found that there was no deprivation of their constitutional rights to freedom of speech, press, assembly, or petition. While the streets and sidewalks are public passages, unlike a jail, the interstate highway is exclusively for the use of motor vehicles. A large crowd, hundreds of people, spanning multiple blocks, blocking an intersection in downtown, with bullhorns, hostile to law enforcement, with the intention of blocking the interstate, is clearly the kind of condition Justice Goldberg states is the duty and obligation of local government to prevent.

This analysis likewise resolves Count 10, at paragraphs 316 and 317, alleging interference with exercise of fundamental rights to speech, assembly and press, as guaranteed by Louisiana's Constitution. As explained by Judge Wilder-Doomes, claims of violation of the Louisiana Constitution's guarantees of free speech are coterminous with claims of violation of the 1st Amendment.[13] This was not a peaceful protest, this was an organized attempt to disrupt the peaceful conduct of the city and interstate highway system, and the City/Parish was obligated to prevent the plaintiffs from accomplishing those objectives.

2.   Violation of First Amendment Freedom of Press (Plaintiffs Karen Savage and Cherri Foytlin Against All Defendants)

In *Turner v. Lieutenant Driver*, 848 F.3d 678, 685-686 (5th Cir. 2017), the Fifth Circuit noted that neither the 5th Circuit nor the Supreme Court had determined that the right to record public activities was well established, and further noted a circuit split. The Fifth Circuit then pronounced:

> We agree with every circuit that has ruled on this question: Each has concluded that the First Amendment protects the right to record the police. As the First Circuit explained, "[t]he filming of government officials engaged in their duties in a public place, including police officers performing their responsibilities, fits comfortably within [basic First Amendment] principles." This right, however, "is not without limitations." Like all speech, filming the police "may be subject to reasonable time, place, and manner restrictions." In this case, however, we need not decide which specific time, place, and manner restrictions would be reasonable. Nonetheless, we note that when police departments or officers adopt time, place, and manner restrictions, those restrictions must be "narrowly tailored to serve a significant governmental interest." That said, to be constitutionally permissible, a time, place, and manner restriction "need not be the least restrictive or least intrusive means of serving the government's interests."
> (*Turner*, supra at 690, citations omitted, emphasis added)

---

[13] *Travis Day v. City of Baton Rouge, et al.* 17-CV-328-JWD-EWD, ECF Doc. 145, at Pg. 39-40.

The exhibits show Ms. Foytlin[14] and Ms. Savage[15] in the roadway, on the sidewalks, and within mere feet of the officers as they try to effect arrests and gain control of the intersection, interfering with the officers as they try to perform their duties and needlessly increasing the risk of injury to themselves, the officers, and the arrestees. Former Chief Dabadie[16] and the City of Baton Rouge[17] both explained the policy of BRPD to be that they give reporters leeway in filming, unless they are interfering with police work or creating unsafe conditions, which is precisely what is shown by the exhibits. The training provided by BRPD to its officers likewise reinforces that reporters and members of the press are to be left alone unless it's interfering with an investigation.[18]

### 3.  First Amendment Retaliation (All Plaintiffs against All Defendants)

The First Amendment to the United States Constitution generally "prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722, 204 L. Ed. 2d 1 (2019)(citing *Hartman v. Moore*, 547 U.S. 250, 256, 126 S. Ct. 1695, 164 L.Ed.2d 441 (2006))(internal quotations omitted). A First Amendment claim is the appropriate manner by which to seek relief for such a retaliatory action. *Id.* A plaintiff asserting such a claim must show (1) that he was injured by the official's action, (2) that the official had a retaliatory motive, and (3) that the retaliatory motive was a "but-for" cause of the injury – in other words, the action against the plaintiff would not have been taken absent the motive. *Id.* When claiming a retaliatory arrest in violation of the First Amendment, a plaintiff must

---

[14]

[15]

[16] Deposition of Carl Dabadie, Jr. Pg. 74:13-76:24.

