UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


BLAIR IMANI, ET AL

DOCKET NO.
17-cv-00439-JWD-EWD

VERSUS


CITY OF BATON ROUGE,
ET AL


       30(b)(6) Deposition of the City
of Baton Rouge through its designated
representatives, MICHAEL BARROW and JAMES
DARRON LEACH, taken on August 18, 2021, via
Zoom Videoconference.

APPEARANCES:

MOST & ASSOCIATES
BY: WILLIAM MOST, ESQ.
AND DAVID LANSER, ESQ.
201 St. Charles Avenue
Suite 114, #101
New Orleans, Louisiana  70170
Phone: (504)533-4521
Email: david.lanser@gmail.com
     REPRESENTING PLAINTIFFS
(IMANI V. CITY OF BATON ROUGE)


RODERICK AND SOLANGE
MacARTHUR JUSTICE CENTER
BY:  ERIC FOLEY, ESQ.
JIM CRAIG, ESQ.
HANNAH LOMERS-JOHNSON, ESQ.
MANDISA MOORE-O'NEAL, ESQ.
4400 S. Carrollton Avenue
New Orleans, Louisiana  70119
Phone: (504)684-2364
Email: eric.foley@macarthurjustice.org
     REPRESENTING PLAINTIFFS
(SMITH V. CITY OF BATON ROUGE AND
BATISTE-SWILLEY V. CITY OF BATON ROUGE)

JOSEPH SCOTT, ESQ.
222 St. Louis Street
Baton Rouge, Louisiana  70802
Phone: (225)389-3114
Email: dsmorris@brla.gov
     REPRESENTING BATON ROUGE CITY
POLICE DEPARTMENT OFFICERS

1    APPEARANCES (CONTINUED):

2    BURGLASS & TANKERSLEY.
     BY:  GREGORY FAHRENHOLT, ESQ.

3    5213 Airline Drive
     Metairie, Louisiana  70001

4    Phone: (504)836-0408
     Email: gfahrenholt@burglass.com

5        REPRESENTING INDIVIDUAL
     STATE POLICE TROOPERS

6

7    RODNEY & ETTER
     BY: JOHN ETTER, ESQ.

8    935 Gravier Street
     Suite 2110

9    New Orleans LA, 70112
     Phone: (504) 483-3224

10   Email: rjr@rodneylaw.com
         REPRESENTING MAX GELLER

11

12

13

14

15   REPORTED BY:

16   Cecilia M. Henderson
     Certified Court Reporter

17

18

19

20

21

22

23

24

25

1        E X H I B I T   I N D E X

2                                              Page

3   Exhibit GGGGGGG ..........................13
    Exhibit K ................................15
4   Exhibit L ................................34
    Exhibit ZZZZZZZ ..........................40
5   Exhibit AAAAAAAAA .......................140
    Exhibit LLLLLLL .........................232
6   Exhibit AAAAA ...........................241

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  S T I P U L A T I O N

2

3      It is stipulated and agreed by and

4  between counsel that the 30(b)(6) deposition

5  of CITY OF BATON ROUGE through its designated

6  representatives, MICHAEL BARROW an JAMES

7  DARRON LEACH, is hereby being taken under

8  Federal Rules of Civil Procedure for all

9  purposes in accordance with law;

10      That the formalities of filing and

11  certification are hereby waived; that the

12  formalities of reading and signing are hereby

13  specifically not waived;

14      That all objections, except those as

15  to the form of the question and/or

16  responsiveness of the answer, are hereby

17  reserved until such time as this deposition or

18  any part thereof may be used in evidence.

19      *   *   *   *   *   *   *   *

20      CECILIA M. HENDERSON, Certified Court

21  Reporter, in and for the State of Louisiana,

22  officiated in administering the oath to the

23  witness.

24

25

1           MICHAEL BARROW, 9000 AIRLINE

2    HIGHWAY, BATON ROUGE, LOUISIANA, AFTER FIRST

3    BEING DULY SWORN IN THE ABOVE-ENTITLED MATTER,

4    DID TESTIFY AS FOLLOWS:

5           MR. MOST:

6               Good morning, everybody.  Joe,

7           can we stipulate that this 30(b)(6)

8           deposition was properly noticed and

9           the court reporter is duly qualified?

10          MR. SCOTT:

11              We'll join in that stipulation

12          for purposes of this deposition.

13          MR. MOST:

14              Thank you.

15                  EXAMINATION

16   BY MR. MOST:

17       Q   Good morning, Lieutenant Barrow.  My

18   name is William Most.  I'm an attorney with --

19   that's representing the plaintiffs in the

20   Imani case, and I'm joined here by two

21   attorneys representing other plaintiffs in

22   other cases and an attorney for the State

23   Police defendants.

24              I'll be asking you some questions,

25   and then with each topic -- what I'm thinking

1   is, we'll cover each topic.  I'll ask the

2   questions.  I'll hand it over to any other

3   attorneys to ask any questions on that topic,

4   and then we'll move it on to the next topic,

5   unless anyone has a better plan.

6          Lieutenant, could you give us your

7   full name and rank for the record?

8      A    Lieutenant Michael Barrow, Baton

9   Rouge Police Department.

10     Q    Great.  Lieutenant, have you ever

11  given a deposition before?

12     A    No.

13     Q    Do you understand that the answers

14  you give here today are under oath and have

15  the same force and effect as if we were in a

16  courtroom with a judge and jury?

17     A    Yes.

18     Q    And is there anything today --

19  whether it's illness, medication you're

20  taking, fatigue or anything else -- that would

21  prevent you from giving truthful and complete

22  answers to our questions?

23     A    No.

24     Q    And this is a deposition.  We'll be

25  asking you questions for a while, but it

1    doesn't have to be continuous.  We can take

2    breaks.  So if you need to take five, take ten

3    to use the restroom, get a drink of water,

4    that's perfectly okay.  Please just let your

5    attorneys know, or me, and we'll take a short

6    break.  However, I'll tell you in advance that

7    my practice is, after each break, to ask you

8    who you talked to -- even if it's your

9    attorney -- and what you talked about, even if

10   it's your attorney, and what documents did you

11   reviewed during the break.  So that's a

12   heads-up.

13        A    I understand.

14        Q    One thing that is important is that,

15   if I or another attorney asks a question that

16   is not clear or you don't understand the

17   question, will you agree to let us know that

18   that's the case, rather than just trying to

19   answer it anyway?

20        A    Yes.

21        Q    And do you have a general sense for

22   what cases you're here for today?

23        A    No, I don't.  I understand it's

24   multiple people, but I don't know who.

25             MR. SCOTT:

```
 1              (INAUDIBLE)
 2         THE COURT REPORTER:
 3              I'm sorry.  I'm not hearing you.
 4         MR. SCOTT:
 5              I'm asking him if he knows what
 6         time period or events these cases
 7         relate to?
 8         THE WITNESS:
 9              No, I don't.  I strictly worked
10         1800 to 0600 for all the events that
11         happened during that time.
12         MR. SCOTT:
13              Would that be July of 2016?
14         THE WITNESS:
15              Yes.
16    BY MR. MOST:
17         Q    So you understand, Lieutenant, that
18    you're here for a number of cases in which
19    protesters are suing the City of Baton Rouge
20    and other defendants for the events of
21    July 2016; do you understand that?
22         A    Yes.
23         Q    And this is -- this deposition is a
24    little different than some depositions.  Some
25    depositions, we're asking questions of a
```

1  person, and they give their own answers.  Like

2  you know, if I'm deposed, I'll be giving

3  answers for William Most.  However, this is

4  what's called a 30(b)(6) deposition.  And so

5  we are deposing the City of Baton Rouge.  Of

6  course, that's not a person.  The City has

7  designated you to give answers for the City of

8  Baton Rouge.  Do you understand that?

9       A    Yes.

10      Q    So when I ask a question today -- or

11  one of the other attorneys ask a question --

12  if we ask a question to you, Lieutenant, we're

13  really asking a question to the City Baton

14  Rouge.  Do you understand?

15      A    Yes.

16      Q    And when you give an answer, you're

17  not just giving the answer for Lieutenant

18  Barrow; you're giving the answer for the City

19  Baton Rouge.  Do you understand that, as well?

20      A    Yes.

21      Q    And if I say, "You" today, what I

22  really mean is the City Baton Rouge.  Will you

23  understand that?

24      A    Yes.

25      Q    And one other way that this is a

little different than a normal deposition is
that a normal deposition, "I don't know" is a
perfectly good answer.  Because people
sometimes don't have recollections of things.
However, in a 30(b)(6) deposition, the City is
obligated to provide someone who has looked
into the answers and figured it out, using
some diligence.  And so, generally, "I don't
know" is not typically a sufficient answer in
a 30(b)(6) deposition.  Do you understand
that?

    A    Yes.

    Q    Lieutenant, aside from talking to
attorneys, did you talk to anyone to prepare
for this deposition?

    A    No.

    Q    And did you look at any documents to
prepare for this deposition?

    A    No.

    Q    Okay.  So did you do anything to
prepare for this deposition?

    A    No.  Like I said, I really don't know
what I'm testifying to or what, I guess.  I'm
waiting to hear the questions.  I'm not sure
what's asked of me.

1    Q    Okay.  So if I understand you
2    correctly, you've done no preparation in
3    anticipation of this deposition, agreed?
4    A    Agreed.
5         MR. SCOTT:
6              Well, he did speak to his
7         attorneys.
8    BY MR. MOST:
9    Q    Okay.  That's fair.  I won't ask you
10   the context of the communications with your
11   attorneys.  But did you talk to some attorneys
12   to prepare today?
13   A    Yes.
14   Q    Approximately, how long did that
15   take?
16   A    About ten minutes.
17   Q    So if I understand you correctly, the
18   only preparation you've done for this
19   deposition today is approximately ten minutes
20   of discussion with attorneys, agreed?
21   A    Agreed.
22   Q    Do you know what topics you're here
23   to testify about?
24   A    I know crowd control.  I think he
25   mentioned something about kettling, which I'm

1 not familiar with.

2     Q    I'm going to pull up Exhibit GGGGGGG.

3 This is a notice of deposition.  Have you ever

4 seen this document before, Lieutenant?

5     A    No.

6     MR. MOST:

7         Okay.  All right.  So taking the

8         first topic -- and just for the

9         record, before we went on the record,

10         Joe Scott represented to us that

11         Lieutenant Michael Barrow would be

12         prepared to testify about Topics 2F,

13         as in Frank; 8D, as in dog; 9A, as in

14         apple; and, perhaps, 9C, as in cat.

15         Is that your understanding,

16         Mr. Scott?

17     MR. SCOTT:

18         Those are the ones I think he's

19         qualified to speak to.  And as I

20         said, I'm not entirely clear on

21         kettling, but we can try.

22 BY MR. MOST:

23     Q    Going back to Document GGGGGGG, Topic

24 2F is "Policies and Procedures regarding any

25 of the following topics:  Crowd control."

1          Lieutenant Barrow, are you prepared
2    today to testify about that topic?
3          A    Yes.
4          Q    And, Lieutenant, what is your current
5    role with the Baton Rouge Police Department?
6          A    I'm the Violent Crimes Unit
7    Commander.
8          Q    How long have you been with the Baton
9    Rouge Police Department?
10         A    Twenty-eight years.
11         Q    Have you served with any other law
12   enforcement departments beside Baton Rouge
13   Police Department?
14         A    East Baton Rouge Sheriff's Office.
15         Q    How long were you an officer with the
16   East Baton Rouge Sheriff's Office?
17         A    Two years.
18         Q    Did you work with any other law
19   enforcement offices?
20         A    No.
21         Q    This is a question that I ask to
22   every deponent.  It's not specific to you.
23   Lieutenant, have you ever been arrested
24   before?
25         A    No. (INAUDIBLE)

1           MR. SCOTT:

2                 Object.  As you pointed out,

3           this is a 30(b)(6).

4           MR. MOST:

5                 Sure.  Objection noted.

6    BY MR. MOST:

7      Q    Was your answer no, Lieutenant?

8      A    Yes.

9      Q    Okay.  So, Lieutenant, crowd control

10   is something that Baton Rouge Police

11   Department has to be prepared for, correct?

12     A    Yes.

13     Q    Baton Rouge is a relatively large

14   city and it hosts large events, including

15   sporting events, correct?

16     A    Correct.

17     Q    So crowd control is something that

18   the Baton Rouge Police Department has policies

19   and procedures in place to deal with, correct?

20     A    Yes.

21     Q    I'm going to pull up Exhibit K.  This

22   is the "Baton Rouge Police Department Policy

23   and Procedure Manual," correct?

24     A    Yes.

25     Q    So this document is what contains

1    official Baton Rouge Police Department policy

2    about various topics, correct?

3        A    Yes.

4        Q    And Baton Rouge is home to LSU,

5    correct?

6        A    Yes.

7        Q    And LSU frequently has football games

8    with crowd attendance of -- I don't even know.

9    Is it thousands or tens of thousands?

10       A    I'm not sure on that.  I know it's

11   thousands.

12       Q    Okay.  So Baton Rouge is frequently a

13   host to very large events every year, correct?

14       A    Yes.

15       Q    And sometimes LSU games, if there's a

16   substantial victory or substantial loss, can

17   result in sometimes unruly crowds, correct?

18       A    Yes.

19       Q    Those crowds sometimes flow into the

20   streets of Baton Rouge, correct?

21       A    Sometimes, yes.

22       Q    Sometimes those crowds block the

23   streets of Baton Rouge, correct?

24       A    No.

25       Q    So it's your testimony that an LSU

1  game crowd has never blocked a street of Baton

2  Rouge?

3      A    Not to my knowledge.

4      Q    Has an LSU game crowd ever blocked a

5  public passageway, other than a street;

6  perhaps, a sidewalk?

7      A    That -- it's possible.  Like I say,

8  I'm not sure if they did.  If they did, it was

9  not that serious.

10     Q    So you're not sure if an LSU crowd

11  has ever blocked a sidewalk ever?

12     A    It's just a lot of them walking, so

13  it's a possibility they have.

14     Q    Okay.  Are Baton Rouge Police

15  Department officers deployed to do crowd

16  control for LSU games?

17     A    If it gets to where the crowd is

18  uncontrollable, they are -- they will be.

19  They're on standby for that.  They can get

20  called out just in case they have to deal with

21  a crowd at LSU or any other event that's

22  hosted at Baton Rouge.

23     Q    So whenever there's an LSU game,

24  Baton Rouge Police Department is on standby

25  for crowd control and prepares to do crowd

1    control; is that correct?

2         A    That's correct.

3         Q    And what steps does that preparation

4    take for Baton Rouge Police Department?  Do

5    they -- what do they do to get prepared to be

6    on standby for crowd control?

7         A    Whoever is in charge from the Command

8    Center out there, if they see a need for it,

9    they'll give a call to the Mobile Field Force

10   Commander and say:  Hey, we have a crowd out

11   here that has the potential -- that we can't

12   move them.  With the officers out there, being

13   to the point where those officers can't handle

14   the situation, as a last resort, they'll call

15   Mobile Field Force.

16        Q    I understand.  So whenever there's an

17   LSU game, some Baton Rouge police officers are

18   there, correct?

19        A    Yes.

20        Q    And then more officers are on standby

21   in case backup is needed to do crowd control,

22   correct?

23        A    Yes.

24        Q    And the officers who are there for

25   each LSU game, they're there to provide

1  security and to do some traffic or crowd

2  control to the extent of their abilities,

3  correct?

4       A    Correct.

5       Q    And so every -- it sounds like -- let

6  me back up.  You're saying the Mobile Field

7  Force is on standby for every LSU game?

8       A    They got days that they're on-call.

9  They make their on-call for two weeks, meaning

10  it's not just LSU games.  Anything Baton Rouge

11  hosts, there's a team on standby, just in

12  case.

13       Q    Yeah.  I understand.  So every time

14  there's a large event in Baton Rouge,

15  including LSU games, there is a contingent of

16  Mobile Field Force that is prepared and on

17  standby in the event that crowd control is

18  needed; is that accurate?

19       A    Yes.

20       Q    And that preparation that the Mobile

21  Field Force does for each of those events,

22  does it include printing up pre-prepared

23  Affidavits of Probable Cause?

24       A    No.

25       Q    Okay.  Does it involve the preparing

1    of an LRAD device?  Are you familiar with that

2    what is?

3         A    I've heard it, but it's been a while,

4    so I'm not sure.  Because I hadn't been on the

5    team in four years.  I'm not remembering

6    exactly what it is.

7         Q    Okay.  If I told you that the LRAD

8    device was a device that has been mounted on

9    top of a BearCat that emits a loud noise to

10   disperse people, would that remind you of what

11   that is?

12        A    It reminds me.  That's something

13   that's not controlled by the Mobile Field

14   Force team.  That's controlled by the

15   Department of Special Response, the SWAT team.

16   They have all that.  They can give commands to

17   deploy that.

18        Q    Is the SWAT team put on standby every

19   time there's a special event or LSU game in

20   Baton Rouge?

21        A    They're just like the Mobile Field

22   Force Unit.  Every day of the week, there's

23   somebody on-call for SWAT and Mobile Field

24   Force.

25        Q    Do you know anything about what the

1    SWAT team's preparation is to be on standby

2    for special events?

3              MR. SCOTT:

4                   William, I have proffered

5              Lieutenant Barrow because he was

6              Commander of Mobile Field Force in

7              2016.  I believe that the next

8              deponent is more qualified to respond

9              to SRT and SWAT questions.

10             MR. MOST:

11                  Okay.  We'll circle back to

12             that.

13   BY MR. MOST:

14        Q    Okay.  I'm looking at page 657 of

15   Exhibit K.  This is the Baton Rouge Police

16   Department Policy on special events, agreed?

17        A    Yes.

18        Q    It says:  "For the purpose of this

19   order, a special event is any planned event

20   likely to draw large crowds necessitating

21   police manpower dedicated specifically to

22   control traffic and/or provide security,"

23   correct?

24        A    Correct.

25        Q    So a large protest would fall under

1  the definition of a special event here,

2  correct?

3      A    Yes.

4      Q    So the Baton Rouge Police Department

5  policy on special events should apply to

6  protests, correct?

7      A    Yes.

8      Q    Subsection VI of this policy

9  describes an "After-action Critique."  Do you

10 see that?

11     A    Yes.

12     Q    Do you see it requires the incident

13 commander and his commanders to conduct a

14 post-incident review after a special event

15 deployment?

16     A    Yes.

17     Q    I don't think we specifically talked

18 about it.  You understand that there were

19 protests in July of 2016 in Baton Rouge?

20     A    Yes.

21     Q    And you were -- do you I understand

22 that you were the head of Mobile Field Force

23 at that time?

24     A    Yes.

25     Q    Was a post-incident review or

1  after-action critique conducted after the 2016

2  protests?

3      A    I was the Mobile Field Force

4  Commander.  I was not the incident commander.

5  That's a separate entity.  The incident

6  commander, he controlled everything.  He

7  called all the shots.  And after that, he took

8  the notes from whatever was done and he had

9  the after-action critique with the higher-ups.

10 It was not something that I was involved in.

11     Q    Okay.  But you're aware that you're

12 -- you're telling me there was an after-action

13 critique?

14     A    Yes.

15     Q    And was there a written document that

16 after-action critique -- was there something

17 written up to do that after-action critique?

18     A    Not being a part of it, I can't

19 answer to say if it was or wasn't.

20     Q    This Subsection VI (A), it says:

21 "Any suggestions for improvement shall be

22 forwarded through the chain of command in

23 writing to the Chief of Police."  Do you see

24 that?

25     A    Yes, sir.

1    Q    So that suggests that, if there were

2    any suggestions for improvement for this

3    after-action critique, that would be in

4    writing, agreed?

5    A    Agreed.

6    Q    Do you know if there was any sort of

7    after-action report that you ever saw?

8    A    I have not.

9         MR. SCOTT:

10             For clarification, you didn't

11        see one?

12        THE WITNESS:

13             I didn't see one.

14   BY MR. MOST:

15   Q    So Baton Rouge Police Department also

16   has -- well, let me back up.  So we've

17   established that the Special Event Policy

18   covers protests, agreed?

19   A    Yes.

20   Q    And the Special Event Policy covered

21   the July 2016 protest, agreed?

22   A    Yes.

23   Q    Baton Rouge Police Department also

24   has a policy on civil disorder.  That's page

25   430 of Exhibit K.  Do you see this?

1    A    Yes.

2    Q    And this talks about a civil

3  disorder, riot, which is "A public disturbance

4  that results in injury or damages to persons

5  or property and creates a clear and present

6  danger or injury or damage to persons or

7  property."  Do you see that?

8    A    Yes.

9    Q    And I want to ask about a particular

10  part of the protests in July of 2016.  Do you

11  recall that on Sunday, July 10th, 2016, there

12  was a group of protesters in the vicinity of

13  East and France Streets?

14    A    I wasn't there, but I do recall that.

15    Q    So you're aware of that East and

16  France Street protest?

17    A    Yes.

18    Q    Okay.  Did that East and France

19  Street protest trigger the Civil Disorder

20  Policy or was it -- or did it only fall under

21  the Special Event Policy?

22    A    I would say it would be the Civil

23  Disorder Policy.

24    Q    What would you lead to that

25  conclusion?

1    A   Because of the incident that unfolded

2  out there -- like I said, I wasn't there, but

3  being told about some of the unruliness of the

4  crowd.

5    Q   What unruliness are you talking

6  about?

7    A   Them trying to take over the

8  interstate.

9    Q   Okay.  So let's suppose that that

10  crowd did not ever make it to the interstate.

11  Would it fall under the Civil Disorder Policy?

12    A   I would still say it will, yeah,

13  because it has that potential.

14    Q   So you're saying, any protests that

15  could potentially go to the interstate --

16    A   I'm not saying any protest.  I'm

17  saying that one.

18    Q   So solely based on its proximity to

19  the interstate?

20    A   The proximity and them wanting to do

21  it.

22    Q   So even if the interstate was made

23  inaccessible to that crowd -- well, let me

24  back up.  Let's say the interstate had been

25  made inaccessible to that crowd.  Would it

1    still count as civil disorder?

2         A     Yeah.   In my opinion, I would say it

3    would.

4         Q     Okay.   So even if the interstate was

5    inaccessible, based on the proximity to the

6    interstate, it would be a civil disorder, even

7    if it was otherwise peaceful?

8              MR. SCOTT:

9                   That was not the testimony.   The

10                  testimony was proximity and the

11                  intentions of the crowd.

12             MR. MOST:

13                  So, Joe, that is a speaking

14                  objection.   If you'd like to make a

15                  form objection, saying, "Form

16                  objection," that's sufficient.   I was

17                  asking him a question.   I wasn't -- I

18                  was asking him a question.

19             MR. SCOTT:

20                  I'm sorry.   I thought you were

21                  characterizing the testimony.

22             MR. MOST:

23                  Well, fortunately, what I say is

24                  not anybody's testimony here, only

25                  what Lieutenant Barrow testifies to.

1    BY MR. MOST:

2         Q    So, Lieutenant Barrow, do I

3    understand you correctly that, even if the

4    interstate was made inaccessible to the

5    protesters at East and France, and even if

6    they were otherwise peaceful, solely their

7    proximity to the interstate and the intentions

8    of some protesters to go to the interstate

9    made them a civil disorder?

10        A    In my opinion, I would say, yes, it

11   was civil disorder, because it was not a

12   special event.  Our special events are, like,

13   concerts, games, parades.  That's special

14   events.  That was not a special event.  They

15   gathered for a specific purpose.

16        Q    What was the purpose?

17        A    It was a protest purpose.

18        Q    Right.  So it was a protest for them

19   to speak out against perceived misconduct by

20   the Baton Rouge Police Department, agreed?

21        A    Agreed.

22        Q    And so that made it not fall under

23   the Special Event Policy?

24        A    Correct.

25        Q    And instead fall under the Civil

1  Disorder Policy?

2      A    Correct.

3      Q    So by contrast, if they had gathered

4  together, say, for a church event or to talk

5  about sales of water skis, that would fall

6  under a special event?

7      A    Yes.

8      Q    And so because of that, the City

9  Baton Rouge treated this group at East and

10  France under General Order 291, rather than

11  the Special Event Policy, agreed?

12      A    Yes.

13      Q    All right.  I'm going down to -- so

14  we saw that the Special Event Policy does not

15  directly address specific levels of force,

16  correct?

17      We can go back and look, if

18  necessary.  Let's see, 657.  I'm looking now

19  at now the Special Event Policy.  I'm going

20  through it.  I don't see any headings for

21  specific "Use of Force," do you?

22      A    I don't.

23      Q    By contrast, the Civil Disorder

24  Policy explicitly addresses the potential for

25  non-lethal force and use of deputy force,

1    agreed?

2        A    Agreed.

3        Q    And the Civil Disorder Policy lays

4    out a procedure that is to be followed,

5    correct?

6        A    Yes.

7        Q    And once the first supervisor on

8    scene arrives, they are to there to assist the

9    immediate situation, correct?  That's Step A?

10       A    Correct.

11       Q    And then Step B is:  "If the

12   disturbance is minor or peaceful in nature and

13   adequate resources are available, efforts

14   should be made disperse the crowd," correct?

15       A    Correct.

16       Q    So even if it's a peaceful

17   assemblage, this policy directs the first

18   supervisor to disperse the crowd, correct?

19       A     If he sees the need to disperse it,

20   yes.

21       Q    It doesn't say:  If the need is

22   there.  It says:  "If the disturbance is

23   minor/peaceful in nature and adequate

24   resources are available, efforts should be to

25   made to disperse the crowd."

1          That's a directive to disperse the
2     crowd, correct?
3          A     Yes.
4          Q     So once an assemblage falls under the
5     Civil Disorder Policy, the first supervisor is
6     directed to disperse the crowd, even if it is
7     minor/peaceful in nature, agreed?
8          A     Agreed.
9          Q     All right.  And then after those
10    efforts to disperse the crowd, there's the
11    capacity to apply escalating series of
12    resources to disperse, correct?
13         A     Correct.
14         Q     And I don't see anything in here that
15    gives the supervisor on scene the ability to
16    just leave them alone.  There's a directive to
17    take action, agreed?
18         A     Agreed.
19         Q     Section VII of this civil disturbance
20    policy contemplates mass arrests, correct?
21         A     Correct.
22         Q     So whenever a Baton Rouge has
23    identified -- has characterized an assemblage
24    as civil disturbance, it prepares to conduct
25    mass arrests; would you agree?

1          A     Yes.

2          Q     And you see under Section 4-B, this

3     policy requires that the Incident Commander or

4     other authority to establish communications

5     with demonstration leaders?

6          A     Yes.

7          Q     And it talks about demonstration

8     leaders.  That explicitly anticipates that a

9     demonstration may be a civil disturbance,

10    agreed?

11         A     Agreed.

12         Q     And so -- presumably the supervisors

13    on scene at a civil disturbance are to give

14    orders to the crowd to disperse; is that

15    accurate?

16         A     Yes.

17         Q     Okay.  Should they first try and

18    clear the streets by directing people to clear

19    the streets?

20         A     Yes.

21         Q     And let's suppose people do clear the

22    streets.  Should the person -- should that be

23    sufficient?

24         A     I mean, I'm not -- just as long as

25    they clear the street, is that sufficient?

1    Q    Correct.

2    A    If they clear the streets and stay

3  out, yes.

4    Q    So if protesters clear the streets

5  after being given a command to clear the

6  streets, there's not the justification to

7  sweep in and make arrests, agreed?

8    A    Agreed.

9    Q    And so any protesters who complies

10  with an order to clear the streets should not

11  be arrested by Baton Rouge Police Department,

12  agreed?

13    A    Agreed.

14    Q    And so if there's an order by Baton

15  Rouge Police Department to clear the streets

16  and then protesters move back on to the

17  sidewalks and private property and clear the

18  streets, Baton Rouge Police Department should

19  not say: "Where you're standing isn't good

20  enough," should it?

21    A    If it's not affecting the area that

22  we needed clear, correct.

23    Q    Right.  So if people haven't cleared

24  the streets, Baton Rouge Police Department

25  could say:  "That's not good enough."  But if

1    they have moved back on to -- and cleared the

2    streets, Baton Rouge Police Department should

3    not say:  "That's not good enough."  Agreed?

4        A    Agreed.

5        Q    All right, Subsection V of this

6    policy says:  "When physical arrests of

7    identified leaders and agitators fail to

8    disperse the crowd."  Do you see that?

9        A    Yes.

10       Q    Then it seems to me to suggest that

11   it's BRPD policy to first target identified

12   leaders and agitators, agreed?

13       A    Yes.

14       Q    I'm going to pull up Exhibit L.  Do

15   you see that this is Responses to Discovery

16   Requests in the Imani case?

17       A    Yes.

18       Q    And a number of these responses --

19   you can see, for example, I'm looking at

20   Response to Request Number 7.  It says:  "Law

21   enforcement targeted agitators (persons

22   encouraging others to upset the status to

23   further their cause) and those breaking the

24   law."  Do you see that?

25       A    Yes.

1    Q    Is that a truthful description of the
2  way BRPD acted during the 2016 protests?
3    A    I'd say we talked with those in the
4  crowd breaking the laws and trying to incite,
5  yes.
6    Q    So I understand that it's BRPD policy
7  to target leaders and agitators at a --
8    A    It's not policy.  I mean, but if we
9  find somebody in the crowd that's breaking the
10  law, yeah, we identify them and arrest them
11  and get them out of there.
12    Q    Right.  I'm looking at page 432 of
13  Exhibit K, the Civil Disturbance Policy.  The
14  policy itself talks about identified leaders
15  and agitators, right?
16    A    Yes.
17    Q    So it is BRPD policy to target
18  identified leaders and agitators, agreed?
19    A    Yes.
20    Q    Okay.  And then this other document
21  that we received provides more explanation for
22  what agitators are.  It says:  "Persons
23  encouraging others to upset the status quo to
24  further their cause."  Do you see it?
25    A    I see it.

