# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

_____

BLAIR IMANI, *et al*.   )
)
          Plaintiffs,   )       Docket No. 17-cv-00439-JWD-EWD
    v.   )
)
CITY OF BATON ROUGE, *et al.*   )
)
          Defendants.   )
_____ )

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs hereby submit this memorandum in support of their *Motion for Partial Summary Judgment* on their claims of (1) violation of the First Amendment; (2) false arrest, (3) false imprisonment, and (4) manufacturing of false evidence.

## I.      INTRODUCTION

The Supreme Court has "repeatedly referred to public streets as the archetype of a traditional public forum."[1] For that reason, restrictions on protesters exercising their right to free speech are "strictly limited."[2]

Plaintiffs are fourteen individuals who attended a protest at the corner of East and France Street on July 10, 2016. Plaintiffs were there either to speak out against Baton Rouge Police Department misconduct, or to document the protest as a member of the press. Each Plaintiff was arrested and imprisoned by the Baton Rouge Police Department for allegedly obstructing a highway or public passageway.

Plaintiffs never should have been arrested. The Supreme Court has held that law enforcement may not tell protesters where they *can* protest and then arrest them once they go there.

_____

[1] *Frisby v. Schultz*, 487 U.S. 474, 480 (1988).
[2] *McCullen v. Coakley*, 134 S. Ct. 2518, 2529 (2014); *see also Pleasant Grove City, Utah v. Summu*m, 555 U.S. 460, 469 (2009) (noting "government entities are strictly limited in their ability to regulate private speech" in "such 'traditional public fora'" as public streets and parks).

But that is exactly what occurred at East & France. Law enforcement guided protesters to East & France, and then told them they could protest on the sidewalks and private property so long as they stayed out of the street. Plaintiffs complied. But then, after the streets were cleared, BRPD ordered that "Everyone has violated. Everyone is under arrest."

Why did BRPD do that? It engaged in mass arrests because it was treating the protesters according to the department's "Civil Disorder" policy, and that policy *mandates* the dispersal and arrest of protesters.

Why did BRPD treat the protesters according to the "Civil Disorder" policy, and not the less-harsh "Special Event" policy? The City's 30(b)(6) witness testified for the City of Baton Rouge that the police applied the "Civil Disorder" policy mandating dispersal rather than the "Special Event" *because* the gathering at East & France was a "protest for them to speak out against perceived misconduct by the Baton Rouge Police Department."[3] And if Plaintiffs had instead gathered "for a church event or to talk about sales of water skis," the City testified that it would have applied the "Special Event" policy, which would not have mandated dispersal.[4] That testimony conclusively establishes  content discrimination in violation of the First Amendment. Accordingly, all fourteen Plaintiffs move for partial summary judgment on their First Amendment claims against the City of Baton Rouge.

Additionally, each Plaintiff's arrest was fatally flawed. Per explicit BRPD policy, the officers who seized Plaintiffs and placed in them in handcuffs were not to pass any information along to the officers who signed the Plaintiffs' Affidavits of Probable Cause. The signing officers filled in Plaintiff's names on pre-printed affidavits, swearing that the contents of the affidavit were true – even though they admit under oath that they had no idea at the time whether the facts were true or not. At deposition, when confronted with their admitted perjury, several

---

[3] Ex. Y (30b6 Witness Dep.) at 28:10-29:12.
[4] *Id.*

Defendants plead the Fifth Amendment, refusing to answer a range of questions on the grounds that doing so would incriminate them.

As a result, each Plaintiff was imprisoned at the parish prison on the basis of affidavits that were wholly fabricated and "don't actually show us what happened at the protests." *Infra*, at 31-39. BRPD concedes that, for most Plaintiffs, it has <u>no idea</u> who arrested them or what they did to merit arrest. *See infra*, at page 20.

For that reason, eight of the fourteen Plaintiffs also move for partial summary judgment on their claims of False Arrest, False Imprisonment, and Manufacturing of False Evidence. They move for partial summary judgment on those claims against the City of Baton Rouge, as well as the six individual officers who executed the falsified Affidavits of Probable Cause. The Plaintiffs who are moving for partial summary judgment on those claims are those Plaintiffs for whom (1) it is established that their Affidavit of Probable Cause was wholly fabricated, with no communication between the arresting officer and the officer who signed the affidavit, and (2) the City cannot identify any officer who saw them commit any alleged crime.

The individual officers are liable for their individual actions. And because the City's 30(b)(6) witness testified that the officers' actions flowed from the City policy, the City of Baton Rouge is liable for these claims per the *Monell* docrine.

The Plaintiffs, Defendants, and claims are summarized in the following chart:

**Chart No. 1:**

| Plaintiff brings | First Amendment claims against: | False Arrest, False Imprisonment, and Manufacturing of False Evidence claims against: |
|---|---|---|
| Blair Imani | City of Baton Rouge | City of Baton Rouge<br>William Alexander |
| Akeem Muhammad | City of Baton Rouge | City of Baton Rouge<br>Travis Norman |
| Raae Pollard | City of Baton Rouge | City of Baton Rouge |
| Samantha Nichols | City of Baton Rouge | City of Baton Rouge<br>Jonathan Abadie |

| Alexus Cheney | City of Baton Rouge | City of Baton Rouge |
|---|---|---|
| Victor Onuoha | City of Baton Rouge | City of Baton Rouge Willie Williams |
| Karen Savage | City of Baton Rouge | |
| Cherri Foytlin | City of Baton Rouge | City of Baton Rouge Derrick Williams |
| Alisha Feldman | City of Baton Rouge | |
| Antonio Castanon Luna | City of Baton Rouge | |
| Nadia Salazar Sandi | City of Baton Rouge | |
| Dr. Daniel Liebeskind | City of Baton Rouge | City of Baton Rouge Alex Bell |
| Finn Phoenix (C. Gaffney) | City of Baton Rouge | |
| Leah Fishbein | City of Baton Rouge | |

## II.    LEGAL STANDARD

Summary judgment is appropriate when there "is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."[5] The non-movant must offer "specific facts" rather than "mere allegations or denials" in order to defeat summary judgment.[6]

## III.    UNDISPUTED FACTUAL BACKGROUND

### A.    On July 10, 2016, BRPD guided Protesters to East & France street.

On July 5, 2016, Baton Rouge police officers shot Alton Sterling to death.[7] Throughout the next week, protesters gathered in Baton Rouge to speak out against the killing.[8]

In response, the Baton Rouge Police Department and other law enforcement agencies deployed law enforcement officers from across the state.[9] These agencies were under the operational command of BRPD.[10]

---

[5] Fed. R. Civ. Proc., Rule 56(a).
[6] *Morris v. Covan World Wide Moving, Inc*., 144 F.3d 377, 380 (5th Cir. 1998).
[7] R. Doc. 202 at 4 (Answer, admitting ¶ 1).
[8] Ex. C (30b6 Witness Dep.) at 109:21-110:1.
[9] *Id*. at 110:2-8
[10] Ex. Y (30b6 Witness Dep.) at 66:21-23 ("Q And under whose command were those Louisiana State Police officers? A The BRPD Incident Command.")

This litigation stems from one particular protest that took place on Sunday, July 10, 2016. On that day, there was a planned, organized, youth-led march to the state capitol building.[11] After speeches on the steps of the capitol building, protesters marched back down Government Street.

According to BRPD, officers were concerned that protesters might continue down Government Street and walk onto the interstate.[12] Officers gave protesters conflicting instructions about whether they could march on the interstate. Some officers told protesters that they <u>were</u> allowed to go on the interstate.[13] But another officer Another officer told protesters that "as soon as you get on the interstate, we're going to arrest you."[14]

The consensus of law enforcement, however, was that they did not want protesters on the interstate. So, they asked the protesters to leave Government Street and head "towards East Boulevard and France Street, to clear a major thoroughfare for downtown."[15] The protesters complied.[16] No protesters ever wound up on the interstate that day.[17] Per law enforcement request, they went to East & France and gathered on the sidewalks and in the roadway there.[18]

**B.      At East & France, officers ordered protesters to clear the roadways, and said that the sidewalks and private property were "where they were supposed to be."**

Once the protesters were at East & France, officers then ordered them to clear the roadways. Officers told protesters that they had to get out of the road, but "they could be on

---

[11] Ex. CC at 68:9-15 ("A. Okay. Yeah. I do recall some particulars. I do know it was a youth group. I do know that it was an organized -- they were very forthcoming and compliant with everything that we needed for an organized march. I do recall working on this, yes. It wasn't spontaneous. It was planned.")

[12] Ex. Y (30b6 Witness Dep.) at 160:20-161:2.

[13] *Id*. at 191:11-15. ("Q They were under the impression -- or your understanding is that many of the protesters were under the impression that they would be allowed to go on to the interstate? A They were told that directly, yes.")

[14] Ex T. at 28:6-29:6.

[15] *Geller v. City of Baton Rouge*, 17-cv-00324 (BRPD Opposition to Consolidate), at 2.

[16] No Plaintiff actually intended to go onto the interstate. For the purpose of partial summary judgment, however, all that is relevant is that the protesters were directed to East and France and did in fact go to East and France.

[17] Ex. Y at 164:9-12 ("Q So my question, Captain, was: Did the protesters ever make it to the interstate on July 10, 2016? A They never did.")

[18] *Id*.

private property or on the curb" and that private property or the curb was "where they were supposed to be."[19]

These directions came both from announcements over loudspeakers and from direct communications between officers and protesters. One officer told a protester that he "had to get out of the street."[20] Another officer told protesters that they could "go stand on the side in the grass and yell."[21]

At that point, the protesters split into two groups. Some protesters linked arms and refused to follow the police's orders to clear the streets. But others complied and moved to the sidewalks and private property. As one officer explained: "there were people who were obeying our orders and requests to clear public passages."[22] The City's 30(b)(6) witness and multiple officers confirmed that individuals in the group that complied should not have been arrested.[23]

Each of the Plaintiffs here was among the group that complied. Each of the Plaintiffs retreated to private property or the curb.

For example, the following photo shows five plaintiffs (Victor Onuoha, Raae Pollard, Sami Nichols, Blair Imani, and Akeem Muhammad) circled in red having retreated to the curb.[24]

---

[19] Ex. G at 37:1-5 ("Q And next, it says: 'Protesters were advised by loud speaker to remain on private property and on the curb. So it's my understanding, based on that, that the protesters were told they could be on private property or on the curb. That's where they were supposed to be, right? A Yes."); Ex. I (Williams) at 41:4-8 ("Q. Okay. So protesters who followed police orders and stood on private property or the curb, they should not have been among the ones arrested, correct? A. They should not."); see also Ex. Y (30(b)(6) Witness) at 94:13-21 (if ordered to clear the streets, protesters who "retreat to sidewalks and private property and continue their protests" are "doing lawful things.")

[20] Ex. V at 71:15-21.

[21] Ex T at 28:6-29:6. Each Plaintiff's Affidavit of Probable Cause also says they were "advised by loud speaker to remain on private property and the curb." Ex. H at 1-13.

[22] Ex. V at 82:21-83:1.

[23] The City's 30(b)(6) Witness testified that "any protesters who complies with an order to clear the streets should not be arrested by Baton Rouge Police Department." Ex. Y at 33:4-13. See also Ex. G at 37:10-13 (if a protester retreated to "private property or on the curb, they should not have been arrested"); Ex. I (Williams) at 41:4-8 ("Q. Okay. So protesters who followed police orders and stood on private property or the curb, they should not have been among the ones arrested, correct? A. They should not."); see also Ex. Y at 94:13-21 (if ordered to clear the streets, protesters who "retreat to sidewalks and private property and continue their protests" are "doing lawful things.")

[24] Ex. E at ¶ 3 (Dec. of William Most, identifying Plaintiffs).



**Fig. 1:** Plaintiffs retreated to the curb and private property.

The following photo shows six plaintiffs (Akeem Muhammad, Sami Nichols, Finn Phoenix, Leah Fishbein, Cherri Foytlin, and Alisha Feldman) having retreated to the curb:[25]



**Fig. 2:** Plaintiffs retreated to the curb and private property.

The City concedes that it has no evidence that <u>any</u> Plaintiff failed to comply with law enforcement orders to retreat to private property or the curb.[26]

---

[25] *Id*. at ¶ 4.

[26] Ex. B at 26:19-27:8 (30b6 Witness Dep.) (Q So then, going to our chart, the first column is 'Does the City have evidence plaintiff didn't comply with orders,' . . . We can truthfully put a 'no' in each of the boxes in this column. Agreed?  A Yes.")

