UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


BLAIR IMANI, ET AL

                        DOCKET NO.
                        17-cv-00439-JWD-EWD

VERSUS


CITY OF BATON ROUGE,
ET AL


            Deposition of JONATHAN ABADIE,
taken on June 9, 2021, via Zoom
Videoconference.

2

```
 1  APPEARANCES:
 2  MOST & ASSOCIATES
    BY: WILLIAM MOST, ESQ.
 3  AND DAVID LANSER, ESQ.
    201 St. Charles Avenue
 4  Suite 114, #101
    New Orleans, Louisiana  70170
 5  Phone: (504)533-4521
    Email: david.lanser@gmail.com
 6      REPRESENTING PLAINTIFFS
    (IMANI V. CITY OF BATON ROUGE)
 7
 8
    RODERICK AND SOLANGE
 9  MacARTHUR JUSTICE CENTER
    BY:  ERIC FOLEY, ESQ.
10  JIM CRAIG, ESQ.
    HANNAH LOMERS-JOHNSON, ESQ.
11  MANDISA MOORE-O'NEAL, ESQ.
    4400 S. Carrollton Avenue
12  New Orleans, Louisiana  70119
    Phone: (504)684-2364
13  Email: eric.foley@macarthurjustice.org
        REPRESENTING PLAINTIFFS
14  (SMITH V. CITY OF BATON ROUGE AND
    BATISTE-SWILLEY V. CITY OF BATON ROUGE)
15
16
    DEELEE MORRIS, ESQ.
17  DAVID LEFEVE, ESQ.
    JOSEPH SCOTT, ESQ.
18  222 St. Louis Street
    Baton Rouge, Louisiana  70802
19  Phone: (225)389-3114
    Email: dsmorris@brla.gov
20      REPRESENTING BATON ROUGE CITY
    POLICE DEPARTMENT OFFICERS
21
22
23
24
25
```

1    APPEARANCES (CONTINUED):

2    BURGLASS & TANKERSLEY.
     BY:  GREGORY FAHRENHOLT, ESQ.
3    5213 Airline Drive
     Metairie, Louisiana  70001
4    Phone: (504)836-0408
     Email: gfahrenholt@burglass.com
5         REPRESENTING INDIVIDUAL
     STATE POLICE TROOPERS

6

7

8    ALSO PRESENT:

9    Chase Gunter
     Megan Koilparampil
10

11

12   REPORTED BY:

13   Cecilia M. Henderson
     Certified Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1
 2                 EXAMINATION INDEX
 3                                        Page
 4   MR. MOST ..................................6
     MR. FOLEY ...............................58
 5   MR. MOST ................................72
 6
 7            E X H I B I T   I N D E X
 8                                        Page
 9   Exhibit K ...............................25
     Exhibit C ...............................27
10   Exhibit D ...............................49
     Exhibit W ...............................63
11   Exhibit X ...............................63
     Exhibit Y ...............................66
12   Exhibit Z ...............................66
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1          S T I P U L A T I O N

2

3          It is stipulated and agreed by and

4     between counsel that the deposition of

5     JONATHAN ABADIE is hereby being taken under

6     Federal Rules of Civil Procedure for all

7     purposes in accordance with law;

8          That the formalities of filing and

9     certification are hereby waived; that the

10    formalities of reading and signing are hereby

11    specifically not waived;

12         That all objections, except those as

13    to the form of the question and/or

14    responsiveness of the answer, are hereby

15    reserved until such time as this deposition or

16    any part thereof may be used in evidence.

17         *   *   *   *   *   *   *   *

18         CECILIA M. HENDERSON, Certified Court

19    Reporter, in and for the State of Louisiana,

20    officiated in administering the oath to the

21    witness.

22

23

24

25

```
1              JONATHAN ABADIE, 9000 AIRLINE
2    HIGHWAY, BATON ROUGE, LOUISIANA  70815, AFTER
3    FIRST BEING DULY SWORN IN THE ABOVE-ENTITLED
4    MATTER, DID TESTIFY AS FOLLOWS:
5                      EXAMINATION
6    BY MR. MOST:
7        Q    All right.  MacArthur folks, is there
8    any reason to wait?  I'll just assume we're
9    good to go, unless I hear otherwise.
10             MS. MORRIS:
11                  Yes, you're good to go, William.
12             MR. MOST:
13                  Great.  Thanks.
14                  David, can we stipulate that
15             this deposition was properly noticed
16             and the court reporter is duly
17             qualified?
18             MR. LEFEVE:
19                  Yes.
20   BY MR. MOST:
21       Q    Officer, can you give us your name
22   and rank, please?
23       A    Yeah, Corporal Jonathan Abadie.
24       Q    Corporal, how would you like me to
25   refer to you; I can refer to you as Corporal,
```

1    Officer or Mr. Abadie.  What's your

2    preference?

3         A    Corporal is fine.

4         Q    Corporal, my name is William Most.  I

5    am a lawyer who represents the plaintiffs in

6    the Imani case, which is one of the cases

7    we're here for today.  Have you ever given a

8    deposition before, Corporal?

9         A    No, I have not.

10         Q    Okay.  So a deposition is an

11    opportunity for the parties to ask questions

12    understood oath.  So do you understand you're

13    under oath here today?

14         A    Yes.

15         Q    And you understand that your answers

16    here today have the same force as if we were

17    in a courtroom with a judge and jury?

18         A    Yes.

19         Q    And although this is similar in some

20    ways to giving testimony in court, there's no

21    reason why it has to be continuous.  So if at

22    any point you need to take a break, just let

23    me know, let David know and we'll take a

24    break.  Although, I will ask you about any

25    person you talked to during the break or any

1    documents you looked at during the break, even
2    if it's your attorney.   Okay?
3         A    Okay.
4         Q    Is there anything that would prevent
5    you from giving my questions full attention
6    here today and providing truthful and complete
7    answers?
8         A    No, there isn't.
9         Q    Are you taking any medications or
10   suffering from any illness that might prevent
11   you from answering truthfully and completely?
12        A    No, I'm not.
13        Q    Okay.   And something you're already
14   doing really well that helps the court
15   reporter is, if you will take care to wait
16   until I finish my question before answering,
17   and in return, I will make an effort to try
18   and wait until you finish answering before I
19   ask the next question.   All right?
20        A    Okay.
21        Q    And if I ask a question that you
22   don't understand, will you agree to tell me
23   that you don't understand, rather than trying
24   to answer it?
25        A    Yes.

```
 1        Q    Thank you.  Corporal, do you know
 2   what case you're here for today?
 3        A    Dealing with the protest from 2016.
 4        Q    And do you understand that you,
 5   personally, are a defendant in that case?
 6        A    Yes, I do.
 7        Q    Approximately, when did you find out
 8   you would be doing this deposition?
 9        A    I can't give you an exact date.  Say,
10   within the past month.
11        Q    Did you talk to anyone or look --
12   aside from your attorney -- talk to anyone or
13   look at any documents to prepare for today's
14   deposition?
15        A    Just the discovery questions that I
16   filled out previously.
17             THE COURT REPORTER:
18                  I'm sorry.  And the -- what?
19             THE WITNESS:
20                  The discovery questions, I
21             believe they're called.
22             THE COURT REPORTER:
23                  And you said something beside
24             that?
25             THE WITNESS:
```

```
 1              That' I filled out previously.
 2         Sorry.
 3         THE COURT REPORTER:
 4              I need you to kind of speak
 5         closer to the computer.
 6    BY MR. MOST:
 7      Q    And, Corporal, since this is a Zoom
 8    deposition and I'm not physically in the room
 9    with you there, I can't see if anyone tries to
10    pass you a note or contact you.  So would you
11    agree to tell me if anyone during this
12    deposition tries to communicate with you in
13    any way, whether by note, by face signal or
14    hand signal or text or anything like that?
15      A    Yes.
16      Q    Thank you.  So to prepare for today's
17    deposition, you looked at some discovery
18    requests and responses, right?
19      A    Yes.
20      Q    Did you look at any other documents
21    to prepare?
22      A    No.
23      Q    Did you bring any documents with you
24    to today's deposition?
25      A    No, I didn't.
```

