UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


BLAIR IMANI, et al                    )
                                      )
              Plaintiffs,             )
     V.                               )  DOCKET NO.
                                      )  17-cv-00439-JWD-EWD
CITY OF BATON ROUGE, et al            )
                                      )
              Defendants.             )




DEPOSITION OF

DERRICK WILLIAMS

appearing remotely via Zoom videoconference from
Baton Rouge, Louisiana taken in connection with the
following captioned cause, pursuant to the
following stipulations before Brenda R. Breaux,
Registered Professional Reporter, Certified Court
Reporter for the State of Louisiana, appearing
remotely from Covington, Louisiana on August 11,
2021, beginning at 1:32 p.m.

```
 1                   REMOTE APPEARANCES
 2    For the Plaintiffs
          (Imani v. City of Baton Rouge):
 3
      MOST  & ASSOCIATES
 4    (BY:  WILLIAM B. MOST, ESQ.)
      williammost@gmail.com
 5    PHONE:  (504) 509-5023
      (BY:  DAVID J. LANSER, ESQ.)
 6    david.lanser@gmail.com
      PHONE:  (504) 533-4521
 7    201 St. Charles Avenue
      Suite 114 #101
 8    New Orleans, Louisiana 70170
 9
      For the Plaintiffs
10        (Smith v. City of Baton Rouge,
          Batiste-Swilley v. City of Baton Rouge, and
11        Tennart v. City of Baton Rouge):
12    RODERICK & SOLANGE MacARTHUR JUSTICE CENTER
      (BY:  JAMES W. CRAIG, ESQ.)
13    jim.craig@macarthurjustice.org
      4400 S. Carrollton Avenue
14    New Orleans, Louisiana 70119
      PHONE:  (504) 620-2259
15
16    For City/Parish of Baton Rouge and Baton Rouge City
      Police Department Officers:
17
      OFFICE OF THE EAST BATON ROUGE PARISH ATTORNEY
18    (BY:  JOSEPH K. SCOTT, III, ESQ.)
      joseph@josephscott.com
19    222 St. Louis Street
      #143
20    Baton Rouge, Louisiana 70802
      PHONE:  (225) 389-3114
21
22
23
24
25
```

REMOTE APPEARANCES (CONTINUED)

For Louisiana State Police and Individual State
    Police Troopers:

BURGLASS & TANKERSLEY, LLC
(BY:  GREGORY C. FAHRENHOLT, ESQ.)
gfahrenholt@burglass.com
5213 Airline Highway
Metairie, Louisiana 70001
PHONE:  (504) 836-0408

```
 1                      INDEX
```

```
 2   CAPTION....................1
 3   APPEARANCES...............2-3
 4   AGREEMENT OF COUNSEL.......6
 5
 6   EXAMINATION OF DERRICK WILLIAMS
 7   BY WILLIAM MOST...........7, 87
 8   BY JAMES CRAIG............50, 89
 9   BY JOSEPH SCOTT...........86
10
11   WITNESS' CERTIFICATE.......96
12   REPORTER'S CERTIFICATE.....97
```

```
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                    EXHIBITS

2                 (NONE OFFERED.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                S T I P U L A T I O N

2        It is stipulated by and among Counsel that the

3   Zoom videoconference deposition of DERRICK WILLIAMS

4   is being taken under the Federal Rules of Civil

5   Procedure for all purposes permitted under the law.

6        The formalities of reading and signing are not

7   waived.

8        The formalities of sealing, certification and

9   filing are hereby waived.  The party responsible

10  for services of the discovery material shall retain

11  the original.

12       All objections, except those as to the form of

13  the questions and/or the responsiveness of the

14  answers, are reserved until the time of the trial

15  of this cause.

16                *   *   *   *   *

17       Brenda R. Breaux, Certified Court Reporter,

18  Registered Professional Reporter, in and for the

19  State of Louisiana, officiated in administering the

20  oath to the witness.

21

22

23

24

25

```
 1                   DERRICK WILLIAMS,
 2           after having been first duly sworn,
 3   testified on his oath as follows:
 4                 P R O C E E D I N G S
 5           MR. MOST:
 6                And I'll just ask if anyone has any
 7       objection to the -- the Zoom related
 8       stipulation we used this morning, if you've got
 9       an objection, raise it now or we'll assume you
10       consent to it.
11           MR. SCOTT:
12                No objections.
13           MR. MOST:
14                And, Joe, can we stipulate that the
15       court reporter is duly qualified and the
16       deponent was properly noticed?
17           MR. SCOTT:
18                We can.
19                 E X A M I N A T I O N
20   BY MR. MOST:
21       Q.    All right.  Well, good afternoon,
22   Mr. Williams.  How are you doing today?
23       A.    I'm fine.
24       Q.    Okay.  My name is William Most.  I am an
25   attorney.  I'm representing the plaintiffs in one
```

1    of the cases related to the -- the 2016 Baton Rouge

2    protests, the -- the case we call they Imani case,

3    and we appreciate you being here today.

4            Could you give us, for the record, your

5    full name and current rank?

6       A.    Derrick Todd Williams, and I am retired.

7    I retired as a sergeant.

8       Q.    Okay.  If -- if I -- I may call you

9    officer today, but it -- it will be in error.  I'll

10   try and call you Mr. Williams since you're not

11   currently an officer, but I may slip up.  But is

12   there anything you prefer that I call you?

13      A.    That's fine.

14      Q.    Okay.  Mr. Williams, have you ever given

15   a deposition before?

16      A.    Yes.

17      Q.    Okay.  Approximately how many

18   depositions have you given in the past?

19      A.    Not very -- not very many.

20      Q.    Okay.  The one -- the first one that you

21   ever did, do you recall what it was about, roughly?

22   Was it a lawsuit you were involved in or you were

23   just a witness in?

24      A.    No, never been, that I can recall, named

25   in a lawsuit.  Probably as a witness.

1      Q.    Okay.  And any other depositions you can
2  recall besides that one?
3      A.    Not right off.
4      Q.    Okay.  So you've been in at least one
5  deposition before so you understand that today
6  you're testifying under oath, correct?
7      A.    Yes, sir.
8      Q.    And you understand that your answers
9  here today have the same force as if we were in a
10  courtroom with a judge and jury?
11      A.    Yes, sir.
12      Q.    Is there anything, whether it's
13  medication you're taking, illness or anything else
14  that would prevent you today from giving us your
15  full and complete attention and truthful and
16  complete answers?
17      A.    No, sir.
18      Q.    Okay.  And although this has the same
19  force as if we're in a court with a judge and jury,
20  this doesn't have to be continuous, we can take
21  breaks along the way; so if you need to take a
22  break for any reason, please just let me or -- or
23  Mr. Scott know and we'll -- we'll take a break.
24  Although I do want to tell you that after each
25  break I will ask you who you talked to, if anyone,

1   and what you talked about even if that person is
2   your attorney; all right?
3       A.    Yes, sir.
4       Q.    Okay.  And one thing you are already
5   proficient at and it's great for the court reporter
6   is you are doing a good job of waiting for me to
7   finish my questions before providing your answer
8   and I will try and give you the same courtesy of
9   waiting for you to finish your answer before I ask
10  the next question, that way we'll have a -- a clean
11  transcript for the court, if necessary.
12      A.    I appreciate that.
13      Q.    Yeah.  And one thing I will ask of you
14  is:  If I ask a question that is not clear or you
15  don't understand the question, will you agree to
16  tell me that it's not clear or you don't understand
17  rather than just trying to answer anyway?
18      A.    Oh, no, by all means.
19      Q.    Okay.  Thank you.  And this is a little
20  different than some depositions in that we're doing
21  it via Zoom, so we can't see the full room there.
22  Is there anyone besides you and Mr. Scott currently
23  in the room?
24      A.    No, a young lady just brought some water
25  but she left.

1      Q.    Yeah.  And -- and because it's via Zoom,

2  we can't see necessarily if someone tries to give

3  you hand signals or slide you a piece of paper.  I

4  don't expect that to be a problem, but if anyone

5  tries to communicate with you via hand signals,

6  paper, text messages or anything else, will you

7  just tell us that that's going on?

8      A.    Yes.

9      Q.    Thank you.

10         All right.  Mr. -- Mr. Williams, do you

11  know what case or cases you're here for today?

12     A.    Specifically; no.

13     Q.    Okay.  Do you understand you're

14  testifying here today for a group of lawsuits

15  related to the 2016 protests?

16     A.    I'm aware of that.

17     Q.    Okay.  And are you aware that you are a

18  defendant in at least one of those cases; i.e., you

19  are one of the people being sued?

20     A.    Yes.

21     Q.    Okay.  Were you aware that you were one

22  of the people being sued before today?

23     A.    Yes, sir.

24     Q.    Okay.  And have you -- did you do

25  anything to prepare for today's deposition?

1        A.     No.

2        Q.     Okay.  Did you talk to anyone besides

3   your attorney or review any documents to get

4   yourself ready or to refresh your recollection in

5   advance of this deposition?

6        A.     No, sir.

7        Q.     Okay.  So you haven't looked at a single

8   piece of paper prior to this deposition to get

9   ready?

10       A.     No, I haven't.

11       Q.     Okay.

12       A.     I've been retired since 2019 and I don't

13   do no police work.

14       Q.     Okay.  All right.  And Mr. Williams,

15   could you give us sort of the -- the very short

16   version of your educational and professional

17   background.

18       A.     Couple years of college, 23 years at the

19   police department, three years in the military,

20   doctorate degree of divinity, St. John Michael

21   Institute, and I'm currently now pastor here in

22   Zachary.

23       Q.     All right.  Do you prefer I refer to you

24   by a title of reverend or something else, I -- I

25   will do so if that's your preference.

1      A.    No, sir.

2      Q.    Okay.  So 23 years, you mentioned 23

3  years on the police force.  Was that entirely Baton

4  Rouge Police Department?

5      A.    Every day, yes, sir.

6      Q.    Okay.  Did you work for any law

7  enforcement agencies other than the Baton Rouge

8  Police Department?

9      A.    No, sir.

10     Q.    And this is a question I ask of every

11 deponent, it's not just of -- to you.  Have you

12 ever been arrested?

13     A.    (No audible response.)

14     Q.    I'm -- I'm sorry?

15     A.    No, sir.

16     Q.    Okay.  And are you currently employed

17 other than your role as a pastor?

18     A.    No, sir; retired.  Trust me, that's

19 enough.

20     Q.    All right.  So in -- in July, 2016, you

21 were employed with the Baton Rouge Police

22 Department, correct?

23     A.    Yes, sir.

24     Q.    And what were -- what was your rank and

25 general job responsibility around that time, if you

1    recall?

2        A.    2016 I was a sergeant.  I was commander

3    of the misdemeanor investigations office.

4        Q.    Okay.  And do you recall that there were

5    protests in July of 2016 in Baton Rouge?

6        A.    Yes, I do recall.

7        Q.    And do you recall in particular that on

8    Sunday, July 10th, 2016, there was a protest where

9    protesters were gathered at one point around East

10   and France Streets?

11       A.    Particulars, no, but just knowing, you

12   know, that that's -- that's -- that's where --

13   where the people were.

14       Q.    Yeah.  So if I talk about the East and

15   France protest you know what I'm talking about; is

16   that right?

17       A.    Yes, sir.

18       Q.    Okay.  And -- and our case -- my case,

19   the Imani case is focused on that particular day.

20   Mr. Craig represents other plaintiffs in other

21   cases involving other days.  So I -- I'm going to

22   ask you about July 10th primarily, but he may

23   follow-up with some questions about other days,

24   just as a road map.

25             Okay.  So talking specifically about

1    July 10th, Sunday, July 10th, 2016, were you

2    working at those protests as an officer in any

3    capacity?

4         A.    I was a supervisor assigned of it; yeah.

5         Q.    So you were physically present in the

6    East and France area on July 10th?

7         A.    Not as I recall.  No.  No.  I know, like

8    you said, there were several days, but to -- to

9    know that day specifically.  But I -- I don't ever

10   be -- remember being at that location you're

11   talking about.

12        Q.    Okay.  Do you recall if -- we've heard

13   some testimony that maybe a few blocks away from

14   East and France Street there was a -- sort of a

15   processing area on Government -- Government Street

16   where protesters, after they had been handcuffed,

17   were brought for paperwork processing then loaded

18   into vans.  Were you perhaps at that location?

19        A.    That -- that's -- as a supervisor,

20   that's where I would have been.  I was never at a

21   place where protesters were actively protesting.  I

22   wasn't there.

23        Q.    Okay.  Do you recall if on July 10th,

24   you were at the Government Street processing area?

25        A.    I was assigned -- assigned as the

1    supervisor.  I remember being out there; yes.

2         Q.    Okay.

3         A.    Specifically that day, I can't 100

4    percent because, you know, day-by-day you got

5    different assignments.  So I know I was assigned

6    there at -- at some point, but if it's that

7    Sunday --

8         Q.    Okay.

9         A.    -- I can't say that.

10        Q.    So I want to talk a little bit about how

11   that processing area where you were at some point,

12   whether it was July 10th or a different day, how it

13   worked.  So my understanding is that there was a --

14   sort of an area set up on -- on Government Street

15   to process arrestees; is that right?

16        A.    Yes, that's the way I -- I -- I

17   recollect it --

18        Q.    Okay.

19        A.    -- the way you described it.  Perfect.

20        Q.    And so an officer would bring a arrestee

21   in handcuffs from wherever the protest was

22   happening to the processing area to be processed,

23   correct?

24        A.    Yes, sir.

25        Q.    And then that officer would hand off the

