UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


BLAIR IMANI, et al

      Plaintiffs

V.                          Docket No. 17-cv-00439-JWD-EWD

CITY OF BATON ROUGE, et al

      Defendants


      DEPOSITION OF SERGEANT JASON DOHM,
given via Zoom Videoconferencing in the
above-entitled cause, pursuant to the following
stipulation, before Raynel E. Schule, Certified
Shorthand Reporter in and for the State of
Louisiana, commencing at 9:35 o'clock a.m., on
Tuesday, the 29th day of June, 2021.

2

```
 1                     EXAMINATION INDEX

 2                                        Page

 3   Caption                              1
     Appearances                          3
 4   Agreement of Counsel                 4
     Examination
 5        MR. ADCOCK                       7
          MR. CRAIG                       65
 6   Reporter's Certificate              88

 7

 8                       EXHIBIT INDEX

 9   EXHIBIT WWWW                    20
     EXHIBIT HHHH                    26
     EXHIBIT XXXX                    36
10   EXHIBIT C                  42
     EXHIBIT ZZZZZZ (EXHIBIT 1)     75
11   EXHIBIT AAAAAAA (EXHIBIT 2)    79

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1    APPEARANCES (Via Videoconferencing):
2
     For the Plaintiffs (Imani v. City of Baton
3        Rouge):
4    LAW OFFICES OF WILLIAM MOST
     Attorneys at Law
5    BY:  DAVID LANSER, ESQ.
     201 St. Charles Avenue, Suite 114#101
6    New Orleans, Louisiana    70170
     Email:  david.lanser@gmail.com
7
     And
8
     JOHN ADCOCK, ESQ.
9    Attorney at Law
     P.O. Box 750621
10   New Orleans, Louisiana    70175
     Email: jnadcock@gmail.com
11
12   For the Plaintiffs (Smith v. City of Baton
             Rouge, Batiste-Swilley v. City of Baton
13           Rouge, and Tennart v. City of Baton
             Rouge):
14
     RODERICK AND SOLANGE MacARTHUR JUSTICE CENTER
15   Attorneys at Law
     BY:  JIM CRAIG, ESQ.
16        HANNAH LOMERS-JOHNSON, ESQ.
     4400 S. Carrollton Avenue
17   New Orleans, Louisiana    70119
     Email: Jim.craig@macarthurjustice.org
18
19   For City/Parish of Baton Rouge and Baton Rouge
             City Police Department Officers:
20
     OFFICE OF THE EAST BATON ROUGE PARISH ATTORNEY
21   Attorneys at Law
     BY:  JOSEPH SCOTT, ESQ.
22   222 St. Louis Street, 9th Floor
     Baton Rouge, Louisiana    70802
23   Email:joseph@josephscott.com
24
25
```

1    APPEARANCES (Continued):

2

     For Louisiana State Police and Individual State
3         Police Troopers:

4    MESSRS. BURGLASS & TANKERSLEY
     Attorneys at Law
5    BY:  GREGORY FAHRENHOLT, ESQ.
     5213 Airline Drive
6    Metairie, Louisiana    70001-5602
     Email:  gfahrenholt@burglass.com

7

8    Also Present:  Sara Tobin

9

     Reported By:  Raynel E. Schule
10                 Certified Shorthand Reporter
                   State of Louisiana

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                S T I P U L A T I O N

2              It is stipulated and agreed by and

3     among Counsel for the parties hereto that the

4     deposition of SERGEANT JASON DOHM is hereby

5     being taken pursuant to the Federal Rules of

6     Civil Procedure for all purposes in accordance

7     with law;

8              That the formalities of reading and

9     signing are specifically waived;

10             That the formalities of sealing,

11    certification, and filing are hereby

12    specifically waived.

13             That all objections, save those as to

14    the form of the question and responsiveness of

15    the answer, are hereby reserved until such time

16    as this deposition or any part thereof is used

17    or sought to be used in evidence.

18                      *  *  *  *  *

19             Raynel E. Schule, Certified

20    Shorthand Reporter in and for the State of

21    Louisiana, officiated in administering the oath

22    to the witness.

23

24

25
```

```
 1                    PROCEEDINGS
 2              THE COURT REPORTER:
 3              Will counsel please identify
 4         themselves and their affiliations
 5         and also stipulate that by agreement
 6         of all parties this deposition is
 7         being held via videoconferencing,
 8         and there is no objection to the
 9         witness being sworn in remotely.
10              MR. ADCOCK:
11              This is John Adcock on behalf of
12         the Plaintiffs, and I agree to that
13         stipulation.
14              MR. CRAIG:
15              This is Jim Craig on behalf of
16         the Plaintiffs in the Tennart,
17         Smith, Batiste-Swilley cases, and we
18         also agree.
19              MR. SCOTT:
20              This is Scott, Baton Rouge Parish
21         Attorneys' Office, and we will
22         accept the stipulations for purposes
23         of this deposition.
24              MR. FAHRENHOLT:
25              This is Greg Fahrenholt, counsel
```

```
 1               for Louisiana State Police,
 2               Defendants in five lawsuits.  We
 3               also agree to the stipulation.
 4          SERGEANT JASON DOHM, having been first
 5      duly sworn by the Court Reporter, was
 6      examined and testified on his oath as
 7      follows:
 8                      EXAMINATION
 9   BY MR. ADCOCK:
10   Q.   Good morning, Joseph and Mr. Dohm.  Can you
11        see me okay?
12   A.   Yes, sir.
13   Q.   Okay.  The mirror of my image back to me is
14        not exactly clear.  So if you can see,
15        that's kind of all that matters.  Okay.  So
16        Joseph and Mr. Dohm, you saw that I'm --
17        we're recording this deposition, correct?
18               MR. SCOTT:
19               Yep.
20               MR. ADCOCK:
21               Okay, and that's okay with you?
22               MR. SCOTT:
23               Fine with us.
24   BY MR. ADCOCK:
25   Q.   All right.  So Mr. Dohm, you can call me
```

```
 1        John.  What would you like me to call you
 2        in this deposition?
 3   A.   You can call me Jason.  I'm fine with that.
 4   Q.   Good.  So Jason, we'll be -- we won't be
 5        here very long today.  So I'm just going to
 6        kind of run through some basic stuff about
 7        the rules of a deposition, and I'll ask you
 8        some preliminary questions, and then we'll
 9        show you some videos and ask you some
10        questions about it, okay?  That's where we
11        are.
12   A.   Yes, sir.
13   Q.   All right.  Have you ever given a
14        deposition before?
15   A.   Yes, sir.
16   Q.   About how many do you think you've done
17        approximately?
18   A.   I'd say maybe approximately anywhere two to
19        five, six, somewhere around there.
20   Q.   Okay.  So you're basically familiar with
21        the rules, huh?
22   A.   Yes, sir.
23   Q.   Just give me a quick review of what kind of
24        cases you were deposed in.  Were these car
25        accidents?  Were these arson?  What are we
```

```
 1          talking about here?
 2     A.    I -- I think they might have been civil
 3          cases.  It has been years, but I remember
 4          being with the Parish Attorney when doing
 5          it.
 6     Q.   Okay, and do you remember what kind of
 7          cases they were?
 8     A.   No, sir, not off the top of my head.
 9     Q.   Okay.  So well let me just run over the
10          rules here basically.  You understand that
11          a court reporter is writing down everything
12          you say and I say and Mr. Scott says,
13          right?
14     A.    Correct.
15     Q.   And you understand that you're under oath
16          for this deposition, correct?
17     A.    That is correct.
18     Q.   And do you understand that a Judge may --
19          may later look at this transcripts of this
20          deposition that the court reporter makes
21          and -- and rely on that to rule -- make
22          rulings in this case, correct?
23     A.    Correct.
24     Q.   You understand that jurors may also later
25          look at this transcript, right?
```

```
 1   A.    Correct.
 2   Q.    Okay, and usually or hopefully these things
 3         become, like, a back-and-forth, like, a
 4         conversation, really informal.  That's what
 5         I would like to do, Jason, but in -- in
 6         doing that, it's important that I not talk
 7         over you and you not talk over me, because
 8         if we do, the court reporter gets very
 9         frustrated, because it's difficult for her
10         to transcribe the deposition if people are
11         talking at the same time, okay?
12   A.    Yes, sir.
13   Q.    Yeah, and then whenever you want to give,
14         like, a basic affirmative answer or
15         negative answer, you have to say yes or no,
16         rather than nodding your head.  You
17         understand that, right?
18   A.    Yes, sir.
19   Q.    A lot of people have problems with that.
20         It's natural.  And if you don't understand
21         anything I'm saying, please tell me so, and
22         I will be happy to repeat it slower or
23         louder, whatever you say.  You -- however
24         you say.  You understand that?
25   A.    Yes, sir.
```

```
1    Q.    And then if you don't ask me to repeat it
2          or say you can't understand it, I'm going
3          to assume that you did understand it
4          clearly, okay?
5    A.    Yes, sir.
6    Q.    And if you need to take a break at any time
7          for whatever reason, just let me know, and
8          we'll take a break, okay?
9    A.    Yes, sir.
10   Q.    You can just tell me or you can tell Mr.
11         Scott.  That's not a big deal.  And is
12         there anything that's preventing you from
13         giving me -- excuse me.  Let me restart
14         that.  Is anything preventing you from
15         giving me your full attention today?
16   A.    No, sir.
17   Q.    All right, and are you under kind of any
18         medications or suffering from any illness
19         that will prevent you from understanding
20         the questions I'm asking you today?
21   A.    No, sir.
22   Q.    Okay.  Thanks, Jason.  Now, give me a kind
23         of overview of your professional
24         background, including your educational
25         background, just an overview.
```

