UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


BLAIR IMANI, et al              )
                                )
            Plaintiffs,         )
     V.                         )
                                ) DOCKET NO.:
CITY OF BATON ROUGE, et al      ) 17-cv-00439-JWD-EWD
                                )
            Defendants.         )



DEPOSITION OF

CURTIS WILSON

appearing remotely via Zoom videoconference from
Baton Rouge, Louisiana taken in connection with the
following captioned cause, pursuant to the
following stipulations before Brenda R. Breaux,
Registered Professional Reporter, Certified Court
Reporter for the State of Louisiana, appearing
remotely from Covington, Louisiana on August 11,
2021, beginning at 8:00 a.m.

```
 1                  REMOTE APPEARANCES
 2    For the Plaintiffs
          (Imani v. City of Baton Rouge):
 3
      MOST  & ASSOCIATES
 4    (BY:  WILLIAM B. MOST, ESQ.)
      williammost@gmail.com
 5    PHONE:  (504) 509-5023
      (BY:  DAVID J. LANSER, ESQ.)
 6    david.lanser@gmail.com
      PHONE:  (504) 533-4521
 7    201 St. Charles Avenue
      Suite 114 #101
 8    New Orleans, Louisiana 70170
 9
      For the Plaintiffs
10          (Smith v. City of Baton Rouge,
            Batiste-Swilley v. City of Baton Rouge, and
11          Tennart v. City of Baton Rouge):
12    RODERICK & SOLANGE MacARTHUR JUSTICE CENTER
      (BY:  ERIC A. FOLEY, ESQ.)
13    eric.foley@macarthurjustice.org
      (BY:  JAMES W. CRAIG, ESQ.)
14    jim.craig@macarthurjustice.org
      4400 S. Carrollton Avenue
15    New Orleans, Louisiana 70119
      PHONE:  (504) 620-2259
16
17    For City/Parish of Baton Rouge and Baton Rouge City
      Police Department Officers:
18
      OFFICE OF THE EAST BATON ROUGE PARISH ATTORNEY
19    (BY:  JOSEPH K. SCOTT, III, ESQ.)
      joseph@josephscott.com
20    222 St. Louis Street
      #143
21    Baton Rouge, Louisiana 70802
      PHONE:  (225) 389-3114
22
23
24
25
```

```
 1              REMOTE APPEARANCES (CONTINUED)
 2    For Louisiana State Police and Individual State
         Police Troopers:
 3
      BURGLASS & TANKERSLEY, LLC
 4    (BY:  GREGORY C. FAHRENHOLT, ESQ.)
      gfahrenholt@burglass.com
 5    5213 Airline Highway
      Metairie, Louisiana 70001
 6    PHONE:  (504) 836-0408
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    INDEX
 2   CAPTION....................1
 3   APPEARANCES...............2-3
 4   AGREEMENT OF COUNSEL.......6
 5
 6   EXAMINATION OF CURTIS WILSON
 7   BY WILLIAM MOST............8, 72
 8   BY ERIC FOLEY..............63, 77
 9
10   WITNESS' CERTIFICATE.......95
11   REPORTER'S CERTIFICATE.....96
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                          EXHIBITS

2                      (NONE OFFERED.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

S T I P U L A T I O N

1

2       It is stipulated by and among Counsel that the

3  Zoom videoconference deposition of CURTIS WILSON is

4  being taken under the Federal Rules of Civil

5  Procedure for all purposes permitted under the law.

6       The formalities of reading and signing are not

7  waived.

8       The formalities of sealing, certification and

9  filing are hereby waived.  The party responsible

10  for services of the discovery material shall retain

11  the original.

12      All objections, except those as to the form of

13  the questions and/or the responsiveness of the

14  answers, are reserved until the time of the trial

15  of this cause.

16                *   *   *   *   *

17      Brenda R. Breaux, Certified Court Reporter,

18  Registered Professional Reporter, in and for the

19  State of Louisiana, officiated in administering the

20  oath to the witness.

21

22

23

24

25

```
 1                   CURTIS WILSON,
 2          after having been first duly sworn,
 3   testified on his oath as follows:
 4             P R O C E E D I N G S
 5        COURT REPORTER:
 6             Will counsel please identify
 7        themselves and their affiliations and also
 8        stipulate that by agreement of all parties,
 9        this deposition is being held via
10        videoconferencing, and there is no objection to
11        the witness being sworn in remotely.
12             MR. MOST:
13             This is William Most and I have Dave
14        Lanser also present on this call for plaintiffs
15        Imani and we so stipulate.
16             MR. CRAIG:
17             Jim Craig, lawyer for the plaintiffs in
18        the Tennart, Smith, and Batiste-Swilley cases.
19        And we similarly stipulate.
20             MR. SCOTT:
21             Joseph Scott for the City of Baton
22        Rouge, Parish of East Baton Rouge, Baton Rouge
23        Police Department, individual police
24        departments, defendants, in particular also
25        Curtis Wilson.  We join in the stipulation for
```

```
 1        purposes of today's deposition.
 2              COURT REPORTER:
 3              You may proceed, Mr. Most.
 4              MR. MOST:
 5              Sure.  And I believe we have a
 6        Mr. Fahrenholt also on the line for State
 7        Police, defendants.  He's currently muted.
 8              Greg, do you have any objections to that
 9        stipulation?
10              MR. FAHRENHOLT:
11              I did not hear the stipulation, but
12        assuming that it's the one we've been using in
13        all other depositions, I have no objection.
14              MR. MOST:
15              Yeah.  I think it was.
16              All right.  Well, let's proceed.  And --
17        and Joe, can we stipulate that this deposition
18        was properly noticed and the court reporter is
19        duly qualified?
20              MR. SCOTT:
21              Yes, sir.
22              MR. MOST:
23              Okay.
24                 E X A M I N A T I O N
25   BY MR. MOST:
```

1    Q.    Good morning, Officer Wilson.

2    A.    Good morning, sir.

3    Q.    My name's William Most.  I'm an attorney

4  and I represent the plaintiffs in one of the

5  protestor cases, the Imani protestor case.  And the

6  -- there are -- there's an attorney, Jim Craig from

7  some of the other cases as well on this line.  This

8  is a deposition we'll be doing for all the

9  protestor cases that these lawyers are handling.

10         Officer, could you give us your full

11  name and title for the record.

12    A.    Curtis Wilson.  I'm a Baton Rouge Police

13  Officer.  I work out of Fourth District, C shift,

14  dog shift.

15    Q.    And what's your current rank?

16    A.    I'm a corporal.

17    Q.    Okay.  Would you like me to call you

18  Corporal Wilson, Mr. Wilson, Officer Wilson, do you

19  have a preference?

20    A.    You can call me -- you can call me

21  Wilson or Curtis, it doesn't -- it doesn't matter

22  to me.

23    Q.    Okay.  I -- I may call you Officer for

24  -- because it's easier for me.

25    A.    All right.

1      Q.     But if you want anything different, let

2    me know.

3      A.     No, that's fine.

4      Q.     Officer Wilson, have you ever given a

5    deposition before?

6      A.     Yes.  Yes.

7      Q.     Okay.  Have you given more than one

8    deposition before?

9      A.     Yes, sir.

10     Q.     Approximately how many depositions have

11   you given in the past?

12     A.     At least two.

13     Q.     Okay.  What was the first deposition you

14   gave, what kind of case was that?

15     A.     A civil matter.  It was in reference to

16   a traffic crash Toyota's -- involving Toyota's

17   airbags.  It was a nondeployment issue or something

18   -- something to that nature.

19     Q.     You were a party to that case or just a

20   witness?

21     A.     I was the primary officer documenting

22   the -- the actual traffic crash.

23     Q.     Okay.  So you weren't a plaintiff or a

24   defendant in that case?

25     A.     No, sir.

1      Q.    Okay.  What about the second deposition

2  you took, what was that about?

3      A.    I can't remember the specifics of it,

4  but I remember at some point meeting with --

5  meeting with attorneys and -- but it wasn't a -- I

6  want to say it was along the same lines as that

7  civil case.

8      Q.    Okay.  Were you a -- a plaintiff or a

9  defendant in that case?

10      A.    No, sir.

11      Q.    Okay.  Any other depositions you can

12  recall taking in the past?

13      A.    No, sir, not that I recall.

14      Q.    Okay.  So you've given at least two

15  depositions.  So you understand that in a

16  deposition like we're doing today, you're currently

17  under oath, correct?

18      A.    Correct.

19      Q.    And you understand that your answers

20  here today have the same force as if we were in a

21  court room with a judge or jury?

22      A.    Yes, sir.

23      Q.    And is there anything today that will

24  prevent you from giving me your full attention and

25  truthful and complete answers?

1        A.      No, sir.

2        Q.      Are you taking any medications or

3    suffering from any illness that would prevent you

4    from giving me your full attention and complete and

5    truthful answers?

6        A.      No, sir.

7        Q.      And I understand you're coming off of a

8    night shift right now?

9        A.      I'm coming off of the night -- night

10   shift schedule; yes, sir.  But I was off last

11   night.

12       Q.      Oh, okay.

13       A.      So.

14       Q.      Okay.  Glad to hear that.  I -- I was

15   going to ask you if you were still fatigued from

16   the night shift but it doesn't sound like that's an

17   issue.

18       A.      Just trying to get back on the family's

19   schedule is all, so.

20       Q.      Yeah.  I understand.  So although this

21   is -- we're asking questions as if we're in a court

22   room with a judge and jury, this does not have to

23   be continuous; so if at any point you need to take

24   a break, to get a drink of water, use the bathroom,

25   that's okay, we'll take a break.  Just let your

1   attorney or me know that you need to take a break.

2   Although I do -- I will warn you that we will ask

3   you who you talked to during the break and what you

4   discussed even if it was with your attorney.  All

5   right?

6        A.    Yes, sir.

7        Q.    And officer, one thing you're already

8   doing well and will continue doing is waiting for

9   me to finish my question before giving your answer

10  and in return, I will do my best to wait for you to

11  finish your answer before I ask a question, that

12  way we'll have a clean transcript for the court

13  reporter.  All right?

14       A.    Okay.

15       Q.    And, Officer Wilson, if I ask a question

16  that isn't clear or you don't understand the

17  question, will you agree to let me know that it's

18  not clear or you don't understand rather than

19  trying to answer it anyway?

20       A.    I'll do my best.

21       Q.    Okay.  But will you agree to tell me if

22  you don't understand the question?

23       A.    Oh, yeah; yes, I will.

24       Q.    Okay.  Thank you.  Also, this deposition

25  is -- is by Zoom, and so we can't see who's in the

1    room with you.  Is there anyone in the room with

2    you besides Mr. Scott?

3        A.    No, sir.  Well, the cabinets.

4        Q.    I'm sorry?

5        A.    The cabinets back here, no.

6        Q.    Okay.  I'm less worried about the

7    cabinets; however, if anyone tries to communicate

8    with you during the deposition, either your

9    attorney by texting you, sliding you a piece of

10   paper, hand signals, calling you, anything, will

11   you please agree to let us know that that's

12   occurring?

13       A.    Yes, sir.

14       Q.    Okay.  Officer, do you know what cases

15   you're here for today?

16       A.    Yes, sir.

17       Q.    What's your understanding of the cases

18   that you're here for today?

19       A.    Could you elaborate?  I...

20       Q.    Sure.

21       A.    What are you looking for?

22       Q.    Yeah.  Just in a broad sense.  What are

23   the cases you're here for today about?  Are they

24   about a traffic crash?  About police practices?

25   Just in a big picture sense.

1      A.    It's two individual arrests relative to
2   the 2016 protest.
3      Q.    Okay.  And -- and do you understand that
4   you are a defendant in at least one of these cases?
5      A.    I'm not -- I -- I didn't know.  I didn't
6   know that.
7      Q.    Okay.  So you didn't know -- you don't
8   know that you are personally being sued in this
9   case?
10      A.    I didn't -- I didn't know it to be
11   exactly that, that that was the case, but I can
12   understand that.
13      Q.    Okay.  Well, again, I'll let you know
14   you are a -- a defendant in the -- at least the
15   Imani case.  You --  you are personally named as a
16   defendant in that case and you are one of the
17   people being sued in addition to the -- the City of
18   Baton Rouge.
19            Officer, what did you do, if anything,
20   to prepare for this deposition today?
21      A.    Nothing, I just -- I just came in and
22   looked at -- I literally just went over maybe five
23   minutes of just looking through the -- the
24   different documentation it took to make these two
25   arrests.

1        Q.    Okay.  So aside from a few minutes of

2    looking at documents this morning you haven't done

3    anything to prepare for this deposition?

4        A.    No, sir.

5        Q.    Okay.  And -- and the documents that you

6    looked at to prepare for this deposition, are they

7    all in -- on the table in front of you?

8        A.    The ones that I've been given, yes.  Rap

9    & PC.  I've got a -- a deposition notice.  The

10   report.  And just some -- yeah, I got the reports

11   in front of me.  Yes, sir.

12       Q.    Okay.  So I just want to go through each

13   of those documents and make sure that we both

14   understand what you're looking at.  So the first

15   document you said, did you say a Rapid PC?

16       A.    Yes, sir.

17            MR. SCOTT:

18            Rap and PC.

19            THE WITNESS:

20            Yeah.

21   BY MR. MOST:

22       Q.    Okay.  And so that's -- that's an

23   affidavit of probable cause and a rap sheet for an

24   arrestee?

25       A.    Yes, sir.

1      Q.    Who is the arrestee identified on that?

2      A.    Fishbein.

3      Q.    Okay.  Okay.  Let me just see if I can

4   pull up the same.

5              MR. SCOTT:

6              William, that would we July 20th

7         supplemental response.

8              MR. MOST:

9              Yeah.

10             (Sharing document electronically.)

11   BY MR. MOST:

12     Q.    Okay.  Can you see the screen here,

13   Officer?

14     A.    Yes, sir.

15     Q.    And so you see this is Exhibit C.  This

16   is the -- is this the same affidavit of probable

17   cause for Fishbein that you're looking at?

18     A.    Yes, sir.

19     Q.    Okay.  Great.  And then also on the

20   table you have the deposition notice.  That's the

21   deposition notice for you to appear today; is that

22   right?

23     A.    Yes, sir.

24     Q.    And what are the other documents you

25   have there on the table?

