UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


BLAIR IMANI, et al.                          DOCKET NO.

      Plaintiffs,                        17-cv-00439JWD-EWD

   V.


CITY OF BATON ROUGE, et al.

      Defendants.



    DEPOSITION OF LIEUTENANT KENNETH BREWER,
given in the above-entitled cause, via Zoom
videoconferencing, pursuant to the following
stipulation, before Sandra P. DiFebbo, Certified
Shorthand Reporter, in and for the State of
Louisiana, on the 15th day of June 2021, commencing
at 9:34 AM.

```
 1   APPEARANCES (Via Zoom):
 2   REPRESENTING THE PLAINTIFFS:
     (Imani v. City of Baton Rouge)
 3
             JOHN ADCOCK,
 4           ATTORNEY AT LAW
             P. O. Box 791309
 5           3110 Canal Street
             New Orleans, Louisiana  70179
 6
             MOST & ASSOCIATES
 7           DAVID LANSER,
             ATTORNEY AT LAW
 8           201 St. Charles Avenue
             Suite 114 #101
 9           New Orleans, Louisiana  70170
10   REPRESENTING THE PLAINTIFFS:
     (Smith v. City of Baton Rouge)
11   (Batiste-Swilley v. City of Baton Rouge)
12           MACARTHUR JUSTICE CENTER
             BY:  ERIC FOLEY, ATTORNEY AT LAW -and-
13           JIM CRAIG, ATTORNEY AT LAW
             4400 S. Carrollton Avenue
14           New Orleans, Louisiana  70119
15   REPRESENTING THE CITY OF BATON ROUGE AND NAMED
     POLICE OFFICERS:
16
             BATON ROUGE PARISH ATTORNEY'S OFFICE
17           JOSEPH SCOTT,
             ATTORNEY AT LAW
18           222 St. Louis Street
             Baton Rouge, Louisana  70802
19
     REPRESENTING THE LOUISIANA STATE POLICE AND NAMED
20   STATE TROOPERS:
21           BURGLASS & TANKERSLEY, LLC
             BY:  GREGORY FAHRENHOLT,
22           ATTORNEY AT LAW
             5213 Airline Drive
23           Metairie, Louisiana  70001-5602
24   Reported By:
25           Sandra P. DiFebbo, CSR
26
```

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

E X A M I N A T I O N          I N D E X

                                              Page

BY MR. ADCOCK:                                 5


  E X H I B I T                   I N D E X

                          Page

Exhibit WWWW                              30
Exhibit XXXX                              45
Exhibit B                                 46
Exhibit C (Page 5)              50

S T I P U L A T I O N

           It is stipulated and agreed by and
between Counsel for the parties hereto that the
deposition of LIEUTENANT KENNETH BREWER is hereby
being taken pursuant to the Federal Rules of Civil
Procedure for all purposes in accordance with law;
           That the formalities of reading and
signing are specifically waived;
           That the formalities of sealing,
certification, and filing are hereby specifically
waived.
           That all objections, save those as to
the form of the question and responsiveness of the
answer are hereby reserved until such time as this
deposition or any part thereof is used or sought to
be used in evidence.
                    * * * * *
           Sandra P. DiFebbo, Certified Shorthand
Reporter, in and for the State of Louisiana,
officiated in administering the oath to the witness
via Zoom.

1          MR. ADCOCK:

2                    This is John Adcock for the

3               plaintiffs.  I just want to put on the

4               record that Greg Fahrenholt, who

5               represents defendants in this matter --

6               I believe he represents the state

7               police.

8          MR. SCOTT:

9                    That's correct.

10         MR. ADCOCK:

11      He e-mailed a few minute ago saying he has a

12  telephone status conference at 9:30, which is the

13  time this is going to start, so he'll be on the

14  Zoom but will probably miss making an appearance on

15  the record.  Please let the court reporter know.

16  Thanks.  So I just want to put that on the record,

17  Sandy, before we start.

18         LIEUTENANT KENNETH BREWER, having been

19      first duly sworn, was examined and testified on

20      his oath as follows:

21  EXAMINATION BY MR. ADCOCK:

22      Q.    Good morning.

23      A.    Morning.

24      Q.    My name is John Adcock.  I represent the

25  plaintiffs in this case.  You can call me John.  I

```
1    am fine going by my first name.  Can you state your
2    name for the record?
3         A.    Kenneth Brewer.
4         Q.    And Brewer is B-R-E-W-E-R?
5         A.    Yes, sir.
6         Q.    Mr. Brewer, where are you employed right
7    now?
8         A.    I'm a lieutenant with the Baton Rouge
9    City Police Department.
10        Q.    Were you employed that way also in July
11   of 2016?
12        A.    Yes, I was.
13        Q.    I just want to go through some
14   preliminaries before we get into the nitty-gritty.
15   We won't be here very long today, so it will be
16   pretty chill.
17        A.    Okay.
18        Q.    Have you ever given a deposition before?
19        A.    I have.
20        Q.    How many times do you think you have done
21   that?
22        A.    I've been a police officer over 30 years,
23   so I've done several.  I don't remember exactly.
24        Q.    That's okay.  Would you say more than
25   ten?
```

1      A.   I've probably done 15 to 20 depositions I
2  would imagine.
3      Q.   And so you generally know the rules about
4  depositions, I assume, right?
5      A.   Yes, sir.
6      Q.   I'll just go through them so they're on
7  record.  So you realize that if I ask you a
8  question, you need to give a verbal response.  So
9  that if the responses is yes, instead of saying
10 uh-huh or nodding your head, you need to say yes.
11 You understand that, right?
12     A.   Yes, I do.
13     Q.   You understand that there is a court
14 reporter who is taking down everything I say, you
15 say, and what your lawyer Joe Scott says?
16     A.   Yes.  It's just like in court.
17     Q.   Yes, just like in court.  So the court
18 reporter is going to make a transcript of this
19 deposition.  You understand that, right?
20     A.   I do.
21     Q.   And you understand this deposition is
22 under oath?
23     A.   I do.
24     Q.   You understand that we may later look at
25 this transcript to rely on, correct?

1          A.    I do.

2          Q.    And you understand that a jury may also

3    later look at this transcript and rely on it,

4    right?

5          A.    I do.

6          Q.    Now, when -- I got warned about this on

7    Friday.  Usually, depositions become like just

8    conversation back and forth.  It's very low key.

9    When that happens, it's good to make sure that I'm

10   not talking over you and you're not talking over

11   me, because then the court reporter gets really

12   upset with us.  We don't want the court reporter to

13   be upset with us, because it makes her life

14   difficult.  You understand that, right?

15         A.    I do.

16         Q.    Are you taking any medication today that

17   would affect your memory?

18         A.    No.

19         Q.    You are not taking any medication that

20   would prevent you from remembering or telling the

21   truth today, right?

22         A.    No.

23         Q.    So, Lieutenant Brewer, what would you

24   like me call you today?  I think you said --

25         A.    You can call me Kenny.  You can call me

1  whatever you want to call me.

2       Q.   All right, Kenny.  I'll call you Kenny

3  then.  You know what case you are here for?

4       A.   Yes, sir, I do.

5       Q.   This is involving protests on July 10th

6  of 2016.  Is that your understanding?

7       A.   Yes, sir.

8       Q.   Have you given a deposition before

9  involving the events of July 10th, 2016?

10      A.   I have not.

11      Q.   Now, give me just a brief rundown of your

12 professional background.  It sounds like you have

13 been a police officer in Baton Rouge for 30 years;

14 is that right?

15      A.    Yes.  I was with the sheriff's office for

16 four years, from '89 to '93.  Then I was with -- I

17 switched over to BRPD in '93.  I worked in uniform

18 patrol, narcotics, ATF Task Force, Serial Killer

19 Task Force, hit and run, back in uniform again for

20 a little while.  I worked a tactical diversion on

21 the opioid investigations, interdiction, drug

22 interdiction, with DEA.  Right now I'm the

23 commander of narcotics and the HIDTA supervisor,

24 also.

25      Q.    Thank you.  That's really helpful.  What

1    was the last thing you said?

