UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


BLAIR IMANI, et al

       Plaintiffs

V.                          Docket No. 17-cv-00439-JWD-EWD


CITY OF BATON ROUGE, et al

       Defendants



     30(b)(6)DEPOSITION OF THE CITY OF
BATON ROUGE, through its designated
representatives, SERGEANT STEWART TATE, SERGEANT
ORSCINI BEARD, II, and SERGEANT HALLIE BRITT
JONES, and given via Zoom Videoconferencing in
the above-entitled cause, pursuant to the
following stipulation, before Raynel E. Schule,
Certified Shorthand Reporter in and for the
State of Louisiana, commencing at 9:00 o'clock
a.m., on Tuesday, the 24th day of August, 2021.

```
 1                    EXAMINATION INDEX
 2                                      Page
 3   Caption                           1
     Appearances                       3
 4   Agreement of Counsel              5
 5        EXAMINATION OF SERGEANT STEWART TATE
 6      MR. CRAIG      7
 7                 EXHIBIT INDEX
 8      EXHIBIT 1                      14
        EXHIBIT 2                      30
 9      EXHIBIT 3                      38
10
     EXAMINATION OF SERGEANT ORSCINI BEARD, II
11
        MR. MOST                       2, 45, 49
12      MR. FOLEY                      36, 51
        MR. SCOTT                      49
13                 EXHIBIT INDEX
14      EXHIBIT ZZZZZ                  47
        EXHIBIT ZZZZZZ                 52
15      EXHIBIT T                      58
        EXHIBIT H                      61
16
     EXAMINATION OF SERGEANT HALLIE BRITT JONES
17
        MR. MOST                       97, 107
18      MR. FOLEY                      105, 116, 123
        MR. SCOTT                      115, 122
19
                 EXHIBIT INDEX
20
        EXHIBIT Y                      111
21      EXHIBIT A                      113
        EXHIBIT 1                      127
22
23
24
25
```

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

```
1   APPEARANCES (Via Videoconferencing):
2   For the Plaintiffs (Imani v. City of Baton
          Rouge):
3
    LAW OFFICES OF WILLIAM MOST
4   Attorneys at Law
    BY:  WILLIAM MOST, ESQ.
5   201 St. Charles Avenue, Suite 114#101
    New Orleans, Louisiana   70170
6   Email:  williammost@gmail.com
7   And
8   JOHN ADCOCK, ESQ.
    Attorney at Law
9   P.O. Box 750621
    New Orleans, Louisiana   70175
10  Email: jnadcock@gmail.com
11
    For the Plaintiffs (Smith v. City of Baton
12        Rouge, Batiste-Swilley v. City of Baton
          Rouge, and Tennart v. City of Baton
13        Rouge):
14  RODERICK AND SOLANGE MacARTHUR JUSTICE CENTER
    Attorneys at Law
15  BY:  JIM CRAIG, ESQ.
          ERIC FOLEY, ESQ.
16        HANNAH LOMMERS-JOHNSON, ESQ.
    4400 S. Carrollton Avenue
17  New Orleans, Louisiana   70119
    Email: jim.craig@macarthurjustice.org
18
19  For City/Parish of Baton Rouge and Baton Rouge
          City Police Department Officers:
20
    OFFICE OF THE EAST BATON ROUGE PARISH ATTORNEY
21  Attorneys at Law
    BY:  JOSEPH SCOTT, ESQ.
22  222 St. Louis Street, 9th Floor
    Baton Rouge, Louisiana   70802
23  Email: joseph@josephscott.com
24
25
```

4

1    APPEARANCES (Continued):

2

     For Louisiana State Police and Individual State
3         Police Troopers:

4    MESSRS. BURGLASS & TANKERSLEY
     Attorneys at Law
5    BY:  GREGORY FAHRENHOLT, ESQ.
     5213 Airline Drive
6    Metairie, Louisiana    70001-5602
     Email:  gfahrenholt@burglass.com

7

8    For Plaintiff Max Geller:

9    MESSRS. RODNEY & ETTER, LLC
     Attorneys at Law
10   BY: ROY J. RODNEY, JR., ESQ.
     935 Gravier Street, Suite 2110
11   New Orleans, Louisiana    70112

12

13   Reported By:  Raynel E. Schule
                   Certified Shorthand Reporter
14                 State of Louisiana

15

16

17

18

19

20

21

22

23

24

25

1           S T I P U L A T I O N

2           It is stipulated and agreed by and

3    among Counsel for the parties hereto that the

4    30(b)(6) Deposition of the CITY OF BATON ROUGE,

5    through its designated representatives, SERGEANT

6    STEWART TATE, SERGEANT ORSCINI BEARD, II, and

7    SERGEANT HALLIE BRITT JONES, is hereby being

8    taken pursuant to the Federal Rules of Civil

9    Procedure for all purposes in accordance with

10   law;

11          That the formalities of reading and

12   signing are not specifically waived;

13          That the formalities of sealing,

14   certification, and filing are hereby

15   specifically waived.

16          That all objections, save those as to

17   the form of the question and responsiveness of

18   the answer, are hereby reserved until such time

19   as this deposition or any part thereof is used

20   or sought to be used in evidence.

21                 *  *  *  *  *

22          Raynel E. Schule, Certified

23   Shorthand Reporter in and for the State of

24   Louisiana, officiated in administering the oath

25   to the witness.

6

```
 1                    PROCEEDINGS
 2            THE COURT REPORTER:
 3            Will counsel please identify
 4       themselves and their affiliations
 5       and also stipulate that by agreement
 6       of all parties this deposition is
 7       being held via videoconferencing,
 8       and there is no objection to the
 9       witness being sworn in remotely.
10            MR. CRAIG:
11            My name is Jim Craig and together
12       with my colleagues, Hannah
13       Lommers-Johnson and Eric Foley, we
14       represent the Plaintiffs in the
15       Tennart, Smith, and Batiste-Swilley
16       cases.
17            MR. MOST:
18            This is William Most on behalf of
19       the Imani Plaintiffs, and we agree
20       to the stipulation.
21            MR. FAHRENHOLT:
22            Greg Fahrenholt on behalf of
23       individual Louisiana State Police
24       Trooper Defendants.  We agree to the
25       stipulation.
```

```
 1            MR. SCOTT:
 2                Joseph Scott for the City of
 3            Baton Rouge, Parish of East Baton
 4            Rouge, assorted officials, Baton
 5            Rouge Police Department, and
 6            individual officers.  We agree to
 7            the stipulation for purposes of
 8            today's depositions.
 9          SERGEANT STEWART TATE, having been
10      first duly sworn by Raynel E.Schule,
11      Certified Shorthand Reporter, was examined
12      and testified on his oath as follows:
13                    EXAMINATION
14  BY MR. CRAIG:
15  Q.   Where we're at?  Good morning, sir.
16  A.   Good morning.
17  Q.   Please, you've already stated your full
18       name.  When did you begin your career with
19       the Baton Rouge Police Department?
20  A.   I was hired March 5th, 2003.
21  Q.   Thank you.  And did you have any full-time
22       employment before working for BRPD?
23  A.   Yes.
24  Q.   What was that?
25  A.   I was in the Marine Corps, and I worked
```

1      construction work, and I worked with the

2      Louisiana National Guard Military Defense.

3   Q.   When were you in the Marine Corps?

4   A.   I was enlisted from '89 to '98.

5   Q.   And what rank had you achieved at the time

6      of your -- the end of your service with the

7      Marine Corps?

8   A.   Sergeant.

9   Q.   In what years were you with the National

10     Guard?

11  A.   From '99 to '04.

12  Q.   Where were you stationed in the National --

13     where were you stationed in the National

14     Guard?

15  A.   I worked Carville, Gillis Long -- former

16     Gillis Long Center Youth Challenge Program

17     and then --

18              THE COURT REPORTER:

19              Wait, wait.  You worked Carville.

20        Say the second part.

21              THE WITNESS:

22              Gillis Long Center, 5445 Point

23        Clair Road, Carville, Louisiana, and

24        then after 911, I was placed on

25        active duty for a year and served at

```
 1            Guantanamo Bay, Cuba.
 2    BY MR. CRAIG:
 3    Q.   And how long were you at Guantanamo?
 4    A.   Six months, and then six months Military
 5         Police Security at Fort Polk, Louisiana.
 6    Q.   Did you also do military police work during
 7         your service in the Marine Corps itself
 8         from '89 to '98?
 9    A.   No, sir.  I was a field radio operator in
10         an infantry battalion.
11    Q.   Okay.  Thank you.  And you understand that
12         today you -- you are being offered as a
13         witness not just for your own testimony,
14         but as a representative of the City of
15         Baton Rouge and the Parish of East Baton
16         Rouge?
17    A.   Yes, sir.
18    Q.   And as I understand it, you're being
19         offered as giving testimony about Baton
20         Rouge Police Department policy on the use
21         of firearms, less than lethal weapons,
22         including the taser.  Is that correct?
23    A.   Correct.
24    Q.   What did you do to prepare for the
25         deposition today, and please exclude any --
```

```
 1          the contents of any conversations you had
 2          with any of the attorneys for the City
 3          Parish.
 4     A.   The only thing I did in preparation for
 5          this deposition was I revert -- reviewed
 6          departmental policies that were in place at
 7          that given time.
 8     Q.   Okay, and by "the given time," we're
 9          talking about July of 2016?
10     A.   Yes, sir.
11     Q.   Okay.  What -- you told us you were a
12          Sergeant with the Baton Rouge Police
13          Department.  What is your current duty
14          assignment?
15     A.   I'm the Commander of the Firearms Training
16          Unit, Rangemaster.
17     Q.   And what does -- what does that entail
18          being the Firearms Training Unit?
19     A.   It's being the ultimate responsibility for
20          safe firearms training for everyone
21          utilizing the facility, making sure
22          officers are proficient with their weapons
23          and that they understand the tactics and
24          all the decision-making process in regards
25          to deadly force applications.
```

1    Q.    Okay, and when you use the term, "deadly

2          force," what -- what do you mean by that?

3    A.    It as we teach is a last alternative in

4          defense fence of yourself or of another to

5          prevent great bodily harm or death.

6    Q.    Yes, sir.  And what -- what -- what -- I

7          suppose I could use the word mechanisms

8          support.  What all -- what all is included

9          in -- in the specific ways in which deadly

10         force is taught at the Baton Rouge Police

11         Department?

12   A.    It's taught just like I stated, last

13         resort.

14   Q.    Yeah, I'm not -- I -- I apologize, and

15         usually we do a little introduction, which

16         I probably should have done.  So but if

17         anything in my question is -- is confusing

18         or you need clarification, please know I

19         would appreciate knowing that and then --

20         and my -- my current questions are probably

21         so confusing that you didn't know they were

22         confusing, but in this particular case,

23         what I'm asking is, for example, a firearm

24         is an implement of deadly force, correct?

25   A.    Correct.  It can be used a deadly force

```
 1            tool.
 2    Q.     And then what is -- what are other -- are
 3            there any other deadly force tools that --
 4            that you train people on at the Baton Rouge
 5            Police Department?
 6    A.     The patrol rifle and the police shotgun.
 7    Q.     So, for example -- pardon me.  Oh, okay.
 8            So, for example, would any kind of way of
 9            holding or restraining a subject that
10            carries a risk of death or great bodily
11            harm, are those maneuvers considered use of
12            deadly force by the Baton Rouge Police
13            Department?
14    A.     I mean, so restraining someone that is --
15            potentially could be a danger, a
16            life-threatening danger, would that
17            constitute them pulling their weapon?  Is
18            that what your question is, sir?
19    Q.     Would that constitute use of deadly force,
20            depending on how the -- how the person is
21            restrained?
22    A.     If he is fully restrained and doesn't have
23            the means to carry out a threat, then no.
24    Q.     Yes, sir.  I guess I'm asking for -- for
25            example, you're familiar with the -- the
```

1           killing of George Floyd in Minnesota --

2     A.    I am.

3     Q.    -- in 2020, correct?

4     A.    From the media, what I've seen on TV.

5     Q.    Yes, sir, that's what I mean.

6     A.    Yes, sir.

7     Q.    And there was no tool of deadly force, no

8           firearm or other weapon that was the cause

9           of Mr. Floyd's death, correct?

10    A.    Correct.

11    Q.    But his -- but he died due to pressure

12          placed upon his -- the organs that helped

13          him breathe by an officer.  Is that your

14          understanding?

15    A.    I don't know the exact cause of death as

16          far as contributing factors or the autopsy

17          results, but as a trainer I feel that

18          threat was neutralized.  There was no need

19          to kneel on his neck any longer.

20    Q.    Thank you.  And so would you consider a

21          tactic such as kneeling on the neck to be

22          the use of deadly force within your

23          training or the policies of the Baton Rouge

24          Police Department?

25    A.    No, we don't teach neck kneeling.

```
 1   Q.   Okay.  I'm going to screen share a set of
 2        policies that were -- have been produced to
 3        us in -- in the case of my team through the
 4        public records process, and they have been
 5        marked as deposition exhibits generally in
 6        this case.  I'm going to call this one
 7        "Exhibit 1" to your deposition.  Can you --
 8        can you see that, Sergeant?
 9   A.   Yes, sir.
10   Q.   If you have -- do you have a written copy
11        of it there in front of you?
12   A.   I do, sir.
13   Q.   Great, so you can refer to that if it's --
14        if it's easier for you.  This is General
15        Order No. 131, and it says the subject is
16        "Use of Deadly Force," correct?
17   A.   Correct.
18   Q.   And in your role as Rangemaster and --
19        Rangemaster and trainer, are you familiar
20        with this policy?
21   A.   Yes, sir.
22   Q.   And in that same capacity, do you train
23        officers of the Baton Rouge Police
24        Department in this policy?
25   A.   Yes, sir.
```

```
 1   Q.   Okay.  And it defines deadly force in
 2        procedures Roman Numeral II as, "Deadly
 3        force shall be defined as that level of
 4        force which a reasonable and prudent person
 5        would consider likely to cause death or
 6        great bodily harm."  Do you see that?
 7   A.   I do.
 8   Q.   Excuse me, I'm sorry.  And then under I A,
 9        it says, "Employees may use reasonable
10        force to effect a legal arrest or detention
11        and also to overcome any resistance or
12        threatened resistance of the person being
13        legally arrested or detained."  Do you see
14        where I'm reading from?
15   A.   Under Roman Numeral III, "Deadly Force"
16        alpha?
17                  MR. SCOTT:
18                  No.  He went back up to the top.
19   BY MR. CRAIG:
20   Q.   No.  I went back up to -- to I -- I A or I
21        alpha.  I'm sorry.
22   A.   All right.
23   Q.   And then -- then I was going to go to III
24        A, and I'm sorry for this long-winded
25        introduction, but I think -- I think it's
```

