UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


BLAIR IMANI, et al              )
                                )
          Plaintiffs,           )
     V.                         )
                                ) DOCKET NO.
CITY OF BATON ROUGE, et al      ) 17-cv-00439-JWD-EWD
                                )
          Defendants.           )
                                )


DEPOSITION OF

IRA ROBERTS

appearing remotely via Zoom videoconference from
Baton Rouge, Louisiana taken in connection with the
following captioned cause, pursuant to the
following stipulations before Brenda R. Breaux,
Registered Professional Reporter, Certified Court
Reporter for the State of Louisiana, appearing
remotely from Covington, Louisiana on August 11,
2021, beginning at 10:32 a.m.

```
1                    REMOTE APPEARANCES
2     For the Plaintiffs
          (Imani v. City of Baton Rouge):
3
      MOST  & ASSOCIATES
4     (BY:  WILLIAM B. MOST, ESQ.)
      williammost@gmail.com
5     PHONE:  (504) 509-5023
      (BY:  DAVID J. LANSER, ESQ.)
6     david.lanser@gmail.com
      PHONE:  (504) 533-4521
7     201 St. Charles Avenue
      Suite 114 #101
8     New Orleans, Louisiana 70170
9
      For the Plaintiffs
10          (Smith v. City of Baton Rouge,
            Batiste-Swilley v. City of Baton Rouge, and
11          Tennart v. City of Baton Rouge):
12    RODERICK & SOLANGE MacARTHUR JUSTICE CENTER
      (BY:  JAMES W. CRAIG, ESQ.)
13    jim.craig@macarthurjustice.org
      4400 S. Carrollton Avenue
14    New Orleans, Louisiana 70119
      PHONE:  (504) 620-2259
15
16    For City/Parish of Baton Rouge and Baton Rouge City
      Police Department Officers:
17
      OFFICE OF THE EAST BATON ROUGE PARISH ATTORNEY
18    (BY:  JOSEPH K. SCOTT, III, ESQ.)
      joseph@josephscott.com
19    222 St. Louis Street
      #143
20    Baton Rouge, Louisiana 70802
      PHONE:  (225) 389-3114
21
22
23
24
25
```

```
1              REMOTE APPEARANCES (CONTINUED)

2   For Louisiana State Police and Individual State
        Police Troopers:
3
    BURGLASS & TANKERSLEY, LLC
4   (BY:  GREGORY C. FAHRENHOLT, ESQ.)
    gfahrenholt@burglass.com
5   5213 Airline Highway
    Metairie, Louisiana 70001
6   PHONE:  (504) 836-0408

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
1              INDEX
2    CAPTION....................1
3    APPEARANCES...............2-3
4    AGREEMENT OF COUNSEL.......6
5
6    EXAMINATION OF IRA ROBERTS
7    BY WILLIAM MOST...........7, 47, 50
8    BY JAMES CRAIG............37
9    BY JOSEPH SCOTT...........49
10
11   WITNESS' CERTIFICATE.......54
12   REPORTER'S CERTIFICATE.....55
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                          EXHIBITS

2                      (NONE OFFERED.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

S T I P U L A T I O N

It is stipulated by and among Counsel that the Zoom videoconference deposition of IRA ROBERTS is being taken under the Federal Rules of Civil Procedure for all purposes permitted under the law.

The formalities of reading and signing are not waived.

The formalities of sealing, certification and filing are hereby waived.  The party responsible for services of the discovery material shall retain the original.

All objections, except those as to the form of the questions and/or the responsiveness of the answers, are reserved until the time of the trial of this cause.

*   *   *   *   *

Brenda R. Breaux, Certified Court Reporter, Registered Professional Reporter, in and for the State of Louisiana, officiated in administering the oath to the witness.

```
 1                    IRA ROBERTS,
 2            after having been first duly sworn,
 3    testified on his oath as follows:
 4                  P R O C E E D I N G S
 5            MR. MOST:
 6                And, you know, I'll say that for
 7        plaintiffs, we agree to the stipulations from
 8        this mornings previous deposition.  And if
 9        anyone disagrees, just please speak now or
10        forever hold your peace; otherwise we'll assume
11        that we're continuing with the same
12        stipulation.
13                And, Joe, can we stipulate that the --
14        Mr. Roberts was properly noticed and the court
15        reporter is duly qualified?
16            MR. SCOTT:
17            We'll stipulate.
18            MR. MOST:
19            Okay.
20    BY MR. MOST:
21        Q.    All right.  Good morning, Officer.
22        A.    Good morning.
23        Q.    My name is William Most.  I am an
24    attorney, and I'm an attorney for -- today for the
25    plaintiffs in the Imani case, which is one of the
```

1   cases about the 2016 protests.  And we appreciate
2   you being here this morning.
3          Could you give us your name and current
4   rank, please.
5          A.    Sergeant Ira Roberts, Baton Rouge Police
6   Department, auto theft commander.
7          Q.    What was the word before commander?
8          A.    Auto theft.
9          Q.    You might want to get a little closer to
10  the mic because I'm not going to ask you to take
11  off your mask, of course, because of safety
12  precautions but --
13         A.    Right.
14              MR. SCOTT:
15              Maybe we'll switch you in this chair.
16              THE WITNESS:
17              This any better?
18  BY MR. MOST:
19         Q.    I think so.  So, sir, what was the word
20  before commander?
21         A.    Auto theft.
22         Q.    Auto theft.  I gotcha.  Okay.  You know,
23  you may have to articulate more than an average
24  person today because -- because of the mask.  But
25  we'll just work with it as we can.

1      A.    Yeah, we're going on two years.  I'm
2  sort of used to that by now.
3      Q.    Yeah.  And would you like me to call you
4  Commander Roberts or officer or Mr., do you have a
5  preference?
6      A.    Whatever works for you as long as it's
7  not a fowl word, we're good.
8      Q.    Thank you.  Officer have -- have you
9  ever given a deposition before?
10     A.    I have.
11     Q.    Approximately how many depositions have
12  you given?
13     A.    Several.  It's several.  It's been some
14  time since I've done one, but I've done several
15  times.  I'm not sure of the number.
16     Q.    Were any of them civil rights cases
17  involving the conduct of Baton Rouge Police
18  Officers?
19     A.    No.
20     Q.    Okay.  Were you a party to any of --
21  like, were you a plaintiff or a defendant or suing
22  or being sued in any of those depositions?
23     A.    No.
24     Q.    Okay.  But you, having done some
25  depositions, you understood that you're under oath

1  here today?

2      A.    Yes.

3      Q.    And that your answers here today have

4  the same force as if we were in a courtroom with a

5  judge and jury?

6      A.    Correct.

7      Q.    Is there anything today, any

8  medications, illness, or anything else that would

9  prevent you from giving me your full attention,

10  truthful, and complete answers?

11      A.    No.

12      Q.    Okay.  If at any point -- I -- I don't

13  expect this to be a super long deposition, but if

14  at any point you need to take a break, please feel

15  free to notify Mr. Scott or myself and we'll take a

16  break; however, I will warn you that I -- I will

17  ask you after any break who you talked to, what you

18  talked about, even if that person is your attorney;

19  is that understood?

20      A.    Yes.

21      Q.    Okay.  And, Mr. Roberts, one thing you

22  are already doing well is waiting for me to finish

23  my questions before answering.  And I will do my

24  best to give you the same courtesy of waiting for

25  you to complete your answers before I ask the next

1    question, that makes it easier on the court

2    reporter.

3         A.    Thank you.

4         Q.    Yeah.  One thing I would ask of you is

5    that if I ask a question that is not clear or you

6    don't understand it, will you agree to tell me that

7    it's not clear, you don't understand rather than

8    trying to answer?

9         A.    Certainly.

10        Q.    Okay.  And this is a Zoom deposition so

11   we can't see the whole room.  Is there anyone

12   besides Mr. Scott in the room there with you?

13        A.    Not that I can tell.

14        Q.    Okay.  And also because this is a Zoom

15   conversation -- deposition, we won't be able to see

16   if someone tries to pass you a note or do hand

17   signals to you so would you --

18        A.    Put my hands where you can see them.

19        Q.    I'm sorry.  What was that?

20        A.    I'll keep my hands where you can see

21   them.

22        Q.    Sure.  I'm more concerned about someone

23   else doing hand signals to you.  So will you agree

24   to tell us if anyone tries to communicate with you

25   or signal to you in any way?

