UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


BLAIR IMANI, ET AL

                         DOCKET NO.
                         17-cv-00439-JWD-EWD

VERSUS


CITY OF BATON ROUGE,
ET AL




            Deposition of JOE SIMONEAUX,
taken on August 2, 2021, via Zoom
Videoconference.

```
 1    APPEARANCES:
 2    MOST & ASSOCIATES
      BY: WILLIAM MOST, ESQ.
 3    AND DAVID LANSER, ESQ.
      201 St. Charles Avenue
 4    Suite 114, #101
      New Orleans, Louisiana  70170
 5    Phone: (504)533-4521
      Email: david.lanser@gmail.com
 6        REPRESENTING PLAINTIFFS
      (IMANI V. CITY OF BATON ROUGE)
 7
 8
      RODERICK AND SOLANGE
 9    MacARTHUR JUSTICE CENTER
      BY:  ERIC FOLEY, ESQ.
10    JIM CRAIG, ESQ.
      HANNAH LOMMERS-JOHNSON, ESQ.
11    MANDISA MOORE-O'NEAL, ESQ.
      4400 S. Carrollton Avenue
12    New Orleans, Louisiana  70119
      Phone: (504)684-2364
13    Email: eric.foley@macarthurjustice.org
          REPRESENTING PLAINTIFFS
14    (SMITH V. CITY OF BATON ROUGE AND
      BATISTE-SWILLEY V. CITY OF BATON ROUGE)
15
16
      DEELEE MORRIS, ESQ.
17    JOSEPH SCOTT, ESQ.
      222 St. Louis Street
18    Baton Rouge, Louisiana  70802
      Phone: (225)389-3114
19    Email: dsmorris@brla.gov
          REPRESENTING BATON ROUGE CITY
20    POLICE DEPARTMENT OFFICERS
21
22
23
24
25
```

```
 1    APPEARANCES (CONTINUED):

 2    BURGLASS & TANKERSLEY.
      BY:  GREGORY FAHRENHOLT, ESQ.
 3    5213 Airline Drive
      Metairie, Louisiana  70001
 4    Phone: (504)836-0408
      Email: gfahrenholt@burglass.com
 5        REPRESENTING INDIVIDUAL
      STATE POLICE TROOPERS
 6

 7

 8

 9

10    REPORTED BY:

11    Cecilia M. Henderson
      Certified Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

1

2                    EXAMINATION INDEX

3                                        Page

4    MR. MOST ...................................7
     MR. LANSER ................................55
5    MR. MOST ..................................71
     MR. FOLEY .................................74
6    MR. RODNEY ...............................128
     MR. MOST .................................130

7

8             E X H I B I T   I N D E X

9                                        Page

10   Exhibit T .................................13
     Exhibit TTTTTT ............................39
11   Exhibit TTTTT .............................47
     Exhibit LL ................................57
12   Exhibit VVVVVV ............................68
     Exhibit 1 .................................86
13   Exhibit 2 .................................86
     Exhibit 3 .................................90
14   Exhibit 4 .................................97
     Exhibit 5 .................................99
15   Exhibit 5 ................................100
     Exhibit 6 ................................107
16   Exhibit 7 ................................112
     Exhibit 8 ................................115

17

18

19

20

21

22

23

24

25

1                S T I P U L A T I O N

2

3          It is stipulated and agreed by and

4    between counsel that the deposition of JOE

5    SIMONEAUX is hereby being taken under Federal

6    Rules of Civil Procedure for all purposes in

7    accordance with law;

8          That the formalities of filing and

9    certification are hereby waived; that the

10   formalities of reading and signing are hereby

11   specifically not waived;

12         That all objections, except those as

13   to the form of the question and/or

14   responsiveness of the answer, are hereby

15   reserved until such time as this deposition or

16   any part thereof may be used in evidence.

17         *   *   *   *   *   *   *   *

18         CECILIA M. HENDERSON, Certified Court

19   Reporter, in and for the State of Louisiana,

20   officiated in administering the oath to the

21   witness.

22

23

24

25

1        MR. MOST:
2            This is William Most and David
3        Lanser on behalf of the Imani
4        plaintiffs.
5        MS.  MORRIS:
6            Deelee Morris and Jeff Simoneaux
7        on behalf of the City of Baton Rouge.
8        MR. FOLEY:
9            Eric Foley, Jim Craig and Hannah
10       Lommers-Johnson on behalf of the
11       plaintiffs in Tennart, Smith and
12       Batiste-Swilley.
13       MR. FAHRENHOLT:
14           Greg Fahrenholt on behalf of the
15       Louisiana State Police defendants in
16       five lawsuits.
17       MR. MOST:
18           All right.  Deelee, can we
19       stipulate that this deposition was
20       properly noticed and the court
21       reporter is duly qualified?
22       MS. MORRIS:
23           Yes.
24       MR. MOST:
25           Great.  Good morning, Officer.

1          THE COURT REPORTER:

2               I didn't -- can I --

3          MR. MOST:

4               Oh, swear him in.

5               JOE SIMONEAUX, 9000 AIRLINE

6    HIGHWAY, BATON ROUGE, LOUISIANA, AFTER FIRST

7    BEING DULY SWORN IN THE ABOVE-ENTITLED MATTER,

8    DID TESTIFY AS FOLLOWS:

9                    EXAMINATION

10   BY MR. MOST:

11       Q    Most good morning, officer.  Can you

12   hear me all right?

13       A    Yes, sir.

14       Q    My name is William Most.  I'm one of

15   the attorneys on the Imani case, which is one

16   of the cases about the protest in 2016.  With

17   us today are the attorneys in several of the

18   cases.  Mr. Lanser works with me.  Mr. Foley

19   and two of the other people present are with

20   the McArthur Justice Center and Mr. Fahrenholt

21   represents the State Police defendants.

22               Could you give us your name and

23   title, please?

24       A    Corporal Joe Simoneaux, Baton Rouge

25   City Police Department.

1    Q    I've seen the name Reab on some of
2 the documents.  Is that a middle name?
3    A    No, sir.  That was my birth name.  I
4 had my name changed.
5    Q    What is your full current name?
6    A    Joe Simoneaux.
7    Q    Okay.  But some documents might say
8 Reab Simoneaux, and that's referring to you,
9 as well?
10    A    Yes, sir.
11    Q    Okay, great.  And how would you like
12 me to refer to you; would you like me to call
13 you Joe, Officer Simoneaux, Corporal?  What's
14 your preference?
15    A    It doesn't matter what you call me.
16    Q    Thank you.  Officer, have you ever
17 given a deposition before?
18    A    Yes, sir.
19    Q    So you realize that you're under oath
20 today, correct?
21    A    Yes, sir.
22    Q    That your answers here today have the
23 same force as if we are in a courtroom with a
24 judge and jury; is that right?
25    A    Yes, sir.

1      Q    Is there anything today, any illness
2  or other condition that would prevent you from
3  giving your full attention and truthful and
4  complete answers?
5      A    No, sir.
6      Q    Are you taking any medications that
7  would prevent you from understanding my
8  questions or providing truthful and complete
9  answers?
10      A    No, sir.
11      Q    And you've done a deposition before,
12  so you know that we can take a break if
13  necessary; if you need to take a drink of
14  water, use the restroom.  However, I will ask
15  you about who you talked to during the break
16  and the contents of that conversation, even if
17  it's your attorney.  Just a heads up on that,
18  all right?
19      A    Yes, sir.
20      Q    Since you've done a deposition
21  before, you're already excellent at this.
22  You've been waiting for me to finish my
23  questions before you provide your answer.  And
24  in turn, I'll try to do the same thing for
25  you; waiting until you to finish your answer

```
 1    before I ask the next question.  That way,
 2    together, we'll create a clean transcript for
 3    the court reporter.  All right?
 4         A    Yes, sir.
 5         Q    Officer, if I ask a question that
 6    isn't clear or you don't understand it, will
 7    you agree to let me know, rather than just try
 8    and answer it?
 9         A    Yes, sir.
10         Q    And since this is a Zoom deposition,
11    I can't see everyone who is in the room with
12    you.  So could you just tell me who's
13    currently in the room with you right now?
14         A    Me and my attorney.
15         Q    Yeah.
16         A    Deelee.
17         Q    And since this is a Zoom deposition,
18    I can't see if anyone passes you notes or
19    gives you hand signals.  Will you agree to
20    tell me if anyone tries to communicate with
21    you during this deposition via hand signal,
22    note, text message, telephone call or any
23    other way?
24         A    Yes, sir.
25         Q    Thank you.  All right.  So you said
```

1    you've been deposed before.  Have you been

2    deposed multiple times before?

3         A    No, sir.

4         Q    So you've participated in one

5    deposition previously?

6         A    I mean, I can't remember how many,

7    but it has not been that many.

8         Q    Okay.  What kind of cases were the

9    depositions that you participated in for?

10        A    Mostly civil with traffic.

11        Q    All right.  So when you say civil

12   cases, do you mean, like, private disputes

13   between parties over a car crash or something

14   like that?

15        A    Yes, sir.

16        Q    Have you ever participated in a

17   deposition for any other kind of case?

18        A    No, sir.

19        Q    All right.  And do you know what

20   cases you're here for today?

21        A    No, sir.  All I know, it's about the

22   protest from 2016.

23        Q    Yes.  That's right.  There are a

24   number of civil rights cases about the 2016

25   protest that this deposition is about, that's

1    correct.  Do you understand that you

2    personally are a defendant in those cases?

3         A    Yes, sir.

4         Q    Approximately when did you begin

5    preparing for this deposition?

6         A    When I was told about it.

7         Q    And roughly, when was that; was it a

8    week ago, three weeks ago, yesterday?

9         A    About a week ago.

10        Q    And I'm not going to ask you any

11   questions about what you and your attorney may

12   have talked about.  But other than talking to

13   your attorney, what did you do to prepare for

14   this deposition?

15        A    Just refreshed myself, basically, on

16   what happened that day.

17        Q    Okay.  And how did you refresh

18   yourself about what happened that day?

19        A    Trying to go back and look at the

20   reports.

21        Q    And what reports did you look at?

22        A    Well, most of them is blocked out.

23   The only report that I can really look at was

24   the one that I wrote.

25        Q    Okay.  And what report is it that you

1    wrote?

2        A     The report with Alexis Cheney and

3    Tammy Cheney.

4        Q     I'm going to pull up a document that

5    is Exhibit T.  I want to see if we're looking

6    at the same document, Officer.  It's Exhibit

7    T.  It's Baton Rouge Police Department

8    Incident Report 16-00070320-6005.  Is this the

9    document you're looking at, Officer?

10        A     Yes, sir.

11        Q     And you have a physical copy of that

12    in front of you right now?  Do you have any

13    other documents in front of you, aside from

14    that initial report?

15        A     It's the whole report.

16        Q     Okay.  Do you have anything else

17    besides that report with you here today in

18    terms of documents?

19        A     No, sir.

20        Q     Aside from this initial report, did

21    you look at any documents or do anything else

22    to refresh your memory about what happened?

23        A     No, sir.

24        Q     Did you talk to anybody besides your

25    attorney to prepare for this deposition?

1    A    I talked to my supervisor about it.

2    Q    Okay.  And who is your supervisor?

3    A    Jeremy Stanley.

4    Q    And what did the two of you discuss?

5    A    I had to talk to him about getting a

6  report printed; because I couldn't print it.

7    Q    Okay.  And to what did you tell him

8  was the purpose for wanting to print it?

9    A    It was for the deposition for the

10  protest.

11    Q    Did the two of you talk about the

12  protest and what happened back then?

13    A    No, sir.

14    Q    Other than your supervisor, did you

15  talk to anyone else in preparing for this

16  deposition?

17    A    No, sir.

18    Q    All right.  Joe, what's the very

19  short version of your education and

20  professional background, if you don't mind?

21    A    I've been in law enforcement for

22  almost 23 years.  I'm a high school graduate.

23  I have some college credits.

24    Q    Did you go directly from school to

25  being a law enforcement officer?

```
 1        A     No, sir.

 2        Q     What did you do in between?

 3        A     I used drive airboats.

 4        Q     And you're 23 years in law

 5   enforcement.  Was that all with the Baton

 6   Rouge Police Department or other agencies?

 7        A     That's with other agencies.

 8        Q     Okay.  What agencies did you work for

 9   before BRPD?

10        A     East Feliciana Sheriff's Department.

11        Q     Any others?

12        A     No, sir.

13        Q     And then what year did you join BRPD?

14        A     In 2005.

15        Q     So you've been with BRPD for

16   approximately is 16 years; is that right?

17        A     Yes, sir.

18        Q     And what have been your roles at

19   BRPD?

20        A     Uniform patrol.

21        Q     Have you been uniform patrol for the

22   entirety of those approximately 16 years?

23        A     I used to work -- I worked in

24   narcotics for a little bit and I worked for

25   the street crimes unit for a little bit, for a
```

```
1    few years, and then I come back to uniform
2    patrol.
3         Q    So you were -- you started on uniform
4    patrol, went to narcotics and then went to
5    street crimes and then back to uniform patrol;
6    is that right?
7         A    Yes, sir.
8         Q    When did you go from uniform patrol
9    to narcotics, approximately?
10        A    That, I don't -- I mean, I can't
11   remember.
12        Q    Okay.  And when was it that you went
13   back to uniform patrol most recently?
14        A    I've been back in uniform patrol
15   probably about 11 years.
16        Q    So in 2016, you were on uniform
17   patrol, right?
18        A    Yes, sir.
19        Q    All right.  I want to ask you some
20   big picture questions about how BRPD paperwork
21   works before we move to talking about the 2016
22   protest.  I want to make sure I understand
23   what an arrest affidavit is.  Do you know the
24   term, "Arrest Affidavit"?
25        A    Yes, sir.
```

1    Q    It's also called an Affidavit of
2    Probable Cause; is that right?
3    A    Yes, sir.
4    Q    The Code of Criminal Procedure
5    Article 385 describes it as:  "An affidavit is
6    a written accusation of a crime made under
7    oath and signed by the affiant." Is that your
8    understanding of what it is?
9    A    Yes, it's reasonable grounds.
10    Q    When you say "Reasonable grounds,"
11    you mean the Affidavit of Probably Cause has
12    to set out the reasonable grounds for
13    someone's arrest, right?
14    A    Correct.
15    Q    It has to be a truthful and
16    sworn-under-oath description of the grounds
17    for arrest, correct?
18    A    Yes, sir.
19    Q    It has to say:  This particular
20    person at this particular place and time
21    committed a particular crime, right?
22         MS. MORRIS:
23              Object to the form, but you can
24         answer.
25         MR. MOST:

