UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


BLAIR IMANI, ET AL

DOCKET NO.
17-cv-00439-JWD-EWD

VERSUS


CITY OF BATON ROUGE,
ET AL


Deposition of BILLY WALKER,
taken on June 9, 2021, via Zoom
Videoconference.

```
1   APPEARANCES:
2   MOST & ASSOCIATES
    BY: WILLIAM MOST, ESQ.
3   AND DAVID LANSER, ESQ.
    201 St. Charles Avenue
4   Suite 114, #101
    New Orleans, Louisiana  70170
5   Phone: (504)533-4521
    Email: david.lanser@gmail.com
6       REPRESENTING PLAINTIFFS
    (IMANI V. CITY OF BATON ROUGE)
7
8
    RODERICK AND SOLANGE
9   MacARTHUR JUSTICE CENTER
    BY:  ERIC FOLEY, ESQ.
10  JIM CRAIG, ESQ.
    HANNAH LOMERS-JOHNSON, ESQ.
11  MANDISA MOORE-O'NEAL, ESQ.
    4400 S. Carrollton Avenue
12  New Orleans, Louisiana  70119
    Phone: (504)684-2364
13  Email: eric.foley@macarthurjustice.org
        REPRESENTING PLAINTIFFS
14  (SMITH V. CITY OF BATON ROUGE AND
    BATISTE-SWILLEY V. CITY OF BATON ROUGE)
15
16
    DEELEE MORRIS, ESQ.
17  DAVID LEFEVE, ESQ.
    JOSEPH SCOTT, ESQ.
18  222 St. Louis Street
    Baton Rouge, Louisiana  70802
19  Phone: (225)389-3114
    Email: dsmorris@brla.gov
20      REPRESENTING BATON ROUGE CITY
    POLICE DEPARTMENT OFFICERS
21
22
23
24
25
```

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

3

1  APPEARANCES (CONTINUED):

2  BURGLASS & TANKERSLEY.
   BY:  GREGORY FAHRENHOLT, ESQ.
3  5213 Airline Drive
   Metairie, Louisiana  70001
4  Phone: (504)836-0408
   Email: gfahrenholt@burglass.com
5      REPRESENTING INDIVIDUAL
   STATE POLICE TROOPERS

6

7

8  ALSO PRESENT:

9  Chase Gunter
   Megan Koilparampil

10

11

12 REPORTED BY:

13 Cecilia M. Henderson
   Certified Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    EXAMINATION

 2                                        Page

 3   MR. MOST  ...................................6
     MR. FOLEY  ................................64
 4   MS. MORRIS  ...............................72
     MR. MOST  .................................75
 5

 6            E X H I B I T   I N D E X

 7                                        Page

 8   Exhibit C  ................................17
     Exhibit B  ................................24
 9   Exhibit A  ................................24
     Exhibit S  ................................27
10   Exhibit T  ................................52
     Exhibit Q  ................................61
11   Exhibit H  ................................78
     Exhibit U  ................................80
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          S T I P U L A T I O N

2

3          It is stipulated and agreed by and

4    between counsel that the deposition of BILLY

5    WALKER is hereby being taken under Federal

6    Rules of Civil Procedure for all purposes in

7    accordance with law;

8          That the formalities of filing and

9    certification are hereby waived; that the

10   formalities of reading and signing are hereby

11   specifically not waived;

12         That all objections, except those as

13   to the form of the question and/or

14   responsiveness of the answer, are hereby

15   reserved until such time as this deposition or

16   any part thereof may be used in evidence.

17         *   *   *   *   *   *   *   *

18         CECILIA M. HENDERSON, Certified Court

19   Reporter, in and for the State of Louisiana,

20   officiated in administering the oath to the

21   witness.

22

23

24

25

```
 1              BILLY WALKER, 9000 AIRLINE
 2   HIGHWAY, BATON ROUGE, LOUISIANA  70815, AFTER
 3   FIRST BEING DULY SWORN IN THE ABOVE-ENTITLED
 4   MATTER, DID TESTIFY AS FOLLOWS:
 5                    EXAMINATION
 6   BY MR. MOST:
 7        Q    Good morning, Officer Walker.
 8        A    Morning.
 9        Q    My name is William Most.  I am one of
10   the lawyers for the plaintiffs in the Imani
11   case.  Thank you for your time here this
12   morning.  Officer, could you give us your name
13   and current title?
14        A    Billy Walker.  I'm a corporal with
15   the Baton Rouge City Police Department and I
16   work in the Traffic Division.
17        Q    Okay.  What would you like me to
18   refer to you as?  Is it appropriate that I
19   call you Officer or Corporal or Mr. Walker;
20   what do you prefer?
21        A    Either/or, whatever you prefer.
22        Q    Thanks.  Officer, have you ever given
23   a deposition before?
24        A    For a crash.
25        Q    And so you -- have you given any
```

```
 1    other depositions besides the deposition about
 2    a crash?
 3         A    No, sir.
 4         Q    So you've done this once before.  So
 5    do you understand that you're under oath here
 6    today?
 7         A    Yes, sir.
 8         Q    You understand that your answers here
 9    today have the same force as if we were in a
10    courtroom with a judge and jury?
11         A    Yes, sir.
12         Q    Is there anything that will prevent
13    you from giving me your full attention and
14    truthful and complete answers today?
15         A    No, sir.
16         Q    Are you taking any medications or
17    suffering from any illness that would prevent
18    from giving true and complete answers today?
19         A    No, sir.
20         Q    And Officer, this deposition, unlike
21    in a courtroom, we can take breaks as needed.
22    So if there's any need for you to take a
23    break, get some water, use the bathroom, just
24    let me or Ms. Morris know and we'll take a
25    break as needed.  However, if you do take a
```

1    break --
2        A    All right.  Thank you.
3        Q    Yeah, thank you.  If you do take a
4    break, I will ask you about who you talked to
5    during the break and what was discussed, even
6    if it is with your attorney.  So that's just a
7    caution in advance.
8            Something you're already doing very
9    well -- and it's a little more difficult over
10   Zoom -- is to make sure that our questions and
11   answers don't overlap.  So if you will wait
12   until I finish my questions, I will do you the
13   same favor and try to wait until you finish
14   with an answer before the next question.  That
15   will create a clean record for the court
16   reporter.  All right?
17       A    Yes, sir.
18       Q    And if I ask a question that you
19   don't understand, will you agree to tell me
20   that you don't understand, rather than just
21   trying to answer it anyway?
22       A    Yes, sir.
23       Q    Corporal, do you know what case
24   you're here for today?
25       A    No, sir.

1    Q    There's a case called "Imani V. City

2    of Baton Rouge" that is a civil rights lawsuit

3    about the July 10th, 2016 protest and some of

4    the people who were arrested there.  You are

5    one of the defendants in that case.  Are you

6    aware of that?

7    A    I am now.

8    Q    Did you know you were a defendant in

9    that case until now?

10    A    I knew I was involved because I'm

11    being called here in some sort of way.

12    Q    Do you understand you're one of the

13    people who is being sued in this case?

14    A    No, sir.

15         THE COURT REPORTER:

16             I have -- can I ask for one

17         second, please?

18             (OFF-THE-RECORD DISCUSSION)

19    BY MR. MOST:

20    Q    So just to confirm, Officer, is your

21    badge number P-10177?

22    A    That is correct.

23    Q    And you're Billy Walker?

24    A    That's correct.

25    Q    And so you were told that you had to

1    appear today, but no one before today told you

2    that you were being sued in this case?

3        A    Do you mean -- I knew there was a

4    lawsuit, the reason why we're here.  Are you

5    referring to me, personally, or the City of

6    Baton Rouge?  I know -- I understand that the

7    City is, also.

8        Q    And without telling me anything about

9    what you've -- well, let me back up a second.

10    Is Deelee Morris your attorney?

11        A    Yes, sir.

12        Q    Okay.  Without telling me anything

13    about what your attorney has told you, you had

14    no awareness before today that you,

15    personally, are being sued in addition to the

16    City in this lawsuit; is that correct?

17        A    That's correct.

18        Q    Well, you are being sued in this

19    lawsuit.  You are one of the defendants.

20        A    Okay.

21        Q    Do you need to take a break to ask

22    any questions of your attorney at this time or

23    do you want to just continue with questioning?

24        A    No, sir, we're good.

25        Q    Okay.

```
 1              MS. MORRIS:
 2                   William, do you want me to kind
 3              of discuss the situation or, like --
 4              I mean --
 5              MR. MOST:
 6                   I mean, I don't think there's
 7              anything I need to discuss.  I have
 8              concerns that Officer Walker was not
 9              aware that he's a defendant in this
10              case.  I mean --
11              MS. MORRIS:
12                   I think he might be
13              misunderstanding.  And I know that's
14              a very direct question.  I think he
15              might be misunderstanding the
16              question.  I can rehabilitate that
17              later or what.  So --
18              MR. MOST:
19                   Okay.
20              MS. MORRIS:
21                   It's up to you.
22              THE WITNESS:
23                   Maybe I'm misunderstanding.
24    BY MR. MOST:
25         Q    Okay.  Maybe I'll be clear.  Officer
```

1   Walker, before today, were you aware of that

2   the plaintiffs in the Imani V. Baton Rouge

3   lawsuit are suing you personally as a person,

4   as a defendant in this case?

