UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


BLAIR IMANI, et al.                    DOCKET NO.

      Plaintiffs,              17-cv-00439JWD-EWD

   V.


CITY OF BATON ROUGE, et al.

      Defendants.




      DEPOSITION OF LIEUTENANT JOHN CLARY,
given in the above-entitled cause, via Zoom
videoconferencing, pursuant to the following
stipulation, before Sandra P. DiFebbo, Certified
Shorthand Reporter, in and for the State of
Louisiana, on the 17th day of August 2021,
commencing at 9:30 AM.

```
 1   APPEARANCES (Via Zoom):
 2   REPRESENTING THE PLAINTIFFS:
     (Imani v. City of Baton Rouge)
 3
             MOST & ASSOCIATES
 4           BY:  WILLIAM MOST,
             ATTORNEY AT LAW -and-
 5           DAVE LANSER, ATTORNEY AT LAW
             201 St. Charles Avenue
 6           Suite 114 #101
             New Orleans, Louisiana  70170
 7
 8   REPRESENTING THE PLAINTIFFS:
     (Smith v. City of Baton Rouge)
 9   (Batiste-Swilley v. City of Baton Rouge)
     (Tennart v. City of Baton Rouge)
10
             MACARTHUR JUSTICE CENTER
11           BY:  JIM CRAIG, ATTORNEY AT LAW
             HANNAH LOMMERS-JOHNSON, ATTORNEY AT LAW
12           ERIC FOLEY, ATTORNEY AT LAW
             4400 S. Carrollton Avenue
13           New Orleans, Louisiana  70119
14   REPRESENTING THE CITY/PARISH OF BATON ROUGE AND
     BATON ROUGE CITY POLICE OFFICERS:
15
             EAST BATON ROUGE PARISH ATTORNEY'S OFFICE
16           BY:  JOSEPH K. SCOTT,
             ATTORNEY AT LAW
17           Suite 902
             222 St. Louis Street
18           Baton Rouge, Louisiana  70802
19   REPRESENTING THE LOUISIANA STATE POLICE AND
     INDIVIDUAL STATE POLICE TROOPERS:
20
             BURGLASS & TANKERSLEY, LLC
21           BY:  GREGORY FAHRENHOLT,
             ATTORNEY AT LAW
22           5213 Airline Drive
             Metairie, Louisiana  70001-5602
23
24   Also Present:  MICHELE GIROIR, ESQ.
                    DPS Office of Legal Affairs
25
```

1    E X A M I N A T I O N          I N D E X

2

3                                        Page

4    BY MR. MOST:                        6, 146

5    BY MS. LOMMERS-JOHNSON:             94, 150

6

7

8

9    E X H I B I T                  I N D E X

10

11                        Page

12
     Exhibit 1                            94
13   Exhibit 2                103
     Exhibit 3                117
14   Exhibit 4                            118
     Exhibit 5                121
15   Exhibit 6                133
     Exhibit 7                            140
16   Exhibit 8                141
     Exhibit 9                143
17   Exhibit 10                           144

18

19

20

21

22

23

24

25

S T I P U L A T I O N

It is stipulated and agreed by and between Counsel for the parties hereto that the Deposition of LIEUTENANT JOHN CLARY, IS hereby being taken pursuant to the Federal Rules of Civil Procedure for all purposes in accordance with law;

That the formalities of reading and signing are specifically reserved;

That the formalities of sealing, certification, and filing are hereby specifically waived.

That all objections, save those as to the form of the question and responsiveness of the answer are hereby reserved until such time as this deposition or any part thereof is used or sought to be used in evidence.

\* \* \* \* \*

Sandra P. DiFebbo, Certified Shorthand Reporter, in and for the State of Louisiana, officiated in administering the oath to the witness via Zoom.

```
 1          LIEUTENANT JOHN CLARY, having been first
 2      duly sworn, was examined and testified on his
 3      oath as follows:
 4           MR. MOST:
 5                Greg, would you like to read the
 6           stipulation into the record that's been
 7           agreed to by counsel?
 8           MR. FAHRENHOLT:
 9                Absolutely.  Prior to this
10           deposition, I reached an agreement with
11           all plaintiff counsel in this matter to
12           read the following stipulation into the
13           record.  All parties stipulate that
14           Lieutenant John Clary will not be
15           asked, will not answer, questions
16           regarding his knowledge of incidents
17           involving Ronald Green, the use of
18           force by any LSP troopers against
19           Ronald Green, the investigation of the
20           incidents involving Ronald Green by any
21           law enforcement agency, any allegations
22           presented in the media regarding
23           Lieutenant Clary related to the Ronald
24           Green matter, and any LSP Internal
25           Affairs investigation against
```

```
 1              Lieutenant Clary or any other LSP
 2              troopers related to Ronald Green.  I
 3              assume we are still in agreement to
 4              that stipulation?
 5         MR. MOST:
 6              This is William Most.  Yes, insofar
 7              as that applies to today's deposition.
 8              I think now that I'm hearing it out
 9              loud, I just want to make sure we're
10              clear on that may not apply to trial.
11              We're certainly agreeing to that as of
12              this deposition, but we may have to,
13              you know, address it at trial, too.
14              With that caveat, yes.
15         MR. FAHRENHOLT:
16              I understand that.  The stipulation
17              is intended only for this deposition.
18         MR. MOST:
19              Yeah.  Then agreed for Imani
20              plaintiffs.
21         MS. LOMMERS-JOHNSON:
22              This is Hannah Lommers-Johnson for
23              the Tennart, Batiste-Swilley, Smith,
24              and AR plaintiffs, and that's agreeable
25              to us as well.
```

```
 1              MR. MOST:

 2                   Greg, can we stipulate that this

 3                deposition was properly noticed and the

 4                court reporter is duly qualified?

 5              MR. FAHRENHOLT:

 6                   Yes, we can.

 7     EXAMINATION BY MR. MOST:

 8         Q.   All right.  Officer, could you give your

 9     full name and current rank for the record?

10         A.   My name is John Clary.  I'm a lieutenant

11     with the Louisiana State Police.

12         Q.   Lieutenant, would you like to be called

13     lieutenant or would you like to be called officer,

14     Mr. Clary?  What is your preference?

15         A.   Lieutenant is fine.

16         Q.   I'll do my best.  If I slip and call you

17     officer, it may be just because that's what I've

18     been saying in these depositions.  It won't be

19     intended to cause any offense.

20         A.   That's fine.

21         Q.   Lieutenant, my name is William Most.  I'm

22     an attorney.  I represent the plaintiffs in a case

23     called Imani v. Baton Rouge.  Other attorneys are

24     here today, including Ms. Lommers-Johnson,

25     Mr. Craig, and Mr. Foley.  They represent
```

1    plaintiffs in other related cases, also, about the
2    2016 protests.  And the way we're going to do today
3    is I'm going to start by asking questions.  One of
4    them may follow up with more questions.  It's
5    possible there may be wrap up at the end.  Your
6    attorney has the right to ask questions as well,
7    and then we will call it a day.  Any big picture
8    questions before we get started?
9         A.   No, sir.
10        Q.   Lieutenant, have you ever given a
11   deposition before?
12        A.   Yes, sir, I have.
13        Q.   Approximately how many depositions have
14   you given before?
15        A.   I'd say probably half a dozen mostly
16   related in crashes.
17        Q.   Have you ever given a deposition in a
18   case where you were a plaintiff or a defendant,
19   i.e., the person suing or being sued?
20        A.   No, sir.
21        Q.   And so you've done enough depositions to
22   understand that you're under oath today, and your
23   answers here today have the same force as if we
24   were in a courtroom with a judge and jury, correct?
25        A.   Yes, sir.

1    Q.   And is there anything today, whether it's

2 illness, medication, or fatigue that might prevent

3 you from giving us your full attention and truthful

4 and complete answers?

5    A.   No, sir.

6    Q.   And, as you know from your past

7 experience with depositions, we will be conducting

8 this questioning, but it doesn't have to be

9 continuous.  We can take breaks as needed.  If you

10 need to get a drink of water, use the restroom,

11 feel free to tell your attorney or me, and we will

12 take a break.  However, I'll tell you in advance

13 that it's my practice after each break to ask you

14 whether you talked to anyone during the break,

15 including your attorney, and the contents of that

16 conversation, even if it's your attorney, and any

17 documents you looked at.  So heads-up in advance.

18    A.   Yes, sir.

19    Q.   One thing you are already quite

20 experienced at is -- I'm pausing here, because it

21 looks like we lost Greg.

22         MR. FAHRENHOLT:

23             William, I am also signing in on a

24          tablet so I can locate the exhibits

25          without physically being on top of

```
 1              Lieutenant Clary.
 2         MR. MOST:
 3              No problem.  I just didn't want to
 4         question him if you were not present.
 5         MR. FAHRENHOLT:
 6              No.  I'm here.
 7    BY MR. MOST:
 8         Q.   All right.  So I was saying, Lieutenant,
 9    one thing you are already doing well, based on your
10    experience, is waiting for me to finish my question
11    before giving your answer, and, in return, I'll do
12    my best to give you the same courtesy of waiting
13    for you to finish before I ask the next question.
14    That way we'll have a clean transcript for the
15    reporter.  All right?
16         A.   Yes, sir.
17         Q.   One thing that is quite important is if I
18    ask a question that isn't clear, or you don't
19    understand it, will you agree to tell me that it's
20    not clear or you don't understand it rather than
21    trying to answer the question?
22         A.   Yes, sir.
23         Q.   Thank you.  One of the limitations of
24    this being a Zoom deposition is we are not in the
25    room with you.  So is there anyone in the room with
```

1   you besides your attorney, Mr. Fahrenholt?

2        A.    Yes.

3        Q.    Who else is present?

4              MR. FAHRENHOLT:

5                   It is Michele Giroir, G-I-R-O-I-R.

6              I believe it's Michele with one L.  She

7              is an attorney for the Department of

8              Public Safety, Office of Legal Affairs.

9   BY MR. MOST:

10       Q.    Okay.  Another limitation of this being a

11  Zoom deposition is that we won't be able to see

12  necessarily if someone tries to communicate with

13  you.  So, Lieutenant, will you agree to tell us if

14  anyone tries to communicate with you during this

15  deposition whether by hand signal, a passed note,

16  text message, or anything else?

17       A.    Yes, sir.

18       Q.    Thank you.  Lieutenant, do you know in a

19  broad sense what case or cases you are here for

20  today?

21       A.    I know that it was -- during 2016, there

22  was a protest, and I think y'all represent a couple

23  of people that were arrested during the protest.

24       Q.    That's correct.  So I represent the

25  plaintiffs in one of those cases.  The other

1    lawyers represent plaintiffs in the other cases.

2    We've also been joined by Mr. Scott who represents

3    the City of Baton Rouge defendants.  Lieutenant, do

4    you understand that in at least one of these cases

5    you are a defendant, i.e., one of the people being

6    sued?

7         A.   Yes, sir.

8         Q.   Lieutenant, aside from your attorney, did

9    you talk to anyone to prepare for this deposition

10   or refresh your recollection in anticipation of

11   this deposition?

12        A.   Yes, sir.  I've talked to -- just briefly

13   talked to Sergeant Mark Dennis and Lieutenant Beau

14   Comeaux.

15        Q.   Did you review any documents to prepare

16   for this deposition or refresh your recollection in

17   anticipation of this deposition?

18        A.   No, sir.  I've not reviewed any

19   documents.  No, sir.

20        Q.   Are there any documents on the table in

21   front of you that you are able to read that are

22   there for you to look at?

23        A.   No, sir.

24        Q.   So I want to talk just briefly about your

25   conversations with Mark Dennis and Beau Comeaux.

1   When did you talk to Mark Dennis to prepare for
2   this deposition?
3           A.   I talked to him briefly after his
4   deposition, and then I talked to him briefly
5   yesterday.
6           Q.   Roughly, how long in total, between those
7   two conversations, did you talk to him?
8           A.   Well, as far as in reference to the
9   deposition itself, maybe ten minutes each day, but
10  then we had other conversations about other stuff
11  not related to this at all.  So I may have talked
12  to him for a total of 30 minutes but probably ten
13  minutes or less maybe each day about the actual
14  deposition.
15          Q.   When you talked about the deposition,
16  what did you talk to Mark Dennis about?  What was
17  the contents of that conversation, roughly?
18          A.   Basically how did it go, how long were
19  you there.  They said that y'all showed a lot of
20  pictures, asked a lot of questions, asked some
21  questions about the formation of the Mobile Field
22  Force command structure, stuff like that, and that
23  would have been very similar to the conversation
24  that I had with Lieutenant Comeaux.
25          Q.   Did you talk with them specifically about

1   what happened in 2016 in terms of arrests of

2   protesters?

3        A.   They -- we talked briefly.  This is in

4   reference to Mark Dennis.  You know, he said you

5   had arrested or y'all had pictures of him arresting

6   somebody, and I forgot exactly what he said, but he

7   said he didn't remember -- he did not recall a

8   whole lot about it, but y'all had photos of him, so

9   it was obvious that he had arrested him.  And then,

10  you know, like I said, he talked about -- I think

11  y'all brought up something about being on private

12  property, about people in the roadway, about who

13  has the authority to arrest somebody or go out and

14  get somebody.  I'm sure there were a few other

15  things, but specifically I don't recall.

16       Q.   With either Mark Dennis or Beau Comeaux,

17  did the name of any particular protester come up?

18       A.   If they did, I don't recall.  I don't

19  recall a specific name, no, sir. I take that back.

20  Yes, I did.  With Mark Dennis, we did discuss

21  Airline Highway.  I think her nickname is Sister

22  Krystal.  As to what her actual legal name is, I do

23  not recall that.

24       Q.   Even if the name of any particular

25  protester besides Sister Krystal didn't come up,

1  did any -- did you discuss any particular

2  protesters by description?

3        A.    No, sir.

4        Q.    Lieutenant, have you brought any

5  documents with you today to this deposition?

6        A.    No, sir.

7        Q.    Could you give us just the very short

8  version of your educational and professional

9  background in broad terms?

10       A.    Okay.  I have less -- about a year of

11 college at Louisiana Tech University.  I started at

12 the Ruston Police Department in May of 1985, and

13 then I was hired by the Louisiana State Police in

14 January of '90.

15       Q.    So you've been a law enforcement officer

16 for --

17       A.    A long time.

18       Q.    -- approximately 36 years, about 30 or 31

19 of that with the state police; is that right?

20       A.    Yes, sir.  That is correct.

21       Q.    What is your job title now?

22       A.    I am a Shift Lieutenant at Troop F.  I am

23 also the platoon leader for the Region 3 Mobile

24 Field Force.

25       Q.    This is a question I ask of every

1    deponent.  It's not specific to you.  Have you ever

2    been arrested?

3         A.    No, sir.

4         Q.    We talked earlier about protesters in

5    2016.  Do you recall that there were protesters in

6    Baton Rouge in July of 2016?

7         A.    I remember it was -- I couldn't tell you

8    if it was June or July, but there were protests in

9    Baton Rouge during that time frame, yes, sir.

10        Q.    What was your -- let me back up.  Do you

11   remember in particular a protest that occurred in

12   the vicinity of the intersection of East and France

13   Streets on Sunday, July 10th, 2016?

14        A.    Yes. Yes, sir, I do.

15        Q.    So the case that I am an attorney on is

16   all surrounding that protest on that July 10th,

17   2016, so my questioning will be focused on that.

18   And if I talk about the East and France Street

19   protest, you'll understand that's the protest I

20   mean?

21        A.    Yes, sir.

22        Q.    Were you present at or near the East and

23   France Street protest?

24        A.    Yes, sir, I was.

25        Q.    What was your role that day?

1          A.    I was the platoon leader.

2          Q.    So you were the leader of a group of

3    state police troopers who were deployed there?

4          A.    Yes, sir, I was.

5          Q.    How many people, approximately, were in

6    that deployment that you were the leader of?

7          A.    Golly.  Just on the Mobile Field Force

8    side, of course, understand SWAT was also there,

9    and they had their own chain of command.  We worked

10   together, but the SWAT officers had their own chain

11   of command.  I'm guessing 40 to 50, maybe.

12   Somewhere around there.

13         Q.    So it sounds like there were two groups

14   of state troopers there with parallel chains of

15   command, and you were the leader of one of those

16   chains of command?  Is that accurate?

17         A.    Yes, sir.

18         Q.    Were you the highest -- were you at the

19   top of the chain of command for the Mobile Field

20   Force in terms of people present at East and

21   France?

22         A.    So just to -- it's kind of a hard

23   question to answer.  Yes and no.  What I mean by

24   that is I was in charge of moving the element.

25   Lieutenant Comeaux was there, and he was in charge

1    of the Mobile Field Force.  He was the head of the

2    Mobile Field Force.  I believe at some point in

3    time Kevin Reeves was there, and he was actually

4    the major that was over the Mobile Field Force.  So

5    there is different layers of -- if you talk about

6    who is in charge of it.  There is a lot of

7    different layers.

8              I think even at one point in time Colonel

9    Edmondson was there, so, you know, that's -- like I

10   said, I'm not trying to not answer your question.

11   I'm just saying that there was a lot of people

12   present that day that had a lot higher rank than

13   me.  As far as the Mobile Field Force, Lieutenant

14   Comeaux was actually over it, and if he said move

15   the -- he would motion or contact me in some way

16   and say, hey, move the team forward, move the team

17   left, right, you know, whatever the case may be,

18   and then I would give my instructions to the squad

19   leaders, and then we would move.

20         Q.   So there were people physically present

21   that you reported to, but you were delegated to

22   instruct your team to take certain actions, and you

23   were the leader of the team taking those actions;

24   is that a fair summary?

25         A.   Yes, sir.

1      Q.   When you say there were people that you
2  were giving orders to, were you giving orders only
3  to state troopers or were you also giving orders to
4  Baton Rouge police officers and sheriff's deputies?
5      A.   Just the state police.   Each -- any other
6  agency that was there would have had their own
7  chain of command.
8      Q.   So the physical actions taken by state
9  troopers at East and France Street were taken at
10  your direction; is that accurate?
11      A.   Well, just to clarify that, so I'm
12  telling the team maybe move left, maybe move right.
13  If my squad leader is on the far left, far right
14  side, and he sees a situation that needs to be
15  handled, maybe make an arrest or move something or
16  something like that, that squad leader has the
17  ability, the authority, to act, because, I mean, if
18  it's -- if the line is just say 50 or 60 people
19  wide, you know, I'm trying to see an overview of
20  it, but they may see something that I can't see, or
21  you know, so they have that authority if they see
22  something where they could go forward.
23          Now, I would have directed them, again,
24  you know, we're going to move forward, or we're
25  going to move left, we're going to move right, but

1    as they encounter things, they have the authority

2    to do what they need to do.

3        Q.   So some of the orders you issued that day

4    involved movement of state troopers, right?

5        A.   Yes, sir.

6        Q.   Did you also give any orders or

7    directions in terms of effecting arrests?

8        A.   I don't recall.  The only arrest that I

9    actually recall instructing, I believe, it was the

10   day before on Airline.  As we were marching up, I

11   notified Mark Dennis that Sister Krystal was there,

12   and there were people there beside her that had

13   guns.  That's the only one I said, hey, we need to

14   -- when we get up there, if we can arrest her, take

15   her into custody, we need to.  As far as other

16   ones, I don't remember specifically giving any

17   direction to go arrest that one or go arrest this

18   one.

19       Q.   So at East and France, you don't recall

20   giving an order to arrest a specific person; is

21   that right?

22       A.   No, sir.  No, sir, I do not.

23       Q.   Do you recall giving any orders to effect

24   arrests generally?  So move to this area and make

25   arrests generally, even if not specific to a

1    particular person?

