UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


BLAIR IMANI, et al.                    DOCKET NO.

        Plaintiffs,              17-cv-00439JWD-EWD

    V.


CITY OF BATON ROUGE, et al.

        Defendants.



        DEPOSITION OF CORPORAL ALAINA MANCUSO,
given in the above-entitled cause, via Zoom
videoconferencing, pursuant to the following
stipulation, before Sandra P. DiFebbo, Certified
Shorthand Reporter, in and for the State of
Louisiana, on the 24th day of June 2021, commencing
at 1:30 PM.

```
 1   APPEARANCES (Via Zoom):
 2   REPRESENTING THE PLAINTIFFS:
     (Imani v. City of Baton Rouge)
 3
              MOST & ASSOCIATES
 4            BY:  DAVID LANSER,
              ATTORNEY AT LAW
 5            201 St. Charles Avenue
              Suite 114 #101
 6            New Orleans, Louisiana  70170
 7   REPRESENTING THE PLAINTIFFS:
     (Smith v. City of Baton Rouge)
 8   (Batiste-Swilley v. City of Baton Rouge)
     (Tennart v. City of Baton Rouge)
 9
              MACARTHUR JUSTICE CENTER
10            BY:  ERIC FOLEY, ATTORNEY AT LAW -and-
              HANNAH LOMMERS-JOHNSON, ATTORNEY AT LAW
11            -and- MANDISA MOORE-O'NEAL,
              ATTORNEY AT LAW
12            4400 S. Carrollton Avenue
              New Orleans, Louisiana  70119
13
     REPRESENTING THE CITY/PARISH OF BATON ROUGE AND
14   BATON ROUGE CITY POLICE OFFICERS:
15            EAST BATON ROUGE PARISH ATTORNEY'S OFFICE
              JOSEPH K. SCOTT,
16            ATTORNEY AT LAW
              Suite 902
17            222 St. Louis Street
              Baton Rouge, Louisiana  70802
18
     REPRESENTING THE LOUISIANA STATE POLICE AND
19   INDIVIDUAL STATE POLICE TROOPERS:
20            BURGLASS & TANKERSLEY, LLC
              BY:  GREGORY FAHRENHOLT,
21            ATTORNEY AT LAW
              5213 Airline Drive
22            Metairie, Louisiana  70001-5602
23
24   Reported By:
25            Sandra P. DiFebbo, CSR
26
```

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

3

```
 1   E X A M I N A T I O N          I N D E X

 2

 3                                      Page

 4   BY MR. LANSER:                     5

 5   BY MS. LOMMERS-JOHNSON:            65

 6   BY MR. SCOTT:              96

 7

 8

 9   E X H I B I T              I N D E X

10                        Page

11

     Exhibit 1(C)                       10
12   Exhibit 2(B)                       24
     Exhibit 3(LL)                      30
13   Exhibit 4(IIIIII)                  35
     Exhibit 5(E)                       40
14   Exhibit 6(JJJJJJ)                  45
     Exhibit 7(KKKKKK)                  46
15   Exhibit 8(LLLLLL)                  49
     Exhibit 9(DDDDDD)                  52
16   Exhibit 10(A)                      57
     Exhibit 11(MMMMM)                  60
17   Exhibit 12(NNNNNN)                 65
     Exhibit 13(OOOOOO)                 69
18   Exhibit 14(PPPPPP)                 70
     Exhibit 15(QQQQ)                   72
19   Exhibit 16                         73
     Exhibit 17                         74
20   Exhibit 18(HHHH)                   74
     Exhibit 19                         77
21   Exhibit 20                         81
     Exhibit 21                         82
22   Exhibit 22                         87
     Exhibit 23                         90
23   Exhibit 24                         94

24

25
```

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

```
 1            S T I P U L A T I O N

 2

 3            It is stipulated and agreed by and

 4   between Counsel for the parties hereto that the

 5   deposition of CORPORAL ALAINA MANCUSO is hereby

 6   being taken pursuant to the Federal Rules of Civil

 7   Procedure for all purposes in accordance with law;

 8            That the formalities of reading and

 9   signing are specifically reserved;

10            That the formalities of sealing,

11   certification, and filing are hereby specifically

12   waived.

13            That all objections, save those as to

14   the form of the question and responsiveness of the

15   answer are hereby reserved until such time as this

16   deposition or any part thereof is used or sought to

17   be used in evidence.

18                    * * * * *

19            Sandra P. DiFebbo, Certified Shorthand

20   Reporter, in and for the State of Louisiana,

21   officiated in administering the oath to the witness

22   via Zoom.

23

24

25
```

1      CORPORAL ALAINA MANCUSO, having been first
2    duly sworn, was examined and testified on her
3    oath as follows:
4          MR. LANSER:
5              Good afternoon, Officer Mancuso.
6          First off to Mr. Scott.  Can we quickly
7          stipulate that the deposition is
8          properly noticed and the court reporter
9          is duly qualified?
10         MR. SCOTT:
11             Yes.
12         MR. LANSER:
13             And stipulate to the remote swearing
14          and all of that?
15         MR. SCOTT:
16             Yes.
17         MR. LANSER:
18             Fantastic.
19   EXAMINATION BY MR. LANSER:
20      Q.   Officer Mancuso, can you just speak and
21   spell your name for the record, please.
22      A.   Alaina Mancuso.  A-L-A-I-N-A,
23   M-A-N-C-U-S-O.
24      Q.   Thank you.  My name is Dave Lanser.  I'm
25   one of the attorneys for the plaintiffs in the

1    Blair Imani suit.  Some attorneys from a couple of

2    the other lawsuits are here that may have some

3    questions for you later.  What is your current rank

4    at the Baton Rouge Police Department?

5         A.    Corporal.

6         Q.    Are you in a particular division there?

7         A.    I work in the NIDA Division.

8         Q.    What is that?

9         A.    It is firearms and ballistics.

10        Q.    Have you ever given a deposition before?

11        A.    I have.

12        Q.    Approximately how many depositions have

13   you given?

14        A.    One.

15        Q.    What sort of case was that?

16        A.    I don't remember all of them.  I just

17   know I had to come do something like this one time.

18   I don't remember what the case was.

19        Q.    Was it related to your job at BRPD?

20        A.    Yes.

21        Q.    Do you know, was it like a personal

22   injury thing or it had to do with --

23        A.    I really don't remember.  It's been many

24   years ago.  Many, many.

25        Q.    Like more than ten years ago?

```
 1         A.    No, but I don't remember.
 2         Q.    We'll just go over the deposition basics
 3   so we'll have it on the record.  So do you realize
 4   you are under oath today?
 5         A.    Yes.
 6         Q.    And you realize your answers here have
 7   the same force as if they were in a courtroom with
 8   a judge and jury?
 9         A.    Yes.
10         Q.    Is there anything that would prevent you
11   from giving me your full attention today?
12         A.    No.
13         Q.    Is there anything that will prevent you
14   from understanding questions and answering them
15   fully throughout?
16         A.    No.
17         Q.    Have you ever been arrested before?
18         A.    No.
19         Q.    If at any point throughout this afternoon
20   you feel like you need to take a break, feel free
21   to let me know, and we can go and take a break.
22   One thing I will say is if we're in the middle of
23   answering a question, we may want to resolve
24   answering that question first, and then we can go
25   on the break after that.  Does that sound good?
```

1        A.    That's fine.

2        Q.    This is true any time we are in a

3    deposition but especially when we're doing it on

4    Zoom.  I'd ask just for the sake of the transcript

5    being created and for the court reporter's benefit,

6    if I ask a question, wait for me to finish before

7    you start answering.  I'll wait to ask a second

8    question until you are done answering the previous

9    one.  Does that sound good?

10        A.    Yep.

11        Q.    And if at any point you don't understand

12    a question, I'd prefer that you just ask for a

13    clarification or for me to restate it a different

14    way rather than trying to guess at what I'm trying

15    to get at.  Does that sound all right?

16        A.    Yes.

17        Q.    And, finally, just because it's Zoom and

18    we're not in the same room here, if anyone other

19    than Mr. Scott is in the room with you at any time,

20    can you just let us know, or tries to contact you

21    at any time throughout, just let us know if that

22    happens.  Okay?

23        A.    Okay.

24        Q.    Do you know which cases you are here for

25    today?

1        A.    The protest Downtown and off Airline, I

2    believe.

3        Q.    And you are talking about July 9th and

4    10th, 2016?

5        A.    Yes.

6        Q.    Did you review any documents to prepare

7    for this deposition?

8        A.    Yes.

9        Q.    Which documents did you review?

10        A.    My report, my training record, an IA

11    printout, and an arrestee rap sheet.

12        Q.    Did you take any notes to prepare for

13    this deposition?

14        A.    No.

15        Q.    When did you first start working for the

16    Baton Rouge Police Department?

17        A.    2007.

18        Q.    When you started in 2007, what was your

19    division assignment?

20        A.    I was a trainee in the training academy.

21        Q.    Between 2007 and 2016, what other

22    positions did you hold in the Baton Rouge Police

23    Department?

24        A.    Uniformed patrol officer and then

25    narcotics detective.

1      Q.    Do you remember the dates you started and
2   ended at narcotics?
3      A.    Started in '13, ended in '18.
4      Q.    So you were in narcotics during July of
5   2016?
6      A.    Yes, sir.
7      Q.    What was your rank as of July 2016?
8      A.    Corporal.
9      Q.    As a corporal in the Narcotics Division,
10  what were your day-to-day job responsibilities?
11     A.    Undercover purchases, CI, control buys,
12  surveillance, search warrants, in-house, report
13  writing.
14     Q.    What did you do prior to joining the
15  Baton Rouge Police Department?
16     A.    I was a waitress.
17     Q.    I'll jump right in and pull up a
18  document.  I'm going to attempt to share the
19  screen.  One second.  This is a document we
20  previously used in these depositions as Exhibit C.
21  For today it will be Exhibit 1. Have you seen this
22  type of document before?
23     A.    Yes.
24     Q.    Can you explain to me what it is?
25     A.    It's an Affidavit of Probable Cause that

1  we fill out when we're booking somebody in the

2  parish prison for the judge to review.

3      Q.   Is it necessary to have an Affidavit of

4  Probable Cause to arrest somebody?

5      A.   No.  Not if you are issuing them a

6  summons.

7      Q.   In what circumstances would you issue a

8  summons?

9      A.   Officer discretion depending on the

10 circumstance of the case and the crime committed.

11     Q.   But you need either an Affidavit of

12 Probable Cause or a summons to arrest somebody?

13     A.   Yes.

14     Q.   And it's --

15     A.   Or a warrant, actually.

16     Q.   Or a warrant.  So you need one of those

17 three documents, a summons, Affidavit of Probable

18 Cause, or a warrant to arrest somebody?

19     A.   Yes, sir.

20     Q.   You need to have one of those three in

21 order to lawfully process them into the jail; is

22 that correct?

23     A.   Yes.

24     Q.   So with the Affidavit of Probable Cause,

25 you filled out one of these before, I take it?

1      A.    Yes, sir.

2      Q.    You filled out many of these before?

3      A.    Yes, sir.

4      Q.    And it's my understanding that these are

5   made under oath in front of a notary public; is

6   that correct?

7      A.    In front of an ex-officiary notary, yes.

8      Q.    Great.  Who is supposed to fill these

9   documents out?

10      A.    Typically, the arresting officer or

11   sometimes somebody helping fill out paperwork will

12   fill in the gaps of the information, but as far as

13   the actual probable cause written, that little

14   synopsis part, that's the arresting officer.

15      Q.    So this synopsis of Probable Cause is

16   written by whoever arrested the individual at

17   issue?

18      A.    Whoever signs affiant right there.

19      Q.    So whoever signs affiant has to fill out

20   the synopsis of probable cause?

21      A.    Supposed to or sign that it's accurate.

22      Q.    What scenarios would exist where the

23   affiant would not be the person who wrote the

24   synopsis of probable cause?