[17] 30(b)(6) deposition, J.D. Leach Pg. 96:4-24

[18] Deposition of Thomas Morse, Pg. 115:2-116:4.

show that the arresting officer lacked probable cause for the arrest and, absent such a showing, the claim fails. *Id.* at 1725. Even if probable cause is absent, the plaintiff must show that retaliation was a substantial or motivating factor behind the arrest. *Id.*

The exhibits, deposition testimony, and admissions of the plaintiffs demonstrate that the protesters intended to shut down the interstate, and that they were prevented from doing so. Law enforcement gave multiple dispersal orders over the course of approximately ninety (90) minutes, which some but not all of the protesters heeded. The plaintiffs provided cell phone video of their own, in which orders to leave the area are repeated, and ignored. There is nothing to indicate that the cause of their arrest was related to the content of their protest, but indeed the totality of the exhibits show that they were arrested for blocking the intersection, resistance to lawful orders to disperse, throwing objects at law enforcement, and refusal to depart the area.

The officers executing the affidavits of probable cause were within hearing range of the dispersal orders, and had varying levels of communication with the officers escorting detainees to the processing area. The officers executing the affidavits of probable cause were aware of the circumstances – that a large protest was going on, that the roadways were blocked, and relied on their collective experience and fellow officers to execute the affidavits of probable cause.[19] As the Supreme Court reminds us, "Probable cause ... is not a high bar: It requires only the 'kind of "fair probability" on which "reasonable and prudent [people,] not legal technicians, act."'"[20]

Officer Curtis Wilson testified that he recalled observing violations by Alisha Feldman and Leah Fishbein, that he cuffed them and wrote the affidavits of probable cause.[21] Officer James Thomas observed violations by Karen Savage, cuffed her, and authorized a prisoner processing

---

[19] Deposition of Jonathan Abadie, Pg. 32:20-35:22, 55:1-7; Deposition of Willie Williams Pg. 75:5-78:15.
[20] *Kaley v. United States*, 571 U.S. 320, 338, 134 S.Ct. 1090, 188 L.Ed.2d 46 (2014) (alteration in original) (quoting *Florida v. Harris*, 568 U.S. 237, 244, 133 S.Ct. 1050, 185 L.Ed.2d 61 (2013) ).
[21] Deposition of Curtis Wilson, Pg. 35:17-36:11; 53:25-54:19.

team officer to put his name on the affidavit of probable cause.[22] Other affidavits of probable cause were completed by persons unknown.[23] That system was imperfect, but the general conditions and common violations were well known to the officers, and sufficient for a determination of probable cause, which does not require certainty, only probability.[24]

### 4.  False Arrest and Imprisonment (All Plaintiffs against All Defendants)

To establish a claim of false arrest, a plaintiff must show that the arresting officer lacked probable cause.[25] "The Supreme Court has defined probable cause as the 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'"[26] "The probable cause defense to a false arrest claim is broad, as 'even if there was not probable cause to arrest the plaintiff for the crime charged, proof of probable cause to arrest the plaintiff for a related offense is also a defense.'"[27] Qualified immunity may shield an officer from a claim of false arrest if the officer demonstrates that he reasonably but mistakenly concludes that probable cause is present.[28]

Both state law and federal actions under 42 USC 1983 turn on the issue of probable cause. "To remain within the bounds of the Fourth Amendment, a warrantless arrest must be supported by probable cause."[29]  "Probable cause exists when the totality of facts and circumstances within

---

[22] Deposition of James Thomas (June 11, 2021) Pg. 78:21-79:7, 80:7-82:2, 95:4-97:3.

[23] Deposition of Billy Walker Pg. 46:15-48:9; Deposition of Joe (Reab) Simoneaux, Jr. Pg. 39:13-41:9, 43:20-25.

[24] *Danna v. Purgerson*, 760 Fed.Appx. 275 (5th Cir., 2019) at 278 " . . . as we have often said, "[p]robable cause does not require certainty."" (Citations omitted).

[25] *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009).