1      Q    Is that an accurate description of

2    what agitators means in this context?

3      A    Yes.

4      Q    And so request for 57 -- Response for

5    Request Number 57 describes two groups of

6    people that were targeted; one is agitators,

7    and two is those breaking the law, agreed?

8      A    Agreed.

9      Q    And so when we talked about persons

10   encouraging others to upset the status quo to

11   further their cause, we might -- that could

12   include -- or that would include persons

13   leading chants, agreed?

14           MR. SCOTT:

15               Objection.  I think you're

16           calling for a legal conclusion from

17           Lieutenant Barrow.

18           THE WITNESS:

19               What was the question?

20   BY MR. MOST:

21      Q    Lieutenant Barrow, it says:  "Persons

22   encouraging others to upset the status quo,"

23   would that include persons leading chants at a

24   demonstration?

25      A    Not particularly.  Like I say, some

 1   were just chanting.  I mean, that's not

 2   breaking the law.  That's not agitating the

 3   crowd.  It depends on what's being chanted.

 4       Q    What's an example of -- if someone

 5   was chanting --

 6       A    You had them chanting:  "No justice;

 7   "no peace."  That's not agitating the crowd.

 8   But if you have them start with:  "Burning

 9   down the city," yeah, that's a threat.  And we

10   will remove them from the crowd.

11       Q    Okay.  It would have to be a specific

12   threat of violence?

13       A    Yes.

14       Q    It says:  "Persons encouraging others

15   to upset the status quo."  So that would

16   mean -- I'm trying to understand what that

17   means.  "Upset the status quo," meaning

18   calling for a major change to things?

19            MR. SCOTT:

20                 Same objection, William.  You're

21            trying to get his legal conclusion as

22            to a document that you haven't laid

23            any foundation for him to have

24            personal knowledge of.

25

1  BY MR. MOST:

2      Q    Right.  Lieutenant Barrow, I'm just

3  asking you what's your understanding of what

4  this means?  It says:  "Person encouraging

5  others to upset the status quo."  Would you

6  understand that to mean, people calling for a

7  serious change?

8      A    I would assume when they say, "Status

9  quo," yes.

10     Q    So, like, want to see a major change

11 in the politics of Baton Rouge, for example,

12 agreed?

13     A    Agreed.

14     Q    I'm looking at Exhibit K, which is --

15 this is the Baton Rouge Policy and Procedure

16 Manual, right?

17     A    Yes.

18     Q    I'm going to do Control F and I'm

19 going to look up the word "Protests."  Okay.

20 Do you see that the word, "Protests" only

21 appears once in this entire 904-page manual?

22     A    Yes.

23     Q    Okay.  And it's in Policy Number

24 502/01-2, Prisoner Transport Vans.

25     A    Yes.

1     Q   And in the purpose of this policy, it

2  says:  "The prisoner" -- it says:  "The vans

3  may also be used in situations where there are

4  or anticipated to be many arrestees, such as

5  civil disturbances, protests or the service of

6  search and arrest warrants."  Do you see that?

7     A   Yes.

8     Q   It looks like to me, there are three

9  situations in which there are anticipated to

10  be many arrestees; one is civil disturbances,

11  two is protests, and the third is the service

12  of search and arrest warrants?

13     A   Yes.

14     Q   So as far as I can see, the only

15  treatment -- at least the word, "Protest" in

16  this entire manual is in the context of

17  anticipating many arrestees, agreed?

18     A   Yes.

19     MR. MOST:

20         I think this wraps up my

21         questioning for Topic 2-F.

22         Would the MacArthur team have

23         any questions for this?

24     MS. LOMMERS-JOHNSON:

25         Thanks, William.  You've been

1          very thorough.  We don't have many

2          questions here, but I do have a

3          couple.  I just want to go back to

4          the General Order 291.  I'm going to

5          share my screen.  Actually -- you

6          know, I'm going to take a 60-second

7          break.  Sorry to make everyone wait

8          while we go off the record for a

9          second.  I have a someone who has

10         come into the room.  I'm going to

11         clear the room and I'll be right

12         back.

13              (BRIEF RECESS)

14              EXAMINATION

15    BY MS. LOMMERS-JOHNSON:

16         Q    I'm going to share my screen back to

17    General Order 291 that William was asking

18    about.  Can you see that on my screen?

19         A    Yes.

20         Q    Okay.  Great.  I think for the

21    record, this is Exhibit ZZZZZZZ in the

22    continuing list.  And I'm actually -- you

23    recognize this as the same document that you

24    were looking at with William, correct?

25         A    Yes.

1      Q     Okay.  Perfect.  I'm just going to

2   take us down to page 2.  I have a couple of

3   questions there.  So on page 2, I direct your

4   attention to Paragraphs D and E.  And so this

5   is falling under the category of, you know,

6   procedures, first officer on scene and first

7   supervisor on scene.  And I just want to ask

8   generally.  Once an event has been deemed by

9   Baton Rouge Police Department to be a civil

10  disturbance, the rest of these procedures are

11  authorized; is that correct?

12      A     Yes.

13      Q     And so going down to page 2, D and E,

14  the first supervisor is directed by D to

15  determine if the situation requires the SRT,

16  Special Response Team, being called out.  Do

17  you see where I'm indicating there?

18      A     Yes.

19      Q     And so my understanding of what this

20  policy means is that, when an event has become

21  -- is deemed a civil disturbance by a Baton

22  Rouge Police Department, the supervisor on

23  scene is authorized to deploy the Special

24  Response Team; is that accurate?

25      A     Yes.

1     Q    And then looking, again, at E, this
2   says, you know, the same, if the SRT -- if the
3   Special Response Team is needed, advise
4   communications to notify the Incident
5   Commander and then the Incident Commander will
6   then inform communications to dispatch the
7   necessary authority.
8          Here, again, that means that the
9   Incident Commander has the authority to
10  dispatch the Special Response Team once an
11  event has been deemed a civil disorder by the
12  Baton Rouge Police Department.  Is that
13  accurate?
14    A    Yes.
15    Q    And during the 2016 protests, when
16  SRT was given the order to deploy, that was
17  pursuant to this policy; is that correct?
18    A    Correct.
19    MS. LOMMERS-JOHNSON:
20          Okay.  And I also -- I have a
21       couple more questions.  They're
22       overlapping with the topic of
23       formations.  I think that to the
24       extent that they do involve this
25       policy, I'm just going to go ahead

1          and ask those right now.  If anyone

2          has any objection to that, let me

3          know.

4               Hearing none, I'd like to, then,

5          look back at Section 3-A of this

6          policy.  I'll pull it back up, since

7          I see you don't have it in front of

8          you.

9     BY MS. LOMMERS-JOHNSON:

10         Q    Okay.  So this is the same document

11    going to Section 3-A.  Can you see Section 3-A

12    here?

13         A    Yes.

14         Q    Okay.  So here it says:  "Once the

15    Incident Commander or SRT Commander assumes

16    the responsibility for the incident, he will

17    ensure" -- and then under Subsection Number 3

18    -- "the appropriate use of tactical

19    formations."

20              So my question here is, according to

21    this policy, once an event has been deemed a

22    civil disturbance by the BRPD, the Incident

23    Commander is authorized to use the tactical

24    formations that he or she deems appropriate;

25    is that correct?

1    A    Yes.

2    Q    What are the tactical formations, in

3  your understanding, that are deemed

4  appropriate in a protest response situation?

5    A    In my opinion, tactical formation

6  would be a line formation between whatever

7  group and whatever we were trying to keep them

8  from.

9    Q    Okay.  And what I heard you say was a

10  line formation.  Is that accurate?

11    A    Yes.

12         MS. LOMMERS-JOHNSON:

13              I do have a couple more

14         questions about formations in general

15         that don't have to do with this

16         policy.  So I'm going to hold those

17         and pass it back to William and then

18         I'll ask those questions once we move

19         on to Topic 9.

20         MR. MOST:

21              Would you toss me the host?

22                   EXAMINATION

23  BY MR. MOST:

24    Q    The next topic I have for you,

25  Lieutenant, is 8-D, which is "Equipment used

1    during BRPD response to protests, including

2    the acquisition of equipment related to follow

3    tactics, determination to use the following

4    tactics, the designation of authority to

5    deploy the following tactics and description

6    of BRPD-authorized use of the same; shields,

7    batons, helmets and vests."

8              Are you prepared to testify about

9    that topic, Lieutenant Barrow?

10        A    Yes.

11        Q    So shields, batons, helmets and

12   vests, I suspect that vests -- by vests, we

13   mean bullet proof vests; is that correct?

14        A    Out there, they had make you wear

15   they were bullet proof vests.  If they wanted

16   you could wear the impact resistance vest.

17             THE COURT REPORTER:

18                  I'm sorry.  Could you repeat

19             that answer?

20             THE WITNESS:

21                  The ballistic vests, the bullet

22             proof vests or the impact resistance

23             vests.

24   BY MR. MOST:

25        Q    So the impact resistance vest, that's

1    different than a bullet proof vest.  That's

2    sort of a hard covering to protect from knives

3    or --

4        A    Not knives, against blunt objects,

5    sticks, bottles, rocks, stuff like that.

6        Q    Okay.  So -- and then shields, batons

7    and helmets, that's part of the standard

8    equipment of an everyday officer, agreed?

9        A    Agreed.

10       Q    So shields, batons and helmets are

11   deployed when there is a special need,

12   correct?

13       A    Correct.

14       Q    And shields, batons and helmets were

15   deployed at the 2016 July protests, agreed?

16       A    Yes.

17       Q    Were they deployed at the July 2016

18   protests because BRPD had classified those

19   protests as a civilian disturbance?

20       A    Yes.

21       Q    Was there any other reason that they

22   were deployed?

23       A    Also for officer protection.

24       Q    Right.  I understand they serve the

25   purpose of officer protection.  But the reason

1 why a supervisor gave the order to deploy

2 shields, batons and helmets was because the

3 protest had been classified as a civilian

4 disturbance, agreed?

5     A    Yes.

6     Q    Any other reason the supervisor chose

7 to do that?

8     A    No.

9         MR. MOST:

10             And John Etter, an attorney, is

11         joining us.  He is an attorney for

12         another lawsuit, related lawsuit.

13         Welcome, John.

14         MR. ETTER:

15             Thank you.

16         MR. MOST:

17             We're on topic 8-D, which is

18         shields, batons and helmets.  That's

19         my only questions about shields,

20         batons and helmets.

21             MacArthur Team, do you have any

22         questions about those?

23         MS. LOMMERS-JOHNSON:

24             No, we don't have any questions

25         about shields, batons and helmets.

```
 1           MR. MOST:
 2                And, Greg, I won't ask you each
 3           time, but at any point you'd want to
 4           ask questions, please just jump in.
 5                John, do you have any questions
 6           about shields, batons, helmets and
 7           vests?
 8           MR. ETTER:
 9                I do not at this point.  Just a
10           comment.  I'm having issues with my
11           computer, so I'll be here without
12           video.  I will put my information in
13           the chat box for the court reporter.
14           MR. MOST:
15                Thank you.
16     BY MR. MOST:
17       Q    Okay.  Moving on to the next topic,
18     which is 9-A.  Topic 9-A is "Tactics used
19     during BRPD response to protests, including
20     the decision to use the following tactics,
21     the designation of authority to deploy the
22     following tactics and description of BRPD
23     authorized use of same;" specifically, "Crowd
24     control."
25                Are you prepared to testify about
```

1  that topic, Lieutenant?

2      A    Yes.

3      Q    Now, we've already covered some

4  elements of this.  But specifically I want to

5  talk about one tactic of crowd control, which

6  is -- we did see that the civilian disturbance

7  policy contemplates the possibility of mass

8  arrests, correct?

9      A    Yes.

10     Q    And one way to facilitate mass

11 arrests is to print the Affidavits of Probable

12 Cause in advance, correct?

13     A    Yes.

14     Q    And that was done at the 2016 July

15 protests, agreed?

16     A    Yes.

17     Q    And when I asked you questions about

18 the 2016 July protests, I'm assuming your

19 answers apply to each of the days and

20 incidents of those protests, unless you tell

21 me otherwise.  Are we agreed on that?

22     A    Yes.

23     Q    In your career as a law enforcement

24 officer, have you ever seen your agency use

25 preprinted Affidavits of Probable Cause, other

1    than at the July 2016 protests?

2         A    No.

3         Q    My understanding is that the

4    preprinted Affidavits of Probable Cause listed

5    a couple of different crimes that protesters

6    were potentially to be arrested pursuant to.

7    The first being 14:97.  Are you familiar with

8    that statute, obstruction?

9              MR. SCOTT:

10                  William, I'm lodging an

11                  objection here.  I didn't designate

12                  him for Affidavits of Probable

13                  Cause -- and these seems to exceed

14                  the scope of it.

15             MR. MOST:

16                  I'll just ask him a couple of

17                  questions about this and we can

18                  always follow up with another

19                  deponent.

20   BY MR. MOST:

21        Q    Lieutenant Barrow, are you familiar

22   with 14:97, obstruction of a highway?

23        A    Yes.

24        Q    In your career as a law enforcement

25   officer, can you recall any instance, other

1  than the July 2016 protests, where you

2  arrested for a 14:97?

3          MR. SCOTT:

4                Objecting to the form.  You're

5          asking him about his personal

6          experience as law enforcement officer

7          as opposed the City.

8          MR. MOST:

9                Yes.  I'll refer you to -- Joe,

10         to Detoy V. City & County of San

11         Francisco.  That's 196 F.R.D. 362,367

12         N.D. Cal 2000.  "If defendants have

13         objections to either questions

14         outside of the scope of a 30(b)(6)

15         deposition ... counsel shall state

16         the objection on the record and the

17         witness shall answer the question to

18         the best of the witness's ability."

19              You're correct, Joe, that any

20         questions outside the scope of

21         30(b)(6) topics may not bind the

22         City, however they are to be

23         answered.

24         MR. SCOTT:

25              I've made my record.  You can go

1         ahead and answer.

2         MR. MOST:

3              Would you like me to repeat the

4         question?

5         THE WITNESS:

6              Repeat the question.

7    BY MR. MOST:

8         Q    So in your career as a law

9    enforcement officer, can you recall any

10   particular instance, other than the July 2016

11   protests, in which you arrested someone for a

12   14:97 violation?

13        A    No.

14        Q    Are you familiar with 14:100.1, which

15   is obstruction of a public passageway?

16        A    Yes.

17        Q    In your career as a law enforcement

18   officer, have you ever -- can you recall any

19   particular instance in which you arrested

20   someone for a 14:100.1?

21        A    No.

22        MR. MOST:

23             Those are my questions for topic

24        9-A.  MacArthur, do you have

25        questions for Topic 9-A?

1    MS. LOMMERS-JOHNSON:

2         I do.  Thank, you William.

3              EXAMINATION

4    BY MS. LOMMERS-JOHNSON:

5    Q    So I want to go back and sort of talk

6    a little bit more about the formations that

7    were used or that are authorized to be used

8    for crowd control.  And so I think -- stepping

9    back a second, you testified that you were the

10   commander of Mobile Field Force in 2016 during

11   the protests; is that correct?

12   A    Yes.

13   Q    When did you become Commander of the

14   Mobile Field Force?

15   A    I think it was around 2014.

16   Q    So you had been Mobile Field Force

17   Commander for about two years prior to the

18   deployment of Mobile Field Force at the Baton

19   Rouge protests in 2016?

20   A    Yes.

21   Q    My next question is:  What are the

22   tactical formation options that an incident

23   commander is authorized to deploy during a

24   protest?

25   A    You got different types of formation,

line, wedges, echelons, bees.  But it depends
on the crowd and which way you want the crowd
to move.  It can be any one of them.

Q    Okay.  And am I correct that the
Incident Commander, once an event has been
deemed a civilian disturbance, is authorized
to deploy any of those formations that he
deems appropriate?

A    Yes.

Q    And which of those formations were
deployed during the Baton Rouge protests in
2016?

A    All of the formations that I was
familiar with that were employed were line
formations.

Q    Did I hear you correctly?  Can you
repeat that one for time?

A    I said that all the formations that
I'm familiar with that was used out there was
a line formation.

Q    And can you tell me a little bit more
about what a line formation is and how it
operates?

A    That's just forming a straight line
between the crowd and the area we want to keep

1  them out of.  That's a line formation, just

2  putting ourselves between them and where we

3  don't want them to be.

4      Q    Okay.  And what is the primary

5  purpose of a line formation?

6      A    To prevent the crowd from advancing

7  -- it's to keep them out of the area we don't

8  want them in.  That's the purpose of it.

9      Q    And my understanding from General

10  Order 291 and some of the things that we've

11  seen in the videos having to do with the

12  July 2016 protests, is that the line formation

13  was also used in conjunction with arrest teams

14  and the operation of those arrest teams; is

15  that accurate?

16      A    Yes.

17      Q    Can you tell me, at the point when a

18  line formation is used and the Incident

19  Commander orders the line to advance, how that

20  is supposed to operate, according to Baton

21  Rouge Police Department Policy?

22      A    Regarding the BRPD, if it's

23  determined that we need to go ahead and clear

24  the crowd out, we need to get everybody out,

25  then an order can be given for the line to

1    start advancing forward, giving demands for

2    the crowd to move back.

3        Q    Okay.  And how do the arrest teams

4    interface with the line formation moving

5    forward; how does that work, according to

6    Baton Rouge policy?

7        A    The arrest teams are behind the line

8    formation and they are identifying any

9    problems.  And what they do, they move between

10   the line to whatever, agitator or somebody

11   breaking the law that has been identified and

12   they pull them back to arrest them.

13       Q    And so as far as I understand it from

14   your testimony, the line officers in front is

15   not comprised of the arrest team; the arrest

16   team is located behind the initial line of

17   officers?

18       A    That's correct.

19       Q    And who is responsible for

20   identifying people that need to be arrested?

21       A    The arrest team.  The arrest team

22   is -- it should be three officers.  It should

23   be four officers back there.  One is directing

24   the arrest team which way to move and that

25   particular officer, or whoever is designated,

1    he identifies the agitators.  Or we also have

2    observers in the crowd that will raise their

3    hand and say:  Hey, this guy over here is

4    agitating the crowd.  They point them out to

5    them.  They point it out to the arrest team,

6    and the arrest team moves in and arrests them.

7        Q    And when a line formation is made and

8    deployed, is there always an arrest team

9    moving in conjunction with the line formation?

10       A    Yes.

11       Q    So at the time that an Incident

12   Commander or SRT Commander orders officers to

13   deploy in a line formation, the arrest team is

14   deployed at the same time?

15       A    Yes.

16       Q    And so at the point -- at the point

17   that a line advances on a crowd of protesters,

18   officers are trained to begin to identify

19   agitators and begin to arresting some of those

20   protesters at that point; is that correct?

21       A    Yes.

22       Q    After the arrest team comes through

23   the line to arrest people who have been

24   identified as agitators at a protest, what

25   happens next?

1    A    After they arrest them, they move

2   them back and then they hand them off to the

3   UP prisoner transportation guys, and they take

4   it from there.

5    Q    You said the UP prisoner

6   transportation guy.  Can you tell me what --

7    A    Uniform Patrol.

8    Q    Okay.

9    A    Is that what you're referring to?

10    Q    Yes.  Okay.  And so, am I correct

11   that if the system is operating as it's

12   supposed to, according to BRPD training and

13   policy, the arrest team will come through,

14   arrest the person who has been identified as

15   an agitator and then take them to the prisoner

16   processing area and hand them off to the

17   individual staffing from Uniform Patrol; is

18   that accurate?

19    A    Yes.

20    Q    So the people -- here we're sort of

21   have been talking about the arrest teams and

22   the line.  Those -- when we talk about the

23   arrest team and the line formation, are those

24   comprised of officers who are in the Mobile

25   Field Force?

1        A       With BRPD?  No.  Because we have a

2    small team.  The arrest people -- our arrest

3    team is comprised of our Street Crimes Unit.

4        Q       Okay.  So it's going to be the line

5    formation and the arrest teams.  They're going

6    to be made up, not just of Mobile Field Force

7    members but also the Street Crimes Unit

8    members?

9        A       Correct.

10       Q       What about the people who are

11   stationed at prisoner processing; are those

12   people going to be members of Mobile Field

13   Force or the Street Crimes Unit?

14       A       No, that's Uniform Patrol officers.

15       Q       Okay.  It's those officers who are

16   then responsible for completing the booking,

17   paperwork and the probable cause affidavits

18   for the arrest of the protesters made by the

19   arrest teams; is that accurate?

20       A       Yes.

21       Q       And so if everything is working

22   according to, you know, the Baton Rouge Police

23   Department's system, the way officers have

24   been trained, it's not ever going to be the

25   arrest teams who are making the arrests who

1    are filling out the probable cause affidavits?

2         A    Yes.

3         Q    And I just -- you were the Mobile

4    Field Force Commander since 2014, I

5    understand.  But I also understand that you

6    were within the Baton Rouge Police Department

7    for much longer than that.  Can you tell me

8    when the Baton Rouge Police Department first

9    started implementing policy and training about

10   this system of using arrest teams?

11        A    The department didn't have a Mobile

12   Field Force team until 2014.  But they trained

13   the officers in-service to deal with crowds.

14   We had equipment that was in the trailer, so

15   if we had an incident, whatever district area

16   it was in, Uniform Patrol officers from what

17   area would get the equipment and go to

18   wherever they needed to be and act as Mobile

19   Field Force.  It wasn't until 2014 that they

20   actually started trying to put a team

21   together.

22        Q    Okay, I have a couple of more

23   questions about that.  What spurred the

24   creation of Baton Rouge Police Department's

25   dedicated Mobile Field Force Unit?

1     A    Due to the increase in the events

2 that the City has starting to have -- I mean,

3 with the -- picking up.  We picked up a lot

4 more parades and stuff like that.  And then to

5 top it off with a lot of the unrest that had

6 been happening around the country.

7     Q    Am I correct in understanding that

8 when Mobile Field Force was formed in Baton

9 Rouge about 2014, it was formed because there

10 had been an uptick events in Baton Rouge and

11 an uptick in unrest around the country.

12     A    Correct.

13     Q    I guess in terms of the unrest around

14 the country that helped spur the creation of

15 Baton Rouge's dedicated Mobile Field Force

16 Unit.  Can you tell me a little bit more about

17 what you're referring to there?

18     A    You're talking about the unrest

19 around the country?  I'm not understanding.

20     Q    Yeah.  I'm just asking, you know, for

21 more specifics about what you mean by that.

22     A    In light of the different events that

23 were happening around the country.  I don't

24 know how to go much further into that.  I

25 mean, it was a lot of stuff happening in the

1    country that had potential to happen in Baton

2    Rouge.  You never know.  I mean, like I say,

3    we had all kinds of -- we even had -- on LSU's

4    campus, we had somebody who wanted to do a

5    flag-burning that we were not prepared for and

6    stuff like that.  They decided:  Hey, we need

7    to get ready for all of this.

8         Q    Okay.  And so I am not trying to ask

9    you questions that you don't know the answer

10   to at all.  But that help clears things up for

11   me a little bit.  I guess in terms of the

12   unrest in other areas of the country that

13   helped spur the BRPD's creation of the Mobile

14   Field Force Unit, can you give any sort of

15   examples of things that come to mind that were

16   going on during that time?

17        A    No, I can't.  I just know it was

18   different stuff going on.  I can't give one

19   particular incident, no.

20        Q    Okay.  I think some -- you know, I've

21   heard discussion elsewhere about events like

22   Ferguson.  I'm not trying to put words in your

23   mouth.  But is that the kind of civil unrest

24   that you're referring to?

25        A    Yes.

1      Q     Is it primarily demonstrations having
2    to do with civil rights protests?
3      A     No.  Like I said, we've had -- we've
4    had other incidents.  We had one parade in
5    Spanish Town.  At the end of that parade,
6    there's always a problem getting the crowd to
7    clear.  It's just different stuff, not just
8    one thing specific.
9      Q     Okay.  And so after the Mobile Field
10   Force Unit in Baton Rouge was created in 2014,
11   were Mobile Field Force trainings started
12   immediately?
13     A     Yes.
14     Q     And how large was the initial Mobile
15   Field Force Unit that was created?
16     A     It was only 20 officers; 20 officers
17   were actually online and myself, made 21.
18     Q     And by the time of the Baton Rouge
19   protests in July of 2016 had the Mobile Field
20   Force unit increased in size at all?
21     A     Yes, it had increased to 40 officers.
22     Q     Forty officers?
23     A     Yes.
24     Q     Did Mobile Field Force Trainings --
25   were those -- obviously, Mobile Field

1    Force officers were given specific MFF

2    training.  My question is whether other Baton

3    Rouge Police Department officers who were not

4    in the Mobile Field Force were given Mobile

5    Field Force Training?

6         A    Yes, we have a -- every officer has

7    to go through in-service training every year

8    in the month of their birthday.  Some of that

9    training within that involved some hours of

10   Mobile Field Force training, just in case they

11   had to fill in.

12        Q    I understand.  So at the yearly

13   in-service training that every BRPD is going

14   to attend, they are given some level of Mobile

15   Field Force training?

16        A    Yes.

17        Q    Including crowd control?

18        A    And I think it's done when they come

19   through the academy now, they touch on it.

20        Q    In 2016, would BRPD officers coming

21   through the academy also have received Mobile

22   Field Force training as part of the academy?

23        A    Not in 2016.  It started after 2016;

24   probably around 2017.

25        Q    Okay.  And so in 2016, the BRPD

1    officers who were deployed at the Baton Rouge

2    protests in July of 2016, they would have

3    received Mobile Field Force training during

4    their in-service trainings but not during the

5    academy; is that accurate?

6         A    Yes.

7         Q    And it's during those, you know,

8    yearly in-service trainings that they would be

9    taught how to interface with Mobile Field

10   Force and participate in this arrest team

11   system and the line formation; is that right?

12        A    Yes.

13        Q    When was the first time that the

14   Mobile Field Force Unit in Baton Rouge was

15   deployed?

16        A    First time it had to be deployed was

17   2016 protests.

18        Q    Were you referring to the deployment

19   during the July 2016 protests in Baton Rouge

20   as the first time that Mobile Field Force

21   deployed in Baton Rouge?

22        A    Yes.

23        Q    And since that first deployment, on

24   what other occasions has Baton Rouge's Mobile

25   Field Force Unit deployed?

1  A Since the 2016 protest, they have not

2 been deployed, but they have been on standby

3 for other events, but it never escalated to

4 where they had to be deployed.

5    MS. LOMMERS-JOHNSON:

6     So I think those are going to be

7    my all my questions for 9-A.  So I

8    can pass it to -- I don't know if --

9    John, did you have any questions for

10    9-A?

11    MR. ETTER:

12     Yes, I do.  I have a few

13    questions for the Lieutenant.

14       EXAMINATION

15 BY MR. ETTER:

16  Q First in July of 2016, am I correct

17 that Louisiana State Police troopers were

18 deployed at the -- on July 10th at East and

19 France?

20  A Yes.

21  Q And under whose command were those

22 Louisiana State Police officers?

23  A The BRPD Incident Command.

24  Q And who was the Incident Commander on

25 that day?

1    A    I'm not sure, because they rotated

2   out.  I'm not sure who was there that specific

3   day, sir.

4    Q    And do you know who was in command at

5   between 5:00 p.m. and 7:00 p.m. on July 10th

6   at East and France?

7    A    I'm not sure.  I would be guessing.

8   I know, like, Captain J.D. Leach worked 1800

9   to 0600 and Lieutenant David Wallace, I know

10  he was part -- he worked from 0600 to 1800.

11  They could have been overlapping.  But like I

12  say, I'm not sure who was actually in Incident

13  Command at that time.

14   Q    Were you on the scene at East and

15  France at that time?

16   A    No, sir, myself and the Baton Rouge

17  Police Department Mobile Field Force Team has

18  specific hours.  We only work 1800 to 0600 at

19  9000 Airline and Goodwood.  Those were the

20  hours we worked.

21   Q    Do you have knowledge regarding the

22  arrest team at East and France on July 10th,

23  2016 between 5:00 p.m. and 7:00 p.m.?

24   A    No, sir.

25   Q    Would Baton Rouge Police Department

1   policy at that time have permitted an arrest

2   team to be composed of Louisiana State Police

3   troopers and Baton Rouge Police Department

4   officers?

5       A    Yes.

6       Q    And do you have any knowledge of

7   the -- regarding the arrest team that arrested

8   Max Geller on that date?

9       A    No.

10      Q    I will say that arrest team included

11  Trooper Jacob Brown.

12      A    No, I do not.

13      Q    And do you have any knowledge of who

14  ordered -- gave the order that the arrests on

15  July 10th, 2016 were to be for violation of

16  14:97?

17      A    No, I do not.

18      Q    I understand you are familiar and

19  here to testify about the training provided to

20  the Mobile Field Force.

21      A    Yes, to BRPD's Mobile Field Force,

22  yes, sir.

23      Q    All right.  And has the Mobile Field

24  Force ever received training regarding the

25  U.S. Supreme Court case of Cox versus

1    Louisiana, which was issued in 1965?

2         A    No.

3         Q    And that's a decision that involved

4    -- that held that arresting protesters for

5    obstructing streets near the capitol building

6    was unconstitutional.