**C.    The East & France protest was generally peaceful, as were all Plaintiffs.**

The East & France street protest was generally a peaceful protest. The sworn Affidavit of Probable Cause for each Plaintiff indicates that it was a "peaceful protest[]."[27] The City conceded that it "does not have evidence of property destruction at the East and France protest,"[28] and although there were some reports of a few items being thrown, the City concedes that no Plaintiff threw any item or committed any act of violence.[29]

Despite the largely peaceful nature of the protest, BRPD's Mobile Field Force was called to the scene. And according to BRPD, "by the time Mobile Field Force is on scene, de-escalation is in the rearview window" and "[n]ot appropriate at that point."[30] BRPD also deployed a range of weaponry to East & France, including an armored vehicle, a directed-sound weapon, and patrol rifles. (Patrol rifles are restricted to "high-intensity, high-risk circumstances."[31]) BRPD also prepared for the "possible need to deploy teargas,"[32] infiltrated the protesters with at least one undercover operative,[33] and deployed a helicopter and a "fixed wing airplane" to provide overhead footage.[34]

---

[27] Ex. H; Ex. DD.

[28] Ex. B at 19 (30b6 Witness Dep.) ("Q So it's the City's testimony that the City does not have evidence of property destruction at the East and France protest. Agreed? A Yes.")

[29] Ex. B at 36:21-37:4 ("Q. . . . So, just to be clear, you don't see any discrepancies on page one of this chart that are discrepancies from the testimony of the City of Baton Rouge. Agreed? A That's a hard thing for me to wrap around. I don't see anything on this chart that's a discrepancy from what I testified for the City on this script.")

[30] Ex. C (30b6 Witness Dep.) at 228:25-229:4 (Q. Okay. So, by the time Mobile Field Force is on scene, deescalation is in the rearview window? Not appropriate at that point? A. Uh, yes.")

[31] Ex. M (30b6 Witness Dep.) at 113:1-6 ("Q. Okay, but this -- their deployment of patrol rifles must be somewhat similar in that it's -- it's restricted to circumstances, high-intensity, high-risk circumstances like the ones we've described, agreed? A. Yes.")

[32] Ex. Y (30b6 Witness Dep.) at 214:8-10.

[33] *Id*. at 222:6-8.

[34] *Id*. at 215:20-21 ("Q Was it via airplane or helicopter? A We had both. We had a fixed wing airplane from Calcasieu Parish, I believe it was.")

**D.    After Plaintiffs retreated to where "they were supposed to be," BRPD then said that "wasn't good enough" and gave the order: "Everyone is under arrest."**

As described above, protesters were ordered to clear the roadways, and BRPD told them that they were "supposed to be" on private property or the curb.[35]

Most of the protesters complied. According to the recorded radio communications, officers reported to the effect of "they are beginning to comply or they're complying in clearing the road at that moment."[36] Law enforcement blocked off the streets and surrounded the protesters on three sides, as shown in the following diagram:



[37]

---

[35] Ex. G at 37:1-5 ("Q And next, it says: 'Protesters were advised by loud speaker to remain on private property and on the curb. So it's my understanding, based on that, that the protesters were told they could be on private property or on the curb. That's where they were supposed to be, right? A Yes."); Ex. I (Williams) at 41:4-8 ("Q. Okay. So protesters who followed police orders and stood on private property or the curb, they should not have been among the ones arrested, correct? A. They should not."); *see also* Ex. Y (30(b)(6) Witness) at 94:13-21 (if ordered to clear the streets, protesters who "retreat to sidewalks and private property and continue their protests" are "doing lawful things.")

[36] Ex. CC at 100:2-8.

[37] Officers confirmed that this diagram was accurate. Ex. K at 21:22-22:7 ("Q. Do you see this diagram here, Officer? A. Yes, sir. Q. You see that this is a map and a diagram of the area around East and France? A. Yes, sir. Q. And does this appear to be an -- an accurate diagram of -- of where the protesters were and where lines of police were? A. I -- let me -- let me analyze it for -- for a minute. (Reviewing document.) Yes, sir."); see also Ex. S at 37:21-38:6 (same).

But then, "about an hour" after the streets had been cleared,[38] BRPD changed its mind and told the protesters that "[w]here you are standing is not good enough."[39] Officers gave the protesters orders that not only were protesters to clear the streets, they also had to "disperse the area."[40] Even though the streets had already been cleared,[41]  BRPD officer David Wallace then gave an order over the interop radio channel: "Everyone has violated. Everyone is under arrest. Those who can safely apprehend violators must do so."[42]

Law enforcement followed the BRPD order that "everyone" was under arrest. They swept in and began making mass arrests of protesters on private property and the curb.[43] BRPD officers went "into the yard and beg[a]n making detentions."[44] Protesters were arrested even though the "vast majority of people were on private property" and were "outside of the public passages."[45] The "whole yard was cleared of protesters,"[46] even though BRPD had no "reason think that those protesters standing on private property at East and France Street did not have permission to be there."[47] Even those protesters who were trying to disperse, as Defendants ordered them to do, were arrested.[48]

---

[38] Ex. Y (30b6 Witness Dep.) at 190:8-23.

[39] Ex. V at 120:8-10; Ex. S at 91:7-9 ("Q. So you heard the leave now, leave now. Where you are standing is not good enough? A. Yes, sir."). The City's 30(b)(6) representative concedes this order should not have issued if the streets were clear. Ex. T at 33:23-34:3 ("Q Right. So if people haven't cleared the streets, Baton Rouge Police Department could say: 'That's not good enough.' But if they have moved back on to -- and cleared the streets, Baton Rouge Police Department should not say: 'That's not good enough.' Agreed? A Agreed.")

[40] Ex. Y (30b6 Witness Dep.) at 148:2-3; *see also* Ex. V at 38 (BRPD used a PA system to "that broadcasted messages to disperse"); Ex. L at 36:15-16 ("My understanding was that they were given 16 the order to disperse.")..

[41] Ex. S at 90:5-9 ("Q. . .  This is a situation where the streets are cleared, and then the troopers move forward, agree? A. There is nobody in the street. I would agree to that, yes, sir.")

[42] Ex. U at 144:8-18 ("Q. Just to repeat what it sounded to me like he said, it was, You've got one of the leaders requesting to walk on the sidewalk past France. Someone else responds, It's too late. Then 10-9. Then responds, Too late. Everyone has violated. Everyone is under arrest. Those who can safely apprehend violators must do so. Primary targets are the white male, red hair, tie-dyed shirt, and everyone else who is violating, which is everybody out there. Does that sound about right? A. Yes, sir.")

[43] See Ex. J at 83:18-84:1 (Dohm) (protesters were arrested in private property and on the sidewalks)

[44] Ex. CC at 90:1-7.

[45] Ex. V at 122:16-19 ("Q The vast majority of people were on private property, though; is that accurate? A Yes, they were outside of the public passages, yes.")

[46] Ex. CC at 90;4-7.

[47] Ex. Y (30b6 Witness Dep.) at 186:23-187:2.

[48] *North Baton Rouge Matters v. City of Baton Rouge*, M.D. La. 16-cv00463-JWD-RLB ("NRBM"), R. Doc. 2-8 at 3 (Affidavit of Legal Observer McDaniel) (protester attempted to leave, and told an officer "that he needed to get to his car to go to work. As he walked to his car, police officers arrested him."); *id*., R. Doc. 2-9 at 13 (Aff. of Legal Observer Lily Ann Ritter) ("I also heard police officers tell people that they needed to disperse several times. However, police were blocking all surrounding intersections and there was nowhere for people to go. Protesters who wanted to leave were not able to do so."

The City's legal justification for arresting people on private property without a warrant is that "at the time of their arrest" they were "fleeing and hiding,"[49] and the officers "were in hot pursuit."[50] That was their justification, even though evidence proves the contrary. For example, the photo below shows Plaintiffs Pollard and Nichols standing still on private property, not fleeing, in the moments before their arrest:



The City concedes that the protesters had "just stayed standing on the property" for "about an hour's worth of time" before the arrests – and yet the City nevertheless contended that its officers were in "hot pursuit."[51] Each of the Plaintiffs was arrested on or near the corner of East & France street.[52]

**E.      Officers seizing protesters handed them off to other officers to process their paperwork. Per BRPD policy, these officers did not communicate any information to each other.**

At the East & France protest, some officers were assigned to seize protesters. Other officers were assigned to an arrestee processing area on Government Street, outside of sight from

---

[49] Ex. Y at 188:18-189:4.
[50] *Id.* at 190:4-15.
[51] Ex. Y (30b6 Witness Dep.) at 190:8-23.
[52] Ex. H, Ex. DD (Affidavits of Probable Cause attesting to arrest of each Plaintiff).

the protest area.[53] Those latter officers did the paperwork to process the arrests of protesters.[54]

Per BRPD policy, these were separate and distinct groups of officers.[55] The paperwork consisted

primarily of Affidavits of Probable cause that had been printed and mostly filled out in advance,

including a pre-written synopsis detailing the exact circumstances under which the arrestee was

arrested.[56] (Pre-printed affidavits are used by BRPD to "facilitate mass arrests."[57]) The

processing area only had pre-printed Affidavits present; there were no blank forms or means to

create new affidavits.[58] One of the pre-printed affidavits[59] is as follows:

---

[53] Ex. G at 12:2-16 ("I wasn't in visual range . . .  in the area that was called by some people, 'The Processing Area.'")

[54] Ex. G (Abadie) at 12:18-21 ("Q And that was an area on Government Street where officers were doing paperwork to process the arrests of detainees? A Yes.")

[55] Ex. Y at 59:21-60:2 (Q And so if everything is working according to, you know, the Baton Rouge Police Department's system, the way officers have been trained, it's not ever going to be the arrest teams who are making the arrests who are filling out the probable cause affidavits?  A Yes.")

[56] See Ex. O (email circulating pre-prepared Affidavits); Ex. G at 13:21-24 ("Q And that paperwork consisted of preprinted Affidavits of Probable Cause; is that correct? A Yes."); Ex. H and DD (Affidavits of Probable Cause).

[57] Ex. Y (30b6 Witness Dep.) at 49:10-16 ("Q And one way to facilitate mass arrests is to print the Affidavits of Probable Cause in advance, correct? A Yes. Q And that was done at the 2016 July protests, agreed? A Yes.")

[58] Ex. G at 18:1-7 ("Q Were there any blank forms that did not have the synopsis filled in A Not that I recall. Q Were there computers or typewriters at the scene to create new Affidavits of Probable Cause? A Not to my knowledge."); Ex. AA at 24:15-18 (same).

[59] Ex. H at 1. Notice the facial inconsistencies: The caption says Ms. Pollard violated R.S. 14:100.1; the synopsis says she violated R.S. 14:97. The synopsis says she "feloniously" violated, even though both statutes are misdemeanors. The synopsis says the protest was at "9000 Airline Highway," nowhere near East & France.



East Baton Rouge Parish Clerk of Court A07-16-0324 AFFIDAVIT FILED

☒ State of Louisiana
☐ City of Baton Rouge

No. _____  Sec. _____  Page 1 of ___

☒ : 19th Judicial District Court
☐ : Baton Rouge City Court
  : Parish of East Baton Rouge
  : State of Louisiana

**VERSUS**

Raae Pollard
(Name of Defendant)

**Affidavit of Probable Cause**

Before me personally appeared the undersigned law enforcement officer(s) who deposed that the following recited facts are true and correct to the best of his knowledge, information and belief, and that based upon these facts, he caused the arrest of the following listed defendant(s) for the listed offense(s).