1    Q    Corporal, how long have you been a
2    law enforcement officer?
3    A    Eight years.
4    Q    Is the entirety of that eight years
5    with the Baton Rouge Police Department?
6    A    Yes.
7    Q    And you're a Corporal now.  What's
8    your general job assignment?
9    A    Uniform Patrol, First District.
10    Q    And what was your rank and job
11    assignment in July of 2016?
12    A    Rank was officer and assigned to
13    First District.
14    Q    Were you similarly in a patrol
15    division, uniform division?
16    A    Yes.
17    Q    The subject of the case that I am
18    counsel on handles the events of the day,
19    Sunday, July 10, 2016, the day where there
20    were protesters gathered at East and France
21    and surrounding areas.  Do you recall that
22    day?
23    A    Yes, I do.
24    Q    Were you present near the protesters
25    that day?

```
 1        A    I was in stationed in a staging area
 2   not far from there; not in eyesight, but could
 3   overhear everything that was occurring.
 4             THE COURT REPORTER:
 5                  I'm sorry.  I didn't hear the
 6             last part of your answer.  You were
 7             stationed in the staging area not
 8             from where --
 9             THE WITNESS:
10                  Not far from where the
11             protesting was occurring.  I wasn't
12             in visual range, but I was within
13             hearing.
14   BY MR. MOST:
15        Q    Were you in the area that was called
16   by some people, "The Processing Area"?
17        A    Yes.
18        Q    And that was an area on Government
19   Street where officers were doing paperwork to
20   process the arrests of detainees?
21        A    Yes.
22        Q    Could you see the corner of East and
23   France where you were stationed?
24        A    I can't recall that.
25        Q    The entire time you were on scene
```

1    that day, were you in that one location on

2    Government Street at the processing area?

3         A    Yes.

4         Q    What was your role that day; what did

5    you do?

6         A    Simply assisting in processing and

7    paperwork for the arrestees.

8         Q    Did you personally cause anyone to be

9    arrested that day?

10         A    No, I did not.

11         Q    So walk me through how it worked.    An

12    officer would physically restrain a protester,

13    put them in cuffs and bring them to the

14    processing area; is that correct?

15         A    Yes.

16         Q    And then would that arresting officer

17    bring paper with them or did you have the

18    paperwork at the processing area?

19         A    We had paperwork at the processing

20    area.

21         Q    And that paperwork consisted of

22    preprinted Affidavits of Probable Cause; is

23    that correct?

24         A    Yes.

25         Q    Is there any other paperwork there?

1    A    Rap sheets that would typically be

2  completed, along with the probable cause.

3    Q    So probable cause affidavits, rap

4  sheets.  Anything else?

5    A    Not that I could recall.

6    Q    And so you filled out some of these

7  probable cause affidavits and rap sheets for

8  arrestees?

9    A    Yes.

10    Q    Do you remember approximately how

11  many you did that day?

12    A    No, I do not.

13    Q    Would you fill out the paperwork with

14  the arrestee in front of you?

15    A    The arrestee, they were pretty much

16  placed in line and go one by one, gather their

17  information, verify who they were and then

18  fill out paperwork.

19    Q    Okay.  So the arresting officers

20  would bring arrestees to the processing area,

21  sit them down in a line and then you would

22  then go down the line and talk to the

23  arrestees; is that correct?

24    A    Yes.

25    Q    Did you talk to the arresting officer

1    relevant to each arrestee or did you just talk
2    to the arrestee?
3        A    As far as speaking with the officer,
4    if I did, it was vaguely.  And speaking with
5    the arrestee, I did have casual conversation
6    with several --
7            THE COURT REPORTER:
8                "Did have casual conversation
9            with" -- I didn't hear the last part
10           of what you said.
11           THE WITNESS:
12               With several of the arrestees.
13   BY MS. MORRIS:
14       Q    So when you say you spoke to the --
15   may have spoken vaguely to the arresting
16   officers; is that right?
17       A    Yes.
18       Q    So they didn't provide you with
19   details of specifics; is that correct?
20       A    No, sir.
21       Q    And so you weren't gathering detailed
22   information from the arresting officers,
23   correct?
24       A    No, sir.
25       Q    And when you say:  "No, sir," you

1    mean you're agreeing with me, you did not

2    gather that information, right?

3        A    Correct.

4        Q    So any specific information that you

5    had came either from the preprinted Affidavits

6    of Probable Cause or from your interview of

7    the arrestee, correct?

8        A    Yes.

9        Q    Do the arrestees tell you what

10   they're arrested for or do they just tell you,

11   like, name, address, stuff like that?

12       A    It would be a mixed response.

13   Mainly, they would say the reason they felt

14   they were arrested or shouldn't have been.

15       Q    And did you incorporate what they

16   said into the Affidavit of Probable Cause?

17       A    No, I did not.

18       Q    One question I meant to ask you --

19   and this is just a background question I ask

20   of every deponent.  It's not particular to

21   you.  Have you, personally, ever been

22   arrested?

23       A    No, I haven't.

24       Q    Okay.  Once you processed one of

25   these arrestees, they would be loaded up and

1    taken to the East Baton Rouge Parish Prison;
2    is that right?
3        A    Yes.
4        Q    So I want to ask about those
5    Affidavits of Probable Cause.  So you had
6    preprinted Affidavits of Probable Cause,
7    right?
8        A    Yes.
9        Q    Were there a bunch of different kinds
10   of ones or one or two kinds or just one kind
11   of Affidavit of Probable Cause?
12       A    That, I can't answer clearly.
13       Q    Were there any blank Affidavits of
14   Probable Cause to use?
15       A    Could you go into details on what you
16   mean, it was blank?
17       Q    Sure.  When I say preprinted, I mean
18   an Affidavit of Probable Cause with the
19   synopsis already filled in.  When I say,
20   "Blank," I mean one without the synopsis
21   filled in.  So I understand that there were
22   preprinted Affidavits of Probable Cause that
23   already had a detailed synopsis already filled
24   in already, right?
25       A    Yeah.

1      Q    Were there any blank forms that did

2    not have the synopsis filled in?

3      A    Not that I recall.

4      Q    Were there computers or typewriters

5    at the scene to create new Affidavits of

6    Probable Cause?

7      A    Not to my knowledge.

8      Q    So it sounds to me like the arresting

9    officer would drop off the arrestees.  You

10   would then process the arrestees.  And there

11   was no detail flow of information going from

12   the arresting officer to you, correct?

13     A    No, sir.

14     Q    And the preprinted Affidavits of

15   Probable Cause, they were printed and brought

16   to the site before the protest, right?

17     A    That, I cannot answer.

18     Q    Okay.  Do you know where those

19   preprinted Affidavits of Probable Cause came

20   from?

21     A    No, I do not.

22     Q    Were you instructed to process

23   arrestees in the way that you've described?

24     A    That was a general instruction we

25   were given, yes.

1    Q    Okay.  Who gave you that general

2    instruction?

3    A    I cannot say.

4    Q    But it came from one of your superior

5    officers at the Baton Rouge Police Department,

6    correct.

7    A    I could not say very clearly.

8    Q    Is there anyone else who is able to

9    give you general instructions besides a

10    superior officer?

11    A    Generally, circumstances like that,

12    in a mass area or how that situation was with

13    a lot of moving parts, officers were entrusted

14    to be able to pass on any commands given, any

15    orders or instructions may be followed out.

16    Q    Okay.  But you didn't come up with

17    this system of processing yourself, right?

18    A    No, I did not.

19    Q    Someone else told you what to do?

20    A    Yes.

21    Q    And that someone else was also a

22    Baton Rouge personnel, police personnel?

23    A    Yes.

24    Q    Okay.  So the preprinted affidavits

25    already had the crime that the arrestee was to

1  be charged with already written in, right?