```
 1   arrestee to the officers doing the paperwork,
 2   correct?
 3        A.    Yes, sir.  Yes, that's the way it
 4   happened.
 5        Q.    Okay.
 6        A.    That's to my recollection.
 7        Q.    And -- and with the officers bringing
 8   the arrestees, would they then turn around
 9   immediately and go back to the -- to the area where
10   the action was or would they stop and have a
11   conversation and explain what that protester had
12   done to the people doing the paperwork?  How did it
13   work?
14        A.    That -- that person would bring or
15   whoever that -- whoever had the person can bring
16   them to the processing area.  And, yes, they didn't
17   just come and leave them.  They just said this is,
18   you know, what happened and that person was given
19   to a person who was doing the paperwork and what
20   happened with the preconversation.
21        Q.    Okay.
22        A.    When the detective -- I don't know what
23   was said.  I wasn't there to hear what he told them
24   or anything like that.
25        Q.    Say that one more time.
```

1      A.    I wasn't there to hear what they were

2  saying, you know, in their conversation.  But I --

3  you know, that was the -- the protocol, when you

4  brought the person explain what happened.

5      Q.    Okay.  So you -- you personally weren't

6  told by any officer what any particular arrestee

7  did; is that correct?

8      A.    No, wasn't -- wasn't part of my duties

9  to do that.

10     Q.    Okay.  All right.  And my understanding

11 is that there were affidavits of probable cause --

12 did -- did -- I'm sorry.  Let me back up.

13          The -- the paperwork that had to be done

14 for each arrestee included an affidavit of probable

15 cause, right?

16     A.    Every, yeah.

17     Q.    And at the protest there were sort of

18 preprinted affidavits of probable cause that had

19 much of the information already filled in and then

20 an officer would add some more details; is that

21 right?

22     A.    Yeah, that's what happened to it.  There

23 were lines there if they wanted to add touches.

24     Q.    You're a little bit fuzzy.  I think if

25 -- if you can speak up a little bit and maybe get a

```
1    little closer to the mic that would be helpful for
2    our court reporter.
3              And so an -- an affidavit of probable
4    cause is signed by an affiant, right?
5         A.    Yes, sir.
6         Q.    And then it's also notarized by a notary
7    public or ex-officio notary?
8         A.    Yes, sir.
9         Q.    Okay.  And -- and how does that work?
10   Does the -- is the notary public, do they notarize
11   it with the officer with the affiant standing right
12   there in front of them signing it or do they do it
13   later or how does it work?
14        A.    Attorneys are affiants -- I mean, are
15   notaries, right?
16        Q.    Many.
17        A.    Right.  And the process is is that that
18   person is there and you notarize it based on what
19   they're saying.
20        Q.    So -- so you're saying to notarize a
21   document you have to have the affiant physically in
22   front of you physically signing it before you?
23        A.    Well, let me -- let me say it -- let me
24   say it over so that you understand.  For me, that's
25   the way it was trained that's the way it was told
```

```
 1   and that's the way I did it.
 2        Q.    Okay.  For what it's worth, that's the
 3   way I do it too.  That's my understanding of how
 4   it's supposed to work.
 5        A.    That's why I asked that question because
 6   you know how that goes.
 7        Q.    Yeah.  And -- and when you were -- if --
 8   if an affidavit said sworn to an subscribed before
 9   me, would you actually ask the affiant to raise
10   their right hand and swear before they signed it or
11   would you just let them sign it?
12        A.    No, if they were there they will sign
13   it.
14        Q.    Okay.  So no requirement to actually
15   swear to a verbal oath?
16        A.    No.  No.  I'm sorry.  No.
17        Q.    Okay.  So I want to talk a little bit
18   about what an arrest affidavit is.  So the Code of
19   Criminal Procedure Article 385 describes it as,
20   quote, an affidavit is a written accusation of
21   crime made under oath and signed by the affiant,
22   end quote.
23             Is that -- is that your understanding of
24   what an affidavit of probable cause is?
25        A.    Yes.
```

1    Q.    Okay.  So the affidavit of probable

2    cause, it has to be a truthful description of the

3    circumstances of someone's arrest, right?

4    A.    Yes, sir.

5    Q.    It has to detail what are the true facts

6    that this person was being arrested for, correct?

7    A.    Yes, sir.

8    Q.    It's the document that tells the court

9    whether this was a justified arrest or a false

10    arrest, correct?

11    A.    Yes.

12    Q.    Okay.

13    A.    The statement of fact.

14    Q.    So if an affiant puts false information

15    into an affidavit of probable cause, they're

16    creating false evidence, correct?

17    A.    If you say so.

18    Q.    Well, would you agree with that

19    statement?

20    A.    Not totally.

21    Q.    Why not?

22    A.    Because we're human and we make errors.

23    And because I make an error doesn't mean that I was

24    fabricating evidence.

25    Q.    Sure.  That -- that's fair.  But if an

1  affiant swears to the truth of an affidavit of
2  probable cause knowing that some of the contents in
3  it are not true, that would be manufacturing false
4  evidence, correct?
5      A.    If what they determined that they
6  knowingly, they purposely with the intent, I think
7  that's the measure.
8      Q.    Okay.  So you'd agree with me?
9      A.    No.  No.  No, because someone can come
10 and buy a car and they can tell you that -- that
11 the guy paid you $500 when in actuality he paid a
12 $1,000 and to save on his taxes they did that and
13 you notarized it, that doesn't mean that you did
14 anything wrong knowingly.
15     Q.    Right.  Okay.  And so I want to -- I
16 agree with you.  So I want to distinguish between,
17 I'm not talking about notarizing a document right
18 now.  I'm talking about the affiant swearing to the
19 truth of the contents of an affidavit of probable
20 cause.  Because I agree with you.  A notary
21 doesn't, like, swear to the truth of it.  But if an
22 affiant knowingly swears to the truth of
23 information in an affidavit of probable cause
24 knowing at -- at least some of the contents if it
25 are not true, that would be manufacturing false

1    evidence, correct?

2        A.    I apologize for my misunderstanding of

3    the question.  And, yes, that -- that would be, to

4    knowingly do that with the intent to mislead is --

5    is -- is -- is actually just falsifying the

6    affidavit, I don't know that.  They're not

7    manufacturing evidence as in -- they're bringing,

8    you know, real evidence, but they are creating a

9    document that not -- not necessarily truthful in

10   all of its facts.

11       Q.    Right.  And -- and it's a crime to

12   create a false document and submit it to the court

13   along those lines, correct?

14       A.    There is a law against that, yes.

15       Q.    Okay.  And -- and likewise, one officer

16   can't sign another officer's name on an affidavit

17   of probable cause, right?

18       A.    No.

19       Q.    And -- and one of the reasons why an

20   affidavit of probable cause is needed for an

21   arrestee is that it -- it's a required document in

22   order to book someone into the East Baton Rouge

23   Parish Prison, correct?

24       A.    Yes, that is one of the requirements.

25   You have to prove that.

1      Q.   Okay.  And -- and signing the affidavit

2   of probable cause is -- is the duty of the

3   arresting officer, correct?

4      A.   Yes, sir.

5      Q.   Okay.  And so I want to pull up a

6   document which we identified as Exhibit BB.

7           (Sharing document electronically.)

8   BY MR. MOST:

9      Q.   Mr. Williams, do you see that these are

10  answers to plaintiff's second set of

11  interrogatories to BRPD officer defendants?

12     A.   Yes, sir, I see it.

13     Q.   Okay.  and going down -- I'm going to go

14  down to the bottom to page -- do you see page -- on

15  page 32, do -- do you see your name here as

16  affiant?

17     A.   Uh-huh.

18     Q.   And you see that this is a verification

19  page?

20     A.   Yes, sir.

21     Q.   And you see that it -- it says Derrick

22  Williams, defendant in the above-captioned matter

23  who after being duly sworn did state that he had

24  read the responses and supplemental responses --

25  and skipping to the bottom, that said responses are

1    true to the best of his knowledge, information, and
2    belief?
3         A.    Yes, sir.
4         Q.    Okay.  So in 2019 you read these
5    responses and -- and made sure that they were true
6    and accurate?
7         A.    Uh-huh.
8         Q.    Okay.  And you -- you swore, and this --
9    this was under oath so you were swearing that they
10   were true and accurate?
11              MR. SCOTT:
12              Mr. Derrick, please say yes or no
13        because all this --
14              THE WITNESS:
15              Okay.  Yes.  Yes.  I'm sorry.
16              MR. SCOTT:
17              That's okay.
18              MR. MOST:
19              Yeah, thank you, Joe.
20   BY MR. MOST:
21        Q.    Okay.  So I'm going to go up to -- to
22   page 15.  And we see that some of these questions
23   and responses were directed to you, Sergeant
24   Derrick Williams?
25        A.    Uh-huh.

1    Q.    And -- and you see that the first one
2  says -- it admits that you signed the affidavit of
3  probable -- well, actually I'm going to skip down.
4  That's not the one I want.    Skipping down to page
5  16, Request for Admission No. 5 says that you
6  signed the affidavit of probable cause for Cherrie
7  Foytlin, do you see that?
8    A.    Is that where your cursor is?
9    Q.    Yes.    Request for Admission No. 5 in its
10  response --
11    A.    Yes.    I see it.    I see it.    And then
12  also it was --
13        COURT REPORTER:
14        I'm sorry.    I'm -- I'm not able to hear
15    him.
16  BY MR. MOST:
17    Q.    Could you try that again, Mr. Williams?
18    A.    I said yes I see where -- where that is
19  in -- in No. 5.
20    Q.    So it says here and it's truthful that
21  you signed the affidavit of probable cause for
22  plaintiff Cherrie Foytlin as an affiant?
23    A.    Well, now I'm not the only Williams on
24  this police department so I -- I'm -- there were
25  other with Williamses out there who may have signed

1    an APC or they may have that, but I was out there

2    as a supervisor and I was notarizing the paperwork.

3    I -- I -- do we have a copy of that?

4         Q.    Yeah, we do.  Let's -- I'll show you a

5    copy but let me -- let's just finish first with

6    this document and then we'll move on to a copy of

7    the document itself.  Maybe this will help clear it

8    up.  Request for Admission No. 6 says, admit you

9    did not personally witness the events described in

10   the July 10th, 2016 affidavit of probable cause for

11   plaintiff Cherrie Foytlin.  You see that?

12        A.    Yes, I do see it.

13        Q.    And do you see that that's admitted?

14        A.    Uh-huh.

15        Q.    So that sounds like what you're saying.

16   If -- if there's contents to an affidavit of

17   probable cause for Cherrie Foytlin, you didn't

18   personally witness or have knowledge of those

19   events, correct?

20        A.    No, I didn't.

21        Q.    Okay.  So I'm going to pull up Exhibit

22   C, as in cat.

23              (Sharing document electronically.)

24   BY MR. MOST:

25        Q.    I'm going to go down to page 7.  Do you

1   see that this is the affidavit of probable cause

2   for Cherrie Foytlin?

3        A.    Yes.

4        Q.    Okay.  And do you see at the bottom here

5   it's signed by what looks like Sergeant Derrick

6   Williams?

7        A.    That's my signature, yes.

8        Q.    Okay.

9        A.    So in that case, yes.

10        Q.    Okay.  So -- so you did sign this but

11   like you said before, you didn't actually have

12   knowledge of or witness the contents of it,

13   correct?

14        A.    No, I didn't.

15        Q.    Okay.  So -- so you, at the time, didn't

16   have any, you know, ability to say whether the

17   contents here were true or -- or false, correct?

18        A.    Other than -- other than the officer who

19   actually brought her over to the processing station

20   saying to me what, you know, what -- what took

21   place and hand me the affidavit.

22        Q.    Well, sir, are you testifying that an

23   officer did tell you about the circumstances of

24   arrest of Ms. Foytlin?

25        A.    Yes.

1       Q.    Mr. Williams, respectfully, you
2  testified earlier that you did not hear any
3  conversations about the -- the specifics of any
4  person arrest.
5       A.    You're right, between anybody else.  And
6  this is one that I am actually the affiant on and
7  somebody brought her to and said this is where she
8  came from.  This is where it happened.  This, this,
9  and, you know, the circumstances.
10      Q.    Okay.  Who was it --
11      A.    When I --
12      Q.    -- that brought her over?
13      A.    When I was operating as a notary, I
14 understand to hear what was being said.  But if
15 someone brought to me -- as in this case here,
16 we're talking 2016 there were -- I did receive that
17 person in the processing area and completed the
18 paperwork.  And it could have been that everybody
19 else was tied up and she was brought at the time
20 when I didn't have an officer -- officer to
21 particularly process so I took it and -- and
22 processed it because their processor -- because
23 there were other notaries there who could notarize
24 affidavits.
25            But, as you said, I did not see with my

1    own two eyes because I wasn't at the location.

2        Q.    Okay.  Do you recall processing

3    Ms. Foytlin?

4        A.    To -- to -- no.

5        Q.    Okay.  Do -- do you recall who brought

6    Ms. Foytlin to you?

7        A.    No.

8        Q.    Okay.  Do you remember anything about --

9    anything related to the processing of Ms. Foytlin?

10       A.    No.

11       Q.    Okay.  So when you say an officer told

12   you the contents of this affidavit, you're

13   imagining that that would be so but you don't

14   actually remember that happening; is that right?

15       A.    Not imagine it.  I wouldn't use the

16   word, "imagine."  That's -- that -- that is -- is

17   the standard of which we operate out there.  But to

18   say that -- that I remember verbatim what was said,

19   no.  But the standard is that nobody just brings

20   you somebody and we just say well, you know, thank

21   you and -- and go on.

22       Q.    Okay.  But you don't have -- remember

23   having a specific conversation with anybody about

24   Ms. Foytlin?

25       A.    I couldn't even tell you who brought her

1    to me.

2         Q.    Okay.  So -- so did the -- so was it --

3    well, let me back up a little bit.

4              So it's your testimony that the standard

5    practice was for the arresting officer to have a

6    conversation detailing the contents of the synopsis

7    to the -- the person who signed the affidavit of

8    probable cause?

9         A.    I would say -- I'll say it this way:  My

10   practice.  That would have been my practice.

11        Q.    Okay.

12        A.    I couldn't speak for anybody else but

13   that would have been my practice.  The one who

14   knows what happened and then completed the

15   paperwork.

16        Q.    Okay.  Now why would you be signing this

17   if it's the duty of the arresting officer to

18   complete the affidavit of probable cause?

19        A.    Under the circumstances in which we

20   were -- were working at that time, the officers

21   were bringing the people to a processing area where

22   they were turned over to the processing team and

23   those officers then would return to where they had

24   come from.  It was a -- a -- a procedural

25   adjustment that we -- we were making, just the way