```
 1  A.   You have to repeat that.  You had a lot of
 2       static.
 3  Q.   Thanks for telling me.  Can you just give
 4       me an overview of your professional history
 5       including your educational history.
 6  A.   Yes, sir.
 7  Q.   Okay.
 8  A.   Completed high school, graduated with a
 9       diploma, completed political science,
10       pre-law degree from the University of New
11       Orleans.
12  Q.   Okay.
13  A.   My employment as far as Baton Rouge Police
14       goes, I've been employed here since April
15       of 2004.
16  Q.   Okay, and when did you graduate college?
17  A.   I graduated college in 2003.
18  Q.   Okay, and so you've been with BRPD since
19       '04?
20  A.   Yes, sir, April of 2004.
21  Q.   Okay, and I don't need to get into real big
22       detail here, but tell me, like, what you've
23       been assigned to, what you've been doing
24       with BRPD, what your rank is, what your
25       experience is.
```

1    A.    Okay.  From April -- well, like, when

2          you're hired, you go through the academy.

3          After that, you're released or into Uniform

4          Patrol.  I remained in Uniform Patrol until

5          sometime in 2007, can't remember the exact

6          month or date.  In 2007, I was then

7          transferred or selected to go to the -- at

8          the time, it was called the Cat Team,

9          C-a-t, Crime Abatement Team, which is very

10         similar to a street crimes unit or what

11         Baton Rouge has seen before, Brave Unit.  I

12         remained there until the end -- the latter

13         part of 2009, and from 2009, I want to say

14         it was November, December, it was the

15         latter part, from that time until present,

16         I am assigned to Narcotics Division, and up

17         until I guess on the -- this month, I was

18         actually promoted to sergeant.  Prior to

19         that, I was an officer and then a corporal,

20         which is based on time in the department.

21    Q.   Okay, and as a sergeant, what are your

22         duties as a sergeant generally?

23    A.   You have to -- as a sergeant, I'm still

24         currently working cases myself; however,

25         I'm also -- I have a couple of guys

```
 1        underneath me, and my job is to assist
 2        them, approve reports.  We have a new time
 3        system, so those kind of things, paperwork,
 4        management, different things like that.
 5    Q.  And when you say you have a couple of guys
 6        under you, you mean you're supervising them
 7        basically, right?
 8    A.   Yes, sir.
 9    Q.   What -- what are -- what are they doing?
10        Are they doing narcotics?  Are they doing
11        -- like, what -- what are they doing
12        exactly?
13    A.   So I'm actually assigned to a HIDTA Task
14        Force.  I work major investigations, which
15        is long -term, which usually ends up being
16        long term and/or it turns into a federal
17        wire tap.  The guys that I'm currently
18        supervising right now actually work
19        Interdiction, which means they work
20        Interstate, the Interstate.
21    Q.   And Interdiction, I think we went over this
22        with one of your colleagues is basically
23        preventing, kind of, narcotics from coming
24        into Baton Rouge, kind of interrupting
25        those supply chains.  Is that correct?
```

1   A.   That's correct.

2   Q.   All right, and you often -- did you say

3        that was part of -- what did you call it?

4        It starts with a H?

5   A.   HIDTA Task Force.

6   Q.   Yeah, and just tell me what that is.  I

7        think I know, but just tell us for the

8        record.

9   A.   HIDTA -- HIDTA is a -- it's -- it's a HIDTA

10       DEA Task Force.  So it's run out of the

11       Drug Enforcement Administration here in

12       Baton Rouge, and then the HIDTA, it

13       encompasses -- it's just a different

14       funding source, and -- and that's why it's

15       called HIDTA, because that's where some of

16       the funding comes from.

17  Q.   Got you, and so it's -- it's local law

18       enforcement and federal law enforcement

19       working together, right?

20  A.   Correct.  Everybody is housed in the same

21       -- people that are on this task force are

22       housed in the same building.  You have

23       City, local, you have Sheriff's Offices,

24       you have State, and then you are teamed up

25       with federal partners as well.

```
 1   Q.   And what building is that that everybody is
 2        in?
 3                   MR. SCOTT:
 4                   That is -- it's the one over on
 5             Corporate?
 6                   John, for security purposes, we
 7             would identify it as an office
 8             building on Corporate Boulevard in
 9             Baton Rouge.
10                   MR. ADCOCK:
11                   Okay.  That's fine.
12   BY MR. ADCOCK:
13   Q.   So Jason, do you know what case you're here
14        for?
15   A.   Yes, sir.
16   Q.   Okay.  What case are you here for in your
17        mind?
18   A.   Last week when I met with Mr. Scott, I
19        believe I'm here on two different cases.
20        One is a young male, and the other one I
21        know is Blair.
22   Q.   Okay, and do you recall these protests back
23        in July of 2016?
24   A.   I recall being there, yes, sir.
25   Q.   Okay.  You know what I'm talking about?
```

```
 1        You know what this about?  That's all I'm
 2        asking.
 3   A.   Oh, yes, sir.  Yes, sir.
 4   Q.   And what did you do basically to prepare
 5        for this deposition?
 6   A.   I met with Mr. Scott last week.
 7   Q.   Okay, and did you read over anything in
 8        preparation for today?
 9                  MR. SCOTT:
10                  Have you read anything?
11   BY MR. ADCOCK:
12   Q.   It's okay if you did.  I'm just asking.
13                  MR. SCOTT:
14                  I -- looked at a couple of
15             videos, still photographs.  I don't
16             think we read anything.
17   BY MR. ADCOCK:
18   Q.   Is that your recollection, Jason?
19   A.   That's correct.
20                  MR. ADCOCK:
21                  Thanks, Mr. Scott, for helping
22             with that.
23   BY MR. ADCOCK:
24   Q.   Now, in July of 2016, what was your job
25        title and job responsibilities?
```

```
1    A.    I was a detective within the Narcotics
2          Division.
3    Q.    Okay, and were you supervising anyone at
4          that time generally?
5    A.    No, sir.
6    Q.    Okay, and I'm going to -- so on July 10th,
7          2016, what I'm going to ask you about,
8          referring to the protest at East and France
9          Street in Downtown --
10   A.    You keep breaking up.  You're -- you're
11         getting real staticky.
12   Q.    Well, let me try my best.  So basically
13         what we're going to be talking about today,
14         Jason, is the arrests and protests in
15         Downtown Baton Rouge on July 10th, 2016,
16         okay?
17   A.    Okay.
18   Q.    And a large part of that is going to be at
19         the corner East and France Streets, okay?
20   A.    Yes, sir.
21   Q.    And I think it's -- some people call that
22         Downtown Baton Rouge.  Some people might
23         call that Beauregard Town.  It doesn't
24         matter to me.  Now, what was your -- what
25         do you recall your duties being that --
```

```
 1        what do you recall your duties being that
 2        day?
 3   A.   That day when we were in the particular
 4        area you were talking about, we were
 5        basically -- we were basically assigned to
 6        be in the back of or behind all of the
 7        uniformed officers, whether they be of
 8        whatever element, whatever division,
 9        whatever agency, and basically we were told
10        that upon them affecting an arrest, they
11        would then hand somebody to us, and
12        basically our job was to transport them or
13        walk them -- I'm sorry, walk them to the
14        appropriate transport teams or transport
15        personnel.
16   Q.   Okay, and do you remember who told you
17        that; who gave you those duties and
18        responsibilities?
19   A.   No, sir.
20   Q.   Okay.  Let's -- let me show you some
21        videos.
22   A.   Okay.
23   Q.  Bear with me.  All right.  Bear with me,
24        Jason.  All right.  Jason, can you hear me?
25   A.   I can hear you.
```

```
1   Q.   Okay.  I'm going to show you this video
2        twice, and it's 23 seconds, and then I'm
3        going to -- if you want me to show it to
4        you again, I'm happy too.  If you want me
5        to show it without the volume, I'm happy to
6        do that, but I just want to show this to
7        you and ask you some questions about it,
8        okay?
9   A.   Okay.
10                  (Video Played)
11                  MR. ADCOCK:
12                  All right.  I'm showing the
13             witness -- I just showed the witness
14             one viewing of Exhibit WWWW, that's
15             four Ws, which is a 23-second video.
16  BY MR. ADCOCK:
17  Q.   Jason, I'm going to show you this again,
18       okay?
19  A.   Okay.  It -- it didn't play through.  I can
20       just see little pieces here.
21                  MR. ADCOCK:
22                  No.  What's going on, Joseph?  Is
23             it me or you?  Probably me.
24                  MR. SCOTT:
25                  I think it's you.
```

 1    BY MR. ADCOCK:

 2    Q.    Okay.  Let me try it again.

 3    A.    Okay.

 4                    (Video Played)

 5    BY MR. ADCOCK:

 6    Q.    Did you see that?

 7                    MR. SCOTT:

 8                    It froze up about 12 seconds in

 9             or 15 seconds in, but I'm pretty

10             sure that we watched this video last

11             week, so maybe ask your questions

12             and we'll see it how goes.

13    BY MR. ADCOCK:

14    Q.    Sounds good.  All right.  So Jason, you saw

15          that video --

16    A.    Yes.

17    Q.    -- or most of it?

18    A.    Yes, sir.

19    Q.    Okay.  Did you see yourself in that video?

20    A.    Yes, sir.

21    Q.    All right.  Let me start back.  Let me play

22          it -- I'm going to play it one more time.

23          We're still at Exhibit WWWW.

24                    (Video Played)

25    BY MR. ADCOCK:

```
1    Q.   Do you see yourself in this video?
2    A.   Yes, sir.
3    Q.   We're about at four seconds into the video.
4         Can you describe yourself.
5    A.   I'm -- my back is to the camera.  You can
6         see "Police" in yellow on a black vest, and
7         it's -- it's either a red or a maroon shirt
8         I'm wearing.
9    Q.   You're wearing blue jeans?
10   A.   Oh, yes, sir.
11   Q.   It looks like you've got a baseball cap on,
12        maybe it's backwards?
13   A.   Looks like that, yes, sir.
14   Q.   All right, and you recognize the gentleman
15        to our -- or your right and our right in
16        the picture?
17   A.   Yes, sir.
18   Q.   Okay.  Who's that?
19   A.   That's Jeff Pittman.
20   Q.   Okay, and you recognize this gentleman to
21        your left where the cursor is?  He's in
22        uniform and a baseball hat?
23   A.   No, sir.
24   Q.   Okay.
25   A.   I can't even -- I can't see.
```

```
1    Q.   This is what I'm going to do, Jason.  I'm
2         going to turn the volume off, and let's
3         start over, I'll show it to you, and maybe
4         you can get a better look at him.
5                    (Video Played)
6    BY MR. ADCOCK:
7    Q.   Okay.  Did you recognize this man in the --
8         uniformed man in the baseball hat now?
9    A.   No, sir.
10   Q.   And this gentleman right here (indicating)
11        where my cursor is, he's in blue jeans and
12        he's wearing a vest with "Police" on the
13        back written in white, he has a
14        short-sleeved on, maybe it's gray, do you
15        know who that is?
16   A.   Can you play the video.
17   Q.   Sure.
18   A.   I can't tell who it is from the back like
19        that.
20   Q.   Yeah, of course not.  All right.  I'm
21        starting it five seconds into the video.
22        This is gentleman I'm asking about.
23                    (Video Played)
24                    THE WITNESS:
25                    Can you go back to the very
```