```
 1        A.    Got the report as well.
 2        Q.    An initial report?
 3        A.    Initial and supplement report.
 4        Q.    For -- for what arrestee?
 5        A.    Also we have the arrestee information
 6   form and probable cause affidavit for Feldman.
 7        Q.    Okay.  Great.
 8             MR. SCOTT:
 9             I think he's asking who's in your
10        initial report.
11   BY MR. MOST:
12        Q.    Yes.  Who's -- who's identified as the
13   arrestee on the initial report you have in front of
14   you?
15        A.    Ms. Feldman.
16        Q.    Okay.  Great.  Any other documents
17   besides the one we -- we just discussed?
18        A.    No, sir.
19        Q.    Okay.
20             MR. SCOTT:
21             Is that her second report?
22             THE WITNESS:
23             This is Mr. Feldman.
24   BY MR. MOST:
25        Q.    Okay.  Officer, just in a nutshell,
```

```
 1   what's your educational and professional history,
 2   the short version?
 3        A.    High school graduate, Marine Corps for
 4   six -- six years; six years active, two years
 5   inactive.  Joined the police department after
 6   working, you know, a hand -- handful of jobs in
 7   between that.
 8        Q.    And what year did you become a police
 9   officer?
10        A.    2014.
11        Q.    So you've been a police officer for
12   approximately seven years?
13        A.    Yes, sir.
14        Q.    Have you been at Baton Rouge Police
15   Department for the entirety of your career as a
16   police officer?
17        A.    Yes, sir.
18        Q.    And what various roles have you had in
19   your seven years at Baton Rouge Police Department?
20        A.    Uniform patrol for a short -- for a good
21   -- good long, I think three, three and a half
22   years.  I was in full time SWAT for two years.  And
23   now I'm back out on the road working in the same
24   building as I -- as I was when I came out from the
25   academy.
```

1    Q.    Okay.  So back to uniform patrol?

2    A.    Yes, sir.

3    Q.    Okay.  And in -- in July of 2016, what

4    was your -- what was your role?

5    A.    In uniform patrol working Fourth

6    District dog shift.

7    Q.    Okay.  So you understand that -- that

8    the cases we're here about today are about protests

9    that happened in July of 2016; do you understand

10   that?

11   A.    Yes.

12   Q.    Okay.  Do you recall those protests in

13   July of 2016?

14   A.    Yes.

15   Q.    In particular, the case that -- that I'm

16   an attorney on is about July 10th, Sunday, July

17   10th, 2016, the protests and arrests that happened

18   in the vicinity of East and France; do you recall

19   that -- that event in particular?

20   A.    Yes.

21   Q.    Okay.  So on Sunday, July 10th, what was

22   your role?

23   A.    We were -- we were the -- we were -- I

24   guess to sum it up, what are -- what are their --

25   what are their name, mobile field force was --

```
 1    mobile field force and other officers in a
 2    tactically, you know, mobile field force would be
 3    up front and officers would be behind mobile field
 4    force and officers, myself and other officers,
 5    would be giving commands to people that were in the
 6    roadway.  And mobile field force would take them
 7    into -- into custody.  And in these two cases, I
 8    placed both subjects in -- in handcuffs and
 9    arrested them for -- for these charges.
10        Q.    Okay.  So it's your testimony that you
11    personally placed these two individuals in
12    handcuffs?
13        A.    Prior to them being transported; yes,
14    sir.
15        Q.    And by these two individuals, we're
16    talking about Ms. Feldman and Ms. Fishbein?
17        A.    Yes, sir.
18        Q.    Okay.  Okay.  I'm going to share Exhibit
19    A at page 30.
20              (Sharing document electronically.)
21    BY MR. MOST:
22        Q.    Do you see this diagram here, Officer?
23        A.    Yes, sir.
24        Q.    You see that this is a map and a diagram
25    of the area around East and France?
```

1    A.    Yes, sir.

2    Q.    And does this appear to be an -- an

3 accurate diagram of -- of where the protesters were

4 and where lines of police were?

5    A.    I -- let me -- let me analyze it for --

6 for a minute.  (Reviewing document.)

7         Yes, sir.

8    Q.    And so where were you stationed on this

9 map?

10   A.    Just north of France Street.

11   Q.    Okay.  Just north of the intersection

12 of -- of France Street and East Boulevard?

13   A.    Yes, sir.

14   Q.    Okay.  Okay.  So -- so your role on

15 Sunday, July 10th, 2016 was to -- part of that was

16 to issue orders to protesters; is that right?

17   A.    Yes, sir.

18   Q.    Okay.  And then part of your role was to

19 arrest and take into custody some of those

20 protesters and comply with those orders; is that

21 correct?

22   A.    Yes, sir.

23   Q.    And then would you walk them from the

24 area wherever they were arrested to a processing

25 area?

1      A.    Yes, sir.

2      Q.    And then what would happen at the

3  processing area?

4      A.    What I can remember was from this --

5  from this incident was obviously it was chaotic,

6  you know, that day with a lot of people out there,

7  a lot of moving parts.  But the subjects were being

8  placed in handcuffs and making sure they didn't

9  have any weapons.  I'm Terry patting for weapons

10  and searching each as a risk.  And then the

11  documentation process started.

12      Q.    Okay.  And the documentation process,

13  that happened at that processing area that we were

14  talking about?

15      A.    Yes, sir.

16      Q.    Okay.  And by the document processing,

17  do you mean the filling out of affidavits of

18  probable cause?

19      A.    Yes, sir.

20      Q.    Okay.  Did you have the affidavits of

21  probable cause with you or did someone at the

22  processing center have them?

23      A.    It was at the -- what we -- it was

24  actually a prefilled out; so I didn't fill it out.

25  It was one of -- it was like a -- a blanket PC for

```
 1    -- for, I guess, you know, expediting the process
 2    because we had so many arrestees.
 3         Q.    Sure.  Were you carrying those
 4    preprinted affidavits around in your pocket or did
 5    someone at the processing area have a -- a stack of
 6    them?
 7         A.    Yes, somebody had -- somebody had
 8    several of them and I -- I happened to get more; so
 9    I was given -- given one and gave it a -- gave it a
10    look over.  I'm guessing leadership was -- was
11    passing them down.
12         Q.    Okay.  And so you signed the affidavits
13    of probable cause at that processing area?
14         A.    Yes, sir; that's what I -- I recall
15    that.  I believe so.
16         Q.    Okay.  And did someone notarize your
17    affidavit of probable cause?
18         A.    Yes, sir, but I'm not -- I don't -- I
19    can't tell who it is by the signature here.  But I
20    don't -- it looks as if a -- a sergeant in rank
21    did; yes, sir.
22         Q.    Did that notarizing happen at that
23    processing area?
24         A.    I -- I don't recall.  I believe so, but
25    I don't recall.
```

1      Q.    And did someone swear you in before you

2   signed the affidavit of probable cause?

3      A.    Swore me in out there on the street?  Is

4   that what you're asking, sir?

5      Q.    Yes.

6      A.    No, sir.

7      Q.    Okay.  Did -- did the notary watch you

8   sign it or -- for --

9      A.    I don't recall.

10     Q.    Okay.  I want to ask you a few questions

11  about an arrest affidavit and what it is.

12     A.    Yes, sir.

13     Q.    The Code of -- Louisiana Code of

14  Criminal Procedure describes an affidavit as,

15  quote, an affidavit is a written accusation of a

16  crime made under oath and signed by the affiant,

17  end quote.

18         Is that your understanding of what an

19  affidavit of probable cause is?

20     A.    Yes, sir.

21     Q.    Okay.  So an affidavit of probable cause

22  has to be a truthful description of the probable

23  cause for someone's arrest, correct?

24     A.    Right.

25     Q.    It has to detail the facts of the crime

1    that they're accused of, correct?

2        A.    Maybe.

3        Q.    It has to say that this particular

4    arrestee at this particular time and place

5    committed this particular alleged crime, correct?

6        A.    Yes, sir.

7        Q.    The affidavit of probable cause is the

8    document that justifies the arrest of that person,

9    correct?

10       A.    Yes, sir.

11       Q.    It's the document that tells us whether

12   that was a justified arrest or a false arrest,

13   correct?

14       A.    In courts; yes, sir.

15       Q.    Okay.  And so if an affiant lies or

16   swears to false information in that affidavit of

17   probable cause, they're manufacturing false

18   evidence, correct?

19       A.    I -- I'm not sure.  I'm not sure about

20   that kind of -- repeat -- can you repeat your

21   question again --

22       Q.    Sure.

23       A.    -- just so I'm clear?

24       Q.    So if an affiant -- you know what an

25   affiant is, right?