2        A.    Commander of narcotics and the HIDTA Task

3    Force with DEA.

4        Q.    Tell me what the HIDTA Task Force is.

5        A.    It's High Intensity Drug Trafficking

6    Areas.  It's a program with DEA where you try to

7    target narcotics trafficking, large level narcotics

8    trafficking.

9        Q.    Got you.  When you say drug interdiction,

10   what does that mean?

11       A.    Trying to interdict the shipment of

12   narcotics, whether by roadway or parcels or

13   smuggling.  So there is -- you know, there is

14   numerous ways.  Sometimes through 18-wheelers.  So

15   it covers a wide variety of topics.

16       Q.    Basically, you are trying to disrupt the

17   transport of --

18       A.    Yeah.  Trying to disrupt drug trafficking

19   organizations by stemming the flow of narcotics.

20       Q.    And you mentioned you, and correct me if

21   I'm wrong, you mentioned you worked with an ATF

22   Task Force?

23       A.    Back in '99, 2000 I think it was, they

24   had a project called Exile, Operation Exile, where

25   they were trying to reduce gun violence.  So if a

1   convicted felon was caught with a firearm, he was

2   taken -- he was indicted federally, and then they

3   would prosecute them federally.  It was like a

4   five-year penalty, but, I mean, as y'all -- since

5   y'all are attorneys, you know that in the federal

6   system they have a point system.  They didn't

7   usually get five years, but it did help reduce gun

8   violence.

9       Q.   So in that you would work with ATF to

10  find -- you arrested people who had guns even --

11      A.   I was writing cases for ATF.

12      Q.   What does that mean?

13      A.   So what would happen is if a local agency

14  made an arrest, I would write up the federal case,

15  and they would pick up the case and then indict it

16  federally, so I would do the federal paperwork so

17  they could do the indictment.

18      Q.   You were like a liaison kind of?

19      A.   Yeah.  I was kind of the liaison.  So I

20  would get the information, and then I would prepare

21  a packet that would go to the federal law court.

22      Q.   So this is with local law enforcement.

23  This is with the sheriff's office in Baton Rouge?

24      A.   I had a co- -- I had a partner over there

25  who was from EBR, so it was BRPD and EBR

1    participating in this.

2         Q.    Was anybody else outside of East Baton

3    Rouge Parish law enforcement involved?

4         A.    I mean, ATF.  It was ATF, BRPD.  I'm

5    trying to think.  We might have at one time had an

6    LSP, a state police person, but I don't think he

7    was there at all.  It was mainly just myself and

8    the sheriff's deputy.

9         Q.    Kenny, let me go close the door to my

10   office.  I'll be right back.  Kenny, how long have

11   you been in charge of BRPD narcotics?

12        A.    I just took it over in March of this

13   year.

14        Q.    Did you have a previous stint in

15   narcotics with BRPD?

16        A.    I was over at HIDTA again.  So before I

17   took over the narcotics division, I was the

18   supervisor of HIDTA for about three years.

19        Q.    You mentioned that before.  Now, before

20   1989, what were you doing?  That was a long time

21   ago.

22        A.    I was in the Marine Corps.

23        Q.    How long were you in the Marine Corps?

24        A.    For four years.

25        Q.    When you were discharged, what rank were

```
 1   you?
 2         A.    Lance Corporal when I got my final
 3   discharge, yes, sir.
 4         Q.    What were you doing before 1985?  Was
 5   that full time or was that --
 6         A.    That was full time.
 7         Q.    What were you doing before 1985?  I'm
 8   just asking generally.
 9         A.    I was in high school.  I signed up when I
10   was 17 and went when I was 18.
11         Q.    You were roughly 18 in 1985.  Okay.  And
12   then so do you have any --
13         A.    Excuse me, sir.  That was in '85.  In
14   '85, I was 18.
15         Q.    That's what I thought I said.  I'm sorry.
16   Thanks for clarifying that.  What, if any,
17   education do you have after high school?
18         A.    I just have a high school diploma.
19         Q.    Kenny, what did you do to prepare for
20   this deposition today?
21         A.    I had a meeting with the parish attorney
22   and discussed my testimony and told to tell the
23   truth.
24         Q.    Of course.  Did you read over anything
25   before today?
```

1    A.    I briefly looked over the little

2    deposition -- the little statements I gave.  Just

3    some questions I answered for the legal advisor.

4    Q.    Do you remember what paperwork you looked

5    over?

6    A.    I think it's the interrogatories.  Is

7    that correct?

8    Q.    You looked over some discovery documents?

9    A.    Yes, sir.

10    Q.    Anything else?

11    A.    That's it.

12    Q.    In July of 2016, what was your job title?

13    A.    I was the HIDTA supervisor.  I was a

14    lieutenant, and I was over the HIDTA Task Force at

15    DEA.

16    Q.    When you say you are a lieutenant, how do

17    the ranks go in the BRPD?

18    A.    You have an officer, and then you have a

19    corporal, and then you have a sergeant, then

20    lieutenant, then captain and now -- well, at one

21    time it was major, but now it's deputy chief and

22    then chief.

23    Q.    Do you mind going through that again

24    from, basically, the bottom to the top?

25    A.    So from the bottom or the top?

1        Q.    From the bottom.

2        A.    It's an officer.  So you have a normal

3   officer, and then your corporal is usually a person

4   with seven years or more.  And then your sergeants

5   -- most sergeants don't make sergeant until around

6   the 15-year mark, and then most lieutenants have

7   about 20 years or so, if not more, and then you

8   have captains, and they're usually closer to

9   between the 23- to 25-year mark.

10       Q.    Got it.

11       A.    And then you have your deputy chiefs

12  which are appointed by the chief.

13       Q.    So there is no real kind of general

14  experience level for that?

15       A.    I don't understand your question.

16       Q.    I'm glad you told me.  When you were

17  going up the ranks, you were like a lieutenant

18  generally has 20 plus years of experience.  There

19  is no such requirement for a deputy chief?

20       A.    A deputy chief there are some

21  requirements, but they have to take a test, and

22  they have to be at least a sergeant.  So they have

23  to have some experience, and then they have to take

24  -- they take a deputy chiefs civil service test,

25  and then after the chief is given a list, and he

1    can appoint somebody to a three-year term as deputy

2    chief.

3         Q.    They serve terms of three years?

4         A.    Yes, sir.

5         Q.    And the chief is above that, I guess?

6         A.    Yes. He is appointed by the mayor.

7         Q.    How long have you been a lieutenant?

8         A.    Since March or April of '16.

9         Q.    What is the role of a lieutenant and what

10   does it mean to be a lieutenant?  What are you in

11   charge of?  What are your abilities?  What are you

12   supposed to do?

13        A.    So I was -- I was administrator over the,

14   as I said, the DEA HIDTA Task Force.  We had

15   several people signed up with DEA working on

16   different task forces.  I was over those

17   individuals.  So I probably had six to seven people

18   at any given time under my command, but since I was

19   also the supervisor for HIDTA, I also supervised

20   individuals from other agencies, so I had a deputy

21   from Iberville.  I had a deputy from West Baton

22   Rouge.  I had two at one time from West Baton

23   Rouge, and then I had several EBR sheriff's

24   deputies under my command, too.

25        Q.    That was specifically through -- related

1  to the HIDTA program?

2         A.    For DEA/HIDTA.

3         Q.    I know you told me, but I have young

4  kids, so I don't sleep.  Tell me again what the

5  HIDTA program is.

6         A.    It's High Intensity Drug Trafficking

7  Areas. The federal government loves their acronyms.

8         Q.    Yeah, they do.  So that was your job,

9  this kind of drug interdiction, drug interception

10 --

11        A.    Yes, sir.

12        Q.    -- work with the DEA?

13        A.    Yes, sir.

14        Q.    How often, if at all, do you get kind of

15 detailed or assigned to work like a parade or Mardi

16 Gras or LSU football game or anything like that?

17        A.    Those were usually overtime assignments

18 that were put out department wide.  I probably did

19 work some of those.  You know, I probably wasn't

20 working a bulk of them, but I probably worked, you

21 know, a decent amount, like LSU football, those

22 type of events.