1          best to think of these -- this group of --
2          of statements together.  So III A says,
3          "Employees shall employ deadly force only
4          in the defense of their own lives or in
5          defense of the life of another person."
6           Do you -- do you see that?
7    A.    Yes, sir.
8    Q.    So can you explain to me how officers of
9          the Baton Rouge Police Department are
10         trained to put these policy principles into
11         effect.
12   A.    They're trained that in the event if they
13         must utilize deadly force that they are --
14         have the -- the skills to carry it out,
15         such as marksmanship, such as there's no
16         innocent bystanders in the background that
17         would catch a missed bullet, and that's the
18         kind of stuff we teach.
19   Q.    Okay.  Do you do any scenario-based
20         training about the principles there in
21         Roman Numeral III?
22                MR. SCOTT:
23                Jim, are you asking about
24            currently or 2016?
25                MR. CRAIG:

```
1                    Oh, thank you.  Thank you, Mr,
2              Scott.
3    BY MR. CRAIG:
4    Q.   I'm -- I'm asking about 2016 actually.
5    A.   Yes, sir, we -- we do -- we do a lot of
6         scenario-based training.
7    Q.   Yes, sir, and are -- and is that part of
8         the training that -- that you participate
9         in, Sergeant Tate?
10   A.   A lot of it, we have a lot of our scenarios
11        where they have to select the appropriate
12        force option.
13   Q.   Right, and that's -- and the purpose of --
14        of the scenario-based training is so the
15        officers learn to apply the principles in
16        this policy under pressure and in a short
17        period of time, correct?
18   A.   Correct.
19   Q.   And do you see there Under III (b), "Deadly
20        force shall not be justified merely in the
21        protection of property nor in the
22        prevention of escape by a prisoner or felon
23        unless the standard set forth above is
24        met."  You see where I'm reading from?
25   A.   Yes, sir.
```

```
 1   Q.   Was there scenario-based training in 2016
 2        or before on officer decision making with
 3        respect to a subject who might be trying to
 4        escape?
 5   A.   No, we didn't have any training scenarios
 6        of a subject attempting to escape.
 7   Q.   Okay.  What about did you have any training
 8        scenarios about using force to effect an
 9        arrest of a subject?
10   A.   Yes, that's primarily a lot of the
11        scenario-based training is what force
12        option to gain control of a resistive,
13        combative suspect.
14   Q.   So let me ask you about the -- about the
15        scenario-based training then.  Where do --
16        do you get, "you," being the Baton Rouge
17        Police Department get the training
18        scenarios from some another source, some
19        provider of training or is it, are the
20        scenarios something that you generate
21        inhouse at the Baton Rouge Police
22        Department?
23   A.   We generate them inhouse.  A lot of them
24        are actual calls that officers responded
25        to, and we view them and reflect on how
```

 1    things could have gone better or ways that
 2    things could have gone worse, and we try to
 3    duplicate some of the real life calls for
 4    service that officers have answered.  We
 5    try to keep our --
 6  Q.  Do you -- yes, please -- please continue.
 7    I'm sorry.
 8  A.  We try to keep our training as realistic as
 9    possible.
10  Q.  Yes, sir.  And so would that be done --
11    would the scenarios be used in the
12    classroom setting or in -- I'm going to use
13    the word role play exercises -- that's
14    probably not correct, but just to get, you
15    know, more kind of outside and in the field
16    or exactly how does that work?
17  A.  We do have role players, and we have a
18    designated training area, and our role
19    players have rules of engagement where they
20    must stick to the script.  That way every
21    officer receives the train -- the same
22    training of value, and they also by them
23    sticking to the script provides a safer
24    training area.
25  Q.  Yes, sir.  And are the role players also

1       members of the Baton Rouge Police
2       Department?
3   A.   Yes.  Most of our role players are field
4        training officers or range safety officers,
5        those who have proven to be proficient and
6        reliable.
7   Q.   Okay, and what -- what form are -- so I
8        think you mentioned -- I think you
9        mentioned a script a minute ago for the
10       role players.  What other written or -- or
11       pictorial documents are used in the
12       scenario-based training on use of force?
13  A.   Well, like, they will write out a script,
14       and the rules of engagement as far as what
15       the -- how the role player should perform,
16       and then we also en -- ensure that safety
17       involved that we don't let them get out of
18       hand, because sometimes, they get heated,
19       and you may actually have to step in and
20       play referee in -- in the scenario.
21  Q.   Yes, sir.  And -- and when it gets -- well,
22       we don't need to get into that.  So if
23       there's somebody, a trainee involved in
24       this kind of scenario, they would be taken
25       to the training area, and I assume they

1          would be dressed and equipped according to

2          the terms of the scenario.  Is that -- is

3          that correct?

4     A.   Yes, sir, that's correct.

5     Q.    And -- and then they're told -- are they --

6          are they told basically, here's the

7          background of, you know, how you got to

8          this place when the scenario starts?

9     A.    Correct.  For example, scenario, "You've

10         just been dispatched to this address

11         regarding a disturbance.  Complainant

12         advised the guy is intoxicated and possibly

13         armed with a firearm.  Do you have any

14         questions?"  "No."  "All right.  You may

15         begin."

16    Q.    Got it.

17    A.   "You may begin."  That's how it goes.

18    Q.    Got it.  And then is there -- are the

19         instructors marking or grading or

20         evaluating in some way different aspects of

21         the trainee's responses to the scenario?

22    A.    Yes, we do document, and then sometimes if

23         they really do poorly, we'll brief them and

24         then not to end training on a negative

25         note, after we schooled them up, more --

1      more to say what could have done better;
2      how you could have improved your tactics,
3      we'll give them another go at it just to
4      build their confidence and make it a -- a
5      lesson learned.
6   Q.   Yes, sir, and then do you retain the
7      scenarios that are used?  Do you have,
8      like, a library or -- or a place on a
9      computer file where you keep the different
10     scenarios that you've trained on in a
11     particular period of time?
12  A.   I don't personally keep them.  The
13     secretary at the training academy has those
14     documented under every academy listing.  So
15     say, for example, right now the 87th Basic
16     Training Academy is in session.  When they
17     do their scenario training, those
18     documented performance scenarios will be in
19     that academy class record files that's kept
20     at the training academy.
21  Q.   Got it, and then would the same be true for
22     in-service training?  Actually, excuse me,
23     excuse me, sir.  Let me withdraw that and
24     -- and ask a preliminary question for that.
25     Do you also use scenarios to teach or train

1    on use of force in in-service training for

2    officers who have already completed the

3    academy and are actually --

4  A.   Yes, sir.

5  Q.   -- sworn law enforcement officers of your

6    department?

7  A.   Yes, sir.

8  Q.   Okay, thank you.  And -- and does the -- or

9    do the scenarios for the in-service

10    training sessions basically in the same

11    form as what you've described earlier in

12    your testimony?

13  A.   No, they're not being graded per se,

14    because they've already been hired and

15    proven police officers, but they do get

16    verbal feedback, verbal counseling, or --

17    or appraisal, however they perform, but as

18    far as writing down any tactical errors or

19    mistakes, it's not documented.  Just verbal

20    feedback.

21  Q.   Okay, and who within the Baton Rouge Police

22    Department are involved in the creation of

23    the scenarios?

24  A.   Depends on the scenario.  If it's the

25    defensive tactics instructor, the firearms

1      instructors, taser instructors, field

2      training officers, range safety officers,

3      we all kind of have a big powwow at the

4      very beginning of the year and brainstorm

5      and come up with training ideas, and that's

6      how -- and we'll talk about some of the

7      calls for service that were close calls and

8      maybe what things we need to address.

9      That's -- but that's how we come up with

10     our training.  We -- we don't go to Google

11     some kind of scenario manual or nothing

12     like that.

13  Q.   Okay.  Got it, got it.  In preparing

14     training scenarios, have you or your

15     colleagues had occasion to review recent

16     court cases about the use of force that are

17     applicable to -- to police officers?

18  A.   We have as far as a lot of our deescalation

19     training.

20  Q.   What do you -- what do you mean by the

21     term, "deescalation" -- "deescalation

22     training"?

23  A.   Pretty much if there's a way to get through

24     an incident without using force, then

25     utilize it --

```
1   Q.   Okay.
2   A.   -- or calm -- calm a potential heated
3        situation.
4                    MR. MOST:
5                    Jim, you're the host.  Could you
6               let Roy Rodney into the room.  He's
7               in the waiting room.
8                    MR. CRAIG:
9                    Oh, I thought I had before.
10              Thank you -- thank you, William.
11                   I'm going to stop sharing because
12              I think that -- oh, I see.  I'm
13              sorry.  Where die that go?  Got it.
14                   My apologies, Mr. Rodney, I
15              thought I -- I thought I had let you
16              in.  There you are.  Yeah.
17  BY MR. CRAIG:
18  Q.   So Sergeant, I was asking you about the --
19       the use of court decisions in developing
20       scenarios or -- or other training
21       materials, and you were saying that -- that
22       you could recall using them in deescalation
23       training, and then you explained your
24       definition of deescalation training.  I
25       just wanted to kind of get us back to where
```

1        we are.  Do you -- do you recall reviewing

2        or using court decisions in any aspect of

3        your training on use of force outside of or

4        other than deescalation?

5   A.   No, because a lot of the court rulings such

6        as, like, choke holds or kneeling on necks

7        or anything like that, we've never ever

8        taught that to begin with, so we didn't

9        have to establish any training for that.

10  Q.   Got it.  Were -- was the BRPD doing

11       deescalation training in and before July

12       2016?

13  A.   Yes, sir, we've already incorporated it,

14       and even before deescalation became the --

15       the key famous word in this day and age

16       because you keep an officer on his toes.

17       Sometimes you don't get dispatched --

18       sometimes the call is not what you perceive

19       it to be.  Most of the hot calls you get

20       dispatched to turn out to be nothing, and

21       some of the -- the mediocre or whatever you

22       think would be redundant, routine calls,

23       those are the ones that -- that get you.

24       So we try to keep them keep them on their

25       toes just -- we may tell him he's going to

1       maybe a guy that's armed with a gun; he's
2       crazy; he's going to shoot anybody on site,
3       and then once they get there, they
4       determine the guy is nice and peaceful, and
5       you can talk -- talk him down, and we do
6       that kind of stuff just to keep them on
7       their toes, because make them think for
8       themselves.  In every situation, everything
9       is different.
10   Q.   Yes, sir.  Prior to July 2016, did you have
11       any use of force scenarios that involved a
12       protest or a large number of people at a
13       protest?
14   A.   Not a protest, but we've had scenarios --
15       for example, we still use to this day, a
16       bar fight, and it's real crowded with
17       patrons standing, real crowded area.
18       Officers have to maneuver through the crowd
19       and maybe displace people here and there,
20       clear the area so they can respond to the
21       fight in progress and get them outside.
22   Q.   Okay, and are -- is one of the goals of
23       that scenario to examine how the officers,
24       the use of -- of force that the officers
25       used to move non-combatant persons out of

```
 1        the way?
 2   A.    Not necessarily that.  We look at that.
 3         We've never had any officer use extreme or
 4         excessive, just push away, making their
 5         way, maneuvering through the crowd, nothing
 6         that we would deem to be a battery, per se,
 7         but what we do find a lot of with all the
 8         loud noise and the intimidation of the
 9         crowd, a lot of them will really step back
10         kind of hide and want to assume a backup
11         position, and we try to correct that.
12         That's the biggest thing.
13   Q.    When you say that -- that some of them want
14         to hide and assume a backup position,
15         you're talking about some of the officers?
16   A.    Correct, correct.
17   Q.    Okay.
18   A.    That's the biggest --
19   Q.    For lack of a better word, they're shying
20         away from --
21   A.    Yes, sir.
22   Q.    -- from the actual engagement?
23   A.    Yes, sir.
24   Q.    Okay.  I understand.  Since 2016, in the
25         time after July 2016 and the protests in
```

1           Baton Rouge in the wake of the killing of
2           Alton Sterling, did -- have there been
3           scenarios developed by your team with a
4           background being responding to a protest?
5    A.     No, sir, and to be quite honest with you
6           due to manpower shortage and everything,
7           it's hard enough just to get a handful of
8           instructors, much less try to muster up a
9           large crowd for that type of training.
10   Q.     I see.  Do you -- in addition to scenarios,
11          do you have more classroom-based
12          instruction on use of force?
13   A.     We do a lot of in-classroom stuff on use of
14          force, and a lot of it's performed on -- on
15          the mats, because you can tell someone over
16          and over a proper handcuffing technique,
17          but if they don't actually do it, they're
18          not going to learn it.  So it's both.
19   Q.     So the policy we were looking at that you
20          still have in front of you, General Order
21          No. 131, "Use of Deadly Force," I didn't
22          see where it covered the times when it
23          might be appropriate for an officer to
24          raise a firearm of any type and point it at
25          a particular person or persons.  Am I -- am

```
 1          I right about that or did I just miss it?
 2     A.   You're right, it's not in there.  It's --
 3     Q.   Is there a different policy where that --
 4          where that is?  I'm sorry.  I cut you off.
 5          You're always allowed to explain your
 6          answer.
 7     A.   Oh.  No, we've never talked when to point
 8          your weapon at someone because all that is
 9          going to come to an individual officer's
10          threat perception and his reasonable fear
11          at that given time, and that's just
12          something you can't put in a policy.
13     Q.   Okay, and I didn't ask you that in terms of
14          a time period, but from your answer is it
15          correct your answer applied to both before
16          July 2016 and to the present?
17     A.   Yes, sir, I -- I have never since I've been
18          employed for this department been told when
19          and when not to point a weapon at someone.
20     Q.   Okay.  Excuse me one minute, please.  I'm
21          going to share screen again, excuse me, and
22          turn to General Order No. 135, which says
23          the subject is less-lethal force.  Do you
24          see that?
25     A.   Yes, sir.
```

1    Q.    Okay, thank you.  And did you review this
2          policy prior to your deposition today?
3    A.    Yes, sir.
4    Q.    Great.  And the first paragraph there of
5          the overall policy states that, "It is the
6          policy of the department that the use of
7          force" shall "be limited to situations
8          involving resistance to arrest, defense
9          against physical assault or to perform
10         official duties, and that only force which
11         is reasonable and necessary may be used to
12         achieve those objective."  You see where
13         I'm -- I'm reading from?
14   A.    Yes, sir.
15   Q.    And -- and in the last paragraph of section
16         on policies says, that "The use of force
17         should follow a prescribed continuum," and
18         then it kind of lists the potential
19         mechanisms of force and then says,
20         "Officers will" demon -- "demonstrate
21         proficiency in all areas and a record of
22         proficiency will be maintained."  Do you
23         see that?
24   A.    Yes, sir.
25   Q.    So where the policies says, "Officers will

1      demonstrate proficiency in all areas," is
2      that done through the training academy?
3  A.   That's where they get there initial, yes,
4      sir, and then they do the annual in-service
5      thereafter.
6  Q.   Okay, and in the academy and in-service
7      training, does that involve scenario-based
8      training as we -- in the form that we
9      discussed with respect to use of lethal
10     force?
11 A.   Yes, sir.
12 Q.   And that was true in the time period before
13     July 2016?
14 A.   Correct.
15 Q.   General Order 135.1 on the -- talks about
16     the TASER.  Do you see that?  It's shared
17     on the screen.  You may have it in front of
18     you as well.
19 A.   Yes, sir, I got it.
20 Q.   Got it?
21 A.   Yes, sir.
22 Q.   Thank you.  And did you review General
23     Order 135.1 in preparation for the
24     deposition today?
25 A.   I did, sir.