```
 1        A.     Certainly.

 2        Q.     Okay.  Thank you.

 3               Mr. Roberts, do you know what case

 4    you're are here for today or cases?

 5        A.     Not specifically; no.

 6        Q.     Okay.  Do you understand you're here as

 7    a witness today for a range of cases related to the

 8    2016 -- July, 2016 protests?

 9        A.     Yes.

10        Q.     Okay.  And did you do anything to

11    prepare for this deposition?

12        A.     No.

13        Q.     Okay.  Did you look at any documents to

14    get yourself ready to testify today?

15        A.     No.

16        Q.     Okay.  Did you take any notes or look

17    back at anything from your past notes or records to

18    refresh your recollection about anything?

19        A.     No.

20        Q.     Okay.  And are there any documents on

21    the table in front of you for you to refer to?

22        A.     There's papers here.  I don't have any

23    idea what they are.

24               THE WITNESS:

25               I'm sorry.  What was your name?
```

1          MR. SCOTT:

2          Joe Scott.

3          THE WITNESS:

4          Mr. Scott has a bunch of stuff.  You can

5     ask him what they are maybe.

6          MR. SCOTT:

7          I have some documents that I suspect

8     you're going to want to review with him but

9     they're on my side of the table at the moment.

10          MR. MOST:

11          Okay.  Fair enough.

12 BY MR. MOST:

13     Q.    And Officer Roberts, could you give us

14 just a very short version of your educational and

15 professional background.

16     A.    Graduated Istrouma High School.  Also

17 graduate of Southern University with a bachelor's

18 degree in technology.  I've been with the police

19 department for 23 years now.  I am Commander for

20 the auto theft division for the department at this

21 time.

22     Q.    So the 23 years as a police officer, has

23 that all been with the Baton Rouge Police

24 Department?

25     A.    It has.

1    Q.    Have you worked for any other law

2  enforcement agencies?

3    A.    Briefly for the East Baton Rouge

4  Sheriff's Office prior to joining the Baton Rouge

5  Police Department.

6    Q.    Okay.  And what was your rank and job

7  assignment in July of 2016, if you recall?

8    A.    I'm not sure of the rank, but -- and

9  actually, I'm not sure.  I think I was in the auto

10  theft division but I'm not sure.  I can't say for

11  sure.

12    Q.    Okay.  Do you recall generally the July

13  2016 protest in Baton Rouge?

14    A.    Vaguely, but not nothing specific.

15    Q.    Okay.  But you recall that there were

16  protests related to the death of Alton Sterling in

17  Baton Rouge in July of 2016?

18    A.    Certainly.

19    Q.    Yeah.  Do you remember Sunday, July

20  10th, 2016 there were protesters assembled at East

21  and France Boulevard, do you recall that event?

22    A.    No, sir.

23    Q.    Okay.  Do you recall anything

24  specifically about July 10th, 2016?

25    A.    No, sir.

1    Q.    Okay.  Maybe I can pull up a -- I'm

2    going to pull up Exhibit A at page 34.

3            Do -- do you see this?  I'll represent

4    to you that the -- the sign here says, East and

5    France.  So this is the corner of East and France.

6            Does this picture or do -- do you

7    remember these events where they were officers

8    arresting people at this corner going onto the

9    porch of this house, et cetera?

10    A.    No, sir.

11    Q.    Okay.  Were you deployed as an officer

12    to any of the July, 2016 protests?

13    A.    I was working.  Of course, where I

14    was -- where I was sent, I'm not sure the exact

15    location.

16    Q.    Okay.  So -- so you were one of the

17    officers at -- at least some of the protests; is

18    that fair to say?

19    A.    No, I really -- I mean, I can't say

20    exactly where I was at, you know, whatever time,

21    you know, it was -- it was a very fluid situation,

22    of course, we just simply was going to wherever we

23    was sent.  So whether I was -- I don't recall

24    whether I was actually out with the protest or

25    whether I was out there doing security or anything.

1    I don't really recall.  It's been quite some time.

2        Q.    Sure.  So do you recall if you were

3    doing anything as an officer related to the July,

4    2016 protests?

5        A.    Yeah, like I just stated, of course, we

6    did -- having to do -- do various different things.

7    I was -- but what specifically I had to go do on,

8    you know, during this period of time, it would be

9    tough to say.  I just don't -- don't recall --

10        Q.    Yeah.

11        A.    -- at the moment.

12        Q.    I understand.  And -- and I can really

13    only ask you for your recollection.  You remember

14    what you remember.  I get that.

15              You know, some other officers have

16    testified that there was, on July 10th, 2016, there

17    was sort of a processing area set up on Government

18    Street where protesters, after they've been

19    arrested and put in cuffs they would be brought to

20    a processing area on the side of Government Street

21    and paperwork would be done and then they'd be

22    loaded into vans and taken to the parish prison.

23              Does that ring a bell to you?

24        A.    On the side of the street?  Yeah, I

25    can't say that it does; no.

1        Q.    Okay.  Do you recall notarizing

2   affidavits of probable cause during the July, 2016

3   protests?

4        A.    Yes.

5        Q.    What -- what was the context of you --

6   you doing that?

7        A.    Man, it's -- it's a vague memory, but as

8   I recall, I signed off on some probable cause

9   affidavits there at headquarters at some point --

10       Q.    Okay.

11       A.    -- during the -- during the protest.

12       Q.    Okay.  So do you have an office at

13  headquarters or where -- where would this have

14  happened?

15       A.    No, it would have happened near the

16  training academy area on the first floor of -- of

17  the headquarters building there at 9000 Avenue.

18       Q.    Okay.  And did someone bring you a stack

19  of affidavits of probable cause to approve or did

20  officers bring them to you one by one?  How did it

21  work?

22       A.    I couldn't -- I couldn't -- couldn't

23  say.  I remember I signed off on some.  I -- I

24  don't know how -- how they came in or who brought

25  them or what the context was that -- that -- that

1    it was in, but I do remember that I signed off on
2    some at some point during that -- that -- that
3    time.
4        Q.    Okay.  And what does it mean when you
5    say you signed off on an affidavit of probable
6    cause?  What does that mean?
7        A.    That -- it means that I signed as an
8    ex-officio notary and notarized the -- the -- the
9    probable cause affidavit.
10        Q.    Okay.  And -- and not everyone may know
11    what it means to notarize a -- an affidavit.  What
12    does it mean to -- to notarize an affidavit?
13        A.    That's part of what we have to do in --
14    in arrest paperwork.  We take a quick ex-officio
15    notary class that allows us to do so and that's
16    just part of one of the requirements of our
17    paperwork where -- where probable cause affidavits
18    are concerned.
19        Q.    Right.  But I mean when -- when you
20    notarize a probable cause affidavit, are -- are you
21    swearing that the contents of it are true?
22        A.    Yes.  Yes, theoretically.
23        Q.    Okay.
24        A.    To the best of my knowledge.
25        Q.    Okay.  And when you notarize a probable

1    cause affidavit, are you watching -- so there's --

2    there's the affiant line on a probable cause

3    affidavit, right?

4         A.    Right.

5         Q.    Okay.  And -- and -- and a Baton Rouge

6    Police Officer signs the affiant line, right?

7         A.    Sure, yes.

8         Q.    And -- and do you watch them do that?

9    Do they do that physically in front of you or they

10   signed it and then later you notarized it?

11        A.    If, in fact, I don't see them actually

12   physically sign it, then I have to check with them

13   at the time that they, you know, present it and

14   make sure that, you know, what they're presenting

15   me is, you know, fact to the best of their

16   knowledge.

17        Q.    Okay.  So -- so sometimes you notarize a

18   document when the affiant didn't sign it right in

19   front of you?

20        A.    I have, yes.

21        Q.    Okay.  And in those circumstances, you

22   have to track down the officer and ask them:  Did

23   you sign this?

24        A.    Typically the officer will be the

25   one that -- the officer that asked me would be the

```
1    one who brings it to me, typically.
2         Q.    Okay.  And is that the way it works for
3    these particular affidavits?
4         A.    There again, I -- I -- I couldn't tell
5    you because I don't know who brought what to me.
6    You know, it would be tough to say.
7         Q.    Okay.
8         A.    You know, with the number of people,
9    arrests and paperwork that was being brought
10   through, you know, I -- I couldn't tell you.  I
11   couldn't tell you.
12        Q.    So you don't know whether the protester
13   affidavits in July of 2016 whether the officer
14   signed it in front of you or maybe didn't sign it
15   in front of you, you -- you can't recall?
16        A.    Right.
17        Q.    But it sounds like your testimony is
18   because of the volume of work that was going on, it
19   may be that you notarized some signatures without
20   checking to see if that officer actually signed it;
21   is that true?
22        A.    I -- I just don't know.  I guess you're
23   asking me whether, you know, that may or may not
24   have happened.  I'm saying that I don't recall
25   exactly how it happened.
```

1          Q.     Okay.  And when you notarize a document,

2     do you keep a log like some sort of record book

3     of --

4          A.     I do not.

5          Q.     -- having notarized it?

6          A.     No, sir.

7          Q.     Okay.  And when an officer brings you

8     a affidavit to notarize -- and do you know every

9     officer by sight in the Baton Rouge Police

10    Department?

11         A.     No, sir.

12         Q.     So how -- how do you determine whether

13    the officer that brings it to you is the officer

14    who's signing it?

15         A.     Typically I -- usually I'm dealing with

16    people who I work with regularly bring them to me.

17    Officers who typically bring those affidavits to

18    their -- their first line supervisors to get

19    signed.  Their supervisor will typically help them

20    and I would help my people or use these people to

21    get them because of the documents need to be

22    notarized.

23         Q.     Okay.  And Mr. -- Officer Roberts, I'm

24    -- I'm having -- I'm okay understanding you.

25              MR. MOST:

```
 1                  Ms. Breaux, are -- are you able to
 2        understand --
 3                  COURT REPORTER:
 4                  I'm having some --
 5                  MR. MOST:
 6                  -- Mr. Roberts?
 7                  COURT REPORTER:
 8                  -- I'm having some problems.
 9                  Maybe, sir, if you could speak slower
10        because sometimes the words kind of get jumbled
11        in with the masks.
12                  THE WITNESS:
13                  Yes, ma'am.
14                  COURT REPORTER:
15                  And maybe a little bit louder, if you
16        can.
17                  THE WITNESS:
18                  Oh, I can get as loud as you like.  I
19        have no problem in that area.
20                  COURT REPORTER:
21                  That's perfect.  That's perfect.
22                  THE WITNESS:
23                  I'm one of the officers he said always
24        spoke up.
25        BY MR. MOST:
```

1    Q.    Okay.  So for those officers you aren't

2  personally familiar with who ask you to notarize an

3  affidavit, do you do anything to ascertain their

4  identity?

5    A.    In those instances certainly, you know,

6  officers wear name tags or especially in certain

7  divisions showed up in, you know, officers are

8  usually pretty easy to, you know, ascertain whether

9  this is, you know, officer whoever, Gerald or Green

10  or whatever his name is, you know.  Yeah.

11    Q.    Okay.  So to ascertain identity, if you

12  don't know the person, if you looked at their

13  uniform or their badge, but you don't actually look

14  to see their driver's license or other ID, correct?

15    A.    I do not.

16    Q.    I'm sorry?

17    A.    No, we do not.

18    Q.    Okay.  And when you notarize an

19  affidavit of probable cause, do you take any steps

20  to swear the officer in before they sign it?

21    A.    No, I do not.

22    Q.    Okay.  Okay.  So we're going to look --

23  okay.  I'm going to pull up Exhibit F as in Frank.

24         (Sharing exhibit electronically.)

25  BY MR. MOST:

1      Q.    Officer, do you see that this is a

2   response to a subpoena?

3      A.    Yes.

4      Q.    Okay.  And I'm going to go down to page

5   5, which is an Exhibit A to that subpoena response.

6   And -- and these on the left most column is the

7   names of the -- some of the plaintiffs in this

8   case.  And then on the far right it says:  Officer

9   from probable cause.  And you can see your name is

10  -- is listed on -- on several of them, like, for

11  example, the top one, do you see that?

12     A.    I do.

13     Q.    Okay.  And you didn't personally sign as

14  an affiant the affidavits of probable cause for

15  protesters in July of 2016, right?

16     A.    Not that I recall.

17     Q.    Yeah.  And -- and we'll look at some of

18  these, but so where your name is on here, that's to

19  reflect that you were the officer notarizing those

20  documents, correct?

21     A.    I'm not sure of --

22     Q.    Okay.

23     A.    -- I guess.

24     Q.    Yeah.  Well, we -- we can look at one.

25           Okay.  I'm going to pull up Exhibit C as

1    in cat at page 2.

2                (Sharing exhibit electronically.)

3    BY MR. MOST:

4        Q.    Okay.  So do you see that this is an

5    affidavit of probable cause?

6        A.    I do; yes.

7        Q.    For arrestee Samantha Nichols?

8        A.    It appears so; yes.

9        Q.    Okay.  And at the bottom, this is your

10   signature here on the notary public line?

11       A.    It is.

12       Q.    Okay.  1775, is that your badge number?

13       A.    Or computer number -- we don't use

14       Q.    Okay.

15       A.    -- badge numbers.

16       Q.    So that's an identifying number for you?

17       A.    It is.

18       Q.    And 134420, is that your notary license

19   number?

20       A.    Yes.  I don't -- license per se.  But,

21   yes, my ex-officio --

22                COURT REPORTER:

23                I need him to repeat the end.  I'm

24       sorry.  I need him to repeat the end of that.

25                THE WITNESS:

1          My ex-officio -- ex-officio notary

2     number, yes.

3  BY MR. MOST:

4     Q.    So this is -- and this case your

5  signature on the notary public line?

6     A.    It is.

7     Q.    Okay.  And so going back to Exhibit F at

8  page 5, we can see Samantha Nichols and then it's

9  got your name on the officer from probable cause.

10 So this chart is reflecting where it's got your

11 name that's because you were the -- the notary

12 there?

13    A.    That's correct.

14    Q.    Okay.  So for -- and it's -- I'm sorry,

15 going back to Exhibit F, you can see that it says:

16 Officer from probable cause, other than you, it's

17 listed Jonathan Abadie?

18    A.    Yes.

19    Q.    Do you know Jonathan Abadie?

20    A.    No.

21    Q.    No?

22    A.    No.

23    Q.    Okay.  Do you see that it appears that

24 it looks like a signature of Jonathan Abadie on

25 this Samantha Nichols affidavit of probable cause?

1    A.    I guess so.

2    Q.    Okay.  So by -- by signing this, you

3  were confirming as a notary that Mr. Abadie was the

4  one who actually signed this?

5    A.    Yes, by notarizing it.

6    Q.    Okay.  And did you take steps to -- to

7  determine whether the person signing this was

8  Jonathan Abadie?

9    A.    There again, that brings us back to

10  2016.  I have no idea what was going -- in terms of

11  verifying who -- who signed what.  I -- I just

12  don't know.