```
 1                    The answer was yes?
 2           THE WITNESS:
 3                    Yes.
 4   BY MR. MOST:
 5      Q    It's the document that justifies the
 6   arrest, correct?
 7      A    Yes, sir.
 8      Q    It tells you whether this was a
 9   justified arrest or a false arrest, correct?
10           MS. MORRIS:
11                    Object to the form.  You're
12                    calling on hypotheticals, but -- I'm
13                    not exactly sure what you're talking
14                    about, but you can go ahead and
15                    answer.
16           THE WITNESS:
17                    Again, please?
18   BY MR. MOST:
19      Q    Sure.  The Affidavit of Probable
20   Cause is the document that shows whether this
21   was a justified arrest or false arrest,
22   correct?
23      A    Yes, sir.
24           MS. MORRIS:
25                    Same objection.
```

1    BY MR. MOST:

2        Q    And it's a document that's submitted

3    to the Court, correct?

4        A    Yes, sir.

5        Q    So if the affiant of an Affidavit of

6    Probable Cause lies or puts inaccurate

7    information into a probable cause affidavit,

8    they're manufacturing false evidence, correct?

9            MS. MORRIS:

10                   Object to the form.

11   BY MR. MOST:

12       Q    Officer, you can generally answer the

13   question after Deelee objects, unless she

14   tells you not to.  She'll make her objection

15   for the record and then you can answer, unless

16   she says:  Don't answer that.

17           So I'll ask it again.  If an affiant

18   lies or puts inaccurate information in a

19   probable cause affidavit, they're

20   manufacturing false evidence, correct?

21       A    Yes, sir.

22           MS. MORRIS:

23                   Object to the form.

24   BY MR. MOST:

25       Q    And in order for BRPD to book someone

1  into the East Baton Rouge Parish Prison, BRPD
2  has to have a signed probable cause affidavit,
3  correct?
4       A    Right.
5       Q    And an Affidavit of Probable Cause,
6  filling it out and signing it is the duty of
7  the arresting officer, correct?
8       A    Correct.
9       Q    And the affiant has to sign their own
10 name; you can't -- one officer can't sign
11 someone's name to an Affidavit of Probable
12 Cause, correct?
13      A    That's correct.
14      Q    Signing someone's name, that would be
15 false testimony, correct?
16      A    Correct.
17      Q    I'm going to ask you about 2016 and
18 the protests that happened in July of 2016;
19 specifically, Sunday, July 10th, 2016.  Do you
20 remember that day?
21      A    Vaguely, yes.
22      Q    Do you remember that there were
23 protesters gathered at East and France?
24      A    Yes, sir.
25      Q    Were you present at that gathering at

1    East and France?

2        A    Yes, sir.

3        Q    And what was your role that day,

4    being there?

5        A    Basically, just escorting people that

6    was handed off to me to the prison van.

7        Q    Did you conduct investigations of

8    anyone committing crimes or were you there

9    just to hand people off?

10       A    I was basically there just to hand

11   people off.

12       Q    Okay.  But did you investigate any

13   crimes?

14       A    I made one arrest, myself.

15       Q    And who was that one arrest?

16       A    The Cheney -- well, more than -- it's

17   two people.  Alexis Cheney and Tammy Cheney.

18       Q    So you arrested both of those people?

19       A    Yes, sir.

20       Q    And did you arrest them at East and

21   France?

22       A    Yes, sir -- well, 500 East Boulevard.

23       Q    So I'm going to pull up a Google map

24   of 500 East Boulevard, so we can see where

25   that is.  And you see that the pin for 500

1    East Boulevard has been dropped here at East

2    and Government?

3         A    Yes, sir.

4         Q    Okay.  And you can see that's just

5    about a block from East and France?

6         A    Yes, sir.

7         Q    And where is it that you took --

8    let's take first the older of the two Cheneys,

9    Tammy Cheney, where did you take her into

10   custody?

11        A    At 500 East Boulevard.

12        Q    So right at the intersection of East

13   and Government Street?

14        A    Yes, sir.

15        Q    Okay.  And so she was standing at

16   that corner and you went over and took her

17   into custody; is that right?

18        A    She was standing in the roadway.

19   Yes, she was taken into custody.

20        Q    Okay.  She was standing in the

21   roadway at the time that you took her into

22   custody?

23        A    Yes, sir.

24        Q    Okay.  Which street was she standing

25   on; was she standing in the roadway of

1    Government Street or East Boulevard?

2        A    500 East Boulevard.

3        Q    Yeah, I understand that.  That's an

4    address of the intersection of those two

5    streets.  And it's your testimony that she was

6    standing in the street when you took her into

7    custody, right?

8        A    Yes, sir.  She was standing in that

9    corner.  I mean, it's an intersection right

10   there.  So it's in that corner.  It can be

11   either street.

12       Q    Okay.  Which corner are you talking

13   about, the northeast, northwest, southeast,

14   southwest?

15       A    I don't see -- I'm going to need

16   something on here to let me know which

17   directions is on the map.

18       Q    Sure.  Up is north on this map.

19       A    Okay.  Then she would be standing in

20   the south -- east southwest corner.

21       Q    Was she standing in the roadway?

22   Well, let me back up.  Did you put your hands

23   on her to effect an arrest?

24       A    Yes, sir.  I had to place her in

25   handcuffs -- well, Zip Ties.

1    Q    Was she standing in the roadway when
2  you put your hands on her to effect the
3  arrest?
4    A    Well, when I was going after her, she
5  had done walked back into the parking lot.
6    Q    Which parking lot?
7    A    To the parking lot that's right there
8  in that corner.
9    Q    So when you arrested her.  She was
10 standing in the parking lot?
11   A    Yeah, but the violation took place in
12 the roadway.
13   Q    Okay.  So it's your testimony that
14 Tammy Cheney, the older of the two Cheneys,
15 committed a violation by standing in the
16 roadway at East and Government Street and she
17 went into the parking lot, and that's where
18 you effected the arrest of her; is that
19 correct?
20   A    Yes, sir.
21   Q    Was she with Alexis Cheney when you
22 took her into custody?
23   A    No.  I believe I took Alexis into
24 custody first.
25   Q    Where was Alexis standing when you

1    took her into the custody?

2        A    She had done made her way back into

3    the parking lot, also.

4        Q    So it's your testimony that when you

5    put your hands on Alexis Cheney to take her

6    into custody, she was standing in the parking

7    lot at East and Government Street; is that

8    right?

9        A    Yeah, parking lot, sidewalk.  She was

10   in that area.

11       Q    Well, was it the parking lot or the

12   sidewalk?

13       A    It's basically like a driveway right

14   there, so it's the same.  The sidewalk goes

15   across the parking lot, the driveway where she

16   was arrested at.

17       Q    I see.  So there's like a curb cut

18   where cars can drive into the parking lot?

19       A    Yes.

20       Q    And you're saying she was standing in

21   that curb cut area when you put your hands on

22   her to arrest her?

23       A    Right.

24       Q    Okay.  So those are the only two

25   people you personally arrested on July 10th,

```
1   2016; is that right?
2        A     Yes, sir.
3        Q     Did you order that anyone else be
4   arrested on that day?
5        A     No, sir.
6        Q     And so let's start with Alexis
7   Cheney.  She was standing there in the curb
8   cut.  You put your hands on her to effect an
9   arrest, correct?
10       A     Right, for the violation that she
11  made.
12       Q     What was that violation?
13       A     She was in the roadway after given
14  numerous warnings to get out of the roadway.
15       Q     Okay.  So she was in the roadway and
16  then she went into the parking lot; is that
17  right?
18       A     She didn't move into the parking lot
19  until we went to make the arrest.  And then
20  she the fled into the parking lot.
21       Q     Okay.  And how did you know she was
22  fleeing rather than complying with orders to
23  get out of the street?
24       A     Because they didn't start moving
25  until several minutes -- until we started
```

```
 1    moving towards them.  And, "Them," meaning the
 2    protesters.
 3         Q    Okay.
 4         A    When given an order, they never did
 5    move.
 6         Q    So I'm going to pull up your initial
 7    report, which is Exhibit T.  I'm looking at
 8    page 52, Exhibit T.  This is your initial
 9    report describing the arrest of Tammy and
10    Alexis Cheney, correct?
11         A    Yes, sir.
12         Q    And so this says:  "During the
13    protest, a large group of protesters blocked
14    in the roadway and refused to move.  Mobile
15    Field Force was activated.  Most protesters
16    backed up and allowed police to clear the
17    street.  The defendants did not."
18              Did you see that part?
19         A    One more time.
20         Q    Yeah.  You see the fourth paragraph
21    where it says:  "Most protesters backed up and
22    allowed police to clear the street.  The
23    defendants did not"?
24         A    Correct.
25         Q    Did you write this?
```

```
 1        A    Yes, sir.  It's my report.
 2        Q    So what it's describing -- if I read
 3   it correctly -- is that there were protesters
 4   in the street.  Orders were given to clear the
 5   roadway and a contingent of protesters
 6   complied and another contingent did not
 7   comply; is that correct?
 8        A    Correct.
 9        Q    And it's your testimony that Alexis
10   and Tammy were part of the contingent that did
11   not clear the street; is that right?
12        A    Correct.
13        Q    I think I have an idea of what you're
14   describing here.  I want to pull it up and see
15   if that's right.  Can you see my screen here,
16   the video?
17             (VIDEO PLAYED)
18        A    Yes, sir.
19        Q    So this is a contingent of
20   protesters.  Is this a contingent of
21   protesters that you're describing that would
22   not clear the street?
23        A    I guess.  I mean --
24        Q    I can play a few seconds here of this
25   exhibit.  Is this the group, you're talking
```

1  about?

2         We're looking at -- this is Exhibit

3  GGGGGG.  That's six Gs.  That appears to me to

4  match what you're describing, a contingent of

5  protesters that would not clear the street.

6  Is this the contingent you were describing in

7  your report?

8      A     Yes, sir.

9      Q     And so it's your testimony that Tammy

10 Cheney and Alexis Cheney were a part of this

11 group here?

12     A     Yes, sir.

13     Q     And that -- okay.

14     A     Now, when you say, "This group here,"

15 are you talking about this specific group?

16 Are you talking about a group of protesters

17 that just refused to move out of the roadway?

18     Q     I'm asking you:  Was this group here

19 that we saw depicted standing at this

20 intersection, is this the group that Alexis

21 and Tammy Cheney were part of that refused to

22 move?

23     A     I can't answer that because I don't

24 know what intersection that is.  There's

25 nothing to let me know what that intersection

```
 1   is.
 2        Q    Yeah.  This is the intersection of
 3   East and France, just near the 500 --
 4             MS. MORRIS:
 5                  I'm going to object to the form
 6                  of the question, just because I think
 7                  saying, "This group" is kind of
 8                  vague.  And I don't know exactly what
 9                  you mean.  Just the people in the
10                  photo or something beyond that?
11             MR. MOST:
12                  Deelee, it's sufficient for you
13                  to simply object to the form.  For
14                  example, in Hunter V. GEICO General
15                  Insurance -- that's Eastern District
16                  of Louisiana, 17-05070 -- the Court
17                  held that, "An objection that a
18                  question is a vague is usually -- and
19                  in this instance was -- a speaking
20                  objection disguised as a form
21                  objection."
22                  I'll qualify my question, but
23                  going forward, you can just say,
24                  "Form objection," and that would be
25                  sufficient.
```

BY MR. MOST:

    Q    Okay.  Officer, this photo is taken at East and France.  Is this the group of protesters that you were describing in your initial report?

    A    It could be.  But like I said, I mean, without something telling me specifically that's that intersection, I'm just going by what you're telling me that it's that intersection.  But there's nothing in this photo telling me that that's that intersection.

    Q    Okay.  Let's see if there's street signs.  I'm looking at 24 seconds.  Do you see -- you can see the street signs of East and France visible at 24 seconds of this exhibit?

        (VIDEO PLAYED)

    A    Yes, sir.

    Q    So going back to the beginning at -- now, we're at 24 seconds.  This group of protesters here, is this the group described in your initial report that included Tammy Cheney and Alexis Cheney?

        MS. MORRIS:

            Object to form.  You can answer.

```
 1            THE WITNESS:
 2                 Yes, sir.  That's a group of
 3            people that refused to get out of the
 4            roadway.
 5   BY MR. MOST:
 6       Q    Right.  And that's the group that
 7   included Alexis Cheney and Tammy Cheney?
 8       A    I'm not sure if they were in that
 9   specific group, but, yes, they were in the
10   roadway.
11       Q    Okay.  But -- what is your
12   recollection?  Where were they standing in the
13   roadway; was it in this area here
14   (Indicating)?
15       A    I said I don't know.  I mean, it's
16   been years since all of this has taken place.
17   I can't tell you that it's this specific spot.
18   I can't say.
19       Q    So you had a very specific
20   recollection of where you arrested Alexis
21   Cheney, right?
22       A    I'm going to put it like this:  If me
23   and you were to go down to that spot, I can
24   tell where she was standing at.
25       Q    Okay.
```

1    A    I can do that.

2    Q    Yeah.  Would it help if we pulled it

3    up on Google Maps, would you be able to look

4    around and see where Alexis Cheney was

5    standing blocking the roadway?

6    A    It might.  I mean, like I said, I

7    don't know.

8    Q    Let's give it a try.  Okay.  So I'm

9    looking at -- this is the corner of East and

10   France on Google Maps.  We're looking at the

11   yard there directly in front of us is where a

12   number of protesters were gathered at one

13   point.  Looking around here, can you identify

14   where Alexis Cheney was blocking the roadway?

15   A    Can you try -- it's not showing on

16   the thing.

17   Q    I'm sorry.  You can't see what I'm

18   looking at, the Google Maps?

19   A    I can see the map system, but where I

20   was standing at is kind of like in an alleyway

21   and the bridge.  I know the bridge was behind

22   me.

23   Q    Was it this alleyway here looking

24   this direction (Indicating)?

25   A    Yes, sir.  Like towards the stop

1    sign?

2        Q    Yeah.

3        A    Yes, sir.

4        Q    Let me see if I can do that again.

5    Okay.  So you were coming down this alley,

6    which is France Street, correct?

7        A    Yes, sir.

8        Q    Towards the intersection of East and

9    France, right?

10       A    Yes, sir.

11       Q    Okay.  And you saw Alexis Cheney

12   blocking the roadway here (Indicating).  Is

13   that your testimony?

14       A    Yes, sir.  She was in the roadway at

15   that location.

16       Q    Okay.  It looks like there's a median

17   there.  Was she between the stop sign and the

18   median?

19       A    She was to the -- where the stop sign

20   is, it would be to the right.

21       Q    Okay.  Was where she was standing

22   currently visible here?

23       A    Yes, sir.

24       Q    So she was standing -- your testimony

25   is, she was standing in the East Street to the

1    right of the stop sign here (Indicating)?

2        A    Yes, just to the right of the stop

3    sign, I seen her.

4        Q    And so we saw that contingent of the

5    people in the video who were right at this

6    location refusing to move as the BearCat came

7    towards them, right?

8        A    Yes, sir.

9        Q    And was Alexis Cheney part of that

10    group, as the BearCat approach, refused to

11    move?

12        A    Yes, sir.  Like I said, she didn't

13    start moving until we started grabbing people.

14        Q    Okay.

15        A    The front line started grabbing

16    people and handing them back.  She didn't

17    start moving until then.

18        Q    So BearCat is coming down.  We saw it

19    on video.  There's a large group of protesters

20    who are declining to move.  Alexis Cheney was

21    part of that group.  And then according to

22    your testimony, fled; is that correct?

23        A    Yes, sir.

24        Q    And Tammy Cheney, she was part of

25    that group, as well?

1        A    She was in the group, too.

2        Q    That's something you recall; that's

3    not based on your initial report, correct?

4        A    Correct.

5        Q    Okay.  And so you put your hands on

6    Alexis Cheney and Tammy Cheney at this

7    intersection here; is that correct?

8        A    At what intersection?

9        Q    The one that we were just looking at.

10       A    No, not at that intersection, because

11   I had to chase them.

12       Q    Okay.  Right.

13       A    That's the intersection where the

14   violation took place.

15       Q    I got you.  Okay.  Thank you.  And

16   once you placed your hands on Alexis Cheney,

17   you then either handcuffed or put Zip Ties on

18   her; is that right?

19       A    Put flex cuffs on her and she was

20   placed on the transport bus.

21       Q    Did you walk -- and there was a

22   processing station near there where paperwork

23   was done; is that right?

24       A    Yes, sir.

25       Q    Did you walk her to the processing

1    station?

2        A    Yes, sir.  I believe I did.

3        Q    And presumably, then, you handed her

4    off to someone for processing?

5        A    Yes, sir.

6        Q    And then did you return to the active

7    barrier after you dropped off Alexis Cheney?

8        A    Yes, sir.

9        Q    Did you have a conversation with

10   anyone at the processing station when you

11   dropped off Alexis Cheney?

12       A    I got their names and stuff for my

13   personal -- so I could write my report.  I --

14       Q    You asked for Alexis Cheney -- I'm

15   sorry.  I cut you off.

16       A    I got the information, so that way

17   when I got back to the office, I knew who I

18   had to write my report on.

19       Q    So at the processing station, you

20   asked Alexis Cheney her name?

21       A    Yes, sir.  I got it from the officer

22   that was there.

23       Q    So an officer at the processing

24   station talked to Alexis Cheney; got her name.

25   And then you got Alexis Cheney's name from