5        A    Yes, sir.  My name is in it, yes.  I

6   am aware.

7        Q    You're aware that you, personally,

8   are being sued in this case?

9        A    Yes, sir.

10       Q    Okay.  When did you first learn that

11  this deposition was going to take place,

12  approximately?

13       A    Last week, I think.

14       Q    Okay.  And what did you do to prepare

15  for this deposition?

16       A    Looked over my one report that I

17  wrote before -- you know, whenever this took

18  place.  I just read that briefly.  I talked to

19  Deelee yesterday.

20       Q    And I don't want to know anything

21  about what you talked to Deelee about.  What

22  is that one report that you're describing?

23       A    I wrote a report.  It was on the date

24  that the case took place on Government Street.

25  I took another officer, Reab Simoneaux -- he

```
 1   arrested a female by the name of Tammy Cheney.
 2   I seen him walking towards me with an
 3   arrestee, myself and another officer, Brandon
 4   Blackwell.  We took her from Corporal
 5   Simoneaux and we -- (INAUDIBLE)
 6              THE COURT REPORTER:
 7                  I lost you.
 8              THE WITNESS:
 9                  Walked her over -- the whole
10          thing?
11              THE COURT REPORTER:
12                  This is what I have:  "We took
13          her from Corporal Simoneaux."
14              THE WITNESS:
15                  So Corporal Simoneaux had her in
16          custody.  Obviously, she was
17          handcuffed.  Me and Corporal
18          Blackwell (INAUDIBLE) approached him
19          and took her to the area where --
20          (INAUDIBLE)
21              THE COURT REPORTER:
22                  I'm sorry.  You and Corporal
23          Blackwell, did you say?
24              THE WITNESS:
25                  Blackwell.  Yes, ma'am.
```

```
 1            THE COURT REPORTER:
 2                And you took her to the area?
 3            THE WITNESS:
 4                We took her to the area where
 5            they were placing the arrestees at
 6            the time.
 7     BY MR. MOST:
 8        Q    You have that one report with you
 9     today?
10            MS. MORRIS:
11                We can get it.
12            THE WITNESS:
13                Yes, we do.
14            MR. MOST:
15                Yeah, if you could.  I don't
16            think we've received that document.
17            MS. MORRIS:
18                It should have been part -- it's
19            one of the supplements in -- hold on
20            and I'll get the number.
21            THE WITNESS:
22                Right there.  That's it.
23            MS. MORRIS:
24                It's one of the supplements in
25            16-70320.  It's Supplemental Report
```

```
 1              23.
 2         MR. MOST:
 3              That's the supplemental report
 4         for -- it says "Tammy Cheney" on it?
 5         MS. MORRIS:
 6              I don't know because the
 7         printout that he has is just kind
 8         of -- it's just the narrative, so I
 9         don't have -- I gave y'all the full
10         reports and there's a person's page
11         and a (INAUDIBLE) page, then there's
12         a narrative page.
13         THE COURT REPORTER:
14              I'm sorry, there's a person's
15         page --
16         MR. CRAIG:
17              Just checking in via text.
18         MS. MORRIS:
19              I'm sorry, Jim, what?
20         MR. CRAIG:
21              Oh, nothing.  I'm going to mute.
22         Please strike that.
23         THE COURT REPORTER:
24              You said there's a person's page
25         and then you described the other
```

```
 1              pages.  I didn't get the middle page.
 2              MS. MORRIS:
 3                   The offense page.
 4              THE WITNESS:
 5                   (INAUDIBLE)
 6              THE COURT REPORTER:
 7                   I'm not hearing his comments.
 8              THE WITNESS:
 9                   I said:  With the supplement,
10              there's not going to be an offense
11              page because I'm not the arresting
12              officer.  There should be only the
13              admin page, a person's page, which
14              should include Ms. Tammy Cheney's
15              name and then a narrative that
16              includes my actions.
17      BY MR. MOST:
18          Q   So you're looking at a one-page
19      document right now that's in front of you?
20          A   Yes.  That's what I used -- that's
21      what I did on that day.
22          Q   Does it have the name of the arrestee
23      or defendant?
24          A   Yes.
25          Q   What is the name?
```

1    A    It's within my narrative, and it is

2 Miss Tammy Cheney, C-H-E-N-E-Y, if I'm

3 pronouncing it correctly, and it has a date of

4 birth of █████████████.

5    Q    We'll come back to that.  Did you

6 look at anything else, any other documents to

7 prepare for today besides that one page?

8    A    This.  And I'm trying to -- because,

9 I mean, I was brought aware of this in 2016.

10 I was brought aware of this in 2016 that

11 supposedly I made an arrest that I didn't, so

12 then I started -- I had to go to Traffic

13 Records and obtain a copy of the rap and PC.

14 And at that time, I looked at that, which I

15 have right here, too.  It's just a copy of the

16 rap and PC of the arrest that I supposedly

17 made, and it has a name of Raae Pollard on

18 that.

19    Q    When you talk about the PC, is that

20 the probable cause affidavit?

21    A    Yes, sir.

22    Q    I'm going to share a document, which

23 I'm going to identify as Exhibit C.  Do you

24 see this document, Officer Walker?

25    A    I'm sorry.  Can you repeat that?

```
 1        Q    Can you see this document, Exhibit C?
 2        A    Yes, sir.
 3        Q    Is this the affidavit you're looking
 4   at, the Affidavit of Probable Cause for Raae
 5   Pollard?
 6        A    Yes, sir.
 7        Q    And you also pulled the rap sheet for
 8   Raae Pollard?
 9        A    Yes, sir.
10        Q    Okay.  Besides the one-page
11   narrative, the rap sheet and the PC, did you
12   look at any other documents to prepare for
13   this deposition?
14        A    No, sir.
15        Q    And this is something I meant to ask
16   before.  Because this is a Zoom deposition,
17   I'm not in the room with you.  So if anyone
18   tries to communicate with you via notes or
19   whispers or text messages or a phonecall,
20   would you please let me know?
21        A    Yes, sir.
22        Q    Thank you.  Officer, what's your --
23   you said your current job title is corporal;
24   is that right?
25        A    That's my rank.
```

1      Q    That's your rank.  What's your job
2  title?
3      A    I am assigned to the Radar Division,
4  which is speed enforcement.
5      Q    What was your rank in July of 2016?
6      A    At the time of the -- I was a
7  corporal at the time.
8      Q    And what was your job in July of
9  2016?
10     A    I was assigned to the Radar Division,
11 which is speed enforcement.
12     Q    Okay.  And this is a question I ask
13 in every deposition, so it's not personal to
14 you.  Have you ever been arrested?
15     A    No.
16     Q    So you looked at some documents prior
17 to this deposition from July of 2016?
18     A    Yeah.
19         MR. MOST:
20             We've lost our deponent.  He has
21         exited the room.
22         MS. MORRIS:
23             I can hear something.
24         MR. MOST:
25             All right.  Deelee, if you keep

```
 1              cutting out, Eric made a suggestion,
 2              which is to have you call in using a
 3              telephone to the Zoom.
 4         MS. MORRIS:
 5              Okay.
 6         MR. MOST:
 7              So that if you freeze, we can
 8              still hear the officer's audio.
 9         MS. MORRIS:
10              Okay.  That's fine.
11         MR. MOST:
12              Would you like to try that or do
13              you want to see if this works?
14         MS. MORRIS:
15              What do I call in?
16         MR. MOST:
17              Let's go off the record for a
18              moment.
19              (OFF-THE-RECORD DISCUSSION)
20         MS. MORRIS:
21              I'm ready whenever you are,
22              William.
23         MR. MOST:
24              Thank you.
25
```

```
 1   BY MR. MOST:
 2       Q    Before we took a break, Officer
 3   Walker, we established that you looked at some
 4   documents from July of 2016.
 5       A    Sure, the rap sheet and PC.
 6       Q    And those are dated July 10th, 2016?
 7       A    The PC, the probable cause.  I do not
 8   see a date on the rap sheet.
 9       Q    Okay.  Do you remember --
10       A    I'm sorry.  There is a date.  It's
11   just not at the normal spot at the top.  It's
12   at the -- midways down.  So, yes, I do see a
13   date on that.
14             THE COURT REPORTER:
15                 I'm sorry.  I see it where?
16             THE WITNESS:
17                 It's midway down on the paper
18             where it says, "Date arrested," it
19             has a date there.  I was looking at
20             the top right corner where it
21             generally goes.
22   BY MR. MOST:
23       Q    And do you remember Sunday,
24   July 10th, 2016?
25       A    I mean, vaguely.  It's been quite a
```

1  while.