2         A.    No, sir.  Like I said, if you are

3    familiar with the intersection, we pretty much kind

4    of just -- and I don't recall the exact name of the

5    streets, but we basically crossed a boulevard and

6    continued straight up.  It was a little offset, but

7    we were pretty much moving forward, if I answered

8    your question correctly.

9         Q.    Sure.  Maybe it would be helpful to look

10   at a map.  I'm pulling up Exhibit LL, larger map.

11   Do you see this map here at the intersection of

12   East Boulevard and France Street?

13        A.    Yes, sir.

14        Q.    So this is the vicinity at which you and

15   your troopers were deployed; is that accurate?

16        A.    Yes, sir.

17        Q.    My understanding is state troopers came

18   before from the direction of the interstate along

19   France Street towards East Boulevard?

20        A.    Yeah.  We actually came -- we actually

21   left the state police academy and came up

22   Government and parked under the interstate and then

23   moved to Francis.  France Street.

24        Q.    And then state troopers assembled in a

25   line on the East side of East Boulevard at France

1   Street, correct?

2        A.   Yes.

3        Q.   And then did you give them the order to

4   assemble in a line there along East Boulevard?

5        A.   I don't remember if I gave -- if it was

6   me or it could have been one of the other -- there

7   was another platoon leader, a couple of other

8   Mobile Field Force people.  As we were moving up,

9   people kind of arrived there at different times.

10  We were bringing a whole bunch of different

11  vehicles, so as -- I don't remember exactly who

12  gave this specific order, but I know we moved up

13  Francis Street, and as troopers arrived, they

14  filled in.  As far as who said, hey, we going to

15  start here and move forward, to be honest with you,

16  I don't recall.

17       Q.   And there were some protesters in the

18  street on East Boulevard, correct?

19       A.   Yes, sir.

20       Q.   Some law enforcement agency gave orders

21  to clear the roadways, correct?

22       A.   Yes, sir.

23       Q.   Did you or your state troopers give those

24  orders or was it a different agency?

25       A.   I believe -- I'm not a hundred percent.

1    I think it was Baton Rouge.  They had a bearcat

2    there with what I think is called a LRAD or

3    loudspeaker.  They were giving the orders over the

4    loudspeaker or the LRAD, whatever it's called.

5         Q.    Based on what I've seen, some protesters

6    refused to comply with that order and remained in

7    the street, and some retreated to the sidewalk and

8    private property on the other side of East

9    Boulevard.  Is that your recollection?

10        A.    There was a lot of people there.  East

11   Boulevard was very full.  There were people all

12   around.  To say that when we gave the orders people

13   left, I don't know if that would really be

14   accurate.  I think more people just kind of milled

15   around.  I don't think when we said y'all leave

16   that people just got in their car and drove off.

17   Maybe I'm misunderstanding your question, but as we

18   gave the orders, I don't recall a bunch of people

19   leaving.

20        Q.    But at least some protesters cleared the

21   streets and moved back to the sidewalks and private

22   property, correct?

23        A.    Maybe at some point.  Like I said, people

24   were just kind of milling around.

25        Q.    At some point, the street was clearer

1    than it was initially, agreed?

2        A.    Yes, sir.

3        Q.    Subsequent to that, the line of state

4    troopers moved forward, correct?

5        A.    Yes, sir.

6        Q.    Did you give that order for them to move

7    forward?

8        A.    Okay.  So let me -- again, I just want to

9    make sure I clarify.  Lieutenant Comeaux -- you

10   know, when Calcasieu came in from, say, the Europe

11   side, street side, and I think East Baton Rouge

12   came in from say Government side, once they arrived

13   there, then I was given direction to move the team

14   forward.

15       Q.    So that reflects the pictures I've seen

16   as well, that there was a line of state troopers at

17   East and France, and there were a line of sheriff's

18   deputies on two different sides of East Boulevard,

19   so the group of protesters were sort of surrounded

20   on three sides by lines of officers, correct?

21       A.    Yes, sir.

22       Q.    And then after that, once there were

23   those three lines of officers, you're saying you

24   received the direction from Comeaux to move your

25   team forward?

1     A.   Yes, sir.

2     Q.   And then you directed your team to move

3   forward across East Boulevard?

4     A.   Yes, sir.

5     Q.   What did you tell them to do?  Did you

6   just say move forward or did you tell them what to

7   do when they were moving forward?

8     A.   So we have -- you know, to move the team

9   forward, we've got a command where we tell

10  everybody to stand by, which means there is a

11  preparatory command coming.  You repeat that three

12  times.  Stand by, stand by, stand by.  Then I give

13  a hand signal and a very verbal command that we're

14  going to move forward.  You are moving your hand,

15  and you repeat it three times, forward, forward,

16  forward.  And as I say that, my squad leaders

17  repeat it, because it's very, very loud out, there,

18  and, obviously, you can picture, and you can see if

19  y'all have any audio, it's very loud.  So as I give

20  that command, my squad leaders are watching me, and

21  they're repeating it, and then we give the order to

22  move or march, and we move forward.

23    Q.   This wasn't like a parade march.  You

24  were not just marching back and forth to look nice,

25  you were giving them an order to move forward to do

```
 1   something, correct?
 2       A.   Yes, sir.
 3       Q.   What were you giving them an order to
 4   move forward and do?
 5       A.   Okay.  So we're just trying to get East
 6   Boulevard cleared and move people.  Like I said,
 7   we've asked them to leave, so we're trying to
 8   disperse the crowd by moving them.
 9       Q.   So the direction you were giving to your
10   troopers was essentially move forward and clear the
11   area of any protesters in this area; is that
12   accurate?
13       A.   Yes, sir.
14       Q.   And did your order include essentially an
15   implied instruction to effect arrests, as
16   necessary, to accomplish that?
17            MR. FAHRENHOLT:
18                Object to the form of the question.
19              Go ahead and answer.
20            THE WITNESS:
21                So understand when we go to a
22              protest, if the team is deployed out,
23              the best case scenario that we hope for
24              is that when we show up and ask people
25              to leave, is that they leave.  That is
```

```
 1          what we're asking.  So as we move, if
 2          people leave, then that's great for us.
 3          We don't want to go out and arrest 40
 4          people.  If we have to, then we have
 5          to, but if we're telling them to move,
 6          move, move -- that's the reason we give
 7          very loud commands, and we say, back,
 8          back, back, as the team is moving, is
 9          trying to get the people to leave, to
10          disperse.
11              When we do arrest somebody, well,
12          now I've got less people in my element,
13          and then it takes a little bit of time
14          by the time you take somebody into
15          custody, you take them back to a secure
16          area, hand them off to Baton Rouge PD,
17          then they're out.  So the more people
18          you arrest, the less people you have to
19          move people.
20              So, like I said, you know, best --
21          what we would like is, Number 1, not to
22          even have to go out there, if it would
23          have stayed peaceful, but if it comes a
24          point where we have to do -- you know,
25          I would love to show up and say, hey,
```

1              y'all go home, and everybody -- or go

2              to a place where you can have your

3              protest.  I mean, on Airline, we were

4              able to get the people into a park, and

5              that was great.  We said, hey, if y'all

6              move in the park, we'll leave.  They

7              are like, y'all will leave if we move

8              into the park?  We're like absolutely.

9              They moved into the park, and we left.

10             I would have loved for that to have

11             happened on East Boulevard and Francis.

12    BY MR. MOST:

13         Q.   Okay.  So just to back up, you were

14    giving your word to your troopers to move forward,

15    to clear the area, and to effect arrests as

16    necessary to accomplish that task.  Is that

17    accurate?

18         A.   If they had to arrest, each individual

19    squad leader had the authority.  If he needed to

20    take somebody into custody, he could, yes, sir.

21         Q.   And that was implied in the order that

22    you were giving them?

23         A.   Well, it's just how the team is set up.

24    When we move, if you come across something that you

25    have to deal with, then they deal with it.

1    Q.    What level of force was authorized by

2  your orders there?  Because I imagine that

3  certainly you were not authorizing your troopers to

4  clear the area by shooting people indiscriminately,

5  agreed?

6    A.    Correct.  Whatever, you know, force is

7  necessary to take somebody into custody.

8  Obviously, you know, reasonable force.

9    Q.    So your order came with it the implied

10  authorization to use reasonable force, as

11  necessary, to clear the area; is that accurate?

12    A.    Again, I feel in a way like you are

13  saying that I specifically told the guys to go

14  arrest people, because you keep saying -- like I

15  said, I'm not -- I just don't want there to be any

16  confusion.  When I move a team forward, that

17  forward, that moving that team forward doesn't mean

18  I want you to go arrest everybody.  That moving the

19  team forward is not an order to arrest everybody

20  that you -- it's to move the team forward to

21  disperse them.  If they have to arrest somebody,

22  they have, but I'm not ordering you to go forward

23  and arrest everybody.  I'm ordering you we're going

24  to move the team forward, and, if you have to

25  arrest somebody, then you do, but, like said I,

1    just wanted to clarify that.  It's not like I'm

2    sitting there going go arrest him, go arrest him.

3    That's not the case.  We're just trying to move the

4    team.

5        Q.   Yeah.  I understand.  You could have

6    given an order like I want you to move forward and

7    arrest every single person you see, but you didn't

8    give that order, right?

9        A.   Yes, sir.  That is correct.

10       Q.   You gave an order that was move forward

11   and, essentially, effect arrests, as necessary, to

12   move forward and clear the area but not necessarily

13   arrest everyone you see, agreed?

14       A.   That's correct, yes, sir.

15       Q.   And that came with the implied

16   authorization to use reasonable force, as

17   necessary, to conduct that task, correct?

18       A.   Yes, sir.

19       Q.   You mentioned a negotiation at a

20   different location, at Airline Highway.  So at

21   Airline Highway, were you -- did you participate in

22   the negotiation with protesters?

23       A.   Oh, yes, sir, I did.

24       Q.   That negotiation was essentially if you

25   clear the streets and retreat to this park, then

1    the officers will not take further action,

2    something to that effect?

3              A.    Yes, sir.

4              Q.    Because the primary goal was to get the

5    protesters out of the streets and stop them from

6    blocking the roadways; is that right?

7              A.    Yes, sir.

8              Q.    And so to the extent that protesters

9    there at Airline Highway were willing to clear the

10    roadways and go into the park, then there was no

11    need or justification to arrest them, correct?

12              A.    Correct.  We did make -- there were some

13    people taken into custody on Airline initially, but

14    I was, myself and Sergeant Clay Revis, we were

15    actually able to talk to -- understand, which I

16    know y'all are aware of, at a protest, there may be

17    several different groups there.  It could be four

18    or five different groups.  Some people just want

19    the right to speak and to hear it, and some people

20    obviously, you know, if they are throwing rocks or

21    doing something like that, then they have a

22    different agenda.

23              So, on Airline, I had the opportunity to

24    talk to one of the leaders, and we had a very good

25    conversation.  The news media was there, and they

1  recorded it.  They just never played it on TV, but
2  we had a very good conversation with them.  And he
3  is like, you know, we want to express our concerns,
4  and we're like absolutely.  That is 100 percent
5  your right, and you should do that, but we can't
6  have you in the middle of the road.
7          So we talked, and there was a park right
8  there, and we said, "If you will move into that
9  park, we will leave.  If somebody shows up and
10 tries to cause some kind of counter protest, we'd
11 even come out here and protect y'all."  Last thing
12 we want to do is -- I mean, if it's a peaceful
13 protest, then by all means do that, and we'll -- if
14 somebody -- like I said, if somebody tries to come
15 in -- anyway, so we had a very good conversation
16 with them, and we were able to do that.
17         We actually cleared Airline.  There were
18 a few people that, like I said, were not part of
19 his group, and they were standing in the road, and
20 his group was even calling out to them.  Hey, man,
21 get out of the road.  Get out of the road.  Get out
22 of the road.  And we even gave them enough time
23 that if somebody was on one side of Airline and
24 wanted to go to the other, we said we'll hold the
25 road, make sure you are where you need to be, and

```
1    we did that, and then we cleared it, went back
2    inside Baton Rouge PD, and me and Sergeant Revis
3    came back out, and that man that we had talked to
4    walked across the street and came over and talked
5    to us and said, "We appreciate y'all's
6    professionalism.  We appreciate the way you handled
7    it.  I wish there were more people like y'all in
8    this world."  And it was a very good meeting.  So,
9    again, it just kind of goes back.  We're not there
10   trying to arrest people, but if we have to, we
11   will.
12        Q.   Right.  When you say when we have to,
13   it's if the roads haven't been cleared and people
14   have not retreated to a space outside of the roads,
15   correct?
16        A.   Yes.  Yes, sir.
17        Q.   And part of the reason for having this
18   negotiation is you understand that people have a
19   First Amendment right to protest, correct?
20        A.   Yes, sir.
21        Q.   And so if they comply with police orders
22   to clear the roadway, and they retreat to out of
23   the roadways, not only do you not need to arrest
24   them, but would it not be lawful to arrest them,
25   because they have a First Amendment right to do
```

1  that, correct?

2      A.    Well, you know, that's kind of a very

3  tricky slope.  I'm sure y'all have heard this

4  analogy before.  I try to stop you for DWI.  You

5  pull up into your driveway, you can't sit there and

6  say, I'm home.  I'm free.  You know, if we've given

7  that order repeatedly, repeatedly, repeatedly, and

8  as we get close to you, you step onto private

9  property, that doesn't mean that we're not going to

10 arrest you.

11     Q.    But, generally, those people who comply

12 with police orders to clear the roadway and do so,

13 and then there is a period of time they've complied

14 with the orders, it would not be lawful to arrest

15 them, correct?

16     A.    Well, if they violated the law, you know.

17 It depends on the individual circumstances.  You

18 know, if I told you to do something, and you did

19 it, and four hours later I see you, that might be a

20 little different, but as we're moving through, and

21 we've repeatedly said you need to leave, you need

22 to leave, and all you do is step on a private

23 property, but you are still there, you're not

24 really -- the fact that you just happened to be on

25 private property, you are still not leaving.

1      Q.   I got you.  Okay.  So if I understand you
2 correctly -- I'm going to describe two different --
3 kind of two different imaginary protesters.  One is
4 a protester who is given repeated orders to clear
5 the roadway, does not clear the roadway, and then
6 troopers march forward, and as the troopers are
7 marching forward, that person steps on private
8 property.  You're saying that person didn't really
9 comply.  They could be lawfully arrested, agreed?
10      A.   Correct.
11      Q.   By contrast, a protester who received
12 orders to clear the roadway, did clear the roadway,
13 stepped out of the roadway onto the sidewalk or
14 private property, remained there for a period of
15 time, and then subsequently troopers moved forward,
16 that person should not be arrested, agreed?
17      A.   No, sir.  I would not agree with that.
18      Q.   Why would you disagree with me?
19      A.   Again, you know, you have to disperse the
20 area.  Just to -- again, like I told you earlier,
21 if you just step back on private property, but, you
22 know, you are still there, then, if we just stop,
23 and we leave, then what is the chance of them
24 coming back out?  The whole idea is to get you to
25 leave the area.  That's what we're trying to do,

1    trying to push everybody out to disperse the entire

2    crowd.  I don't recall exactly what Baton Rouge

3    said over the speaker, but it's not just clear the

4    roadway.  It's please disperse and leave the area.

5        Q.   Why is it lawful to order people to

6    disperse the area entirely?  If they are not

7    blocking the streets, if they're standing on a

8    sidewalk with a sign, they're allowed to protest

9    there, right?

10       A.   If they have -- you know, again, you go

11   back to what happened prior to that, because we had

12   water bottles thrown at us.  We had rocks thrown at

13   us.  We had all of that.  So, again, if there are

14   still 2,000 people there, then you haven't left the

15   area.  It's kind of semantics, you know.  Is there

16   one person there that is just, okay, I'm leaving

17   and stand in the yard, or is there 1,000 people

18   there?  Every situation is going to be a little bit

19   different.

20       Q.   So let's move out of the realm of the

21   hypothetical and talk about a concrete situation,

22   which is East and France Street.  You're saying

23   that protesters there received orders to clear the

24   roadway, right?

25       A.   To leave the area.

1       Q.   So it's your contention that any person

2   there who had not left the area could be lawfully

3   arrested?

4       A.   Yes, sir.

5       Q.   Even if they lived in that home?

6       A.   Well, I mean, come on.  If you lived

7   inside of the home, and we tell you to leave, you

8   go inside your house, that's a little bit

9   different.

10      Q.   What about someone who is standing on

11  private property with permission from the property

12  owner to be there? Could they be lawfully arrested?

13      A.   If they have -- if the homeowner says you

14  can come inside my house and stay here, I would not

15  arrest them.

16      Q.   It would not be lawful to arrest them,

17  right?  They have permission to be there.

18      A.   That would probably be something I would

19  have to get some direction on from a district

20  attorney. That's a -- you know.

21      Q.   Okay.  I'm going to pull up Exhibit A at

22  Page 30.  Do you see this diagram here that is

23  Figure 12?

24      A.   Yes, sir.

25      Q.   This appears to me roughly what you were

1    describing earlier with three lines of law
2    enforcement officers at three different sort of
3    parts of the street.  Does this roughly describe
4    your recollection of where people were positioned?
5         A.   Yes, sir.
6         Q.   Your state troopers obeyed your command
7    and did, in fact, move forward and clear that
8    intersection, correct?
9         A.   Yes, sir.
10        Q.   And they effected some arrests in the
11   course of doing so, correct?
12        A.   Yes, sir.
13        Q.   But did they do the paperwork for those
14   arrests or did they hand them off to another law
15   enforcement agency to handle?
16        A.   Okay.  So when we go -- you know, Baton
17   Rouge Police Department had requested our
18   assistance, so the agreement was that they would
19   handle all of that.  We were basically detaining
20   people and taking them into custody and handing
21   them off to them.  So that's got -- were they
22   physically under arrest and did we arrest them?  We
23   took them into custody and handed them off to Baton
24   Rouge Police Department, if that makes sense.
25        Q.   It does.  Setting aside the question of

1    whether the word "arrest" applies, your troopers

2    were physically seizing people and then handing

3    them off to Baton Rouge Police Department officers,

4    correct?

5         A.    Yes, sir.  That is correct.

6         Q.    Did your troopers do any paperwork

7    related to the people they seized?

8         A.    None that I'm aware of, no, sir.

9         Q.    When the troopers were physically seizing

10   people and handing them to Baton Rouge Police

11   Department officers, was that happening quickly,

12   like a seizure, a hand-off, and a moving forward,

13   or would they stop and have a conversation with the

14   Baton Rouge police officer about what were the

15   reasons and the basis for the seizure?

16        A.    I would think, and, again, I was up

17   front, so I wasn't seeing all of what happened

18   behind me.  I think if there was a -- I don't think

19   we -- let's just say a guy had a gun.  Take that

20   for an example.  Or let's say he had a bag of drugs

21   on him, and they found that.  I'm sure they would

22   go to the Baton Rouge officer and say, hey, look,

23   he was in the road.  He didn't leave.  Here is also

24   this.  I'm not saying that happened, but I'm just

25   using that for an example.  Most of the people, if

40

1    they just -- if it was just a basic -- they were

2    taken into custody because you failed to leave,

3    then I don't know how much conversation they had

4    between them, but they probably would have just

5    taken them and handed them off.

6        Q.    Without a detailed discussion of the

7    circumstances of their seizure, right?

8        A.    Yes, sir.

9        Q.    Let's talk about the LRAD.  I think you

10   referred to an LRAD earlier?

11       A.    Yes, sir.

12       Q.    That's a long-range acoustical device?

13       A.    If that's what the acronym stands for.

14   All I know is it is a loudspeaker, and it's loud.

15       Q.    It's not a pop quiz, but you understand

16   the large device or the device that was mounted on

17   the top of the bearcat was an LRAD, and it emits a

18   very loud noise to get people to disperse, correct?