25      A.    The only one I've ever had was protests.

1      Q.    Outside of a protest scenario, the

2  affiant would always be the person who wrote the

3  synopsis of probable cause or could at least attest

4  to the synopsis of probable cause?

5      A.    Yes.

6      Q.    How does that work?  You said it's

7  different for a protest. How does it work

8  differently during a protest?

9      A.    No, no.  It's the only time I have had

10  that situation occur. This specific protest.

11      Q.    This specific protest or --

12      A.    These, these.  These are the only

13  protests I've ever had to work, so it's the only

14  example I have of a protest.

15      Q.    Okay.  So for these protests, meaning

16  July 9th and 10th, 2016 specifically, how did --

17  what was the process for filling out these

18  Affidavits of Probable Cause?

19      A.    We didn't really fill out a whole bunch

20  of them ourselves at all, because I was actually in

21  the crowd getting people out of the street.

22      Q.    Do you know who did fill them out?

23      A.    I do not.

24      Q.    This one appears -- the synopsis always

25  appears to be typed.  Is that common or is that

1    something that would be handwritten usually?

2        A.   It can be either or.  It's pretty common

3    nowadays just because we have computers everywhere,

4    but it's not a hundred percent of the time a typed

5    affidavit, no.

6        Q.   Do you know if for July 9th and 10th, do

7    you know if these affidavits were drafted ahead of

8    or prior to the protests?

9        A.   Some of them were, yes.

10       Q.   Some of them were.  Okay.  Does this

11   appear to be one of those that would have been

12   printed out ahead of time?

13       A.   I can't speak to whether it was or

14   wasn't.  I have no idea what this is even about.  I

15   mean I know what it's about, but I don't know when

16   this arrest occurred if it was typed on scene or

17   not.

18       Q.   That's fine.  For the ones that were

19   printed ahead of time, do you know who drafted

20   those?

21       A.   No, sir.

22       Q.   Do you know who circulated them?

23       A.   No, sir.

24       Q.   If you don't mind, just take a few

25   seconds here.  Are you able to clearly read the

1   synopsis of probable cause on there?

2        A.   Yes, sir.

3        Q.   Do you mind just reading that to yourself

4   real quick and then let me know when you are done?

5        A.   I'm done.

6        Q.   Thank you.  Do you see at the bottom --

7   can you tell what day this Affidavit of Probable

8   Cause was signed?

9        A.   The 10th of July.

10       Q.   So this synopsis should refer to the July

11   10th protest?

12       A.   Yes.

13       Q.   Is this your signature under Affiant?

14       A.   No.

15       Q.   Do you know whose signature that is?

16       A.   I have no idea.

17       Q.   I'm assuming you're not the notary who

18   signed this?

19       A.   No, sir.

20       Q.   I also see some handwritten information

21   on top by defendant's name, race, sex, you know,

22   those sections.  Is that your handwriting?

23       A.   No, sir.

24       Q.   So that synopsis that you just read, is

25   this -- from your memory of July 10th, is this an

1    accurate synopsis to what occurred on July 10th at

2    the protest?

3         A.    What day was July 10th?

4         Q.    Sunday.

5         A.    No.

6         Q.    What is not accurate about it?

7         A.    The location. Sunday was Downtown, I

8    believe.

9         Q.    So looking at the synopsis, it says, "In

10   the vicinity of Baton Rouge Police Department's

11   Headquarters located at 9000 Airline Highway."  Was

12   that the location you are talking about?

13        A.    No.

14        Q.    What was that?

15        A.    No.

16        Q.    When you say the location is not

17   accurate, that's the location that you are saying

18   is inaccurate?

19        A.    Yes.  That's the location that's not

20   accurate, yes.

21        Q.    Got it.  Let's see.  It also mentions --

22   I'm looking.  I don't know if you can see my

23   cursor.  Right after that part, it says,

24   "Protesters assembled at provided parking areas and

25   in surrounded parking lots." Do you know if that

1    part is accurate?

2         A.    It's accurate for 9000 Airline.

3         Q.    But not accurate for the July 10th

4    protest?

5         A.    Not to my knowledge.

6         Q.    How about this next part?  "Protesters

7    were advised by loudspeaker to remain on private

8    property and on the curb."  Is that part accurate?

9         A.    Loudspeaker announcements were made at

10   both locations, yes.  Stay off the road and on

11   private property.

12        Q.    On July 10th, the protesters were told to

13   stay on private property via loudspeaker?

14        A.    To stay out of the roadway, yes.

15        Q.    So if someone had been standing on

16   private property and out of the roadway, they would

17   have been complying with those orders?

18        A.    As long as they were not in the roadway

19   at some point.

20        Q.    What do you mean by at some point?

21        A.    You can't go stand in the road and block

22   the traffic and then run to home base on somebody's

23   property.  It doesn't work like that.

24        Q.    If there had been a protester who had

25   been standing in the road and then was ordered out

1    of the road, and at that point walked onto private
2    property, would that be okay?
3         A.    For them to walk out of the roadway?
4         Q.    Yes.
5         A.    Yes.
6         Q.    Let's say there is a group of protesters.
7    Some of them are standing in the street and some of
8    them are not standing in the street.  Would they
9    all be considered noncompliant in that scenario?
10        A.    No.
11        Q.    So just the ones standing in the street
12   would be noncompliant?
13        A.    Correct.  As long as the ones in the yard
14   were (inaudible).
15             THE COURT REPORTER:
16                  What did you say?  I didn't hear
17               your answer.
18             THE WITNESS:
19                  As long as the ones that were
20               standing out of the street weren't at
21               one point in the street and then went
22               to out of the street.
23   BY MR. LANSER:
24        Q.    Let me stop sharing that for a minute
25   here.  Backing up a little bit.  I want to ask you

```
 1    a couple of questions about your training.  So you
 2    mentioned you trained in the Academy?
 3         A.   Yes.
 4         Q.   What sort of -- do you get continuing
 5    training every year on the job?
 6         A.   We get annual in-service training, yes.
 7         Q.   The topics that you cover in annual in-
 8    service training, are they the same every year or
 9    do they rotate?
10         A.   Some of them are the same.  Some of them
11    rotate.
12         Q.   Have you received any training
13    specifically about policing protest situations?
14         A.   Briefly in the Academy in '07, but that's
15    it.
16         Q.   So nothing since '07?
17         A.   Not that I can recall.
18         Q.   What about other large crowd scenarios?
19    Like how to police an LSU football game or
20    something like that?
21         A.   Not specific training for that.
22         Q.   So you, as a BRPD officer, have you ever
23    been assigned to working at LSU football or a
24    parade or that sort of thing?
25         A.   I have worked parades very, very
```

1    seldomly, and I've never worked an LSU football

2    game.

3         Q.    So for the parades, is there any sort of

4    specific training about how to deal with a large

5    crowd at a parade?

6         A.    No.  Only work your area, make sure there

7    is nothing going on, make sure nobody gets hurt, if

8    you can.  It's a parade.  They can't be in the road

9    in front of the parade.  I mean, things like that,

10   but it's not large crowd training of any kind, no.

11        Q.    Sure.  So instead of receiving prior

12   training, you just get to your assignment, you

13   circle up and get your orders from your supervisor?

14        A.    They give you your assignment, whatever

15   your location is, and that's where you work.

16        Q.    Were you ever trained on deescalation

17   procedures?

18        A.    Yes.

19        Q.    What sort of deescalation procedures were

20   you trained on?

21        A.    I don't exactly know what it's called,

22   but you try to deescalate the situation before you

23   have to use any kind of force, of course.

24        Q.    How would you try to deescalate a

25   situation?

1      A.    Try to talk people out of doing whatever
2  it is they decided they wanted to do.
3      Q.    Does the phrase "verbal judo" mean
4  anything to you?
5      A.    That's what people call it sometimes, but
6  that was an academy instructor's lingo, I guess.  I
7  don't know if it's an official thing or if that's a
8  lingo that he used.
9      Q.    I'm not sure either.
10     A.    Yeah.  I couldn't tell you.
11     Q.    Did you receive any deescalation training
12  outside of what we're referring to as verbal judo?
13     A.    No, sir.
14     Q.    Were you ever trained on specific rights
15  that a journalist might have?
16     A.    No.
17     Q.    Is it your understanding that a
18  journalist at a protest is part of the protest or
19  are they separate from the protest?
20     A.    I have no understanding one way or the
21  other.  Depends on what they're doing, I guess.  If
22  they're standing in a crowd with everybody else
23  there, they're part of the peaceful protest.  If
24  they're standing in the street, they are part of
25  standing in the street.  I've never distinguished

1    between the two.  We haven't been told one way or
2    another.
3         Q.    What sort of training did you receive on
4    use of force during an arrest?
5         A.    It depends on the circumstances, but use
6    the lowest possible use of force that you can use
7    to safely and effectively effect the arrest.
8         Q.    Were you trained on a duty to intervene
9    if you see another officer breaking the law?
10        A.    Yes.  I wasn't trained.  I was told we
11   had a duty.
12        Q.    What is your understanding of that duty?
13        A.    If someone is doing something they're not
14   supposed to be doing, even if they're law
15   enforcement, that I have a duty to step in and
16   prevent furthering of that and report depending on
17   the circumstances, obviously.
18        Q.    Would that include a constitutional
19   violation?
20        A.    Sure.
21        Q.    Would that include unlawful use of force?
22        A.    Yes, sir.
23        Q.    What if the officer was from a different
24   law enforcement agency?  Would that still apply?
25        A.    Yes.

1      Q.    Have you ever heard of the Supreme Court

2   case called Cox v. Louisiana?  Does that ring any

3   bells to you?

4      A.    No, sir.

5      Q.    So you don't recall --

6      A.    Not that I know.

7      Q.    It's a Supreme Court case about, I think,

8   a 1965 arrest of a Baton Rouge protester that was a

9   violation of their First Amendment rights.  Does

10  that ring any bells?

11     A.    No.

12     Q.    Let's move on to July 10th specifically.

13  Let me pull -- let's start with this.  What was

14  your -- so you were there as part of the Narcotics

15  Division on July 10th, correct?

16     A.    Yes.

17     Q.    What was your assignment on July 10th?

18     A.    To work the protest.

19     Q.    Was there more detail than that?  Did

20  that involve any specific tasks you were assigned

21  to do?

22     A.    Basically do what we were told.  Whatever

23  task they had at hand.  It was fluid throughout the

24  day, so it just depended on what was going on with

25  the Task Force.

page 24 header

```
 1        Q.    Who would have been giving you those
 2   instructions throughout the day?
 3        A.    Command or a supervisor of some sort.
 4   When you are a low man on the totem pole, you take
 5   orders from the uppers, no matter who it is.
 6        Q.    Throughout July 10th, there were multiple
 7   supervisors of people that gave you instructions?
 8        A.    Yes.
 9        Q.    I'm going to pull up another exhibit
10   here.  This one we've also previously used.  It's
11   been labeled Exhibit B, which for today's purposes,
12   I believe, would be Exhibit 2.  Can you tell me
13   what we're looking at here?
14        A.    A map.
15        Q.    This is a map of Downtown Baton Rouge?
16        A.    Correct.
17        MR. SCOTT:
18              Can you go up a little?
19        MR. LANSER:
20              Yeah.  Let me try.
21        MR. SCOTT:
22              We don't have the big screen today.
23   BY MR. LANSER:
24        Q.    Is that easier to see?
25        A.    Yes.
```

1          Q.    Were you stationed to a particular area
2     here on July 10th?
3          A.    Initially, I was up here by the
4     interstate.  Right here on France, South 10th.  All
5     that right in there.
6          Q.    You see where my cursor is?
7          A.    Yes.  Right in there.
8          Q.    So intersections of France and 10th,
9     Europe and 10th?
10         A.    Yeah.  A little bit north and south,
11    yeah.
12         Q.    France and 10th, is that also where the
13    processing station was?
14         A.    No.  I believe the processing was on
15    Government.
16         Q.    Government and 10th?
17         A.    Government.  Somewhere in there, yeah.
18         Q.    Did you have any interaction with the
19    officers at the processing station or protesters
20    there?
21         A.    Only dropping people off. I'm pretty sure
22    it was on Government Street.
23         Q.    Do you know approximately, just on July
24    10th, approximately how many people you might have
25    dropped off there?