[26] *Piazza v. Mayne*, 217 F.3d 239, 245–46 (5th Cir. 2000) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)), see also *Lockett v. New Orleans City*, 607 F.3d 992, 998 (5th Cir. 2010).

[27] *Roten v. City of Minden*, CV 16-0381, 2017 WL 1398655, at *5 (W.D. La. Apr. 18, 2017), citing *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir. 1990)

[28] *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 206 (5th Cir. 2009).

[29] *Sam v. Richard*, 887 F.3d 710, 715 (5th Cir. 2018).

a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense."[30] Similarly, a false-arrest claim under Louisiana law requires the plaintiff to show the officer acted without reasonable cause, which "exists when the facts and circumstances within the arresting officer's knowledge, and of which he has reasonable trustworthy information, are sufficient to justify an average man of caution in the belief that a [crime] has been committed."[31]

As noted regarding Count 3, supra, there was probable cause to believe that the plaintiffs had obstructed a roadway, and that many, though perhaps not all, had resisted arrest. There might have been more accurate charges, such as La. R.S. 14:329.3, for failure to disperse after being commanded to do so, but that is exactly the kind of 20/20 hindsight that is not applied in 1983 suits. The question remains whether the officers made reasonable determinations based on what they knew at that time.

5.  Violation of Fourth Amendment Rights to be Free from Unlawful Search and Seizure (All Plaintiffs against All Defendants)

General detention for investigative purposes is based on reasonable suspicion, which may likewise give rise to a search of the subject for weapons or contraband.[32] Reasonable suspicion can be found even where there is a reasonable mistake of law or fact.[33] While distinguishable from a seizure of the person, a traffic stop is still a 4th Amendment seizure, which requires government officials to act reasonably, not perfectly, and gives those officials "fair leeway for enforcing the

---

[30] *United States v. Castro*, 166 F.3d 728, 733 (5th Cir. 1999) (en banc) (per curiam).
[31] *Kyle v. City of New Orleans*, 353 So.2d 969, 971 (La. 1977); see also La. Code Crim. Proc. Ann. art. 213(A)(3) (authorizing warrantless arrest when "[t]he peace officer has reasonable cause to believe that the person to be arrested has committed an offense").
[32] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)
[33] *Heien v. North Carolina*, 574 U.S. 54, 135 S.Ct. 530 (2014)

law."[34] Searches and seizures based on mistakes of fact may be reasonable. The limiting factor is that "the mistakes must be those of reasonable men."[35]

The officers knew that the protest had been going on for an extended time, and the public address system on the BRPD vehicle giving orders to disperse was audible at a long distance. When the plaintiffs were seized, the standoff was over. The search of Tammy Cheney's vehicle was based on seeing a small child and a dog locked in a car in south Louisiana on an evening in July, because it's in plain view, a hazard, and life threatening. Other plaintiffs claim to have been searched for weapons, but no excessive search is pled in the Third Amended Complaint.

6.  Excessive Force (All Plaintiffs against All Defendants)

Plaintiffs allege the use of excessive force by the officers making arrests, at Paragraphs   of the Third Amended Complaint. To prevail on an excessive force claim, a plaintiff must demonstrate the three elements: (1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable.[36] The injury element to support an excessive force claim "must be more than a de minimis injury and must be evaluated in the context in which the force was deployed."[37]

As set forth in Section f., the plaintiffs' responses to discovery propounded by the City/Parish demonstrate that for most plaintiffs, no significant injury was suffered. The plaintiffs' responses further fail to establish a causal link between the police conduct and the injuries claimed. The exhibits presented show minimal force being used, without strikes, hard empty hand

---

[34] *Heien*, supra at 60-61. To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them "fair leeway for enforcing the law in the community's protection." *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).
[35] *Heien*, supra at 61, citing *Brinegar*,supra, at 176, 69 s.CT. 1302.
[36] *Cass v. City of Abilene*, 814 F.3d 721, 731 (5th Cir. 2016) (quoting *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000)) (internal quotation marks omitted).
[37] *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001)

technique, use of batons or chemical sprays, no Tasers were fired, and no firearms were discharged. The LRAD complained of was ineffective, and the officers gave up on using it.[38]  Plaintiffs cannot show an excessive use of force with minimal injury and an absence of force applied by the officers.