7         A    No, they didn't train on that.

8         Q    Have you ever -- what training has

9    the Mobile Field Force received regarding the

10   constitutional rights of people to peacefully

11   assemble and protest?

12        A    They were trained to let them protest

13   as long as it's peaceful and not out of hand.

14        Q    What training has Mobile Field Force

15   received as to how to determine if people were

16   out of hand?

17        A    By their actions.  I mean, if they're

18   trying to incite the crowd to do something

19   against the law and evidence of them,

20   themselves, of doing something against the

21   law; just observing them.

22        Q    Going back to a little bit of your

23   use of the arrest teams and then the Uniform

24   Patrol officers to complete the Affidavits of

25   Probable Cause.  In the way that was done in

1　July 2016, was it possible for the officer who
2　completed the Affidavit of Probable Cause to
3　have witnessed the arrestee's contact?
4　　　A　The way they were situated, I would
5　say, no, it wasn't.
6　　　Q　Are you aware that in these cases,
7　the officers who have completed the Affidavits
8　of Probable Cause attested that they had
9　witnessed the particular person's conduct?
10　　　　　MR. SCOTT:
11　　　　　　　Object to form.  If you can
12　　　　　　　answer, answer it.
13　　　　　THE WITNESS:
14　　　　　　　No, I was not aware of it.
15　BY MR. ETTER:
16　　　Q　You stated that there was an incident
17　at Baton Rouge regarding -- at LSU regarding
18　people who were intending on burning a flag.
19　Did I correctly note your testimony?
20　　　A　Yes.
21　　　Q　And do you recall approximately when
22　that incident occurred?
23　　　A　No, I don't.  I just remember it
24　occurring.  I can't tell you exactly.
25　　　Q　Is it the policy of the Baton Rouge

1  Police Department that burning a flag -- a

2  United States flag is illegal?

3      A    No, it's not a policy, but when that

4  particular individual upsets that crowd and

5  there's a potential to get violent, yes,

6  that's an involvement for the police

7  department.

8      Q    What is -- what training is provided

9  to the Mobile Field Force regarding

10 neck-holds?

11          MR. SCOTT:

12              Regarding what?

13          MR. ETTER:

14              Neck-holds.

15          THE WITNESS:

16              We do not train in neck-holds.

17 BY MR. ETTER:

18      Q    Do you train that neck-holds are

19 prohibited?

20      A    That's not part of Mobile Field Force

21 at all.  The only hands-on at Mobile Field

22 Force are the arrest teams.  Other than that,

23 it's strictly using the shields between them

24 and the crowds.  They're not trained to do any

25 neck-holds or anything like that.

1      Q     Are members of the Mobile Field Force

2    trained to intervene if they see another law

3    enforcement officer applying a neck-hold to an

4    arrestee?

5      A     No.

6      Q     Based on your review of the Baton

7    Rouge Police Department records, do you know

8    who identified Max Geller as a person to be

9    arrested?

10     A     No, I do not.

11           MR. ETTER:

12               That's all my questions.  I will

13           pass the witness.

14           MR. MOST:

15               I'll just ask a few followup

16           questions about this and then we can

17           move to the next topic.

18                     EXAMINATION

19   BY MR. MOST:

20     Q     Regarding the flag-burning

21   incident -- and I'm trying to understand your

22   testimony, Lieutenant Barrow.  It sounds like

23   the flag-burning incident was one of the

24   events that precipitated the creation of the

25   Mobile Field Force; is that right?

1      A     Yes, it was events like that, yes.

2      Q     Including that event, correct?

3      A     Yes.

4      Q     And the relevance of that event was

5  that the Mobile Field Force might need to be

6  deployed to prevent the flag-burning; is that

7  correct?

8      A     Not to prevent the flag-burning.  It

9  was one individual who wanted to burn a flag,

10 but you had multiple individuals out there

11 protesting that that were violent towards him.

12 It was more for this protection.  It would

13 have been more for this protection.

14     Q     I see.  So the need for the Mobile

15 Field Force might be to control the people who

16 were opposed to flag-burning; is that

17 accurate?

18     A     That's accurate, yes, sir.

19     Q     And then, just a few questions about

20 the process of the handoff between the arrest

21 team and the processing team at the July 16,

22 2000 -- I'm sorry.  The July 2016 protests.

23 All right?

24     A     Okay.

25     Q     So it's my understanding that the

1  arrest team is sort of on the front lines.

2  They physically seize them and hand an

3  arrestee off to the processing team for

4  processing and then return to the front lines,

5  correct?

6       A    Correct.

7       Q    And the goal is to have that process

8  be as quick and efficient as possible so that

9  the arrest team can return to the front lines;

10  is that accurate?

11       A    That's correct, yes, sir.

12       Q    Okay.  So it's BRPD policy that the

13  arrest team should not stop and have a

14  conversation with the processing team?  They

15  should simply hand off the arrestee and return

16  to the front lines, correct?

17       A    Correct.

18       Q    Okay.  That covers -- we were on --

19  that was 9-A topic.  Moving on to topic 9-C.

20  "Tactics used during BRPD response to

21  protests, including the decision to use the

22  following tactics, the designation of

23  authority to deploy the following tactics and

24  the description of the BRPD-authorized use of

25  same.  Kettling of protesters (surrounding

1 protesters so they can't leave)."

2      Are you prepped to talk about that

3 topic, Lieutenant?

4      MR. SCOTT:

5          When I was going through the

6          topics with the Lieutenant, he was

7          not familiar with the phrase

8          "Kettling."  If you want --

9      MR. MOST:

10         Sure.

11     MR. SCOTT:

12         If you want ask him something,

13         it might be worth a try.  It wasn't a

14         phrase used in their training.

15     MR. MOST:

16         Fair enough.

17 BY MR. MOST:

18     Q    I represent to you, Lieutenant, that

19 I understand kettling to mean law enforcement

20 officers surrounding protesters so they can't

21 leave.  Will you understand what I mean by

22 kettling?

23     A    Yes.

24     Q    Kind of kettling fish in a pot, for

25 example?

1    A    Okay.  Yes.

2    Q    With that understanding of the term

3 "Kettling," are you prepared to testify about

4 that topic?

5    A    Yes.

6    Q    So you testified earlier about the

7 line formation being used by BRPD officers

8 during the July 2016 protest, correct?

9    A    Yes.

10    Q    And that was sometimes in conjunction

11 with other agencies forming lines and coming

12 from other directions, correct?

13    A    Correct.

14    Q    For example, at the East and France

15 Street protests, multiple lines of officers

16 surrounded protesters from multiple

17 directions, correct?

18    A    Correct.

19    Q    So the purpose of that was to

20 restrict the avenues for protesters to leave

21 the area, correct?

22    A    Correct.  Well, not to leave the

23 area, but leave in a direction that the police

24 wanted them to go.  It wasn't designed to keep

25 them in that area.  It was designed to keep

1    them from getting into specific areas.

2        Q    Okay.  At any point during the

3    July 2016 protest, did BRPD engage in actions

4    to try and prevent protesters from leaving?

5        A    No.  Like I say, not to my knowledge.

6    Like I said, here at 9000 Airline where I

7    worked, that did not happen.  And they're not

8    trained to do that.  They're trained to

9    prevent them from getting to one place and to

10   move them out of the area.  It was never

11   designed to keep them from leaving an area.

12       Q    I understand.  At certain protests in

13   July 2016, protesters were told to clear the

14   streets to not enter the roadway, agreed?

15       A    Yes.

16       Q    And so that's an order saying those

17   protesters can't go in the streets?

18       A    Correct.

19       Q    So if there's a group of protesters

20   and they have officers coming at them from

21   three sides and then on the fourth side

22   there's a street and they've been told not to

23   go into the street, all their avenues of exit

24   have been restricted, agreed?

25       A    Yes.  If that's the way it happened,

1  yes.

2          MR. MOST:

3              That's the questions I have for

4       9-C.  MacArthur, do y'all have any

5       questions about topic 9-C?

6          MS. LOMMERS-JOHNSON:

7              No, we don't have any more

8       questions about kettling.

9          MR. MOST:

10             Mr. Etter, do you have any

11      questions about this Topic 9-C,

12      kettling?

13         MR. ETTER:

14             No, I'll move -- you can move on

15      to the next topic.

16         MR. MOST:

17             So, Joe, that's the topics I

18      have listed as Lieutenant Barrow

19      being able to testify about.  Maybe

20      we can just look at the notice real

21      quick and see if there's anything

22      else you want him to testify about.

23         MR. SCOTT:

24             I went through it with him

25      before we got started.

1       MR. MOST:

2            Okay.  So would you like to

3       bring in the next witness?

4       MR. SCOTT:

5            I'd like to take, like, a

6       ten-minute break.

7       MR. MOST:

8            Sure.

9       MR. SCOTT:

10            And I will bring in the next

11      witness.

12      MR. MOST:

13            We'll reconvene at 11:00 a.m.

14      MS. LOMMERS-JOHNSON:

15            Before you go -- and apologies

16      if this was already discussed, but

17      are we going to wait to hit -- let's

18      see what it is -- surveillance -- I'm

19      not sure subsection under 9 that is.

20      Are we waiting for 9-B?

21      MR. SCOTT:

22            I think I've got Topic 9 pretty

23      well covered with Captain Leach, but

24      we'll find out.

25      MS. LOMMERS-JOHNSON:

1          Okay.  I just wasn't sure if we

2     were covering 9-B with Lieutenant

3     Barrow.  But that sounds good.

4     MR. MOST:

5          We'll reconvene at 11:00 a.m.

6     Thank you.

7          (BRIEF RECESS)

8     MR. MOST:

9          Let's go on the record.  For

10    planning purposes, Joe, which topics

11    is Lieutenant Leach going to cover?

12    MR. SCOTT:

13         2-H, K, L, P through T.  I

14    believe he can speak to Subject 7, 8

15    and 9, which was Incident Command, I

16    believe on the overnight shift during

17    the 2016 protests, SWAT Commander and

18    was Director of the Training Academy

19    in 2016.

20    MR. MOST:

21         Highly qualified witness.

22    Fantastic.

23         CAPTAIN JAMES DARRON LEACH, 9000

24 AIRLINE HIGHWAY, BATON ROUGE, LOUISIANA, AFTER

25 FIRST BEING DULY SWORN IN THE ABOVE-ENTITLED

MATTER, DID TESTIFY AS FOLLOWS:

                    EXAMINATION

BY MR. MOST:

     Q     Would you give your full name and
rank for the record, please?

     A     Captain James Darron Leach.

     Q     Captain, my name is William Most.
I'm an attorney for the plaintiffs in the
Imani case, and we have with us here today
some attorneys for other plaintiffs in other
related cases, as well as an attorney for the
State Police defendants.  And so the way this
will work is, we'll go topic by topic and I'll
ask you questions, and then I'll hand it off
to our colleagues as needed.  There may be
followup, and then we'll move on and sort of
handle it like that.

     A     Okay.

     Q     Captain, have you ever given a
deposition before?

     A     Yes, I have.

     Q     Approximately how many have you
given?

     A     Through my career, a dozen or more,
maybe.  My last one was about five hours, so

1   hopefully this one doesn't take that long.

2   I'm experienced with them.

3      Q    All right.  So you understand that

4   your answers here today are under oath and

5   have the same force as if we're in a courtroom

6   with a judge and jury.

7      A    I do.

8      Q    Is there anything, any medication,

9   illness, fatigue or anything else that will

10  prevent you from giving us your attention and

11  complete and truthful answers?

12     A    No, I'm good.

13     Q    Great.  As you know, we can take a

14  break at any time.  Just let me and your

15  attorneys know, and we'll take a break.

16  Although, I'll warn you in advance, it's my

17  practice to ask, after each break, what you

18  talked about, even if it's your attorneys, and

19  any documents that you reviewed during the

20  break.  All right?

21     A    Okay.

22     Q    One thing that is important is, if

23  any of the attorneys ask you a question that

24  is unclear or you don't understand, will you

25  agree to tell us that, rather just trying to

1    go ahead and answer it?

2         A    Absolutely.

3         Q    Thank you.  Do you have a broad sense

4    of what kind of cases you're here for today?

5         A    I do.  I think I understand it.

6         Q    Okay.  So you understand that we're

7    here today about a number of cases that deal

8    with the July 2016 protests?

9         A    Yes, sir.

10        Q    And I don't know if you've done a

11   deposition like this one before, but this is a

12   little different than a normal deposition.

13   It's what's called a 30(b)(6) deposition.  So

14   today you are here appearing and giving

15   answers but you're doing it on behalf of the

16   City Baton Rouge.  Do you understand that?

17        A    I do.

18        Q    So when I ask you a question or

19   another attorney asks you a question, we're

20   asking you questions of the City of Baton

21   Rouge, agreed?

22        A    Agreed.

23        Q    And your answers are not just the

24   answers of Captain Leach, they're the answers

25   of Baton Rouge.  Agreed?

1       A       Agreed.

2       Q       And so if I refer to you, I really

3  mean the City Baton Rouge.  Will you

4  understand that?

5       A       I do understand.

6       Q       Okay.  And one way that this

7  deposition is a little different than a normal

8  one is that, in a normal deposition, "I don't

9  know" or "I don't remember" is a perfectly

10 good answer.  However, at a 30(b)(6)

11 deposition like this one, the City is

12 obligated to provide someone who has looked

13 into the issues and has become knowledgeable.

14 So in most circumstances, "I don't know" or "I

15 don't recall" is generally not a sufficient

16 answer today.  Do you understand that?

17      A       I will answer to the best of my

18 knowledge.

19      Q       All right.  And you understand that

20 the City had an obligation to provide someone

21 knowledgeable, so you understand that general

22 obligation?

23      A       I understand.

24      Q       And besides talking to your

25 attorneys, did you talk to anyone to prepare

1  for today's deposition?

2      A    I did not.

3      Q    Did you look at any documents to

4  prepare for today's deposition?

5      A    I have not.

6      Q    I don't want to know anything about

7  the contents of your communications with the

8  attorneys, but did you talk to attorneys to

9  prepare for this deposition?

10     A    Only just this morning when I got

11 here.

12     Q    And approximately how long did you

13 talk to the attorneys to prepare for this

14 deposition?

15     A    Maybe ten minutes.

16     Q    Captain, how long have you been with

17 the Baton Rouge Police Department?

18     A    Twenty-nine years.

19     Q    Have you served with any law

20 enforcement department, other than BRPD?

21     A    I served with a small department in

22 Hodge, Louisiana.  It's in the northern part

23 of Louisiana -- for a year, seven or eight

24 months prior to coming to Baton Rouge.

25     Q    So you've been in law enforcement for

1  approximately 30 years; is that accurate?

2      A    That is correct.  November, it will

3  be 31 years.

4      Q    All right.  And what's your current

5  job responsibility or role?

6      A    I'm a Commander over our Special

7  Operations Division in the police department.

8      Q    And Special Operations, is that the

9  same thing as SWAT or are those different

10  things?

11      A    Special Operations is sort of a big

12  umbrella the SWAT falls underneath.  There are

13  other divisions.  We have our K9 Division, our

14  Air Support Division, our Mounted Division,

15  our EOD Division.  And we have part-time

16  division, such as Mobile Field Force, a dive

17  team, a boat operation team, for rescue and

18  things like that.

19      Q    So if I understand it correctly,

20  Special Operations handles most of the things

21  that are not everyday Uniform Patrol stuff?

22      A    Yes.

23      Q    And within that is SWAT?

24      A    Yes, sir.  I am the Incident

25  Commander over SWAT, as well.  You have the

1 big umbrella that everything falls underneath,

2 but I'm the Incident Commander for SWAT.

3     Q    And I heard the phrase "SRT."  Is

4 that the same thing as SWAT or is that a

5 different thing?

6     A    It's the same thing.  It's sort of

7 used universally.  Special Response Team is

8 the SWAT team.

9          MR. MOST:

10              Okay.  Let's jump into our first

11          topic that you've been designated

12          for, which is 2-H.

13              So 2-H is "Passive Resistance."

14          I thought this had already been

15          covered in a previous 30(b)(6), but I

16          wasn't present for it.  Do I have

17          that wrong, anybody?

18          MR. SCOTT:

19              I don't know.  I think Wallace

20          Britton from the training academy did

21          a pretty good job.  I don't know if

22          plaintiffs' counsel want to talk

23          about to anybody additionally about

24          "Passive resistance."

25          MS. MOORE-O'NEAL:

1    Myself and Dave covered it --

2    Mr. Lanser -- excuse me -- pretty

3    thoroughly.  As I remember, it wasn't

4    "Passive Resistance" that we had

5    further questions on.  As I remember,

6    it was not "Passive Resistance" that

7    we had further questions on.  I don't

8    want to speak for the Imani team, of

9    course.

10   MR. MOST:

11   That reflects my notes, as well.

12   Although, I wasn't present.  In the

13   interest of efficiency, let's move on

14   to -- actually, I have the same thing

15   for K, that "First Aid or Medical

16   Training" was covering in that, as

17   well.

18   Do you think that's right,

19   Mandisa?

20   MS. MOORE-O'NEAL:

21   Hannah, what do you think?  I

22   remember that being an area that we

23   didn't think needed more testimony.

24   MS. LOMMERS-JOHNSON:

25   I agree.

BY MR. MOST:

Q    We'll move on.  The next one is "First Amendment Rights," which I don't believe has been covered.  So that topic is Topic 2-L, "Policies and Procedures regarding any of the following topics:  First Amendment Rights."

Captain, are you prepared to testify today about that topic?

A    Yes.

Q    So starting with the big picture, the City of Baton Rouge and the Baton Rouge Police Department are bound of the U.S. Constitution and the Louisiana Constitution, right?

A    Correct.

Q    And the U.S. Constitution has a First Amendment, which is mirrored partially by the Louisiana Constitution, agreed?

A    Yes.

Q    And when we say First Amendment Rights, we mean things including the right to free speech, the right of assembly, the freedom of the press and religion liberties, agreed?

A    Correct.

1      Q     And so for the Baton Rouge Police

2  Department, to comply with its obligations

3  under those constitutional provisions, has an

4  understanding of what the Supreme Court has

5  ruled in those areas, right?

6      A     Correct.

7      Q     And officers in Baton Rouge are

8  trained on certain Supreme Court cases, like,

9  for example, like Miranda, agreed?

10      A     Yes.

11      Q     So when there's big U.S. Supreme

12  Court cases that touch on officers'

13  activities, they need to be trained on those,

14  agreed?

15      A     Yes.

16      Q     One case of particular interest here

17  is a case called Cox V. Louisiana from 1965

18  that involved the arrest of a protester in

19  Baton Rouge Louisiana.  Have you ever heard of

20  that case?

21      A     I don't recall that case.

22      Q     If I told you it was a case involving

23  a protester who was arrested in Baton Rouge,

24  Louisiana and the Supreme Court held that his

25  First Amendment rights had been violated,

1    would that ring any bells for you?

2        A    It doesn't.

3        Q    So to your knowledge -- well, let me

4    back up.  Is there any training on this case,

5    as far as you know, in any of the training

6    provided to Baton Rouge police officers?

7        A    I'm not familiar with that case or it

8    is part of the training curriculum at all.  I

9    haven't heard that case.

10       Q    Does BRPD have a specific written

11   policy about First Amendment Rights, to your

12   knowledge?

13       A    I'm not a hundred percent on how it's

14   worded, but it definitely talks about voting,

15   the constitution and protecting the civilian

16   rights as a part of being a law enforcement

17   officer, it's a very important part of what we

18   do.

19       Q    So, for example, the Baton Rouge

20   Police Department Code of Ethics requires

21   officers to uphold the constitution?

22       A    Yes.

23       Q    But to your knowledge, there's no

24   specific policy related to First Amendment

25   Rights, agreed?

1      A     I'm not certain if there is.   I
2    would --
3      Q     So I haven't been able to find a
4    particular policy related to First Amendment
5    Rights in the Baton Rouge Police Department
6    Policy and Procedure Manual.  Are you aware of
7    any particular policy that specifically
8    addresses First Amendment Rights?
9      A     No, I'm not.
10     Q     Is the Baton Rouge Police Department
11   aware that streets and sidewalks are generally
12   considered to be public forums for speech and
13   assembly.
14     A     Of course, as long as it's in public
15   safety and safely to operate there, of course.
16     Q     Right.  So if people are assembled on
17   a sidewalk, for example -- or are private
18   property -- so long as it's safe, if they're
19   exercising their First Amendment Rights to
20   speech, they should not be arrested, agreed?
21     A     Agreed.  As long as there's nothing
22   other -- illegal activity goes on, of course.
23     Q     Does the City or Baton Rouge
24   Department have any ordinance or policies
25   specifically limiting how long a protest can

1  last?

2      A    No, not that I'm aware of.

3      Q    If the City is aware -- I'm sorry.

4  Let me back up.  Is the City aware that, if a

5  protest has been directed to go to a

6  particular area, it may be subsequently a

7  violation of those people's rights if they're

8  then ordered to disperse and arrested for

9  failing to disperse?  Does the City have any

10  awareness of that sort of structure?

11          MR. FAHRENHOLT:

12              Object to the form of the

13          question.

14          MR. MOST:

15              Can you answer that, Captain?

16          THE WITNESS:

17              I didn't understand what the

18          comment was after your question.

19          MR. SCOTT:

20              It sounds like it calls for a

21          legal conclusion from Captain Leach

22          who is very well-versed in these

23          things, but not an attorney or a

24          judge.

25          MR. MOST:

1               Sure.

2               Can you answer the question,

3       Captain, or would you like me to

4       rephrase it?

5       THE WITNESS:

6               Please rephrase.

7       MR. MOST:

8               Sure.

9  BY MR. MOST:

10      Q    So let's say there's a group of

11  protesters.  All right?

12      A    Okay.

13      Q    And they have been directed to clear

14  the streets, and they do clear the streets.

15  They retreat to sidewalks and private property

16  and continue their protests.  Okay?

17      A    Okay.

18      Q    So far what we're describing, they're

19  doing lawful things, right?  They're

20  protesting and they've complied with a police

21  order to clear the streets.  Agreed?

22      A    Okay.

23      Q    Do you agree with me?

24      A    I do.

25      Q    So at that point, it would not be

1  lawful for police officers to sweep in and

2  arrest them, agreed?

3          MR. FAHRENHOLT:

4              Objection to form.  Subject to

5          that, you can answer.

6          THE WITNESS:

7              I would agree with you, as long

8          as they comply with the order to

9          disperse and they're gathered

10          peacefully, there's no problem.

11  BY MR. MOST:

12      Q    Yeah.  Just to be clear, the order in

13  this hypothetical is an order to clear the

14  streets and they've complied with that.  Would

15  your answer be the same?

16      A    Yes.

17      Q    So these protesters who have been

18  issued an order to clear the streets and who

19  have complied with it, does the City have any

20  understanding of whether they

21  can thereafter -- were to disperse and

22  completely clear the area?

23      A    It depends on what order that they

24  were given.  If they're given an order to

25  disperse, it's because there's been violence

1  or another reason for that to happen.  If it's

2  just a simply clear the streets and they

3  comply, there's no need for arrests.

4      Q    Okay.  Let's move on to the Freedom

5  of the Press.  So I imagine the City Baton

6  Rouge -- let me back up.  Freedom of the Press

7  includes journalists and photographers, right?

8      A    Okay.

9      Q    I'm sorry.  I didn't quite hear your

10  answer.

11      A    Yes.  Okay.

12      Q    And so journalists and

13  photographers -- it's not lawful for them to

14  arrest them just for doing their job and

15  taking pictures, right?  They'd have to -- or

16  reporting?  They'd have to commit an

17  independent crime to be arrested, agreed?

18      A    Agreed.

19      Q    So if journalists and photographers

20  are present at an event, taking pictures,

21  conducting reporting, unless they're

22  obstructing police activity, they should not

23  get arrested, agreed?

24      A    Agreed.

25      Q    I want to talk next about religion

1    rights, Freedom of Religion.  When someone is

2    arrested -- I haven't seen anything in the

3    policy manual that requires the arresting

4    officer to immediately remove that person's

5    hat.  Is there any such policy?

6         A    Not particularly on that, unless

7    they're going to photograph that person.

8         Q    Right.  And it's not BRPD practice to

9    remove someone's hat as soon as they're

10   arrested, unless for the purpose of

11   photography, agreed?

12        A    It might be an officer safety issued

13   if they think they could have a weapon under

14   their hat, I'm sure they would be searched.

15   That would be standard.

16        Q    Sure.  So, for example, if someone

17   was -- do you know what a yamaka is?

18        A    Yes.

19        Q    If someone was arrested with a

20   yamaka, the officer shouldn't just immediately

21   pull off that person's yamaka, correct?

22        A    I wouldn't think so.  It would be

23   hard to hide a weapon underneath one.  If that

24   happened, I'm not aware or what officer's

25   reasons would have been.

1      Q    Right.  If officers were just

2   removing people's yamaka's immediately upon

3   arrest, without the need for some officer

4   safety issue, it could be a violation of that

5   person's religion freedom, agreed?

6      A    You're asking me a hypothetical.  If

7   it happened, I don't know if an officer would

8   have a reason.  It could be they're thinking

9   about it like any other hat or cap, and

10  they're going to check underneath it as part

11  of the search.

12     Q    Okay.  But in the absence of those

13  needs, it could be a religion freedom

14  violation, agreed?

15     A    Okay.

16     Q    Do you agree?

17     A    I don't --

18          MR. SCOTT:

19              I'm going to object for asking

20          for agreement on a hypothetical that,

21          as far as I know, has no application

22          to any of the fact patterns presented

23          by these cases.

24          MR. MOST:

25              Okay.  Objection noted.

1   BY MR. MOST:

2       Q    Officer, would you agree with me?

3       A    I honestly don't know that that falls

4   under violating his religion freedom or not.

5   It's his right to wear it, so I suppose.

6       Q    Okay.  And do you what a hijab is?

7       A    Yes.

8       Q    That's a head covering for some

9   Muslim women, correct?

10      A    Yes.

11      Q    Just like a yamaka -- someone has a

12  right to wear a yamaka -- people have a right

13  to wear a hijab, agreed.

14      A    Agreed.

15      Q    Do you know if, in the absence of a

16  need for an immediate search for weapons,

17  would there be any justification for removing

18  a Muslim woman's hijab when seizing them?

19      A    You could definitely hide things

20  under there, so I would imagine that would be

21  an officer safety issue.

22      Q    Are you saying officers should remove

23  people's hijab's upon seizing them?

24      A    I've seen weapons hidden in a lot of

25  places.  I would definitely search that

1  person, yes.

2      Q    Okay.  So a hijab might need to be

3  removed pursuant to a search.  But other than

4  pursuant to a search, would there be any

5  reason to remove a hijab from an arrestee?

6      A    No, I think not.

7           MR. MOST:

8                Okay.  We talked about -- I

9                think we covered that.  Okay.  Those

10               are my questions, although there may

11               be the need for followup.

12               MacArthur, would like to ask any

13               questions about this topic of First

14               Amendment, 2-L?

15          MS. MOORE-O'NEAL:

16               Yes.

17                    EXAMINATION

18  BY MS. MOORE-O'NEAL:

19      Q    Hi, I'm Mandisa Moore-O'Neal.  I'm

20  one of the plaintiffs' attorneys in the

21  Tennart, Smith and Batiste-Swilley cases, and

22  I have a few more questions about First

23  Amendment trainings.

24      A    Okay.

25      Q    I know earlier it was mentioned that

1    education and trainings on First Amendment

2    Rights is a part of what every officer

3    undergoes.

4        A    Yes, ma'am.

5        Q    I'm curious.  How long is that

6    training?

7        A    There are several subjects or subject

8    matter in the academy that is taught that

9    involves civilian rights, such as, they go

10   through their law class in one of them.  We

11   talk about Mobile Field Force or crowd control

12   is a big component of that class.  First

13   Amendment Rights and recognizing that right to

14   free speech and gathering and such.

15       Q    Is there any specific written

16   training material?  I'm not talking about,

17   like, policies and procedures.  But is there

18   anything else that's written on First

19   Amendment Rights?

20       A    Yes.  When you go through law class,

21   there's a section on that where it talks about

22   the civil rights.  And also, as I mentioned in

23   the Mobile Field Force class and the civil

24   disturbance class, there's written material

25   for the class on that.

1      Q    Thank you.

2      A    Yes, ma'am.

3      Q    So in addition to what's written in

4   these classes, is there any scenario planning

5   that happens?

6      A    Yes.  In the Mobile Field Force

7   class, there's actually hands-on part of it.

8   So we have role players that will, you know,

9   confront the group, distance training, so they

10  have to recognize, you know, the right for

11  them to be there.  It is a hands-on section.

12  It would fall under type of scenario training.

13          MR. SCOTT:

14              Mandisa, are you asking about

15          the current practice or the practice

16          in 2016?

17          MS. MOORE-O'NEAL:

18              I'm just asking in general.  I'm

19          actually moving into 2016 now.

20          THE WITNESS:

21              Right.  It was something that

22          was taught in 2016.  As far as I

23          know, it still is taught here.

24  BY MS. MOORE-O'NEAL:

25      Q    So who was responsible for these

1  trainings in 2016?

2     A    I was the Director of Training for

3  the police department then.

4     Q    Okay.  So you were the one who would

5  teach, like, these law classes and the

6  scenarios?

7     A    I was responsible for scheduling and

8  getting instructors.  We had instructors

9  within the department.  We had (INAUDIBLE)

10 instructors that would come in and teach the

11 certain classes.