2030-16
BRPD File No.        EBR3690054

Pollard Raae                      (4)          F          1990
Defendant's Name              Race         Sex        Date of Birth

Address   New Orleans La          Social Security Number
          Public Passage

Simple Obstruction of a Highway of Commerce, Resistin An Officer     LRS 14:97; 14:108
Charge(s)                                                             Statute/City Code Number
                                                                     14.108.1

**Synopsis of Probable Cause:**

The Affiant stated to the Court that on this 10th day of July, 2016, the Defendant did knowingly and feloniously violate LRS 14:97 Simple Obstruction of a Highway of Commerce in that they intentionally placed themselves in the roadway thus rendering movement there on more difficult and LRS14:108 Resisting an Officer in that the Defendant actively attempted to prevent their lawful arrest after being placed under arrest. This occurred within the city of Baton Rouge, Parish of East Baton Rouge.
To Wit: On the above listed date numerous Baton Rouge Police Department Officers were assigned to provide security for peaceful protests at and in the vicinity of Baton Rouge Police Department's Headquarters located at 9000 Airline Highway. Protesters assembled at provided parking areas and in surrounding parking lots. Protesters were advised by loud speaker to remain on private property and the on the curb. They were further advised to stay out of the roadway and to not impede the flow of traffic. These announcements were made frequently via loud speakers and by individual Police Officers on the scene. During the protest, the Defendant entered the roadway and was provided another verbal order to exit the lanes of travel. Moments later the Defendant entered the roadway again and was taken into custody by Officers on the scene. After being advised that they were under arrest, the Defendant did actively attempt to prevent being taken into custody and completion of the arrest process.
The Defendant was placed under arrest and verbally advised of their rights as per the Miranda ruling. The Defendant was then transported to the East Baton Rouge Parish Prison and booked accordingly.

TR Walker P10177
Affiant

Sworn to and subscribed before me this 10 day of July , 20 16 .

_____
Notary Public

BRPD08

The seizing officers would bring protesters from the protest area to the processing area. Or they would hand the protester to an intermediary officer who would take the protester to the processing area.[60] The seizing or intermediary officer would hand the protester off to the processing officers, and then the seizing/intermediary officers would return to the protest area.[61] The processing officers would then sign the Affidavits of Probable Cause under oath.[62]

---

[60] Ex. J (Dohm) at 24:88 ("Somehow she was handed or passed on to where we were standing, and our job was to then escort her by walking her to where the transport team would be."); see also Ex. Y (30b6 Witness Dep.) at 59:21-60:2 ("Q And so if everything is working according to, you know, the Baton Rouge Police Department's system, the way officers have been trained, it's not ever going to be the arrest teams who are making the arrests who are filling out the probable cause affidavits? A Yes.")
[61] Ex. L at 51:4-14 ("We passed them off, and then we'd go back.")
[62] Ex. G at 30 ("Q Did you sign this document under oath? A Yes.")

There was not any exchange of information between the seizing officers and the processing officers, at least for the moving Plaintiffs. It was "BRPD policy that the arrest team should not stop and have a conversation with the processing team."[63] Instead, they should simply hand off the arrestee and return to the front lines."[64]

For example, Defendant Jonathan Abadie was one of the processing officers. He testified that he "may have spoken vaguely to the arresting officers," but they did not provide any "details of specifics" and Abadie didn't gather any "detailed information from the arresting officers."[65] Defendant Derrick Williams was also one of the processing officers. He testified he was not "told by any officer what any particular arrestee did."[66] Likewise, Defendant Alex Bell testified that he did not "have a conversation with that arresting officer. . . about the arrestee."[67] State Police troopers confirmed that there was no "interaction between the arresting officer and the person they're handing them off to" and no explanation of "who the person is or why they're arrested."[68] Nor would the arresting officer later follow up with the affidavit-signer.[69]

As a result, there was no "flow of information" going from the arresting officer to the processing officer who signed the Affidavit of Probable Cause.[70] And so the officers swearing as to the truth of the contents of the Affidavits had no knowledge of whether the contents were true or false. As Derrick Williams conceded, he signed the Affidavit of Probable Cause allegedly detailing the events of Plaintiff Cheri Foytlin's arrest, even though he did not "have knowledge

---

[63] Ex. Y (30b6 Witness Dep.) at 74:12-17.
[64] *Id.*
[65] Ex. G at 15:14-16:4.
[66] Ex. I at 18:5-9 ("Q. Okay. So you -- you personally weren't told by any officer what any particular arrestee did; is that correct? A. No, wasn't -- wasn't part of my duties to do that.")
[67] Ex. AA at 21:8-16 (Q. Okay, and did you have a -- a -- would you have a conversation with that arresting officer or the officer that brought you the arrestee about the arrestee? A. No, sir. Only thing I can remember is, you know, they bring them to us. If they had an ID, we got the ID and did the paperwork. Like I said, that's all -- that's all I remember."); *id.* at 22:11-15 ("Q. But at no point did you ever have any lengthy conversation with any officer about the specifics of a particular arrestee, correct? A. Correct.")
[68] Ex. W at 28:11-20.
[69] Ex. W at 30:14-18 ("Q. But the procedure didn't involve them following up and having a conversation? A. That's correct.")
[70] Ex. G. at 18:8-13 ("Q So it sounds to me like the arresting officer would drop off the arrestees. You would then process the arrestees. And there was no detail flow of information going from the arresting officer to you, correct? A No, sir."); *see also* Ex. Q at 37:23-38:13 (when handing off Alexus Cheney, arresting officer exchanged no information with processing officer other than her name).

of those events."[71] Perhaps not surprisingly, the Affidavits of Probable Cause contain many inaccuracies.[72]

For some plaintiffs, an intermediary created even more of a disconnect between the arresting officers and the officer who signed their probable cause affidavit. For example, Blair Imani was seized by state troopers. The state troopers handed her to BRPD officers Jeff Pittman and Jason Dohm, who then escorted her to the processing area.[73] Pittman and Dohm had not seen her arrest,[74] and had no "first-hand knowledge" of what she was arrested for.[75] When Ms. Imani was handed to Dohm and Pittman, the arresting troopers did not say what she "been arrested for,"[76] or say "anything about why she was arrested."[77] As a result, Dohm and Pittman had no reason to think there was "there was probable cause to arrest Blair for resisting an officer" (one of the crimes she was arrested for).[78] Because they had no knowledge of the circumstances of Ms. Imani's arrest, Dohm and Pittman were not able to "pass on any information to people at the transportation area about why Blair had been placed in custody" to the processing officers.[79] And they were not asked any questions by the processing offices about individual arrestees.[80]

---

[71] Ex. I at 27:15-20 ("Q. So that sounds like what you're saying. If -- if there's contents to an affidavit of probable cause for Cherrie Foytlin, you didn't personally witness or have knowledge of those events, correct? A. No, I didn't."); *id*. at 28 ("Q. Okay. So -- so you did sign this but like you said before, you didn't actually have knowledge of or witness the contents of it, correct? A. No, I didn't.")

[72] For example, many of the affidavits say that the protest occurred "at and in the vicinity of the Baton Rouge Police Department Headquarters located 9000 Airline Highway." Ex. H, Ex. DD. BRPD headquarters is nowhere near East & France, and so officers conceded that "that part is not truthful" (Ex. G at 36:3-10) or "accurate" (Ex. K at 34:2-3). The Affidavits also say that Plaintiffs "did knowingly and feloniously" La. R.S. 14:97 or 14:100.1 – both of which are misdemeanor statutes.

[73] Ex. J (Dohm) at 24:18-25; 36:21-22.

[74] Ex. J at 30:19-21 ("Q. Okay. So you didn't see her at all until she was basically given to you, correct? A. Yes.")

[75] Ex. J at 37:23-38:10  (A. I -- do I know what she was arrested for? . . . I -- first-hand knowledge, no, I personally do not know.")

[76] Ex. J at 38:11-17 ("Q. Okay. Now, when -- I think we went over this -- when Blair was handed to you -- I don't want to put words in your mouth, but it seems like that's what you were using, she was handed to you, no one told you she has been arrested for X, right? A. No.")

[77] Ex. J at 38:22-24 ("Q. No one said anything about why she was arrested? A. No.")

[78] Ex. J at 41:4-8 ("Q. Okay. What information did you have when she was handed to you that Blair -- there was probable cause to arrest Blair for resisting an officer? A. I didn't have any.")

[79] *Id*. at 41:19-25 ("Q. . .  you didn't pass on any information to people at the transportation area about why Blair had been placed in custody, correct? A. I did not."); Ex. BB at 59:9-11 ("Q. In any of those circumstances, did Mobile Field Force describe the details of the arrest or the reasons the person was being arrested? A. No, they did not. Q. So since you didn't have those details described to you, I'm assuming you did not describe those details to the people on the processing team? A. No, I did not.")

[80] Ex. BB at 34:24-35:1 ("Q. Did they ask you any questions about the individual arrestees? A. No, they did not.")

But despite the complete lack of any information being transmitted about Ms. Imani's arrest, a BRPD officer signed an Affidavit of Probable Cause that went into great detail about the alleged circumstances of her arrest, down to what happened in the "[m]oments" before her seizure.[81]

Similarly, Alaina Mancuso, the officer who escorted Sami Nichols and Cheri Foytlin to the processing area, testified that she did not have "any interaction with the officers at the processing station," she was only "dropping people off."[82] She did not describe "circumstances of [Nichol's] arrest" to anyone.[83] And regarding Cheri Foytlin, she "didn't describe who this was and why she was being arrested."[84] But again, a BRPD officer signed an Affidavit of Probable cause that detailed precisely Ms. Foytlin's alleged actions.[85]

The end result was Affidavits of Probable Cause that did not reflect the actual events. As Defendant Simoneaux testified:

> Q    Okay.  And as we can see from the
> Affidavits of Probable Cause, those also don't
> actually show us what happened during the
> protests, correct?
>        A    Right.                                [86]

But the Affidavits of Probable Cause had a significant impact on Plaintiffs. A person cannot be booked into the East Baton Rouge Parish Prison without an Affidavit of Probable Cause,[87] and so the false Affidavits resulted in the actual physical imprisonment of Plaintiffs.

After the protests, BRPD officers were also instructed to write up incident reports using pre-prepared language that did not reflect the actual facts of the arrests:

---

[81] Ex. H at 5
[82] Ex. T at 25:18-21
[83] *Id*. at 37:13-15
[84] *Id*. at 20-22.
[85] Ex. H at 7.
[86] Ex. Q at 132:7-11.
[87] Ex. G at 24:18 ("Q And you have to have a signed probable cause affidavit in order to book 20 someone into the East Baton Rouge Parish Prison, correct? A Yes. Q Someone can't be imprisoned there without a probable cause affidavit, right? A No, they cannot."); Ex. I at 23:19-25.

> Q    So as an officer, you were instructed
> to use these templates and change only the
> names and dates; is that correct?
>
> A    Yes, sir.
>
> Q    So you were instructed to use the
> common language, whether or not it reflected
> the actual events as they occurred; is that
> correct?
>
> A    Yes, sir.
>
> Q    So looking at the incident reports,
> that doesn't tell us what actually happened
> that day, correct?
>
> A    No, sir.
>
> [88]

In the end, every Plaintiff was arrested for either R.S. 14:97 (Obstruction of a Highway) or R.S. 14:100.1 (Obstruction of a Public Passageway) and resisting arrest.[89]

**F.    Summary of BRPD's knowledge about Plaintiffs' Arrests.**

In discovery, the City of Baton Rouge's 30(b)(6) representative testified regarding the City and BRPD's knowledge about the circumstances of each Plaintiff's arrest.[90] Pursuant to the nature of 30(b)(6) testimony "the Rule 30(b)(6) deposition testimony will bind the corporate deponent."[91]

That information is reflected in the following two charts, and attached as Exhibit A. The representative confirmed that the two charts are accurate compilations of BRPD's testimony as an entity.[92]

---

[88] Ex. Q at 131:19-132:6.

[89] Ex. H.

[90] Ex. B (30b6 Witness Dep.) at 13:21-14:9 ("One topic is reports of illegal activity during the July 9th and 10th protest, including several specific subsections. Are you prepared to testify about that topic today? A Yes, on this paper, I can. "); 27:9-15 ("Q Moving onto topic, which is the arrest of each plaintiff, and it's subsection A is any illegal activity committed -- allegedly committed by either plaintiff. Are you prepared to testify about that topic today? A Yes.")

[91] *Rahman v. ExxonMobil Corp.,* 18-894-BAJ-RLB at *21 (M.D. La. Jan. 21, 2020).

[92] The 30(b)(6) representative confirmed that both charts reflected the City's testimony.  Ex. B at 36:21-37:4 ("Q. . . . So, just to be clear, you don't see any discrepancies on page one of this chart that are discrepancies from the testimony of the City of Baton Rouge. Agreed? A That's a hard thing for me to wrap around. I don't see anything on this chart that's a discrepancy from what I testified for the City on this script."); Ex. B at 47:12-22 ("Q. . . I'm putting at the top according to the City of Baton Rouge. Okay, so looking at this page of the second page of the Imani plaintiff chart, we've gone through each of these columns. Do you see any discrepancies here between what's on this page and the testimony of the City of Baton Rouge as you've given it? A Do not.")