2      A    Yes.

3      Q    So someone at Baton Rouge Police

4  Department had already decided what crime was

5  going to be -- people were going to be

6  arrested for before they were arrested for it,

7  right?

8      A    I can't say it was within the

9  department, but whoever would have filled the

10 paperwork out, yes.

11     Q    Have you ever -- in your eight years

12 as an officer, ever had a situation where you

13 used preprinted affidavits like this before or

14 after?

15     A    No, I haven't.

16     Q    So it's unusual for someone to write

17 in advance of an event what happened and what

18 crime was committed, correct?

19     A    I couldn't say it would be unusual.

20 I've only had one instance, this being it

21 where --

22          THE COURT REPORTER:

23              I'm sorry.  "This being" --

24          what?

25          THE WITNESS:

```
 1              This being the only incident
 2          where it's occurred.
 3  BY MR. MOST:
 4      Q    One time in eight years, I would call
 5  that unusual.  Would you disagree with me?
 6      A    Yes.
 7      Q    You would disagree?
 8      A    Yes.
 9      Q    Why?
10      A    This is the only protest that I've
11  been involved in on such a large scale.
12      Q    Okay.  So you had your preprinted
13  affidavits.  You would then collect certain
14  identifying information from an arrestee who
15  is sitting or lying on the ground, right?
16      A    Yes.
17      Q    And then you would sign the Affidavit
18  of Probable Cause, correct?
19      A    Yes.
20      Q    And then a notary would sign it, as
21  well?
22      A    Yes.
23      Q    And did the notary swear you in prior
24  to signing it?
25      A    Never had that occur before on any
```

1    probable cause, PC form.

2        Q    But the notary was present to watch

3    you sign it?

4        A    I can't answer that clearly.

5        Q    I mean, generally when you do PC

6    forms, does the notary watch you sign it?

7        A    Depending on the circumstances.

8        Q    Are there circumstances where you

9    signed an Affidavit of Probable Cause and

10   someone notarizes it later, not in your

11   presence?

12       A    I've had it where -- for instance,

13   printed off at the printer at our district and

14   sign it and then walk it over to my supervisor

15   who would notarize it.

16       Q    And who is your supervisor who does

17   that?

18       A    Currently?  Sergeant Israel Chatman

19   and Douglas Bearing.

20       Q    And so both of those supervising

21   officers have notarized documents when you

22   signed it not in their presence; is that

23   correct?

24       A    Yes.

25       Q    Before the July 10th protest, before

1    you arrived there, were you told what people

2    would be arrested for?

3         A    No, I wasn't.

4         Q    I want to talk a little bit about

5    what a probable cause affidavit is, generally.

6    My understanding is an arrest affidavit and a

7    probable cause affidavit are the same thing,

8    right?

9         A    Yes.

10        Q    Could you just generally, in your own

11   words, tell me what that document is?

12        A    Probable cause is pretty

13   self-explanatory in the actual name itself.

14   It's probable cause for the arrest you make.

15        Q    Right.  So I'll read you the Criminal

16   Code definition and see if it matches your

17   understanding.  The Criminal Code says:  "It's

18   an affidavit, written accusation of crime made

19   under oath and signed by the affiant," end

20   quote.  Is that your understanding of a

21   probable cause affidavit?

22        A    Yes.

23        Q    So the arrest affidavit has to be a

24   truthful description of the probable cause for

25   someone's arrest, right?

```
 1        A     Yes.
 2        Q     It has the same detail, what are the
 3   facts that this particular person did and what
 4   crime they're accused of, correct?
 5        A     Yes.
 6        Q     And so this is a document that
 7   justifies this person's arrest, correct?
 8        A     Yes.
 9        Q     It's the document that tells you
10   whether you have a justified arrest or an
11   unjustified arrest, correct?
12        A     Yes.
13        Q     So if an affiant lies or makes up
14   false information in a probable cause
15   affidavit, they're manufacturing false
16   evidence, correct?
17        A     Yes.
18        Q     And you have to have a signed
19   probable cause affidavit in order to book
20   someone into the East Baton Rouge Parish
21   Prison, correct?
22        A     Yes.
23        Q     Someone can't be imprisoned there
24   without a probable cause affidavit, right?
25        A     No, they cannot.
```

1     Q    And signing the probable cause

2  affidavit is the responsibility and duty of

3  the arresting officer, correct?

4     A    It can be anywhere from the arresting

5  officer to the officer that's processing --

6  (INAUDIBLE)

7              THE COURT REPORTER:

8                    "The officer that's

9              processing" --

10             THE WITNESS:

11                   That individual.

12  BY MR. MOST:

13     Q    I'm looking at the BRPD Policy and

14  Procedure Manual, which is Exhibit K at page

15  253.  I'm going to pull it up here.  Let me

16  know when this pops up for you, Corporal.

17     A    All right.  I've got it up.

18     Q    Do you see that this is General Order

19  Number 203 from the Baton Rouge Police

20  Department, Policy and Procedure Manual?

21     A    Yes.

22     Q    And you see that this is the

23  instructions for booking procedures?

24     A    Yes.

25     Q    Do you see in Section 3-C, the second

```
1    sentence, it says:  "The arresting officer
2    must complete arrestee information form,
3    probable cause affidavit and have the NCIC hit
4    confirmation."  Do you see that?
5        A    Yes.
6        Q    Does this indicate that it's the duty
7    of the arresting officer to complete the
8    probable cause affidavit?
9            MR. LEFEVE:
10               Let me object, since you're
11           asking him to interpret a general
12           order that he didn't write, but to
13           the extent he can answer, he can
14           answer.
15   BY MR. MOST:
16       Q    Do you want me to --
17       A    From what that states, yes.
18       Q    And does that refresh your
19   understanding of who is supposed to do a
20   probable cause affidavit?
21       A    Going by that, yes.
22       Q    So based on Baton Rouge Police
23   Department orders, it's supposed to be the
24   arresting officer who does the probable cause
25   affidavit, right?
```

```
 1              MR. LEFEVE:
 2                   Let me object to the extent
 3              you're asking him to interpret a
 4              document and give a conclusion on
 5              something that he's not familiar
 6              with.  That's it.
 7    BY MR. MOST:
 8        Q    You can answer the question.
 9        A    Do you mind repeating it for me?
10        Q    Subject to the foregoing objection,
11    is it now your understanding that it's the
12    arresting officer's duty to complete the
13    probable cause affidavit?
14        A    Yes.
15        Q    So, Corporal, your badge number is
16    P-10439; is that right?
17        A    Yes.
18        Q    And you're the only officer with that
19    badge number, right?
20        A    Yes.
21        Q    I'm going to pull up Exhibit C at
22    page 2.  Do you see -- let me know when you
23    see this document, Corporal.
24        A    Okay.
25        Q    Is this your signature at the bottom
```

1  of this document?

2      A    Yes.

3      Q    So you personally signed this

4  document, right?

5      A    Yes.

6      Q    As the affiant?

7      A    Yes.

8      Q    And this is the Affidavit of Probable

9  Cause for Samantha Nichols, correct?

10     A    Yes.

11     Q    Did you fill in this information

12 where it says:  "Samantha Nichols, race, sex,"

13 et cetera?

14     A    Yes.

15     Q    So all the handwriting on this,

16 except for the notary, is yours, correct?

17     A    Yes.

18     Q    So you signed this under oath,

19 correct?

20     A    Yes.

21     Q    You swore under oath that the facts

22 in this were true and correct?

23          MR. LEFEVE:

24               Let me object because he says he

25          didn't recall whether or not he was

```
 1              sworn in before this.
 2              MR. MOST:
 3                   David, I'll just need you to
 4              make the form objections, rather than
 5              something like that that suggests the
 6              answer.  So if you'd like to just
 7              say, you know, "Form," that's
 8              sufficient.
 9   BY MR. MOST:
10       Q    Corporal, do you under -- you signed
11   this under oath that the facts in here were
12   true and correct; is that right?
13              MR. LEFEVE:
14                   Object to form.
15              THE WITNESS:
16                   Like I stated earlier, I was
17              never sworn in at the time I signed
18              the document.
19   BY MR. MOST:
20       Q    So you this was not under oath; is
21   that your contention?
22       A    If you're asking about sworn in, no,
23   I was not.
24       Q    My question is:  Did you sign this
25   under oath?  Do you know what under oath
```

1    means?