```
 1    we were operating, the procedures we were operating
 2    at that time.
 3         Q.    All right.  But you didn't cause the
 4    arrest of Ms. Foytlin, did you?
 5         A.    No, sir.
 6         Q.    Well, you see that this is a document
 7    that's submitted to the clerk?
 8         A.    Yes, sir.
 9         Q.    In fact, the first line of the synopsis
10    says, it's being stated to the clerk?
11         A.    Yes.
12         Q.    So it's very important that all of the
13    contents of this be accurate and truthful, correct?
14         A.    Yes, sir.
15         Q.    Okay.  But you didn't cause the arrest
16    of Ms. Foytlin?
17         A.    No, sir.
18         Q.    Do you see in the -- in the --in the
19    section right above --
20         A.    Uh-huh.
21         Q.    -- Ms. Foytlin's name it says, he caused
22    the arrest of the following listed defendants?
23         A.    Wait.  Point at it again.
24         Q.    Yeah.  Right here.
25         A.    Yeah, I see it.  I see it.  Yeah.
```

1    Q.    Okay.  So that part's not accurate

2  because you didn't cause the arrest of Ms. Foytlin,

3  right?

4    A.    If -- if you're saying it's not

5  accurate, then -- then -- then it's not accurate.

6    Q.    Well, you literally just told me you did

7  not cause Ms. Foytlin's arrest, right?  This says

8  you did.

9    A.    Well, okay.  If -- if that's -- okay.

10  If that's what you're -- you're saying, that's what

11  it -- that's what I said.  I said I did not, the

12  document said it, he caused.  I guess it's left to

13  interpretation.

14    Q.    What about "he caused" is left to

15  interpretation?

16    A.    Well, once she is placed under arrest,

17  I'm still a law enforcement officer, just like that

18  law enforcement officer and he passed her on to me.

19  And she's -- she's still in continued custody of

20  the initial arrest.  He tells me the facts and we

21  completed the paperwork.  That's what I did.  That

22  -- that's what happened.

23    Q.    Okay.  So let me ask you again:  Did you

24  cause the arrest of Ms. Foytlin?

25    A.    I was part of a continued arrest of

1  Ms. Foytlin.

2      Q.    All right.

3      A.    I didn't take her into custody.

4      Q.    All right.  So in the synopsis it says,

5  it describes these as peaceful protests.  You see

6  that part?

7      A.    Uh-huh.

8      Q.    Is that part truthful?

9      A.    It says that -- are you -- are you just

10 taking that word out or you're going to read this

11 statement that is contained?

12     Q.    It says, on the above listed date,

13 numerous Baton Rouge Police Department Officers

14 were assigned to provide security for peaceful

15 protests.  Is that part truthful?

16     A.    That's what we were assigned to do.

17     Q.    Okay.  Were the protests peaceful?

18     A.    It led to some arrests so I guess at

19 some point it got to where officers deemed it

20 necessary to arrest.  Arrests were made.

21     Q.    Okay.  So are you saying that the people

22 arrested were those people who were not being

23 peaceful?

24     A.    I wasn't -- I -- I did not make the

25 arrests, but they were arrested for -- for a reason

```
 1    that the officer saw necessary.
 2         Q.    Okay.  What was the reason for the
 3    arrest of Ms. Foytlin?
 4         A.    For simple obstruction of a highway of
 5    commerce and resisting an officer.
 6         Q.    Okay.  What did she do to resist an
 7    officer?
 8         A.    I can't recall the specifics, but that's
 9    what she was detained for.
10         Q.    All right.  But you swore under oath
11    that she resisted an officer, right?
12         A.    Yes.
13         Q.    Okay.
14         A.    I did.
15         Q.    But you -- today you -- you don't have
16    any knowledge of what she did to --
17         A.    I can't recall.
18         Q.    -- resist an officer?
19         A.    I can't recall what -- what he
20    specifically said she did to resist.
21         Q.    Okay.  You -- you said "he."  Was it a
22    male officer who brought Ms. Foytlin to you?
23         A.    It's gender neutral.
24         Q.    Okay.
25         A.    An officer, via female, male because
```

1    there were female officers out there.

2        Q.    Okay.  The -- the next part of that

3    sentence says, in the vicinity of Baton Rouge

4    Police Department's headquarters located at 9000

5    Airline Highway.

6        A.    Uh-huh.

7        Q.    Do you see that?

8        A.    Yes, sir.

9        Q.    Is that part truthful?

10       A.    I'm kind of not sure.  I know we were

11   assigned to -- to different areas.  I don't

12   remember, as I said earlier, exactly where this

13   incident -- it was preprinted and it could have --

14   could have been left in there in error.

15       Q.    Okay.  I'll -- I'll represent to you

16   that Ms. Foytlin was among the people arrested at

17   East and France.  That's nowhere near 9000 Airline

18   Highway, right?

19       A.    Right.

20       Q.    Right.  So if Ms. Foytlin was arrested

21   at East and -- in that East and France area, then

22   this part of it would be not correct, agreed?

23       A.    Wouldn't be the proper address; no, sir.

24       Q.    Okay.  The next part says, protesters

25   assembled at provided parking areas in surrounding

1    parking lots.  Was that part true of the East and
2    France protests?
3          A.      I'm -- I'm not sure what -- right now I
4    can't recall East and France if there is a parking
5    lot there or not, but I'm -- I'm not sure of the
6    location.  I'm not sure if they have parking lots,
7    you know, at East and France wherever they -- they
8    were.
9          Q.    Okay.
10         A.    I'm not sure if -- if parking lots
11    exist.  Because it could have been in a parking lot
12    and not -- not 9000 Airline but it could have been
13    in another parking lot somewhere.  So I don't know.
14         Q.    Well, I guess that's my point is that
15    this -- this affidavit describes the protest at
16    9000 Airline Highway, provides specifics about that
17    protest, but that's not the protest Ms. Foytlin was
18    arrested at.  So at least parts of this are
19    inaccurate, agreed?
20         A.    Yes, sir.  Yes, sir.
21         Q.    Okay.  And then it provides a great deal
22    of specificity about Ms. Foytlin's alleged conduct.
23    It says, the defendant entered the roadway, was
24    provided another verbal order to exit the lanes of
25    traffic -- travel.  Moments later the defendant

 1    entered the roadway again and was taken into

 2    custody by officers on the scene.  Is -- is that

 3    what happened with Ms. Foytlin?

 4         A.    I wasn't -- I wasn't there, you know.  I

 5    wasn't there to witness it.

 6         Q.    Was -- when you had conversations with

 7    officers where they were describing conduct, is

 8    that the level of detail they would have given to

 9    you?

10         A.    Yes, I'm -- I'm sure they -- they would

11    because that's what happened.  That's why they

12    effected the arrest.

13         Q.    So you wouldn't have signed this if the

14    arresting officer hadn't gone into this level of

15    detail, the synopsis of probable cause?

16         A.    Personally, no; I would not.

17         Q.    So you're telling me -- you're swearing

18    under oath today that an officer came up to you and

19    said something to the effect of Ms. Foytlin placed

20    themselves in a roadway thus surrendering movement

21    there on more difficult actively attempts to

22    prevent their lawful arrest.  They -- they were

23    advised to stay out of the roadway and did not

24    impede the flow of travel.  Announcements were made

25    frequently.  During the protests the defendant

1 enters the roadway in spite of another verbal

2 order.  Moments later, et cetera, et cetera.

3    You're saying that an officer gave you

4 that level of detail about Ms. Foytlin?

5  A. Well, I -- I can't say it was as in

6 detail as you have just said.  But the overview

7 was, this is what they were out there to arrest

8 people for doing and she was arrested for that

9 based on the fact that -- that -- that he took her

10 into -- or they took them into custody and brought

11 them to the prisoner processing station.  That was

12 what they -- we were to enforce, they were to

13 enforce as a police department.

14  Q. Right.  These -- these affidavits were

15 written up in advance, correct?

16  A. Yes.

17  Q. Right.  And so it doesn't necessarily

18 describe the exact specifics of Ms. Foytlin's

19 arrest because this was just generally something

20 that was written in advance, correct?

21  A. Yes.

22  Q. Okay.

23   MR. SCOTT:

24   Written in advance.

25   MR. MOST:

1           I'm sorry, did you say something, Joe?

2           MR. SCOTT:

3           Yes, written in advance.

4           MR. MOST:

5           Okay.

6    BY MR. MOST:

7      Q.    So we've established that at least parts

8    of this document are not true with regard to

9    Ms. Foytlin's arrest, right?

10     A.    The address; yes.

11     Q.    Okay.  But you signed it under oath that

12    it was true, correct?

13     A.    Yes.

14     Q.    Okay.  When you signed this under oath

15    saying that it was true when parts of it may not

16    have been true, were you committing the crime of

17    perjury?

18     A.    No.

19     Q.    Okay.  Were you committing the crime of

20    manufacturing -- or the -- were you committing

21    manufacturing of false evidence?

22     A.    No, sir.

23     Q.    Were you committing false imprisonment?

24     A.    No, sir.

25     Q.    Okay.  This thing here where my cursor