```
 1                beginning where that guy is looking
 2                towards the camera towards --
 3                towards the side.
 4     BY MR. ADCOCK:
 5     Q.   Sure.
 6                (Video Played)
 7     BY MR. ADCOCK:
 8     Q.   How about now, do you recognize him?
 9     A.   I believe that's going to be Andy Kuber.
10     Q.   And to your knowledge his last name is
11          C-u-b-e-r?
12     A.   K-u-b-e-r.
13     Q.   All right.  Thank you.  And do you remember
14          this incident, Jason?
15     A.   Yes, sir.
16     Q.   All right.  Tell me what you remember about
17          this incident.
18     A.   What I remember about it is being towards
19          the back of all these uniformed officers.
20          Somehow she was handed or passed on to
21          where we were standing, and our job was to
22          then escort her by walking her to where the
23          transport team would be.
24     Q.   Okay, and do you know who handed you to
25          her, quote, unquote?
```

```
 1   A.    No, sir.
 2   Q.    Okay.  Do you -- let me show you -- I'm
 3         going to show two more videos, and I'll ask
 4         you more questions about them.
 5   A.    Okay.
 6   Q.    Bear with me.  Bear with me now.
 7                   (Video Played)
 8   BY MR. ADCOCK:
 9   Q.    All right.  Jason, do you remember in the
10         video I just showed you the young woman who
11         is being arrested; she had something white
12         on her head?
13   A.    Correct.
14   Q.    And do you remember when she was arrested
15         in the video she started screaming or not
16         when she was arrested, but after she was in
17         cuffs maybe?
18   A.    Correct.
19   Q.    Okay.  Now, I'm going to play this video,
20         and it's a little confusing, so I'm going
21         to play it at least twice and then ask you
22         questions about it, okay?
23   A.    Yes, sir.
24                   (Video Played)
25                   MR. ADCOCK:
```

```
 1                    Yes, Joseph.
 2               MR. SCOTT:
 3               The screen is locked up on our
 4          end.
 5               MR. ADCOCK:
 6               All right.  Let the record
 7          reflect I'm trying to show the
 8          witness Exhibit HHHH, that's four
 9          Hs.
10               Joseph, would you happen to have
11          this on your computer right now?
12               MR. SCOTT:
13               I --
14               MR. ADCOCK:
15               You're not supposed to, so I
16          don't expect you to.
17               MR. SCOTT:
18               That's -- that's good.  Oh, I'm
19          getting a notification that my
20          Internet connection is unstable.
21          Neat.  Haven't had that before.
22               MR. ADCOCK:
23               I think the last two times we did
24          this, this is my fault, but I do
25          think my Internet is working okay
```

27

```
 1                right now, and I -- I say that
 2                because we had to call a technician
 3                last week, and I'm at home right
 4                now.  So it better be working well.
 5                What do you think, Joseph, you need
 6                a break?
 7                     MR. SCOTT:
 8                     Yeah, let's -- let's take two
 9                minutes, and let me see if I can do
10                anything on my end to improve this.
11                Probably going to disconnect and
12                leave and return.
13                     MR. ADCOCK:
14                     All right.  All right.  We'll
15                take two minutes.
16                     MR. SCOTT:
17                     Thank you.
18                     (Break in proceedings.)
19   BY MR. ADCOCK:
20   Q.   We're back on the record.  Jason, I'm going
21        to show you this video again, okay?  All
22        right.  Jason, I'm going to play this over,
23        okay?
24   A.   Okay.
25                     (Video Played)
```

```
 1    BY MR. ADCOCK:
 2    Q.    The video I'm showing you is -- we played,
 3          this is Exhibit HHHH.  It's about two
 4          minutes and four seconds.  I've played you
 5          about 36 seconds.  I'm representing to you
 6          that there's -- I don't think that Blair is
 7          pictured anymore in this video, but let me
 8          play it again, okay?
 9    A.    Yes, sir.
10    Q.    I'm going to play it one more time.
11    A.    Okay.
12                    (Video Played)
13    BY MR. ADCOCK:
14    Q.    So I'm going to stop at 21 seconds.  Do you
15          agree that shortly after you hear those
16          screams you see this lady right here
17          (indicating) with the white thing on her
18          head?
19    A.    That is correct.
20    Q.    Okay, and I'm representing to you that that
21          is Blair Imani, also known as Blair Brown,
22          okay?
23    A.    Okay.
24    Q.    That's my client that was arrested, and
25          that's what I'm asking you about.  We're
```

```
 1          just going to call her Blair, okay?
 2   A.   You have to repeat that.  You broke up
 3        again.
 4   Q.   Oh, no.  I'm just going to call her Blair.
 5        Is that okay?  Can you hear me?
 6   A.   Yeah, we got you.
 7   Q.   I'm just going to call her Blair.  Is that
 8        okay?
 9   A.   Yes, sir.
10   Q.   All right.  Let me go back to the
11        beginning.
12                   (Video Played)
13   BY MR. ADCOCK:
14   Q.   You see this individual --
15                   (Video Played)
16   BY MR. ADCOCK:
17   Q.   -- this is about three seconds in?
18   A.   Okay.
19   Q.   You see that person right there
20        (indicating)?
21   A.   Yes.
22   Q.   She has a -- a garment or something around
23        her head.  It's white.
24   A.   Yes, I see that person.
25   Q.   Does that look like the same person that
```

```
 1          was arrested at a few seconds later in this
 2          video?
 3   A.    Yes.
 4   Q.    Would you agree that that's Blair in this
 5          picture right now at three seconds?
 6   A.    I -- I believe so.
 7   Q.    Okay.  Now, do you see yourself in this
 8          video at this moment at three seconds in?
 9   A.    No, sir, I don't.
10   Q.    Okay.  I'm going to turn -- okay.  Let me
11          play it one more time.
12                    (Video Played)
13   BY MR. ADCOCK:
14   Q.    Do you remember seeing her when she's
15          standing next -- next to that tree on July
16          10th, 2016?
17   A.    I do not recall seeing her prior to her
18          being handed off or passed off to us.
19   Q.    Okay.  So you didn't see her at all until
20          she was basically given to you, correct?
21   A.    Yes.
22   Q.    Okay.  Let me ask you a few more questions.
23                    (Video Played)
24   BY MR. ADCOCK:
25   Q.    Did you hear those screams there, Jason?
```

```
1    A.    You have to repeat it.
2    Q.    Yeah.  Did you hear screams just now?
3    A.    In the video, yes.
4    Q.    And that looks like it's about 16 seconds,
5          correct?
6    A.    Yeah.  We can't see that.
7    Q.    What -- what do you see Jason and Joseph?
8    A.    We can see it now.  It's clear now.
9                    MR. SCOTT:
10                   Yep.
11   BY MR. ADCOCK:
12   Q.    It looks like it's at 16 seconds.  Can you
13         see that?
14   A.    Yes.
15   Q.    Okay.
16                   (Video Played)
17   BY MR. ADCOCK:
18   Q.    Blair comes into the screen now at about 21
19         seconds, correct?
20   A.    Correct.
21   Q.    Okay, and we're still referring to HHHH,
22         four H, and so this person to our left,
23         Blair, where my cursor is (indicating),
24         that's you correct?
25   A.    That is me.
```

1    Q.    Okay, and the person on right is Jeff
2          Pittman, correct?
3    A.    Correct.
4    Q.    All right.  Let me ask you about this.
5                    (Video Played)
6    BY MR. ADCOCK:
7    Q.    What are you doing right there?  You put
8          something under her hands and then perhaps
9          you're putting something in your pocket on
10         your -- on your front there.  Do you recall
11         what you were doing?
12   A.    No, sir.
13   Q.    Let me play it again.
14                   (Video Played)
15   BY MR. ADCOCK:
16   Q.    Do you see that video again I just played?
17   A.    I see the video.
18   Q.    Okay.  I'm referring to what happened,
19         like, the last -- between roughly 21
20         seconds and 26 seconds.  Did you recognize
21         what you were doing?  It looks like you're
22         putting something in your pocket.  What
23         does it look like?
24   A.    I don't recall what I'm doing there, and I
25         -- I -- I can't say if I was putting

1      something in my pocket or not.  I'm not

2      sure what's going on --

3   Q.   Okay.

4   A.   -- as far as that action.

5   Q.   And that day, do you remember when you were

6      -- I'm using the word "arrests."  You might

7      not want to use that, but when you were

8      handed people, and you were putting them in

9      custody, were you -- do you remember if you

10     were using handcuffs or flex cuffs?  Do you

11     remember?

12  A.   I believe it was flex cuffs.

13  Q.   Okay, and flex cuffs are basically plastic

14     kind of -- how would you describe flex

15     cuffs?

16  A.   We'll go with a hard plastic or --

17  Q.   Okay.

18  A.   -- or a plastic.

19  Q.   It seems like I saw what you-all were using

20     is white ones and dark ones, maybe black

21     ones that day.  Is that correct?  Am I

22     remembering that right?

23  A.   I -- I couldn't tell you the color.

24  Q.   Okay.  Do you remember what you were using?

25  A.   No, sir.

1    Q.   Okay, and when you -- this day, when you

2         were using flex cuffs to put people in

3         custody, where were you wearing those flex

4         cuff on your person?  Was that in -- in the

5         back on your belt?  Was that on your chest?

6         Was that in your pocket?  Do you remember?

7    A.   I do not recall.

8    Q.   Okay.  When you normally are using flex

9         cuffs and you have them on you, where do

10        you normally keep them on your person?

11   A.   We -- we usually don't use flex cuffs,

12        because usually you're not dealing with

13        such a large amount of people.

14   Q.   Okay.  Have you ever arrested someone with

15        flex cuffs before?

16   A.   I do not recall.

17   Q.   Okay, and when is it appropriate -- when

18        would you normally use flex cuffs when

19        you're taking someone into custody?

20   A.   I believe due to the fact there was so many

21        people out there that we were dealing with,

22        it was decided that we would use those that

23        -- and that was what was passed down to us.

24   Q.   Okay, and I didn't ask you this, but it

25        looks like in the first video I showed you,