```
1        A.     Myself.

2        Q.     Okay.  An affiant is whoever is signing

3    the affidavit of probable cause, right?

4        A.     It's not necessarily whoever's signing

5    it, it's whoever -- it's -- it's what we explain

6    this -- what this affidavit is, it's the person

7    that's -- is signing relative to the -- to the

8    actual information here; yes, sir.

9        Q.     Okay.  So the person signing it is the

10   affiant for any particular affidavit of probable

11   cause, correct?

12       A.     Normally; yes, sir.

13       Q.     Okay.  So if -- if an affiant on an

14   affidavit of probable cause swears to things that

15   aren't true in the affidavit of probable cause and

16   then signs their name to it under oath, they're

17   creating a false document, correct?

18       A.     It'd be perceived that way; yes, sir.

19       Q.     Would you agree that that's what they're

20   doing?

21       A.     I can't speak on other -- on other

22   people's behalf, sir.

23       Q.     Well, do you have any reason to disagree

24   with the idea that swearing to false information in

25   an affidavit of probable cause is creating a false
```

1    document?

2        A.    I understand the idea you're -- you're

3    -- you're saying, I -- I can -- I can see where

4    you're going with that and why it would be creating

5    a false document; yes, sir.

6        Q.    Right.  But I'm trying to figure out, do

7    you -- is that your understanding?

8        A.    Yes.

9        Q.    Okay.  And part of the reason an

10   arrestee has to have an affidavit of probable cause

11   is because they can't be booked into the East Baton

12   Rouge Parish Prison without one, correct?

13       A.    Correct.

14       Q.    And filling out the affidavit of

15   probable cause is the duty of the arresting officer

16   for that arrestee, correct?

17       A.    Yes, sir.

18       Q.    Okay.  All right.  So Officer, your

19   badge number is P-1057; is that right?

20       A.    1057; yes, sir.

21       Q.    Okay.  Oh, and before we move on, one

22   officer can't sign another officer's name on an

23   affidavit of probable cause, correct?

24       A.    Right.

25       Q.    If they did that, they'd be forging

1    another officer's signature, correct?

2         A.    Uh-huh.

3         Q.    And forging another officer's signature

4    on an affidavit of probable cause, that would be a

5    criminal act typically, correct?

6         A.    I would -- I would -- I would think so.

7    I wouldn't doubt that; yes, sir.

8         Q.    Okay.  Okay.  So I --I'm going to pull

9    up here what is labeled Exhibit UUUUU, that's five

10   Us.

11              (Sharing document electronically.)

12   BY MR. MOST:

13        Q.    Do you see this, Officer?

14        A.    Yes, sir.

15        Q.    This is the affidavit of probable cause

16   for Alisha Rae Feldman, correct?

17        A.    Yes, sir.

18        Q.    Okay.  And the signature in the -- on

19   the affiant line, is that your signature?

20        A.    Yes, sir.

21        Q.    Okay.  And -- and you personally signed

22   this document?

23        A.    Yes, sir.

24        Q.    And it -- and this is a document that is

25   signed under oath, correct?

```
 1        A.     You asked me if I was advised -- if I
 2   was sworn under oath out there on the street.  I
 3   was -- I was sworn in -- I was sworn in as a police
 4   officer under oath when I graduated the academy.
 5   Is that what you're referring to or are you
 6   expecting me to say that I was sworn out on the
 7   street when I signed this?
 8        Q.     Yeah, I should be clearer.
 9             What I'm trying to understand is -- is
10   this a -- a document -- you understand the
11   difference between when you're signing a document,
12   just signing it and you're signing it under oath?
13        A.     I wasn't in a court room under oath.  I
14   wasn't out there on the street under oath.  This
15   was a document I perceived that day to be true,
16   signed it with my name and ID; yes, sir.
17        Q.     Okay.  And did you understand that you
18   were signing it under penalty of perjury, it was an
19   under oath document?
20        A.     Yes, sir.
21        Q.     Okay.  And this is a document that is
22   filed with the court, correct?
23        A.     Yes, sir.
24        Q.     Okay.  And it's -- and you can see under
25   synopsis of probable cause here the first word
```

1  says:  The affiant stated to the court.  That's the

2  beginning of that section?

3      A.    Yes, sir.

4      Q.    So this is a document filed with the

5  court and these are statements you, as an officer,

6  are making to the court under your oath under

7  penalty of perjury, correct?

8      A.    Yes, sir.

9      Q.    Okay.  Further down that section it

10 says:  To wit, on the above listed date, numerous

11 Baton Rouge Police Department Officers were

12 assigned by security for peaceful protests; do you

13 see that part?

14     A.    Yes, sir.

15     Q.    Is -- is that truthful?  This -- this

16 was a peaceful protest that you were present at?

17     A.    We were assigned -- we were assigned to

18 give security for a peaceful protest and peaceful

19 protesters.  It was not a peaceful protest

20 considering.  There was arrests made in this

21 matter.

22     Q.    Okay.  What makes you -- or what do you

23 recall that makes you say it was not a peaceful

24 protest?

25     A.    That's up for -- that's up for

1    interpretation, you know, things being thrown is
2    not very peaceful.  Things -- people being -- being
3    hurt are not peaceful to such incidents to occur as
4    a -- at a peaceful protest.
5         Q.    Okay.  So due to --
6         A.    Relative to the charges -- I'm sorry,
7    Mr. Most.
8              Relative to the charges, they weren't --
9    they weren't violent, you know, offenders of any
10   kind, but they were obstructing a roadway and
11   resisting -- resisting arrest.
12        Q.    Okay.  So if I'm understanding you
13   correctly, you're saying there may have been
14   violence at this protest but Ms. Feldman and
15   Ms. Fishbein, to your knowledge, were not involved
16   in any of those acts of violence; is that your
17   testimony?
18        A.    I didn't see them throw anything
19   personally --
20        Q.    Did you see --
21        A.    -- but they did that day prior me
22   contacting them.  So it wasn't a peaceful protest
23   as a whole, but Ms. Feldman and Ms. Fishbein, I
24   didn't observe them to be, you know, throwing
25   bottles and rocks and stuff that -- that -- that

1    actually were thrown during -- during the 2016

2    protests.

3        Q.    Did you see Ms. Fishbein or Ms. Feldman

4    engage in any other acts of violence?

5        A.    They were advised to get out of the

6    roadway and they refused to comply with verbal

7    instructions, and they were taken into custody by

8    BRPD officers and processed for obstruction of a

9    roadway.  Obstructing a roadway, right, Count 1;

10   and resisting, Count 2.

11       Q.    Yeah.  I -- I understand, Officer, but

12   my question was:  Did you see Ms. Fishbein or

13   Ms. Feldman engage in any act of violence?

14       A.    No, sir.

15       Q.    Okay.  Did you personally witness any

16   acts of violence by any protesters on July 10th,

17   2016?

18       A.    I don't recall.  I don't recall.

19       Q.    Do you recall seeing any protester hurt

20   anyone on July 10th, 2016?

21       A.    Not specifically on July 10th regarding

22   the last two questions you asked; no, sir.

23       Q.    Okay.  So this document also says -- it

24   was talking about peaceful protests at and in the

25   vicinity of Baton Rouge Police Department

1    Headquarters located at 9000 Airline Highway.  Is

2    that part of it accurate?

3          A.    That's not accurate.

4          Q.    Okay.  In fact, the protest that

5    Ms. Feldman was arrested at was across town at East

6    and France; is that right?

7          A.    Yes, sir.

8          Q.    Okay.  It says:  Protesters assembled at

9    provided parking areas in surrounding parking lots;

10   is that true of the protest that Ms. Feldman was

11   at?

12         A.    Protesters assembled at provided parking

13   areas.  I'm not sure.  I'm not -- I don't know if

14   there were parking -- parking being provided for

15   those protesters.  I can imagine there were.  You

16   might -- may have to -- to check with traffic

17   division maybe they designated some parking spaces

18   for them.

19         Q.    Okay.  But at the time you signed this

20   you didn't know if that piece of it was true or

21   not, correct?

22         A.    Correct.

23         Q.    So this says that:  During the protest

24   the defendant entered the roadway and was provided

25   another verbal order to exit the lanes of travel.

```
 1   Moments later the defendant entered the roadway
 2   again and was taken into custody by officers on the
 3   scene.
 4            Does that part of it truthfully describe
 5   Ms. Feldman's activity?
 6        A.    Where is that on the -- can you --
 7        Q.    Sure.  It's about three-quarters of the
 8   way down.  The protest -- I'm sorry, about three-
 9   quarters down the synopsis it -- it says:  Moments
10   after a verbal order the defendant entered the
11   roadway again and was taken into custody.
12            Is -- is that true about Ms. Feldman
13   that there was an order and then moments later she
14   was taken into custody?
15        A.    Let me refer to my report and see what
16   it says.
17        Q.    Well before you do that, I -- I want to
18   know what your recollection is.
19        A.    I don't recall exact specifics of -- of
20   -- I remember -- I remember -- I remember, you
21   know, seeing them not, you know, following commands
22   within the roadway and not get out of the roadway.
23   And I remember them being taken into custody; yes,
24   sir.
25        Q.    Okay.  But this description here is very
```

1    specific.  It talks about a specific verbal order

2    and then moments later Ms. Feldman entered the road

3    and was arrested.  That part of it, at least,

4    doesn't necessarily describe what actually

5    happened, correct?

6        A.    Moments later the defendant entered the

7    roadway again and was taken into custody by

8    officers.  Yes, that is correct.  That's -- that is

9    what happened.

10        Q.    Okay.  And you observed that?

11        A.    Yes, sir.

12        Q.    Okay.  So I want to pull up another

13    document, which is Exhibit BB.

14            (Sharing document electronically.)

15    BY MR. MOST:

16        Q.    And -- and basically, Officer, I -- I

17    want to see there's -- if perhaps you'll be

18    refreshed that you did not witness these events.

19    So I'll -- I'm going to do gown to page 19 of

20    Exhibit BB.

21            Do you see that these are requests for

22    admission to Officer Curtis Will -- Curtis Wilson?

23        A.    Which number are we looking at?

24        Q.    We're looking at No. 2 on page 19.

25            Do you see above it, it says:  To

1    Officer Curtis Wilson?

2              THE WITNESS:

3              Which one?

4              MR. SCOTT:

5              Number 2?

6    BY MR. MOST:

7        Q.    Yeah.

8        A.    Admit that you did not personally

9    witness the events described in the July 10th, 2016

10   affidavit.

11             I -- I did witness them not listening to

12   verbal commands to get out of the roadway, and I

13   believe I was part of the group telling them to get

14   out of the roadway in which they did not comply.

15             So I did witness the events described on

16   that date.

17       Q.    Okay.  So this request for admission

18   response is -- is then false, correct?

19       A.    I did witness them in the roadway and

20   them not get out of the roadway after being advised

21   to get out of the roadway.  So whatever that --

22   whatever that is, that's -- that's fact.

23       Q.    Okay.  So this response to Request for

24   Admission No. 2, the response is false, agreed?

25       A.    Sure.

1      Q.    Okay.  Okay.  I'm going to go down to

2   now page 33 of this document which is a

3   verification page; do you see this?

4      A.    Yes, sir.

5      Q.    You see that it's -- it's got your name

6   on it?

7      A.    Yes, sir.

8      Q.    Do you recall reviewing these responses

9   and swearing to the truth of them?

10      A.    Yes, sir.

11      Q.    Okay.  So you -- you did swear to the

12   truth of these documents, right?

13      A.    To my knowledge.  I -- is that a

14   E-signature of some sort?

15      Q.    Well, you tell me.  Did -- did you --

16   did you meet with Ms. Morris at some point and

17   verify that these discovery responses were true?

18      A.    Yes, sir.

19      Q.    Okay.  Well, we just established that at

20   least one of the responses was false, correct?

21      A.    Must have been a clerical -- clerical

22   error of some kind.

23      Q.    Okay.  So you swore under oath that

24   these discovery responses were true.  We've now

25   established that one was false and it's your