23        Q.    But not that often?

24        A.    Through the years I worked my fair share

25 of them, but I wouldn't say I was one of the main

1    ones working them, but I worked my fair share of

2    overtime events.

3        Q.   So those are not -- when people do work

4    Mardi Gras or LSU football, they're not there as a

5    private detail; they're working overtime?  Is that

6    what you're saying?

7        A.   From what I understand.  I haven't been

8    working them in the past couple of years, but when

9    I was working them, the traffic office was assigned

10   to run these events, and then they would put out

11   how much manpower they need, and then they would

12   put it out department wide for you to sign up to

13   work these.  They would put out a number.  We need

14   these many officers to fill these positions, and

15   then you'd just sign off.  That's basically how it

16   would work.

17       Q.   How often did you work in the past ten

18   years doing Mardi Gras parades?

19       A.   I worked Mardi Gras parades.  I might not

20   work all of them, but I would maybe work one or two

21   a year, because Baton Rouge would have Artemis,

22   Mystique, and Orion.  They have different ones.

23   Spanish Town.  I would work -- you know, sometimes

24   I'd work two or three of them.  One year I might

25   only work one.  It just depends on the schedule,

```
 1    and if I could get on and there was enough space.
 2         Q.    Enough space?
 3         A.    (Inaudible)
 4              THE COURT REPORTER:
 5                   I didn't hear that answer.
 6              THE WITNESS:
 7                   I said if you want an exact number
 8                on how many I worked, I don't really
 9                remember, but I did work several
10                parades.
11    BY MR. ADCOCK:
12         Q.    How often did you work kind of non-Mardi
13    Gras parades, whether it be a Christmas parade or
14    anything like that?
15         A.    I mean, each year is different.  Some
16    years I would work multiple events.  Other years it
17    didn't work with my schedule, and I wasn't able to
18    work.  So it would just depend on the year.  I
19    probably worked more of those events when I was a
20    sergeant, but when I became a lieutenant, it was
21    kind of harder with my schedule to work some of the
22    events.  I got small kids, so I was trying to be at
23    home more on the weekends than working those
24    events.
25         Q.    Now, Kenny, if you are doing basically
```

1   narcotics, and -- this is my word, not yours -- you
2   occasionally do parades and kind of large
3   gatherings of people, how much, if any, training do
4   you get at POST Academy on policing parades and
5   working parades and making sure people behave
6   themselves during parades, how to treat people and
7   that kind of stuff?
8        A.   I mean, we have in-service every year.
9   During our in-service, our 40-hour in-service,
10  there is a wide variety of topics they talk about.
11  And, I mean, working a parade or a big event like
12  that, I mean, it's basically, you know, you treat
13  people like you want to be treated.  For the most
14  part, people are out there having a good time.
15  You're just trying to manage, make sure things
16  don't get out of hand.
17       So, I mean, we do -- from time to time we
18  would have instruction on, you know, how to
19  interact with people.  We've had, you know, classes
20  on Verbal Judo and different techniques to work
21  with the public, but, usually, for most of the
22  events, the traffic division -- for pretty big
23  event like that, they put enough officers out
24  there, enough people who have experience working
25  those events to where usually you have somebody

1    there with a lot of experience.  So if somebody is
2    kind of new or doesn't really -- has not worked it,
3    they're not alone.
4         Q.    You mentioned Verbal Judo.  Is that what
5    you learned to handle your kids or is that helpful
6    for large gatherings?
7         A.    I mean, it's a way to talk to people.  I
8    mean, large gatherings, you know, it's still, at
9    the end of the day, you are going to have one-on-
10   one interaction, an officer with an individual.  So
11   that was one of the techniques they taught.  That
12   was actually some of agents, too.  They have
13   different units of instruction now for that.  But
14   the Verbal Judo is what they taught in the '90s,
15   you know, how to treat people the way they want to
16   be treated.  Try to talk to people in a down-to-
17   earth way.  It was just giving you tools on how to
18   actually interact with people in a respectful way.
19        Q.    I was trying to make a joke of that, but
20   Verbal Judo.  If you can, just tell me what that
21   is.  What do you mean by that?  I know you said
22   it's like treating people the way you want to be
23   treated.
24        A.    It was basically a system that they
25   promoted giving you some tools on how to talk with

1    people and try to bring down the -- just basically

2    a deescalation tool.

3        Q.    Can you give me an example?

4        A.    You know, basically, one of the

5    techniques was like when you introduce yourself,

6    and you talk to someone that -- and you introduce

7    yourself, you bring it down to more of a personal

8    level, try not to be intimidating.  It's been a

9    while since I took the class, but, basically, I've

10   always boiled it down to if you just treat people

11   with respect and talk to them in a low, normal

12   manner, most people are going to comply.  You

13   always will have people who don't, but, you know,

14   you try -- we always try to deescalate the

15   situation and keep it calm.

16       Q.    How much deescalation training do you

17   think you've had since 1993?

18       A.    To be honest with you, I don't really

19   know, but I do know that deescalation is mentioned

20   a lot in in-service.  I just don't know how much

21   total training we have on that.

22       Q.    You say it's mentioned a lot.  Are there

23   specific trainings on deescalation that you

24   remember?

25       A.    I just know that -- I just remember when

1    we're having instruction, you know, that's kind of

2    like a standard.  We always want to deescalate.  We

3    want to deescalate as soon as possible, and that's

4    just -- I mean, out on the street, I mean, you

5    always want to try to bring it down, you know.  I

6    mean, things go from bad to worse, and they don't

7    get better.  So you try to prevent that, and you

8    try to deescalate every situation as quick as

9    possible.  So I think they use the term in more of

10   a general discussion.  Hey, we need to deescalate

11   and try to keep -- you know, you don't want things

12   to go from bad to worse.

13       Q.   Do you recall like what should you do, if

14   you recall, from your training, what should you do

15   if you are dealing with kind of large group that

16   you think is getting unruly or out of hand? What

17   are the tenets?  What are the principles you should

18   follow in dealing with a situation like that?

19       A.   I mean, it's hard for me to say with a

20   hypothetical situation like that.  I really don't

21   know.  It would depend on the situation, is the

22   best I could say.  I would have to judge the

23   situation, because it's pretty much a case-by-case

24   basis.

25       Q.   Have you been trained on how you are

```
 1   supposed to engage with a crowd if they're part of
 2   a protest that gets out of hand?
 3        A.   We've had Mobile Field Force training,
 4   but it's been a while since I've had that training.
 5        Q.   When do you think you last had that
 6   training?
 7        A.   I don't know.  It's been a while.
 8        Q.   What do you remember about Mobile Field
 9   Force training, if anything?
10        A.   They would teach people how to get on
11   line and wear the protective equipment, how to move
12   as a team.  It was more of preparing if you had to
13   be in part of the Mobile Field Force.
14        Q.   The Mobile Field Force is like -- tell
15   me.  So it's like people are kind of wearing
16   equipment.  I would call it riot gear, in the
17   front, and there is people behind them that are
18   handling the arrests, and then they hand off the
19   person?  Is that what we're talking about?
20        A.   Well, yeah.  It's usually protective
21   equipment.  They wear protective equipment, and
22   they get on line, and they may move forward, and as
23   they encounter individuals, they pass them back.
24   As in the incident I was involved in, I was -- the
25   group of narcotics detectives that I was over were
```

1    just augmenting the Mobile Field Force.  They

2    passed the young lady back.  She was struggling a

3    little bit.  I just helped steady her.  They

4    finished securing -- cuffing her, and then I walked

5    her back to the bus, and that was pretty much it.

6    That was pretty much the interaction I had with the

7    young lady.

8        Q.    We'll get to that.  Once you take the

9    arrestee back to the bus or wherever so they can

10   take her to jail, what do you do in terms of

11   relaying the information about her arrest to the

12   person that books her or whatever the next person

13   is? What are you supposed to do there?

14       A.    The way it was, we were advised was to

15   drop them off to the person at the bus, and the

16   individual officer who initially put her in custody

17   handled the report.