1  Q.   Are you a Certified TASER Instructor,
2       Sergeant?
3  A.   Yes, sir, I'm currently a Master TASER
4       Instructor.
5  Q.   Very good.  And with respect to -- to the
6       policy and training on tasers, does the
7       department use any materials provided by
8       the -- by the company that manufactures and
9       sells tasers to you?
10 A.   Yes, sir, we -- we use all their training
11      materials, their PowerPoint, their
12      equipment, a lot of their -- their safety
13      guidelines.  The only thing that they don't
14      do is dictate policies for the departments,
15      but other than that, we -- we stay on board
16      with their recommendations and suggestions.
17 Q.   Okay, and what's the name of that company
18      that provides those materials?  Do you
19      know?
20 A.   Now, they're called Axon.  They were
21      formally known as TASER.
22 Q.   Okay, and does Axon also provide scenario
23      scripts or anything like that for use in
24      training?
25 A.   No, they do not, but when I went through

1       the TASER instructor school and the master

2       schools, we did a lot of scenario-based

3       training, and a lot of that was the same

4       way.  Other instructors for different

5       agencies all over the United States, and we

6       all kind of worked in groups.  Each group

7       came up with your own scenario, and so you

8       got a lot of exposure to different types of

9       tactics and stuff and -- because they do

10      incorporate scenario-based training at the

11      Axon schools.

12  Q.  Okay, and the -- if I'm understanding what

13      you said correctly, the Axon schools are

14      really are more train the trainer type

15      sessions?

16  A.  Yes, sir.

17  Q.  And you've been to the Axon schools in

18      order to become a Master TASER Instructor?

19  A.  Yes, sir.

20  Q.  And as I read procedures in General Order

21      135.1, "Deployment," the first section

22      there A or alpha says, "The decision to use

23      the TASER is based on the same criteria an

24      officer uses when selecting to deploy any

25      less lethal force option.  The decision

1          must be made dependent on the actions of

2          the offenders or threat, human or animal,

3          facing the officer or officers and the

4          totality of the circumstances surrounding

5          the incident."  You see where I'm reading

6          from?

7     A.    Yes, sir.

8     Q.    And so am I reading that correctly that an

9          officer in the field confronted with the

10         situation considers both this General Order

11         135.1 and then the Use of Force Continuum

12         that's in General Order 135 in the decision

13         whether to use a TASER on a subject?

14    A.    Correct.

15    Q.    Going back to General Order No. 135, which

16         is on the screen now, Page 5 of that

17         document, it talks about Use of Force

18         Reports.  Do you see that?

19    A.    Yes, sir.

20    Q.    Do you or the other or other officers

21         involved in training have a role in -- in

22         training or retraining officers after

23         they've made a --

24              (Interruption in proceedings.)

25    BY MR. CRAIG:

```
 1   Q.   So my question to you before then was, what
 2        -- what role, if any, does the training --
 3        do you as a trainer in use of force have in
 4        -- with respect to an Use of Force Report
 5        that may disclose that -- that an officer
 6        -- that raises a concern about an officer's
 7        use of force?
 8   A.   Oh, there have been situations where I was
 9        contacted by a supervisor, and they had me
10        read the report, and they wanted my input
11        on if he utilized the appropriate force
12        options.  That happens pretty frequent.
13   Q.   Okay, and then -- then do you have a
14        further role with the officer, him or
15        herself?
16   A.   If we find it to be not appropriate, then a
17        lot of times we'll bring that officer in,
18        talk to him, and correct his tactical
19        deficiencies.
20   Q.   And is there any place then in that
21        officer's record where that exchange
22        between you and the officer or your -- or
23        the training academy in general and the
24        officer is documented?
25   A.   If it's a preventive, no, but if it was a
```

```
 1          case that referred to me by Internal
 2          Affairs Division, then that's -- they do a
 3          documentation of it.
 4   Q.    I see.  So in addition to supervisors
 5          referring Use of Force Reports to you, you
 6          might also get referrals from Internal
 7          Affairs?
 8   A.    Correct.  We -- we nip -- we nip a lot of
 9          stuff before it becomes a problem.
10   Q.    In what you were talking -- and when you
11          say, "we" -- I think you used the word,
12          "nip," like nip in the bud?
13   A.    Correct, yes, sir.
14   Q.    Yeah, and that -- and that goes along with
15          what you're saying in terms of preventative
16          training?
17   A.    Yes, sir.
18                MR. CRAIG:
19                Okay.  Let's go off the record.
20          Let's go off the record for just a
21          second so I can -- well, let's say
22          five minutes until 10:00, and I'm
23          going to confer with my team about
24          -- about what any further questions
25          that I might have for Sergeant Tate.
```

```
 1              MR. SCOTT:
 2              Got it.
 3              MR. CRAIG:
 4              We'll be back at -- I have 9:55
 5         a.m.  We'll back at 10:00.
 6              (Break in proceedings.)
 7  BY MR. CRAIG:
 8  Q.   I'm just going to ask one question about
 9       General Order No. 132.  The subject of it
10       is "Firearms."  Do you have that in front
11       of you as well, Sergeant?
12              MR. SCOTT:
13              It appears I only have the
14              updated one, so if you would screen
15              share the 2016 that might be --
16              MR. CRAIG:
17              Yes, sir, I will -- I will be
18              happy to do that.
19  BY MR. CRAIG:
20  Q.   I believe for the question I have, so this
21       will be "Exhibit 3" for Sergeant Tate's
22       deposition.  It's General Order No. 132 as
23       revised January 14, 2015, and the subject
24       is "Firearms," and we can scroll through
25       it, but my question -- well, first of all
```

1         did you look at -- at this policy or the
2         current version of this policy in preparing
3         to testify today?
4    A.    I looked at that version this morning, sir.
5    Q.    Which version, I'm sorry, Sergeant?
6    A.    I believe that one on the slide.  I think
7         I've got it here in the midst of these
8         papers.
9    Q.    Okay.  I actually have a pretty -- a pretty
10        simple question that you might want to
11        refer to the -- the policy for, but you may
12        not need it.  So earlier this morning you
13        testified that -- that the department,
14        Baton Rouge Police Department doesn't train
15        officers on when it's appropriate to raise
16        or point their firearms.  Am I remembering
17        that correctly?
18   A.    It's not in the policy.
19   Q.    It's not in the policy, which was the
20        question I was going to ask.  So this --
21        this General Order 132 as I read it doesn't
22        contain any guidelines for when an officer
23        should or should not raise or point their
24        firearm at a subject or civilian.  Is that
25        correct?

1    A.    Correct, that's not in policy, but I can
2          tell you exactly what I teach.
3    Q.    Tell me exactly what you teach.
4    A.    A man's hands will kill you.  His feet
5          might hurt you, but his hands will kill
6          you.  If you cannot see his hands and
7          properly identify the threat, you need to
8          have your gun out, because you can always,
9          always put your gun back in the holster,
10         but you can't get that gun out quick
11         enough.  So if the threat is unknown, you
12         need to have your gun out.  Like
13         approaching a suspicious vehicle or
14         something, you need to have your gun out.
15         Once you deem that the situation is safe,
16         then by all means holster your gun.
17   Q.    When -- we talked about the use of force
18         continuum earlier.  When would it be more
19         appropriate for an officer to unholster
20         their TASER instead of their firearm or is
21         that a -- does that make sense to you?  It
22         may not be -- it may be a confusing
23         question.
24   A.    No, as far as that aspect, if the officer
25         foresees it's fixing to be a physical

1      confrontation, but yet it's not a deadly

2      force encounter, then the TASER is the tool

3      for that.

4  Q.   Okay.  I don't have any questions at this

5      time.  Mr. Scott probably told you the way

6      this works is that I pass you to the

7      lawyers for either other plaintiffs --

8      there's two other sets of lawsuits whose

9      lawyers are -- are represented on this

10     call, and -- and then there are -- are

11     lawyers for two sets of Defendants, Mr.

12     Scott, who's with you, and Mr. Fahrenholt,

13     who represents individual State Troopers,

14     and they're also permitted to ask you

15     questions, and then I'm allowed to ask you

16     questions if -- if anything comes up that I

17     would like clarification on from the

18     previous ques -- from their questions.

19               MR. CRAIG:

20               So with that, I will pass

21           Sergeant Tate to it looks like Mr.

22           Most is ready to ask questions on

23           behalf of the Imani Plaintiffs.

24               MR. MOST:

25               Yeah, I -- I don't have any

1          questions, but can we just go off

2          the record for a moment.

3               (Off the record.)

4          MR. CRAIG:

5               So on behalf of the Tennart,

6          Smith, and Batiste-Swilley

7          Plaintiffs I'm passing the witness.

8          Mr. Most -- it may appear on the

9          record, but if not, Mr. Most on

10         behalf of the Imani Plaintiffs

11         indicated he had no questions, and I

12         don't see Mr. Rodney on the screen.

13         So I will ask if Mr. Fahrenholt or

14         Mr. Scott have any questions.

15         MR. FAHRENHOLT:

16              I have no questions.

17         MR. SCOTT:

18              Neither do I.

19         MR. CRAIG:

20              Then I think that concludes this

21         part of the 30(b)(6) deposition.

22         Thank you for coming this morning,

23         Sergeant Tate, for your -- and for

24         your participation and preparation.

25         THE WITNESS:

```
 1                    Yes, sir, no problem.
 2               MR. CRAIG:
 3                    So we can off the record I think.
 4          Very good.
 5     TESTIMONY OF SERGEANT ORSCINI BEARD, II
 6               THE COURT REPORTER:
 7                    Will counsel please identify
 8          themselves and their affiliations
 9          and also stipulate that by agreement
10          of all parties this deposition is
11          being held via videoconferencing,
12          and there is no objection to the
13          witness being sworn in remotely.
14               MR. MOST:
15                    This is William Most on behalf of
16          Imani Plaintiffs, and we so
17          stipulate and agree.
18               MR. SCOTT:
19                    Okay.  Joseph Scott for BRPD
20          Defendants, City of Baton Rouge,
21          Parish of East Baton Rouge, the
22          Department, and various officials.
23          We so stipulate for purposes of this
24          deposition.
25               MR. FAHRENHOLT:
```

1          Greg Fahrenholt for individual
2      Louisiana State Police Trooper
3      Defendants.  We agree to the
4      stipulation.
5          MR. FOLEY:
6          Eric Foley along with Jim Craig
7      and Hannah Lommers-Johnson,
8      Plaintiffs in Tennart v. City of
9      Baton Rouge, Smith v. City of Baton
10     Rouge, and Ayre (phonetic) v. City
11     of Baton Rouge, and we agree to that
12     stipulation.
13         MR. MOST:
14         All right.  This is William Most.
15     I have John Adcock with me as well
16     for Imani Plaintiffs.
17         All right.  Would you swear in
18     the witness, Raynel.
19     SERGEANT ORSCINI BEARD, II, having
20   been first duly sworn by Raynel E. Schule,
21   Certified Shorthand Reporter, was examined
22   and testified on his oath as follows:
23                  EXAMINATION
24 BY MR. MOST:
25 Q.  All right.  Good morning, Sergeant Beard.

```
 1        Good to see you again.
 2   A.   Good morning.
 3   Q.   Sergeant Beard, we started your deposition
 4        last Thursday, and it was interrupted, but
 5        do you understand that you are under oath
 6        again here today?
 7   A.   Yes, sir.
 8   Q.   And are -- are you currently suffering from
 9        a -- a migraine at this time?
10   A.   No.  I'm -- I'm a hundred percent today.
11        Thank you for asking.
12   Q.   Okay.  I'm very glad to hear that.  Do you
13        -- are experiencing any other illness,
14        medication, or anything else that would
15        prevent you from giving us truthful and
16        complete answers today?
17   A.   No, sir.
18   Q.   Okay, and like last Thursday, if you need
19        to take a break at any point, just let us
20        know, and I will -- but I will ask after
21        each break who you talked to, what you
22        talked about, even if it's your attorney
23        and any documents you've looked at.
24   A.   Understood.
25   Q.   And you understand that today like last
```

1          time you are here to represent the
2          knowledge of the City of Baton Rouge.  Is
3          that your understanding?
4    A.    Yes.
5    Q.    Okay, and did you take any steps aside from
6          talking to your attorney between the
7          beginning of your deposition last Thursday
8          and today to prepare for this deposition?
9    A.    No, sir.
10   Q.    Okay.  You brought a couple of pages of
11         documents last Thursday, which we have a
12         copy of.  Did you look at any documents or
13         bring any documents today other than those?
14   A.    No, sir.
15   Q.    Okay, and approximately how many minutes of
16         talking with your attorney did you do
17         between last Thursday and today to prepare
18         for today's deposition?
19   A.    Five minutes.
20   Q.    Okay.  All right.  So Sergeant Beard, we
21         established last Thursday that you're
22         prepared to testify about any
23         investigations that flowed from the July
24         2016 protests, agreed?
25   A.    Agreed.

1    Q.   Okay, and so I want to start with the
2         documents that you provided to us.  Let me
3         share them.  I have this identified as
4         ZZZZZ, that's five Zs, Sergeant Beard's
5         notes.  Do you see that this is four pages
6         of documents here?
7    A.   Yes, sir.
8    Q.   These are the four pages that you brought
9         with you to the beginning of the deposition
10        on Thursday, correct?
11   A.   Correct.
12   Q.   Okay, and we have one page of Internal
13        Affairs Accountability Form and then some
14        other pages printed with handwritten notes,
15        correct?
16   A.   Correct.
17   Q.   Are these your handwritten notes?
18   A.   Yes, sir.
19   Q.   Okay, and starting on Page 2 through 4, the
20        -- the typed text here, is this an excerpt
21        from a policy or an Union contract or
22        something lake that?
23   A.   An Union contract.
24   Q.   Okay, and I see your handwritten notes
25        appear to say, "State statute not permit IA

1           histories become expunged but the courts

2           decided that IA History's were public

3           documents" and "The expungement process

4           stopped," correct?

5      A.   Correct.

6      Q.   Okay, and then you've got a notation of

7           2006 and 2009 to the left of that?

8      A.   Correct.

9      Q.   So am I to understand that by 2009 Baton

10          Rouge Police Department ceased any process

11          of expunging Internal Affairs documents

12          with regard to Baton Rouge Police

13          Department Officers?

14     A.   Correct.

15     Q.   Okay.  So if there were any Internal

16          Affairs or other disciplinary files

17          regarding the events of July 2016, Baton

18          Rouge Police Department would still have

19          them, agreed?

20     A.   Agreed.

21     Q.   And -- and you would know about them,

22          agreed?