13    Q.    Do you have any recollection of this

14  affidavit at all?

15    A.    None.

16    Q.    Okay.  And you testified earlier that by

17  putting your name on this you're -- you're swearing

18  under oath as to the truth of the contents of this

19  affidavit of probable cause?

20    A.    No.  The officer who wrote the probable

21  cause is swearing under oath that that was facts of

22  the record.

23    Q.    Okay.  But by notarizing, you're not

24  taking a position on whether it's true or false?

25    A.    No.

1    Q.    Okay.  Yeah.  That's my understanding as
2  well, so.
3    A.    Okay.  You're certain then I'm you're
4  trying to.
5    Q.    Well -- well, I'm really not trying to
6  trip you up.  Earlier I was just asking you what
7  your understanding of what your understanding of
8  what it means.
9    A.    Uh-huh.
10    Q.    So -- but you -- you were taking this
11  officer at -- it says:  Sworn to and subscribed
12  before me.
13    A.    Uh-huh.
14    Q.    Do -- but you don't swear in officers
15  before they sign these?
16    A.    No.
17    Q.    So -- so why does it say:  Sworn to and
18  subscribed before me?
19    A.    Actually, the end of the verbiage -- I
20  think it's actually included in the verbiage
21  somewhere, you know, the officer is --
22        COURT REPORTER:
23        I'm sorry.  The officer is?
24        THE WITNESS:
25        Is saying that what's implated in here

1      is true and correct.

2    BY MR. MOST:

3      Q.    Right, at the top here; yes.

4      A.    So that kind of covers that so that I

5    don't have to.

6      Q.    Okay.  So your understanding is you

7    don't actually have to take any steps to swear an

8    officer in before they sign this?

9      A.    Right.

10     Q.    Okay.  Okay.  Going down to page 5 of

11   Exhibit C.  You see that this is an affidavit of

12   probable cause for Blair Brown?

13     A.    It appears so; yes.

14     Q.    And this, likewise, has your notary

15   signature on here?

16     A.    Yes, sir.

17     Q.    Okay.  And cross-referencing it with

18   Exhibit F, we can see that Blair Brown, the other

19   officer listed there is Officer William Alexander;

20   do you see that?

21     A.    Yes, sir; I do.

22     Q.    Do you know Officer William Alexander?

23     A.    I do not.

24     Q.    Okay.  But you see that William

25   Alexander signed this affidavit of probable cause

1    for Blair Brown?

2         A.    Okay.  Yeah, I see the signature there.

3    Is that Officer Alexander's signature?

4         Q.    Well, I'm asking you.  I mean, you

5    notarized this.

6         A.    I mean, you know, can you make -- I -- I

7    -- I can't make out what that says.  Can you?

8         Q.    It looks like William Alexander's name,

9    but.

10        A.    There's a "T" crossed right there it's

11   kind of throwing me off, but anyway I -- I -- I'm

12   supposing it is and -- but I don't know for sure,

13   but -- and there again, obviously I have no

14   independent recollection of this document so I have

15   to just try to go off what I see on the screen

16   here.

17        Q.    But you understand that the whole point

18   of a notary is to be able to rely that when someone

19   signs something it's the person signing it who is

20   actually signing it, right; that's the point of a

21   notary, correct?

22        A.    Yes.

23        Q.    Okay.  But you don't have any way of

24   confirming either from records or from your

25   recollection that it was, in fact, that -- that who

1   signed this affidavit at all, correct?

2      A.   On August 11th, 2021, no, I don't.

3      Q.   Okay.  Going down to page 6, it says

4   it's an affidavit of probable cause for Karen

5   Savage; do you see that?

6      A.   Yeah, I'll go with you on it.  Yeah, I

7   see.

8      Q.   Okay.  Any recollection of this

9   affidavit of probable cause?

10     A.   No, I don't.

11     Q.   Okay.  You can see from Exhibit F that

12  the city has told us that this was Corporal James

13  Thomas signing it; do you see that?

14     A.   Where you at?  You on the -- the last

15  Simoneaux.

16     Q.   It's fourth from the bottom is Karen

17  Savage.

18     A.   Yeah, James Thomas.  Okay.

19     Q.   Okay.

20     A.   Yes, he was before Abadie.

21     Q.   Do you know James Thomas?

22     A.   No.  No, I do not.

23     Q.   Okay.  And you see that this affidavit

24  is signed just -- just Thomas?

25     A.   I see that.

1        Q.    Yeah.  Do you have any recollection of
2    this affidavit?
3        A.    None.  Not that one or any of the rest.
4        Q.    Yeah.
5              THE WITNESS:
6              If we can stipulate, Joe.
7    BY MR. MOST:
8        Q.    Yeah.  I understand.  I guarantee you,
9    this will be a shorter deposition than many we
10   take.
11             So do you have any way of actually
12   confirming who the person was that signed this
13   affidavit of probable cause, whether it was James
14   Thomas or any other person?
15       A.    On August 11th, 2021; no, I do not.
16       Q.    Okay.  But you would agree with me that
17   an officer can't sign someone else's name as an
18   affiant on an affidavit of probable cause, right?
19       A.    He shouldn't.
20       Q.    Right.  Because if one officer signed
21   another officer's name, that'd be forgery, right?
22       A.    I don't know.  Would it?  If he put the
23   signature there -- actually, are you referring to
24   the Thomas affidavit, just generally?
25       Q.    Just generally.  Like if you signed for