```
1    that officer; is that correct?
2        A    Yes, sir.
3        Q    Did you talk to that officer about
4    anything else?
5        A    No, sir.
6        Q    So you didn't describe in detail the
7    circumstances of the arrest or the violation
8    to that officer?
9        A    No, sir.
10       Q    Did you have any other conversation
11   with anyone at the processing center about
12   Alexis Cheney, other than that?
13       A    No, sir.
14       Q    Then you returned to the active
15   barrier.  Then did you effect the arrest of
16   Tammy Cheney?
17       A    Yes, sir.
18       Q    She was also standing in the parking
19   lot?
20       A    Yes, sir.  Whenever I made the
21   arrest, she was in the parking lot.
22       Q    Were you part of a group of officers
23   who took her into custody?
24       A    Yes, sir.
25       Q    What was she saying as you took her
```

1    into custody?

2        A    I don't know.  I can't -- I don't

3    know.

4        Q    Roughly, how long was it between what

5    you describe as Alexis and Tammy's

6    violation -- how long was it between that time

7    and when you effected their arrests?

8        A    I don't know.  A few minutes.

9        Q    Okay.  So less than ten minutes?

10       A    Most likely.

11       Q    Definitely less than twenty?

12       A    Yes, sir.

13       Q    Okay.  I'm going to pull up the

14   probable cause affidavit for Alexis Cheney and

15   share it on the screen.  This is Exhibit

16   TTTTTT.  That's six Ts.  Do you see this is

17   the Affidavit of Probable Cause for Alexis

18   Cheney?

19       A    Yes, sir.

20       Q    You see in the upper left that this

21   was submitted to the East Baton Rouge Parish

22   Clerk of Court?

23       A    Yes, sir.

24       Q    So this a document submitted to the

25   Court about Alexis Cheney, right?

1        A    Yes, sir.

2        Q    And this is the document we were

3    describing earlier that it's supposed describe

4    under oath the circumstances of someone's

5    arrest and the violation that they caused,

6    correct?

7        A    Correct.

8        Q    Is it your handwriting here on the

9    top half of the page where Alexis Cheney's

10    name is written in?

11        A    No, sir.

12        Q    And on the line that says:

13    "Affiant," it says, "R. Simoneaux."  Is that

14    your handwriting?

15        A    That's not my handwriting.

16        Q    Is there another R. Simoneaux on the

17    Baton Rouge force?

18        A    Not to my knowledge.

19        Q    So someone is signing your name here,

20    right?

21        A    Yes, sir.

22        Q    And then below that, someone else

23    notarizes it and confirms the identity of the

24    signatory, right?

25        A    Yes, sir.

1      Q     It wasn't you that signed this?

2      A     No, sir.

3      Q     So someone in the Baton Rouge Police

4    Department is signing R. Simoneaux's name to

5    an Affidavit of Probable Cause, right?

6          MS. MORRIS:

7               Object to the form.

8          THE WITNESS:

9               Yes, sir.

10   BY MR. MOST:

11     Q     Do you know who that was?

12     A     No, sir.

13     Q     Did you authorize anyone to sign your

14   name to this document?

15     A     No, sir.

16     Q     So this is a false document, correct?

17         MS. MORRIS:

18               Object to the form.

19         THE WITNESS:

20               Repeat that.

21   BY MR. MOST:

22     Q     Sure.  It's a false document, right?

23     A     Yeah, that's not my document.

24     Q     Right.  It's a false document?

25         MS. MORRIS:

1              Object to the form; asked and
2         answered.
3    BY MR. MOST:
4         Q    You can answer the question, Officer.
5         A    Yeah, that's not my document.
6         Q    Right.  And the facts in it are also
7    untrue, correct?  This talks about protests in
8    the vicinity of 9000 Airline Highway.  Do you
9    see that about midway down?
10        A    Okay.  Yes, sir.
11        Q    And that's not where --
12        A    No, sir.
13        Q    Okay.  So both the facts in this
14   document and the affiant's signature are
15   false, correct?
16        A    Yes, sir.
17             MS. MORRIS:
18                  Object to the form.
19   BY MR. MOST:
20        Q    So someone, and we don't know who at
21   BRPD, created a false Affidavit of Probable
22   Cause regarding Alexis Cheney and submitted it
23   to the Court; is that correct?
24             MS. MORRIS:
25                  Object to the form.

```
 1              THE WITNESS:
 2                   Yes, sir.
 3   BY MR. MOST:
 4       Q    That's a problem, right?
 5              MS. MORRIS:
 6                   Object to that form.
 7              THE WITNESS:
 8                   That's not my document.  That's
 9              not my handwriting.
10   BY MR. MOST:
11       Q    Oh, I understand.  And, Officer, I
12   believe you.  How long have you known that
13   this document exists, roughly?
14       A    That, I don't know.  I mean, I was
15   given about two years ago, when all of this --
16   maybe more -- when all of this started coming
17   about.  And I started seeing my name put on
18   documents.  And I brought it to the attention
19   of the attorneys and they know about it.
20       Q    Great.  So -- and we'll look at Tammy
21   Cheney's.  And I'll preview for you.  It also
22   has an "R. Simoneaux" on it.  Other than those
23   two documents, were there other documents with
24   your name on it that you didn't sign?
25       A    Yes, sir.
```

```
 1        Q    Were they other Affidavits of
 2   Probable Cause?
 3        A    That, I'm not sure.  I know that my
 4   name was put on numerous papers from the
 5   protest, and I had nothing to do with it.
 6        Q    And numerous, do you mean five, ten,
 7   a hundred, a thousand?
 8        A    It's more than one.
 9        Q    More than ten?
10        A    I don't know.  I know it's more than
11   one.
12        Q    Okay.  And what did you do when you
13   found out that someone had been signing your
14   name to documents, aside from talking to the
15   attorneys?
16        A    That's it.  That's the only thing
17   that I did.
18        Q    Did you report it to your supervisor?
19        A    I let my supervisor know, but my
20   supervisor has nothing to do with the --
21   (Inaudible).
22             THE COURT REPORTER:
23                  I'm sorry.  You broke up.
24             THE WITNESS:
25                  I was explaining myself.  My
```

```
 1              supervisor told me that he had
 2              nothing do with the papers that was
 3              going on.  He wouldn't know nothing
 4              about it.  So I just let him know
 5              that my name was placed on papers
 6              that I didn't do.
 7    BY MR. MOST:
 8        Q    Do you know if your supervisor
 9    reported this to Internal Affairs or anybody
10    else?
11        A    No, sir.
12        Q    Did anyone come and talk to you about
13    this to the try to investigate what happened?
14        A    No, sir.
15        Q    So you didn't know of any
16    investigation that BRPD took into why someone
17    was signing your name to documents you didn't
18    sign, correct?
19        A    Correct.
20        Q    I mean, candidly, Officer, that seems
21    like a really big problem.  Does it bother you
22    that someone was out there signing your name
23    to stuff?
24              MS. MORRIS:
25                  Object to the form.
```

```
 1              THE WITNESS:
 2                   Yes, it does.
 3   BY MR. MOST:
 4        Q    And why?
 5        A    Because it's putting a bad name on
 6   me.  And it's proving that I'm not truthful.
 7   Because my report says one thing and that says
 8   another.
 9        Q    Have you ever figured out who it was
10   that was signing your name to documents?
11        A    No, sir.
12        Q    It's a crime to submit a false
13   affidavit, correct?
14              MS. MORRIS:
15                   Object to the form.
16              THE WITNESS:
17                   Correct.
18   BY MR. MOST:
19        Q    But to your knowledge, you don't know
20   of any BRPD investigation into this crime,
21   correct?
22        A    Correct.
23        Q    And a crime was committed by someone
24   submitting this false affidavit, correct?
25              MS. MORRIS:
```

```
 1                    Object to the form.
 2           THE WITNESS:
 3                    Yes, sir.
 4  BY MR. MOST:
 5       Q    And let's pull up Tammy Cheney's.
 6  Okay.  We're going to look at Exhibit TTTTT.
 7  That's five Ts.
 8           Officer, this is the Affidavit of
 9  Probable Cause for Tammy Cheney; is that
10  right?
11       A    Yes, sir.
12       Q    And you can see at the bottom this
13  one also says "R. Simoneaux"?
14       A    Yes, sir.
15       Q    And you, likewise, did not sign this
16  one, correct?
17       A    No, sir.
18       Q    Is any of the handwriting on this
19  page yours?
20       A    No, sir.
21       Q    Okay.  So just like with Alexis
22  Cheney's Affidavit of Probable Cause, someone
23  created a false Affidavit of Probable Cause
24  for Tammy Cheney, correct?
25           MS. MORRIS:
```

```
 1                      Object to the form.
 2            THE WITNESS:
 3                      Yes, sir.
 4    BY MR. MOST:
 5        Q    Someone, likewise, committed a crime
 6    by manufacturing this false affidavit,
 7    correct?
 8        A    Yes, sir.
 9            MS. MORRIS:
10                      Object to the form.
11    BY MR. MOST:
12        Q    Then your answer to the questions I
13    asked about the Alexis Cheney's affidavit are
14    the same for this Tammy Cheney affidavit,
15    correct?
16        A    Yes, sir.  That's not my -- that's
17    not me.
18        Q    Were you directed to arrest
19    protesters on July 10th, 2016?
20        A    Yes, sir.
21        Q    Someone gave you an order to effect
22    arrests?
23        A    Yes, sir.
24        Q    Who was the person that gave you that
25    order?
```

1    A    It was a commander.  I don't know him

2  by name.  I don't know their name.  All I know

3  we were giving orders.

4    Q    What was the order you were given, to

5  the best of your recollection?

6    A    Basically, move in and clear the

7  street and arrest the violators.

8    Q    Okay.  And did you follow Alexis and

9  Tammy Cheney from the location we looked at

10  earlier to the parking lot?

11    A    No.  I tried to follow -- I lost

12  sight of Tammy.  And whenever I went after

13  Alexis -- because Alexis had retreated into

14  the crowd and that's whenever I -- she was

15  back into the parking lot, back on private

16  property whenever I grabbed her.

17    Q    Okay.  So you didn't follow her from

18  the location of the violation to the location

19  of the arrest, you -- she went to those

20  locations and you also went to those locations

21  and recognized her?

22    A    Yes, sir.

23    Q    And so you saw her and recognized her

24  from that group of people we saw in the video

25  that we looked at earlier?

```
 1        A     Yes, sir.
 2        Q     And so did you witness Tammy Cheney
 3   or Alexis Cheney engaging in any acts of
 4   violence?
 5        A     With Alexis, yes.
 6        Q     What acts of violence did you witness
 7   her engaging in?
 8        A     She, with the group of people that
 9   she was with, were throwing rocks and frozen
10   water bottles at us.
11        Q     She was part of a group, you say,
12   that was throwing rocks and frozen water
13   bottles?
14        A     Yes, sir.
15        Q     Did you witness Alexis engage in that
16   conduct?
17        A     She did throw a rock.
18        Q     You saw Alexis Cheney throw a rock?
19        A     Yes, sir.
20        Q     While she was standing as part of
21   that group we saw in that video earlier?
22        A     Like I said, I don't know if it was
23   part of that group.  I just know it was a
24   group of people that were in the front of us.
25   There were rocks and frozen water bottles
```

1    thrown at us.

2        Q    Where did she throw that rock?

3        A    She threw it into the crowd where the

4    officers were at.

5        Q    Did it seem like she was trying to

6    hit an officer with it?

7        A    She threw it into the crowd where we

8    were standing.

9        Q    Okay.

10        A    Now, was that her intent?  I can't

11    say.  But she threw it into the crowd where we

12    were standing at.  And when I say, "Crowd," it

13    means the officers that were there.  Because

14    it was more than just me, numerous officers

15    right there.

16        Q    That's pretty significant that --

17    your testimony is that you witnessed Alexis

18    Cheney attempt to battery on an officer?

19        A    Yes, sir.

20        Q    That's the kind of thing that you

21    would include in an incident report?

22        A    Yes, sir.  The only reason why it was

23    not put in there was because I had no victim.

24    If an officer was hit, I have to have a victim

25    to charge her.  That's why it was left out,

1   why I didn't charge her.

2       Q    You didn't even describe that in your

3   incident report, correct?

4       A    No, sir.

5       Q    So your incident report contains no

6   mention of Alexis Cheney throwing a rock, but

7   it's your testimony that that happened?

8       A    Yes, sir.

9       Q    Even if you didn't know the identity

10  of the victim or if there was a victim,

11  wouldn't that be the kind of thing you put in

12  an incident report?

13      A    Yes, sir.

14      Q    Did you see Tammy Cheney engage in

15  any acts of violence?

16      A    No, sir.

17      Q    What is -- what training have you

18  received as a BRPD officer about when to

19  arrest protesters?

20      A    No training about protesters.

21      Q    Okay.  Have you ever received any

22  training related to the law of when it's

23  appropriate to -- or permissible to arrest

24  protesters?

25      A    No, sir.