2      Q    Do you remember that there were

3  protests going on in Baton Rouge at that time?

4      A    Yes, sir.

5      Q    Do you remember in particular a

6  daytime protest where some protesters gathered

7  at East and France Street?

8      A    Yes, sir.

9      Q    Were you present somewhere in the

10 area on that day?

11     A    Yes, sir, I was at Government and

12 T.J. Jemison, which is on the north side of

13 Government.  T.J. Jemison -- (INAUDIBLE) --

14 Boulevard.

15          THE COURT REPORTER:

16              I'm sorry.  T.J. --

17          THE WITNESS:

18              Yeah, they renamed that street.

19          It's T.J. Jemison now.  That's what

20          we use it as.  I'm not sure exactly

21          when they changed it.  It should show

22          on that map, which is on the north

23          side of Government across from East

24          Boulevard.

25

```
 1              THE COURT REPORTER:
 2                   I'm hearing you perfectly where
 3              you are right now.  So if you could
 4              stay right there, it would really
 5              help me.
 6              THE WITNESS:
 7                   I can get really close in.
 8     BY MR. MOST:
 9         Q    Okay.  So on July 10th, 2016, there
10     were protesters in the neighborhood of East
11     Boulevard and France Street, correct?
12         A    Yes, sir.
13         Q    And you were located on the north
14     side of Government Street?  Where were you
15     located?
16         A    Can I move this mouse or no?
17         Q    Unfortunately, I don't think you can?
18         A    Okay.  If you -- well, see, on this
19     map, it's actually showing it East Boulevard,
20     too.  So Government -- yeah, so if you look on
21     the Dudley Debosier sign, there's a -- on the
22     side of the road, there's a little blue box in
23     the roadway.  I was right there on that corner
24     there.  Which that north side of Government is
25     now called T.J. Jemison, just for the record.
```

```
1    This map still shows it as East Boulevard.
2        Q    So you were located on the north East
3    corner of East and Government Street on this
4    map; is that correct?
5        A    Yes, sir.
6        Q    And were you part of a -- what I'll
7    call a processing team positioned there?
8        A    No, sir.
9        Q    What were you doing there?
10       A    We were there blocking the road on
11   Government to prevent vehicles from traveling
12   westbound on Government was my job there.
13       Q    Okay.  Did you personally cause
14   anyone to be arrested that day?
15       A    No, sir.
16            MR. MOST:
17                This map I'll note as Exhibit B
18            to this deposition.  Exhibit A, I'll
19            attach is the Third Amended
20            Complaint.  I'm going to pull this
21            up.
22   BY MR. MOST:
23       Q    Officer, do you see this Figure 12
24   here?  Do you see this Figure 12 that shows
25   the map around East and France with the
```

```
 1    locations, approximate, of protesters and
 2    lines of police?  Corporal, do you see it?
 3              THE COURT REPORTER:
 4                   I think I got lost.  Did I miss
 5              anything?  It looks like I was
 6              disconnected for a minute.
 7              MS. MORRIS:
 8                   William, are you there?
 9              MR. MOST:
10                   Yes.
11    BY MR. MOST:
12       Q    Sorry.  I lost you.  Do you see that
13    diagram, Corporal?
14       A    It popped up for a second before we
15    lost connection.
16       Q    Do you see it now?
17       A    No, sir.  I have not -- wait a
18    minute.  I have a paper copy of it here.
19       Q    Okay.  Is that a -- based on your
20    experience of that day -- a roughly accurate
21    diagram of the positions of various personnel
22    that day?
23       A    I can't say for sure because I
24    couldn't -- (INAUDIBLE)
25              THE COURT REPORTER:
```

```
 1                    I'm sorry.
 2           THE WITNESS:
 3                    I couldn't see all these areas
 4           where I was at.
 5           THE COURT REPORTER:
 6                    I'm going to have to ask you to
 7           repeat that because it was kind of --
 8           THE WITNESS:
 9                    On my end?
10           THE COURT REPORTER:
11                    Yes.  Could you repeat your
12           answer?
13           THE WITNESS:
14                    I can't say that 100 percent
15           because I couldn't see all these
16           areas from where I was at.
17    BY MR. MOST:
18        Q    Okay.  Do you know where the
19    processing area was where protesters were
20    being processed as they were arrested that
21    day?
22        A    Based on -- the report that I wrote
23    where I did walk Ms. Cheney to the area, it
24    was on Government Street close to the
25    interstate.  Now whether that was the
```

```
1    processing area or not, I'm not sure or if
2    that was just a place they were being held
3    until they were, you know, put on a van to be
4    brought to a processing area.  I never
5    actually seen a processing area.
6        Q    Okay.  So I'm going to designate as
7    Exhibit S, as in Sam, this document Ms. Morris
8    circulated.  Is this the narrative that you
9    were describing, Corporal?
10       A    Yes, that's the report to the only
11   actions that I did on that day.
12       Q    So this is a narrative that you
13   wrote?
14       A    Yes, sir.
15       Q    Is it a truthful narrative?
16       A    Yes, sir.
17       Q    And it's based on your observations
18   that day?
19       A    And my actions, yes, sir.
20       Q    So this says that at approximately
21   2025 hours, you were assigned to work a
22   peaceful protest; is that right?
23       A    Yes, sir.
24       Q    So that would be 8:25 p.m.?
25       A    Yes, sir.
```

1    Q    Okay.  Is 8:25 p.m. approximately

2    when you got to that area or was that when you

3    were first given the assignment?

4    A    That's got to be -- I would have to

5    look at Corporal Simoneaux's report again.

6    But I would be willing to think that was the

7    time that I did what I did in the report,

8    where I took custody of Ms. Cheney.

9    Q    Okay.  And this says it was a

10   peaceful protest?

11   A    That's what was planned.

12   Q    What do you mean, that's what was

13   planned?

14   A    As in the Traffic Division, we were

15   originally assigned to go down there to escort

16   protesters to the Capital.  And what was

17   planned they were going to walk in the street

18   and we were going to provide a safe route for

19   them and block intersections as they

20   approached them to prevent any vehicle passage

21   as they went through.

22   Q    Okay.  When this says a peaceful

23   protest, it means that's the Baton Rouge

24   designation for the protest before it happens;

25   is that right?

```
 1        A     Yes.   That's what I assigned to go
 2   down there to work originally is the protest
 3   that would walk towards to the Capital.
 4        Q     So the Baton Rouge Police Department
 5   designates protests as peaceful or not
 6   peaceful before they happen?
 7        A     No, I'm not saying that.
 8        Q     But this designation of "Peaceful
 9   Protest" was before the protest happened; is
10   that right?
11             MS. MORRIS:
12                  Object to the form, but you can
13             answer.
14             THE WITNESS:
15                  Say that one more time?
16             MR. MOST:
17                  Sure.  So this (INAUDIBLE) --
18             THE COURT REPORTER:
19                  I'm sorry, Mr. Most.  Did you
20             say something and I didn't hear it?
21             I'm not hearing you.
22             MR. MOST:
23                  (INAUDIBLE) Correct, Corporal?
24             THE COURT REPORTER:
25                  I'm sorry.  I did not hear your
```

```
 1              question.
 2    BY MR. MOST:
 3         Q    These are your words, in this
 4    narrative, Corporal; is that correct?
 5         A    "Peaceful Protest"?
 6              THE COURT REPORTER:
 7                   I guess we lost Mr. Most.
 8                   The last thing that I have is:
 9              "These are your words in this
10              narrative, Corporal; is that
11              correct?"
12    BY MR. MOST:
13         Q    Yes.  To Corporal:  You wrote the
14    words, "Peaceful Protest" in here, right?
15         A    Yes, sir.
16         Q    And that was the designation of the
17    protest before you went and saw the protest,
18    right?
19         A    Yes.  I used that word because that's
20    what --
21              THE COURT REPORTER:
22                   I'm sorry.  I have:  "Yes, I
23              used that word because that's
24              what" -- and I don't have what you
25              said after that.
```

```
 1            THE WITNESS:
 2                 I used the word "Peaceful
 3            Protest" because that's what we
 4            called -- they called the assignment
 5            when it was given to me.
 6    BY MR. MOST:
 7       Q    So before you were assigned to go
 8    work a protest, BRPD will designate whether it
 9    is a peaceful protest in advance; is that
10    correct?
11       A    I don't think they can determine that
12    if it's going to be peaceful or not.
13       Q    You said you were assigned to work a
14    peaceful protest.
15       A    It was planned to be peaceful.
16       Q    Okay.  Are any protests -- have you
17    ever seen a protest that was considered
18    planned to not be peaceful?
19            MS. MORRIS:
20                 Object to the form.
21    BY MR. MOST:
22       Q    Let me rephrase.  I'm just asking why
23    does it say, "Peaceful Protest"?
24            MS. MORRIS:
25                 If you can, answer.
```

```
 1              THE WITNESS:
 2                   Because it was supposed to be
 3              a (INAUDIBLE) --
 4              THE COURT REPORTER:
 5                   "It was supposed to be a" --
 6              THE WITNESS:
 7                   Peaceful protest.
 8    BY MR. MOST:
 9         Q    What does Baton Rouge call it if it's
10    not supposed to be a peaceful protest?
11         A    Unpeaceful (INAUDIBLE) --
12              THE COURT REPORTER:
13                   I'm sorry.  I did not get that
14              answer.  I didn't get it.
15              THE WITNESS:
16                   I don't think they would call it
17              that because I don't think the Police
18              Department would hold an unpeaceful
19              protest.
20              MR. MOST:
21                   Deelee, do you want to turn off
22              the microphone on your computer and
23              just use the phone?
24              MS. MORRIS:
25                   (INAUDIBLE)
```

```
 1            MR. MOST:
 2                 We can't hear you at all.
 3            MS. MORRIS:
 4                 Okay.  There we go.
 5            MR. MOST:
 6                 You may need to turn off the
 7            audio on your computer so that you
 8            don't get feedback.
 9            MS. MORRIS:
10                 That seems to be working.
11                 We're going through the phone on
12            audio and I muted it.
13            THE WITNESS:
14                 My answer was:  I don't think
15            the Police Department would hold an
16            unpeaceful protest.
17            THE COURT REPORTER:
18                 I'm going to ask you to get
19            close to wherever it is that's
20            picking up the sound.
21            MR. MOST:
22                 You may have to turn the volume
23            down on your computer to avoid
24            feedback.
25            MS. MORRIS:
```