19       A.    That is correct.

20       Q.    It's a kind of non-lethal weapon that can

21   be used on people, correct?

22       A.    Yes, sir.

23       Q.    My understanding is the LRAD was owned by

24   the state police.  Is that your understanding?

25       A.    To be honest with you, the Mobile Field

1    Force doesn't have one.  I can tell you that.

2         Q.    I'm pulling up Exhibit OOOOOOO.  That's

3    seven Os.  Do you see Request for Admission Number

4    21 here?  It says, "Admits that the LRAD was owned

5    by the Louisiana State Police."  Do you see that

6    here?

7         A.    Yes, sir.

8         Q.    Do you have any reason to think that's

9    not accurate?

10        A.    No, sir, I do not.

11        Q.    Do you know who owned the bearcat?

12        A.    No, sir, I do not.  I'm sure there is

13   pictures somewhere that has got the name of an

14   agency on it but just off the top of my head, no,

15   sir, I do not remember.

16        Q.    Do you know what agency was operating the

17   LRAD or choosing to use it?

18        A.    No, sir.

19        Q.    Your troopers, were they wearing earplugs

20   or any sort of ear protection?

21        A.    No, sir.

22        Q.    Do you know anything about the safe

23   operation of the LRAD and what range it's intended

24   to be used at?

25        A.    No, sir, I do not.

1    Q.   Was there any discussion in any planning

2  meeting that you were present at or any sort of

3  team meeting or discussion about the use of the

4  LRAD?

5    A.   Not that I recall.

6    Q.   So it's your recollection you don't

7  remember anything talking about if it's safe to use

8  the LRAD, how far should we use it on people, stuff

9  like that?

10   A.   No, sir, I do not.

11   Q.   You've been an officer for approximately

12  36 years.  Is this the only -- was the summer of

13  2016 protest the only time you saw the LRAD

14  deployed?

15   A.   I don't -- yes, sir.  I don't recall

16  seeing it at anything else.  No, sir.  I don't

17  recall seeing it anywhere else.

18   Q.   So, to your recollection, this is a non-

19  lethal weapon that, in your experience, you've only

20  seen used on protesters in the summer of 2016,

21  correct?

22   A.   Yeah.  I don't know if it's technically

23  considered a weapon.  It's something that just is

24  real loud.  Is that a weapon? I don't know who

25  would classify that as a weapon.  I mean, it's loud

1    and annoying.  I don't know if that's considered a

2    weapon or not.  When you talk to a policeman about

3    a weapon, we think of a taser, a nightstick, a gun,

4    or something like that, not just being really loud

5    and obnoxious.

6         Q.   Fair enough.  That's not really crucial

7    to my question, so I'll rephrase. In your

8    approximately 36 years as a law enforcement

9    officer, the only time you can recall witnessing

10   the LRAD device being used was on protesters in the

11   summer of 2016, correct?

12        A.   That would be correct.

13        Q.   I'd like to talk to you about one

14   particular protester.

15        A.   Okay.

16        Q.   I'll show you a picture to orient

17   ourselves.  I'm pulling up Exhibit P, as in Paul.

18   Do you see this person in the middle with the

19   reddish hair holding the love sign?

20        A.   Yes, sir.

21        Q.   Is this someone you've seen pictures of

22   before or have any recollection of?

23        A.   I don't have any recollection.

24        Q.   So I'll represent to you this person's

25   name is Raae Pollard.

1       A.    Okay.

2       Q.    Any reason to disagree with me about

3   that?

4       A.    No, sir.

5       Q.    I'm going to pull up the Affidavit of

6   Probable Cause for Raae Pollard that was filled out

7   by Baton Rouge Police Department.  I'm looking at

8   Exhibit C at Page 1.  Do you see that this is an

9   Affidavit of Probable Cause for Raae Pollard?

10      A.    Okay.

11      Q.    An Affidavit of Probable Cause is a

12  document that is signed by law enforcement under

13  oath correct?

14      A.    Yes, sir.

15      Q.    It's the document that is submitted to

16  the court to justify the arrest, correct?

17      A.    Yes, sir.

18      Q.    So it's under oath, and it's a

19  representation to the court, so it's important that

20  the contents of it be truthful, correct?

21      A.    Yes, sir.

22      Q.    If the contents of an Affidavit of

23  Probable Cause are not truthful or sworn without

24  any knowledge of the truth or falsity, that's

25  breaking the law, right?

1          A.    Well, I mean, it wouldn't be a valid --

2    you would not be able to use it, you know, for the

3    probable cause hearing, so it's not a valid

4    affidavit if it's untruthful or not signed.

5          Q.    Right.  So it would not justify the

6    arrest if the contents were not truthful or the

7    officer signing didn't have any knowledge of the

8    truth or falsity, correct?

9          A.    Correct.

10         Q.    And, in fact, if an officer signed their

11   name to an Affidavit of Probable Cause without any

12   knowledge of whether the content were true or

13   false, they would be creating a false document,

14   correct?

15         A.    Okay.  Yes, sir.

16         Q.    You agree with me?

17         A.    Yes, sir.

18         Q.    Obviously, this was not signed by any

19   state police trooper, so I'm not accusing any

20   trooper of signing this document and doing anything

21   bad by it, but I want to take a look at it.  So

22   this is saying that Miss Pollard feloniously

23   violated RS 14:97.  Do you see that?

24         A.    Yes, sir.

25         Q.    Are you familiar with 14:97?

```
 1          A.   Yes, sir.

 2          Q.   That's --

 3          A.   Simple obstruction of a highway.

 4          Q.   Is that a statue that you have arrested

 5    people for, to your recollection?

 6          A.   Not that I recall.

 7          Q.   So in your approximately 36 years as a

 8    law enforcement officer, you can't recall a

 9    particular time you arrested someone for a 14:97,

10    agreed?

11          A.   I don't recall.  I'm not saying I

12    haven't, because we work a lot of traffic, so there

13    may have been some kind of incident on the highway

14    or something where somebody threw something,

15    blocked something, but to sit here and tell you,

16    yeah, on December the 2nd of 2000 we did, I

17    couldn't do that.

18          Q.   I get that.  I'm not asking you to say

19    you have never arrested someone for this.  I'm just

20    saying, in your 36 years as a law enforcement

21    officer, you don't have any recollection of a

22    particular time you arrested someone for a 14:97,

23    agreed?

24          A.   Yes, sir.  That would be correct.

25          Q.   It looks like the officer here is also
```

1   crossed out up top 14:97 and written in 14:100.1.
2   Do you see that?
3           A.   Yes, sir.
4           Q.   Are you familiar with that statute?
5           A.   Right off the top of my head, no, sir.
6           Q.   I'll represent to you it's a related
7   statute about obstruction of a public passageway.
8   If you're not familiar with it, I'm guessing that
9   in your 36 years as a law enforcement officer, you
10  can't recall a particular time that you've arrested
11  someone for a 14:100.1; is that correct?
12          A.   That would be correct.
13          Q.   So in the sort of bottom third of the
14  synopsis, do you see it says, "Protesters were
15  advised by loud speaker to remain on private
16  property and on the curb?"
17          A.   Okay.
18          Q.   "They were further advised to stay out of
19  the roadway and do not impede the flow of traffic."
20  Do you see that?
21          A.   Okay.
22          Q.   "These announcements were made frequently
23  via loud speakers and by individual police officers
24  on the scene."  Do you see that?
25          A.   Yes, sir.

1        Q.    "During the protests, the defendant

2    entered the roadway and was provided another verbal

3    order to exit the lanes of travel."

4        A.    Yes, sir.

5        Q.    "And then moments later, the defendant

6    entered the roadway again and was taken into

7    custody by officers on the scene."  You see that?

8        A.    Okay.  Yes, sir.

9        Q.    So this Affidavit of Probable Cause is

10   saying that Ms. Pollard was told to remain on

11   private property on the curb, was advised to stay

12   out of the roadway, then entered the roadway again

13   and moments later was arrested, correct?

14       A.    Yes, sir.

15       Q.    And so if she had followed commands to

16   remain on private property and on the curb and

17   stayed back from the roadway, she should not have

18   been arrested, correct?

19       A.    So if -- again, I'm not trying to be

20   disrespectful.  I don't want to get into a -- say

21   something that's incorrect, but if you're saying

22   that there is a problem with certain parts of this

23   affidavit, my concern would be that they say that

24   we told them to move to private property, and I

25   don't recall that.  If what I recall is right, we

1    told them to disperse the area.

2         Q.   So if I'm understanding you correctly,

3    you're saying that the description in this synopsis

4    of Probable Cause does not match your recollection

5    of what actually happened; is that accurate?

6         A.   As far only in regards to what was spoken

7    over the loudspeaker, because I don't even remember

8    seeing her, so I couldn't say that she got on the

9    curb, got off.  I couldn't answer that.

10        Q.   Sure.  At least parts of this Affidavit

11   of Probable Cause do not match your recollection of

12   what actually happened, agreed?

13        A.   Yes, sir.  Parts of it, yes, sir.

14        Q.   And so this, as we discussed, has a very

15   specific description of Ms. Pollard receiving

16   another verbal order to exit the lanes of travel,

17   and then moments later being arrested, correct?

18        A.   Yes, sir.  That's what the affidavit

19   says.

20        Q.   So if that's not what happened to Ms.

21   Pollard, then this is not a truthful affidavit,

22   agreed?

23        A.   I would agree.

24        Q.   I'm going to -- we're going to look at

25   some pictures of Ms. Pollard and try and see

1    whether what happened to her matches the affidavit
2    or not.  This is Exhibit OOOOOOOO.  That's eight
3    Os, 2016.7.10 image showing Raae standing on
4    sidewalk outside Batiste yard.j.  Do you see this
5    picture here, lieutenant?
6         A.   Yes, sir.
7         Q.   These officers sort of in the middle
8    ground in green fatigues, are those state troopers?
9         A.   If you could zoom in on them, because a
10   lot of -- if I can see -- yes.  Okay.  I see the
11   patch.  Yes, sir.
12        Q.   So this patch on the right arm that says
13   SWAT, these are state trooper SWAT team members?
14        A.   Yes, sir.  If you see the patch itself,
15   it's shaped like a boot.  I'm pretty sure it says
16   Louisiana State Police SWAT or something like that
17   on it.
18        Q.   And then the officers in the -- I am a
19   little bit colorblind.  Is that a blue uniform
20   directly in front of the SWAT officers?
21        A.   Yes, sir.  That is correct.
22        Q.   Are they state troopers as well?
23        A.   Yes, sir.  Right there where your cursor
24   is, yes, sir.
25        Q.   So the officer in blue fatigues in the

1    far right of the formation, that's also a state

2    trooper, agreed?

3        A.    That is correct.  Yes, sir.

4        Q.    You can see that these officers --the

5    troopers are in the formation we described earlier,

6    a line on the east side of East Boulevard, correct?

7        A.    From that picture, it looks like the

8    right corner of it.  The closest policeman to you

9    where it says police across the front, that's not a

10   trooper.

11       Q.    Right.  I agree with you, but the

12   officers standing in the street, that's the

13   formation we described earlier of state troopers,

14   correct?

15       A.    Yes, sir.

16       Q.    So now looking in the background, it

17   looks like East Boulevard has been cleared,

18   correct?

19       A.    Well, I don't know if it's been cleared

20   or if they haven't moved, but for whatever -- you

21   know, for this picture here, I don't see anybody

22   standing in the roadway.

23       Q.    Right.  So there is a group of protesters

24   who appear to have retreated back to the sidewalks

25   and private property at East and France Street,

1    correct?

2         A.    There is some in the grass.  Looks like

3    most people -- I can't really see past the sidewalk

4    that much, but it looks like a lot of people in the

5    grass and sidewalk, and there may be some people in

6    that property.

7         Q.    And do you see -- it's a little fuzzy,

8    but we can see Raae Pollard holding the love sign

9    here.  Is that correct?

10        A.    I see the love. Are you saying she is the

11   one on the left side of the picture?  It's kind of

12   blurry.

13        Q.    Yeah.

14        A.    It does resemble the picture you showed

15   me initially, yes, sir.

16        Q.    So if that is Raae Pollard, then she is

17   among the protesters who have retreated back to

18   private property and the sidewalk, correct?

19        A.    Well, she is in the sidewalk.  She is not

20   on -- the sidewalk is still a public passageway.

21        Q.    Okay.  So if this is Raae Pollard, then

22   she is among the protesters who have retreated to a

23   sidewalk, correct?

24        A.    To a sidewalk, yes, sir.

25        Q.    So if she was responding to an order to

1    clear the roadway, then she complied with that

2    order, correct, at this point?

3         A.   So like I said, if I recall, the order

4    was to disperse, leave the area.  If it was just

5    simply get out of the roadway, then she is out of

6    the roadway, but as far as dispersing, as,

7    obviously, you can tell, the crowd has not

8    dispersed, and, like I said, they're still on --

9    some of them are still on the sidewalk.

10        Q.   So if she was given an order to clear the

11   roadway, she complied with that order, but if she

12   was given an order to disperse, she did not comply

13   with that order.  That's your testimony?

14        A.   Yes, sir.

15        Q.   This might be a stupid question, but

16   let's suppose orders were issued to the protesters

17   to both clear the roadway and disperse.  Okay?

18        A.   Yes, sir.

19        Q.   They're not going to be able to disperse

20   without crossing the roadway, correct?

21        A.   Well, I mean, if you have to walk across

22   the roadway to leave, then that would make sense.

23   Like I said, it's not like we said leave right now,

24   and then two seconds we're going out and running

25   them.  We were there for a very long time.  They

1    had -- it was like I told you on the night before
2    on Airline.  If people said, hey, I need to get
3    from over here to over here to leave, then by all
4    means we would let you cross the roadway and get to
5    wherever you need, as long as you were leaving,
6    dispersing and leaving the area.
7        Q.   We can at least agree that disperse and
8    clear the roadways are, to a certain extent,
9    contradictory orders, because you have to cross a
10   roadway to disperse, agreed?
11       A.   I wouldn't agree with that.  Like I said,
12   you know, if -- again, from my opinion, if I say,
13   hey, I need you to leave, and you've got to walk
14   across the road to leave, and walking across a road
15   facilitates you leaving, then you are leaving.  I'm
16   not going to sit there and say leave, and then as
17   soon as you step out in the road, grab you.  That
18   wouldn't make any sense, because if you are
19   leaving, you got to cross the road to leave, then
20   I'm going to let you.
21       Q.   Right.  I understand.  Let's say you are
22   standing somewhere, and you've got one officer
23   telling you leave, get out of this area, and you've
24   got another officer saying, clear the roadways.
25   You've got contradictory orders to a certain

1    extent.  I can understand there might be an

2    interpretation where you might interpret it that

3    one controls the other, but there is some

4    contradiction between those orders, correct?

5          A.    To me, there is not.  Let's put it in

6    perspective.  If we're in this situation here, and

7    let's just say -- well, I know you can't see where

8    I'm pointing, but you see the grassy median between

9    the two streets?

10         Q.    Uh-huh.

11         A.    And you are standing there, and I say,

12   hey, you need to clear the roadway and get out of

13   here, and so you walk across the street to where

14   those other people are standing, and you get on the

15   sidewalk, and you start leaving.  To me, my

16   opinion, I would say you are doing exactly what I

17   ordered.  But then let's say it is two o'clock in

18   the morning, and none of that crowd is there, and I

19   just happen to run into you for whatever reason.  I

20   say, hey, man, you need to get out of the roadway

21   or you need to get out of here, and then you step

22   out in the roadway at two o'clock in the morning

23   wearing black clothes.  That's going to be a bad

24   day.  I would not want you to -- I would stop and

25   say, hey, look, let's get you across the road

1    somewhere, if that makes sense.  In this situation,

2    if I say you need to clear the roadway and leave,

3    then I'm going to allow you to cross over the road

4    and leave.  Just like I told you the day before we

5    blocked the roadway so people could cross the

6    roadway to leave.  My opinion, if you ask me if

7    it's two contradictory terms, I don't really -- I

8    guess maybe if like you said technically, but it's

9    really not.  If you've got to cross the road to

10   leave, as long as it's safe and a place where you

11   can cross, then you're leaving.  That's just John's

12   opinion.

13        Q.  You mentioned earlier that at Airline

14   Highway there had been some negotiation between

15   protesters and the law enforcement.  Did that

16   happen at East and France?

17        A.  There were some.  Again, I wasn't privy

18   to all of that information, but I know that we had

19   investigators, intelligence, whoever, that were

20   talking to different groups of the protesters, and

21   I think Baton Rouge may have talked to them.  I did

22   not personally do like I did before on Airline.  I

23   just didn't have that opportunity.

24        Q.  So we saw a photo earlier of the state

25   troopers lined up.  East is free of protesters.

1    The protesters have gathered on the other side of

2    East Boulevard on the sidewalk and private

3    property, right?

4         A.   Yes, sir.

5         Q.   And then subsequent to that, your state

6    troopers moved -- you ordered your state troopers

7    to move across East Street and clear the area,

8    correct?

9         A.   Yes, sir.

10        Q.   I'm going to share a video.  This is

11   WWWW.  It's four Ws, raw video of riot police

12   moving in on Baton Rouge protesters.  You see this

13   video here?

14        A.   Yes, sir.

15                    {VIDEO PLAYED}

16   BY MR. MOST:

17        Q.   You see this video here?  This is after

18   the state troopers have moved across East Boulevard

19   and interacted with the protesters; is that right?

20        A.   Yes.  There are troopers, but I also see

21   it looks like several other agencies there, also.

22        Q.   Right.  I don't mean to imply it's only

23   troopers, but this video reflects your troopers and

24   other law enforcement officers having moved across

25   East Boulevard and are effecting arrests on the

1    west side of East Boulevard, correct?

2        A.    Correct.

3        Q.    And there are troopers that are going

4    onto private property to do so, correct?

5        A.    Yes, sir.

6        Q.    They're going into the area where we saw,

7    in the prior photo, the woman holding the love

8    sign, correct?

9        A.    Yes, sir.

10       Q.    They are taking protesters to the ground

11   and either cuffing them with handcuffs or zip ties

12   on the ground, correct?

13       A.    Yes, sir.

14       Q.    I'm now looking at Exhibit 11 Os-19C(Raae

15   throat.)  Do you see this picture here?

16       A.    Yes, sir.

17       Q.    Do you see that in the center of this

18   picture is the woman with the red hair that I

19   represented to you is Raae Pollard?

20       A.    Okay.

21       Q.    You can see that there are two state

22   troopers with their hands on her, correct?

23       A.    Yes, sir.

24       Q.    Do you know the identity of either of

25   these troopers?

1       A.    No, sir.

2       Q.    Have you ever seen this picture before?

3       A.    I think I remember it several years ago.

4       Q.    It was on the --

5       A.    Sorry.

6       Q.    It was on the front page of either the

7   Advocate or the Times-Picayune, so it would be a

8   memorable photo, agreed?

9       A.    It would be a memorable photo, but I'm

10  not from this area, so I don't get the Times or the

11  -- so.

12      Q.    So these state trooper here in seizing

13  Ms. Pollard are effecting the order that you gave

14  them, correct?

15      A.    Well, again, I'm telling them to move.  I

16  don't want to get it confused that I said

17  specifically go arrest the lady with the red hair.

18  Like I said, we're moving forward in the line, so

19  it depends on your definition of the order.

20      Q.    I understand.  You didn't say to anybody

21  go get that woman with the red hair and grab her.

22  You did say move forward and implied, at least,

23  meant for your officers to clear the area, and so

24  what they were -- these officers were doing in this

25  photo, they're doing pursuant to your orders,

1    correct?