1           A.    I have no idea.

2           Q.    More than five?

3           A.    Probably around there.  I don't know how

4      many.

5           Q.    Approximately five to ten, maybe?

6           A.    That I interacted with at the processing

7      or that I physically brought to the processing

8      myself?

9           Q.    That you brought to the processing

10     yourself.

11          A.    I couldn't tell you how many, honestly.

12     Five to ten would be an inaccurate statement,

13     because it might be less than that.

14          Q.    And if you are bringing someone to

15     processing, that means they are already under

16     arrest at that point?

17          A.    Yes.

18          Q.    Did you personally arrest anybody?

19          A.    I did.

20          Q.    Do you remember how many people you

21     personally arrested?

22          A.    I do not.

23          Q.    Was there anyone you arrested and did not

24     transport to processing?

25          A.    No, not that I recall.

1       Q.    Do you remember approximately what time

2   you would have showed up to this area, France and

3   10th?

4       A.    It was in the afternoon.

5       Q.    In the afternoon.  And what happened when

6   you arrived?

7       A.    The first thing that happened when I

8   arrived were they told us that we had to go and get

9   there or whatever, and I actually was approached by

10  a juvenile female who was attempting to get on the

11  interstate. I approached her, rather, and was

12  attempting to get on the interstate, and I had a

13  conversation with her and her mother.

14      Q.    Do you remember what her name was?

15      A.    I do not.  I didn't ask it.  She didn't

16  tell it.

17      Q.    Was she with a large group of protesters,

18  or was it just her and her mother?

19      A.    She was with a large group of juveniles

20  who had previously been, I believe, at the State

21  Capitol doing a juvenile or a young people protest

22  or something there, and they had migrated to that

23  area.  At the time, she was kind of by herself, but

24  there was a large group of people kind of behind

25  her, but she was kind of flying solo at that

1    moment.

2        Q.   You said she was trying to get on the

3    interstate?

4        A.   Correct.

5        Q.   What happened when you encountered her?

6        A.   I told her she could not get on the

7    interstate, and she said that she felt what was

8    going on was wrong and that she wanted her voice

9    heard.  She was just out there so everybody could

10   hear her voice, because she had a right to peaceful

11   protest, and I said, "You're correct.  You do have

12   a right to peacefully protest, but you cannot get

13   on the interstate and block traffic.  That's

14   against the law."  She said, "Well, I want my voice

15   heard."  I said, "Well, think about it like this."

16              About that time, her mom walked up.  I

17   don't know who they are, and I said, "Think about

18   it like this.  You want your voice heard, so you go

19   get on the interstate, I arrest you, I put you in

20   jail, you are silenced.  Nobody hears you anymore,

21   right?  If you go stand on the side in the grass

22   and yell and scream and holler at me about how I'm

23   a horrible police officer, then everybody standing

24   around you can still hear you, but as soon as you

25   get on the interstate, we're going to arrest you,

```
 1    because you can't get on the interstate, and then
 2    you are going to go to jail, and nobody can hear
 3    you."  And the mom said, "That makes sense.  Come
 4    on," and they turned around and walked off, and
 5    that was the end of her trying to get on the
 6    interstate.
 7         Q.   Okay.  So if she had just -- if she or
 8    any protester, if they -- not to put words in your
 9    mouth, but I heard you say something about they
10    could stand on the grass all they wanted and yell
11    insults, if that's what they felt like doing, and
12    that was fine?
13         A.   Yes.
14         Q.   If someone is standing on the grass
15    yelling insults or chanting or anything like that,
16    would you consider that a peaceful protest?
17         A.   Peaceful enough.
18         Q.   What would make a protest stop being
19    peaceful and turn into a nonpeaceful protest?
20         A.   Violence, throwing things, stepping into
21    the road and stopping traffic, assaulting anybody,
22    things like that.
23         Q.   Did you see anyone else attempting to get
24    on the interstate?
25         A.   Not after that.  Shortly after that I had
```

1    to go to a different location and go deal with
2    people who were in the road.
3         Q.   Did you report -- in the moment, did you
4    report that there were people trying to get on the
5    interstate to any of your supervisors?
6         A.   Yes.  The reason I went there was because
7    we knew they were trying to get on the interstate
8    and saw them.  So I said, hey, they are trying to
9    get on the interstate.  I'm talking to this girl.
10   She turned around, and then pretty much that part
11   of that died pretty quickly down there, Downtown on
12   Sunday.
13        Q.   So there was some push to get on the
14   interstate, but that was mostly resolved?
15        A.   Pretty quickly, yes.  Downtown it was
16   pretty quickly resolved.
17        Q.   Would that have been at France and 10th
18   here?
19        A.   No.  It was south of there.
20        Q.   Actually, I think we might have -- I
21   think I know where you are talking about.  I
22   believe we have a larger map.  Yeah.  This is
23   another one we have previously introduced.  This is
24   Exhibit LL.  For today Exhibit 3.  Let me switch
25   over to that just so we're on the same page here.

1    Do you see a new map here?

2         A.   Yes.

3         Q.   This is the same general area as the last

4    exhibit?

5         A.   Yes.  Europe and 10th right in there, and

6    there is that on-ramp at Mayflower.

7         Q.   So down here at Mayflower and 10th is the

8    on-ramp you are talking about?

9         A.   Yes.  She was stopped there.

10        Q.   So she was stopped there.  Where did she

11   or the other protesters go from there?

12        A.   I don't know.  They didn't get on the

13   interstate.

14        Q.   At that point did you go over to East and

15   France?

16        A.   Yes.

17        Q.   Tell me what was happening over at East

18   and France while you were there.

19        A.   There were a whole bunch of protesters in

20   the road.  We were trying to clear the road.

21        Q.   Were these the same protesters that had

22   tried to get on the interstate?

23        A.   I'm not sure. I don't recall.

24        Q.   Did you recognize --

25        A.   No.

1    Q.    When did that happen in relation to when
2    you interacted with the person trying to get up on
3    the interstate?
4    A.    Immediately after we were sent back up,
5    went back up to France and East to deal with that.
6    Q.    So you resolved the interstate issue, and
7    then you were immediately assigned to go over to
8    East and France?
9    A.    I just (inaudible)--
10    THE COURT REPORTER:
11    Can you repeat that?
12    THE WITNESS:
13    I was assigned Downtown, yeah.  I
14    was assigned Downtown.  I wasn't --
15    they were not like, hey, go handle this
16    one protester, and, hey, go handle this
17    one protester.  It was more fluid than
18    that.
19    BY MR. LANSER:
20    Q.    Got it.  But you interacted with that
21    protester at Mayflower and 10th, and then you
22    walked over to East and France after that?
23    A.    Yes.  Well, somewhere in there.  I
24    wouldn't say I was at East and France.  I was some-
25    where in that whole area of stuff going on.

1    Q.    Do you remember was there -- do you
2  remember which area around East and France you
3  would have been specifically?
4    A.    No.
5    Q.    Do you remember protesters being on a
6  yard on East and France?
7    A.    I do.  On the yard and off the yard and
8  on the yard and off the yard again.
9    Q.    I believe there had been a number of
10  protests -- right now I'm only asking about July
11  10th, but I know there had been a number of
12  protests in the days leading up to July 10th; is
13  that right?
14    A.    Yes.
15    Q.    Did you work those protests as well?
16    A.    I did.
17    Q.    Did you work -- I believe Alton Sterling
18  was killed on July 5th.  Did work protests every
19  day between July 5th and 10th or just some of those
20  days?
21    A.    I don't recall it would have been every
22  day, but it's all a mass of protests.  I don't
23  think they started right after that.  I don't know
24  when they started official.
25    Q.    By that Sunday, though, by July 10th, do

1    you think they had sort of, the protesters, had
2    kind of gotten their point across by then?
3         A.    I can't presume what they had done by
4    that point.
5         Q.    Did you think there were too many
6    protests that week?
7         A.    Do I think there was too many protests?
8         Q.    Yeah.
9         A.    My personal opinion, sure, but they can
10   protest all they want as long as it's peaceful.
11        Q.    Specifically about East and France on
12   July 10th again.  I believe you said the commands
13   given to protesters was to get out of the roadway;
14   is that correct?
15        A.    Most of it is, yes.  I don't remember
16   exactly what was said but clear the roadway was the
17   message.
18        Q.    Do you remember any other commands given
19   to the protesters?
20        A.    Off the top of my head, no.
21        Q.    Just at East and France, did you witness
22   any violence from protesters?
23        A.    I think they were throwing some stuff at
24   one point, but I don't recall exactly.
25        Q.    Do you remember what kind of stuff they

1   would have been throwing?

2        A.   I don't.

3        Q.   Do you remember any specific people who

4   threw items?

5        A.   No.

6        Q.   You mentioned that you had made some

7   arrests on July 10th.  Did you write any of the

8   affidavits of probable causes for those arrests?

9        A.   No.

10       Q.   I'm going to pull up another exhibit.

11  This one is a new one.  Today it will be Exhibit 4,

12  but this will be Exhibit 6 I's, sextuple I.  Let me

13  pull it up real quick.  Okay.  Do you see that

14  photo?

15       A.   I do.

16       Q.   I assume this is you here in the purple?

17       A.   It is.

18       Q.   Do you recognize this individual you are

19  holding onto?

20       A.   I recognize her, yes.

21       Q.   Do you remember her name?

22       A.   Not a clue.

23       Q.   I can represent to you that that is one

24  of the plaintiffs in the Imani case, Sami Nichols,

25  also goes by Samantha and Soni.  Soni is spelled

1   S-O-N-I.  Does any of that ring a bell to you?

2       A.   No.

3       Q.   Do you remember arresting Soni?

4       A.   Not particularly, no.

5       Q.   Do you remember where Soni was when you

6   arrested him?

7       A.   Downtown.

8       Q.   Anything more specific than that?

9       A.   No.

10      Q.   You don't remember what law Soni was

11  arrested for?

12      A.   Being in the roadway like everybody else

13  that was arrested.

14      Q.   So when you arrested Soni, they would

15  have been in the roadway?

16      A.   They would have been being arrested for

17  being in the roadway, yes.

18      Q.   Do you remember any conversations with

19  Soni?

20      A.   I do not.

21      Q.   Let me go back to Exhibit C. Can you see

22  the Affidavit of Probable Cause again?

23      A.   Yes.

24      Q.   This is for Samantha Nichols; is that

25  correct?

1          A.    Yes.

2          Q.    Who is, as far as what I represented to

3    you, is the same person we were just looking at?

4          A.    Yes.

5          Q.    So I take it on this Affidavit of

6    Probable Cause, even though you did arrest

7    Samantha, you did not fill out the synopsis; is

8    that correct?

9          A.    I did not.

10         Q.    And you're not the affiant, we have

11   already established, correct?

12         A.    Correct.

13         Q.    Do you remember describing the

14   circumstances of Soni's arrest to anyone else?

15         A.    No.

16         Q.    I know you said you don't remember

17   exactly where Soni was.  Is it fair to say that

18   Soni was not in the vicinity of Baton Rouge Police

19   Department's headquarters located on 9000 Airline

20   Highway?

21         A.    Yes.

22         Q.    So that part of this affidavit is not

23   correct?

24         A.    Correct.

25         Q.    It also says, "Moments later the

1    defendant entered the roadway again and was taken

2    into custody by officers on the scene."  Do you

3    recall that happening?

4         A.   All the protesters that I had dealings

5    with were given numerous warnings to clear the

6    roadway.