### 7.   Failure to Intervene (All Plaintiffs Against All Defendants.)

The 5th Circuit has accepted that an officer may be liable under  § 1983 when he is present at the scene of a constitutional violation by another officer and "does not take reasonable measures to protect" a person from the other officer's violation of the person's constitutional rights.[39]  This theory of liability against officers "most often applies in the context of excessive force claims, [but] other constitutional violations also may support a theory of bystander liability."[40]

Generally, to prevail on a failure to intervene/bystander liability claim against an officer, the plaintiff must prove that the defendant officer (1) knows that a fellow officer is violating an individual's constitutional rights; (2) is present at the scene of the constitutional violation; (3) has a reasonable opportunity to prevent the harm; and (4) chooses not to act.[41]  When the alleged constitutional violation by the other officer is excessive force, important considerations in deciding whether these elements are met are whether the defendant officer (1) observed the use of the alleged excessive force or (2) had sufficient time to prevent the use of excessive force.[42]

In Paragraphs 298 and 299 of the Third Amended Complaint, plaintiffs make the conclusory allegations that the defendants "stood by without intervening to prevent the violation

---

[38] Deposition of Myron Daniels Pg. 38:9-39:3; Deposition of JD Leach Pg. 140:24-142:9; Deposition of Thomas Morse, Pg. 27:23-29:4, 30:15-31:12, 40:21-41:18.

[39] *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013); see also *Hale v. Townley*, 45 F.3d 914 (5th Cir. 1995); *Sanchez v. City of Chicago*, 700 F.3d 919, 926 (7th Cir. 2012); *Stevenson v. City of Seat Pleasant*, 743 F.3d 411, 416–19 (4th Cir. 2014).

[40] *Whitley*, 726 F.3d at 646 n.11.

[41] *Whitley*, 726 F.3d at 646.

[42] See *Tufaro v. City of New Orleans*, 2004 WL 1920937 at *4 n. 20, 2004 U.S. Dist. LEXIS 17146 at *12 n.20 (E.D. La. 2004), citing *Lanigan v. Vill. of E. Hazel Crest*, 110 F.3d 467, 477 (7th Cir. 1997).

of Plaintiffs' constitutional rights under the First, Fourth and Fourteenth Amendments, even though they had the opportunity and duty to do so." The defendants disagree – there was no First Amendment violation, as set forth as to Counts 1 and 2, and so no duty to intervene would be invoked as to those alleged violations. The seizure, detention, searches, and ultimately arrests, were supported by reasonable suspicion and/or probable cause. The search of Tammy Cheney's vehicle was a clear "plain view" search, in that the officers identified a small child and dog locked in a vehicle with no adult supervision. Finally, the officers understand their duty to intervene to prevent Constitutional violations, and are trained in their duty to intervene.[43]

8.  Civil Conspiracy to Violate Civil Rights (All Plaintiffs Against All Individual Defendants)

At Paragraphs 301-306, plaintiffs allege civil conspiracy to violate civil rights, to wit, conspiring to "unlawfully detain, arrest, and imprison the Plaintiffs, knowing they lacked probable cause to do so, and for the purpose of impeding Plaintiffs from exercising their First Amendment rights to protest by engaging in non-disruptive speech in support of an issue of pressing public importance." (Emphasis added). 42 U.S.C. 1985 provides for three causes of action, one specific to interference with federal officers, one specific to parties and witnesses who seek to attend or testify in federal court, and the third prohibits private conspiracies to deprive persons of equal protection of the laws, which appears to be the operative section for this count.