12           THE COURT REPORTER:

13               We had -- I'm sorry.  Wait.

14           Wait.  You had what kind of

15           instructors to come in to teach the

16           classes?

17           THE WITNESS:

18               The person who taught our law

19           class is a civil attorney, who would

20           come in from outside the department

21           to teach.

22           MS. MOORE-O'NEAL:

23               Thank you.

24           THE WITNESS:

25               Yes, ma'am.

1          MS. MOORE-O'NEAL:

2             Do you have any further

3           clarifying questions, Ms. Henderson?

4          THE COURT REPORTER:

5             No.

6          MS. MOORE-O'NEAL:

7             Did you ever have any professors

8           from -- John, if you could go on

9           mute?  Is everyone able to hear me

10         and is there still an echo?

11         MR. SCOTT:

12            No, go ahead.

13  BY MS. MOORE-O'NEAL:

14    Q   I was asking if you ever had any law

15  professors from LSU Law School or Southern Law

16  School?

17    A   No, ma'am.  That would have been

18  great, but not from either one of those

19  schools, no.

20    Q   Okay.  And thinking of 2016 in

21  particular, would you say that the July 2016

22  protests that were in response to the killing

23  of Alton Sterling were First Amendment

24  protests?

25    A   I believe any protest is a First

Amendment protest.

    Q    Okay.  Thank you.  And prior to the
deployment of BRPD officers to the protest,
were the officers given any sort of
refreshment training on First Amendment
Rights?

    A    Yes, ma'am.  We, you know, as a
department -- after the first events in 2014,
we kind of recognize the step-up of training
in that type of situation.  We had other
training at the time.  We implemented a
refresher course that was required by all
officers in our department to go through a
refresher course in Civil Rights and Mobile
Field Force type.  To be more specific on your
question, to answer it, before our officers
were deployed from Emergency Operation Center
to confront any protester, they were all
briefed on what was expected of them and the
rights of the civilian was something that we
have to protect.

         So, yes, they were trained through
in-service training and they were briefed
before deployment from Emergency Operations
Center.

1    Q    Thank you.  And I understand it was

2    the briefing.  I'm curious about the -- how

3    long were those briefings?

4    A    The particular ones that I'm talking

5    about were actually the officers that were

6    assigned to Emergency Operations, because the

7    department -- the manpower was sort of divided

8    to still answer public service calls and calls

9    of emergency services, and some officers were

10   assigned to the response to civil unrest.

11         So those briefings were, you know,

12   probably 15 to 30 minutes.  I'm just guessing.

13   It's been a few years back.  But before their

14   deployment, there was also a briefing and then

15   we would always discuss anything afterwards in

16   a debrief to see what we could improve, you

17   know, and do things better.

18   Q    Thank you.  So in the debriefs

19   afterwards, how long after, say, someone is --

20   I'll just say -- if an officer is deployed to,

21   say, Airline and Goodwood, where a lot of the

22   protests happened and they are leaving.  How

23   long after they have left the scene does the

24   debrief occur?

25   A    Well, the debrief might have occurred

just between the supervisors and the emergency

operations, just to gather what had happened

during the hours of operation, any lessons

learned, any improvements, any shortages,

logistical operations, anything like that, so

we could try to improve on the Operations.

Q     And then once this information is

given to the supervisors, is it given to their

supervisor?

A     No.  Initially, it would be kind of

passed off.  Under Unified Command, I was in

charge of it, but there are many levels.  But,

certainly, it was passed up to me, because

after the night's events, you know, there was

always a briefing from the Chief's office for

the next morning as to what had happened and

what was expected to happened during the

daytime.  So those debriefs were passed up and

compiled into a briefing for to the chief and

his administrators.

Q     Just to confirm, is this written?

A     No, ma'am.  It was just usually

verbal.  Sometimes we would meet at the end of

our shift or sometimes if it was a busy night,

we could get a phonecall briefing.  The

1  briefings were given in person to the chief's
2  office.
3       Q    Thank you.
4       A    Yes, ma'am.
5       Q    Still staying with 2016, I imagine
6  that in the course of your 30 plus years,
7  there's been something that in the last
8  several years is fairly new.  And that is,
9  civilians filming officers.  You know, like
10 with the cellphone camera or tablet camera.
11 Like I imagine that 30 years ago, that wasn't
12 really something that existed.
13      A    Right.  No, I mean, probably, the
14 past ten years from the first iPhone, you
15 know.  But the first two-thirds of my career,
16 you didn't see much of that.
17      Q    Exactly.  It's like a news camera.
18      A    Right.
19      Q    So given this newer sort of way, has
20 there been -- in 2016 was there any training
21 for officers on how to engage with civilians
22 filming?
23      A    Yes, ma'am.  By 2016 every officer
24 was training to know:  Well, it's within
25 someone's right to interview.  They should

1  ignore that unless or it's impeding
2  investigation or something, if there was some
3  reason.  Certainly, it's something that we
4  tell our officers:  Just expect.  Someone is
5  always filming it.  And when brought about
6  body cameras, that was something, I think, our
7  department accepted quite well.  Because we
8  were already under the impression, we're
9  already being filmed anyway.  So we might as
10 well film ourselves.
11      Q    And so there have been any training
12 or discussions on filming in the context of
13 First Amendment Rights?
14      A    I believe we're following, not only
15 your First Amendment Rights -- like I said, if
16 you're being lawful and you're not impeding
17 the investigation, it's within your rights to
18 stand there with your cellphone and film.
19          MS. MOORE-O'NEAL:
20              Thank you so much.
21          THE WITNESS:
22              Yes, ma'am.
23          MS. MOORE-O'NEAL:
24              At this time, I don't have any
25              further questions.  But I want to

1          turn it over to John or, you know, if

2          William has any more.

3          MR. MOST:

4               Go ahead, John.

5          MR. ETTER:

6               I have just a couple of

7          followups here.

8          THE WITNESS:

9               Okay.

10                    EXAMINATION

11     BY MR. ETTER:

12          Q    First you have to -- Captain, was

13     there -- to your knowledge, was there any

14     training specifically regarding arresting

15     people pursuant to statute 14:97 for

16     obstructing a street prior to 2016?

17          A    Not specifically, I wouldn't think.

18          Q    Do you recall any -- was there at any

19     training at all regarding violation of

20     statutes for obstructing a street or highway?

21          A    I don't think there was any specific

22     training on one specific law.

23          THE COURT REPORTER:

24               Wait.  Wait.  I'm sorry.

25          There's a lot of feedback coming

1          through.  Could you repeat your

2          answer, please?

3          THE WITNESS:

4               I think it's going to

5          continue --

6          MR. MOST:

7               John, if you have headphones or

8          try and separate your speaker and

9          audio.

10          THE WITNESS:

11               He's muted.  My answer was, I

12          don't think there was any specific

13          training on that one statute, no.

14     BY MR. ETTER:

15     Q    You mentioned that there had been

16     refresher training regarding First Amendment

17     Rights that occurred between 2014 and 2016.

18     Am I correct?

19     A    That's correct.

20     Q    And were there specific materials

21     used for that training?

22     A    Yes, sir.  There was a class that was

23     presented all of our police officers through

24     in-service, in their required in-service

25     training, so there was a class with training.

```
 1     Q     Doe you or your counsel --
 2           THE COURT REPORTER:
 3                 Is anybody else getting -- I'm
 4           hearing --
 5           MR. MOST:
 6                 You have a feedback loop going
 7           on where your audio is going into
 8           your speakers.  So we're hearing
 9           everything multiple times
10           overlapping.
11           MR. ETTER:
12                 Sorry.  I'm not quite sure.
13           MR. MOST:
14                 One solution would be to use
15           head phones.  Another would be to
16           somehow move your microphone and your
17           speakers further apart from each
18           other.
19           MR. ETTER:
20                 Yeah.  I'm trying to.
21           MR. MOST:
22                 Let's go off the record while we
23           address this.
24                 (BRIEF RECESS)
25           MR. MOST:
```

1          Back on the record.  Until John
2          comes back, I've just got one
3          followup, which is:  You were talking
4          about sort of refresher trainings
5          about First Amendment Rights that
6          were given before or in anticipation
7          of the July 2016 protests.  Is that
8          right?
9          THE WITNESS:
10             Yes.
11    BY MR. MOST:
12        Q    If there was a U.S. Supreme Court
13    case about protesters in Baton Rouge and about
14    whether it was lawful for Baton Rouge Police
15    Department to arrest them for a 14:97, that's
16    the kind of thing that should have been in
17    that training; agreed?
18        A    I wish I would have known about that
19    '65 case that you mentioned.  That would have
20    been a great example.
21        Q    So that case, if there's a case like
22    what I'm describing, that's the kind of thing
23    that should have been in that training,
24    agreed?
25        A    It would have been nice to have

1  known.  It would have fit right in, yes.

2      Q    More than nice to have.  If there's a

3  case by the U.S. Supreme Court about this

4  city, this topic and this police department,

5  that's the kind of thing you would expect to

6  have and should have in a training on that

7  topic, agreed?

8      A    I tell you that, if it had been

9  known, it would have been in there.  But you

10  can't include something you didn't know about.

11          MR. MOST:

12              Okay.  That's my question.

13          MR. SCOTT:

14              You're asking for legal

15          conclusions and --

16          MR. ETTER:

17              I'm back.  Is this better?

18          MR. MOST:

19              Yes.

20          MR. ETTER:

21              I switched to doing this through

22          my phone instead of through the

23          laptop.

24  BY MR. ETTER:

25      Q    Captain, do you now have the training

1   materials from that refresher course on the

2   First Amendment being produced to the

3   plaintiff's counsel in these cases?

4      A    I suspect that it has.  I can't say

5   100 percent.  I know that the academy has

6   given everything that they've been asked of.

7   And over the past five years, that should have

8   been included, I would think.

9           MR. ETTER:

10              Mr. Scott, plaintiffs are

11           calling for the production of those

12           materials -- the training materials

13           from that refresher course, if they

14           have not been previously produced.

15           MR. MOST:

16              Moving on to topic 2-P, as in

17           Paul.

18           MR. FAHRENHOLT:

19              William, I actually have some

20           questions on the topic.

21           MR. MOST:

22              Yeah, you're good.

23           MR. FAHRENHOLT:

24              No problem.

25              EXAMINATION

BY MR. FAHRENHOLT:

Q    Is it the City's position that the
First Amendment gives people an absolute right
to protest anywhere they want at any time they
want?

A    It would have to follow within the
safety guidelines, of course.  But there are
no time restraints on anything.

Q    Is it ordinary for the City to
encounter protests that are in residential
areas?

A    Well, then that would fall in
violation of noise ordinance, so that might be
-- that could be something that would not be
allowed.

Q    Is it the City's position that a law
enforcement officer does not have the ability
to give the crowds commands to disperse if the
officer believes a riot is occurring or is
likely going to occur?

A    If he believes there's going to be
violence, yes, they would give an order to
disperse, if they couldn't bring about a
peaceful solution for the protesters.

Q    If an event is occurring on private

1  property and the police officer believes

2  there's a violation of the law, would the

3  police officer have the ability to command a

4  crowd to disperse from private property?

5      A    Like I said, unless they're violating

6  some other type of ordinance, then they would

7  be fine there.

8      Q    Let me give you a hypothetical.

9  Let's say someone is having a very large house

10  party in their yard with hundreds of people

11  and that party becomes unruly.  Is it the

12  City's position that, because those people are

13  in a private yard, that a police officer could

14  not tell those people to disperse and go home?

15      A    No, that happens all the time around

16  LSU.  There are college parties broken up, if

17  they're disturbing the peace of the neighbors

18  around them, it's perfectly within that

19  officer's right to give that order to

20  disperse.

21      Q    So for the example you just gave, if

22  there's large party at LSU, Baton Rouge police

23  officers have commanded people to leave those

24  parties, even if the party was happening on

25  private property, correct?

```
1        A     That's correct.  That's happened
2   before, and it will probably happen many more
3   times.  If it's a disorderly crowd and
4   disturbing another person's peace, then, yes,
5   they will give that order.
6              THE COURT REPORTER:
7                   I need one second, please.
8                   (OFF-THE-RECORD DISCUSSION)
9              MR. MOST:
10                  Let's go back on the record.
11                  All right.  Topic -- moving on to
12                  Topic 2-P, as in Paul, which is
13                  policies and procedures regarding any
14                  of the following topics:  "Peaceful
15                  versus non-peaceful protests."
16             MR. SCOTT:
17                  Do plaintiffs' counsel feel that
18                  we've adequately addressed 2-N,
19                  2-November.
20             MR. MOST:
21                  N as in Nancy?
22             MR. SCOTT:
23                  Whatever N you want.
24             MR. MOST:
25                  No, N as in neck is not on my
```

1          list as ones that were already done,

2          which is BearCats and other vehicles

3          primarily deployed for crowd control.

4          Although, my questions about that

5          would be super brief.  So if we'd

6          like to address that now, I'm fine

7          with that.

8      MR. SCOTT:

9          Just trying to be more orderly.

10     MR. MOST:

11         Yeah.  Let's try it out.  Let's

12         try and do 2-N as in neck.

13                    EXAMINATION

14 BY MR. MOST:

15     Q    All right.  That topic is:  "Policies

16 and procedures regarding any of the following

17 topics:  Use of BearCats or other vehicles

18 primarily deployed for crowd control."

19         Captain, are you prepared to testify

20 about that topic?

21     A    Yes, sir.

22     Q    So it's my understanding that a

23 BearCat was deployed to the July 2016 protest.

24     A    Yes, BearCats were used regularly,

25 yes.

1      Q     By BearCat, we mean a large

2   military-style vehicle that is owned by the

3   City of Baton Rouge?

4      A     Yes, it's an armored vehicle made by

5   a company called Lenco out of Massachusetts.

6      Q     Was that a military vehicle that

7   Baton Rouge Police Department obtained in some

8   fashion?

9      A     No, it's not a military vehicle at

10  all.  It's just an armored truck.

11     Q     Okay.  That was a vehicle on which an

12  LRAD device was mounted; is that correct?

13     A     On one occasion, yes.

14     Q     Okay.  And that occasion was the

15  protests at East and France Streets on

16  July 10th, 2016?

17     A     That's correct.

18     Q     But the BearCat was deployed to other

19  protests in July 2016 without the LRAD?

20     A     Yes.  BearCat was deployed simply for

21  overwatch in case there was violence --

22  related violence, such as the attack in Dallas

23  at the protest that killed five officers.

24  But, also, not just for officer safety, in

25  case there's an active shooter, for civilian

1    safety.

2        Q    All right.  Can you recall other

3    times the BearCat has been deployed, other

4    than July 2016?

5        A    Can you be more specific?  Because

6    it's used quite frequently.

7        Q    What other context is the BearCat

8    used?

9        A    As transport for our SWAT operators.

10   It's used on every warrant that we do, every

11   call-out that we have.  Anytime there's a

12   danger, there's a need for a good solid cover

13   vehicle, it's brought out and utilized.  We

14   use it to rescue victims, flood victims around

15   here on many occasions.

16       Q    And is it proper to use the BearCat

17   to drive at people who are standing in place

18   to try and push them back?

19       A    No, it wouldn't be utilized in that

20   fashion for that reason, no.

21       Q    Should it be driven at people who are

22   standing in place and not moving?

23       A    I know the particular incident you're

24   talking about.  The crowd was refusing to move

25   and they were trying to position the LRAD to

1  be more effective.  They weren't trying to run

2  over people.

3        Q    Yeah.  I don't even think that they

4  were trying to run over people.  I guess what

5  I'm asking, is it proper to drive at

6  stationary people?

7        A    No.

8             MR. MOST:

9                  Okay.  Those are my only

10                 questions about the BearCat for topic

11                 2-N.  MacArthur, do you have any

12                 questions about that?

13            MS. LOMMERS-JOHNSON:

14                 Just a few questions about the

15                 BearCat.

16                     EXAMINATION

17  BY MS. LOMMERS-JOHNSON:

18        Q    Good afternoon.  My name is Hannah

19  Lommers-Johnson.  I'm with the MacArthur

20  Justice Center.  And today on this conference,

21  Mandisa Moore-O'Neal and myself represent the

22  plaintiffs from the Tennart, Smith and

23  Batiste-Swilley cases.

24             You discussed what a BearCat looks

25  like a little bit in your testimony with

1  William just now.  I just wanted to confirm,

2  so the armored vehicle called the BearCat has

3  a turret similar to a tank; is that accurate?

4      A    It is called a turret.  You are

5  correct.  Unlike the military, ours doesn't

6  have a machine gun poking up out of it.  We

7  will use it for cover for officers and for

8  civilians because it's mounted.  Once you

9  stand up, you can see over a lot of people in

10  the crowd.  So it's used to be a covered

11  vehicle in case there is that active threat,

12  like an active shooter threat.

13      Q    And is the BearCat deployed every

14  time the Special Response Team is deployed?

15      A    Yes, ma'am, pretty much.  We would

16  always like to have it close by if we're not

17  deploying it, just in case it's needed.  And

18  it is a way -- it will haul about --

19  comfortably, it will haul ten operators and

20  gear.

21      Q    Do you know, during the Baton Rouge

22  protests in July of 2016, did -- was the

23  BearCat used for transport during that time?

24      A    It was.  We use it to transport

25  officers in during the protest and other

1    times.

2            THE COURT REPORTER:

3                  I need one second.

4                  (OFF-THE-RECORD DISCUSSION)

5            MS. LOMMERS-JOHNSON:

6                  Okay.  Back on the record.

7    BY MS. LOMMERS-JOHNSON:

8        Q    We were looking earlier today at

9    General Order 291.  This is the policy on

10   civil disorder.  Are you familiar with that

11   policy?

12       A    Yes, ma'am.  I haven't read it in a

13   file, but I am familiar with it.

14       Q    I can -- here.  Let me bring it up on

15   the screen so we can see it while we're

16   chatting about it.  Can you see my screen now,

17   Captain Leach?

18       A    Yes, ma'am.

19       Q    And so this has been entered into the

20   record as Exhibit ZZZZZZZ.  It's the civil

21   disorder policy.  My understanding is that

22   this was in place at the time of the July 2016

23   protests; is that accurate?

24       A    I assume it was.  I'm not certain

25   that revised date is the last one or not.  I

1  see renewed -- I guess it was, yes, ma'am.

2      Q    And I'll just try to scroll through

3  this policy briefly down to, you know, the

4  responsibilities and obligations of the

5  Incident Commander.  My understanding of this

6  policy is that, once an event has been deemed

7  by BRPD to be a civil disorder policy, the

8  Incident Commander is at that point authorized

9  to order the Special Response Team to deploy.

10  Is that correct?

11      A    It would cover under this.  It would

12  cover also Mobile Field Force.  You're

13  correct, whatever is needed, yes.

14      Q    So at the point that BRPD has deemed

15  an event a civil disturbance, at that point

16  the Incident Commander is authorized by this

17  policy to deploy Special Response Team and/or

18  Mobile Field Force?

19      A    Correct.

20      Q    And my question here with regard to

21  the BearCat is just -- I think you testified

22  that the BearCat is deployed along with

23  Special Response Team, whenever they deploy.

24  And so when an Incident Commander orders

25  Mobile Field Force and the Special Response

1  Team to deploy at a protest, they're aware

2  that a BearCat will be arriving on scene, as

3  well?

4       A    Yes, ma'am.

5       Q    And I know you said the BearCat is

6  not equipped with a gun in the turret area.

7       A    Correct.

8       Q    Okay.  My question here is, what

9  equipment is contained within the BearCat as

10  part of this standard equipment?

11       A    Okay.  There are quite a number of

12  items.  Each officer is going to be, you

13  know -- and, of course, protective gear,

14  heavier level than your normal uniform officer

15  would wear.  They will have a pistol and a

16  riffle as standard issued.  Once inside the

17  BearCat, there will be breaching tools, such

18  as a ram or even a shield, you know, a

19  handheld shield.  There will be some kind of

20  bolt cutters for breaching as well, a sledge

21  hammer, a Halligan tool, which is used to pry

22  open doors.  Those would be certain things

23  each officer would also be equipped.  They're

24  supposed to have all of their protective gear,

25  in addition, their gas mask, if needed.

1    Things like that will be standard issue

2    equipment in a BearCat.

3         Q    And I understand that the turret on

4    the BearCat is not equipped with a gun itself.

5    But is it the practice of BRPD at some point

6    to have an officer standing up in the turret

7    and have that officer armed with a pistol or

8    other weapon?

9         A    At some point, yes.  If it's deemed

10   to be a cover situation where you're covering

11   a team's movement or you're on a watch for

12   threat, it could be where an officer would be,

13   you know, even with a rifle in a turret.

14        Q    Okay.  And are you aware of an

15   incident during the July 2016 protests when

16   the BearCat and the Special Response Team were

17   deployed to the area of the mayor's house.

18        A    I do remember -- if you say the

19   BearCat was there, I don't recall if it was or

20   not.  I do know, you know, that SRT or our

21   response guys we were out there that evening.

22   I'm not sure how they were transporting those

23   teams, because we would also operate in what

24   we call QRF.  It's just a Quick Response

25   Force.  It's usually two guys in a Tahoe.  I'm

1   not sure if the BearCat was there or not.

2         THE COURT REPORTER:

3             I'm sorry.  "Two guys and a"

4         what?

5         THE WITNESS:

6             In a Tahoe, Chevrolet Tahoe.

7         It's unmarked.  It's what most of the

8         guys drive.

9   BY MS. LOMMERS-JOHNSON:

10     Q    If the BearCat were on scene at the

11   mayor's house during the July 2016 protests,

12   it wouldn't be, you know, a violation of BRPD

13   practice or policy to have an officer armed

14   with a rifle standing up, looking out of the

15   turret; is that correct?

16     A    Yes, ma'am.  You're correct.  It's

17   not a violation of policy.

18     Q    And I think you testified previously

19   that the BearCat has been deployed at several

20   different types of events previously.  I think

21   you mentioned flood response, different types

22   of disaster responses.  My question is:  What

23   other events related to demonstrations or

24   crowd control has the BearCat been deployed to

25   respond to?

1    A    Specifically, I can't really answer

2    that.  I would say most of them, because of

3    the advantage that it brings if that solid

4    structure -- that covered structure is needed,

5    it's going to be close by.  Whether it's

6    actually deployed or not, it's probably going

7    to be on scene somewhere.  If it's a large

8    crowd that has gathered, sometimes it used

9    just for the observation point, because it's

10   relatively tall compared to other vehicles,

11   and you can see further over into the crowd.

12   So it's utilized like that, as well.

13   Q    And can you remember or are you aware

14   of the BearCat being deployed to any events

15   with crowds that are not protest-related?

16   A    Yes, ma'am.  We use it for all of our

17   festivities.  Of course, we just had a big

18   Fourth of July fireworks display.  The BearCat

19   was prominently displayed, as well.  It's on

20   the scene just in case, you know, things go

21   bad.  Bad things happen in good places all the

22   time, so we just try to be prepared.

23   Q    When the BearCat is deployed at an

24   incident that the BRPD has determined to fall

25   under this Civil Disturbance Policy, who is

1    responsible for directing the BearCat where to

2    go?

3         A    That would just fall on whoever is

4    the ground command at the time, I suppose.  If

5    the BearCat -- if it was an unplanned event --

6    so if the BearCat was called to an event -- I

7    guess you're kind of talking hypothetically

8    now.  It would be whoever is in charge on the

9    ground, boots-on-the-ground type of thing as

10   to where the BearCat would be.

11             MS. LOMMERS-JOHNSON:

12                  Those are all my questions on

13             Topic 2-N.  I'll pass it to -- John,

14             did you have questions on 2-N?

15             MR. ETTER:

16                  No questions.

17             MR. MOST:

18                  Greg, just jump in wherever you

19             want to.  So then we'll move on --

20             MR. SCOTT:

21                  I just wanted to ask one

22             question.

23             MR. MOST:

24                  Oh, sure.

25

1          MR. SCOTT:

2              Captain Leach, does the BearCat

3      that BRPD owns have any --

4      THE COURT REPORTER:

5              I'm sorry.  I'm having a hard

6      time hearing you, Mr. Scott.  Can you

7      talk to him but face the mic, please?

8      MR. SCOTT:

9              Yes, ma'am.

10             Does BRPD have any intergraded

11     weapons symptoms, whether they're in

12     the turret or not?

13     THE WITNESS:

14             No, it has nothing that's

15     integrated on the vehicle, no.

16     MR. MOST:

17             So I wonder if -- there's a

18     separate topic for the LRAD device.

19     Since we're close to that

20     conceptually, is that something that

21     Leach would want to testify about,

22     Joe, or is that something you'd like

23     to have someone else for?

24     THE WITNESS:

25             I can talk about it, certainly.

1          MR. MOST:

2               So this is Topic 8-A, "Equipment

3          used during BRPD response to protest,

4          including the acquisition of

5          equipment related to the following

6          tactics; determination to use the

7          following tactics; the designation of

8          authority to deploy the following

9          tactics; and the description of the

10         BRPD authorized use of the same,

11         Subsection B, LRAD."

12              Are you prepared to testify

13         about that, Captain?

14         THE WITNESS:

15              Yes, sir.

16                   EXAMINATION

17    BY MR. MOST:

18         Q    Okay.  So the LRAD device, that's an

19    acronym that stands for Long Range Acoustical

20    Device?

21         A    Correct.

22         Q    And that is -- would you consider it

23    to be a nonlethal weapon that's attached to

24    something?

25         A    It is a nonlethal weapon.  It's not

attached to anything.  The one that was used

in 2016 was mobile and relatively small.  I

can't remember the decibel level, but it's

basically a big speaker.  We didn't own it at

the time.  We borrowed one from the State

Police.  It wasn't attached to anything.  And

to be quite honest, it was very directional.

If you're not directing it in the exact area,

it's not that effective.

     Q     Okay.  So just backing up a little

bit for context.  It's my understanding that

your testimony is that in July of 2016, BRPD

borrowed an LRAD from the State Police and

used it at the protests on July 10th on East

and France Street; is that right?

     A     That's correct.

     Q     And it was -- the person operating it

was in the turret of the BRPD BearCat?

     A     Yes, sir.

     Q     And you said that the LRAD was

directional.  Was it something that officer

was holding and moving around or was it fixed

so that it's pointed forward or in a

particular direction?

     A     Well, the officers standing up there

1   and, you know, they moved -- they moved it

2   very little.  And they thought that they'd get

3   closer.  I think that was where the BearCat

4   was trying to position whenever -- that's how

5   they chose to move it, I suppose.

6       Q    So when you say they moved it very

7   little, so it's mostly pointed forward; is

8   that correct?

9       A    Correct.  I think it was pointed

10  forward and the projection from -- I wasn't on

11  scene -- but the projection -- well, from what

12  I've seen, would have been kind of ineffective

13  for what it's designed for.

14      Q    And it's designed to make standing in

15  one place so uncomfortable because of the

16  noise that people leave?

17      A    That's correct.  It's also used to --

18  you can use it as a speaker, whereas you're

19  giving commands, commands to disperse can be

20  given, or it can be directed and understood

21  over a lot of noise or you can really put it

22  on this uncomfortable setting where you just

23  don't want to stand there and listen to it.

24  It makes you really nauseated.  It can make

25  you nauseated, a little bit.  But it's less

1    lethal.  We've trained with it and used it

2    multiple times on each other.  But it is

3    directional.  If you just put it up there and

4    expect it to work, it's not going to be

5    effective.

6         Q    Okay.  Just so I understand, there's

7    at least two settings for it; one is to use

8    the LRAD as a speaker; the other is to use it

9    as a nonlethal weapon for the purpose of

10   making people move, because it is so loud and

11   it causes someone to might have nausea,

12   correct?

13        A    It can, yes.

14        Q    And so what unit within the Baton

15   Rouge Police Department borrow this LRAD; was

16   it the SWAT team or SRT team?

17        A    Yes.

18        Q    So you were in charge of that unit in

19   July of 2016?

20        A    I was.

21        Q    So you know some of the information

22   about the circumstances of borrowing the LRAD?

23        A    Yes.  We had multiple agencies in

24   town as part of the unified command system, so

25   it was quite common to share equipment or

1    whatever was needed.

2         Q     Right.  Had Baton Rouge Police

3    Department ever used an LRAD before July 10th,

4    2016?

5         A     We had not.

6         Q     Has Baton Rouge Police Department

7    ever used an LRAD since July 10, 2016.

8         A     To my knowledge, we haven't.  We have

9    our own now and we've trained on multiple

10   occasions.  To my knowledge, we've never

11   deployed the use.

12        Q     Okay.  So the only time, as far as

13   you know, the Baton Rouge Police Department

14   has ever used an LRAD device on people was

15   July 10, 2016 at East and France Streets,

16   agreed?

17        A     And it was used as a device to move

18   people there.  I believe it was used as a

19   speaker to give commands during the protest

20   and some on Airline Highway, as well.  I can't

21   say on what date.  I know it was out there.  I

22   know commands were given.  It's louder than a

23   P.A. would be on a police car or a BearCat.

24        Q     Okay.  So to your knowledge -- just

25   to be more specific -- the only time that the

1   BRPD has used an LRAD device in its capacity
2   as a less-than-lethal weapon on people was at
3   the -- aside from training -- was at the East
4   and France Street protest on July 10, 2016,
5   agreed?
6       A    Agreed.
7       Q    And so at that protest, there was an
8   LRAD because the Baton Rouge Police Department
9   had borrowed it from State Police.  Did the
10  State Police give any training on the safe
11  operation of the LRAD to Baton Rouge Police
12  Department personnel before it was used at
13  East and France?
14      A    They showed our operators how to use
15  it and switch it from a speaker to this
16  disturbing sound or whatever.  They gave them
17  brief instruction, yes.
18      Q    They gave them brief instruction
19  about the actual -- like how to operate the
20  device, right?
21      A    Correct.
22      Q    Did they give them any instruction
23  about -- in what circumstances the device
24  would be safe to use on people?
25      A    I don't know anything specifically

1    outside of just the operations of it.