According to that testimony, the City has:

- No evidence that any Plaintiff failed to comply with law enforcement orders;[93]

- No evidence other than Affidavits of Probable Cause that any Plaintiff was violent;[94] and

- No description of any Plaintiff's alleged illegal activity, other than Affidavits of Probable Cause.[95]

Furthermore, for those moving for summary judgment on false arrest, the City has:

- No knowledge of what officer saw Plaintiff commit any alleged crime;[96] and

- No knowledge of what officer seized Plaintiff.[97]

---

[93] Ex. B at 26:19-27:8 ("Q So then, going to our chart, the first column is "Does the City have evidence plaintiff didn't comply with orders," and I think we can put a no in each of these columns, because we've seen no evidence specific to any plaintiff that they failed to comply with a lawful order. Agreed? A Blair Imani is the only name I saw. Q Right, and for Blair Imani, Pittman specifically said he didn't know anything specific about her? A Correct. Q We can truthfully put a "no" in each of the boxes in this column. Agreed? A Yes.")

[94] Ex. B at 17:21-18:1 ("So I believe we just covered that we don't have any specific evidence that any particular plaintiff engaged in the act of violence. Agreed? A Yes. I have nothing on the script.")

[95] Ex. B at 32:8-13 ("Q Lieutenant, so, I now have it as other than the affidavit of probable cause, does the City have any description of any specific plaintiff's illegal activity, and so I think the answer is no. Agreed? A Yes. If you're talking about a specific plaintiff, yes.")

[96] Ex. B (30b6 Witness Dep.) at 42:21-43:18 (Castanon, Salazar, Feldman, and Fishbein, are "the only plaintiffs that you have -- that the City has any knowledge of which officers allegedly saw and reported each plaintiff committing a crime. Correct? A That is correct. Q So, for the remainder of this column I've put in unknown. Would that be accurate? A Correct.")

[97] Ex. B at 45:4-9 ("Q So this column here, which officers laid hands on plaintiff on page two of Imani plaintiff chart, I filled in [Castanon and Savage] and put unknown for the rest. Is that an accurate reflection of the City's testimony? A Correct.")

| According to City of Baton Rouge | | | | |
|---|---|---|---|---|
| **Plaintiff** | **Does City have evidence Plaintiff didn't comply with orders?** | **Other than APC, does City have any evidence Plaintiff was violent?** | **Other than APC, does City have any description of specific Plaintiff's illegal activity?** | **Other than description of facts in APC or RAP, does City have justification for specific Plaintiff's arrest?** |
| Blair Imani | No | No | No | No |
| Akeem Muhammad | No | No | No | No |
| Raae Pollard | No | No | No | No |
| Samantha Nichols | No | No | No | No |
| Alexus Cheney | No | No | No | No |
| Victor Onuoha | No | No | No | No |
| Karen Savage | No | No | No | No |
| Cherri Foytlin | No | No | No | No |
| Alisha Feldman | No | No | No | No |
| Antonio Castanon Luna | No | No | No | No |
| Nadia Salazar Sandi | No | No | No | No |
| Dr. Daniel Liebeskind | No | No | No | No |
| Finn Phoenix | No | No | No | No |
| Leah Fishbein | No | No | No | No |

| According to the City of Baton Rouge | | | | | | |
|---|---|---|---|---|---|---|
| Plaintiff | Which officer(s) saw Plaintiff commit any alleged crime? | Which officer(s) ordered Plaintiff's arrest? | Which officer(s) laid hands Plaintiff? | Which officer(s) handcuffed or ziptied Plaintiff? | Which officer(s) transported Plaintiff to processing? | Which officer(s) signed Affidavit of Probable Cause as affiant? |
| Blair Imani | **UNKNOWN** | **UNKNOWN** | **UNKNOWN** | Jeff Pittman and/or Jason Dohm | Jeff Pittman, Jason Dohm, Kenneth Brewer | William Alexander |
| Akeem Muhammad | **UNKNOWN** | **UNKNOWN** | **UNKNOWN** | **UNKNOWN** | **UNKNOWN** | Travis Norman |
| Raae Pollard | **UNKNOWN** | **UNKNOWN** | **UNKNOWN** | **UNKNOWN** | **UNKNOWN** | **UNKNOWN** |
| Samantha Nichols | **UNKNOWN** | **UNKNOWN** | **UNKNOWN** | Alaina Mancuso | Alaina Mancuso | Jonathan Abadie |
| Alexus Cheney | **UNKNOWN** | **UNKNOWN** | **UNKNOWN** | **UNKNOWN** | **UNKNOWN** | **UNKNOWN** |
| Victor Onuoha | **UNKNOWN** | **UNKNOWN** | **UNKNOWN** | **UNKNOWN** | **UNKNOWN** | Willie Williams |
| Karen Savage | James Thomas | James Thomas | Richard McCloskey and/or James Thomas | James Thomas | **UNKNOWN** | **UNKNOWN** |
| Cherri Foytlin | **UNKNOWN** | **UNKNOWN** | **UNKNOWN** | **UNKNOWN** | Alaina Mancuso | Derrick Williams |
| Alisha Feldman | Curtis Wilson | Curtis Wilson | **UNKNOWN** | Curtis Wilson | Curtis Wilson | Curtis Wilson |
| Antonio Castanon Luna | Alan Hamilton | Alan Hamilton | most likely Alan Hamilton | **UNKNOWN** | **UNKNOWN** | Willie Williams |
| Nadia Salazar Sandi | Alan Hamilton | Alan Hamilton | **UNKNOWN** | **UNKNOWN** | **UNKNOWN** | Jonathan Abadie |
| Dr. Daniel Liebeskind | **UNKNOWN** | **UNKNOWN** | **UNKNOWN** | **UNKNOWN** | **UNKNOWN** | Alex Bell |
| Finn Phoenix (C. Gaffney) | **UNKNOWN** | **UNKNOWN** | **UNKNOWN** | **UNKNOWN** | **UNKNOWN** | Taylor Giroir |
| Leah Fishbein | Curtis Wilson | Curtis Wilson | **UNKNOWN** | Curtis Wilson | Curtis Wilson | Curtis Wilson |

# IV.    DISCUSSION

## A.    The First Amendment subjects arrests of protesters to "exacting scrutiny."

Organized political protest is a form of "classically political speech."[98] "[T]he First Amendment safeguards an individual's right to participate in the public debate through political expression and political association."[99] That safeguard "reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open."[100]

For that reason, "speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection."[101] That protection extends to assembly, in part because "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association."[102] Thus, the Supreme Court "has repeatedly held that police may not interfere with orderly, nonviolent protests merely because they disagree with the content of the speech or because they simply fear possible disorder."[103]

The Supreme Court has recognized three distinct forums of speech for First Amendment analysis: traditional public, designated public, and non-public forums.[104] Sidewalks, streets, and parks owned by the government that have historically been used as places of assembly and communication are categorized as traditional public forums.[105] The Supreme Court has "repeatedly referred to public streets as the archetype of a traditional public forum."[106] And "streets and parks" have for "time out of mind . . . been used for purposes of assembly,

---

[98] *Boos v. Barry*, 485 U.S. 312, 318 (1988).
[99] *McCutcheon v. Fed.Election Com'n*, 572 U.S. 185, 203 (2014).
[100] *Id*. (internal citations omitted)
[101] *Connick v. Myers*, 461 U.S. 138, 145 (1983), *quoting NAACP v. Claiborne Hardware Co*., 458 U.S. 886, 913 (1982) (internal quotations and citation omitted)). *See also McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 347 (1995) (political speech, especially that involving controversial issues, is "the essence of First Amendment expression.")
[102] *NAACP v. Alabama*, 357 U.S. 449, 460 (1958).
[103] *Jones v. Parmley*, 465 F.3d 46, 56 (2nd Cir. 2006) (*citing Cox v. Louisiana*, 379 U.S. 536, 550 (1965)).
[104] *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-7 (1983).
[105] *United States v. Grace*, 461 U.S. 171, 179 (1983); Hague v. CIO, 307 U.S. 497, 515 (1939).
[106] *Frisby v. Schultz*, 487 U.S. 474, 480 (1988).

21

communicating thoughts between citizens, and discussing public questions."[107] And so,

"[c]onsistent with the traditionally open character of public streets and sidewalks, [the Supreme

Court] ha[s] held that the government's ability to restrict speech in such locations is 'very

limited.'"[108]

    As a result, even where protesters "violate the law by entering the roadway and

obstructing traffic," arrests will be subject to the "'exacting scrutiny' to which restrictions on

First Amendment rights to political speech and assembly are subject."[109] And where some

protesters are peaceful and others are not, "the proper response to potential and actual violence is

for the government to ensure an adequate police presence, and to arrest those who actually

engage in such conduct, rather than to suppress legitimate First Amendment conduct as a

prophylactic measure."[110]

**B.**    **The Motion should be granted on First Amendment grounds because the City of Baton Rouge admits to content and viewpoint-based discrimination with regard to the East & France protesters.**

    Under the First Amendment, it "is axiomatic that the government may not regulate speech

based on its substantive content or the message it conveys."[111] This principle was reaffirmed last

year by the U.S. Supreme Court: "Above 'all else, the First Amendment means that government'

generally 'has no power to restrict expression because of its message, its ideas, its subject matter,

or its content.'"[112]

    Accordingly, the first step in a First Amendment inquiry is to determine whether a

challenged restriction on speech is either content based or content neutral.[113] "Government

---

[107] *Satawa v. Macomb Cty. Rd. Comm'n*, 689 F.3d 506, 517 (6th Cir. 2012) (citation and internal quotation marks omitted).
[108] *McCullen v. Coakley*, 134 S. Ct. 2518, 2529 (2014); *see also Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009) (noting "government entities are strictly limited in their ability to regulate private speech" in "such 'traditional public fora'" as public streets and parks).
[109] *Lucha Unida de Padres y Estudiantes*, 470 F. Supp. 3d 1021 (D. Ariz. 2020).
[110] *Collins v. Jordan*, 110 F.3d 1363, 1372 (9th Cir. 1996)
[111] *Chiu v. Plano Independent Sch. Dist.*, 260 F.3d 330, 350 (5th 2001), *quoting Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 828 (1995).
[112] *Barr v Am. Assn. of Political Consultants, Inc.*, 591 U.S. ____ (2020), *quoting Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972).
[113] *Texas Entertainment Association, Inc. v. Hegar*, 20-50262 at *16 (5th Cir. 2021)

regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."[114] If it is content-based, the restriction on protected First Amendment expression is presumptively unconstitutional and subject to strict scrutiny.[115]

A restriction may also be viewpoint-based if the "specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."[116] In that case, the restriction will necessarily violate the First Amendment, because "[v]iewpoint-based restrictions on speech are *per se* violative of the First Amendment."[117]

Here, BRPD has two policies that address how its officers should deal with "crowds." It has a "Special Events" policy (No. 502/95-3) for handling "any planned event likely to draw large crowds."[118] And it has a "Civil Disorder" policy (No. 291) for dealing with "unruly crowds and illegal gatherings."[119] BRPD testified that either of these policies could be applied to this protest.[120]

So which policy did BRPD apply to the East & France protest? The Civil Disorder policy.[121] Why did it apply the Civil Disorder policy to that protest? Astonishingly, BRPD's 30(b)(6) witness volunteered that it was because of the <u>content of the protester's speech</u>:

---

[114] *Id*. (citations omitted). Content

[115] *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

[116] *Heaney v. Roberts,* 846 F.3d 795, 802 (5th Cir. 2017).

[117] *Heaney v. Roberts*, 147 F. Supp. 3d 600, fn. 4 (E.D. La., Dec. 2, 2015), *affirmed in Heaney v. Roberts*, 846 F.3d 795 (5th Cir. 2017).

[118] Ex. Z at 6-7.

[119] Ex. Z at 1-5.

[120] Ex. Y (30b6 Witness Dep.) at 22:25-23:3 ("Q So a large protest would fall under the definition of a special event here, correct? A Yes."); *id*. at 25:18-23("Q Okay. Did that East and France Street protest trigger the Civil Disorder Policy or was it -- or did it only fall under the Special Event Policy? A I would say it would be the Civil Disorder Policy.")

[121] *Id*. at 25:18-23("Q Okay. Did that East and France Street protest trigger the Civil Disorder Policy or was it -- or did it only fall under the Special Event Policy? A I would say it would be the Civil Disorder Policy.")