2        A    Yes.

3        Q    Did you sign this document under

4    oath?

5        A    Yes.

6        Q    And so because you signed it under

7    oath, you were swearing as to the truth of the

8    contents of it, correct?

9        A    Yes.

10        Q    Whether or not a notary had you raise

11    your right hand or not, you were swearing it

12    was the truth, correct?

13        A    Yes.

14        Q    Right.  And you were swearing to the

15    truth under penalty of perjury, correct?

16        A    Yes.

17        Q    So about the middle of the way down

18    the page here it says:  "To wit, on the above

19    listed date, numerous Baton Rouge Police

20    Department officers were assigned to provide

21    security for a Peaceful Protest."  Is that a

22    true statement?

23        A    Yes.

24        Q    So the protest at which this person

25    was arrested was a peaceful protest, correct?

```
 1        A    I wasn't out there personally, so I
 2   couldn't answer that.
 3        Q    Okay.  Let's start at the top.
 4   Before this synopsis, right under where it
 5   says:  "Affidavit of Probable Cause," it says
 6   that you caused the arrest of the following
 7   listed defendant, correct?
 8        A    Yes.
 9        Q    Did you cause the arrest of Samantha
10   Nichols?
11        A    Yes.
12        Q    You caused the arrest of Samantha
13   Nichols?
14        A    Processing her to be booked, yes.
15        Q    You testified earlier you did not
16   cause the arrest of any person that day?
17             MR. LEFEVE:
18                  Object to the form.
19   BY MR. MOST:
20        Q    Do you recall testifying earlier that
21   you not cause the arrest of any person on
22   June 10th, 2016.
23             MR. LEFEVE:
24                  Same objection.
25             THE WITNESS:
```

```
 1                 No, I do not.
 2    BY MR. MOST:
 3        Q    Okay.  And you see under "Synopsis of
 4    Probable Cause," it starts:  "The affiant
 5    stated to the Court" -- do you see that?
 6        A    Yes.
 7        Q    So this document is a statement to
 8    the Court, correct?
 9        A    Yes.
10        Q    And it was filed with the Court.  We
11    can see that at the very top.  Is that
12    correct?
13        A    Yes.
14        Q    Yeah.  And so when you are testifying
15    as to the facts in this document by signing
16    it, you're making those representations that
17    the truth therein to the Court itself,
18    correct?
19        A    Yes.
20        Q    It says that "The Affiant stated to
21    the Court that on this 10th day of July 2016,
22    the defendant did knowingly and feloniously
23    violate Louisiana Revised Statute 14:97,
24    simple obstruction of a highway of commerce."
25    Is that statement truthful?
```

1      A     Yes.

2      Q     How do you know that?

3      A     Given by the information that was

4    gathered that was given to us at the time.

5      Q     Okay.  Who told you that Samantha

6    Nichols violated that law?

7      A     I couldn't give you the name

8    directly.

9      Q     Did someone tell you that Samantha

10   Nichols violated that law.

11     A     From the information gathered from

12   the groups that were being brought in, yes.

13     Q     How was that information conveyed to

14   you?

15     A     Word of mouth.

16     Q     Okay.  So someone told you verbally

17   Samantha Nichols violated Louisiana Revised

18   Statue 14:97?

19     A     May not have been directly, but that

20   was the information I was given.

21     Q     What do you mean -- I don't think I

22   heard you.  Could you say that again?

23     A     That may not have been directly from

24   the officer that may have detained or arrested

25   her, but that was information I was able to

1  gather.

2      Q    Who did you gather it from?

3      A    Other officers on the scene.

4      Q    Okay.  So for Samantha Nichols, you

5  asked other officers about the circumstances

6  of Samantha Nichols's arrest?

7      A    Not her specifically.  The way I

8  stated, there were groups that came in and

9  those groups were all detained for the same

10  reasons.

11      Q    So you didn't receive any information

12  about the specifics of Samantha Nichols's

13  conduct at all, correct?

14      A    Not as a sole individual, no, I did

15  not.

16          THE COURT REPORTER:

17              I'm sorry.  I'm not sure I heard

18          that last response.

19          "Not individual --"

20          THE WITNESS:

21              Not a sole individual.

22          THE COURT REPORTER:

23              Thank you.

24  BY MR. MOST:

25      Q    So no one told you specifically that

1    Samantha Nichols intentionally placed

2    themselves in the roadway, correct?

3         A    Correct.

4         Q    No one told you that Samantha

5    Williams (sic) specifically actively attempted

6    to prevent their lawful arrest, correct?

7         A    Yes.

8         Q    So you didn't have any specific

9    information whatsoever to conclude those

10   facts, correct?

11        A    No, other than what I had already

12   stated about information that was gathered as

13   the groups were brought in.

14        Q    Okay.  And when you say that other

15   information, you just mean information about

16   protesters generally that day, correct?

17        A    The totality of the circumstances.

18        Q    Totality of the circumstances.  By

19   which you mean, you were generally told about

20   what the protesters in general were doing that

21   day, correct?

22        A    Yes.

23        Q    After where it says:  "To wit," it

24   says:  "This was at and in the vicinity of the

25   Baton Rouge Police Department Headquarters

1    located 9000 Airline Highway."  Do you see

2    that part?

3         A    Yes.

4         Q    In fact, you were nowhere close to

5    there; you were about five or six miles away

6    at East and France, correct?

7         A    Yes.

8         Q    So that part is not truthful,

9    correct?

10        A    No.

11        Q    It says:  "Protesters assembled at

12   provided parking areas."

13             Who provided the parking areas?

14        A    I couldn't tell you.

15        Q    Do you know that -- did you know at

16   the time that protesters assembled at provided

17   parking areas?

18        A    No, I did not.

19        Q    So you didn't have any basis to swear

20   to the truth of this section of the probable

21   cause affidavit, correct?

22        A    Correct.

23        Q    And next, it says:  "Protesters were

24   advised by loud speaker to remain on private

25   property and on the curb."

1          So it's my understanding, based on
2    that, that the protesters were told they could
3    be on private property or on the curb.  That's
4    where they were supposed to be, right?
5          A    Yes.
6          Q    So if Samantha Nichols was on private
7    property or on the curb, she was where she was
8    supposed to be?
9          A    Yes.
10         Q    And if Samantha Nichols was on
11   private property or on the curb, they should
12   not have been arrested, correct?
13         A    Yes.
14         Q    Further down, it says:  "During the
15   protest, the defendant entered the roadway and
16   was provided another verbal order to exit the
17   lanes of travel."
18              Did you have any basis at the time
19   for the truth of that sentence in this
20   probable cause affidavit, specifically with
21   regard --
22         A    That was the information that I had
23   gathered.
24         Q    By which you mean nothing specific to
25   Samantha Nichols, correct?

1          A     Correct.

2          Q     It says:  "Moments later, the

3     defendant entered the roadway again and was

4     taken into custody by officers on the scene."

5     Do you see that part?

6          A     Yes.

7          Q     Did you at the time have any specific

8     information about Samantha Nichols -- about

9     the truth of that sentence with regard to

10    Samantha Nichols?

11         A     Other than the fact she was brought

12    to me by officers that were working that area.

13         Q     But they didn't bring you Samantha

14    Nichols to you, specifically.  They brought

15    Samantha Nichols, sat her down in a line on

16    the ground, correct?

17         A     Yes, in a group.

18         Q     So you didn't know what crime they

19    were arresting Samantha Nichols for?  It could

20    have been assault on an officer.  It could

21    have been blocking a passageway.  It could

22    have been theft.  They just set them down,

23    correct?