```
 1   is says, protesters were advised by loudspeaker to
 2   remain on private property and on the curb, right?
 3       A.    Yes, sir.
 4       Q.    Okay.  So protesters who followed police
 5   orders and stood on private property or the curb,
 6   they should not have been among the ones arrested,
 7   correct?
 8       A.    They should not.
 9       Q.    And this document says that Ms. Foytlin
10   was not among that group, and, in fact, she refused
11   to comply with police orders, right?
12       A.    According to the document; yes, sir.
13            COURT REPORTER:
14            Say again, please.
15            THE WITNESS:
16            According to the document; yes, sir.
17   BY MR. MOST:
18       Q.    And you don't have any recollection of
19   whether that's true or not because you didn't
20   witness it but you -- it's your testimony that you
21   think an officer would have told you that but you
22   don't specifically recollect it, correct?
23       A.    That's correct.
24       Q.    Ms. Foytlin was arrested for RS 1497,
25   that's simple obstruction of a highway.  You see
```

1   that?

2        A.    Yes, sir.

3        Q.    In your 23 years as a police officer, do

4   you recall any other times aside from July, 2016,

5   that you arrested someone for a 1497?

6        A.    Me myself?

7        Q.    Uh-huh.

8        A.    Can't say that I haven't, but to just

9   recall one right off the top of my head.

10       Q.    So you can't recall any particular time

11  you arrested someone for a 1497 except for the

12  July, 2016 protest?

13       A.    Correct.

14       Q.    Some of the other protesters were

15  arrested for a similar statute, a 14:100.1, Which

16  is obstruction of a public passageway, are you

17  familiar with that statute?

18       A.    Familiar in what sense?

19       Q.    That's just do you know that that's a --

20  a statutory crime?

21       A.    Yes, sir.  Yes, I remember that.

22       Q.    And -- and can you recall in your 23

23  years as an officer any particular time you

24  arrested someone for a -- a 14:100.1?

25       A.    No, sir.

```
1        Q.    Okay.  And as a Baton Rouge Police
2   Officer, did you receive any training about --
3   about when it's appropriate or lawful to arrest a
4   protester?
5        A.    To arrest a protester or a?
6        Q.    Yes.
7        A.    Protesters?  Uh-uh.
8        Q.    (Nods head.)
9              Sir, are you still thinking or did you
10  answer?
11       A.    I answered.
12       Q.    Oh, I'm -- I'm sorry.  I didn't hear
13  you.  I thought you were still recollecting.  What
14  -- what was your answer?
15       A.    No.
16       Q.    No.  Okay.  Thank you.  I'm sorry.
17       A.    Maybe we lost contact or something.
18       Q.    Yeah.
19             MR. SCOTT:
20             It looked like you froze up again.
21             MR. MOST:
22             Yeah, I -- I thought it was just a long
23        thinking process.
24  BY MR. MOST:
25       Q.    Okay.  So -- so you don't recollect any
```

1   training specific to arresting protesters, right?

2        A.    No.

3        Q.    Okay.  Your training did involve

4   discussion of some cases, say Miranda, right?

5        A.    Yes.

6        Q.    Okay.  Do you recall if your training

7   ever addressed a case called, Cox v. Louisiana

8   C-O-X, about an arrest of a protester in Baton

9   Rouge, Louisiana?

10       A.    No.

11       Q.    Okay.  I'll represent to you it's a --

12  it's a U.S. Supreme Court case about where the U.S.

13  Supreme Court held that the arrest of a particular

14  Baton Rouge protester was a clear violation of his

15  Constitutional Rights.  Does that ring a bell in

16  terms of you receiving any training on that case or

17  that topic?

18       A.    No, it doesn't ring a bell.  Not to say

19  that I haven't, but it doesn't.

20       Q.    Yeah.  Now, you mentioned that you

21  notarized some affidavits of probable cause at

22  these protests, right?

23       A.    Yes, sir.

24       Q.    Okay.  Did you keep a -- a log of or

25  some sort of records of whose -- who you notarized

45

```
 1   aside from just signing the -- on the notary line?
 2        A.    No, sir.
 3        Q.    Okay.  And did you know by personal
 4   knowledge the identities of all the officers whose
 5   affidavits you signed?
 6        A.    I knew it when I, you know, looked down
 7   at it because those -- those people were working --
 8   if I notarized it, they were working in the P --
 9   prisoner processing area with them.
10        Q.    And so all those people you -- you knew
11   personally by name?
12        A.    Yes.  Yes.
13        Q.    Okay.
14        A.    The reason for the hesitation was as I
15   got further along in my career I would ride up on
16   people that I really didn't know and that wasn't --
17   you know them early on, everybody that worked at
18   the police department.
19        Q.    Sorry.  So later in your career there
20   were some people working at BRPD you didn't know?
21        A.    Didn't know their names.  I may have
22   seen their faces, but I just didn't -- I'd -- I'd
23   have to look at their shirt to really, you know.
24        Q.    You would have to look at their shirt.
25   What -- what do you mean?
```

1    A.    Because we wear our name on our suit, so

2    I'd -- I'd see the name and then it kind of come

3    back who I -- I -- they were in a training class

4    that I did.

5    Q.    Did you sometimes notarize affidavits of

6    probable cause for officers you didn't personally

7    know them by name?

8    A.    You work with -- not -- maybe not -- not

9    -- maybe not their first name or anything like

10   that.  Are you talking about over my career or

11   while we were out there?

12   Q.    I just mean in general in your career.

13   A.    I -- not -- they'd have supervisors so

14   it's not often that I have to, but they are times

15   when I -- I may be working and I -- I'm actually at

16   the district and I'm the only supervisor in there,

17   and, you know, the officers may say Serg, can you

18   sign my PC.  I would take that document, read it

19   and, you know, have them sign it and then notarize

20   it if it contains questions.

21   Q.    And -- and what would you do to

22   determine who that officer was to verify their

23   identity?

24   A.    What would I do to verify their

25   identity?

1        Q.    Well, like an officer you don't know

2   personally comes up to you and says, can you sign

3   my affidavit of probable cause?  You say, sure.  Do

4   you do anything to identify -- to identify them if

5   you don't know them personally or?

6        A.    Well, we just don't have a whole lot of

7   people walking around in a police department

8   uniform, you know, just shoving an affidavit in

9   your face, I -- I -- usually, as I said, their name

10  is on their shirt.  We're -- we're in a controlled

11  access building.  They're around other officers

12  who -- who -- who work with them, but just for me

13  identifying them, you know, there's conversations

14  that we may have while we're there, I just don't

15  take the paperwork, you know, I'm -- I'm not that

16  guy.  Hey, how you doing?  How was your day or

17  whatever.  We'll -- we'll have a -- a conversation,

18  you know.  I -- I'm saying that I don't know them

19  personally, meaning I -- I've seen them coming

20  through the district.  I've seen them in a roll

21  call if I did a roll call kind of.  But to just

22  personally know them, their mom, their dad, their

23  brother, their sister, their children's names, no,

24  I don't know that.  But I know that they are a

25  police officer with the Baton Rouge City Police

1    Department, commissioned officer.

2        Q.    Okay.  So you would be sure that anyone

3    you were notarizing was a Baton Rouge Police

4    Officer although you didn't, like, check their ID

5    to see if that's their name, right?

6        A.    Oh, no, I didn't check their ID.

7        Q.    Okay.  One of the problems we're having

8    here with this case is that there are affidavits of

9    probable cause signed with people's names signed to

10   it, but the officer whose name that is says, that's

11   not me.  That's not the case, as far as you know

12   with any of the affidavits you signed, but that

13   seems like a really big problem that someone was

14   signing an officer's name to affidavits of probable

15   cause; would you agree?

16       A.    If that happened, yes, that is an issue.

17       Q.    Did you -- and -- and you were a -- a

18   supervisor at the time, did you hear about anybody

19   complaining that their name was signed to -- to an

20   affidavit they didn't sign or hear about any sort

21   of investigation into that?

22       A.    No, sir.

23       Q.    Is that the kind of thing you would have

24   heard about if -- if it was going on, an

25   investigation to that effect?

1       A.      Maybe, maybe not.  I just -- as -- as,
2   you know, the latter years of my career I -- I was
3   concerned more so with -- with my job and the
4   people that worked for me.  I didn't stand around
5   the water cooler too much because I -- I had an
6   office that was off -- wasn't in a location of
7   access of other offices.  So maybe somebody at the
8   precinct would be able to tell you that better, but
9   where I worked I had six people working for me at
10  one time and that -- that's, you know, that's who I
11  dealt with, supervising those six people.
12      Q.      Yeah.
13      A.      I never -- I never heard anything like
14  that.  I never heard anything.
15      Q.      And you were never interviewed as part
16  of an investigation into someone forging signatures
17  or anything like that?
18      A.      No, sir.
19      Q.      But you would expect if -- if -- if
20  that's -- if some -- if an officer reported to his
21  superiors that someone's forging my name to
22  documents, that's the kind of thing you would
23  expect there to be an investigation of and the
24  department to take very seriously, agreed?
25      A.      If that were to be true, I'm sure they