```
1          it looks like you're taking Blair kind of
2          away from the scene.  Would you agree with
3          that?
4     A.   Correct.  We -- I would say we were walking
5          her away from where the -- the scene, the
6          majority of the people and everything was
7          going on.
8     Q.   Okay, and where were you walking her to?
9     A.   We were walking her out back away from
10         where everybody was, trying to get her to
11         the -- our job is just to get them to the
12         transport personnel.
13    Q.   Okay, and who do you -- once you do that,
14         who -- what are you supposed to do?  Who
15         are you supposed to give them to quote,
16         unquote?
17    A.   Whoever the assigned transport assigned
18         people were that were accepting or
19         receiving people that were brought to them.
20    Q.   And what did it look like there?  Is there,
21         like, a folding table set up?  Is there a
22         booth?  What -- what are we talking about
23         here?  Do you remember?
24    A.   I don't remember -- I -- I -- the
25         specifics.
```

1    Q.   Is there any kind of paperwork that you

2         handed off with the arrestee?

3    A.   No, sir.

4    Q.   Okay.  Let me ask you about this.  Do you

5         see this, Jason?

6    A.   It's black.

7    Q.   Black.  You have a black screen?

8                    MR. SCOTT:

9                    Yeah.  It says, "John Adcock has

10              started screen sharing," but it's

11              not displaying anything.

12   BY MR. ADCOCK:

13   Q.   Okay.  Let me try it again.  Jason, you

14        should know that lawyers are very

15        sophisticated people.  That was a joke.

16        Can you see this picture?

17   A.   Yes.

18   Q.   Okay.  I'm showing you what's marked as

19        "Exhibit XXXX," that's four X.  Describe

20        what you see in this picture.

21   A.   I see myself and Jeff Pittman escorting

22        Blair Imani in this picture.

23   Q.   Okay, and is this -- it would be fair to

24        say this is what you described, you're

25        escorting her away from the scene to the --

1        I forget what you call it.

2   A.   The transport personnel, transport area.

3   Q.   Yeah.  It looks like that's where you're

4        escorting her to.  Is that fair?

5   A.   I -- I believe so.

6   Q.   Okay, and do you see it looks like Jeff

7        Pitmann is doing a thumbs up there?

8   A.   According to that picture, yes.

9   Q.   Okay.  Do you know why he's doing that?

10  A.   I could not tell you.

11  Q.   Do you know if -- like, if anyone spoke to

12       him or asked him a question before he did

13       that?

14  A.   I -- I don't recall what -- what -- what

15       that's -- I don't recall if he was speaking

16       to somebody prior to this or not.

17  Q.   Okay.  Now, do you know what -- so that was

18       Exhibit XXXX, basically a still shot of a

19       video.

20  A.   Yep.

21  Q.   And do you know what Blair was arrested

22       for?

23  A.   I -- do I know what she was arrested for?

24       I believe she was arrested for the same

25       thing pretty much everybody was out there

```
1          was arrested for, which was --
2     Q.   If you don't --
3     A.   -- obstruction of a highway or whatever the
4          charge was.
5     Q.   Okay.  It's okay if you don't know.  I just
6          want to know if you know, and so do you
7          know what --
8     A.   No.  I -- first-hand knowledge, no, I
9          personally do not know.  I did not write a
10         report.  I did not --
11    Q.   Okay.  Now, when -- I think we went over
12         this -- when Blair was handed to you -- I
13         don't want to put words in your mouth, but
14         it seems like that's what you were using,
15         she was handed to you, no one told you she
16         has been arrested for X, right?
17    A.   No.
18    Q.   Okay, and no one said she has drugs on her
19         person or she has a gun or anything like
20         that, correct?
21    A.   That's a correct statement.
22    Q.   No one said anything about why she was
23         arrested?
24    A.   No.
25    Q.   Okay.  So pursuant to the orders you were
```

```
 1        given that day, she was handed to you, and
 2        your job according to the orders you got
 3        that day was to take her to the
 4        transportation area, correct?
 5   A.   Correct.  Our job was to escort them from
 6        wherever they were to the -- whoever the
 7        transport personnel.
 8   Q.   Okay, and the also -- the orders also were
 9        the people you were transporting were to be
10        placed in custody, whether it be handcuffs
11        or flex cuffs, correct?
12   A.   That is correct.
13   Q.   All right.  Now -- now so -- okay.  Now, do
14        you have any information to support -- was
15        anyone -- do you have any information at
16        the time or did anyone give you any
17        information to support probable cause for
18        arrest of simple obstruction of a highway
19        of commerce that day for Blair?
20   A.   Can you repeat your question.
21   Q.   Did anyone give you any information that
22        would support probable cause for arresting
23        Blair for simple obstruction of a highway
24        of commerce?
25   A.   Did anybody specific?  I'm not sure what
```

1      you're looking for here or what you're --
2      I'm not sure what you're asking me is -- is
3      what I'm trying to get to.
4   Q.  That's okay.  I'm --- I'm basically going
5      over what we just talked about.  No one
6      gave you information and said these are the
7      three reasons why Blair should be arrested
8      for simple obstruction of a highway of
9      commerce, correct?
10  A.   Nobody specifically told me that, no, but
11      being I've been a police officer, I mean, I
12      can make an educated guess that due to the
13      circumstances and everything that was going
14      on that's what she was arrested for, but
15      nobody personally specifically said this is
16      what they're being arrested for.
17  Q.   And so making an educated guess -- tell me
18      about the educated guess.  Why could you
19      make an educated guess that's what she was
20      arrested for?
21  A.   Due to the fact we were out there for a
22      long period of time; people were blocking
23      the roadway, and there were several orders
24      over and over and over for people to
25      disperse.

1    Q.    Okay.  Was she blocking the roadway?

2    A.    I didn't see here prior to her being handed

3          to me, so I -- that's -- I don't know.

4    Q.    Okay.  What information did you have when

5          she was handed to you that Blair -- there

6          was probable cause to arrest Blair for

7          resisting an officer?

8    A.    I didn't have any.

9    Q.    Okay.  Do you -- as you sit here now, do

10         you have any facts that would support

11         probable cause for arresting Blair for

12         resisting an officer that day?

13   A.    I didn't -- I don't recall or see any in

14         that -- in that portions of the video you

15         showed me.

16   Q.    So you don't have any information to that

17         effect, correct?

18   A.    That's correct.

19   Q.    Okay.  Now, and it goes -- then if you --

20         so therefore, I'm just trying to move this

21         along, you didn't pass on any information

22         to people at the transportation area about

23         why Blair had been placed in custody,

24         correct?

25   A.    I did not.

```
 1   Q.   Because no one had told you any such
 2        information, correct?
 3   A.   Correct.
 4   Q.   You didn't have any information to pass on,
 5        correct?
 6   A.   Correct.
 7   Q.   Okay.  All right.  Let me -- I'm going to
 8        show you Exhibit C, Jason, okay?
 9   A.   Okay.
10   Q.   And this should be a very fun adventure
11        like all screen sharing is always, okay?
12        All right.  Jason, can you see that?
13   A.   I can see it.
14   Q.   Okay.  What would you -- without -- we're
15        going to go through it, but what -- what is
16        that generally without going into
17        specifics?
18   A.   That's an Affidavit of Probable Cause.
19   Q.   Okay.  You've seen this before?
20   A.   Have I -- an Affidavit of Probable Cause,
21        yes, sir.
22   Q.   Yeah, not this -- but you haven't seen this
23        particular one, correct?
24   A.   No, sir.
25   Q.   Okay, and what -- do you -- you fill out of
```

```
 1        Affidavits of Probable Cause all the time I
 2        imagine or you used to, correct?
 3   A.   Correct.
 4   Q.   I mean, do you do it so much anymore
 5        actually?
 6   A.   When I'm working state cases, I -- I will,
 7        but recently being assigned to the task
 8        force, most of the paperwork is on the
 9        Federal side, so not -- that is correct,
10        not as much as I used to.
11   Q.   Got you, but you're familiar with them,
12        right?
13   A.   Yeah, I'm familiar with it.
14   Q.   Got you.  And what -- just tell me what is
15        -- and what is an Affidavit of Probable
16        Cause?  What is it used for?
17   A.   This is a document that is completed,
18        signed by the officer saying the reason
19        that a person should be put in jail.
20   Q.   Okay.  All right.
21             MR. SCOTT:
22             John, that document is, like,
23          pixilated.  You can't read the type
24          on it.
25             MR. ADCOCK:
```

```
 1                  No.  What can you read, Joseph,
 2          on there?  I mean, like, how -- can
 3          you read anything on there?
 4              MR. SCOTT:
 5                  You can kind of make out,
 6          "Affidavit of Probable Cause," but
 7          it's like that game you play at the
 8          eye doctor with the --
 9              MR. ADCOCK:
10                  Oh, no.  Okay.
11              MR. SCOTT:
12                  -- you know, can you read Line 4?
13          No.
14              MR. ADCOCK:
15                  Yeah.  I know what you mean.
16                  All right.  I'm trying my best
17          here.  Dave Lanser, how do I get rid
18          of this thing right here where these
19          people are?
20              MR. LANSER:
21                  That's a great question, and I'm
22          not sure I know the answer.
23              MR. SCOTT:
24                  If we were good with math and
25          computers, we would be engineers.
```

```
1                    THE WITNESS:
2                    Yeah.
3                    MR. ADCOCK:
4                    Joseph, do you happen to have
5             this on your computer?  Again, it's
6             not your duty to have it, but I was
7             wondering if you do.
8                    MR. SCOTT:
9                    No.  I'm -- I'm using the shared
10            laptop and --
11                   MR. ADCOCK:
12                   Yeah, okay.  And just for the
13            record, I'm looking at Exhibit C at
14            Page 5.  That's the Affidavit of
15            Probable cause for Blair.
16  BY MR. ADCOCK:
17  Q.   Let me try this again.  I want to ask you
18       about this.  Let's try this one more time.
19                   MR. SCOTT:
20                   That's it.  Not anymore.
21                   MR. ADCOCK:
22                   What about right here
23            (indicating)?
24                   MR. SCOTT:
25                   That's it.
```

1    BY MR. ADCOCK:

2    Q.    All right.  Again, can you see it well,

3          Jason, I mean?

4    A.    We can see it.

5    Q.    All right.  For now you can.  All right.

6          I'm showing you the same exhibit, Exhibit

7          C, at Page 5.  Do you see down there at the

8          bottom where I put my cursor, it says,

9          "Affiant" or "Affiant"?  You see there?

10   A.    Yes.

11   Q.    Okay.  Do you recognize that signature?

12   A.    I do not.

13   Q.    Okay.  If I told you that was the signature

14         of William Alexander, do you -- do you

15         recognize it now?

16   A.    I'll go with it that that's what it says.

17         It appears it can be that.

18   Q.    It could be that.  I guess -- yeah, it

19         could look like that, but you're not sure.

20         I guess what I'm asking is, have you ever

21         seen William Alexander's signature before?

22         Would you recognize it?

23   A.    Not that I would recall because --

24   Q.    Do you know who William Alexander is?

25   A.    I don't believe so.