```
 1    testimony that the discrepancy there is a clerical
 2    error?
 3         A.    Yes, sir.
 4         Q.    How is admitting something that's not
 5    true a clerical error?
 6         A.    I can remember -- I -- I don't remember
 7    when that was taken.  I don't remember when I -- I
 8    remember going over some things with Ms. Morris --
 9         Q.    Uh-huh.
10         A.    -- you know, it could have been a
11    clerical error in the matter.
12         Q.    Okay.  So -- so you went over these
13    documents in -- in 2019, right; that's the date on
14    this verification page?
15         A.    Yes, sir.
16         Q.    Okay.  So in -- in 2019, you were -- you
17    were swearing under oath that you did not
18    personally witness the events described in the July
19    10th, 2016 affidavit of probable cause for
20    Ms. Feldman, correct?
21         A.    I don't remember being under oath.  I
22    don't remember any of -- any of those questions he
23    asked me back then so I couldn't -- couldn't tell
24    you.
25         Q.    You don't recall looking at -- at them
```

```
1   on a piece of paper?
2               MR. MOST:
3               Okay.  Joe's raising his hand.
4               MR. SCOTT:
5               Yes.  You're digging into his
6       communications with his attorney.
7               MR. MOST:
8               Joe, respectfully, I'm -- I'm not going
9       to ask him about anything he said to his
10      attorney or what his attorney said to him, but
11      I -- I am going to ask him about whether he
12      looked at these documents because he has sworn
13      under oath that he did and I'm going to just
14      see if -- if he did, in fact, look at them
15      before.
16              THE WITNESS:
17              I never looked at these documents here.
18      I remember going -- I remember speaking with
19      Morris about -- about some questions.  Now, if
20      those questions were -- something was
21      misconstrued, I -- I guess from the time those
22      were taken and now.  But my -- my statements
23      have never -- have never changed on these
24      matters.
25  BY MR. MOST:
```

1        Q.    Okay.  So looking back at page 33, this

2    verification page, it says:  Personally came and

3    Curtis Wilson the defendant in the above-captioned

4    matter, who after being duly sworn, did state that

5    he has read the responses and supplemental

6    responses to plaintiff's first set of

7    interrogatories and first set of request for

8    admission.

9             You see where it says that?

10       A.    Yes, sir.

11       Q.    And it's your testimony today that you

12   did not read these responses?

13       A.    I don't remember reading them is -- is

14   my response to your -- your question.  Now, I'm not

15   saying I didn't read them.  I'm saying I don't

16   remember reading them back from 2019.

17       Q.    Okay.

18       A.    I may have read them and I may not have

19   looked at them close enough, obviously.

20       Q.    Okay.  So we established that at least

21   parts of the affidavit of probable cause for

22   Ms. Feldman were not accurate, right; like, for

23   example, those protests at 9000 Airline Highway,

24   correct?

25       A.    Yes, sir.  There's a -- it looks like a

1    couple of discrepancies with the -- specifically
2    with the probable cause affidavit; yes, sir.
3        Q.    Okay.  So there -- there are a couple of
4    discrepancies by which you mean a couple of facts
5    in this affidavit of probable cause that were not a
6    truthful description of what happened with
7    Ms. Feldman, correct?
8        A.    Yes, sir.
9        Q.    Okay.  And yet you -- you signed your
10   name to it under oath, correct?
11       A.    Yes, sir.
12       Q.    Swearing that the recited facts were
13   true, correct?
14       A.    Yes, sir.
15       Q.    So you swore that certain things were
16   true when they were, in fact, not all true;
17   correct?
18       A.    At the time of -- of my signing the
19   probable cause affidavit I may have looked over a
20   couple of the details, the discrepancies in which
21   we just discussed.  It was not my intention to get
22   that address wrong within the PC.
23       Q.    Uh-huh.  So when you swore to the truth
24   of facts that weren't true, were you committing
25   perjury?

1      A.    No, sir.  I was acting in good faith
2  that this document was accurate to the events that
3  happened out there that day.  It was not my
4  intention or do I believe that I -- I was -- I
5  committed perjury.
6      Q.    Okay.  And when you say you were acting
7  in good faith, it's because you were relying on
8  whoever gave this to you to -- to have written a
9  true statement?
10     A.    Yes, sir.
11     Q.    Okay.  So when you signed it, you didn't
12  know if all the facts in there were true, but you
13  were relying on someone else to have given you a
14  true document?
15     A.    Partially; yes, sir.
16     Q.    What do you mean "partially"?
17     A.    I -- I -- look, I -- I take a lot of
18  responsibility on myself as well, but I partially
19  -- how do I say it?  I partially relied on the
20  truths in this PC to be accurate to the arrest that
21  I was making out there on -- on this boulevard.
22     Q.    So when you say you relied on -- on this
23  PC, you mean someone handed you this piece of
24  paper, right?
25     A.    Yes, sir.

1      Q.    And -- and you didn't know if all of it
2  was true, right?
3      A.    Correct.  Correct.
4      Q.    And so you assigned -- you signed it
5  assuming it was true but not knowing whether it was
6  all true, correct?
7      A.    At the time I -- I thought it was all
8  true.
9      Q.    You thought the part about 9000 Airline
10 Highway was true?
11     A.    Do I think that it's true?  No.  At the
12 time I may have looked over 9000 Airline in the
13 actual narrative of this PC.  So I -- yes, I
14 believed all this information was correct but there
15 was obviously clerical errors on somebody else's
16 behalf because I didn't personally type this
17 document up.
18     Q.    So you read over it not carefully enough
19 to determine if all the contents of it were true,
20 correct?
21     A.    Correct.
22     Q.    Okay.  When you signed your name to a
23 document swearing that the contents were true, even
24 though you did not know if all the contents were
25 true, were you engaged in the manufacturing of

1    false evidence?

2         A.    No, sir.

3         Q.    Okay.  So the narrative of this

4    affidavit of probable cause describes police giving

5    orders to clear the roadways and some protesters

6    not complying, correct?

7         A.    Yes, sir.

8         Q.    There were, however, that day, some

9    protesters who did comply and retreated to the

10   sidewalks and the yard of -- of a piece of private

11   property, correct?

12        A.    I don't recall.  I don't recall.

13        Q.    You don't recall any protesters standing

14   on -- on private property that day?

15        A.    On the side of the roadway, yes, sir.

16   How is -- yeah, a lot of individuals were listening

17   to verbal commands to stay out of the roadway; yes,

18   sir.

19        Q.    Okay.  So the ones who listened to those

20   commands and complied, they should not have been

21   arrested, correct?

22        A.    They weren't, to my knowledge.

23        Q.    Okay.  So if Ms. Feldman was one of the

24   persons who complied with verbal commands and

25   retreated to a sidewalk or private property, she

1    should not have been one of the ones arrested,

2    correct?

3        A.    Depending on the time frame.  I mean if

4    she -- if we're talking -- what is the word?

5    You're -- are you speculating that she didn't?  Is

6    that what you're -- what you're saying?

7        Q.    Well, I -- yeah, I'm asking you a

8    hypothetical.  Suppose Ms. Feldman --

9        A.    Hypothetically, if she did get out of

10   the roadway within a reasonable time after being

11   advised to get out of the roadway, it wouldn't have

12   been -- she would not have been taken into custody.

13       Q.    Okay.

14       A.    So I believe -- but that's a

15   hypothetical and that's not what happened on July

16   10th, 2016 out there on this boulevard.

17       Q.    Okay.  So I'm going to share this

18   picture, which I'm going to label UUUUUU, that's

19   six Us.

20             (Sharing document electronically.)

21   BY MR. MOST:

22       Q.    Do -- do you see this picture here?

23       A.    Yes, sir, I see it.

24       Q.    Okay.  So you see the -- these are

25   protester who have retreated to a -- a yard of a

```
 1    piece of private property at East and France?
 2         A.    I can't say they retreated because I
 3    can't determine if they were in the roadway to
 4    begin with.  They may have been there the entire
 5    time, right?
 6         Q.    Right.  Okay.  Good point.
 7               So these protesters are ones who were
 8    either always on private property or retreated
 9    there after police commands, correct?
10         A.    Very well could -- could have been the
11    case; yes, sir.
12         Q.    Okay.  Any reason to think that's not
13    the case?
14         A.    I don't know all of these individuals
15    specific actions on that exact day.
16         Q.    Right.
17         A.    And recall specifically for all seven --
18    well, how many people are in this picture?  I can
19    see probably 35, 40?
20         Q.    Uh-huh.
21         A.    I don't -- I can't recall each specific
22    person's actions on that day.  I can't really speak
23    on that -- on that at all.
24         Q.    Yeah, I understand.  But just generally,
25    this shows where the people if they were standing
```