18       Q.    So the individual person/officer that

19   said, "This person needs to be arrested," they're

20   supposed to get with the booking person -- they're

21   supposed to do the report? That's their

22   responsibility?

23       A.    They're supposed to do the -- document

24   the report, yes.

25       Q.    You know what a Probable Cause Affidavit

```
 1   is, right?
 2        A.   Yes, I do.
 3        Q.   It's what you use when you arrest someone
 4   without a warrant?
 5        A.   Yes, sir.
 6        Q.   In that scenario that you are describing,
 7   who is responsible for the Probable Cause
 8   Affidavit?
 9        A.   It should have been the officer that,
10   after everything was set, the officer was going to
11   -- I'm not really sure how they handled it there,
12   but, usually, the officer would handle the probable
13   cause.  The officer that makes the arrest handles
14   the probable cause.
15        Q.   But you're not sure -- I don't want to
16   put words in your mouth.  You're not sure what the
17   protocol was supposed to be that particular day?
18        A.   I'm not sure how they did the processing
19   that day.
20        Q.   We're talking about July 10th, right?
21        A.   Yes.  I'm not sure how they handled that.
22        Q.   Let's talk about July 10th, 2016.  What
23   was your -- let me go get some water.  Give me 30
24   seconds. I'll be right back.
25        A.   Okay.  Cool.
```

1      Q.    What was your -- we're talking about July

2  10th, 2016.  What was your understanding of your

3  role and responsibilities that day?

4      A.    The SRT Command Center advised me to take

5  my individuals, the detectives that I was over,

6  down to East Boulevard/Europe Street area and

7  assist the Mobile Field Force.  That was -- so we

8  went down there, and we augmented the Mobile Field

9  Force and was there to assist them.

10     Q.    What is SRT?

11     A.    Special Response Team.

12     Q.    What is the Special --

13     A.    They were in charge of the -- they were

14  the command in charge of the event.

15     Q.    What do they normally do, the SRT?

16     A.    They're like the SWAT team.

17     Q.    Where had you been?  Had you been working

18  -- which shift had you been working?  Had you been

19  on duty anyway or did you get called at home?  What

20  was the --

21     A.    No.  They had us on -- they had us

22  working 12-hour shifts.  They had individuals at

23  headquarters just on standby if we -- they were

24  trying to prepare for events no matter where they

25  happened.  They were worried that people might come

1    to headquarters, so they had extra officers on

2    standby, and we were on standby working at

3    headquarters.  We received instruction from the

4    command staff to go down off of Government Street

5    and assist, because there was a crowd there, and

6    Mobile Field Force was there, and they needed the

7    assistance.

8         Q.   Were you given any information about like

9    why they needed assistance or what was going on

10   with that crowd?

11        A.   No.  I was just told to go down there.

12        Q.   Were you told that the crowd was a

13   peaceful protest or a violent protest, that people

14   had guns, people didn't have guns?  Were you given

15   any information along those lines?

16        A.   When I got down there -- not until I got

17   down there.  When I got down at that area, I talked

18   to the narcotics commander that was in charge at

19   the time.  He advised me that there were concerns

20   that the group were planning to try to take the

21   interstate, and they were really worried about

22   people's safety, if they tried to get up on the

23   interstate.  And so we were to augment the Mobile

24   Field Force that was already lined up over on East

25   Boulevard.

1          Q.    When you got down there, Downtown that
2    day, whereabouts did you meet with the narcotics
3    commander in charge?
4          A.    Around the interstate.  The interstate
5    and Government.
6          Q.    What was that narcotics commander's name?
7          A.    Wayne Brashier.
8          Q.    Do you know how to spell his last name?
9          A.    B-R-A-S-H-I-E-R, I believe.
10         Q.    Got you.  You said they were worried that
11   these folks might get on the highway and hurt
12   themselves and hurt other people?
13         A.    He was worried.  He was advised that he
14   had learned that there was a concern that the group
15   might try to take the interstate.
16         Q.    Did you have any additional information
17   other than what Brashier told you that they might
18   try to take the interstate?
19         A.    He told me that, and then I had to go
20   down with the -- take the detectives down and
21   augment the Mobile Field Force.
22         Q.    You didn't have any additional
23   information other than what you learned from
24   Mr. Brashier about them wanting to --
25         A.    Yes, sir.

1    Q. When you said you were supposed to help

2 or augment the Mobile Field Force, what was your

3 understanding of what you were supposed to do

4 specifically?

5    A. Mobile Field Force had the protective

6 gear, so they were in front, and then we were just

7 supposed to be there to assist.  So as they started

8 taking individuals into custody, if we were given

9 the word to move forward, then the detectives would

10 have helped with any prisoners obtained.

11    Q. And then you brought people that were

12 working under you, I think you said, right?

13    A. I had several -- I had people under --

14 from HIDTA, and I had people from narcotics, so the

15 narcotics division was kind of split. We had two

16 shifts.  We had kind of a day shift and a night

17 shift and evening shift.

18    Q. How many people would you say went

19 downtown with you from headquarters that day?

20    A. Oh, from all of headquarters?

21    Q. No, no.  That you said you kind of --

22    A. Just under me? Eight.

23    Q. Just to be clear, you were not given any

24 information about what had happened earlier that

25 day?

1      A.    No.

2      Q.    You were not given any information about

3  what was happening at the state capitol that day?

4      A.    No.

5      Q.    You weren't given any information about

6  kind of the nature of the protest, like what it is

7  they were protesting or what was the purpose of the

8  protest?

9      A.    It was -- they didn't volunteer any

10  information like that.  I was given direction from

11  my commander, and I followed through with it.

12      Q.    Were you given any information about how

13  that group ended up at France and East?

14      A.    No.

15      Q.    Let me show you basically what I want to

16  ask you about.  I'm going to show you a video which

17  I think is a video of an arrest.

18            MR. ADCOCK:

19                  Joseph, this is a video in the

20            shared exhibits.  It's Exhibit WWWW, so

21            four Ws.  I'm just going to play this.

22  BY MR. ADCOCK:

23      Q.    Officer, I'm going to play this video for

24  you. I'll play it twice.  If you want me to play it

25  again, I'll play it again.  Okay.  Then I'm going

```
 1   to ask you questions about it.
 2                  {VIDEO PLAYED}
 3            MR. SCOTT:
 4                  John, how about I play it on my
 5               machine over here? We're not getting
 6               anything through the Zoom.
 7            MR. ADCOCK:
 8                  Yeah.  That was my fault.  I started
 9               without doing it properly.  Dave, if
10               you are, there I can't share this.
11            MR. LANSER:
12                  I just made you the host.
13            MR. ADCOCK:
14                  Great. I have the power. Bear with
15               me. Thanks, everyone.
16   BY MR. ADCOCK:
17        Q.   Can you see that?
18        A.   Yes.
19                  {VIDEO PLAYED}
20   BY MR. ADCOCK:
21        Q.   Officer, I'm going to play this again.
22   It's the arrest at the very very beginning with the
23   woman screaming or yelling.  I'm going to ask you
24   about that.
25        A.   Okay.
```

1                    {VIDEO PLAYED}

2    BY MR. ADCOCK:

3         Q.   Do you see that?

4         A.   Yes, sir.

5         Q.   I'm going to play it one more time.

6                    {VIDEO PLAYED}

7    BY MR. ADCOCK:

8         Q.   So, Kenny, you were referring earlier to

9    -- I don't know if -- you said a young lady that

10   you had in custody.  Is that the incident you were

11   talking about in the video?

12        A.   Yeah.  That was it.  Yes, sir, that's it.

13        Q.   Tell me who -- were you in that video?

14        A.   Yes, I was.

15        Q.   What were you dressed -- what were you

16   wearing in that video?  Who were you?

17        A.   I had the police raid vest on, and I was

18   in blue jeans.

19        Q.   Blue jeans and a police what vest?

20        A.   Raid vest.  It was like a bulletproof

21   vest, like over the top.