23     A.   I wouldn't know about them personally,

24          because I didn't personally work the Alton

25          Sterling case, but yeah, I would be able to

```
 1        have access to them.
 2   Q.   Okay, and -- and I -- I don't mean in
 3        particular the Alton Sterling case.  I am
 4        focused on the protests that occurred in
 5        July of 2016.  Would you have knowledge of
 6        any Internal Affairs investigations or
 7        discipline that flowed from the July 2016
 8        protests?
 9   A.   Yes, sir, I would.
10   Q.   Okay.  And -- and just out of curiosity,
11        this Pages 2, 3, 4, the -- the union
12        contract excerpt, why did you bring that to
13        this deposition?
14   A.   For my personal notes if I was asked any
15        questions about my knowledge of the
16        expungements between the years 2006 and
17        2009.
18   Q.   Okay, got it.  All right, and then Page 1
19        is an Internal Affairs Accountability Form,
20        correct?
21   A.   Correct.
22   Q.   Okay, and this is -- an Internal Affairs
23        Accountability Form is created when there's
24        a -- a complaint by a member of the public
25        or someone else.  Is that right?
```

```
 1   A.    Yes, sir.
 2   Q.    Okay, and so this is a -- a complaint.  It
 3         says, "Self initiated."  Does that mean a
 4         member of Internal Affairs Department began
 5         this investigation?
 6   A.    It can mean -- "self initiated" means that
 7         the detective picked up the phone or the
 8         detective was approached.  It doesn't
 9         actually mean that it was a proactive
10         approach where a detective, you know, was
11         -- sought -- sought an individual out.
12   Q.    Okay.  You might have to speak up a little
13         bit for our court reporter or get a little
14         closer to the mic.  Thank you.  And before
15         I move on, are there any papers on your --
16         on the desk in front of you other than
17         these ones I have up on the screen?
18   A.    Yes, General Order No. 112.
19   Q.    Okay.  Anything else?
20   A.    No, sir.
21   Q.    Okay.
22   A.    Just a binder, but it doesn't have anything
23         in it.
24   Q.    Okay.  Okay.  So this Page 1 of "Exhibit
25         ZZZZZ" regardless of who initiated this,
```

1       this was an Internal Affairs record of a

2       brief investigation into a public

3       allegation that someone had been beaten by

4       officers during the Alton Sterling

5       protests.  Is that a fair summary?

6   A.   Well, it says arrested.  It doesn't say

7       anything about being a -- a victim of

8       excessive force.  It does say -- well, "had

9       been beaten by Officer."  Yes, I see it.

10      "Had been beaten," yes, I see it.

11  Q.   Okay.  So my -- my -- my short summary was

12      a fair description of this document?

13  A.   Correct.

14  Q.   Okay, and so it looks to me that the

15      potential complainant did not follow up,

16      and so no action was taken on this

17      accountability record, agreed?

18  A.   Agreed.

19  Q.   Okay, and -- and you provided this to us.

20      Is this the only Accountability Form from

21      the -- related to the July 2016 protests?

22  A.   Yes, sir.

23  Q.   Okay, and any complaint to Baton Rouge

24      Police Department would generate an

25      Internal Affairs Accountability form,

```
 1        agreed?
 2   A.   Well, it depend on the level of the
 3        complaint.  It depended on -- depended on
 4        the level of evidence that the complainant
 5        could provide or searching body camera to
 6        see if what the complainant actually said
 7        matches the officer's body camera.
 8   Q.   So if a complainant makes a complaint that
 9        is not substantiated by evidence, it won't
10        even generate an Accountability Form entry?
11   A.   No.  It would.  It -- yes, Accountability
12        would be documented.
13   Q.   Okay, right.  So there would be -- any time
14        there's a complaint, if there was a
15        complaint related to the July 2016
16        protests, it would generate an
17        Accountability Form like this, agreed?
18   A.   Correct.
19   Q.   And this is the only one, correct?
20   A.   Correct.
21   Q.   Okay.  I'm going to pull up one other
22        document.  Okay.  That is "Exhibit ZZZZZZ"
23        at Page 14.  It's entitled, "RFP No. 61
24        Marcus Thompson.pdf."  Do you see this
25        Investigative Summary, Sergeant Beard?
```

1    A.    Yes.

2    Q.    Okay, and you see that this is a -- this is

3          an Investigative Summary of an

4          investigation by the Internal Affairs

5          Department of Baton Rouge Police

6          Department, agreed?

7    A.  Agreed.

8    Q.    Okay, and this was an investigation into

9          Officer Marcus Thompson, correct?

10   A.    Correct.

11   Q.    It was -- it was an investigation prompted

12         by two corporals who overheard Officer

13         Marcus Thompson telling arrestees that BRPD

14         Police Officers are violating their civil

15         rights and how fucked up that is, agreed?

16   A.    Agreed.

17   Q.    Okay, and -- and so Internal Affairs

18         conducted an investigation and generated a

19         -- it appears to be a 12-page investigative

20         summary of this?

21   A.    Correct.

22   Q.    Okay.  They took statements from various

23         officers and investigated Officer Thompson,

24         correct?

25   A.    Correct.

1    Q.    Okay.  So we've now seen two Internal

2          Affairs documents related to the July 2016

3          protests.  One was an Accountability Form

4          about a complaint of excessive force, and

5          the other was a more lengthy investigation

6          into Officer Marcus Thompson for his

7          behavior, agreed?

8    A.    Agreed.

9    Q.    Okay, and the Accountability Form, was

10         there even really a -- a real

11         investigation?  It looked like it was just

12         the complainant didn't follow up, and so no

13         investigation occurred.  Would you agree

14         with that?

15   A.    No, I wouldn't.

16   Q.    Okay.  You would characterize it as an

17         investigation?

18   A.    Yes, sir.

19   Q.    Okay.  Other than these two -- so other --

20         we've got the Accountability Form about

21         that excessive force, and we've got the

22         investigation into Officer Marcus Thompson.

23         Are these the only two investigations that

24         you know of about BRPD misconduct that

25         flowed from the July 2016 protests?

1    A.    Yes, sir.

2    Q.    Okay, and the Internal Accountability Form

3          we looked at, it doesn't identify any

4          specific officer that was subject to this

5          investigation, agreed?

6    A.    Agreed.

7    Q.    Okay.  So if I understand you correctly,

8          the only investigation of any particular

9          officer for conduct related to the July

10         2016 protests was the investigation into

11         Officer Marcus Thompson, agreed?

12   A.    I can't agree.  I was asked to provide

13         things as much as I could research

14         involving the -- the protests.  I was

15         unaware of this.  I don't even see where it

16         says -- I mean, it's understood that it was

17         during that timeframe, but I don't see

18         anything that says anything about protests,

19         so I can't give you a -- a definite answer.

20   Q.    Okay.  Let's see.  Do you see on Page 3 of

21         this Marcus Thompson investigation, it's

22         sort of the middle paragraph, it talks

23         about "they were assigned to process

24         prisoners during ongoing protests outside

25         of police headquarters"?

1   A.   I see it now, correct.

2   Q.   Okay.  So do you see that this Marcus

3        Thompson investigation was in the context

4        of the July 2016 protests?

5   A.   Correct.

6   Q.   Okay.  So based on your testimony, I

7        understand that the only investigation into

8        a particular officer's conduct by Baton

9        Rouge Police Department that flowed from

10       the July 2016 protests was this

11       investigation into Marcus Thompson, agreed?

12  A.   As of today's date, yes, I agree, but that

13       -- again, that can be something that next

14       week this time there's another -- something

15       surfaces, but as to my knowledge, the only

16       two things as of today are this

17       Accountability what you have in front of

18       me.

19  Q.   Okay.  So you do agree with my

20       characterization at least as of today,

21       agreed?

22  A.   Agreed.

23  Q.   Okay.  So the only investigation as of

24       today into a particular officer's conduct

25       related to the July 2016 protests is the

1       officer who said that other officers were
2       violating civil rights, agreed?
3   A.   Agreed.
4   Q.   Okay.  And you mentioned just now that's
5       true as of today, but it could be different
6       tomorrow or in the future.  Do you know of
7       any pending investigations into anything
8       related to the July 2016 protests?
9   A.   No, sir, not that I'm aware of.
10  Q.   Okay.  Do you anticipate any future
11      investigations into the July 2016 protests?
12  A.   If somebody came forth in the present,
13      possibly.
14  Q.   Okay, but -- but that's -- you're -- you're
15      saying if someone came forward, we would
16      investigate it, but you have no reason to
17      believe that anyone is or is going to come
18      forward, agreed?
19  A.   Agreed.
20  Q.   Okay.  And just before we were cut short on
21      last Thursday, I represented to you that we
22      had heard testimony about some Baton Rouge
23      Police Officers signing other officers'
24      names without their knowledge.  Do you
25      recall me saying that?

1    A.    Yes, sir.

2    Q.    And to your knowledge there -- you didn't

3          know about that, and -- and there was no

4          investigation of that to your knowledge,

5          agreed?

6    A.    Agreed.

7    Q.    Okay.  I'm sharing "Exhibit T" at Page 245.

8          So Sergeant, one of the officers who told

9          us that was Billy Walker.  Do you see Page

10         245 of "Exhibit T" here is a letter from --

11         from Billy Walker?

12   A.    Yes, sir.

13   Q.    And you see that it's dated -- it says

14         7-21-2106, but I think that's a typo.  It

15         indicates it's July 21st, 2016, agreed?

16   A.    Agreed.

17   Q.    Okay.  Do you see that -- and this would

18         have been shortly after the July 2016

19         protests, agreed?

20   A.    Agreed.

21   Q.    Okay, and -- and do you see that this

22         letter from Billy Walker explains that --

23         in the second paragraph, it says, "My name

24         was also on the Probable Cause report which

25         was half printed and half signed.  Note

1          that the printed and signed name on the
2          Affidavit wasn't done by me."  Do you see
3          that?
4    A.    Yes.
5    Q.    So this is an officer reporting that
6          someone else was signing his name to -- to
7          some documents, agreed?
8    A.    Agreed.
9    Q.    Okay, and you can see that below, there's a
10         handwritten signature.  Do you happen to
11         know whose signature that is?
12   A.    No, sir.
13   Q.    Okay, and it's cc'd to Sergeant Honore,
14         Lieutenant Nelson, Lieutenant Wallace, and
15         Lieutenant Vernon?
16   A.    Yes, sir.
17   Q.    Are those supervisors or ranking officers
18         at BRPD?
19   A.    Yes, sir.
20   Q.    Okay.  Just roughly what divisions are they
21         in or were they in at that time?
22   A.    Each one of them had went higher rank.
23         Sergeant Honore I think is a lieutenant
24         now.  Lieutenant Gerrick Nelson is a
25         Captain.  Lieutenant David Wallace is a

```
 1        Captain, and I think Lieutenant Vernon
 2        actually retired.
 3   Q.   Okay.  This indicates at least that Billy
 4        Walker was reporting to a range of ranking
 5        officers that someone had signed his name
 6        to documents without his knowledge, agreed?
 7   A.   Agreed.
 8   Q.   Okay, and -- and yet there was no Internal
 9        Affairs investigation into this issue,
10        agreed?
11   A.   My recollection, no.  And as to the
12        investigation, if any of the supervisors
13        thought that it was Internal Affairs deemed
14        worthy, then it would have -- it would have
15        been reported to my office, and my office
16        would have looked into it.
17   Q.   Okay.  So you're speculating about why it
18        might not have gotten to -- well, let me
19        back up.  Did this letter ever make it to
20        Internal Affairs?
21   A.   I'm not aware if it did or if it didn't.
22   Q.   Okay, but the very least you can say,
23        Internal Affairs did not investigate this
24        issue, agreed?
25   A.   To my knowledge as of today, agreed.
```

```
 1    Q.   Okay.  Do you know if any other branch of
 2         BRPD investigated this issue?
 3    A.   No, sir, I can't answer that.
 4    Q.   Okay.  Next I'm going to pull up -- okay.
 5         So it was reported by the officer in 2016
 6         that someone was signing his name to
 7         documents, but it was not investigated at
 8         that the time, agreed?
 9    A.   Agreed.
10    Q.   Okay.  I'm going to pull up "Exhibit H."
11          Do you see that these are responses to
12         discovery requests in the Imani case?
13    A.   Yes, sir.
14    Q.   Okay, and do you see that it's dated --
15         there's dates of 2019 on here?
16    A.   Yes, sir.
17    Q.   Okay.  So turning to Page 8, do you see
18         these are responses of Officer Billy
19         Walker?
20    A.   Yes, sir.
21    Q.   Okay, and do you see that -- that Officer
22         Walker is responding that he did not
23         personally sign the Affidavit of Probable
24         Cause?
25    A.   Yes.
```

```
 1    Q.   Okay.  So the -- the issue of Billy Walker
 2         not signing Affidavits with his name on it
 3         was raised again in 2019, agreed?
 4    A.   Agreed.
 5    Q.   Did anyone at Baton Rouge Police Department
 6         investigate that issue in 2019?
 7    A.   I'd have to research -- research that, sir.
 8         I -- I -- I don't know as of -- as of
 9         today.
10    Q.   Okay.  You were head of Internal Affairs in
11         2019?
12    A.   No, sir.
13    Q.   No, sir?
14    A.   No, sir.  I was acting supervisor, but I
15         wasn't the commander.
16    Q.   Okay.  If there had been in 2019 an
17         investigation into some officer signing
18         other officers' names to documents, is that
19         something you would have known about as a
20         supervisor?
21    A.   Highly likely.
22    Q.   Okay, but you do not recall any such
23         investigation in 2019, agreed?
24    A.   Agreed.
25    Q.   Okay.  Another officer, Reab Simoneaux, do
```

1       you know who that officer is?

2    A.    Yes, sir.

3    Q.    Okay.  Reab Simoneaux also testified in one

4          of these depositions that his name was

5          signed on numerous Affidavits of Probable

6          Cause.  Are you aware of that?

7    A.    No, sir.

8    Q.    And by, "signed," I mean signed without his

9          knowledge or consent, all right?

10   A.    Okay.

11   Q.    And -- and he testified that he similarly

12         reported it to his supervisors.  Do you

13         know if there was any investigation into

14         officers signing Reab Simoneaux' name

15         without his knowledge or permission at any

16         point?

17   A.    No, sir.  No, sir.

18   Q.    Okay.  And so to the knowledge of the City

19         of Baton Rouge, there was no such

20         investigation into forged signatures on

21         Reab Simoneaux' -- forged signatures of

22         Reab Simoneaux' name, agreed?

23   A.    No, from my knowledge, I have no

24         recollection of any kind of investigation

25         involving Corporal Simoneaux.

```
 1   Q.   All right, but you understand you -- you
 2        are here today to represent the knowledge
 3        of the City of Baton Rouge, agreed?
 4   A.   Agreed.
 5                  MR. SCOTT:
 6                  Can we take a quick break,
 7             William?
 8                  MR. MOST:
 9                  Sure.  Let's go off the record.
10                  (Off the record.)
11   BY MR. MOST:
12   Q.   Okay.  So Sergeant Beard, you prepared to
13        be the officer representing the City of
14        Baton Rouge's knowledge of any
15        investigation that flowed from the July
16        2016 protests, correct?
17   A.   Not correct.  I was told that I would be
18        giving a deposition of the inner workings
19        of my office, which I'm very knowledgeable
20        of, but if I would have known I had to
21        research particular -- particular detailed
22        topics, I would have took the time to
23        research.  I was only told to answer
24        questions pertaining to the inner workings
25        of Internal Affairs, how complaints come
```

1          in, how they're generated, what's the
2          process as far as different house
3          violations as far as Category 1, Category
4          2, Category 3, how is discipline rendered,
5          but no, if I would have been advised that I
6          needed specifics, I would have been more
7          prepared.
8     Q.   Okay.  I'm going to pull up the transcript
9          of your deposition from last Friday at Page
10         -- from -- from last Thursday at Page 17.
11         Do you see this, Sergeant?
12    A.   Yes.
13    Q.   The question was, "So Sergeant Beard,
14         you're prepared to testify today about any
15         investigations that flowed from the July
16         2016 protests, agreed," and your answer
17         was, "Agreed."  Do you see that?
18    A.   Yes, I do.
19    Q.   Okay, and so on Thursday and today, you're
20         prepared to testify about any
21         investigations that flowed from the July
22         2016 protests, agreed?
23    A.   No, I'm not -- I'm not prepared.
24    Q.   Do you recall earlier today testifying that
25         you were so prepared?