```
 1   Officer --
 2        A.     I'm not --
 3        Q.     -- Johnson --
 4        A.     -- I never worked forgery.  I'm not a
 5   forgery expert.  It's tough for me to say what
 6   qualifies and what doesn't.
 7        Q.     Sure.
 8        A.     I'm not going to weigh it for those
 9   words.
10        Q.     Sure.  But you're not allowed to, like,
11   sign someone else's name on an affidavit of
12   probable cause as a Baton Rouge Police Officer,
13   right?
14        A.     Not a common practice, no.  If that's
15   what you're asking.  I don't know if that's what
16   you're asking.  Is that what you're asking?
17        Q.     Well, my -- my question is --
18        A.     Are you allowed to do that?
19        Q.     (Nods head.)
20        A.     No.
21        Q.     Okay.  So the problem we're having is
22   that certain officers are saying they didn't sign
23   these affidavits of probable cause.
24        A.     Oh, okay.
25        Q.     That's one of the reasons why we're
```

1  asking you here as a witness is because we've had

2  multiple officers saying, that's not my signature.

3       A.   Okay.

4       Q.   One of them is Officer James Thomas.

5  He's testified that he didn't sign that.

6       A.   Okay.

7       Q.   One officer concluded that -- or

8  testified that there were numerous affidavits of

9  probable cause with his name on it that he didn't

10 sign.

11      A.   Okay.

12      Q.   That seems like a really big problem to

13 us.

14      A.   It is.

15      Q.   But it seems like even though you

16 notarized some of these documents, you have no way

17 of confirming today whether it was or was not the

18 person who actually signed it back in 2016; is that

19 fair?

20      A.    Yeah, I think that's fair and, you

21 know, I -- I'd go out on a limb to say that most

22 folks who, you know, there's any sort of paperwork

23 relative to the department in 2016 would not have

24 any recollection of anything like that.  Most folks

25 wouldn't.

1    Q.    Have you heard anything about officers

2  signing names that weren't theirs to affidavits of

3  probable cause?

4    A.    Have not until you mentioned it.

5    Q.    Okay.  If there were officers going

6  around -- well, let me actually back up.  At the

7  very least, before you notarize a document, you

8  make sure that it's a Baton Rouge Police Officer

9  signing it, correct?

10    A.    Yes.

11    Q.    Okay.  So if we do have -- if we do

12  have, like, for example, this one signed, Thomas,

13  you may not be able to confirm whether it was James

14  Thomas, but for sure it was a Baton Rouge Police

15  Officer who signed this, correct?

16    A.    Again, I have no idea who signed what in

17  2016.  I do not know.

18    Q.    Right.  But you're not going to let a

19  civilian or an officer from a different agency sign

20  a Baton Rouge Police Department affidavit of

21  probable cause, right?

22    A.    I'm -- I don't -- are you asking me am I

23  sure that it was a Baton Rouge Police Office that

24  put Thomas on that affidavit?  I am not -- I -- I

25  don't know who signed it.  I don't know who did