```
 1        Q    Have you ever received any training
 2   that in some circumstances, it can be a
 3   violation of protesters' first amendment
 4   rights to be arrested?
 5        A    No, sir.
 6        Q    You never received any training about
 7   a case called Cox V. Louisiana about a person
 8   in Baton Rouge who was arrested by the Baton
 9   Rouge Police and the Supreme Court found it to
10   be a clear violation of their rights?
11        A    No, sir.
12        Q    You never heard of that case?
13        A    No.
14        Q    Okay.
15        A    I've never dealt with
16   protesters in my whole career until that time.
17   That was my first dealings with any
18   protesters.
19        Q    So you weren't provided with my
20   training with how to deal with that situation;
21   is that correct?
22        A    No, sir.
23        Q    And by "No, sir," you're agreeing you
24   weren't provided any training, correct?
25        A    Correct.
```

1    Q    Officer, I just want to ask about --

2    you're wearing some patches on your uniform.

3    On your left, it looks like that's your badge.

4    A    Yes, sir.

5    Q    What's the next one in the middle

6    there?

7    A    It's a memory patch of my partner

8    that was killed in 2016.

9    Q    Sorry to hear that.  And then the

10   patch adjacent to that, is that a Blue Lives

11   Matter flag?

12   A    It's a thin blue line flag.  It's an

13   American flag.  It don't say:  "Blue Lives

14   Matter."

15   Q    I just heard it described that way

16   sometimes.  That's why I asked.  Okay.  I

17   think my colleague, David Lanser, is going to

18   ask some questions based on some dash camera

19   video that we have.  And then I'm going to

20   turn it over to the MacArthur lawyers and,

21   perhaps, Mr. Rodney, to see if they have any

22   questions.  And then Ms. Morris may have some

23   questions.  We might have followup and that's

24   how we will proceed.

25           Do you need to take a break or does

```
1    anybody need to take a break before we move on
2    to the next section?
3              THE WITNESS:
4                   I just need a bottle of water.
5              MS. MORRIS:
6                   Why don't we take a quick
7              five-minute break to go find some
8              water.
9              MR. MOST:
10                  Yeah, absolutely.  We'll pause
11             the recording.  We'll regroup at
12             10:43.
13        (BRIEF RECESS)
14             MR. MOST:
15                  Did you get some water, Officer?
16             THE WITNESS:
17                  Yes, sir.
18             MR. MOST:
19                  I'm going to turn it over to my
20             colleague, Dave Lanser, to do the
21             next section of questioning.
22                       EXAMINATION
23   BY MR. LANSER:
24        Q    Good morning, Officer Simoneaux.  As
25   Mr. Most has said, my name is Dave Lanser.
```

```
 1    I'm another attorney for the plaintiffs in the
 2    Blair Imani case.  I just want to ask some
 3    questions about a video we have here.  Let me
 4    see if I can share.
 5              MR. LANSER:
 6                   William, can you enable screen
 7              sharing for everybody?  Thank you.
 8              Let me see if I can pull this up.
 9    BY MR. LANSER:
10       Q    So I'll represent to you, this is a
11    video that was produced by BRPD in discovery.
12    It's a dash cam video or in-car camera video
13    from Corey Edwards -- I believe the officer
14    name is.  I just had a couple of questions
15    about what we can see here.  First of all, I
16    believe it was your testimony earlier that you
17    had escorted some individuals, including
18    possibly Alexis and/or Tammy Cheney to where
19    the van was, correct?
20       A    Yes, sir.
21       Q    Okay.  Do you remember what
22    intersection that the van was located at?
23       A    No, sir, I noted it was just in that
24    general area.  I think -- it might have been
25    on Government Street.  I'm not sure.
```

1      Q    Okay.  I can pull up a map, if you
2    want, if that's helpful.  Actually, why don't
3    I do that?  Let me stop sharing this for a
4    second, just so we're totally on the same
5    page.  I believe we have an Exhibit LL, two
6    Ls.  Can you see that map?
7      A    Yes, sir.
8      Q    Okay.  I'm going zoom in -- sorry.
9    So here is -- can you see where my curser is?
10     A    Yeah, you circling East Boulevard.
11     Q    Yeah, East Boulevard and France.  I
12   believe we've had testimony earlier from other
13   officers that testified that the prison
14   processing area where the van would have been
15   would have been here on 10th and Government.
16   Does that sound right?
17     A    I don't know.  I mean, I can't say.
18     Q    Okay.  That's fine.  But it is within
19   a block or two of East and France?
20     A    Yes, sir.
21     Q    All right.  Let me go back to the
22   video -- so like I said, this is a dash cam
23   video from Officer Corey Edwards.  Are you
24   familiar with Officer Edwards?  Do you know
25   who that is?

```
 1        A    I mean, I know him, but, I mean, I'm
 2   not, like, really good friends with him.
 3        Q    Okay.  That's fine.
 4        A    I mean, I know him because he works
 5   with the police department.
 6        Q    Sure, sure.  I'm just going to hit
 7   "Play" for a minute here so you can kind of
 8   see the area and stuff.  Sort of let me know
 9   if this is the processing area where the van
10   would have been that you're referring to.
11             (VIDEO PLAYED)
12   BY MR. LANSER:
13        Q    Is that the area, you think?
14        A    It could be.  Like I said, I'm not
15   sure.
16        Q    Okay.  Was sound coming through when
17   they did that?
18        A    No, sir.  Ain't wasn't nothing.  Just
19   a video.  I didn't hear sound.
20        Q    Let me see if I can get the sound
21   going.  Here we go.  Sound should work moving
22   forward now.
23             (VIDEO PLAYED)
24             MR. LANSER:
25                  I'm going to -- I know it's not
```

1           the highest quality video here and

2           these individuals are a little far

3           away.  I'm just going to hit "Play"

4           again and let me know if you

5           recognize any of these officers over

6           here.

7                (VIDEO PLAYED)

8    BY MR. LANSER:

9        Q    Do you recognize any of those

10   officers in the right side here (Indicating)?

11   I know it's tough.

12       A    I don't know who that is.

13       Q    Okay.  That's fine.  I'm going to

14   forward a little bit where it might be a

15   little clearer.

16           Oh, also I should have said.  This is

17   a new exhibit.  We haven't used before.  I

18   believe we're up to six Us, so Exhibit UUUUUU.

19   Let me move forward on here.  This technology

20   is a little clunky, so please bear with me.

21           Okay.  I'm going to hit "Play" for

22   another 20 seconds or so.  Pay attention to

23   the individuals to the right side of this car

24   here and let me know if you recognize any

25   officers or any of the people being arrested.

```
 1              (VIDEO PLAYED)
 2    BY MR. LANSER:
 3        Q    Were you able to recognize anyone in
 4    that video?
 5        A    No, I can't tell.
 6        Q    Were you able to hear the audio that
 7    time?
 8        A    Yeah, I hear the radio, like the
 9    radio in the background.  A lot of buzzing
10    noise.
11        Q    Yeah.  Unfortunately, I think that's
12    just part of the way the video -- that's
13    coming through on my end, too, so it's not
14    something with the computer.  It's just how
15    the had recording was captured, unfortunately,
16    with the buzzing.
17             You said you heard the radio.  Were
18    you on the radio at any point during July
19    10th?
20        A    No, sir.
21        Q    Let me ask you something about it
22    anyways, just in case you might know what
23    they're referring to.  I'm skipping ahead to
24    -- sorry, hold on.  Okay.  I'm going to hit
25    "Play" at -- this is -- in the video, it's 19
```

```
1    hours, 41 minutes and 42 seconds.  I'm going
2    to hit "Play."  I just have a question about
3    the radio here.  So if you could try to listen
4    to the radio call.  I'm hitting "Play" right
5    now.
6              (VIDEO PLAYED)
7              MR. LANSER:
8                   Okay.  Hit "Play" again.
9                   (VIDEO PLAYED)
10             MR. LANSER:
11                  It keeps skipping ahead on me.
12                  Okay.  I apologize for the technology
13                  here.  I'm starting at 19 hours, 41
14                  minutes and 32 seconds.
15                  (VIDEO PLAYED)
16   BY MR. LANSER:
17       Q    I know that's kind of difficult to
18   make out.  It sounded to me like they said:
19   "We need EMSs for all of these 15s because
20   they all have injuries."
21             Does that sound right to you?
22       A    I can make out that they said they
23   needed EMS at the staging area.
24       Q    As far as you know, they're saying
25   for 15s, correct?  Does that mean arrestees?
```

1        A     I don't know.  I can't answer that,

2    because I don't know.

3        Q     Fifteens means -- what does 15s mean?

4        A     Fifteens means people that's under

5    arrest.

6        Q     So just based on the actual language

7    of the call, they're saying all the 15s, so

8    all the people under arrests have injuries, so

9    they're calling for EMS; is that correct?

10              MS. MORRIS:

11                   Object to the form.

12              THE WITNESS:

13                   I can't say.  All I know is they

14              called for EMS to that staging area.

15              Now, what's going on over there, I

16              don't know.

17   BY MR. LANSER:

18        Q     But they said it's for the 15s?

19              MS. MORRIS:

20                   Object to the form.

21   BY MR. LANSER:

22        Q     Correct?

23        A     Sir.

24        Q     You said it was for the 15s?

25        A     I know for 15s means arrestees.  Now,

1    is it for the 15s?  I don't know.  I wasn't

2    there.

3         Q    All right.  Let me move forward to --

4    find the right spot here.  Okay.  I'm going to

5    start playing at 19 hours, 44 minutes and 57

6    seconds.  And, again, I'm not concerned about

7    the radio at this point.  I'm going to, again,

8    ask you if you can recognize any of the

9    officers or any of the people being arrested?

10             All right.  I'm hitting "Play" now.

11             (VIDEO PLAYED).

12   BY MR. LANSER:

13        Q    Do you recognize anyone there?

14        A    No, sir.

15        Q    I'm going to back this up a little

16   bit, if I can get to it.  I'm going to pause

17   it here; 19 hours, 45 minutes and zero

18   seconds.  I know she has her back to us.  But

19   do you recognize this person being escorted

20   here (Indicating).

21        A    No, I can't tell.

22        Q    If I represent to you that that was

23   Alexis Cheney, would that jog your memory at

24   all?

25        A    I can't say because I can't tell --

1    even if I look at her picture right now, I
2    couldn't tell, because it's been years since
3    I've dealt with all of that.
4        Q    Okay.  Either officer on the side of
5    this individual, do you recognize either one
6    of them?  I know they have their backs to you
7    right now.
8        A    No, sir, I can't tell.
9        Q    Okay.  Neither one is you, I'm
10   guessing, because you would be able to tell, I
11   imagine?
12       A    Yes, sir.  None of them is me.
13       Q    All right.  Moving forward -- sorry.
14   I'm trying to get to the right spot here.  I'm
15   going to start playing this at 19 hours, 47
16   minutes, 56 seconds.  I'm going to ask you to
17   listen to the radio call real quick.  I'm
18   hitting "Play" now.
19                    (VIDEO PLAYED)
20   BY MR. LANSER:
21       Q    Did you hear that?
22       A    Yes, sir.
23       Q    Do you recognize any of those voices?
24       A    One of them was me.
25       Q    And what were you saying in that

1    video?

2         A    There was a child -- I was by a car

3    and there was child inside the car with a dog.

4         Q    Do you remember who that child was or

5    who that dog was?

6         A    It was Alexis or Alexis's mom.  It

7    was with them.

8         Q    Okay.  So what were you -- sort of

9    describe the circumstances there.  I know you

10   -- with Mr. Most, you went through the arrest

11   of Alexis and Tammy.  I'm curious sort of how

12   you came about the car with the child and the

13   dog.  If you could just describe those

14   circumstances?

15        A    Because they had told me their

16   vehicle was right there.

17        Q    And so they told you the vehicle was

18   there, so you went and look at it and saw

19   there was a child and dog inside?

20        A    Yeah.  Didn't know anything about a

21   child being in there.  That was their vehicle.

22   And once we got there, the child said that was

23   his mom and stuff.  And the dog was up in

24   there, in the car with no one around.

25        Q    And this is after Alexis and Tammy

1    had been arrested?

2        A    Yes, sir.

3        Q    And so what was -- what did you do

4    after that point?

5        A    We stayed with the child and stuff

6    until we got some other guys there to where we

7    could bring everybody back to the district.

8        Q    What other -- other BRPD officers

9    or --

10       A    Yeah, it was other BRPD officers.

11       Q    And what about the dog?

12       A    I think we called Animal Control for

13   the dog.

14       Q    And you waited there until Animal

15   Control came, as well?

16       A    I didn't.

17       Q    Do you remember who did?

18       A    No, sir.

19       Q    Do you remember who stayed with the

20   child?

21       A    The child was, I believe, brought

22   back to the district with us.  Because we

23   called -- we had called Child Services to come

24   to the district.

25       Q    Okay.  Let me move forward a little

```
 1   bit here in the video.  I'm sorry.  It's tough
 2   to get precise moments here.  Okay.  I'm going
 3   to hit "Play" at 19 hours, 54 minutes and 15
 4   seconds.  I also don't think the radio matters
 5   at this point.  So I'm just going to take the
 6   sound off, so we can all avoid that awful
 7   buzzing noise.
 8           Okay.  I'm hitting "Play" there.
 9           (VIDEO PLAYED)
10   BY MR. LANSER:
11       Q    Okay.  Let me just back up for a
12   second here.  So pausing at 19 hours, 54
13   minutes and 22 seconds, do you recognize
14   anyone in this shot at this point?
15       A    No, sir.
16       Q    You don't recognize this officer
17   talking to an arrestee?
18       A    No, sir.
19       Q    Or this one escorting an arrestee?
20       A    No, sir.
21       Q    I'm going to skip ahead.  I think I
22   need to go -- okay.  I'm going to stop sharing
23   this video and pull up a different one.  This
24   is just a -- this is just a continuation of
25   that same dash cam footage, but it's on two
```

1    different files, for whatever reason.

2              Let me start sharing that.  So this

3    is, again, Corey Edwards's dash cam footage of

4    the same area.  The car appears to just be

5    parked in the same spot as it had been this

6    time.  This would be Exhibit VVVVVV, as in

7    Victor.

8              Let me jump ahead.  Okay.  I'm going

9    to hit "Play" here.  And, again, I'm going to

10   be looking for identifies of these people, if

11   you happen to know any of them.

12             (VIDEO PLAYED)

13   BY MR. LANSER:

14       Q    Do you recognize this individual here

15   (Indicating)?

16       A    No, sir.

17       Q    What about any of these officers?

18       A    No, sir.

19       Q    Okay.  What about if I back up -- I'm

20   backing up a few seconds.  This is at 20

21   hours, 10 minutes and 50 seconds.  Do you

22   recognize this individual on the left

23   (Indicating)?

24       A    No, sir.

25       Q    You were in this area at some point

1  on July 10th, correct?

2      A    Yes, sir.

3      Q    But you don't remember any of the

4  officers there?

5      A    No, sir.  We had police officers from

6  all over; not just from our department.

7      Q    So you're saying none of these are

8  BRPD officers or you're not sure?

9      A    I can't tell with just the pictures,

10  with that video.

11      Q    Do you remember, just from your

12  recollection, which BRPD officers were at the

13  processing area?

14      A    There was a lot.  I mean, do I know

15  them all by name?  No.

16      Q    Yeah.  You don't remember who you

17  would have handed off any of the people you

18  arrested to?

19      A    I don't remember.

20      Q    Okay.  Well, just bear with me for a

21  couple more of these, if you don't mind, just

22  in case.  Okay.  I'm going to hit "Play" here

23  at 20 hours, 18 minutes and five seconds.

24  I'll have similar questions for you maybe

25  after 30 seconds or so.