1          He's okay right now.

2     THE WITNESS:

3          Better?

4     MR. MOST:

5          Would you say something?

6     THE WITNESS:

7          Is that better for y'all?

8     MR. MOST:

9          Yes.

10 BY MR. MOST:

11    Q    So if I'm understanding you

12 correctly, Baton Rouge Police Department

13 expected the protest in the area of Government

14 Street and East Boulevard to be a peaceful

15 protest when you were assigned to it; is that

16 correct?

17    A    Yes, sir.

18    Q    When you got there, did you see

19 officers in body armor?

20    A    No, sir.

21    Q    Did you see officers with gas masks?

22    A    No, sir.

23    Q    Do you know what an LRAD device is?

24    A    Is that what we would call, maybe,

25 the BearCat?

1      Q    Yeah, the BearCat with the acoustic

2  cannon on the top of it?

3      A    Which is an armored vehicle?

4      Q    Did you see that present on

5  July 10th?

6      A    In the beginning?

7      Q    Yeah, when you got there or at any

8  point.

9      A    No, sir.

10      Q    Did you see it at any point when you

11  were there that day?

12      A    Yes, sir.

13      Q    Okay.  Approximately how long after

14  you got there did you see the BearCat?

15      A    I don't know the exact time.  It was

16  after they had walked to the Capital, walked

17  all the way back towards Government Street.

18      Q    Okay.  Did you see any protesters

19  engaging in violence on July 10, 2016?

20      A    Yes.

21      Q    What did you see?

22      A    The person that -- which we've been

23  referring to as Ms. Cheney, Tammy Cheney, that

24  Corporal Reab Simoneaux arrested, I did see

25  her standing on top of her vehicle and what

```
 1    appeared to be throwing water bottles.
 2         Q    You saw Tammy Cheney on top of a
 3    vehicle throwing water bottles?
 4         A    Yes, sir.
 5         Q    Is Tammy Cheney -- you remember
 6    roughly what she looks like?
 7         A    No, sir.
 8         Q    Okay.  Is she a large woman, a small
 9    woman?
10         A    I really can't recall.
11         Q    Do you recall if she was white,
12    black, Asian, Latino?
13         A    She was a white female.
14         Q    Was she a child, teenager, young
15    woman, older woman?
16         A    Well, she was a woman, because I have
17    her date of birth.  She's the same person that
18    I took from Officer Simoneaux and escorted to
19    the area where they were lining arrestees up
20    at.  So I wrote a report, so I do know her
21    date of birth.
22         Q    I'm asking about your recollection.
23    What did she -- do you recall her being a
24    young woman, an older woman?
25         A    I would say middle aged.
```

```
 1        Q    What kind of car was she standing on?
 2        A    I don't remember that.
 3        Q    Where was the car located that she
 4   was standing on?
 5        A    That would be on the corner of
 6   Government and East Boulevard.
 7        Q    Which corner of Government and East
 8   Boulevard?
 9        A    That would be the southwest side.
10        Q    And you said she was throwing
11   multiple water bottles?
12        A    No, I only seen one.
13        Q    (INAUDIBLE)
14             THE COURT REPORTER:
15                  I'm sorry.  I did not hear you.
16             MR. MOST:
17                  I'm sorry.  I'll repeat that.
18             I'll repeat the question.
19   BY MR. MOST:
20        Q    She threw a single water bottle
21   within your vision; is that correct?
22        A    Yes, sir.  I only observed one.
23        Q    Was it a frozen water bottle?
24        A    That, I don't know.
25        Q    And which direction did she throw it
```

1    in?

2        A    She threw it towards Government

3    Street in probably what you would call a

4    northeast direction.

5        Q    So she was standing on a car at the

6    southwest corner of Government and East

7    Street, she threw it towards -- into the

8    middle of the intersection; is that correct?

9        A    Yes, sir.

10        Q    Did it hit anyone?

11        A    I don't recall it hitting anybody.

12    To be honest, I don't know if it went far

13    enough to even say it went into that

14    intersection from where she was parked at.  I

15    don't think it hit anybody there.

16        Q    Did you see any other violence by

17    protesters that day?

18        A    No.

19        Q    So aside from a single woman throwing

20    a water bottle into the middle of the street,

21    this was a peaceful protest, according to what

22    you saw; is that correct?

23        A    No.

24        Q    Okay.  What is incorrect about that

25    statement?

1      A    Well, from where I was at, I couldn't

2    technically hear -- I couldn't see the BearCat

3    once it was in a position.  Based off of this

4    map, it would have been parked over on France.

5    And I couldn't see it, but I could hear a lot

6    of verbal commands coming from either that or

7    an amplified device for people to leave the

8    area and move out of the roadway.  And I would

9    say at that point time, it was not peaceful

10   because a lot of the people were not

11   cooperating.

12      Q    Okay.  So to your mind, not

13   cooperating with a verbal command of an

14   officer makes someone not peaceful?

15      A    It definitely makes it -- let's see.

16   Yeah, I would say it's not peaceful because at

17   that point in time, they're being incompliant

18   and they're not listening to the officers on

19   the scene.

20      Q    Is that Baton Rouge Police

21   Department -- how Baton Rouge Police

22   Department defines a peaceful or not peaceful

23   protest?

24      A    That, I don't know.

25      Q    I'll rephrase my question.  Is it

1    accurate to say that, aside from a single

2    water bottle thrown by a single woman, you saw

3    no acts of violence by protesters on July 10,

4    2016; is that an accurate statement?

5        A    From Government and East Boulevard

6    where I was at, yes, sir.

7        Q    Have you seen any

8    video (INAUDIBLE) --

9            THE COURT REPORTER:

10               I'm sorry, Mr. Most.  I didn't

11           get that question.

12   BY MR. MOST:

13       Q    Have you seen any video or

14   photographs of Tammy Cheney standing on a car?

15       A    No.

16       Q    A moment ago you were looking at a

17   document in front of you.  What was that

18   document?

19       A    That was a map that we looked at

20   earlier --

21       Q    Okay.

22       A    -- trying to get -- to make sure my

23   streets are correct before I answer your

24   question.

25       Q    Sure.  Do you know what Tammy Cheney

1  was arrested for?

2      A    I do not.

3      Q    I want to talk about what an

4  Affidavit of Probable Cause is.  Are you

5  familiar with what is an Affidavit of Probable

6  Cause?

7      A    Yes, sir.

8      Q    It's also called an arrest affidavit;

9  is that right?

10     A    Yes, sir.

11     Q    The criminal -- why don't you just

12 tell me your understanding what an arrest

13 affidavit is?

14     A    It's a sequence of events that

15 occurred and basically what the officer

16 observed the defendant on there doing.

17         THE COURT REPORTER:

18             What they're doing?

19         THE WITNESS:

20             Observe the defendant listed on

21         the affidavit was doing.

22 BY MR. MOST:

23     Q    So an arrest affidavit is based on

24 the affiant's observations; is that correct?