2         A.    Correct.

3         Q.    Did you witness this happening to this

4    woman?

5         A.    I don't recall it, no, sir.

6         Q.    Did you have the -- if you had seen it,

7    did you have the power to stop it from happening?

8         A.    So, I mean, I could, but it wouldn't be

9    very realistic, because I am a ways behind them,

10   and me yelling, don't do that, would have been --

11   they probably would not have heard me.  If I had

12   been standing, say, right here, you can't tell

13   where I was pointing, but if I was standing five

14   feet from them, then, if I would have needed to,

15   yes, sir, I could.

16        Q.    These troopers are using force on Raae

17   Pollard, correct?

18        A.    Again, it depends on what you consider

19   force.  The guy that is facing us, it looks like he

20   is holding her arm.  The other one that is back

21   toward us that has his hand up close to her neck,

22   you know, I don't know if it's -- I don't know

23   exactly what is happening there.  Is she trying to

24   head butt him?  Is she spitting on him or whatever?

25   It may be more of a defensive block or something

1    like that.  So, again, it just depends on what your
2    definition of force is.
3         Q.    Fair enough.  So one trooper here has his
4    arms around Ms. Pollard's arms.  The other trooper
5    has his hand on Ms. Pollard's throat, correct?
6         A.    Yes, sir.
7         Q.    Would you consider this to be a use of
8    force?
9         A.    We would probably do one, yes, sir.
10        Q.    So by "do one" you mean state police
11   would consider this to be use of force, and it
12   would require whatever process or paperwork is
13   related to a use of force, agreed?
14        A.    Yes, sir, I would agree.
15        Q.    Next I'm going to show a video that is 12
16   Os-22C video of Raae.  This one is a little blurry,
17   but as we get into it, I think you may be able to
18   see another angle on what happened to Ms. Pollard,
19   so we'll take a look.  I'm going to start playing
20   at 13 seconds.
21                    {VIDEO PLAYED}
22   BY MR. MOST:
23        Q.    I'm just going to pause it right there at
24   23 seconds.  Did you see the line of state troopers
25   moving towards the west side of East Boulevard?

1    A.    From what I'm seeing on my end, I don't

2    know if it's buffering a little bit.  It was

3    really, really fuzzy.  Very hard to see.

4    Q.    Was what you could see at least

5    consistent with that line of troopers moving

6    forward towards the west side of East Boulevard?

7    A.    I can see it just briefly.  What I can

8    see it's -- like right now, I don't know what you

9    see on your side, but it's -- what I'm seeing on

10   this, I can see a fuzzy body in the middle and

11   really can't see much of anything else.

12   Q.    I'll go back to 14 seconds.  We'll just

13   watch that piece through again to get a little more

14   context and then get to the next piece.

15   A.    Yes, sir.

16                 {VIDEO PLAYED}

17   BY MR. MOST:

18   Q.    Okay.  I'm ending at 34 seconds.  In that

19   video, did you see the line of state troopers

20   moving towards the private property on the west

21   side of East Boulevard?

22   A.    Yes, sir.

23   Q.    Then you saw the woman who I represented

24   to you as Raae Pollard sort of being moved back and

25   forth?

1     A.   Again, I'm not trying to be difficult,

2  but what I'm seeing is very, very fuzzy.  I mean,

3  if you are telling me it's her, but from what I can

4  see, I could tell it was a redheaded something

5  moving around.

6     Q.   So a redheaded something was being moved

7  around with a substantial amount of force there,

8  correct?

9     A.   It's hard to -- it was -- can you back it

10  up again?  Because I couldn't tell if she was

11  moving on herself or if she was being moved.  I

12  just --

13     Q.   Yeah.  I'd be happy to.  I've looked at

14  this video a number of times, and you haven't, so

15  I'm happy to look at it several times.  I'm going

16  back to 34 seconds here.

17     A.   Yes, sir.

18              {VIDEO PLAYED}

19           THE WITNESS:

20              Can you go back like about four

21              seconds?  I can see her moving, and it

22              looks like there may be somebody beside

23              her, but then after she goes out of the

24              picture, I can see it looks like maybe

25              one of the SWAT guys backing back up.

```
 1              MR. MOST:
 2                   Okay.  I'll play it again.
 3                   {VIDEO PLAYED}
 4              THE WITNESS:
 5                   Stop right there.  Back up.  I'm
 6                sorry.
 7              MR. MOST:
 8                   It's all right.
 9              THE WITNESS:
10                   What I'm seeing here is -- right
11                there.  See that?  I see that looks
12                like a bicycle officer which is not us,
13                and then see like right there, on the
14                right side of what I'm assuming is her,
15                it looks like -- it's very pixilated.
16                I can see she has red hair, and on the
17                right side it looks like a Baton Rouge
18                -- I'm not sure.  I say Baton Rouge,
19                but it looks like somebody that is in a
20                bicycle police officer uniform on the
21                right side, and the left side I really
22                can't see that well.
23     BY MR. MOST:
24          Q.   Fair enough.  I'll tell you what it looks
25     like to me, which it looks to me like this red-
```

1   heard person is being moved around, and it is just

2   sort of like completely passive, being almost

3   thrown around.  Is that consistent with what you

4   see?

5        A.   I wouldn't -- like I said, it's hard for

6   -- I'm not trying to be difficult or anything, but

7   it's just from the video that I see, I can see that

8   she is moving around, but I can't tell if the

9   officer on the right is actually touching her and

10  pushing her or not.  It's just from the video that

11  I see, sir, I just couldn't make that -- I couldn't

12  say yes or no.

13       Q.   That's okay.  We can't ask you to testify

14  about more than you know or can tell.  But we

15  established that force was used on Ms. Pollard

16  under the state police's understanding of what use

17  of force is, correct?

18       A.   Okay.  Yes, sir.

19       Q.   Now I'm going to go back to seven Os.  Do

20  you see that this is the Louisiana State Police's

21  responses to certain discovery requests?

22       A.   Okay.  Yes, sir.

23       Q.   Do you see on Page 35 of this document

24  you signed a verification saying that you had

25  reviewed these documents and determined they were

1   true and correct?

2        A.   Yes, sir.

3        Q.   And that is your signature on there?

4        A.   Yes, sir.

5        Q.   So at some point you looked these over

6   and made sure that they were accurate, correct?

7        A.   Yes, sir.

8        Q.   Okay.  I'm looking at Request for

9   Production of Document Number 12 on Page 21.  You

10  see that this was asking for any and all records

11  held by the Louisiana State Police regarding Raae

12  Pollard?

13       A.   Yes, sir.

14       Q.   And the response is that there are no

15  records about Raae Pollard that state police has,

16  correct?

17       A.   Okay.  You are talking about -- I don't

18  think we had any written records, no, sir.

19       Q.   So tell me about when an officer uses

20  force under the state police's definition of use of

21  force I assume there is some documentation that

22  they have to fill out related to that?

23       A.   It's a use of force form, yes, sir.

24       Q.   What do you call it?  Is there a number

25  for that form?  How do you describe it?

1    A.    We have a database called Lotus Notes,

2    and the individual officer has to log in to his

3    laptop, and he'll complete it, submit it to a

4    supervisor.  There may be a written copy form that

5    we could do.  To be honest with you, I don't think

6    there is, because it has to be checked off from the

7    supervisor on up.

8    Q.    So when an officer uses force on a

9    person, they're required to fill out this

10   electronic use of force form, correct?

11   A.    Yes.

12   Q.    It's not optional?  It's something they

13   have to do, right?

14   A.    So if I understand, and I may be wrong.

15   I'm not trying to jump ahead, but I think if you

16   are asking why was one not done on this, there are

17   -- you know, under special situations there are

18   times where we know that there is going to be like

19   this.  We knew that this was going to happen that

20   we'd probably be encountering people, but we didn't

21   have a system or a way in place at that time to do

22   a use of force on every individual that we

23   encountered.

24   Q.    So it's your -- well, let's get there.

25   A.    Let me -- so let's say Thursday night I

1    go out, and I work, and one of my guys has to
2    tussle with somebody.  Well, then he is going to
3    come back right then and do a use of force, and
4    he'll sign off and go through the chain of command.
5    In 2016, we just didn't have anything in place to
6    handle, for lack of better terms, a mass arrest in
7    a Mobile Field Force functioning situation.  So
8    that was a reason.  And there were discussions way
9    above my level that I was not part of.  That, to my
10   understanding, was the reason there was not
11   individual use of forces done.
12       Q.   So generally, setting aside special
13   circumstances --
14       A.   Yes, sir.
15       Q.   -- when a state trooper uses force on
16   someone, they have to fill out a use of force form.
17   It's not optional, it's required, unless there's
18   special circumstances, agreed?
19       A.   Yes, sir.  I would agree, yes, sir.
20       Q.   And then that form gets approved by a
21   chain of supervisors going up; is that right?
22       A.   Yes, and actually ends up also going to
23   the training academy so our people that, obviously,
24   that are doing the training, they can look.  They
25   can review it and make sure everything -- all

1    policy and all of that was followed.

2          Q.    Part of the purpose of having the officer

3    fill out the form and have a chain of command

4    review it is to ensure that any use of force was

5    lawful, correct?

6          A.    Yes, sir.

7          Q.    And so I think I'm hearing from you that

8    use of force forms were not filled out for the East

9    and France Street protest, agreed?

10         A.    That would be agreed, yes, sir.

11         Q.    And there was a discussion about not

12   filling out use of force forms above your pay

13   grade, correct?

14         A.    Yes, sir.  Correct.

15         Q.    And then that was somehow communicated to

16   you that officers at that protest didn't have to

17   fill out use of force forms?

18         A.    I don't remember exactly how it was -- I

19   don't remember exactly the conversation it was, but

20   I know that there was a discussion, and they said

21   no.  In this particular situation -- I couldn't

22   tell you who, but we were -- it was, hey, we're not

23   going to do one in this particular situation, so,

24   yes, sir.

25         Q.    So someone higher up than you told --

1    communicated to you in some form your troopers did

2    not have to fill out use of force forms for the

3    East and France Street protest, correct?

4         A.   Yes.  That would be correct.

5         Q.   So just to be clear, use of force forms

6    were not filled out for the East and France Street

7    protests, correct?

8         A.   That would be correct.  Yes, sir.

9              MR. FAHRENHOLT:

10                  William, I don't know where you are

11               in your train of thought.  I don't want

12               to interrupt you if you are in the

13               middle of --

14             MR. MOST:

15                  No.  We can take a break, if you'd

16               like.

17             MR. FAHRENHOLT:

18                  Okay.  Yes.  Five minutes, please.

19             MR. MOST:

20                  Sure.  We will reconvene at 11:10.

21                  {BRIEF RECESS, 11:05-11:11}

22    BY MR. MOST:

23         Q.   Let me do my standard thing.  During the

24    break, did you talk to anyone about this case?

25         A.   This break, no.  He just said you were

1  doing good.  Keep doing a good job, and, you know,
2  nothing specific, no, sir.
3       Q.   Did you look at any documents during the
4  break?
5       A.   Absolutely no, sir.
6       Q.   So before the break, we looked at some
7  pictures and videos leading up to the arrest of the
8  redheaded person who I represented to you is Raae
9  Pollard, right?
10      A.   Yes, sir.
11      Q.   And now we're going back to look at the
12 Affidavit of Probable Cause that Baton Rouge Police
13 Department filled out.  It seems like there are
14 some problems with this Affidavit of Probable
15 Cause.  For one thing, we already established that
16 the description of what was ordered to protesters
17 doesn't match your recollection, right?
18      A.   Yes, sir.
19      Q.   It also says in here that this was
20 located at 9000 Airline Highway.  That's not where
21 this was, right?
22      A.   I don't think so, no, sir.
23      Q.   In fact, it's nowhere close to --
24      A.   I didn't catch that when you said that
25 earlier.  No, sir.  That is not 9000 Airline

1    Highway.

2         Q.    That fact in this affidavit is just

3    clearly wrong, agreed?

4         A.    Yes, sir.

5         Q.    And there is a mismatch between the

6    statute in the upper right, which says 14:100.1 and

7    the statute in the synopsis, right?

8         A.    Yes, sir.

9         Q.    And, also, this describes Ms. Pollard

10   entered the roadway, was provided another verbal

11   order to exit.  Moments later the defendant entered

12   the roadway again and was taken into custody by

13   officers on the scene moments later.  That does not

14   appear to match the photos and videos of what we

15   saw of Ms. Pollard, right?

16        A.    So just to clarify, you know, a photo --

17   I don't know when it was taken.  It could have been

18   taken, you know, at whatever time.  The video that

19   I saw, it looked like the Baton Rouge officer --

20   there was already something going on, but I

21   couldn't tell really prior where she was before

22   that.  I couldn't tell was she was just standing,

23   there, and they came up and got her, or had she --

24   you know, from the video that you showed me, I

25   couldn't tell if she was in the road, on the

1    sidewalk, or whatever.  It just -- from the video I

2    saw, I couldn't tell you, no, she was not in the

3    road, or, yes, she was in the road.  I couldn't

4    tell you either one of those.

5         Q.   Fair enough.  If she had just been

6    standing there, and then the officers came and got

7    her, that would not match the description of this

8    Affidavit of Probable Cause, agreed?

9         A.   Yes, sir.  I would agree with that, yes,

10   sir.

11        Q.   So there are elements of this Affidavit

12   of Probable Cause that are definitely false and

13   some that don't match your recollection and others

14   that are maybe false, maybe true, you're not sure,

15   agreed?

16        A.   Correct.  Yes, sir.  That would be fair.

17        Q.   And that is a problem that an officer

18   signing their name to an Affidavit of Probable

19   Cause that has at least partially false

20   information, agreed?

21        A.   Yes, sir.

22        Q.   That officer who signed it broke the law

23   in signing it under oath, agreed?

24        A.   I guess if you wanted to look at maybe

25   filing a false report or something, maybe that's a

```
 1    violation of the law.  To me, the bigger problem is
 2    he doesn't have -- whatever the affidavit is, you
 3    really -- you know, the problem there is it's not
 4    truthful.
 5         Q.   Right.  So it's potentially a criminal
 6    matter as filing a false arrest, and it's also
 7    potentially a constitutional matter, but it's not
 8    truthful, agreed?
 9         A.   Correct.
10         Q.   So whatever officer signed this and had
11    it submitted to the court filed a false report,
12    agreed?
13         A.   Yes.
14         Q.   Whatever officer signed this and
15    submitted it to the court committed a
16    constitutional violation, because it wasn't
17    truthful, agreed?
18         A.   Okay.  Yes, sir.
19         Q.   Do you agree?
20         A.   I would -- exactly what constitutional
21    violation are you talking about?  I just want to be
22    clear that I'm not just saying, you know, he broke
23    the law.  Specifically, you know, what are you
24    talking about?
25         Q.   Sure.  So you understand there is a
```

1    constitutional requirement that Affidavits of
2    Probable Cause have to be truthful, right?
3         A.    Truth and accurate, yes, sir.
4         Q.    And so whatever the exact nature of that
5    constitutional violation is, this officer violated
6    it by signing and filing this Affidavit of Probable
7    Cause, correct?
8         A.    Okay.  I'm following you now.  Yes, sir.
9         Q.    And you agree with that?
10        A.    Yes, sir.
11        Q.    So because of this Affidavit of Probable
12   Cause, Ms. Pollard's rights were violated in some
13   form, agreed?
14        A.    Again, please understand I'm not trying
15   to be difficult, but what rights are you talking
16   about?  It's kind of like the Constitution.  What
17   -- you talking about due process of --
18        Q.    Sure.
19        A.    Okay.  I can go with that.
20        Q.    So you're saying Ms. Pollard's due
21   process rights were violated by the signing and
22   filing of this Affidavit of Probable Cause?
23        A.    Yes, sir.
24        Q.    That's -- you're saying yes?
25        A.    Yes, sir.  I'm sorry.  I'm not being

1    clear.  Yes, sir.

2         Q.   Great.  We are going to look at another

3    document, which is 13 Os entitled LSP Intelligence

4    E-mail.  You see this is an internal state police

5    e-mail dated July 11, 2016?

6         A.   Yes, sir.

7         Q.   It's entitled BRPD shooting sit rip

8    update 0800 hours.

9         A.   Yes, sir.

10        Q.   It's from 8:20 in the morning on July 11,

11   2016?

12        A.   Yes, sir.

13        Q.   Did you get e-mails like this?

14        A.   I did not.  I'm not even on that e-mail

15   group that I can see.  I don't see my name, sir.

16        Q.   So I'm going down to Page 5.  Do you see

17   this sort of -- it looks to me like it's a summary

18   of what happened the day before.  Do you see that?

19        A.   You talking about the Louisiana related

20   incidents?

21        Q.   Yeah.

22        A.   Okay.

23        Q.   Did you see intelligence summaries like

24   this?

25        A.   No, sir, I did not.

1      Q.   Do you see this on Page 6?  It says,
2  "1900 hours.  Baton Rouge, Government Street, at
3  approximately 1800 hours.  Large group of
4  protesters gathered at Government Street and the
5  I-10/110.  A group attempted to enter the I-10/110.
6  BRPD and LSP units are closing the adjacent bridge
7  to prevent pedestrian traffic to the interstate."
8  Do you see that?
9      A.   Yes, sir.
10      Q.   Is that describing the East and France
11  protesters before they assembled at East and
12  France?
13      A.   I didn't think it was that late in the
14  evening, but I couldn't disagree.  I'm just saying
15  I thought it was earlier in the afternoon than
16  that, but it's possible.
17      Q.   But this is saying that at least at
18  approximately 1800 hours, they were closing to
19  prevent -- they were closing some roadway to make
20  sure that no protesters got on the interstate,
21  correct?
22      A.   Yes. Closing the adjacent bridge to
23  prevent pedestrian traffic to the interstate, yes,
24  sir.
25      Q.   And then at 2000 hours, it says,

1    "Government Street.  Approximately 200 protesters

2    are beginning to disperse.  Multiple arrests have

3    been made at this location.  Reports indicate that

4    these protesters are traveling back to BRPD

5    headquarters."  Do you see that?

6         A.   Yes, sir.

7         Q.   Is that describing sort of what happened

8    at the East and France Street protests, to your

9    understanding?

10        A.    In three lines?  I guess.  As far as

11   indicating the protesters were traveling back to

12   Baton Rouge PD headquarters, I didn't -- I don't

13   recall that.  They may have.  I'm just saying.

14   But, yeah, I guess that's a very -- three-line,

15   four- line synopsis of that.

16        Q.    Okay.  But I'm just trying to see if --

17   it's your understanding that that synopsis refers

18   to the East and France Street protest based on your

19   understanding; is that right?

20        A.    Yes, sir.

21        Q.    I'm not seeing anything here about it

22   being a violent protest, do you?

23        A.    In that brief synopsis, no.  There is no

24   word of -- if you're asking if -- there is no word

25   about a protest, but I guess it would kind of

1    depend on whoever was writing it, what his

2    intention was.  If they were saying, you know, we

3    had to deploy out, and we made an arrest.  I don't

4    know if he would -- I don't know if he would write

5    in there it was a violent protest or what.  I

6    couldn't even begin to get into whoever wrote

7    that's reason for the way they worded it.

8          Q.   Did you witness any acts of protester

9    violence at the East and France Street protests?

10         A.   It depends on what you mean by violence.

11   We had frozen water bottles, rocks, and it was --

12   you know, so to me that is -- somebody hits you in

13   the head with a rock, that would be pretty violent.

14   Somebody hits you in the head with a frozen water

15   bottle, it's going to hurt.

16         Q.   Did you witness any frozen water bottles

17   being thrown?

18         A.   I remember seeing water bottles.  I

19   didn't specifically see a frozen one, but I do

20   remember seeing some rocks and maybe a part of a

21   brick.