7         Q.   You mentioned earlier in some

8    circumstances, you know, if they were blocking the

9    roadway earlier, and they went onto a property,

10   that doesn't give them a free pass, correct?

11        A.   Correct.

12        Q.   Some of the people that were arrested

13   were just on the property but had not reentered the

14   roadway that they had earlier violated, correct?

15        A.   If they were arrested, they were given

16   multiple warnings to get out of the roadway.

17        Q.   But they didn't necessarily reenter the

18   roadway and then get arrested?

19        A.   Everybody that was arrested entered the

20   roadway multiple times prior to being arrested

21   regardless of whether they were standing in the

22   roadway when they were arrested or when they were

23   standing off the roadway.

24        Q.   So they were not all necessarily arrested

25   in the roadway?  They just had been in the roadway?

```
 1        A.    Had been in the roadway multiple times,
 2   yes.
 3        Q.    It also says in here the defendant did
 4   knowingly and feloniously violate R.S. 14:97,
 5   Simple Obstruction of a Highway of Commerce.
 6             MR. SCOTT:
 7                  Dave, she already said she did not
 8             author this document.
 9             MR. LANSER:
10                  I understand that.  She is the
11             arresting officer, though.
12             THE WITNESS:
13                  No, I'm not.
14   BY MR. LANSER:
15        Q.    I thought you said you did arrest
16   Samantha?
17        A.    That is me with my hands on her, yeah,
18   but if I don't sign the affidavit and the PC, then
19   I'm not the arresting officer.  Just because I
20   secured somebody doesn't mean I'm the arresting
21   officer. There are many times when we secure
22   multiple persons at a scene.  Just because we
23   secure them does not mean that we're the arresting
24   officer.
25        Q.    Okay.  So you did not arrest Samantha
```

```
1   Nichols?
2        A.   No.  I have her being escorted to the
3   processing, and that is what happens.
4        Q.   You did not arrest her? That's what
5   you're saying?
6        A.   I detained her and transferred her to the
7   processing bus or van, whatever it was over there.
8        Q.   I'm going to switch to another exhibit.
9   This one has previously been introduced as well.
10  Exhibit E. I think we are up to Number 4 for today.
11            MR. SCOTT:
12                 This will be 5, Dave.
13            MR. LANSER:
14                 Five.  Sorry about that.  Thank you.
15  BY MR. LANSER:
16       Q.   So what we're looking at here I can
17  represent to you is responses to interrogatories by
18  Baton Rouge Police officer defendants in the Imani
19  case.  Have you seen this document before?
20       A.   Yes. No, I haven't seen that document
21  that you have. No, I haven't seen it.
22            MR. SCOTT:
23                 Dave, I clipped out her answer to
24              the interrogatory and printed it out
25              for her.  I have a copy here.
```

1          MR. LANSER:

2                Perfect.

3    BY MR. LANSER:

4        Q.    I'm going to scroll down to that just to

5    make sure we're looking at the same thing here.  I

6    imagine that we are.  I'm looking at what looks

7    like Page 8.  Does this appear to be the same thing

8    that Mr. Scott showed you?

9        A.    Yes.

10          MR. SCOTT:

11                Yeah.

12    BY MR. LANSER:

13        Q.    Thank you.  So this is directed -- it

14    says to Corporal Alaina Mancuso, correct?

15        A.    Uh-huh.

16        Q.    Interrogatory Number 1.  "Describe your

17    involvement with arrest and seizure of the

18    plaintiffs."  In answering that -- I'm just going

19    to read it because it's brief.  "Subject to the

20    objection that the language involvement in the

21    arrest and seizure as used in this context is

22    ambiguous, vague, and overly broad, upon best

23    recollection at this time, Corporal Alaina Mancuso

24    arrested Cherri Foytlin and Samantha Nichols.  All

25    answers are subject to change at the time of the

1   discovered evidence."  Is that accurate?

2        A.   Yes.

3        Q.   This is your -- you helped respond to

4   this discovery request?

5        A.   No.  I don't remember responding to a

6   discovery request.  These are based on pictures,

7   similar to the one that you have, where I had my

8   hands on this particular person.

9        Q.   So you had no involvement in --

10       A.   Subject to the objection of the language

11  involvement of arrest and seizure being used as

12  ambiguous and vague and overly broad, that is what

13  I was explaining.  Just because I put my hands on

14  somebody does not mean I'm the arresting officer.

15  Those were based on photographs.

16       Q.   Okay.  But you did answer in here upon

17  your best recollection, subject to that objection,

18  you arrested two people, Cherri Foytlin and

19  Samantha Nichols, correct?

20       A.   No.

21       Q.   That's not what it says?

22       A.   That's exactly what it says, but it's

23  based on pictures.  If you have a picture of me

24  escorting someone, obviously, I escorted that

25  person.  That does not make me the arresting

1    officer.

2        Q.    Do you remember -- let's go back to this

3    picture real quick.  We're going back to sextuple

4    I.  Do you remember who the arresting officer was

5    for Samantha Nichols?

6        A.    I do not.

7        Q.    If you are just transporting someone,

8    does that mean that Soni would have been arrested

9    prior to you transporting him?

10       A.    It's possible.  I don't remember if I put

11   the cuffs on her or not.

12       Q.    On July 10th, what was the process for

13   arresting a protester?

14       A.    They were given multiple orders to get

15   out of the roadway.  If they did not comply after

16   multiple orders, they were detained, transported to

17   the processing area, and released to processing

18   officers, and those of us that were detaining

19   people went back.

20       Q.    So who in that process would be the

21   arresting officer or what makes someone the

22   arresting officer?

23       A.    The person who advised them of their

24   rights and advised them that they are under arrest.

25       Q.    Do you recall advising anyone on July

1    10th?

2           A.    No.

3           Q.    Nobody?

4           A.    No.

5           Q.    You don't recall advising anyone?

6           A.    I don't recall if I did or who it would

7    have been, if I did.  We had a bunch of people in

8    the road.  We were told to detain the people that

9    were in the road.  We detained them.  We

10   transported them to the processing, dropped them

11   off, went back and got more people who were

12   standing in the road.  I was part of a group of

13   people who were tasked with detaining people who

14   were in the roadway.  That's what I did.  I don't

15   know who I would have advised or who I wouldn't

16   have advised.

17          Q.    So you don't recall -- do you recall

18   whether any -- you advised anyone of their rights

19   and put them under arrest?

20          A.    I don't recall.

21          Q.    Do you recall pushing Soni's face into

22   the concrete?

23          A.    Absolutely not.

24          Q.    Do you recall Soni resisting arrest?

25          A.    I don't recall that.

45

```
 1        Q.   Do you recall telling Soni something
 2   along the lines of trashy bitch, go back to
 3   California?
 4        A.   No, I do not.
 5        Q.   Do you know where Soni is from?
 6        A.   I do not.
 7        Q.   Let's move on to another one.  This will
 8   be Exhibit sextuple J.  Can you see these two
 9   photos in this frame?
10        A.   Yes.
11             MR. LANSER:
12                  Exhibit sextuple J, which -- correct
13               me if I'm wrong, Mr. Scott.  I believe
14               we're up to Number 6?
15             MR. SCOTT:
16                  That's correct.
17   BY MR. LANSER:
18        Q.   Do you recognize this person?
19        A.   That's Cherri Foytlin, I believe. She is
20   one they have a picture of me escorting.
21        Q.   Sure.  I'll bring that up soon.  What do
22   you recall about Cherri Foytlin on July 10th?
23        A.   Nothing.  She was somebody else I was
24   escorting.
25        Q.   So you just remember -- you recognize
```

```
 1    her, and you remember her name from escorting her
 2    that day?
 3         A.    No.   I recognize her name from those
 4    papers sitting in front of me.   Otherwise, I
 5    wouldn't.
 6         Q.    Do you remember putting her under arrest?
 7         A.    No.
 8         Q.    But she is the other individual in that
 9    interrogatory response we looked at?
10         A.    She is, I believe. I think that's her.
11         Q.    Do you remember her identifying herself
12    as press?
13         A.    No.
14         Q.    Let's move on to Exhibit 7 for today,
15    which will be sextuple K.
16         A.    Did you say sextuple K?
17         Q.    Yeah.  We have a running list of exhibits
18    from all the previous.
19         A.    Okay.  I was just trying to make sure I
20    heard you correctly.
21         Q.    It's just Number 7 for today.  Do you
22    recognize yourself in this photo?
23         A.    Yes.
24         Q.    That's you in the purple?
25         A.    It is.
```

1      Q.   Do you remember any other law enforcement
2  officers wearing a purple shirt on July 10th?
3      A.   I don't believe, but there might have
4  been one.
5      Q.   Sure.   I also see you could be wearing a
6  gas mask; is that accurate?
7      A.   Yes.
8      Q.   Do you remember tear gas or anything
9  similar to that being deployed?
10     A.   No, sir.
11     Q.   Do you remember if they were preparing to
12 deploy gas?
13     A.   Yes.   They were preparing if they had to,
14 yes.
15     Q.   Was there an order for everyone to put
16 masks on or was that just you being cautious in
17 case they deployed it?
18     A.   No.   Some of us had them.   Some of us
19 didn't.
20     Q.   Do you recognize anyone else in this
21 photo?
22     A.   Some other officers in there.
23     Q.   Let's just -- how about let's start on
24 the left side here.   Do you know who this is?
25     A.   I do not.

```
 1        Q.    Can you see where my cursor is?
 2        A.    I can.
 3        Q.    This gentleman here, do you know him?
 4        A.    That's Corporal Collins.
 5        Q.    How about this one just in front of
 6   Corporal Collins?  Do you recognize him?
 7        A.    No.
 8        Q.    How about this person just to the left of
 9   those other two?
10        A.    That looks McGarner, but I can't be sure.
11   I think it's McGarner.
12        Q.    I know he's cut off, but I can see some
13   patches and stuff here.  Do you know who this is
14   all the way over on the right?
15        A.    I do not.
16        Q.    Collins and McGarner, do you know their
17   first names?
18        A.    Nick Collins and I think Robert McGarner,
19   if that's -- I think that's who that is.
20        Q.    If I represented to you that this photo
21   was taken by Cherri Foytlin, would you have any
22   reason to dispute that?
23        A.    No.
24        Q.    Do you recall her taking photos of you?
25        A.    I do not.
```

1     Q.    Do you know where this photo was taken?

2     A.    Somewhere Downtown.   No.   I couldn't tell

3  you where that is.

4     Q.    Do you remember any interaction with

5  Cherri Foytlin?

6     A.    No.

7     Q.    Do you remember giving her any commands?

8     A.    No.

9     Q.    I'm going to share another one here.   I

10  believe we are up to Number 7 for today.

11           MR. SCOTT:

12                Eight.

13           MR. LANSER:

14                I am sorry.   Exhibit 8.   I

15             appreciate that Joe.

16  BY MR. LANSER:

17     Q.    In the uniform system, this is sextuple

18  L.  This is a video.  Hopefully, this works.  So

19  this is a really brief three-second clip.  I'm just

20  going to hit play.  Just let me know -- make sure

21  you can see this.

22                {VIDEO PLAYED}

23  BY MR. LANSER:

24     Q.    Were you able to see that?

25     A.    I was.

1     Q.   I'm just going to hit play one more time
2  since it's only three seconds.
3                    {VIDEO PLAYED}
4  BY MR. LANSER:
5     Q.   This is you here in the middle of the
6  screen in the purple shirt?
7     A.   It is.
8     Q.   Does this appear to be Cherri Foytlin
9  over here?
10    A.   I can't see her face, but I would assume
11 that's her.
12    Q.   Does she appear to be handcuffed at that
13 point?
14    A.   Yes.
15    Q.   Correct me if I'm wrong.  It appears that
16 -- I'll just hit play one more time.  It looks like
17 someone is handing her to you.
18                    {VIDEO PLAYED}
19         THE WITNESS:
20              Yes.
21 BY MR. LANSER:
22    Q.   She is already handcuffed at that point?
23    A.   Correct.
24    Q.   I know it's just a quick clip here.  Can
25 you tell who this individual is that hands her to

1    you?