To prevail on a claim under Section 1985(3), plaintiffs must establish four elements:

(1) a conspiracy;

(2) to deprive the plaintiff of the equal protection of the laws;

---

[43] Deposition of Thomas Morse, Pg. 82:18-86:21;

(3) an act in furtherance of the conspiracy; and

(4) a resulting injury.[44]

The Third Amended Complaint asserts the existence of this conspiracy, using the words conspiracy, conspired, and conspirator, without any factual allegations of the nature or scope of the alleged conspiracy. The language used is colorful and hyperbolic, but there is an absence of proof, and indeed, the declaration of J.D. Leach[45] that no such conspiracy existed, and the testimony of former Chief Dabadie that he was given updates regarding Sunday, July 10, 2016, but gave no instructions,[46] creates a disconnect with the supposed "supervisory level" defendants. The totality of the exhibits and deposition testimony show that this was ordinary police work, an effort to keep peace on the streets of the city, that the plaintiffs were ordered to disperse and refused to do so, resulting in their arrests.

9.    *Monell* Claim (All Plaintiffs Against Policymaker Defendants)

Municipalities and other bodies of local government are considered "persons" who may be sued directly under § 1983.[47] However, "a municipality cannot be held vicariously liable for the constitutional torts of its employees or agents."[48] In other words, "a municipality cannot be held liable under § 1983 on a respondeat superior theory."[49] Thus, ordinarily, municipal liability must be based on a municipal "policy" or "custom" that caused the plaintiff's injury.[50]

---

[44] *United Broth. of Carpenters and Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 828-29, 103 S. Ct. 3352, 3356, 77 L.Ed.2d 1049 (1983).
[45] Incorporated from Travis Day v. City of Baton Rouge, et al. 17-CV-328-JWD-EWD, ECF Doc. 109-15.
[46] Deposition of Carl Dabadie, Pg. 45:3-48:4.
[47] *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).
[48] *Gros v. City of Grand Prairie*, 181 F.3d 613, 615 (5th Cir.1999).
[49] *Monell*, 436 U.S. at 691, 98 S.Ct. 2018.
[50] *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

Plaintiffs list ten (10) supposed policies as sub-parts to Paragraph 254, at Pages 69-70 of the Third Amended Complaint, followed by three paragraphs of conclusory allegations regarding the "policies, procedures, practices, customs, and usages" as the moving force behind the plaintiffs' alleged injuries. However,

### 10. Violation of the Louisiana Constitution (All Plaintiffs Against All Defendants)

As noted in Counts 1, 2, and 3, a defense to a federal constitutional claim for speech, assembly, or the press, is likewise a defense to a Louisiana constitutional claim. Defendants would suggest that false arrest was addressed in Count 4, and that the defense to Count 5 would suffice for the state constitutional claim regarding search and seizure.

### 11. Intentional and Negligence State Torts - Infliction of Emotional Distress, Negligent Infliction of Emotional Distress, Assault, Battery, False Imprisonment, Malicious Prosecution, and Negligence (All Plaintiffs Against All Defendants)

The plaintiffs allege state law tort liability through application of the Louisiana Civil Code, at Paragraphs 318-322 of the Third Amended Complaint.

***Intentional/Negligent Infliction of Emotional Distress***

Louisiana law provides that intentional infliction of emotional distress constitutes: "(1) extreme and outrageous conduct by the defendant; (2) severe emotional distress suffered by the plaintiff; and (3) the intent by the defendant to inflict severe emotional distress or the knowledge that severe emotional distress was certain or substantially certain to result from the defendant's

conduct."[51] All three elements are required for a viable intentional infliction of emotional distress claim.[52]

While plaintiffs have alleged perjured and fabricated Affidavits of Probable Cause, the officers preparing the affidavits of probable cause believed at the time that they were conducting themselves within the boundaries of the law, and at least some of the affidavits of probable cause were prepared by officers with knowledge of the violations, as set forth in Count 5. The reference to Tammy Cheney is inapposite, as Ms. Cheney settled her claims with the City/Parish defendants. Several plaintiffs have alleged brief counseling, and a few have claimed longer periods of counseling for emotional trauma, anxiety, and so forth, but few if any have tried to show any causation linking the supposed trauma and distress to the conduct of the defendants. Furthermore, there is no evidence to show the intent of the officers on scene to inflict emotional distress, merely to clear the roadways and prevent the protesters from taking over the interstate.