2       Q    Okay.  So you don't know if any

3    training or instruction Baton Rouge Police

4    Department received before using it on

5    July 10th about, say, how close to someone the

6    device could be safely used, correct?

7       A    I don't know of any.

8       Q    And do you know of any training that

9    was given to Baton Rouge Police Department

10   personnel before they used it on July 10th

11   about at what decibel levels the device could

12   be safely used on people?

13      A    I don't know if that was covered or

14   not.

15      Q    And do you have any knowledge as to

16   what decibel level the device was used in

17   less-than-lethal weapon mode on protesters on

18   East and France Street?

19      A    I don't know.  It's a smaller unit,

20   but I'm not sure of the maximum decibel rating

21   for it.

22      Q    Okay.  So it sounds to me like, as

23   far as you know, City Baton Rouge doesn't know

24   anything about that device, how close to

25   people it could be safely used, at what

1   decibel it could be safely used or at what

2   decibel level it was actually was used on

3   people, agreed?

4       A    I agree.  We had no formal training

5   on it.  But I'm not sure what they were

6   briefed on or instructed on once they took

7   possession of it.  There was no formal

8   training on the device.

9       Q    Did the State Police, when they

10  handed over the device to the Baton Rouge

11  Police Department, hand it over with any

12  paperwork or documentation, an owner's manual,

13  a safety manual or anything like that?

14      A    Not that I recall.

15      Q    And the device was used on July 10th,

16  2016 within close range to protesters, agreed?

17      A    I don't think it ever left the

18  BearCat.  I think it stayed on top of the

19  BearCat, to my knowledge.

20      Q    When I say close range, I mean less

21  than 30 feet.  Would you agree it was used

22  close range under that definition?

23      A    Yes.  Less than 30 feet, I would

24  agree with that.

25      Q    I'm going to pull up a video.  This

1  is going to be Document AAAAAAAAA.  Can you

2  see this video here?

3      A    Yes.

4      Q    I'm going to press "Play" for the

5  first few seconds of that.

6           (VIDEO PLAYED)

7  BY MR. MOST:

8      Q    Can you hear that noise that we can

9  hear in the first few seconds of this video?

10     A    Yes.

11     Q    That's the LRAD being used in its

12 less-than-lethal weapon mode, correct?

13     A    Correct.

14     Q    And you can see it's being operated

15 while -- at least one protester physically has

16 their hands on the vehicle, correct?

17     A    Yes.

18     Q    And the distance between the front of

19 the vehicle and that LRAD device is probably

20 what?  Maybe six or eight feet, agreed?

21     A    Yeah.  Probably no less than that.

22 Probably around that, ten, maybe, max to be

23 used as a deterrent.

24     Q    So the LARD device we can see is

25 being used on protesters at a range of ten

1  feet or less, agreed?

2      A    I'd agree with that.  It is

3  directional and the failure of the --

4          THE COURT REPORTER:

5              I'm sorry.  Can you repeat that?

6          THE WITNESS:

7              I was saying the device is very

8              directional, so -- what you're seeing

9              on top of the BearCat, basically --

10             it wasn't useful because they weren't

11             directing it down at the protesters

12             in front of the BearCat.  It was

13             basically going over the crowd, the

14             level they had it was mounted at --

15             or sitting.  It wasn't mounted.  They

16             had it sitting there.

17 BY MR. MOST:

18     Q    So it's your testimony that the

19 device was not pointed at the protesters?

20     A    That's what I'm saying, yes.  It was

21 sitting on top of the BearCat, which the

22 elevation would have been -- the directional

23 elevation be would have been projecting that

24 horrible noise over the crowd.  And that's why

25 it wasn't effective.  If they had turned the

1    LRAD down on it, they would have actually

2    positioned it physically, picked it up or

3    leaned it down towards that protester, she

4    would not have stood there, in my opinion.

5         Q     Because it would have been such a

6    significantly impacted less-than-lethal weapon

7    that it would have --

8         A     It's very uncomfortable.  I don't

9    think anybody would have stood there.

10        Q     Officer, you understand that very

11   loud noises at high decibel levels can cause

12   injury to people's ears, eardrums and hearing,

13   agreed?

14        A     I agree.

15        Q     And it sounds to me like, prior to

16   the use of this LRAD device on July 10, 2016,

17   BRPD had not done -- to your knowledge -- any

18   training or investigation into the safety use

19   of this LARD device in a manner to prevent

20   injury, agreed?

21        A     Agreed.

22             MR. MOST:

23                  That's all my questions about

24             the LRAD device.  MacArthur, are you

25             guys interested in the LRAD?

1    MS. LOMMERS-JOHNSON:

2         Very interested, but we don't

3    have any questions about the LRAD

4    today.  Thank you.

5    MR. MOST:

6         John?

7    MR. ETTER:

8         No questions about the LRAD.

9    MR. FAHRENHOLT:

10         I have a couple of questions to

11    jump in.

12    MR. MOST:

13         Sure.

14              EXAMINATION

15    BY MR. FAHRENHOLT:

16    Q    Were you actually at the scene of the

17    protest at East and France on July 10th?

18    A    No.

19    Q    But you testified that the LRAD could

20    be used as a speaker, correct?

21    A    Yes.

22    Q    Do you know if it was used as a

23    speaker on that day?

24    A    I'm not certain.  I think that it

25    was, but I'm not certain.  I'm don't know if

1    they used the PA in the BearCat or the LRAD.

2    I'm not certain.

3              MR. FAHRENHOLT:

4                   I'm going to share -- I think

5              it's the same -- is there a way that

6              I can share my screen, William?

7              MR. MOST:

8                   You should have permission to

9              share now.

10             MR. FAHRENHOLT:

11                  Thank you.

12   BY MR. FAHRENHOLT:

13        Q    I'm going to show you -- okay.  I'm

14   going show you what was just discussed as

15   Exhibit AAAAAAAAA.  Let me see if this is --

16   okay.  I'm going to jump ahead to the

17   one-minute mark.  Do you have sound?

18        A    Yes.

19        Q    Just listen for the next, say, 15

20   seconds or so, and then I have a question for

21   you.

22        A    Okay.

23             (VIDEO PLAYED)

24             MR. FAHRENHOLT:

25                  It may be a little longer.

```
 1              MR. SCOTT:
 2                   Greg, I don't think we're
 3              getting the audio from your video
 4              tape.  We can hear you talking, but
 5              there's --
 6     BY MR. FAHRENHOLT:
 7         Q    Did you hear that command being given
 8     over the LRAD?
 9         A    No, we didn't hear it on this end.
10         Q    You don't have sound?
11              MR. SCOTT:
12                   We can hear you talking, but
13              we're not getting --
14              MR. MOST:
15                   Alternatively -- can we go off
16              the record for a second?
17              MR. FAHRENHOLT:
18                   Sure.
19         (OFF-THE-RECORD DISCUSSION)
20              MR. MOST:
21                   This is William Most.  I'm going
22              to be playing Exhibit AAAAAAAAA
23              starting at one minute, 31 seconds
24              for about 15 seconds.
25                   (VIDEO PLAYED)
```

1          MR. FAHRENHOLT:

2              You can stop it there, William.

3    BY MR. FAHRENHOLT:

4      Q    I have a question.  Is it the City's

5    understanding that that order to disperse

6    meant that the protesters could stay nearby,

7    as long as they were on a residential

8    property?

9      A    They were given an order to disperse.

10   That means they had to leave.  They had

11   displayed acts of violence.  It was determined

12   it was no longer a lawful assembly.  If they

13   gave an order to disperse, that means they

14   were supposed to leave.

15     Q    What does an order to disperse mean?

16     A    It means they're supposed to leave.

17     Q    Does that mean cross the street and

18   stay there or leave the area?

19     A    It means leave the area.

20         MR. FAHRENHOLT:

21              William, can you just play that

22              video again?  I think it's a

23              three-minute mark, and play it for a

24              bit.  Thank you for in indulging my

25              technical difficulties.

1           MR. MOST:

2                I'm sorry.  You said the

3           three-minute mark?

4           MR. FAHRENHOLT:

5                At three minutes exactly, yes.

6           Thank you.

7           MR. MOST:

8                We're at three minutes, Exhibit

9           AAAAAAAAA.

10          MR. FAHRENHOLT:

11               That's fine.

12               (VIDEO PLAYED)

13          MR. FAHRENHOLT:

14               You can pause it there, William?

15 BY MR. FAHRENHOLT:

16     Q    Captain, did you hear that portion of

17 the audio?

18     A    Yes.

19     Q    Was that, again, an order given by

20 Baton Rouge over the LRAD to disperse the

21 area?

22     A    I'm not sure they were using the

23 PA or the LRAD.

24     Q    Okay.  But it was over some sort of

25 public address system, correct?

1      A     Correct.

2      Q     And you heard an order to disperse,

3 correct?

4      A     Yes, sir.

5            MR. FAHRENHOLT:

6                  William, one last thing.  If you

7            could pull up -- it's the next

8            Exhibit in your list.  It's

9            AAAAAAAAAA.

10           MR. MOST:

11                 This one here (Indicating)?

12           MR. FAHRENHOLT:

13                 Yes.

14 BY MR. FAHRENHOLT:

15     Q     Captain, again, I'd like to have you

16 listen to the audio from this video and then

17 answer a question for me.

18           (VIDEO PLAYED)

19 BY MR. FAHRENHOLT:

20     Q     Captain, did you hear that audio?

21     A     Yes, sir.

22     Q     Would you consider that to be an

23 order to disperse?

24     A     It is.

25     Q     And, again, under the City's

understanding of an order to disperse given by
a Baton Rouge police officer, would just
remaining in place on a private property be
dispersing?

     A     No, it would not.

          MR. FAHRENHOLT:

               That's all the questions I have
          about the LRAD.  Thank you.

          MR. MOST:

               It's 12:40.  Does anybody need
          to quick break for lunch or anything
          before we move to the next topic?

          MR. SCOTT:

               Okay.  So it looks like we got
          through a few of the topics, but
          there are substantial topics left
          over.  I have somebody on deck to
          start at 2:00.  But I had kind of
          planned to go until 1:00 o'clock.  If
          we could take a break at 1:00.

          MR. MOST:

               Sure.

               Okay, so moving on to the next
          topic for Captain Leach, which I have
          as Topic P, as in Paul, which Is

```
 1              "Policies and procedures regarding

 2              any of the following topics:"

 3              Subsection P is:  "Peaceful versus

 4              Non-peaceful protests."

 5                   Captain Leach, are you prepared

 6              to talk about that topic?

 7         THE WITNESS:

 8              Yes, sir.

 9                   EXAMINATION

10    BY MR. MOST:

11         Q    All right.  So the topic is "Peaceful

12    versus Non-peaceful protests," right?

13         A    Okay.

14         Q    Does Baton Rouge Police Department

15    distinguish between peaceful and non-peaceful

16    protests; does it treat them definitely?

17         A    I would think so.  If you're

18    peaceful, it's your right to be there, civil

19    and have your voice heard.  If it's not

20    peaceful, if there's violence or there's

21    illegal activities, then, certainly, we treat

22    it differently.

23         Q    You said -- okay.  So what makes a

24    non-peaceful protest is -- I think I heard you

25    say either violence or illegal activity; is
```

1    that correct?

2         A    A couple of things, yes.

3         Q    Could anything else make a protest

4    not peaceful?

5         A    I don't know.  I suppose if there

6    were certain types of threats that might be

7    known or, perhaps, if there's -- of course, if

8    they're illegal activity, if they were

9    occupying a roadway and they're told to move,

10   that's still illegal activity.  I guess that

11   would cover it.

12        Q    So, for example, chanting slogans,

13   unless they are a true threat, would not make

14   a protest into a non-peaceful protest, agreed?

15        A    Agreed.

16        Q    And you said that illegal activity

17   can make a protest not peaceful; is that your

18   testimony?

19        A    Correct.

20        Q    Does it have to be -- can, like, one

21   illegal act make an otherwise peaceful protest

22   non-peaceful?

23        A    It should not.  One illegal action

24   could be addressed.  If the rest of the crowd

25   is peacefully protesting, then they should be

1   able to continue with their protest.

2       Q    Right.  I agree with you.  So it

3   sounds to me like, you can't just lump all

4   protesters together.  If some of them are

5   committing illegal acts and some are not,

6   Baton Rouge Police Department has to treat

7   those groups of protesters independently,

8   agreed?

9       A    It possible, yes.

10      Q    So if there's a group of -- let's say

11  there's an order to clear the streets and some

12  protesters comply and others do not.  Baton

13  Rouge Police Department has to treat those

14  groups differently, agreed?

15      A    If they can, for sure.  If they know

16  who left or who didn't, yes.

17      Q    And when you say illegal activity can

18  make a protest not peaceful -- okay -- does it

19  have to be violent illegal activity?

20      A    That's the one where -- at that point

21  they make it not a peaceful protest, but it

22  could be simple obstruction of a highway and

23  refusing to move.  It could be that illegal

24  activity.  The problem with having one or two

25  people that are committing illegal acts, it

1  usually instigates the crowd to follow.
2  That's pretty much what you see in a lot of
3  protests.  If you could target the illegal
4  activity individually, it's much better to do
5  so.
6       Q    Right.  I'm guess I'm trying to
7  figure out what makes a peaceful protest into
8  a not peaceful protest.  For example, let's
9  say, you've got a protest that's otherwise
10  peaceful, but you have some people smoking
11  marijuana.  Would you class that as not
12  peaceful?
13       A    No.
14       Q    So it has to be an illegal act that
15  is not-peaceful illegal act, agreed?
16       A    Agreed.
17       Q    So, for example, just standing on a
18  sidewalk is not a not-peaceful illegal
19  activity, agreed?
20       A    Agreed.  That's a lawful act.
21       Q    Or just standing on private property
22  if they have permission to be there, that's
23  not a non-peaceful illegal act, agreed?
24       A    I will agree.  And if you're speaking
25  of France Street, they had already committed

1  the crime.  It was -- you can't undo what you

2  did.  You can't rob a bank and give the money

3  back.  If you're told to disperse and you

4  don't disperse, you can still get arrested for

5  it, even if the property owner says you can be

6  there.  The problem the guys faced on France

7  Street was -- the crowd -- well, first off, it

8  started as a peaceful march.  It was

9  un-permitted.  It was led by our traffic

10  division and went to the state capitol and

11  back to a local resident, a local church.  And

12  then the crowd or certain members of the crowd

13  decided they wanted to overtake the interstate

14  system.  They failed to disperse after given

15  orders.  There was limited manpower there to

16  make arrests.  Once the manpower got there,

17  the arrests began to be made.  It looks like

18  protesters were just hanging out at some

19  unknown person's house with permission, but

20  that wasn't the case at all.  They committed

21  the crime.  And once the resources got there

22  to make arrests, arrests were made.

23      Q    So those people standing in that

24  private property at East and France and on the

25  sidewalks, were they engaged in a non-peaceful

1    protest?

2         A    They had been, yes.

3         Q    When had they been?

4         A    When they refused to disperse and

5    remove themselves from the roadway.

6         Q    So it's your testimony that a refusal

7    to disperse is a non-peaceful illegal

8    activity?

9         A    They were told to disperse because

10   they were occupying a roadway trying to make

11   their way to the interstate system, which

12   would have been dangerous for everyone.

13        Q    So are you saying the non-peaceful

14   act was standing in a roadway or attempting to

15   get on the interstate, which was it?

16        A    Non-peaceful act was standing into

17   the roadway.  And that's what led to the

18   disperse order.  And that -- there were other

19   items thrown at officers out there that day,

20   items like pieces of concrete -- which is the

21   first day of actually someone caught it on

22   film and it made television.  So those were

23   unlawful acts and an order to disperse was

24   given.

25        Q    Did you have any knowledge of any

1  pieces of concrete thrown on the July 10th,

2  2016?

3      A   That's the incident I was speaking

4  of.  It was shown on the local news, even.

5      Q   So you've seen video of concrete

6  being thrown?

7      A   I did see a video, yes.  It's been

8  many years ago, but, yes.

9      Q   Okay.  Do you know what television

10 station that was?

11     A   We only have a couple over here, but

12 I don't remember which one it was.

13     Q   Okay.  So the protesters who were

14 standing on the private property or sidewalks

15 at East and France, I'm trying to understand

16 the non-peaceful act that they had committed

17 and that made it a not-a-peaceful protest was

18 that they had been standing earlier in the

19 roadway?

20     A   They had been standing in roadway in

21 anticipation of overtaking an interstate

22 system, yes.

23         MR. MOST:

24             Those are my questions about

25         peaceful versus non-peaceful.

1          MacArthur?

2               John, do you have any?

3     MR. ETTER:

4               No, I do not.

5     MS. LOMMERS-JOHNSON:

6               Sorry, William.  Let me just

7     confirm.  I think, but I'm not sure

8     if Ms. Moore-O'Neal has questions.

9     Oh, never mind.

10              I don't have -- I guess my one

11    question, Captain Leach, is at the

12    point that Baton Rouge Police

13    Department determines that a protest

14    is no longer peaceful, does that mean

15    that the protesters who remain are

16    subject to arrest at that point?

17    THE WITNESS:

18              Yes, ma'am.  Simply put, it is,

19    yes.

20    MS. LOMMERS-JOHNSON:

21              Okay.  Am I -- you know, I think

22    we looked earlier at General Order

23    291 -- and I can pull it up again.

24    But in your understanding, is it

25    General Order 291 that gives

1    authorization for that?

2    THE WITNESS:

3         I think it would fall under that

4    order.  I think you're correct.

5    MS. LOMMERS-JOHNSON:

6         Okay.  And just so I'm

7    completely sure that I understand

8    your testimony, General Order 291 on

9    civil disturbances would give the

10   authorization for arrests of any

11   remaining protesters to be made after

12   BRPD has deemed a protest to be no

13   longer peaceful?

14   THE WITNESS:

15        Correct.

16   MS. LOMMERS-JOHNSON:

17        I think that's the only question

18   I have for this topic.

19   MR. MOST:

20        Great.

21   MR. FAHRENHOLT:

22        I have a few.

23   MR. MOST:

24        Sure.

25             EXAMINATION

BY MR. FAHRENHOLT:

Q    It's my turn.  Captain, is it safe
understanding that if protesters were in fact
blocking the lanes of traffic on I-110, that
would not be a peaceful protest?

A    It would be very unpeaceful, yes,
sir.

Q    And this is probably obvious, but is
it the City's position that protesters
blocking off an interstate highway would be a
danger both to protesters and for other
members of the public?

A    Yes, sir.  That was our fear that
day.  And they came really close -- were
actually about to go up an entrance ramp from
Government Street when a motorman asked them
not to.  Because he told them he was going to
shut the interstate off for them.  We knew
what they were trying to do.  That's when we
got more personnel there to deal with the
situation.  They believed we were shutting off
the interstate for them.  It's extremely
dangerous, especially in that location.  The
traffic speeds and it's sort of a blind curve
in the interstate there.  It would have been

1    disastrous.

2        Q    The corner of East and France, that's

3    pretty close to the interstate, correct?

4        A    Yes, sir.

5        Q    And I think there might be either an

6    exit ramp or an entrance ramp about a block

7    away from that location; is that correct?

8        A    It's close, yes, sir; a block or

9    maybe two at the most.

10       Q    Is it the City's position that the

11   officers on the scene had a reasonable belief

12   that if they had allowed these protesters to

13   stay at the corner of France, that they would

14   eventually enter the interstate?

15       A    It was a known fact, because

16   communication with protesters -- because the

17   intelligence officer in the crowd, we knew

18   exactly what their intentions were.  So yes,

19   sir, it was a fact.

20       Q    And I know that when protesters were

21   arrested, they were charged with obstruction

22   of a roadway or a public passageway.  Wasn't

23   it the City's real concern that these

24   protesters weren't an imminent threat to take

25   over the interstate?

1    A    Yes, sir.  That was the main concern,

2  yes, sir.

3    Q    And if orders were made by Baton

4  Rouge police officers to disperse from the

5  area, those orders were given because officers

6  believed that those protesters were going take

7  over the interstate, correct?

8    A    That's correct.  You can't just stay

9  there if there doesn't effectively fix the

10  situation and all.  They had to disperse.  We

11  weren't going to allow them to take the

12  interstate.

13    Q    Other than the interstate at the

14  corner of East and France, there any other

15  major public monuments or city-owned buildings

16  or anything like that at that corner?

17    A    At that particular corner, no, sir.

18  And we've given up roadways for protesters

19  many times and will continue to do so, as long

20  as it's a peaceful protest and we can safely

21  mitigate it.  But knowing the intentions of

22  the protesters on that day, they had to

23  disperse.  It was the only option of

24  protecting them from themselves, if they took

25  the interstate.

1    Q    Is it your understanding that

2  protesters were given at least an hour or more

3  between the point when they were first

4  directed at the corner of East and France to

5  leave the scene?

6    A    That's correct.  It took a while to

7  deploy two Mobile Field Force units to get

8  there.  It probably was an hour.

9    Q    To the extent that the Baton Rouge

10  police officers gave orders to disperse, is it

11  the City's position that those orders were

12  lawful?

13    A    Yes.

14    Q    And any protesters who didn't respond

15  to that order, regardless of whether they were

16  being violent or not violent, they were

17  disregarding those orders, correct?

18    A    Correct.

19        MR. FAHRENHOLT:

20            I have no other questions.

21        Thank you.

22        MR. MOST:

23            Sure.  Just a couple of

24        followups there.

25                EXAMINATION

BY MR. MOST:

Q    Captain, you testified that dispersal was the only option to prevent the protesters from getting on the interstate.

A    Yes.  They had to leave the area.

Q    Okay.  And would that be true after the interstate had been secured and made inaccessible to protesters?

A    How can you do that?  You can't stop a crowd if they want to take it.  If the crowd is still there, then you can still lose the interstate.  We don't have enough police officers to block of entrance ramps.  There's at least two in that area right there.  But if a crowd wants it, they're going to run right by whatever you try to put in place if they're still there and able to do so.  That was the feeling that day.  That was the decision that was made.

Q    And the protesters never made it to the interstate, correct, that day?

A    Correct.  There's a main crowd. There was a group, as I mentioned, that was confronted by a motorcycle officer as they were approaching an entrance ramp at

1    Government Street.  And he talked them into

2    stopping -- letting us stop traffic for them

3    on the interstate.  By that time we were

4    rolling in the necessary backup to deal with

5    the crowd.  So, yes.  I think if that group

6    would have continued, we would have lost the

7    interstate and perhaps have somebody injured

8    or killed that day.

9        Q    So my question, Captain, was:  Did

10   the protesters ever make it to the interstate

11   on July 10, 2016?

12       A    They never did.

13       Q    Okay.  So the primary concern that it

14   was the basis for the arrests of protesters at

15   East and France was the possibility that they

16   might have continued on to the interstate,

17   correct?

18       A    Yes.

19       Q    And if something is to -- that was

20   the primary reason for their arrest?

21       A    That was the concern, because we knew

22   what their intentions were.  Their arrests, as

23   they were charged, was failure to disperse or

24   occupying the roadway.

25       Q    Okay.  But the primary cause for the

arrest was to prevent them from accessing the
interstate; is that accurate?

     A     That was a primary objective, yes.

     Q     And if something is the primary
objective for someone's arrest, should that be
reflected in their Affidavit of Probable
Cause?

     A     That might have not been understood
on the level of the arresting officer.  But it
was understood from the level of command.

          MR. MOST:

               Okay.  Fair enough.  That's all
          my questions for that one.  It's
          1:00 o'clock exactly.

               Joe, do you want to take the
          break that you anticipated at
          1:00 p.m.?

          MS. LOMMERS-JOHNSON:

               I have just one followup before
          we break.  It's super short.

                    EXAMINATION

BY MS. LOMMERS-JOHNSON:

     Q     When you testified that the order to
disperse was given and at the point that
protesters remained and did not disperse, they

1    were subject to arrests.  You referenced

2    command giving that order to disperse.  I'm

3    wondering how far up the chain of command the

4    order to disperse came from?

5         A     It came from the Unified Command.  It

6    came from members of the Operations Center.

7    So it came from the top.  It's not the Chief

8    of Police, but certainly the Unified Command.

9         Q     And it's my understanding that under

10   the General Order 291, BRPD policy gives

11   authority to Unified Command and the Incident

12   Commander to make those orders that would

13   normally need to come from the Chief of

14   Police; is that correct?

15        A     Yes, ma'am, you're understanding that

16   correctly.  Not everything goes directly to

17   Chief.  Obviously, he's got to trust his

18   commanders.  Yes, that ordinance covers that.

19   The Chief of Police cannot make every single

20   decision in an operation.  That's why he has

21   to trust his commanders.  That particular

22   ordinance we were discussing covers that.

23        Q     And here we're talking just about

24   general Order 291 specifically giving that

25   authority, correct?

1     A    Yes.

2        MS. LOMMERS-JOHNSON:

3           That's my only question here.

4        Thanks.

5        MR. MOST:

6           Joe, how would you like to

7        proceed?  Shall we continue with the

8        Captain?  Take a break?  Bring in

9        someone new?  What would you like to

10       do?

11       MR. SCOTT:

12          I'd like to take a break.  I'll

13       consult with Captain Leach, whether I

14       need to bump Sergeant Jones off this

15       afternoon or reproduce Captain Leach

16       tomorrow.  Let me get that squared

17       away.

18       MR. MOST:

19          Let's go off the record.

20          (LUNCH RECESS)

21       MR. MOST:

22          I think we've got everyone back

23       that we need to have back.  And it

24       looks like you still have Captain

25       Leach with you.  So we're going to

1          continue with Captain Leach; is that

2          right?

3          MR. SCOTT:

4               Yes, sir.

5          MR. MOST:

6               Great.  I was just saying to

7          Greg over the break.  I was kind of

8          looking over the topics.  And I think

9          the most important ones, from my

10          perspective, to get done by the close

11          of Imani -- for discovery are 10

12          through 12, Topics 10, 11 and 12

13          because those are going to be the

14          ones specific to Imani plaintiffs.

15          If it's possible to prioritize those,

16          Joe, I think that would be helpful.

17          MR. SCOTT:

18               I'm doing as much as I can.

19          MR. MOST:

20               Okay.  Let's go back on the

21          record.

22                    EXAMINATION

23     BY MR. MOST:

24          Q    Good afternoon, Captain Leach.

25     During your break, did you talk to anyone

1    about this deposition or these cases?

2         A    No, I did not.

3         Q    Even the attorneys?

4         A    Not even the attorneys.  We went to

5    lunch.

6         Q    And did you look at any documents

7    relevant to this deposition or these cases

8    during the break?

9         A    No.

10        Q    The next topic I have you identified

11   is Topic 2-P, as in Paul.  No, we did that

12   one.  So the next one is 2-Q, which is

13   "Policies and procedures regarding any of the

14   following topics."  And Subsection Q:

15   "Searches and seizures, including searches and

16   seizures of vehicles."

17             Are you prepared to testify regarding

18   that topic today?

19        A    I mean, I can.  I'll do my best.

20        Q    And the good news, I don't have much

21   about this.  There was an issue about a search

22   of a vehicle in this case, but that -- in my

23   case -- and that one has resolved.

24             So I'll just ask you briefly about

25   seizures.  At the July 2016 protests, officers

1    were only effecting seizures of protesters

2    insofar as they were only effecting arrests,

3    agreed?

4         A    Yes.

5              MR. MOST:

6                   So I think that most of my other

7              questions have been addressed under

8              other topics.

9                   MacArthur, do you have any

10             search or seizure specific questions?

11             MS. LOMMERS-JOHNSON:

12                  We don't.

13             MR. MOST:

14                  John or Greg?

15             MR. FAHRENHOLT:

16                  No, thank you.

17             MR. ETTER:

18                  No.

19    BY MR. MOST:

20         Q    2-Q is done.  The next one is

21    "Policies and procedures regarding any of the

22    following topics:  Identification of threats

23    and/or agitators in the crowd."

24                  Are you prepared to talk about that

25    topic, Captain?

1       A     Yes, sir.

2       Q     I believe, if I recall right, that

3   you testified earlier that the Baton Rouge

4   Police Department had contemporaneous

5   intelligence regarding the intent of

6   protesters in the East and France group, based

7   on an officer deployed within that group; is

8   that accurate?

9       A     Giving away our secrets, but, yes,

10  sir.

11      Q     Okay.  So it is not a secret that

12  sometimes law enforcement agencies deploy

13  undercover police officers to infiltrate

14  protester groups that is -- I don't think is

15  secret, but that is something that BRPD did on

16  the July 2016 protest, right?

17      A     It is.

18      Q     According to you, an undercover

19  officer reported back to superiors that some

20  protesters in the East and France group had

21  expressed an intent to go onto the interstate,

22  correct?

23      A     Correct.

24      Q     Now, there were hundreds of

25  protesters there at East and France, agreed?

1    A    Yes.

2    Q    Did the undercover officer indicate

3  that he or she had surveyed the intent of all

4  the protesters there or some subset of them?

5    A    No.  As I mentioned earlier, the

6  group started off as a very peaceful,

7  unplanned, un-permitted, but we watched

8  streets and led their protest.  Once it

9  returned to the starting point, many of the

10  protesters got in the cars and left.  And then

11  a certain group that you've seen on France

12  Street were the ones that our intelligence

13  officer was infiltrated into and was hearing

14  the talk as they're marching:  Where we're

15  going?  Where we're going?  What we're doing?