> A    In my opinion, I would say, yes, it
> was civil disorder, because it was not a
> special event.  Our special events are, like,
> concerts, games, parades.  That's special
> events.  That was not a special event.  They
> gathered for a specific purpose.
>     Q    What was the purpose?
>     A    It was a protest purpose.
>     Q    Right.  So it was a protest for them
> to speak out against perceived misconduct by
> the Baton Rouge Police Department, agreed?
>     A    Agreed.
>     Q    And so that made it not fall under
> the Special Event Policy?
>     A    Correct.
>     Q    And instead fall under the Civil
> Disorder Policy?
>     A    Correct.
>     Q    So by contrast, if they had gathered
> together, say, for a church event or to talk
> about sales of water skis, that would fall
> under a special event?
>     A    Yes.
>     Q    And so because of that, the City
> Baton Rouge treated this group at East and
> France under General Order 291, rather than
> the Special Event Policy, agreed?
>     A    Yes.
>
> 122

To repeat: BRPD treated Plaintiffs' protest under the Civil Disorder policy *because* they were speaking out "against perceived misconduct by the Baton Rouge Police Department." And if they had been gathered to talk about a different topic – "a church event or to talk about sales of

---

[122] Ex. Y (30b6 Witness Dep.) at 28:10-29:12.

water skis" – that would have been treated under the Special Events policy. That is content-based speech discrimination, clear and simple.[123]

But did it matter which policy applied? Very much so. The Special Event policy does not address force at all; by contrast, the Civil Disorder policy explicitly contemplates force up to and including the "Use of Deadly Force."[124] The Special Event policy does not address arrests; by contrast, the Civil Disorder policy explicitly contemplates "Mass Arrest."[125] Once an event is deemed a Civil Disturbance, the supervisor on scene is authorized to deploy the Special Response [SWAT] Team."[126] The choice of policy also dictates the equipment deployed: "shields, batons and helmets were deployed at the 2016 July protests . . . because BRPD had classified those protests as a civilian disturbance."[127]

And most importantly, the Special Event policy gives BRPD officers discretion to allow crowd to remain where it is. But the Civil Disorder policy *requires* BRPD officers to disperse the crowd – even if the crowd is peaceful. It says: "If the disturbance is minor/peaceful in nature and adequate resources are available, efforts should be to made to disperse the crowd."[128] Under that policy, BRPD officers are not <u>allowed</u> to just leave the crowd alone:

---

[123] This is corroborated by the remainder of BRPD's 904-page Policy Manual. That manual only uses the word "protests" once – in its policy on "Prisoner Transport Vans." It reads: "The vans may also be used in situations where there are or anticipated to be many arrestees, such as civil disturbances, protests or the service of search and arrest warrants." Ex. Y (30b6 Witness Dep.) at 38:18-39:7.

[124] Ex. Y at 29:20-30-2; Ex. Z.

[125] Ex. Z at pg. 4 (Section VII).

[126] Ex. Y at 41:19-25.

[127] *Id*. at 46:14-47:8 ("Q Right. I understand they serve the purpose of officer protection. But the reason why a supervisor gave the order to deploy shields, batons and helmets was because the protest had been classified as a civilian disturbance, agreed? A Yes. Q Any other reason the supervisor chose to do that? A No.")

[128] Ex. Z at pg. 1 (Section II(B)).

```
    Q    So once an assemblage falls under the
Civil Disorder Policy, the first supervisor is
directed to disperse the crowd, even if it is
minor/peaceful in nature, agreed?
    A    Agreed.
    Q    All right.  And then after those
efforts to disperse the crowd, there's the
capacity to apply escalating series of
resources to disperse, correct?
    A    Correct.
    Q    And I don't see anything in here that
gives the supervisor on scene the ability to
just leave them alone.  There's a directive to
take action, agreed?
    A    Agreed.
```
[129]

BRPD's 30(b)(6) witness also confessed that the agency engaged in viewpoint discrimination. He admitted that it is "BRPD policy to target identified leaders and agitators."[130] And by "agitators," BRPD means "Persons encouraging others to upset the status quo to further their cause."[131] And those persons include persons who "want to see a major change in the politics of Baton Rouge."[132]

To sum up: BRPD treated Plaintiffs under its Civil Disorder policy rather than its Special Event policy explicitly because of the content of their speech. The Civil Disorder policy *required* officers to take action to disperse Plaintiffs and prevent them from continuing to exercise their right to protest. And BRPD also targeted "agitators" for arrest, which included people who "want to see a major change in the politics of Baton Rouge."  The Motion should therefore be granted on First Amendment grounds.

---

[129] Ex. Y (30b6 Witness Dep.) at 31:4-18.
[130] *Id*. at 35:17-19 ("Q So it is BRPD policy to target identified leaders and agitators, agreed? A Yes.")
[131] *Id.* at 35:20-36:3 ("Q Okay. And then this other document that we received provides more explanation for what agitators are. It says: 'Persons encouraging others to upset the status quo to further their cause.' Do you see it? A I see it. Q Is that an accurate description of what agitators means in this context? A Yes.")
[132] Ex. Y at 38:2-13 ("Q Right. Lieutenant Barrow, I'm just asking you what's your understanding of what this means? It says: 'Person encouraging others to upset the status quo.' Would you understand that to mean, people calling for a serious change? A I would assume when they say, "Status quo," yes. Q So, like, want to see a major change in the politics of Baton Rouge, for example, agreed? A Agreed."

C.     **The motion should be granted with regard to First Amendment retaliation, because officers could recall only a single time someone had been arrested under these statutes in a combined <u>251 years</u> of their policing experience.**

"[S]elective enforcement of an extremely broad prohibitory statute" can form the basis for a First Amendment violation, as it is evidence of prohibited First Amendment retaliation.[133]

Here, each Plaintiff was arrested for violation of either R.S. 14:97 (misdemeanor obstruction of a highway) or R.S. 14:100.1 (misdemeanor obstruction of a public passageway). In deposition, officers were asked if they could recall any time <u>other</u> than the July 2016 protests that they ever arrested someone under those statutes. With a single exception, they could not. They testified that in a combined **251 years** of law enforcement experience, only a single officer could recall a single time they arrested anyone under those statutes[134] – and that was for a person blocking a railroad track.[135] A caselaw search provides no reported cases involving arrests under these statutes in Baton Rouge, even though the cases reflect BRPD officers actually observing persons impeding traffic and forming reasonable suspicion of 14:100.1 violations – but not arresting them for it.[136]

These laws were so seldom enforced that some Defendants were not even aware they existed. For example, Defendant Willie Williams testified that he was "not familiar with" R.S.

---

[133] *Cox I* at 557-558 ("It is clearly unconstitutional to enable a public official to determine which expressions of view will be permitted and which will not or to engage in invidious discrimination among persons or groups either by use of a statute providing a system of broad discretionary licensing power or, as in this case, the equivalent of such a system by selective enforcement of an extremely broad prohibitory statute."); *Berg v. Village of Scarsdale*, 18-cv-01002 (S.D.N.Y Nov. 16, 2020) ("Defendants have impermissibly considered the content of signs placed in public places to the extent they provided preferential treatment to political signs by rarely enforcing the sign laws against them.")

[134] Ex. E at 54:9-25 (Abadie – 8 years); Ex. I at 42:3-13 (Derrick Williams; 23 years); Ex. K at 76:13-17 (Wilson; 7 years); Ex. P at 47:18-49:5 (Roberts; 23 years); Ex. Q at 94:20-22 (Simoneaux; 23 years); Ex. R at 55:21-57:4 (Walker; 18 years). Ex. S at 46:18-47:12 (Clary of LSP; 36 years); Ex. X at 56:6-57:9 (Willie Williams; 16 years); Ex. Y at 52:8-21 (Barrow; 30 years); Ex. Y at 209 (Leach; 30 years); Ex. AA at 49-50 (Bell; 6 years); (Earl Lapeyrouse; 31 years).

[135] Ex. K 76:13-17 (Curtis Wilson testified that he had arrested one person for a 14:97 for blocking a railroad track.)

[136] *E.g., United States v. Mitchell*, 16-00099-BAJ-RLB (M.D. La., April 5, 2017) ("This observation is a 'specific and articulable fact[]' that provided Officer Collins reasonable suspicion that Defendant was committing a violation of a traffic law, Louisiana Revised Statutes section 14:100.1."); *United States v. Williams* (M.D. La. 2016) ("The Government contends that the officers' uncontroverted testimony established the length of time that the Defendant's vehicle remained unmoved in the street; thus, pursuant to La. R.S. 14:100.1, the officers had reasonable suspicion to believe that the Defendant was obstructing a public passageway - a traffic violation.")

14:97,[137] and Defendant Abadie was only "vaguely" familiar with R.S. 14:100.1.[138] (Despite not being more than vaguely familiar with these statutes, Williams and Abadie signed affidavits of probable cause attesting that Plaintiffs violated those statutes.)

This is the precise scenario that the U.S. Supreme Court recently offered as a *prototypical example* of First Amendment retaliation. In *Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019), the Court explained:

> For example, at many intersections, jaywalking is endemic but rarely results in arrest. If an individual who has been vocally complaining about police conduct is arrested for jaywalking at such an intersection, it would seem insufficiently protective of First Amendment rights to dismiss the individual's retaliatory arrest claim on the ground that there was undoubted probable cause for the arrest.

The same is true here: In Baton Rouge, officers testified that it is "not uncommon to find people in the street -- whether during an argument or for some other reason, impeding the flow of traffic."[139] Officers testified that they have had to "break up fights on the street that were impeding traffic" but never charged "any of them with obstruction of a highway or public passage."[140]

Blocking a public passageway or street rarely results in arrest in Baton Rouge – so rarely that officers could only recall making a single such arrest in a combined 251 years of policing. But when protesters were vocally complaining about police conduct, the police arrested them *en masse* for blocking a public passageway.

Nor could Defendants ever remember using pre-printed affidavits in preparation for events, not even a single time. They testified that in a combined total of **119 years** of service, they had never used preprinted affidavits like that.[141] BRPD is no stranger to rowdy crowds that might break the law. BRPD deploys officers to work crowds at the "Artemis, Mystique, and

---

[137] Ex. X at 57:2-4 ("Q Are you familiar with R.S. 14:97, obstruction of a highway of commerce. A I'm not familiar with it, no.")
[138] Ex. G at 54:18-20.
[139] Ex. Q at 132:23-133:3.
[140] Ex. Q at 133:4-11.
[141] Ex. G at 20:11-15 (Abadie; 8 years); Ex. I at 66:24-67:4 (Williams; 23 years); Ex. J at 12:18-20, 53:5-9 (Dohm; 17 years); Ex. R at 55:11-13 (Walker; 18 years); Beaux Comeaux (17 years); Ex. Y at 49:23-50:2 (Barrow; 30 years); Ex. AA (Bell; 6 years)

Orion" Mardi Gras parades, and also the Spanish Town Mardi Gras.[142] As Defendants conceded, LSU games can lead to "acts of violence or criminal acts" in the "crowd after an LSU game."[143] LSU games sometimes result in "result in rowdy and sometimes law-breaking crowds in the streets."[144] One officer explained that "crowds can get unruly at times" at LSU games, because there "are very passionate people here in Tiger Land."[145] The Mobile Field Force is also deployed "[a]ny time there is a protest or something at the Capitol," and for "Mardi Gras . . . the Sugar Bowl, Wrestlemania," *etc.*[146]

But even though BRPD regularly handles such rowdy crowds that block streets and passageways, they have never prepared preprinted affidavits of probable cause, or even *once* arrested a LSU game-attendee for blocking a public passageway or highway. The City testified that its preparation for LSU games does not include "printing up pre-prepared Affidavits of Probable Cause."[147] Similarly, the City has a "yearly problem getting the crowd to clear" after the Spanish Town parade.[148] But it does not prepare preprinted affidavits or make 14:97/100.1 arrests. It only did so when protesters were speaking out against the police.

Other aspects of the East & France street mass arrests highlight their retaliatory nature. For example, Defendants used a non-lethal acoustic weapon called an LRAD on protesters at the East & France protest. That is the *only* time BRPD has ever used that weapon on anyone in any context, other than training.[149] BRPD used that weapon on protesters even though it did not "know anything about that device, how close to people it could be safely used, at what decibel it

---

[142] Ex. L at 18:19-22.

[143] Ex. I at 85:13-16.