24         A     For the people that were in that

25    group, yes.  If any other crime was committed,

```
 1    that individual was taken --
 2            THE COURT REPORTER:
 3                 "That individual was taken" --
 4            I'm sorry.  "That individual was
 5            taken" -- I didn't hear the last
 6            part.
 7            THE WITNESS:
 8                 Aside.
 9            thecourt reporter:
10                 Aside?
11            THE WITNESS:
12                 Yes, ma'am.
13    BY MR. MOST:
14        Q    Okay.  So walk me how the groups were
15    divided up.  There was a group for everyone
16    who violated a particular statute?
17        A    Yes.
18        Q    And so which group were you with?
19        A    The processing area I worked was
20    mainly anything dealing with obstruction of
21    roadway, resisting.
22        Q    Okay.  Well, some people were
23    arrested for obstruction of a roadway.  Some
24    people were arrested for obstruction of a
25    passageway.  How many groups were there total?
```

1      A    I couldn't tell you.

2      Q    Some people were arrested for

3  obstruction of a roadway and resisting arrest.

4  Were they separated out into separate groups?

5      A    I couldn't tell you.

6      Q    So really, aside from the fact that

7  Samantha Nichols was set down in this

8  particular area, you had no reason to think

9  that Samantha Nichols had done the things

10 described in this synopsis, correct?

11     A    Other than what I previously stated

12 from the information I gathered at the time

13 she was brought in.

14     Q    Right.  So other than just general

15 information about the protesters that day,

16 generally, and aside from where they sat

17 Samantha Nichols, you didn't have any

18 information regarding Samantha Nichols

19 specific to the facts in the synopsis; is that

20 correct?

21     A    Like I stated several times already,

22 it was information whatever the group she was

23 brought in with, word of mouth.  From like I

24 said, I can't give you a specific officer's

25 name stating the violations we have on these

1    individuals and we began processing them.

2        Q    Okay.  I'm just trying to sum up what

3    you've told me.  You've got general

4    information about the protesters, generally,

5    and what area Samantha Nichols was set down

6    in, and that's the basis for the facts in this

7    synopsis, correct?

8        A    Yes.

9        Q    Anything else?

10       A    Not that I can think of.

11       Q    It says:  "Subsequently, after being

12   advised that they were under arrest the

13   defendant did actively attempt to prevent

14   being taken into custody and completion of the

15   arrest process."

16            Do you know anything about the

17   specifics of how Samantha Nichols did that?

18       A    No, I do not.

19       Q    Do you see where it says at the top,

20   "Synopsis:  Defendant did knowingly and

21   feloniously violate Revised Statute 14:97"?

22   Do you see that part?

23       A    Yes.

24       Q    Do you know if 14:97 is a felony or

25   misdemeanor?

42

```
1        A    Going by the 14 code, it would be a
2   felony.
3        Q    Let's take a look.  I've actually got
4   the - it's not a pop quiz.  We can look at it.
5   Do you see this 14:97?
6        A    Yes.
7        Q    You see that it's -- "Shall be fined
8   not more than $200 or imprisoned for not more
9   than six months"?
10       A    Yes.
11       Q    So this would be a misdemeanor?
12            MR. LEFEVE:
13                 Object to the form.  You can
14            answer.
15            THE WITNESS:
16                 Going by that, yes.
17  BY MR. MOST:
18       Q    So there's no way that Samantha
19  Nichols could feloniously violate 14:97,
20  correct?
21            MR. LEFEVE:
22                 Object to the form.  You can
23            answer.
24            THE WITNESS:
25                 Going by that, without pulling
```

```
 1              up the specific statute and typing
 2              that, I mean, any officer would see a
 3              14 code and use the word
 4              (INAUDIBLE) --
 5         THE COURT REPORTER:
 6              I'm sorry, "14 code" --
 7         THE WITNESS:
 8              An officer would use the wording
 9              that was used.
10    BY MR. MOST:
11       Q    So we talked earlier how the purpose
12    of a probable cause affidavit is to provide
13    the true facts about what a particular person
14    did to justify a particular allegation of a
15    crime, right?
16       A    Yes.
17       Q    And you didn't have any particular
18    information about the things that Samantha
19    Nichols did, did you?
20         MR. LEFEVE:
21              Object to the form you.  Can
22              answer.
23         THE WITNESS:
24              As I stated numerous times, the
25              information that I gathered once --
```

```
 1              THE COURT REPORTER:
 2                   I'm sorry.  You stated --
 3              THE WITNESS:
 4                   Numerous times the information
 5              that I gathered at the time she was
 6              brought with the group of individuals
 7              she was with did see probable
 8              cause in completing that.
 9              THE COURT REPORTER:
10                   "Is the probable cause in
11              completing that?"  I'm sorry.  I
12              didn't hear the last part of your
13              answer.
14              THE WITNESS:
15                   That was it.
16              THE COURT REPORTER:
17                   Can I ask you to sit a little
18              bit closer to the computer?
19              THE WITNESS:
20                   Yes, ma'am.
21              THE COURT REPORTER:
22                   Thank you.
23      BY MR. MOST:
24          Q   So this document provides great
25      specificity.  It says, for example, Samantha
```

```
 1    Nichols was arrested moments after entering
 2    the roadway, right?
 3         A    Yes.
 4         Q    But you did not personally have that
 5    level of specificity of information about Ms.
 6    Nichols, did you?
 7         A    Not as an individual, no.
 8         Q    But you swore under oath that these
 9    were the actual facts of what happened with
10    Samantha Nichols, correct?
11         A    Yes.
12         Q    Even though there are parts of this
13    that are not true, correct?
14         A    Yeah.
15         Q    So you swore to the truth of things
16    that are not true, correct?
17              MR. LEFEVE:
18                   Let me stop you there.  To the
19              extent you're accusing him of perjury
20              or falsely swearing, I'm going to
21              instruct him not to answer.
22              MR. MOST:
23                   Okay.
24    BY MR. MOST:
25         Q    Corporal, are you going to take the
```

1    suggestion of your counsel and decline to

2    answer this question and invoke your Fifth

3    Amendment right?

4         A    Of course.

5         Q    I'd like to reflect for the record

6    that this is not a criminal proceeding and so

7    it is possible for there to be consequences

8    for an invocation of the Fifth Amendment in a

9    civil proceeding.

10             Given that, are you still invoking

11   your Fifth Amendment right?

12        A    Yes.

13        Q    So I'll ask you a couple more

14   questions to make it very specific.  Corporal,

15   when you signed your name to this document

16   under oath, swearing as to the truth of the

17   contents of it, were you lying?

18             MR. LEFEVE:

19                  Objection.  I'm going to

20             instruct him not to answer and invoke

21             his Fifth Amendment rights.

22             MR. MOST:

23                  Corporal, are you going to take

24             the advice of counsel and invoke your

25             Fifth Amendment rights and not

```
 1            answer?
 2            THE WITNESS:
 3                 Yes.
 4  BY MR. MOST:
 5     Q    Corporal, when you signed this
 6  document under oath, swearing as to the truth
 7  of the contents of it, were you committing
 8  perjury?
 9            MR. LEFEVE:
10                 Let me object.  I'm going to
11                 instruct him not to answer on his
12                 Fifth Amendment rights.
13  BY MR. MOST:
14     Q    Corporal, are you going take the
15  advice of counsel and not answer this question
16  on Fifth Amendment grounds?
17     A    Yes.
18     Q    Corporal, when you signed this
19  affidavit under oath, swearing as to the truth
20  of its contents, were you manufacturing false
21  evidence?
22            MR. LEFEVE:
23                 Let me object and instruct him
24                 not to answer under this Fifth
25                 Amendment rights.
```

1    BY MR. MOST:

2        Q    Corporal, are you going to take the

3    suggestion of counsel and decline to answer on

4    Fifth Amendment grounds?

5        A    Yes.

6        Q    And, Corporal, when you signed this

7    document under oath, swearing to the truth of

8    the contents of it and then that document you

9    knew would be used to imprison Samantha

10   Nichols at East Baton Rouge Parish Prison,

11   were you committing false imprisonment?