```
 1    would take that very seriously.
 2         Q.    Okay.  Because that is a very serious
 3    matter for an officer to do that, correct?
 4         A.    Yes, sir.
 5         Q.    Okay.
 6              MR. MOST:
 7              Okay.  Jim, would you -- would you like
 8         to ask any questions of Mr. Williams?
 9              MR. CRAIG:
10              Yes.  If you're ready for me to, I'd be
11         happy to do that.  And thank you for making me
12         the host.  I appreciate it.
13    BY MR. CRAIG:
14         Q.    Good afternoon, Mr. Williams.
15         A.    Good afternoon.
16         Q.    My name is Jim Craig.  I'm one of the
17    attorneys for plaintiffs in three cases, the
18    Tennart versus City of Baton Rouge; Smith versus
19    City of Baton Rouge; and Batiste-Swilley versus
20    City of Baton Rouge which all involve the events of
21    July 9th and 10th of 2016.  And so that's the
22    connection with which I'm going to be asking you
23    questions today.
24              I'm going to show you some documents as
25    Mr. Most did, so I'm going to share my screen and
```

1    call up this -- this document is Exhibit V, as in

2    Victor, to -- in the overall numbering of exhibits.

3    And I'm going to pull it up to just to the -- so

4    you could see the full page.

5                    (Sharing document electronically.)

6    BY MR. CRAIG:

7        Q.    This is an affidavit of probable cause

8    for one of our clients, Sophie Kosofsky, who was

9    arrested on the 10th of July.  And do you see the

10   bottom -- I can blow -- let me blow it up again,

11   make it -- we'll make it wider.  And now I'm

12   scrolling down to the bottom of the page.

13                    Is that your signature there as the

14   notary on that document?

15       A.    Yes, sir.

16       Q.    Okay.  And then the affiant is listed as

17   D-E-T-W Williams, do you see that?

18       A.    Yes, sir.

19       Q.    Do you know -- I'm going to assume

20   that's detective, but maybe it's something else.

21   But a -- a W. Williams who worked at the Baton

22   Rouge Police Department when you did?

23       A.    Yes, sir.

24       Q.    And -- thank you.  So I'm sorry that --

25   that I'm a little bit confused by the -- the --

1    some of your answers to Mr. Most's questions.  That

2    Sunday when people like Ms. Kosofsky were being

3    arrested at the corner of East and France close to

4    downtown Baton Rouge, where physically would you

5    have been located when this affidavit was made?

6         A.    I -- it's -- it's -- there were two

7    places where during this time that prisoner

8    transport -- I mean prisoner processing was done.

9    One was at the location of 9000 Airline.  And the

10   other was on Government Street right where the

11   interstate passes over.

12            So it was either one of those two

13   location is where I was both days doing whatever it

14   was I was doing.

15        Q.    Okay.  And you notice here on the

16   synopsis of probable cause that the words, 9000

17   Airline Highway, have been struck out; do you see

18   that?

19        A.    Yes.

20        Q.    And I don't see, and I don't know if

21   this is large enough for you to be able to see what

22   location Ms. Kosofsky was purportedly had allegedly

23   violated Louisiana law.  I want to strike that

24   because I went meandering.

25            Am I right in saying that after striking

1    out the 9000 Airline Highway there is no

2    description here of a location where Ms. Kosofsky

3    was arrested?

4          A.    Right.

5          Q.    Okay.

6          A.    Other than headquarters, which is a

7    building, right, but it doesn't say like a

8    numerical address.

9          Q.    Well, let me -- let me share the screen

10   again because I don't -- I don't know that it even

11   does that, but I'm -- but -- but if it does -- oh,

12   yes, here -- well, let me see.  Yes, you're right.

13   I -- I -- I appreciate that.  Thank you.  Thank

14   you, sir.

15              What you're referring to is the language

16   that says, on the above listed date, numerous Baton

17   Rouge Police Department officers who were assigned

18   to provide security for peaceful protests at and in

19   the vicinity of Baton Rouge Police Department's

20   headquarters.

21         A.    Yes, that's -- that's what I see.

22         Q.    And that's -- and that's the language

23   you were referring to just now --

24         A.    Yes, sir, I was.

25         Q.    Okay.  Thank -- thank you.  I appreciate

1    that clarification.

2            I want to share my screen again and I'm

3    going to show you what has been marked as Exhibit G

4    as in giraffe.  And this is four pages.  I'm going

5    to scroll through them in a minute so you can see

6    what they are.

7            (Sharing document electronically.)

8    BY MR. CRAIG:

9        Q.    But it starts out as an Email from Chris

10   Johnson to Ira Roberts and Derrick Williams, do you

11   see that?

12       A.    Yes.

13       Q.    And do you see where it has -- it states

14   that it has two attachments, PC 71016 simple

15   obstruct, and PC 71016 simple obstruct; resisting?

16       A.    Uh-huh.

17       Q.    I'm sorry.  It's helpful if you say

18   "yes" or "no."

19       A.    I'm sorry.  Yes.  Yes.

20       Q.    Yeah.  Thank you.

21            Do you know who Chris Johnson is?

22       A.    Yes, he's a prior police officer.

23       Q.    Okay.  And he was a -- he was an officer

24   with the Baton Rouge Police Department in July of

25   2016?

1      A.    Yes.

2      Q.    And then Ira Roberts, you know that

3    individual?

4      A.    Yes, another prior -- another -- well,

5    he's a current police officer.

6      Q.    Okay.  With the -- and is he a police

7    officer with the Baton Rouge Police Department?

8      A.    Yes.

9      Q.    And was Mr. Roberts working with you in

10   prisoner processing on that weekend of July 9th and

11   10th?

12     A.    As best I recall; yes.

13     Q.    Okay.  That's fair.  What, if -- whether

14   you had been at headquarters or under the

15   interstate, what would that be, Interstate 110

16   overpass, right is -- is what you were describing?

17     A.    Yes, sir.

18     Q.    Whether you had been at headquarters or

19   under the Interstate 110 overpass, what device

20   would you have to receive an Email like this?

21     A.    Computer in my -- in my unit.  But out

22   there on the scene?  At headquarters, my office is

23   upstairs or -- or -- or was -- no, not there

24   because I wasn't in -- in robbery unit so.  But

25   there will be computer stations inside of

1    headquarters.  But other than that, we -- we were,

2    you know, our units, but I didn't have a printer in

3    my unit but I could receive Email on my laptop

4    computer.

5        Q.    Okay.  And would you agree with me that

6    the way an Email like this one is sent out

7    chronologically is from the most recent Email to

8    going backwards to the original Email.  You see

9    what I'm saying?

10       A.    Yeah.  Yes.

11       Q.    So -- so that the first Email in what

12   I'll call this "Email chain," is from Glenn Hucco

13   (assumed spelling) to three individuals at 10 in

14   the morning on the 10th of July?

15       A.    Yes.

16       Q.    And then that was forwarded by Chris

17   Johnson to Jimmy Nicholson at 6:29 p.m. on the

18   10th, do you see that?

19       A.    Uh-huh.

20       Q.    I'm sorry.  "Yes" or "no"?

21       A.    Yes, sir.  I'm sorry.  Yes.  Yes.

22       Q.    It's -- it's okay.  It's -- it's the way

23   we communicate.  We're just in an artificial

24   environment here.

25             And then the third, the second

1    forwarding was the one we've been talking about,

2    which included you as a recipient at, according to

3    this document, about 9:30 in the evening on the

4    10th.

5        A.    Yes.

6        Q.    Excellent.  Thank you.  So Jimmy

7    Nicholson who is in that middle description, do you

8    know who Jimmy Nicholson is?

9        A.    No.

10       Q.    Okay.  Fair.  So the attachments which

11   were also produced by the police department to us

12   to go with this -- that Email are this page, which

13   is affidavit of probable cause that only sets out

14   simple obstruction as a highway of commerce,

15   correct?

16       A.    Yes.

17       Q.    Thank you.  Sure.  And then this page,

18   which sets out, if you look at the charges section

19   in -- on the middle of the page, both simple

20   obstruction of a highway of commerce and resisting

21   an officer, do you see that?

22       A.    Yes.

23       Q.    And I don't know whether Mr. Scott has

24   any of these documents on the table in front of

25   you, if not --

1            MR. SCOTT:

2            I don't have Kosofsky, it just didn't

3       occur to me.

4            MR. CRAIG:

5            Sure.

6            MR. SCOTT:

7            I have the others.

8            MR. CRAIG:

9            Do you have the blank one, Mr. Scott, by

10      chance?

11           MR. SCOTT:

12           I do not, sir.

13           MR. CRAIG:

14           Okay.  That's -- that's perfectly fine.

15  BY MR. CRAIG:

16      Q.    And just to -- just to close out what

17  this document is, page 4 is just the last two lines

18  of that longer affidavit of probable cause.  So

19  Mr. Williams, do you remember receiving these blank

20  affidavits of probable cause with the synopsis of

21  probable cause pretyped?

22      A.    Not really.  The moment I received them,

23  no, I -- I -- don't, but that's what we use so at

24  some point I got it.

25      Q.    When you say, "I got it," you mean you

1    -- you -- you came to the realization that that's

2    what was being used?

3        A.    No.  No.  No.  What -- what I'm saying

4    is that's what we end up using out there and --

5        Q.    I see.  And can you please then describe

6    for me where would there be these affidavit forms

7    in the location where you were at where -- in

8    either of those two locations doing prisoner

9    processing or would the people transporting an

10   arrestee to you have those documents already?

11       A.    Those documents would -- as far as I can

12   recall --

13       Q.    Yes.

14       A.    -- would be at the prisoner processing

15   site.

16       Q.    Okay.

17       A.    Regardless of which one it was, somebody

18   had them, either in their cars or -- or, you know,

19   at -- on a desk at -- at -- at the -- at 9000

20   Airline, and One was a building.  The other one was

21   a makeshift so the dynamics were different between

22   the two.

23       Q.    Right.  Right.  Was there any kind of --

24   at that location under the Interstate 110 overpass,

25   was there any printer or any -- anything like that

1   that was printing forms like this or -- or were

2   they -- or do you recall whether they were just

3   already printed and -- and there for use?

4        A.    I can say this that I didn't -- I

5   didn't print.  I didn't print any because I didn't

6   have a printer in my car.  Some -- other officers

7   have printers in their cars and they could have

8   printed it out if they needed it.  But I didn't

9   have it.  So I would have to have gotten it, you

10  know, by a hard copy from somebody.

11       Q.    Thank you.  That was -- that was -- that

12  was my question exactly.

13             I believe you -- I'm going to -- I'm

14  going to pull up Exhibit V for victory again just

15  so we have it in front of us in case it's helpful.

16             (Sharing document electronically.)

17  BY MR. CRAIG:

18       Q.    But do you -- do you have any actual

19  memory of Detective Willie Williams bringing a -- a

20  white female to you to process with this affidavit

21  of probable cause?

22       A.    No, I don't.  To -- to say that I

23  remember him bringing her to me because -- him

24  bringing her to me wasn't -- probably wasn't part

25  of what we -- what we did.  He probably would have