```
1    Q.   Do you know if he works for BRPD?

2    A.   I do not know.

3    Q.   Do you know if he works for the Baton Rouge

4         Sheriff's Office?

5    A.   I don't know.

6    Q.   Okay, and you see below that it says --

7         there's a Notary there, "Sworn and

8         Subscribed Before Me July 10th, 2016," and

9         there's a signature there?

10   A.   Yes, I see it.

11   Q.   Do you recognize that signature?

12   A.   I have no idea.

13   Q.   Okay.  I think it might be Sergeant Ira

14        Roberts.  Does that name ring a bell?

15   A.   I know who Ira is.

16   Q.   Okay.  Who is Ira?

17   A.   He's a sergeant within the Baton Rouge

18        Police Department.

19   Q.   Okay.  Did you see him or her on July 10th,

20        2016?

21   A.   I -- I do not recall.

22   Q.   Okay.  All right.  So did you fill out this

23        Affidavit of Probable Cause?

24   A.   You got to repeat it.  You're breaking up.

25   Q.   Man.  Did you fill out this Affidavit of
```

```
 1        Probable Cause, Jason?
 2   A.    No.
 3   Q.    Okay, and at the bottom -- the bottom half
 4        of the Affidavit of Probable Cause, correct
 5        me if I'm wrong, is where you would put
 6        information that sets forth the arrest,
 7        correct?
 8   A.   That's correct in the -- that's correct.
 9   Q.    I'm just saying generally, that's what --
10        that's what that's for?
11   A.    Correct.
12   Q.    Okay.  I'm going to move on.  That's
13        Exhibit C, Page 5.  I'm going to move on
14        now.  Give me a second, Jason.  Now, Jason
15        on July 10th, do you know -- did you know
16        then of any kind of violence directed
17        towards law enforcement?
18   A.    I don't recall specifics of when I knew,
19        didn't know.  It was a -- but I know that
20        there were several instances throughout
21        this -- throughout this tumultuous time
22        that there was violence directed at -- at
23        officers.
24   Q.   Like what?
25   A.    Specifically, I remember there was a guy I
```

1        believe he got hit with something in the
2        face and knocked out some of his teeth.
3        Towards the end of all of this, I mean, we
4        all know that there was officers that were
5        killed, which I know is after the date
6        you're asking.  So the answer to your
7        question, I don't remember specifically
8        when I learned of violence during these
9        incidents or these -- these few tumultuous
10       weeks.
11   Q.  Got you.  And I think the officers were
12       killed on July 17th, but yeah, that's an
13       obvious example of violence obviously.
14       When you were talking about the officer who
15       got his teeth knocked out, do you remember
16       when or where that happened?
17   A.   No, sir.  I just -- no, sir, I don't
18       remember the exact date.  I don't remember
19       the location.  Like I say, with everything
20       going on, you would be relayed certain
21       things, and that's two of the incidents
22       obviously that stick out in my mind, but I
23       don't remember when it was relayed to me or
24       where, if it was prior to the date you're
25       asking.

```
 1   Q.   Okay.  Do you know who that officer was,
 2        the name of that officer, where they worked
 3        or anything like that?
 4   A.   I believe it was Brad Ford.
 5   Q.   Okay.  Do you know who he worked for or
 6        works for or worked for at the time I
 7        should say?
 8   A.   At the time he worked for Baton Rouge
 9        Police Department.
10   Q.   Do you know if he's still there?
11   A.   I believe he has left the department.
12   Q.   Okay.  Do you know why?
13   A.   I do not know specifically why he left, and
14        I don't want to speculate.
15   Q.   Sure.  Were -- did you experience -- did
16        anyone throw any rocks at you?  Was any --
17        did anyone shoot at you?  Did any -- any
18        projectiles come your way on July 10th?
19   A.   I -- that -- to answer that question, I
20        would say, I do remember that things were
21        being thrown.  I don't know exactly what
22        they were, but we were so far in the back
23        that to say they were being thrown at me, I
24        -- I couldn't say that.
25   Q.   Because there was so many law enforcement
```

```
 1            there together?  That's what you mean?
 2    A.   Correct, correct.
 3    Q.    Where -- are you talking about July 10th?
 4    A.    The same date that we're talking about
 5            involving all these videos we just watched.
 6    Q.   Okay, and where were you -- do you remember
 7            where you were standing?  How do you know
 8            that people were throwing things at law
 9            enforcement?
10    A.    Because you -- when you have law
11            enforcement out there like that, everybody
12            is trying to keep everybody abreast.  It's
13            being relayed to everybody, you know, hey,
14            be careful, hey, watch out, hey this, hey
15            that for the best interest of the officers.
16            So it's being relayed to everybody.
17    Q.    So it was relayed to you as you recall that
18            civilians were throwing things at law
19            enforcement that day?
20    A.    That is correct.
21    Q.    Do you remember where you were standing
22            when you learned that?
23    A.    I do not recall.
24    Q.    Okay.  Was it when you were in the yard
25            where Blair was arrested?
```

1  A.   I do -- I do not recall.

2  Q.   Okay.  Would anything that you can recall

3       now kind of refresh your recollection about

4       when you learned about that?

5  A.   I don't understand your question.  I don't

6       recall when it was relayed or where I was

7       standing when it was relayed to me or made

8       to my knowledge.

9  Q.   Okay.  So the Affidavit of Probable Cause I

10      showed you, Jason, for Blair, did you know

11      that those Affidavits of Probable Cause

12      that day, a lot of them were printed in

13      advance?  Do you -- were you aware of that?

14 A.   I didn't -- I didn't know what they -- I

15      don't know what they were doing with the

16      probable affidavits.

17 Q.   Okay.  So you weren't aware that some of

18      them or all of them were preprinted in

19      advance before the arrests?

20 A.   I don't know if that was made or if I was

21      aware of that or not.  Like I say, our job

22      was to escort that person from where they

23      were handed to us to the transport area.

24 Q.   Right.  And have you ever been in a

25      situation, whether it's Mardi Gras or a

1        graduation or a LSU football game or
2        anything where BRPD is using preprinted
3        Affidavits of Probable Cause?
4    A.    I don't recall offhand.
5    Q.    And I mean, preprinted, I mean the reasons
6        for the arrest are already on the Affidavit
7        before the person's name goes on there.
8        That's what I'm talking about.
9    A.    Yeah, I don't recall offhand.
10   Q.    Would you be disturbed to learn that such
11       Affidavits were being used?
12   A.    I don't know if "disturbed" is the correct
13       word I would use.  I guess this is kind of
14       -- I mean, you're -- given the situation
15       that was going on at the time, I guess the
16       Command made a decision or somebody higher
17       than me made that decision.
18   Q.    Would you describe it as unusual to use
19       preprinted Affidavits of Probable Cause?
20   A.    I -- I would go with unusual that it's not
21       a common, everyday occurrence.  I will -- I
22       will say that.
23   Q.    Do you think it's the right thing to do?
24   A.    In certain situations if -- if Command or
25       whoever is making decisions deems that to

```
 1         be the appropriate measure, then that's
 2         what the appropriate measure was.
 3    Q.   You don't question it?
 4    A.   No.  We were given a job, and we went out
 5         there to do our job.
 6    Q.   Jason, after a protest or after a parade or
 7         after a large gathering, is it common for
 8         Baton Rouge Police to do a debrief about
 9         what happened at that event?
10    A.   I work several parades or large events.  I
11         don't specifically being part of a debrief
12         after those.  I'm not sure if they do or
13         don't or who would be involved in them.  I
14         -- I couldn't answer that.  I -- I don't
15         know.
16    Q.   Okay.  When you go -- I don't know what you
17         would normally do, like, on a particular
18         day, but say when you have to make an
19         arrest where you need, like, ten officers
20         to make that arrest in someone's home, and
21         I don't know if you do that, have you ever
22         done that before?  I'm guessing --
23    A.   Yes.
24    Q.   Okay.  Well, after you make that arrest,
25         let's say you make the arrest, and there's
```

```
 1          no incidents or something or there are
 2          incidents, is there a debrief after that
 3          where you talk about what went right, what
 4          went wrong?
 5     A.   It depends.  We -- we -- if something needs
 6          to be addressed, then we'll address it.  If
 7          every -- if there's nothing that needs to
 8          be addressed, then no.
 9     Q.   Can you give me an example without -- you
10          don't have to tell me particulars, like,
11          what -- what -- what would be an example of
12          what needs to be addressed?
13     A.   Just certain tactics if we were clearing a
14          house and, you know, maybe you should have
15          looked here rather than here first.
16     Q.   Okay, and where would that debrief happen?
17          Would that happen a day later?  Would it
18          happen at a police precinct?  Would it
19          happen on the scene?  Where would -- what
20          does it look like?  What are we talking
21          about?
22     A.   It just depends.  There is no set, this is
23          what a debrief looks like.
24     Q.   Okay.
25     A.   It depends.  It just depends.  I mean, a
```

1      lot is going on.  It can happen at the same
2      house; it can happen later on.  It just
3      depends.
4   Q.   Okay.  What -- do you remember if you've
5      gotten any training either, like, right
6      when you went with BR -- BRPD or since then
7      about the best way to do a debrief?
8   A.   No, I don't recall.
9   Q.   Okay.  Now, before an event, whether it be
10     a protest or an arrest or a raid or
11     whatever, Mardi Gras, before is it common
12     for Baton Rouge Police to have a meeting
13     about -- to establish what to look for,
14     that kind of thing?
15  A.   I would say so, but I wouldn't have been a
16     part of those meetings dealing with large
17     scale events like that.
18  Q.   You mean you wouldn't have been a part of
19     that meeting for this event we're talking
20     about?
21  A.   That's correct.
22  Q.   Why is that?
23  A.   I wouldn't be in a command meeting with all
24     the higher-ups and the Chief and all that
25     about what's going on.  It would basically