```
 1    in this area --
 2        A.    I don't --
 3        Q.    -- they should not have been arrested.
 4        A.    Geographically speaking, I can't -- I
 5    can't determine whether that's in the middle of the
 6    street or not.  I see a house there but I -- I -- I
 7    can't -- I can't get context for this picture.  I
 8    guess it -- it just doesn't show me enough, you
 9    know.
10        Q.    Okay.
11             THE WITNESS:
12             Can I take a little bathroom break?
13             MR. MOST:
14             Oh, yeah, of course.  Let's take five
15        minutes.  Do you -- how much -- just come back
16        whenever you're done and we'll be here.
17             THE WITNESS:
18             I'll be back in two minutes.
19             (Whereupon, a short break was taken.)
20    BY MR. MOST:
21        Q.    Officer, I -- I do this after every
22    break.
23             Did you talk to anyone during the break?
24        A.    No, sir.
25        Q.    Did you communicate with anyone during
```

1    the break?

2         A.    No, sir.

3         Q.    Look at any documents, except the ones

4    we've discussed, on the break?

5         A.    No, sir.

6         Q.    Okay.  And -- and also a question that I

7    forgot to ask you earlier that I ask of every

8    deponent is:  Have you ever been arrested?

9         A.    Yes, sir.

10        Q.    Okay.  For -- for what kind of crime

11   were you arrested?

12        A.    Misdemeanor possession of marijuana.

13        Q.    Any other arrests?

14        A.    No, sir.

15        Q.    Okay.  I'm going to share another photo

16   of the corner of East and France.  This is UUUUUUU,

17   that's seven Us.

18              (Sharing document electronically.)

19   BY MR. MOST:

20        Q.    Do you see this picture?

21        A.    Yes, sir.

22        Q.    You can see that this is also a picture

23   of the corner of East and France?

24        A.    I can't see the -- I'll believe you,

25   East and France.  I -- I would have -- it looks

1    like it, I guess.  I can -- East and France.

2        Q.    You see -- you see the sign here that

3    shows that it's East and France corner?

4        A.    Now I can -- now I can confirm that

5    that's -- that's it.

6        Q.    Okay.  Thank you.  So does this picture

7    show the group of protesters who either were

8    standing on private property or sidewalk or

9    retreated there?

10       A.    Well, the gentleman all -- all the way

11   to the far left looks like he could be out in the

12   middle of the road.

13       Q.    Okay.

14       A.    Basically, a little bit.  So I --

15   geographically speaking, same as last photo, I

16   don't know if I could say whether they're in the

17   roadway or not.

18       Q.    What about the protesters except the one

19   --

20       A.    No --

21       Q.    -- far left of them?

22       A.    -- I -- I mean the gentleman -- I mean

23   these -- these first -- the first front of the

24   crowed, I don't know how far out they -- they look

25   like they may be out in the roadway, maybe not,

1    it's hard to tell.

2        Q.    Okay.  But the ones holding the signs,

3    they appear to be on the sidewalk or private

4    property?

5        A.    I mean, there's multiple people holding

6    signs.  The -- the lady out in front there is

7    holding a sign.  She looks maybe like she's in the

8    roadway.  And then there's another one right behind

9    her that may look like she's in the roadway.  I'm

10   not sure.  I mean, if you've got an over --

11   overhead view of this?  Maybe it could create some

12   parameters for me to go off of, but I -- I can't

13   really give you --

14       Q.    Okay.

15       A.    -- an answer relative to the picture.

16       Q.    I agree with you.  If we had an overhead

17   picture that would certainly be more specific.

18       A.    That would be great.

19       Q.    Yeah.

20       A.    You know, like a drone or something to

21   that nature.

22             MR. SCOTT:

23             Or even from a higher angle.

24   BY MR. MOST:

25       Q.    All right.  Okay.  So we've been talking

1    about Ms. Feldman.  I want to tun now to

2    Ms. Fishbein.  I'll pull up Exhibit C at page 10.

3    Well, actually, before we do that, I'm going to

4    pull up Exhibit BB.  Okay.  I'm going to pull up

5    Exhibit BB at 20.

6              (Sharing document electronically.)

7    BY MR. MOST:

8        Q.    You see we're looking at those request

9    for admissions that -- that you signed were

10   truthful; do you see this?

11       A.    Yes, sir.

12       Q.    Okay.  And -- and you see where it says,

13   admit that you signed the July 10th, 2016 affidavit

14   of probable cause for plaintiff Leah Fishbein,

15   admitted?

16       A.    Yes, sir.

17       Q.    You see it says:  Officer Wilson

18   personally signed the affidavit of probable cause?

19       A.    Yes, sir.

20       Q.    Okay.  So that's a truthful answer?

21       A.    I'm sorry.  You asked something?

22       Q.    Yeah.  So that's a truthful answer to

23   response to Request for Admission No. 6?

24       A.    Yes, sir.

25       Q.    Okay.  And then Request for Admission

1  No. 7, admit that you did not personally witness
2  the events described in the July the 10th, 2016
3  affidavit of probable cause for plaintiff Leah Hope
4  Fishbein, responses admitted; do you see that part?
5      A.   I did witness the -- I did witness this
6  happen; so whatever that's saying, whether it be
7  the right answer on this document or not that's --
8  may or may not be the case.
9      Q.   Okay.  So Request for Admission No. 7
10  here the response is false, correct?
11      A.   I -- I don't want to say the wrong
12  thing.  I'm -- I'm speaking to the facts here that
13  I did witness this subject within the roadway.
14      Q.   Okay.
15      A.   Could you ask --
16          COURT REPORTER:
17          Repeat that last answer, please, sir.
18          THE WITNESS:
19          I mean, could we -- could you ask it --
20      ask it again, sir?
21  BY MR. MOST:
22      Q.   Sure.
23      A.   I just -- I want to be clear on -- on my
24  statement here.
25      Q.   Yeah.  This isn't a -- a trick question.

```
 1   I'm just trying to understand --
 2        A.    I know, I just -- false and true, false
 3   and true.  I'm -- I did sign the -- the PC and the
 4   affidavit for arrest and saw Ms. Fine -- Fishbine
 5   -- Fishbein in the roadway not complying with
 6   verbal instructions and she was arrested for the
 7   charges that we -- we talked about.
 8        Q.    And -- and how do you know that you saw
 9   it?
10        A.    I -- I remember seeing it and I wrote a
11   report saying that I -- I saw her in the roadway
12   and not listening to verbal commands to get out of
13   the roadway and she was arrested for such.
14        Q.    Okay.  So you know it partly because
15   your -- your signature is on the document and
16   partly because you have a specific recollection of
17   it?
18        A.    I remember seeing these two subjects in
19   the roadway.
20        Q.    Uh-huh.
21        A.    Vividly, I remember them being in the
22   roadway and not listening to commands given and
23   they were arrested for those -- the charges that
24   they're relative to this case.
25        Q.    Okay.  So you have a vivid recollection
```

```
1    of these two women?
2         A.    I have a recollection of it.
3         Q.    Okay.  But you just used the word,
4    vivid, didn't you?
5         A.    Vivid.
6         Q.    Yeah.  So you have a vivid recollection
7    of these two women, correct?
8         A.    Vivid wouldn't -- maybe a different
9    adjective might -- might be better.  I remember
10   these two sub -- I remember these two subjects
11   being in the roadway.  I don't know if it was
12   vividly.  I guess that's more like a phrase that
13   people use to explain that they remember something.
14        Q.    Well, you just used the word "vivid."
15   Are you telling me you have a vivid recollection of
16   these two women or you don't have a vivid
17   recollection of these two women?
18        A.    Mr. William, I'm saying maybe I used the
19   wrong adjective there in vividly.  We can ask the
20   question again and I can give you -- give you a
21   statement.
22        Q.    Okay.  Do you have a vivid recollection
23   of these two women?
24        A.    I have a recollection.
25        Q.    Okay.
```

1        A.      Those two women being in the roadway and

2    being arrested for these charges relative to this

3    case.

4        Q.      Okay.

5        A.      Vivid -- vivid wasn't the -- maybe the

6    -- the correct word.  I remember them being in the

7    roadway.

8        Q.      Okay.  So what do you recall about

9    Ms. Feldman's appearance?

10       A.      Ms. Feldman in particular?

11       Q.      Don't look at the document, Mr. Wilson.

12   You're looking down at the table.  I want you -- I

13   want to know --

14       A.      I'm looking at Ms. Fishbein's rap sheet.

15       Q.      Right.  Okay.

16       A.      So what are we -- what are we asking,

17   Mr. William?

18       Q.      I want to ask:  What is your

19   recollection of Ms. Feldman's appearance?

20       A.      Ms. Feldman's appearance.  She's a white

21   female.

22       Q.      Uh-huh.

23       A.      She had hairy armpits.  She dressed

24   maybe -- maybe -- I think she may have had like a

25   tank top on or something like that.  I don't

1  remember specifics exactly what she was wearing or

2  -- but I do remember both females had hairy

3  armpits.  I know that's odd to -- to say, but I do

4  recall that specifically.

5       Q.    Okay.  What do you recall about the

6  appearance of Ms. Fishbein aside from hairy

7  armpits?

8       A.    Yeah, I just -- another -- another white

9  female.

10      Q.    Do you recall what she was wearing?

11      A.    Not specifically; no, sir.

12      Q.    What color her hair was?

13      A.    No, sir.

14      Q.    Was she wearing glasses?

15      A.    I don't recall specific either subject

16 what they were wearing.

17      Q.    Do you recall if either of them was

18 wearing a hat?

19      A.    No, sir; I can't recall.

20      Q.    Do you recall whether they had died hair

21 or natural colored hair?

22      A.    Not vividly, but I -- I do remember

23 maybe seeing some pink highlights or tips or

24 something in their hair.  But I -- I couldn't be --

25 I couldn't be sure on that unless I saw a picture

1    of them on that day.

2        Q.    Okay.  Do you recall exactly where they

3    were standing when you put handcuffs on them?

4        A.    I -- I don't recall.

5        Q.    Okay.  So it sounds like the only

6    specific recollection you have about these two

7    women is that they had hairy armpits.  So aside

8    from what's on paper that's your only recollection

9    about them in particular?

10       A.    No, sir.  I -- I saw them standing in

11   the roadway refusing to comply with the verbal

12   instructions and commands to get out of the roadway

13   and they were taken into custody.  Whether we're

14   talking about their personal appearance and -- and

15   this -- this manner, I remember them being white

16   females.  Oddly enough, I remember that they were

17   -- they had hairy armpits, but other than that, I

18   guess -- I guess it's irrelevant.

19       Q.    Okay.  So you received training as a --

20   to be a Baton Rouge Police Officer, correct?

21       A.    Yes, sir.

22       Q.    Did you receive training about when it's

23   permissible to arrest protesters?

24       A.    I can't recall if we specifically went

25   over those exact scenarios relative to protesters.

1    I remember we had law class.  I remember doing

2    everything I was asked of by the training academy

3    or Baton Rouge Police to be certified and duly

4    appointed as a -- as a Baton Rouge Police Officer.

5         Q.    Okay.  But you don't have any

6    recollection about any training specific to dealing

7    with protesters; is that correct?

8         A.    Not specifically.  I very well could

9    have but I can't remember specifically if I was

10   taught anything specifically to that topic.

11        Q.    Okay.  Do you recall any training

12   about -- you -- you said you had a law class?

13        A.    Yeah, it's a law class portion of the

14   academy, right.  It's like a -- I think it's two

15   week -- two-week interval of training, it's similar

16   to POST.

17        Q.    And in that law class you probably

18   discussed some specific causes like Miranda,

19   correct?

20        A.    Yes, sir.

21        Q.    Okay.  In that law class or at any other

22   training program for Baton Rouge Police Department,

23   did they discuss a case called "Cox v. Louisiana"

24   about the arrest of a protester?

25        A.    What was the name again?

1      Q.    It's Cox, C-O-X?

2      A.    You said, Cox verses Louisiana?  It

3    sounds familiar.  I don't remember the exact

4    specifics of it.  But I'll take your word that

5    that's what you intended.

6      Q.    But you don't have any -- sorry.

7            You don't have any specific recollection

8    about any training about that specific case,

9    correct?

10     A.    I want to say we went over it, but right

11   now at this moment in time, I don't remember the

12   specifics relative to the Cox versus Louisiana

13   case.

14     Q.    Okay.  And you -- you arrested

15   Ms. Feldman and Ms. Fishbein for a violation of

16   Revised Statute 1497?

17     A.    Yes, sir.

18     Q.    That's obstruction of a highway of

19   commerce?

20     A.    I know it is obstructing a roadway.

21     Q.    Okay.  How many times in your -- aside

22   from July -- the July protests, how many other

23   times have you arrested someone for a 1497

24   violation?

25     A.    I want to say in FTO phase we had a

1    subject obstructing -- obstructing a road -- a

2    railway, but other than that, no.  And -- and --

3    and before these -- these two females were

4    arrested, obviously days leading up till July,

5    other people -- I did arrest maybe four,

6    approximately four other people for -- for these

7    charges as well.

8                   MR. MOST:

9                   I think I may be frozen.  Can you hear

10       me?

11                  THE WITNESS:

12                  We hear you.

13                  COURT REPORTER:

14                  I hear you but you do appear to be

15       froze.

16                  (Technical difficulties with Zoom

17       connection.)

18                  MR. MOST:

19                  Okay.  Okay.

20   BY MR. MOST:

21       Q.    I'm back.  Can you hear me?

22       A.    Yes, sir.

23       Q.    Okay.  I apologize about that.

24             So if I'm understanding you correctly,

25   setting aside the days leading up to July 10th and