22        Q.   You called it a rain vest?  R-A-I --

23        A.   No.  Like a raid vest.

24        Q.   I want to know for the record is it

25   R-A-I-N or R-A-I-D?

1          A.    R-A-I-D.

2          Q.    And there was maybe one or two other

3    individuals helping you or you helping them?

4          A.    Yeah.  It was two detectives, and then I

5    went off to help them.

6          Q.    Do you know the names of those two

7    detectives?

8          A.    Jason Dohm and Jeff Pittman.

9          Q.    And were they detectives who kind of came

10   with you, one of those aid guys that came with you?

11         A.    Actually, Jason Dohm and Sergeant Pittman

12   were the day shift.  We kind of combined them

13   together that day.

14         Q.    Which shift were you on?

15         A.    I was kind of on evening shift, three to

16   three.

17         Q.    These shifts, these 12-hour shifts, were

18   these what you normally did or this is after the

19   Sterling --

20         A.    This was after the Alton Sterling death.

21         Q.    So this was unique to the time after

22   Alton Sterling's death?

23         A.    Yes, sir.

24         Q.    Do you know how long the BRPD was kind

25   keeping these 12-hour shifts?

1    A.    Like three weeks until those officers
2    were killed.
3    Q.    And that was July 17, I think?
4    A.    Yeah, July 17th of 2016.
5    Q.    Did it stop then or did it continue after
6    that?
7    A.    I think the next day after they kind of
8    discontinued it.
9    Q.    Now, what is your understanding of who
10   executed the arrest of that young lady?  Her name
11   is Blair Brown.  She also goes by Blair Imani.
12   A.    I don't know who gave the individual to
13   detectives, so I don't know.
14   Q.    Say that again.  You don't --
15   A.    So the young lady was passed back by
16   officers, and those two detectives took control of
17   her, moved her out, like you saw on the video,
18   moved her out of the way.  Now, who initially gave
19   her to the two detectives, I don't know.
20   Q.    So it looks like the two detectives -- it
21   looks like what you're saying -- don't let me put
22   words in your mouth.  It looks like what you are
23   saying is -- we'll just call her Blair.  Blair was
24   given to these two detectives, Dohm and Pittman,
25   correct?

1        A.    Yes.

2        Q.    By another officer?

3        A.    Yes.

4        Q.    And you don't know the identity of that

5   other officer?

6        A.    No, sir.

7        Q.    How does that work normally, or in this

8   case?  I know there is a lot going on.  I just

9   blinked out.  There I go.  I know there is a lot

10  going on, but does someone get passed back, and

11  they're like, she is arrested for having a gun.

12  She is arrested for cocaine.  She is arrested for

13  spitting on somebody.  She is arrested because she

14  took a swing at somebody.  I mean --

15       A.    My understanding was that they were given

16  the order to disperse.  This crowd refused to

17  disperse, and then the order was given from the

18  command to take the street back, and the people who

19  were still here were to be arrested.  That's what

20  happened.  They were passed -- as I said, the

21  narcotics individuals, like you saw how you had a

22  line of people with just -- like they didn't have

23  protective gear on.  They just had like a little

24  black vest that said Police on it, those people --

25  we were there to augment them as they handed people

1    back.  We took them off and took them to the bus.

2        Q.    So your understanding is there was an

3    order to disperse.  They didn't do it, so there was

4    an order to take back the street, and that's when

5    people got arrested?

6        A.    Yes, sir.

7        Q.    And so that is -- so, anyway, I really

8    don't want to put words in your mouth.  What you're

9    saying is when people are passed back, they're not

10   saying this person has a knife or this person took

11   a swing at an officer or anything like that?

12       A.    I have no knowledge of what, if any,

13   conversation occurred with those two detectives and

14   the people that were the front line Mobile Field

15   Force people with protective equipment.  I don't

16   know what conversation happened.  I couldn't tell

17   you.

18       Q.    But no one said that to you?

19       A.    No.  No one said what to me?

20       Q.    No one said this is the reason she is

21   arrested to you?

22       A.    No.  I mean, I'm sure there was a lot of

23   assumption going on, because we were taking the --

24   we were told to clear the street, and people who

25   refused to leave were going to be arrested.  That

```
 1   was my assumption, that anybody who was still there
 2   was being arrested because they refused to
 3   disperse.
 4        Q.   I want to -- it seems like there is two
 5   guys here with a vest on.  I just want to -- are
 6   you the guy with the gray shirt or the red shirt?
 7   Do you want to see it again?
 8        A.   If you share it.  If I saw the picture, I
 9   could tell you.
10        Q.   I'll show you a picture.
11        MR. ADCOCK:
12             Can you play it for him real quick.
13        MR. SCOTT:
14             Just put it up.  The first frame I
15          think we can pull that up.
16        MR. ADCOCK:
17             Bear with me.
18             {PHOTO DISPLAYED}
19        THE WITNESS:
20             If you look right there, I got the
21          patrol vest.  I got jeans on.  It looks
22          like a black shirt.
23   BY MR. ADCOCK:
24        Q.   Right there, where my cursor is?
25        A.   Yeah.  I'm the big guy right off to the
```

1    left.  You see there is a uniformed guy?  Then I'm

2    there.  Come over.  Come over one more.  Right

3    there. That's me.  You just passed me.  Where the

4    cursor was, right there.

5         Q.    That's you?

6         A.    Yes, sir.

7         Q.    I wasn't going to say you were the big

8    guy.  Joseph said you were the big guy.  I just

9    want to note that for the record. So tell me who is

10   Dohm and who is Pittman?

11        A.    Where the cursor is, that is Pittman.

12        Q.    Right here?

13        A.    Yeah.  And then Dohm is right in front of

14   that other officer.  I'm not even sure who that is,

15   but there is another officer.  You can't really see

16   Dohm, but he is in a reddish shirt.

17        Q.    Pittman has the vest on and Police on the

18   back of his back in yellow?

19        A.    Yes.

20        Q.    And then --

21        A.    Dohm is in red.  You see he's right

22   there?

23        Q.    Right here? That's him there?

24              {TECHNICAL DIFFICULTIES}

25              THE WITNESS:

```
 1              Like I told you, we have a lot of --
 2   BY MR. ADCOCK:
 3        Q.   Let me show the video, and you can
 4   describe it.
 5              {VIDEO PLAYED}
 6   BY MR. ADCOCK:
 7        Q.   Kenny, do you see that?
 8        A.   Yes.
 9        Q.   I'm just going to go through this again
10   with the cursor.  So you see where my cursor is
11   now?
12        A.   Yes.  That's Jeff Pittman.
13        Q.   And he is a detective?
14        A.   He was a sergeant.
15        Q.   He was a sergeant.  Okay.  And you're not
16   sure who this officer is?
17        A.   It's kind of hard to tell.
18        Q.   His back is to you?
19        A.   Yeah.
20        Q.   If you don't know, you're not sure --
21        A.   I'm not sure.
22        Q.   You're not sure about this guy either?
23        A.   Like I told you, we had a lot of bald
24   police officers.
25        Q.   This is you?
```