1  A.   I was told by our legal advisor that I only

2       have to answer three topics.  I wasn't told

3       by our legal advisor that I would have to

4       give answers, detailed answers about some

5       of the questions that you're asking me.

6        Now I'd be more than welcome to give a

7       deposition at a later time, but I'm not

8       prepared for these detailed questions that

9       I'm being asked.

10                 MR. SCOTT:

11                 Sergeant Beard, did you review

12            the 2016 Accountability Forms?

13                 THE WITNESS:

14                 Yes, sir, I did.

15                 MR. SCOTT:

16                 And to your understanding, that

17            would have shown the protest-related

18            complaints?

19                 THE WITNESS:

20                 Yes, sir.

21                 MR. MOST:

22                 Okay.

23                 MR. SCOTT:

24                 So if I made an error by telling

25            him look at 2016 because that's what

```
 1              I recall being asked was how many IA
 2              complaints were there in 2016
 3              relating to the protests --
 4                   MR. MOST:
 5                   Okay.
 6                   MR. SCOTT:
 7                   -- that's what I had him do.
 8    BY MR. MOST:
 9    Q.   That may solve the problem.  So Sergeant
10         Beard, to prepare for this deposition, you
11         looked to see if there were any
12         investigations that flowed from the July
13         2016 protests, correct?
14    A.   No, I looked to see if there were any
15         Accountabilities related to the one
16         protests.  I was prepared, again, to give a
17         breakdown of the inner workings of my
18         office, but no, I was not prepared to give
19         detailed statements about any complaints
20         dealing with the 2016 protests.
21    Q.   Okay.  Would there be any investigations
22         that flowed from the July 2016 protests
23         that did not generate an Accountability
24         Form?
25    A.   I couldn't answer that.
```

```
 1              MR. SCOTT:

 2              Well --

 3              MR. MOST:

 4              Well -- well, maybe I can back

 5         up.

 6    BY MR. MOST:

 7    Q.    Every IA investigation involves at least an

 8          Accountability Form, agreed?

 9    A.    Agreed.

10    Q.    Okay.  So if there was any investigation

11          related to the July 2016 protests, it would

12          be reflected in at least an Accountability

13          Form, correct?

14    A.    No, because you have people that would go

15          to different precincts, and an

16          investigation involving anything with the

17          protests could have been handled inhouse by

18          a supervisor.  So no, I -- I -- I can't say

19          yes, anything involving pro -- an

20          allegation or a complaint of a 2016

21          protests went on Accountability.

22          Supervisors on a lower level in the field

23          are allowed to take any kind of complaint

24          as long as it's not class -- classified as

25          a Category 3, but we have five precincts,
```

1       so I can't say that every complaint made

2       involving 2016 protests went on an

3       Accountability.

4   Q.  Okay, but based on your investigation, you

5       have not found any investigations related

6       to the 2016 protests other than the ones

7       we've described here today, correct?

8   A.  No, not the ones we described today.

9        The 2016 Accountabilities.  In fact, I

10      broke it down.  Look at my handwriting on

11      the last page of the four documents that

12      you-all have or that you have in front of

13      you.  We had five detectives or four

14      detectives.  At that time one detective had

15      41, one had 43 Accountabilities, one had

16      61, and one had 50.  We had a total of 195

17      accountabilities.  We went from January 1

18      all the way to the last Accountability that

19      we received in December of 2016, and this

20      is the only Accountability that I was able

21      to locate in our documentation.  I was

22      briefly made aware about Corporal Walker

23      prior to last week and the bomb threat, and

24      now I'm just seeing the paperwork that you

25      showed me with -- involving Corporal

```
 1        Simoneaux.
 2   Q.   All right.  Can we at least rely that the
 3        testimony you've given up until now today
 4        has been the testimony of the City of Baton
 5        Rouge?
 6   A.   You keep saying, "the City of Baton Rouge."
 7        I can rely on my own knowledge of what I
 8        know.
 9   Q.   Okay, I understand, but you understand that
10        you're here today as -- to speak for the
11        City of Baton Rouge, agreed?
12   A.   I -- I'm realizing it now.
13   Q.   Okay.  You're realizing that right now at
14        12:25 p.m. on August 24th, 2021.  Is that
15        right?
16   A.   Yes, that's right.
17   Q.   Okay.
18   A.   I'm not trying to be rude or condescending.
19        I just like to be prepared and I feel like
20        some of the questions I'm being asked, I
21        wasn't told to be able to expound on these
22        if asked.
23   Q.   I understand.  Can we at least rely that
24        what you have told us up until now is
25        truthful testimony?
```

1    A.    Yes, sir.

2    Q.    Okay.  Is there anything you've said today

3          that is not the testimony of the City of

4          Baton Rouge as -- as well as your

5          testimony?

6    A.    Well, as far as me representing the City

7          and my testimony, yes, sir, everything I

8          said today was truthful and everything I

9          said in the deposition before that was

10         truthful.

11   Q.    Right, and -- and was it both your

12         testimony as well as the testimony of the

13         City of Baton Rouge?

14   A.    No.  It's my testimony.  I understand I'm

15         here as a --

16   Q.    Okay.

17   A.    -- member of the Baton Rouge Police

18         Department, but I'm speaking from my own

19         personal knowledge.  I can't say that the

20         administration or, you know, high-ranking

21         officers in other parts of the department

22         I'm representing them as well.

23               MR. MOST:

24               Joe, do you think we can take a

25            break and you can have him after the

```
 1                 break speak to whether what he has

 2                 said up to until now is or is not

 3                 the testimony of the City of Baton

 4                 Rouge?  I think we can move on if --

 5                 if what we have so far can be

 6                 designated as the testimony of the

 7                 City of Baton Rouge, I think I can

 8                 move on, but if not, we're going to

 9                 have to find someone who is

10                 prepared.  Can you -- can we take

11                 five and -- and re -- regroup do you

12                 think, Joe?

13                     MR. SCOTT:

14                     Yeah.  I show 12:27.  12:35 okay?

15                     MR. MOST:

16                     Sure, let's do that.

17                     (Break in proceedings.)

18   BY MR. MOST:

19   Q.   Let's go back on the record.

20                     MR. SCOTT:

21                     William, which topic are we on

22                 here?

23                     MR. MOST:

24                     So if you recall, Joe, we met and

25                 conferred, and you agreed to provide
```

1          a 30(b)(6) witness to testify about
2          investigations that flowed from the
3          July 2016 protests considering the
4          -- we -- we discovered information
5          through the course of discovery.
6               MR. SCOTT:
7               And I had Sergeant Beard check
8          2016 for IA level investigations,
9          and he has produced what he found.
10         Now --
11              MR. MOST:
12              I -- I guess all we need to know,
13         Joe, is, is the testimony that
14         Sergeant Beard has given so far, is
15         it the testimony of the City?
16              MR. SCOTT:
17              What I would like it do is take a
18         break, go chase down people for you
19         and Mr. Rodney, return in a little
20         while and give Sergeant Beard time
21         to read his testimony from August
22         5th, and chances are I'll stipulate,
23         but I would like to have his comfort
24         level known to me at least.
25              MR. MOST:

```
1              Wait.  I thought we were only
2         calling into question whether his
3         testimony from Thursday and today
4         was the testimony of the City.
5         You're also saying maybe his
6         testimony from August 5th was not
7         the testimony of the City?
8              MR. SCOTT:
9              Could I have him read it over?
10             MR. MOST:
11             Sure.
12             MR. SCOTT:
13             Because I think it is --
14             MR. MOST:
15             Yeah.
16             MR. SCOTT:
17             -- but --
18             MR. MOST:
19             Yeah.  Look, we want everyone to
20        be comfortable with their testimony,
21        so let's do that.  How much time do
22        you need, Joe?
23             MR. SCOTT:
24             I don't remember -- I haven't
25        read the transcript, so I don't know
```

```
 1              how long his transcript actually is.
 2                   MR. MOST:
 3                   Do you want -- do you want to
 4              take 20 minutes and then we
 5              reconvene, and if you need more
 6              time, we can do that?
 7                   MR. SCOTT:
 8                   Can we reconvene at 1:00 p.m. --
 9                   MR. MOST:
10                   All right.
11                   MR. SCOTT:
12                   -- and I'll -- this thing ain't
13              working correctly.  What is wrong
14              with it?
15                   MR. MOST:
16                   All right.  Well, let's reconvene
17              at 1:00 p.m., and we'll go off the
18              record now.
19                   (Break in proceedings.)
20                   MR. MOST:
21                   Okay.  Let's go back on the
22              record.
23                   Joe, having taken this break, are
24              -- are you prepared to stipulate
25              that Sergeant Beard's testimony up
```

1          until now has been the testimony of

2          the City of Baton Rouge?

3               MR. SCOTT:

4               Yes.

5               MR. MOST:

6               Okay.

7               MR. SCOTT:

8               I do stipulate.  The -- looking

9          at the transcript from August 5th, I

10         went through and found questions

11         that Sergeant Beard said he would

12         have to research to answer.  I

13         thought I had asked everybody to

14         send me, you know, their list, but

15         --

16              MR. MOST:

17              Okay.  So I guess what is your

18         point?  Would you --

19              MR. SCOTT:

20              Just that I didn't get any of

21         those lists, and I didn't tell

22         Sergeant Beard to research them.

23              MR. MOST:

24              Okay.

25              MR. SCOTT:

```
 1                He is planning to travel, you
 2                know, as soon as I cut him loose
 3                from this, but anybody from IA could
 4                research the questions as set forth
 5                in that transcript and appear
 6                tomorrow to provide the results of
 7                that research.
 8                     MR. MOST:
 9                     Okay.  That will work.
10                     (Break in proceedings.)
11    BY MR. MOST:
12    Q.   All right.  Sergeant Beard, you -- you now
13         understand that you are speaking on behalf
14         of the City of Baton Rouge, and you have
15         been speaking on behalf of the City of
16         Baton Rouge, agreed?
17    A.   Agreed.
18    Q.   Okay.  Any reason to dispute anything Joe
19         just said?
20    A.   No, sir.  We -- we can go ahead.
21                     MR. MOST:
22                     Okay.  So I think that covers the
23                topics that I would like to ask
24                Sergeant Beard, including Order 112.
25                I've looked it over.  I think it has
```

```
1              been covered sufficiently from my
2              perspective so far, although I
3              reserve the right for follow-up
4              questions.
5                   MacArthur, would anyone from your
6              team like to ask questions of
7              Sergeant Beard?
8                   MR. FOLEY:
9                   Yeah, I think I have just a few
10             followups.  I think William covered
11             most of what I was going to ask.
12                       EXAMINATION
13   BY MR. FOLEY:
14   Q.   So Sergeant Beard, if I understand your
15        testimony correctly, on the last page of
16        that -- that four-page document of notes
17        that you provided, the tally on -- on Page
18        4 there, 195, so that's -- that's the
19        number of Accountability Forms for the year
20        2016 that you reviewed.  Is that right?
21   A.   Yes, sir.
22   Q.   Okay, and so your testimony so far has been
23        that of all the Accountability Forms in
24        2016, the only that you found that would
25        have been responsive to a complaint about
```

1       the protests was this Accountability Form

2       -- well, we all know his name, but since

3       it's blacked out, I won't say it, but this

4       use of force that was investigated by John

5       Dauthier?

6  A.   Yes, sir.

7  Q.   Okay.

8  A.   There were other Accountabilities during

9       that timeframe.  We had people that made

10      anonymous complaints; we had people from

11      different states make complaints on what

12      they saw nationally around the world, but

13      as far as the word, "Protests," this is the

14      only one from that timeframe that we have

15      in the office.

16 Q.   Okay.  Can you describe that a little bit

17      more for me.  So you -- you said people

18      made --

19 A.   So --

20 Q.   -- complaints around the world?

21 A.   The incident occurred July 5th, 2016.  Of

22      course, my officers, fellow officers were

23      ambushed July 17th of 2016, but throughout

24      that timeframe, early July to the end of

25      July, we have had people that called in

1      saying they wanted to make a complaint on

2      behalf of Alton Sterling.  Some were

3      disgruntled; some had questions, but as far

4      as the word, "protests," this is the only

5      -- the one that you-all have in front of

6      you-all is the only one that I found, and

7      my secretary assisted me with the word

8      "protests."

9   Q.    Okay, and so there were none others that

10      you found in your search that involved the

11      complaint by a protestor or on behalf of a

12      protestor or by another officer complaining

13      about conduct towards a protestor.  Is that

14      right?

15  A.    Correct.

16  Q.    Okay.  One question for you on -- on this

17      Accountability Form.  Where Officer Dau --

18      Dauthier or Dauthier, I'm probably

19      mispronouncing it one way or the other,

20      when he writes that, "I was asked to try

21      and speak to," you know, the name of the

22      arrestee, "to investigate," to -- who --

23      who was it that would have asked him to

24      investigate into this news story?