```
 1   what to that document in 2016.  I have no idea.
 2        Q.    This might be a dumb question, but
 3   what's the point of having a notary sign these at
 4   all if it's no assurance who signed it?
 5        A.    Well, I don't think that -- well, I
 6   think that there is assurance, but that assurance
 7   is not infinite of that person who notarized it is
 8   not going to be able to say definitively on each
 9   and every document that they notarize exactly who
10   it was and -- and what the circumstances were
11   surrounding it in -- in some infinite time in the
12   future, you know.  It just -- it just doesn't work
13   that way.  We're still, you know, we're still
14   having to deal with this old brain.  It doesn't
15   work that way.
16        Q.    Okay.  Let me see, one second.
17             MR. MOST:
18             Jim, do you have any questions here?
19             MR. CRAIG:
20             I'm going to have questions for -- for
21        Mr. Roberts; yes.
22             MR. MOST:
23             Okay.  Why don't you go ahead and -- and
24        if I've got any cleanup questions at the end
25        I'll -- I'll handle them then.
```

1           MR. CRAIG:

2           Sure.  One second, please.

3    BY MR. CRAIG:

4       Q.    Good morning, sir.

5       A.    Good morning.  How are you?

6       Q.    I'm good except I've got my headphones

7    on backwards.  Give me a second.  I'm not exactly

8    sure why it should matter but it says so.

9           My name is a Jim Craig.  I'm the

10   attorney in three other of the cases involving the

11   arrests of protesters in July of 2016, and I have

12   just a couple of questions for you.  Give me just

13   one second here.

14          You referenced a couple of times being a

15   ex-officio notary.  Can you explain what your

16   understanding is of what an ex-officio notary is?

17      A.    It gives me the ability, as I understand

18   it, to notarize paperwork having to do with which

19   work, which cases.  And that's the limit of it as I

20   understand it.

21      Q.    Okay.  And is there any training that --

22   that you undergo to be an ex-officio notary for the

23   Baton Rouge Police Department?

24      A.    Yes, there's a short class.

25      Q.    And so I assume that -- that you took

1    the short class; is that correct?

2        A.    Yes.  Yes.

3        Q.    And then is there some kind of test or

4    something about the -- that knowledge and

5    obligations of an ex-officio notary after the

6    class?

7        A.    Yes.

8        Q.    Who -- who conducts the class, is that

9    done from within the BRPD or is it another --

10   another group?

11       A.    I -- I took that class many years ago

12   and I'm not sure.  I don't exactly recall who

13   administered the class, but it's through the

14   department.  So that's probably something you can

15   get from the department.

16       Q.    Yeah.  I appreciate -- I appreciate your

17   candor about that.

18             Prior to the protests of the death of

19   Alton Sterling in July of 2016, had you been

20   involved in any other large scale prisoner

21   processing for Baton Rouge Police Department?

22       A.    Not that I could recall.

23       Q.    So it would be fair to say that -- that

24   the assignment that you had to assist in prisoner

25   processing during the July, 2016, protests was kind

1  of a first of its kind experience for you?

2      A.    I -- yeah, that would be fair 206 --

3  July, 2016, is the first of its kind of experience

4  for Baton Rouge, period; so, yeah, certainly that

5  prisoner processing part of my job that went on

6  during the protests.  Yes, I had never done

7  something like that before or since.

8      Q.    Thank you.

9            How -- how did you get assigned to be

10  involved in the prisoner processing part of the

11  protest response?

12      A.    I was directed to do so by a superior

13  officer.  I'm not even sure who it was at this

14  time, but some superior directed me to do so.

15      Q.    Okay.  And did you report for roll call

16  at the beginning of shifts during the protests?

17      A.    I don't recall.

18      Q.    Yeah, I don't remember is a perfectly

19  legitimate truthful response in that.  You know, I

20  don't know what you don't know as -- as the now

21  deceased Secretary Rumsfeld used to say so I have

22  to ask the questions.  But if you -- if you don't

23  know the answer, that's -- we all understand how

24  long it's been since the protests, we're -- I'm

25  just --

1     A.    Good.

2     Q.    -- trying to see what you do and don't

3  remember.  I appreciate that.

4          I am going to screen share if I have --

5          MR. CRAIG:

6          Whoever is the host, if you could enable

7      screen sharing for me I would appreciate it.

8          MR. MOST:

9          Okay.  You should have it.

10         MR. CRAIG:

11         I do.  Thank you.

12  BY MR. CRAIG:

13    Q.    I am screen sharing, Mr. Roberts,

14  exhibit that has been previously used in these

15  depositions.  It's marked as Exhibit G as in

16  giraffe and it is -- was produced to us by the

17  Baton Rouge Police Department in the course of this

18  litigation, and I'm going to first show like the

19  whole screen so you can see what -- what is in

20  here.

21         (Sharing exhibit electronically.)

22  BY MR. CRAIG:

23    Q.    So that's an Email from Chris Johnson on

24  Sunday, July 10, 2016, 9:34 p.m. to Ira Roberts and

25  Derrick Williams.  Do you see where it says that?

1    A.    The to line, yes.

2    Q.    Right.  And then there's going to be

3    these documents that were attached to the Email

4    that are affidavits of probable cause.  I'm going

5    to ask you about in a minute.  So -- but just

6    wanted you to see what the total -- total document

7    was before we started with questions about this.

8         Do you know an officer named Derrick

9    Williams?

10    A.    I do.

11    Q.    Who is Derrick Williams?

12    A.    A guy who retired with the police

13    department.

14    Q.    Okay.  And what -- what position did he

15    hold?  How did you know -- you knew him through the

16    police department?

17    A.    Yes.

18    Q.    And was Derrick Williams working with

19    you in prisoner processing during the July, 2016

20    protests in Baton Rouge?

21    A.    I have no idea, sir.

22    Q.    Okay.  Do you know who Chris Johnson is?

23    A.    I do.  I do.  He's also retired.

24    Q.    Okay.  That's how long this case has

25    been going on, I guess.

1    A.    Right.

2    Q.    Who is -- who is Chris Johnson?

3    A.    A retired police officer.

4    Q.    Okay.  And you see here that the subject

5    line of this Email is:  Forward PC affidavits for

6    7/10/16 --

7    A.    Correct.

8    Q.    -- do you see where I'm looking at?

9    A.    Yes, sir.

10    Q.    And it attaches, it says:  PC 7/10/16

11    simple obstruct and PC 17 -- PC 7/10/16 simple

12    obstruct, dash, resisting.

13          Do you see where I'm reading from?

14    A.    Yes.

15    Q.    When -- do you recall when you were at

16    prisoner -- working in prisoner processing downtown

17    in Baton Rouge on July the 10th, was there any kind

18    of printer or anything close by?

19    A.    I don't recall working a prisoner

20    processing downtown on the 10th of July 20 -- 2016.

21    Q.    Okay.  In terms of the affidavits of

22    probable cause, like the one that Mr. Most saw you

23    previously -- showed you previously --

24    A.    Uh-huh.

25    Q.    -- is that affidavit, before it was

1  signed had, like this one, a typed synopsis of

2  probable cause; is that correct?

3      A.    I have no idea.  I only saw it after it

4  was signed and presented to me for my signature and

5  notarization.  I -- I don't know what was on it

6  prior to me signing it.

7      Q.    Oh, I see.  So that -- was it the

8  arresting officer or the officer who brought an

9  arrestee to the processing station had the

10  affidavit of probable cause in their hand?

11      A.    I don't know.

12      Q.    Were there -- do you recall seeing

13  stacks of affidavits of probable cause that were to

14  be used at the prisoner processing stations, maybe

15  not on the 10th of July, but during the protests as

16  a whole?

17      A.    No.

18      Q.    Not necessarily focused just on the 10th

19  of July, but can you describe for me the physical

20  setup of prisoner processing at the location, at

21  any location that you recall being involved in?

22      A.    The physical setup?

23      Q.    Yeah, what did it look like?

24      A.    The only -- only area that I actually

25  recall being involved with was at BRPD headquarters

1    near the training academy area.  And it was a door,

2    entry/exit door which led into a hallway.  Hallway

3    led -- if you continue down the hallway, you would

4    go to another entry/exit door.  So there's a door

5    on each end of the hallway in between and then

6    there's a area just off the hallway which -- with

7    some seating.  I guess that -- that's pretty much

8    it.

9        Q.    Yes, sir.  Was there -- and -- and was

10   there a table at that area off the hallway?

11       A.    I don't really recall.  I know that

12   there was some chairs.

13       Q.    Yes, sir.

14       A.    I don't know whether there was a table

15   or not.

16       Q.    Okay.  And then would you -- you were

17   sitting in one of those chairs during the prisoner

18   processing?

19       A.    I have no idea.

20       Q.    Okay.

21       A.    Working a 12-hour shift at that time, I

22   do recall that so there --

23       Q.    So all's fair.

24       A.    -- during that 12 hours I can not only

25   ever say I sat in one of those chairs probably.