```
1              (VIDEO PLAYED)
2     BY MR. LANSER:
3         Q    I'm going to stop it here at 20
4     hours, five minutes, 18 seconds.  Did you
5     recognize anyone in the video?
6         A    No, sir.
7         Q    Do you recognize either of these two
8     officers?
9         A    No, sir.
10        Q    And this here, I'll just represent to
11    you, this person they're speaking to is Alexis
12    Cheney, again.  That doesn't jog your memory
13    at all who these other officers who are
14    speaking to her might be?
15        A    No, sir.
16        Q    Do you know why they're speaking to
17    her?
18        A    No, sir.
19        Q    I've just got one more of these, I
20    believe.  I'm going to move ahead another 15
21    minutes or so.  Okay.  Hitting "Play" at 20
22    hours, 32 minutes and 26 seconds.
23             (VIDEO PLAYED)
24    BY MR. LANSER:
25        Q    Pausing at 20 hours, 32 minutes and
```

1    44 seconds.  Did you recognize anyone in that

2    video?

3         A    No, sir.

4         Q    You don't recognize either of these

5    two people speaking with Alexis Cheney?

6         A    No, sir.

7         Q    Just give me one minute to review my

8    notes here.  That might be everything I have

9    for you.  Although, I'm sure other attorneys

10   have more questions.  Just bear with me for

11   one second.

12              MR. MOST:

13                   This is William most.  I've just

14              got a followup question from our

15              discussion earlier, and then I'll

16              hand it off to the other lawyers.

17              Can you hear me all right, Officer?

18              THE WITNESS:

19                   Yes, sir.

20                        EXAMINATION

21   BY MR. MOST:

22        Q    We were talking earlier about Alexis

23   Cheney and how she was part of that group we

24   saw on the video that refused to comply with

25   orders to clear the streets, right?

```
 1        A    Yes, sir.
 2        Q    If she had not been part of that
 3   group and instead was part of the other
 4   contingent of protesters that did retreat to
 5   the sidewalks and private property, if that
 6   was the case, she shouldn't have been
 7   arrested, correct?
 8        A    Correct.
 9        MS. MORRIS:
10             Object to the form.
11        MR. MOST:
12             That's it of what I've got.  Any
13             of the McArthur team would like to
14             ask some questions?
15        MR. FOLEY:
16             Yes.  Was Dave going to show
17             another video?
18        MR. LANSER:
19             Sorry.  Just give me one second,
20             if you don't mind.  I'm trying to
21             pull something up and it might take a
22             while.  Just give me one minute
23             before MacArthur jumps into it.
24        MR. FOLEY:
25             For planning purposes, I can
```

```
1          tell everyone that I probably have
2          about an hour to an hour and a half
3          of questioning.  So I don't know what
4          people want to do for a lunch break
5          and when.  Because after me, I don't
6          know if Mr. Rodney might have
7          additional questions or
8          Mr. Fahrenholt or Mr. Most or Lanser
9          might have followup after hearing my
10         questions.  Roy?
11    MR. RODNEY:
12         I will have very few questions
13         that I anticipate.  I suspect after
14         that, maybe after you, I won't have
15         any.
16         Did everyone here that?
17    MR. FOLEY:
18         Yes.
19    MR. LANSER:
20         I apologize, Eric.  Computer
21         issues over here.  Just give us one
22         second.
23         Thanks for being patient.  I
24         don't have anything else.  Thank you.
25              EXAMINATION
```

1    BY MR. FOLEY:

2        Q    All right.  So, Officer Simoneaux,

3    I -- to start off, let me just confirm.  Is

4    your rank corporal?  I just want to make sure

5    I'm addressing you correctly.

6        A    Yes, sir.

7        Q    Corporal Simoneaux, I represent a

8    group of plaintiffs across several other

9    cases.  Most of my plaintiffs were arrested on

10   July 9th.  A lot of my questions for you are

11   going to be about Saturday, July 9th, the day

12   before the day we've been talking about today.

13   I do have a few questions about the 10th.  I

14   wanted to go back to the exhibit that --

15           Actually, Dave or William, can you

16   enable screen sharing?

17           MR. LANSER:

18               You should be able to now.

19           MR. FOLEY:

20               Great.  Yes.

21   BY MR. FOLEY:

22       Q    So Officer, I wanted to back to this

23   exhibit that was marked as GGGGGG.  The title

24   of the final file being "201607.10 Up to 40

25   Black Lives Matter Protesters."  I want to

```
 1   show you this video and ask you about your
 2   recollection of that day.  I'm going to play
 3   about 20 or 30 seconds of this, and I'll be
 4   back with questions.  I was not intending to
 5   play any audio, because I am more addressing
 6   just the image.  But if you want me to play it
 7   with the audio, I can do that, too.
 8               (VIDEO PLAYED)
 9   BY MR. FOLEY:
10       Q    Corporal Simoneaux, do you recognize
11   that scene there?
12       A    No, sir.
13       Q    Let's do a reversal on that.  This
14   is -- as you can see on the screen here -- the
15   corner of East and France, the same corner we
16   were talking about earlier with the Cheneys'
17   arrests.  I want to direct your attention to
18   this house on the corner, this gray house
19   here.  At the time that this crowd of
20   protesters is being forced off of that
21   property as the various law enforcement
22   agencies are entering the property.  Where
23   would you be at that time?
24       A    That, I don't know.  I know I wasn't
25   over there.
```

1        Q    Was there any point during that day

2   that you entered the property on the corner of

3   East and France there?

4        A    Not that I recall.

5        Q    So apart from the arrest of the

6   Cheneys, which you've already discussed

7   earlier in this deposition, where else were

8   you?  Were you entering any other private

9   property?

10       A    No, not that I recall.

11       Q    Okay.  So you were in the streets,

12   then?

13       A    I was basically in the streets and

14   over there by Government.

15       Q    Okay.  And I want to switch between

16   screens.  I want to show you a different

17   image.

18            Corporal, can you see my screen here,

19   it's an Excel spreadsheet?

20       A    Yes, sir.

21       Q    This was produced to us in discovery

22   by the City.  And it purports to be a listing

23   of the rosters by district as of July 5th,

24   2016.

25       A    Yes, sir.

1      Q    I pulled up District 3 here.  And it
2  has you listed under Lieutenant Kevin
3  Lapeyrouse?
4      A    Yes, sir.
5      Q    So looking at this screen here, does
6  it look like an accurate representation of the
7  folks that were in that district and,
8  particularly, in your -- I guess you call it
9  you unit, perhaps?
10      A    Yes, sir.  That's my squad.
11      Q    Squad.  Were any of these folks there
12  on July 10th, do you know?
13      A    Yes, sir.
14      Q    Which ones?
15      A    I can say that Montrel was there,
16  Jeremy Hollis was there.  I believe Brad
17  Lawrence was there.  I'm not sure.  And
18  Jonathan Birch.
19      Q    And were you all assigned to the same
20  duties; did you have different duties; what
21  was everyone doing?
22      A    My squad was assigned to SRT and
23  Mobile Field Force units as security,
24  basically.
25      Q    Can you describe a little bit more

1    what that means?
2        A    Basically, we were just there for
3    whenever they would grab people and hand them
4    to us, we were to escort them to the van.
5        Q    So SRT would physically apprehend
6    someone, hand them off to you; you would bring
7    them to the van, come back and grab someone
8    else from SRT; is that right?
9        A    Yes, sir.
10       Q    And so everyone in your squad would
11   have had the same duty that day, everyone who
12   was present from your squad?
13       A    Basically, yes, sir.
14       Q    Were there any other squads that were
15   assigned that same duty?
16       A    Sir?
17       Q    Were any other squads assigned that
18   same duty?
19       A    Yes, sir.  There was numerous
20   officers assigned to that.
21       Q    Any other squads from District 3?
22       A    I believe so.
23       Q    Okay.  Do you know which ones?
24       A    No, sir.
25       Q    Are you aware of any of the other

1    officers from your squad or from your district

2    who would have entered the property at First

3    and East?

4         A     No, sir.  I'm not sure.

5         Q     Did you hear anyone talking about

6    entering that property?

7         A     No, sir.

8         Q     Okay.  That's going to be all the

9    questions I have about July 10th.  Before I

10   move to July 9th, I want to ask you a couple

11   more questions about some background.

12              So I had heard you talking earlier

13   about some training.  I was curious about your

14   time in the academy.  So that would have been

15   -- if I remember your testimony correctly,

16   that would have been 2005; is that right?

17        A     Yes, sir.

18        Q     During the academy, were there any

19   classes or instruction on dealing with

20   protesters or demonstrations?

21        A     I don't believe.

22        Q     And what about Mobile Field Force?

23   Did you have any training in Mobile Field

24   Force?

25        A     Vaguely, a little bit.  Like, maybe

1   an hour worth of it of us just holding shields

2   and beating on them, basically.

3       Q    And so that would have been in the

4   academy or in-service?

5       A    In the academy.

6       Q    What about any in-service trainings

7   on Mobile Field Force?

8       A    I didn't.  I've never had in-service

9   training with Mobile Field Force.

10          I take it back.  I'm sorry.  They had

11  the training form Mobile Field Force, but I

12  was not directly involved in it.  Basically,

13  they were telling us how we would stand with

14  Mobile Field Force.

15      Q    When was that?  Was that before or

16  after these protests we're talking about

17  today?

18      A    I'm not sure.  I don't remember.  I

19  just note that there was maybe an hour's worth

20  of training on it.

21      Q    Can you tell me a little bit more?

22  When you stand with them, what does that mean?

23      A    We were to -- basically, you let

24  Mobile Field Force do what they need to do and

25  we're just there to take people whenever they

1    hand them off to us.

2         Q    Was there any part that training that

3    dealt with processing, prisoner processing,

4    arrest reports?

5         A    No, sir.  No, sir.

6         Q    And who provided that training?

7         A    The academy staff.

8         Q    Did you ever receive any training

9    from outside sources, outside trainers that

10   would have been contracted by the department?

11        A    No, sir.

12        Q    I know you talked a bit about

13   probable cause affidavits earlier.  Can you

14   define probable cause for me?

15        A    It's reasonable grounds to make an

16   arrest.

17        Q    And that's the entirety of the

18   definition, as you understand it?

19        A    I mean, that's probably not the

20   entirety of the definition, but that's the

21   basics of it.

22        Q    So reasonable grounds to make

23   arrests, that's your understanding of probable

24   cause; is that correct?

25        A    Yes.

1    Q    Have you ever had any training about

2  your duties if you see another officer

3  unlawfully arresting a person?

4    A    No, sir.

5    Q    So if you did see an officer

6  unlawfully arresting a person, what would you

7  do?

8    A    Contact my supervisor.

9    Q    Okay.  Would you -- you would contact

10  your supervisor first before doing anything

11  else?

12    A    I would contact my supervisor and let

13  them handle it.

14    Q    Would you do anything else?

15    A    It's -- no, sir, it's not my -- I

16  mean, I wouldn't -- I couldn't step in because

17  our chain of command is not like that.

18    Q    And a slightly different question --

19  similar, but slightly different.  Does your

20  answer change if the officer that you see

21  making an unlawful arrest is from a different

22  agency or a different department?

23    A    It's the same.  I would still contact

24  my immediate officer and let him take it from

25  there.

```
1        Q    When filling out a probable cause
2    affidavit, what is supposed to be contained in
3    the affidavit?
4        A    Evidence that a crime has been
5    committed.
6        Q    I want to pause it just one moment.
7    I believe my colleague, Jim -- there he is.
8    He texted.  He was stuck in the waiting room,
9    but he's here.  Sorry about that.  So your --
10   Officer, your answer is the contents of the
11   probable cause affidavit is that a crime has
12   been committed; is that right?
13       A    Yes.
14       Q    Let me ask you a question on incident
15   reports.  What's the purpose of an incident
16   report?
17       A    What's the purpose of it?
18       Q    Yes.
19       A    To describe the incident that has
20   taken place and the evidence therein --
21   everything that's taking place at that time.
22       Q    Okay.  And how are you supposed to
23   write it?
24       A    In order.  I guess.  I mean, that's
25   how I write my reports.
```

1      Q    Can you tell me what kind of training

2   did you receive in writing incident reports?

3      A    We received training in the academy

4   and then you just continue to learn as you go

5   through working as a police officer.

6      Q    So if I was recruiting for a brand

7   new officer and I asked you:  How should I

8   write a report?  What would you tell me?

9      A    I would tell you to write it how

10  things happened.  And I would sit there with

11  you and explain the date, the time, the

12  location of the incident, the crime that's

13  committed, the victim's statement, the

14  complainant's statement and the conclusion of

15  what you did.

16     Q    When are arrest reports -- I'm

17  sorry -- incident reports -- I want to be

18  accurate.  When are incident reports supposed

19  to be completed?

20     A    If an arrest is made or what?  Can

21  you --

22     Q    Sure.  I'll rephrase.  If an arrest

23  is made, what is the time frame in which an

24  incident report should be completed?

25     A    It has to be turned in before you

1    leave -- before you secure your tour of duty.

2        Q    So once you complete your report,

3    what happens to it?

4        A    It's being sent to -- it's in the

5    system and the sergeant has to approve it or

6    the lieutenant.

7        Q    And when you say:  "In the system,"

8    does that mean that you complete the report on

9    a computer or a network of some sort?

10       A    Yes, sir.

11       Q    In the report system, is it possible

12   for you to author a report for someone else?

13       A    Do what?

14       Q    Is it possible for you to author a

15   report for someone else?  In other words, is

16   it possible for you to create a report that

17   would have another officer's name as the

18   reporting officer?

19       A    Unless you have their password and

20   stuff like that to get into their system.

21       Q    So every time an officer writes a

22   report, they have to put in a password, and

23   that report is tied to them as being the

24   person that created it; is that right?

25       A    Whenever you log into the report