25     A    Yes, sir.

```
 1        Q    It's based on the affiant's
 2   observations of what the defendant did; is
 3   that correct?
 4        A    Yes, sir.
 5        Q    And if it's not based on the
 6   affiant's observations of what the defendant
 7   did, then it's not a truthful affidavit, is
 8   it?
 9        A    No, sir.
10        Q    So the Criminal Code describes an
11   arrest affidavit as, quote:  "An affidavit is
12   a written accusation of crime made under oath
13   and signed by the affiant."  Is that your
14   understanding of what it is?
15        A    Yes, sir.
16        Q    So an arrest affidavit or probable
17   cause affidavit has to be a truthful
18   description of the basis for that person's
19   arrest, correct?
20        A    Correct.
21        Q    It has to detail what are the facts
22   of the crime that person is being accused of,
23   correct?
24        A    Yes, sir.
25        Q    That this particular person did these
```

```
1   acts that constituted the particular crime;
2   correct?
3       A    Yes, sir.
4       Q    And so it's the document that
5   justifies someone's arrest, correct?
6       A    Correct.
7       Q    That's the document that tells you
8   whether you have a justified arrest or a false
9   arrest, correct?
10      A    I don't know if the document -- I
11  mean -- say that one more time.
12      Q    Sure.  So the arrest affidavit is the
13  document that justifies someone's arrest,
14  correct?
15      A    Correct.
16      Q    And so it's what tells you whether
17  you have a justified arrest or an unjustified
18  arrest, correct?
19      A    Correct.
20      Q    And an arrest affidavit is submitted
21  to the Court, correct?
22      A    Yes, sir.
23      Q    So if someone signs a false Affidavit
24  of Probable Cause, they're creating false
25  evidence for the Court; is that correct?
```

```
 1          MS. MORRIS:
 2                Object to the form.  If you can
 3          answer.
 4          THE WITNESS:
 5                Yes.
 6   BY MR. MOST:
 7      Q    In order to book someone into the
 8   East Baton Rouge Parish Prison, the arresting
 9   officer has to have a signed probable cause
10   affidavit; is that correct?
11      A    That is correct.
12      Q    So you can't put someone in East
13   Baton Rouge Parish Prison without one of these
14   documents, right?
15      A    The PC?
16      Q    Right.
17      A    On these circumstances, yes, they
18   have to have that, unless they're booked on a
19   warrant.
20      Q    And filling out the Affidavit of
21   Probable Cause is the duty of the arresting
22   officer, correct?
23      A    Correct.
24      Q    And one officer can't sign an
25   Affidavit of Probable Cause for another
```

```
 1   officer, right?
 2              MS. MORRIS:
 3                   Object to the form.  Calls for
 4              speculation.
 5              THE WITNESS:
 6                   No other officer should sign a
 7              document for another officer.
 8   BY MR. MOST:
 9       Q   It would be untruthful for one
10   officer to sign another officer's name,
11   correct?
12              MS. MORRIS:
13                   Object to the form.  Calls for a
14              legal conclusion.
15              MR. MOST:
16                   Officer, sometimes Ms. Morris
17              will make objections, but you can
18              then just answer the question, unless
19              she tells you not to.  You want me to
20              repeat the question?
21              THE WITNESS:
22                   Yes, sure.
23   BY MR. MOST:
24       Q   It would be untruthful for one
25   officer to sign another officer's name under
```

```
 1   oath, correct?
 2        A    Correct.
 3             MS. MORRIS:
 4                  Same objection.
 5             THE WITNESS:
 6                  Correct, your answer -- I mean
 7             your question.
 8   BY MR. MOST:
 9        Q    I'm going to show a document.  Can
10   you see this Affidavit of Probable Cause here?
11        A    Can you scroll up?  The bottom of it
12   is cut off.
13        Q    This is Exhibit C on page 1.
14        A    I also have a copy of it.
15        Q    This is an Affidavit of Probable
16   Cause for defendant Raae Pollard, correct?
17        A    Yes, sir.
18        Q    And your badge number is P-10177?
19        A    Yes, sir.
20        Q    Is that your signature on the affiant
21   line here?
22        A    No, sir.
23        Q    What indicates to you that it's not
24   your signature?
25        A    I've been writing my name for quite
```

```
1   sometime and that's not my handwriting.
2       Q    It's not just you don't remember
3   signing this, you're sure you did not sign
4   this document; is that correct?
5       A    Absolutely and my name is actually
6   Billy Walker, III.  And I make sure I put
7   "III" on all of my documents.
8       Q    So whoever signed this affiant line,
9   I mean they're definitely trying to say they
10  are you, correct?
11      A    Yes.
12      Q    There's only one BRPD officer with
13  badge number P-10177, correct?
14      A    Yes, sir.
15      Q    That's you?
16      A    Correct.
17      Q    So someone -- do you know who signed
18  this?
19      A    No, I do not.
20      Q    So someone -- and we don't know
21  who -- created an Affidavit of Probable Cause
22  for Raae Pollard and signed your name to it;
23  is that right?
24      A    Yes, sir.
25      Q    So they created a false document
```

1    about Raae Pollard; is that correct?

2         A    Well, I don't know if the document --

3    I can't say that for sure, because I had -- I

4    don't know who Raae Pollard is, but that

5    document is not signed by me.

6         Q    Right.  I mean, that's a problem that

7    someone is signing Affidavits of Probable

8    Cause with your name, correct?

9         A    Yes, sir.

10        Q    You found out about this in 2016,

11   correct?

12        A    Yes, sir.

13        Q    And you found out that someone was

14   signing your name to at least one document,

15   correct?

16        A    Yes, sir.  The report was being

17   looked for.

18        Q    And you wrote a letter about this; is

19   that right?  Because it seems like you took

20   this very seriously, that someone was signing

21   your name to documents falsely; is that

22   correct?

23        A    Yes, sir.  I take pride in my job.

24        Q    I'm going show this here.  This is a

25   letter from Corporal Walker, this is you,

1    reporting about this situation, correct?

2        A    Yes, sir, that is my letter.

3        Q    And you are saying in this letter

4    that this probable cause affidavit, which has

5    your name, was not signed by you, correct?

6        A    Correct.

7        Q    What's the signature in the lower

8    left-hand corner; is that Sergeant Honore?

9        A    Yes, that's a letter just to show

10   that it was received.  Any letter that we

11   would write, it has to go up the chain of

12   command.

13       Q    And so you reported that someone was

14   falsifying your name on an Affidavit of

15   Probable Cause, right?

16       A    Yes, sir.

17       Q    And what happened -- did you get a

18   response to this letter?

19       A    I did not.

20       Q    Do you know if there was an

21   investigation as to who was falsifying your

22   signature?

23       A    I do not.

24       Q    Do you know if anyone was ever

25   disciplined for falsifying your signature?

1      A      No, sir.

2      Q      Anyone in BRPD's chain of command

3  ever got back to your report about someone

4  falsifying your signature?

5      A      No.

6      Q      Did that surprise you?

7      A      I wouldn't say that.  I, maybe, would

8  think they may not have been aware.

9      Q      What do you mean, they may not have

10  been aware?

11      A      Well, this letter -- my sergeant

12  signs it to state that -- saying that it was

13  written.  And this letter was in response to

14  criminal records.  Because they sent me a

15  letter saying that I did not write a report on

16  a Ms. Raae Pollard's arrest and that was my

17  response to them.  And I figured that they

18  just put that letter in replace of that report

19  they were looking for.

20      Q      So they may not have investigated to

21  find out who was falsifying your name?

22      A      Correct.

23      Q      Does that bother you that they may

24  not have investigated to find out who was

25  falsifying your name?

1    A    Yeah.

2    Q    Did you ever bring it up with a

3  superior subsequent to this letter?

4    A    I'm sure my supervisor at the time

5  was aware of it because I had to write the

6  letter.  I guess -- I assume they took their

7  respective roles and do what they were

8  supposed to do.  I never questioned it.

9    Q    After sending this letter, did you

10  ever talk to somebody about this falsification

11  of your signature?

12    A    Yes.

13    Q    Who did you talk to?

14    A    I started getting the emails about

15  the -- I mean, not the email, the notification

16  about this lawsuit going on, and I told Deelee

17  that --

18    Q    I'm sorry.  I don't need to know what

19  you told your lawyer.  I apologize.  Aside

20  from your lawyer, did you talk to anyone about

21  the falsifying of your signature?

22    A    No.

23    Q    Okay.  So if Raae Pollard was

24  arrested on July 10, 2016, it was based on a

25  false Affidavit of Probable Cause; is that

 1    correct?

 2             MS. MORRIS:

 3                  Object to the form.  You can

 4             answer.

 5             THE WITNESS:

 6                  If this is the only document,

 7             then, yes.

 8    BY MR. MOST:

 9        Q    I'm pulling up Exhibit C at page 1

10    again.  We were just looking at Exhibit T at

11    245.  And so if -- where you were stationed at

12    Government and East, it's nowhere near 9000

13    Airline Highway, correct?

14        A    That's correct.

15        Q    And you see in this Affidavit of

16    Probable Cause, it says the location was 9000

17    Airline Highway?

18        A    Yes, sir.

19        Q    Okay.  So if Raae Pollard was

20    arrested near where you were positioned, then

21    the facts in this synopsis are not true; is

22    that correct?