22         Q.   You saw someone throw a part of a brick?

23         A.   Yes.

24         Q.   Where was that located?  I can pull up

25   the map.

1         A.    Okay.

2         Q.    So where did you see a part of a brick

3    being thrown?

4         A.    So if you're -- if I -- so I'm on Francis

5    Street facing East Boulevard.  Okay.  So to my

6    right is Government Street.  I remember seeing a

7    piece of a brick, and I couldn't tell you where it

8    come from.  I just kind of caught it in the air.

9    It landed kind of in that private property area.  I

10   think we had some people -- it's hard to describe,

11   but -- so Francis Street back towards Government

12   Street.  You see the little gray there.  Right

13   there.  That looks like a house.  Go back to your

14   left.  Go back to your left.  Right there.  You see

15   -- oops, too far.  Little bit more.  To the right.

16   To the right.  Okay.  Straight down.  You see those

17   little gray areas?  Those, I guess -- I'm assuming

18   those indicate houses or a structure.  Is that

19   correct?

20        Q.    Yes.

21        A.    Somewhere in there I remember seeing a

22   brick, a partial brick.  It could have been -- you

23   know, I guess it could have been more of a rock.

24   Something to that effect fly through the air and

25   land there.  As far as water bottles, I remember

1    seeing several water bottles as the officer were on
2    Francis Street facing East Street.  Several water
3    bottles being thrown at us.
4         Q.   Maybe a better way to approach this is to
5    get a photo.  I'm looking at Photo eight Os, and it
6    is showing Raae standing on the sidewalk outside
7    Batiste yard.  This is the group of protesters here
8    that have retreated to the sidewalks and private
9    property at East and France.
10        A.   Okay.  Yes, sir.
11        Q.   Was this the group that was throwing
12   objects?
13        A.   When the objects were being thrown, there
14   were people in the street.  Now, obviously, do I
15   know if the people that threw it are in that crowd
16   now, I couldn't tell you that.
17        Q.   Once the protesters retreated to this
18   area, did you see any objects being thrown?
19        A.   So I don't remember during this process
20   exactly when this picture was taken, so I really
21   couldn't answer that.  If they came back out in the
22   street or whatever the case may be, to be honest
23   with you, I can't remember that.
24        Q.   Sure.  Do you have any reason to think
25   that Raae Pollard, the redheaded woman, was the one

1    throwing any object?

2        A.    I have no idea, sir. I couldn't say yes

3    or no.

4        Q.    You couldn't say yes or no because you

5    don't have any reason to connect her to any

6    throwing or any act of violence, correct?

7        A.    I don't remember her.

8        Q.    Sure.  So this same photo.  This is --

9    the same photo reflects a group of people who had

10   retreated to private property and the sidewalks,

11   and then state troopers moved forward in a line and

12   cleared them out and effected arrests in order to

13   do so, right?

14       A.    Like I said, I don't know at what point

15   in time we moved out.  Like I said, I don't know

16   when exactly this photo was taken in relation to

17   when we moved.

18       Q.    Sure.

19       A.    I don't recall.

20       Q.    Fair enough.  But there were protesters

21   on the west side of East Street who were on private

22   property and on the sidewalks who had retreated

23   there, and then a line of state troopers moved

24   through and removed them, including by effecting

25   arrests, agreed?

1          A.    Well, again, I don't -- maybe I am
2    misunderstanding your question.  If you're saying
3    that this was right before we moved, I don't have
4    any recall of it being it, so I don't know if these
5    people moved back out into the street and then
6    retreated or just was initially -- so in reference
7    to this particular picture you are showing me, I
8    really can't tell you at what point we moved from
9    there.  It could have been 20 minutes later.  It
10   could have been 30 minutes later.  It could have
11   been 500 more people there.  I just --
12         Q.    Fair enough.  So without reference to
13   this particular picture, because, as you pointed
14   out, you don't know when it was, my understanding
15   is that East Street was cleared of people.  Some
16   protesters retreated to the private property and
17   sidewalks, and then state troopers moved through
18   and removed them, including through the process of
19   effecting arrests, correct?
20         A.    So, again, as we're moving, are people
21   backing up, and as they back up, they cross onto
22   private property?  I don't recall.  I mean, that's
23   my memory.  As we're moving, people were then
24   moving back away from us, if that makes sense.
25   Again, if they were told to disperse, you can't

1   just run to home base and say I'm here, if that

2   makes sense.

3          Q.   So it looks to me like from every video

4   and picture I've seen of this incident, that the

5   streets were cleared, and then there was some

6   extended period of time where protesters had

7   retreated to East -- to the west side of East

8   street on private property and the sidewalks well

9   before the state troopers began their march

10  forward.  Do you have any reason to disagree with

11  that?

12         A.   So I don't recall everybody being cleared

13  of East Street when we started moving.  I just

14  don't.  You know, so as this crowd is, say, 50 feet

15  deep, are there people in the back side of it

16  furthest away from us that could be in private

17  property, yes, but as we move forward, obviously,

18  as we're pushing people back, you know, they're

19  going to end up getting either in the roadway or on

20  private property, if I'm making myself clear.  It

21  sounds like -- I would have to watch the video of

22  when we actually started our march to say, hey,

23  this is where people were when we started our

24  march.

25         Q.   Okay.  I think I do have a video of that.

```
1         A.    Okay. It's been five years.
2         Q.    Yeah.  I understand.  We're looking at
3    Exhibit 9 As, BRPD terrorizes nonviolent
4    protesters--7/10/16.  I'm starting at seven 25.
5    Seven minutes and 25 seconds.
6                    {VIDEO PLAYED}
7    BY MR. MOST:
8         Q.    Do you see depicted here -- this is the
9    line of state troopers we talked about that are
10   arrayed along the East side of East Street?
11        A.    Yes, sir.  I'm trying to see if -- I
12   don't know if it's all -- I think there may be some
13   other agencies in there, also, but, yes, sir.
14        Q.    When I say the line of state troopers, I
15   don't mean only state troopers.  Going forward I
16   mean a line of state troopers, and, also, there
17   might be other officers.
18        A.    Okay.  Yes, sir.  Yes, sir.
19        Q.    Do you happen to see yourself in this
20   image?  Do you know where you were standing?
21        A.    No.  I'm sure I'm probably there
22   somewhere, but, no, I don't see myself.
23        Q.    So playing forward a few seconds, it
24   looks like the troopers and other officers are sort
25   of gearing up to do their action.  I'll go back a
```

1  few seconds.  It looks like they are putting on

2  some sort of masks or something to me?

3       A.   It looks like they're taking off their

4  gas masks. Yes, sir.  I think they're taking off

5  their gas masks.  I believe that's what they're

6  doing.

7       Q.   So they're preparing to conduct the

8  action of moving forward?

9       A.   Looks like it, yes, sir.

10      Q.   So you can see at this point East Street

11 has been cleared, correct?

12      A.   Yes, sir.

13      Q.   So we saw there that were other

14 protesters on the other side who had retreated back

15 to the sidewalk and private property, agreed?

16      A.   I'm sorry.  Ask that again.

17      Q.   Sure.  So then in that last swing of the

18 camera, we saw some protesters who had retreated to

19 private property or the sidewalk?

20      A.   Can you back it up?

21      Q.   Sure.

22      A.   I don't know if I can actually see them

23 moving.  I'm not arguing with you.  I'm just saying

24 there are -- right there I don't see anybody on

25 East Street.  I thought I saw a foot right -- so,

1  yeah.  It looked like -- for me it looked like

2  there was -- from the little clip you showed me

3  right there, yeah.  I don't see anybody on East

4  Street right that second.

5       Q.   It looks like East Street was cleared

6  well before the march of the state troopers,

7  agreed?

8       A.   Are we moving right now? I mean, is the

9  line moving right now?  I can't tell if they're

10  moving right now.

11       Q.   It is eight minutes and three seconds.

12  They haven't moved yet.

13       A.   These people are -- it looks like they're

14  in maybe East Street.

15       Q.   I'll skip forward a little bit.

16            {VIDEO PLAYED}

17  BY MR. MOST:

18       Q.   Okay.  I'm going to skip forward to ten

19  minutes and 29 seconds.  Okay.  But there was at

20  least well before the movement forward of the state

21  trooper line, agreed?

22       A.   Ask that again.  We watched a long video

23  there.

24       Q.   We watched a long video that showed the

25  state troopers lining up in preparation for their

1   march forward.  East and France Street had been

2   largely cleared, agreed?

3       A.   From that video you showed me, I didn't

4   see anybody at that moment -- I mean, obviously, we

5   saw a few people on -- I don't know.  Does France

6   Street continue on across the boulevard?  Is that

7   still France as it crosses the boulevard? As it

8   crosses East Street?

9       Q.   It's still France Street, yes.

10      A.   So we're on the other side of France

11  Street.  You showed that video.  We were not moving

12  yet, and everybody was -- I didn't see anybody

13  other than a few people on the other side of

14  Francis.  We saw a few of those people walking

15  around.

16      Q.   So unless the protesters moved back into

17  the street substantially after this, then we can

18  say that the streets had been largely cleared well

19  in advance of the state troopers march forward,

20  agreed, unless there was another movement of the

21  protesters into the street?

22      A.   Right.  Like I said, from that video that

23  you showed me, of course, the state police -- we

24  had not moved yet at that moment, like I said,

25  during that video.  I didn't see anybody in East

1  Street on that video.

2      Q.   Here we go.  I'm going to be showing ten

3  A's from Finn Vid.  I'll start at the very

4  beginning.

5                  {VIDEO PLAYED}

6  BY MR. MOST:

7      Q.   So you see this?  This is now the moments

8  leading up to the -- well, let's just watch it

9  through all the way through, and then we'll talk

10  about it.

11      A.   Okay.

12                  {VIDEO PLAYED}

13  BY MR. MOST:

14      Q.   So this video depicts the beginning of

15  that march forward, agreed?

16      A.   Yes, sir.

17      Q.   You agree?

18      A.   Yes, sir.

19      Q.   We can see that the streets are cleared

20  in advance of the state trooper march forward,

21  agreed?

22      A.   Yes, sir. Like I said, the back side of

23  East Street, you know, I'm sure, if you spin left

24  to right, it's probably -- this other boulevard is

25  probably cleared, too, but I just can't see it

1    where it is stopped right now.

2         Q.    Sure. But at least we can say this is not

3    a situation where people refuse to leave the

4    streets until the officers are moving, and then

5    they just jump into private property.  This is a

6    situation where the streets are cleared, and then

7    the troopers move forward, agree?

8         A.    There is nobody in the street.  I would

9    agree to that, yes, sir.

10        Q.    So this is not the situation you

11   described earlier where people are refusing to

12   leave the streets until officers start moving,

13   agreed?

14        A.    Okay.  So just to be clear, I think the

15   order was to disperse the area.  I don't recall it

16   being just to get out of the roadway.

17        Q.    So these people standing here would have

18   complied with an order to leave the roadway but not

19   an order to disperse the area, agreed?

20        A.    Correct.

21             THE COURT REPORTER:

22                  William, I think Mr. Scott was

23                trying to say something.  He was

24                motioning, but I could hear no sound.

25             MR. MOST:

```
1              I think he suggested doing this with
2          the sound, which we can do.
3          MR. SCOTT:
4              I think that would be helpful.
5              {VIDEO PLAYED}
6  BY MR. MOST:
7      Q.   So you heard the leave now, leave now.
8  Where you are standing is not good enough?
9      A.   Yes, sir.
10     Q.   So is that the dispersal order that you
11 described?
12     A.   Yes, sir.  I don't remember -- like I
13 say, I don't remember exactly.  Now that I hear it,
14 I can't -- it's not like I can say that's not what
15 happened, but I didn't remember exactly the
16 wording, but now that I hear it.
17     Q.   So that is a dispersal order, leave now,
18 leave now?
19     A.   Yes.
20     Q.   Just listening to it again.  I'm going to
21 look at the time stamp share.
22              {VIDEO PLAYED}
23 BY MR. MOST:
24     Q.   So it looks like that order was going
25 from about two seconds to six seconds of this
```

1    video.
2        A.    Okay.
3        Q.    Do you agree that that is roughly
4    accurate?
5        A.    As far as your time.  Like I said, I
6    don't know -- I know that way before we got to this
7    point, way before it, we had been asking people to
8    leave.  When this picks up, I don't know.  Like you
9    said, two seconds.  I don't know what was said
10   before that, prior to that.
11       Q.    Sure.  This order is being, at least in
12   this video, is being given as the troopers move
13   forward, right?
14       A.    Okay.
15       Q.    Do you agree?
16       A.    Yes.
17       Q.    When you say okay, it almost sounds like
18   you are just taking my word for it.
19       A.    I'm sorry.
20       Q.    I want to make sure it's your testimony
21   as well.  That's why --
22       A.    I apologize.  Yes, sir.
23       Q.    No problem.  So the troopers are moving
24   forward as this order is given.  So if this is the
25   first dispersal order, the protesters aren't being

1    given time to comply.  The officers are moving as

2    they give the order, agreed?

3         A.    That is not the first dispersal order.

4         Q.    But if it were, then the protesters were

5    not being given time to comply, agreed?

6         A.    If that was the first time they heard it,

7    -- well, I would hate to say that.  If it was the

8    first time it was given, okay, but it wasn't.

9         Q.    Okay.  I'm just looking through my notes.

10   So that's the questions I've got for right now.  I

11   might have some clean-up questions afterwards.

12             MR. MOST:

13                 MacArthur, do y'all want to take

14              over questioning now or do we want to

15              take a break? Would anyone like to take

16              a quick break for lunch or just keep

17              going?

18             MR. FAHRENHOLT:

19                 William, I'd like to try to get

20              through this deposition before lunch.

21             MR. MOST:

22                 Ms. Lommers-Johnson will be taking

23              over the questioning.  I'll share the

24              permission with you.

25             MS. LOMMERS-JOHNSON:

1              Thank you.

2    EXAMINATION BY MS. LOMMERS-JOHNSON:

3         Q.   Hi there.  My name is Hannah Lommers-

4    Johnson, and I, along with Eric Foley and Jim Craig

5    on this call, represent plaintiffs in the AR,

6    Smith, Batiste-Swilley, and Tennart cases.  I just

7    want to jump in by showing you a document.  Can you

8    see what I have up on my screen?

9         A.   Yes, ma'am.

10        Q.   Perfect.  So it's my understanding that

11   this is your time sheet from about the week of July

12   4th through July 16th of 2016.  Is that accurate?

13        A.   I think it's through the 17th.

14        Q.   Oh, perfect.  Yeah.  Here we go.  So I

15   think that -- someone correct me if I'm wrong.  I

16   think that this is going to be the first new

17   exhibit for today's purposes, so I'm going to call

18   this Exhibit 1.  Hearing no objections, this is

19   going to be Exhibit 1.  Looking at Exhibit 1, it

20   looks to me like you first were on duty in Baton

21   Rouge for the protests around July 8th.  Is that

22   what you remember?

23        A.   Yes. Looking at my time sheet, I would --

24   12 regular.  17.  I would say yes.  That would be

25   correct.

1    Q.   I can let you know that the days that we

2    are most interested in are going to be July 9th and

3    July 10th.  Going down to July 9th, it looks like

4    the hours that you worked on July 9th were 24

5    hours.  Is that accurate?

6    A.   Okay.  Yes, ma'am. So let me explain how

7    that works.  Once the Mobile Field Force is

8    activated into a situation like that, when we drive

9    to the state police compound, wherever we're housed

10   at -- in this case, we were housed at the training

11   academy.  Once we arrive there, we're not allowed

12   to leave.  We have to be ready at all times.

13        So from the time -- 12 was probably the

14   -- I don't know if that was the time I left my

15   house or the time I got to Baton Rouge.  Whatever

16   the case may be.  Once you are activated for that,

17   you stay on the clock until you leave, because you

18   can't -- I mean, you can't run to the store and get

19   a diet Coke or whatever the case may be.  You are

20   confined to that compound, so they put you on a 24-

21   hour clock.

22        Q.   That makes sense to me.  I see you were

23   on the 24-hour clock for both the 9th and the 10th.

24        A.   Correct.

25        Q.   Do you remember with regard to the 9th

1    what times you were actually actively on duty out

2    at the protest?

3         A.    Are you talking about the Airline Highway

4    or you are talking about Francis Street?  The days

5    kind of run together.

6         Q.    Yeah.  So it's my understanding from your

7    interrogatory response is that on the 9th you were

8    at Airline.

9         A.    Okay.

10        Q.    And on the 10th --

11        A.    So what happened the day that we went to

12   Airline, we had -- I don't know where the

13   information came from or whatever, but the decision

14   was made to send a team to the Baton Rouge Police

15   Department.  Obviously, somebody had some kind of

16   information there may be a protest or something

17   there.  So, to be honest with you, I couldn't tell

18   you what time we got to Baton Rouge Police

19   Department, but they had a place where we could go

20   in, set up, and be in the air-condition and have

21   food and water and all of that.  As far as the

22   actual time that we went out onto Airline Highway

23   the first time, I'll be honest with you.  That's

24   five years ago.  There is no way I could tell you

25   exactly what time.

1    Q.    Do you remember, I guess, whether it was

2  still -- I'm assuming it was still light outside at

3  the time that you went out on Airline on the 9th.

4    A.    The first time that day, yes, ma'am.

5    Q.    Did you stay until it was dark on

6  Airline?

7    A.    It was still daylight when we came back

8  inside for -- we had gotten off Airline the first

9  time, and it was still daylight.

10    Q.    Did you ever go back out after dark on

11  Airline on the 9th?

12    A.    We went back out a second time, and if my

13  memory serves me right, if it wasn't dark, it was

14  getting dark or not far from dark.

15    Q.    On that next day, on Sunday, the 10th,

16  it's my understanding that you deployed to the East

17  and France Street area.  Do you remember about what

18  time you went on active duty that day?

19    A.    Okay.  If you are talking about the time

20  that we actually drove -- excuse me -- down to

21  Francis Street, no, ma'am, I don't recall.

22    Q.    Just generally, am I correct that Troop F

23  is a general Louisiana State Patrol designation of

24  a unit?

25    A.    Okay.  So the state is broken down into

1    nine troops.  A, B, C, D, E, F, G, I, L.  Nine

2    troops.  So Troop F is where I work out of, which

3    is, if you could picture -- so, basically, it is

4    from here over.  It's kind of the northeast part of

5    the state.  It's 12 parishes.  It begins in Ruston,

6    goes down to Jonesboro, all the way from Arkansas

7    to Vicksburg, if you can kind of imagine that. It's

8    12.  So each individual troop area has a letter

9    designation.  Obviously, there are some letters

10   missing because there used to be more troops than

11   that, but right now there is nine.

12       Q.   It's my understanding that you, in 2016,

13   were the leader of the third platoon, and Platoon 3

14   is a Mobile Field Force designation; is that

15   correct?

16       A.   That's not correct.  So not only are we

17   divided into nine troops, we're divided into three

18   regions.  Baton Rouge/New Orleans is one region.

19   Lake Charles/Lafayette area is the second region.

20   From Alexandria north is Region 3.

21       Q.   So you led the platoon that was

22   Alexandria north in 2016?

23       A.   Okay.  So that was the majority of the

24   makeup of the team.  That is not to say that there

25   couldn't have been somebody from Region 1 or Region

1    2 that was in the -- to be honest with you, I don't

2    remember if there was or not, but I'm just saying,

3    when you deploy out, there can be people from other

4    regions and other troops that's assigned to you.

5        Q.   But, generally, you, along with members

6    of Platoon 3, deployed as a group to the Baton

7    Rouge protests?

8        A.   Yes, ma'am.

9        Q.   On the different days, say, July 9th, for

10    instance, you would go to a specific location,

11    wherever you were deployed, with the other members

12    of the third platoon; is that accurate?