2          A.    That's Nick Collins.

3          Q.    That's Nick Collins.  Okay.  Did Nick

4    Collins describe the circumstances of her arrest to

5    you?

6          A.    No.  That's what I explained about people

7    being passed off and transported to the bus. That's

8    a perfect example of what I was describing earlier.

9          Q.    Correct.  So Nick Collins may or may not

10   have been the arresting officer, but she was

11   handcuffed by someone.  Nick Collins handed her to

12   you, and then where did you go after that?

13         A.    To the processing area.

14         Q.    To the processing area.  Okay.  So when

15   you got to the processing area, what happens then?

16         A.    Just drop them off.

17         Q.    Do you have any conversations with anyone

18   at the processing area?

19         A.    Not that I recall, no.

20         Q.    You didn't describe who this was and why

21   she was being arrested?

22         A.    No.

23         Q.    Let me switch to another exhibit.  This

24   one was previously introduced as sextuple D.  It's

25   got the caption 2016.7.10 video by Kelly

```
 1   Orians.com. This will be --
 2             MR. LANSER:
 3                   I've confused myself, Mr. Scott.  I
 4                think we are up to Exhibit 9.
 5             MR. SCOTT:
 6                   Nine is what I show.
 7             MR. LANSER:
 8                   Great.  Let me share this video by
 9                Kelly Orians.
10   BY MR. LANSER:
11        Q.   Can you see the new video up there now?
12        A.   Yes.
13        Q.   This one is three minutes and 53 seconds,
14   so if it's all right with Mr. Scott, I'm going to
15   fast forward a little bit here.
16             MR. SCOTT:
17                   Feel free.
18             MR. LANSER:
19                   It is again not giving me the time
20                stamp on my screen when I do this,
21                which is unfortunate.
22   BY MR. LANSER:
23        Q.   I'm just going to play this for a few
24   seconds, and I'm going to ask you if you recognize
25   where this video was taken.
```

1               {VIDEO PLAYED}

2          THE WITNESS:

3               Downtown.

4     BY MR. LANSER:

5          Q.   This says 38 seconds.  Do you recognize

6     this intersection?

7          A.   I think that's East Boulevard, but that's

8     about all I know.  I think that's East.  Yeah.

9          Q.   Yeah.  Does it appear to be East and

10    France, from what you can tell?

11         A.   I reckon that's it.  Yeah.  I haven't

12    been down there since then.  I guess that's it.

13         Q.   Do you recognize this person in the white

14    shirt with the ponytail over here as Cherri

15    Foytlin?

16         A.   Vaguely, based on what she looked like a

17    couple of seconds ago, yeah.  That could be

18    anybody.

19         Q.   I'm going to back up and play it again.

20    I want you to just try to -- any time you see Miss

21    Foytlin enter the screen, just keep an eye on what

22    she is doing for me, if you don't mind.

23               {VIDEO PLAYED}

24          THE WITNESS:

25               All I see is her standing in the

```
 1                   road.  I don't see anything else. She
 2                   is still in the road, but other than
 3                   that, nothing.  Now I can't see her.
 4                   Is that her right there?  Oh, there she
 5                   is.
 6      BY MR. LANSER:
 7           Q.   Do you see what she was doing in that
 8      video or could you tell?
 9           A.   No.  It's very like fuzzy looking.
10           Q.   It's not the best quality I know.  Did
11      you see where the protesters were located in that
12      video?
13           A.   I assume they were on that other side,
14      but I can't -- I don't know.  There is a whole
15      bunch of people in the middle of the road right
16      now, and I don't know where they came from.
17           Q.   Cherri Foytlin is one of them?
18           A.   We had protesters all over out there.
19           Q.   Let me back up just a little bit.  This I
20      think is one of seven.  Do you see this group of
21      people in the road here, including Cherri Foytlin?
22           A.   Yes.  Cherri Foytlin is in the front.
23           Q.   Do these appear to be protesters?
24           A.   Those appear to be camera people.  I
25      don't see a camera on Cherri Foytlin's shoulder,
```

1    though.

2         Q.    Camera people meaning journalists?

3         A.    I guess.  Is that a technical term? Is

4    that technical for reporter or --

5         Q.    Yeah.  People from the news agency

6    filming, correct?

7         A.    Yes, I guess.  I don't know where they're

8    from.

9         Q.    It seems to me that law enforcement went

10   right by them on the way to the protesters.  Are

11   they breaking the law in this video?

12        A.    Is who breaking the law in this video?

13        Q.    This group of people with the cameras.

14        A.    Technically, they're breaking the law,

15   yeah, I guess, if they're in the road.

16        Q.    What do you mean technically?

17        A.    They're in the road just like the

18   protesters were.

19        Q.    So there is no difference between them

20   being in the road and the protesters being in the

21   road?

22        A.    As far as I know, no.  I mean, I don't

23   know if they have some media thing that is in place

24   for them to do something different, but I have no

25   idea if that's a thing or not.

1        Q.    So you were never trained on any

2    difference or anything like that?  You were never

3    given any instructions about a difference?

4        A.    No.

5        Q.    Let me jump back to Exhibit C real quick.

6    I'm going to scroll down to a different page on

7    here, Page 7.  We're looking at another Affidavit

8    of Probable Cause, correct?

9        A.    Correct.

10       Q.    This appears to be Cherri Foytlin?

11       A.    Correct.

12       Q.    Are you the affiant on this one?

13       A.    I am not.

14       Q.    Any of this other part with handwritten

15   sections, is any of that your handwriting?

16       A.    No, sir.

17       Q.    Does this synopsis -- you can take a

18   minute to read it again, if you want.  Does this

19   synopsis appear to be the same synopsis as the last

20   one we looked at?

21       A.    It does appear to be so, yes.

22       Q.    So anything that was incorrect about the

23   last one would likely be incorrect about this one,

24   too?

25       A.    Correct.

1    Q.    Do you remember Cherri Foytlin resisting

2  arrest at any point?

3    A.    No.  She might have.  I don't remember.

4    Q.    Was she resisting your efforts in

5  transporting her to the processing center?

6    A.    Other than making me bring her over

7  there, no.

8    Q.    What do you mean by that?

9    A.    Well, she wasn't just, let's go to the

10  processing center.  I had to escort her over there.

11  Other than that, I don't remember any specific

12  resistance, no.

13    Q.    I would imagine anyone you are arresting

14  and transporting somewhere, you don't let them go

15  on their own; you have to be with them?

16    A.    Correct.  So, no, there wasn't a specific

17  resistance that I recall, no.

18    Q.    I'm going to switch over to what has

19  previously been used as Exhibit A, which today will

20  be Exhibit 10.  I can represent to you this is a

21  copy of the complaint from the Imani lawsuit.  I'm

22  going to use it just to skip -- to use a photo

23  here.  I am now on Page 36 of the complaint.  Do

24  you see this photo?

25    A.    Yes.

1    Q.    Do you see yourself in that photo?

2    A.    Yes.

3    Q.    In the purple shirt again?

4    A.    Yes.

5    Q.    Do you recognize anyone else in this

6    photo? I can zoom in.  Why don't I zoom in.

7    A.    Everybody is wearing masks and stuff. No.

8    I think this one down in the corner with the

9    stripes, that one is Troy Lawrence, only because I

10   recognize --

11   Q.    At the top?

12   A.    No.  Right there at the bottom.

13   Q.    Right here?

14   A.    Yeah.  Outside of that -- I think that's

15   who that is.  Outside of that, I don't recognize.

16   Q.    Say that name again.

17   A.    Troy Lawrence.

18   Q.    Troy Lawrence.  Okay.  It appears that

19   some of these individuals are from the Louisiana

20   State Police; is that correct?

21   A.    If that's what that badge says.  I can't

22   see what the words on it are, but I assume that is

23   the badge.

24   Q.    Do you recognize this person in the

25   middle getting arrested?

```
1          A.    No, sir.

2          Q.    Sorry?

3          A.    No, sir, I do not.

4          Q.    Do you remember this scene happening on

5    July 10th?

6          A.    No, sir, I do not.

7          Q.    It appears that you are looking right at

8    it; is that accurate?

9          A.    That's what it appears to be.

10         Q.    Whether justified or not is a tougher

11   question, but is putting your hands on someone's

12   throat like that a use of force?

13              MR. SCOTT:

14                   Dave, those appear to be state

15                troopers.

16              MR. LANSER:

17                   Yeah.

18              MR. SCOTT:

19                   What has this got to do with her use

20                of force?

21              MR. LANSER:

22                   I'm getting to that.

23              THE WITNESS:

24                   I can't speak to appropriate use of

25                force depending on what their
```

1            circumstances were.

2   BY MR. LANSER:

3        Q.   If this had been an inappropriate use of

4   force, would you have had a duty to intervene?

5        A.   Based on this picture, if I saw it,

6   potentially, yeah.  There is no guarantee that I

7   was looking at that incident.  I don't recall that

8   at all, in any way, shape, or form, recall that

9   picture.  I don't recall that face.  I don't recall

10  those people.  It literally does not spark my

11  memory in any way, shape, or form.

12       Q.   Let me pull up one more thing here.  Give

13  me one second.  Let me share my screen.  Okay.  Can

14  you see that on the screen?

15       A.   Yes, sir.

16       Q.   This is -- In the joint thing, I believe

17  we're up to sextuple M.  In today's I believe we're

18  at 11.  Have you ever seen this document before?

19       A.   Yes, sir.

20       Q.   Can you tell me what it is?

21       A.   An IA Officer History.

22       Q.   What is an IA Officer History?

23       A.   I assume it's a printout of my IA jacket

24  investigations.

25       Q.   What does IA stand for?

1          A.     Internal Affairs.

2          Q.     This is you up here, Alaina Gutierrez

3     Mancuso?

4          A.     Yes, sir.

5          Q.     It looks like just two pages here.  The

6     second page is blank.  I just want to ask real

7     quick about what -- it looks like there is four

8     different dates listed on here.  This first one I'm

9     looking at 10/20/09.

10         A.     Yes.

11         Q.     It appears to be a use of force

12    complaint.

13         A.     Yes.

14         Q.     Do you recall that?

15         A.     I do.

16         Q.     Can you tell me a little bit about that?

17         A.     It was not sustained.

18         Q.     Yeah.  I see it is not sustained.  Do you

19    recall the circumstances, though?

20         A.     I do.

21         Q.     Can you explain them?

22         A.     In the provocative details of the case?

23         Q.     Just a brief explanation.

24         A.     A gentleman went into a local grocery

25    store, made a provocative comment to the cashier.

1    She then called the police because he was refusing

2    to leave after making her uncomfortable.  We

3    escorted him outside, and subsequently had to kind

4    of wrestle around with him a little bit, spray him,

5    I think, in order to get him handcuffed and get him

6    in the back of a police car.

7         Q.   And then Date Number 2 here, 05/08/09.

8    Damaging department equipment it looks like.  Can

9    you tell me about that?

10        A.   I don't know what that is.  I assume it's

11   a car wreck or something.  I have no idea.

12        Q.   This one was sustained, correct? At least

13   according to the report?

14        A.   Correct.

15        Q.   You received a Letter of Caution?

16        A.   Yes.

17        Q.   You don't recall the exact circumstances?

18        A.   No.

19        Q.   What about 06/14/12.  Looks like same

20   thing, damaging department equipment.  Do you

21   recall that one?

22        A.   I do not.

23        Q.   But that one was also sustained, and you

24   received a Letter of Caution?