Negligent infliction of emotional distress is evaluated using the duty-risk analysis. As explained by Louisiana's First Circuit,

> The duty-risk analysis is used to assist our courts in determining whether one may recover under LSA–C.C. art. 2315. For liability to attach under a duty-risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) actual damages (the damages element). A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability. However, this recovery has been limited to cases involving the "especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious."

---

[51] Gressett v. Southwest Airlines Co., 216 F. Supp. 3d 743, 748 (E.D. La. 2016) (citing White v. Monsanto Co., 585 So. 2d 1205, 1209 (La. 1991)).
[52] Id.

> (*Barrino v. E. Baton Rouge Par. Sch. Bd.,* 96-1824 (La. App. 1 Cir. 6/20/97), 697 So. 2d 27, at 33-34, internal citations omitted.)

Louisiana's First Circuit has further explained that as regards police officers, ". . . the scope of an officer's duty to act reasonably under the circumstances does not extend so far as to require that the officer always choose the "best" or even a "better" method of approach."[53]

As always, the touchstone of police interactions is reasonableness. The behavior described, both as intentional and negligent infliction of emotional distress does not rise to the stringent levels of "extreme and outrageous" behavior by the defendants. In order to recover for abuse of this sort, "The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. Persons must necessarily be expected to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind."[54]

### Assault and Battery

As explained by Louisiana's Second Circuit,

> To constitute an assault, threats, coupled with the present ability to carry out the threats, are sufficient when one is placed in reasonable apprehension of receiving an injury. Battery is an intentional offensive contact with another person. The intention need not be malicious nor an intent to inflict actual damage. It is sufficient if the actor intends to inflict an offensive contact without the other's consent. Not every intentional, nonconsensual contact is a battery.
> (*Johnson v. English*, 34,322 (La. App. 2 Cir. 12/20/00), 779 So. 2d 876 at 880, citations omitted.)

As to police use of force, Louisiana law looks at a number of factors to determine the reasonableness of the force used and to determine if a duty was breached: (1) the known character

---

[53] *Syrie v. Schilhab* 96-1027 (La. 5/20/97) 693 So.2d 1173 at 1177.
[54] *White v. Monsanto Co.*, 585 So. 2d 1205 (La. 1991) at 1210.

of the arrestee, (2) the risks or dangers faced by the officers, (3) the nature of the offense, (4) the chance of escape if that means of force is not employed, (5) the existence of alternative methods of arrest, (6) the physical strength, size and weaponry of the officers as compared to the arrestee, and (7) the exigencies of the moment.[55]

Under the circumstances presented, where the officers have been pelted with bottles and stones, the large numbers of protesters whose status as armed or unarmed is unknown, the possibility of being separated and outnumbered in a physical conflict, and the officers not using weapons, whether lethal or non-lethal, all indicate a reasonable use of force.

### *False Imprisonment*

Addressed in Count 4, supra.

### *Malicious Prosecution*

It is well established that the District Attorney declined to prosecute these cases.[56] Defendants suggest that the demonstration of probable cause as to Count 4, and as shown by the statement of undisputed material facts, present a suitable defense to the claim of malicious prosecution, as ""probable cause to arrest 'is an absolute defense to any claim against police officers for wrongful arrest, false imprisonment, or malicious prosecution.""[57]

### *General Negligence*

---

[55] *Kyle v. City of New Orleans*, 353 So.2d 969, 973 (La.1977).
[56] *Travis Day v. City of Baton Rouge, et al*. 17-CV-328-JWD-EWD, ECF Doc. 145, at Pg. 46.
[57] *McMasters v. Dep't of* Police, 2013-0348 (La. App. 4 Cir. May 15, 2015); 172 So.3d 105,  116-117.