16  That group.  Certainly, not everyone.  Maybe

17  some people in the group didn't know where

18  they were going.

19    Q    Sure.  So an undercover officer had

20  some intelligence about the intent of some

21  protesters, but unclear or if that reflected

22  the intentions of the entire group, agreed?

23    A    Correct.

24    Q    And then that group sort of stopped

25  at East and France Street, right, for some

1    extended period of time?

2        A    Correct.

3        Q    And some people may have joined that

4    group after it stopped, agreed?

5        A    Possible.

6        Q    Okay.  And so those persons who

7    joined the group after it stopped, any

8    intelligence about the intent to go on the

9    freeway would not necessarily apply to those

10   persons, agreed?

11       A    Correct.  I couldn't speak to what

12   they would have had knowledge of.

13       Q    Sure.  Okay.  I'm going to pull up a

14   document.  The other aspect to this topic is

15   "Identification of threats and/or agitators in

16   crowd."

17           So we heard from an earlier deponent,

18   I believe, that Baton Rouge Police

19   Department -- its policy is to identify and

20   target for arrest agitators; is that your

21   understanding as well?

22       A    That's correct.  It's always our

23   intent is to not punish the crowd for a few

24   people who are agitating.

25       Q    I'm going to pull up Exhibit L.  Do

1  you see this document here?

2       A    Yes.

3       Q    Do you see that this appears to be

4  responses from City Baton Rouge defendants to

5  requests for discovery in this case?

6       A    Yes.

7       Q    Skipping down to the Response to R --

8  Request for Admission Number 57 on page 17 of

9  Exhibit L, I think this provides us with some

10 more understanding of what agitator means,

11 according to the City Baton Rouge, and I

12 wanted to see if you agree.

13      A    I agree with that.

14      Q    You'd agree with it where it says:

15 "Law enforcement targeted agitators" -- by

16 which it describes as "Persons encouraging

17 others to upset the status quo to further

18 their cause."

19           Do you agree with that?

20      A    And/or breaking the law, as it

21 states.

22      Q    Sure.  So agitators -- so this

23 defines two kinds of agitators; persons

24 breaking the law or persons encouraging others

25 to upset the status quo to further their

1  cause, correct?

2      A    Correct.  Those people were trying to

3  get them to throw objects at the police or get

4  them to overtake a roadway.  On France Street,

5  in another case, they were jumping on cars or

6  trying to (INAUDIBLE) --

7      Q    But this is at least -- what we read

8  here -- is how Baton Rouge Police Department

9  -- what Baton Rouge Police Department

10 understands an agitator to be, agreed?

11     A    Agreed.

12     Q    And one element of this is -- one

13 element is encouraging others, right?

14     A    Right.

15     Q    The second element is to upset the

16 status quo?

17     A    Correct.

18     Q    And then the third element is to

19 further their cause, agreed?

20     A    Correct.

21     Q    So when -- so Baton Rouge Police

22 Department is assessing what people's cause is

23 when it's determining whether or not they're

24 an agitator, right?

25     A    Correct.

```
 1      Q    And then targeting them for, you
 2  know, being in the first group to be arrested,
 3  depending on that analysis, agreed?
 4      A    Correct.
 5           MR. MOST:
 6                That is my questioning about
 7           that topic, although I might have
 8           followup.
 9                MacArthur, any questions on
10           "Identification of threats and/or
11           agitators in crowd"?
12           MS. LOMMERS-JOHNSON:
13                Yes, just a couple followup
14           questions.  I'm going to share my
15           screen.
16                William, if you wouldn't mind
17           enabling me -- thank you.
18                I'm going to try to pull up
19           Exhibit ZZZZZZZ again, so we can look
20           back at that.  Okay.
21                     EXAMINATION
22  BY MS. LOMMERS-JOHNSON:
23      Q    Captain Leach, can you see the
24  exhibit on my screen?
25      A    Yes.
```

1      Q     Perfect.  So, again, just looking

2  back at General Order Number 291, my

3  understanding is that what we've been talking

4  about with identifying agitator is somewhat

5  encompassed in this Section 4 that's titled

6  "General" on page 3 of General Order 291.  In

7  B here -- I'll just read the whole thing.  It

8  says:  "The Incident Commander or authority in

9  charge will establish communication with

10  demonstration leaders as soon as conditions

11  permit as a means of obtaining firsthand

12  knowledge of crowd mood and as a tool to

13  facilitate negotiations and maintain the

14  peace.  If demonstration leaders refuse to

15  communicate and they violated the law, they

16  will be the first group of persons to be

17  arrested."

18          My question here is:  Does this mean

19  that -- I guess, first of all, how are BRPD

20  officers trained to identify demonstration

21  leaders?

22      A     It's quite simple that -- to be the

23  person that's in the crowd that's encouraging

24  the civil disorder continue or amplify.  It's

25  quite easy that anybody that's in the crowd

1  will know who's the ones encouraging to do

2  unlawful things.

3      Q    Here is the definition confined to

4  demonstration leaders who encourage crowd

5  members to do unlawful things or is it also

6  encompassed in demonstration leaders, people

7  who are encouraging others to protest or

8  leading chants?

9      A    Chanting is not a problem.  That's a

10 part involved in the civil rights that they

11 can do.  They can say what they want the say,

12 but if they're encouraging to break the law or

13 to participate in something that someone could

14 be injured, then that person is probably going

15 to be removed first.

16     Q    Okay.  When it says:  "If

17 demonstration leaders refuse to communicate

18 and they violate the law, they will be the

19 first group of persons to be arrested," that

20 doesn't apply to leaders who are helping

21 organize --

22     A    No, ma'am.

23     Q    -- organize the protest?

24     A    Absolutely not.  As I mentioned,

25 France Street began a peaceful march.  We

1    waives the permit, we sent motors to them, we

2    led.  We would always meet with organizers.

3    When it was here in our headquarters, we would

4    go out and make signs of what was lawful and

5    what was expected.  We brought waters.  We

6    were always making those kind of

7    communications, you know, when the protest

8    started and recognizing their right to be

9    there and to do that.

10        Q    And I guess going down to this

11   Section here, 5, if you can see it on the

12   screen "Nonlethal Force," where it talks about

13   physical arrests of identified leaders and

14   agitators there, what is being referred to as

15   identify leaders?

16        A    Right.  What was your question?

17        Q    I just wanted to know under Section

18   5, "Nonlethal Force" when it refers to

19   physical arrests of identified leaders and

20   agitators failing to disperse the crowd, who

21   is being referred to as identified leaders in

22   this provision?

23        A    That would be whoever is encouraging

24   people to do things that may get them injured

25   or unlawful anythings.  The policy doesn't

1  specify that.  That's the determining factors

2  of the investigators on the scene.

3          THE COURT REPORTER:

4              I'm sorry, sir.  Can you repeat

5          what you just said?

6          THE WITNESS:

7              The policy can't be that

8          specific as to tell you who the

9          identified leaders are.  That's up to

10          the investigator on the scene as to

11          who is trying to facilitate unlawful

12          activity or unsafe activity.

13  BY MS. LOMMERS-JOHNSON:

14     Q    And I guess specific -- and here I'm

15  thinking of some of the events on Airline, not

16  specifically at East and France.  But when

17  officers there and the command structure

18  identify the leaders on Airline, is it your

19  testimony that they were only identifying

20  leaders who they believed to be encouraging

21  others to break the law?

22     A    That's correct.  So the organizers

23  were normally the people who wanted the

24  agitators removed.  And we actually even had

25  then encouraging people to remain calm and to

1  be lawful.  It was quite a few times when we
2  removed agitators that the crowd actually
3  cheered for the police officers.  They don't
4  want that trouble.  Most of them are there
5  peacefully.
6      Q    With regard to the charge inciting a
7  riot, what's your understanding under Baton
8  Rouge Police Department policy of what would
9  constitute inciting a riot?
10     A    That's encouraging violence towards
11  law enforcement officials or encouraging
12  property damage, you know, any of those
13  things.  Become disorderly, have potential to
14  be life-threatening, even, when it comes to
15  that.
16     Q    And so encouraging others to protest,
17  encouraging others to join the protest and
18  join in on chanting, none of that alone
19  constitutes inciting a riot?
20     A    That's not even close.
21     Q    Is it the position of the City and
22  the BRPD that inciting violence is the key
23  part of inciting a riot?
24     A    Yes, ma'am.
25          MS. LOMMERS-JOHNSON:

```
 1              Okay.  I think that's all the
 2         questions that I have here.
 3              John, do you have any followup
 4         questions?
 5         MR. ETTER:
 6              Yes.
 7         MS. LOMMERS-JOHNSON:
 8              And I'll just note, it looks
 9         like the recording has been paused.
10         MR. MOST:
11              You're the host, so you could
12         probably restart it.  Thank you.
13         MS. LOMMERS-JOHNSON:
14              I turn it to you, John.
15         MR. ETTER:
16              Yes.
17                     EXAMINATION
18    BY MR. ETTER:
19         Q    Captain Leach, as regarding inciting
20    or agitating, is it the position of the Baton
21    Rouge Police Department that Max Geller was an
22    agitator?
23         A    I'm not familiar with who that is.
24         Q    All right.  He was the relatively
25    thin white man who was one of the first
```

1  targeted, assaulted and arrested during the

2  July 10th protest at East and France.

3     A    I'm not familiar with that particular

4  arrest.

5          MR. MOST:

6              John, if it's helpful, you might

7              be able to circle back to that in

8              Topic 12, which details particular

9              plaintiffs.  Not to stop you from

10             asking questions, but just a friendly

11             suggestion.

12         MR. ETTER:

13             I appreciate the suggestion.  I

14             will actually, then, pass on this

15             topic.

16         MR. MOST:

17             Okay.  So that was to Topic R.

18         MR. SCOTT:

19             Can I follow up?

20         MR. MOST:

21             Of course, Joe.  Thank you.

22                  EXAMINATION

23  BY MR. SCOTT:

24     Q    Captain Leach, apart from the

25  undercover officer in the group on East and

1    France, did you also have intelligence from

2    one of the motorcycle officers?

3         A    That's correct.

4         Q    Any other officers on the scene, if

5    you recall corroborate, as well?

6         A    None that I recall.

7              MR. SCOTT:

8                   Thank you, sir.

9              MR. MOST:

10                  All right.  And moving on to the

11             Topic 2-S, which is:  "Policies and

12             procedures regarding any of the

13             following topics.  Subsection S,

14             accommodating Second Amendment

15             Rights."

16                  That's not something I think I

17             have questions about.  Does MacArthur

18             have question on that topic?

19             MS. LOMMERS-JOHNSON:

20                  No, we don't.  Thank you.

21             MR. MOST:

22                  John, there may be a dog in your

23             background.  Do you have any Second

24             Amendment questions?

25             MR. ETTER:

1          No, I do not have a Second

2     Amendment question.  The dog is

3     barking at the garbage truck.

4     MR. MOST:

5          Okay.  That crosses off Topics

6     S.  And then Topic T, which I do

7     expect there will be more questioning

8     about is "Policies and procedures

9     regarding any of the following

10    topics."  Subsection T is "Entry of

11    private property to make arrests."

12         Are you prepared to testify

13    about that topic today, Captain.

14    THE WITNESS:

15         I think so.

16    MR. MOST:

17         And, MacArthur, this might be

18    most relevant to y'all's case.  Would

19    you like to take the lead on this and

20    I'll follow you or would you like me

21    to start?

22    MS. LOMMERS-JOHNSON:

23         Either way, William.  Whatever

24    you prefer.  We don't have a

25    preference.

1      MR. MOST:

2            I'll get started and then I'm

3       sure you can correct any errors that

4       I make.

5                    EXAMINATION

6  BY MR. MOST:

7      Q    We talked earlier, Captain, about the

8  East and France protests and certain

9  protesters who were standing on the sidewalks

10 or private property there.

11     A    Yes.

12     Q    And some of those protesters were

13 standing on private property at the time of

14 their arrest, agreed?

15     A    Yes.

16     Q    And those protesters had permission

17 from either the property owner or tenant of

18 that property to be present on that property,

19 agreed?

20     A    You're telling me that?  I don't know

21 if they did or not.  Okay.

22     Q    Does the City have any reason to

23 think that those protesters standing on

24 private property at East and France Street did

25 not have permission to be there?

1    A    No.

2    Q    Generally, the general rule is that

3  law enforcement officers have to have a

4  warrant to effect an arrest of a person on

5  private property, correct?

6    A    It's always best.

7    Q    More than best.  It is the general

8  rule -- unless an exception applies, it's a

9  constitutional requirement, agreed?

10    A    Unless it's a hot pursuit of an

11  arrest, warrant is necessary, right.

12    Q    Exactly.  So unless it's hot pursuit

13  or another specific exception, law enforcement

14  has to have a warrant to effect an arrest on

15  private property, agreed?

16    A    I'll agree.

17    Q    The officers who made arrests on

18  private property on East and France did not

19  have warrants for the arrest of the persons on

20  that private property, agreed?

21    A    Agreed.

22    Q    Was there an exception to the warrant

23  requirement that applied to the arrest of

24  those persons?

25        MR. SCOTT:

1          I'm going object to the form of

2          the question.  Calls for legal

3          opinion.

4          MR. MOST:

5          Acknowledging that objection,

6          you can answer that question,

7          Captain.

8          THE WITNESS:

9          Yes, sir.  To my knowledge, the

10         arrests were made on those

11         properties.  They were done because

12         they witnessed that person commit a

13         crime and they were fleeing at the

14         time that they were arrested.  They

15         were trying hide from the arresting

16         officers.

17    BY MR. MOST:

18         Q    So it's the City's position that

19    anyone arrested at East and France on private

20    property was -- at the time of their arrest --

21    fleeing and hiding; is that the City's

22    position?

23         A    It's my position, yes.

24         Q    Okay.  But it's also -- you're

25    speaking for the City today.

1      A     I get it.  Yes, sir.

2      Q     We had a little cross-talk.  That's

3  the City's position, agreed?

4      A     Yes, sir.

5      Q     Someone who is just standing still in

6  plain sight, not obstructed by anything, is

7  not fleeing, agreed?

8      A     That would be passively resisting;

9  but, yes, they're not fleeing.

10          MR. MOST:

11               Okay.  I think that's the

12          questions I have.

13               MacArthur, would you like to

14          follow up?

15          MS. LOMMERS-JOHNSON:

16               Yes.  Thank you, William.

17                    EXAMINATION

18  BY MS. LOMMERS-JOHNSON:

19      Q     And so, correct me if I'm wrong,

20  Captain Leach, my understanding is that your

21  testimony is that the protesters that were

22  arrested in the yard at East and France were

23  arrested pursuant to hot pursuit?

24      A     When we refer to that is, in the

25  cases where you enter private property or a

1  structure without a warrant, because the

2  officer had witnessed that person committed a

3  crime.

4      Q    And in terms of those protesters that

5  were arrested on private property on

6  June 10th, is it the City's position that the

7  officers were authorized to do so because they

8  were in hot pursuit?

9      A    Yes.  That's the term, right.  So

10  they were on scene.  And once we had enough

11  manpower there to effectively make arrests to

12  those refusing to disperse, they basically

13  walked a few feet to arrest the people.  There

14  was no running pursuit, as it references it.

15  But, yes, it's just a term.

16      Q    Okay.  I guess from the testimony

17  earlier, I think when Greg was questioning

18  you, you testified that there was about an

19  hour's worth of time when protesters were

20  gathered on the property at 602 East Boulevard

21  where they just stayed standing on the

22  property, correct?

23      A    Correct.  I believe that was his

24  time.  I agreed it could be around that much

25  time because our responsive elements came from

across the city.  So I imagine it could take

that time.  And after talking to our motor

officer, the protesters for sometime, anyway,

believed that we were shutting off the

interstate so they could occupy it.  So they

were content to stand there or a while.

Q    They believed that you were helping

close down the interstate so that they would

be allowed to walk on the interstate?

A    Yes, ma'am.

Q    They were under the impression -- or

your understanding is that many of the

protesters were under the impression that they

would be allowed to go on to the interstate?

A    They were told that directly, yes.

Q    Who told them directly that they were

going to be allowed to walk on to the

interstate?

A    I don't know the officer, but it was

one of our motor units that saw the group

going towards the entrance ramp.  He just

pulled in front of them and asked them what

they were doing.  And they told him we're

going to go take the interstate.  He said

that's really dangerous.  Don't do that.

You're going to get run over.  I'm going to
get some my guys and we'll get up there and we
can stop traffic so that y'all can safely
occupy.  They said okay.  They kind of waited.
The crowd was really big.  So he radios in and
we're going to have a major problem here.  And
that's whenever the resources started to be
notified and respond.

     Q    Okay.  So BRPD had notified the
protesters that they were going to allow them
to walk on the interstate and the protesters
were waiting after hearing that?

     A    Right.  There was a group of them.
I'm sure it wasn't all the hundreds that were
there, but, yes.

     Q    Okay.  And after being told that they
would be allowed to enter the interstate with
the help of BRPD, they didn't try to get
around BRPD, they were actively waiting?

     A    They were waiting, yes, ma'am.

     Q    Okay.  And in terms of -- you know,
after whenever length of time it was -- I
think you had said you agreed it could be
close to an hour where protesters were waiting
and standing in the yard at 602 East

1  Boulevard.  At the point when officers
2  approached the yard and began to arrest those
3  protesters, what was the BRPD's position about
4  what crime these protesters were being pursued
5  on to private property for committing?
6      A    They at that time were ordered to
7  disperse after being unruly and occupying the
8  roadway when asked to leave.  They would have
9  been -- most were charged with -- I don't know
10 if some others were charged with other things.
11 That primarily was the thing.
12     Q    I think -- and so I'm going go to go
13 back to the Policy Manual here.  I'm going to
14 try to share my screen, if I can.  And the one
15 that I'm going to pull up here is just an
16 arrest policy.  Can you see it now?
17     A    Yes.
18     Q    Okay.  Perfect.  So this is page
19 Number 276 of the Policy and Procedure Manual.
20 And it's under -- here I'm looking at
21 Subsection 3 of the General Order Number 209
22 on arrests.  And my questions are going to be
23 about arrests without a warrant in Subsection
24 3.  Here it says:  "Officers may arrest a
25 person without a warrant when the officer

1   observed the offense, whether it's a

2   misdemeanor or a felony. Misdemeanor arrests

3   should be made immediately or upon close

4   pursuit." Then it says: "Officers may arrest

5   a person who has committed a felony, even

6   though the officer did not witness the crime."

7       My question here is: Am I correct

8   that Subsection 3 of General Order Number 209,

9   that I just read, indicates that officers are

10   not authorized to arrest without a warrant in

11   normal situations where the officer did not

12   witness the commission of a misdemeanor.

13      A   That's not exactly what it says.

14   You're kind of reading into that. You can

15   make the arrest whenever safely to do so. In

16   that case on France Street, they have enough

17   manpower to make the arrest immediately. I

18   imagine some of them -- a lot probably didn't

19   get arrested because they changed their mind

20   by the time other officers did get there. We

21   had some people decide to go to their cars and

22   leave. So whenever the final command was

23   given -- and the command was given to make the

24   arrests of those still there -- it had been a

25   little while, but the officers there had

1  witnessed the people that they placed under

2  arrest.

3       Q    I think part of my confusion here is

4  that the video footage that we've seen is of

5  officers approaching and entering the yard and

6  arresting all those protesters that remains in

7  the yard.  And my understanding is that there

8  wasn't specific identification by any BRPD

9  officers of protesters who had been standing

10 in the roadway or committing obstruction of a

11 public passageway.  Those people weren't

12 specifically identified.  So an hour later, or

13 whatever length of time similar to an hour

14 later when officers entered the yard and began

15 to arrest all the protesters who remained

16 there, there was no identification of which

17 protesters had actually committed the crime of

18 obstruction a public passage way.

19      A    How do you know that?  How do you say

20 that?  That's the arresting officer is the

21 only person who knows that.  How can you say

22 that?

23      Q    Yeah, I guess -- my question for you

24 is, is it your understanding, as a

25 representative of the City here today, that

1    the protesters who were arrested in the yard

2    at 602 East Boulevard were those who had been

3    identified by some officer on the ground as an

4    hour earlier having been in the roadway?

5        A    Well, the timeframe was an hour

6    total.  Let's just say we are all agreeing it

7    took a while.  You can see that the orders

8    were given and given and given.  As some point

9    the people fled to the yard when they realized

10   they were about to get arrested.  That's only

11   minutes, if not less than minutes.  It wasn't

12   like they were setting up on somebody's porch

13   for an hour and the officer went up there and

14   snagged them off of it.  Once they realized:

15   Oh, we're so serious.  You're about to get

16   arrested.  Then fled to people's front

17   porches.  It was only in minutes.

18       Q    Am I correct in understanding your

19   testimony now that the protesters were in the

20   yard for 602 East Boulevard for only a matter

21   of minutes?

22       A    That's a large crowd.  Some may have

23   been standing there for an hour.  I'm not

24   saying that.  I'm saying the ones that were

25   placed under arrest were seen by the arresting

1  officers committing a crime and fled to evade

2  arrest.

3      Q    Okay.  And just so I'm clear on your

4  testimony, you're not contending that all of

5  those protesters who were arrested within the

6  yard were specifically identified by officers

7  on the ground as having committed a crime

8  prior to entering the property at 602 East

9  Boulevard?

10     A    They were witnessed committing a

11 crime or they wouldn't -- they were still

12 committing a crime because they were failing

13 to disperse.  We already agreed you were told

14 to leave.  It doesn't matter where you're at,

15 you were still told to leave.  The group was

16 not going to be left there.  They still failed

17 to disperse.

18     Q    Okay.  I do have a couple of followup

19 questions on that, as well.  I hear you

20 referencing a crime of failing to disperse.

21 Can you direct me to a specific revised

22 statute or ordinance that you're reverencing

23 there?

24     A    I don't know the revised statute

25 number, but it is an ordinance.

1    Q    Sorry.  I think I didn't hear your

2    complete answer.  Were you concluded?

3    A    Yes, ma'am.  I said I don't know the

4    exact ordinance number on it.  There is an

5    ordinance.

6    Q    But none of the protesters arrested

7    at East and France were arrested for failure

8    to disperse, correct?

9    A    I don't know.  Are you telling me

10   that?  I'm not sure of the charges.  It's been

11   five years.  I honestly don't remember that.

12          MR. SCOTT:

13                 Would you like me to provide the

14          Title 14 citation for you?

15          MS. LOMMERS-JOHNSON:

16                 You know what, if -- I think

17          that's okay.  If Captain Leach has

18          indicated that he doesn't know it off

19          the top of his ahead, that's fine.

20          We can look into that later and look

21          back.  But I do appreciate it, Joe.

22          MR. SCOTT:

23                 I mean, I could point him to

24          part of the book.

25          THE WITNESS:

1          I'm sorry.  I don't memorize --

2     MS. LOMMERS-JOHNSON:

3          You're good.  I think it's

4     relevant to the extent if anyone was

5     charged with failure to disperse.  My

6     understanding is that nobody was

7     charged with failure to disperse and

8     so the City representative doesn't

9     have a different understanding there,

10    then I'm not going to take us down

11    the pathway of looking into the

12    specifics of a charge that no one was

13    charged with.  But if I turn out to

14    be wrong on that or if there was a

15    failure to disperse charge that

16    anyone else knows of, then we can

17    definitely get more involved with

18    that statute.

19         I think that those are all of my

20    questions on private property or on

21    -- sorry.  On this subsection.  I

22    forget which topic subsection letter

23    we're on.

24         John, do you have any questions

25    on this subsection?

1          MR. ETTER:

2               No, I do not.

3          MS. LOMMERS-JOHNSON:

4               Okay.  Perfect.  Greg?

5          MR. FAHRENHOLT:

6               I have a few.

7     BY MR. FAHRENHOLT:

8          Q    Captain, when you were being

9     questioned by Mr. Most, you were discussing

10    some exceptions to the requirements for a

11    warrant and I wanted to ask you:  Are you

12    familiar with there being what's called a

13    plain view exception in obtaining a warrant?

14         A    Yes, sir.

15         Q    What is your understanding of what

16    the plain view exception entails?

17         A    There's a couple.  The subject

18    incident to arrest of searching someone's

19    vehicle or the home where arrestee was or the

20    plain view or this witness that there's

21    evidence that could be part of the crime.  You

22    could control that or access that without a

23    warrant.

24         Q    Are you aware, or is the City aware

25    of whether the law allows a police officer to

arrest someone on private property if there is

probable cause for the arrest and the person

is in plain view of the police officer?

    A    Yes, sir.  That's completely lawful.

    Q    I believe you testified that you are

familiar with there being either a City

ordinance or a Louisiana Revise Statute which

makes it a crime to fail to disperse when

commanded to do so by police officers; is that

correct?

    A    Correct.

    Q    I'm going to read you a section of

what is Louisiana Revise Statute 14:329.3.

I'm going to read to you the sentence from the

statute and I'm going to ask you if it's the

City's position that this statute could have

been applied to anyone standing on the

property at East and France.

       Statute states:  "Any law enforcement

or peace officer or public official" -- excuse

me -- "public official responsible for keeping

the peace may issue a command to disperse

under the authority of R.S. 14:329.1 through

329.8 if he reasonably believes that riot is

occurring or about to occur, the command to

1   disperse shall be given in a manner reasonably

2   calculated to be communicated to the

3   assemblage."

4           Do you understand what I just told

5   you?

6       A    Yes, sir.

7       Q    We discussed earlier that commands to

8   disperse were given to the protesters at the

9   corner of East and France, correct?

10      A    Yes.

11      Q    And I'm not going to read you the

12  riot statute.  Is it the City's position that

13  officers on the scene had probable cause to

14  believe that those protesters -- scratch

15  that -- that the officers reasonably believed

16  that a riot was occurring or about to occur?

17      A    Yes.

18      Q    Is it the City's position that

19  protesters taking over the interstate and

20  blocking the interstate would fit the

21  definition of a riot?

22      A    Yes.

23      Q    We've talked about charges that were

24  made against some of the protesters.  Can

25  someone commit a crime without being charged

1   for it?

2       A    I suppose they could if the officer

3   didn't arrest them.

4       Q    Let me ask it this way:  If someone

5   is arrested and charged with one crime, does

6   that mean that they did not commit any other

7   crime for which probable cause might have

8   existed to arrest that person?

9       A    No, it doesn't mean that.  It just

10  means they were lucky or fortunate enough not

11  to be charged on anything.

12          MR. FAHRENHOLT:

13              Those are all questions I have

14          on that topic.

15          MR. MOST:

16              One followup.  Oh, Joe, you've

17          got some questions?

18          MR. SCOTT:

19              Yes, I don't know who the host

20          is, but if the host could pull back

21          up the arrest policy, General Order

22          209.

23          MR. MOST:

24              Sure.  This one here?

25          MR. SCOTT:

1          Yes, sir.  The next page,

2        Section 3 is at the top of the page.

3                    EXAMINATION

4   BY MR. SCOTT:

5      Q    Captain Leach, do you see Section 3,

6   "Arrests without a warrant"?

7      A    Yes, sir.

8      Q    Would you read out loud 3-A.3.

9      A    "Officers may make arrests without

10  warrants based on probable cause."

11     Q    How rigorous is this demand of

12  probable cause?

13     A    The officer has to believe that the

14  person has committed crime.

15          MR. SCOTT:

16               That's all I'm getting from that

17          one.  Thank you, William.

18  BY MR. SCOTT:

19     Q    I understand it's been a long time

20  since you had to write a misdemeanor Affidavit

21  of Probable cause.

22     A    It's been a minute.

23     Q    Did you ever write a misdemeanor

24  affidavit of probable cause and go to court

25  and find out the prosecutor had changed the

1  charges around?

2      A    That's quite common, yes, sir.

3      Q    Does that make it an invalid arrest?

4      A    No, it's just the prosecutor may

5  choose a charge that better fits the crime

6  that the officer did.

7           MR. SCOTT:

8               Those are all my questions.

9           Thank you, sir.

10                   EXAMINATION

11  BY MR. ETTER:

12     Q    Captain, is it the policy of the

13  Baton Rouge Police Department to determine the

14  crime that will be charged before the person

15  actually commits the act that they're charged

16  with?

17     A    I don't think I understand your

18  questioning there.

19     Q    Let me try going back.  Are you aware

20  that in this case, Affidavits of Probable

21  cause were preprinted, listing the charges as

22  violations of R.S. 14:97 and for people --

23  another version listing 14:97 and 14:101.

24     A    I do know that some of the probable

25  causes would have had the date and the

1   location on it.  As far as having a charge on

2   it, I'm not aware that they were pre-written

3   charges.  Although, it might have been common

4   charges.  I'm aware of date and location, but

5   not anything else.

6        Q    Is it the policy of -- if I tell you

7   that there were emails addressed throughout

8   BRPD, that the arrests will be for violation

9   of 14:97 and if those emails were sent as

10  early as July 9th, would that be in compliance

11  with the BRPD policies and practices?

12       A    It may have been advice, legal

13  advice, that the charges better fit, similar

14  as to the prosecutor changing the charges of

15  the arresting officer.  It may have been

16  determined that was a better charge to use.

17       Q    Is it consistent with BRPD policy and

18  practice for an officer in charge to announce

19  over the radio that all arrests will be

20  pursuant to the 14:97?