[144] Ex. AA at 50 ("Q. Okay, but without comparing it, would -- would you agree that LSU games sometimes revolve -- involve -- result in rowdy and sometimes law-breaking crowds in the streets? A. Yeah.") *See also* Ex. Y at 16:15-21 (30(b)(6) Deponent) (LSU games can result in "unruly crowds" that "flow into the streets of Baton Rouge")

[145] Ex. V at 29:11-16 ("Q What about -- I've been to a couple of LSU games. I know some of those crowds can get unruly at times, I'd say. Is that accurate to say? A Yes. We are very passionate people here in Tiger Land.")

[146] Ex. S at 125:17-20, 126:7-11.

[147] Ex. Y at 19:20-24.

[148] *Id.* at 63:3-8.

[149] Ex. Y (30b6 Witness Dep.) at 136:24-137:6 ("Q Okay. So to your knowledge -- just to be more specific -- the only time that the BRPD has used an LRAD device in its capacity as a less-than-lethal weapon on people was at the -- aside from training -- was at the East and France Street protest on July 10, 2016, agreed? A Agreed.")

could be safely used or at what decibel level it was actually was used on people."[150] Prior to deploying the device, BRPD had not done "any training or investigation into the safety use of this [LRAD] device in a manner to prevent injury."[151]

Nor did BRPD follow its own rules about uses of force at the East & France protest. According to BRPD policy, "any use of force requires a [use of force] report to be generated."[152] All such reports go to the Academy's defensive tactics coordinator for review, as well as to Internal Affairs to see if there were any policy or law violations.[153] But despite the repeated and frequent application of force at the East & France protest, not a single officer filled out a use of force report.[154]

And finally, Defendants' first amendment retaliation is corroborated by its treatment of its own officers. During and after the protests, there was broad condemnation of BRPD's actions. As the protests were going on, BRPD was sued by a coalition of civil rights organizations. BRPD quickly reached a settlement with them.[155] The United Nations Special Rapporteur on The Rights To Freedom Of Peaceful Assembly And Of Association visited Baton Rouge and issued a statement criticizing BRPD's actions, noting that "a show of massive force, coupled with aggressive police approaches lead to escalation."[156] Many other groups called for investigation of BRPD's actions.[157]

---

[150] *Id*. at 138:22-139:8.
[151] *Id*. at 142:15-21.
[152] Ex. C (30b6 Witness Dep.) at 211:6-10 ("Q. Okay. That's what I figured. I just wanted to make sure. So any use of force requires a report to be generated, is that correct? A. Yes."); Ex. C at 266:9-11 ("if they have to use force on somebody, they have to fill out a Response to Resistive Behavior Report.")
[153] Ex. C at 266:16-267:2.
[154] Ex. E (30b6 Witness Dep.) at 18:11-19:7 ("MR. SCOTT: I directed IA to check their files and the training academy to check their files for use-of-force reports, and none were located as to July 10th East and France.  MR. MOST: Those are the places that they would be if they existed. Agreed? MR. SCOTT: Those are the places they should be if they existed.")
[155] *North Baton Rouge Matters v. City of Baton Rouge*, M.D. La. 16-cv00463-JWD-RLB
[156] *Statement By The United Nations Special Rapporteur On The Rights To Freedom Of Peaceful Assembly And Of Association At The Conclusion Of His Visit To The United States Of America* (July 27, 2016), available online at http://freeassembly.net/news/usa-statement/
[157] See Mitchell, David J., *Special U.N. representative hears complaints from Baton Rouge residents, advocacy groups on handling of protests*, The Advocate (July 23, 2016).

But despite those complaints, and despite being put on notice of officers' explicitly criminal conduct,[158] BRPD conducted <u>no investigations whatsoever</u> of its officers' actions – except one.[159] Who was that one exception? What did he do to merit being singled out?

The only officer BRPD investigated was Officer Marcus Thompson.[160] He was investigated for saying that BRPD officers were "<u>violating peoples' rights, wrongfully arresting them and that the protesters had a right to retreat to the median without the fear of being arrested</u>."[161]

The Motion should therefore be granted on First Amendment grounds.

**D.    The motion should be granted with regard to false arrest, false imprisonment, and manufacturing of evidence because of Defendants' policy of creating entirely fabricated affidavits of probable cause.**

In the Fifth Circuit, "the right of criminal defendants to be free from false or fabricated evidence" has been well settled since the 1980s.[162]  Indeed, "every court of appeals that has considered the question of whether a state actor has violated the defendant's right to due process of law by fabricating evidence to charge or convict the defendant has answered the question in the affirmative."[163]

In the specific context of affidavits of probable cause, "[l]iability under *Franks* requires a certain mindset and certain conduct: an officer must intentionally, 'or with a reckless disregard for the truth,' include 'a false statement in a warrant application' or omit a material fact from it."[164]

---

[158] Ex. D (30b6 Witness Dep.) at 20:8-11 ("Q. Because an officer forging another officer's name on an Affidavit of Probable Cause would be a crime, agreed? A. Agreed.")

[159] Ex. E (30b6 Witness Dep.) at 14:19-25 ("Q So we can conclude that there were no -- Internal Affairs had no reports of violations or investigations of any Baton Rouge police officers other than that one accountability form we looked at in the Marcus Thompson investigation. Agreed? A Agreed.")

[160] Ex. E at 14:19-25 ("Q So we can conclude that there were no -- Internal Affairs had no reports of violations or investigations of any Baton Rouge police officers other than that one accountability form we looked at in the Marcus Thompson investigation. Agreed? A Agreed.")

[161] Ex. F at 2.

[162] *Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008) (denying qualified immunity for fabrication of evidence).

[163] *Halsey v. Pfeiffer*, 750 F.3d 273, 289, 292-96 & n.19 (3d Cir. 2014), *citing Whitlock v. Brueggemann*, 682 F.3d 567, 585 (7th Cir.2012) (collecting court of appeals cases).

[164] *Nerio v. Evans*, 974 F.3d 571, 577 (5th Cir. 2020)

Here, Louisiana Code of Criminal Procedure Art. 385 provides that an affidavit of probable cause is "a written accusation of crime made under oath and signed by the affiant. It must be filed in open court in a court having jurisdiction to try the offense, or in the office of the clerk thereof." Because they are to be filed in open court, BRPD Affidavits are explicitly a court document: the synopsis of each Affidavit begins "The Affiant stated to the Court…."[165] After a person is arrested pursuant to an Affidavit of Probable Cause, the Affidavit is submitted to the Court.[166]

And because it is a sworn document submitted to the court, Defendants concede that the Affidavit of Probable Cause "has to be a truthful description of the probable cause for someone's arrest."[167] It has to detail what "facts that this particular person did and what crime they are accused of."[168] It is the 'document that justifies this person's arrest."[169] Defendants concede that if an affiant "puts inaccurate information in a probable cause affidavit, they're manufacturing false evidence"[170]And thus, Defendants concede that the "Affidavit of Probable Cause is the document that shows whether this was a <u>justified arrest or false arrest</u>."[171]

But as described above, there was no information communicated between the seizing officers and the processing officers.[172]

---

[165] Ex. H at 1, 2, 3, *et seq.*

[166] Ex. H (each Affidavit stamped received by the court).

[167] Ex. G at 23:23-25; Ex. Q (Simoneaux) at 17 ("Q It has to be a truthful and sworn-under-oath description of the grounds for arrest, correct? A Yes, sir.")

[168] Ex. G at 24:2-5; see also Ex. I at 21:1-3 (Williams) ("Q. It has to detail what are the true facts that this person was being arrested for, correct? A. Yes, sir."); Ex. Q at 17:19-18-3 ("Q It has to say: This particular person at this particular place and time committed a particular crime, right? . . . THE WITNESS: Yes."); Ex. R (Walker) at 43:25-44:3 ("Q It has to detail what are the facts of the crime that person is being accused of, correct? A Yes, sir. Q That this particular person did these acts that constituted the particular crime; correct? A Yes, sir.")

[169] Ex. G at 24:6-7. See also Ex. K (Wilson) at 26:7-10 ("Q. The affidavit of probable cause is the document that justifies the arrest of that person, correct? A. Yes, sir."); Ex. R at 43:12-15 (same).

[170] Ex. Q at 19:17-21 ("If an affiant lies or puts inaccurate information in a probable cause affidavit, they're manufacturing false evidence, correct? A Yes, sir."); *see also* Ex. G at 24:13-17 ("makes up false information in a probable cause affidavit, they're manufacturing false evidence"); Ex. K at 27:23-28-5 ("swearing to false information in an affidavit of probable cause . . . would be creating a false document."); Ex. R at 43:23-44:5 (same).

[171] Ex. Q (Simoneaux) at 18:19-23 ("Q. Sure. The Affidavit of Probable Cause is the document that shows whether this was a justified arrest or false arrest, correct? A. Yes, sir."); Ex. I at 8-11 ("Q. It's the document that tells the court whether this was a justified arrest or a false arrest, correct? A. Yes."); Ex. G at 24:9-12 ("the document that tells you whether you have a justified arrest or an unjustified arrest."; Ex. K (Wilson) at 26:11-13 ("Q. It's the document that tells us whether that was a justified arrest or a false arrest, correct? A. In courts; yes, sir."); Ex. X at 29:19-21 (Walker) ("Q It tells you whether you have a justified arrest or unjustified arrest,  correct? A Yes.")

[172] *E.g.*, Ex. J at 41:19-25 (Escorting officer Jason Dohm testified he did not "pass on any information to people at the transportation area about why Blair had been placed in custody").

The choice not to transmit information between seizing officers and processing officers was not a result of the exigencies of the moment; <u>it was explicitly BRPD policy</u>. As BRPD's 30(b)(6) witness testified:

> Q    Okay.  So it's BRPD policy that the
> arrest team should not stop and have a
> conversation with the processing team?  They
> should simply hand off the arrestee and return
> to the front lines, correct?
>     A    Correct.                            173

As a result, the processing officers were swearing, under oath, that the contents of the affidavit were true – even though they had <u>no basis</u> whatsoever to know whether the contents were true. For example, Defendant Jonathan Abadie, the officer who signed Samantha Nichols' Affidavit of Probable Cause, conceded that:

> Q    So you didn't receive any information
> about the specifics of Samantha Nichols's
> conduct at all, correct?
>     A    Not as a sole individual, no, I did
> not.                                         174

He testified that certain parts of the Affidavit were false,[175] and that he had no basis for swearing to the truth of other parts:

> Q    So you didn't have any basis to swear
> to the truth of this section of the probable
> cause affidavit, correct?
>     A    Correct.                            176

---

[173] Ex. Y (30b6 Witness Dep.) at 74:12-17.
[174] Ex. G at 34:11-14. *See also id.* at 37:22-38:1 ("A That was the information that I had gathered. Q By which you mean nothing specific to Samantha Nichols, correct? A. Correct.")
[175] *Id*.at 36:3-10 ("Q In fact, you were nowhere close to there; you were about five or six miles away at East and France, correct? A Yes. Q So that part is not truthful, correct? A No.")
[176] *Id*. at 36:18-22. *See also id.* at 41:11-19 (Admitting that he did not "know anything about the specifics" of how Sami Nichols supposedly resisted arrest.)