12           MR. LEFEVE:

13               Objection.  I'm going to, again,

14           instruct him not to answer under his

15           Fifth Amendment rights.

16   BY MR. MOST:

17       Q    Corporal, are you going to take the

18   suggestion of counsel and decline to answer on

19   the Fifth Amendment grounds?

20       A    Yes.

21       Q    Corporal, did all the affidavits you

22   signed that day look like this one?

23       A    I couldn't recall.

24       Q    Were there multiple different

25   versions of this form to use?

1      A    As I stated earlier, not to my
2  knowledge.
3      Q    So if you signed -- so there's
4  someone at Baton Rouge that said you signed
5  their Affidavit of Probable Cause and they
6  can't find it, can we safely assume it looked
7  either exactly like this or very similar to
8  this one?
9      A    Can you run that by me again?
10     Q    Sure.  So there's another person,
11  Nadia Salazar, that Baton Rouge Police
12  Department has told us you signed their
13  Affidavit of Probable Cause.  They can't find
14  the actual affidavit, however.  But can we
15  assume that it looks like either exactly like
16  or very similar to the one for Samantha
17  Nichols?
18     A    I couldn't answer that.
19     Q    I'm going to pull up Exhibit D at
20  page 19.  Do you see this incident report that
21  we're looking at?
22     A    Yes.
23     Q    It says:  "Report officer 1, Jonathan
24  Abadie."  Is that you?
25     A    Yes.

1    Q    Does that mean that you filled out

2    this incident report?

3    A    Yes.

4    Q    And do you see going down to page 20

5    that this is the incident report for a Nadia

6    Salazar?

7    A    Yes.

8    Q    Nadia was one of the other people

9    arrested that day on July 10th.  Does this

10   mean that you, personally, arrested them or

11   just that you filled out their paperwork?

12   A    It could mean both.  I couldn't

13   answer directly.

14   Q    Okay.  So she was arrested on July

15   10th, 2016.  This says that the offense

16   occurred on July 14th, 2016.  Is that correct?

17   A    Going by what I'm assuming was the

18   auto-generated date, yes.

19   Q    So this might have auto-generated

20   date that you were filling out the form,

21   rather than when she was actually arrested?

22   A    Correct.

23   Q    Okay.  And you see charges for Nadia

24   Salazar were obstruction of a public passage

25   and resisting an officer?

1       A    Yes.

2       Q    Then the narrative part -- this, I'm

3    confused about.  It says:  "I Officer Norman."

4            If you're filling this out, why is it

5    Officer Norman's narrative?

6       A    Jogging my memory on that one, there

7    should have been a supplemental report that I

8    corrected that.

9       Q    Did you copy this from some other

10   document, this narrative here?

11      A    Not that I can recall.

12      Q    But you filled this part out, right?

13      A    I honestly couldn't answer that.

14      Q    But you filled out this document,

15   right?

16      A    For the report, yes.

17      Q    Is the narrative part of the report

18   that you filled out?

19      A    Yes.

20      Q    So you got this part from somewhere

21   and put it in here?

22      A    Not to my knowledge.

23      Q    Well, you're not Officer Norman.  I'm

24   just totally confused.  Why does it says:  "I,

25   Officer Norman," if this is something you were

1    filling out?

2        A    There's a lot of possibilities that

3    could play into effect.

4        Q    So one possibility is you're copying

5    and pasting from some another document?

6        A    I wouldn't have done that.

7        Q    I also assume you wouldn't have said:

8    "I, Officer Norman."  That would be even

9    weirder, right?

10        A    We have situations where at times you

11    type on somebody else's file number on a --

12            THE COURT REPORTER:

13                I'm sorry.  I didn't understand

14            you, sir.

15            THE WITNESS:

16                There are times in the ADSI

17            report writing system that you can

18            type on somebody else's file number.

19    BY MR. MOST:

20        Q    So this might have been an

21    auto-generated text by the computer software?

22        A    No, we didn't have that.  You get --

23    if you put an incorrect file number and begin

24    typing a narrative such as this, you can

25    make -- sorry -- you can make changes to the

```
 1   narrative without it being yours.  Whether or
 2   not that happened in this circumstances, I
 3   couldn't tell.
 4        Q    Corporal, have you ever received any
 5   training in your eight years as a BRPD officer
 6   about interacting with protesters?
 7        A    My academy was actually the first to
 8   do Mobile Field Force training.
 9        Q    And that training incorporated some
10   training about dealing with protesters?
11        A    Mainly dealing with manning a shield
12   line and different types of security.
13             THE COURT REPORTER:
14                  Manning a what line?
15             THE WITNESS:
16                  Shield line.
17   BY MR. MOST:
18        Q    You understand that people have a
19   First Amendment right to protest?
20        A    Yes.
21        Q    Did that training describe or give
22   you any instruction about how to respect the
23   First Amendment rights of protesters?
24        A    No, it did not.
25        Q    Have you ever heard of a case from
```

1    the 1960s, Cox V. Louisiana about -- Supreme

2    Court case about a protester arrested in Baton

3    Rouge?

4        A    No, I haven't.

5        Q    So that's never come up in any of

6    your training in eight years as a Baton Rouge

7    officer?

8        A    Not to my knowledge.

9        Q    So we talked about Revised Statute

10    14:97, which was that misdemeanor obstruction

11    of a highway, right?

12        A    Yes.

13        Q    In your eight years as an officer,

14    have you ever arrested someone for violation

15    of that statute, aside from that day in July

16    2016?

17        A    Not that I recall.

18        Q    Do you know statute 14:100.1,

19    obstruction of a public passageway?

20        A    Vaguely.

21        Q    In your eight years as a law

22    enforcement officer with Baton Rouge Police

23    Department, have you ever arrested someone for

24    violation of that statute?

25        A    Not to my knowledge.

1        Q    Do you see any problem with you

2    signing Samantha Nichols's Affidavit of

3    Probable Cause, even though you didn't have

4    specifics about what Samantha did?

5        A    Going on good faith from other

6    officers and the information I gathered from

7    them, no, I do not.

8        Q    So if you were confronted with the

9    same situation tomorrow, you would do the same

10   thing?

11       A    To be very upfront, after dealing

12   with this situation, no.

13       Q    What would you do differently?

14       A    I'll be sure to get the exact details

15   from each individual.  Even though, given the

16   situation at the time with the large crowd

17   that we were dealing with and the limited

18   manpower that we had.

19       Q    So if this happened tomorrow and you

20   were asked to sign someone's probable cause

21   affidavit, you would make sure you got

22   detailed information about why this particular

23   person did the acts that they're accused of,

24   right?

25            MR. LEFEVE:

```
 1                    Let me object to the form.  He
 2            can answer.
 3            THE WITNESS:
 4                    Yes.
 5   BY MR. MOST:
 6       Q    That's what you would do differently
 7   tomorrow?
 8            MR. LEFEVE:
 9                    Object to the form.  You can
10            answer.
11            THE WITNESS:
12                    Yes.
13            MR. MOST:
14                    Let me go over my notes.  I
15            might not have many more questions
16            for you.
17                    That's all the questions I've
18            got right now.  I may have some
19            followup, based on if anybody asks
20            you any other questions.
21                    Eric, would you like to ask any
22            questions?
23            MR. FOLEY:
24                    Yes.  Thank you, William.  I
25            actually think that you covered a
```

```
 1              large portion of what we were going
 2              to, and so what I would ask, if we
 3              could take a brief pause -- maybe
 4              five minutes, so I can consult with
 5              my co-counsel and I think we could
 6              chalk down significantly what I was
 7              going to ask.  So maybe a pause for
 8              the cause here could help us shorten
 9              this overall.  I expect, maybe, like,
10              20 minutes of questioning when I get
11              back, if that.
12         MR. MOST:
13              Great.
14         MR. FOLEY:
15              It's 4:07.  You want to say 4:15
16         we all meet back?
17         MR. MOST:
18              It's 3:07.  But, yeah.
19         MR. FOLEY:
20              Sorry.  I'm Eastern Time.
21         Constantly screwing me up.
22         MR. LEFEVE:
23              What time do you want to come
24         back?
25         MR. FOLEY:
```

1           3:15, a little over five

2      minutes.  All right.  Thank y'all.