```
 1    brought the paperwork to me, so I don't remember
 2    him bringing --
 3         Q.    Oh --
 4         A.    -- her --
 5         Q.    -- I see.  Oh, I see.  Can you then -- I
 6    misunderstood something about all this then.
 7              Can you describe just generally how the
 8    -- a prisoner processing operated, like, what did
 9    it look like, just the part that you were there
10    involved with?
11         A.    Sure.  How?
12              MR. SCOTT:
13              I'd ask you to distinguish between when
14         Mr. Williams -- Mr. Derrick Williams was acting
15         as an affiant as opposed to when he was acting
16         as a notary, because I think they are two
17         different things and they are both two didn't
18         processes.
19              MR. CRAIG:
20              Yes.  Thank you.  I withdraw the
21         question.  I'm going to state it more
22         specifically in accordance with counsel's
23         objection.
24    BY MR. CRAIG:
25         Q.    So Mr. Williams, my question is:  Can
```

1    you describe the process that you were part of as a

2    notary doing prisoner processing, whether it was in

3    the -- underneath the I-110 overpass or at the --

4    you said the academy or somewhere on the grounds of

5    the police department headquarters.  In other

6    words, what -- what did it look like, could you

7    just kind of describe how it operated?

8         A.    Our -- our -- my function or how the

9    whole process operated?

10        Q.    No, just your function, like if I was

11   sitting there next to you --

12        A.    Well, to start --

13        Q.    -- what would I -- what would I have

14   seen?  I think that's what you can testify to best.

15        A.    All right.  You -- you would have seen

16   officers coming from the -- the -- coming into

17   the -- because I -- I don't know where they're

18   coming from, so -- specifically.  So coming into

19   the prisoner processing area, whether it was under

20   the interstate, which we were just there under the

21   interstate with cars.  Our vehicles were parked.

22   The roadway was blocked.  They were diverging

23   traffic.  They had transportation vehicles to take

24   the prisoners from that location, the arrestees

25   from that location to parish prison for further

1    processing.

2              So what you would have saw with me was

3    an officer, we would see an officer bring up

4    somebody and they -- they would turn them over to

5    someone like Detective Williams.  Detective

6    Williams -- and that person would talk or do what

7    they do.  And then Detective Williams would bring

8    the paperwork to me and say, Serg., here -- here is

9    Ms. Jane Doe.  And from there I would have him

10   notarize that paperwork -- I mean sign -- sign that

11   affidavit as an affiant and then I would notarize

12   it.  Give him his paperwork back and he did what --

13   whatever the next step was.

14       Q.    I'm frozen so I'm going to wait a

15   second.

16             MR. SCOTT:

17             Okay.  We can see you moving, Jim.

18             MR. CRAIG:

19             Am I moving?  Okay.  Good.  Thank you.

20       Thank you, William.

21   BY MR. CRAIG:

22       Q.    I'm going to share the screen again.

23   This is Exhibit BBBBBB, which is six Bs as in baby.

24             (Sharing document electronically.)

25   BY MR. CRAIG:

1     Q.     And in the middle of this picture the

2    first officer who is escorting the young woman with

3    dark hair and some kind of -- I don't know if

4    that's a sweater or a scar or something around her

5    neck.  Do you see where I'm referring to?

6         A.     Yes, sir.

7         Q.     And is that Detective Willie Williams?

8         A.     No, sir.

9         Q.     Do you know who that is?

10        A.     That appears to be Jeff -- Lieutenant

11   Jeff Pittman.

12        Q.     Jeff Pittman.  Okay.  And then this

13   person behind the woman officer in the purple

14   shirt, do you recognize that person?

15        A.     Yes, I recognize her.

16        Q.     Who is she?

17        A.     I don't know her name.  I can't recall

18   her right now.

19        Q.     Okay.  If I -- if I suggested her name

20   might Ashley Mancuso, does that prompt your memory?

21        A.     Yes.

22        Q.     Okay.  Has there been any time, either

23   previous or since the protests in July, 2016, where

24   you were part of any prisoner processing in -- on a

25   large scale like was done during the Baton Rouge

1    protests?

2         A.    No, sir.

3         Q.    And then who did you report to during

4    the protests?  Did you have a -- a particular

5    superior officer during that time?

6         A.    As -- and -- and when you ask that

7    question, are you talking about specifically who

8    was in command of the scene there or are you asking

9    who did I work for particularly -- particularly in

10   my everyday job?

11        Q.    Actually neither.  Let me -- let me --

12   let me ask in a more specific way and -- and maybe

13   we'll do better.

14              Was there anyone in particular that you

15   reported to with respect to your duties in prisoner

16   processing during the July, 2016 protests?

17        A.    I -- I -- I don't recall who -- who was

18   a particular on scene commander for that -- for

19   that particular process.  I -- I don't -- no, I --

20   I can't recall.  Trust me I -- I -- I was a small

21   fish in the sea.  So there was somebody over me but

22   I just don't recall.

23        Q.    Yeah.  And we talked to many of those

24   people, sir, but, you know, we're going to have --

25   they -- because we're dealing with peoples'

1    individual schedules, you know, we're neither going

2    from the top down or from the bottom up.  We're --

3    we're kind of putting a puzzle together more or

4    less.  But, yeah, well -- okay.  Well, that's...

5            Do you recall any specific

6    communications about at the time of the July, 2016

7    protests, about the reasons for using preprinted

8    affidavits of probable cause?

9        A.    No, sir, I don't -- I don't recall.  The

10   reason for it, I don't know.

11       Q.    Yeah, I mean, you had offered, I -- I

12   think, something of a reason in your answers to

13   Mr. Most, but my -- my question was really specific

14   to were you -- do you recall being at a role call

15   or anybody else saying, hey, here are these

16   documents.  Here's what we're going -- here's why

17   we're using these?

18       A.    No.

19       Q.    Okay.  Because you would agree with me

20   that it's -- well, let me ask you this:  You -- you

21   had occasion prior to the protests in July of 2016

22   to notarize affidavits of probable cause, I assume?

23       A.    Yes, sir.

24       Q.    And do you remember occasions prior to

25   the July, 2016 protests, where the synopsis of

```
 1    probable cause was -- was filled out, you know, to

 2    the length of an entire paragraph the way it is in

 3    the ones that we've seen this afternoon?

 4         A.    No.  No, but -- no.  No, I --

 5         Q.    Thanks.

 6         A.    -- no.

 7         Q.    Okay.  Is the way ordinarily with an

 8    affidavit of probable cause, is it a form on --

 9    that -- that an officer can type up from the

10    computer unit in his or her vehicle or at

11    headquarters?  Or is it -- or have you seen them

12    completely handwritten or how -- how are they

13    usually created?

14         A.    Well -- well, that -- that has

15    modernized over time.

16         Q.    Yes, sir.

17         A.    Every report when I came on was

18    handwritten.

19         Q.    Yes, sir.

20         A.    Then the computer era came and that was

21    after -- now, you still have handwritten affidavits

22    in the precinct, but as a means of convenience,

23    every officer has a laptop.  So there are

24    documents, blank documents that just contain a

25    heading and the blanks that you fill in with your
```

1    name and your information.

2         The legal part of it that we were

3    talking about earlier at the top, that's on there,

4    but the events that took place, those are -- are

5    filled in by the officer.  But we still -- well not

6    me, let me say that, I don't want to put myself

7    back in that.

8    Q.    No.

9    A.    You'll have both, hard copies where

10   you -- you fill it out or -- and it looks just like

11   that but it's -- it's -- it's several copies.

12   Because, you know, with the computerized, you just

13   print it out however many times I need it.  So --

14   Q.    I see.

15   A.    But they have carbon paper on the ones

16   in the precinct so that you'll have just as many

17   copies as you need if you wanted to do it hard

18   copy.

19        I'm -- I'm old school.  I kind of do

20   both.  I was old school.  I kind of did both.  I

21   kind of have handwriting so I'll write them.

22   Q.    Great.  And -- and I -- I thank you for

23   that testimony.  I'm going to -- just to make sure

24   that it's clear when we're all looking at this

25   deposition a length of time after today, I've -- I

1    pulled up Exhibit G for giraffe again.

2              (Sharing document electronically.)

3    BY MR. CRAIG:

4        Q.    And if I'm understanding you correctly,

5    the language and the -- and the -- and the lines of

6    the blank affidavit of probable cause that would

7    usually be used would be similar to this but it

8    wouldn't have the charge typed up and it wouldn't

9    have the revised statute numbers typed up and it

10   wouldn't have the information that's the paragraph

11   under, in this document, the synopsis of probable

12   cause; am I understanding you correctly?

13       A.    Correct.

14       Q.    Great.

15             And again to make -- to be sure that --

16   that we're on the same page here, the -- the

17   protests in July, 2016, best as you can remember

18   today, was the first time that you saw affidavits

19   of probable cause being used that had the synopsis

20   of probable cause preprinted?

21       A.    Best -- yeah.  Best I can recall for me.

22       Q.    Yes, sir.  Absolutely, that's all I can

23   ask you.

24       A.    Yes, sir.

25       Q.    I appreciate that.

1           As our friend Mr. Adcock would say, bear
2    with me here for a second.  Okay.  All right.  Next
3    I want to turn to just a couple of videos that come
4    from the 9th of July.  And what I'm trying to do
5    here, Mr. Williams, is potentially identify
6    particular officers of the BRPD that are seen with
7    a couple of our clients.  So I'm -- I'm telling you
8    in advance that I'm not claiming that you were
9    physically present at any of the events depicted in
10   this video, it's just a matter of looking at the
11   picture themselves and saying, does this person at
12   all look familiar to you.
13              MR. SCOTT:
14              So --
15              MR. CRAIG:
16              Go ahead, Joe.
17              MR. SCOTT:
18              Okay.  So it's all right they've --
19         they've been showing these videos to every
20         officer they talked to and, thus far, they
21         haven't been able to identify --
22              MR. MOST:
23              I'm going to object to this.  If -- if
24         Mr. Craig would like to provide context for
25         these videos that's okay.  But Joe, I'm going

1          to have to object to you just explaining
2          something to your client.
3                     MR. SCOTT:
4                     Explain what?
5                     MR. MOST:
6                     You explain to him what other people
7          have testified to.  You're telling him what
8          other people have testified.  And I'm not
9          allowing that.
10                    MR. CRAIG:
11                    How about -- how about with -- with --
12         with permission, gentlemen, I will -- I will --
13         let me pick up because I do -- I do think --
14         up -- up to the point where you mention what
15         other people said, I think I -- I think I
16         understand what was happening, but -- and so I
17         appreciate that.
18    BY MR. CRAIG:
19         Q.    But -- but, Mr. Williams let me ask you
20    this first.  Did you -- are -- are -- do you have
21    some -- an objection, not a legal objection because
22    that's for your lawyer, but do you have a problem
23    with looking at these videos and potentially
24    telling us who folks are if you recognize them?
25         A.    If I recognize them -- if I recognize

1    them I don't have a problem.

2        Q.    Okay.  And I will just say and everyone

3    can object to me this time, but I will just say

4    that on some occasions people have been recognized

5    on other occasions they have not.  And it's not a

6    guessing game.  It's really a matter of trying to

7    figure out who was particularly involved in various

8    of these arrests.

9            So just as you did earlier with the

10   picture that was of Lieutenant Pittman, that's all

11   I'm going to be asking you to do, who I actually

12   erroneously thought was somebody else.  So that's

13   -- that's what we're doing.  And it won't take but

14   a couple minutes because there's only a couple of

15   these where you can see faces.

16           The first one is a video that Mindy

17   Stewart took on July 9th, 2016.  It is MES 7056

18   protest 070916-6.  And we sometimes refer to this

19   just as Stewart Video 6.  And so I'm going to put

20   it up and try to -- let -- let me see if I can

21   share the screen.  And I'm connected to it as well.

22           I'm not going to put -- there's no need

23   to have audio here because we're not going to be

24   able to -- we -- we can't take out -- pick up the

25   individual voices anyway.  So for ease of

1    reference, Mr. Williams, this is about a minute

2    long video.  I'm just going to scroll it forward to

3    the place where I'm -- where the folks are

4    involved.

5              (Sharing document electronically.)

6    BY MR. CRAIG:

7        Q.    So obviously here at time stamp 056.

8    I'm not asking you about these two folks with the

9    shields on, but this gentleman, Zachary Hill, is

10   one of our clients.  The -- the black man in the

11   white shirt and the jeans and the boots.  So you

12   see who I'm talking about there?

13       A.    Uh-huh.

14       Q.    Oh, I'm sorry "yes" or "no," please.

15       A.    Yes.  I'm sorry.  Yes.

16       Q.    No, you're doing fine.  It's okay.  Like

17   I said, I get it.  So here we are at a minute 02

18   with Mr. Hill.  And next to him is this gentleman

19   here in the sunglasses with no -- no indication of

20   rank, at least not on that shoulder.

21             Do you recognize that gentleman?

22       A.    No, sir.

23       Q.    Okay.  And then the other fellow who is

24   on the other side now of Mr. Hill is wearing a ball

25   cap and sunglasses.  And I'll just say he's a

1  little -- little thicker in the neck than the

2  other -- than the other gentleman.  And we all were

3  skinnier before, so I'm not -- I'm not disparaging

4  him.  But do you recognize this gentleman in the

5  ball cap and the sunglasses?

6      A.    No, I can't make him out.

7      Q.    Okay.  I want to hit play, it's only

8  going to be 11 seconds after this.  So if you'll

9  please just look with me.

10          Any luck with that, sir?

11     A.    No, I don't recognize either of those --

12  those men.

13     Q.    Okay.  I'm going to stop sharing.  Oh,

14  that was on.  This next -- this next one, it's

15  actually the last one I'm going to ask you about.

16  The last person I'm going to ask you about.  We may

17  look at a couple different angles of videos.  One

18  is -- excuse me for just one second.

19          Okay.  Good.  This video is -- is from

20  the Twitter account of Criminalist Brynstole;

21  B-R-Y-N-S-T-O-L-E, and it depicts the arrest of our

22  client, Leroy Tennart, Sr.  He's -- Mr. Tennart is

23  going to be wearing kind of a light gray and light

24  blue striped shirt.

25          I want to stop this and see if I can