```
 1            trickle down to me through -- from my
 2            supervisors.
 3     Q.    Okay.  I probably didn't ask the question
 4            right, so that's what I'm asking, like, how
 5            would you get this information about what
 6            to expect on this particular day, July
 7            10th, 2016?  Does it come to you over the
 8            radio and everybody hears it?  Does someone
 9            call you on your cell phone?  Is it you're
10            in the car or truck riding over?  What are
11            we talking about here?
12     A.    I mean, it -- it depends.  You're talking
13            about a long day.  I mean, I would imagine
14            that prior when we showed up to the work,
15            we all meet up, and then I'm sure things
16            were relayed to us, and then throughout the
17            day, you have a radio on, and things are
18            being relayed.
19     Q.    Okay.  So do you recall a meeting where
20            officers including you got together and
21            people were, like, okay, you're going down
22            Downtown; there's a protest; they were
23            trying to get on the highway, and this is
24            what we're trying to do, anything like
25            that?
```

```
 1   A.    I wouldn't say it was a meeting, but I do
 2         remember being -- I think we were at Third
 3         District, and we heard over the radio that
 4         there was protests Downtown, and they were
 5         trying to possibly take over the
 6         Interstate, and we as a Narcotics Division
 7         were told to go assist.
 8   Q.    Okay, and you rode down there with some
 9         other officers?
10   A.    That's correct.
11   Q.    About how many?
12   A.    I don't know.  It depends on how many were
13         at work that day, who was there with us.  I
14         don't know how many would specifically show
15         up, but I know there was lots of officers
16         there.
17   Q.    Yeah.  Do you remember who told you, like,
18         gave you the order to, you-all need to go
19         Downtown?
20   A.    I don't recall specifically.
21   Q.    Do you recall being told anything about
22         whether these people that were arrested and
23         the other people in the yard, whether they
24         had a permit to protest that day?
25   A.    I -- I don't recall.
```

```
 1   Q.   Do you know anything about whether they had
 2        a permit to protest or march that day?
 3   A.   I don't recall.  To my knowledge, no.
 4   Q.   Okay.  After Alton Sterling died, between
 5        then and I think it's July 17th, is it
 6        right that BRPD was on two shifts;
 7        everybody was on two -- just two shifts?
 8   A.   I -- I can't speak for the whole
 9        department.
10   Q.   Yeah, okay.  What -- what -- how -- what
11        were you working?  Were you working the day
12        shift, the night shift?  Were you working a
13        12-hour shift, an eight-hour shift?  Do you
14        remember at -- at the time, July 9th and
15        10th?
16   A.   Oh, I don't -- I don't recall, and I don't
17        want to speak out of turn without looking
18        at a duty roster for that day.
19   Q.   I'm not trying to trick you on that.  If
20        you don't recall, you don't recall.  Do you
21        -- do you know on July 10th, had you been
22        working the previous evening?  Like, did
23        you go to work at, like, 7:00 p.m. or
24        something like that or 7:00 a.m. or
25        midnight or --
```

```
 1   A.   I believe I was working some sort of day
 2        shift.  I don't know the exact hours.  I
 3        believe so.
 4   Q.   Okay.  So you're not sure?
 5   A.   Not sure.
 6   Q.   That's okay.  Jason, tell me what training
 7        do you recall about deescalation
 8        procedures.  Do you know what I mean by
 9        deescalation procedures?
10   A.   No.  I -- I know -- I know what you mean.
11        I'm just -- I'm trying to think.  I don't
12        recall the specific dates or classes or --
13        or any training.
14   Q.   Okay.  What do you recall, if anything,
15        about that training about deescalation?
16   A.   I don't -- I don't know what your specific
17        question is here.
18   Q.   So did you or didn't you get training on
19        deescalation techniques and procedures from
20        the BRPD or anybody else?
21   A.   I believe so.
22   Q.   Okay.  I'm just asking what, if anything,
23        you recall from that training?
24   A.   Main point of the training is to deescalate
25        the situation.
```

1    Q.   Well, of course by name, but I'm -- what
2         about deescalation do you remember?  What
3         are the -- I mean, how do you do it?  What
4         are the important things to remember, that
5         kind of thing?
6    A.   Each -- each situation is different.  Each
7         situation is going to require or recall or
8         need different things.  I mean, your --
9         this is a broad question for any kind of
10        situation.
11   Q.   Huh-huh.  I'm asking about the training,
12        though, Jason.  What --
13   A.   I don't recall specifically that -- that
14        training.  I know I believe I've had it,
15        but I don't recall specifically the
16        training that you're referring to.
17   Q.   And how often have you had it?  Do you
18        remember?
19   A.   I can't recall.
20   Q.   Okay.  Does the phrase -- have you ever
21        heard the phrase verbal judo?
22   A.   That's correct.
23   Q.   What is -- what does that mean to you?
24   A.   Verbal judo I believe was the way it was
25        taught where basically it's that same

```
 1          thing, you use your words and try to
 2          deescalate the situation.
 3    Q.    Okay.  Can you expand on that?  Is that --
 4          is that basically what it is?
 5    A.    I believe so.
 6    Q.    Okay, and so you just have -- you don't
 7          recall whether deescalation training
 8          involved large events versus just
 9          deescalating a situation involving one or
10          just a few people?
11    A.    I don't recall.
12    Q.    Okay.  What training, if any, did you
13          receive about how to police a protest?
14    A.    I'm just -- when -- when you say, "police a
15          protest," I mean, this is a big open-ended
16          question here.
17    Q.    So say someone wants to march Downtown to
18          protest climate change or they want to
19          protest pollution into the Mississippi
20          River, and let's just say it's a hundred
21          people.  That kind of category of protests,
22          marching down the street, what, if any
23          training, have you gotten about how to
24          police such a protest?
25    A.    I -- I don't recall.
```

1   Q.   You don't recall ever getting it or you
2        don't recall what?
3   A.   I don't recall if I've ever been trained on
4        that.
5   Q.   Okay.  Have you ever been trained on the --
6        have you ever been trained specifically on
7        when it's appropriate to arrest protestors?
8        I'm just asking about training.
9   A.   Same thing, I don't recall specifically
10       when we got -- received training on -- on
11       what you're asking me.
12  Q.   Okay.  That's okay.  Have you ever heard --
13       and again, it's okay if you say no.  Have
14       you ever heard of the U.S. Supreme case
15       called, "Cox," C-o-x, "v. Louisiana"?
16  A.   No.
17  Q.   Okay.  So you've never been -- you don't
18       recall ever being trained on that case,
19       what it means; what it says?
20  A.   Not to my knowledge.
21  Q.   Okay.  What training, if any, have you
22       gotten about the appropriate use of flex
23       cuffs?
24  A.   I can't recall.
25  Q.   And then what training have you gotten on

1          the appropriate use of handcuffs?

2     A.   I know they teach you to -- that's part of

3          defensive tactics.  That was taught in the

4          academy, and then we go to a yearly

5          inservice, and depending on what part of

6          defensive tactics you're learn -- or

7          training on that time, handcuffing may be

8          gone over again.

9                    MR. ADCOCK:

10                   Okay.  Okay.  Joseph, I think I'm

11              done, but if you give me a second.

12                   Does anybody else have any

13              questions?

14                   MR. CRAIG:

15                   I will have a couple of questions

16              when you're done, John.

17                   MR. ADCOCK:

18                   Why don't you go ahead, Jim.  I

19              think I'm done, but go ahead.

20                   MR. CRAIG:

21                   Yeah.

22                   MR. SCOTT:

23                   Guys, could we take 10 minutes

24              here?

25                   MR. CRAIG:

1              Yeah, absolutely, sure.  No

2         problem.

3              MR. SCOTT:

4              Excellent.  Thank you.  I show

5         10:42.  Back on for --

6              (Break in proceedings.)

7              MR. ADCOCK:

8              On the record.  I'm ready to go

9         back on.  This is John Adcock for

10        the Plaintiffs in Imani.  We're back

11        on the record.  The video is

12        recording, and I have no more

13        questions for Jason Dohm.  Thank

14        you, Jason, for talking with me

15        today.

16             THE WITNESS:

17             Yes, sir.

18                 EXAMINATION

19   BY MR. CRAIG:

20   Q.   Mr. Dohm, my name is Jim Craig.  I am one

21        of the attorneys in some of the other cases

22        that have been filed regarding the July

23        2016 protests of the killing of Alton

24        Sterling, and in particular, we represent

25        Lisa Batiste-Swilley, who is the woman who

1     was renting and -- and therefore, had the

2     property rights to the house at the corner

3     of East and France where the arrests and

4     detention that you've been testifying about

5     took place, so just so you know where --

6     where we're coming from.  And I am just

7     going to ask some follow-up questions.

8     We're not going to start from the

9     beginning, but I do have some -- some

10    questions that -- that we're interested in

11    that I don't believe have been asked

12    exactly.  Besides the protests in July 2016

13    related to the killing of Alton Sterling,

14    what other large-scale protests in Baton

15    Rouge have you been involved with as a law

16    enforcement officer during your years at

17    the BRPD?

18  A.   I don't recall any other ones to this

19    magnitude.  This -- this might be the only

20    one that I can recall.

21  Q.   Okay.  Do you -- I'm just focusing on the

22    year 2016.  There was a State Capitol rally

23    -- a rally at the State Capitol in Baton

24    Rouge in January about abortion on the

25    anniversary of the decision in Roe versus