```
 1    the arrest of the protesters, the only time you've
 2    arrested someone for a 1497 violation in your
 3    career as an officer was one time when someone was
 4    blocking some train tracks; is that correct?
 5         A.    I -- I don't recall.  I -- I can't
 6    remember specifics.  I would have to look over
 7    hundreds of arrests over a seven-year -- seven
 8    active year period.  I -- I can't recall at this
 9    time.  I very well could have arrested somebody for
10    it but I -- I can't recall at this time.  Can maybe
11    look it up on our report writing system and get
12    back with you.
13              THE WITNESS:
14              I think his camera messed up again.
15              MR. LANCER:
16              William just called me.  He's going to
17         relocate, which should just take a couple
18         minutes.  Hopefully a better Wifi.
19              If -- if -- I think for efficiency sake,
20         if Eric or Jim has any questions if they want
21         to ask now, we could do that or we could just
22         take a quick five.
23              MR. SCOTT:
24              I -- we're -- we're here for your
25         convenience, so.
```

```
 1                THE WITNESS:
 2                Yeah.
 3                MR. FOLEY:
 4                Yeah, I mean, we can ask a few questions
 5         now.
 6                MR. LANSER:
 7                Just to keep things moving.
 8                MR. FOLEY:
 9                I'm sorry.  What was that, Dave?
10                MR. LANSER:
11                I said just to keep things moving while
12         William relocates.
13                MR. FOLEY:
14                Right.  No, that makes sense.
15    BY MR. FOLEY:
16        Q.    Okay.  Officer Wilson, my name is Eric
17    Foley.  I'm one of the attorneys representing a
18    different group of plaintiffs in a couple of cases
19    called Tennart v. City of Baton Rouge and Smith v.
20    City of Baton Rouge and Batiste-Swilley v. City of
21    Baton Rouge.
22                Since we're already -- since we -- where
23    we left off we were talking about July 10th, that
24    Sunday, I'm just going to ask you a couple of
25    questions then about that day and then I have a few
```

1    questions about the day before, Saturday July 9th.

2              So starting with Sunday, July 10th, in

3    the -- in some of the images we've seen already,

4    you know, they're focused on the property at the

5    corner of East and France where protesters were

6    lined up on the lawn.  Did you ever enter that

7    property or step foot on the grass, on the lawn of

8    that property?

9         A.    I don't -- I don't recall specifically.

10        Q.    Okay.

11        A.    Specifically where -- where you're

12   asking, what geographically speaking, I don't know

13   where you're talking about.

14        Q.    Okay.  I can -- I can show you a video

15   and point out where I'm talking about.  Hold on

16   just a moment.

17             MR. FOLEY:

18             Oh, Dave, can you enable share?

19             MR. LANSER:

20             Let's see.  Actually, I think when

21        William exited, Brenda was made the host.  You

22        need to make Mr. Foley the host or me.

23             COURT REPORTER:

24             (Complies.)

25             (Sharing document electronically.)

1  BY MR. FOLEY:

2      Q.    All right.  Officer, can you see that in

3  the middle of your screen now?

4      A.    Yes, sir.

5      Q.    Okay.  I'm going to play this for a

6  minute and I'll point out what I'm talking about.

7              (Viewing video.)

8  BY MR. FOLEY:

9      Q.    Okay, Officer, the -- the property that

10  I was referencing earlier is this house here, right

11  on the corner of East and France.  And so my

12  question was if you'd ever entered that property

13  either on the front lawn here or on the side lawn

14  of that -- well, there's two side lawns, one on the

15  other side of the house and this one here.

16      A.    I don't remember.  I don't remember

17  specifically entering that property.  Is that on

18  the northwest corner or is that on the southeast

19  corner?

20      Q.    That would be northwest.  So this is --

21  from this view, the officers here are walking

22  towards the river, right, and on the -- towards the

23  left side of the screen is going towards the

24  interstate; that make sense?

25      A.    If I were looking at a map I might be

1    able to verify that with you just so I can get a

2    better understanding to answer your questions

3    accurately.

4         Q.    Right.

5              MR. SCOTT:

6              Do you mind if I show him a map?

7              MR. FOLEY:

8              No, not at all.

9              MR. SCOTT:

10             It's -- it's our Librum (assumed

11    spelling) Daniels map.

12             MR. FOLEY:

13             Which -- which number is that or letter,

14    I guess?

15             THE WITNESS:

16             Maybe it's like 20 U or something.

17             MR. FOLEY:

18             Hey, I -- I share your confusion.

19             MR. SCOTT:

20             You got East.  You got France.

21             THE WITNESS:

22             Yeah, he said northwest corner of East

23    and France, so.

24             MR. SCOTT:

25             That --

```
1              THE WITNESS:
2              So that would be right there.
3              MR. SCOTT:
4              Southwest corner of East and France.  It
5       goes --
6              THE WITNESS:
7              So this is west corner.
8              MR. SCOTT:
9              Right.
10             THE WITNESS:
11             So that's this structure here?
12             MR. SCOTT:
13             Yes.
14             THE WITNESS:
15             And they're going eastbound down France
16      this way?
17             MR. SCOTT:
18             Right.
19             THE WITNESS:
20             So --
21             MR. SCOTT:
22             That's the direction --
23             THE WITNESS:
24             -- if they're going east on France
25      that's actually on the northeast corner.  It
```

```
1          looked -- yeah.  That's the northeast corner.
2          So if they're walking down France eastbound,
3          that's going this way, toward the interstate.
4               MR. SCOTT:
5               Westbound.
6               THE WITNESS:
7               They're going westbound.  All right.
8          They're going westbound.
9               MR. SCOTT:
10              Because they end up by the McDonalds.
11    BY MR. FOLEY:
12         Q.    Right.  So I'm just going to share that
13    Google Maps to my screen here.  And I think we're
14    talking about the same thing here.  Right.  So it's
15    6002 --
16         A.    Southwest.
17         Q.    -- is the property.
18         A.    Southwest.
19         Q.    Southwest, yeah.
20         A.    Now it makes sense.
21         Q.    So right here.  So the view you were
22    seeing here, I mean, you can see my -- my cursor.
23    I mean, this is about where the camera is --
24         A.    Right.
25         Q.    -- and, you know, the crowd of officers
```

1    is -- is marching down this way.

2        A.    Yes, sir.

3        Q.    And so did you, you know, at any point

4    during that day enter this property?

5        A.    No, sir, I don't believe so.  Not -- not

6    that I recall.

7        Q.    Okay.  You didn't -- you didn't enter

8    that property, make any arrests?

9        A.    I don't remember going into that -- on

10   that property line; no, sir.

11       Q.    Okay.  And then if -- I'm going to

12   reshare that -- that video for one second.

13            (Sharing document electronically.)

14   BY MR. FOLEY:

15       Q.    So as this is going on, as -- as

16   officers -- other officers are entering that

17   property and it looks to be, you know, EBR and

18   several officers here on the street and possibly

19   some BRPD street crime folks here that are marching

20   down.  Do you know where you would have been

21   during -- during all these -- these events here?

22       A.    I couldn't recall specifically it's so

23   many people we contacted and, you know, man, we're

24   -- we're all on 12 hour shifts for 24 days, I mean,

25   when you do something crazy like that.  That day in

1    particular, I can't tell you where -- where I was

2    exactly.  I'm out there.

3         Q.    Okay.  So after -- after bringing people

4    to the processing area you would have come back.

5    Did you -- did you take anyone else to the

6    arresting processing area?

7         A.    I'm not -- I don't recall taking anybody

8    else to the processing area; no, sir.

9         Q.    So the two -- the two folks we talked

10   about you arresting today, where -- where did those

11   happen?  Were those on the street?  Where?

12        A.    They were in the street.

13        Q.    Okay.  So when you -- when you

14   physically laid hands on them they were in the

15   street?

16        A.    I mean can you -- more specifically what

17   are you asking?  What exactly are you asking me?

18        Q.    So when you physically detained those

19   two people they were in the street, they were not

20   on that property is my question?

21        A.    I didn't -- I didn't -- wasn't the

22   initial officer that detained the subject.  But I

23   was -- I was the officer that put -- put both

24   subjects in handcuffs.

25        Q.    Okay.  How about -- let me rephrase

```
 1    that.
 2              When you received custody of those two
 3    people --
 4         A.    Yes, sir.
 5         Q.    -- where were they?
 6         A.    They were in the street.
 7         Q.    Okay.  And you were in the street as
 8    well then?
 9         A.    I -- like I said, I -- I don't know
10    specifically where that -- where that -- where
11    exactly that was, but I believe so.  But I can't
12    give you a hundred percent confirmation on that.
13    It may have been the sidewalk.  It may have been
14    the street.  Like I said, I can't recall
15    specifically.
16         Q.    Okay.
17              MR. FOLEY:
18              Most of my other questions are about
19         July 9th, and so I think it might be better for
20         me to switch -- hand it back off to William so
21         he can finish his line of questioning on that.
22              MR. MOST:
23              Yeah.
24              MR. FOLEY:
25              So I'm going to stop sharing here.
```