1      A.    That's me. Like I told you, Dohm is right
2  there in the red shirt.
3      Q.    That's Dohm. He is in a red shirt with a
4  raid jacket that says "Police" in yellow on the
5  back?
6      A.    Yes.
7      Q.    Then there is a police officer in blue
8  jeans.  It looks like maybe black shoes.  Then
9  there is a guy also there who is wearing blue jeans
10  and maybe a gray shirt, and he's got a raid jacket
11  with Police on his back in white, and you're not
12  sure who that is?
13      A.    We have two or three detectives who kind
14  of look like that, but it's kind of hard -- the way
15  his head is kind of pushed down, I can't really
16  tell.  I can't see a facial feature. I'm not sure
17  who that is.
18      Q.    What about right there?  Does that help?
19  I know that's not good.
20          MR. SCOTT:
21              You want to try advancing it another
22          frame and see if it depixelates a
23          little bit?
24          THE WITNESS:
25              I'm not real sure.  That could be --

```
 1                let me see it again.  I think that
 2                might be Andy Kuber, but I'm not sure.
 3     BY MR. ADCOCK:
 4          Q.    This guy right here.
 5                THE COURT REPORTER:
 6                     Andy who?
 7                THE WITNESS:
 8                     Kuber.
 9     BY MR. ADCOCK:
10          Q.    That's C-O-O-P-E-R?
11          A.    No.  C-U-B-E-R. I'm sorry.  K. K-U-B-E-R.
12          Q.    Okay.  You follow them, like you said,
13     and you take her back to the --
14          A.    Yes.
15          Q.    Is it a bus or whatever you --
16          A.    There was a -- the sheriff's office had
17     bought a big bus.  They had like a station for
18     people that were arrested.
19          Q.    Now, I want to ask you about this other
20     person in front of you.  You are there.  It looks
21     like they're arresting another person on the ground
22     here.
23          A.    Yes, sir.
24          Q.    I'll play it, and then I'll ask you about
25     that.
```

```
 1                  {VIDEO PLAYED}
 2    BY MR. ADCOCK:
 3         Q.   See that person?
 4         A.   Yes.  I didn't deal with that person too
 5    much.  I think that person was complying pretty
 6    well with the officers.  Blair was screaming and
 7    kind of yelling, and she caught my attention, so
 8    that's why I went to kind of assist those officers
 9    with her.
10         Q.   Do you know who these two officers are?
11    I'll play it a few times. Let me start over.
12                  {VIDEO PLAYED}
13             THE WITNESS:
14                 I don't really know who they are or
15              anything.
16    BY MR. ADCOCK:
17         Q.   I'm asking about that guy and that guy.
18    You obviously can't tell who that guy is.  He might
19    have been -- I'm not sure.  Let me play it.
20                  {VIDEO PLAYED}
21             THE WITNESS:
22                 Yeah.  I'm not sure who that guy is.
23              He is either a corporal or a sergeant.
24              I can't really see the stripes.  The
25              sunglasses don't help.
```

```
 1    BY MR. ADCOCK:
 2         Q.   I'll do it one more time.
 3                   {VIDEO PLAYED}
 4              THE WITNESS:
 5                   I definitely don't know who the guy
 6              is.  He is like looking down.
 7    BY MR. ADCOCK:
 8         Q.   Looks like the guy pinning him down is
 9    the one actually putting cuffs on?
10         A.   Yeah. Yes.
11         Q.   I think that person right there is Finn
12    Phoenix.  That name doesn't mean anything to you,
13    right?
14         A.   Never dealt -- never had any dealings.
15         Q.   I'm talking about the arrestee.
16         A.   Yeah.  I never talked to that person at
17    all.
18         Q.   Did you see why this person is being
19    arrested?
20         A.   I think it was another one that was
21    refusing to leave.  I'm not really sure.  I don't
22    know what went on with her, because, as I said,
23    Blair was like yelling and screaming and kind of
24    took my attention away from what was going on.  And
25    so she kind of brought my attention away, and I
```

1    went to help those detectives.  I really didn't
2    know what transpired with them.
3         Q.   You said that -- let me stop sharing.
4    These technical difficulties are kind of setting me
5    back.  Bear with me, Officer.
6         A.   Understand.
7         Q.   Just so the record is clear, since we're
8    recording, we've been looking at a video that is
9    marked Exhibit WWWW, four Ws, just so the record is
10   clear.  Let me show you a screen grab, a picture,
11   so we're all clear.  You see this picture, Kenny?
12        A.   Yes.
13        Q.   Can you describe who you see in that
14   picture?
15        A.   That is Sergeant Pittman and Dohm.
16        Q.   That would be Pittman right there on the
17   left?
18        A.   Yes, sir.
19        Q.   On the right would be Sergeant Dohm?
20        A.   Yes.
21        Q.   That's D-O-H-M, right?
22        A.   Yeah, D-O-H-M.
23        Q.   It looks like they have that arrestee
24   we've been talking about, Blair, in custody, right?
25        A.   Yes.

1    Q.   It looks like she is in flex cuffs, black

2    flex cuffs?

3    A.   That's what they were using.  I can't

4    remember exactly what we cuffed her with, but that

5    is probably accurate.

6    Q.   It looks like Sergeant Pittman is giving

7    a thumbs up.

8    A.   I'm not really sure.  I guess that she is

9    in custody.  I'm not really sure what he means by

10   that.

11   Q.   You don't know who he is doing that to?

12   A.   No.

13   Q.   You don't know if anybody -- had you

14   asked him a question right before that, like

15   everything is okay?

16   A.   I don't know what that reference is.

17   Q.   Okay.  Let the record reflect this is

18   Exhibit XXXX, four Xs, which means this is not for

19   children.  So that exhibit we just looked at, four

20   Xs, Kenny, that was Dohm and Pittman taking her.

21   Do you know where they were taking her?  What I'm

22   asking is it looks like they are escorting her

23   somewhere.

24   A.   They were -- it appears they started to

25   escort her back, and then I told them I would take

```
 1    her, because I walked -- I actually walked her all
 2    the way back to the bus several blocks away.  I
 3    didn't want to tie up two detectives on that, so I
 4    took her, and I walked her all the way back to the
 5    bus.
 6         Q.    Gotcha.  Gotcha.  Do you remember where,
 7    what corner -- I know you don't know the address --
 8    where that bus was?
 9         A.    It was on Government by the interstate. A
10    couple of blocks away.  I mean, it took -- we had
11    to walk there.  It took a little time.
12         Q.    Let me show you another map, or I'll show
13    you a map and see if this is helpful.  All right,
14    Kenny.  Can you see this? I'm showing the witness
15    what we've marked as Exhibit B, which is
16    essentially a Google map representation of an area
17    of Downtown Baton Rouge.  He is looking at it right
18    now?
19         A.    So you want to know where -- so we walked
20    up France.
21         Q.    First of all, Kenny, you see where East
22    and France -- the corner of East and France is?
23         A.    Yes.
24         Q.    That's where a lot or most all of this
25    took place?
```

1      A.    Yes.

2      Q.    I'm just going to ask you if you see on

3   there where that bus was parked that day?

4      A.    The bus was up -- so if you go down to

5   Government, you go towards the interstate, it was

6   right there by the interstate on Government.

7      Q.    By a stop light by the Sonic?

8      A.    Yes.  By where it says Sonic. Sonic

9   wasn't there then.

10      Q.    It's a new Sonic.  Was Government blocked

11   off at this time?

12      A.    Yeah.  We had police units from all over.

13   They brought in people from Calcasieu.  They had

14   all kinds of people from different agencies, LSP,

15   BRPD, EBR.  Calcasieu sent us some people.  I think

16   Livingston sent us some people.  We had all kinds

17   of law enforcement there.

18      Q.    Do you know where -- I'm referring to

19   Blair now.  Do you know what Blair was arrested

20   for? I'm not trying to trick you here.

21      A.    I don't know what actual charges they

22   charged her with.  I know that it was for her not

23   dispersing, not leaving when -- I mean, we were

24   there a long time, and they were instructed to

25   disperse.  I don't know exactly how long it was,

1    but it was -- they were given every opportunity to

2    leave, and when the word was given, a few people

3    were taken into custody, and whatever the statute

4    is, I'd have to -- I don't know it off the top of

5    my head, but they -- she was arrested for that and

6    then taken to the bus.

7        Q.    It looks like she was arrested for simple

8    obstruction of a highway of commerce and resisting

9    an officer. That sounds right?

10       A.    Yes, sir.

11       Q.    And what, if any, information did you

12   have at the time, Kenny, that supported the arrest

13   of Blair for simple obstruction of a highway of

14   commerce?

15       A.    What information did I have?

16       Q.    At the time, yeah.

17       A.    They were given time to leave, and they

18   did not leave.  The command staff advised us to

19   effect the arrest, so that's what information I

20   went on.

21       Q.    Is there anything else?

22       A.    I mean, she was still there when the

23   Mobile Field Force started moving forward.  They

24   took her into custody.  They passed her back to

25   detectives, so we processed her.