25  A.    From what I'm reading or from what I've

```
 1          read, I would assume the attorney, Mr.
 2          James Williams.
 3    Q.    Okay.  Is there anyone in the -- in the IA
 4          Division that would have made that request
 5          to him or --
 6    A.    I'm -- I'm kind of lost on your question.
 7    Q.    Okay.  Let me -- let me start over.  I --
 8          I'm interested in figuring out how it is
 9          that, you know, a story is printed in the
10          paper and then transmits to this request
11          for an investigation, and I'm trying to
12          figure out is that from someone in the IA
13          Division that sees that news report and
14          then asks this officer to investigate?
15    A.    No.  From what I gathered from this
16          particular Accountability, either the
17          complainant or his attorney called our
18          office to initiate the complaint.
19    Q.    Okay.  So in the, "How Received" section,
20          then the "Self initiated" is not a
21          reference to it originating from within
22          BRPD?
23    A.    It could have.  "Self initiated" could mean
24          that obviously at that point Sergeant
25          Dauthier, when he was still in the office
```

1      might have answered the phone, might have
2      been a walk-in, but I -- I -- I can't say
3      for certain "Self initiated" meant that he
4      took the time, he, you know, proactively
5      looked into it on his own.
6   Q.   Okay.  So it's -- it's unknown then?  We
7      just don't know --
8   A.   Yes, sir.
9   Q.   -- where it came from?  Okay, and so for
10      the year 2016 of the Accountability Forms
11      that you reviewed, do you recall seeing any
12      regarding the deployment of a TASER on
13      Chris and Brachell Brown by Officer Jason
14      Acree?
15  A.   No, sir.
16  Q.   Okay, and then also there were no other
17      Accountability Forms for -- regarding uses
18      of force on protestors on July 9th.  Is
19      that right?
20  A.   Yes, sir.
21  Q.   And then so when we spoke last time on the
22      5th, I believe one of the outstanding
23      questions I had for you was the criteria
24      for expungements prior to the change in
25      policy in 2006.  So in reading over the

1      four-page document you provided or four
2      pages of notes that were provided, is it --
3      is my understanding correct in that it
4      would have been, you know, prior to 2006
5      any -- basically any complaint that didn't
6      result in a -- a termination would have
7      been eligible for this expungement at some
8      point; it was just a difference of years so
9      it seems on the upper end of, you know,
10     violence and five years, but barring a
11     termination or resignation, everything else
12     would have been expunged?
13  A.   Yes, sir.
14  Q.   Okay, and then just to clarify, for the
15     search of the Accountability Forms, did
16     that include any search for complaints
17     regarding the falsification of either
18     Probable Cause Affidavits or arrest
19     reports?
20  A.   No, sir.
21  Q.   Okay.  Another question I had had for you
22     last time that I wanted to follow up on,
23     and this might be answered later today by a
24     different deponent, but I'll just ask to
25     see if it's something you have looked into

1          was whether there were any actions taken
2          within Internal Affairs to address reports
3          of disproportionate numbers of
4          investigations against officers of color,
5          and I think we -- we talked a bit about a
6          news story where Myron Daniels was quoted
7          as commenting on the Union's assertions
8          that there was a -- a disparate impact on
9          -- on white officer, and Officer Daniels
10         had said, no, in actuality the numbers show
11         a disparate number of investigations
12         against black officers.  So I'm wondering
13         if there -- if you're aware of any kind of
14         policy changes or reactions to that within
15         IA?
16    A.   No, sir, I'm not aware of that.
17    Q.   Okay, and was that something you were able
18         to look into between -- since our last
19         deposition on the 5th?
20    A.   No, sir.
21    Q.   Okay.  I think most -- most of the rest of
22         my questions are larger policy issues,
23         which I suspect will be answered by a
24         different deponent.  One question I have
25         more of kind of a nuts-and-bolts IA issue

1      that I wanted to ask that we didn't get to

2      last time was the role of the criminal or

3      statisticians' office, which is this, it's

4      my understanding is that the Use of Force

5      Report once completed, a copy would go to

6      your office and then a copy would go to the

7      Training Division.  Is that correct?

8  A.    That's correct.

9  Q.    And from reports we have of the crime

10      statisticians that were produced in

11      discovery, they -- their reports note that

12      they also receive copies of the -- what --

13      I'm referring to them as Use of Force

14      Reports, but I understand the technical

15      term has now changed to -- I'm sorry, I'm

16      blanking, the resistance response?

17  A.    Response to resistive behavior?

18  Q.    Yes.  So are there ever any --

19              THE COURT REPORTER:

20              I'm sorry.  What -- wait, wait,

21          wait.  What's it now refer to as?

22              THE WITNESS:

23              Response to resistive behavior.

24              THE COURT REPORTER:

25              Thank you.

```
 1                   THE WITNESS:
 2                   Yes, ma'am.
 3     BY MR. FOLEY:
 4     Q.   So my question is just this, do you ever
 5          receive any referrals for investigation
 6          from the criminal statisticians who are
 7          analyzing that data?
 8     A.   And I'm not trying to be rude when I make
 9          sure I'm understanding the question.
10          You're asking me if the Crime Stat
11          Department sends us referrals saying, hey,
12          you might want to look at this as use of
13          force?
14     Q.   Exactly.
15     A.   Okay.  No, sir, that's doesn't occur.
16     Q.   Okay.  I think that would round out my
17          questions.  Just allow me one minute to
18          confer with Mr. Craig and -- and see if had
19          anything.  Just one moment.
20                   (Break in proceedings.)
21                   MR. FOLEY:
22                   Okay.  That's -- that's all we
23              have, so I will tender to Mr.
24              Fahrenholt.  It looks like Mr.
25              Rodney is not -- not with us right
```

```
1              now unless I'm missing him on my
2              screen.
3                   MR. FAHRENHOLT:
4                   I do not have any questions.
5                   MR. MOST:
6                   I just have a brief followup, but
7              Joe, would you like to go first or
8              you want me to ask?
9                   MR. SCOTT:
10                  No.  Why don't you go ahead.  I'm
11             cobbling together some response over
12             here.
13                  MR. MOST:
14                  Sure.
15                  FURTHER EXAMINATION
16   BY MR. MOST:
17   Q.   So Sergeant Beard, what used to be called
18        Use of Force Reports are now called
19        Response to Resistive Behavior Reports, is
20        that correct?
21   A.   Yes, sir.
22   Q.   Okay.  When did that name change happen
23        approximately?
24   A.   I don't want to give an approximate,
25        because like I said, I -- I was assigned to
```

1    IA in 2014 to the present.  It was well
2    before, say, 2016.
3  Q.   Okay.  So if the -- the change in the name
4    happened before 2016, correct?
5  A.   Correct.
6  Q.   Is there another form that is to be used
7    for force that is used in a context that's
8    not Response to Resistive Behavior?
9  A.   No.  That force is anything from
10    handcuffing to deadly force.
11 Q.   Okay.  So there isn't any other use of
12    force related form other than the Response
13    to Resistive Behavior Form, correct?
14 A.   Correct.
15 Q.   So use of -- calling it an Use of Force
16    Form is a more general term because it
17    doesn't suggest what the force was used in
18    response to, agreed?
19                MR. SCOTT:
20                Could you say that again.
21                MR. MOST:
22                Sure.
23                MR. SCOTT:
24                I'm not sure I got that.
25                MR. MOST:

```
 1                    Sure.
 2    BY MR. MOST:
 3    Q.   Okay.  Let me -- let me phrase it a
 4         different way.  Calling it a Response to
 5         Resistive Behavior Form implies that any
 6         use of force is responding to resistive
 7         behavior.  Do you agree with that?
 8    A.   I agree.
 9    Q.   All right.  So in the name of the form,
10         it's already implied that the officer was
11         responding to resistive behavior by an
12         arrestee or some other person, agreed?
13    A.    My answer to that is I think Sergeant Britt
14         Jones from Accredition can answer it
15         better, and I don't know if Corporal
16         Wallace Britton touched on it, but over the
17         years we've changed our defensive tactic
18         company, the company that, you know, shows
19         us what's proper to use any type of force
20         against someone, so I don't know if it
21         coincided with that name changed because we
22         changed.  Since I've been here, it changed
23         at least twice or three times with a
24         different company that we go to that gives
25         us a manual showing this is the level of
```

1    force to use against this level of force.
2    So either Corporal Wallace Britton or
3    Sergeant Britt Jones can answer that
4    better.
5  Q.   Okay, fair enough, and I -- I will ask
6    them, but Baton Rouge Police Department
7    wants its officers to report force whether
8    it was responding to resistive behavior or
9    not responding to resistive behavior,
10    agreed?
11  A.   For reporting force, yes, but I don't how
12    to answer -- well, if any type of force,
13    like I said, from handcuffing to deadly
14    force has to be documented, but if you
15    don't use force against anyone, then, no,
16    you don't -- I mean, it's kind of
17    pointless, I mean, and I'm not trying to be
18    rude when I say this, it's, like, common
19    sense, why would you fill out a Use of
20    Force -- or excuse me, a -- a Response to
21    Resistive Behavior if you didn't use force.
22    You document everything else in your
23    narrative of your actual report.
24  Q.   I guess where I'm going with this is,
25    doesn't it seem like a problem to you,

```
 1          Sergeant, that in the name of your Use of
 2          Force Form, you sort of imply that it was
 3          in response to an arrestee's behavior?  It
 4          doesn't even contemplate any other kind of
 5          use of force.  Does that seem like a
 6          problem to you?
 7   A.   No.
 8   Q.   Okay.  Okay.  That -- that was my follow-up
 9          questions.
10               MR. MOST:
11               Joe, do you want to take over?
12                    EXAMINATION
13   BY MR. SCOTT:
14   Q.   If you have a compliant handcuffing of a
15          suspect, does that require an Use of Force
16          Form?
17   A.   No, sir.
18   Q.   Is the Use of Force or Response to
19          Resistive Behavior is only for when the use
20          of force is authorized?
21   A.   Correct.
22   Q.   And that would be in response to resistance
23          or threats to the public?
24   A.   Yes, sir.
25   Q.   That's about all I've got.
```

```
 1                   FURTHER EXAMINATION
 2    BY MR. MOST:
 3    Q.   Okay.  So if I understood your testimony in
 4         response to Joe's questions correctly, the
 5         Response to Resistive Behavior Form is to
 6         be used for authorized uses of force.  Is
 7         that correct?
 8    A.   Yes, sir.
 9    Q.   What form is there to fill out for
10         unauthorized uses of force?
11    A.   Well, it's not a matter of authorized.
12         It's matter of that officer's mindset or
13         discretion at that particular moment.  It's
14         not about authorizing it.  Officers have
15         discretion and have been trained to know
16         how to handle, you know, a subject that is
17         resisting.  So no, there's nothing saying
18         that you have to call a supervisor or you
19         have to fill out a form.  At that
20         particular moment, you have the discretion
21         to take what particular actions are
22         necessary.
23    Q.   I understand that.  So is -- is the
24         Response to Resistive Behavior Form to only
25         be used for a lawful proper use of force?
```

1   A.    No, for an use of force more than

2         handcuffing.

3   Q.    Okay.

4   A.    If you've got to do more than handcuffing,

5         then a use of force -- excuse me, you've

6         got me stating Use of Force -- Response to

7         Resistive Behavior Form should accompany

8         your report if you did more than handcuff.

9   Q.    Okay.  I think that's -- that's good.

10              MR. MOST:

11              Any other questions anybody has

12        for Sergeant Beard?

13              MR. FOLEY:

14              Yeah, I have one.  It's just a

15        followup on the -- the additional

16        documentation.

17                  EXAMINATION

18  BY MR. FOLEY:

19  Q.    I -- I was just curious I think Mr. Rodney

20        had a question on the 5th that was

21        specifically about whether any -- anyone

22        from the Training Division or the academy

23        had been asked to comment on or consult on

24        any -- any investigations arising from the

25        protests.  So I was wondering if that was

1        also going to be part of the questions that

2        were going to be further investigated or

3        could be further searched?

4    A.  No.  The training academy if they had

5        anything during that timeframe that was

6        presented to them, it has to come to my

7        office.  Internal Affairs is the only part

8        of this organization that can initiate

9        investigations, follow through, and give

10       the conclusion to the Chief.  Now, if

11       somebody from the academy were -- had that

12       came during that timeframe, and said, "Hey,

13       can you-all look into this," then an

14       investigation should have or could have

15       been initiated, but they don't start any

16       type of initiation of use of force.

17   Q.  Oh, I'm -- I'm sorry.  I -- I think I --

18       maybe I just misspoke.  I think Mr. Rodney

19       concern and question before had been

20       whether once an investigation was underway

21       whether IA had ever consulted with a

22       trainer in the Training Division or in the

23       academy to, say, almost act as a consultant

24       on whether the use of force had been

25       appropriate and whether they had been

1      brought in by IA to offer an opinion on use
2      of force?
3   A.   Yes, sir, that -- that happens.
4   Q.   Okay.  Yeah, so I guess my question was I
5      think he had -- he had asked for
6      specifically for someone to search for
7      whether that had ever happened in regard to
8      any investigation of the protests in July
9      2016?
10  A.   Okay.  My attorney has that question
11     already jotted down, and that would be
12     something that is to be brought back at a
13     later date.
14  Q.  Yeah, I know.  I just wanted to -- I just
15     wanted to know if that was part of what was
16     going to be researched.  If it can be,
17     that's great.  Thank you.  I didn't have
18     anything else.
19              MR. MOST:
20              All right.  Any other questions
21           for Sergeant Beard?  Okay.  Well,
22           let's go off the record.
23      EXAMINATION OF SERGEANT HALLIE BRITT JONES
24              THE COURT REPORTER:
25              Will counsel please identify

1          themselves and their affiliations

2          and also stipulate that by agreement

3          of all parties this deposition is

4          being held via videoconferencing,

5          and there is no objection to the

6          witness being sworn in remotely.

7               MR. MOST:

8               This is William Most on behalf of

9          Imani Plaintiffs.  We so stipulate

10         and agree.

11              MR. CRAIG:

12              This is Jim Craig together with

13         Eric Foley and Hannah

14         Lommers-Johnson, we represent the

15         Plaintiffs in Tennart,

16         Batiste-Swilley, and Smith, and we

17         agree with the stipulations.  Thank

18         you.

19              MR. FAHRENHOLT:

20              Greg Fahrenholt on behalf of the

21         Louisiana State Police Trooper

22         Defendants.  We agree.

23              MR. SCOTT:

24              Joseph Scott for the City of

25         Baton Rouge, Parish of East Baton

```
1              Rouge, various officials, Baton
2              Rouge Police Department, and 183
3              individual officer defendants in six
4              suits.  We take that stipulation for
5              today's deposition.
6              SERGEANT HALLIE BRITT JONES, having
7       been first duly sworn by Raynel E. Schule,
8       Certified Court Reporter, was examined and
9       testified on his oath as follows:
10                      EXAMINATION
11  BY MR. MOST:
12  Q.   All right.  Good afternoon, Sergeant.
13  A.   Good afternoon.
14  Q.   Would you give your full name and title for
15       the record, please.
16  A.   Sergeant Hallie Britt Jones.  I'm the
17       Accreditation Manager for the Baton Rouge
18       City Police Department.
19  Q.   Thank you.  Sergeant, my name is William
20       Most.  I -- Sergeant, my name is William
21       Most.  I'm an attorney for the Plaintiffs
22       in the Imani case, and I'm joined here by
23       Mr. Craig, Mr. Foley, and Ms.
24       Lommers-Johnson, who are attorneys for
25       Plaintiffs in other related cases; Mr.
```

1          Fahrenholt, who's a lawyer for the State
2          Police.  Sergeant, have you ever given a
3          deposition before?
4    A.    A couple.
5    Q.    Okay.  Were you the person being sued or
6          the person doing the suing in any of those
7          cases?
8    A.    No, sir.
9    Q.    But at least based on your past experience
10         with depositions you understand that today
11         you're here under oath?
12   A.    Yes, sir.
13   Q.    And that your answers here today have the
14         seem force as if we were in a courtroom
15         with a Judge and Jury?
16   A.    Yes.
17   Q.    Is there anything, Sergeant, that would
18         prevent you from giving us your full
19         attention and truthful and complete
20         answers, whether it's illness, fatigue,
21         medication, substances, or anything else?
22   A.    No, sir.
23   Q.    All right, and like you've experienced with
24         past depositions probably, this doesn't
25         have to be continuous.  We can take breaks

```
 1          if needed.  So you can let Mr. Scott or
 2          myself know if you need to take a break;
 3          however, I will tell you in advance that it
 4          is my practice to ask question -- ask you
 5          questions after every break about who you
 6          talked to, what you talked about, even if
 7          it's your attorney and any documents you
 8          looked at during the break, all right?
 9     A.   Okay.
10     Q.   And one thing that is important to make
11          sure we're understanding each other is that
12          if I ask a question that isn't clear or you
13          don't understand the question, will you
14          agree to tell me that that is the case
15          rather than just trying to answer it
16          anyway?
17     A.   Yes.
18     Q.   Thank you.  Do you know in a general sense
19          what cases you're here for today?
20     A.   Something about the protests from 2016.
21     Q.   Yeah, that's right, and the depositions you
22          took in the past, you were likely acting as
23          a witness speaking for yourself, what you
24          saw or heard.  Is that right?
25     A.   No.  I was representing the City Police on
```

1       the policies of the Baton Rouge Police

2       Department.

3  Q.  Okay.  So you were acting as the -- the

4       witness speaking for the City itself in the

5       past.  Is that right?