```
 1        Q.    That's -- yeah, okay.  I get -- I get
 2   it.  Here -- here's -- here's what I'm really
 3   asking is:  Can you describe, again, like you did
 4   about the -- the hallway, describe what you did
 5   when another BRPD officer brought an arrestee
 6   during the protests to you for physical -- for
 7   prisoner processing?
 8        A.    I can't describe that.  I'm sorry.  I --
 9   I know that I worked in that prisoner processing
10   area.  What exactly I did, I don't really recall in
11   terms of processing prisoners or -- I don't even
12   know if they actually brought people to me per se.
13   I -- I -- it's just been too long.  I just -- I
14   couldn't tell you.
15        Q.    Okay.  So you don't have and -- and --
16   if I'm understanding you correctly.  I don't want
17   to put words in your mouth, but you don't have an
18   actual memory of -- of processing any particular
19   protester --
20        A.    Certainly.
21        Q.    -- who was arrested?
22        A.    No, sir.  That is --
23        Q.    Okay.
24        A.    -- correct.
25        Q.    Thank you.  Did you do other -- did you
```

1    perform other duties related to the protests

2    besides prisoner processing?  Were there days when

3    you were doing something else?

4         A.    I don't know.  I would assume I -- I --

5    I'm sure there was.  We were short, as we are now;

6    so, you know, everybody was kind of wherever they

7    needed to be at the time.  So I -- I would -- I

8    would guess that I did other things.  I don't know

9    what they were or where they were, but, you know,

10   we went where we...

11        Q.    Okay.  And I apologize if Mr. Most asked

12   this in a slightly different way, but what's your

13   understanding of the purpose of the affidavit of

14   probable cause?

15        A.    To establish facts justifying the arrest

16   of someone.

17        Q.    Thanks.  And so in -- in that context,

18   you understand why it's important for people who

19   are being arrested that they -- that the facts that

20   are stated in the affidavit be correct?

21        A.    Sure.

22             MR. CRAIG:

23             Mr. Most, I believe I am going to pass

24        the witness either back to you or to one of the

25        other lawyers on the call.  I appreciate your