```
 1   writing system, you have to log in under your
 2   IBM and your password.
 3        Q    And for purposed of the record, can
 4   you describe IBM for us?
 5        A    A IBM is your officer badge number.
 6   That's how they identify you.
 7        Q    Let me -- I'm just realizing this.
 8   I'm about to bring this exhibit back up --
 9   that I didn't mark it, the squad listing.
10   I'll bring this back on the screen and we'll
11   offer this as Exhibit 1.  So every officer
12   here in the division and the squad would have
13   a unique IBM; is that right?
14        A    Yes, sir.
15        Q    One moment.  I'm going to bring up
16   another -- I'm sharing a different document
17   with you that I'll mark as Exhibit 2.  It's
18   the file titled "Simoneaux pages from" -- I'm
19   sorry.  Am I mispronouncing your last name?
20   Is it Simoneaux or Simoneaux?
21        A    Simoneaux.  You said it.
22        Q    "Simoneaux Pages From Assignment
23   Sheets.PDF" I'll represent to you that this
24   was produced to us by the City.  It's part of
25   a much larger file, assignment sheets for all
```

1    of the divisions and districts.  I just want

2    to direct your attention to the middle of the

3    page here.  I see your name listed and number

4    10121.  Was that your IBM number?

5        A    Yes, sir.

6        Q    And there's a separate number for

7    call 3626.  What would that be?

8        A    That's my call number.

9        Q    Explain what a call number is used

10   for.

11       A    A call number is used for whatever

12   dispatch has to get -- is tying to get in

13   touch with a certain unit.

14       Q    And unit, you have 1579.  Is unit

15   just a patrol car, a vehicle?

16       A    Yes, sir.  Yes, sir.

17       Q    So this is page 1 of this four-page

18   exhibit, which doesn't have a date on it.  I'm

19   going to scroll down to page 3, which lists

20   July 9th.  Have you ever seen these Assignment

21   Sheets before, Corporal Simoneaux?

22       A    Yes, sir.  It's a duty roster.

23       Q    Does this look like an accurate

24   reflection of the folks in your squad and in

25   the district that would have been on duty on

1    July 9th?

2         A    Yes, sir.

3         Q    I can zoom out here a bit, so you can

4    see more of the page.  I'm sorry.  So on that

5    date, would Wayne Stroughter -- if I'm

6    pronouncing that correctly -- would he have

7    been your direct supervisor?

8         A    Yes, sir.

9         Q    Who would Officer Stroughter report

10   to?

11        A    Lieutenant Kevin Lapeyrouse.

12        Q    And then Kevin Lapeyrouse would

13   report to who?

14        A    The captain, Duane Scrantz or the

15   acting captain would be Lieutenant Cox.

16        Q    And just for purpose of clearing up

17   some confusion on my part, I realize on the

18   sheet -- and also on the squad listing we saw

19   a moment ago, there's both an Earl and Kevin

20   Lapeyrouse.

21        A    Yes, sir.

22        Q    Are they related?

23        A    They're brothers.

24        Q    Okay.  I'm going to hop back very

25   quickly to that first exhibit.  There's one

1    more question I wanted to ask you.  For the
2    record, can you explain the difference between
3    A and B letters?
4        A    It's different shifts.  Like, it
5    could be evening shift.  We have three
6    different shifts, day shift, evening shift and
7    dog shift.
8        Q    Is there an A, B and C, then?
9        A    Yes -- no.  It's only like -- the A
10   and the B, I think, is the rotations and then
11   there's different shifts.  But we were on
12   12-hour shifts that time.
13       Q    So you'd have two, obviously, if it's
14   12 hours?
15       A    Yes, sir.
16       Q    So since you're in this B column
17   here, everyone on in your squad would have
18   been on the night half of the 12-hour shifts;
19   is that right?
20       A    Well, at that time, I was working
21   from 4:00 in the morning until sometime 12:00
22   at night, so.  I was supposed to be on the day
23   shift.
24       Q    Okay.  Let me bring up what we'll
25   term as Exhibit 3, which I'm just going to

1    show to see if this helps jog your memory to

2    see if we can nail down times here.  So this

3    Exhibit 3 is a file titled "Simoneaux Protest

4    Roster 07-09-16, 07-15-16.pdf"

5            Officer, I'm going to represent to

6    you that this is a selection of a much larger

7    PDF of all of the protest rosters that were

8    given to us by the City.  I'd like to address

9    the order of relevant pages here and make it

10   slightly larger, so it's easier to see.  So

11   for the 9th here, the middle of the page where

12   my cursor is, I see ten hours of regular time

13   and seven hours of paid overtime; is that

14   accurate?

15       A    Yes, sir.

16       Q    And then for Sunday, ten hours

17   regular and six hours overtime; is that right?

18       A    I believe so, yes, sir.

19       Q    When would you have started each of

20   those shifts?

21       A    When?

22       Q    Yeah.  What time of day?

23       A    At that time, I think they had us

24   coming in at 5:00.  I'm not sure, but it's

25   usually -- we do 10-8 at 6:00.  When I say

1    10-8, that means on duty.

2        Q    Okay.

3        A    But like I said, they had us on

4    12-hour shifts, so our times were, like,

5    adjusted, all crazy at that time.

6        Q    So you did your shifts plus an

7    additional five hours on top of that?

8        A    Yes, sir.

9        Q    So you would have been there for --

10    on Saturday, you would have been there, likely

11    from -- well, starting at 6:00 a.m.  Probably

12    got there earlier and then until about

13    11:00 p.m.?

14        A    Yes, sir.

15        Q    Back in July of 2016, did you have a

16    cellphone that would have been issued by the

17    department?

18        A    No, sir.

19        Q    Did you recall -- I'm sorry.  Let me

20    rephrase that.  Did you send any text messages

21    on your personal cellphone about the protest

22    to other officers?

23        A    No, sir.

24        Q    Did you send or receive -- well, let

25    me ask that.  Did you receive any text

1    messages from other officers about the

2    protests on your personal phone?

3        A    No, sir.

4        Q    Did anyone from technology services

5    or IT -- or however they might be termed --

6    did anyone from your technology services come

7    and speak to you to ask whether you had any

8    such messages?

9        A    No, sir.

10       Q    Did you receive any notification from

11   anyone asking you to preserve any messages?

12       A    No, sir.

13       Q    On your Baton Rouge Police Department

14   email, would that be rosimoneaux@brla.gov?

15       A    Yes, sir.

16       Q    Did you receive any emails about the

17   protest response on that email address?

18       A    If I did, I don't remember.

19       Q    Similarly, do you recall getting any

20   emails or have any other communications from

21   anyone asking you to preserve or not delete

22   any emails about the protests?

23       A    No, sir, not that I recall.

24       Q    I know you said that you would

25   never -- and outside of the one-hour training

```
 1   you talked about at Mobile Field Force, you've
 2   never done any kind of in-depth training to
 3   participate as a Mobile Field Force member; is
 4   that right?
 5        A    No, sir.
 6        Q    Aside from these protests in July
 7   2016, were there other incidents, whether they
 8   were demonstrations or protests, where you
 9   were called out to support either SRT or
10   Mobile Field Force?
11        A    No, sir.
12        Q    Can you explain to me what your
13   understanding of the rights that protesters
14   have?
15        A    That -- I mean, I don't know.
16   Because I don't get into all of that.  To tell
17   you the truth, I don't, to answer that.  I
18   know everybody has a right to freedom of
19   speech.
20        Q    How would you determine when a
21   protest becomes unlawful?
22        A    Well, whenever they become violent,
23   blocking streets and throwing rocks and
24   causing great bodily harm to people and
25   property and everything else or damage to
```

1   property and stuff.

2       Q    So you said, violence, damage to

3   property, blocking the streets.  So in the

4   absence of those factors, a protest can occur

5   lawfully?

6       A    Can occur unlawfully or lawfully?

7       Q    Lawfully.  It can be lawful if those

8   things aren't present?

9       A    Yes.  People can protest lawfully all

10  they want, as long as they keep it civil.

11      Q    When you say blocking the streets, at

12  what point is a person blocking a street?

13      A    They keep the traffic from moving.

14      Q    Do you recall -- have you received

15  training on Louisiana Revised Statute Section

16  1497, simple obstruction of a highway?

17      A    No.  I mean, I received criminal law

18  training, but I can't say on that specific

19  code.

20      Q    How many times in your career have

21  you arrested somebody under that statute?

22      A    Never.

23      Q    You've never arrested under 14 --

24      A    Yes.  Besides the protest, that I can

25  remember.

95

```
 1        Q    So neither before nor since that
 2   time, you don't recall any arrests under --
 3        A    No, sir.  I don't normally go after
 4   that kind of stuff.
 5        Q    So on July 8th, there were of number
 6   of protests on Airline Highway.  Were you
 7   deployed to assist in that protest response,
 8   as well?
 9        A    I believe so.
10        Q    To be clear, we're talking about
11   Friday night, July 8th.  Did you make any
12   arrests on the Friday, July 8th?
13        A    I'm not sure.  I mean, I don't think
14   I did.
15        Q    What would your duties have been on
16   July 8th?
17        A    Basically, just stay behind Mobile
18   Field Force and provide security if they
19   needed it.
20        Q    A question I should have asked
21   earlier when we were talking about July 10th,
22   who instructed you on that duty that you were
23   going to have that day?
24        A    Sorry.
25        Q    We talked about on July 10 that you
```

1    had that duty of assisting SRT to grab folks

2    that they had physically apprehended.  Who

3    instructed you that day on what your duties

4    would be?

5        A    The Command Center tells our

6    lieutenant where we need to go and then our

7    lieutenant tells us.

8        Q    How did you receive that; was that

9    in-person briefing or did you get a memo?

10       A    No, they told us in person.

11       Q    Do you know which lieutenant that

12   was?

13       A    My lieutenant, Kevin Lapeyrouse.

14       Q    Would that have been the procedure on

15   July 8th and July 9th, as well?

16       A    Yes, sir.

17       Q    I know I asked you about arresting

18   protesters on July 8th.  Do you remember

19   having any physical contact with the

20   protesters on July 8th?

21       A    I'm not sure.  I don't remember.

22       Q    Did you receive any emails or have

23   any direct communication with the incident

24   commanders, Officers Leach and Martin?

25       A    No, sir.

1        Q    Let's talk a bit about July 9th,

2   then, specifically.   Corporal Simoneaux, are

3   you familiar with the name Deon Tennart?

4        A    No, sir.

5        Q    At the beginning of this deposition,

6   I think Mr. Most asked you if you reviewed any

7   documents.   I think you said you reviewed some

8   of the paperwork from the Cheneys.   Did you

9   review any other arrest reports or probable

10  cause affidavits?

11       A    No, sir.

12       Q    I'm going to show you a series of

13  documents.   The first one we'll mark as

14  Exhibit 4.   We're up to.   If I'm wrong in the

15  numbering, please jump in and correct me on

16  that.   It's going to be a probable cause

17  affidavit.   Let me know you can see that on

18  the screen, on your screen?

19       A    Yeah, it's too big.

20       Q    It's too big much.   I'll shrink it

21  down some.   So this file also is Tennart, Deon

22  PC Affidavit.pdf.   The defendant's name here

23  is Deon Leroy Tennart.   And if you scroll down

24  here, the affiant appears to be Officer B.

25  Lawrence.

1              So, Officer Simoneaux, my question
2      for you, have you ever seen this Affidavit of
3      Probable Cause report?
4          A    That one specifically, no.
5          Q    Do you recognize his handwriting; is
6      this yours?
7          A    No, sir.
8          Q    How about on this notary public
9      signature; do you recognize that?
10         A    No, sir.
11         Q    Are you familiar with Officer
12     Lawrence's handwriting?
13         A    Somewhat.
14         Q    Would you say this appears to be his
15     handwriting?
16         A    I can't.  I mean, I can't say.  I
17     know he works on my squad.  I know Officer
18     Brad Lawrence, but his handwriting is his
19     handwriting.
20         Q    At this moment, you have no
21     recollection of participating in the creation
22     of this document?
23         A    No, sir.
24         Q    I'm sharing another document, which
25     we'll mark as Exhibit 5.  It's titled:

```
 1    "Tennary Deon-Booking Record."  That was the
 2    original title.  I didn't want to change it.
 3    It's actually Deon Tennart, with a "T."
 4           Do you see this document on the
 5    screen titled:  "Arrestee Information Form" at
 6    the top?
 7    A     Yes, sir.
 8           MR. FOLEY:
 9               Mr. Rodney, would you mind
10           muting?
11           MR. RODNEY:
12               I'm sorry.  Hold on one second.
13           MR. FOLEY:
14               That's all right.  Let me zoom
15           out of this, so you can see this
16           better.  Scroll down again.
17    BY MR. FOLEY:
18    Q     So this has an officer's ID number
19    P-10582 and officer's name B. Lawrence.  I
20    want to ask you, Officer Simoneaux, what is
21    the purpose of the "Arrestee Information
22    Form."
23    A     That goes with the booking, whenever
24    you book be somebody in parish prison.
25    Q     And who fills that out?
```

1        A     The officer.

2        Q     And do you recall filling out this

3    form for the arrestee on Tennart?  I'm sorry.

4    I spoke over you.

5        A     No, I didn't fill the form out.

6        Q     The second page of this exhibit is

7    the same probable cause affidavit that were

8    attached.  I'm going to show you another

9    document.  Bear with me one moment.  It should

10   appear on the screen here.  This is titled,

11   "Deon Tennart Arrest Report."  We'll mark this

12   as Exhibit 5.

13            Let's go up here.  Officer Simoneaux,

14   I see Report Officer 1 has your name listed

15   and Report Officer 2 has Bradley Lawrence

16   listed.  Is that right?

17       A     I don't know.  I'm still looking at a

18   rap sheet.

19       Q     Okay.  Let me stop sharing and

20   reshare.  How about now?

21       A     I see what you're looking at.

22       Q     Incident Report?

23       A     Yes, sir.

24       Q     This is Report Number 1600070022081.

25   And as I was mentioned earlier, it appears to

```
 1   have your name and Officer Lawrence's name as
 2   the reporting officer fields.
 3        A    Right.
 4        Q    From our discussion before, for you
 5   to be listed as Report Officer 1, does that
 6   mean you had to create this report?
 7        A    I believe so.
 8        Q    And how does one become Report
 9   Officer 2?
10        A    You can add them in there.
11        Q    Can a Report Officer 2 add in a
12   Report Officer 1?  In other words, can an
13   officer author a report and make himself
14   officer 2?
15        A    That, I'm not sure.  I'm not sure
16   about that.  I can't answer that.
17        Q    Okay.  If you can't answer it, you
18   can't answer it.  That's all right.  Let me
19   scroll down.  To the second half of the first
20   page here.  For begin date/end date, there
21   appears to be 10:51 p.m. of July 9th, 2016.
22   Is that right?
23        A    Yes, sir.
24        Q    What's the significance of the begin
25   date and the end date?
```

1      A    It's supposedly from -- the way I use

2  it, it's the beginning from the time that you

3  get there and then the end date and the end

4  time is, like, whenever you're leaving.  But

5  on certain charges, like, for a burglary, you

6  can -- the begin time would be -- or the begin

7  date would be whenever the victim stated that

8  they left.  The end would be whenever they

9  came back.  Am I explaining it where you can

10  understand it?

11      Q    I think so.  I just -- can you tell

12  me what significance would be in this

13  instance, where you have the same beginning

14  and end date?  Is that just the time you

15  created the report?

16      A    Yeah.  All he did was just basically

17  he just put the same time in both of them.

18  But you can't -- I don't want to get into what

19  he's supposed to do.

20      Q    So when you say, "He," who's he?

21      A    The officer.

22      Q    All right.  And so would that be you,

23  Officer Lawrence or someone else?

24      A    It would be the arresting officer,

25  but I see that this is a supplemental report.