23        A    I don't even know who Raae Pollard

24    is.  I don't know if she was arrested near my

25    location or not.

```
 1        Q    Sure.  But if she was arrested near
 2   your position, this would not be truthful
 3   facts, correct?
 4             MS. MORRIS:
 5                  Object to the form.  You can
 6             answer.
 7             THE WITNESS:
 8                  Correct.
 9             MS. MORRIS:
10                  William, can I interrupt for a
11             second?
12             MR. MOST:
13                  Sure.
14             MS. MORRIS:
15                  We have Officer Williams here,
16             and I just wanted to know, should we
17             ask -- you know, for his convenience,
18             how much longer do you think we'll
19             be?
20             MR. MOST:
21                  I don't think we're going to be
22             that much longer.
23             MS. MORRIS:
24                  Okay.  I was just going to see
25             if he wanted to go eat and come back,
```

```
 1              but if it's not going to be over a
 2              half hour or something like that --
 3              MR. MOST:
 4                  Yeah.  I would suggest he
 5              remain.
 6              MS. MORRIS:
 7                  Okay.
 8    BY MR. MOST:
 9        Q    So Officer, your only actions at the
10    protest on July 10, 2016 were to block traffic
11    and escort one arrestee; is that correct?
12        A    That was my only action, yes, sir.
13        Q    You didn't escort any other
14    arrestees?
15        A    No.  Just the one listed in my report
16    that I wrote, which is, again, Ms. Cheney.
17        Q    Do you receive training as a Baton
18    Rouge police officer in how to deal with
19    protests?
20        A    No.
21        Q    Does any of your training talk about
22    when it is permissible to arrest peaceful
23    protesters?
24        A    I've never attended a protesting
25    training class.
```

 1      Q    Have you ever attended any sort of
 2  training class or any other sort of training
 3  that addresses even in part how to deal with
 4  protests?
 5      A    Not that I recall.
 6      Q    Have you ever been -- in any of your
 7  training, has a case called Cox V. Louisiana,
 8  which is a protest case from Baton Rouge in
 9  the 1960s.  Has that ever come up?
10      A    Not that I can recall.
11      Q    Have you ever used a preprinted
12  Affidavit of Probable Cause in your role as a
13  police officer?
14      A    Never.
15      Q    Do you know what R.S. 14:97 is?  It's
16  not a pop quiz.  It's obstruction of a highway
17  of commerce.  Are you familiar with that
18  statute?
19      A    Yeah, I was looking back at the
20  affidavit that was on the desk here.
21      Q    Have you ever arrested someone for
22  14:97, obstruction of a highway of commerce?
23      A    No.
24      Q    Are you familiar with 4:100.1, which
25  is obstruction of a public passageway?

```
 1       A    Again, I've never arrested anybody
 2   for that, either.
 3       Q    And how long have you been in Traffic
 4   Enforcement?
 5       A    Since 2012, so going on ten years
 6   now.
 7       Q    And how long you been with BRPD in
 8   total?
 9       A    Since June of 2006.
10       Q    Were you in (INAUDIBLE) --
11            THE COURT REPORTER:
12                 I'm sorry, Mr. Most.  I lost
13            you.  I'm sorry, Mr. Most.  I lost
14            you for a second.
15   BY MR. MOST:
16       Q    Corporal, were you a law enforcement
17   officer before 2006?
18       A    Yes, sir.
19       Q    When did you first become a law
20   enforcement officer?
21       A    April 2003.
22       Q    So you've been a law enforcement
23   officer for 18 years, approximately?
24       A    Yes, sir, correct.
25       Q    And in those 18 years, you've never
```

1    arrested someone for 14:97, obstruction of a

2    highway commerce or 14:100.1, obstruction of a

3    public passageway; is that correct?

4         A    Not that I can recall.

5         Q    And as a -- and you've been a traffic

6    enforcement officer for nearly ten years,

7    correct?

8         A    Yes, sir.

9         Q    And so you deal frequently with

10   people in and around streets and highways of

11   commerce, public passageways, correct?

12        A    Yes, sir, generally focusing on

13   speed.

14        Q    But dealing with how people pull

15   their cars over to the side of the road,

16   that's all wrapped into traffic enforcement,

17   correct?

18        A    Correct.

19        Q    So you escorted a Tammy Cheney.  Do

20   you know anything about an Alexis Cheney?

21        A    I'm thinking that was her daughter

22   because there was two people there.

23        Q    Did you see Alexis Cheney throw any

24   water bottles?

25        A    I really don't remember.  I do not

1  recall that.

2      Q    You didn't see any other acts of

3  violence by Alexis Cheney, other than throwing

4  a water bottle, correct?

5      A    I didn't see Alexis Cheney throwing a

6  water bottle.  That was Tammy.

7      Q    Did you see the arrest of Alexis

8  Cheney?

9      A    No.  I did not see the arrest of her,

10  but I do know she was arrested by the same

11  officer while I was walking Tammy to wherever

12  they, you know, all gathered up to be picked

13  up.

14      Q    Did you see the circumstances leading

15  up to the arrest of Tammy Cheney?

16      A    No.  You said Tammy Cheney just now.

17  Did you mean Alexis or Tammy?

18      Q    I meant Tammy Cheney.  Did you see

19  the circumstances leading up to the arrest of

20  Tammy Cheney, the mother?

21      A    Yes, she was throwing the water

22  bottle, not Alexis.

23      Q    So you witnessed Tammy Cheney being

24  arrested for throwing a water bottle?

25      A    I seen Corporal Simoneaux take her

```
1    into custody, yes, sir, and start walking her

2    in the direction we were in.  So that's when

3    we met him halfway and brought her the rest of

4    the way where everybody was being sat to be

5    picked up.

6         Q    So you saw Tammy Cheney throw a water

7    bottle.  And then you saw her shortly

8    thereafter be being arrested, correct?

9         A    Correct.

10        Q    How quickly did the officers get to

11   her after she threw the water bottle?

12        A    I mean, it was within seconds.

13        Q    Okay.  And they cuffed her when they

14   arrested her?

15        A    Correct.

16        Q    Okay.  So within a span of a few

17   seconds, Tammy Cheney was standing on a car.

18   She threw a water bottle --

19             THE COURT REPORTER:

20                  I'm sorry, Mr. Most.  I think I

21             lost you.

22             MR. MOST:

23                  Let me restate the question.

24   BY MR. MOST:

25        Q    So, Corporal, it's your testimony
```

1    that within a span of a few seconds, Tammy

2    Cheney was standing on a car, threw a water

3    bottle, officers seized her and put her in

4    handcuffs, and then you escorted her to a

5    processing area, correct?

6        A    How long she was standing on a car, I

7    do not know, because there was a lot going on.

8    But I do know that whenever I looked at her,

9    it was a matter within seconds by the time I

10   seen her throw the water bottle and be

11   approached by the officer.

12       Q    So within seconds -- it was a span of

13   seconds, a few seconds between her throwing

14   the water bottle and an officer's hands on

15   her, correct?

16       A    He made contact with her within

17   seconds.  No, I do not remember if she got

18   down willingly or if he put his hands on her

19   or not.  I do not know that.  Because I wasn't

20   solely focused on just that.  I was looking

21   around at other things also, because I had a

22   job with vehicles.

23       Q    And you're confident in that

24   testimony?

25       A    From what I can recall, I mean, from

 1    five years ago, that's what I remember of the

 2    incident that day involving Ms. Cheney.

 3        Q    Would you recognize a photo of

 4    Ms. Cheney if you saw it?

 5        A    That, I don't know.  I didn't spend a

 6    lot of time with her.  I just walked her

 7    several feet.

 8        Q    I'm going to show -- do you see the

 9    image of this woman here.  This is Exhibit A,

10    page 40, Figure 20.  Do you see that,

11    Corporal?

12        A    Yes, I see the picture it's blurry.

13    I couldn't tell you if that was Tammy or not.

14        Q    I'm going to play a video for you.

15    This is Exhibit Q.  It's going to --

16            THE COURT REPORTER:

17                I'm sorry, Mr. Most.  Did I lose

18            you?  "I'm going to play a video for

19            you.  This is Exhibit Q.  It's going

20            to" -- and then I lost you.