13        A.   I mean, the third platoon was there.  I

14    think we had the most amount of people there, but

15    there were other -- I think when we -- when the

16    third platoon was sent over to Baton Rouge Police

17    Department, I want to think we still had a couple

18    of other platoons back at headquarters.

19        Q.   But, generally, when you deployed out,

20    say, on Airline, or the day you went to East and

21    France, the third platoon wouldn't split up?  You

22    deployed as a group?  Is that accurate?

23        A.   So, you know, each day that we went, I

24    would say the majority of the troopers there on the

25    Mobile Field Force side -- to be honest with you, I

1    couldn't answer on the SWAT side, but on the Mobile
2    Field Force side, a large majority of those guys
3    were Region 3.  I'm not saying all of them, because
4    there may have been some other people in there.  I
5    don't know if I'm clarifying it or making it worse.
6         Q.   No, no.  That is helpful.
7         A.   Yeah.  Like I said, the majority of the
8    people on Airline and Francis were -- the majority
9    of those people were the third platoon.
10        Q.   So the majority of those people were
11   people you directly supervised as the leader of the
12   third platoon?
13        A.   So when the element -- it doesn't matter.
14   I just want to understand just -- when we're there,
15   and it's a deployment, whoever that platoon leader
16   is, it doesn't matter where you are from, you are
17   in charge of that platoon.  You could have two guys
18   from Troop A, two guys from Troop B, two guys from
19   Lafayette, two guys from -- it doesn't matter.
20   When that team -- when that element is designed,
21   whoever the platoon leader or squad leader is,
22   they're in charge of that group.  I don't know if
23   I'm understanding what you're asking me.
24        Q.   I think so.  And so when you deployed out
25   on the 9th on Airline, you were the leader of that

1    group; is that accurate?

2         A.    Me and Clay Revis were the platoon

3    leaders.  Of course, Lieutenant Comeaux was in the

4    TOC, and we're talking to them, but as far as

5    making the movements and pushing people, I was

6    doing that.

7         Q.    Did I hear correctly you said Lieutenant

8    Comeaux was in the TOC?  Can you tell me what that

9    means?

10         A.    Tactical Operations Center.  It's an

11    acronym.  So that's where they have a lot of live

12    feeds.  They can watch the camera video.  A lot of

13    the other command staff can sit in there and watch

14    what is going on.  They may get intelligence from

15    the intelligence section or we may get something

16    from Baton Rouge PD or somebody.  All of that is

17    like a mini headquarters, for lack of better terms.

18    They'll get the information, and if it's something

19    that they need to push out to me, they can, or if

20    it's something that we need to maybe -- it's just

21    kind of like -- it's just an operations center.

22         Q.    I got you.  And the live feeds that were

23    visible at the Tactical Operations Center, were

24    those coming from mainly BRPD cameras and street

25    cameras or were there also Louisiana State Patrol

1    cameras?

2         A.   I don't think state police has got any

3    cameras that they would have accessed.  It would

4    have been -- I don't know if it's DOTD, if it's

5    Baton Rouge PD.  I don't know who it was, but I

6    couldn't answer that.

7         Q.   Of the members of Platoon 3, for

8    instance,  that deployed to Baton Rouge, were those

9    all either Mobile Field Force and SWAT personnel or

10   did anyone deploy from Platoon 3 that was not in

11   either SWAT or Mobile Field Force?

12        A.   I don't think I understood what you were

13   asking.  I'm not trying to be rude.  I just don't

14   -- I mean, you are either Mobile Field Force or

15   SWAT.  It wasn't all Region 3.  The majority of the

16   Mobile Field Force was Region 3, but, to be honest

17   with you, I can't tell you what the majority of the

18   SWAT guys were.

19        Q.   Let me just make sure I'm understanding

20   correctly.  So there were no troopers who deployed

21   to Baton Rouge that were not in Mobile Field Force

22   and not in SWAT but just normal sort of troopers?

23        A.   Well, no.  You also have got a logistics

24   team, which is what gets us, you know, whatever

25   equipment or whatever needs we need.  I would think

1    probably the public information officers I assume

2    was there.  I think the EOC was activated, so

3    anybody that would have fell under the EOC umbrella

4    I would think.  Like I said, I'm just assuming.  We

5    probably had some bureau people that were

6    intelligence gathering or whatever the case may be.

7    There was a lot more people than just Mobile Field

8    Force and SWAT that would have been there.

9         Now, we may not have been in contact with

10   them.  They could have been offsite somewhere doing

11   something, but as far as what was staying at the

12   training academy, the majority of -- you were

13   either logistics or Mobile Field Force or SWAT.  We

14   had -- I think we had a DPS officer that helped

15   drive the bus.  So there was a lot of people that

16   were there.

17        Q.   I apologize if you said this earlier, but

18   which area of Louisiana do you normally live in, in

19   2016?

20        A.   The Monroe area.

21        Q.   I'm going to go to another document now

22   that we can label Exhibit 2 for today's deposition.

23   Do you see this document up on the screen?

24        A.   Yes.

25        Q.   So this one is a little bit harder to

1  read.  This is a four-page document.  Do you

2  recognize this document marked as Exhibit 2?

3       A.   Yes.  I don't remember it, but, I mean, I

4  know what it is.

5       Q.   Perfect.  I'm just going to scroll down

6  to the, let's see, the third page of this document.

7  This document on Page 3 of Exhibit 2 is dated July

8  8th of 2015. Do you see that?

9       A.   Yes.

10      Q.   And I think it's titled MFF Training.

11  Does that stand for Mobile Field Force training?

12      A.   Yes.

13      Q.   Is this a training that you led in July

14  2015?

15      A.   Looks like me and Sergeant Clay Revis

16  did.

17      Q.   Are the individuals who participated in

18  this training on this attendance roster, are these

19  members of the third platoon?

20      A.   Some of them.  I see some that are not.

21  I can't see the whole thing.  I see down to 19.

22      Q.   I can zoom out a little bit so you can

23  see. There we go.

24      A.   I can't read that.  I can't read the

25  signature at 24.  Catherine Slaughter, Number 4,

1    she works in Baton Rouge.  I'm trying to look, just

2    glance through it.  Like I said, I couldn't read

3    24.  I know who Catherine Slaughter is from Baton

4    Rouge, and, obviously, Clay Revis is also from

5    Baton Rouge, also.

6         Q.   I'm curious.  For this Mobile Field Force

7    training, how was it decided who would attend this

8    particular training?

9         A.   So we do training.  That is a Region 3

10   training at the Camp T School.  I don't remember

11   the training, but I don't know -- so, obviously,

12   Clay Revis drove up from Baton Rouge.  At the time,

13   he was kind of the assistant to Lieutenant Comeaux,

14   and he handled a lot of it.  He handled the

15   training.  So Catherine Slaughter could have either

16   ridden up to help assist him, or she could have

17   possibly missed the training for the Region 1 so

18   made it up at Region 3.

19        Q.   That makes sense.  Okay.  For the first

20   two names on this list, obviously we talked a

21   little bit about Mark Dennis already today, but for

22   Mark Dennis and Kory York, were they in the platoon

23   that you supervised back in 2015?

24        A.   Yes.  Yes, ma'am.

25        Q.   Let me stop sharing this screen.  Can I

1    ask just generally what does platoon supervision

2    involve?

3          A.   So as far as on a day-to-day basis, or

4    are you talking about during a deployment or what

5    exactly?

6          Q.   So I guess let's start with on a day-to-

7    day basis, normal course of business, not during a

8    deployment.

9          A.   Okay.  Normal day-to-day business, it

10   doesn't involve anything, because I'm still -- my

11   main job is a shift lieutenant.  At the time, I was

12   a shift sergeant.  So my main job was handling the

13   shift.  Whenever there is training or anything like

14   that, it depends on what we're doing.  Let's just

15   say Clay Revis wants to cover a specific area of

16   training.  He comes up from Baton Rouge.  He says,

17   hey, John.  Today we're going to do this.  Pick

18   anything.  Then I'll assist him with it, maybe help

19   him with it or whatever the case may be.

20              So that's how the training side of it

21   goes.  If it's something that I think that -- they

22   come to me and say, hey, John, we need to make sure

23   the guys get trained on this.  Can you handle it?

24   Then I'd be the one maybe doing the training.  Just

25   kind of depends as far as a squad leader or a

1    platoon leader.  As far as the deployment goes, it

2    just really -- again, it depends.  I'm not trying

3    to be vague, but it just really depends.  So like

4    the day out on Airline, I was the only platoon

5    leader I think that was on Airline.  Clay Revis,

6    even though he is an assistant, he is not a -- he

7    wasn't a platoon leader, but we worked together,

8    and we discussed, hey, we need to move forward, we

9    need to do that or this.

10             So the next day on Francis Street, I

11   believe, I saw Kevin Cannatella in there.  He is

12   the platoon leader for Region 1.  So, you know,

13   whoever is in charge of moving the element, the

14   other platoon leader and squad leader will help do

15   whatever needs to be done.  I don't know if I made

16   it muddier or cleared anything up for you.

17       Q.   No.  I think that helps.  I guess I'm

18   curious about the Mobile Field Force trainings

19   specifically.  Do you have any -- you know, the

20   answer here might be again that it depends, but,

21   generally, is it your responsibility to make sure

22   that the Platoon 3 troopers complete a certain

23   number of trainings each year?

24       A.   So the way we are set up is it was two --

25   back then it was two -- you tried to get -- we held

1    two trainings per quarter a year.  I think they

2    could miss one a quarter.  To be honest with you, I

3    just don't -- I don't recall what it was back then.

4    Now it's a little bit different.  You still have

5    two trainings per quarter, but we also have a

6    firearms day, so it's actually -- basically, you

7    are doing something every month now, but back then

8    I think it was, like I said, two trainings every

9    quarter.

10        Q.   In terms of the platoon supervision that

11   was happening during the Baton Rouge protests in

12   2016, my understanding from your testimony earlier

13   is that you communicated the orders to your line

14   that you were getting from Lieutenant Comeaux; is

15   that accurate?

16        A.   Okay.  So just to be -- so Lieutenant

17   Comeaux would say, hey, you know, it's time to move

18   forward, so I would give the command, and my squad

19   leaders would repeat it, and then the line itself.

20   When you said line, I want to make sure you are --

21   of course, they can hear me, but they are also more

22   responding to the squad leader, because the squad

23   leader is looking at me or whatever, and I'm giving

24   a verbal and a hand sign, because, like I said,

25   it's very loud, and we're spread out.  The troop on

1    the very end may not hear me.  So that's why you

2    have a squad leader there repeating it.  So I relay

3    it to the squad leader, and the squad leader

4    repeats it so the line can hear it.

5         Q.   On the 10th, am I correct that Sergeant

6    Dennis was one of the squad leaders?

7         A.   That is correct.

8         Q.   So I understand that the chain of

9    communication went from Lieutenant Comeaux to you,

10   to the squad leaders, to the line generally.  My

11   next question is, was it your responsibility to

12   step in if you saw any of the squad leaders or

13   members of the line doing something either illegal

14   or unconstitutional?

15        A.   Again, I tried to answer a similar

16   question earlier.  I didn't see anything illegal

17   being done, but if somebody is five feet from me,

18   and I can do something, well, that's different than

19   somebody, you know, 50 feet and through a hundred

20   people.  There's not going to be a whole lot I can

21   do about that, if that answered your question.

22        Q.   Yeah.  I definitely understand the

23   ability to intervene in that situation is

24   definitely different depending if someone is close

25   to you in your immediate eyesight and reach.  I

1    guess, generally, as part of your platoon leader
2    responsibilities, is it your responsibility to step
3    in if you see someone acting illegally or
4    unconstitutionally who is in your platoon?
5         A.   If I can reach them, well, yeah, I would,
6    but more than likely, I'm going to have a squad
7    leader in front of me.  You know, let's just say
8    Mark Dennis is ten feet away from me, and somebody
9    directly in his area of responsibility is doing
10   something.  I'm going to say -- I'd probably say,
11   Mark, you know, right there, right there, if that
12   makes sense, whereas -- just so you understand,
13   there is a line of troopers then you've got -- we
14   have an arrest team, squad leaders, and Mobile
15   Field Force, and then I'm standing back behind
16   that.  That's why I'm not trying to say that I
17   wouldn't, but I'm just saying I'd have to get
18   through a lot of people to get up there and do it.
19   I would probably grab somebody and say, hey, fix
20   that problem.  There was a problem over there.  See
21   what is going on.  Something like that.
22        Q.   So you would still see it as your
23   responsibility to intervene if one of your
24   supervisees was doing something illegal or
25   unconstitutional --

1      A.   If I --

2      Q.   -- you'd delegate --

3      A.   Like I said, if I see something, and I

4  can get to it, I would, but, you know, again, if I

5  see it, and I can get to it.

6      Q.   So I want to go a little bit back and

7  talk a little bit more about training.  Can you

8  tell me just generally what does LSP training teach

9  about what rights protesters have?

10     A.   That's a really vague question.  We're

11 always doing legal studies.  I mean, we'll talk

12 about stuff.  So, I mean, I really don't know

13 exactly what you wanting there.

14     Q.   I guess I can get a little bit more

15 specific.  What does LSP training cover about when

16 it's acceptable to arrest protesters?

17     A.   Obviously, there has to be a violation of

18 the law.  I mean, that would be the key.  We

19 wouldn't just go out there if there is no law being

20 broken whatsoever and just go arrest the people,

21 because how are you going to arrest somebody that

22 is not breaking the law?

23     Q.   In terms of -- we talked a lot today and

24 have talked in previous depositions about moving

25 the line or the element forward.  Can you tell me,

1  you know, in that Mobile Field Force trainings,

2  what officers or -- excuse me, what troopers are

3  trained on as far as moving the line forward and

4  all of the duties and responsibilities that come

5  with that?

6      A.    Okay.  So you're asking -- so we do a lot

7  of -- we will form the line up, and, you know,

8  we'll go through the commands.  Forward, forward,

9  forward, or left, left, left, or right, right,

10 right, or rear, rear, rear, or, you know, we may go

11 into a diamond formation.  We may move around

12 obstacles.  You know, maybe we might have a street

13 set up and put a car in there and move the unit

14 around the car, around the obstacle, whatever the

15 case may be.

16     Q.    I think I heard previously a reference

17 that when the line is moving forward, there should

18 never be a civilian who is able to make it behind

19 the line.  Can you tell me a little bit more about

20 that?

21     A.    So, typically, yeah, you wouldn't allow

22 somebody behind your line or into the middle of it.

23 Obviously, if they are arrested, then you are going

24 to handcuff them or whatever the case -- secure

25 them, handcuff them, or whatever, and you'll bring

1    them through the line and hand them off to the

2    process team, but as far as a civilian just walking

3    around behind the line, no, we would not allow

4    that.

5         Q.   So if the line is moving forward, and a

6    civilian -- approaching a civilian, and the

7    civilian does not move out of the way of the line,

8    are your troopers trained that at that point that

9    civilian should be arrested?

10        A.   Okay.  So just to go back, we would not

11   deploy and start moving people if there wasn't

12   already a violation of the law.  So if the line

13   comes up to them, and we're asking you -- and it's

14   a very loud repetitive command, back, back, back.

15   And if you just continue to stand there, yes, you

16   are probably going to be arrested.

17        Q.   So I just want to make sure that I fully

18   understand.  So correct me if anything I'm saying

19   is wrong.  My question now is at the point that the

20   line moves forward, at that point, the troopers

21   know that there's been a determination made by

22   their superiors that whoever they're advancing on

23   has broken the law and is subject to arrest?

24        A.   Correct.

25        Q.   At the time the order is passed down,

1    that the line should move forward, forward,

2    forward, troopers are aware that they are

3    authorized to arrest anyone in the path; is that

4    accurate?

5         A.   Yes.

6         Q.   I guess is there any Mobile Field Force

7    or other Louisiana State Patrol training that

8    addresses when a protest can be deemed no longer

9    peaceful?

10        A.   I think the protest would define itself.

11   I mean, if you get a permit to go to Park A to have

12   a protest, or a peaceful gathering, or, you know,

13   whatever, or if you get a permit to go to the State

14   Capitol, and you file all the permits, you do that,

15   and people want to just go and express their

16   displeasure with whatever it is, then that's a

17   peaceful protest.

18             Now, if you start blocking the highway,

19   you start threatening people, other civilians.  You

20   start blocking -- you start throwing stuff, you

21   know, you start committing crimes, then at that

22   point, it's no longer a lawful protest.  It's an

23   unlawful protest.

24        Q.   Is there training given to troopers on

25   when to make that designation between a peaceful

1    protest and an unlawful protest?

2        A.    So we have a lot of discussions about it

3    during the Mobile Field Force training, but, you

4    know, before we move out and ask people to start

5    moving, you know, that line has already been

6    crossed.  It's already been deemed an unlawful

7    protest.  Now, who may technically deem it, like I

8    said, it may be somebody higher up than us, or it

9    may be -- what is to say that you have a perfectly

10   peaceful protest, and everything is going good, and

11   then somebody all of a sudden starts throwing rocks

12   on cars passing by.  Well, then that's not real

13   hard to figure out, but now it's not peaceful.  I

14   don't know if that cleared it up for you.

15       Q.    I think so.  Am I understanding correctly

16   that, you know, at the point that the line is

17   ordered to move forward and advance on a protest,

18   troopers, at that point, are aware from their

19   training that the protest has been deemed no longer

20   peaceful by their superiors?

21       A.    Correct.  Yes, ma'am.

22       Q.    I think I stopped sharing here, but let

23   me just share the screen again with Exhibit 2.  I'm

24   just going to scroll up to Page 2.  This one from

25   June 8th of 2016 says it's a Mobile Field Force

1    quarterly training.  Can you tell me what the

2    quarterly trainings focused on or whether each of

3    them was different?

4         A.   Each training is a little bit different.

5    You know, you may train on -- let's just say line

6    formation.  We try to do line formation and

7    everything, but then we may say, okay, today we're

8    going to do vehicle rescues.  So we may do -- we

9    try to always do some line formation every time,

10   but let's say today we're going to concentrate on a

11   vehicle rescue.  Somebody is trapped in a vehicle,

12   and we're going to move the team in there and get

13   them.  Well, we may not train on that again for

14   four quarters.  All training is a little bit

15   different.  Even though you may go over the same

16   thing, we try to cover as many different things as

17   we can.

18        Q.   Would this have been, this training that

19   is dated June 8, 2016, would this have been the

20   most recent Mobile Field Force training that

21   preceded the deployment to the Baton Rouge protests

22   in 2016?

23        A.   I want to say that probably was.  I don't

24   think we would have had any -- what did you say,

25   July 4th on the other one, or July the -- it was a

1    month apart.  That was probably the one closest to

2    the protests.

3         Q.   Understanding it was some number of years

4    ago, but given that it was, you know, probably the

5    training directly before deployment to the Baton

6    Rouge protests, do you remember what this

7    particular training covered?

8         A.   It was at JES Tech, which is in Baton

9    Rouge.  I do not.

10        Q.   I'm going to stop sharing this document

11   and move to another one, in case it helps us get a

12   little bit more specific.  Do you see the document

13   that I have up on my screen now?

14        A.   Yes.  That's a SWAT training.

15        Q.   This document I'm going to mark Exhibit

16   3.  I'm going to scroll down just to the calendar

17   that's dated 2016.  Can I ask, what does CNT stand

18   for?

19        A.   Crisis or -- negotiation.  The NT is

20   negotiation team.  Maybe crisis negotiation.  So it

21   would be -- say you've got somebody that is

22   barricaded in a house, and you want a negotiator to

23   talk with them.  That's the negotiations team.  To

24   be honest with you, I don't remember what the C

25   stands for.  Maybe Crisis Negotiation Team, but

1   it's our negotiators.