25        A.   Yes.

```
 1        Q.   What about 04/30/15?  Same thing,
 2   damaging department equipment, sustained.  I assume
 3   LOC is Letter of Caution.  Do you recall that one?
 4        A.   I do not, no.  I guess it was a car
 5   crash, also.  Women drivers.
 6        Q.   What was that?
 7        A.   Women drivers and all.
 8        Q.   Also, looking at disposition four line
 9   here, it says Number 8HRDRVSCH.  I assume that is
10   eight hours of driving school.  Does that --
11        A.   That looks about right.
12        Q.   Do you remember having to take eight
13   hours of driving school?
14        A.   I've taken several driving courses since
15   I've been with the department.
16        Q.   Do you remember having to take eight
17   hours of driving courses in response to an Internal
18   Affairs complaint?
19        A.   No.  Like I said, there were several. I'm
20   sure I did, if it says I did it, but I don't
21   remember when that would have been.
22        Q.   Out of the four dates on here, do you
23   remember the circumstances from 2009, the use of
24   force not sustained one, but you don't recall --
25        A.   That was a true use of force.
```

1    Q.   But you can't recall anything about '09,

2    '12, or '15, those other three dates?

3    A.   Correct.  I've been in several wrecks.

4    My fault and otherwise.

5    Q.   Is it possible these are referring to

6    three of those wrecks?

7    A.   It's very possible, yes.

8    Q.   Did you receive any other discipline or

9    been investigated for anything that's not listed on

10   here?

11   A.   No, sir.

12   MR. LANSER:

13        That might be everything I have for

14        you.  Let me just take a quick look

15        over my notes.

16        That's all the questions I have.  I

17        imagine someone from MacArthur is going

18        to have some additional questions for

19        you.

20   MS. LOMMERS-JOHNSON:

21        Hi.  I'm Hannah.

22   THE WITNESS:

23        Hello.

24   MS. LOMMERS-JOHNSON:

25        I'm going to be going next, but

```
 1              before I get started, do you or does
 2              anyone else here need a bathroom break
 3              or anything like that?
 4         MR. SCOTT:
 5              I was going to suggest a ten-minute
 6              recess.  I show 2:52 PM.
 7         MS. LOMMERS-JOHNSON:
 8              Sounds good.  We'll come back at
 9              3:02.
10              {BRIEF RECESS, 2:52-3:02}
11   EXAMINATION BY MS. LOMMERS-JOHNSON:
12        Q.   I'm going to start out by sharing the
13   screen.  Are you able to see the document that I've
14   pulled up?
15        A.   Yes.
16        Q.   I'm going to mark this document Exhibit
17   12 for today's deposition and Exhibit 6 Ns for the
18   continuing numbering.  Do you recognize this
19   document as your duty roster from July 9th to 15th?
20        A.   Yes.
21        Q.   It's my understanding that this document
22   indicates that on July 10th you went on duty at
23   3:00 PM and stayed on duty for 12 hours.  Is that
24   accurate? I apologize.  Let me scroll down to the
25   second page.
```

1          MR. SCOTT:

2               I have a printed copy here, Hannah.

3      BY MS. LOMMERS-JOHNSON:

4          Q.   Oh, perfect.  Turning to the second page

5      of Exhibit 12, does this look like you went on duty

6      at 3:00 PM and stayed on duty until 3:00 AM on the

7      10th?

8          A.   Yes.

9          Q.   On the 9th, I think it indicates that you

10     went on duty at 6:00 PM and off duty at 6:00 AM; is

11     that accurate?

12         A.   Yes.

13         Q.   Does that fit with what you remember from

14     the 9th and 10th of 2016?

15         A.   Yes.

16         Q.   So I want to ask you first a couple more

17     questions about the 10th.  When you arrived at the

18     area of East and France, were protesters already

19     gathered in and around the yard there at the

20     intersection?

21         A.   When I first went over there, yes.  In

22     and around that intersection, yes.  I don't know

23     how long they had been there.

24         Q.   Did you receive any orders at the time

25     that you got to the area of East and France?

67

1       A.    Not specifically.

2       Q.    If you had wanted to arrest any of the

3  protesters who were in the roadway at that time,

4  would you have been free to do so or were you

5  supposed to wait for orders to do so?

6       A.    I was supposed to wait for enough orders

7  -- enough warnings for people.  I wasn't supposed

8  to go and arrest the first person I see stepping

9  into the road.  They were supposed to be given

10  ample opportunity to stop, get out of the road

11  prior to effecting any type of detainment or

12  arrest, but if I seen somebody needing to be

13  arrested, yes, I had the freedom to do that, but

14  that wasn't what we were doing.

15       Q.    While protesters were gathered in the

16  yard, where were you initially located in relation

17  to the yard?

18       A.    At what point?  They were in and out of

19  the yard the entire time.  I don't know.  I

20  couldn't tell you.  Maybe across the street, maybe

21  in the road, maybe right next to the yard.  I don't

22  know.

23       Q.    So what length of time, while you were on

24  the scene at East and France, do you remember

25  protesters being in the yard?

1      A.    I couldn't tell you.  I was out there for

2  hours.

3      Q.    I guess would you say that the protesters

4  were also in the yard for hours?

5      A.    They were in the road, also, during the

6  time, in and out.

7      Q.    My understanding is that at some point

8  that law enforcement officers formed lines along

9  the streets facing the property; is that accurate?

10      A.    They formed lines across the roadway,

11  yes.

12      Q.    They formed lines along East.  I guess

13  along East Boulevard; is that correct?

14      A.     In East Boulevard, yes, and along East

15  Boulevard, yes.

16      Q.    So formed a line across the street from

17  the protesters and also going across East Boulevard

18  blocking it off; is that accurate?

19      A.    Yes.

20      Q.    Do you recall how long you were on the

21  scene until these lines were formed by officers?

22      A.    No.

23      Q.    I'm going to pull up a picture.  Do you

24  see this image on the screen?

25      A.    Yes. Well, no, not anymore.

1          MR. SCOTT:

2               It just disappeared.

3          THE WITNESS:

4               It was there very briefly.

5          MS. LOMMERS-JOHNSON:

6               I pulled up all these images in

7            advance so we could go quickly, but

8            they timed out.

9    BY MS. LOMMERS-JOHNSON:

10        Q.   Do you see the image now?

11        A.   Yes.

12        Q.   Perfect.  I'm doing my first image as

13   Exhibit 13.  This is going to be six Os.  Do you

14   recognize this as the intersection of East and

15   France on the 10th?

16        A.   Yes.

17        Q.   Do you recognize yourself in the picture

18   in purple?

19        A.   Yes.

20        Q.   In this picture, I think you are staged

21   in a line of law enforcement across the street from

22   the yard at 602 East Boulevard; is that accurate?

23        A.   Is that that house with the white stuff

24   on it?

25        Q.   Yeah.

1      A.   Yeah.  I don't know the address, but,

2   yeah.  That's also across the street from it.  I

3   guess that's a line in the front.  I wasn't part of

4   the a line.  I was in the back.

5      Q.   Do you remember about how long you staged

6   at this location before moving in to arrest

7   protesters?

8      A.   No.

9      Q.   To your knowledge, was Myron Daniels in

10  command of the protest response on July 10th at

11  East and France?

12     A.   I don't remember who was in command that

13  particular day.

14     Q.   Do you remember who gave the order to

15  begin advancing on the protesters?

16     A.   No.

17     Q.   I'm going to pull up a video.  I'm going

18  to be marking this video as 14, and it's six Ps.

19  You see that video?

20     A.   Yes.

21     Q.   I'm going to start playing the video and

22  let it role for about 20 seconds.

23                 {VIDEO PLAYED}

24  BY MS. LOMMERS-JOHNSON:

25     Q.   Did you see yourself in this video,

1    Exhibit 14?

2          A.    Yes.

3          Q.    This video footage depicts the initial

4    approach to movement on the yard of protesters.  Is

5    that accurate?

6          A.    I assume.  I don't remember.

7          Q.    I'm going to go a little bit further.

8                    {VIDEO PLAYED}

9    BY MS. LOMMERS-JOHNSON:

10         Q.    Here we see you go to the ground and

11   arrest a protester on the street.  Is that

12   accurate?

13         A.    It appears that's what's happening, yes.

14         Q.    And you are the one with the light blue

15   shoes that have pink soles and the purple shirt?

16         A.    Yes.

17         Q.    Do you recall whether you arrested any

18   protesters within the yard at the intersection of

19   East and France?

20         A.    As I stated earlier, everybody that was

21   arrested was in the road at some point.  Whether

22   they went to home base and tried to get on the

23   grass to get out the road once it was time to

24   arrest people, it was a moot point as far as

25   whether or not they violated or not.

1      Q.    Just in terms of the locations that you

2  arrested people, do you recall arresting anyone

3  while they were physically standing in the yard?

4      A.    I don't know.

5      Q.    This is going to be Exhibit 15.

6            MS. LOMMERS-JOHNSON:

7                  And I think, Dave, I'll let you

8                  correct me if I'm wrong.  I think --

9                  I'll pull it up.  I think this was

10                 already tagged as four Qs in the

11                 continuing exhibit list.

12  BY MS. LOMMERS-JOHNSON:

13     Q.    Can you see this photo?

14     A.    Yes.

15     Q.    The photo here in Exhibit 15 shows a

16  woman in a tan scarf and white tank top.  Do you

17  see her?

18     A.    Yes.

19     Q.    She appears to be being arrested by two

20  officers who are wearing blue uniforms.  Is that

21  accurate?

22     A.    Yes.  Like a navy blue.

23     Q.    Yeah, navy blue with black helmets.  Is

24  that accurate?

25     A.    Yes.

1      Q.    I think the officer on the right wearing

2  the blue uniform with the black helmet with his

3  face shield pulled down, he appears to be securing

4  her hands behind her back; is that accurate?

5      A.    I don't know what he is doing.  I guess

6  that's what he is doing.

7      Q.    You're not in this picture at all?

8      A.    Not at all.

9      Q.    Move on to the next picture, which is

10  going to be Exhibit 15.  Can you see this one?

11      A.    Yes.

12      Q.    So here in Exhibit 16, we see the same

13  woman with the tan scarf being flanked by the two

14  officers with the blue uniforms and black helmets;

15  is that correct?

16      A.    Yes.

17      Q.    Here -- can you see in this picture she

18  appears to have a white flex cuff around her

19  wrists.

20      A.    That's what it looks like, yes.

21      Q.    And here we see this officer to the right

22  of her in the picture has a bunch of white flex

23  cuffs attached to his backpack.

24      A.    Yes.

25      Q.    This picture is a little bit of a wider

1    angle here, so you see more people, but you don't

2    see yourself anywhere in this shot, do you?

3         A.   No.

4         Q.   I'm going to pull up our next picture.

5    This is going to be Exhibit 17.  Here we see again

6    the same individual more towards the background

7    here but the same individual wearing the tan scarf

8    with the white tank top, right?

9         A.   Yes.

10        Q.   This picture seems to depict her being

11   escorted off the lawn by two officers in blue

12   uniforms.  Is that accurate?

13        A.   No.  It actually looks like she is

14   standing in the yard.

15        Q.   I think, again, we have a slightly wider

16   angle here, and please correct me if I'm wrong, but

17   you're not anywhere in this shot that you can see,

18   are you?

19        A.   Nope.

20        Q.   I'm going to close this and take us to a

21   video.  This video I'm going to mark Exhibit 18 for

22   today's deposition.  It's been previously marked

23   with four Hs in the continuing exhibit list.  Can

24   you see that video now?

25                    {VIDEO PLAYED}

```
 1              THE WITNESS:
 2                   Yes.
 3    BY MS. LOMMERS-JOHNSON:
 4         Q.   I'm going to fast forward, if there are
 5    no objections, to minute 1:43.  I'll start at 1:29
 6    here.  I'm going to pause here at minute mark 1:50
 7    of Exhibit 18.  This video showed the same woman
 8    that we've been speaking about with the tan scarf
 9    and white tank top; is that right?
10         A.   Yes.
11         Q.   In this video, we see her being placed
12    into flex cuffs it appears; is that accurate?
13         A.   I didn't see her being placed into flex
14    cuffs.  All I was able to see was her standing in
15    the yard.  It was very, very brief.
16         Q.   Yeah.  I have the benefit of watching it
17    a bunch of times, but definitely let me know if --
18    whether it looks to be accurate by you.  I am going
19    to rewind it to give you a chance to look at it one
20    more time.
21                   {VIDEO PLAYED}
22    BY MS. LOMMERS-JOHNSON:
23         Q.   After having seen it again, do you think
24    it looks --
25         A.   Again, I don't know what -- she's got
```

1    something white on her left wrist, but I can't say

2    that's flex cuffs or not, because I don't know.  I

3    don't see flex cuffs.  I see just something white

4    on her left wrist.