For Plaintiffs to recover on their state law negligence claims they must show that (1) the Defendants' conduct was the cause in fact of the harm, (2) the Defendants owed a duty of care to plaintiffs, (3) the duty was breached, and (4) the risk was in the scope of harm afforded by the duty.[58] As noted above, ". . . the scope of an officer's duty to act reasonably under the circumstances does not extend so far as to require that the officer always choose the "best" or even a "better" method of approach."[59]

The complaint here is generic and general, and the evidence does not support a finding of negligence. The officers were faced with an unprecedented event, had reliable information, known to all, of an impending attempt to take over the interstate. With hundreds of protesters lining the streets, over an hour of trying to convince them to depart, and the generally nominal injuries claimed by plaintiffs, the defendants herein cannot be seen as negligent.

### 12. Vicarious Liability (All Plaintiffs Against All Supervisor Defendants)

Louisiana Civil Code article 2320 provides

> Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed.
> Teachers and artisans are answerable for the damage caused by their scholars or apprentices, while under their superintendence.
> In the above cases, responsibility only attaches, when the masters or employers, teachers and artisans, might have prevented the act which caused the damage, and have not done it.
> The master is answerable for the offenses and quasi-offenses committed by his servants, according to the rules which are explained under the title: Of quasi-contracts, and of offenses and quasi-offenses.

The Louisiana Supreme Court has explained the burden of proof as follows "With regard to imputed fault, the foundation of liability under respondeat superior is the employee's tort. FRANK

---

[58] *Batiste v. Theriot*, 458 Fed. Appx. 351, 359 (5th Cir., 2012).
[59] *Syrie v. Schilhab* 96-1027 (La. 5/20/97) 693 So.2d 1173 at 1177.

L. MARAIST & THOMAS C. GALLIGAN, JR. LOUISIANA TORT LAW § 13.02(2d ed. 2016).

See also La. Civ. Code art. 2320. In order for liability to attach to the employer under this doctrine,

there must be some fault on the part of the employee."[60]

As set forth in Count 12, plaintiffs cannot meet their burden of proof to show the underlying

torts, which are a necessary prerequisite to application of respondeat superior.

13. Indemnity (All Plaintiffs Against All Agency Defendants)

Count 13 appears to a restatement of vicarious liability through Louisiana Civil Code

Article 2320 in Count 12. Custodial liability can be found for use of defective equipment, by way

of Louisiana Civil Code Article 2317, but such liability does not appear to be pled by plaintiffs.

### *Conclusion*

Plaintiffs cannot meet their burden of proof, and the defendants are entitled to qualified

immunity. Plaintiffs' claims should be dismissed as a matter of law, at plaintiffs' cost.

By Attorneys:
**Anderson O. Dotson**
**Parish Attorney**

*/s/ Joseph K. Scott, III*
**Joseph K. Scott, III (Bar Roll #28223)**
**Deelee S. Morris (Bar Roll #28775)**
**A. Gregory Rome (Bar Roll #21062)**
**222 St. Louis Street, 9th Floor**
**Baton Rouge, LA 70802**
**Telephone: (225) 389-3114**
**Facsimile:   (225) 389-8736**
**Email:** jkscott@brla.gov
**Email:** dsmorris@brla.gov
**Email:** grome@brla.gov

---

[60] *Coulon v. Endurance Risk Partners, Inc.* 16-1146, p. 8 (La. 3/15/17), 221 So.3d 809, 813-14,

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

**BLAIR IMANI, ET AL**                              **CIVIL ACTION**

**VERSUS**                                          **NO.: 3:17-CV-439-JWD-EWD**

**CITY OF BATON ROUGE, ET AL**


**CERTIFICATE OF SERVICE**

    I hereby certify that a copy of the foregoing *Memorandum in Support of Motion for Protective Order* was this date electronically filed with the Clerk of Court using the Court's CM/ECF system.  Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.  Notice will be mailed to any party or counsel not participating in the Court's CM/ECF system by this date depositing same in the United States Mail, first class postage prepaid, and properly addressed.

    Baton Rouge, Louisiana this 26th day of March, 2021.


        */s/ Joseph K. Scott, III*
        **JOSEPH K. SCOTT, III**