21       A    I don't know that particular incident

22  that you're referring to, but, no, it wouldn't

23  be policy to tell officers what the arrest is

24  for.  Like I said, the only thing I can think

25  would be when the arrests were made, our legal

advisor would have been advising us of a
better charge instead of what was used.  But,
no, there's no blanket policy saying this is
what you arrest people for.

     Q    We heard testimony earlier today from
another representative of the Baton Rouge
Police Department that, as to the arrests at
East and France, that an arrest team would
have seized the person and then turn them over
to another officer or group who were
processing, who then completed the Affidavits
of Probable cause without actually witnessing
what the arrestee's conduct had been.  Are you
aware of that?

     A    I'm aware of that practice that
shouldn't -- now, prisoner processing is
responsible for many things, but they're not
responsible for writing what had happened or
what crime took place.  That should be the
arresting officer.  As far as following up and
finishing the rest of the paperwork and the
booking process, that's what PPT was for.

     Q    Sir, are you aware that there are
more than a hundred essential identical
Affidavits of Probable cause, which were all

1  completed by the processing team and not by

2  the officer who actually witnessed the

3  arrestee's conduct?

4          MR. SCOTT:

5              Mr. Etter, I'm going to object.

6              We're supposed to be on subject 2-T,

7              "Entry on to private property."

8              Captain Leach is not designated for

9              Affidavits of Probable Cause.  That

10             that would be Topic 11, I believe.

11         MR. ETTER:

12             Just to respond, he testified to

13             as to -- that the entries on private

14             property and the officers having a

15             basis for entering private property

16             because at some prior knowledge of a

17             violation, so why I think this is an

18             appropriate question.  However, I

19             will defer that question to the

20             representative designated for

21             Affidavits of Probable Cause.

22             That includes my questions on

23             this topic.

24                  EXAMINATION

25

BY MR. MOST:

    Q    All right.  And just a quick followup, while we're talking about different statutes.  Captain Leach, you've been an officer for approximately 30 years, correct?

    A    Yes, sir.

    Q    In your 30 years as an officer, can you recall any particular time -- other than the July 2016 protests -- when you arrested someone for a violation of 14:97, obstruction of a highway?

    A    I cannot.

    Q    And in your approximately 30 years as an officer, can you recall any particular time, other than the July 2016 protests, that you arrested someone for 100.1, obstruction of a public passageway?

    A    No.

    Q    Was that a no?

    A    No.  Sorry.  Yes, no.

        MR. MOST:

            Okay.  Any other questions on this topic "Entry on Private Property to Make Arrests"?

            All right.  Hearing none, we

1      will move on to topic -- next topic I

2      believe you're designated for is

3      Topic 7, which is "Planning and

4      preparation for protests, including

5      the date, attendance and content of

6      planning meetings between Baton Rouge

7      Police Department and other law

8      enforcement agencies from July 5th to

9      July 10, 2016; all aspect of planning

10      of protests response from the time

11      Alton Sterling was killed through

12      July 10, 2016; designation and

13      identification of chain of command

14      for July 9th and 10th, 2016 protests

15      at both Goodwood and Airline and

16      Government Street and downtown, both

17      withing BRPD and between BRPD and

18      other law enforcement agencies;

19      identification of individuals who

20      gave law enforcement -- orders to law

21      enforcement officers."  And finally,

22      "Identification of individuals who

23      gave orders to protesters."

24          That's a lot, but that's all

25      under the heading of Topic 7.  Are

1          you prepared to testify on those

2          topics?

3          THE WITNESS:

4               Yes.

5          MR. MOST:

6               And, frankly, MacArthur, I feel

7          like this is something y'all know in

8          more detail than I.  Would y'all like

9          you to lead the questioning of this

10         topic?

11         MS. LOMMERS-JOHNSON:

12              I'm happy to start.  We're

13         actually going to have Jim Craig come

14         on line because he has prepped this

15         topic time.  He just needs like five

16         minutes to switch over from another

17         deposition.  So with that being said,

18         I'm happy to start or you can start,

19         William, and pass to Jim on behalf of

20         MacArthur.  But if --

21         MR. MOST:

22              Why don't we knock out some of

23         topic 8?  Because I think he's

24         designated, as well, for Topic 8 and

25         we might be able to knock out much of

1       8 while we wait for Jim.  How about

2       that?

3       MS. LOMMERS-JOHNSON:

4           Perfect.

5       MR. MOST:

6           That all right with you, Joe and

7       Captain?

8       THE WITNESS:

9           Yes.

10      MR. SCOTT:

11          Yeah, Topic 8 appears to be more

12      discrete and less nebulous.

13      MR. MOST:

14          Yeah.  I think it might be

15      quick.  Topic 8, Captain, is:

16      "Equipment used by BRPD's response to

17      protests, including the acquisition

18      of equipment related to the following

19      tactics; determination to use the

20      following tactics; the designation of

21      authority to deploy the following

22      tactics; and the description of the

23      BRPD authorized use of same."

24          And we've got a couple different

25      discrete items here.  We covered

1           some, but remaining to be covered are

2           teargas, teargas masks, drones,

3           listening devices and cameras.

4                Are you prepared to testify

5           about those topics?

6      THE WITNESS:

7           Yes.

8                     EXAMINATION

9  BY MR. MOST:

10     Q    Great.  All right, in terms of -- we

11  already talked about the BearCat, I think, at

12  some length.  We talked about the LRAD.  The

13  next one up is "Teargas/teargas masks."  My

14  understanding is that teargas masks at least

15  were deployed to BRPD officers responding to

16  the July 2016 protests, agreed?

17     A    Yes.

18     Q    Is that a common kit for BRPD

19  officers or is it particularly triggered by

20  some policy or determination?

21     A    No, it's not -- at that time, it

22  wasn't part of a uniform officer's daily

23  equipment list, no.  It was deployed because

24  of fear of protesting could become violent and

25  a need to deploy gas.

```
 1      Q    Was teargas deployed at any point
 2   during the July 2016 protests?
 3      A    I'm quite proud to say:  No, it was
 4   not.
 5      Q    But the officers were prepared in the
 6   event that they had to, agreed?
 7      A    Yes.
 8      Q    And so they anticipate the possible
 9   need to deploy teargas, agreed?
10      A    Agreed.
11      Q    I'll go through each of these
12   equipment and then hand off to other people,
13   unless anyone wants to go item by item.
14           Drones, were drones deployed at the
15   July 2016 protest?
16      A    No, we have drone programs now, but
17   at the time -- it might have been in the
18   infant stages, but I don't think we had any
19   there.
20      Q    Okay.  Topic -- Subsection F of Topic
21   8 is "Listening devices."  Did BRPD deploy any
22   listening devices during the 2016, July
23   protests?
24      A    No, we didn't have any listening
25   device, other than just the officers that
```

1    might have been deployed there.

2        Q    So I'm thinking, for example, a long

3    range microphone, parabolic microphone?

4        A    To my knowledge, we don't have one.

5        Q    Have you ever heard of a Stingray

6    device that intercepts cell phone signals?

7        A    Definitely don't have that.

8        Q    Any other sort of electronic

9    monitoring of cell phones or other electronic

10    devices that BRPD used during the July 2016

11    protests?

12        A    No.

13        Q    Topic -- Subsection G is:  "Cameras,

14    including those used from an

15    airplane/helicopter."

16        Maybe we can answer the easier part

17    first.  Did BRPD deploy any airborne cameras

18    during the July 2016 protests?

19        A    We did.

20        Q    Was it via airplane or helicopter?

21        A    We had both.  We had a fixed wing

22    airplane from Calcasieu Parish, I believe it

23    was.  It was able to downlink to EOC to give

24    live feed, where he's able to -- it's call a

25    downlink to link live footage from the

1    aircraft to our Emergency Operations Center,

2    so you get live footage.  But at the time I

3    don't believe our helicopter could do that.

4        Q    So during the July 2016 protests,

5    there was a camera in an airplane that was

6    providing live video to BRPD, correct?

7        A    When it was available, yes; not all

8    the time.

9        Q    Sure.  Was that live video recorded

10   in any fashion?

11       A    I don't believe it had that

12   capability.

13       Q    Okay.  And then in terms of other

14   cameras, other than mounted on an airplane,

15   did BRPD deploy officers with cameras or video

16   cameras to document the protests in July 2016?

17       A    I believe we may have sent Crime

18   Scene to record some of the verbiage that was

19   given to the crowd, the order to disperse and

20   such.  We do that now, but I'm certain

21   100 percent we did that in 2016.

22       Q    Yeah.  I'll represent to you that

23   there's been images provided to us from some

24   sort of BRPD photographer.  Do you recall if

25   there were multiple photographers deployed or

1   just one, any idea?

2       A    I don't know.  If it were more than

3   one, it probably wouldn't be more than two.

4   If it was Crime Scene, they might have sent

5   two officers there.

6       Q    Did BRPD receive photographs or video

7   from other agencies, maybe other agencies had

8   photographers out there that they were sharing

9   information from?

10      A    Other than the Calcasieu fixed wing,

11  I don't believe so.  Other than that, I don't

12  think that we had any other footage from

13  anybody else.

14      Q    And any other method or device that

15  BRPD used to document the protests, other than

16  what we've discussed?

17      A    I don't think so.

18          MR. MOST:

19              Okay.  I think those are my

20          questions for Topic 8.

21              MacArthur, is there any Topic 8

22          questions to followup on?

23          MS. LOMMERS-JOHNSON:

24              No, we don't have anything more

25          on Topic 8.  Thanks, William.

1            John, do you?

2       MR. ETTER:

3            Yes, I have a couple of

4       questions on Topic 8.

5                 EXAMINATION

6  BY MR. ETTER:

7       Q    Who gave the order to distribute gas

8  masks to the officers who responded on

9  July 10th?

10      A    That's part of their equipment by

11 that point.  I don't know who ordered the

12 masks to be dispersed at any time -- in the

13 beginning, because not everybody had them.  So

14 that order came from above me in the chief

15 administration somewhere.  But that -- once it

16 was distributed to everyone and everyone was

17 equipped with it, it became part of your

18 equipment that you bring in wherever you go.

19 Wherever you're at, you have all of your

20 equipment with you.

21      Q    Did BRPD coordinate with the

22 Louisiana State police for officers to be

23 wearing -- be issued and wearing gas masks?

24      A    If you're -- you're speaking in

25 general terms or on France Street?

1    Q    Particularly, East and France.

2    A    France Street, I'm not a hundred

3    percent who gave an order to -- everybody you

4    see that had masks were masked up.  BRPD

5    Mobile Field Force is not present on France

6    Street.  That was Calcasieu Parish and state

7    police.  So I'm assuming somebody in that --

8    you know boots-on-the-ground command would

9    have said:  Hey, everybody put on your gas

10    masks.  To my knowledge, that's how it

11    occurred.

12    Q    And had been -- were BRPD issued

13    teargas on July 10 on East and France?

14    A    Yes, sir.  That's part of what this

15    Special Response Team responsibility, besides

16    coverage, in case there's an active shooter or

17    something like that.  They were the only ones

18    certified to deliver teargas, other than -- I

19    take that back.  For us, for BRPD, they were

20    the only ones.  Our Mobile Field Force wasn't

21    certified in that, but that day, state police

22    were well capable of doing that and I'm sure

23    Calcasieu was, as well.

24         MR. ETTER:

25             Thank you.  That's all I have.

1      MR. MOST:

2           Great.  Well, the next topic

3      that I believe he's designated for is

4      Topic 7, which is generally about

5      planning and preparation for

6      protests.  The witness already

7      testified that he was prepared for

8      this topic.

9           Jim, you may know this aspect of

10     this best.  Would you like to lead

11     the questioning of Topic 7?

12     MR. CRAIG:

13          I can do that.  I just need a

14     couple of minutes to pull up my

15     documents because I've been in a

16     deposition in an entirely different

17     case, so I'm just changing just a

18     little bit.  I'll be ready -- if we

19     could just take five and come back

20     and 3:20.  I will not have a lot of

21     questions, but we'll go through what

22     I have.

23     MR. MOST:

24          Sure.  Why don't we see if we

25     can knock out -- while you're doing

1  that, we might be able to knock out

2  Topic 9, which I think is the last

3  one Mr. Leach is designated for.

4  Because I think we've largely covered

5  much of it, if that's all right with

6  everyone.

7  THE WITNESS:

8      Good with me.

9  MR. MOST:

10      Yeah.  I expected you would like

11  to be out of here sooner than later,

12  Captain.

13      All right.  So Topic 9 is

14  "Tactics used during BRPD response to

15  protest, including the decision to

16  use the following tactics, the

17  designation to deploy the following

18  tactics; and the description of the

19  BRPD authorized use of same."

20      And remaining to cover is "The

21  surveillance from operatives within

22  the protest group," and "D,

23  Identification and arrests of protest

24  leaders."

25      Are you prepared to testify

1           about those topics today, Captain?

2       THE WITNESS:

3          Yes.

4            EXAMINATION

5  BY MR. MOST:

6     Q   So we identified that there was one

7  operative -- one undercover operative deployed

8  within the East and France Street group on

9  July 10th, correct?

10    A   Yes.

11    Q   Were other undercover operatives

12  deployed to other protests in July 2016?

13    A   Yes.

14    Q   And had undercover operatives been

15  deployed to infiltrate the groups by BRPD

16  prior to that, prior to July 2016?

17    A   I can't speak to that.  Our

18  Intelligence Division does try to stay, you

19  know, part of groups that they think they need

20  to be part of, I guess.  So I don't really

21  know how.  I never worked in a division like

22  that.  I'm not sure how their day-to-day

23  operations manages.  But, yes, they stay

24  connected to many groups in the area.

25    Q   Sure.  By stay connected, do you mean

1   send undercover operatives to infiltrate?

2       A    Yes.   There's a public forum type

3   event.   It's common for them to attend those

4   type of events to see what groups or different

5   groups are planning or organizing.

6       Q    And then -- I think we've already

7   talked about identification and arrests of

8   protest leaders.

9           MacArthur team, do you have any

10  questions and Topic 9?

11          MS. LOMMERS-JOHNSON:

12              I have just a couple followup

13              questions on surveillance.

14                      EXAMINATION

15  BY MS. LOMMERS-JOHNSON:

16      Q    I think for the July 10th incident, I

17  think you previously testified that you

18  weren't aware of who was the person embedded

19  within the protest group on July 10th?

20      A    That's correct.   I believe it was our

21  Intelligence Division, but I'm not sure who.

22  And honestly we've used some of our narcotic

23  detectives in those types of roles, as well.

24  So I'm not sure who was there that day.

25      Q    I guess in terms of figuring out

1    answers to the questions about who that person

2    was and how many people they had talked to

3    when they received the communication that

4    there was a plan to enter the highway, do you

5    know who the right person would be to talk to

6    get answers to those questions?

7        A    I do not.  Like I said, I don't know

8    who was there that day, as far as who was in

9    command of our Intelligence Division.  I don't

10    even believe they even work here any more.

11    I'm not sure they could even tell you they

12    were there.  I guess, it kind of makes it

13    sound like it was a group talking.  But in

14    this group, word kind of spread what they were

15    doing, what the end goal was.  I think -- most

16    people out there had an idea of what they were

17    doing.  Some may; some may not.  But I think

18    word spreads pretty quick in a group like

19    that.  It wasn't just a select handful.

20        Q    And when you say it wasn't just a

21    select handful who were planning to enter the

22    highway, what do you base that on?

23        A    Like that officer was telling us or

24    relating to emergency operations that day is

25    that:  Hey, people are talking.  This is what

1    we're going to do.  You know, as they moved

2    around through the group, they were hearing

3    that kind of talk.  And that plus, you know,

4    the officer talking to the other group.  So we

5    felt pretty confident what they were doing.

6        Q    And so there I think you're

7    referencing two officers; one was the

8    surveillance officer and is the other one the

9    motorcycle officer?

10       A    Oh, yes.  Sorry about that, yes.

11   Intelligence operators, usually they don't

12   send just one person.  I don't want to

13   misspeak, but I'm almost certain there was

14   more than one intelligence officer out there

15   that day.  He attended the march and stayed

16   with it and reported back, the movements and

17   stuff.

18       Q    And so is it your testimony that the

19   intelligence officer who was, you know, plain

20   clothes officer surveilling the protest group

21   on June 10th, communicated back to BRPD that

22   they had heard people talking about trying to

23   enter the highway, but you're unaware of

24   whether it was two, three, four or more people

25   talking about --

1     A    It was a pretty big consensus from

2  our officer relaying the information on what

3  the group was doing.  I can't put a number on

4  who.  And I'm not going to say every single

5  person knew exactly what they were doing,

6  because they might have been just following

7  them.  I'm sorry.  It sounds like impossible

8  to answer that.

9     Q    It's okay.  And I'm not trying to,

10  you know, get you to answer questions that you

11  don't know the answer to.  Just to the extent

12  that you do know -- I guess what I'm hearing

13  from your testimony is that you don't know how

14  many people your surveillance officer heard

15  that from --

16     A    Correct.

17     Q    -- particularly?

18     A    Right.

19     Q    Would they have written any kind of

20  report after the fact?

21     A    I'm not sure.  I'm not sure what

22  their procedures are, if they -- you know,

23  what's documented and what's not.  I'm sure

24  they don't go write a report of every time

25  they go and attend -- maybe that day.  I had

1    never seen it.

2        Q    Have you been unable to hear their

3    communications directly from the surveillance

4    officer?

5        A    I recall -- this particular protest

6    occurred during a shift change in Emergency

7    Operations Center.  So I can't really -- I

8    kind of came in and it was ongoing.  So I

9    don't really -- I can't tell you, I heard

10   directly from the intelligence officer.  I

11   don't remember where or how we got that

12   information.  It came through them.  I'm not

13   sure through what channel it was.

14       Q    And, in general, how did the

15   intelligence officer at the protest

16   communicate intelligence back to the BRPD?

17       A    They attended something that -- you

18   know, they were give us updates -- like, we

19   knew the progression of the peaceful protest,

20   the march, you know, from the church to the

21   capitol.  And they were giving orders similar

22   to, like:  Okay.  We're at the capitol.

23   Someone is speaking now.  Okay.  We're

24   leaving.  We're marching back to the church.

25   They were giving updates that's quite common

1    for any protests or events that we had.  I'm

2    certain on that day they were giving updates

3    as to what they received.

4         Q    Was the course of communication

5    conducted, you know, by phone or text?

6         A    Yeah.  Usually, it's just a

7    phonecall.  They'll call in and that's the

8    quickest way to communicate and to be

9    understood and not to misunderstand a text or

10   something.

11              MS. LOMMERS-JOHNSON:

12                   I think that's all the

13              surveillance questions I have.

14              THE WITNESS:

15                   Okay.

16              MR. ETTER:

17                   I have question, Captain.

18              THE WITNESS:

19                   Yes, sir.

20                   EXAMINATION

21   BY MR. ETTER:

22         Q    Are you aware that the Baton Rouge

23   Police Department was receiving communications

24   from the Governor's Officer of Homeland

25   Security and Emergency Preparedness during the

1    July 2016 protests?

2        A    Like I said, from early on, the

3    governor's office had Unified Command System,

4    a group.  Their command -- their EOC was

5    operational, as well as ours, our Office of

6    Homeland Security.  So there was communication

7    between our group, the Louisiana Sheriff's

8    Office Association and members, the Louisiana

9    Chief of Police Association, so there was

10   massive groups and massive communication

11   between all the groups.

12       Q    Were the -- part of this collective

13   team conducting surveillance of people's

14   emails and websites?

15       A    I don't know of anybody that was

16   monitoring any emails.  They may have been

17   looking at a social media page or something.

18   That's standard for our intelligence group to

19   do.

20       Q    To your knowledge, did members of the

21   Black Panther Party or the New Black Panther

22   Party participate in the July 10 protest?

23       A    I don't believe they were there on

24   France Street, not to my knowledge.  I don't

25   remember the New Black Panther Party being

1  present at that particular protest.

2      Q    Was there surveillance done to

3  determine who were the agitators for the East

4  and France -- to your knowledge, was there

5  surveillance to determine who were the

6  agitators and leaders of (INAUDIBLE) --

7      A    I think your question is, who were

8  agitators?  Were there any intelligence of who

9  the agitators were on protest on France

10 Street?  Was that your question.

11     Q    I started asking if there had been

12 surveillance done to identify the agitators

13 and leaders for the --

14          THE COURT REPORTER:

15              Mr. Etter, I'm not getting your

16          question.  You broke up.

17          MR. MOST:

18              As the emcee of this, I'm going

19          to suggest that, John, you save that

20          question for the end and we'll move

21          on to --

22          MR. ETTER:

23              I have a thunderstorm here.  All

24          right.  I will save that and let you

25          move on.

1        MR. MOST:

2              Great.  Thank you.

3              Jim, would you like to start

4        with Topic 7, the planning and

5        preparation for protests?  Is this a

6        good time?

7        MR. CRAIG:

8              Yes, sir.  And thank you all for

9        indulging me.

10                  EXAMINATION

11   BY MR. CRAIG:

12      Q    Captain Leach, we met a while back on

13   another one of these cases.  I'm Jim Craig.

14   I'm with the team representing the plaintiffs

15   in Tennart, Batiste-Swilley and Smith.  And

16   this afternoon, Ms. Lomers-Johnston is my

17   co-counsel.  I am going to start -- well,

18   first of all, I'm questioning on Topic 7,

19   which involves the planning and preparation

20   for the protest response, including planning

21   meetings between the BRPD and other law

22   enforcement agencies starting late on July 5th

23   and going forward.  Is that one of the topics

24   that you were asked to prepare to talk about

25   today.

1    A    Yes, sir.  I'm ready.

2    Q    Okay.  What did you -- besides your

3  own personal knowledge as a participant in

4  some of those events, have you done anything

5  to prepare specifically to talk about this

6  topic of the planning and preparation?

7    A    No, sir.  Until I came here today, I

8  didn't know what type of questions I was going

9  to be asked.

10    Q    Okay.  Well, this one is about

11  planning.  And I'm going to start with a

12  document.  I'm going to try to share my

13  screen.  This document, I believe, is in the

14  group of Exhibits LLLLLLL, as in Lion,

15  L-I-O-N.  And it is the Operational Log for

16  the Mayor's Office of Homeland Security and

17  Emergency Preparedness.  And I believe we've

18  shown you these in previous depositions.

19    A    Yes, sir.

20    Q    And as you may remember, this

21  particular document in a lot of the logs read

22  in reverse chronological order, so we're

23  starting with the last page, page 9 of 9.  And

24  I'm going to blow it up a little bit, so we

25  can see it better now that we know what we're

1  talking about.  You see here that there's a

2  report beginning with July 5, 2016 at

3  12:30 a.m. about the shooting of Alton

4  Sterling?  Do you see that?

5       A     Yes, sir.

6       Q     And then the 4:00 a.m. log says:

7  "Cellphone and surveillance videos were

8  released of the shooting.  The shooting went

9  viral."

10      A     Yes, sir.

11      Q     I'm looking for -- I'm going to skip

12 just for a second to a document -- I don't

13 think you've seen before, but we used it in

14 Chief Dabadie's deposition.  It's a one-page

15 email from Chuck Hurst.  And you know Chuck

16 Hurst as one of the employees of Louisiana

17 Sheriff's Association?

18      A     Yes, sir, I know him.

19      Q     Okay.  And this one is dated in

20 the -- it's dated July 6, 3:12 p.m. and it

21 refers to a meeting that same day, Wednesday

22 July the 6th at 1:00 p.m. of law enforcement

23 officials with the Mississippi State Police,

24 the Baton Rouge Police Department and the East

25 Baton Rouge Sheriff's Office, meeting that

afternoon, that being the first full day after
the shooting of Alton Sterling.  And so my
first question to you is:  Do you recall that
meeting?

     A     I believe I remembered vaguely that
meeting.  We went -- we had many.  But, yes,
that's probably one of the first Unified
Command meetings.

     Q     Right.  So -- and I have also for
you -- I don't have the exhibit number for it
yet, but it was also used in Chief Dabadie's
deposition in this case -- sign-in sheets for
the MOHSEP.  I'm going to call it, the acronym
for the Mayor's Office of Homeland Security.

     A     Okay.

     Q     And this is the sign-in sheet for
that same day, July 6, 2016.  I'm just
wondering in that first meeting, the first
meeting that you all had to set up the Unified
Command Structure, who, if anyone, do you
remember being present from the various
agencies?

     A     Oh, man.  I don't know -- the
leaders, the time -- I'm trying to recall.  I
wasn't familiar with them at the time, like I

1  was some of the operator, their SWAT guys and

2  stuff.  So some of the administration guys who

3  were at that meeting, I would have just met at

4  that time.

5      Q    Okay.  Let's look at this sign-in

6  sheet and see -- I understand -- we had been

7  told in other depositions, this is the sign-in

8  sheet for the building.  It's not necessarily

9  for a sign-in sheet for this particular

10  meeting.  I don't want to mislead you.

11     A    I realize that.

12     Q    Thank you.  I want to go through the

13  people who are designated here as being from

14  one or another law enforcement agencies.  So

15  Joel Calahan, do you know what his role is

16  with the BRPD?

17     A    Yes, sir.  I know him.  And he's a

18  lieutenant, a shift lieutenant right now.

19     Q    So is he Uniform Patrol?

20     A    He is, Third District Precinct.

21     Q    Carl Wilson?

22     A    I believe he retired as a captain a

23  couple of years ago.  At the time he was

24  probably there -- he was probably still a

25  captain then, I would imagine.  He's -- he's

1    one of those shift supervisors.

2        Q    But he is also Uniform Patrol?

3        A    Yes, sir, he was.

4        Q    Don -- I'm going to murder his last

5    name, but it looks like Gurzynski.

6        A    Yes.  We just call him Ski because

7    it's much easier.

8        Q    Okay.  What does Ski do?

9        A    Ski is a uniform lieutenant, I

10   believe, now, but at the time he was sergeant

11   in the Traffic Division.

12       Q    Okay.  I'm on page 2 now, Captain.

13   And going back passing the MOHSEP employees,

14   who I assume have to sign in just to get

15   there.  But Chanta Beard of BRPD --

16       A    Yes, sir.  She's a uniform officer.

17       Q    Gabrielle Collins?

18       A    She is -- works in our Street Crimes

19   Division.  At the time, she was probably

20   uniform.

21       Q    Shane Totty, T-O-T-T-Y?

22       A    Yes, sir.  Unfortunately, we lost

23   Shane a few years ago.  He's passed.

24       Q    I'm sorry to hear that.  Mitchin.  I

25   know who Mr. Ramirez is.  He's the Information

1    Services Officer for the City Parish.

2    "Mitchin," I think it says.

3         A    Yes, sir.

4         Q    Does he have any particular role or

5    she?

6         A    He does.  He's still currently where

7    he was then.  He basically works our Grant

8    Writing Division.  He works really closely

9    with the Mayor's Office of Homeland Security.

10        Q    Got it's.  David Fauntleroy?

11        A    David was Uniform Patrol.

12        Q    Britt Jones, I think we've met

13   earlier today, or at least you all have.

14             MR. SCOTT:

15                  No, we kind of flipped the

16             schedule around.  We took Mike Barrow

17             this morning.  I get feeling we're

18             not going to get to Britt Jones this

19             afternoon.  We're just going to power

20             through.

21             THE WITNESS:

22                  Britt is -- works in our

23             Accreditation Division and Policy.

24   BY MR. CRAIG:

25        Q    Bryan Taylor.  We have met Mr.

1  Taylor.  He was -- he ultimately became your

2  assistant as Incident Commander on the 6:00

3  p.m. to 6:00 a.m. shift; is that correct?

4       A     That is correct.

5       Q     Joel Patterson?

6       A     Where did he work at time?  Oh, man.

7  His role was a SWAT Commander or a SWAT

8  Leader.  I'm not sure if he was a commander

9  then or not.

10       Q     Okay.  Cindy Carmack?

11       A     She's a civilian employee that works

12  with the Fusion Center, intelligence gathering

13  center.  She still works for the City in our

14  Realtime Crime Division.

15       Q     Okay.  And then we have a Ralph

16  Williams from East Baton Rouge Sheriff's

17  Office.  Do you remember Mr. Williams?

18       A     Oh, yeah.  I know Ralph.

19       Q     Okay.  Who is Ralph?

20       A     Ralph's role -- I think he was still

21  part of their SWAT time, one of their -- I

22  forget his rank, but one of them is supervisor

23  for East Baton Rouge Parish Sheriff's

24  Department.

25       Q     I promise you I'm not going to go

1    through all of these, but we do have -- we're

2    still on that July 6th sign-in sheet.  And we

3    have Adam Albright from the Louisiana State

4    police.

5         A    Yes, sir.

6         Q    Do you know Trooper Albright?

7         A    I know who he is now.  I don't know

8    what his role was there.  He was kind of

9    liaison just to be at our Emergency Operation

10   Center, so between the two agencies.

11        Q    Was that -- at the time, was that his

12   position, even before the protests or was he

13   there in the capacity just for the protest?

14        A    Yes, sir, just for the protest.  I'm

15   not sure of his assignment prior to that.

16        Q    Okay.  And then there's Lawrence

17   McLeary from EBRSO.  Do you know Mr. McLeary?

18        A    I don't remember Mr. McLeary.  Again,

19   his role was probably like a liaison between

20   the departments.  So they would change.

21   Sometimes they would send different people.

22        Q    Looking at this sixth page, I want to

23   go all the way down to the bottom here.  You

24   see -- it this Todd -- would this

25   Captain Todd --

1      A      Todd Weishar.

2      Q      Yeah.

3      A      Yes, sir.

4      Q      And he was involved in the leadership

5   of BRPD during the protest response?