This caused an obvious problem: the officers swore to the truth of some things that they did not know were true or not, and swore to the truth of other things they actively knew to be false. As Defendant Abadie testified:

> Q    So this document provides great specificity.  It says, for example, Samantha Nichols was arrested moments after entering the roadway, right?
>
> A    Yes.
>
> Q    But you did not personally have that level of specificity of information about Ms. Nichols, did you?
>
> A    Not as an individual, no.
>
> Q    But you swore under oath that these were the actual facts of what happened with Samantha Nichols, correct?
>
> A    Yes.
>
> Q    Even though there are parts of this that are not true, correct?
>
> A    Yeah. [177]

During deposition questioning, it began to dawn on some Defendants that they were confessing to perjury. At that point, they began to invoke their Fifth Amendment right not to answer questions that might incriminate them:

---

[177] Ex. G at 44:24-45:14.

```
        Q    Corporal, when you signed this
document under oath, swearing as to the truth
of the contents of it, were you committing
perjury?
            MR. LEFEVE:
                Let me object.  I'm going to
            instruct him not to answer on his
            Fifth Amendment rights.
BY MR. MOST:
        Q    Corporal, are you going take the
advice of counsel and not answer this question
on Fifth Amendment grounds?
        A    Yes.                            178
```

Defendant Abadie plead the Fifth and refused to answer the following questions on the grounds that they might incriminate him:

- "[W]hen you signed your name to this document under oath, swearing as to the truth of the contents of it, were you lying?"[179]

- "[W]hen you signed this document under oath, swearing as to the truth of the contents of it, were you committing perjury?"[180]

- "[W]hen you signed this affidavit under oath, swearing as to the truth of its contents, were you manufacturing false evidence?"[181]

- "[W]hen you signed this document under oath, swearing to the truth of the contents of it and then that document you knew would be used to imprison Samantha Nichols at East Baton Rouge Parish Prison, were you committing false imprisonment?"[182]

Defendant Willie Williams also refused to answer questions on the grounds that his answers might incriminate him in a crime.[183] He was the officer who signed an Affidavit of Probable Cause for Antonio Castanon.[184] But Williams did not have any information whatsoever

---

[178] Ex. G at 47:5-17.
[179] *Id*. at 46:13-47:3.
[180] *Id*. at 47:5-17.
[181] *Id*. at 47:18-48:5.
[182] *Id*. at 48:6-20.
[183] Ex. X at 39:9-40:1, 80:3-19, 80:21-81:8, 81:9-82:1.
[184] Ex. X at 34:5-21.

about the circumstances of Mr. Castanon's arrest.[185] He testified that he did not know <u>anything</u> about Mr. Castanon on July 10, 2016.[186]

In the sworn Affidavit, however, Detective Williams said under oath that he caused the arrest of Plaintiff Antonio Castanon.[187] But Williams testified at deposition that that he had *not* caused the arrest of Mr. Castanon.[188] When confronted with the fact that he had sworn to the truth of false statements in the Affidavit, he refused to answer:

```
      Q    Do you see the part, Detective, where
   it says he caused the arrest?
      A    Yeah, I see it.
      Q    So that part is not truthful, right?
      A    I plead the Fifth.
```
[189]

Willie Williams also refused to answer the following questions on the grounds that his answers might incriminate him in a crime:

- "Detective, when you signed the Affidavit of Probable Cause and swore that the facts therein were true and correct, were you committing perjury?"[190]

- "When you signed the Affidavit of Probable Cause under oath saying that the facts therein were true and correct, were you manufacturing false evidence?"[191]

- "when you signed the Affidavit of Probable Cause for Antonio Castanon, swearing that the facts therein were true and correct and then that document was used to imprison Mr. Castanon, were you committing false imprisonment?"[192]

---

[185] *Id*. at 41:23-42:2 ("Q Okay. Did you have a conversation with that officer about the contents of this affidavit? A No, it was too much going on, no."); *id*. at 48:22-24 ("I don't know anything about him. I didn't handle him or anything like that; nothing out of that.")

[186] *Id*. at 49:4-6 ("Q And you didn't know anything about him on July 10, 2016, correct? A Not as far as -- no, no, sir."); *id*. at 53:11-14 ("Q . . . This also says: "Antonio Castanon resisted arrest." Is it true that he resisted arrest? A I don't know.")

[187] Ex. H at 13 ("undersigned law enforcement officer . . . caused the arrest" of Antonio Castanon).

[188] Ex. X at 34:22-35-1 ("Q Okay. But you didn't personally arrest Antonio Castanon, right? A No. Q You didn't cause his arrest, did you? A No, sir."); *id*. at 19:17-19 ("Q Okay. Did you personally cause anyone to be arrested on that day? A No, I did not.")

[189] *Id*. at 39:9-13.

[190] *Id*. at 80:3-19.

[191] *Id*. at 80:21-81:8.

[192] Ex. X at 81:9-82:1.

He plead the Fifth to these questions even after being explicitly told that "unlike a criminal case, there can be consequences for pleading the Fifth in a civil matter."[193]

Defendant Derrick Williams similarly admitted that his sworn Affidavit of Probable Cause for Plaintiff Cheri Foytlin "doesn't necessarily describe the exact specifics of Ms. Foytlin's arrest because this was just generally something that was written in advance."[194] He speculated that he *might* have talked to the officer who brought Ms. Foytlin to him, but had no recollection of it.[195]

Likewise, the officers who escorted Blair Imani to the processing area testified that he did not "pass on any information to people at the transportation area about why Blair had been placed in custody."[196] But Defendant William Alexander nevertheless signed an Affidavit of Probable Cause for her anyway, that went into great detail about the circumstances of her arrest, and accused her of resisting arrest. Because William Alexander had no information whatsoever to base the affidavit on, he was creating an entirely manufactured and false piece of evidence.

The same was true for Defendant Alex Bell, who signed the Affidavit of Probable Cause for Dr. Liebeskind without any knowledge of whether the facts in it were true or not:

---

[193] *Id*. at 45:21-24.
[194] Ex. I at 39:18-20 ("Q. Right. And so it doesn't necessarily describe the exact specifics of Ms. Foytlin's arrest because this was just generally something that was written in advance, correct? A. Yes.")
[195] *Id*. at 78:21-79:3 ("Q. All right. So, Mr. Williams, you testified earlier that you didn't have any specific recollection of a conversation regarding Ms. Cherrie Foytlin with the officer who brought Ms. Foytlin to you, right? You think it would have happened but you don't have a specific recollection of it happening, correct? A. Yes, that's what I said.")
[196] Ex. J at 41:19-25; see also Ex. L (Brewer) at 58:20 ("I didn't provide them any information").

```
Q.   But you didn't have a basis to know if Dr.
     Liebeskind actually did any of these things
     because other than a preprinted Affidavit,
     you didn't have any information about
     specifically what he did, correct?
A.   Correct.
Q.   Okay.  So you didn't have a way of knowing
     whether these statements were true about
     Dr. Liebeskind or false about Dr.
     Liebeskind, correct?
A.   Myself, no, I did not.  I did not know if
     they were true or not.
Q.   Okay, and when you signed it, you didn't
     know if they were true or not?
A.   Correct.                              197
```

He signed the Affidavit under oath even though he did not know if any of the facts in it "were true or not." (Other than the parts that he admits he knew were false.[198]) But nonetheless he signed the Affidavit and swore under oath that the "following recited facts are true and correct."[199]

The problems with this system are obvious. Lt. John Clary, a thirty-six year veteran the Louisiana State Police, reviewed the Affidavit of Probable Cause for Raae Pollard and concluded that it was a <u>criminal act</u> for BRPD officers to fill out the false Affidavits and file them with the court, because it constituted the crime of filing a false report:

---

[197] Ex. AA at 37:25-10.
[198] *Id*. at 37:6-8 ("Q. Right, right. So at least this part of this sentence on this document is false? A. Yes.")
[199] Ex. H at 11.

```
    Q.   Right.  So it's potentially a criminal
matter as filing a false arrest, and it's also
potentially a constitutional matter, but it's not
truthful, agreed?
    A.   Correct.
    Q.   So whatever officer signed this and had
it submitted to the court filed a false report,
agreed?
    A.   Yes.
```
[200]

He also concluded it was a constitutional violation:

```
    Q.   So you're saying Ms. Pollard's due
process rights were violated by the signing and
filing of this Affidavit of Probable Cause?
    A.   Yes, sir.
```
[201]

He said the same was true for all the similar Affidavits of Probable Cause – BRPD

officers had committed the crime of filing false reports and had violated Plaintiffs' due process

rights.[202]

The Affidavits of Probable Cause are significant for a number of reasons. First,

Defendants concede that if they had not signed the affidavits, Plaintiffs would have been free to

go.[203] Thus, by signing the false affidavits, Defendants caused the arrest and continued the

detention of Plaintiffs. And the City has conceded that it has no evidence to support any specific

Plaintiff's arrest for illegal activity *other than* the manufactured affidavits of probable cause.[204]

---

[200] Ex. S at 74:5-13.
[201] *Id*. at 75:20-25
[202] *Id*. at 148:15-149:23 ("Q. So it would be filing a false police report if -- A. Yes, sir. Q. And it would be a violation of Samantha Nichol's due process rights? A. Yes, sir. . . . Q. So this one, if this was a preprinted affidavit, would be a -- whoever signed it would be filing a false report and a due process violation, correct? 20 A. Yes, sir.
[203] Ex. G at 73 ("Q And that's because, if you hadn't signed the affidavit, I guess Samantha Nichols could have been free to go, right? A Yes. Q So you made a decision, based on the information you had, to arrest Samantha Nichols and continue their detention, correct? A Yes.")
[204] Ex. B (30b6 Witness Dep.) at 32:8-14 ("Q Lieutenant, so, I now have it as other than the affidavit of probable cause, does the City have any description of any specific plaintiff's illegal activity, and so I think the answer is no. Agreed? A Yes. If you're talking about a specific plaintiff, yes.")

Indeed, they cannot identify any officer who allegedly witnessed any moving Plaintiff of committing a crime.[205] Accordingly, the constitutional and state-law elements of false arrest have been met.[206]

Furthermore, without the affidavits, Plaintiffs would not have spent time in the Parish Prison. BRPD officers cannot imprison someone in the East Baton Rouge Parish Prison without a probable cause affidavit.[207] And the processing officers signed the Affidavits, without any basis to believe they were true, so as to effect the imprisonment of each Plaintiff in the parish prison. Accordingly, the elements of false imprisonment have been met.[208]

And as described above, by creating a document, signing it under oath without any basis, and submitting it to the court, Defendants met all the elements of the due process violation of manufacturing false evidence. The motion should therefore be granted against the individual officers identified in Chart No. 1, *supra*, who signed the affidavits of probable cause without basis. It should also be granted against the City of Baton Rouge because the City has conceded that signing the affidavits without basis was its explicit policy.[209]

And because these effects flowed from the explicit policy of the City of Baton Rouge, the City of Baton Rouge is liable for these claims per the *Monell* doctrine.[210]

---

[205] Ex. B (30b6 Witness Dep.) at 42:21-43:18 (Castanon, Salazar, Feldman, and Fishbein, are "the only plaintiffs that you have -- that the City has any knowledge of which officers allegedly saw and reported each plaintiff committing a crime. Correct? A That is correct. Q So, for the remainder of this column I've put in unknown. Would that be accurate? A Correct.")

[206] *Resendiz v. Miller*, 203 F.3d 902, 903 (5th Cir. 2000) ("A warrantless arrest must be based on 'probable cause.'"); *Richard v. Richard*, 74 So. 3d 1156, 1159 (La. 2011) (state-law claim "for false arrest requires the following elements: (1) detention of the person; and (2) the unlawfulness of the detention.")

[207] Ex. G at 24:18 ("Q And you have to have a signed probable cause affidavit in order to book 20 someone into the East Baton Rouge Parish Prison, correct? A Yes. Q Someone can't be imprisoned there without a probable cause affidavit, right? A No, they cannot."); Ex. I at 23:19-25.

[208] *See Whirl v. Kern*, 407 F.2d 781, 792 (5th Cir. 1968) ("The tort of false imprisonment is an intentional tort. It is committed when a man intentionally deprives another of his liberty without the other's consent and without adequate legal justification."). *See also McNeal v. DPS&C*, 18-cv-00736-JWD-EWD (granting Plaintiff's summary judgment motion on false imprisonment, because  that tort has two elements "(1) detention of the person; and (2) the unlawfulness of the detention"), citing *Tabora v. City of Kenner*, 94-613 p. 8 (La. App. 5 Cir. 1/18/95), 650 So. 2d 319, 322, *writ denied*, 95-0402 (La. 3/30/95), 651 So. 2d 843.

[209] Ex. Y (30b6 Witness Dep.) at 74:12-17 ("Q Okay. So it's BRPD policy that the arrest team should not stop and have a conversation with the processing team? They should simply hand off the arrestee and return to the front lines, correct? A Correct."); *cf. Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

[210]*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (holding that "[l]ocal governing bodies... can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes" a policy or custom.)

**E.    The motion should be granted for Raae Pollard, Karen Savage, and Alexus Cheney against the City of Baton Rouge because the signatures on their affidavits were forged, and the City ratified that forgery.**

In addition to the reasons above, the Motion should also be granted for Raae Pollard, Karen Savage, and Alexus Cheney against the City of Baton Rouge because the signatures on their affidavits were forged, and the City ratified that forgery.