3      MR. MOST:

4           Just a reminder, we will ask if

5      there's any discussions during the

6      break with the deponent.

7           (BRIEF RECESS)

8      MR. FOLEY:

9           We can go back on the record,

10     then.

11               EXAMINATION

12  BY MR. FOLEY:

13     Q    Thank you, Officer Abadie.  My name

14  is Eric Foley.  I'm representing a different

15  set of plaintiffs, in particularly, a lady

16  named Ms. Lisa Batiste-Swilley.  And you were

17  named as a defendant in her suit as well and

18  there's a suit called Smith V. City of Baton

19  Rouge.  As I said, a big chunk of my questions

20  have already been covered, so I just have a

21  limited scope.  I will probably be about 15 or

22  20 minutes.  And then I'll turn it over to

23  your attorney to see if he has any followup.

24  And then back to Mr. Most.

25           Before I get into the arrests that

1    day, I just wanted to ask you a couple of

2    questions on a topic you mentioned, which was

3    training for the Mobile Field Force.  Am I

4    right in that you said you had some training

5    in that in the academy?

6          A     Yes.

7          Q     And you had said, also, that was the

8    first year that they offered it?

9          A     Yes.

10         Q     What year were you in the academy,

11   sir?

12         A     That was 2013.

13         Q     And how is that you know that that

14   was the first year they offered it?

15         A     That's what they told us.  First time

16   we had the equipment.

17         Q     Who was the instructor for that?

18         A     I couldn't tell you.

19         Q     Was it someone who is in the Baton

20   Rouge Police Department or outside of the

21   organization?

22         A     Within the department.

23         Q     Can you tell me, what do you remember

24   about the training?

25         A     In general, it was just the mechanics

1    of operating a shield line, safety, arrest

2    teams.

3        Q    Do you know about how long it lasted?

4        A    Not specifically.

5        Q    Would you be able to give me a range;

6    was it more than a day, less than five,

7    something like that?

8        A    I'd say at least a week; five working

9    days.

10       Q    Okay.  To clarify that, it would be

11   five working days of just Mobile Field Force

12   training or was it one training that was part

13   of a day?

14       A    I'm saying, not being specific with

15   it, but I believe it could have been five

16   working days with Mobile Field Force.

17       Q    Do you have any materials that were

18   handed out to you, like a text book or any

19   other training documents?

20       A    Not that I can recall.

21       Q    And did the entire academy receive

22   that training or just a subset of people?

23       A    The 79th BTA or Basic Training

24   Academy, we all did.

25       Q    Upon leaving the academy, were you

1    all automatically enrolled in Mobile Field

2    Force.

3          A    No, I believe -- no, we were not.

4          Q    In July of 2016, were you technically

5    part of the Mobile Field Force?

6          A    No, I wasn't.

7          Q    Okay.  And how is it that one becomes

8    part of Mobile Field Force?

9          A    Now, I couldn't tell you the process

10   on it, if it's volunteer or not, but I know

11   whenever it became department-wise, it was

12   volunteer basis.

13         Q    Okay.  And do you think -- I guess I

14   should rephrase.  Not as of current time, but

15   in July 2016, do you know what the process was

16   then?

17         A    Volunteer.

18         Q    Volunteer.  And did you ever

19   ultimately deploy with the Mobile Field Force?

20         A    No, at 9000 Airline Highway at our

21   headquarters, I did participate in the arrest

22   team there.

23         Q    Was that on July 10th or a different

24   day?

25         A    A different day.

```
 1        Q    Would that have included the previous
 2   day, July 9th, the Saturday?
 3        A    I couldn't tell you.
 4             THE COURT REPORTER:
 5                  I'm sorry.  "Couldn't tell you?"
 6             THE WITNESS:
 7                  Yes, ma'am.
 8   BY MR. FOLEY:
 9        Q    I want to screen share a couple of
10   documents with you, the (INAUDIBLE) Mobile
11   Field Force, and ask if you recognize them?
12   I'm just going to ask -- since there's a lag
13   here, there's going to be a bit of a delay
14   between when I share and you see it.  Just let
15   me know when it appears on the screen and then
16   we can start.
17        A    Okay.
18        Q    So this a document that we've
19   received from the Baton Rouge Police
20   Department in the past.  I just want you to
21   take a look at this first page here and can
22   you tell me if this looks familiar to you as
23   part of your Mobile Field Force training?
24        A    Not at all.  I mean, I don't recall
25   that at all.
```

```
 1            MR. FOLEY:
 2                  Jim, you're un-muted.  Thank
 3            you.
 4  BY MR. FOLEY:
 5      Q    So I'm changing the view on the
 6  screen.  It's a different document I'm going
 7  to ask you if you can see the first page.
 8  It's Baton Rouge Police Department Mobile
 9  Field Force.  Can you see that?
10      A    Yes.
11      Q    I'm going to zoom out slightly.  It's
12  a series of PowerPoint slides.
13            MR. MOST:
14                  Designate that as Exhibit W.
15            MR. FOLEY:
16                  W.  Thank you.  I guess Exhibit
17            W would be the Police Training Group,
18            PTG exhibit.  We can designate this
19            as Exhibit X.
20  BY MR. FOLEY:
21      Q    So, officer, I was just wondering, do
22  any of these slides look familiar to you?  I'm
23  going to slowly scroll through.
24      A    Some of them, I don't remember.
25      Q    Okay.  And this isn't any kind of
```

1    printed material you would have received and

2    taken away for reference?

3        A    I couldn't answer that truthfully.

4        Q    More, generally, are there any

5    printed materials from the academy that you're

6    given?

7        A    You walk out with a paper box full.

8        Q    I'm going to move to a different

9    group of documents.

10            MS. MORRIS:

11                I just wanted you to know that

12            I'm back too.  I just walked back in

13            the door.

14            MR. FOLEY:

15                Thank you, Deelee.

16    BY MR. FOLEY:

17        Q    Okay.  Officer Abadie, can you see

18    the screen now that I'm sharing?

19        A    Yes.

20        Q    All right.  I want to represent to

21    you that this is an incident report that we

22    received in discovery from the protest.  It

23    was for a former client of ours in the Smith

24    case.  And it has you listed here as -- or

25    there's listed on "Report Officer 2, Abadie,

1    Jonathan P-10439."  Is that you?

2        A    Yes.

3        Q    I want to scroll down and let you

4    read through this narrative.  And I'll zoom in

5    a bit.  Can you just let me know when you've

6    had a chance to fully read through it.

7        A    Okay.

8        Q    Thank you.  Just a few short

9    questions on this one.  My understanding from

10   your testimony today is that you were at the

11   prisoner processing area throughout the

12   protest downtown on July 10th; is that

13   correct?

14       A    Yes.

15       Q    And do you have any recollection of

16   participating in this arrest of Mr. Gilbert?

17       A    Not that I can recall.

18       Q    Did you participate in anyone's

19   arrest that day?

20       A    Specific names, being able to

21   identified somebody, no.

22       Q    Not being able to identify by name,

23   but do you recall physically detaining anyone?

24       A    No.

25       Q    Let me qualify by saying, apart from

1    the act of processing paperwork, but actually

2    taking somebody into custody.

3        A    No.

4        Q    And so can you explain why you would

5    appear on the report as a reporting officer,

6    then?  I'll move this back up to that first

7    page that has you listed there.

8        A    Without touching bases with the

9    initial officer, no, I couldn't.

10        Q    I'm going to -- let's mark that as Y,

11    I believe Exhibit Y.  This the incident report

12    from Lubin Gilbert.  And it's report

13    16-00070320-001.  I'm going to switch views to

14    another document, which is the Affidavit of

15    Probable Cause for Mr. Gilbert.  Officer

16    Abadie, can you see that on your screen?

17        A    Yes.

18            MR. MOST:

19                It can be Exhibit Z.

20            MR. FOLEY:

21                Thank you.

22    BY MR. FOLEY:

23        Q    The signature down here, "Affiant,"

24    is that your signature, Officer?