```
 1    revert to where we can see it better.
 2            This is Mr. Tennart here on the ground.
 3    Do you recognize this man who's standing on top of
 4    him?  Not standing on top of him, but who is in the
 5    picture on top of him?
 6        A.    No --
 7            COURT REPORTER:
 8            Repeat that, please.  I didn't hear
 9        that.
10            THE WITNESS:
11            No, I can't.
12            COURT REPORTER:
13            Okay.
14    BY MR. CRAIG:
15        Q.    Yeah.
16        A.    I'm sorry.  My eyes and my ears ain't
17    working too good.
18        Q.    Yeah, let's just not even -- yeah.  The
19    next one I'm going to show is again from
20    Ms. Stewart with the BRPD.  It is MES 70567916,
21    parentheses 10.  So that is Steward Video No. 10.
22    So I'm going to stop here for a second.  This
23    collection of people -- this collection of police
24    officers, you see the man with the blue striped
25    shirt here on the ground?
```

1      A.    On ground.  Yes, sir.

2      Q.    Great.  Thank you.  So this -- do you

3 have any recognition of this gentleman?  He's got

4 some kind of stripes that's standing up here in the

5 back.

6      A.    No, I don't know.  I don't know who that

7 is.

8      Q.    Okay.  And I don't know if this

9 gentleman here whose back is to us is going to look

10 up.  But if you'll be watching him and then also

11 this -- it looks like a -- a black officer with

12 kind of some gray in the temples but not on the top

13 of his head -- which I'm also not disparaging for

14 reasons specific to me.  But those are the people

15 that I would like you to keep an eye on here in the

16 little bit that we have.

17      A.    Yes, sir.

18      Q.    Oh, man, he was so close.

19            This -- so we've got a couple little

20 clearer shots of this guy.  Any -- any easier to

21 identify him?

22      A.    No.

23      Q.    There we go.  At 009, that's about as

24 good a shot as we're going to have of him, I think.

25      A.    No.

1          Q.     Okay.  Your answer is no?

2          A.     No.  No.

3          Q.     Okay.  Thank you.  Yeah, I didn't want

4     to.

5          A.     Yeah.

6          Q.     Okay.  We'll try one more.  Okay.  And

7     they've already moved him off that was at -- that

8     was not an easy one.  I'm not even going to ask you

9     a question about that.

10              There's protest -- this is -- can you

11    see the video here?  I have it stopped but I just

12    want to make sure.

13         A.     Yes, sir.

14         Q.     I thought so.  Thank you.  And I'm going

15    to start advancing it so we get to the same scene.

16    And I -- I -- and I appreciate this is fuzzy, but

17    thank you for -- for hanging in there with me.

18    This -- this gentleman on the far right -- and this

19    is protest 7916 KDH parentheses one.  Any -- any

20    recognition of that person?

21         A.     No, sir.  No, sir.

22         Q.     Okay.

23              MR. CRAIG:

24              So that will conclude, Mr. Williams, my

25         questioning of you.  The way this works is,

1          depending on whether Mr. Scott or

2          Mr. Fahrenholt, whose name you see there and

3          who represents troopers of the State Police,

4          have any questions they're -- they are allowed

5          to ask questions, and Mr. Most is allowed to

6          follow-up on any questions that have been

7          asked, but that will be the end of my

8          questioning of you.  And thank you for your

9          time.

10              THE WITNESS:

11              Thank you.  I appreciate it.

12              MR. MOST:

13              Greg, would you like to ask any

14      questions?  I just have a few follow-ups.

15              MR. FAHRENHOLT:

16              I have no questions for this witness.

17      Thank you.

18              MR. MOST:

19              Thank you.

20  BY MR. MOST:

21      Q.    All right.  So, Mr. Williams, you

22  testified earlier that you didn't have any specific

23  recollection of a conversation regarding

24  Ms. Cherrie Foytlin with the officer who brought

25  Ms. Foytlin to you, right?  You think it would have

```
 1   happened but you don't have a specific recollection
 2   of it happening, correct?
 3        A.    Yes, that's what I said.
 4        Q.    Right.  So Mr. Craig actually showed a
 5   video of -- of someone bringing Ms. Foytlin to the
 6   processing area.  I'll pull this up again.  It's
 7   Exhibit BBBBBB, that's six Bs.
 8               (Sharing document electronically.)
 9   BY MR. MOST:
10        Q.    On the right-hand side of this, you see
11   Officer Mancuso?
12        A.    Uh-huh.
13        Q.    And the person here --
14        A.    Yes.  I'm sorry.
15        Q.    -- she has her hands on --
16        A.    Yes.
17        Q.    Yeah.  I'll represent to you the -- the
18   officer -- the person Ms. Mancuso has her arms on
19   is Cherrie Foytlin.  Do you see that?
20        A.    Yes.
21        Q.    Any reason to think that's not Cherrie
22   Foytlin?
23        A.    No, no reason not to.  If you say it's
24   her, that's her.
25        Q.    Right.  So you didn't have a specific
```

1  recollection of -- of talking to the officer who

2  brought Ms. Foytlin to you.  If the officer who

3  brought Ms. Foytlin to you specifically remembers

4  not having a conversation, like actually testified

5  that no such conversation occurred, I mean, would

6  you have any reason to disagree with that?

7      A.    If she doesn't have a recollection?

8  That's her recollection.  I -- I -- I can't think

9  for her or speak for her.  I -- I'm -- no.  I -- I

10  don't.

11     Q.    Right.  But if -- if you've testified

12  today I -- I don't recollect whether we had a

13  conversation or not and she -- and Ms. Mancuso

14  testifies we did not have a conversation, any

15  reason to think we shouldn't rely on Ms. Mancuso's

16  testimony?

17     A.    That what?

18     Q.    Any reason to think we -- any reason to

19  think we should not rely on Ms. Mancuso's

20  testimony?

21     A.    No, that's her -- that's her testimony.

22  That's what she recalled, what she believed.

23     Q.    Right.  And -- and it's quite

24  significant whether there was a conversation

25  between whoever witnessed the alleged crime and

1    whoever signed the affidavit of probable cause,

2    right?  If there was no communication of

3    information there, there's no way to rely on the

4    affidavit of probable cause, correct?

5         A.    If there was none, yes.

6         Q.    Okay.  So if -- if there was not any

7    conversation between the officer who witnessed the

8    events that are the alleged crime by Ms. Foytlin

9    and the officer who signed her affidavit of

10   probable cause, then nothing in the affidavit of

11   probable cause could be reliably accurate, correct?

12        A.    You're saying I don't remember that --

13   that -- that it's not reliable?

14        Q.    No.  I'm sorry.  I'll be clearer.

15             So the process in July, 2016 is that

16   there would be the officer, in many cases the

17   officer who witnessed the alleged crime, and the

18   officer who signed the affidavit of probable cause,

19   those are different people, right; in many cases?

20        A.    Yes, sir.

21        Q.    And if there wasn't communication

22   between those two officers, then nothing in the

23   affidavit of probable cause of that arrestee would

24   be reliably accurate, agreed?

25        A.    Not true.

1      Q.    In what way?

2      A.    Not true because if you have both

3  parties, if you have both parties, you can go to,

4  in this case, her and say, what happened?  She can

5  truthful testify to what she did.

6      Q.    You mean the arrestee?

7      A.    No, the arresting officer.

8      Q.    Oh, okay.  Right.  Right.  And exactly

9  right, so but in --

10     A.    You can come to me and say when I picked

11 up, what happened.

12     Q.    Right.

13     A.    And I can say, this is what I did from

14 that point on.

15     Q.    Right.  But let's say for a specific

16 arrestee, no such conversation occurred.  The

17 arrestee was just dropped off.  No conversation.

18 And then the affiant signed the affidavit of

19 probable cause.  In that circumstance, nothing in

20 that affidavit of probable cause could be reliably

21 accurate, correct?

22     A.    I -- I -- I don't think it -- I don't --

23 I don't -- I don't know how to answer that question

24 because -- because you still have the person who

25 made the arrest that you can talk to and ask, Is

1    this what happened and they not say that's what I

2    witnessed.

3         Q.    I -- I think that's exactly right, they

4    could.  But let's say no such conversation occurs,

5    then nothing in the affidavit of probable cause

6    would be reliable, correct?

7              MR. SCOTT:

8              I'll object to the form, but if you can

9         answer it, give it a try.

10             THE WITNESS:

11             All right.  Ask your question another

12        time and I'll answer it.

13   BY MR. MOST:

14        Q.    Sure.  You're saying if there's one

15   arresting officer --

16        A.    No, sir.  I'm sorry.  Can you ask your

17   question?  Not what I said.  Your question.

18        Q.    Sure.  If no such conversation occurred

19   between the arresting officer and the affiant on

20   the affidavit of probable cause, there's no

21   communication between those officers, then nothing

22   in that affidavit of probable cause could be

23   reliably accurate; would you agree?

24        A.    No, I don't.

25        Q.    Okay.  If there was no conversation

1    between those officers, on what basis could the

2    affiant swear as to the contents of the affidavit

3    of probable cause?

4        A.    On what basis can he swear to it?

5        Q.    (Nods head.)  Like if he didn't witness

6    it and he didn't talk to the arresting officer, on

7    what basis could he swear to the -- the truth of

8    the contents of the affidavit?

9        A.    Can he testify to the truthfulness of

10   the affidavit?  If he didn't witness it and -- and

11   there was no conversation, he can't testify to it.

12   He can't.  But I'm saying that the -- if you know

13   who brought the person there, they can.  That's

14   what I -- that's what I'm saying.

15            But I'm saying that -- that those

16   relevant facts in there could have actually taken

17   place, you just got to ask the right person who

18   knows that they took place.  And in this case, you

19   have that person.

20       Q.    Right.  Okay.  I think we're on the same

21   page there.  Moving on.  I -- I believe you told

22   Mr. -- Mr. Craig that you had not seen another

23   example where BRPD used preprinted affidavits of

24   probable cause with this much information filled

25   out in advance; is that right?

1          A.    I can't recall ever using one like that.

2          Q.    Yeah.  Have you ever worked -- worked

3    anything related to, like, an LSU game, like

4    assigned to work crowd control or anything -- okay.

5          A.    That's not my -- I usually worked

6    traffic when I worked it and that was early in my

7    career, I was a motorman then and we were

8    responsible for traffic.

9          Q.    Okay.  Sometimes LSU games may be, if

10   there's a win or loss, sometimes the crowd

11   afterwards can get rowdy sometimes, right?

12         A.    Uh-huh.  Yes.  I'm sorry.  Yes.

13         Q.    Okay.  And -- and sometimes there's even

14   acts of violence or criminal acts, you know, crowd

15   after an LSU game, right?

16         A.    Yes.

17         Q.    But you've never seen BRPD, like, write

18   out in advance before an LSU game what crimes they

19   anticipated having and having preprinted affidavits

20   of probable cause for those crimes, right?

21         A.    I can't say that they don't exist, but I

22   have never seen one.

23         Q.    Okay.

24               MR. MOST:

25               All right.  That closes out my

1        questioning unless -- unless Joe has some

2        questions that requires follow-up.

3               But Joe, do you have any questions for

4        the deponent?

5               MR. SCOTT:

6               Sure, why not.

7    BY MR. SCOTT:

8        Q.    When doing -- when we're doing prison

9    processing for these July, 2016 protests, is the

10   affidavit of probable cause the only document

11   that's required for processing?

12       A.    No, there are -- there are other

13   documents that go into the process -- process.

14       Q.    And if there's a prisoner information

15   form, does that have a more common name?

16       A.    Rap sheet.

17       Q.    Rap sheet.  Does the rap sheet include

18   the location of the offense?

19       A.    Yes.  Should, yes.

20       Q.    Now, have you ever prepared affidavits

21   in support of an arrest warrant or a search

22   warrant?

23       A.    Yes.

24       Q.    Have you ever found a defect in one of

25   those affidavits?