```
 1        Wade, January 23, 2016.  Do you remember
 2        anything about that rally?
 3   A.   I don't recall anything about that rally.
 4   Q.   You were not called out to provide
 5        assistance for law enforcement response
 6        with respect to that rally?
 7   A.   I don't believe so.
 8   Q.   Do you have any memory of anybody that you
 9        work with at BRPD being called out for that
10        rally.
11   A.   I do not recall that.
12   Q.   Okay.  On June 2 of 2016, there were
13        rallies of people again both for and
14        against abortion in Baton Rouge.  I believe
15        it was called The Rally For Life.  There
16        were a large number of people, including
17        Knights of Columbus and both pro-life and
18        pro-choice demonstrators.  Do you have any
19        recollection of those rallies?
20   A.   I do not recall that.
21   Q.   And so you don't recall -- well, I think
22        I'll will ask it this way.  Were you called
23        out to assist in law enforcement response
24        to any rallies in June of 2016 that you can
25        remember.
```

```
1    A.    Not that I can remember.
2    Q.    Okay, and then on June 11, 2016, right
3          about a month before the events we're
4          talking about, there was the Annual Pride
5          Festival in Baton Rouge.  Do you remember
6          just generally that there is an Annual
7          Pride Festival in Baton Rouge in June of
8          every year?
9    A.    Can you -- I -- I couldn't understand.
10         You're breaking up.  I couldn't understand
11         the first part of that question.
12   Q.    Yeah.  I'm going to switch microphones,
13         okay?  Give me a second.
14   A.    Okay.
15   Q.    Just give me one second here.  Can you hear
16         me now, Mr. Dohm?
17   A.    Yes.
18   Q.    Okay.
19   A.    Yes.
20   Q.    Sure, that's fine.  So it's basically the
21         same question.  Let me kind of back up.
22         Your -- your -- you know what Pride
23         Festival is or do you?  Do you know what
24         Pride Festival is?
25   A.    Yes.
```

1    Q.    And they have a Pride Festival in Baton
2          Rouge except for last year every June?
3    A.    Okay.
4    Q.    Okay.  You don't know that one way or the
5          other, which is fine?
6    A.    I -- I -- I know there's plenty of
7          festivals all throughout the year, and I
8          don't recall specifically if I knew that it
9          was in June on a certain date.
10   Q.    Okay, and so then do you recall ever having
11         been called out to assist in law
12         enforcement response to any rallies held
13         around Pride Festival in Baton Rouge?
14   A.    No, sir, not that I recall.
15   Q.    Okay.  Now, turning specifically to the
16         July 2016 protests, when were you first
17         assigned to assist in the law enforcement
18         response to the protests?  What -- what can
19         you tell us about how you initially came to
20         be given an assignment?
21   A.    I don't recall the exact date, but I would
22         say it was shortly after the Alton Sterling
23         incident when events were taking place in
24         the city, and it was decided by Command or
25         the higher-ups that we were going to go

```
 1          into -- I believe we were working 12-hour
 2          shifts, a different divisions, you know,
 3          were -- were separate and doing different
 4          things, and the decision was made and
 5          passed down to us what we would -- our role
 6          would be in -- in this.
 7     Q.   And you at the time were assigned to the
 8          Narcotics Division, correct?
 9     A.   Correct.
10     Q.   Were you split up from the Narcotics
11          Division and assigned to any other units of
12          the BRPD during the protests?
13     A.   No, I was not.
14     Q.   Okay, and so your supervisor was Myron
15          Daniels?
16     A.   No, sir.
17     Q.   Who was your supervisor?
18     A.   My immediate -- my immediate supervisor
19          would have been Jeff Pittman, and then I'm
20          trying to think at the time.  I mean, we're
21          talking five years ago who was where.  I
22          believe my --
23     Q.   Sure.
24     A.   -- supervisor would have been Jeff Pittman,
25          and then he would have respond -- reported
```

1          to the Narcotics Commander at the time.
2     Q.    Okay.  So every day of the protests I
3          assume you reported at a particular
4          location.  Where -- where did you report
5          generally to begin your shift during the
6          protests?
7     A.    I won't say it was every day, because we
8          might have been sent other places or doing
9          certain things, but generally I believe we
10         reported to 9000 Airline Highway, which is
11         Headquarters.
12    Q.    Okay, and then how would you receive your
13         orders for each day of the protests?
14    A.    From a supervisor.
15    Q.    And would that be orally or written or in
16         some other form?
17    A.    It would usually be either in person orally
18         because we worked as a group or it could
19         have been over the radio, depending on what
20         -- what we were doing.
21    Q.    Okay, and now let's just turn briefly to
22         July 10th, which is the same day Mr. Adcock
23         has been asking you about.  That was that
24         Sunday, the Sunday of the first weekend of
25         the protests.  I believe you testified that

1          you received radio communication that there
2          were protests Downtown, and there was a
3          concern about occupation of the Interstate?
4    A.    That's correct.
5    Q.    Which -- which radio frequencies would you
6          have been using during the protests and
7          particularly on that day?
8    A.    To back up on your last statement, it -- it
9          is correct that that information was
10         relayed to us, but I'm not sure that was on
11         the radio.  I -- I believe that might have
12         been in person.
13   Q.    Okay.
14   A.    To me.
15   Q.    And -- and you're talking about the
16         specific information about the Interstate
17         or about the orders to go Downtown?
18   A.    All.  It was all in -- it's all the same
19         incident.  It's all the same -- it was all
20         relayed at the same time.
21   Q.    Okay, and so as you're sitting here today,
22         you don't remember whether that came --
23         whether you heard that on the radio or
24         whether a fellow officer or supervisor told
25         you that you were headed Downtown for that

```
 1        reason?
 2   A.   That's correct.
 3   Q.   Okay.  When you got -- and so where did you
 4        go?  You -- you went Downtown?  Did you go
 5        directly to the corner of East and France
 6        where we've been seeing those pictures and
 7        videos Mr. Adcock showed you?
 8   A.   That is -- that is correct.
 9   Q.   At the time that you arrived at that
10        location, where were the protestors?
11   A.   I don't recall specifically.
12   Q.   Okay.
13   A.   They were -- it was in that -- it was all
14        at that intersection right there.
15   Q.   Okay.  Were there already protestors on the
16        lawn of the -- of the property on the
17        corner of East and France?
18   A.   No, I don't recall.  That was on the
19        opposite side from where I was, and I was
20        even -- even further back behind all the
21        uniformed officers.
22   Q.   Okay.  Give me one second here if you will.
23        Six Zs.  I need to catch up with these
24        exhibits.  I am going to try to screen
25        share.  This will be -- I think -- I think
```

```
 1        there were no new exhibits in Mr. Adcock's
 2         questioning.
 3                    MR. CRAIG:
 4                    Oh, whoever is the host, could
 5            you please transfer screen sharing.
 6                    MR. ADCOCK:
 7                    Yeah, how do I do that, Jim?
 8                    MR. CRAIG:
 9                    I'm older than you, so I don't
10            know either.  Dave or Hannah, how do
11            you we do that?
12                    MS. LOMERS-JOHNSON:
13                    When you click on "Screen
14            Sharing" at the bottom of the
15            screen, there should be a little
16            carrot that comes up that allows you
17            to select, "Allow multiple people to
18            share screen at once," and I think
19            you can select that or you can just
20            make Jim the host if you prefer.
21                    MR. CRAIG:
22                    Great.  Thank you, Hannah.
23                    MR. ADCOCK:
24                    Right, I -- I prefer to do that,
25            but I just don't know how to do
```

```
 1                   that.
 2                        MR. CRAIG:
 3                        Well, you go to the screen --
 4                   she's saying go to, like, you were
 5                   going to screen share, hit that same
 6                   button, and then there should be a
 7                   menu that comes up, and -- and among
 8                   the selections on the menu.
 9                        MR. ADCOCK:
10                        All right.  Let me try.
11                        MR. CRAIG:
12                        Yeah.  If it doesn't work, it
13                   doesn't work.
14                        MR. ADCOCK:
15                        How about -- maybe try it now,
16                   Jim.
17                        MR. CRAIG:
18                        Okay.  Yes, sir.  Thank you.
19    BY MR. CRAIG:
20    Q.   Mr. Dohm, are you seeing this picture?
21    A.   I can see it.
22    Q.   Super.  This is going to be "Exhibit 1" to
23         your deposition.  It is in the overall
24         numbering six Zs as in zed as the -- as
25         some folks would say.  And do you see a
```

1          line of Louisiana State Police Troopers

2          there at the corner of East and France?

3   A.    Correct.

4   Q.    And that would be -- you had mentioned

5          being behind a line, and so I guess one

6          question is -- well, first of all, you

7          under -- do you understand the orientation

8          of this picture, that is, it appears the

9          Troopers are facing the protestors across

10         the street, across East Street?

11  A.    That's correct.  The cameraman is facing

12         south taking this picture.

13  Q.    Okay.  Thank you.  And so I don't think

14         because you were wearing that very

15         distinctive shirt, that maroon red shirt, I

16         don't -- I don't know that you're in this

17         view.  Just in case, do you see yourself?

18  A.    I do not.

19  Q.    Do you know -- does this picture help you

20         to describe for us where you would have

21         been located when you first arrived at the

22         corner of East and France?

23  A.    Yes, I would be to the left.  I can

24         possibly be even -- if you're looking at

25         the picture, to your left, which would be

1        to the east down France.

2   Q.   Okay.  So looking at these officers here

3        who don't have helmets on, you're saying --

4        you would be saying down France away from

5        the protestors behind where these officers

6        here are standing?

7   A.   That's correct.

8   Q.   Great.  I'm going to share one other

9        picture.  Can you see that picture, Mr.

10       Dohm?

11  A.   I can see it.

12  Q.   So apparently there's -- you would agree

13       with me there's a group of sheriff deputies

14       with shields across -- across East Street

15       -- well, where -- help me out.  You did --

16       you did very well, better that I did on the

17       first picture anyhow.  So looking at this

18       picture, can you tell us the orientation?

19            MR. SCOTT:

20            Jim, could you make it a little

21       bigger.

22            MR. CRAIG:

23            That's an excellent question, and

24       we will find out.  Oops, hang on.

25            Is that bigger?