```
 1              MR. MOST:
 2              Thanks, Eric.
 3              MR. FOLEY:
 4              Yeah.
 5              MR. MOST:
 6              And I'm almost done with mine.
 7    BY MR. MOST:
 8       Q.    So Officer Wilson, it's my understanding
 9    that you weren't the first officer to -- to put
10    hands on Ms. Fishbein and Ms. Feldman another
11    officer brought them to you and then you handcuffed
12    them and took them to the processing area; is that
13    accurate?
14       A.    Yeah, eventually they were handcuffed by
15    me and -- and the paperwork was done at the
16    processing area as well.
17       Q.    Okay.  Do you recall who was the officer
18    who brought them to you?
19       A.    No, sir; not specifically.  There were
20    so many officers out there.  At that time I hadn't
21    been on the department for maybe more -- a little
22    bit over three and a half, three years or so; so
23    I -- I couldn't tell you specifically who it was.
24       Q.    Okay.  So you didn't witness the moment
25    when an officer first -- first put their hands on
```

1    Ms. Fishbein and Ms. Feldman, correct?

2         A.    Yes, sir; I do.

3         Q.    You -- you did witness that?

4         A.    Yes, sir.

5         Q.    Okay.  So you watched an officer place

6    their hands on Ms. Fishbein and then bring

7    Ms. Fishbein to you?

8         A.    I watched officers take Ms. Fishbein in

9    -- into protective -- or into custody; yes, sir.

10        Q.    Uh-huh.  So you saw the first moment at

11   which hands were laid by an officer on

12   Ms. Fishbein?

13        A.    The first moment?  I don't know exactly

14   if I can say first moment.  I specifically don't

15   know what you're asking.

16        Q.    Sure.  Maybe I can be clearer.  So I can

17   imagine either you turn around and an officer's

18   bringing Ms. Fishbein to you but you didn't see the

19   beginning of her interaction with an officer or,

20   alternatively, maybe you saw it from start to

21   finish, from the moment that Ms. Fishbein first had

22   an officer put their hands on her to the moment she

23   was brought to you.  Which of those was it?

24        A.    I observed an officer go after her into

25   the crowd and I -- I can't really specifically say

1   exactly when he put his hands on her.

2         I know she was walked out of -- of that

3   crowd and I ended up placing her in handcuffs at

4   some point, whether it be I -- I don't know

5   specifically whether it be in the roadway or the

6   sidewalk, and she was arrested for these charges

7   relative to this case.

8         Q.   Okay.  But you didn't see the place

9   where she was standing or the moment she was first

10  apprehended, correct?

11        A.   When she was at -- when she was taken --

12  I mean that's kind of -- could you repeat that --

13        Q.   Sure.

14        A.   -- specifically, like what you're

15  asking?

16        Q.   Sure.  Did you see the moment that

17  Ms. Fishbein was first apprehended by an officer

18  "yes" or "no"?

19        A.   Your definition, apprehended, I -- I

20  guess the --

21        Q.   Sure.

22        A.   -- which I can speak on.

23        Q.   By "apprehended," I mean the -- the

24  first -- the moment where an officer puts their

25  hands on Ms. Fishbein.  Did you see that moment

1    occur "yes" or "no"?

2         A.    I don't recall.  I don't recall exactly.

3    I remember them being in the roadway not following

4    verbal commands, and those two individuals,

5    specifically didn't follow instructions and they

6    were taken into custody.  And I don't recall me

7    seeing them at that exact point where those

8    officers took them into custody.

9         Q.    Okay.

10        A.    Apprehended unless you said.

11        Q.    Okay.  And -- and I think I -- I broke

12   up.  This was my fault.  My Internet cut out before

13   I got the answers to the question about any other

14   1497 so I'll just ask it again.  You may have

15   answered it.

16             But aside from the July, 2016 protests,

17   the only time in your seven years as an officer

18   that you've arrested someone for a 1497 violation

19   was one person who was blocking a train track,

20   correct?

21        A.    I can't give a -- I can't give a hundred

22   percent answer on that because I would have to

23   refer to our reporting system and pull it up.

24   Over hundreds of arrests over my career I -- I

25   can't -- I can't tell you that right now.  I have

```
 1      to have that information out in front of me to be
 2      able to say "yes" or "no" to that.
 3           Q.    Yeah, fair enough.  Maybe I can rephrase
 4      it.
 5                 So the only 1497 arrests that you can
 6      recall executing other than the July, 2016 protests
 7      is one person --
 8           A.    Off the top of my head yes, sir.  Sorry
 9      for interrupting.
10           Q.    That's okay.  I'll just do it again so
11      we've got a clean record.
12           A.    Not a problem.
13           Q.    The only 1497 arrests you can recall
14      executing in your time as a police officer, except
15      for the July, 2016 protests, is one person who was
16      blocking a train track, correct?
17           A.    Yes, sir.
18           Q.    Okay.
19                  MR. MOST:
20                  Okay.  Those -- those are my questions.
21           I think that'll be it.  I'll -- I'll let
22           Mr. Foley take over.  I might have one or two
23           at the end, but that might be it.
24                  So thank you very much for your
25           patience.
```

BY MR. FOLEY:

Q.    Okay.  So as I said right before we
switched off there, I have a few questions for you
about July 9th, which was the Saturday protests on
Airline Highway in front of the BRPD headquarters.

And so I saw from the protest rosters
that the city provided to us that you were on duty
that night; is -- is that right?

A.    I believe so.  I don't have any
documentation for me to refer to, but I -- I didn't
miss a night.  I didn't miss a shift I don't
believe.

Q.    Okay.  Do -- do you have any other
memory of July 9th, 2016, the Saturday evening
protest in front of the BRPD headquarters?

A.    Not specifically.

Q.    Okay.  So do you have any memory of
making any arrests that night?

A.    I'd have to refer to my reports and
maybe it would refresh my memory in such matters.

Q.    All right.  I want to show you a few
videos and ask if you recognize some of the
officers these in the videos.

A.    Okay.

MR. SCOTT:

1          Eric, do you mind if I explain to him,

2     because it's -- it's a little mysterious.

3          MR. FOLEY:

4          Explain what?

5          MR. SCOTT:

6          Yeah, for him to figure out who arrested

7     your clients.

8          MR. FOLEY:

9          Sure.  I can do that right now.  Yeah.

10  BY MR. FOLEY:

11     Q.    The reason for most of the questions

12  we're about to ask you is that I have a number of

13  clients whose arrest reports did not actually list

14  the arresting officers; however, we do have some

15  videos of officers who are physically apprehending

16  them, and as of today's date we still have not been

17  able to identify some of those officers.  And so --

18     A.    Are they masked?

19     Q.    Are they masked?  No.

20     A.    Okay.

21     Q.    So I'm going to show you about three or

22  four videos and just ask if you recognize any of

23  the folks who are in there or if you recognize

24  yourself.

25     A.    I'll let you know.

```
 1        Q.    Sounds good.
 2        A.    And who -- may I ask a question,
 3   Mr. Eric?
 4        Q.    Sure.  Sure.
 5        A.    Who -- who are your clients?  Who -- who
 6   is this referring to?
 7        Q.    There is a lot of them, but for
 8   Saturday, July 9th, there's particularly, the --
 9   the client I'm about to show you -- well, you're
10   not going to be able to see much of him, but the
11   officers who are on top of him is a man named Leroy
12   Tennart, also his son, Deon Tennart, and then the
13   third person who's arrested, I'll show you, is a
14   man named Tommy Hutcherson.
15        A.    Did I arrest any of these subjects?
16        Q.    You're not on any of the arrest reports,
17   but neither is anyone else who seems to have
18   arrested them, so.
19        A.    Oh, okay.
20        Q.    I'm going to share my screen here.
21              I'm going to play this briefly and ask
22   you if you recognize any of the officers here.
23        A.    Yes, sir, I'll try my best.
24              (Sharing document electronically.)
25   BY MR. FOLEY:
```

1      Q.    So Officer Wilson, that's first, do you

2  recognize this officer in the foreground here where

3  my cursor's indicated?

4      A.    No, sir.  I believe -- is he a corporal

5  of some kind or?  I know it looks likes he's been

6  on the department for a while.

7      Q.    Yeah.  He does have some priors on his

8  sleeve.

9      A.    No, I don't know.  No.

10     Q.    How about this officer in the

11 background, he's standing above the -- the hall

12 here?

13     A.    Is that a female?

14     Q.    It appears like it might be.

15     A.    I -- I'm sure -- I can't really.

16     Q.    Okay.  Let me play it a little further.

17          THE WITNESS:

18           Is that a female?

19 BY MR. FOLEY:

20     Q.    I'm going to pause in advance, that's

21 slightly...

22     A.    That's BRPD guys.

23     Q.    Sorry, this one doesn't come back around

24 to that ease.  So that's really just these

25 beginning shots here.  And so you're -- you're not

1  able to recognize any of these folks anyone on the

2  ground or either of these two folks who are -- who

3  are standing up?

4      A.    No, sir.

5      Q.    Okay.  Let me show you a different

6  video.  And are you able to see that on your screen

7  now?

8      A.    Yes, sir.

9      Q.    Okay.  I'm going to begin playing and

10  then advance it just the relevant portion that --

11  that we're interested in.  It's about halfway

12  through.

13          So that first video -- I'm sorry, I

14  should have noted -- was MES 7056 protest 07, dash,

15  09, dash, 16, parentheses, 10.  And this video is

16  protest seven, dash, nine, dash, 16, KDH,

17  parentheses, one.

18          Okay.  So I'm going to start playing

19  here, it's at the two minute 44 second mark.

20          (Sharing video electronically.)

21  BY MR. FOLEY:

22      Q.    Officer, did you recognize any of

23  officers who were on the ground?

24      A.    No, sir; nothing.  Nothing popped out to

25  me.

1          Q.    Okay.  So none of these five here, none

2     of those -- I'm just trying -- for the purposes of

3     the record, I just advanced this back to for 2:52.

4     Just to confirm, none of those folks jog your

5     memory, huh?

6          A.    Right.

7          Q.    Okay.  I'm going to show you a video of

8     another client of mine arrested at about the same

9     time and around the same location only about 50

10    feet away.  His name's Tommy Hutcherson.  And I'm

11    going to show you a video from a news source.

12         A.    Okay.

13         Q.    And it's really -- we're really only

14    concerned with the first, you know, 15 seconds or

15    so of this clip.  So I will play it for you and

16    stop it.  If we need to see it again, I'll replay

17    it.

18              (Sharing video electronically.)

19    BY MR. FOLEY:

20         Q.    Okay.  Officer Wilson, were you able to

21    recognize any of these officers who were on the

22    ground above Mr. Hutcherson?

23         A.    No, sir.

24         Q.    No.  How about at the beginning of the

25    clip there's these three officers holding batons

1    and shields.  Are you able to recognize any of

2    those officers?

3         A.    Which one?  The ones looking away with

4    the helmets on?

5         Q.    Yeah.

6         A.    Yeah, no.

7         Q.    Okay.  Let me show you one alternate --

8    a different video from a different angle that shows

9    those officers too with the helmets.

10              (Sharing video electronically.)

11              THE WITNESS:

12              Yes, sir.

13   BY MR. FOLEY:

14        Q.    Okay.  Are you able to see that image on

15   the screen now?

16        A.    It's very blurry.

17        Q.    Right.  I'm going to play it just for a

18   few seconds and see if you're able to recognize any

19   of them.

20        A.    Okay.

21              (Sharing video electronically.)

22   BY MR. FOLEY:

23        Q.    Play that one more time.  You recognize

24   any of those officers?

25        A.    No, sir.  I couldn't -- I couldn't make

1    out anybody.

2        Q.    Okay.

3        A.    But, I mean.

4        Q.    And for the record, this was 201607.13

5    WWL-TV who is being arrested in Baton Rouge and

6    what they're being charged with, parentheses, at

7    one, dot, two, three.

8                (Sharing video electronically.)

9    BY MR. FOLEY:

10       Q.    This is from a slightly different angle,

11   same event.  Are you able to see that on your

12   screen?

13       A.    I can see it.

14       Q.    Okay.  Let me just play this for a few

15   seconds again.  This might be clearer.

16               (Sharing video electronically.)

17   BY MR. FOLEY:

18       Q.    Were -- were you able to recognize those

19   officers?

20       A.    No, sir.

21       Q.    Okay.  I have one -- I believe just one

22   more video to show you.

23       A.    Okay.

24       Q.    And this is from -- also from Saturday,

25   July 9th in -- in front of the BRPD headquarters;