1     Q.    What reasons do you have to support a
2  probable cause for arresting Blair for resisting an
3  officer?
4          MR. SCOTT:
5               John, he's already told you he
6            didn't make the arrest.
7          MR. ADCOCK:
8               Okay.
9  BY MR. ADCOCK:
10     Q.    You understand the question?
11     A.    Yes, I do.
12     Q.    What information, if any.  If you don't
13  have it, that's okay.
14     A.    I don't.  She was passed back to me by
15  another officer, and I walked -- like I said, I
16  walked her back to be processed.
17     Q.    That's the same thing for simple
18  obstruction of a highway of commerce?
19     A.    Yes.
20     Q.    No one gave you the information that
21  supported that charge of probable cause for that
22  charge?
23     A.    No.  Other than me transporting her back,
24  I didn't effect the -- I didn't make -- I didn't
25  actually make the arrest.  All I did was transport

1    her, basically.

2        Q.    When you take them back to the bus, they

3    get processed before they get put in the bus?

4        A.    East Baton Rouge Parish had people there

5    that was processing the people as we brought them

6    back.  It was not just Blair.  It was multiple

7    people.  They brought them back.  We passed them

8    off, and then we'd go back.  And so it was -- I

9    probably brought several people there that day.  So

10   you drop one, go get another one, and they had a

11   station set up, and they had -- EBR had people

12   there.  BRPD had people there, and they would take

13   them and process them.

14       Q.    Bear with me here.  Zoom is very

15   difficult for people like me who are over 40, so I

16   appreciate your patience, Officer.

17       A.    I understand.  I have a young child who

18   loves to do Zoom, and I can't do it either.

19       Q.    So, Officer, bear with me here.  I'm

20   showing you Exhibit -- Page 5 of Exhibit C.  That's

21   just for the record.  This looks like the Affidavit

22   of Probable Cause for Blair Brown; is that right?

23       A.    I never saw it.  This is the first I'm

24   seeing it.

25       Q.    You've never seen this?

1      A.    No.

2      Q.    I'm just asking.  It looks like the

3  Affidavit of Probable Cause for Blair Brown.

4      A.    I don't even know who the officer is.  I

5  can't read it.

6      Q.    Yeah.  I'm just asking who the arrestee

7  is for this Probable Cause Affidavit.

8      A.    Blair Brown.

9      Q.    That's all I'm asking.  This looks like

10  the Probable Cause Affidavit for Blair Brown.

11  That's all I'm asking.

12      A.    I guess.  Like I said, I've never seen

13  it.

14      Q.    And then down for Affiants, you were just

15  looking at that.  Who would you -- do you recognize

16  that signature?  Maybe is that William Alexander,

17  perhaps?

18          MR. SCOTT:

19              Blow it up a little bit.

20          MR. ADCOCK:

21              Yeah, let me try.

22  BY MR. ADCOCK:

23      Q.    Can you still see it?

24      A.    Yeah.

25      Q.    I'm trying to blow it up.  This is moving

1    very slow.

2           A.    William.  I don't know who that is.

3    Alexander.

4           Q.    Oh, my goodness.

5           A.    I'm not certain who that is.

6           Q.    I'm so frustrated dealing with different

7    exhibits.  This is all my fault.  Sorry about this.

8           A.    No worries.

9           Q.    We're back to Exhibit C, Page 5.  All

10   right.  You see that handwriting for Affiant?  I

11   don't know how you say that word.  Affiant.

12          A.    Okay.  I'm not sure who that is.  William

13   Alex -- is it Alexander?

14          Q.    If you don't know, you should not say.

15   I'm not trying to trick you.  The second word does

16   look like Alexander, but --

17          A.    I don't know who it is.  I don't know.

18          Q.    Do you know who William Alexander is, the

19   person?

20          A.    I know an Alexander, but I don't know if

21   it's this person.  It would be helpful if they

22   would have like an IBM or something, a number or

23   something, to see the number.

24          Q.    You can't tell here whether this person

25   works for the Baton Rouge sheriff or Baton Rouge

1    PD, right?

2         A.    Yes.  This is an Affidavit of Probable

3    Cause.  It could be either.  Now, the notary is --

4    I'm not sure.  I can't read that really well

5    either.

6         Q.    That was my next question.  You don't

7    recognize that notary?

8         A.    Sergeant --

9         Q.    If I told you it looks like it's -- in

10   discovery, we've learned it's Sergeant Ira Roberts.

11   Would that ring a bell?

12        A.    I think he is in uniform.  He was in

13   uniform.  I believe he was in uniform patrol.

14        Q.    You mean he was a uniform patrol that

15   day?

16        A.    I believe so.

17        Q.    You're not certain?

18        A.    I'm not certain, but I know at one time

19   we had an Ira Roberts in uniform.

20        Q.    Just to be clear, Kenny, at one point you

21   had an Ira Roberts in uniform on the force or

22   present that day?

23        A.    I'm saying the name Ira Roberts I know as

24   being a member of the city police department.  Now,

25   whether he was out there or whether he signed this

1    -- if that's his signature, I don't know.

2         Q.   Got you.  Okay.  That was my question.

3    What is your understanding, in your experience as a

4    police officer, about what the process is for a

5    probable cause affidavit?  Specifically, my

6    question is, there is the affiant, and then there

7    is the notary public.  How do y'all normally do it?

8    The arresting officer fills it out, and they are

9    the affiant, right?

10        A.   Then the affiant's -- so the affiant

11   fills it out, and then he is swearing what is in

12   that is true, and the notary is notarizing saying

13   that it is true and correct.

14        Q.   And who normally is -- do y'all normally

15   use like a supervisor as a notary or is it just

16   anybody who can verify this is this person?

17        A.   The supervisors are ex-officio notaries,

18   so we can notarize police paperwork, but that's it.

19   We're not like full notaries to where -- we can't

20   like notarize in public.  We can only do police

21   paperwork.

22        Q.   Gotcha.  To be clear, this is -- the

23   notary signature, that's not your signature?

24        A.   No.

25        Q.   That's a sergeant on there?

1    A.    Yes.

2    Q.    So is it your memory, Kenny, that when

3    you took Blair back to, whether you call it

4    processing, or the bus, or whatever, did you speak

5    to anyone named William Alexander?

6    A.    I don't recall who I spoke to.  I brought

7    her back.  I dropped her off at the processing

8    group with those individuals, and then I went back

9    and got somebody else.  So that is basically what

10    my -- what I was doing that day.  As I would drop

11    somebody, I would go pick somebody else up, and we

12    were ferrying people back to the processing center.

13    Processing area.

14    Q.    Let me ask you a few questions about this

15    affidavit.  Up at the top -- well, let's just go

16    through it.  I'm still referring to Exhibit C, Page

17    5.  Let me read the first sentence on the bottom

18    half under synopsis.  I'm going to read it into the

19    record and ask you about it.  "The Affiant stated

20    to the Court that on this 10th day of July 2016,

21    the defendant did knowing and feloniously violate

22    Louisiana Revised Statute 14:97, Simple Obstruction

23    of a Highway of Commerce, and that they

24    intentionally placed themselves in the roadway,

25    thus rendering movement thereon more difficult,"

1    and Louisiana Revised Statute 14:108, "Resisting an

2    Officer, in that the defendant actively attempted

3    to prevent their lawful arrest after being placed

4    under arrest."  Did I read that correctly?

5        A.   Yes, sir.

6        Q.   Did you relay that information I just

7    read to anyone when you dropped Blair off at the

8    bus?

9        A.   No.

10       Q.   Then it says this occurred within the

11   City of Baton Rouge, Parish of East Baton Rouge.

12   Did I read that correctly?

13       A.   Yes, sir.

14       Q.   I'm going to move on.  It says, "To wit:

15   On the above-listed date, numerous Baton Rouge

16   Police Department officers were assigned to provide

17   security for peaceful protests at and in the

18   vicinity of Baton Rouge Police Department's

19   headquarters."  Did I read that correctly?

20       A.    Let me find it. Vicinity of Baton Rouge

21   headquarters located -- yeah.  You read that

22   correctly, but it looks like they crossed it out

23   and put East Boulevard.  They probably should have

24   crossed out Baton Rouge Police Department

25   headquarters, too.