6  A.  Correct, pretty much validating were these

7       the policies in place at the time the

8       incident occurred.

9  Q.  Okay.  So today's deposition is like those

10      in that it's what's called a 30(b)(6)

11      deposition.  So like you did before it

12      sounds like today you are here to testify

13      for the City of Baton Rouge.  Do you

14      understand that?

15  A.  Yes, sir.

16  Q.  And so when I'm asking a question of you

17      today or the other lawyers are asking a

18      question of you, we're really asking a

19      question of the City of Baton Rouge, and

20      your answers are the answers of the City of

21      Baton Rouge.  Do you understand that?

22  A.  Yes.

23  Q.  Okay, and so one reason why this deposition

24      is different than some other kinds of

25      depositions is that in a normal deposition

1   "I don't know" is typically a sufficient
2   answer if it's truthful; however, in a
3   deposition like this one today, there's an
4   obligation for the City to produce someone
5   knowledgeable on a particular topic, so
6   generally, "I don't know" in many contexts
7   will not be a sufficient answer.  Do you
8   understand that?
9   A.   Yes.
10  Q.   Okay.  Did you -- did you talk to anyone
11       besides an attorney to prepare for today's
12       deposition?
13  A.   No.
14  Q.   Okay.  Did you talk to an attorney to
15       prepare for today's deposition without
16       telling me what you said?
17  A.   Yes.
18  Q.   Approximately how long did you talk to an
19       attorney to prepare for today's deposition?
20  A.   Five minutes.
21  Q.   Okay, and did you look at any documents to
22       prepare for today's deposition?
23  A.   No, other than the couple of documents I
24       have right here in front me when I got
25       here.

```
1    Q.   Okay.  So can you tell us what documents
2         are there in front of you.
3    A.   Several General Orders from Baton Rouge
4         City Police Department.  The ones you-all
5         were inquiring about are amongst those
6         documents, General Order 112, which is
7         discipline; General Order 134, which is
8         body armor; and General Order, which is an
9         IDP 502/06-2, "Patrol Rifles," and there's
10        other policies here for the police
11        department.
12   Q.   Do you have any documents in front of you
13        that are not BRPD policies?
14   A.   No, sir.
15   Q.   Okay, and so you mentioned -- did you say
16        you are the Accreditation Manager for the
17        City of Baton Police Department?
18   A.   That is correct.
19   Q.   What is an Accreditation Manager?
20   A.   The Baton Rouge City Police Department is
21        nationally accredited by CALEA, which is
22        the Commission for Law Enforcement --
23        Accreditation for Law Enforcement Agencies,
24        and I'm the person that represents the
25        police department in that particular
```

1          endeavor.  CALEA, which is the acronym for
2          them, gives us a set of standards that we
3          have to adhere to, and those standards, you
4          know, obviously have to produce policies,
5          state laws, general things that are used to
6          say you do these things that you're asked
7          to do, and then you have to provide them
8          proof that you do these things.  So that's
9          kind of my job is I go through the
10         accreditation standards, and if they
11         require a General Order or a policy or
12         state law that says, X, Y, Z, I make sure
13         it's in our policy, and then from there on
14         the backside, I provide them a proof of
15         that we actually did that particular item.
16    Q.   And so -- so it's your job to view BRPD
17         policies and make sure they're up to date
18         and up to accreditation standards.  Is that
19         a fair summary?
20    A.   Yes, sir.
21    Q.   And that's your full-time job?
22    A.    Yes, sir.
23    Q.   Okay.  I believe you.  I just want to make
24         sure there wasn't some other big piece of
25         your job that we're not talking about.

```
1   A.   Well, I mean, I do little special projects
2        here and there, but that is my full-time
3        job.
4   Q.   Okay, got it.  I didn't mean to suggest
5        that that's not a full-time job.  I believe
6        that's a lot of work.  All right.  So the
7        -- the first topic is General Order 112,
8        Topic 3b, which is General Order 112 about
9        discipline, I feel like we have
10       sufficiently addressed that for my purposes
11       through other witnesses.
12            MR. MOST:
13            MacArthur, do you have additional
14       questions on 112 that you would like
15       to ask of the witness?
16            MR. FOLEY:
17            Yeah.  I'm sorry.  My mic was not
18       on.  Yeah, we had questions for
19       followup on policies with IA, but we
20       can either ask now or we can wait
21       until the end.  I don't know if you
22       have a preference, William.
23            MR. MOST:
24            I don't.  If -- can we go off
25       the record for just a moment so we
```

1        can plan it out?

2                MR. FOLEY:

3                Sure.

4                (Off the record.)

5                  EXAMINATION

6    BY MR. FOLEY:

7    Q.   Okay.  Officer Jones, my name is Eric

8         Foley.  I'm one of the attorneys for

9         another group of Plaintiffs in cases called

10        Tennart v. City of Baton Rouge, Smith v.

11        City of Baton Rouge, and Batiste-Swilley v.

12        City of Baton Rouge.  When we had discussed

13        some IA disciplinary policies earlier with

14        Officer Beard, there were a couple of

15        questions I had for him about larger policy

16        issues that he said he would not be able to

17        answer, and so I want to pose a few of

18        those to you, and the first would be

19        whether there were -- whether you're aware

20        of any actions that were -- any remedial

21        actions taken after the July 2016 protests

22        to alter any of the disciplinary policies

23        in effect in the Baton Rouge Police

24        Department?

25    A.   None that I can recall off the top of my

1      head.  I do maintain the policies for the

2      administration.  I actually provided these

3      policies to our legal team for the date to

4      make sure they were valid at the time, and

5      they were not old or I didn't give them one

6      that was updated between now and then.  To

7      my knowledge, I don't recall anything

8      specifically stemming from the protests

9      that would have effected a policy change.

10     That's not to say that a policy change

11     hasn't occurred, because they have.  Our

12     policies are continuously; they're ever

13     living.  They're continuously changing.

14  Q.  Okay, but as -- as it stands today, your

15     testimony would be that you're not aware of

16     any specifically that promulgated in

17     response to the protests?

18  A.  Not -- not specifically from the protests,

19     not from my knowledge.

20  Q.  Okay.  Second question I had had for

21     Officer Beard regarding policies that

22     affect IA, and I'm sorry, by that I mean

23     Internal Affairs, was a question regarding

24     a statement that Myron Daniels had made in

25     the press in response to the Union.  The

```
 1        Union had been alleging that there was a
 2        disparate enforcement in IA against white
 3        officers, and Myron Daniels had responded
 4        that not only was that incorrect, but
 5        actually there was a disparate -- disparate
 6        number of IA investigations against black
 7        officers, and so I'm wondering if there
 8        were any policy changes made in regards to
 9        those concerns or -- or that statement that
10        was made?
11   A.   No, sir, not to my knowledge.
12   Q.   Okay.  I think the rest of my questions
13        will go to separate policies, so I'll turn
14        it back to William.
15              MR. MOST:
16              Okay, and I'll just keep moving
17           unless, Joe or Craig, you want to
18           jump in, let me know.
19                   EXAMINATION
20   BY MR. MOST:
21   Q.   Moving on to General Order 134, which is
22        body armor, I -- I feel like -- are you
23        familiar with that topic, Sergeant?
24   A.   Yes, sir.  I mean, I -- I'm aware we have
25        it.  I've -- I've read it before, yes, sir.
```

```
1              MR. MOST:
2              We covered body armor in Topic
3         8d, and I think the discussion there
4         was sufficient for my purposes.
5              MacArthur, do you have more
6         follow-up questions for this one?
7              MR. FOLEY:
8              I do not, and Jim, I -- I don't
9         know, I don't want to speak for you,
10        but -- or Hannah, but there -- there
11        were none in my -- in my list.
12             MR. CRAIG:
13             Yeah, I -- I agree that we've
14        covered this with other witnesses.
15             MR. MOST:
16             Okay.
17             MS. LOMMERS-JOHNSON:
18             Agreed.
19             MR. MOST:
20             Thank you.
21   BY MR. MOST:
22   Q.   Okay.  Moving on to Topic 3j, which is
23        General Order No. 502/06-2, are you
24        prepared to testify about that topic of
25        that General Order, Sergeant?
```

```
 1   A.   To the best of my ability, yes.
 2   Q.   Okay, and that is -- do you have that --
 3        that General Order in front of you?
 4   A.   Yes, sir.
 5   Q.   Okay.  That is the Baton Rouge Police
 6        Department policy regarding patrol rifles,
 7        correct?
 8   A.   Yes, sir.
 9   Q.   So I -- I reviewed this topic or this
10        policy.  I'm not sure it has a definition
11        of what a patrol rifle is in it.  Could you
12        describe to us what is a patrol rifle as
13        described in this policy.
14   A.   It's just a rifle that the patrol officers
15        would use in the performance of their jobs.
16   Q.   So does that mean any long gun other than a
17        shotgun?
18   A.   They have criterias on what specific patrol
19        rifles they can carry, which is outlined in
20        another policy I believe.
21   Q.   Sure.  So backing up, most patrol officers
22        in BRPD carry a -- a pistol of some kind,
23        correct?
24   A.   Most -- every officer in un -- in uniform
25        and with the police department is issued a
```

1    departmental -- is issued a departmental

2    pistol.  Patrol rifles are only issued to

3    those officers who will go qualify with

4    those particular weapons after they attend

5    the training course.

6    Q.   Okay, and in -- in Section 1 of this --

7    okay, and so a patrol rifle would be a gun

8    that is longer than a pistol and is not a

9    shotgun that's issued to an officer who

10   qualifies, agreed?

11   A.   Correct.

12   Q.   Okay, and Section 1 of this policy sets

13   restrictions on the deployment of patrol

14   rifles, agreed?

15   A.   Yes, sir.

16   Q.   Okay.  So officers should not be walking

17   around without cause pointing patrol rifles

18   at people?  It should be under these

19   specific circumstances detailed in this

20   policy, agreed?

21   A.   It looks like it depends on the criteria of

22   the situation they're deployed in as to

23   whether they can present that weapon or

24   not.

25   Q.   Right.  So there's specified criteria for

1      the situations in which it's permissible to

2      deploy a patrol rifle, agreed?

3   A.   Right, correct.

4   Q.   Okay.  Such as when a suspect is believed

5      to be wearing protective armor, has

6      immediate access to a weapon which can

7      cause death or great bodily injury, where's

8      in a distant or fortified location,

9      correct?

10  A.   Yes, and engaged in activities or

11     situations that have a high potential for

12     suspects who may be armed -- may be armed

13     with dangerous weapon such as bank

14     robberies, felony stops, weapons calls,

15     yes.

16  Q.   Okay.  So the patrol rifle is restricted to

17     sort of high intensity, high risk scenarios

18     in which a long gun is -- is appropriate,

19     agreed?

20  A.   Yes.

21  Q.   Okay.  I'm just going to look at a couple

22     of examples.  I'm pulling up "Exhibit Y,"

23     which is described as Savage 1.JPG.  Do --

24     do you see the -- officer here in the

25     background?  This is a Baton Rouge Police

```
 1        Department Officer?
 2   A.   I guess it is.  I can't quite see the
 3        patch.  The other officers are.  I can see
 4        their patches.
 5   Q.   Okay, and so this would be a patrol rifle
 6        that this officer in the background is --
 7        is carrying?
 8   A.   I believe so unless he's a member of SRT,
 9        which I'm not sure about that either.
10   Q.   Sorry.  I -- I don't think I understand.
11        You're saying it's a --
12   A.   SR -- SRT has their own particular set of
13        policies that they utilize for their
14        purposes, kind of a little bit different
15        guidelines that they use based on whatever
16        situation they're deployed in.  I'm not
17        particularly sure if that person is a
18        member of SRT because I can't identify him.
19   Q.   I see.  So a member of SRT, their
20        deployment of a -- of a -- of a patrol
21        rifle would not fall under this policy
22        we're look at together?
23   A.   Not -- potentially not necessarily,
24        depending on what their mission is.  I
25        don't know.
```

1    Q.   Okay, but this -- their deployment of

2         patrol rifles must be somewhat similar in

3         that it's -- it's restricted to

4         circumstances, high-intensity, high-risk

5         circumstances like the ones we've

6         described, agreed?

7    A.   Yes.

8    Q.   Okay.  I'm going to pull up another

9         document.  This is going to be "Exhibit A"

10        at -- at 24.  I'll pull it up for you.  Do

11        you see this -- this photo of a Baton Rouge

12        Police Officer on the left?

13   A.   Yes, sir.

14   Q.   The weapon that she is holding, is that a

15        patrol rifle?

16   A.   Yes, sir.

17   Q.   Okay, and it -- it appears that she is

18        pointing it at a person holding a -- a

19        camera?

20   A.   The screen is kind of broke.  Maybe you can

21        slide it over a little bit.

22   Q.   Yeah.

23   A.   Yeah, it looks -- that's what it appears.

24        It looks to be a reporter possibly.

25   Q.   Okay.  So it appears to me that this

1       deployment of a patrol rifle would not

2       comply with -- with Policy 502/06-2,

3       agreed?

4  A.   It would appear that way.

5  Q.   And by "deployed," we mean more than just

6       -- deployed does not mean just pointing it

7       at someone.  It means taking the gun to a

8       scenario, agreed?

9  A.   I am not sure because I did not -- have not

10      been through patrol rifle school.  I've

11      never attended one and do not know what

12      they teach in that school.  I don't have a

13      patrol rifle.

14  Q.   Okay.

15  A.   So I couldn't tell you what they teach them

16      as far as deployment purposes or what other

17      than the general criteria that's listed in

18      the policy.  I -- I don't have those

19      answers, because I've never been to one,

20      and I don't teach it.