```
 1        time, Mr. Roberts, and thank you.
 2               THE WITNESS:
 3               Thank you, Mr. Craig.
 4               MR. MOST:
 5               I've just got a few follow-ups.  Greg,
 6        would you like to ask any questions.
 7               MR. FAHRENHOLT:
 8               I have no questions for this witness.
 9               THE WITNESS:
10               Your mic, Mr. Most.  Your mic.
11     BY MR. MOST:
12        Q.    Thank you.  Thank you, Officer.
13               MR. MOST:
14               Jim, would you give me back screen
15        sharing.
16     BY MR. MOST:
17        Q.    Okay.  So just going back to these
18     affidavits of probable cause and looking at Exhibit
19     C again.  Do you see that these protesters were
20     arrested for -- one of the crimes some of them were
21     protest -- arrested for was 1497 obstruction of a
22     highway of commerce.  Are you familiar with that?
23        A.    No.
24        Q.    Okay.  No.  So you're not familiar with
25     it because it's not one you commonly come across as
```

1    an officer?

2        A.    I'm not really familiar with it because

3    I've been working auto thefts for the last five or

4    six years probably.  And about eight or 10 years of

5    armed robbery prior to that.  So, no, I don't

6    typically come across -- what is it, simple

7    obstruction of a highway?

8        Q.    Yeah.  Do you recall anytime in your

9    career where you arrested someone for simple

10   obstruction of a highway?

11       A.    Not particularly, but it -- it is a

12   fairly common charge.

13       Q.    Okay.

14       A.    If that's what you're asking.  Is that

15   what you're asking?

16       Q.    Yeah.  My -- my -- my question is:  Can

17   you recall any specific time where you arrested

18   someone --

19       A.    No.

20       Q.    Okay.  And others were arrested for, it

21   seems like, a related 14:100.1, which is simple

22   obstruction of a public passageway.  Do you know of

23   that one?

24       A.    Do I know of it?

25       Q.    Yeah.

1      A.    I know of it.

2      Q.    Okay.  Can you recall anytime in your

3  career that -- any particular time you arrested

4  someone for a 14:100.1?

5      A.    No, no particular time.

6      Q.    Okay.

7       MR. MOST:

8       Joe, would you like to ask any

9    questions?

10       MR. SCOTT:

11       I -- hopefully not due to any whiplash,

12    but just to establish that I'm -- I'm asking

13    the questions and there's still nobody else in

14    here but.

15  BY MR. SCOTT:

16      Q.    You remember notarizing affidavits of

17  probable cause at headquarters?

18      A.    Yes.

19      Q.    But the whole weekend and week was a big

20  blur to you?

21      A.    More or less; yes.

22      Q.    Is it possible that you went to

23  Government Street?

24      A.    It's possible.

25      Q.    Mr. Craig showed you an Email that was

1    directed to you and Derrick Williams?

2        A.    He did.

3        Q.    Did you notice on there who originally

4    sent the Email?

5        A.    Chris Johnson, I believe.

6        Q.    So okay, the -- the document speaks for

7    itself.

8             MR. SCOTT:

9             That was all my questions.

10            MR. MOST:

11            Okay.  Just to follow-up a little bit

12        about that Email.

13   BY MR. MOST:

14       Q.    Do you recall receiving that Email?

15       A.    No.

16       Q.    Okay.  Seeing it today, does it look

17   like the purpose of that Email was to provide, you

18   know, partially prefilled out affidavits of

19   probable cause for use at that time?

20       A.    Those were the attachments.  I'm not

21   sure what his purpose was.

22       Q.    Okay.  I mean if you received that Email

23   today, what would you infer as -- as the purpose

24   behind it?

25            MR. SCOTT:

```
 1              Object to the form.
 2    BY MR. MOST:
 3         Q.    You -- you can answer.
 4         A.    I would probably, you know, write back
 5    and ask him, what's this.
 6         Q.    Fair enough.  Fair enough.
 7              MR. MOST:
 8              Okay.  Well, look, that's all the
 9         questions I've got.  Officer, thank you for
10         your time this morning.  We appreciate you
11         taking the time to do it.
12              Let's go off the record.  We'll conclude
13         the deposition.
14              [Deposition concluded 11:33 a.m.]
15
16
17
18
19
20
21
22
23
24
25
```

```
 1          R E P O R T E R ' S   P A G E
 2          I, BRENDA R. BREAUX, Certified Court
 3    Reporter, Registered Professional Reporter in and
 4    for the State of Louisiana, the officer, as defined
 5    in Rule 28 of the Federal Rules of Civil Procedure
 6    and/or Article 1434 (B) of the Louisiana Code of
 7    Civil Procedure, before whom this proceeding was
 8    taken, do hereby state on the record:
 9          That due to the interaction in the
10    spontaneous discourse of this proceeding, dashes
11    (--) have been used to indicate pauses, changes in
12    thought, and/or talkovers; that same is the proper
13    method for a Court Reporter's transcription of
14    proceeding, and that the dashes (--) do not
15    indicate that words or phrases have been left out
16    of this transcript;
17          That any words and/or names which could
18    not be verified through reference material have
19    been denoted with the phrase "(spelled
20    phonetically)."
21
22
23                    BRENDA R. BREAUX
                      Certified Court Reporter
24                    Registered Professional Reporter
25
```

```
 1              CHANGES AND SIGNATURE
 2   WITNESS NAME:  IRA ROBERTS
     DATE OF DEPOSITION: AUGUST 11, 2021
 3
     PAGE    LINE        CHANGE        REASON
 4
     _____
 5
     _____
 6
     _____
 7
     _____
 8
     _____
 9
     _____
10
     _____
11
     _____
12
     _____
13
     _____
14
     _____
15
     _____
16
     _____
17
     _____
18
     _____
19
     _____
20
     _____
21
     _____
22
     _____
23
     _____
24
     _____
25
```

                    WITNESS' CERTIFICATE


         I, IRA ROBERTS, have read or have had the
foregoing testimony read to me and hereby certify
that it is a true and correct transcription of my
testimony with the exception of any attached
corrections or changes.








                    _____

                         IRA ROBERTS

PLEASE INDICATE

[   ]      NO CORRECTIONS

[   ]      CORRECTIONS; ERRATA SHEET(S) ENCLOSED

```
 1            C E R T I F I C A T E
 2            This certificate is valid only for a
      transcript accompanied by my original signature and
 3    original required seal on this page.
 4            I, BRENDA R. BREAUX, Certified Court
      Reporter, Registered Professional Reporter in and
 5    for the State of Louisiana, as the officer before
      whom this testimony was taken, do hereby certify
 6    that IRA ROBERTS, after having been duly sworn by
      me upon authority of R.S. 37:2554, did testify as
 7    hereinbefore set forth in the foregoing 51 pages;
      that this testimony was reported by me in the
 8    stenotype reporting method, was prepared and
      transcribed by me or under my personal direction
 9    and supervision, and is a true and correct
      transcript to the best of my ability and
10    understanding; that the transcript has been
      prepared in compliance with transcript format
11    guidelines required by statute or by rules of the
      board, and that I am informed about the complete
12    arrangement, financial or otherwise, with the
      person or entity making arrangements for deposition
13    services; that I have acted in compliance with the
      prohibition on contractual relationships, as
14    defined by Louisiana Code of Civil Procedure
      Article 1434 and in rules and advisory opinions of
15    the board; that I have no actual knowledge of any
      prohibited employment or contractual relationship,
16    direct or indirect, between a court reporting firm
      and any party litigant in this matter nor is there
17    any such relationship between myself and a party
      litigant in this matter. I am not related to
18    counsel or to the parties herein, nor am I
      otherwise interested in the outcome of this matter.
19
20
21                 BRENDA R. BREAUX
                   CERTIFIED COURT REPORTER
22                 LOUISIANA CERTIFICATE NO. 22036
                   REGISTERED PROFESSIONAL REPORTER
23
24
25
```