```
 1   I'm thinking in the supplemental report, but
 2   you can add officers on any rotation that you
 3   want to on that list.
 4        Q    Okay.  So I see down here on the
 5   bottom of this first page, as well, it says,
 6   "Report approved by Adam Cheney on July
 7   27,2016."
 8        A    Yes, sir.
 9        Q    Do you know why there would have been
10   a delay in approval?
11        A    No, sir, other than -- everything
12   going on at that time.  I know the supervisors
13   wasn't basically sitting in there approving
14   reports on time, because there was a lot of
15   stuff going on at that time.
16        Q    Right.  Right.  I'm going to keep
17   scrolling through the document here.  The
18   second page lists Mr. Tennart's relevant
19   personal information, aliases.  And moving on
20   to the third page, which is the charge of
21   1497, obstruction of a public highway, which
22   we discussed earlier.  And then we get to the
23   last page here, which is a narrative.  And so
24   first I'll ask:  Have you seen this before,
25   Officer Simoneaux?
```

1       A    No, sir.

2       Q    Would you like to take a minute to

3    review it?

4       A    It's basically describing an arrest

5    that was subject for -- at 9000 Airline

6    Highway.

7       Q    Did you write this, Officer?

8       A    Not that I recall.  I don't think I

9    did.

10      Q    It says:  "On Saturday, June 9, 2016"

11   -- which seems to be the wrong month -- "at

12   about 2:17 p.m., Officer Bradley, Lawrence and

13   I, Corporal Reab Simoneaux, were assigned to a

14   security detail."

15           It was written in the first person as

16   though you wrote it.  You think someone else

17   write this?

18      A    It could be.  Because I don't

19   remember writing it.

20      Q    So what you're just saying a moment

21   ago, it's possible with a supplemental report

22   that someone could have gone in and created

23   this narrative?

24      A    Yes, sir.  Yes, sir.

25      Q    And that could be someone who is not

```
 1    listed on either of those reporting officer
 2    fields?
 3         A    It could be.  All you have to do is
 4    pull the file number up.
 5         Q    All right.  I'm going to leave this
 6    and come back to this in a little bit.  I want
 7    to show you some video footage of Deon
 8    Tennart's arrest.  I think a couple of minutes
 9    ago you were not familiar with the name Deon
10    Tennart; is that right?
11         A    Correct.
12         Q    I'm going to bring up a video that
13    has not yet been introduced, I don't think, in
14    our shared deposition exhibits.  This is a
15    file title "2016.07.09 08:37 p.m. Twitter
16    (Bryn Stole) arrest of Deon Tennart."
17              I'm going to attempt to share that
18    with the sound, which sometimes is not
19    successful for me. If you would do me a favor
20    and tell me, A, if you see the image and, B,
21    if you hear the sound?
22              (VIDEO PLAYED)
23    BY MR. FOLEY:
24         Q    Let me pause that.  Officer, can you
25    see that here?
```

```
 1        A    Yes, sir.
 2        Q    I'm going to start back from the
 3   beginning.  I'm also going to play it at a
 4   slightly slower speed.  It's a short clip and
 5   the action is pretty fast.  So I'm going to
 6   reduce the speed by about half, so that we can
 7   at least see what's going on.
 8             (VIDEO PLAYED)
 9   BY MR. FOLEY:
10        Q    I'm going to represent to you that
11   the figure we just saw, this man in the
12   foreground here that my cursor is pointing,
13   that is Mr. Deon Tennart.
14             (VIDEO PLAYED)
15   BY MR. FOLEY:
16        A    I'm pausing here.  There's an officer
17   who is coming up through the ranks of the EBR
18   deputies who are holding the shields who bust
19   through and grab Mr. Tennart.  I'm going to
20   ask you to pay attention and try to follow
21   Mr. Tennart for the next 15 seconds or so of
22   this video.
23             (VIDEO PLAYED)
24   BY MR. FOLEY:
25        Q    Okay.  Officer Simoneaux, did you
```

1    recognize any of the officers that were in

2    that footage?

3         A    No, sir.

4         Q    I'm going the play it again, but I

5    want to do a specific frame.  Can you see

6    this, Officer, where my cursor is pointing?

7    He's in the background with the ball cap on.

8         A    Yes, sir.

9         Q    Is that you, Officer Simoneaux?

10        A    I don't think it is.

11        Q    I'm going to try to advance frame by

12   frame, since it's such a -- kind of a fast

13   pace bit of action and it blurs a bit, so I'm

14   going to see if I can get a clearer shot.

15            (VIDEO PLAYED)

16   BY MR. FOLEY:

17        Q    Officer, did you recognize anyone

18   that time?

19        A    No, sir.

20        Q    So we'll mark that as Exhibit 6, I

21   believe I've got my numbering correct.

22            I'm going to bring up a separate

23   video.  This is the same incident of a

24   different angle.  This is a clip taken from a

25   much longer video that I'm not going to

1  subject everyone to watching all 40 minutes of

2  it.  But this is "EBRSO MFF Part I."  It was a

3  video obtained from the East Baton Rouge

4  Sheriff's Office from the night of July 9th.

5  Can you see that that playing on your screen,

6  Officer Simoneaux?

7      A    The yes, sir.

8             (VIDEO PLAYED)

9  BY MR. FOLEY:

10     Q    I'm going to pause here and just note

11 that this figure where my cursor is pointing,

12 we would represent that that is, again,

13 Mr. Tennart.  So we're seeing this from the

14 opposite angle of where we saw it before.  I'm

15 just going to ask you to follow him.

16            (VIDEO PLAYED)

17 BY MR. FOLEY:

18     Q    I'm going to pause here, again, and

19 just represent to you that this individual

20 that has now hit the ground is, again,

21 Mr. Tennart.  I'm going to let it play for

22 another 30 or 40 seconds or so and I'm going

23 to have a question for you.  The camera is

24 going to pan back and forth between this

25 scene, but he's going to be on the ground for

1   a good bit.
2              (VIDEO PLAYED)
3   BY MR. FOLEY:
4       Q    I'm going to pause here, Officer
5   Simoneaux.  So, again, this is Mr. Tennart on
6   the ground surrounded by what appears to be
7   six or seven officers.  Do you recognize
8   yourself in any of this footage?
9       A    No, sir.
10      Q    Do you have any memory of being part
11  of this group that laid hands on Mr. Tennart?
12      A    No, sir.
13             (VIDEO PLAYED)
14  BY MR. FOLEY:
15      Q    Let me pause here, Officer.  There's
16  a -- you can see an officer on Mr. Tennart's
17  left side in baseball cap that's going to be
18  escorting him.  Do you recognize that officer?
19      A    No, sir.
20             (VIDEO PLAYED)
21  BY MR. FOLEY:
22      Q    I have one more video of another
23  scene that's very short and it has another
24  view of that officer who is escorting
25  Mr. Tennart.  I'm just going to ask you to

```
1    take a look at that and tell me if --
2           (VIDEO PLAYED)
3    BY MR. FOLEY:
4        Q    While we're on this frame here, do
5    you recognize any of these officers who are
6    standing in the foreground?
7        A    No, sir.
8        Q    These don't look like anyone from
9    your district?
10       A    No, sir.
11          (VIDEO PLAYED)
12   BY MR. FOLEY:
13       Q    I'm just rewinding slightly there,
14   because you can see Mr. Tennart right about
15   center of the screen; again, with that
16   officer, somewhat higher definition.  My
17   question for you, Officer Simoneaux:  Would
18   that appear to be Bradley Lawrence who's with
19   him?
20       A    I don't know.  I mean, I can't say.
21       Q    Can you describe Bradley Lawrence for
22   me, physically?
23       A    He's probably about 5'6", probably
24   200 pounds.
25       Q    So that looks like a significantly
```

```
1   taller, thinner man than 5'6", 200 pounds?
2        A    Yes.
3        Q    Would you agree with me on that?
4        A    Yes.
5        Q    I'm going to advance this frame just
6   to show you that there's no further shots of
7   Mr. Tennart here.
8             (VIDEO PLAYED)
9   BY MR. FOLEY:
10       Q    So the question of -- did you ever
11  encounter Mr. Tennart at all?
12       A    No, sir.
13       Q    Did you see yourself in any of these
14  videos?
15       A    No, sir.
16       Q    Again, this is the night of Saturday,
17  July 9th.  Did you make any physical arrests
18  that night?
19       A    I don't think I did.
20       Q    And I should define -- when I say
21  physical arrest, did you escort anyone that
22  night.
23       A    I don't remember.  If I did, I don't
24  remember.
25       Q    Were you ever asked any questions
```

1    about Deon Tennart's arrest by either Bradley

2    Lawrence or any other BRPD Officer you work

3    with?

4        A    No, sir.

5        Q    I'm going to stop sharing this

6    screen.  I want to show you a video -- well,

7    first I'm going to show you a document from

8    another arrest earlier that day.  This is

9    still July 9th.  This is going to be a

10   document called "Kailath" -- K-A-I-L-A-T-H --

11   "Arrest Report."  I might be mispronouncing

12   that name, as well, but you all get the idea.

13   This would be -- I forgot to mark the last

14   exhibit, which would be 6.  This would be 7, I

15   believe.

16            And Officer Simoneaux, can you see

17   this incident report on your screen right now?

18       A    Yes, sir.

19       Q    So I have a Report Number

20   1600070022009, July 9, 2016 with a time stamp

21   of -- appears to be 6:55.  Officer, this is --

22   your name is listed here as the Report Officer

23   1 field; is that right?

24       A    Yes, sir.

25       Q    I'm going to scroll down.  This is --

1    primary offense.  This says:  "Obstruction of

2    a public highway," Statute 1497, which we

3    (Inaudible) already and the report, again,

4    approved by Adam Cheney on the same date of

5    the last report for Mr. Tennart was approved,

6    July 27.  This is for the man arrested of a

7    man named Ryan Kailath or Kailath.  Do you

8    recognize this name at all, Officer?

9         A    No, sir.

10        Q    I'll scroll down to his narrative

11   section.  And I'll zoom out a bit, so you can

12   see the whole -- or most of the document here.

13   Are you able to read that, Officer?

14        A    It's basically the same thing that

15   the other one said, but it's just name changes

16   and stuff in it.

17        Q    Right.  That's what it looks like to

18   me, too.  Do you remember writing this report?

19        A    No, sir.

20        Q    Do you have reason to believe that

21   you did write it?

22        A    No, sir, I didn't.

23        Q    Someone else wrote his report?

24        A    It's got to be, because I don't

25   remember writing it.

```
 1        Q    Okay.  I want to show you a video
 2   that that arrestee had made a couple of
 3   seconds before he was arrested.  And it's
 4   titled:  "Two minutes leading up to my arrest
 5   in Baton Rouge."
 6             I'm going to share that on the screen
 7   in a moment.  It's about two minutes long.
 8   The relevant part is the last 20 seconds or
 9   so.  So unless Ms. Morris objects or one of
10   the other attorneys objects, I'm going to
11   forward us to that position.
12             MS. MORRIS:
13                  That's fine.
14             MR. FOLEY:
15                  Ms. Morris and I have seen this
16             video too many times in another case.
17             This is the one-minute-45-second
18             mark.  I'm going to press "Play"
19             here.
20                  (VIDEO PLAYED)
21   BY MR. FOLEY:
22        Q    I'm paused here.  Officer Simoneaux,
23   do you recognize any of these officers?
24        A    I can see me standing off to the
25   side.
```

1      Q      And that would be --
2      A      The one with the sunglasses on to the
3  left.
4      Q      Right here (Indicating)?
5      A      Yes, sir.
6      Q      Okay.  I'm going to continue playing.
7             (VIDEO PLAYED)
8  BY MR. FOLEY:
9      Q      Officer Simoneaux, I saw you in the
10 background there.  Do you recall actually
11 grabbing Mr. Kailath?
12     A      No, sir.
13     Q      Allow me just one moment here.  So
14 that could have been Exhibit 8.
15            Let me move on to what we'll call
16 Exhibit 9, which is a file called "DeSalvo
17 Protest, 7-9-16 (1)."
18            Officer Simoneaux, can you see my
19 screen now?
20     A      I can see the screen.  That picture?
21     Q      Yes.  I'm about to hit "Play."
22 Before I do, I just want to - if can you see
23 my cursor pointing at a gentleman with a white
24 button down shirt with a baseball cab with
25 some headphones on.  Can you see him?

1        A    Yes, sir.

2        Q    I'm going to ask you to follow him.

3    I'm going to play this about 20, 30 seconds or

4    so.  I should note that there's no sound on

5    this video.

6            MS. MORRIS:

7                Eric, I think our little picture

8            in picture situation is blocking the

9            person.  So if you want to --

10           MR. FOLEY:

11               Okay.

12           MS. MORRIS:

13               I'll lower these pictures.

14           MR. FOLEY:

15               Okay.  Great.  Thank you,

16           Deelee.

17           MS. MORRIS:

18               Go ahead.

19           MR. FOLEY:

20               On I'm going to pause here.  And

21           Mr. Kailath is now turned around.

22           I'm going to direct your attention

23           there and press "Play" again.

24               (AUDIO PLAYED)

25           MR. FOLEY:

```
 1              I'm going to play it once more
 2          because I had a visual hiccup on
 3          mine.
 4                  (VIDEO PLAYED)
 5  BY MR. FOLEY:
 6      Q    Officer Simoneaux, does this man that
 7  I represented to you as Ryan Kailath, does he
 8  appear to be standing on the grass?
 9      A    Yes, sir.
10      Q    I'm going to press, "Play" again
11  here.
12                  (VIDEO PLAYED)
13  BY MR. FOLEY:
14      Q    It appears he's -- if I'm describing
15  this accurately, let me know.  It's appears he
16  was just shoved by an officer.  Is that
17  correct?
18      A    Yes, sir.
19      Q    I'm going to switch back to the
20  arrest report.  I'd like to ask you a question
21  there.  So, Officer, can you see that arrest
22  report again that's on the screen?
23      A    Yes, sir.
24      Q    So I wanted to ask you about this
25  paragraph here that I brought into the middle
```

```
 1   of the screen.  It says:  "During the protest,
 2   a large group of protesters walked in the
 3   roadway of 9000 Airline and refused to move.
 4   Mobile Field Force was activated and used to
 5   push the crowd back with riot shields and
 6   batons.  Most prosecutors backed up and
 7   allowed police to clear the street.  The
 8   defendant did not.  He stood his ground and
 9   engaged on known Mobile Field Force officers
10   who were wearing riot gear, including helmets.
11   Eventually, the defendant was pulled through
12   the first line of police and handed to
13   Corporal John Shirley and me."
14            Does that description reflect the
15   video that you just saw, Officer Simoneaux?
16       A    No, sir.
17       Q    What's different about it?
18       A    We were standing in grass for one.
19       Q    Did it appear to you that he engaged
20   unknown Mobile Field Force officers?
21       A    No, sir.
22            MS. MORRIS:
23                 Object to form.
24   BY MR. FOLEY:
25       Q    You can answer?
```

1        A     I said no.

2        Q     The question, too, is Corporal John

3    Shirley, did you recognize him anywhere in the

4    video?

5        A     I did not see him.

6        Q     And so if I'm correct, you didn't

7    author this report and you never saw it before

8    it was submitted; is that correct?

9        A     Correct.

10       Q     Who did author it, then?

11       A     That, I don't know.

12       Q     Do you recall receiving any

13   instructions from anyone in your squad, your

14   division or anyone with the department about

15   how to write these specific arrest reports

16   from protesters?

17       A     Our supervisors were telling us that

18   if we do write a report that they already have

19   the outlay of it.

20       Q     So this -- they had his language

21   already drafted; is that what you mean?

22       A     Yeah.  It was a template.

23       Q     So there was a template arrest report

24   and --

25       A     Yes.