21    BY MR. MOST:

22        Q    So, Corporal, I'm going to show you

23    Exhibit Q, which is a video of the arrest of

24    Tammy Cheney, taken by a cellphone camera in

25    her hand.  Can you see this, this video?  It

```
 1   hasn't started playing yet.  Are you ready?
 2        A    It's sideways.  As best I can.
 3             (VIDEO PLAYED.)
 4   BY MR. MOST:
 5        Q    Were you able to see that video?  I
 6   know it's a little shaky.
 7        A    Yes, sir.
 8        Q    So that shows about a minute and a
 9   half before this woman is cuffed, correct?
10        A    Yes, sir.  That's what it says.
11        Q    It's about a minute and a half before
12   the officers put their hands on her, correct?
13        A    Yes, sir.
14        Q    And it does not depict her standing
15   on a car, does it?
16        A    That does not.
17        Q    It doesn't depict her throwing a
18   water bottle, does it?
19        A    That does not.
20        Q    So if this is Tammy Cheney, it's not
21   consistent with your testimony about the
22   arrest of Tammy Cheney, correct?
23        A    I also didn't see the officer that I
24   received her from.  So correct.
25        Q    Would you like to -- if this is Tammy
```

```
 1   Cheney, would you want to change your
 2   testimony about the arrest of Tammy Cheney?
 3            MS. MORRIS:
 4                 Objection.  It calls for
 5            speculation.
 6            THE WITNESS:
 7                 No, I would not.
 8   BY MR. MOST:
 9       Q    Even though this video would be
10   inconsistent with your testimony?
11            MS. MORRIS:
12                 Object to the form.
13            THE WITNESS:
14                 Correct.
15   BY MR. MOST:
16       Q    And you're certain that the person
17   who you saw throw a water bottle was Tammy
18   Cheney?
19       A    Correct.
20            MR. MOST:
21                 Okay.  That's all the questions
22            I've got.  Would any of the other
23            attorneys who are present, including
24            you, Ms. Morris, like to ask any
25            questions?
```

```
 1          MR. FOLEY:
 2              This is Eric Foley for the
 3          plaintiffs in Smith and
 4          Batiste-Swilley.  I do have a few
 5          questions.  Before I roll into those,
 6          does anyone need a break, bathroom
 7          break or anything like that?
 8              Give me just a moment to fix my
 9          audio here.  And, William, can you
10          enable screen share?
11                    EXAMINATION
12   BY MR. FOLEY:
13     Q    Mr. Walker, my name is Eric Foley.  I
14   represent plaintiffs in a different case --
15   let me turn my camera on.  Sorry about that --
16   of events arising from that same day.  I just
17   wanted to ask a couple of clarifying questions
18   to start with.  On that day, do you remember
19   what type of uniform you were wearing?
20     A    That, I don't.  Generally, we should
21   wear the gray.  In Traffic, we wear a gray
22   shirt.  But at times, our supervision would
23   allow us to wear a blue Class B, depending on
24   the workdays.  I don't know exactly which one
25   I was wearing that day.
```

```
 1        Q    Okay.
 2        A    Class A would be consistent with
 3   this, but it would have brass on it.
 4             THE COURT REPORTER:
 5                   I'm sorry.  It would have brass
 6             on it?
 7             THE WITNESS:
 8                   Yes, ma'am.  The middle badge,
 9             the middle nametag, brass.
10   BY MR. FOLEY:
11        Q    So you would not have been, for
12   example, in plain clothes with a vest and,
13   like, a badge on a lanyard, right?  You would
14   have had an actual uniform on?
15        A    Yes, sir.
16        Q    Did you drive a cruiser that day to
17   the protest?
18        A    Yes, sir.
19        Q    Where did you park that?
20        A    In the general area of where I was
21   standing, Government Street.
22        Q    So that would be Government Street
23   and East?
24        A    Within that vicinity, yes, sir,
25   within walking distance.  Yeah, I wasn't -- it
```

```
 1   was on Government.
 2       Q    Okay.  And remind me again, about
 3   what time did you arrive there?
 4       A    I don't recall the exact time we were
 5   sent down there; whatever time the protest was
 6   supposed to start.
 7       Q    Okay.  I want to screen share that
 8   map again you saw earlier.  I believe that was
 9   Exhibit S, if I'm not mistaken.
10            MR. MOST:
11                 The map was Exhibit B.
12            MR. FOLEY:
13                 B, sorry.  Exhibit B.
14   BY MR. FOLEY:
15       Q    So can you see that on the screen,
16   Mr. Walker?
17       A    Not yet.
18       Q    There's a bit of a lag, so I'll give
19   it a second.
20       A    Yes, sir, we have.  I also have a
21   copy of it in my hand.
22       Q    Great.  So another question
23   location-wise.  So if I understand your
24   testimony correctly, you're saying that you
25   were stationed, for the most part, at
```

1  Government and East Boulevard.  Is that

2  correct?

3      A    Yes, sir.

4      Q    And when you talked about the

5  prisoner processing area, where you were

6  escorting Ms. Cheney.  Where was the prisoner

7  processing area?

8      A    That's what I was saying.  I'm not a

9  hundred percent sure if it was a processing

10 area or just an area that the arrestees were

11 being walked to either get on a van or a bus

12 or something of that sort.  I just walked her

13 a little bit east of where I was at and they

14 had another group of officers there that we

15 just dropped them off to.

16     Q    And that was on Government Street

17 itself or on East?

18     A    It was on Government Street.  I would

19 say closer towards the interstate is the

20 direction I walked.

21     Q    So somewhere in this

22 area (Indicating)?  I'm notating the image on

23 the screen.  I don't know if you can see that.

24     A    Ballpark, that's around the area I

25 walked her to and we handed her off to the

```
 1    area that the other arrestees were at, where
 2    the other officers were.  I'm not sure if
 3    there was a processing area.  Because there
 4    was police cars lined up down Government to
 5    the interstate and if not past it.
 6         Q    So if not an official processing
 7    area, it was somewhere arrestees were being
 8    brought and waiting for whatever the next step
 9    was going to be; is that a fair
10    characterization?
11         A    Correct.
12              MR. FOLEY:
13                   I'm going to save an image of
14              this and mark it as S-1, and I'll --
15              I created a PNG file -- the court
16              reporter should have access to it
17              through Zoom, but I'll share it
18              everyone by email, as well.
19    BY MR. FOLEY:
20         Q    Officer Walker, when you say you're
21    in that general area, was there any point in
22    which you were at the corner of East Boulevard
23    and France.  It would be about here on the map
24    (Indicating)?
25         A    No, sir.
```

1    Q    So you never went further down East

2    Boulevard towards France in that direction?

3    A    No, sir, I stayed on Government.

4    Q    Did you at any point escort other

5    arrestees other than Ms. Cheney to that area?

6    A    No, sir.

7    Q    I'm going to stop sharing this for a

8    moment.  I'm going to share an image with you

9    and ask if you recognize a person in there.

10   It might take a moment to show up on the

11   screen.  Just let me know when you can see the

12   image.

13   A    Do I recognize who is in there?

14   Q    I want to know if you recognize the

15   woman who's being escorted by the officer in

16   the gray T-shirt in the foreground here.

17   She's got a scarf on, wearing black jean

18   shorts (indicating)?

19   A    No, I've never seen her.

20   Q    Okay.  And to be clear, you were

21   never in this area of East Boulevard?

22   A    Correct.

23   Q    I think I have just one more image I

24   want to show you just to clarify locations.  I

25   think it might jog a memory as to this

1    processing area.  It's a video that was -- I'm

2    going to represent to you that was obtained

3    from East Baton Rouge Sheriff's Office from

4    July 10th.  And I'm going to forward the

5    video.  It's 12 minutes long.  Unless counsel

6    objects, I'm going to forward to around the --

7    well, it's around 13 minutes long.  I'm going

8    to forward to the 12-minute mark, unless

9    anyone has an objection to that and wants to

10   sit through that.  It's just one cue this up.

11          So I'm going to play about 30 seconds

12   of this, Officer Walker.  And once I stop, I'm

13   going to ask if you recognize this area and if

14   you can confirm that this is the area that we

15   were talking about earlier about the prisoner

16   staging.

17          A    Okay.

18          Q    I'm going to attempt to screen share

19   now with the computer audio; although the

20   audio, I think, is not really relevant here.