2        Q.   Here it looks like Platoon 3 trained

3   about once a month.

4        A.   You know you are looking at the SWAT one.

5   You are not looking at Mobile Field Force.

6        Q.   Right.  So did you not participate in the

7   SWAT trainings at all?

8        A.   No, ma'am.

9        Q.   Only Mobile Field --

10        A.   Now, if you'll see, if you look, on July

11   the 5th, Platoon 2 with Mobile Field Force, so

12   there are certain days -- like I was telling you

13   earlier, there are certain days that we will train

14   with SWAT, but we also have our individual

15   training.

16        Q.   That's helpful.  In that case, I'm going

17   to move on to Exhibit 4.  Can you see this document

18   that I've marked Exhibit 4?

19        A.   Okay.

20        Q.   I'm going to scroll down on this

21   document.  I can represent to you that we received

22   this document in discovery.  Here we go.  So this

23   document is titled Louisiana State Police Mobile

24   Field Force Training Report, dated April 29th,

25   2016.  Do you recognize this document?

1      A.    Yes, ma'am.

2      Q.    Is this one of the trainings that you did

3  participate in?

4      A.    I had to look at the roster, but I'm sure

5  I probably was there.

6      Q.    I'm not sure if this is the roster for

7  this training or another one.

8      A.    Scroll back to the top of it and see if

9  it's got a name on who submitted it.  I would say I

10  was -- I would think I probably would have been

11  there.  I did miss a few from time to time, but,

12  obviously, I wouldn't remember a specific training

13  from five years ago.

14      Q.    One of my questions about this document

15  is under Description of Training, it says, Region 3

16  Mobile Field Force conducted training.  The team

17  had a briefing on current trends and possible

18  upcoming events.  Can you tell me what types of

19  current trends would be discussed at these

20  trainings?

21      A.    They look at different problems

22  throughout the country, things that have happened

23  throughout the country, maybe another protest, or

24  whatever it was decided to discuss that day.  Let's

25  just say they looked at the protest in Ferguson.

1    They may show some videos and talk about what

2    happened up there and how that team responded to

3    it, and then we'd say, okay, well, what would we do

4    if it happened up here.

5         Q.   Was responding to protests a primary

6    focus of a lot of the Mobile Field Force training?

7         A.   I would say that was a large majority of

8    it.  It's not all that the Mobile Field Force does,

9    but that's a lot of the training that we do.

10        Q.   Back on Exhibit 4, the last line where it

11   says, "Team members worked on arrest procedures,

12   QRF responses, and donning and doffing drills."

13   First of all, what does QRF responses mean?

14        A.   Quick Reaction Force.

15        Q.   Can you tell me a little bit more about

16   what that is or where that is employed?

17        A.   So we use a -- during the, say, the 2016

18   protests.  I'll just take that as an example.  When

19   Region 3 left the training academy and went to

20   Baton Rouge Police Department, we took -- like you

21   said earlier, the majority of it was Region 3.

22   Okay.  So we were stationed there in the event of

23   something happened at the Baton Rouge headquarters.

24   So back at the training academy, we probably set up

25   what is called QRF.  Probably had two of them

1    sitting in a ready room ready to go, which means it

2    would have been Mobile Field Force and SWAT.  We

3    would have had a couple of vehicles identified.  So

4    let's just say somebody showed up at -- I'm not

5    from Baton Rouge, but let's just say somebody

6    showed up and said, hey, we are going to march on

7    the governor's mansion.

8              Well, we would have had that team that

9    would have been at Baton Rouge Police Department.

10   It wouldn't have been -- you couldn't very well ask

11   them to move, because then you would not have been

12   prepared, but what they would have done was, we

13   would have probably had two or three QRFs in the

14   ready room that can jump in their car and respond

15   to any other thing that would have happened.

16        Q.   Now I'd like to move to Exhibit 5.  This

17   document marked Exhibit 5 is titled Agenda:  Mobile

18   Field Force Supervisor Meeting.  Do you recognize

19   this generally as one of your Mobile Field Force

20   supervisor meeting agendas?

21        A.   Yes, ma'am.

22        Q.   So you are listed under the section on

23   transition to a three-platoon structure.  I want to

24   scroll down just a little bit below that.  So

25   scrolling down to the platoon leader meeting, Page

1    4 of Exhibit 5, it's dated April 28th, 2016.  I
2    apologize.  A little disorganized with this.  Now
3    we're on Page 6 of Exhibit 5.  It's titled,
4    Itinerary:  Mobile Field Force Introductory Course.
5    My question here, and I think this is what you were
6    referencing a little bit before.  It says,
7    "Reviewed the incidents in Ferguson and Baltimore."
8    Do you remember what type of review of those
9    incidents and what type of training was given to
10   the Mobile Field Force?
11        A.   So this is a supervisory meeting or what
12   is this?
13        Q.   My understanding -- so we were given
14   these documents just as a group.  I think that this
15   -- basically, all I know about this document is
16   it's Mobile Field Force Introductory Course, is
17   what it's titled.  I'm not exactly sure if
18   (inaudible) was training.
19        A.   I'm sorry.  Could you let me look at Day
20   2 and see if there is anything past that?  And then
21   keep going.  Okay.  Go back to Day 1.  Let me look
22   at it.  So we do have a Mobile Field Force course
23   now.  I don't know the date that this itinerary was
24   sent out, so I don't know that -- if we discussed
25   it in a supervisor meeting thinking, hey, this is

1    how we're thinking about doing the course or if
2    that is actually the course itself, if you
3    understand what I'm saying.  Because we would have
4    had a lot of discussion about, hey, we want to do a
5    five-day, a four-day or whatever.  What do we need?
6    So I'm sure somebody, Clay or Beau or Steven or
7    somebody along the way would have -- hey, because
8    you got to put it on paper to look at it and then
9    talk about it with all the platoon leaders.  I
10   don't know if that's what it is or if that is
11   actually the course that we did.
12        Q.   I understand.  I guess whether it was
13   taught at an actual course that was given or
14   whether you just discussed it as platoon leaders,
15   do you know if there were any take-a-ways from your
16   review of the incidents in Ferguson and Baltimore
17   that you applied to the Baton Rouge protest
18   response?
19        A.   I specifically do not remember.
20        Q.   I'm going to stop sharing this screen.  I
21   have just a couple of question about Mobile Field
22   Force at LSP.  Do you know when LSP first started
23   having a Mobile Field Force unit?
24        A.   So it was somewhere around Y2K, 2000,
25   because everybody thought the computers were going

1   to crash and the world was going to end and all of

2   this stuff. And I'm not 100 percent sure, but I

3   think there was some kind of grant going, hey,

4   let's get police agencies ready in case of this

5   global meltdown.  So we did a bunch of training

6   where we went over, you know, some of the initial

7   stuff with sticks and shields, all of that.  That

8   would have probably been before 2000.

9          The actual day that it was formed, and

10  they actually created a specific team, it would

11  have been around that 2000 time, but I couldn't

12  tell you exactly it was January 1st of 2000.  You

13  know, I can't.  But it would have been around that

14  2000 when they decided, hey, we need to have a team

15  in the event that something happens.

16      Q.   And when did you join Mobile Field Force?

17      A.   From the start.

18      Q.   Do you remember the first time that you

19  deployed as a part of Mobile Field Force?

20      A.   So there were two, and I don't remember

21  the exact time frame, but -- so we would -- give me

22  just a minute.  So the space shuttle blew up one

23  time, and it spread debris over Texas, across

24  Toledo Bend into Louisiana, so we deployed on that,

25  and then we also had Jena Six protest in -- well,

```
1   in Jena, and to be honest with you, I don't
2   remember which one came first, but we responded to
3   both of those.  That would have probably been the
4   first really big one.  I mean, we might do little
5   stuff, you know, like they may call up to Monroe
6   and say, hey, I need ten people to work Mardi Gras,
7   and the captain may have said, hey, send my ten
8   Mobile Field Force guys down there, but I don't
9   think it was a specific Mobile Field Force
10  deployment.  It was just a lot of times the captain
11  would say, hey, just send the Mobile Field Force
12  guys.  But actual deployments would have either
13  been the space shuttle or the Jena Six.
14       Q.   Including those and including the Baton
15  Rouge deployment, about how many times have you
16  been deployed in a Mobile Field Force deployment?
17       A.   A bunch.  Katrina.  Just every hurricane
18  has been a deployment.  Any time there is a protest
19  or something at the Capitol, whatever.  I don't
20  recall exactly how many, but I want to -- if I
21  remember, Larry Badeaux was the most recent
22  lieutenant over the Mobile Field Force, and it
23  seems like I recall him saying last year they -- 20
24  plus, almost 30 deployments.
25       Q.   He was saying there were 20 plus or 30
```

1   deployments in a year?

2       A.   Yes.   Now, understand that that could be

3   anything from, hey, we are just going to send some

4   people over there because there could be a problem,

5   you know.   As far as actual protests, I mean, y'all

6   would be aware of actual protests, but if they

7   think, you know, hey, we just might need to have

8   some people here just in case, you got to count

9   Mardi Gras.   You got to count maybe the Sugar Bowl,

10  Wrestlemania, all the hurricanes we had last

11  summer.   All of those counts as deployments.

12      Q.   Besides the Baton Rouge protests in 2016

13  and the Jena protests, do you remember other

14  protest situations to which you've been deployed?

15      A.   Define what you mean by deployed, because

16  as far as having to actually move out and move

17  people, those numbers have been very few, but -- so

18  like when I think there was a grand jury on the

19  Baton Rouge protests maybe a year -- whatever the

20  -- we had people down there.   We didn't actually go

21  out on anything.   There weren't any problems, but

22  we had assets in place.   I don't know if you can --

23  that's a little bit different than, say, the

24  Airline or the France.   Those we actually deployed

25  out and had a protest, but we might have people in

1    an area just in case something happens.

2        Q.    I guess in terms of when you have had to

3    deploy in response to a protest where there were

4    people actively protesting in public areas or

5    elsewhere, about how many times has that occurred?

6        A.    Golly.  There has been a couple now that

7    I'm thinking about.  When they were going to take

8    the monuments down in New Orleans, we had some

9    people there.  I've been in New Orleans a couple of

10   different times for some possible protests.  There

11   has been a couple times -- I forgot.  Something at

12   the Capitol.  Like I said, we just had people

13   there, but we didn't have to actually do anything.

14   I would hate to even put a number on it.

15       Q.    I can appreciate that.  Just one follow-

16   up question about the Jena protest.  Do you

17   remember participating in any arrests or detentions

18   during your deployment at the Jena protest?

19       A.    At the Jena protest.  I think there was

20   one arrest made.  I'm pretty sure it was Sister

21   Krystal, I think, but I'm not a 100 percent sure.

22       Q.    Do you know, did you participate in

23   making that arrest of Sister Krystal back during

24   the Jena protest?

25       A.    No.

1      Q.   I think you referenced just now the

2  protest at the Capitol.  Was that a protest at the

3  Capitol in 2016?

4      A.   No.  It's been since then.  It was

5  something about maybe a pipeline or people thought

6  some of the industries down in South Louisiana was

7  causing people cancer, and so I think they were

8  having some kind of protest, rally, at the Capitol,

9  if I remember it.

10      Q.   I heard your testimony earlier today that

11  you did not arrest or detain anyone at the Baton

12  Rouge protests in July of 2016 except for the

13  arrest of Sister Krystal.

14      A.   I didn't do that.  I just told -- as we

15  were approaching, she had a loudspeaker.  She was

16  trying to get everybody excited.  I told Sergeant

17  Dennis, I said, "When you get up there, we need to

18  grab her first."

19      Q.   Did you tell him that just by pulling him

20  aside and verbally telling him that or did you use

21  a hand signal or tell him on the radio or anything

22  like that?

23      A.   I'm sure I just eased up beside him and

24  said something to him.

25      Q.   Now I have just a couple of questions

1     about July 9th specifically.  Do you remember who

2     you reported to on July 9th?  Who would have been

3     directly above you in the chain of command?

4          A.    Beau Comeaux.

5          Q.    I know you said that Lieutenant Comeaux

6     on the 9th was located at the Tactical Operations

7     Center.  Do you remember receiving orders from

8     Lieutenant Comeaux as you were on the ground at

9     Airline?

10         A.    I don't know that once we got out on

11    Airline that I received any orders from him.  I'm

12    not saying I didn't talk to him.  Maybe after

13    things had settled down we may have talked, but

14    once, you know, you get out there on the line, it's

15    pretty loud.  It would have been hard to talk to

16    him.  When I say we didn't, I don't recall.

17         Q.    Did you receive orders, I guess, before

18    you went out from Lieutenant Comeaux?

19         A.    So there would have been a discussion as

20    to -- at what point are we going to actually go

21    out, and it would have been if they, obviously, if

22    they're tearing stuff up, hurting people, or doing

23    anything like that, or if they are blocking -- you

24    know, what's Airline?  US-61, I think.  If they're

25    obstructing US-61, then we'll have to go out and

1    handle something.

2         Q.   While you were on Airline on July 9th, do

3    you remember sort of like how far up Airline you

4    traveled?

5         A.   No, ma'am.

6         Q.   I guess going back to the arrest of

7    Sister Krystal, I know you said she was -- she had

8    people beside her who may have had guns.

9         A.   Oh, they had guns.  They had shotguns.

10        Q.   What was the reason for arresting her

11   specifically on the 9th?

12        A.   Well, she was, like I said, she was out

13   in the middle of the road, walking down the middle

14   of US-61 with a loudspeaker trying to incite

15   people, trying to -- you know, we need to get them.

16   You know, we need to stop -- I don't remember

17   exactly what she said.  I would hate to say she

18   said this, and she didn't, but she was basically

19   kind of inciting, trying to get everybody stirred

20   up.

21        Q.   Moving on to the next day, to Sunday,

22   July the 10th.  I know you said earlier that you

23   reported to Lieutenant Comeaux on the 10th as well.

24   I'm wondering in terms of sort of the coordination

25   of movements and the staging of lines around East

1   and France, what is your understanding of who was

2   in charge of all of that? Was it Lieutenant

3   Comeaux?  Was it someone from BRPD?

4        A.   So, obviously, we would have been in

5   charge of the state police, but it was a joint

6   effort, and, to be honest with you, who exactly

7   talked to Baton Rouge PD and East Baton Rouge PD

8   and Calcasieu SO, that was above my level.  I just

9   know they said y'all got to come down Francis and

10  hold the line there until we get other people in.

11  That's as far as -- I don't know if I answered your

12  question or not.

13       Q.   I think so.  When you said that they said

14  y'all have to come down France and hold the line

15  there until other people come in, were you

16  referring to the Baton Rouge Police Department when

17  you said they or were you referring to Lieutenant

18  Comeaux and other --

19       A.   No.  We came down Francis Street, and if

20  you look at Francis, without somebody on -- what's

21  it, East Boulevard?  If we had just moved down East

22  Boulevard, they could have went straight sideways

23  and come back in behind us, so we had to wait.  And

24  they being the other law enforcement agencies to

25  get there.  We were kind of at a position where we

1    couldn't really move forward.

2         Q.   When you were stationed -- I think we

3    looked at a couple of pictures earlier that

4    Mr. Most brought up of where state troopers were

5    staged at East and France.  Do you remember being

6    staged in that group of troopers that was facing

7    the house in the yard at 602 East Boulevard where

8    the protesters were?

9         A.   Yeah.  I was there with other troopers.

10        Q.   We saw in some of those videos when the

11   approach to the yard began.  Do you know who gave

12   the order to begin the approach?

13        A.   It would have been Lieutenant Comeaux.

14        Q.   We've seen in some of the other videos

15   that LSP troopers started to move forward at the

16   same time as the other law enforcement agencies.

17   BRPD was moving forward at the same time,

18   Calcasieu.  Can you tell me who gave the overall

19   order that everyone should move forward?

20        A.   I don't know if there was -- like I said,

21   that would have been above me.  I don't know that

22   there was.  More than likely, when we started

23   moving, I would think they were probably just

24   reacting.  Not saying that they weren't.  Above us

25   they may have been talking, hey, when state police

1    moves, y'all move with them.  I don't know.  But
2    from my view, I was moving the team, and those
3    other two agencies were coming in.  I don't know
4    who organized all of that.
5        Q.   I'm going to pull up a picture now.  This
6    is going to be Exhibit 6.  Here we go.  This is
7    just another view.  My understanding is it's
8    another view of the same viewpoint that you looked
9    at with Mr. Most earlier.  Is this generally the
10   area that you remember staging in?
11       A.   Yes, ma'am.
12       Q.   Where would you have been located when
13   you were staging in relation to the other troopers
14   in this picture?
15       A.   So depending on what is going on here.
16   Ideally, when we're moving, I try to stay in the
17   middle, but if we're staging here, and we're not
18   moving, then I may have stepped back and talked to
19   Lieutenant Comeaux.  I may not even be in that
20   picture.  I could have been talking to somebody
21   else or trying to get some information, doing
22   whatever, or  I could be standing -- like I said, I
23   could be standing right there in the middle of it.
24   But, typically, my position would be in the middle.
25       Q.    I think you said when you move the line

1    forward, you typically stand in the middle at that

2    point.  Can you tell me what you mean by the

3    middle? Do you mean like --

4         A.   Yes.  Like -- yeah.  So let's say you've

5    got 15 troopers.  I'm just using that for an odd

6    number.  I would have probably been in that seven,

7    eight area.  Kind of dead middle of the line.

8         Q.   At the front of the line is where you

9    would be located?

10        A.   No.  So I would be -- so if you see on

11   your left, you see the SWAT guy there in the green?

12   Okay.  Right there.  Go back to your right just a

13   little bit.  You see that SWAT guy? Now, if you

14   look -- it's kind of hard to see, but if you look

15   to his left, you can just see a shoulder patch.

16   That right there.  More than likely, that is either

17   a squad leader or somebody on the arrest team.

18             So you got your line of troopers up front

19   that's got the -- you can see with the face

20   shields.  They are up and all of that.  Behind them

21   is going to be squad leaders and arrest team, and

22   there will be some SWAT guys mixed in there, and

23   then, typically, I would be even farther behind

24   that.

25        Q.   So would you say you are maybe about

1   three rows back from the front of the line when the

2   line moves forward?

3        A.   Probably in that area, you know.  There

4   is no fixed position that I have to be in.  I just

5   have to be where I can effectively relay the

6   information to my squad leaders.  If I know

7   something is happening on the right side, and I

8   need to walk down to speak to those squad leaders,

9   then, obviously, I would walk down there.

10       Q.   Can you tell me a little bit about why

11  the arrest team is second in line from the front

12  here?

13       A.   Well, you've got your front line.  I

14  mean, it's just -- you wouldn't have your arrest

15  team out front.  The line is going to move up, and

16  if you see somebody that has to be arrested, the

17  front line guys are going to separate a little bit.

18  The arrest team and SWAT guys are going to come

19  through the line, and they are going to effect an

20  arrest.  It may be that they grab the people up and

21  walk them back through, or they may just hold them

22  right there.  We may move the line past them.

23       Q.   If everything is happening according to

24  how troopers are trained, as the line moves up, the

25  front of -- the people in the front of the line

1    will identify who needs to be arrested, and then

2    they -- then the arrest team at that point comes

3    through and arrests whoever has been identified by

4    the front line?  Is that accurate?

5         A.   No, that's not.  The squad leader is

6    going to -- you don't want your front guy, because

7    if -- let's just say you take those first three

8    guys, and they go over, and they arrest somebody.