5         Q.    And do you recognize those officers in

6    the blue uniforms with the black helmets at all?

7         A.    I do not.

8         Q.    I'm going to let it advance to minute

9    1:57.

10                    {VIDEO PLAYED}

11   BY MS. LOMMERS-JOHNSON:

12        Q.    Would you say that it's accurate that one

13   of the officers in the blue uniforms is escorting

14   her off into the road?

15        A.    It looks like, maybe.  I don't know if

16   that's a blue uniform or -- again, it's very close

17   angle and very brief.

18        Q.    Definitely.  Let me --

19        A.    Come back.

20        Q.    I'll hit play again and then pause.

21                    {VIDEO PLAYED}

22              THE WITNESS:

23                    Yeah.  It kind of looks like -- the

24              uniform actually looks black from this

25              angle, but it looks like the Louisiana

```
 1              crest on his arm.
 2    BY MS. LOMMERS-JOHNSON:
 3         Q.   Is the Louisiana crest --
 4         A.   Or badge, rather.
 5         Q.   Is that the badge of the Louisiana State
 6    Police?
 7         A.   And several other that have the boot, but
 8    I think the state police.
 9         Q.   I know it moved pretty quickly.  We can
10    go back and look again, if we need to, but you
11    didn't see yourself in any of the images in Video
12    18, did you?
13         A.   No.
14         Q.   I'm going to show you a video we are
15    going to mark as 19.  If there is no objection, I'm
16    just going to advance this video to minute 3:12.
17    Here we go.
18                  {VIDEO PLAYED}
19    BY MS. LOMMERS-JOHNSON:
20         Q.   Started at minute 3:12 of Exhibit 19, and
21    I paused it here at 3:13.  Do you see the same
22    woman with the tan scarf and the white tank?
23         A.   Yes.
24         Q.   Do you recognize the man who is standing
25    right next to her?
```

1        A.    Jeff Pittman.

2        Q.    I'm going to let this play from minute

3    3:13 for a couple of seconds.

4                    {VIDEO PLAYED}

5    BY MS. LOMMERS-JOHNSON:

6        Q.    Okay.  Did you see yourself in that clip?

7        A.    I did.

8        Q.    But you weren't physically just handling

9    the woman in the tan scarf at all; is that

10   accurate?

11       A.    Correct.

12       Q.    Sorry.  I didn't mean to cut you off.

13       A.    I said yes, that's correct.

14       Q.    There we see that she has the white flex

15   cuffs on.  Is that accurate?

16       A.    I wasn't paying attention to white flex

17   cuffs, but I assume.  I didn't see any flex cuffs.

18   It was fast, very fast.

19                    {VIDEO PLAYED}

20   BY MS. LOMMERS-JOHNSON:

21       Q.    There at minute 3:17 do we see the white

22   flex cuffs?

23       A.    Yes.

24       Q.    In this same shot, you are physically

25   just handing someone else; is that accurate?

1      A.   Yes.

2      Q.   And it appears that you have black flex

3  cuffs; is that accurate?

4      A.   Yes.

5      Q.   Is it fair to say that you didn't put

6  flex cuffs on the woman with the tan scarf and the

7  tank top?

8      A.   Yes.

9      Q.   Would you say that Jeff Pittman is

10  bringing the woman in the tan scarf to prisoner

11  processing?

12      A.   Yes.

13      Q.   In this video, did it appear to you at

14  all that the woman in the tan scarf and the white

15  tank top was resisting arrest?

16      A.   Not in these videos and pictures, no.

17      Q.   Not in any of the videos that you and I

18  have looked at today?

19      A.   Correct.

20      Q.   So I'm going to show you one more video

21  of this woman from a slightly different angle,

22  which we're going to -- which has already been

23  marked today as Exhibit 9 for today's purposes and

24  with six Ds for the continuing exhibit list.  Can

25  you see the video on the screen?

1    A.    Yes.

2    Q.    I'm going to attempt to get to the three-

3  minute mark.  I'm going to ask you just to sort of

4  look in the area in front of the house.  This image

5  and this video is shot from further away.

6                    {VIDEO PLAYED}

7  BY MS. LOMMERS-JOHNSON:

8    Q.    In this video, can you see the woman in

9  the white tank top just in front of the house

10 there?

11   A.    I see a person in a white shirt, yes.

12 Suffice it to say, I can't identify anybody on

13 that.

14   Q.    I'm going to play a little bit more.

15                   {VIDEO PLAYED}

16 BY MS. LOMMERS-JOHNSON:

17   Q.    So I can represent to you that Jeff

18 Pittman testified that he is the figure in this

19 video taking custody of the woman in the white tank

20 top and the tan scarf.  Do you have any reason to

21 dispute his testimony there?

22   A.    No.

23   Q.    I know it's hard to see in this video.  I

24 can represent to you that the woman in the white

25 tank top with the tan-colored scarf is our client,

1    Sophie Kosofsky, in the Smith case.  I'll stop
2    screen sharing here and move to -- whoops.  Move to
3    another document.  Do you see the document I've
4    pulled up on the screen now?
5        A.   Yes.
6        Q.   I'm going to mark this one as 20.  Do you
7    recognize this as an Affidavit of Probable Cause?
8        A.   Yes.
9        Q.   Do you recognize this as one of the
10   probable cause affidavits that was used during the
11   Baton Rouge protest in 2016?
12       A.   Yes.
13       Q.   You and Mr. Lanser, I know, went through
14   the same synopsis of probable cause here earlier
15   today, so I'll just ask you briefly were you
16   involved in the preparation of this probable cause
17   affidavit for Sophie Kosofsky?
18       A.   No.
19       Q.   I see here at the bottom that Detective
20   Williams was listed as the affiant for this
21   particular affidavit.  Did ever speak to Detective
22   Williams about the arrest of Sophie Kosofsky?
23       A.   Other than being over there when we
24   transported them, no.  Not specifically that I
25   recall.

1       Q.   Next I'm going to show you a document

2  that we can mark as Exhibit 21.  Do you recognize

3  this document as an incident report that you

4  authored?

5       A.   Yes.

6       Q.   I think that Joe probably has printed it

7  out for you.

8       A.   Yes.

9       Q.   Perfect.  So on this first page, we see

10  your name written next to the box that says Report

11  Officer One.

12       A.   Uh-huh.

13       Q.   Then I'm just going to scroll down.  This

14  is the incident report for Sophie Kosofsky; is that

15  correct?

16       A.   Yes.

17       Q.   And then I'm just going to advance to

18  Page 5 of the incident report where it says

19  Supplemental Report.

20       A.   Yes.

21       Q.   Looking at the narrative, the second

22  paragraph reads, "While assisting with the Mobile

23  Field Force, I observed Sophie Kosofsky in the

24  roadway refusing to leave.  Upon contact with

25  Kosofsky, she was advised she was under arrest and

1    to place her hands behind her back.  While grabbing

2    Kosofsky's right hand, she began to pull away from

3    me.  After a short struggle, I was able to place

4    Kosofsky's hands behind her back without further

5    incident.  I placed Kosofsky into flex cuffs.  Then

6    she was transported Kosofsky to a nearby bus."  Is

7    that an accurate reading of the second paragraph of

8    your supplemental report here?

9         A.   It is.

10        Q.   Going through sort of the specifics of

11   this narrative here, we already saw that you were

12   not the one who placed Sophie Kosofsky in flex

13   cuffs; is that accurate?

14        A.   Yes.

15        Q.   So that line in your report is

16   inaccurate, would you agree?

17        A.   Yes.  In terms of Sophie Kosofsky, yes.

18        Q.   The line that as well grabbing -- excuse

19   me.  "While grabbing Kosofsky's right hand, she

20   began to pull away from me," that line is

21   inaccurate?

22        A.   In terms of Kosofsky, yes.

23        Q.   Then just the last line here.  "After a

24   short struggle, I was able to place her hands --

25   Kosofsky's hands behind her back without further

1    incident," that also was not accurate to Sophie
2    Kosofsky; is that accurate?
3         A.    Correct.
4         Q.    I didn't mean to talk over you just then.
5         A.    That's fine.  On scene, I didn't know any
6    of their names at any point.
7         Q.    But I guess after watching the video of
8    Sophie today, you'd agree that this doesn't --
9         A.    This does not apply to Sophie Kosofsky,
10   yes.
11        Q.    Did you get an instruction to write the
12   supplement report for Sophie Kosofsky?
13        A.    Yes.
14        Q.    Who was that instruction from?
15        A.    One of my supervisors.  I don't recall
16   which one.  It appears as though they confused who
17   I arrested when they told me to write a supplement.
18        Q.    We have not dealt with the first
19   paragraph here yet specifically.  Sorry.  First
20   line here of the second paragraph.  "While
21   assisting with Mobile Field Force, I observed
22   Sophie Kosofsky in the roadway refusing to leave."
23   Do you ever remember observing Sophie Kosofsky in
24   the roadway refusing to leave?
25        A.    Not at this point.

1          Q.    Now I'm going to stop sharing this

2     document, and I have some questions for you about

3     Saturday, July 9th.  I think we discussed earlier

4     today that you were on duty from about 6:00 PM to

5     6:00 AM on the 9th.  Do you remember at what

6     location you were initially stationed on Saturday,

7     July 9th?

8          A.    I think 9000 Airline is where we were

9     supposed to be.

10         Q.    What was your assignment on Saturday,

11    July 9th?

12         A.    I maintained the protest as peaceful, get

13    intel from the crowd, get intel from people around

14    there, watch people, you know, that kind of stuff.

15         Q.    Can you tell me more about what you mean

16    by getting intel from the crowd?

17         A.    We had CIs and people in the crowd.  At

18    the point we were parked amongst the vehicles near

19    the crowd, parked across the street, watching,

20    observing, things like that.  Had CIs that were in

21    the crowd giving us real-time information, stuff

22    like that.

23         Q.    So at the time of the protest in 2016,

24    you were assigned to the narcotics unit; is that

25    correct?

```
 1        A.    Correct.
 2        Q.    Was the entire narcotics unit assigned to
 3   the protest response on Saturday, July 9th?
 4        A.    I believe so, yes, if they were needed.
 5        Q.    That day do you remember who was giving
 6   you your orders and assignments?
 7        A.    No.
 8        Q.    At some point that day did you make your
 9   way to the neighborhood of the mayor's house around
10   Rivercrest Avenue?
11        A.    Yes.
12        Q.    Did you have orders to go assist with the
13   protest response in the area of the mayor's house?
14        A.    We were told to go up there because some
15   people were going to the mayor's office, but -- I
16   mean the mayor's house, but I don't remember what
17   the specifics of that were other than go up there.
18        Q.    Do you remember who was told to go up to
19   the mayor's house along with you?
20        A.    No.
21        Q.    Were you aware of any special concern
22   about the mayor or the mayor's house when you
23   started your shift on Saturday?
24        A.    No.
25        Q.    Are you familiar with the name Silky
```

1   Slim?

2       A.    Yes.

3       Q.    Can you tell me what your knowledge of

4   Silky Slim is?

5       A.    All I know is he is a local activist in

6   the area.

7       Q.    How did you first come to know of Silky

8   Slim?

9       A.    Just hearing about him.

10      Q.    Before 2016?

11      A.    Yes.

12      Q.    Were you aware of any specific concerns

13  about Silky Slim during the July 2016 protests?