6      A      His role -- I think at the time he

7   was a uniform supervisor.  He went to Health

8   and Safety, but I think at the time he was a

9   uniform supervisor.

10      Q      I'm going to share another document

11   here for -- we're going to talk about some of

12   this information kind of at the same time.  So

13   this document, the first page of it, Captain,

14   this is an exhibit that is five As, AAAAA, and

15   it is the City Parish and Baton Rouge Police

16   Department Answers to the First Set of

17   Interrogatories offered in the Blair Imani

18   case.  I'm going to turn to page 4, which was

19   -- includes Interrogatory Number 1, which

20   starts -- the question:  "Describe any and all

21   meetings you" -- and "You" in this case

22   means -- you know what would say in

23   Mississippi, "All of y'all" -- so all of y'all

24   have worked within the City Baton Rouge --

25   "with any law enforcement agency official or

1   entity other than the BRPD in preparation for

2   anticipated or actual protests in the month

3   after Alton Sterling's death."

4          And according to this written answer,

5   you were consulted about the answer to this

6   interrogatory.  And -- here, again, do you see

7   here on the -- it's page 5 of Exhibit AAAAA

8   says:  "Officer J.D. Leach believes that BRPD

9   opened Emergency Operating Command Center on

10  July 6, 2016."

11         Do you see where I'm reading from?

12     A    Yes, sir, I see that.

13     Q    And so that opening of the EOC, was

14  that during that early afternoon meeting on

15  July the 6th that we saw in Mr. Hurst's email?

16     A    Yes, sir.  I believe that would be

17  the same.

18     Q    Okay.  And you list some folks two

19  paragraphs down that were involved in some of

20  these meetings, including Colonel Stanton from

21  the State Police, Mr. Hurst, Lane Bernham with

22  the State Police, you, and Bryan Taylor from

23  the BRPD and Todd Morris with the Sheriff's in

24  East Baton Rouge.  Do you see that?

25     A    Yes, I couldn't remember Colonel

1    Stanton's name.  He led the meeting, the first

2    meeting at LSP.

3        Q    Okay.  So yeah.  I'm sorry I

4    scattered shot it.  We went through a lot of

5    names and kind of the purpose of that, in

6    addition just me learning a little bit about

7    them, was maybe to be thinking about seeing

8    some of those folks signed in on the 6th

9    prompts any particular memory on you part

10   about who might have been there for BRPD or

11   East Baton Rouge Sheriff's Office or the State

12   Police?

13       A    Yes, I believe you have an accurate

14   list there in that paragraph.  There were

15   more -- certainly more people there, but I

16   don't recall who or maybe at the time I didn't

17   even know who.  But I was previously familiar

18   with Todd Morris because he was there, the

19   SWAT Commander for East Baton Rouge Parish

20   Sheriff's Department.  So we had trained

21   together and even been on call together, so I

22   was quite familiar with him and a lot of guys

23   I was introduced to that day.

24       Q    Okay.  Thank you.

25       A    Yes, sir.

1      Q    Do you recall was -- in any of those

2  early meetings, either that first one or

3  shortly thereafter, did Mayor Holden

4  participate?

5      A    I couldn't say.  I don't recall him

6  ever attending a meeting that I was at.

7      Q    Thank you.  Chief Dabadie?

8      A    The Chief had sort of his own

9  meetings, and then we were kind of the

10  operational group.  I may have gone to a

11  meeting with Chief Dabadie, but I don't really

12  recall being in a meeting or meeting with him.

13      Q    Okay.  Colonel Mike Edmonson of the

14  state police?

15      A    Again, that's -- talking about this

16  upward administration.

17      Q    Yeah.

18      A    They have their own meetings and us

19  working staff had our own meetings.

20      Q    Got it.  Yeah, okay.  So the meetings

21  that you were in, you were talking about

22  operational issues and that would be in the

23  nature of logistics?

24      A    Yes, sir.  Manpower and logistics is

25  a big part of it.

1    Q    And then it talks about in this

2  document, the Answer to Interrogatory 1,

3  Exhibit AAAAA, that you created a set of rules

4  or suggestions about some of those logistical

5  areas?

6    A    Yes, sir.

7    Q    Do you see that?

8    A    Yes, I do.

9    Q    One of the issues that I would like

10  to talk about is the planning with respect to

11  the processing center.  Is that referring to

12  prisoner processing?

13    A    Yes, sir.

14    Q    What do you remember or what was

15  discussed, to the extent that you know it --

16  or that the City knows it -- in terms of early

17  planning or discussions about how arrestees at

18  the protests would be processed?

19    A    So early on the 6th -- July the 6th

20  of 2016, a protest group had not left North

21  Foster area at that time.  So our operational

22  plan was to be deployed if needed, but to stay

23  out of the area as much as possible.  So we

24  literally shut North Foster off to allow them

25  to protest and -- you know, we understood they

were upset and angry.  We monitored it and
they actually would try to generate calls to
have confrontation with police.  We realized
that was happening, so we sent undercover cars
to check and see if it was actually a real
call or not.  I don't want to go too much off
the question there.  Early on with prisoner
processing, we had so many unknowns, we would
stage Mobile Field Force slot, response
officers.  Instead of having them on the
scene, we would have them staged.  And that
would be staged with the prison processing.
And if I'm not mistaken, it was one of the
buses from EBR Sheriff's Department that we
had standing by.  But in those first couple of
nights, as a group, didn't have any
interactions with the protesters whatsoever.
But to answer your question, the Mobile Field
-- I mean, the Prisoner Processing Team was
set -- I believe it was set by East Baton
Rouge Sheriff's Department.  We didn't have a
capability -- we didn't have a bus, you know,
like the Sheriff's Departments did.

    Q    Right.  What else do you remember
about those early meetings in terms of the

1  coordination of the response to the protests?

2      A    Yes, there was a lot to do with

3  assessing everyone's capabilities and their

4  limitations.  We had so much response from own

5  state.  Some departments could send one or two

6  officers.  Some could send a whole SWAT team.

7  Everybody had their different capabilities.

8  So what we would have to do is sit and look at

9  what each agency had and what was still

10  needed.  So a lot of that planning was seeing

11  who brought what to the table.  And then where

12  we were going to put them?  And lucky for us,

13  the State Police runs their own academy.  And

14  they did not have one in session, so they had

15  the room to house our responding help and they

16  had a cafeteria, so they could feed them.  So

17  two big things for us logistically were so

18  because of LSP's availability.

19      Q    Thank you.

20      A    Yes, sir.

21      Q    We heard a fair amount of testimony

22  about this in other depositions in these

23  cases, and in some of the Travis Day case,

24  where you testified.  I'm correct in saying

25  that, because the Baton Rouge Police

1    Department was the law enforcement agency with

2    jurisdiction over the area where the protests

3    were occurring, that you, the BRPD, in effect

4    became the lead agency for the protest

5    response?

6         A    Yes, sir.  I know this is serious,

7    but I always make jokes about it.  At press

8    conferences, law enforcement agencies like to

9    stand behind the mic and take credit for

10   stuff.  I remember early on thinking:  Nobody

11   wants to take the mic now.  Right?  They all

12   thought it was going to crash and burn.  So

13   that was definitely left in BRPD's hands.

14        Q    Right.  They were behind you, but far

15   behind you?

16        A    Far behind.

17        Q    Lawyers have that phenomenon, too.

18   That will be a discussion for another year.

19   And at some point, Chief Dabadie asked you to

20   be one of -- if not the only overall Incident

21   Commander for the law enforcement protest

22   response?

23        A    Yes, sir.  I remember exactly when

24   that was.  I had met with him on the 5th, the

25   morning after the shooting of Alton Sterling.

1   And I think he still thought it was going to

2   end up not really being a major issue.  And so

3   it wasn't until the 6th when we had some

4   protesters show up on Foster on the 5th, the

5   night of the fifth, and we realized that we

6   need to upgrade our response in case it being

7   necessary.  I remember meeting with him on the

8   morning of the 6th.  And, him just

9   specifically pointing to me saying:  "J.D.,

10  you're the Incident Commander.  You've got

11  this.  Anything you need, the department is

12  yours."  I'm like:  "Gee, thanks."

13      Q    And then were you then involved in

14  selecting the rest of the leadership team or

15  was that also designated by the Chief?

16      A    No, that was -- from our department,

17  it was my choice.

18      Q    Okay.  But I think I know the answer

19  to this question, just to be clear I have your

20  testimony, can you describe for us the overall

21  chain of command of Baton Rouge Police

22  Department during the protests?  Obviously,

23  Chief Dabadie is at the top at the high level.

24  But I'm talking about you as Incident

25  Commander back down.

1      A      Well, the Chief, basically --

2             MR. CRAIG:

3                    Wait.  I think --

4             MR. SCOTT:

5                    Jim, to be clear, you're asking

6             him about the chain of command for

7             incident command, and we're not

8             looking for every shift captain in

9             five districts?

10            MR. CRAIG:

11                   No, no.  That's right.  Thank

12            you, Mr. Scott.  I'll rephrase my

13            question, Captain.

14     BY MR. CRAIG:

15     Q      What I'm really asking is -- you are

16     the Incident Commander.  Can you tell us who

17     you selected to work with you in leadership of

18     the BRPD's protest response during the

19     protests and basically why you picked those

20     particular people?

21     A      Yeah, that's a very simple answer.

22     The Chief left me in a position where there

23     was no one that could operate any rebuttal to

24     anything that I requested, except for himself.

25     He basically promoted me to his assistant

because of the things that I was able to
acquire.  For me, it was quite simple.  I
chose people who I had been in sticky
situations in on SWAT for many years, and that
was I -- I chose as my assistant at night time
to be Bryan Taylor, and I chose -- placed us
on nights because of the following protests
around the country, most of the violence had
been at nighttime, so we chose to work 12-hour
shifts from 6:00 p.m. to 6:00 a.m., and then I
chose the counterpart for daytime operations
to be Wayne Martin.  And, again, because of
his leadership capabilities, he had been on
SWAT with me for years.  He was one of the
leaders on the team.  So it was pretty much
no-brainer on who would run the daytime
operations.

    Q    And then did Wayne Martin have
someone that filled the role that Bryan Taylor
fill for you?

    A    Yes, sir.  David Wallace is his name.

    Q    And you referenced other protests
across the country.  Were you -- at the point
at which the Chief asked you to take over the
protest response on behalf of BRPD, did you go

1  looking to see what the trends had been in
2  other locations or was that something that you
3  or others in BRPD had been studying
4  previously?
5     A    Yes, sir.  I think that day he
6  announced me as Incident Commander was kind of
7  like a nightmare come true.  Ever since August
8  of 2014, when I turned on my television to get
9  ready for work and saw Ferguson, Missouri on
10  fire, I was like:  Where is that?  Because I
11  had never heard of it.  It was kind of an
12  awakening for me.  If it can happen there.  It
13  can happen mere.  I can remember talking to
14  Chief Dabadie about it, like:  Hey, are you
15  seeing that?  Of course, you have other cities
16  Baltimore, New York and things.  You see it
17  happening in big places all the time.  And for
18  me seeing Ferguson was a wake-up.  We need to
19  be prepared because something like this could
20  happen here.  So, yeah, for him appointing me
21  to that, it was kind of like something I
22  always felt was coming and basically changed
23  my career.
24     Q    Yes, sir.  So between August 2014 and
25  the activities in Ferguson, Missouri and then

1    July 2016 with the protests after the shooting

2    of Alton Sterling, what, if anything, did the

3    police department do to become prepared for

4    that possibility?

5         A     Well, for me, I was in a role where I

6    brought training in to the department, because

7    I was the Director of Training at the time.

8    So I made sure, you know, most people had gone

9    through the civilian disturbances classes if

10   they were in the academy or Mobile Field

11   Force, which our equipment was poor.  And

12   unfortunately, it was poor when this event

13   happened.  But I think this happened

14   before you get the stuff you need a lot of the

15   times, unfortunately.  But we did have a

16   refresher on the training for the entire

17   department.  During that time, between August

18   of 2014 and the protests in 2016, I attended

19   the FBI National Academy.  We had 230 people

20   in my class there.  There were a lot of

21   commanders all over the world.  We had 48

22   state representatives and I believe 17

23   different countries.  So there were a lot of

24   conversations we had, different problems that

25   were developed.  In a leadership classes that

1    we would attend, we would talk about a lot of
2    things.  There were a lot of tactics and
3    preparations and, you know, logistical
4    concerns.  For those three months, there was a
5    lot of talk on that.  So I think that kind of
6    helped prepared me for an event like that.
7        Q    In that same time period, August 2014
8    to July 2016, did you, formally or informally
9    discuss, the need to prepare for large scale
10   protests or issues like Ferguson with your
11   counterparts in other capitol area law
12   enforcement agencies?
13       A    Yes, sir.  I remember talking with
14   Major Morris, Todd Morris with the Sheriff's
15   Department about what -- of course, I didn't
16   know a lot of the state police or Louisiana
17   Sheriff's Association, things like that, I
18   didn't know that type of stuff was accessible
19   to us in that manner.  So I prepared, I guess,
20   in my wheelhouse, people that I knew, people
21   that I would be associated with and I would
22   need their support.  They would need ours to
23   happen.  We prepared as much as we could.
24   Unfortunately, the equipment side of it costs
25   money.  Money is not usually spent when it's

needed. It's was spent after the fact, where
we were able to upgrade equipment and things,
but prepare as much as we could. At the time
our Mobile Field Force gear was in a trailer
and it was probably about 30 years old. I'm
not exaggerating. And we didn't even have a
commander over the group. It was going to be
like: Somebody is going to get the trailer.
And we're going to roll out there and hand out
gear. I was, like: No, that's not good
enough. So we had in-service training.
Everybody was retrained in the operation of
it. I actually talked Chief Dabadie into
appointing a commander over Mobile Field
Force, which was Mike Barrow. And I was able
to send -- at the time, I believe, it was four
people to become updated and recertified in
civilian disturbance and Mobile Field Force
operations. I did what I could to get us
prepared. You just can't make them spend the
money when they need to sometimes.

    Q    Sure. I understand that. Who were
the four people that you sought to get in
civilian disturbance response?

    A    I knew you were going to ask me that.

1　The nights I remember was one a uniform

2　officer named Don Johnson.  John O'Donohue was

3　one of my trainers at the training academy at

4　the time, and I believe Mike Barrow went

5　through it, himself.  And the fourth name --

6　I'm sorry.  It slips my mind at the moment.

7　　　　Q　　That's okay.  I appreciate it.  So at

8　the time when you were meeting with your

9　counterparts in other law enforcement agencies

10　on the logistics or operations side, were you

11　also connecting with your supervisors and the

12　supervisors of those counterparts?  In other

13　words, people like Chief Dabadie or Colonel

14　Edmonson or Sheriff Gautreaux or, for that

15　matter, the mayor or the governor?

16　　　　A　　I never attended any of the

17　governor's meetings.  I know they had -- I

18　know they did have meetings.  For me, it was

19　just the report back to Chief Dabadie.  I

20　talked to my counterparts with other agencies.

21　We had liaison officers always assigned to the

22　EOC.  So we always had that open

23　communication.  If there's anything that was

24　needed, you just turn to that person and you

25　ask for it.  We had morning briefings for the

1  Chief and his command staff.  I attended some
2  of them -- maybe half of them.  I don't know.
3  Wayne Martin attended the others, because he
4  was the daytime supervisor doing what I was
5  doing for nights.  A lot of times -- most of
6  the, Chief's meetings wouldn't happen until
7  8:00 o'clock.  I got off at 6:00 a.m.  After
8  being up all night -- unless it was something
9  major happen -- I would go home.  And Wayne
10 Martin would give the Chief the briefings from
11 the night before.

12     Q    And there would be -- you might not
13 have been present for them, but there would
14 be, then, briefings on a daily basis in the
15 morning at MOHSEP?

16     A    Yes, sir.  Wayne Martin would have
17 been present, unless he would have been at a
18 Chief staff meeting.

19     Q    You mentioned in your testimony and
20 in your interrogatory answer -- or in the
21 City's interrogatory answer -- pardon me --
22 Colonel Stanton.  What role -- in terms of the
23 work that you were involved with of
24 coordinating operations, what role did Colonel
25 Stanton have?

1      A    My first expression that comes to my

2  head is Colonel Stanton was the man.  He was

3  in charge of whatever response Louisiana State

4  Police had at the time.  He led the first

5  meeting.  First time I ever met him.  He left

6  a grand impression, just a really well

7  put-together guy and guy that basically knew

8  what to do or knew what needed to be done.

9      Q    Were there regular meetings of those

10  of you who were the operations leadership of

11  the various law enforcement agencies?

12      A    Yes.  We would meet at EOC.  You

13  know, Todd Morris would stop by daily and

14  things that happened.  There was always end

15  shift change between Wayne Martin and his

16  counterpart and myself and mine, we would

17  meet, brief them on what intelligence had come

18  through, what events had taken place.  And

19  there were other meetings going on.  Louisiana

20  State Police had their own Emergency

21  Operations Center open and we had one of our

22  officers there as a liaison, just like they

23  had at our EOC.  The Governor's office had

24  their own things going on.  There were a lot

25  of moving pieces that -- you know, once the

1  operations started for me, anyway, I was

2  mostly just at EOC and didn't really attend a

3  lot of those other meetings.  That information

4  came to me through the liaison officer or

5  through the commanders that I was associated

6  with.

7       Q     In what form of communication?  How

8  would you receive the reports about those

9  meetings?

10      A     Like I said, that normally would be

11  in person.  That would be Todd Morris stopping

12  by or the liaison officer from LSP being there

13  with us.  Sometimes Chuck Hurst would come by.

14  It was usually like an in-person meeting.

15  There were occasions where something may

16  happen or something that we could get

17  intelligence information off that I would call

18  Chief Dabadie about and say:  This what might

19  be happening or this is happening and this is

20  what I'm thinking.  His response was usually:

21  Whatever you think.  Whatever you need to do.

22  So -- but there were phone meetings or

23  in-person meetings.

24      Q     Thank you.  Was there anybody, either

25  you or probably more likely somebody who was

1   on your team that was assigned to take notes

2   or keep any kind of written documentation of

3   what different people were telling you would

4   be needed?

5       A    As far as -- Bryan Taylor would take

6   a lot of information.  If I was on the phone

7   with what command group or whatever or

8   something came through, he would be the guy

9   that would relay it to me.  He would take

10  information -- if I was in not available at

11  the time, he would take information and be the

12  person who relayed that information to me.

13  That was Bryan Taylor.

14      Q    Was there anyone -- I guess I'm

15  thinking, like, Radar O'Reilly in the old

16  "M.A.S.H." series -- which is going to date me

17  and Mr. Scott as people who sought

18  pre-syndication.  That was kind of the person

19  who followed you around and made sure, you

20  know, that there was a checklist of what was

21  to be done.

22      A    Yes, sir.  You mentioned Joel

23  Calahan's name earlier on that log-in.  He was

24  sort of that guy for daytime, and we had Randy

25  Richard for nighttime who would answer the

1  phone and jot on a note what came in,

2  something like that. He would be kind of that

3  person that would document the note or the

4  information.

5      Q    Okay. And when you were getting

6  information and trying to decide how best to

7  deploy -- or at least request the deployment

8  of the different agencies' resources at a

9  particular moment, did you -- like, did you do

10 all of that in your head or did you have a

11 white board like the one in that room behind

12 you? How did you -- how did you, like, mark

13 it up to know: Okay. LSP will be here and

14 BRPD will be here. And these other sheriffs

15 will be over here. How physically what did

16 that look like?

17     A    It was a mess, to be honest.

18     Q    I'm sure.

19     A    That's a great question, Mr. Jim.

20 And the white board like you see behind me was

21 in the EOC room, which is not much bigger than

22 the one I'm sitting in. White board literally

23 went around the entire room. Because I

24 remember the second weekend of protests, we

25 really had the most manpower we ever had. We

had over 600 people assigned just to EOC --
not out there answering emergency calls --
just assigned to EOC. I remember talking to
Bryan Taylor, looking at these white boards,
if we have to deploy everybody, how are we
going to keep track of everybody? Right?
There's technology that we didn't have at the
time that we have now, and it makes it much
more simple. For us, yeah, write this on the
white board. It's easy to wipe it off or
change, if you need to. That was the way we
operated, honestly.

Q    Was there anyone -- sometimes in
meetings involving white boards, somebody is
assigned or takes it on themselves to take a
picture of the white board so that it can be
erased and used for something else. Do you
remember any kind of practice to try to keep
up with what was being written on the white
board?

A    I remember JoAnn Morrow who was in
charge of -- who is the Director of Office of
Homeland Security at the time. And if we
mentioned running out of space, she came in
with another white board, whatever was needed.

1   You need another white board?  Here it is.  It
2   was one of those type of deals.  She heard
3   mention -- we didn't have to ask for things.
4   Sometimes it just showed up.  We really had
5   everything we needed when it came to that.
6       Q    So was Ms. Morrow and the other
7   MOHSEP folks, were they basically the mayor's
8   liaison with the operations level of the
9   police department or was there anybody else in
10  the mayor's office who was involved with that?
11      A    No.  I don't recall the mayor,
12  himself, ever coming by.  I'm assuming
13  Ms. JoAnn kept him informed as to the
14  activities.  But to my knowledge, she was the
15  representative for the mayor's office.
16      Q    And you referenced that Baton Rouge
17  Police Department had someone as a liaison,
18  for example, at the State Police's EOC and
19  vice versa.  You know this question is coming.
20  Do you remember who those people were?
21      A    I remember one.
22      Q    Okay.
23      A    John O'Donohue, who I mentioned as
24  being one of my instructors for Mobile Field
25  Force.  I remember he -- I think he served the

1  daytime operations there.  I honestly don't

2  remember who we had at night over there.  But

3  I know he was within of them.

4      MR. CRAIG:

5          I am going to tender you,

6      Captain, to either Mr. Etter or

7      Mr. Most.  And in the meantime, I'll

8      confer with Ms. Lomers-Johnson if we

9      have any other questions about Topic

10     7 for our clients.  I don't know

11     which of the two of you lawyers wants

12     to go next, but here you come.

13     THE WITNESS:

14         Yes, sir.  Mr. Jim, not good

15     circumstances to see you, but good

16     see you.

17     MR. CRAIG:

18         I told you we'd meet again.

19     We'll probably meet again after this,

20     too.

21     MR. FAHRENHOLT:

22         If no one else has questions, I

23     actually have a few things I'd like

24     to ask you.

25     THE WITNESS:

1          Yes, sir.

2      MR. CRAIG:

3          I have to get on camera, so I

4      can go --

5      MR. FAHRENHOLT:

6          There's been a few today, Jim.

7      You really missed the show.

8                  EXAMINATION

9  BY MR. FAHRENHOLT:

10     Q    So you testified in response to

11  questions by Mr. Craig that you had been kind

12  of following the protests that were going in

13  other cities around the country, correct?

14     A    Correct.

15     Q    And to place July 10th into the

16  timeline of what was going on, you know Alton

17  Sterling was killed in Baton Rouge by the

18  police on July 5th, correct?

19     A    Yes.

20     Q    And a day later on July 6 Philando

21  Castile was killed in the Minneapolis,

22  St. Paul area, correct?

23     A    Correct.

24     Q    There were a number of protests going

25  on nationwide involving those two incidents,

1  correct?

2      A      Yes, sir.

3      Q      And we've discussed today the issue

4  that there was some belief that some of the

5  protesters in Baton Rouge were going onto the

6  interstate and blocking the interstate.

7      A      Okay.

8      Q      On July 7th, a few days earlier in

9  Oakland, California, protesters blocked the

10  interstate.  Were you aware of that at that

11  time?

12      A      I remember watching it, yes, sir.

13      Q      The night before July 10th, July 9th,

14  in Baton Rouge, there was an effort for

15  protesters to block the I-12 near Airline

16  Highway, correct?

17      A      Yes, sir.

18      Q      In the early morning hours between

19  July 9th and July 10th, were you aware that in

20  Memphis, protesters blocked the interstate?

21      A      Yes, sir.

22      Q      At the same time, late night

23  July 9th, early morning July 10, in Columbia,

24  South Carolina, protesters blocked the

25  interstate.  Were you aware of that?

1    A    I don't remember that particular one.

2   I know they were happening everywhere.  I

3   recall watching it on TV.

4    Q    Again, I'll represent to you on late

5   night, July 9th, early morning, July 10,

6   St. Paul, Minnesota, the interstate was

7   blocked.  Were you aware of that?

8    A    I think I remember that one, yeah.

9    Q    In all of these events -- I mean, we

10  live in the age of social media, so all of

11  these events, they're all filmed on cameras;

12  they're all posted on social media.  And word

13  gets around pretty quickly, correct?

14   A    That's correct.  One thing I

15  believe you might may have mention, it wasn't

16  an interstate occupation, but Dallas police

17  were monitoring a peaceful protest, and an

18  active shooter came and murdered five of them.

19  I believe that happened on the 7th.

20   Q    Sure.  There's a lot going on.

21   A    There's a lot of tenson, a lot of

22  nervous people, a lot of scared people.  It

23  was just a boiling point in the United States

24  where -- I mean, the worse thing you could

25  imagine could have happened.

1    Q    And you've testified today that
2  through undercover officers -- or whatever
3  means -- Baton Rouge Police Department
4  obtained information and they believed that
5  protesters at the corner of East and France
6  were also going to take the interstate and
7  block it, correct?
8    A    Yes.
9    Q    Did you consider all of these other
10 incidents that were occurring around the same
11 time -- in fact, many of them on the same
12 day -- in determining whether that
13 intelligence or information you were provided
14 might be credible?
15   A    We believed it was, yes.
16   Q    So when you heard this idea that
17 these protesters at East and France might be
18 trying to get on to I-110 to block it, this
19 wasn't some crazy idea that no one had ever
20 heard of, correct?
21   A    No, it was a common practice for
22 protesters to -- I guess to gain attention.
23 So, yes, it was a common practice and we were
24 aware of it.
25   Q    So based on your knowledge -- and

1  this is directed to the City of Baton Rouge.

2  Based on the City's awareness that all of

3  these events were happening in these other

4  cities -- including that it was attempted the

5  night before -- is it the City's position that

6  it was reasonable for the department to

7  believe that there was a credible threat on

8  July 10th, that the protesters at East and

9  France were going to attempt to enter and

10  block the I-110?

11            MR. CRAIG:

12                 Object to the form, please.

13            MR. FAHRENHOLT:

14                 You can answer the question.

15            THE WITNESS:

16                 I had no doubt that that's what

17            their intentions were.

18            MR. FAHRENHOLT:

19                 Okay.  I have no other questions

20            on this.  Thank you.

21            MR. MOST:

22                 I'm sorry.  I stepped away, but

23            I'm back.  But I don't have any

24            questions right now.  So.

25            MR. CRAIG:

1          Mr. Etter, do you have

2     questions?

3          We can't hear you, but it sounds

4     like you're saying you don't.

5     MR. ETTER:

6          I do not have questions at this

7     point on this topic.

8     MR. MOST:

9          I believe that's the last one

10    that the captain was designated for.

11    Is that right, Joe.

12    MR. SCOTT:

13          It is.

14    MR. MOST:

15          Okay.  So then I think we are

16    then likely wrapped for the day.

17    I'll send out an email with

18    tomorrow's link and the topics you

19    identified in your letter, Joe.  And

20    we talked this morning about trying

21    -- that you would try to see if we

22    could cover 10 and 12 tomorrow, as

23    well.

24    MR. SCOTT:

25          I have a plan.  I don't know if

1    I have time to implement that plan,

2    but I'm going to try.

3              *         *         *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WITNESS' CERTIFICATE


1          I, MICHAEL BARROW, do hereby certify

that the foregoing testimony was given by me,

and that the transcription of said testimony,

with corrections and/or changes, if any, is

true and correct as given by me on the

aforementioned date.



Dated: _____  Signed:_____

                    MICHAEL BARROW



_____  Signed with corrections as noted.

_____  Signed with no corrections noted.



DATE TAKEN: August 18, 2021

WITNESS' CERTIFICATE

I, JAMES DARRON LEACH, do hereby certify that the foregoing testimony was given by me, and that the transcription of said testimony, with corrections and/or changes, if any, is true and correct as given by me on the aforementioned date.


Dated: _____  Signed:_____

JAMES DARRON LEACH


_____  Signed with corrections as noted.

_____  Signed with no corrections noted.



DATE TAKEN: August 18, 2021

1

2                    C E R T I F I C A T E

3

4          I, CECILIA M. HENDERSON, Certified
Court Reporter, in and for the State of
5  Louisiana, as the officer before whom this
testimony was taken, do hereby certify that
6  MICHAEL BARROW AND JAMES DARRON LEACH  after
having been duly sworn by me upon authority of
7  R.S. 37:2554, did testify as hereinbefore set
forth in the foregoing 272 pages; that this
8  testimony was reported by me in the stenotype
reporting method, was prepared and transcribed
9  by me or under my personal direction and
supervision, and is a true and correct
10 transcript to the best of my ability and
understanding; that the transcript has been
11 prepared in compliance with transcript format
guidelines required by statute or by rules of
12 the board, that I have acted in compliance
with the prohibition on contractual
13 relationships, as defined by Louisiana Code of
Civil Procedure Article 1434 and in rules and
14 advisory opinions of the board; that I am not
related to counsel or to the parties herein,
15 nor am I otherwise interested in the outcome
of this matter.

16

17      Dated this 22nd day of September, 2021

18

19

20

21         CECILIA M. HENDERSON, CCR
           CCR #84099
22         STATE OF LOUISIANA

23

24

25