A BRPD officer cannot sign another officer's name on an affidavit of probable cause.[211] The City says that would be forgery and false testimony.[212] It says it would be a criminal act. And so if BRPD were notified of such falsification, it would be a "serious matter" and "cause for investigation."[213]

But at the East & France protest some officer or officers were forging affiant signatures on Affidavits of Probable Cause. Plaintiffs Pollard, Savage, and Alexus Cheney were each arrested pursuant to Affidavits of Probable Cause with forged signatures.[214] The forged Affidavits were used to imprison them in East Baton Rouge Parish Prison, and were submitted to the East Baton Rouge court.[215]

This was especially egregious, because each forged signature was notarized by another officer. It is unknown how many of the hundreds of affidavits had forged signatures, but three plaintiffs here – Raae Pollard, Karen Savage, and Alexus Cheney – had Affidavits of Probable Cause with forged signatures.  This resulted in Affidavits with both false facts and false signatures. As Officer Simoneaux testified about Alexus Cheney's Affidavit:

---

[211] Ex K at 28:21-24 ("Q. Okay. Oh, and before we move on, one officer can't sign another officer's name on an affidavit of probable cause, correct? A. Right."); Ex. R at 45:6-7 ("No other officer should sign a document for another officer.")

[212] Ex. Q at 20:14-16 ("Q Signing someone's name, that would be false testimony, correct? A Correct."); Ex. R at 45:23-46:2 ("Q It would be untruthful for one officer to sign another officer's name under oath, correct? A Correct.")

[213] Ex. D (30b6 Witness Dep.) at 19:16-20:1.

[214] Ex. B (30b6 Witness Dep.) at 40:2-24 (BRPD does not know who signed Affidavits of Probable Cause for Pollard, Cheney, and Savage); Ex. Q at 40:12-41:2 (regarding Alexus Cheney Affidavit: "Q It wasn't you that signed this? A No, sir."); Ex. R at 46:20-47:23 (regarding Raae Pollard Affidavit: "Q Is that your signature on the affiant line here? A No, sir. . . .  Q So whoever signed this affiant line, I mean they're definitely trying to say they are you, correct? A Yes.")

[215] Ex. H at 1, 4, 6 (Affidavits stamped received by East Baton Rouge Clerk of Court).

```
Q    Okay. So both the facts in this
document and the affiant's signature are
false, correct?
     A    Yes, sir.                    216
```

Simoneaux thus testified that that "a crime was committed by someone submitting this false affidavit."[217]

The signature forgery was reported by multiple BRPD officers to their superiors. For example, Billy Walker did so in a written memorandum that he shared with multiple ranking officers.[218] Officer Simoneaux reported it to his supervisor.[219]

But despite being notified in 2016 about the repeated forgeries of names on court documents, BRPD took no action and did not investigate the issue.[220] The issue was raised again in 2019, when officers were asked about their signatures on the affidavits.[221] The issue was not investigated then either.[222] The City's witness conceded that it at no point has it conducted any "no referrals or investigations or administrative reviews" on the issue,[223] of what the City concedes is a crime and a "cause for investigation." The City did not even respond to Officer Walker's letter reporting that "someone was falsifying [his] name on an Affidavit of Probable Cause."[224]

Thus, Ms. Pollard, Ms. Savage, and Ms. Cheney were each arrested and imprisoned on the basis of a probable cause affidavit that had (1) false contents; (2) a forged signature by a

---

[216] Ex. Q at 42:13-16.
[217] *Id*. at 46:23-47:3 ("Q And a crime was committed by someone submitting this false affidavit, correct? . . . THE WITNESS: Yes, sir."); see also id. at 48:5-7, regarding Affidavit for Tammy Cheney ("Q Someone, likewise, committed a crime by manufacturing this false affidavit, correct? A. Yes, sir.")
[218] Ex. N (July 21, 2016 Memo); Ex. M (30b6 Depo.) at 59:5-8 (City concedes this was "an officer reporting that someone else was signing his name to [] some documents.")
[219] Ex. Q at 44:18-21.
[220] Ex. M (30b6 Witness Dep.) at 60:22-25 ("Q. Okay, but the very least you can say, Internal Affairs did not investigate this issue, agreed? A. To my knowledge as of today, agreed.")
[221] *Id*. at 62:1-4 ("Q. Okay. So the -- issue of Billy Walker not signing Affidavits with his name on it was raised again in 2019, agreed? A. Agreed.")
[222] *Id*. at 62:22-24 ("Q. Okay, but you do not recall any such investigation in 2019, agreed? A. Agreed.")
[223] Ex. E (30b6 Witness Dep.) at 11:18-25 ("Q So we can conclude that there were no referrals or investigations or administrative reviews regarding the falsification or inclusion of false information in probable cause affidavits or arrest reports of protesters from the July 2016 protest. Agreed? A Agreed.")
[224] Ex. R at 49:13-19 ("Q And so you reported that someone was falsifying your name on an Affidavit of Probable Cause, right? A Yes, sir. Q And what happened -- did you get a response to this letter? A I did not.")

BRPD officer; (3) a false notarization by another officer. Each forged affidavit was submitted to the East Baton Rouge Parish Court,[225] and not withdrawn even after it was discovered to be a forgery. Indeed, BRPD took no steps to investigate or remedy the matter, despite multiple officers reporting the problem, and despite the issue being specifically flagged to the Parish Attorney's office several times.

The City is liable for the forgery of these documents, for two reasons. First, because the choice of the City not to investigate what it concedes is "cause for investigation" constitutes municipal ratification of the activity, generating *Monell* liability. Thus, for these three Plaintiffs, the City's ratification of the forgery of their Affidavits provides another reason to grant the Motion.

And second, because Fifth Circuit law recognizes the application of estoppel to prevent a "defendant from taking inequitable advantage of a predicament caused by his own failure to investigate." Here, the City's choice not to investigate the forgeries prevented Ms. Pollard, Ms. Savage, and Ms. Cheney from knowing which BRPD officer signed and fabricated their Affidavits of Probable Cause. For that reason, the City should be estopped from disclaiming liability for the actions of its officers. To hold otherwise would allow BRPD to escape liability by (1) having officers anonymously forge documents, (2) choosing not investigate, and (3) resulting in Plaintiffs not having anyone to hold accountable for the forgery. Accordingly, the motion should be granted against the City of Baton Rouge.

**F.      The motion should be granted because the undisputed facts match *Cox* precisely.**

In a series of two cases *Cox v. Louisiana*, 379 U.S. 536 (1965) ("Cox I") and *Cox v. Louisiana*, 379 US 559 (1965) ("Cox II"), the Supreme Court ruled on the constitutionality of a Baton Rouge obstructing public passages conviction with startlingly similar facts to those at issue here.

---

[225] Ex. H at 1 (stamped received by East Baton Rouge Clerk of Court).

Those cases involved thousands of protesters proceeding in a student-led march through the streets of Baton Rouge. They marched to the courthouse to protest "the illegal arrest of some of their people who were being held in jail."[226] Law enforcement "asked Cox to disband the group and 'take them back from whence they came.'"[227] Cox refused. Law enforcement told Cox that "he must confine: the demonstration "to the west side of the street."[228] The area was "effectively blocked off by the police and traffic rerouted."[229]

After some time, law enforcement then said "Now, you have been allowed to demonstrate. Up until now your demonstration has been more or less peaceful, but what you are doing now is a direct violation of the law, a disturbance of the peace, and it has got to be broken up immediately."[230] Cox was then arrested for obstructing public passages.

The Court held that his arrest was unconstitutional. The key to the Court's holding was that Cox had been told he *could* remain in a certain area, and the subsequent "dispersal order did not remove the protection accorded appellant by the original grant of permission."[231] The principle is clear: it is unconstitutional for law enforcement to tell protesters where they can protest, and then arrest them once they go there.

Here, the facts are nearly identical to *Cox*. Plaintiffs were part of a Baton Rouge protest speaking out against police misconduct. Police told them to go to East & France street. Police told them that "they could be on private property or on the curb" and that "[t]hat's where they were supposed to be."[232] According to one officer, "it was repeated often and frequent for protesters to remain outside of the roadway and on private property."[233]

As a result, everyone agrees that protesters on the sidewalks and private property should *not* have been arrested. BRPD's 30(b)(6) witness testified that:

---

[226] *Cox I* at 540.
[227] *Id*.
[228] *Id*. at 541.
[229] *Cox II* at 571.
[230] *Cox I* at 543.
[231] *Cox II* at 573.
[232] Ex. G at 37:1-5
[233] Ex. V at 21:21-24.

```
Q     So if protesters clear the streets

after being given a command to clear the

streets, there's not the justification to

sweep in and make arrests, agreed?

A     Agreed.

Q     And so any protesters who complies

with an order to clear the streets should not

be arrested by Baton Rouge Police Department,

agreed?

A     Agreed.
```
[234]

Individual Defendants agreed, testifying that if a protester retreated to "private property or on the curb, they should not have been arrested,"[235] and that "protesters who followed police orders and stood on private property or the curb, they should not have been among the ones arrested."[236]

So just as in *Cox,* protesters in 2016 were told where they could protest. Just as in *Cox,* the streets were blocked off around the protesters. And just as in *Cox*, the police changed their mind and swept in, saying "Everyone has violated. Everyone is under arrest. Those who can safely apprehend violators must do so."[237] The same result should follow as in *Cox* – a determination that the arrests were unconstitutional.[238]

---

[234] Ex. Y (30b6 Witness Dep.) at 33:4-13.

[235] Ex. G at 37:10-13

[236] Ex. I (Williams) at 41:4-8 ("Q. Okay. So protesters who followed police orders and stood on private property or the curb, they should not have been among the ones arrested, correct? A. They should not."); see also Ex. Y at 94:13-21 (if ordered to clear the streets, protesters who "retreat to sidewalks and private property and continue their protests" are "doing lawful things.")

[237] Ex. U at 144:8-18 ("Q. Just to repeat what it sounded to me like he said, it was, You've got one of the leaders requesting to walk on the sidewalk past France. Someone else responds, It's too late. Then 10-9. Then responds, Too late. Everyone has violated. Everyone is under arrest. Those who can safely apprehend violators must do so. Primary targets are the white male, red hair, tie-dyed shirt, and everyone else who is violating, which is everybody out there. Does that sound about right? A. Yes, sir.")

[238]Despite the fact that *Cox* was a U.S. Supreme Court case about Baton Rouge law enforcement, not a single Defendant had ever heard of *Cox* or been trained about *Cox*. Ex. G at 54 (Abadie); Ex. I at 44: (Williams: "it doesn't ring a bell"); Ex. J at 63; Ex. K (Wilson) at 59-60; Ex. Q at 53 (Simoneaux); Ex. R (Walker) at 55; Ex. V (Daniels) at 39. Nor could most Defendants recall any specific training about how to handle protesters or when it is permissible to arrest protesters. Ex. J at 63 (Dohm); Ex. K at 59 (Wilson); Ex. Q. (Simoneaux) at 53; Ex. R (Walker) at 55. Even BRPD's "Director of Training" was "not familiar" with *Cox*. Ex. Y at 91 (Leach); *id*. at 103:2-3. He testified that "I wish I would have known about" *Cox*, because it would have "been a great example." Ex. Y at 113:18-20.

**G.    Summary**

To sum up, Defendants:

1. Told protesters that the sidewalks and private property was where they were "supposed to be," and then swept in and made mass arrests on the theory that "Everyone has violated. Everyone is under arrest."

2. Applied the Civil Disorder policy to protesters explicitly because they chose to "speak out against perceived misconduct" by BRPD;

3. Targeted "agitators" for arrest, which included persons who "want to see a major change in the politics of Baton Rouge";

4. Filed with the court sworn affidavits of probable cause that were entirely fabricated, some with forged signatures;

5. Conducted mass arrests of protesters pursuant to a statute they could only recall using once in a quarter-millennium of policing experience;

6. Used a method (pre-printed affidavits of probable cause) that they had *never* used before;

7. Used a weapon (the LRAD) that they did not know was safe or not, which they have never used before or since in any context;

8. Only investigated a single officer's conduct – the one who said they BRPD was "wrongfully arresting" protesters.

Under these circumstances, no reasonable jury could reach any conclusion other than that

the City of Baton Rouge violated Plaintiffs' rights. The motion should be granted.

## V.    CONCLUSION

For these reasons, Plaintiffs ask this Court to grant their *Motion for Partial Summary

Judgment*.

Respectfully submitted,

*/s/ William Most*
WILLIAM MOST                             JOHN ADCOCK
Louisiana Bar No. 36914                  Louisiana Bar No. 30372
DAVID LANSER                             P.O. Box 750621
Louisiana Bar No. 37764                  New Orleans, LA 70175
201 St. Charles Ave., Ste. 114 #101      Tel: (504) 233-3125
New Orleans, LA 70170                    Fax: (504) 308-1266
Tel: (650) 465-5023                      Email:  jnadcock@gmail.com
Email: williammost@gmail.com