25        A    Yes, it is.

1      Q    And is it safe to say that, as with

2   your testimony earlier today, you filled out

3   this form, but you did not physically arrest

4   Mr. Gilbert?

5      A    Yes.

6      Q    And so was there any point during

7   that afternoon when you left that processing

8   area and went further down east -- towards

9   East and France?

10      A    (INAUDIBLE)

11         THE COURT REPORTER:

12             I'm sorry.  I didn't hear your

13         response.

14         THE WITNESS:

15             No, there wasn't.

16         MR. FOLEY:

17             I am going to share a video with

18         you briefly, and I just want you to

19         walk through it and confirm for me

20         whether you notice yourself or if you

21         were in the vicinity.

22   BY MR. FOLEY:

23      Q    Officer Abadie, can you see that

24   image on your screen now?

25      A    No.

```
 1              MR. FOLEY:
 2                   Let me try that again.  Okay.
 3              I'm going to play this for a little
 4              bit under a minute and I'll come back
 5              and ask you some questions.
 6                   (VIDEO PLAYED)
 7              THE WITNESS:
 8                   The video froze.
 9    BY MR. FOLEY:
10        Q    You said the video froze?
11        A    Yes.
12        Q    We've had some poor connections
13    today.  Well, let me advance slightly and we
14    can just look at the still frame of it.  It's
15    not terribly blurry.  I'm going to represent
16    to you that this house here on the corner that
17    we're looking at, this gray cottage, can you
18    see that on the screen?  That's the residence
19    of our client, Ms. Batiste-Swilley.  And to be
20    clear, at any point were you on her property
21    or in this area, the vicinity of these arrests
22    that were occurring?  I'm sorry, sir.  I think
23    you might be muted.  I'm still unable to hear
24    you.
25              MS. MORRIS:
```

```
 1                    Hello.
 2          MR. FOLEY:
 3                    We can hear you now.
 4          MS. MORRIS:
 5                    It's going through the computer,
 6          I think, so we'll see how that works
 7          now.  I don't know why it isn't going
 8          through the phone any more.  But I
 9          can still hear you on the phone,
10          unless --
11          MR. FOLEY:
12                    I'm not seeing the phone number
13          showing up on the participant list,
14          which it usually does.  Maybe the
15          phone line dropped.
16          MS. MORRIS:
17                    Can you hear me now?
18          MR. FOLEY:
19                    Yes.
20          MS. MORRIS:
21                    Let's try this.  Well, we'll
22          just -- it sounds like -- if Eric is
23          here, I suppose we're getting towards
24          the end of it, right?  We can just
25          try to do it through the computer.
```

```
 1            MR. FOLEY:
 2                 That's fine by me.  I think
 3            before we ran into that difficulty.
 4            MS. MORRIS:
 5                 It's sound like we're kind of
 6            getting to the close of the
 7            deposition.  We can just probably do
 8            it through the computer and not
 9            through the phone.  Does that sound
10            good to y'all?
11            MR. FOLEY:
12                 Yes.
13            MS. MORRIS:
14                 If it doesn't work, we'll just
15            call back in.
16            MR. FOLEY:
17                 Before we hit that technical
18            bump -- are you able to hear me now?
19            MR. LEFEVE:
20                 Yeah, we have it.
21            MR. FOLEY:
22                 Okay.  Great.
23     BY MR. FOLEY:
24          Q   We were just saying that that's fine
25     with us to try it on the computer for now.
```

1    There isn't a lot left in the way of questions

2    for us.  I think what I was saying right when

3    we ran into that technical difficulty, I was

4    explaining that that's the -- at the time, was

5    the residence of our resident, Ms.

6    Batiste-Swilley.  I was asking you if you had

7    ever at any point that day set foot on her

8    property?

9         A    No, I hadn't.

10        Q    Were you in -- at any point did you

11   leave the processing area to assist in any of

12   these arrests here at the corner of East and

13   France?

14        A    No, I did not.

15             MR. FOLEY:

16                  I'll stop sharing that.  Allow

17             me one moment.  I'm going to mute

18             myself.  I'm going to consult with my

19             co-counsel.  I'm either at very close

20             to the end or at the end of my

21             questions.  Just one moment.

22                  (BRIEF RECESS)

23             MR. FOLEY:

24                  Thank you for your patience.

25             We're concluding our questions.  I'll

```
 1              turn it over to your attorney,
 2              Mr. Abadie.
 3              MR. MOST:
 4                   I have a few followup questions.
 5              You can go, David.
 6              MR. LEFEVE:
 7                   I don't have any questions for
 8              him.  Go ahead.
 9                        EXAMINATION
10    BY MR. MOST:
11         Q    Just a few things.  Number one,
12    Mr. Foley showed an image that included kind
13    of a monster holding a sphere that had wings.
14    Do you know what I'm talking about?
15         A    Yeah, vaguely.
16         Q    Did you recognize --
17         A    Yeah.
18         Q    Do you know what that was?  Are you
19    familiar with this icon or monster or whatever
20    it is?
21         A    No, I'm not.
22         Q    You mentioned that you went home
23    with, like, a box of documents from training
24    in the academy.  Do you still have a box of
25    documents?
```

1      A    Unfortunately, along with all of my
2  personal possessions and family, it was lost
3  in the flood of '16.
4      Q    Sorry to hear that.  Finally, you
5  mentioned that -- it's your testimony that by
6  signing the Affidavit of Probable Cause, you
7  caused the arrest of Samantha Nichols, right?
8      A    Yes.
9      Q    And that's because, if you hadn't
10 signed the affidavit, I guess Samantha Nichols
11 could have been free to go, right?
12     A    Yes.
13     Q    So you made a decision, based on the
14 information you had, to arrest Samantha
15 Nichols and continue their detention, correct?
16     A    Yes.
17          MR. MOST:
18               Okay.  That's all I've got.
19          Corporal, thank you very much for
20          your time here today.  We appreciate
21          it.  And if anybody else has no
22          further questions, I think we can
23          close this deposition.
24                 *        *        *
25

1                    WITNESS' CERTIFICATE

2

3           I, JONATHAN ABADIE, do hereby

4    certify that the foregoing testimony was given

5    by me, and that the transcription of said

6    testimony, with corrections and/or changes, if

7    any, is true and correct as given by me on the

8    aforementioned date.

9

10

11   Dated: _____  Signed:_____

12                            JONATHAN ABADIE

13

14

15   _____  Signed with corrections as noted.

16

17   _____  Signed with no corrections noted.

18

19

20

21   DATE TAKEN: June 9, 2021

22

23

24

25

1              C E R T I F I C A T E

2

3          I, CECILIA M. HENDERSON, Certified
   Court Reporter, in and for the State of
4  Louisiana, as the officer before whom this
   testimony was taken, do hereby certify that
5  JONATHAN ABADIE  after having been duly sworn
   by me upon authority of R.S. 37:2554, did
6  testify as hereinbefore set forth in the
   foregoing 74 pages; that this testimony was
7  reported by me in the stenotype reporting
   method, was prepared and transcribed by me or
8  under my personal direction and supervision,
   and is a true and correct transcript to the
9  best of my ability and understanding; that the
   transcript has been prepared in compliance
10 with transcript format guidelines required by
   statute or by rules of the board, that I have
11 acted in compliance with the prohibition on
   contractual relationships, as defined by
12 Louisiana Code of Civil Procedure Article 1434
   and in rules and advisory opinions of the
13 board; that I am not related to counsel or to
   the parties herein, nor am I otherwise
14 interested in the outcome of this matter.

15

16       Dated this 30th day of June, 2021

17

18

19

20       CECILIA M. HENDERSON, CCR
         CCR #84099
21       STATE OF LOUISIANA

22

23

24

25

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**