```
1        A.    Yes, I have.
2        Q.    Do you have the ability to correct it?
3        A.    Yes.  Yes, I've done it before.
4        Q.    Mr. Most was asking you about any
5   investigation into signing affidavits of probable
6   cause by the wrong officers or possibly officers
7   signing each other's names; do you recall that line
8   of questioning?
9        A.    Yes, I do.
10       Q.    Were you ever in internal affairs?
11       A.    No.
12       Q.    What would be the outfit to investigate
13  such allegations?
14       A.    Internal affairs.
15       Q.    Does internal affairs make a habit of
16  putting its business out on the street for all the
17  officers --
18       A.    That would be counter productive to
19  their mission.
20             MR. SCOTT:
21             That would be all of my questions.
22             MR. MOST:
23             Okay.  Just a single follow-up.
24  BY MR. MOST:
25       Q.    Mr. Williams, you mentioned you have the
```

1    ability to correct affidavits after the fact; did I

2    understand that correctly?

3        A.    After what fact?

4        Q.    You mentioned it's -- it's possible to

5    correct an error in an affidavit after it's been

6    signed some how?

7        A.    Can I give you an example?

8        Q.    Sure.

9        A.    I complete an -- a -- a search warrant

10   for a particular structure and I type B and I'm --

11   I'm there -- we're -- we're moving right now

12   they're waiting on me, and I go to the judge and I

13   didn't realize that it's a C and I say, Your Honor,

14   I apologize, that should be C.  I have sat right

15   there, lined it out, put the C, put my initials and

16   the judge initials on the side of the page right

17   next to that line and that one has been signed.

18       Q.    Okay.

19       A.    And we do that word.

20       Q.    So then looking at the affidavit of

21   probable cause for Cherrie Foytlin, do you see

22   anywhere on here any correction of any -- any part

23   of this?

24       A.    No.  No.

25       Q.    Okay.  Do you recall correcting any

```
 1    other protester affidavit that you may have signed
 2    in the July, 2016 protests?
 3         A.    You're talking about from six years ago?
 4    Five years ago?  No.
 5         Q.    Okay.
 6         A.    No idea.
 7         Q.    Okay.
 8              MR. MOST:
 9              Anybody else have any follow-ups or
10         should we let Mr. Williams go on with his day?
11              MR. CRAIG:
12              No, I'm afraid I have just a very simple
13         follow-up too.
14              MR. SCOTT:
15              Should have known better.
16              THE WITNESS:
17              We were doing good.
18              MR. CRAIG:
19              Well, it's just the way it goes
20         sometimes.
21    BY MR. CRAIG:
22         Q.    I do -- I'm going to share my screen
23    again.  And this is going to be --
24              MR. CRAIG:
25              William, can you reopen my ability to do
```

```
 1        that?
 2                MR. MOST:
 3                (Complies with request.)
 4                MR. CRAIG:
 5                Great.  Thank you.
 6    BY MR. CRAIG:
 7        Q.    And I'm showing you this document, it's
 8    two pages.  The second page is that same affidavit
 9    of probable cause for Ms. Kosofsky we saw before,
10    but then the first page is this document that says:
11    Arrestee information form.  Can you see that or do
12    you want me to --
13        A.    Sure.  I can -- I can see it.
14        Q.    When you were talking about -- I can't
15    remember if you were talking about booking form or
16    rap sheet, but is this the document that you were
17    referring to in answer to Mr. Scott's questions --
18        A.    Yes.
19        Q.    -- about paperwork?
20                This is what is called a "rap sheet" by
21    the police department?
22        A.    Yes.
23        Q.    Okay.  And then I think you testified
24    that the rap sheet has a place -- has a -- a -- an
25    entry on it for the location of the offense or the
```

1  arrest, correct?

2       A.    Yes, sir.

3             COURT REPORTER:

4             I'm sorry, repeat the last part of your

5       answer, please, sir.

6             THE WITNESS:

7             Yes, sir, about midways down.

8             COURT REPORTER:

9             Thank you.

10 BY MR. CRAIG:

11      Q.    Great.  And on -- on the rap sheet for

12 Ms. Kosofsky -- Ms. Kosofsky, I'm sorry, the place

13 is not filled out, do you see that?

14      A.    Yes, sir.

15      Q.    And the officer's name on the rap sheet

16 is Mancuso, do you see that?

17      A.    Yes, sir.

18      Q.    But then, again, the affidavit, turning

19 to page 2 of this same document is, under the

20 affiant's name it has D-E-T-W, Williams, correct?

21      A.    Yes, sir.

22      Q.    So on just looking at -- at what these

23 two pages indicate, there's really nothing on here

24 that gives the correct location where Ms. Kosofsky

25 was arrested, if, in fact, she was arrested at the

1    corner of East and France.  Do you agree with me?

2        A.    Well, technically, yes.  If you move up

3    to -- can I read it?

4        Q.    Oh, yeah, please do.

5        A.    Your client stated to the court on this

6    and it gives the date, defendant did knowingly and

7    feloniously violate -- it gives the statute -- and

8    placed themselves in a roadway thus rendering

9    movement more difficult, resisting an officer.

10   Defendant's activity attempted to prevent this

11   lawful arrest for being made under arrest.  This

12   occurred within the City of Baton Rouge in the

13   Parish of East Baton Rouge.  So kind of broad but

14   it gives a location.  It ain't Texas.

15       Q.    Okay.  I see.  So that the only -- then

16   I'll ask it to you this way.  The only indication

17   of a location for this on either the rap sheet or

18   the affidavit of probable cause for Ms. Kosofsky is

19   somewhere within the City of Baton Rouge?

20       A.    Within the jurisdiction of Baton Rouge

21   City Police.

22       Q.    Okay.

23           MR. CRAIG:

24           Okay.  That's all I have.  Thank you

25       again for your time.

```
 1              THE WITNESS:
 2              Thank you, Mr. Jim.
 3              MR. MOST:
 4              Unless anybody has anything else I'll
 5      stop the recording.
 6              COURT REPORTER:
 7              I have one question.  Mr. Scott, are any
 8      of the clients going to read and sign or waive?
 9              MR. SCOTT:
10              We'll -- we -- we've been doing reading
11      and signing with all of them, so send me a
12      copy.  I'll get that to Mr. Williams and we'll
13      get that squared away.
14              COURT REPORTER:
15              Thank you.
16              MR. MOST:
17              Thank you everybody for your time.
18              THE WITNESS:
19              Can you pull your microphone down, I
20      can't hear you.
21              MR. MOST:
22              I -- I was just was saying thank you
23      everybody for our time.  We'll be in touch.
24              [Deposition concluded 3:34 p.m.]
25
```

1          R E P O R T E R ' S   P A G E

2              I, BRENDA R. BREAUX, Certified Court

3     Reporter, Registered Professional Reporter in and

4     for the State of Louisiana, the officer, as defined

5     in Rule 28 of the Federal Rules of Civil Procedure

6     and/or Article 1434 (B) of the Louisiana Code of

7     Civil Procedure, before whom this proceeding was

8     taken, do hereby state on the record:

9              That due to the interaction in the

10    spontaneous discourse of this proceeding, dashes

11    (--) have been used to indicate pauses, changes in

12    thought, and/or talkovers; that same is the proper

13    method for a Court Reporter's transcription of

14    proceeding, and that the dashes (--) do not

15    indicate that words or phrases have been left out

16    of this transcript;

17             That any words and/or names which could

18    not be verified through reference material have

19    been denoted with the phrase "(spelled

20    phonetically)."

21

22

23                        BRENDA R. BREAUX
                          Certified Court Reporter
24                        Registered Professional Reporter

25

```
 1              CHANGES AND SIGNATURE
 2   WITNESS NAME:  DERRICK WILLIAMS
     DATE OF DEPOSITION: AUGUST 11, 2021
 3
     PAGE     LINE          CHANGE          REASON
 4
     ------------------------------------------------
 5
     ------------------------------------------------
 6
     ------------------------------------------------
 7
     ------------------------------------------------
 8
     ------------------------------------------------
 9
     ------------------------------------------------
10
     ------------------------------------------------
11
     ------------------------------------------------
12
     ------------------------------------------------
13
     ------------------------------------------------
14
     ------------------------------------------------
15
     ------------------------------------------------
16
     ------------------------------------------------
17
     ------------------------------------------------
18
     ------------------------------------------------
19
     ------------------------------------------------
20
     ------------------------------------------------
21
     ------------------------------------------------
22
     ------------------------------------------------
23
     ------------------------------------------------
24
     ------------------------------------------------
25
```

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

96

1                    WITNESS' CERTIFICATE

2

3          I, DERRICK WILLIAMS, have read or have had

4     the foregoing testimony read to me and hereby

5     certify that it is a true and correct transcription

6     of my testimony with the exception of any attached

7     corrections or changes.

8

9

10

11

12

13                    _____

14                         DERRICK WILLIAMS

15     PLEASE INDICATE

16     [   ]      NO CORRECTIONS

17     [   ]      CORRECTIONS; ERRATA SHEET(S) ENCLOSED

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E
 2              This certificate is valid only for a
    transcript accompanied by my original signature and
 3  original required seal on this page.
 4              I, BRENDA R. BREAUX, Certified Court
    Reporter, Registered Professional Reporter in and
 5  for the State of Louisiana, as the officer before
    whom this testimony was taken, do hereby certify
 6  that DERRICK WILIAMS, after having been duly sworn
    by me upon authority of R.S. 37:2554, did testify
 7  as hereinbefore set forth in the foregoing 93
    pages; that this testimony was reported by me in
 8  the stenotype reporting method, was prepared and
    transcribed by me or under my personal direction
 9  and supervision, and is a true and correct
    transcript to the best of my ability and
10  understanding; that the transcript has been
    prepared in compliance with transcript format
11  guidelines required by statute or by rules of the
    board, and that I am informed about the complete
12  arrangement, financial or otherwise, with the
    person or entity making arrangements for deposition
13  services; that I have acted in compliance with the
    prohibition on contractual relationships, as
14  defined by Louisiana Code of Civil Procedure
    Article 1434 and in rules and advisory opinions of
15  the board; that I have no actual knowledge of any
    prohibited employment or contractual relationship,
16  direct or indirect, between a court reporting firm
    and any party litigant in this matter nor is there
17  any such relationship between myself and a party
    litigant in this matter. I am not related to
18  counsel or to the parties herein, nor am I
    otherwise interested in the outcome of this matter.
19
20
21                   BRENDA R. BREAUX
                     CERTIFIED COURT REPORTER
22                   LOUISIANA CERTIFICATE NO. 22036
                     REGISTERED PROFESSIONAL REPORTER
23
24
25
```