```
 1              MR. SCOTT:
 2                   Yes, that's -- that's bigger.
 3    BY MR. CRAIG:
 4    Q.   Okay.  Does this help you tell us what the
 5         orientation of this picture is as in where
 6         would the photographer or videographer be
 7         standing and where would -- they would be
 8         facing?
 9    A.   I can see that they're -- it looks like
10         France Street by the sign back there.
11    Q.   Right, and so would that mean that this
12         group of deputies and police officers are
13         forming a line across East?
14    A.   Based on that picture, I'll go along with
15         that.  I can say I agree with that.
16    Q.   Okay, and so this would not be -- this
17         would not be the area -- you were not
18         standing behind these officers.  Is that
19         correct?  They're on a different side of
20         the corner?
21    A.   Hold on.  Let me get my bearings.
22    Q.   Yeah.
23    A.   I believe so, because I would have been
24         further on France Street.
25    Q.   You went out on me right before the words,
```

```
 1         "France Street."
 2    A.    I said I believe so because I was on France
 3         Street.
 4    Q.    You were on France Street.  Okay.  Thank
 5         you.
 6                   MR. CRAIG:
 7                   And for the record, that will be
 8              "Exhibit 2," and it is on the
 9              overall marking, seven As.
10    BY MR. CRAIG:
11    Q.    When you first arrived, did you have any
12         orders to arrest protestors at that point?
13         In other words, you -- you arrived with
14         your -- with your colleagues in the
15         Narcotics Division.  What -- what orders
16         did you have at the point in which you
17         arrived?
18    A.    I don't remember exactly when they were
19         given to us, but our job or our -- what we
20         were instructed to do was we were going to
21         be handed or we would receive individuals,
22         and we were to walk -- transport those
23         individuals to the transport personnel.
24    Q.    Okay.  Did you move your position at any
25         point where you were staged in the time
```

1      after you arrived at East and France?  In

2      other words, at one point you were down --

3      you were down France as you indicated with

4      reference to that photograph, and obviously

5      you moved at various points to transport

6      Ms. Imani and -- and perhaps others as

7      you've previously testified, but -- but was

8      there a point in which you moved from your

9      standing location on France behind the line

10     of other officers to a position closer to

11     the yard at the corner of East and France?

12  A.  As the -- as that line that you showed me

13     in that previous pictures, they proceeded,

14     which would be west, we followed in behind

15     them, because our job was like I'll state

16     again was to receive an individual and then

17     walk them or transport them to the

18     transport personnel.  That way the front

19     line people or the second line people, they

20     didn't have to be tied -- be busy with

21     walking these people to the transport.  So

22     our job was to receive them and transport

23     them, and as they moved up, we would have

24     moved up behind them or walked in behind

25     them to be closer to them.

1   Q.   Okay, and my apologies if this is repeating

2        something Mr. Adcock asked you, but did you

3        -- do you remember hearing or receiving an

4        order for protestors to be arrested?

5   A.   I know there were several announcements

6        made over a -- I don't know exactly know

7        how long we were out there, but we were out

8        there a long time where orders or requests

9        for the crowd to disperse over the PA

10       system was given numerous times.

11  Q.   Okay, but were you -- what precipitated the

12       movement of -- of law enforcement officers

13       onto the yard and the beginning of the

14       arrests?

15  A.   I -- I don't know the exact answer to that.

16       Like I say, our job was to transport an

17       individual from where they were handed to

18       us back.  So we were in the back, and we

19       were doing what our job was, which was

20       basically a supporting role.

21  Q.   If -- thank you.  So you don't -- just to

22       make sure that I'm understanding you

23       correctly, you don't recall any specific

24       order?  It wouldn't have been given to you.

25       It would have been given to the officers in

```
 1          front of you, but you don't recall any
 2          specific order, proceed to make arrests or
 3          anything of that sort?
 4    A.    I don't -- I -- I don't recall a specific
 5          order.
 6    Q.    Okay, and in performing your duty to -- to
 7          transport people who had been arrested, you
 8          -- you personally went onto the front yard
 9          of the property on the corner of East and
10          France where the protestors were standing.
11          Is that correct?
12    A.    I don't recall specifically if I was on --
13          inside the yard or -- or not, but it's
14          possible.
15    Q.    Okay.  From your vantage point in -- at the
16          point which you were beginning to transport
17          arrested individuals, you saw -- you saw
18          other Baton Rouge Police Department
19          Officers going onto the front yard of the
20          property at the corner of East and France?
21    A.    I saw officers.  I -- I don't know who they
22          worked for, but yes, I did see police
23          officers on -- in that yard.
24    Q.    Okay, and you -- and you don't recall
25          seeing that some of them were Baton Rouge
```

```
 1        Police Department Officers?
 2   A.   It's -- it's very possible.  I don't recall
 3        --
 4   Q.   Okay.
 5   A.   -- as we sit here today.
 6   Q.   Okay, and do you recall seeing any
 7        Louisiana State Police Troopers on the yard
 8        of the property at the corner of East and
 9        France where the protestors had been
10        standing?
11   A.   Same -- same thing.  It was a group.  It
12        was a large group of people on both sides.
13        It's very possible, but I don't want to sit
14        here and say yes, one hundred percent I saw
15        State Policemen, but I believe so.  It's
16        very possible given all the incidents and
17        actions that were going on at the time.
18   Q.   Okay.  Protestors were arrested that --
19        arrests of some protestors were made in --
20        in that front yard.  Is -- is that correct?
21   A.   I believe so.
22   Q.   Okay, and some protestors were arrested on
23        the sidewalk that I think is on East in
24        front of the house at the corner of East
25        and France?
```

1    A.    I believe so.

2    Q.    And some protestors were arrested on both

3          East and France Streets at that -- at the

4          point in which arrests commenced?

5    A.    Okay.

6    Q.    Oh, my -- my question is whether you

7          remembered that.  If you don't --

8    A.    Oh, no, I -- I don't recall specifically

9          who was arrested, where they were arrested,

10         but I'm saying, I -- you know, I -- it's --

11         it's very believable.  It's very possible,

12         plausible, but for me to have first-hand

13         knowledge of exactly where people were

14         detained or arrested at, I -- I couldn't

15         speak on that.  I'm just saying given the

16         circumstances, the videos that you-all

17         showed, the pictures, I'm saying I -- I'll

18         go -- you know, I'll go with it, but as far

19         as specifics, I'm Not quite sure.

20   Q.    Okay.  Mr. Adcock focused on the arrest of

21         one protestor who you transported.  We

22         talked about that for a fair bit this

23         morning.  I -- is it true that you

24         accompanied other protestors from the

25         point at which they were initially detained

```
1              to the processing station or was -- was it
2              just that one?
3    A.    No, sir.  It was more -- more than her.
4    Q.    Do you have any -- any notion of how many
5              that you might have transported?
6    A.    No, sir.
7    Q.    Would it have been more than ten or -- or
8              are you even able to tell that?
9    A.    I couldn't tell you if it was more than ten
10             or not.
11   Q.    Okay, and you observed -- did you observe
12             other protestors being detained and then
13             transported to prisoner processing by your
14             colleagues that you were not participating
15             in, but you saw other colleagues leading
16             folks away?
17   A.    Yes, sir.
18   Q.    Do you recall any protestors being given a
19             summons for a municipal violation rather
20             than being arrested under a state statute?
21   A.    I -- I don't recall.
22   Q.    Do you recall any discussions or orders to
23             arrest protestors under the state statute
24             for obstruction of a highway of commerce or
25             obstruction of a road rather than the
```

1      similar City/Parish Ordinance?
2   A.    I don't recall.
3   Q.    Okay.  Mr. Adcock asked you some about the
4      probable cause affidavits that were used
5      that day.  Was it your understanding that
6      the affidavit forms for July 10th came from
7      the Baton Rouge Police Department?
8   A.    To be honest, I don't recall where it came
9      from.  I just know that we were told to
10      transport these people on to the processing
11      team and every -- and they would take care
12      of everything.
13   Q.    Okay.  So you don't recall swearing -- you
14      yourself didn't fill out or sign any
15      probable cause affidavits with respect to
16      protestors you had transported?
17   A.    That is correct.
18   Q.    Okay.  Let's take just a five-minute break.
19      It might even be sooner than that as I
20      consult with my -- my colleague, Ms.
21      Lomers-Johnson about if we have anything
22      further.  Then we'll may be ready to close
23      this out.  So let's please go off the
24      record.
25              MR. SCOTT:

```
1                    Okay.
2                    (Break in proceedings.)
3    BY MR. CRAIG:
4    Q.   Thank you, Mr. Dohm.  We have no further
5         questions.  Possibly the Parish Attorneys'
6         Office or the attorney from the State
7         Police Trooper may have questions, but
8         that's -- that's the end of my questioning.
9         Thank you for being here today.
10                   MR. SCOTT:
11                   Greg?
12                   MR. FAHRENHOLT:
13                   I have no questions.
14                   MR. SCOTT:
15                   Nor do I.
16                   MR. ADCOCK:
17                   All right.  That's what I like to
18             hear.  So I think we're done.  Is
19             everybody -- is that right?  Thank
20             you, Raynel.
21                   THE COURT REPORTER:
22                   Thank you, John.
23                   (Whereupon, the taking of the
24             witness' testimony was concluded.)
25
```

```
 1              C E R T I F I C A T E
 2          THIS CERTIFICATION IS VALID ONLY FOR
    A TRANSCRIPT ACCOMPANIED BY MY ORIGINAL
 3  SIGNATURE AND ORIGINAL REQUIRED SEAL ON THIS
    PAGE.
 4
            I, RAYNEL E. SCHULE, Certified Court
 5  Reporter, #77005, in good standing, in and for
    the State of Louisiana, as the officer before
 6  whom this testimony was taken, do hereby certify
    that JASON DOHM, after having been duly sworn by
 7  me upon authority of R.S. 37:2554, did testify
    as hereinbefore set forth in the foregoing 87
 8  pages; that this testimony was reported by me in
    stenotype reporting method, was prepared and
 9  transcribed by me or under my personal direction
    and supervision, and is a true and correct
10  transcript to the best of my ability and
    understanding; that the transcript has been
11  prepared in compliance with transcript format
    guidelines required by statute or by rules of
12  the Board, that I have acted in compliance with
    the prohibition on contractual relationships, as
13  defined by Louisiana Code of Civil Procedure
    Article 1434 and in rules and advisory opinions
14  of the Board; that I am not of counsel, not
    related to counsel or to the parties herein, nor
15  am I otherwise interested in the outcome of this
    matter.
16
17
18  _____  _____
    Date                   Raynel E. Schule, CSR
19                         Certified Shorthand Reporter
                           State of Louisiana
20
21
22
23
24
25
```

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**