```
 1   however, earlier in the day.  This is --
 2        A.    I'd been there earlier in the day.
 3        Q.    What time did your shift start on July
 4   9th?
 5        A.    I believe it was 1800, if I'm not
 6   mistaken.
 7        Q.    Okay.  This -- this might have been
 8   within that time frame.  It's earlier in the day --
 9              (Sharing video electronically.)
10   BY MR. FOLEY:
11        Q.    Can you see that image on your screen
12   now?
13        A.    Yes, sir.
14        Q.    Okay.  This is MES 7056, protests, 07,
15   dash, 09, dash, 16, parentheses, six.  I'm going to
16   advance this video to about the, let's see, 55
17   second mark.
18              The person I'm interested is my client
19   I'm indicating with the cursor, that's Zachary
20   Hill.  He's being lifted up by two LSP Troopers at
21   the moment.  He's going to be handed off to BRPD
22   officers in the course of this footage I'm about to
23   show you.  I'm just curious whether you're able to
24   identify either of those two officers.
25        A.    Yes, sir, I --
```

```
1              (Sharing videoelectronically.)
2      BY MR. FOLEY:
3          Q.    Let me reverse that and just leave it on
4      the frame where you can see both officers.
5              Do you recognize either of these two
6      BRPD officers on either side of Mr. Hill?
7          A.    I wasn't there at that time of day.  And
8      no, I don't.  I was not there during that time.
9          Q.    Okay.
10         A.    Or I wouldn't recognize these guys.
11         Q.    I'm sorry.  I was speaking over you.
12     Can you say that again.
13         A.    I wasn't -- I wasn't on duty at this
14     time this video was taken.  I would bet money on
15     it.
16         Q.    Okay.  And again, you don't recognize
17     either of those two officers, right?
18         A.    Correct.
19         Q.    Okay.
20             MR. FOLEY:
21             I would ask we just go off the record
22         for one minute.  I'm going to consult with my
23         co-counsel to see if he has any additional
24         questions for me to ask you, and if not then I
25         will hand it over to Mr. Fahrenholt and your
```

```
1          attorney and then I think that'll -- that'll be
2          it.  But I'm going to go off video and mic for
3          a moment while I consult with Mr. Greg.
4                    THE WITNESS:
5                    Okay.
6                    (Whereupon, a short break was taken.)
7                    MR. FOLEY:
8                    Okay.  Thanks everyone for your
9          patients.  For our clients, we have no further
10         questions at this point.  So I'll turn it over
11         to Mr. Fahrenholt or Mr. Scott, either of those
12         two.
13                   MR. FAHRENHOLT:
14                   I have no questions for this witness.
15                   MR. MOST:
16                   Joe, do you have any?
17                   MR. SCOTT:
18                   I had a couple things marked but you
19         know, I don't think I need to do that.
20                   MR. MOST:
21                   Okay.  In that case I've got no further
22         questions.  I would like to remain on the
23         record to discuss something with you, Joe,
24         about these cases in general.  So it's up to
25         you whether you'd like to excuse your client
```

1    and close this deposition or have him present
2    for it, it's up to you.
3              MR. SCOTT:
4              Give me a minute or two to pack up
5    Officer Wilson and I'll be back with you.
6              MR. MOST:
7              Sure.  Thank you.
8              THE WITNESS:
9              Nice talking with y'all.
10             MR. MOST:
11             Yes, Officer, thank you for your time
12   this morning.  We appreciate it.  So back to
13   you.
14             THE WITNESS:
15             God bless.
16             (Whereupon, a short break was taken.)
17             MR. MOST:
18             So, Joe, I would like to discuss with
19   you some concerns I have.  They're not a knock
20   on you personally.  And I'm speaking about the
21   parish attorney's office.
22             I have concerns about whether the parish
23   attorney's office is providing competent
24   representation to these defendants in Imani and
25   perhaps the other cases, I don't know.  My

1    concern is prompted by the fact that we have

2    now had multiple defendants testify that they

3    did not know that they were defendants until

4    midway into their deposition, or at least into

5    their deposition.  We've also had a defendant

6    not know he was going to be deposed until the

7    moment of his deposition.

8         And we saw today a -- a defendant

9    testify that his sworn discovery responses were

10   false.  All that leads me to believe that they

11   may not be receiving competent representation,

12   especially that fact that they didn't know they

13   were defendants.  I -- I don't know what to do

14   about that.  I'm raising it as a concern.  I

15   want to be on the record that I have a concern

16   about it.  I hope you will raise that with your

17   team and communicate my concerns, but I -- I

18   don't think that should be a surprise to you.

19        Do you have thoughts about that, Joe?

20        MR. SCOTT:

21        I have taken note of your concerns and

22   I'll tell you that there's a reason I took over

23   six out of seven of these cases.

24        MR. MOST:

25        I -- I understand that.  I -- I don't

```
1       need to get into the details of it, but I will
2       say that the defendants who are testifying they
3       didn't know they were defendants have been
4       subsequent to you taking over the case.  I -- I
5       do have an ethical duty under the rules of
6       professional conduct to inform the office of
7       disciplinary counsel when -- when I have reason
8       to believe that there's a -- a problem such
9       that it -- it implicates an attorney's ability
10      to perform their job.  I'm not sure I see that
11      yet, but if -- if you can represent to me that
12      you will make sure that these issues are
13      addressed and discussed on your side, that
14      would certainly help me satisfy my ethical
15      duty, if that makes sense.
16           MR. SCOTT:
17           Well, I'm -- I'm real familiar with 8.3,
18      Mr. Most.  I will take care of my guys here.
19           MR. MOST:
20           Okay.
21           MR. SCOTT:
22           One of the things that I have found is
23      that they don't understand or many officers
24      don't understand that when you say:  Did you
25      know you were a defendant?  They know they're
```

1      involved in some kind of civil suit, but when
2      they hear defendant, they think almost
3      exclusively in terms of criminal charges.
4          And so they -- they don't understand the
5      lingo half the time.  And I found that and I
6      was kind of surprised, but, you know, I've been
7      lawyering for a while now and so we understand
8      it.  There are civil defendants.  There are
9      criminal defendants.  There are administrative
10     respondents in the posture of defendants.  And
11     a lot of these guys when they hear defendant,
12     they think exclusively in terms of criminal
13     charges, so.
14          MR. MOST:
15          I would like to believe that does
16     explain it.  Unfortunately, it doesn't.  So,
17     for example, page 9 of the Billy Walker
18     deposition transcript.  I asked him:
19          Question:  Did you know you were a
20     defendant in that case until now?
21          He said, I knew I was involved because I
22     was called here in some sort of way.  And then
23     the follow-up question was:  Do you understand
24     you're one of the people who is being sued in
25     this case?  And the answer was:  No, sir.

1          So I -- I -- that may be true.  What

2     you're discovering may be true for some of

3     them, but at -- at least for Billy Walker we

4     clarified that that was, you know, it wasn't

5     the word, "defendant" tripping him up.  He

6     actually didn't understand he was being sued in

7     this case.

8          So, you know, you're representing to me

9     that you're going to take care of this.  That

10    -- that is helpful for me too hear.  I'm not

11    specifically asking for a particular course of

12    action.  I just want to sure you understood my

13    concerns.  I've raised these concerns and that

14    I'm hearing that they will be taken care of on

15    your end.

16         MR. SCOTT:

17         Right.  And if you feel my actions are

18    insufficient, then by all means, contact the

19    ODC.  This being my first rodeo.

20         MR. MOST:

21         Yeah, and I'm not saying I'm going to.

22    I'm just trying to explain that part of my --

23    I have -- I am required to go through this

24    thought process, right, and so that -- that's

25    what I'm doing here.  You know, I'm just trying

1        to satisfy my own ethical obligations by
2        conferring and analyzing as we're all required
3        to do.
4               So I -- I appreciate you talking to us
5        about this, Joe.  Anything else you want to
6        discuss?
7               MR. SCOTT:
8               No, sir.  I'm thinking I need to go find
9        a snack and my next deponent and tell him that
10       he's been sued.
11              MR. MOST:
12              I -- you know, hopefully that's not the
13       first time he hears that, but certainly he
14       should hear it before his deposition.  So let's
15       reconvene at 10:30 if that gives everyone
16       enough time.
17              MR. SCOTT:
18              Yeah.
19              MR. MOST:
20              Thank you, everybody.
21              [Deposition concluded 10:08 a.m.]
22
23
24
25

94

```
1              CHANGES AND SIGNATURE
2    WITNESS NAME:  CURTIS WILSON
     DATE OF DEPOSITION: AUGUST 11, 2021
3
     PAGE    LINE         CHANGE         REASON
4
     _____
5
     _____
6
     _____
7
     _____
8
     _____
9
     _____
10
     _____
11
     _____
12
     _____
13
     _____
14
     _____
15
     _____
16
     _____
17
     _____
18
     _____
19
     _____
20
     _____
21
     _____
22
     _____
23
     _____
24
     _____
25
```

95

```
 1              WITNESS' CERTIFICATE

 2

 3         I, CURTIS WILSON, have read or have had

 4    the foregoing testimony read to me and hereby

 5    certify that it is a true and correct transcription

 6    of my testimony with the exception of any attached

 7    corrections or changes.

 8

 9

10

11

12

13                    _____

14                    CURTIS WILSON

15    PLEASE INDICATE

16    [  ]    NO CORRECTIONS

17    [  ]    CORRECTIONS; ERRATA SHEET(S) ENCLOSED

18

19

20

21

22

23

24

25
```

1              C E R T I F I C A T E
2              This certificate is valid only for a
   transcript accompanied by my original signature and
3  original required seal on this page.
4              I, BRENDA R. BREAUX, Certified Court
   Reporter, Registered Professional Reporter in and
5  for the State of Louisiana, as the officer before
   whom this testimony was taken, do hereby certify
6  that CURTIS WILSON, after having been duly sworn by
   me upon authority of R.S. 37:2554, did testify as
7  hereinbefore set forth in the foregoing 93 pages;
   that this testimony was reported by me in the
8  stenotype reporting method, was prepared and
   transcribed by me or under my personal direction
9  and supervision, and is a true and correct
   transcript to the best of my ability and
10 understanding; that the transcript has been
   prepared in compliance with transcript format
11 guidelines required by statute or by rules of the
   board, and that I am informed about the complete
12 arrangement, financial or otherwise, with the
   person or entity making arrangements for deposition
13 services; that I have acted in compliance with the
   prohibition on contractual relationships, as
14 defined by Louisiana Code of Civil Procedure
   Article 1434 and in rules and advisory opinions of
15 the board; that I have no actual knowledge of any
   prohibited employment or contractual relationship,
16 direct or indirect, between a court reporting firm
   and any party litigant in this matter nor is there
17 any such relationship between myself and a party
   litigant in this matter. I am not related to
18 counsel or to the parties herein, nor am I
   otherwise interested in the outcome of this matter.
19
20
21              BRENDA R. BREAUX
                CERTIFIED COURT REPORTER
22              LOUISIANA CERTIFICATE NO. 22036
                REGISTERED PROFESSIONAL REPORTER
23
24
25