58

1       Q.    You are referring to they crossed out --
2    someone crossed out 9000 Airline Highway and wrote
3    in --
4       A.    Yeah.
5       Q.    Is that 500 East Boulevard?
6       A.    Yes, 500 East Boulevard.
7       Q.    Did you relay what I just read to anyone
8    at that bus in that sentence?
9       A.    No.
10      Q.    Did you relay that this was near the
11   Baton Rouge Police Department headquarters?
12      A.    No.
13      Q.    Is your understanding that the Baton
14   Rouge Police Department headquarters is at 9000
15   Airline Highway?
16      A.    Yes.
17      Q.    Do you know why this appears in this
18   Affidavit of Probable Cause for Blair Brown?
19      A.    No.  I didn't -- as I said, I didn't
20   prepare it.  I didn't provide them any information,
21   so no.
22      Q.    As far as you saw, that doesn't -- what
23   we've already read doesn't represent what you saw
24   as you were -- as she was given to you based on
25   what you saw that day, correct?

1      A.    I don't understand your question.

2      Q.    It wasn't clear.  So based on what you

3  saw that day in the video we watched, she wasn't

4  arrested near the Baton Rouge Police Department

5  headquarters, correct?

6      A.    No, she was not.

7      Q.    And then the next sentence says,

8  "Protesters --"

9      A.    Excuse me.  But they did try to correct

10  that by crossing it out.  Apparently, they just

11  left that in there, and they tried to just put in a

12  different location instead of -- that's what it

13  looks like.  They tried to use that like a

14  template, and they just put the wrong address.

15      Q.    The next sentence says, "Protesters

16  assembled at provided parking areas and in

17  surrounding parking lots."  Did you relay that

18  information to anyone when you dropped Blair off?

19      A.    No, I did not.

20      Q.    Did you witness any facts that would

21  demonstrate that sentence to be true with regard to

22  Blair's arrest?

23      A.    No knowledge of that.

24      Q.    It says in the next sentence, "Protesters

25  were advised by loudspeaker to remain on private

1    property and the on the curb."  Did I read that

2    correctly?

3         A.   Yes.

4         Q.   Did you relay that to anyone when you

5    dropped Blair off?

6         A.   No, I did not.

7         Q.   Is that your understanding, that

8    protesters were advised by loudspeaker to remain on

9    private property and the curb?

10        A.   I don't recall that.  I recall them

11   trying to get people to disperse and to leave.

12        Q.   You didn't hear any commands from law

13   enforcement or otherwise telling people to stay on

14   private property?

15        A.   I do not remember that, no.

16        Q.   Next sentence.  They were further advised

17   to stay out of the roadway and to not impede the

18   flow of traffic.  Did I read that correctly?

19        A.   Yes.

20        Q.   Did you relay that information to someone

21   when you dropped Blair off?

22        A.   No, I did not.

23        Q.   I think you said this, but you don't have

24   any knowledge about how that information or what I

25   read earlier got in this affidavit of probable

 1   cause?  You don't have firsthand information, like

 2   how it made it into this affidavit?

 3        A.   I do not.

 4        Q.   Let me read the next sentence.  "These

 5   announcements were made frequently via loudspeakers

 6   or by individual police officers on the scene.

 7   During the protests, the defendants entered the

 8   roadway and was provided another verbal order to

 9   exit the lanes of travel."  Did you relay that to

10   anyone when you dropped Blair off?

11        A.   No, I did not.

12        Q.   Did you witness that with respect to

13   Blair Brown?

14        A.   I do know -- I do remember they were -- I

15   don't know the verbiage, but I do remember that

16   multiple announcements were made to leave and to

17   exit the roadway and not be in the roadway.  Now, I

18   don't remember the verbiage, exact verbiage, but I

19   do know they were -- that the command staff was

20   trying to get people to disperse.

21        Q.   Do you have information that Blair was

22   standing quote/unquote in the roadway or the street

23   when she was arrested?

24        A.   I didn't see her until she was taken --

25   was given to the two detectives, and they brought

 1    her back, so I'm not -- I don't have any

 2    information where she was.

 3         Q.   After being -- it says, "Moments later,

 4    the defendant entered the roadway again and was

 5    taken into custody by officers on the scene."

 6    Again, did I read that correctly?

 7         A.   Yes, but I didn't relay that.

 8         Q.   Gotcha.  Next sentence.  "After being

 9    advised that they were under arrest, the defendant

10    did actively attempt to prevent being taken into

11    custody and completion of the arrest process."  Did

12    I read that correctly?

13         A.   Yes, sir.

14         Q.   Did you relay that to anyone when you

15    dropped Blair off?

16         A.   No, I did not.

17         Q.   And based on what you saw that day or

18    what you saw in this video, is that a true

19    statement with regard to Blair Brown?

20         A.   That she was resisting?

21         Q.   Yes.

22         A.   I would assume so, yes.  She was

23    screaming and yelling.  Two officers had to pull

24    her -- had to take her out of the roadway and was

25    cuffed, so, yes, I would say that, you know, she

1    did not follow the instructions being asked to

2    disperse and that she didn't want -- she definitely

3    didn't want to be arrested. Now, she wasn't

4    throwing punches or anything, but she definitely

5    was not wanting to be cuffed and taken away with

6    her screaming and yelling. So I would agree with

7    that, that she refused to leave the roadway and was

8    resistant.

9        Q.   When you say, Kenny, you've never seen

10   this before, you mean this affidavit, correct?

11       A.   Yes.  I have not seen it.

12       Q.   Do you have any information about when

13   this was written up?  My question is, do you have

14   any information about when -- whether this was

15   preprinted before these arrests on July 10?

16       A.   I don't know.

17           MR. ADCOCK:

18               Can we take a very quick break?

19           MR. SCOTT:

20               Okay, gentlemen.

21               {BRIEF RECESS}

22           MR. ADCOCK:

23               Before the Internet goes out again,

24           I want to just say I am done with

25           questions.  Thank you, Kenny, for

1              spending the morning with us.  I
2              appreciate your time.
3         THE WITNESS:
4              Thank you.
5         MR. FAHRENHOLT:
6              I have no questions.
7         MR. CRAIG:
8              Plaintiffs in the Batiste-Swilly and
9              Smith cases have no questions.
10        MR. SCOTT:
11             I can always have Kenny come back
12             and make any declarations for my
13             purposes, so I will ask no questions in
14             the deposition.
15        MR. CRAIG:
16             Before we close the record, I want
17             to note that on behalf of our clients,
18             I don't acquiesce in a post-deposition
19             declaration, but we can talk about that
20             later on.  I don't want the deposition
21             to close without noting that we don't
22             agree with that.  Thank you.
23        MR. SCOTT:
24             I don't know any better, Jim, but we
25             can sort that out later.

1          MR. CRAIG:

2                  Fair enough.

3                  [End of deposition, 11:14]

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2

 3              This certification is valid only for
      a transcript accompanied by my original signature
 4    and original required seal on this page.

 5              I, SANDRA P. DIFEBBO, Certified
      Court Reporter, in and for the State of Louisiana,
 6    as the officer before whom this testimony was
      taken, do hereby certify that LIEUTENANT KENNETH
 7    BREWER, after having been duly sworn by me upon
      authority of R.S. 37:2554, did testify as
 8    hereinbefore set forth in the foregoing 65 pages;

 9              That the testimony was reported by
      me in stenotype, was prepared and transcribed by me
10    or under my personal direction and supervision, and
      is a true and correct transcript to the best of my
11    ability and understanding;

12              That the transcript has been
      prepared in compliance with transcript format
13    guidelines required by statute or by rules of the
      board, that I have acted in compliance with the
14    prohibition on contractual relationships as defined
      by Louisiana Code of Civil Procedure Article 1434
15    and in rules and advisory opinions of the board;

16              That I am not related to Counsel or
      to the parties herein, nor am I otherwise
17    interested in the outcome of this matter.

18

19

20

21    _____
      Sandra P. DiFebbo,
22    Certified Shorthand Reporter

23    Date:  _____

24

25
```

SOUTHERN COURT REPORTERS, INC.
(504)488-1112