21          MR. MOST:

22          Okay.  That's my questions for

23        Topic 3j, although there may be

24        fellow-up questions based on other

25        questioning.

```
 1                    MacArthur, would you like to ask
 2               questions about this General Order?
 3                    MR. CRAIG:
 4                    No, we -- we don't have questions
 5               on that order besides the ones
 6               you've asked.  Thank you.
 7                    MR. MOST:
 8                    Okay.  Greg or Joe, any follow-up
 9               questions there?
10                         EXAMINATION
11     BY MR. SCOTT:
12     Q.   Sergeant Jones, have you ever been on SRT?
13     A.   No, sir.
14     Q.   So if you know -- I don't know if you know,
15          but does SRT commonly get detailed for
16          counter sniper security?
17     A.   I have no idea.
18                    MR. SCOTT:
19                    And William, would you put your
20               photograph back up from "Exhibit A"
21               at Page 24.
22                    MR. MOST:
23                    Certainly.  Stand by.
24                    MR. SCOTT:
25                    Thank you.
```

```
 1    BY MR. SCOTT:
 2    Q.    Sergeant Jones, we've seen this photograph
 3          before.  My question is, can you tell what
 4          her site picture is from this angle?
 5    A.    No, sir.
 6    Q.    Those are all my questions.
 7                    MR. MOST:
 8                    All right.  Well, then unless
 9              anyone has any followup, I'll --
10              let's go off the record.  I'll pause
11              recording.
12                  (Break in proceedings.)
13                      EXAMINATION
14    BY MR. FOLEY:
15    Q.    Okay.  Thank you, Officer Jones, I just had
16          a few questions for you about the bias and
17          discrimination policy kind of similar to
18          the -- the questions I had for you on -- on
19          the other policy.  Just one moment here.
20          Okay.  So in the first of our 30(b)(6)
21          depositions, I believe I had asked, it
22          might have been Sergeant Beard or -- or one
23          of the other deponents who had been
24          designated a question about policy changes
25          in response to criticisms by then Chief
```

1      White, and so my question had been that in

2      -- in our Complaint, we had included an

3      allegation regarding a news report covering

4      comments that Chief White had made that,

5      quote, "at least ten percent of the

6      department's officers failed to exercise

7      basic levels of professionalism," and that

8      it has become so ingrained in the minds of

9      some officers that they, quote, "believe

10     that everybody that they come across or

11     most people they come across with that

12     color of skin is probably a criminal," and

13     so the question I had had for the previous

14     designee was whether there had been any

15     policy changes or discussions for -- or

16     remedial action arising from -- from those

17     comments.

18  A.  "Remedial actions," you mean disciplinary

19     action or you're speaking of remedial

20     training?

21  Q.  I was thinking specifically whether any --

22     there had been any amendments or changes to

23     policies in reaction to those comments.

24  A.  Not that I'm aware of.  That would be

25     something I would -- I would have to

```
 1            research, basically go pull that section of
 2            files to see, because this particular
 3            policy only gives me effective date and
 4            whenever it was revised, a revision date of
 5            4-26-2004.  I can't speak off the top of my
 6            head.  Our policy manual is 951 pages.
 7    Q.   I understand.
 8    A.    It's a large item to try to navigate and
 9            try to manage.  I just -- I can't remember
10            them all.  I remember some, but I can't
11            remember them all.  I could research that
12            and provide it to you.
13    Q.    Well, let -- let me -- I'm sorry.  Let me
14            ask a couple of questions.  I might be able
15            to --
16                    MR. SCOTT:
17                    I'm sorry.  I think you can find
18                the answer in the document itself is
19                what I'm telling you, Eric.
20    BY MR. FOLEY:
21    Q.    Okay.  Just to -- to be clear, at that time
22            when Chief White was then Chief and -- and
23            these comments were made, were you in your
24            current position then?
25    A.    Yes, sir.  I was Accreditation Manager at
```

1       that time, yes.

2   Q.   Okay, and were there any internal reviews

3        or -- or discussions or reports of -- of

4        those comments or of reforms that Chief

5        White wanted to see?

6   A.   None were had with me.  Whether he had

7        those discussions with his administration,

8        I just work for him.  I don't work in his

9        office.  To my knowledge nothing was ever

10       brought to my office --

11  Q.   Okay.

12  A.   -- about revisions.

13  Q.   And if there were any revisions that he

14       made to the policy, those would have gone

15       -- ultimately gone through you at some

16       point?

17  A.   Correct, yes, sir, because pretty much the

18       Chief and them dictate or tell me what they

19       want reviewed or what they want changed.

20       It goes through a little process, goes to

21       Legal, blah, blah, blah, and then I make

22       sure it gets incorporated in the policy

23       manual, which is published to the rest of

24       the policeman.

25  Q.   Okay, and then so it's to your knowledge

120

1          there weren't any such changes to 108 that

2          arose at that time?

3     A.   Not that I can recall.  That would have

4          been back in -- I don't even remember when

5          he was Chief.

6                    MR. SCOTT:

7                    If I told you 2013 or

8               thereabouts?

9                    THE WITNESS:

10                   Yeah, that's probably about

11              right.

12                   MR. SCOTT:

13                   And what was -- that is the

14              version of the policy that was in

15              effect in 2016?

16                   THE WITNESS:

17                   Correct.  This -- this is

18              probably -- this is the version that

19              I was presented to the legal team

20              because they asked me for all these

21              different versions.  I'm pretty sure

22              it is.  There would have been no

23              changes from '13 to '16.

24                   MR. SCOTT:

25                   Because the last change noted on

1          this version would have been --

2               THE WITNESS:

3               Would have been 04, but to my

4          knowledge, I don't remember any.

5     BY MR. FOLEY:

6     Q.   Okay.  Next question, similar, I imagine it

7          will be a not wildly different answer, but

8          I'll ask because it was hanging out from

9          the last deposition as well, but in 2017 a

10         community group called Together Baton Rouge

11         issued a report analyzing data from 2011 to

12         2016, and their conclusions of the report

13         were that there had been disproportionate

14         enforcement of drug laws in zip codes that

15         were majority black and that the areas that

16         were, you know, 90-percent black, twice as

17         poor as -- as white areas had higher

18         enforcement rates, and so my question is

19         that, you know, in that period of 2011 to

20         2016, do you recall any discussions of --

21         of changes, proposed changes to 108 to kind

22         of deal with these allegations of

23         disproportionate enforcement?

24    A.   No, sir.

25    Q.   Okay.  All right.  I think that's all I

```
 1          have on 108.  And then I believe we had a
 2          follow-up question on -- give me just one
 3          moment so I can direct you to the proper
 4          policy.
 5                    MR. SCOTT:
 6                    Eric?
 7                    MR. FOLEY:
 8                    Yes.
 9                    MR. SCOTT:
10                    Can I follow up on your --
11                    MR. FOLEY:
12                    Oh, sorry, yes, yes, of course.
13                         EXAMINATION
14     BY MR. SCOTT:
15     Q.   In general, administration doesn't come to
16          you to change policy until the
17          administration has made up its mind that
18          there's a policy change they want?
19     A.   No, not necessarily.  Sometimes they --
20          they have -- they'll come up with, hey, you
21          might want to look at this; we had the
22          Policy Review Committee look at this, give
23          you some suggestions, what does the
24          accreditation standard say?  They'll come
25          to me with stuff like that, and I'll review
```

1          the research to the accreditation

2          standards; we'll have discussions with

3          Policy Review Committee from time to time,

4          because as a whole, the Policy Review

5          Committee tries to review the whole policy

6          yearly, which is very hard to do, but when

7          we meet, we try to review as much as

8          possible we can to see if there's any

9          changes because every day laws change;

10         every day things is fluid, and, you know,

11         unlike anything else, every now and then we

12         miss something, hey, that's out of date,

13         let's get rid of it; let's modify it, but

14         no, they don't wholesale say this is what

15         we want to do, change it.  Sometimes that

16         occurs but not wholesale.

17    Q.   Okay.  I just wanted to figure that one

18         out.

19                   MR. SCOTT:

20                   Eric, you're still on mute.

21                   MR. FOLEY:

22                   Thank you.  Sorry about that.

23                   FURTHER EXAMINATION

24    BY MR. FOLEY:

25    Q.   Thank you.  Sorry about that.  My remaining

```
 1          question had to deal with use of force, and
 2          a question specifically on discussions
 3          regarding policy changes.  I'm going to
 4          share a document on the screen.  Hole on
 5          just one moment.
 6                    MR. FOLEY:
 7                    Oh, actually, William or whoever
 8               is currently host, could you allow
 9               me to share a screen.  Thank you.
10   BY MR. FOLEY:
11   Q.   Okay.  Officer Jones, I have up on screen
12        -- here, let me adjust this so it's a
13        little bit more visible, but we were
14        produced in discovery a 142-page document
15        here of use of force reporting, statistical
16        reporting from the Crime statisticians, and
17        I had raised the question in an earlier
18        deposition with I believe Officer T.J.
19        Morse about the conclusions of -- of this
20        2016 report, and so I'm going to advance to
21        I believe Page 6 -- sorry, not Page 6.
22        Where are we?  The last page of the 2016
23        report, which is Page 14.  Let me increase
24        the size here, and it has a section here of
25        conclusions of the study, and about halfway
```

1    down it notes that "The current level of

2    reporting of force used does not appear to

3    be consistent with studies prior to 2012.

4    The number of UF" -- "UOF reports are

5    declining, but unable to pinpoint reason.

6    The December ratio of UFO to CAD is at the

7    lower limit.  This is an indication of a

8    system problem.  The issue with UOF numbers

9    may be the result of failing to get the

10   forms for data entry.  No system exists to

11   ensure a report eventually is entered into

12   the system.  A report can go off track at

13   any point, and there is no way to determine

14   where it is in the process.  A failure to

15   report the use of force by officers, a

16   change to the system resulting in BRPD

17   Officers using force with a lower frequency

18   or possible underreporting of 'hands on'

19   force."  So my question for you would be,

20   you know, in your role as kind of

21   maintaining the policies and implementing

22   amendments, specifically amendments to the

23   policies, do you recall ever receiving any

24   of these statistical analyses by the

25   criminal statisticians about use of force

```
1        reports and were there -- was there any
2        discussion about altering policies to
3        address some of these concerns that they
4        pinpointed here?
5   A.   Yeah, I get that annual report every after
6        it goes to the Chief.  It's an
7        accreditation document that I use to prove
8        that we are doing use of force analysis
9        yearly to make sure things are on track.  I
10       don't recall any specific changes being
11       related from her report that she said to
12       reflect into the policy itself.
13  Q.   Okay.  Were there any, you know,
14       discussions that you are aware of regarding
15       --
16  A.   They wouldn't --
17  Q.   -- these conclusions?
18  A.   They wouldn't have been had on my end.  If
19       it would have been the tracking of it and
20       stuff like that, that's done on a different
21       level, because the way Use of Force reports
22       come in, they -- they don't come through my
23       office.  They go to multiple different
24       people.  Then they get signed off on, and
25       then go give them to the data entry people,
```

```
 1        and that's what they were worried about
 2        more than anything at the time that they
 3        were, I guess, losing some of the
 4        information and not getting all of it is
 5        what it appears.
 6   Q.   And so did you -- well, so I understand
 7        your testimony being that you do not
 8        personally receive any of the Use of Force
 9        Reports --
10   A.   Correct.
11   Q.   -- or not?  Okay, but you're unaware of any
12        proposals to change policies in order to
13        address any of these issues that were
14        raised by this report I have on the screen
15        here?
16   A.   No, sir.
17                  MR. FOLEY:
18                  Okay.  I just want to mark that
19             as an exhibit.  I believe -- I don't
20             know that it is actually in the kind
21             of unified deposition -- deposition
22             exhibits, although it was used in
23             Officer Morse's.  So I guess we
24             could just mark this as -- as 1 for
25             our purposes right now, unless 1 has
```

1          already been taken today.  I believe
2          everything else has already been in
3          evidence we've discussed.
4               So allow me one moment.  I am
5          going to go off screen just consult
6          with Mr. Craig and Ms.
7          Lommers-Johnson and see if they have
8          additional questions.
9               (Break in proceedings.)
10          MR. FOLEY:
11               Okay.  Thank you.  We don't have
12          any further questions, so I'll
13          tender back to Joe if he has
14          anything else.
15          MR. SCOTT:
16               No, sir, nothing further over
17          here.
18          MR. MOST:
19               Let's go off the record.
20          (Whereupon, the taking of the
21     witnesses' testimony was concluded.)
22
23
24
25

1                    WITNESS' CERTIFICATE

2

3            I, SERGEANT STEWART TATE, have read or

4     have had the foregoing testimony read to me

5     pursuant to Rule 30(e) of the Federal Rules of

6     Civil Procedure and/or Article 1445 of the

7     Louisiana Code of Civil Procedure and do hereby

8     certify that to the best of my ability and

9     understanding, it is a true and correction

10    transcription of my testimony.

11

12

13    Please check one:

14

15    _____Without corrections

16

      _____With correction (see errata sheet)

17

18

19    _____    _____

      WITNESS' SIGNATURE                   DATE

20

21

22

23

24

25

1              WITNESS' CERTIFICATE

2

3          I, SERGEANT ORSCINI BEARD, II, have

4    read or have had the foregoing testimony read to

5    me pursuant to Rule 30(e) of the Federal Rules

6    of Civil Procedure and/or Article 1445 of the

7    Louisiana Code of Civil Procedure and do hereby

8    certify that to the best of my ability and

9    understanding, it is a true and correction

10   transcription of my testimony.

11

12

13   Please check one:

14

15   _____Without corrections

16

17   _____With correction (see errata sheet)

18

19   _____    _____

20   WITNESS' SIGNATURE                   DATE

21

22

23

24

25

1          WITNESS' CERTIFICATE

2

3          I, SERGEANT HALLIE BRITT JONES, have

4   read or have had the foregoing testimony read to

5   me pursuant to Rule 30(e) of the Federal Rules

6   of Civil Procedure and/or Article 1445 of the

7   Louisiana Code of Civil Procedure and do hereby

8   certify that to the best of my ability and

9   understanding, it is a true and correction

10  transcription of my testimony.

11

12

13  Please check one:

14

15  _____Without corrections

16

17  _____With correction (see errata sheet)

18

19  _____        _____

    WITNESS' SIGNATURE                        DATE

20

21

22

23

24

25

```
 1              C E R T I F I C A T E
 2              THIS CERTIFICATION IS VALID ONLY FOR
    A TRANSCRIPT ACCOMPANIED BY MY ORIGINAL
 3  SIGNATURE AND ORIGINAL REQUIRED SEAL ON THIS
    PAGE.
 4
                I, RAYNEL E. SCHULE, Certified Court
 5  Reporter, #77005, in good standing, in and for
    the State of Louisiana, as the officer before
 6  whom this testimony was taken, do hereby certify
    that SERGEANT STEWART TATE, SERGEANT ORSCINI
 7  BEARD, and SERGEANT HALLIE BRITT JONES, after
    having been duly sworn by me upon authority of
 8  R.S. 37:2554, did testify as hereinbefore set
    forth in the foregoing 128 pages; that this
 9  testimony was reported by me in stenotype
    reporting method, was prepared and transcribed
10  by me or under my personal direction and
    supervision, and is a true and correct
11  transcript to the best of my ability and
    understanding; that the transcript has been
12  prepared in compliance with transcript format
    guidelines required by statute or by rules of
13  the Board, that I have acted in compliance with
    the prohibition on contractual relationships, as
14  defined by Louisiana Code of Civil Procedure
    Article 1434 and in rules and advisory opinions
15  of the Board; that I am not of counsel, not
    related to counsel or to the parties herein, nor
16  am I otherwise interested in the outcome of this
    matter.
17
18
19  _____   _____
    Date                    Raynel E. Schule, CSR
20                          Certified Shorthand Reporter
                            State of Louisiana
21
22
23
24
25
```