```
 1        Q    -- how was that used?
 2        A    It was used for, basically, all the
 3   reports.
 4        Q    Okay.  And so if we're looking at
 5   these two examples, it looks like the only
 6   things that changed were the names; is that
 7   right?
 8        A    Yes, sir.
 9        Q    And how did that language get
10   distributed?
11        A    What do you mean?
12        Q    I think -- if I understood your
13   testimony correctly, there was a template that
14   supervisors wanted folks to use or told people
15   they could use; is that right?
16        A    Yes, sir.  It was given to the
17   supervisors and then the supervisors gave it
18   to us.
19        Q    And so my previous question, then,
20   how did they give it to you?
21        A    They told us that it was written
22   under that one file and to take that narrative
23   on there and just change the names and stuff
24   in it.
25        Q    Okay.  So the direction was to look
```

```
1    at one of them that already been prepared and
2    use that same language, just change the names
3    and dates?
4         A    Correct.
5              MR. FOLEY:
6                   I'm almost done.  I have 15
7              minutes more of questions.  People
8              want to hang on that for a lunch
9              break or are people starving and
10             ready to drop now?
11                  Hearing no objection, I will
12             keep going.
13             THE COURT REPORTER:
14                  I need one second, please.
15             MS. MORRIS:
16                  Can we take a five-minute break?
17             MR. FOLEY:
18                  Absolutely.
19             (BRIEF RECESS)
20             MR. FOLEY:
21                  Everyone else online is good to
22             go?
23             MS. MORRIS:
24                  Yes.
25
```

1    BY MR. FOLEY:

2        Q    Officer Simoneaux, when we left off,

3    we were talking a bit about these templates.

4    My followup question on that was:  Who in the

5    chain of command should I talk about to get

6    more information on how those were created and

7    sent out?  I saw from our squad listing before

8    that Kevin Lapeyrouse is the head of your

9    squad, and below him, you had the two

10    sergeants.  Is that who I should talk to or

11    somebody above them?

12        A    It would probably somebody above

13    them.  It came down to us, so it come from up

14    above.

15        Q    So who did you receive that directly

16    from?

17        A    We receive it from our sergeants.

18        Q    And when you say, "Our sergeants,"

19    that would have been Stroughter and Cheney?

20        A    Yes.

21        Q    And then so you believe or do you

22    have other reason to know that they got from

23    someone else?

24        A    They got it from somebody else

25    because it was already written.

1    Q    And did this exist as like a paper
2    document, or they just pointed to you where in
3    the system it had already been written up and
4    you copied and paste it?
5    A    It already written under a first file
6    number that was pulled and someone had wrote
7    it.
8    Q    And then --
9    A    And they just went by that template.
10    Q    I'm sorry.  I cut you off.
11    A    They just went by that template.
12    Everything was written by that template.
13    Q    And my first file number -- hold on
14    one second, so I'm clear we're talking about
15    the same thing.  If I'm looking at that arrest
16    report -- I just shared that again on the
17    screen -- this being Deon Tennart's arrest
18    report.  The file number, would that be 70022?
19    A    Yes, sir.
20    Q    And then -- if I'm reading this
21    correctly, 081 is Mr. Tennart's report,
22    specifically.  And then everyone else arrested
23    in the same incident or event would have
24    different last three numbers, but they would
25    all share the 7022; is that accurate?

124

1    A    They would share the same file
2  number, but that 081, that would be the number
3  of supplements.
4    Q    Okay.  So the original that we're
5  talking about would be somewhere further
6  down -- further back in time than that
7  three-digit number?
8    A    Yes, sir.
9    Q    I have one more video that I wanted
10  to show you to ask if you could help me
11  identify two of the officers who are shown
12  there.  And bear with me just one moment.
13  I'll bring it up.  I am getting towards the
14  very end of my questioning.  I promise, I'm
15  almost done.
16         I'm going to share with you a video
17  that's titled "Dozens arrested during protests
18  in Baton Rouge, Kilmeny Duchardt reports."
19  Let me know when this shows up on your screen.
20         (VIDEO PLAYED)
21  BY MR. FOLEY:
22    Q    Are you able to see that, Officer?
23    A    It's got a big dot in front of it.
24    Q    I'm sorry.  Let me back it up a bit.
25  I'm only interested in the first 20 seconds or

```
 1   so of this.  I'm going to play it and then ask
 2   you a couple of questions.
 3                 (VIDEO PLAYED)
 4   BY MR. FOLEY:
 5        Q    Officer Simoneaux, do you recognize
 6   any of the officers, either the ones that
 7   grabbed this man and threw him on the ground
 8   or the officers that are surrounding him right
 9   now?
10        A    No, sir.
11        Q    These don't appear to be Third
12   District folks?
13        A    I'm not sure.
14        Q    Let me just freeze on a frame.  These
15   two officers with the shields, you're not able
16   to identify them?
17        A    No, sir.
18        Q    I'm going to advance the video a
19   little bit because there's a point here where
20   they're shown again from a different angle,
21   these two officers.  Does that aid you in
22   identifying them at all?
23        A    No, sir.
24        Q    And, again, here from a profile view,
25   are you able to identify either of these two
```

```
 1    I'm indicating with my cursor?
 2         A    No, sir.
 3         Q    How about this man with the baseball
 4    cap in the foreground (Indicating)?
 5         A    No, sir.
 6              MR. FOLEY:
 7                   I believe that's all my
 8              questioning.  I would just ask if we
 9              could take one minute.  I just want
10              to consult with my co-counsel and I
11              will turn it over to anyone else who
12              might have questions.  Indulge me for
13              just a moment.
14              MR. MOST:
15                   Yes.  This is William Most.
16              We'll have a few followups, but not a
17              lot.
18              MS. MORRIS:
19                   William, if I don't ask anything
20              else, how can you follow up?
21              MR. MOST:
22                   We're doing followups based on
23              Mr. Foley's questioning.
24              MS. MORRIS:
25                   He is not -- I don't think that
```

```
1          you can turn that back over, based

2          upon a co-plaintiff's situation.

3     MR. MOST:

4              Do you have -- Deelee, do you

5          have some authority to cite for that

6          proposition?

7     MS. MORRIS:

8              I do not.  You can go ahead, and

9          I'll object to the whole thing and

10         preserve the objection.

11    MR. MOST:

12             Yeah.  That's makes sense.

13    MR. RODNEY:

14             Is it my turn?

15    MR. FOLEY:

16             I was asking one-minute pause

17         just to make sure none of my

18         co-counsel had anything else for me

19         to be asking.

20    MR. RODNEY:

21             No, that's okay.  My phone has

22         been going in and out because -- I

23         was trying to do this by phone.

24         Apparently, it doesn't work when

25         you're getting a lot of phonecalls.
```

```
 1            MR. FOLEY:
 2                  I am getting word that is all
 3            that we have.  So I turn it back
 4            over.  Thank you very much, Officer.
 5            I appreciate your time today.
 6            THE WITNESS:
 7                  Yes, sir.
 8            MR. MOST:
 9                  Roy, go ahead, and then I'll
10            follow you.
11            MR. RODNEY:
12                  Yes.
13                     EXAMINATION
14    BY MR. RODNEY:
15         Q    Hello, Officer Simoneaux -- is that
16    right?
17         A    Yes, sir.
18         Q    Okay.  My name is Roy Rodney, and I
19    represent a plaintiff by the name of Max
20    Geller.  Have you ever heard the name Max
21    Geller before?
22         A    No, sir.
23         Q    Okay.  Do you know a fellow officer
24    by the name of, I believe, Abraham Wilson?
25         A    No, sir.
```

1    Q    I'm going to share this picture with

2  you.  Can you see the picture that I have up

3  there?

4    A    Yes, sir.

5    Q    All right.  So do you recall this

6  scene at the time that you were there on

7  July 10th?

8    A    No, sir.

9    Q    You don't recall this scene?

10    A    No, sir.  That specific picture?

11    Q    Yeah, that specific happening in

12  that --

13    A    No, sir.

14    Q    Did you see this arrest, how about

15  that?

16    A    No, sir.

17    Q    All right.  Have you seen this

18  picture since that date?

19    A    No, sir.

20    Q    All right.  So in the middle there,

21  you see what looks like a Baton Rouge police

22  officer with the patch.  Can you see that?

23    A    Where at?  I seen the state police.

24    Q    You see two state police officers.

25  And I'm talking about the officer in the

1    middle.

2        A    Yeah.  I can't tell which agency he's

3    from.

4        Q    You can't?

5        A    No, sir.

6        Q    Okay.  You don't recognize the patch

7    on his uniform?  Isn't it the same as yours?

8        A    You can't see his patch.  I can't

9    tell.

10       Q    Okay.  Had you seen this photograph

11   before today?

12       A    No, sir.

13            MR. RODNEY:

14                That's all the questions I have.

15            Thank you.

16                      EXAMINATION

17   BY MR. MOST:

18       Q    All right.  Officer, William Most,

19   again.  I have some followup questions.  I

20   want to ask you a little bit about the

21   templates you described.  You were talking

22   with Mr. Foley about templates that you were

23   instructed to use for the incident reports for

24   arrests during the protests, right?

25            MS. MORRIS:

```
 1              Wait.  Hold on.  I'm just going
 2         to go ahead and lodge my question.
 3         MR. MOST:
 4              Sure.
 5         MS. MORRIS:
 6              I don't think that you're
 7         supposed to be asking him questions
 8         on followup based upon Mr. Foley's
 9         line of question.
10         MR. MOST:
11              Objection noted and we'll keep
12         it on the record.
13    BY MR. MOST:
14         Q    The incident report that we were
15    looking at for Tammy and Alexis Cheney, was
16    that also created using, at least in part, a
17    template?
18         A    In part, yes, sir.
19         Q    So as an officer, you were instructed
20    to use these templates and change only the
21    names and dates; is that correct?
22         A    Yes, sir.
23         Q    So you were instructed to use the
24    common language, whether or not it reflected
25    the actual events as they occurred; is that
```

1    correct?

2         A    Yes, sir.

3         Q    So looking at the incident reports,

4    that doesn't tell us what actually happened

5    that day, correct?

6         A    No, sir.

7         Q    Okay.  And as we can see from the

8    Affidavits of Probable Cause, those also don't

9    actually show us what happened during the

10   protests, correct?

11        A    Right.

12        Q    Is there any document that you know

13   of that -- aside from pictures and video --

14   any written document that reflects what

15   actually happened?

16        A    Not to my knowledge.

17        Q    Okay.  I believe you also testified

18   that in your approximately 16 years as a BRPD

19   officer, you've never made an arrest under

20   these statutes for obstruction of a passageway

21   or a highway; is that right?

22        A    Yeah, not to my knowledge.

23        Q    Right.  I would suspect it's not

24   uncommon to find people in the street --

25   whether during an argument or for some other

1    reason, impeding the flow of traffic, as an

2    officer; is that right?

3        A    Yes, sir.

4        Q    You've probably had to break up

5    fights on the street that were impeding

6    traffic; is that right?

7        A    Yes, sir.

8        Q    And yet never charged any of them

9    with obstruction of a highway or public

10   passage, right?

11       A    No, sir.

12       Q    Have you ever worked -- dealt with a

13   celebration or event after a loss of an LSU

14   game where people were in the street?

15       A    No, sir.

16       Q    Okay.  Aside from your personal

17   experience, do you know of any time Baton

18   Rouge Police Department has ever arrested

19   someone for impeding a passageway or highway,

20   except in the context of these 2016

21   protesters?

22       A    Not that I recall.  I mean, I don't

23   know what other officers do.  All I can

24   testify is on what -- on me.

25            MR. MOST:

```
 1              Sure.  Okay.  I think that's all
 2         the questions I've got for now;
 3         although I'll reserve for any
 4         redirect after you, Deelee, if have
 5         any questions?
 6    MS. MORRIS:
 7              I don't have any followups.
 8    MR. MOST:
 9              Officer, thank you very much.
10         On behalf of all of us here today,
11         thank you very much for your time.
12         We know you took your time here
13         today.  I also want to reiterate,
14         we're sorry for the loss of your
15         partner, the patch that you're
16         wearing there.  And we appreciate
17         your time.  Thank you.
18              *       *       *
19
20
21
22
23
24
25
```

1              WITNESS' CERTIFICATE

2

3              I, JOE SIMONEAUX, do hereby certify

4    that the foregoing testimony was given by me,

5    and that the transcription of said testimony,

6    with corrections and/or changes, if any, is

7    true and correct as given by me on the

8    aforementioned date.

9

10

11   Dated: _____  Signed:_____

12                        JOE SIMONEAUX

13

14

15   _____  Signed with corrections as noted.

16

17   _____  Signed with no corrections noted.

18

19

20

21   DATE TAKEN: August 2, 2021

22

23

24

25

```
 1              C E R T I F I C A T E

 2

 3         I, CECILIA M. HENDERSON, Certified
        Court Reporter, in and for the State of
 4      Louisiana, as the officer before whom this
        testimony was taken, do hereby certify that
 5      JOE SIMONEAUX  after having been duly sworn by
        me upon authority of R.S. 37:2554, did testify
 6      as hereinbefore set forth in the foregoing 135
        pages; that this testimony was reported by me
 7      in the stenotype reporting method, was
        prepared and transcribed by me or under my
 8      personal direction and supervision, and is a
        true and correct transcript to the best of my
 9      ability and understanding; that the transcript
        has been prepared in compliance with
10      transcript format guidelines required by
        statute or by rules of the board, that I have
11      acted in compliance with the prohibition on
        contractual relationships, as defined by
12      Louisiana Code of Civil Procedure Article 1434
        and in rules and advisory opinions of the
13      board; that I am not related to counsel or to
        the parties herein, nor am I otherwise
14      interested in the outcome of this matter.

15

16         Dated this 6th day of September, 2021

17

18

19

20         CECILIA M. HENDERSON, CCR
           CCR #84099
21         STATE OF LOUISIANA

22

23

24

25
```

SOUTHERN COURT REPORTERS, INC.
(504)488-1112