21   It's more the images we're concerned about.

22   Let me know if you can see that.

23          A    Yes, sir, I can see it.

24          Q    I'm going to commence playing this

25   file.  (VIDEO PLAYED.)

```
 1              Okay.  Officer, did you recognize
 2      that scene?
 3          A    Yes, sir, that's Government Street
 4      between East Boulevard and the interstate,
 5      which, looking at my map, was just before 10th
 6      Street.
 7          Q    Okay.
 8          A    I think there is (INAUDIBLE) --
 9              THE COURT REPORTER:
10                  I'm sorry, Officer.  What did
11              you say?
12              THE WITNESS:
13                  That's generally the area he
14              highlighted just now on the map.
15      BY MR. FOLEY:
16          Q    And that is the area that you recall
17      bringing arrestees?
18          A    That's where I brought Ms. Cheney.
19              MR. FOLEY:
20                  Okay.  Just one moment.  I think
21              that might be all of the questions I
22              have.  I want to consult with my
23              co-counsel to see if they have
24              anything additional.
25                  (BRIEF RECESS)
```

```
 1            MR. FOLEY:
 2                 Thank you for your patience.  I
 3            think that's all the questions that
 4            we have.  I don't know, Deelee, if
 5            you have any followup.
 6            MS. MORRIS:
 7                 Yes, I do, real quick.
 8                      EXAMINATION
 9    BY MS. MORRIS:
10       Q    Going back your original assignment
11    on July 10th, 2016.  Can you describe the --
12    (INAUDIBLE) -- that you were assigned to?
13            THE COURT REPORTER:
14                 I'm sorry, Ms. Morris.  Can you
15            step a little bit closer?
16            MS. MORRIS:
17                 Sure.
18            THE COURT REPORTER:
19                 "Can you describe" -- and I
20            didn't hear the rest of what you
21            said.
22    BY MS. MORRIS:
23       Q    Can you describe the assignment, the
24    planned protest that you were assigned to,
25    like the route?
```

1      A    I don't know the full route.  We were
2  told -- we kind of got there once it was kind
3  of already starting -- at least I did.  I was
4  probably, maybe -- whenever I got there, they
5  were making their way up Fourth Street and we
6  blocked the side streets along Fourth as they
7  were walking towards the Capital just to
8  prevent any cross-traffic while they were in
9  the roadway.
10     Q    So they were walking to the Capital?
11     A    Correct.
12     Q    And that was part of the planned
13  protest?
14     A    Correct.
15     Q    Was there any other parts of the
16  planned protest you were assigned to,
17  route-wise?
18     A    They was supposed to go there and
19  back to where they started, to a location on
20  Government Street.
21     Q    Then you also stated earlier that you
22  were subsequently parked on Government close
23  to the interstate to block traffic; is that
24  correct?
25     A    Yeah.  I didn't know the route.

1    Apparently, the officers or command staff or
2    whoever was running this event made note they
3    continued past where they were supposed to go.
4    What location it was, I'm not sure of.  At
5    that point in time, it looked like they were
6    walking towards the interstate.
7         Q    So was your assigned -- was the
8    planned protest -- your assignment at
9    Government Street, was that part of the
10   planned protest?
11        A    No, that changed.  I had to take over
12   blocking traffic on Government once the
13   protesters remained in the roadway.
14        Q    Would you say that was after the
15   planned protest ended.
16        A    It was well after.  They were given
17   announcements for everybody to move out of the
18   road so we could allow traffic to flow, but we
19   were unable to do that because a lot of the
20   people was not moving.
21             MS. MORRIS:
22                  That's all I have.
23             MR. MOST:
24                  Just a couple of followup from
25             that.

                    EXAMINATION

1   BY MR. MOST:

2        Q    So, Corporal, you got to the protest

3   on Sunday, July 10, 2016 when the protesters

4   were headed towards the Capital; is that

5   right?

6        A    Yes.  So they originally started at a

7   location on Government.  I didn't see the

8   exact starting point.  But the plan was to

9   walk to the Capital and then back to where

10  they were originally started.

11       Q    When you got there, they were walking

12  towards the Capital?

13       A    I didn't go to Government Street.  I

14  know the location that they started.  I'm sure

15  that we went to destinated intersections that

16  was not covered to block, you know, the side

17  streets along Fourth.  I know whenever I got

18  to Fourth Street, they had not made it to me

19  quite yet, so I was actually ahead of them as

20  they were walking on the street to prepare for

21  their arrival.

22       Q    Which direction were the protesters

23  headed when you got on scene?

24       A    They were heading to the Capital.

1    Q    Okay.  And you got there -- you got

2    to the scene sometime after 8:00 o'clock p.m.,

3    correct?

4    A    I don't recall the exact time it

5    started.  I didn't -- the only documentation I

6    have is my actions on the report.  But that

7    was well after the protest ended.

8    Q    Okay.  Do you have your narrative

9    still in front of you?

10    A    So this says 8:25.

11    Q    So you got to the scene of the

12    protest some time after 8:25; is that correct?

13    A    No.  It would have to have been

14    before that.  Because my report says at 8:25,

15    I was assigned to the peaceful protest and

16    assigned to area of Government Street and East

17    Boulevard.  So if I was assigned to Government

18    and East Boulevard, the protest would have

19    been back by then.

20    Q    I'm just trying to figure out what

21    does this 2025, this 8:25 p.m. mean?  That's

22    when you were already on scene and got an

23    assignment?

24    A    8:25 hours is my -- is the time of

25    the report for the Tammy Cheney thing, for the

1    escort -- for walking her to the escort area.

2    So, therefore, they would have been going to

3    the Capital prior to 8:25.  They would have

4    actually made it back by then.

5        Q    But this says you got the assignment

6    to work the protest at 8:25 p.m., correct.

7        A    I labeled that just to show what I

8    was doing down there.

9        Q    I see.  So it's like:  At this time,

10   my assignment was.  It wasn't:  I got this

11   assignment at this time?

12       A    Correct.

13       Q    Okay.  Okay.  I was confused.

14       A    That was the time I was given.  It

15   was just giving the time -- at that time I was

16   at that location and that's my actions at that

17   time.

18       Q    Got it.  That clarifies it.  One

19   final thing you verified some -- do you know

20   what it means to verify a document?

21       A    To look at it and review it?

22       Q    And then sign a document saying it's

23   truthful under oath; have you done that?

24       A    Have I done that?

25       Q    I'll give you an example.  This is

```
 1   Exhibit H.
 2           MR. MOST:
 3               Would you give me back Screen
 4           Sharing, Eric.
 5   BY MR. MOST:
 6       Q    Exhibit H at page 42.  Do you see
 7   this verification page?
 8       A    Correct.
 9       Q    And do you see that says:  "Affiant,
10   Billy Walker."
11       A    Correct.
12       Q    Is that you?
13       A    That was me.  But generally, I put
14   III on there.
15       Q    Did you type your name in here or did
16   someone type it in for you?
17       A    I didn't type that.
18       Q    Did you look at some documents on
19   this date?
20       A    Correct.
21       Q    Did you swear on that date that some
22   documents were truthful?
23       A    Between -- is that Deelee on the
24   there?  Yeah.  Me and her went over documents.
25   There should be a part where I did sign.
```

```
 1      Q    Do you remember physically signing
 2   something that day?
 3      A    (INAUDIBLE).
 4           THE COURT REPORTER:
 5                I'm sorry.  Did you respond?
 6           THE WITNESS:
 7                Yes, ma'am, I did.
 8           MR. MOST:
 9                That's all my questions.
10           Officer, thank you very much for your
11           time today.  I appreciate you taking
12           the time out of your morning to meet
13           with us.
14           THE WITNESS:
15                Thank you.
16           MR. FOLEY:
17                William, I'm sorry.  One thing.
18           No further questions from us.  As a
19           point of order for the video that I
20           showed.  I didn't want to mess with
21           your exhibit numbering scheme, but I
22           wanted to attach that as an exhibit.
23           I'm not sure what's open.
24           MR. MOST:
25                I'm up to T.  If you want to
```

1        make it U, as in umbrella.

2     MR. FOLEY:

3            We'll make Exhibit U, MFF

4     Protest Downtown 7-10-16.MP4.  And I

5     will circulate that, as well.

6     MR. MOST:

7            Thank you.

8            *        *        *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  WITNESS' CERTIFICATE

 2

 3          I, BILLY WALKER, do hereby certify

 4    that the foregoing testimony was given by me,

 5    and that the transcription of said testimony,

 6    with corrections and/or changes, if any, is

 7    true and correct as given by me on the

 8    aforementioned date.

 9

10

11    Dated: _____  Signed:_____

12                           BILLY WALKER

13

14

15    _____  Signed with corrections as noted.

16

17    _____  Signed with no corrections noted.

18

19

20

21    DATE TAKEN: June 9, 2021

22

23

24

25
```

1          C E R T I F I C A T E

2

3          I, CECILIA M. HENDERSON, Certified
Court Reporter, in and for the State of
4    Louisiana, as the officer before whom this
testimony was taken, do hereby certify that
5    BILLY WALKER  after having been duly sworn by
me upon authority of R.S. 37:2554, did testify
6    as hereinbefore set forth in the foregoing 81
pages; that this testimony was reported by me
7    in the stenotype reporting method, was
prepared and transcribed by me or under my
8    personal direction and supervision, and is a
true and correct transcript to the best of my
9    ability and understanding; that the transcript
has been prepared in compliance with
10   transcript format guidelines required by
statute or by rules of the board, that I have
11   acted in compliance with the prohibition on
contractual relationships, as defined by
12   Louisiana Code of Civil Procedure Article 1434
and in rules and advisory opinions of the
13   board; that I am not related to counsel or to
the parties herein, nor am I otherwise
14   interested in the outcome of this matter.

15

16        Dated this 30th of June, 2021

17

18

19

20        CECILIA M. HENDERSON, CCR
          CCR #84099
21        STATE OF LOUISIANA

22

23

24

25