9    Well, then you've basically got a hole in your line

10   where anybody could walk through.  It would be a

11   big security problem.  So your front guys on your

12   line typically don't do any arresting.  If we get

13   up to somebody or a situation, they'll stop.  We'll

14   spread the line out a little bit.  The arrest team

15   will come through the line with the SWAT guys.

16   They'll make the arrest.  Like I said, they will

17   either bring them back through the line or we will

18   move the line past them.

19        Q.   And does the front line identify for the

20   people behind them who should be arrested?

21        A.   No.  Again, that's -- more than likely,

22   that's going to be a squad leader.  Now, within

23   reason, if this front guy on the end is sitting

24   there, and somebody comes up and punches him or

25   hits him, well, yeah, he is probably going to take

1    that action.  I hope that it wouldn't happen, but,
2    if it does, we're going to try -- you know, we're
3    going to try to move the arrest team out prior to
4    it, and the squad leader and that platoon leader,
5    hopefully, they will see the problem and let the
6    squad leader send the arrest team out or maybe the
7    SWAT guy.  The SWAT guy may see something that
8    somebody else doesn't see, so he would tell the
9    squad leader, hey, that guy over there with the
10   green baseball cap, he has done this, this, or
11   this, and then they would send the team forward.
12        Q.   And earlier there was a discussion about
13   incidents where a person had thrown either a water
14   bottle or a brick during the time that people were
15   located at East and France.  When that happened,
16   did you ever see any law enforcement officers
17   trying to identify or go arrest the specific person
18   who threw that item?
19        A.   You know, I remember seeing the rock or
20   the little piece of brick or the brick thrown
21   through the air.  I never saw who threw it.  I feel
22   if one of my squad leaders or one of the guys on
23   the line would have said, hey, that guy in that red
24   shirt right there just threw the brick, then we'd
25   probably -- you know, it depends on how far it was.

1    If he is 30 yards away, then we're not going to be
2    able to send the team.  You would have to move the
3    whole line up there and then send an arrest team
4    out to get him.  Not saying they weren't trying to
5    identify him, but if you didn't see it.  If you
6    have five people in front of you, and you throw the
7    brick over their heads, you are probably not going
8    to be able to identify who threw it.
9         Q.   So the instances where you did see people
10   throw things, you didn't see Baton Rouge Police
11   Department or anyone else go in and try to detain
12   that individual?
13        A.   I couldn't put the two together.  I know
14   there was one time when some Baton Rouge officers
15   did break the line and go in front, but I could not
16   tell you what for or who they were.
17        Q.   In terms of when the line was moving
18   forward, approaching the yard of protesters, I know
19   you said that you were a couple of rows -- a few
20   rows back, probably towards the middle.  As the
21   line approached the yard, did you stay in that
22   location or do you remember --
23        A.   I don't remember.
24        Q.   Did you move with the line into the yard
25   at 602 East?

1      A.   I couldn't answer you if I went in the

2  yard or not.

3      Q.   But you saw other troopers move forward

4  into the yard as they began approaching protesters?

5      A.   Yes, ma'am.

6      Q.   What is your understanding of what the

7  probable cause was for the detention and arrest of

8  protesters who were located inside the yard?

9      A.   You know, I don't recall specifically,

10  but, obviously, they didn't leave when they had

11  been told to.  As far as all of the -- whatever

12  decision was made by the command staff of what to

13  charge them with or Baton Rouge PD, I was not part

14  of that.

15      Q.   When the line moved forward and

16  approached and entered the yard, you saw other

17  troopers from your platoon making detentions of

18  protesters in the yard; is that accurate?

19      A.   Okay.  Yes, I did see troopers detaining

20  people, if that's what you're asking.

21      Q.   Did you see -- I think we have discussed

22  that Mark Dennis was there that day.  Do you

23  remember seeing Kory York as part of this group of

24  troopers that day?

25      A.   I'm sure Kory was there.  I remember Kory

1    being there.

2         Q.    Do you recall seeing Kory York and

3    Sergeant Dennis detaining protesters?

4         A.    Specifically, no, ma'am.

5         Q.    After the line of officers approached and

6    entered the yard -- sorry, troopers.  Did you stay

7    at the intersection of East and France or do you

8    remember moving on down France Street?

9         A.    I mean did we stop for a little bit?  I

10   think we did, but did I keep moving -- the end

11   result was we kept moving them down France Street.

12   As far as did I stop, I mean, yeah.  I mean, we

13   we're moving back and forth.  You stop, move, stop,

14   move, stop, move.

15        Q.    I only have a couple more questions.  I'm

16   going to show you a series of videos.  The first

17   one is going to be Exhibit 7.  Basically, as we

18   look through Exhibit 7, it's about two minutes

19   long.  I'm just going to ask you whether you

20   recognize any of the troopers who are present.

21        A.    Are you going to be able to stop it?

22        Q.    Yes.  So what I will ask you to -- I'm

23   going to stop it at intervals, but if you see

24   people, if you do recognize them, please call it

25   out so I can stop it, if you see someone before I

```
 1   do.
 2                    {VIDEO PLAYED}
 3   BY MS. LOMMERS-JOHNSON:
 4        Q.   I'll stop there.  I know it was a little
 5   bit far away.  Did you recognize anyone?
 6        A.   There is no way I can tell you 100
 7   percent who that is.
 8        Q.   I'll keep it going.
 9                    {VIDEO PLAYED}
10   BY MS. LOMMERS-JOHNSON:
11        Q.   Could you recognize anyone in that clip?
12        A.   No, ma'am.
13        Q.   I'll continue.
14                    {VIDEO PLAYED}
15   BY MS. LOMMERS-JOHNSON:
16        Q.   Could you recognize that trooper?
17        A.   No, ma'am.
18                    {VIDEO PLAYED}
19   BY MS. LOMMERS-JOHNSON:
20        Q.   I'm going to move now to Exhibit 8.  Can
21   you see Exhibit 8 up on my screen now?
22        A.   Yes, ma'am.  It's the back of two police
23   officers.
24        Q.   Perfect.  This one, just for the record,
25   is also Exhibit 8 for today's deposition, and,
```

```
 1    also, in the continuing alphabetical list it's six
 2    Ps.  If there is no objection, I'm going to advance
 3    this video to a minute 50 about.
 4                    {VIDEO PLAYED}
 5    BY MS. LOMMERS-JOHNSON:
 6         Q.   Can you recognize anyone in this video
 7    clip that I just played?
 8         A.   No, ma'am.
 9         Q.   I will continue just about 30 seconds.
10                    {VIDEO PLAYED}
11    BY MS. LOMMERS-JOHNSON:
12         Q.   And that was a little bit hard to see,
13    but let me play just that clip again so I can see
14    if any of these troopers look familiar to you.
15                    {VIDEO PLAYED}
16    BY MS. LOMMERS-JOHNSON:
17         Q.   Were you able to tell who those troopers
18    were?
19         A.   I did see a backpack that had H. Newell
20    on it.  That would have been Herman Newell.  I
21    visually couldn't see his face, but I can't imagine
22    why somebody else would have Herman Newell's
23    backpack on, but as far as being able to physically
24    look at him and say, no, but that was his back-
25    pack.
```

1      Q.   I'll play this one just a little bit
2  further.
3                   {VIDEO PLAYED}
4  BY MS. LOMMERS-JOHNSON:
5      Q.   Now I'm going to move on to Exhibit 9.
6  This is going to be our last video exhibit.  Can
7  you see it up on my screen now?
8      A.   Yes, ma'am.
9      Q.   This one is relatively short.
10                  {VIDEO PLAYED}
11 BY MS. LOMMERS-JOHNSON:
12     Q.   I realize it is kind of quick, but did
13 you see anyone you recognized in either of those
14 clips?
15     A.   No, ma'am.
16                  {VIDEO PLAYED}
17 BY MS. LOMMERS-JOHNSON:
18     Q.   Can you see anyone that you recognize
19 there?
20     A.   No, ma'am.
21                  {VIDEO PLAYED}
22 BY MS. LOMMERS-JOHNSON:
23     Q.   Do you recognize any of those troopers?
24     A.   No, ma'am.
25                  {VIDEO PLAYED}

1   BY MS. LOMMERS-JOHNSON:

2        Q.   I apologize.  I did unintentionally lie.

3   I have one more video to show you, and that will be

4   the last one.  Here we go.  So this is going to be

5   -- once I get it up, this one will be Exhibit 10.

6   Can you see this video on my screen?

7        A.   Yes, ma'am.

8        Q.   Perfect. I'm going to start playing from

9   44 seconds here.

10                   {VIDEO PLAYED}

11  BY MS. LOMMERS-JOHNSON:

12       Q.   Do you recognize anyone that you've seen

13  thus far in this clip?

14       A.   No, ma'am.  No, ma'am.

15       Q.   I'll play it a little bit more.  I'm also

16  curious whether you remember being located in this

17  area on July 9th?

18       A.   If that's Airline Highway, I'm there

19  somewhere.

20       Q.   Would you be able to say that you were

21  located in the same general vicinity as these

22  troopers or did you all split up at times?

23       A.   So I don't know how to answer that. There

24  was a line across Airline, if I'm thinking right,

25  and so I would have been somewhere along that line.

1    As far as splitting like somebody going to the

2    north side and somebody going to the south side,

3    that didn't happen.  We stayed together in a line.

4         Q.   That is helpful.  I appreciate that.  I'm

5    going to keep playing.  So now we're at the 56

6    second mark.

7                    {VIDEO PLAYED}

8    BY MS. LOMMERS-JOHNSON:

9         Q.   I'm actually going to dial it back,

10   because I didn't pause it in time.  I'm wondering

11   if you recognize the troopers who were flanking the

12   man who was being detained in this video?

13        A.   They were what, ma'am?  They were doing

14   what?

15        Q.   I just said flanking.

16        A.   Oh, flanking.  I thought you said

17   slinking.  I don't recognize anybody in that

18   picture.

19        Q.   Let me go back a little bit just to make

20   sure I'm showing you all of this.  Okay.  You don't

21   recognize these troopers?

22        A.   No.  With goggles on and a face shield,

23   there is no way.

24        Q.   Do you think that they -- that given that

25   you don't recognize them, would you guess that they

```
1    were not in your platoon or could they be in your
2    platoon and --
3         A.   They could very much be in my platoon.
4    It's just, you know, with glasses on and a shield
5    across their face and the whole -- you know, there
6    is no way I could positively identify them.
7              MS. LOMMERS-JOHNSON:
8                   I'm going to stop sharing Exhibit 10
9              and just request a very brief
10             two-minute break so that I can check in
11             with other attorneys.
12             MR. MOST:
13                  I have just few follow-up questions.
14             Do you want me to just do those while
15             you are talking to your team?
16             MS. LOMMERS-JOHNSON:
17                  Yeah.  That's perfect.
18             MR. MOST:
19                  That might be most efficient. Will
20             you give me the host permission while
21             you do that?
22             MS. LOMMERS-JOHNSON:
23                  Yes.
24   BY MR. MOST:
25        Q.   Looking at Exhibit C.  We looked at this
```

1   before.  This was the affidavit of Raae Pollard

2   where you testified that whatever officer signed

3   this, because the contents of it were not totally

4   truthful, was filing a false report and had

5   violated due process rights, right?

6        A.   Yes, sir.

7        Q.   I just want to see if that's also true

8   for some other very similar Affidavits of Probable

9   Cause. On Page 2 of Exhibit C, we see an Affidavit

10  of Probable Cause for Samantha Nichols.  You can

11  see it's got some of the same problems we

12  identified as the previous one.  It says 9000

13  Airline Highway.  It talks about the same

14  announcements made out loud that you testified

15  didn't match your recollection. Would your answers

16  be the same for this affidavit, that if this person

17  was arrested in the same area as Ms. Pollard, then

18  this, too, would be whoever signed this was filing

19  a false police report and violating the due process

20  rights of Samantha Nichols?

21       A.   There are definitely mistakes, so I guess

22  just to clarify, if they're just not paying

23  attention, and they just inadvertently made a

24  mistake and put Airline Driveway instead of

25  Francis, I don't know if -- but if they are using

1   something, say it was pre-made two days before and

2   just didn't take the time to change it, then there

3   might be a problem there, if you understand what

4   I'm saying.  You might be typing something and say

5   I was on Francis Street, but, ooh, wait a minute.

6   That was a mistake.  I really was on Airline, if

7   you understand what I mean. Just to clarify it.

8        Q.   I do.  So if this was preprinted in

9   advance, then signing this document would be filing

10  a false police report, right?

11       A.   I would have -- if it would have been me,

12  I would have read over it, but, yeah.  If he didn't

13  take the time to fill it out and make sure it was

14  correct, then, yes, sir, there is a problem there.

15       Q.   So it would be filing a false police

16  report if --

17       A.   Yes, sir.

18       Q.   And it would be a violation of Samantha

19  Nichol's due process rights?

20       A.   Yes, sir.

21       Q.   That would be true -- I'm moving down to

22  Page 4.  Alexis Cheney.  You see that this has the

23  same issues, 9000 Airline Highway.  The verbal

24  orders that we discussed and other problems.  Your

25  answers would be the same for this one as well?

1    A.   Yes, sir.

2    Q.   Blair Brown.  This one has 9000 Airline

3  Highway crossed out, but everything else appears to

4  be the same.  Would your answers be the same for

5  this one as well?

6    A.   So what is the difference?  He is saying

7  that the -- allowed to remain on the property, like

8  -- yes, sir.

9    Q.   So your answers would be the same

10  regarding false report and due process violation

11  here?

12    A.   Yes, sir.

13    Q.   Karen Savage.  Same answers for this one?

14    A.   They also corrected that on there, too,

15  on East Road, yes, sir.

16    Q.   So this one, if this was a preprinted

17  affidavit, would be a -- whoever signed it would be

18  filing a false report and a due process violation,

19  correct?

20    A.   Yes, sir.

21    Q.   I could go through more, but would your

22  answers be the same for similar affidavits?

23    A.   If they're similar, yes, sir.

24         MR. MOST:

25              Those were my follow-up questions.

```
 1              Hannah, do you have more?
 2          MS. LOMMERS-JOHNSON:
 3              Yeah.  Just a couple more.
 4    BY MS. LOMMERS-JOHNSON:
 5      Q.   Does Mobile Field Force do after action
 6    deployment reports?
 7      A.   Correct.  Yes, ma'am, we do.
 8      Q.   Do you remember the after action report
 9    for the deployment in Baton Rouge?
10      A.   I remember going to -- I'm sorry.  Did I
11    cut you off?
12      Q.   No.  I just realized I didn't specify for
13    2016.
14      A.   I follow you.  So I do remember having a
15    meeting and having an after action review, however
16    you want to word it.  As far as being a part of
17    actually typing it up and submitting it, no, I
18    didn't have anything to do with that.  I was in the
19    group discussion, kind of what went well, not so
20    well.  That is kind of what the after action is.
21    We talk about what went well, what we need to
22    change and all of that.  As far as who wrote it up
23    and submitted it, it wasn't me.
24      Q.   Do you remember who the other
25    participants were of that discussion that you had,
```

1    the after action discussion?

2         A.    Shoot.  I know Lieutenant Comeaux was

3    there.  I feel like Sergeant Clay Revis was there.

4    I don't remember if any of the other platoon

5    leaders or squad leaders were there for sure.  I'm

6    sure there were some people on the SWAT side there.

7    Maybe Lieutenant -- maybe he was a sergeant then,

8    Jody Hasselbeck.  Major Schexnayder I would think.

9    Specifically, I think I remember those.  As far as

10   I know, there were other people there, but I could

11   not sit there and tell you exactly who was part of

12   it.

13        Q.   Do you remember what some of the topics

14   were that were discussed?

15        A.    Probably some tactical stuff.  How do we

16   move.  What could we have done better here.  How do

17   we get from Point A to Point B.  We now have our

18   own arrest process team.  I don't know if that was

19   something that came out of there or not.  Man, I

20   just about -- I don't.

21        Q.   Do you remember any problems that you

22   identified during the Baton Rouge protests in 2016

23   that you have brought up at that after action

24   discussion?

25        A.    The biggest thing that I remember was

1    communication, and we're still working on that.

2    When you are out there on the line, and, you know,

3    everybody is yelling and screaming.  Even if you've

4    got the LRAD, it's hard for me to communicate back

5    to the top or even maybe to one of my squad

6    leaders.  I think that was probably one of the

7    biggest things that bothered me, how to communicate

8    with my people.

9         Q.   One last question.  I guess in terms of

10   the people who were present in Exhibit 10 -- I'll

11   just share my screen.  Oh, wait.  I can't share my

12   screen anymore, but Exhibit 10 was the last video

13   that I showed you with the man in the white T-shirt

14   on Airline who was being arrested.  I guess do you

15   -- from the documents that were present back then

16   or the people that were present back then, do you

17   know how we would obtain a list of the troopers who

18   were present in that area on Airline?

19        A.   I would start with the state police.  So

20   I would probably contact maybe Sergeant Steve

21   Hammons or maybe Larry Badeaux.  He took over after

22   Beau.  And Beau may still have access to it.

23   Lieutenant Comeaux may still have access to it. I'm

24   sure it's on file somewhere.  Just to be honest, to

25   point you in that direction.  One of those three

```
 1   would probably at least answer your question for
 2   you.
 3              MS. LOMMERS-JOHNSON:
 4                   I appreciate it.  I don't have
 5                anything further, but thank you for
 6                your patience today.  Now I don't know
 7                if --
 8              MR. FAHRENHOLT:
 9                   William, do you have anything else?
10              MR. MOST:
11                   I don't. It looks like we don't have
12                Joe with us anymore.
13              MR. FAHRENHOLT:
14                   I think he dropped off at some point
15                to go prep his witness.
16              MR. MOST:
17                   Well, he is not going to be asking
18                questions if he is not here.  Can we go
19                off the record?
20              MR. FAHRENHOLT:
21                   Sure.  I have no questions.
22                   [End of deposition, 1:30.]
23
24
25
```

```
 1                    WITNESS CERTIFICATE
 2
 3
 4
 5              I, LIEUTENANT JOHN CLARY, have read
 6    or have had the foregoing testimony read to me
 7    pursuant to Rule 30(e) of the Federal Rules of
 8    Civil Procedure and do hereby certify that to the
 9    best of my ability and understanding, it is a true
10    and correct transcription of my testimony.
11
12
13    Please check one:
14
      _____Without corrections
15
16
      _____With corrections (see errata sheet)
17
18
19
20    _____        _____
      LIEUTENANT JOHN CLARY                 Date
21
22
23
24
25
```

1               C E R T I F I C A T E

2

3                This certification is valid only for
a transcript accompanied by my original signature
4 and original required seal on this page.

5                I, SANDRA P. DIFEBBO, Certified
Court Reporter, in and for the State of Louisiana,
6 as the officer before whom this testimony was
taken, do hereby certify that LIEUTENANT JOHN
7 CLARY, after having been duly sworn by me upon
authority of R.S. 37:2554, did testify as
8 hereinbefore set forth in the foregoing 154 pages;

9                That the testimony was reported by
me in stenotype, was prepared and transcribed by me
10 or under my personal direction and supervision, and
is a true and correct transcript to the best of my
11 ability and understanding;

12                That the transcript has been
prepared in compliance with transcript format
13 guidelines required by statute or by rules of the
board, that I have acted in compliance with the
14 prohibition on contractual relationships as defined
by Louisiana Code of Civil Procedure Article 1434
15 and in rules and advisory opinions of the board;

16                That I am not related to Counsel or
to the parties herein, nor am I otherwise
17 interested in the outcome of this matter.

18

19

20

21 _____
Sandra P. DiFebbo,
22 Certified Shorthand Reporter

23 Date:  _____

24

25

SOUTHERN COURT REPORTERS, INC.
(504)488-1112