14      A.    Other than he was out there, no.

15      Q.    Now I'm going to play some audio for you

16  that I'm going to mark as 22, Exhibit 22.  I'm

17  going to try to play it starting at the one hour

18  five minute and eight second mark.  As this is

19  playing, if you could give me like a thumbs up if

20  you are able to hear it.  Just one second.

21                  {AUDIO PLAYED}

22  BY MS. LOMMERS-JOHNSON:

23      Q.    Now I'm going to advance it to our right

24  minute mark.

25                  {AUDIO PLAYED}

1  BY MS. LOMMERS-JOHNSON:

2      Q.   Did you recognize your voice on the

3  audio?

4      A.   Yes.

5      Q.   It sounded to me like you said, "Our

6  Black Panther group have all loaded up into

7  vehicles."  Is that accurate?

8      A.   Yes.

9      Q.   Can you tell me where you were located at

10  this point?

11     A.   No.

12     Q.   Do you remember who was in the Black

13  Panther group you were talking about?

14     A.   No.

15     Q.   Can you tell me anything about how you

16  knew they were affiliated with the Black Panthers?

17     A.   I don't remember how I knew.  They might

18  have been dressed like Black Panthers.  I don't

19  know.

20     Q.   Do you remember what type of cars they

21  loaded into?

22     A.   No.

23     Q.   I'm going to play to you a little bit

24  more of this audio clip just until we reach the

25  next minute mark.

```
 1                    {AUDIO PLAYED}
 2    BY MS. LOMMERS-JOHNSON:
 3         Q.   Did you again hear your voice on that
 4    audio?
 5         A.   Yes.
 6         Q.   Can you tell me what you were saying
 7    there?
 8         A.   I was saying that they were loading up.
 9    Somebody was giving them directions.  Somebody else
10    was telling them to calm down.  They were trying to
11    get people out of jail, and that they were leaving
12    southbound.
13         Q.   Did you end up following this group of
14    individuals?
15         A.   I don't know.  I assume I tried to.  I
16    don't know if I was able to or not.  I might have
17    also just stayed right there, and somebody else
18    might have followed.  I don't know.  I could have.
19         Q.   You did observe, at least as far as the
20    audio recording says, that they had no weapons; is
21    that accurate?
22         A.   Yes.
23         Q.   Did you hear anyone say that they were
24    planning a protest at Rivercrest?
25         A.   Not with my own ears, no.
```

1    Q.    Were you ever told by CI that someone was
2    planning a protest at Rivercrest?
3    A.    I don't recall that, no.
4    Q.    Now I'm going to pull up Exhibit 23.  Can
5    you see the video on the screen that I'm marking
6    Exhibit 23?
7                    {VIDEO PLAYED}
8              THE WITNESS:
9                    Yes.
10   BY MS. LOMMERS-JOHNSON:
11   Q.    I'm going to go ahead and advance this
12   video to minute mark 4:49. I've got it at 4:45. I'm
13   going to start playing.
14                   {VIDEO PLAYED}
15   BY MS. LOMMERS-JOHNSON:
16   Q.    Do you recognize yourself in this video?
17   A.    Yes, I do.
18   Q.    And you are the one holding the assault
19   rifle; is that correct?
20   A.    Holding the rifle, yes.
21   Q.    And so I can represent to you that this
22   video was posted online Saturday, July 9th, at
23   9:28.  Do you recognize the location you are at in
24   this video?
25   A.    The interstate by Airline. Right before

1    the interstate on-ramp actually.  Off-ramp.

2        Q.    Right before the interstate off-ramp on

3    Airline?

4        A.    Correct.

5        Q.    Is this prior to you going into the

6    Rivercrest neighborhood?

7        A.    I have no idea.

8        Q.    Is the rifle you are holding part of your

9    standard issue equipment?

10        A.    Yes.

11        Q.    When are you trained in your Baton Rouge

12    Police Department training to arm yourself with

13    your rifle?

14        A.    Whenever I deem it necessary.

15        Q.    Did any of your supervising officers

16    discuss with you at the time of the 2016 protests

17    you using your rifle and pointing it at the people?

18        A.    What do you mean?

19        Q.    I can rephrase. I guess after -- let me

20    step back a second. Would it be fair to say that

21    this video depicts you pointing the rifle at

22    protester?

23        A.    It would be fair to say that this is what

24    this very short clip depicts, yes.

25        Q.    I guess my question is just whether any

1    supervising officer discussed with you whether it

2    was appropriate to point your rifle at protesters

3    in July of 2016?

4         A.   After this incident, they discussed why I

5    had pointed my gun at someone, and it was the fact

6    that someone in the crowd was motioning that they

7    had a firearm, is why I did it.  So, yes, we

8    discussed it.  I was not pointing my rifle at just

9    all of protesters around we were around.  There was

10   a gentleman or a person in the crowd motioning that

11   he potentially had a gun in this waistband, at

12   which point I pointed my rifle at him, yes.

13        Q.   And when you discussed it with a

14   supervising officer, after you explained why you

15   were pointing your rifle at that individual, what

16   did your supervising officer say?

17        A.   That I trust my training and my judgment,

18   and that if someone had a weapon, I had a weapon,

19   also.

20        Q.   So we already mentioned that you

21   relocated to Rivercrest at some point in the

22   evening of Saturday, July 9th.  Can you tell me

23   what your role was in the Rivercrest area?

24        A.   No.  I don't remember what I was tasked

25   to do up there. I went up there, but I don't think

1    we were up there -- I don't think I was up there

2    very long, but I don't remember.

3         Q.   About how long would you --

4         A.   I don't know.

5         Q.   Do you remember whether you drove your

6    own vehicle to the Rivercrest neighborhood?

7         A.   I assume I was in my own vehicle, but,

8    again, I don't know.  I don't remember.

9         Q.   Did you have a marked or unmarked vehicle

10   at the time?

11        A.   Unmarked.

12        Q.   Do you remember whether you arrived with

13   anyone else in your vehicle?

14        A.   No. There were times when we were by

15   ourselves.  There were times when we had other

16   people with us.  I don't remember which one of

17   these times it was.

18        Q.   When you did travel with other people,

19   was it usually with other narcotics officers?

20        A.   Yes, usually.  Not always but usually.

21        Q.   When you arrived on Rivercrest, how many

22   protesters did you see there?

23        A.   I have no idea.

24        Q.   Do you have a recollection of seeing any

25   protesters there?

1       A.   No.

2       Q.   Do you recall who was in command of the

3   Rivercrest scene when you arrived?

4       A.   No, ma'am.

5       Q.   So just to clarify, you don't remember

6   seeing -- talking to any protesters on Rivercrest

7   at all?

8       A.   No.

9       Q.   Do you recall any protesters on

10  Rivercrest being arrested while you were there?

11      A.   No.

12      Q.   Just in case it comes up later, I am

13  going to show you a picture that I'm going to mark

14  as Exhibit 24.  Can you see this image on the

15  screen?

16      A.   No.

17      Q.   I'll try again.  Can you see it now?

18      A.   Yes.

19      Q.   Do you recognize that individual in the

20  image marked Exhibit 24?

21      A.   No, ma'am.

22      Q.   Just a couple more questions.  Do you

23  recall seeing Silky Slim on the evening of July

24  9th, 2016?

25      A.   No.

1    Q.    Can you recall seeing him during the

2    protests at all?

3    A.    Not in person, no.  Not that I can

4    recall.

5    Q.    Going back just for one minute to Sunday,

6    July 10th.  Earlier, when we were talking about

7    Detective Williams who was listed as the affiant on

8    the Probable Cause Affidavit for Sophie Kosofsky,

9    do you remember -- I think I had asked you whether

10   you had talked to Detective Williams at all that

11   day, and I think you said something to the effect

12   of just when you dropped people off.  My question

13   is, did you talk to Detective Williams specifically

14   about Sophie Kosofsky at all?

15   A.    Not that I can recall.

16        MS. LOMMERS-JOHNSON:

17            I'm just going to ask if we can take

18          a two-minute break to 3:56.  Hopefully,

19          we'll be all set.

20        THE WITNESS:

21            All set to be finished?

22        MS. LOMMERS-JOHNSON:

23            Yeah, unless Joe or Greg have any

24          questions for you.

25            {BRIEF RECESS, 3:50-3:56}

```
 1              MS. LOMMERS-JOHNSON:
 2                   I don't have any further questions
 3              for you.  Thank you for your patience
 4              today.
 5          THE WITNESS:
 6                   Thank you.
 7      EXAMINATION BY MR. SCOTT:
 8          Q.   I just want to clean up a couple of
 9      little things here.  How do you think you ended up
10      getting directed to write a report on Sophie
11      Kosofsky if you didn't handle her?
12          A.   After everything was over, you know,
13      because we don't know what names were whose when we
14      were arresting them, I was given a copy of this and
15      told to write the report.  At the time, my
16      recollection of the person that I arrested was
17      accurate based on the report I wrote.  I didn't
18      know any of their names on scene.  I was told this
19      was my person, and that's the report I wrote.
20          Q.   Is it possible somebody confused Soni and
21      Sophie?
22          A.   That's very possible.
23          Q.   What do you do when you misidentify
24      somebody in a report?
25          A.   If you know you do it, you write a
```

```
1    report, a sup fixing the name, but this is the
2    first time I realized that they were not the same
3    person.
4          Q.   If there is a mistake in the location,
5    the street address of where an offense occurs, does
6    that invalidate the Affidavit of Probable Cause, in
7    your opinion?
8          A.   Not in my opinion.
9          Q.   Is it a crime to block the roadway on
10   Airline and France Street?
11         A.   Yes, it is.
12         Q.   Your service rifle, is that a full
13   automatic weapon or is that semi?
14         A.   Semiautomatic.
15         Q.   Kind of thing you can buy at Academy?
16         A.   Yes, when they're available.
17              MR. SCOTT:
18                   Indeed.  The great gun shortage of
19                2020.  That's all my questions.
20              MR. FAHRENHOLT:
21                   I have no questions.
22              MS. LOMMERS-JOHNSON:
23                   Dave, do you have any follow-up?
24              MR. LANSER:
25                   Nothing else for me.
```

```
 1              [End of deposition, 4:00]

 2

 3

 4

 5              WITNESS CERTIFICATE

 6

 7

 8

 9              I, CORPORAL ALAINA MANCUSO, have

10   read or have had the foregoing testimony read to me

11   pursuant to Rule 30(e) of the Federal Rules of

12   Civil Procedure and do hereby certify that to the

13   best of my ability and understanding, it is a true

14   and correct transcription of my testimony.

15

16

17   Please check one:

18

     _____Without corrections
19

20
     _____With corrections (see errata sheet)
21

22

23

24   _____      _____

     CORPORAL ALAINA MANCUSO               Date
25
```

1          C E R T I F I C A T E

2

3              This certification is valid only for
a transcript accompanied by my original signature
4   and original required seal on this page.

5              I, SANDRA P. DIFEBBO, Certified
Court Reporter, in and for the State of Louisiana,
6   as the officer before whom this testimony was
taken, do hereby certify that CORPORAL ALAINA
7   MANCUSO, after having been duly sworn by me upon
authority of R.S. 37:2554, did testify as
8   hereinbefore set forth in the foregoing 98 pages;

9              That the testimony was reported by
me in stenotype, was prepared and transcribed by me
10  or under my personal direction and supervision, and
is a true and correct transcript to the best of my
11  ability and understanding;

12             That the transcript has been
prepared in compliance with transcript format
13  guidelines required by statute or by rules of the
board, that I have acted in compliance with the
14  prohibition on contractual relationships as defined
by Louisiana Code of Civil Procedure Article 1434
15  and in rules and advisory opinions of the board;

16             That I am not related to Counsel or
to the parties herein, nor am I otherwise
17  interested in the outcome of this matter.

18

19

20

21  _____
Sandra P. DiFebbo,
22  Certified Shorthand Reporter

23  Date:  _____

24

25