UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


BLAIR IMANI, et al.                    DOCKET NO.

       Plaintiffs,              17-cv-00439JWD-EWD

   V.


CITY OF BATON ROUGE, et al.

       Defendants.




DEPOSITION OF LIEUTENANT CHRISTOPHER BRYAN TAYLOR
given in the above-entitled cause, via Zoom
videoconferencing, pursuant to the following
stipulation, before Sandra P. DiFebbo, Certified
Shorthand Reporter, in and for the State of
Louisiana, on the 2nd day of July 2021, commencing
at 9:30 AM.

```
 1   APPEARANCES (Via Zoom):
 2   REPRESENTING THE PLAINTIFFS:
     (Imani v. City of Baton Rouge)
 3
                 MOST & ASSOCIATES
 4               BY:  DAVID LANSER,
                 ATTORNEY AT LAW
 5               201 St. Charles Avenue
                 Suite 114 #101
 6               New Orleans, Louisiana  70170
 7               JOHN ADCOCK,
                 ATTORNEY AT LAW
 8               P. O. Box 750621
                 New Orleans, Louisiana  70175
 9
     REPRESENTING THE PLAINTIFFS:
10   (Smith v. City of Baton Rouge)
     (Batiste-Swilley v. City of Baton Rouge)
11   (Tennart v. City of Baton Rouge)
12               MACARTHUR JUSTICE CENTER
                 BY:  JIM CRAIG, ATTORNEY AT LAW
13               ERIC FOLEY, ATTORNEY AT LAW
                 MANDISA MOORE-O'NEAL, ATTORNEY AT LAW
14               4400 S. Carrollton Avenue
                 New Orleans, Louisiana  70119
15
     REPRESENTING THE CITY/PARISH OF BATON ROUGE AND
16   BATON ROUGE CITY POLICE OFFICERS:
17               EAST BATON ROUGE PARISH ATTORNEY'S OFFICE
                 BY:  JOSEPH K. SCOTT,
18               ATTORNEY AT LAW
                 Suite 902
19               222 St. Louis Street
                 Baton Rouge, Louisiana  70802
20
     REPRESENTING THE LOUISIANA STATE POLICE AND
21   INDIVIDUAL STATE POLICE TROOPERS:
22               BURGLASS & TANKERSLEY, LLC
                 BY:  GREGORY FAHRENHOLT,
23               ATTORNEY AT LAW
                 5213 Airline Drive
24               Metairie, Louisiana  70001-5602
25
```

```
 1   E X A M I N A T I O N           I N D E X
 2
 3                                        Page
 4   BY MR. CRAIG:                        5, 168, 170
 5   BY MR. LANSER:                       132
 6   BY MR. SCOTT:               170
 7
 8
 9   E X H I B I T                 I N D E X
10                        Page
11
     Exhibit 1(SSSSSSS)           26
12   Exhibit 2(TTTTTTT)           27
     Exhibit 3(X)                     28
13   Exhibit 4(UUUUUUU)           29
     Exhibit 5(VVVVVVV)               46
14   Exhibit 6(WWWWWWW)               52
     Exhibit 7(KKKKKKK)               63
15   Exhibit (LLLLLLL)                65
     Exhibit 9(XXXXXXX)               68
16   Exhibit 10(YYYYYYY)              71
     Exhibit 11(ZZZZZZZ)              83
17   Exhibit 12(SSSSS)                91
     Exhibit 13(G)                    99
18   Exhibit 14(AAAAAAAA)             111
     Exhibit 15(BBBBBBBB)             113
19   Exhibit 16(CCCCCCCC)             116
     Exhibit 17(DDDDDDDD)             119
20   Exhibit 20(ZZZZ)                 135
     Exhibit 21(LL)            138
21   Exhibit 22(CCCCC)                151
22
23
24
25
```

```
1            S T I P U L A T I O N
2
3              It is stipulated and agreed by and
4   between Counsel for the parties hereto that the
5   deposition of LIEUTENANT CHRISTOPHER B. TAYLOR is
6   hereby being taken pursuant to the Federal Rules of
7   Civil Procedure for all purposes in accordance with
8   law;
9              That the formalities of reading and
10  signing are specifically reserved;
11             That the formalities of sealing,
12  certification, and filing are hereby specifically
13  waived.
14             That all objections, save those as to
15  the form of the question and responsiveness of the
16  answer are hereby reserved until such time as this
17  deposition or any part thereof is used or sought to
18  be used in evidence.
19                    *  *  *  *  *
20             Sandra P. DiFebbo, Certified Shorthand
21  Reporter, in and for the State of Louisiana,
22  officiated in administering the oath to the witness
23  via Zoom.
24
25
```

```
 1          LIEUTENANT CHRISTOPHER B. TAYLOR, having
 2      been first duly sworn, was examined and
 3      testified on his oath as follows:
 4  EXAMINATION BY MR. CRAIG:
 5          Q.   Please introduce yourself for the record.
 6          A.   I'm Christopher Bryan Taylor.  I'm a
 7  lieutenant with the Baton Rouge Police Department.
 8          Q.   Lieutenant Taylor, my name is Jim Craig.
 9  I am the attorney for the plaintiffs in actually
10  four cases that I may ask you about.  So for
11  purposes of appearances, I am counsel of record in
12  Tennart against City of Baton Rouge, Smith against
13  City of Baton Rouge, Batiste-Swilley against City
14  of Baton Rouge, and AR against City of Baton Rouge,
15  and with me on the Zoom today are my colleagues,
16  Eric Foley and Mandisa Moore-O'Neal.  We may be
17  joined by Hannah Lommers-Johnson later in the
18  deposition.
19              MR. CRAIG:
20                  Do other counsel wish to make
21              appearances?
22              MR. LANSER:
23                  This is Dave Lanser on behalf of the
24                  plaintiffs in the Blair Imani versus
25                  City of Baton Rouge, and John Adcock is
```

```
 1                  also here in that case.
 2           MR. FAHRENHOLT:
 3                  Greg Fahrenholt on behalf of the
 4             Louisiana State Police, defendants in
 5             the Nikole Smith, Blair Imani, Lisa
 6             Batiste-Swilley, Leroy Tennart, and Max
 7             Geller matters.
 8           MR. CRAIG:
 9                  Then I believe Joseph Scott for the
10             City/Parish, correct?
11           MR. SCOTT:
12                  Correct.
13     BY MR. CRAIG:
14        Q.   So this deposition is being taken
15     pursuant to the Federal Rules of Civil Procedure,
16     and we would ask, lieutenant, that you read and
17     sign the deposition.  Mr. Scott will go over that
18     procedure with you.  Have you been deposed before?
19        A.   For this incident, no, sir.
20        Q.   You've never been in a deposition before?
21        A.   Oh, a deposition overall, in my career,
22     yes, sir, I have.
23        Q.   That was -- right.  When was the last
24     time you were deposed?
25        A.   Oh, over ten years ago, I believe.
```

1          Q.    Then I just want to go over what we -- I
2     think all lawyers on this call consider the ground
3     rules for the deposition to make sure we're on the
4     same page.  First, our court reporter you see here
5     on the Zoom is taking everything down.  We are
6     recording, but it will still be helpful if you
7     speak out, speak clearly, as you have been doing.
8     Try not to use nonverbal communications like
9     shaking, nodding of the head, and, also, those kind
10    of nonverbal but audible type of responses that we
11    all sometimes do, like uh-huh or na-huh.  And if I
12    ask you to restate, if you do one of those things,
13    I'm not trying to pick at you.  I'm just trying to
14    make sure we get a clean record and know what your
15    testimony is today.  Does that make sense?
16         A.    Yes, sir.
17         Q.    You understand that you have taken an
18    oath that requires you to tell the truth the same
19    as if you were in a court of law?
20         A.    Yes, sir.
21         Q.    In terms of the information that you'll
22    be giving today, if, in answer to, as you are
23    answering later questions in this deposition, you
24    think of something that supplements or maybe
25    subtracts from something you have said before, I

1    would ask you to just interrupt me at whatever

2    convenient point and say, I just remembered

3    something, or I thought about it or whatever it is,

4    and so that we make sure that by the end of the day

5    we have your best recollections of what happened on

6    the weekend of July 9th and 10th of 2016.  Is that

7    acceptable?

8            A.    Yes, sir.

9            Q.    Great.  I sometimes will ask questions

10   that don't entirely make sense, and I will

11   sometimes ask questions that don't make sense at

12   all, and when I do that, I would like you to just

13   tell me that doesn't make sense to me, if there is

14   a particular part of it that you can identify.

15   Sometimes people will say, I don't know what you

16   mean by X, or whatever, then I'm happy to rephrase

17   and try to get common ground with you so that you

18   can answer the question.  Is that okay?

19           A.    Yes, sir.

20           Q.    Sometimes -- this happened yesterday.

21   When I'm asking my confusing and sometimes over

22   long questions, I will sometimes pause, and that

23   can lead to you answering the question or you

24   might, in the middle of the question, kind of

25   figure out what you think I'm asking for, and that

1    ends up with us talking over each other.  So I will

2    try to let you finish your answers, and I would ask

3    that you try to let me finish my questions.  It

4    doesn't always happen, but it's just a point of

5    etiquette, I suppose.

6         A.    Yes, sir.

7         Q.    Any time during this deposition, I don't

8    know how long it will take, but I would expect at

9    least through the full morning and maybe a little

10   bit of the afternoon.  It's not an endurance test,

11   and so if at any point you need a break, you just

12   need to let us know, and that includes if you or

13   your attorney believe that you should talk in the

14   middle of the deposition.  You are allowed to do

15   that.  Our only request is that if there is a

16   question pending to you that you answer the

17   question, and then we'll take a break, and that way

18   we avoid even the appearance of impropriety.  Do

19   you understand?

20        A.    Yes, sir.

21        Q.    Last ground rule orientation type

22   question.  We ask everybody -- we are not picking

23   on you -- whether there is any medication or

24   personal hardships, lengthy shifts, lack of sleep,

25   anything that as sitting here today you think would

1    prevent you from having your best recollection and
2    to give your truthful testimony about these
3    matters?
4         A.   No, sir.  No issues.
5         Q.   If that changes during the day, which
6    sometimes it does, then feel free to take a break,
7    tell your lawyer, and we'll deal with it.
8              MR. SCOTT:
9                   Just to let you know, we are going
10                to want some lunch.
11             MR. CRAIG:
12                  It's kind of early for lunch, Joe,
13                but it's --
14             MR. SCOTT:
15                  In a couple of hours.
16             MR. CRAIG:
17                  Yes.  I'm happy to stop to go at --
18                you know, we sometimes, lieutenant,
19                just try to push through to finish.
20                Yesterday that ended up with all of us
21                pushing and like eating in five-minute
22                breaks and such as that.  Sure.  We
23                will definitely take a break around the
24                noon hour so that everybody can take
25                care of themselves.

1    BY MR. CRAIG:

2        Q.    My question to you, lieutenant, is did

3    you do anything to prepare to testify today?

4        A.    No, sir.  There had been some brief

5    discussion.  Obviously, this was five years ago.  A

6    lot has transpired through my career, personal

7    life, and everything.  Some of it is a blur, and

8    I'm sure some of your questions will jog my memory

9    on a few things, but, no, sir, not really.

10        Q.    Have you reviewed documents at all before

11    -- let me -- excuse me.  Let me stop for a second

12    and make sure I clarify that.  In asking you about

13    preparation for any question, I'm never going to be

14    asking you for the contents of any conversation

15    you've had either with Mr. Scott or any other

16    attorney, city/parish, or any -- the union attorney

17    or any attorney that you might consult.  I'm never

18    going to be asking you for attorney-client

19    privileged information, but I think I can ask you

20    if you looked at any papers or documents today.

21    Before today.  Sorry.

22        A.    Prior to today, the two documents that I

23    viewed was my Internal Affairs jacket and my

24    training records.  Besides that, that's all.

25        Q.    Did you review any video or audio of any

1    of the events of the 9th and 10th?

2         A.    No, sir.

3         Q.    Have you spoken to other law enforcement

4    officers, whether with BRPD or not?  I know you

5    have, but I'm talking about the events of the

6    weekend of July 9th through 10th as it relates to

7    this deposition.

8         A.    No, sir.  In preparation for this, I have

9    not.

10        Q.    I assume that you have talked to your

11   colleagues on a minute-by-minute basis.

12        A.    Absolutely.

13        Q.    Let's start by giving me a brief overview

14   of your educational background, please.

15        A.    I have a high school degree.  I attended

16   several years of college, and that didn't work out

17   for me, so I went to work in construction until I

18   became a police officer when I was 22 years old.

19        Q.    Let's just stop for a second.  Where did

20   you go to high school?

21        A.    Zachary High.

22        Q.    Where did you attend college?

23        A.    I went to LSU for a semester.  USL in

24   Lafayette, when it was USL for a year and a half,

25   and that was it.

1      Q.   And so when you were 22, which police

2    department did you join?

3      A.   Baton Rouge Police Department.

4      Q.   What year was that?

5      A.   September 1st, 1995.

6      Q.   So I assume you went through the academy

7    associated with the Baton Rouge Police Department?

8      A.   Yes, sir.  58th Basic Training Academy.

9      Q.   Where were you first assigned after your

10   academy and any field instruction?

11     A.   My first permanent assignment was Second

12   District.  I was Second District which is around

13   LSU, College Drive area on night shift.

14     Q.   Was that night shift patrol?

15     A.   Yes, sir, it was.  Uniform patrol.

16     Q.   How long were you in that position?

17     A.   Approximately two and a half years before

18   my first transfer.

19     Q.   Where was your first transfer?

20     A.   It was -- at the time, it was called the

21   Neighborhood Strike Force or 700 Club.  It was a

22   criminal patrol unit.

23     Q.   Why did they call it the 700 Club?

24     A.   I think it was a slang term that was

25   given to them when it was originated.  It was a --

1    they got all brand new equipment, because it was

2    something that our mayor at the time liked, and all

3    of their unit numbers started with 700, so the term

4    on the street was, that's the 700 Club, so it just

5    kind of stuck.

6        Q.   That was a TV show, if I remember

7    correctly.

8        A.   It was a little different from that, but,

9    yes, sir.

10       Q.   I would assume so.  And so that was from

11   -- was that '97 or '98?

12       A.   Somewhere end of '97, beginning of '98, I

13   believe.

14       Q.   How long were you with them?

15       A.   That was disbanded with some changing of

16   administration probably a year and a half later.  I

17   returned to uniform patrol for approximately eight

18   months and then transferred to the K-9 Division in

19   February of 2000.

20       Q.   We may come back to that very briefly,

21   but how long were you with the K-9 Division?

22       A.   I actually worked a patrol dog for 11

23   years.  I only stayed in K-9 until 2007, where I

24   transferred to our full-time SWAT unit as an

25   operator and as a dog handler for SWAT.

1    Q.    How long were you a full-time SWAT unit
2    member?
3    A.    I remained in full-time SWAT until around
4    November, I believe.  October, November of 2011.
5    Q.    What did you --
6    A.    To my recollection.  I moved around a
7    lot.
8    Q.    I should say as long as you qualify and
9    let us know when you are approximating, that's
10    okay, and it's also okay if you just flat can't
11    remember with any certainty.  I will also never ask
12    you to guess.  It just doesn't help you, doesn't
13    help me, but it's fine.  So where did you -- what
14    happened in October or November-ish of 2011?
15    A.    I transferred from full-time SWAT and was
16    a firearms instructor full time at our firearms
17    training range.
18    Q.    How long were you in that position?
19    A.    Approximately two years.
20    Q.    What happened next?
21    A.    I transferred from there back to full-
22    time SWAT as the full-time SWAT commander.
23    Q.    We had not talked about rank during this
24    time.  Did becoming the full-time SWAT commander
25    involve a promotion in rank or was it just a new

1    assignment?

2        A.    Yes, sir.  For full time it did.  I

3    achieved the rank of sergeant about halfway through

4    my stint at the firearms training unit. It's a

5    little complex in that during all of this time,

6    beginning in November of 1998, I was on SWAT.  I

7    made the SWAT team, and it is up until 2000 and --

8    end of 2006 it was a part-time unit, so it was like

9    auxiliary.  We were on call.  So I was also a SWAT

10   operator that entire time.  When it comes to the

11   entire team for SWAT, rank does not necessarily --

12   rank has its privileges, but it's on ability.  I

13   moved up through the positions on the part-time

14   SWAT unit, and at the time that I transferred back

15   to full-time SWAT as a sergeant commander, I was

16   our operations commander for Alpha team.

17       Q.    I'm sorry.  I didn't hear the last two

18   words of that.  Operations commander for --

19       A.    Operations commander for Team Alpha.  We

20   have two teams, Alpha and Bravo.

21       Q.    I'm sure we'll come back to that, but how

22   long were you or have you been with the full-time

23   SWAT team as commander?

24       A.    I stayed with them -- I actually call it

25   retiring from the team.  I didn't quit.  I did 18

1    and a half years with them.  It was the end of --
2    middle to the end of '18 is when I -- I guess I
3    will go ahead and call it resigned from SWAT
4    altogether.
5        Q.    What was your assignment after that?
6        A.    Prior to me getting off of SWAT
7    altogether, I moved from full-time SWAT commander
8    and was the assistant commander for our entire
9    Special Operations Bureau.
10        Q.    What is the Special Operations Bureau?
11        A.    Special Operations Bureau is more of
12    uniformed support.  It's specialty.  It is SWAT.
13    It's dive team.  It's mounted patrol.  At the time
14    it was K-9, the traffic division, our motor units,
15    our EOD, bomb techs.
16        Q.    What is EOD?
17        A.    Explosive ordnance.  I don't know what
18    the D stands for.
19        Q.    So if you have a bomb threat, those are
20    the people that come and check it out?
21        A.    Yes, sir.
22        Q.    Anything else included under Special Ops?
23        A.    I'm sorry.  I couldn't hear you.
24        Q.    Was anything else included under Special
25    Ops?  Thank you for asking, by the way.

1     A.    K-9 was under there at the time.  I don't

2  know if I said that.  I believe I covered all of

3  them.

4     Q.    You did.  You did say K-9.

5     A.    I'm sorry.

6     Q.    Are you still in that role?

7     A.    No, sir.

8     Q.    Okay.  So what happened next?

9     A.    I left that role and did a brief stint as

10  the commander of our intelligence unit.  That

11  lasted approximately eight or nine months.  I'm

12  more of a uniform guy, so I left there, went back

13  to uniform patrol, remained in uniform patrol for

14  several years.  February of last year up until the

15  end of last year I moved as the assistant uniform

16  patrol commander, and then end of last year, I left

17  that position and went to my current assignment as

18  a shift commander at First District in North Baton

19  Rouge, uniform patrol. I told you I moved a lot.

20     Q.    Yeah, but at the time, Baton Rouge is not

21  that big.  So you moved a lot, you didn't move a

22  lot.  So let me ask you, when were you promoted?

23     A.    You cut out, sir.

24     Q.    Yeah.  Sorry about that.  When were you

25  promoted to lieutenant during that -- in that

```
 1   stretch?
 2        A.   I had been promoted lieutenant
 3   approximately -- I think you have to have two years
 4   -- I'm trying to talk myself through it.
 5        Q.   Understood.
 6        A.   Year and a half ago.
 7        Q.   Okay.
 8        A.   Maybe two.  Year and a half to two years.
 9        Q.   That works.  Thank you. Have you had any
10   connection or participation in Baton Rouge Police
11   Department's Mobile Field Force?
12        A.   I have done some training with them, yes,
13   sir.
14        Q.   As a trainer or as a trainee?
15        A.   No, sir.  It was -- the only training
16   that I -- well, I did have Mobile Field Force
17   training in the Academy, which, again, was in 1995,
18   was my only actual training for Mobile Field Force
19   with SWAT.  With the collaboration between the SWAT
20   working with Mobile Field Force, I have attended
21   one or two trainings with that, but that's my
22   extent.
23        Q.   So focusing in on July of 2016, that was
24   when you were the SWAT commander for Team Alpha?
25        A.   Yes, sir.
```

1    Q.    So was there an overall SWAT commander?

2    A.    Yes, sir.  At the time, the overall SWAT

3    commander was Noel Salamoni. The name will ring a

4    bell.  So he was actually off at the time,

5    therefore, I believe he was a lieutenant at the

6    time.  Darron Leach, J.D. Leach was over the entire

7    team.

8    Q.    The entire SWAT team or over the entire

9    --

10   A.    Yes, sir.  Over the entire SWAT team.

11   Q.    When you said ring a bell, was your

12   lieutenant related to one of the officers involved

13   in the shooting death of Alton Sterling?

14   A.    Yes, sir.  My captain was.  Noel Salamoni

15   was his father.

16   Q.    Your captain was the father of the

17   officer?

18   A.    Correct.

19   Q.    I just want to make sure I understood

20   that.  And then who was the commander of Team Bravo

21   in July of 2016?

22   A.    I can give you two names.  I believe it

23   was Richard Arnette.  I believe he was still here

24   at that time.  If it was not him, it was Kenneth

25   Wayne Martin.

1      Q.    How many SWAT officers were under your
2  command on Team Alpha?
3      A.    Approximately 12 at the time.
4      Q.    I believe you said that that, as of July
5  2016, was a full-time unit?
6      A.    Yes, sir.  There was a full-time unit,
7  but the full-time unit was only approximately eight
8  or nine officers that did it full time, but they
9  came from the part time.  So say if we had 24
10 operators on SWAT, out of those 24, eight or nine
11 were full time.  The rest of them had other jobs.
12 They were detectives.  They were uniform patrol.
13 They were, you know, in different capacities.
14     Q.    I see.  So it was kind of -- the entire
15 force of the SWAT team was kind of a hybrid of some
16 full-time people who were enhanced with people who
17 were part time, but, otherwise, had day-to-day
18 duties in the department?
19     A.    Correct.  You had to be part of the part-
20 time team to be eligible to be on full time.  Those
21 people chose to do it on a full-time basis where
22 others chose to do other jobs and only do it on a
23 call-out basis.
24     Q.    Is there a relationship between SWAT and
25 an acronym I've seen, SRT? Are you familiar with

1    SRT?

2        A.    If you get technical about it, we are the

3    Special Response Team, which is SWAT and

4    negotiators.  So the SWAT is the actual operators.

5    Negotiators are attached.  The entirety is SRT.

6    SWAT, I guess, is the operator section of it.  The

7    tactical guys.

8        Q.    What was the occasion for the department

9    to move to a full-time SWAT component?

10        A.    The full-time SWAT began after Katrina.

11    All of part time was activated during Katrina and

12    the aftermath and all of the people that were being

13    housed in and around Baton Rouge and at our River

14    Center.  At the time, our uniform patrol commander

15    was actually the commander over all of SRT/SWAT

16    negotiators, and at the time, they decided to keep

17    a small element together, I guess, you know, his

18    special little group.  If anything needed to be

19    done, he would call them to go do it.  At the same

20    time, right after Katrina, we had -- there was a

21    narcotics warrant that was run in South Baton Rouge

22    where two officers were injured and one was killed,

23    therefore, they believed there was a need for a

24    full-time tactical team to start running those

25    high-risk search warrants.  So there was a lot of

1   things evolving at the time, but that's how full-
2   time initiated.
3       Q.   Thank you.  So I want to focus on this
4   time period between 2013 and 2016, which was the
5   time period where you came back and became a
6   supervisor in the SWAT team and through the time of
7   these protests we'll be talking about a little
8   later.  What were the day-to-day activities of the
9   SWAT team when they were not called out for
10  something large and special?
11      A.   We did a multitude of things.  We would
12  -- Crimestoppers in our area, if there were Crime-
13  stoppers tips.  If we weren't planning a search
14  warrant, didn't have a search warrant planned, we
15  would go, I guess, knock on doors just see if we
16  could locate some of these people that were wanted
17  with tips that came through Crimestoppers. Murders
18  down to thefts.  It allowed our uniform guys to
19  stay on the street.  It also allowed a small group
20  of people that had worked good together to have a,
21  I guess, a better tactical advantage to keep
22  ourselves safe when we went to these unknown
23  situations just knocking on doors.  We also would
24  go -- would be assigned to hot areas.  If there
25  were areas where crime was spiking, we would go

1  ride those areas doing criminal patrol, being seen,
2  being proactive.
3       Q.   Are you familiar with the term "Jump Out
4  Team" or "Jump Out Boys?"
5       A.   I heard the term.
6       Q.   You heard the term?  Is that a term that
7  is used within the BRPD or just something that
8  you've heard on the streets, as it were?
9       A.   Oh, that's a street term.
10       Q.   What is your understanding of the meaning
11  of it?
12       A.   I have no understanding.  It doesn't make
13  any sense to me, to be honest with you.
14       Q.   That's fair.  Thank you.  Whatever the
15  term is supposed to mean, is it making reference to
16  -- in your understanding, is it making reference to
17  the SWAT team?
18       A.   I believe we have been referred to as
19  that.  Our criminal patrol unit has been referred
20  to as that.  I think it's any group of officers
21  together going out doing proactive work as a group.
22  That term is loosely used throughout the community.
23       Q.   Are you familiar with the -- is it BRAVE
24  Initiative or Bravo? BRAVE, right?
25       A.   BRAVE, yes, sir.

1        Q.    What is BRAVE?

2        A.    The enforcement side of BRAVE was our --

3   what they now call our street crimes unit.  It was

4   an initiative to combat crime.  They had the

5   enforcement side.  They also had the -- they did

6   things like call-ins when they identified people

7   that were headed down the wrong path where they

8   could talk to them, offer them solutions to get out

9   of the criminal -- you know, out of their criminal

10  stuff.  It wasn't just a street crimes unit going

11  out looking for people.  They interacted.  People

12  were identified as repeat offenders.  They tried to

13  offer them help.  Different things of that nature.

14  I was never actually part of that, so that's my own

15  version of it.

16       Q.    That was my next question.  That

17  sometimes dangerously leads us into new territory,

18  but I was going to -- obviously, I was going to ask

19  whether you were a part of that.  I want to talk

20  about training.  You said you participated in

21  training, obviously, in your SWAT capacity, and,

22  also, had some connection to training with Mobile

23  Field Force.  Am I understanding that right?

24       A.    Very limited with Mobile Field Force,

25  but, yes, sir.

1            MR. CRAIG:

2                I believe this will be a new

3            exhibit, and I hate to press you into

4            service, Mr. Lanser, but do you, by

5            chance, know what we're starting on

6            today?

7            MR. LANSER:

8                This should be seven Ss.  S as in

9            Sam.

10            MR. CRAIG:

11                Thank you.

12    BY MR. CRAIG:

13        Q.   So this will be Exhibit 1 to your

14    deposition and Exhibit 7 Ss.  I will share my

15    screen.  I'm aware that we have seen this logo

16    before, those of us attorneys in this deposition,

17    but this, I believe, is a different document than

18    the one which was Exhibit W, which we'll talk about

19    in a little bit.  In any event, we are kind of

20    looking at Exhibit 1.  Do you recognize this logo

21    for police training group?

22        A.   No, sir.  I've never seen that before in

23    my life.

24        Q.   That's why I started with it, because

25    most people, if they have -- I kind of feel like

1    you would know.  In the trainings for either SWAT

2    that you attended, and, also, taught, and in the

3    Mobile Field Force trainings that you participated

4    in as a trainer, did you coordinate or use outside

5    vendors or agencies to assist in that training?

6        A.   As far as Mobile Field Force, I've never

7    been a trainer.  Like I said, I've attended a few

8    trainings with them, but I never -- just to clarify

9    that.

10       Q.    I appreciate that.

11       A.    The outside instruction as far as SWAT is

12   that I have attended conferences and/or trainings

13   which were under the either Louisiana Tactical

14   Police Officer Association or the NTOA, which is

15   the National Tactical Police Officers Association.

16   Actually, National Tactical Officers Association.

17       Q.    The word "police" isn't in the national

18   title? The word "police" isn't in there?

19       A.    Police is not in the national

20   association, yes, sir.

21       Q.    I'm going to screen share -- this is

22   going to be Exhibit 2 to your deposition, I

23   believe, and it will be seven Ts, as in Tommy, in

24   the overall marking.  I can flip through these

25   slides.  This is, obviously, a PowerPoint

1    presentation.  Let me kind of flip through them.

2    My question is just going to be do you recognize

3    this at all? There are more slides.  I'm just

4    wondering if that's enough for you to be able to

5    figure out if you have seen this before.

6         A.    I have not.

7         Q.    I'm going to screen share what I think

8    has been marked as Exhibit X, one X, and it will be

9    Exhibit 3 to your deposition.  It will be the same

10   question, whether you are familiar with this

11   presentation.

12        A.    If this was done after 1995, no, sir.  I

13   have not seen it.  I have not attended a class with

14   a PowerPoint for Mobile Field Force.

15        Q.    Yeah.  It's from 2015 is my understanding

16   from the city/parish which produced it to us. Okay.

17   That's helpful.  Thank you.  In your capacity --

18   well, in any capacity, actually, within the Baton

19   Rouge Police Department, have you been trained in

20   crowd control?

21        A.    Just the limited about of training and

22   training that I attended for Mobile Field Force.

23        Q.    Just to be clear, do you know when that

24   was that you were trained for Mobile Field Force?

25        A.    I guess if we went back to my training

1    records, it would show my actual training was

2    probably in 1995, when I was in the academy.

3          Q.    Okay.

4          A.    I may -- I recall having a refresher at

5    an in-service one year.  I don't know if it was

6    half a day, one day, but there was some type of

7    refresher, but I couldn't tell you exactly when

8    that was.

9          Q.    So Exhibit 4 to your deposition, which

10   will be Exhibit 7 Us.  I'll screen share.  It is

11   what we've been given as your training records.  If

12   we start at the top here, this fits what you were

13   telling us, in fact, including the fact that you

14   were in the 58th Training Academy.  You have a hard

15   copy there in front of you?

16         A.    Yes, sir, I do.

17         Q.    Why don't we do it this way, lieutenant.

18   I think it will be most efficient if we went

19   through and you pointed out to us the pages on

20   which either SWAT or Mobile Field Force training

21   was taken by you.

22         A.    As far as the Mobile Field Force in the

23   academy, there was so many classes.  It was 20

24   weeks of the academy.  My Mobile Field Force would

25   have been done between 9/1 of '95 and 1/22 of '96,

1    as far as my original training for that.

2        Q.    Thank you.

3        A.    I am believing, also, as far as -- I

4    don't think the way it's listed on this is -- do

5    you see SRT monthly training?

6        Q.    Yes.

7        A.    Over and over and over again, it doesn't

8    give the exact topic that was discussed or that was

9    trained on, but it would fall under one of those

10   recurring SRT monthly trainings.  I would not be

11   able to point out an exact date.

12       Q.    Fair.  And then, also, looking at these

13   -- at your training record, in addition to the SRT

14   monthly training, there are multiple, as many as

15   three to six-ish, per year specific trainings with

16   respect to SRT.  Is that correct?

17       A.    Yes, sir. We, as a team, for SRT, we do

18   quarterly qualifications, so that's going to show

19   four times a year.  I see building entries,

20   building movement techniques.  Earlier on, where

21   it's starting in 1999, it was more descriptive than

22   getting to the new format where it just says SRT

23   monthly training, but a lot of building entries, a

24   lot of close-quarter defensive tactics, dignitary

25   protection, the school crisis response scenario

1    training, which is basically active shooter

2    training, hostage rescue.  Here we go.  My

3    recollection was correct.  On Page 2, Number 47, in

4    2001, 10/5 of 2001, Mobile Field Force Cycle 3,

5    October 5th. So what that would be, that's going to

6    be an eight or -- the number out to the right is

7    the number of hours.  It was an eight-hour

8    retrainer for Mobile Field Force.  I knew I

9    attended at some point.  It would have been during

10   an in-service.

11        Q.   What is the cycles referring to?

12        A.   I have no idea.

13        Q.   It was some collection of topics, I

14   assume, or issues?

15        A.   Yes, sir.  I don't know what the cycle

16   means.  I can tell you I don't know the year.

17   Prior to Dewayne White becoming our chief, he left

18   state police, our in-services were -- 2013 is when

19   -- if he came in 2013, we changed our in-services

20   to do in-service.  We did all 40 hours within a

21   week.  So we would take a week during our birthday

22   month and attend in-service, which is actually what

23   I've been doing all week.  Prior to some changing

24   of POST mandates for the number of hours you had to

25   have per year, in-services were done by topic.

1    They would take one topic, and they would run

2    everyone through it on a one-day cycle.  Then they

3    would go to another topic, and you would have

4    another day that you were assigned.  Logistically,

5    it was terrible, so they started making you do a

6    complete 40-hour week during your birthday month

7    around 2013, 2014, which is a whole lot of useless

8    information, but that is probably why this stuff is

9    broke up in the manner in which it's broke up.

10        Q.    Have you had training on what I believe

11   some law enforcement agencies call legal aspects

12   or, you know, learning about either Louisiana

13   statutes or constitutional provisions?

14        A.    Yes, sir.  Obviously, we had a huge legal

15   section within -- I don't know the number of hours,

16   broken down within our training academy, and we

17   receive legal updates by e-mail from our legal

18   advisor on occasion.  There have been many times

19   during in-service where there is a section of legal

20   updates.  I can't give you exact dates, but, like I

21   said, we receive, in the age of the computer, we

22   receive a bunch of legal updates.  I say a bunch.

23   We receive legal updates when things change through

24   e-mail.

25        Q.    During that time period of 2013 until

1    2016, what would be the uniform -- what kind of

2    gear would a SWAT team member wear when on

3    assignment outside of the headquarters?  Like if

4    you were, as a full-time SWAT commander of Team

5    Alpha, if you had occasion to do any of the tasks

6    that you talked about, serving a high-risk warrant,

7    or dealing with an issue that called for SWAT, what

8    equipment would your team members be wearing?

9          A.   If it was a search warrant or serving a

10   high-risk arrest warrant, we would have on Level 3

11   entry vests, helmets.  We would have our gun belts,

12   obviously, and we would probably be carrying one of

13   our long guns, one of our rifles.  That's for that.

14   Any other day we'd just be in Class B with soft

15   body armor.  After '16, sometime around '17, the

16   department actually ordered us plate carriers that

17   we wore in place of the soft body armor, so we

18   would have better rifle protection.

19          Q.   What was that word that you used, plate?

20          A.   Plate carriers.

21          Q.   P-L-A-T-E?

22          A.   Yes, sir.

23          Q.   What does that mean?

24          A.   Basically, the plate carriers that we

25   have -- a plate carrier holds a rifle, a Level 3 or

1    Level 4 plate.  Instead of it being soft ballistic

2    kevlar, it was just a large ten by 12 plate that

3    you had on your front and on your back.

4         Q.    I see.

5         A.    Obviously, you can put pouches and things

6    of that nature.  The only soft ballistic material

7    we had was what we called a cummerbund, which is a

8    piece that covered your ribs on the side that

9    connected the two together.  They bought those

10   after the events at B-Quik on Airline Highway.

11        Q.    You are talking about the killing of

12   Baton Rouge police officers in the latter part of

13   July of 2016 when you talk about B-Quik?

14        A.    Yes, yes.

15        Q.    Thank you.  You mentioned Level 3 entry

16   vests.  Can you distinguish that from the soft

17   armor or the plate carrier?

18        A.    Basically, Level 3 is the ability of what

19   type of rounds that it will stop.  It's a little

20   bit heavier, a little bit thicker, more cumbersome.

21   Obviously, in Baton Rouge it's a lot hotter.  You

22   can't wear it for 12 hours.  It is used -- it gives

23   you protection on your throat, on your neck,

24   biceps, front and rear, and it also had the

25   capability of holding Level 3 and/or Level 4 plates

1    in the front.

2         Q.   Is it called an entry vest because it

3    might be used if you are making entry into an area

4    to apprehend a subject or serve a warrant or

5    something like that?

6         A.   Yes, sir.  That's the terminology we use

7    is entry vest, yeah.

8         Q.   In terms of the helmets that the Baton

9    Rouge Police Department's SWAT team used, did they

10   have visors?

11        A.   That was an option.  Some people wore the

12   helmets with the ballistic face shield. That was

13   optional.

14        Q.   You mentioned certification earlier.  Did

15   you say certification or qualification?  I can't --

16   I'm sorry.  I don't remember.

17        A.   In reference to the firearms, it's

18   qualifications.

19        Q.   Then with reference to SRT or SWAT, was

20   there a term you used?  Let me look back at your

21   training records.  Looking at your records, Exhibit

22   4 here to your deposition, it looks like the term

23   "qualification" is used with in terms of particular

24   firearms.  Is that a fair statement?

25        A.   Yes, sir.

1      Q.    Was there any separate manual or policies

2   or procedures book or binder that was devoted just

3   to the SWAT team?

4      A.    There are general orders with standard

5   operating procedures that describes what SWAT is

6   capable of, what they do.  I haven't read it in

7   years, but, yes, sir, there is a portion of our

8   policy and procedure manual that discusses that.

9      Q.    Is there a separate -- any separate

10  manual or procedure guide that is just devoted to

11  SWAT? In other words, if I was joining SWAT as a

12  part-time person, and hoping, ultimately, to get

13  into full time, would I receive any separate set of

14  procedures?

15     A.    No, sir.  I don't believe.  It's pretty

16  much outlined in the general order, and everything

17  else may be just something that was put together as

18  just, hey, this is what you can expect when you get

19  on SWAT.  You'll be on call for this amount of

20  time.  This is what is expected of you.  But there

21  was -- it's nothing that, to my knowledge, that I

22  can remember, that is -- I mean, it goes to your

23  day-to-day operation SWAT.

24     Q.    In your role as commander of the Alpha

25  team of SWAT during those years, 2013 through at

1    least 2016, did you have input or authority over

2    whether a particular officer could join either the

3    part-time SWAT team or go from part time to full

4    time?  Were you part of the group that decided who

5    should be on SWAT?

6         A.   Yes, sir.  I had a vote.  I was one of --

7    I was one vote of what we considered the command

8    staff, which was the operations commanders, the

9    tactical commanders, team leader and assistant team

10   leader.

11        Q.   So you were a team leader in that

12   structure?

13        A.   No, sir.  What the structure is, the

14   operations commander is basically the top guy over

15   one of the teams.  Then he had a tactical

16   commander.  Then there was a team leader and an

17   assistant team leader.

18        Q.   I see.  So you were the --

19        A.   Each team had --

20        Q.   -- leader for your team?

21        A.   -- those positions.  Sorry.

22        Q.   You were the operations lead for Team

23   Alpha?  Is that what I'm understanding?

24        A.   That is correct.

25        Q.   And you reported directly to Captain

1    Salamoni?

2        A.    Correct, or, in his absence, it would be

3    now Captain Darron Leach, J.D. Leach. If for some

4    reason they were out of town, something that they

5    were not there, then I assumed the role as the

6    commander over the entire SWAT team.

7        Q.    Were there any kinds of tasks or

8    scenarios that somebody who aspired to be a member

9    of the SWAT team would have to do in order to be

10   admitted to the SWAT team?

11       A.    Yes, sir.  There was tryouts.  They have

12   changed and evolved over time, but it basically --

13   the nuts and bolts of it was there were several

14   courses that you had to shoot with your handgun and

15   a rifle and reach a minimum score.  If you did

16   that, there was some physical tests which was

17   Cooper standards.  Don't ask me how that all got

18   started, but I think it's -- everyone probably

19   understands Cooper standards.  We did push-ups and

20   sit-ups to see what type of strength you have, and

21   then we have a hellacious obstacle course you had

22   to run and complete unassisted.  If you passed all

23   of that, then, obviously, a background check was

24   done.  We talked to supervisors to get input on

25   their work ethic, things of that nature.  We would

 1    check their IA records, and then they did an oral

 2    interview.  We asked a series questions, and at the

 3    end of that, the command staff would vote on

 4    whether that person would be selected to be part of

 5    SWAT.  If you are selected, you are on a six-month

 6    probation where you've got to prove to us that

 7    you're going to work out and keep advancing, and

 8    you can pick up certain things.  This is prior to

 9    them attending a 40-hour school where they had to

10    do -- most of it was CQB, close-quarter battle

11    drills, learning how to tactically move through a

12    building with a team.  So there's a lot to it.

13         Q.   Prior to July of 2016, did the SWAT team

14    and the Mobile Field Force team work together on

15    how they might deploy together in a large scale

16    rally or protest or something like that?

17         A.   I don't recall if it was prior to that or

18    if it was after.  I'm not sure.  At the time, I

19    wasn't on the ground participating, per se.

20    Leading up to 2016, I was in a position -- an

21    administrative position, so I didn't always attend

22    those trainings, when it got that close.

23         Q.   Yes.  I understand.  Not the protest in

24    July 2016, but, for anything else, if SWAT -- if

25    your team, Alpha, was called out to handle a matter

1    that was appropriate for SWAT, would you yourself

2    go into the field with the other members of the

3    SWAT team?

4         A.    Yes, sir.

5         Q.    So, as you know, these protests are --

6    this lawsuit is about the protests that happened

7    after Mr. Sterling was killed in July 2016, and I'm

8    going to be focusing on four specific protests

9    which, just to kind of give you a spoiler alert,

10    will be protests at around the BRPD headquarters on

11    Saturday, July 9th, and that goes through different

12    periods of the afternoon and evening; a protest

13    that occurred at the mayor's house on Rivercrest on

14    the night of July 9, I believe going into the super

15    early hours, just past midnight, of July 10, and

16    then a protest where the individuals protesting

17    ended up at the corner of East and France

18    approximate to the Downtown Baton Rouge area where

19    some other events happened.  So that's ultimately

20    where we're going, just to kind of orient you.

21    Prior to July 2016, had you, as a BRPD officer,

22    under any assignment, been part of a response to a

23    large scale protest for a rally in Baton Rouge?

24         A.    No, sir, I had not.

25         Q.    Let me ask you about some specific

1    probably more rallies than protests and just see if

2    that refreshes your recollection or if indeed it

3    wasn't staffed the same way.  So the first is

4    January 2016 roundabout the anniversary of the

5    issuance of the decision in Roe versus Wade.  There

6    was a large rally at the state capitol about

7    abortion, and there were people from both sides

8    present.  It was rather large.  Do you remember

9    being present as a Baton Rouge police officer for

10   that?

11        A.   I remember doing something with state

12   police at the capitol, but I don't know if that's

13   what it was.  I don't recall, no, sir.

14        Q.   The other two rallies that I'm familiar

15   with both happened in June, the month before the

16   Alton Sterling protests, and that was, again, in

17   June there was -- there were rallies both for and

18   against abortion in Baton Rouge, and then on the

19   11th, in association with the annual Pride

20   Festival, there was a march from the River Center

21   to the state capitol.  It may be that these

22   different gatherings kind of run together in your

23   head, if they didn't, but I guess those are the

24   ones I'm thinking of.  Do you remember having any

25   involvement as a Baton Rouge Police Department

1    officer with those?

2        A.    No, sir.  Like I said, I'm not saying

3    that I wasn't there in some capacity as maybe

4    security for the march or something along that

5    nature, because when things would come up that were

6    a little out of the norm, they would always have

7    some type of SWAT contingency as an emergency force

8    that worked in conjunction with our traffic office.

9    So I may well have done it.  Once special

10   operations was combined and the Traffic Division

11   and SRT, or SWAT, were there together, they said,

12   okay, traffic office is in charge.  They're in

13   charge of setting everything up, making sure

14   permits are there, but what are we doing to protect

15   the persons that are there.  With that being said,

16   it was determined that there would always be four,

17   six, or eight, depending on the size of the crowd,

18   QRFs, quick reaction forces, in case something bad

19   happened in these large groups that we had people

20   capable of going in and handling that.  So that

21   could be festivals Downtown, any large permitted

22   event.  There was always some type of SWAT

23   contingency there as two-man groups, not actually

24   in the capacity of SWAT, just having the skills and

25   the equipment and the ability and the trust to go

1    in and handle any type of situation that may occur.

2    We did a lot of that for, like I said, festivals.

3    Every year for the Louisiana Marathon we had

4    contingencies, Fourth of July, Earth Day, you name

5    it.  Any type of festival or any gathering where

6    they required permits, because in Baton Rouge you

7    have to have a permit to have a street closure.

8    Any time there was something with a street closure,

9    Traffic has to work it, and they usually had a SWAT

10   contingency there. I worked a whole lot of those,

11   so I could tell you one doesn't stand out any more

12   than the other.

13        Q.    Thank you. Let's turn then specifically

14   to July of 2016.  How did you first hear about the

15   death of Mr. Sterling?

16        A.    I received a phone call at home.  I

17   actually worked Fourth of July Downtown that night.

18   I went home for an hour, hour and a half.  My good

19   fortune, my luck, and I'm being facetious.  In June

20   of 2016, I became the Baton Rouge Union of Police's

21   president, so, therefore, any time there was an

22   officer-involved shooting, I was contacted and went

23   out on it so that I could help, one, to check on

24   our members, also, to contact an attorney for them

25   and things of that nature.  So I was called in that

1    capacity to go out to the scene.

2         Q.    Do you remember who called you?

3         A.    No, sir, I sure don't.

4         Q.    So you went to the actual scene at the

5    Triple S store?

6         A.    Yes, sir.

7         Q.    Did you receive any texts or e-mails from

8    your co-workers about either the death itself or

9    the protests that followed it?

10        A.    Not to my knowledge, no, sir.

11        Q.    At any point, let's say, the first

12   several months after the protests, did you have any

13   occasion to check your e-mails or your text

14   messages to see if there was any communications

15   related to the protests that followed

16   Mr. Sterling's killing?

17        A.    I had probably hundreds of e-mails in my

18   position.  I was in our Homeland Security office.

19   I was one of the incident commanders, so I received

20   bulletins, briefs, and e-mails by the hundreds.

21   Just updates, things from -- you know, intel

22   bulletins, things of that nature, but anything

23   specific, if that's what you are looking for.  If

24   there is something specific you are looking for --

25   I can tell you we were inundated with e-mails.

1        Q.    Yeah.    What I was actually -- I

2    appreciate all of that.    What I was actually asking

3    was whether you ever, when it was all -- when the

4    protests were done, and, of course, I know there is

5    the flood after that, but I'm talking about any

6    time in the months after that, were you or any

7    other officer that you know tasked with going

8    through your e-mails and pulling out those that had

9    to do with the protests?

10       A.    I don't recall that.    Our e-mail stuff I

11   won't go and pull it.    I think there may have been

12   something that came through where they -- any

13   e-mails pertaining to the protests -- because it

14   stays, I think, on the server.    I was never tasked

15   to go through or I do not remember going through

16   each and every individual e-mail and go, okay, this

17   pertains to the protest, this does not.

18       Q.    Separate from Mr. Sterling's death, how

19   did you first hear about the protests?    Well, I

20   should ask this, probably.    Were there people

21   assembling at the Triple S Food Store when you

22   arrived in your capacity as union president?

23       A.    Yes, sir.    There were a few.

24       Q.    How did you first -- were you first

25   informed that there were protests either

1    anticipated or actually larger than that?

2         A.   I don't recall how I was notified.  The

3    actual scene that night was no different than any

4    other scene.  There was tape set up.  There were

5    onlookers, friends, family members, probably.

6    Obviously, whether it's officer involved, or if

7    it's just two civilians, there is always a

8    commotion out there, but I wouldn't call it

9    protests at the -- of the actual scene.  Obviously,

10   follow up.  I don't know where we received

11   information or intelligence that there was possibly

12   going to be protests over this issue.

13        Q.   I'm going to screen share the next

14   document which is Exhibit 5 to your deposition.  It

15   will be seven Vs. These will be, I believe, duty

16   rosters for you. So I have put on the screen,

17   lieutenant, a document.  The way that I have it

18   formatted is four pages.  It is actually two

19   documents combined.  One is the duty roster from

20   July 2 to July 8 of 2016.  That's the first few

21   pages, and the second two is the duty roster for

22   July 9th through July 15th of 2016.  I'm putting on

23   the screen right now, there it is, the one from the

24   2nd through the 8th.  Are these documents that you

25   would see in the ordinary course of your work as a

1    BRPD officer?

2          A.    Yes, sir.

3          Q.    What I would like to ask you to do is

4    let's start with the 4th, because you have given

5    testimony about that.  If we can just walk through

6    each of these days and you interpret for me what

7    this form is telling us about your work schedule

8    during those days.

9          A.    Beginning on the 4th, sir?

10         Q.    Yeah.  I think you said -- I think it

11   reflects it that you worked ten hours on the 4th.

12         A.    Yes, sir, and that would have been ten

13   hours worked Downtown for the fireworks show and

14   the annual event that occurs down there.

15         Q.    Sure.  That makes sense.

16         A.    From one to -- from 1300 to 2300.  So I

17   worked special assignment Downtown.  If you look at

18   the second page, it corresponds on the 4th, where

19   it says 10, 4th of July, security assignment on

20   levee Downtown.

21         Q.    Yep.  I sure do.  I do see that.  So

22   let's go to the 5th.

23         A.    The 5th.  Ten hours regular Shift 1,

24   which means I worked day shift that day.  I just

25   did a normal ten-hour shift.

1      Q.    So where it says Shift 1, that is
2  referring to the day shift?
3      A.    Yes, sir, it is.
4      Q.    And so if it was -- if it said 2, that
5  would be the night shift?
6      A.    Two would be an evening shift.  There is
7  a 2A, and it gets real complicated.  Basically,
8  normal 1 is day shift.  Two is evening shift, which
9  starts at 1400 hours and runs to 2400 hours, and
10  Shift 3 is night shift, which is 2100 hours at
11  night until 07 the next morning.
12      Q.    Got it.  Is that night shift what they
13  sometimes refer to as dog shift?
14      A.    Yes, sir.  Sure is.
15      Q.    Well, then, let's go to the 6th, 7th, and
16  8th.  Why don't you tell me those combined just
17  what this form says.  We'll be talking about them
18  in a little bit more detail.
19      A.    It shows I worked Shift 1 for ten hours,
20  and I believe at the time our -- let me see.  I'm
21  not going to speculate.  Regular duty.  On the 6th,
22  I worked 07 to -- I can't actually read it here.
23      Q.    Because of that strike through, right?
24      A.    1700.  Is that what it is showing?
25      Q.    It's hard to say.

1   A.   07 to 1700, that would give me ten hours.

2   Q.   Yeah, it sure would.

3   A.   And then I had 13 hours of overtime.  It

4   was only labeled MOHSEP security from five at night

5   until six in the morning.  So something occurred,

6   to the best of my knowledge.  Again, this was five

7   years ago, and there is a whole (inaudible) on here

8   that something occurred and started building I

9   believe around -- I don't know if it was going to

10   be at police headquarters or if crowds started

11   gathering at the Triple S on Foster, and I was

12   called back out as part of incident command to

13   monitor it.  That shows that I worked 13 hours from

14   five in the evening, 1700 to 0600.  The reason that

15   the 13 is on the 6th, though it carried over to 06

16   the next morning, is I believe that SWAT was

17   activated at that time.  The entire Alpha and

18   Bravo.  Alpha team would have been the on-call

19   team, so they were called first, and that's why

20   they assumed the position of night shift, because

21   once we were activated, we went to 12-hour shifts.

22   Q.   In the 12-hour shift model, when would

23   the shift begin?

24   A.   I believe we worked six to six.  1800 to

25   06, and then 06 to 1800, obviously.  For us in

1    command, you will probably see 13 in several

2    places, because we came out an hour early so we

3    could get briefed up as to the occurrences of what

4    happened on days so there was smooth transition in

5    our leadership roles.

6         Q.   If you look at the third page of the

7    document, as it's been formulated for this

8    deposition, is the first page of the duty roster

9    for the 9th through the 15th of July, and then the

10   next page is the corresponding explanation.  I

11   really think your interpretation is sufficient.  I

12   understand that with this exception.  So that first

13   set of days, your special assignment was listed as

14   MOHSEP security.  That would be, for example, the

15   6th, the 7th, and the 8th, but the next week it's

16   listed as EOC.  Does that -- can you help me

17   understand the difference between those two?

18        A.   I cannot.  I can tell you that my

19   assignment time -- that we went to 12-hour shifts,

20   which would have been on -- according to -- if I'm

21   reading the duty roster correctly -- hold on one

22   second.  We went on 12-hour shifts beginning July

23   6th.  From that point through this duty roster,

24   where it shows EOC, I was assigned to the EOC. This

25   was a sergeant in full time, Sergeant Jeff

1    Williams, that was completing these rosters, and
2    that was just, I guess, the terminology he used.
3    Obviously, you can see you are keeping up with a
4    lot of people, but I was assigned to the Mayor's
5    Office of Homeland Security.
6         Q.    Got it.
7         A.    The entire duration.
8         Q.    Yeah?
9         A.    Which is just kind of one and the same,
10   to be honest with you.
11        Q.    Is it the same physical location?
12        A.    Yes, sir, same physical location.
13        Q.    Great.  Thank you.  I have one other
14   question.  Since you got to be facetious, I'll be a
15   little facetious.  Why is Officer Walker in the
16   kennel from 7/9 to 7/15? Was he --
17        A.    So he -- Kibble time.
18        Q.    You had to feed him Kibble and dog wet
19   food?
20        A.    By federal law, you either have to pay
21   them overtime an hour a day or you give them seven
22   hours a week.  He gets one hour a day, even on his
23   days off, for taking -- he is assigned a patrol
24   dog, to take care of his dog.
25        Q.    I see.  To feed and walk the dog?

1          A.    Technically, he works 33 hours

2     physically, and seven hours are, I guess you'd say,

3     given to him or credited to him for kennel time to

4     take care of his police dog.

5          Q.    Okay.  That's interesting.  Okay.  I am

6     going to screen share again.  This will be Exhibit

7     6, and it will be seven Ws.  Let me start by doing

8     the whole page.  I think, if I'm not mistaken,

9     these -- yeah.  Okay.  It's the same form, so I'm

10    going to actually turn, for purposes of figuring

11    this out, to the third page of Exhibit 7, which is

12    associated with July 6th, 2016.  Do you recognize

13    this document?

14         A.    Yes, sir.  That's the document we had to

15    sign in just so they had record of who was at

16    MOHSEP.

17         Q.    MOHSEP, as you said, is the Mayor's

18    Office of Homeland Security?

19         A.    Yes, sir.

20         Q.    Would you have ordinarily, if it had not

21    been for something special or particular like these

22    protests, would you report for duty at the EOC or

23    MOHSEP?

24         A.    No, sir, I would not.

25         Q.    You would -- is your regular duty station

1    in headquarters?

2         A.   No, sir.  At the time of this, my regular

3    duty station was at the full-time SWAT office.

4         Q.   Which is a separate location?

5         A.   Yes, sir, it is.

6         Q.   We'll stop that for now.  We know what

7    that is.  Can you think back to the time when you

8    started reporting at the EOC and tell us what your

9    duties and responsibilities were in that location

10   during the protests?

11        A.   Yes, sir.  I guess I would say I was

12   co-incident command with JD, Darron Leach, for the

13   night shift.  We, I guess, were overseeing the

14   entire operation not only for the Baton Rouge

15   Police Department but for every assisting agency.

16   We had -- I'm trying to think of the term right

17   now.  Unified command.  So at that location, with

18   unified command, it was Lieutenant Leach at the

19   time and myself representing BRPD.  There was a

20   representative from the East Baton Rouge Parish

21   Sheriff's Office, a representative from Louisiana

22   State Police, a representative from the Baton Rouge

23   Fire Department, St. George Fire Department, I

24   believe, EMS.  It was all of, I guess, our partners

25   that had, obviously, an interest for the well-being

1    of the city were in that area making decisions.  We

2    were there.  We had people that were gathering

3    intel for us.  We had people that were monitoring

4    social media to try to find out exactly what was

5    happening, getting as much of the logistics set in

6    place as possible with the anticipation of large

7    crowds that could potentially become unruly.

8        Q.  I don't think -- I might be wrong, but I

9    don't think you mentioned the state police.  Was a

10   representative of the state police also present?

11       A.  Yes, sir.  I did mention them, but, yes,

12   sir.  State police did have a representative, yes,

13   sir.

14       Q.  Did these different agencies, other than

15   yours, typically have the same people reporting for

16   the night shifts like you did?  It was you and then

17   Lieutenant Leach?

18       A.  The same -- I know for -- I believe it

19   was the same person, yes, sir assigned for each.

20       Q.  Do you remember who they were?

21       A.  I do not remember who was there for the

22   East Baton Rouge Parish Sheriff's Office.  I think

23   he was a captain at the time, Carl Saizan was the

24   representative for state police. At the -- I call

25   it the EOC.  I don't call it MOHSEP all the time.

1    If I say MOHSEP or EOC, we're on the second floor

2    of that location, and we just referred to it as the

3    EOC.

4         Q.   Is there a room there that is referred to

5    as the overwatch room?

6         A.   Yes, sir.  That is the large room.  It

7    over -- they call it overwatch room, because there

8    is some big screens.  It overlooks all of dispatch

9    for East Baton Rouge Parish, fire, police, EMS.

10        Q.   And do you either in the overwatch room

11   or anywhere else at EOC, did you have any live feed

12   video running about things happening in the city?

13        A.   Yes, sir.

14        Q.   Were there particular locations where the

15   live feed was coming from?

16        A.   Yes, sir.  We had crime cameras

17   throughout the city, so some of those -- we were

18   able to utilize that.  I believe at the time,

19   though they were stationary, we had access to view

20   live feed from DOTD cameras.  We received

21   information or intelligence from Facebook Live that

22   was streaming on social media.  Confidential

23   informants sending video clips.  There were under-

24   cover officers in the area that were providing

25   information, so, yes, sir.

1    Q.    When you mentioned the DOTD cameras, were

2    those exclusively on the interstates or were they

3    other places, too?

4    A.    As I recall, I believe they were just on

5    interstate.  They're wide-view cameras, and you can

6    kind of -- it will pick up certain things on ground

7    level, but at the time, just to add to it, there

8    was also -- we had -- we were getting live feeds

9    and photos from -- aerial from helicopters as well,

10    our police operatives.  Maybe even the sheriff's

11    office at the time.

12    Q.    I think I've seen reference to the

13    Calcasieu Parish Sheriff's Office also providing a

14    helicopter.  I don't know if you remember that?

15    A.    They did not provide a helicopter.  They

16    provided a plane.

17    Q.    Oh, okay.

18    A.    They had a small fix lean.  The actual

19    pilot during that time just died in a plane crash

20    about three weeks ago.

21    Q.    I'm sorry to hear that.

22    A.    I saw it on the news.

23    Q.    I did not know that.  I'm sorry to hear

24    that.  Let me focus on just BRPD then.  So if you

25    were on the shift that you and -- I'll call him

 1    Captain Leach.  Is that okay with you?

 2          A.    Sounds great.  Yes, sir.

 3          Q.    When you and Captain Leach were working

 4    the 6:00 PM to 6:00 AM shift, who, if anyone, would

 5    you have reported to up the chain of command?

 6          A.    The only person above us, once incident

 7    command was established, would have been Chief Carl

 8    Dabadie. We had a direct line to him.

 9          Q.    When you say direct line, you just mean

10    you had permission to call him directly or did he

11    have like a special frequency or phone or something

12    like that?

13          A.    No, sir.  It was just we had the

14    authority to call him directly. I usually let

15    Captain Leach handle that part.

16          Q.    That was probably smart.  Are you

17    familiar with the southern phrase "Momma didn't

18    raise no fool?"

19          A.    Exactly.

20          Q.    So then under you, the people who were

21    immediately down the line from you and Captain

22    Leach in authority on your shift, was there a name

23    for that position?

24          A.    I don't know that there was a name for

25    that position.  If we -- we were at EOC, at MOHSEP,

1    overseeing everything.  If we had someone I would

2    call boots on the ground, he is the area commander

3    of one particular area, so if there are two

4    incidents going on at one time, you have an area

5    commander, let's just say, at police headquarters,

6    and at the same time something is going on

7    Downtown, we had an area commander at that

8    location.

9         Q.   Okay.  And where were the area commanders

10   drawn from?

11        A.   The area commanders for night shift were

12   drawn from -- it was two people that were on SWAT.

13   They were part of the command.  So it was a

14   tactical commander and a team leader, which would

15   have been our two area commanders, co-commanders.

16        Q.   And who were those two individuals?

17        A.   That would have been Joel Pattison,

18   P-A-T-T-I-S-O-N, and Shane Mouch, M-O-U-C-H.

19        Q.   So Mr. Pattison and Mr. Mouch would be

20   the officers actually on the ground with the BRPD

21   contingent in the field as the protests were

22   happening?

23        A.   Yes, sir.  They were in the field, but

24   they would not have been on the front lines.  They

25   would have been at some place where they had like a

1    little onsite command post set up.

2        Q.    Sure.   That makes sense. How did you or

3    Captain Leach communicate with the area commanders

4    as things were taking place?

5        A.    Radio and/or cell phone.

6        Q.    Did you have a city/parish issued phone

7    or were you using your own phone?

8        A.    I believe I had both at the time.   I

9    hated carrying two phones, so I tried not to have

10   them, but I believe at that time I did have a city

11   phone.

12       Q.    Was that -- you had the city phone in

13   your capacity even before the protests; is that

14   right?

15       A.    Yes, sir.  Yes, sir.

16       Q.    Do you know when you received that phone

17   was it checked out to you on some kind of inventory

18   list?

19       A.    I believe so, yes, sir.

20       Q.    And then, if I'm understanding your

21   testimony correctly, at some point you were

22   liberated from the requirement of carrying a city

23   phone; am I right?

24       A.    Yes, sir, absolutely.

25       Q.    And when did that happen-ish? You can

1  tell me if -- was it associated with a change in

2  assignment for you?

3       A.   Yes, sir.  It would have been, yes, sir.

4  I believe it may have been at the time when I --

5  I'd be speculating.  I would assume it would have

6  been when I got off of SWAT, but I'm not sure.  I

7  may have just gotten tired of it.  I can tell you I

8  had the phone prior to July of '17, and at some

9  point after all of that, it was turned in.

10  Probably even after the floods and things, because

11  I was incident commander --

12       Q.   Oh, of course, right.

13       A.   Things run together.  Trust me.  It was a

14  hell of a year.

15       Q.   Yes.  I appreciate that.  You said '17.

16  I'm sure you meant July of 2016.

17       A.   Yes, sir.  I apologize.  Yes, sir.

18       Q.   And you will have an opportunity to look

19  through the printed deposition.  You have the right

20  to make corrections of that sort.  Mr. Scott is

21  well-versed in how that works.  He will work with

22  you on that.  I am going to show you just a couple

23  of other exhibits and -- to see if you can identify

24  them, and then we may take a break, since we've

25  been going for a little bit.  While we're kind of

1    rocking on here.

2              MR. CRAIG:

3                   Let's go off the record and take a

4              break until 11:20.  Maybe before that

5              break, before we go back on the record

6              after that, we can kind of discuss when

7              we want to take our food break.

8                   {BRIEF RECESS, 11:07-11:21}

9    BY MR. CRAIG:

10        Q.    So we had mentioned the area commanders

11   that worked on your shift during the protests under

12   the leadership of you and Captain Leach.  Let me

13   flip it and ask you about the other shift.  I

14   believe your testimony, when you were looking at

15   your duty roster was that their shifts would

16   overlap, so that you could report to each other as

17   either your giving up a shift to the next team or

18   picking up the shift after them.  Did I understand

19   that correctly?

20        A.    That is correct, yes, sir.

21        Q.    So who was the counterpart to you and

22   Captain Leach during the day?

23        A.    Wayne Martin.  Captain Wayne Martin. Now

24   Captain Wayne Martin.

25        Q.    That's fine.  We'll call him Captain

1    Martin.

2         A.    I believe the person that was assisting

3    him in that capacity was Lieutenant David Wallace.

4         Q.    Who were their area commanders?

5         A.    I know one was then Sergeant, now Deputy

6    Chief, Myron Daniels.  I am not sure if there was

7    another.  Day shift was a whole lot slower than we

8    were.

9         Q.    Do you know an officer named Chris

10   Polito?

11        A.    I do, yes, sir.

12        Q.    Could he have been the other -- could he

13   have been the other area commander?

14        A.    Yes, sir.  Quite possibly so, yes, sir.

15        Q.    I believe you, if I understood your

16   testimony, your team, the team for the night shift

17   during the protests, was basically formed from, at

18   least the leadership part, was formed from the

19   Alpha team of the full-time SWAT?

20        A.    I was the only one.  Yes, sir.  Area

21   command as well as my position.  I'm not sure.  I

22   believe Captain Leach may have been over the

23   training academy at that time.

24        Q.    I think you are right, actually.  Okay.

25   And then so with respect to the day shift, would

1    those leaders, being Wayne Martin, David Wallace,

2    Myron Daniels, and possibly Chris Polito, have come

3    from the Bravo team of the full-time SWAT?

4         A.    No, sir, not full time.  I believe they

5    came from Bravo, but Bravo represents one half of

6    the part-time team, and I do not believe at that

7    time any of those four were part of full time.

8         Q.    Thank you.

9         A.    I take that back.  Myron Daniels was part

10   of full time.  Yes, sir.

11        Q.    Thank you.  You did exactly what I asked

12   you to do in the beginning, which is to revise your

13   testimony on the go if something comes to you.  I

14   appreciate that.  I am going to screen share the

15   next exhibit.  This is, I think, Exhibit 7 to your

16   deposition.  It's is already Exhibit 7 K.  Oh, you

17   just saw my outline.  Good for you.  You know what

18   I'm going to say.

19              MR. SCOTT:

20                   If you gave us the outline, we'd be

21                better prepared.

22   BY MR. CRAIG:

23        Q.    Now is when we call upon Eric or Mandisa

24   to give me a hard time for how close to the

25   deposition the outlines get done.  At least in my

1    case.  Turning back to you, lieutenant.  So Exhibit

2    7 to your deposition is 16 pages.  There are all

3    printed and have a date and an hour and the term

4    "briefing."  Have you seen these documents before?

5        A.    No, sir.

6        Q.    Was there usually a briefing at the EOC

7    in the morning around nine o'clock or thereabouts

8    during the days of the protests?

9        A.    Yes, sir, there was.

10       Q.    Who would -- I imagine there might be

11   multiple briefings, but what briefings do you

12   recall, not exact like meetings, but I'm just

13   asking what categories of briefings do you recall?

14       A.    My briefings consisted of coming in an

15   hour early every evening and seeing what had

16   transpired during the day and making sure that we

17   had effective transition.  Nine o'clock briefings.

18   I got off at 0600, so I would have been at home

19   sleeping.  Any information that we thought was

20   important would have been passed along to Captain

21   Martin when he came in for day shift, and he is the

22   one that attended the meetings on behalf of the

23   incident command, if that makes sense.

24       Q.    It does.

25       A.    I hate meetings.  It was great.  I got to

1  sleep while he did all of that.

2      Q.   That sounds -- we are sympathetic.  This

3  is a document that is, in the overall counting,

4  seven Ls, as in Larry.  It has the term

5  "Operational Log."  It is nine pages.  It goes in

6  reverse chronological order.  It's like flipping --

7      A.   Can you blow that up, sir?

8      Q.   Yeah, sure. Do you recognize this

9  document?

10     A.   No, sir.  These documents, I believe,

11 they were prepared on this letterhead may have come

12 from notes and incidents that occurred.  I don't

13 know that once it was put into a nice format at

14 whatever time it was done that I've ever reviewed

15 any of these documents.

16     Q.   I see, but in terms of the Operational

17 Log, could you have seen a less formally presented

18 synopsis or log of events during the course of the

19 days of the protests?

20     A.   No, sir.  I'll tell you, I took it day by

21 day.  I've never actually seen a log of events from

22 beginning to end.

23     Q.   I appreciate that.  When we get into the

24 specific protests that are at issue in this case, I

25 may come back to this document and another one I'm

1  about to show you just to see if it helps refresh

2  your recollection, but, please, understand that I,

3  in doing that, I will not be trying to imply that

4  you know, that you had seen this document before.

5  It would just be maybe looking at it you remember,

6  oh, yeah, I remember that.  I remember that

7  scenario.

8       A.   Yes, sir.  An After Action Report?  Is

9  that what that document is from?

10      Q.   I don't think it is.  There is an After

11 Action Report that we've seen that I may or may not

12 show you, because we've shown it to other

13 witnesses.  I don't think those are part of that,

14 but I don't know.  Maybe we'll find someone, some

15 day, who was at either a high enough level or cushy

16 enough level that they received these pretty

17 letterhead style documents.

18           MR. SCOTT:

19                You might want to give me a phone

20             call about that, Jim.

21           MR. CRAIG:

22                Sir?

23           MR. SCOTT:

24                You might want to give me a phone

25             call off the record about that, because

```
 1                  they have a particular style, now that
 2                  I've seen them, who the author is.
 3            MR. CRAIG:
 4                  Okay.  Yeah, yeah.  We don't need to
 5                  take up record time with that.  I
 6                  appreciate that, Joe.  We'll follow up
 7                  with you.
 8      BY MR. CRAIG:
 9            Q.    The next document -- y'all guessing who
10      it might be?
11                  MR. SCOTT:
12                  Yeah.  We're putting together a
13                  little pool over here.
14      BY MR. CRAIG:
15            Q.    Are you at any level of probability,
16      lieutenant, as to who you think it might be?
17            A.    No, sir.
18            Q.    That's fair.
19            A.    I have a long list, and I'm not going to
20      just go throw people's names out without having any
21      --
22            Q.    You don't want to share the fun of being
23      deposed?
24            A.    No, no.
25            Q.    Oh, well.  Okay.  I'm hurt, but I'll
```

1    live.

2         A.    At the end of the day, it doesn't matter

3    who wrote it, as long as it's accurate.

4         Q.    That is true. Without a doubt, that's

5    true.  The question just becomes who is in the best

6    position to say what.  If a term is ambiguous, who

7    is in the better position to tell us what it means,

8    but, yes.

9         A.    Understand.

10        Q.    I will not be asking you that because of

11   the -- you already said you didn't -- you have not

12   seen it, and you don't have a role in creating it.

13   So I'm going to turn to Exhibit 9.  Exhibit 9 will

14   also be Exhibit 7 X's.  This is a document that is

15   less formally written, but says, "MOHSEP Synopsis

16   Operational Period, Saturday, July 9th, 2016, 0600

17   to 1800 hours."  Do you see that?

18        A.    Yes, sir.  I can see it.

19        Q.    I will -- having done that, let me just

20   back it into a full page and ask -- this is a

21   different kind of document.  Have you seen

22   documents like this before?

23        A.    I have, yes, sir.

24        Q.    So what is it?

25        A.    This was -- I guess the best way to

1    describe it is as just a brief, brief synopsis of
2    what we encountered or what was encountered. Let me
3    see.  06 to 1800.  I'm sorry.  What confused me is
4    at the top you have 0600 to 1800 under the date,
5    which would have been a daytime synopsis.  This is
6    actually showing the synopsis, if you read in the
7    first paragraph, from 1800 to 06, so the top
8    numbers, the top time frame, is reversed.
9         Because if I go down and look at the log
10   at the bottom, it basically says Lieutenant Leach
11   conducted roll call, training and uniform at 0600
12   hours.  Officer assignments were made.  Situational
13   information was provided.  So, basically, for the
14   officers that were boots on the ground, for lack of
15   better terms, they were just briefed on any
16   information that they may know or any intelligence
17   that we had of something that may be going on, and
18   then at some point, and I couldn't tell you who it
19   is, we had a scribe that would document specific
20   times that they deemed to be important, and that's
21   what that block stuff is at the bottom. So one of
22   these would have been prepared --
23        Q.   For every day?
24        A.   -- at the completion of our shift, yes,
25   sir.  Day shift would have done the same thing.

```
 1    Maybe not the same format, because it was a
 2    different scribe.
 3               MR. CRAIG:
 4                    Thank you.  I think I'm going to
 5                    turn -- the next set of questions I
 6                    have, counsel, is going to be maybe 45
 7                    minutes, maybe less, and I would just
 8                    want to know do you all prefer to stop
 9                    at 12:30 to eat or do you prefer to
10                    stop now, or I can just go on until
11                    spot-on noon, and we'll stop wherever
12                    we are.  I'm okay either way.  What
13                    works for other people?
14               THE WITNESS:
15                    I'm on your timetable.  I could care
16                    less.  I eat out of necessity.
17               MR. SCOTT:
18                    I'd say let's try to roll through to
19                    12:30 or so or whenever your natural
20                    break is.
21               MR. CRAIG:
22                    Got it.  I'm very comfortable with
23                    that.  If anyone disagrees with that,
24                    will you stick it in the chat?
25                    Otherwise, we will just keep rolling.
```

1          I am going to take like two or three

2          minutes to print something that I need

3          to consult for this next series of

4          questions.  Off the record.

5                    {BRIEF RECESS}

6    BY MR. CRAIG:

7          Q.    This is going to be a new exhibit,

8    Exhibit 10.  It will be seven Ys.  Let me just show

9    you the entire first page.  It's got an exhibit

10   sticker from a deposition in one of our other cases

11   about this same group of protests.  I'll go ahead

12   and do the complete width so you can see what we're

13   talking about.  Lieutenant, are you familiar with

14   General Order 244 of the Baton Rouge Police

15   Department titled, "Planning for Unusual

16   Occurrences?"

17         A.    I am aware of its existence, sir.  To say

18   that I have it memorized or can tell you the last

19   time I read it, I would be lying to you.

20         Q.    Well, I don't want that.  Do you have it

21   there in front of you or not?

22         A.    Yes, sir, I do.

23         Q.    Good.  That will at least make it easier

24   for us to talk together here.  This version, it

25   appears -- it says it was revised December 3, 2015.

1    Do you see that?

2        A.   Okay.  Yes, sir.

3        Q.   So that would have been before the

4    protests the next year?

5        A.   That is correct.

6        Q.   Did you have any particular role in

7    drafting or reviewing this policy in your capacity

8    as one of the commanders of the SWAT team for the

9    BRPD?

10       A.   No, sir.

11       Q.   The third sentence in that first section

12   about policy says, "The Incident Command System or

13   ICS defines a command structure that may be used

14   for incidents that require a unified response with

15   other agencies."  Do you see that?

16       A.   Yes, sir, I do.

17       Q.   Was the law enforcement response to the

18   July 2016 protests, did they use the incident

19   command system?

20       A.   Yes, sir.  That's what we had discussed

21   earlier about being at the EOC, having us as lead

22   and having the sheriff's office, fire department,

23   state police, that was our unified command at the

24   top of the structure for incident command.

25       Q.   Great.  On Page 3 of this document, which

1    is still in the definitions section, it further

2    defines unified command as a unified team effort

3    that allows all agencies with responsibility for

4    the incident, either geographical or functional, to

5    manage the incident by establishing a command set

6    of incident objectives and strategies without

7    losing or abdicating agency authority responsi-

8    bility or accountability.  Do you see where I'm

9    reading from?

10        A.    Yes, sir, I do.

11        Q.    Do you recall any discussion with your

12   compatriots in other agencies about a common set of

13   incident objectives and strategies?

14        A.    Yes, sir.

15        Q.    Was that an overall discussion or was it

16   -- did it change from a day-to-day basis or both?

17        A.    There were three common objectives for

18   the entire incident.  First was preservation of

19   life, safety of people.  Second was to prevent

20   destruction of property, which we had seen around

21   the country, and, three, was to keep our roadways

22   open.  So just to make it as general as possible,

23   preservation of life, prevent any destruction of

24   property, and keep our roadways open.

25        Q.    So that would probably have been decided

1    very, very early on in the protests?

2        A.   Yes, sir.

3        Q.   Correct?

4        A.   Yes, sir.  I apologize.  I spoke over

5    you, but, yes, sir.

6        Q.   Yeah.  No, we're good.  Do you recall

7    that the first meeting that you participated in at

8    EOC, you know, it was decided to convene high-

9    ranking officials from various law enforcement

10   agencies to discuss potential protests?

11       A.   I do not recollect the exact particulars

12   of that meeting or exactly who was there, but, yes,

13   sir, there was one that was held.

14       Q.   Do you remember whether that would have

15   been on July 5th, which would have been at sometime

16   later on the day when Mr. Sterling was killed or

17   was it the 6th, the next day?

18       A.   Give me one second.  I'm looking back at

19   the duty roster to tell you.

20       Q.   Okay.  That's excellent.

21       A.   According to the duty roster, the 6th was

22   the first day where it shows me as MOHSEP security,

23   but I was actually EOC.  Again, those two were

24   synonymous.

25       Q.   Yes, sir.

1      A.    So I would believe that it would have

2  occurred -- it's my recollection, according to the

3  duty roster, it makes sense it would have been

4  during the day shift hours of July 6th.

5      Q.    Looking at Page 4 of this document,

6  General Order 244, this is Roman numeral I, Command

7  Structure and Organization, and then under C it

8  says, "It should be clear that only one person is

9  in charge of the incident, the IC.  The individual

10 assuming incident command should be known to all

11 personnel involved in the event."  Do you see that?

12     A.    Yes, sir.

13     Q.    IC is talking about incident commander,

14 correct?

15     A.    Yes, sir.

16     Q.    During the July 2016 protests, when it

17 was night shift, and you and Captain Leach were

18 incident commanders, what would your relationship

19 be to other law enforcement agencies who were there

20 assisting BRPD with the response to the protests?

21     A.    Repeat that again.  I'm not sure exactly

22 what you're asking.  I'm sorry.

23     Q.    No.  I'm very glad you asked.  I can ask

24 it a much shorter way.  As incident commanders,

25 what amount of authority did you and Captain Leach

1    have with respect to other law enforcement

2    agencies, like the state police or sheriff's

3    deputies or what have you?

4         A.    Because it was happening within our

5    jurisdiction, I guess you could say that we were

6    the lead department.  We had the final say-so, and

7    we had the, I guess you'd call it, the compromised

8    authority from Chief Dabadie that we didn't have to

9    call him every time a decision was made.  It was

10   there for a reason and said we cannot make a wrong

11   decision, and he would back us whatever we did.

12        Q.    Then would you have the authority to

13   deploy law enforcement officers from other agencies

14   to various places within the city/parish during

15   protests?

16        A.    Yes, sir.

17        Q.    How would that happen logistically? Like

18   if you all were to decide, gosh, we don't have the

19   people, we need additional people at X spot, what

20   would you do?

21        A.    I would turn to the representative from

22   -- depending on what we needed, I could turn to the

23   representative for state police or the Baton Rouge

24   Parish Sheriff's Office and say, these are the

25   assets we have at this location.  We need either a

1    Mobile Field Force team or something from your

2    department to go to another location.  Then they

3    would facilitate that by communicating with their

4    rank and file to have that done.

5        Q.    In doing that, did the other agency's

6    representative, did they have the authority to tell

7    you we can't do that or we won't do that at any

8    point?

9        A.    That I don't know.  I can say that we

10   never had to order anyone to do anything.  When we

11   asked the supporting agencies that were with us for

12   help on something, they immediately helped.  We

13   were a team.

14       Q.    So it never came up?

15       A.    No, sir.

16       Q.    I'm going to turn to Page 5, which under

17   still Roman numeral I, Subsection E, it says, "The

18   incident command structure provides leadership,

19   management, and unity of command under the

20   following kinds of operations."  Do you see there

21   are three types of operations listed there?

22       A.    Yes, sir.

23       Q.    Which -- I shouldn't say which.  Do one

24   of those options fit for the way that you

25   implemented incident command structure during the

1    Baton Rouge protests in early July 2016?

2         A.    I could give you a reason why it would be

3    any of the three, and I'll explain that.  What I

4    mean is that it happened --

5         Q.    Please.

6         A.    -- in the City of Baton Rouge, therefore,

7    we assume the lead role, but Louisiana State Police

8    as well as East Baton Rouge Sheriff's Office

9    obviously have jurisdiction within the city where

10   we would not have jurisdiction outside of the city.

11   Does that make sense?

12        Q.    It does.

13        A.    We were the lead organization.  They were

14   assisting, but, technically, they do have

15   jurisdiction within inside the city limits of Baton

16   Rouge.  So you could consider it multi-

17   jurisdictional, because all three enforcement

18   agencies have jurisdiction within inside the city

19   or you could see it as a single jurisdictional

20   responsibility with multi-agency involvement.

21        Q.    Thank you.  Then I'm going to turn to

22   Page 7 of this document under Letter M, as in

23   marmalade.  Sorry.  It describes incident action

24   plans.  If you could just read that to yourself,

25   not out loud.  My question is going to be whether

1    there was any document like this created for the

2    response to the protests in Baton Rouge in July of

3    2016?

4         A.    There were -- we -- incident action plan

5    we consider -- we -- the terminology we use for

6    that is ops orders or operations orders.  I am

7    aware that there were many operations orders that

8    were prepared and written during the day shift

9    hours after intelligence led them to do preplanning

10   for certain incidents.  I can tell you at the time

11   that I would arrive to work every day, myself and

12   Captain Leach had no time to sit down and prepare

13   an IAP or an ops order, because things were so

14   fluid.  Does that answer your question?

15        Q.    I think it does.  Let me just ask the

16   court reporter if she got all of that, because the

17   connection got a little choppy toward the end.

18             THE COURT REPORTER:

19                  Yes.  It got a little choppy there

20                  towards the end.  It wouldn't be bad if

21                  he repeated it, but I --

22   BY MR. CRAIG:

23        Q.    I certainly understand the gist of what

24   you are saying.  How about if we do this.  Are you

25   saying, lieutenant, that because of the fluidity of

1    the situation, that the incident commanders, at

2    least on the night shift, didn't have the

3    opportunity to create written incident action plans

4    for each day?

5         A.    That is correct.

6         Q.    I have seen some operational orders which

7    I may show you after our break, but I understand

8    what you're saying about operational orders.  We'll

9    talk about that in a little bit. So then Letter N,

10   which is Integrated Communications.  We've heard a

11   little bit about this, but could you tell us your

12   understanding of how communications were managed

13   not just within each single law enforcement agency

14   but between BRPD and let's say the LSP or the

15   various deputies who were there?

16        A.    Obviously, we probably have (inaudible)

17   radio channels just for BRPD.

18              THE COURT REPORTER:

19                   How many channels?

20              THE WITNESS:

21                   The goal is that we have to have --

22              MR. CRAIG:

23                   I'll ask him.

24              THE COURT REPORTER:

25                   You have to repeat that answer. You

1              are breaking up.

2         MR. CRAIG:

3              Horribly.

4         THE WITNESS:

5              I'll try again.  We have a bunch of

6         radio channels within BRPD that other

7         agencies do not have, so we had to have

8         a common ground, which is our interop

9         channels that are handled by the state

10        that every agency has on their radios,

11        so that when we have a large scale

12        incident, we can switch to certain

13        channels that everyone has so that

14        there is communication throughout, no

15        matter the jurisdiction.

16   BY MR. CRAIG:

17        Q.    Thank you.  Speaking of the state police,

18   was it sometimes true that your counterpart who had

19   ultimate responsibility for the state police during

20   the protests would sometimes be at their head-

21   quarters, which, of course, was also there in Baton

22   Rouge?

23        A.    My counterpart meaning who?

24        Q.    Well, I'm going to say -- I think you had

25   talked about Major -- now Major Saizan, just as a

1    for instance.  I guess I'm going back to testimony

2    you gave a couple of minutes ago about all of the

3    counter -- all of the representatives of the

4    agencies would be there at the EOC, so the main way

5    you might communicate agency to agency at the top

6    level, you understand, would be simply to walk up

7    to or turn to the person from the other agency and

8    walk through the situation and see what assets they

9    had to help? I understood your previous testimony

10   correctly?

11        A.   Yes, sir.  That would happen.  We would

12   contact them.  Now, if the state police, just to

13   manage all of their personnel also had a subsection

14   somewhere else at their headquarters, where they

15   were managing their people, that may have been set

16   up, but from where we were at MOHSEP, I had one

17   contact with either state police or the sheriff's

18   office.  How they relayed their information, I

19   can't -- that would have been outside of my span of

20   control.

21        Q.   I get it.

22        A.   However, it was done effectively, and the

23   information was passed along.

24        Q.   And if the person -- if they needed

25   approval from another agency -- well, let's just

 1   say the state police required contacting somebody

 2   not at the EOC.  Would you use a telephone to

 3   contact that person or how would you reach out to

 4   --

 5        A.   Everything that I did with the unified

 6   command was face-to-face.  If it was -- if I needed

 7   resources from the sheriff's office, or if I needed

 8   resources from state police, it would have been

 9   face-to-face contact.  This is what we need, and

10   then I moved on to someone else.  They would

11   contact someone down their chain to facilitate

12   whatever we needed.

13        Q.   I see.

14        A.   I had one point of contact with each.

15   They would handle it from there.

16        Q.   Great.  Thank you.  I'm bringing up what

17   will be Exhibit 11 to your deposition, and in the

18   overall numbering system, it is seven Zs, so it

19   will be appropriate for us to discuss this document

20   and eat before we get snoozing.  So this is Exhibit

21   ZZZZZZZ.  It is titled, "General Order Number 291,

22   Civil Disorder."  Have you seen this document

23   before, lieutenant?

24        A.   Yes, sir, and just as the previous

25   document, I'm aware of its existence, but I could

1    not tell you the last time I actually sat down and
2    read it in its entirety.
3        Q.    Thank you.  I seen with this one it had
4    only been revised -- it had been most recently
5    revised back in 2001, so I'm going to assume that
6    you were not asked to participate in the revision
7    of the General Order on Civil Disorder?
8        A.    No, sir.
9        Q.    Both of these General Orders, 244 and
10   291, have a mark that says reviewed 9/1/16.  I'll
11   just go to that General Order 244 to confirm that.
12       A.    That's correct.  I'm looking at it.
13       Q.    Do you recall being involved in any
14   effort to review these two particular policies
15   based on your experiences, actually, not just with
16   the protests in July but then later with the flood
17   in, I think, August?
18       A.    I attended several meetings to discuss
19   actually postops from the protests and the floods,
20   but to say I sat down and reviewed the policy, no,
21   sir, or I don't recall having any input in the
22   policy, no, sir.
23       Q.    Yeah.  There was -- your latter point was
24   the one I was asking about, was whether you were
25   tasked to provide your view in light of the

1    circumstances in July and August of 2016 of how

2    well these policies met their goals.

3         A.    No, sir.  Not to my recollection.

4         Q.    I want to turn -- this one we're going to

5    move down a fair bit to Page 3, I think.  No.  Page

6    2.  Roman numeral III is about incident commander,

7    and we've talked about that, but under Section B,

8    Roman numeral III (b), it says, "Field commanders

9    will ensure that lines of communication remain open

10   both up and down the chain of command."  Do you see

11   where I'm looking at?

12        A.    Yes, sir, I am.

13        Q.    So we had talked about area commanders

14   previously.  Was there a different level of command

15   called field commanders or is this basically

16   referring to what you called in July 2016 the area

17   commander?

18        A.    That's what I'm referring to as the area

19   commander.

20        Q.    Thank you.  And then under the area

21   commanders, there would have been not just,

22   obviously, the SWAT team members, but, also,

23   officers of the BRPD drawn from the uniform patrol

24   units, correct?

25        A.    That is correct, yes, sir.

1      Q.   Would the command structure for these

2   different -- for these other officers, would they

3   retain the same supervisors or superiors as they

4   had in their day-to-day work for the BRPD, or was

5   there a separate chain of command down from the

6   area commanders to the individual officers?

7      A.   Repeat that one more time.  I apologize.

8      Q.   Yeah.  I promised you I was going to do

9   that, so I'll break that down into a shorter

10   question.

11      A.   I'm ADD, so I caught the first part and

12   forgot before you finished with the second part.

13      Q.   Well, we have been communicating pretty

14   well considering our respective challenges.  No.

15   What I'm asking is the area commanders we talked

16   about.  Your area commanders were Joel Pattison and

17   Shane Mouch on your shift.  How were the BRPD

18   officers under their general command, how were they

19   organized? There must have been some kind of sub

20   command of a smaller unit of people.

21      A.   It depends on what their responsibility

22   was at the time, but what we attempted to do or I

23   think that we actually did, is that we kept squads,

24   uniform patrol squads.  The goal was we have

25   officers that are familiar with each other that

1    work with each other on a daily basis that have

2    sergeants and a lieutenant over them that work

3    together on a daily basis, and we kept them as a

4    small group.  Now, we may take two, three, or four

5    squads and combine them together, depending on what

6    the task was or what it dictated for the number of

7    officers that we had.  We tried to keep the -- we

8    kept the squads together.  So the lieutenant or the

9    shift commander of that one unit reported up to the

10   area command.

11        Q.   Is there any -- well, no.  In Section C,

12   where it says, "Superior officers will constantly

13   observe and speak with subordinate --" Yeah.

14   "Superior officers will constantly observe and

15   speak with subordinate officers to ensure that

16   they're complying with the orders of the incident

17   commander," and then the sentence goes on, but

18   that's the part I want to ask you about.

19             In the field, during the protests in July

20   of 2016, if you or Captain Leach would give a

21   directive or an order to Mr. Pattison or Mr. Mouch,

22   how, physically or logistically, would that be

23   translated to the level of the individual officer?

24        A.   If I'm understanding what you're asking,

25   the directive or order would have been passed down

1    to area command.  Area command would have spoken

2    directly to the group or just their supervisor that

3    was over that squad, and tasks were carried out.

4    There was not a whole lot of levels of bureaucracy.

5    It went from EOC to the area command, area command

6    to the group that we needed to have something done.

7        Q.    Thank you.  I'm turning now to Page 4,

8    which is subsection -- which is Roman numeral VII

9    "Mass Arrests."  The first Subsection A says,

10   "Arrest teams are designated to detain all

11   prisoners until arrival of PPT teams."  So in that

12   context, does PPT -- what does PPT mean?

13       A.    Prisoner processing team.

14       Q.    Can you describe for me -- I'll do that

15   after the break.  I want to show you a picture and

16   have you help me understand exactly what BRPD's

17   process was in lining up and responding to a large

18   group of individuals, but I think maybe it will

19   make sense to do that with reference to a picture.

20   It talks about G, Field liaison is established

21   between the court and prosecutorial function with

22   jurisdiction and incident commander.  Do you recall

23   any field contact or communication with the

24   district attorney's office while you were at EOC

25   with Captain Leach?

1      A.    During the time of the incidents, no,
2  sir.  I don't recall speaking with the district
3  attorney's office.  I did not.
4      Q.   F, just above it, says, "All arrested
5  juveniles are handled in accordance with this
6  department's procedures for the arrest,
7  transportation, and detention of juveniles."
8      A.   Yes, sir.
9      Q.   What is your understanding of what BRPD
10 policy is with respect to the arrest,
11 transportation, and retention of juveniles? Here
12 I'm asking for your understanding not for you to
13 quote me line and verse.
14      A.    No.  Depending on the severity of the
15 crime, we have choices as it pertains to the arrest
16 of juveniles.  They can be booked into juvenile
17 detention, which has a process of completing
18 necessary paperwork, raps, probable causes.  It
19 would be based on the AFIS machine, which is the
20 Automatic Fingerprint Identification System, and
21 transported to juvenile detention.  The other
22 option, depending on the severity, is -- not only
23 the severity but the actual having space for them
24 to be held is to do a custodial agreement, which is
25 basically a document that a parent or guardian

1    signs, and they are released to that parent or
2    guardian.  By signing that paperwork, they're
3    basically stating that they will have them appear
4    in court once they receive a court date.  It's like
5    a misdemeanor summons or a summons.  We call it a
6    custodial agreement.  They're not issued a summons.
7    It's just that is done in lieu of booking them.
8         Q.   I see.  Yeah.  You don't give a minor a
9    summons, you do the --
10        A.   Correct.
11        Q.   -- custodial agreement to have somebody
12   of the age of majority commit to the subject's
13   appearance?
14        A.   Or they are placed in juvenile detention,
15   yes.  That's the two choices.
16        Q.   So I think you said with the custodial
17   agreement, it would be in lieu of booking, so if
18   somebody who went through that custodial agreement
19   process, would they be fingerprinted on AFIS or do
20   you know?
21        A.   Nothing prevents it, to my knowledge, but
22   I would say custodials are, 99 percent of the time,
23   done in the field, so, no.  I would say they were
24   not printed.  That's standard operating just in
25   general.

1      Q.   That's what I was asking you for, was

2  your understanding.  If there is a different --

3  something different or more specific in writing,

4  that's not what I was asking you for.

5      A.   Okay.  Yes, sir.

6      Q.   I'm asking for your working knowledge of

7  how it worked.  We don't need to detain ourselves

8  with that in this deposition.  The last document to

9  look at before we break is going to be Exhibit 12

10  in your deposition.  It is five Ss, SSSSS.  I'm

11  going to share the screen on that.  This cover

12  page, I believe, was created by the parish

13  attorney's office, but then looking at the document

14  itself -- I don't know.  If you don't have this one

15  with you, I can e-mail it to counsel.  It was one

16  that should be in the general group, SSSSS.

17           MR. SCOTT:

18                Jim, can you --

19           THE WITNESS:

20                July 8th one?

21           MR. CRAIG:

22                No.  There's a whole group of them

23             that are combined together.

24           MR. SCOTT:

25                I don't have them set up that way.

```
 1              I have a bunch of them just sort of all
 2              over the place.
 3         MR. CRAIG:
 4              Well, I'm mostly going to be asking
 5              you some general questions, lieutenant.
 6              I think we can probably do it on the
 7              screen at least for now.  Let me find
 8              one.
 9         MR. SCOTT:
10              Pick one and tell me the title, I
11              may well just be able to find it.
12         MR. CRAIG:
13              That's great.  So this one is 7/9/16
14              at 1800 hours.
15         MR. SCOTT:
16              Yeah, yeah.
17         THE WITNESS:
18              This is the date of East and France.
19    BY MR. CRAIG:
20         Q.   No.  That was the next day.  I'm actually
21    not a hundred percent sure this protest happened.
22    That was actually going to be my first question.
23    It's possible, isn't it, that an operations order
24    would be formulated and ultimately not need to be
25    employed; is that correct?
```

1        A.    There were many of those.  Like I said,

2   day shift had the time to do that.  If they

3   received any type of credible intelligence that

4   something may occur, they prepared an operations

5   order.  Depending on -- what helps me with this is

6   looking down at the names.  This would have been an

7   operations order prepared on day shift because the

8   QRF forces and the names being used from SWAT are

9   Bravo team, which means this is a day shift

10  operation.

11       Q.    Thank you.  So specifically on the --

12  right there on the first page where it says

13  Friendly Forces, SRT, QRF, we've covered SRT, and I

14  believe QRF is quick response force?

15       A.    That is correct.

16       Q.    Can you tell from looking at this what

17  assignments this is proposing with respect to the

18  six names that are listed under SRT, QRF?

19       A.    Yes.  So what this is saying is the

20  situation is a march from city hall to the state

21  capitol.  If they had information on this, it is

22  showing BRP Motor Division.  So with it being a

23  march, the motor division would take care of

24  traffic along with uniform patrol so that they

25  could safely use the roadways to get from city hall

1    to the state capitol, and that the QRF forces would

2    have been three, two-man units.  They would ride in

3    pairs, and they would be on the outskirts or

4    perimeter in case something bad would occur,

5    destruction of property, someone was getting hurt.

6    If, unexpectedly, an adversarial group would show

7    up to counter protest and things of that nature to

8    keep the peace.

9        Q.   By adversarial group, you mean a group

10   with a different -- who didn't agree with the

11   protesters?

12       A.   Those of this march, yes.

13       Q.   For example, the one that I'm thinking

14   of, tell me if this is what you mean.  Later,

15   several years later, in Charlottesville, Virginia,

16   there were a group of protesters, anti-racism

17   protesters, and there were a group of, I guess,

18   counter protesters.  I don't know if you remember

19   the --

20       A.   I don't remember that specifically.  I'm

21   not saying that there was ever any counter

22   protesting during any time in '17, but in our

23   plannings, we have to plan for the worst.  That is

24   something we would have to consider, because we go

25   back to our three things, which is preservation of

1    life, destruction of property, and the interstate

2    system, our roadways staying clear.  So that would

3    fall within one of our three criteria, which would

4    include all of these people that were marching,

5    protesting.  It was protecting them as well from

6    others.

7        Q.    Thank you.  Coming back to the -- I'm a

8    little confused.  I understand what you are telling

9    me, that the names on the assignment sheets for

10   this document, 7916 and 1800 hours, are people who

11   are on the day shift.  Looking at, I think, the

12   second page of this document, where it says,

13   "Coordinating instructions, 1800 hours, final

14   assault position, final inspection staged at 1700

15   hours."  Do you see where I'm looking at?

16       A.    Yes, sir, I am.

17       Q.    What has me confused right now,

18   lieutenant, is whether this is describing something

19   that had previously happened or is it talking about

20   something that was going to happen? Let me start

21   with that one.

22       A.    Something that was going to happen,

23   because on the first page, where it says this was

24   -- the information they had that this was going to

25   occur at 1800 hours, that would have been shift

```
 1    change for everyone, so to make sure that everyone
 2    was prepared, the day shift element had been given
 3    tasks.  They were going to see this through and
 4    probably stay past their 1800 hours so that there
 5    could be a transition.  You can't transition or
 6    have a shift change in the middle of an event that
 7    may or may not occur.
 8         Q.   Yeah.  That's extremely helpful.  That's
 9    exactly -- you answered my question precisely.
10    Paragraph 5, where it says, "Command and
11    Communications," it says, command and then
12    commander's location, chain of command, commander's
13    location MOHSEP, which we already discussed is also
14    the EOC, chain of command Walker, McGinnis,
15    Daniels.  Can you explain that line to me, the
16    chain of command line?
17         A.   I know all three of these officers.  I do
18    not recall what their titles were on Bravo team.
19    In '16, I don't know if -- I don't know if this is
20    a correct order or they just wrote the names down
21    this way.  I know all three of those are Bravo team
22    members.  These would have been field commanders or
23    area command.  At some point they would have been
24    at the location on the ground, and it appears to me
25    with three of them, they all probably had specific
```

1  duties.  Because you see in here the bearcat was

2  staged, so if the bearcat was staged, one of them

3  may be over a small element at the bearcat.  One

4  may have been over the small element for the QRS.

5  There is a lot of working parts.

6      Q.   Yeah.  That's exactly -- that was obvious

7  just from looking at the video, and that is exactly

8  a big piece of what I'm trying to do today, is

9  understand how they got there and how this large

10 ship made turns and got to where it needed to go.

11          MR. CRAIG:

12              So, counsel, I think this is a good

13          time for a break.  What is your

14          pleasure about how much time you want

15          to take?

16          MR. SCOTT:

17              I'm going to shoot for 45 minutes.

18          {LUNCHEON RECESS, 12:30-1:17}

19 BY MR. CRAIG:

20      Q.   Afternoon, lieutenant.

21      A.   Good afternoon.

22      Q.   Was there any point during -- let's just

23 start this way.  Was there any point during the

24 protests in which you left the EOC and went to the

25 scene of one or another of the protests?

1    A.   I believe early on, one of the first

2  nights, I may have left and gone down to police

3  headquarters, but it was after everything had

4  calmed down and everyone went home and everybody

5  was just kind of staging.  Just to go down there

6  and cheer them on.  They were doing the hard work.

7  I wasn't.

8    Q.   I appreciate that, because, as I under-

9  stood your previous testimony, your role -- to play

10  the role you were playing, it was important for you

11  to remain at the EOC in order to coordinate the

12  Baton Rouge Police Department and other

13  department's responses to the protests; is that

14  correct?

15    A.   That is correct.  Yes, sir, that is

16  correct.

17    Q.   Thank you.  Excuse me a second.  I'm

18  sorry.  I lost track of the next document I was

19  going to show you.

20    A.   I think you were saying we're done for

21  the day.

22    Q.   Well, maybe I am done for the day.

23  That's hilarious.  No such luck, my friend. There

24  we go.  Lieutenant, were you aware at any time

25  between the protests and now that officers in the

1    field used preprinted probable cause affidavits in

2    the arrests of a number of the protesters in July

3    2016?

4          A.    Yes, sir.

5          Q.    When did you come to find out about that?

6          A.    I believe after they had been used or

7    started being used.  I don't know if it was during

8    the actual protests or immediately following.

9          Q.    I believe, if I'm not mistaken, there was

10   an Officer Glenn Hutto, who may be deceased now; is

11   that correct?

12         A.    That is correct.

13         Q.    Did you know Mr. Hutto?

14         A.    I did.

15         Q.    What was his role during that first week

16   of the protests?

17         A.    I don't recall.  I know that he was

18   assigned to uniform patrol at the time of this

19   event.  I'm pretty sure he was assigned to uniform

20   patrol.  He may have had -- I don't know if he was

21   a sergeant or if he had not made rank yet.  I'm not

22   sure.

23         Q.    I'm going to share the screen again,

24   showing you what is Exhibit G, just one G, as in

25   golly, which will be Exhibit 13 to your deposition.

1    What this is, is a -- hang on.  This is a series of

2    e-mails, lieutenant.  Attached to the first one of

3    them is an e-mail from Mr. Hutto to himself, Chris

4    Johnson at br.gov.com, and Adam Cheney at

5    br.gov.com, and that the subject line for the

6    original -- for the first in this chain of e-mails

7    is PC Affidavits for 7/10/16.  Do you see where I'm

8    looking?

9         A.    Yes, sir.

10        Q.    Thank you.  See if we can try to figure

11   out how to -- oh, here we go.  You can see here

12   that one of the documents that was attached to

13   Mr. Hutto's e-mail was an Affidavit of Probable

14   Cause with no name of the arrestee, no identifying

15   information of the arrestee, and then a synopsis of

16   probable cause that's printed out.  Do you see

17   that?

18        A.    Yes, sir, I do.

19        Q.    Then the next page is the same form, but

20   it adds to it the charge for resisting an officer.

21   Do you see that?

22        A.    Yes, sir.

23        Q.    I believe you already told us you were

24   not sure what Mr. Hutto's role was during the

25   protests.  Do you know what Mr. Johnson's or

1    Mr. Cheney's role was?

2         A.   Chris Johnson was -- I don't know what

3    rank, but he did have rank, maybe lieutenant.  He

4    had time on me, but he -- Oh, was he -- I don't

5    know if he was back in uniform patrol at that time

6    or if he was still in the detective division.  I

7    know the name.  I know the officer, but I'm not

8    sure.  Adam Cheney.  If Glenn is cc'ing Adam Cheney

9    in an e-mail, then Adam may have been his

10   lieutenant.  I know at the time that Glenn was

11   murdered last year, that Adam was his lieutenant,

12   and he was a shift sergeant.  They were on the same

13   squad.  I don't know if it dated back until then.

14   I take that back.  Adam Cheney did not work there

15   then.  Adam Cheney was a lieutenant for Montrel and

16   --

17            MR. SCOTT:

18                 I know who you're talking about.

19   BY MR. CRAIG:

20        Q.   It can come to you later.

21        A.   Yes.  So Adam Cheney would have been the

22   Third District lieutenant.  I'm not sure exactly

23   where Glenn was working.

24        Q.   I appreciate that.  Jimmy Nicholson, who

25   is the person Chris Johnson then forwarded this

1    e-mail to, do you know who Mr. Nicholson is?

2          A.    The name sounds familiar.  I can't put a

3    face to it.  No, sir.

4          Q.    That's fine.  That fits with the way

5    we've been -- the only way we can approach this,

6    actually.  And then at the very top then, which is

7    actually the last in the e-mail chain, Chris

8    Johnson is e-mailing this group of e-mails and the

9    attachments to Ira Roberts and Derek Williams.  Do

10   you recall those individuals and what their

11   assignment was during the protests?

12         A.    Ira Roberts was in detectives.  I am not

13   -- I'm pretty sure at that time he was in armed

14   robbery.  And Derek Williams may have been as well.

15   They were in the armed robbery division at some

16   point.  I'm just not sure if that was their current

17   assignment during the time period.

18         Q.    Thank you.  We talked just before the

19   break in looking at -- I think it was general --

20   well, one of the general orders about prisoner

21   processing teams.  Was there one officer on your

22   shift who was in charge of prisoner processing

23   during that shift or how was prisoner processing

24   organized from a command perspective?

25         A.    For the incidents around headquarters,

1    they developed a prisoner processing area somewhere

2    around our training academy, if I recall correctly,

3    and a shift sergeant at the time kind of headed it

4    up, I guess you would say.  As far as the intricate

5    details, I am not -- I can't tell you this is

6    exactly how the process went, because I never

7    actually laid eyes on it and went down there.

8         Q.   I was really more thinking about the who

9    than the what.  In other words, we've discussed

10   your role.  We discussed the area commander's role.

11   Would whoever was in prisoner processing be

12   reporting to the area commanders or did they have a

13   whole separate line of command?

14        A.   They would have reported to the area

15   commanders.  I'm believing for night shift, because

16   I do remember speaking with and getting a little

17   correspondence was Caan Castleberry. That was more

18   of a joint effort as well, because we had the

19   sheriff's office assisting us with transports,

20   especially en masse transports.

21        Q.   You don't remember who on the sheriff's

22   side was working on the -- was working on -- who

23   was in charge, sorry, of prisoner processing?

24        A.   I am thinking it was Caan Castleberry.

25        Q.   Okay.  I appreciate that. And the first

1    name of that -- I believe Mr. Foley has told us in

2    the chat or maybe just told me is C-A-A-N, correct?

3    Mr. Castleberry's first name?

4         A.    That is correct.

5         Q.    Great.  Coming back, as I promised I

6    would, to this synopsis, which is Exhibit 9 to your

7    deposition and seven X in the regular series,

8    because I want to talk just a little bit about the

9    actual events of July 9th and 10th, 2016, as best

10   we can. As best your memory is.  We can go back and

11   look at this, but I'll tell you that those MOHSEP

12   sign-in sheets have you signing in at 1730 on the

13   9th.  Was that consistent with your general

14   practice during that time?  Sorry.

15        A.    Yes.  That time may have not been

16   completely accurate.  I was probably there prior to

17   that.  That was just the time that I remembered,

18   hey, I have to sign this sheet.  I'm not used to

19   signing in and out.

20        Q.    Neither am I.  I'm with you.  So at the

21   time you signed in, and this would have been the

22   first Saturday of the protests, just to kind of

23   orient you. Do you remember that there was already

24   an ongoing protest in front of the police

25   department headquarters at the corner of Airline

1    and Goodwood?

2         A.   Yes, sir.

3         Q.   What would have been -- can you give us

4    any kind of description of what you would have been

5    doing while an active protest was going on, as your

6    shift began?

7         A.   Well, if we're specifically looking at

8    this timeline here, which I believe to be accurate,

9    1730, Black Panthers walking on Airline northbound

10   armed with firearms.  I was at the EOC well before

11   that time, because I remember watching that from

12   aerial cameras.  I don't know if it was from the

13   helicopter or if it was crime cameras that were

14   placed around there, but I do remember that.

15            Because of the time frame, I do know that

16   day shift was technically still in charge, and it

17   was -- instead of just turning all of the

18   operations over at one time, hey, it's 1800 hours,

19   we're done, it's y'all's, we would fully transition

20   control over to the night shift.  That may not have

21   happened.  I see Mouch was incident command at

22   headquarters at 1834, so somewhere between 1730 and

23   1830 it took an hour to transition over to the

24   night shift, myself and Captain Leach being

25   completely in charge.  There was a lot going on out

1   there that day.  You can imagine a bunch of Black

2   Panthers with long guns walking up and down the

3   roadway, brandishing weapons.  It's not a pretty

4   sight.  And at the end of the day, I was

5   responsible for every police officer out there to

6   include their safety.

7        Q.   What, if anything, do you -- do you

8   remember any particular -- well, let me ask this

9   first.  I'm sorry.  Why does it say Mouch IC at

10  headquarters?

11       A.   That's the terminology.  That means he

12  was -- at that point, he took over area command or

13  field command.

14       Q.   Okay.

15       A.   At the headquarters location.

16       Q.   Okay.  Yeah.  Thank you.

17       A.   That's someone else's terminology that

18  wrote it down.

19       Q.   I appreciate that.  I appreciate you

20  looking at it, and we're going to come back to

21  this, but I want to -- there is something else I

22  want to look at first.  Would you have issued any

23  orders with respect to whether or not arrests

24  should be made at this particular point of the

25  protest?

1      A.   I may have, yes, sir.

2      Q.   Do you recall -- let me ask it this way

3  so we know what we're talking about.  When you say

4  you may have, do you recall giving orders to make

5  arrests at any time during the protests?

6      A.   Yes, sir.

7      Q.   Do you have any particular recollection

8  of the circumstances in which you would have given

9  orders?  I'm trying to reverse engineer to figure

10  out when you would have done that.

11      A.   It is my recollection, going by this,

12  when the Black Panthers were marching up and down

13  the street, at some point they did enter the

14  roadway.  I helped orchestrate the disarming and

15  taking the Panthers into custody.  As far as using

16  our armored vehicles for the protection of our

17  officers, at some point, and I don't know if it was

18  this date or another date.  Again, they all run

19  together.  They were, in our opinion at the time,

20  orchestrating an attempt to walk south on Airline

21  Highway from Goodwood to I-12 and to take the

22  interstate at I-12, at which time we were

23  monitoring them again by crime cameras and

24  helicopter and UCs, Facebook Live, and at any given

25  point that entire crowd, from any one of those

1    sources, we had seen were in the roadway, and,

2    again, one of our three was you are not going to

3    obstruct our interstate system, because you are

4    putting too many travelers, innocent bystanders, at

5    stake, because bad things can happen when you start

6    blocking off interstates.  At that point, we were

7    not going to allow it.  The law of civil

8    obstruction had been broken, and orders were given

9    over the radio to start effecting arrests for that

10   charge.

11        Q.   The interstate involved in this

12   particular event that you're remembering, was that

13   Interstate 12?

14        A.   Yes, sir, it was, 12 at Airline.

15        Q.   You see down here where it says, "1904

16   crowd in road at Old Hammond.  MFF deployed?"

17        A.   Hold on.  I'm looking.  Crowd in road at

18   Old Hammond.  Yes, sir.  I see that.

19        Q.   So Old Hammond is a relatively large

20   street that intersects Airline; is that correct?

21        A.   That is correct.  From our location to

22   headquarters all the way back to the interstate,

23   that is the largest intersection on Airline

24   Highway.

25        Q.   It is between BRPD headquarters and the

1  interstate; is that correct?

2      A.   Yes, sir.  Closer to the interstate, a

3  third of the way down.

4      Q.   Yeah.  So what would it mean in this

5  context, MFF deployed?

6      A.   Mobile Field Force.

7      Q.   Yeah, but I guess I would have thought

8  they were already there on the street, so that's

9  what I'm asking.

10     A.   There were several different groups of

11 Mobile Field Force.  We had a Mobile Field Force

12 contingency, East Baton Rouge Parish Sheriff's

13 Office had a Mobile Field Force contingency, and

14 state police also had a Mobile Field Force

15 contingency for multiple locations in and around

16 that area.  As far as which Mobile Field Force was

17 deployed, and what they mean by deployed is they

18 had to physically move from their staging location

19 at headquarters and travel to Old Hammond.

20     Q.   Was this part of the incident that you

21 were describing just a minute ago of protesters

22 that you were concerned might be trying to get on

23 the interstate?

24     A.   Yes, sir.  To my recollection, that is

25 the only time that that crowd moved that far south

1   along Airline Highway.

2       Q.   Great.  Would that then have been the

3   point at which you ordered for arrests to be made

4   or -- I don't want to put words in your mouth.  I'm

5   not sure how specific your recollection is.

6       A.   I'm sure I said it more than once.  It

7   may have been prior to, during that time, and

8   after.

9       Q.   Oh, not an either or, but it could have

10  been different points --

11      A.   Correct.

12      Q.   -- that day?

13      A.   Correct.

14      Q.   How would you have conveyed that order to

15  the area commander?

16      A.   I don't know if it went straight to area

17  command or any officers that were out there dealing

18  with those subjects.  It may have just been

19  directly -- it would been over one of the interop

20  channels so that everyone could hear.

21      Q.   Then a little bit later on at 2141, Page

22  2 of this document, M. Daniels IC I-12 at Airline.

23  Is that referring to Myron Daniels?

24      A.   It is.

25      Q.   What does it mean -- to the extent that

1   you know, what would this be reflecting?

2       A.   To my recollection, this would be

3   reflecting he would have been in charge of a team

4   at I-12 positioned on or near the entrance/exit

5   ramps to prevent anyone from going up the ramps and

6   overtaking the interstate.

7       Q.   I see.  So that's related to the entry at

8   2102, Crowd began moving? Crowd began moving south

9   on Airline?

10      A.   Yes.

11      Q.   I'm going to make sure this isn't already

12  in use.  So this will be Exhibit 14 to your

13  deposition, and that will make it eight As.  It may

14  be that -- somebody can correct me if, in fact,

15  this has already been used as an exhibit.  So,

16  lieutenant, I'm going to play parts of this video.

17  It involves the events of the 9th of July.  Part of

18  my questioning is really going to be to try to

19  understand how the Baton Rouge Police Department

20  units work in the field.  You may or may not

21  remember this particular incident, and that's okay,

22  and if it does not help you in describing for us

23  how the units worked in the field, just say so, and

24  I'll try to find something else.  It is still

25  warming up.

1                    {VIDEO PLAYED}

2      BY MR. CRAIG:

3          Q.    We actually passed through the part I

4      wanted to talk about, about that afternoon, so

5      we'll stop there.  Let me see if I can get to a

6      couple of pictures I wanted to -- let's start with

7      this one.  Do you see this picture of the officers

8      with shields and it looks like batons and helmets?

9          A.    Yes, sir.

10         Q.    Are those Baton Rouge Police Force

11     officers or can you tell?

12         A.    I can't really tell.  I see a green

13     helmet.  I know that's not us, all the way to the

14     right.  I see some updated equipment all the way to

15     the bottom left.  I believe it's state police, and

16     that is possibly BRPD, the majority of them in the

17     middle.

18         Q.    This group with the visors and the darker

19     uniforms, would those be BRPD officers?

20         A.    No, sir.  With the way the equipment

21     looks, I believe that that is state police.

22         Q.    I'm sorry.  That's at 038.  So looking at

23     037 in this video, this looks like the same kind of

24     uniforms you described as being state police?

25         A.    State police, yes, sir.

```
 1         Q.   This will also be a new exhibit.  It will
 2    be Exhibit 15 to your deposition, eight Bs in the
 3    overall listing.  I'm going to start this, but I'll
 4    scroll it forward to 50 seconds.  Let me get to
 5    where -- see if I can do this a little shorter than
 6    I have been.  Okay.  Here we go.
 7                   {VIDEO PLAYED}
 8              MR. FOLEY:
 9                   Jim, we're not getting the sound on
10                that.
11              MR. CRAIG:
12                   Say that again.  No sound is coming
13                through?
14              MR. FOLEY:
15                   Right.  You've got to check that box
16                in the lower hand corner on the sharing
17                screen.  It says, "Share computer
18                audio."
19              MR. CRAIG:
20                   Okay.
21              MR. FOLEY:
22                   That might be unchecked.
23              MR. CRAIG:
24                   I feel like it probably is.  That,
25                by the way, I think was Mr. Foley.
```

```
 1            MR. FOLEY:
 2                 It was.  Sorry.
 3            MR. CRAIG:
 4                 Not a problem.  I have basic,
 5             advanced, and files.
 6            MR. FOLEY:
 7                 Look at the bottom of that window.
 8             Bottom left is a little check box.
 9            MR. CRAIG:
10                 I see it.  Share sound.  Thank you.
11     BY MR. CRAIG:
12        Q.   Okay.  We're going to start again, and if
13     Mr. Foley disappears after this, it's because he
14     had a previous appointment not because he
15     demonstrated my lack of knowledge of video
16     equipment. I'm going to wind this back.  I'm just
17     going to play it one more time.
18                 {VIDEO PLAYED}
19     BY MR. CRAIG:
20        Q.   I'm going to wind this back and play it
21     one more time.
22                 {VIDEO PLAYED}
23     BY MR. CRAIG:
24        Q.   Did you hear that voice that said, "Clear
25     the crowd?"
```

1      A.   I did.

2      Q.   Did you recognize it?

3      A.   No, sir.  I can go ahead and guess.

4      Q.   I don't want you to guess.

5      A.   I do know I heard Polito's voice one

6 time.  He said his name, but I'm not sure who the

7 other one was. In context, I don't know what time

8 that was.  Was the time on there?  Sequence of

9 events it was close, so I don't know exactly when

10 that was going on at the time of the whole

11 incident.

12      Q.   Yep.  I understand that.  It appears it

13 was taken by Dylan, and the time that is identified

14 in the production is 7/9/2016 at 5:07 PM.  Does

15 that help you?

16      A.   I can only speculate that that would have

17 been the day shift, so, no, sir, I wouldn't.  Like

18 I said, I heard Polito's name, and I heard his

19 voice.  At one point, for a brief minute, I believe

20 I heard Mike Walker's voice, but who made the exact

21 comment of clear the crowd, I could not understand

22 that, because it was other audible noises.  I just

23 didn't recognize the voice.

24      Q.   I appreciate that.  What was that order

25 -- was that order given on like a loudspeaker? That

1  wasn't the radio.  The interop radio is not that
2  loud, is it?
3      A.   Well, it depends on -- I don't think it
4  was given over a loudspeaker.  I don't believe.  I
5  can tell you that I don't know who that was filming
6  it, but if he was close enough to an officer that
7  had a radio, and considering the noise of the crowd
8  and everything going on, they probably may have had
9  their radio turned up real loud, and it picked it
10 up.
11     Q.   Oh, okay.  I'm going to show you next
12 what will be marked as Exhibit 16 to your
13 deposition.  It will be eight Cs. This will be a
14 still picture.  Looking at that picture, I'll tell
15 you that the gentleman there in the white shirt is
16 our client, Zachary Hill.  There appears to be two
17 different groups of officers in body armor.  Are
18 you able to distinguish like who they are?  Not who
19 they are individually but what departments they're
20 with?
21     A.   It appears that those on the left without
22 the shields are state police, and then the ones
23 with the shields with police written across the
24 front would be Baton Rouge Police Department.
25     Q.   I want to ask you a question about how

1    tactically this worked.  We saw a reference in the
2    General Order to an arrest team on the piece about
3    mass arrests.  Do you remember?
4         A.   I'm aware of arrest teams, yes, sir.
5         Q.   That will do it.  So officers who are
6    lined up opposite Mr. Hill, they're not the arrest
7    team, correct?
8         A.   No, sir.
9         Q.   Because an arrest team would have to be
10   someone that wouldn't have to put their gear down
11   in order to effectuate an arrest?
12        A.   That is correct.  The arrest team would
13   have been behind this line.
14        Q.   Exactly.  Would the arrest team have been
15   -- well, were some arrest team members anything
16   other than SWAT?  BRPD arrest team.  Let me
17   withdraw that and ask it in one sentence that makes
18   sense.  Would the BRPD arrest teams be composed
19   exclusively of SWAT team members?
20        A.   No, it would not.  The SWAT was utilized
21   mainly for lethal cover for the Mobile Field Force
22   because of the equipment that they had in their
23   hands.
24        Q.   By lethal --
25        A.   They were there to protect our Mobile

1    Field Force in case someone in the crowd produced

2    and started firing a weapon or did something that

3    would be considered a deadly force encounter.

4    Uniform patrol was used for arrest teams.

5         Q.   I see.  So in a situation like this one,

6    in this picture that we're looking at, would the

7    people who were forming the arrest team be

8    previously designated? Were there officers, BRPD

9    officers, behind this line who knew they were part

10   of the arrest team?

11        A.   Oh, yes, sir.  If they were behind them,

12   they knew they were part of an arrest team.  Again,

13   they stayed together in squads.  So you may have

14   two squads of eight people or six people assigned

15   to just the Mobile Field Force unit.  When they

16   went out, the arrest teams would go out with them,

17   behind them, in case arrests had to be made.

18        Q.   Again, I'm not asking you to identify

19   these particular BRPD officers which looks

20   daunting, but would that line of shields be one

21   particular -- one distinct unit of Mobile Field

22   Force?

23        A.   I believe so, yes.  That was probably our

24   entire Mobile Field Force for BRPD that worked the

25   night shift.

1    Q.    That worked the night shift?

2    A.    Yes, sir.  Or the day shift, depending on

3  what time.  We had -- they were split.  Half worked

4  nights, half worked days.  We did not have a large

5  contingency of Mobile Field Force officers mainly

6  because we didn't have the equipment.

7    Q.    I can understand that.  This is going to

8  be Exhibit 17 to your deposition, eight Ds for the

9  overall deposition numbering.  I'm going to run it.

10  It's too long for us to see in its entirety, but

11  what I'm going to do is share the screen first so

12  y'all see where I am.  I'm going to start here at

13  6:58.  Do you recognize where this video is coming

14  from?

15    A.    I believe that is the hallway outside of

16  our main classroom for our training academy at 9000

17  Airline.

18    Q.    I'm going to run in a little bit.  Let me

19  make sure I'm doing -- I'm going to be sharing the

20  -- okay.  All right.  I should be sharing the

21  sound.  There is going to be someone coming onto

22  the screen and making a statement that says --

23  starts with the words, "all right."  We'll play it

24  a couple of times, if we need to.  What I'm trying

25  to figure out is who that speaker is.  It will come

1   up at 7:25?

2      A.   Do you have the video playing?  We are

3   actually looking at your desktop screen right now.

4      Q.   Oh, you sure are. Don't you love the

5   church where my daughter was married?

6      A.   That's right.

7      Q.   Thank you.

8      A.   You're welcome.

9      Q.   That was a lovely ceremony.  Are we

10   looking at officers now?  Are you seeing a video?

11   It's not playing yet, but I --

12      A.   It's not playing.  I see shields with a

13   CE, which means police, but further up I also see a

14   shield that has a FF at the end, so that may be a

15   mixture of the sheriff's office as well as BRPD.

16      Q.   Okay.  So I am going to play it now.

17   Let's see what happens.

18               {VIDEO PLAYED}

19   BY MR. CRAIG:

20      Q.   I'm going to stop for a second, because I

21   see Joe's puzzled face.  I'm wondering how I turn

22   up the volume or whether that has to be done by

23   you.

24         MR. SCOTT:

25           We have maxed it out over here.

1      MR. CRAIG:

2          I'm going to try to max it out on my

3          end, too, but I don't know if that

4          makes a difference as to how it plays

5          to you.

6          {VIDEO PLAYED}

7   BY MR. CRAIG:

8      Q.   I'm going to stop here for a second and

9   see if there is a way for me to enlarge this.

10  Talking about this gentleman in the middle, he is

11  the one who is speaking.  He's got something yellow

12  written across the front, and he is wearing a kind

13  of a ball cap.  He is dead in the middle of this

14  video.

15     A.   We couldn't hear on this end.  You could

16  tell that someone was talking, but it was so faint

17  you can't recognize the voice.  The picture is too

18  blurry for me to identify.

19     Q.   I wonder if we do stereo high fidelity.

20  I'm going to do this just one more time, and then,

21  then we'll see where we are.

22          {VIDEO PLAYED}

23  BY MR. CRAIG:

24     Q.   Any better with that, Lieutenant?

25     A.   No, sir.

1          Q.   I appreciate it.  I want to move to a
2     different point at that evening and that is the
3     protest that happened in front of the mayor's house
4     on Rivercrest, which was much later in the evening.
5     I believe -- was there only one protest in front of
6     the mayor's house that resulted in arrests during
7     the protests, or do you recall?
8          A.   I believe that was the only one.
9          Q.   It is on our synopsis, if we -- if that
10    helps you, but there is only one entry on it, but
11    I'll show it to you.  It's here under 2355.
12         A.   Okay.  I remember.
13         Q.   Well, let's just start from the
14    beginning.  Start from the first day you became
15    aware of a protest at the mayor's house and what
16    you recall of that event in your even words.
17         A.    I don't know the avenue, but I do know
18    that we received information.  I don't know if it's
19    from social media or exactly how that a large group
20    of people were going to go to the mayor's house to
21    protest.  Uniform patrol was obviously contacted,
22    because that's our Fourth District area.  He lives
23    in the Fourth District, so they were responding and
24    not aware of how many people were going to assist.
25    We had a small element of SRT respond up there as

1   well.

2       Q.   Were you receiving updates on radio while

3   people were proceeding -- your units were

4   proceeding to the mayor's house?

5       A.   Did I receive -- I'm sorry?

6       Q.   Were you in contact with them by radio?

7       A.   I don't recall if I was in contact with

8   the Fourth District, but I was in direct contact

9   with the SRT element that was heading that way.

10      Q.   What do you recall?

11      A.   If I recall correctly, they actually took

12  the bearcat up there and backed it into his

13  driveway as a deterrent.

14      Q.   By his driveway, you mean the mayor's?

15      A.   The mayor's driveway, yes, sir.

16      Q.   That's kind of a half, semi-circle

17  driveway with two openings basically on the street?

18      A.   Oh, I don't remember.  It's been a long

19  time since I --

20      Q.   Don't worry.  It's fine.  I am going to

21  try to share an audio from Interop 1.  It's a very

22  long audio, so I am going to move it to one hour

23  and ten minutes and about 15 seconds.  I guess I

24  can play the audio without playing the video.  Can

25  you hear that?

1        A.    No, sir.

2        Q.    Well, I'm going to share my screen, but

3    it's going to look really goofy, because it's just

4    the arrows, but I think that will enable me to

5    share the sound as well.  I'm just going to try it

6    once here and see if you can hear it.

7                    {AUDIO PLAYED}

8    BY MR. CRAIG:

9        Q.    So that was just for purposes of seeing

10   if you could hear.  I want to move it forward now.

11   I was not able to identify that gentleman. Okay.

12   Ready for me?

13       A.    Yes, sir.

14       Q.    You will hear your own voice but --

15       A.    Awesome.

16       Q.    I need you to tell me.

17                    {AUDIO PLAYED}

18   BY MR. CRAIG:

19       Q.    Did you hear your voice at any point in

20   there?

21       A.    Yes, sir.

22       Q.    Pardon?

23       A.    Yes, sir.

24       Q.    Where was that? At what point did you

25   hear your voice?

1      A.   I believe I told McClure to give me a 21,

2   and then a little bit later I said special details

3   switch to Interop 3.

4      Q.   And what is a 21?

5      A.   21 is a phone call.

6      Q.   So then I'm going to play a piece from

7   the Interop 3 from that evening, and I'm going to

8   move to -- that is basically a 29-minute audio.

9   I'm going to move it to 21 and about, I don't know,

10  a half.  21:30.  I'm going to share the screen now.

11  So this is from Interop 3 which was produced to us

12  by the state police.

13                 {AUDIO PLAYED}

14  BY MR. CRAIG:

15     Q.   Did you hear your voice on that one,

16  lieutenant?

17     A.   Yes, sir.

18     Q.   Based on what you heard, what were you

19  saying?  What was that conversation?

20     A.   So there were multiple interop channels.

21  They were designated for different assets, and for

22  whatever reason, I guess, from listening to that, I

23  don't remember which one was designated for what,

24  but that our air units were currently using Interop

25  3.  We moved them to Interop 4 because this group

1    that was going to the mayor's office, that entire

2    group was going to operate off Interop 3, so I was

3    just clearing the radio channel for that specific

4    assignment.

5        Q.   So then this should be the last of the

6    excerpts from that, I think.  This is at 22:51.

7                    {AUDIO PLAYED}

8    BY MR. CRAIG:

9        Q.   Did you recognize your voice in that

10   conversation, lieutenant?

11       A.   Yes, sir, I did.

12       Q.   Can you describe, in your own words, what

13   the conversation was between you and the folks in

14   the field on Rivercrest?

15       A.   The initial was we were anticipating

16   possibly up to 200 people to be out protesting, and

17   they have the -- obviously enough flex cuffs, if

18   mass arrests were to be made, so the initial was in

19   preparation for worst case scenario to make sure

20   they had the equipment they had, they needed, to do

21   their job.  The second part we had information of

22   who was going to be up there and who one of the

23   main instigators was throughout this entire event,

24   which would have been Arthur Reed, so my

25   conversation with him was, I'm assuming that at

1    this point we have detained people, and I was
2    confirming that one of the ones up there, without
3    saying his name over the radio, was up there, and
4    he would not be released tonight, because he was
5    one of the main agitators.
6         Q.   And so when in saying, "One will not be
7    released," you were specifically referring to
8    Arthur Reed?
9         A.   Absolutely.
10        Q.   Do you recall that juveniles were at that
11   protest?
12        A.   If I recall correctly, there were two
13   juveniles.
14        Q.   Do you recall what happened to the
15   juveniles?
16        A.   They were released with the custodial
17   agreement, if I recall correctly.
18        Q.   Before they were released with the
19   custodial agreement, were they transported to a
20   precinct?
21        A.   I do not recall if they were transported
22   or if they were released from the scene out there.
23   I do not know.  I don't recall.
24        Q.   Thank you.
25        A.   But they were released.

1    Q.    Yes.    I want to move quickly, because I

2  know that I've taken up a lot of time of other

3  folks and you.    What I want to draw your attention

4  to now is the next day, July the 10th.    For your

5  reference, we represent one of the people who were

6  arrested at the corner of East and France, and we

7  also represent the woman who was living at the

8  residence where some of the protesters were allowed

9  to come on with her permission.    Many of those

10  protesters were arrested on her lawn.    With that

11  description, do you recall that particular protest

12  and series of events?

13    A.    I recall the protest.    I know what

14  happened early.    That was one of the ones that was

15  initiated with day shift, and we actually slowly

16  transitioned.

17    Q.    You were still at the EOC in the entire

18  time when that was -- when the subject protest

19  ended up at the corner of East and France?

20    A.    Yes, sir.    That is correct.

21    Q.    Did you have any role -- do you recollect

22  any role in giving directions or orders to arrest

23  protesters at that site?

24    A.    I do not directly remember any specific

25  order, but, yes, sir, I am sure I had a part in the

1   direction to begin arresting people, yes, sir.

2       Q.   We heard testimony that Colonel

3   Edmondson, just, for example, was physically

4   present at the -- near the corner of East and

5   France during that protest.  Was there any high

6   level person in the city/parish or Baton Rouge

7   Police Department who would have been at the scene

8   at that protest?

9       A.   I guess above the incident command level

10  would have only been the chief.  I do not believe

11  he was out there.  As far as incident command goes,

12  our highest ranking person out there would have

13  been the area commander.  I believe that was Deputy

14  Chief Daniels at the time.

15      Q.   Thank you.  If there was, consistent with

16  your earlier testimony about the way that y'all

17  were communicating at the EOC, if you were

18  communicating with, for example, the state police

19  that evening, would your communications with them

20  have been face-to-face at the EOC, as you described

21  previously?

22      A.   Yes, sir.  If it was something that I

23  needed or that we, as BRPD and incident command,

24  needed from state police, we would have

25  communicated face-to-face with one of theirs.  If

1    at the time there was a decision that needed to be

2    made at the incident command level, state police

3    could contact incident command over the radio, and

4    we could give them a direct answer.

5         Q.   That would have been on one of the

6    interop channels?

7         A.   Yes, sir.

8         Q.   I want to switch gears and ask a couple

9    of general questions.  First of all, how were, in

10   the setting of this special command structure, my

11   words, that we've been talking about, during the

12   protests in Baton Rouge in July of 2016, how would

13   use of force reports be handled?

14        A.   Meaning the actual internal documents use

15   of force?

16        Q.   Yeah.  Let me back up.  I'm going to

17   assume, just to move through this rather quickly,

18   I'm going to assume that, generally speaking, use

19   of force reports within BRPD are handled at the

20   precinct level in the first instance and then

21   transmitted to headquarters.  Would that be

22   correct?

23        A.   Yes, sir.  A use of force report would

24   have to go up the chain of command, yes.

25        Q.   Thank you.

1      A.    Signed by each level.

2      Q.    Right.  So I was just asking whether

3  there was any change in that during the Baton Rouge

4  protests in light of the fact that you and Captain

5  Leach and then Captain Martin, and I think you said

6  David Wallace, were at the top of the chain of

7  command, short only to Chief Dabadie?

8      A.    No, sir.  It would follow their normal

9  chain, because to accompany a use of force report,

10  an internal document from Baton Rouge Police

11  Department, our protocol was to also have a copy of

12  the report brought with it, the narrative section,

13  so that you had detail as to what the force -- what

14  force was used and the justification to use that

15  force.  Does that make sense?

16     Q.    It does.  I do not have further

17  questions.  I'm going to tender you to Mr. Lanser.

18  I do have the right to ask follow-up questions if

19  either Mr. Lanser or Mr. Fahrenholt or your

20  attorney asks you questions, but they will be

21  limited to following up on material that they've

22  covered.  So I really appreciate your concentration

23  and assistance in understanding what happened that

24  weekend, and I will pass it to Mr. Lanser.

25     A.    Thank you, sir.

1  EXAMINATION BY MR. LANSER:

2      Q.   All right.  Good afternoon.  My name is

3  Dave Lanser.  I'm one of the plaintiffs' attorneys

4  in the Blair Imani case. I'm going to be asking

5  specifically about the July 10th East and France

6  incident.  Mr. Craig just went through some of the

7  radio communications from July 9th.  Were you also

8  on the radio on July 10th?

9      A.   At some point, yes, sir, I assume I was.

10      Q.   I'm just going to pull up a couple of

11  documents here by screen sharing.  You see that

12  document on your screen?

13      A.   Yes, sir.

14      Q.   I'm guessing this maybe was compiled

15  after the fact or something.  I'm not quite sure

16  who pulled all of this together, but does this look

17  familiar at all to you?

18      A.   No, sir.  That may be a document from

19  BRPD.

20      Q.   I think it's from BRPD.  It was at least

21  produced to us by BRPD.  I believe what it is, is

22  just sort of a log of, you know, time stamps and

23  all of that from the interop communications from

24  that day.

25      A.   Okay.

1    Q.   But I just had a quick question about it,

2  and we can move on.  Do you see this column here

3  that says, "Unit ID?"

4    A.   I do.

5    Q.   Do you have any idea what that might be

6  referring to?

7    A.   My limited knowledge of the details of

8  how our portables and stuff work, I do know that

9  each radio has an ID number and that at some point

10  they assign your call number to it, but people move

11  around, call numbers change, people get promoted.

12  That's not always up to date, but that IDs the

13  actual radio that it came from.

14    Q.   I see.  Then what about individual alias?

15  What is the difference -- the difference between

16  those three?

17    A.   I don't understand what CBR is, but I can

18  tell you HQ14 is probably someone's call number.  I

19  see a K970.  That would be a call number we would

20  use.  N537.  That would be their actual call

21  number.

22    Q.   Did you have a particular --

23    A.   I worked First District.  My call number

24  is 1170.  If headquarters calls me, if any of my

25  units called me, that is my call number.

```
1        Q.    1170.  Okay. Some of these --
2        A.    I don't see it on here, but mine was -- I
3   don't even remember what it was back then.
4        Q.    Some of these have like what appears to
5   be a person's name, like Jeremy Owens right here.
6   Do you have any idea why that might be?  They just
7   don't have a call number.
8        A.    Well, if BRPD uses call numbers, other
9   jurisdictions may assign or other agencies may
10  assign names to it.
11       Q.    We won't go through all the names.  Do
12  you recognize any of these names that are on the
13  screen right now, though? Gary Ruiz?  Any of these?
14       A.    I do not.
15       Q.    I was just curious.  I am going to pull
16  up, however, the recording from July 10th, which
17  was produced to us in discovery.  First of all, I'm
18  just going to skip ahead to a random point to make
19  sure the sound is coming through.  Did you hear
20  that?
21       A.    No, sir.
22       Q.    Let's try this.
23                  {AUDIO PLAYED}
24  BY MR. LANSER:
25       Q.    Do you hear that now?
```

1      A.   Yes.

2      Q.   Great.  So this is Exhibit -- I'm not

3  sure what exhibit -- Oh, actually, someone just --

4           MR. CRAIG:

5                We're on 20. I just put in the chat

6             where we ended up.  I neglected to add

7             the two interops, but the chat explains

8             it.

9  BY MR. LANSER:

10     Q.   Got it.  So I believe this would then be

11 Exhibit 20 for this deposition.  This one we have

12 used before.  It is four Zs.  I am going to first

13 jump ahead.  Sorry.  All right.  I'm going to jump

14 ahead to -- this is a two-hour plus document, so

15 we're obviously not going to sit here and listen to

16 all of that.  Let me jump ahead to -- we'll start

17 it at one hour, ten minutes, and 32 seconds.  All

18 right.  I'm hitting play right now. Did that last

19 part sound like your voice?

20     A.   We didn't hear any audio that time.

21     Q.   Oh, really.  Let me back up.  I'm not

22 sure why that happened.  Okay.  Hitting play at one

23 hour, ten minutes, 32 seconds.  I think I fixed it.

24               {AUDIO PLAYED}

25 BY MR. LANSER:

1    Q.    That last part, did that sound like your

2    voice?

3    A.    Yes, sir.

4    Q.    So, yeah.  So I guess we're right.  You

5    were on this radio feed at some point, apparently.

6    Let me back up.  Do you remember like about when in

7    the day you would have been on this radio, this

8    interop channel?  This channel is 1N3, I believe.

9    A.    My roster shows 1800 is when I started.

10    I don't know.

11    Q.    Well, let's try it this way.  We don't

12    know exactly when this radio feed starts either.

13    Maybe -- let's do it this way.  Do you remember

14    what was going on -- whenever you started, where

15    was -- was the protest already at East and France?

16    Where were the protesters?

17    A.    I believe it was headed that way.  I

18    don't remember the route.  I know that there was a

19    planned march or something that went to the capitol

20    earlier that day.  Somewhere along the way I

21    believe that went smooth, and somebody had the

22    great idea of continuing, and we received

23    intelligence that they were going to get on the

24    interstate at Government Street, and then all hell

25    broke loose.

1      Q.   So you -- were you on duty when they
2  received that intelligence about getting on the
3  interstate or that was later?
4      A.   That was relayed by incident command from
5  day shift. This was unfolding as we were arriving
6  at work.  Again, duty roster says I began my time
7  at 1800.  I can guaranty you I was there by 1700,
8  but I will tell you, just for clarification, that
9  was myself calling Browning, which would have been
10 Tim Browning, who was a lieutenant in uniform
11 patrol and had a squad.  He was a very excellent
12 supervisor.  He was one of our go-to guys.  So at
13 some point they worked 1800 to 0600, so I would
14 assume it was after he arrived for 1600 or 1800 at
15 headquarters and then had to travel from there down
16 to that location.  So I would say after 1800 hours.
17     Q.   And when you said the day shift incident
18 command relayed the information about getting on
19 the interstate to you, who was that person?
20     A.   It would have come from either Captain
21 Martin, Lieutenant David Wallace.  That's why we
22 arrived at worker early, so we could any intel they
23 had, when time permitted, depending on what was
24 going on, on the street.  They were filling us in
25 on information that they had from earlier in the

1    day so that we would know how to proceed.

2        Q.    Did they explain to you how they got that

3    information, where they had that intelligence from?

4        A.    No, sir.

5        Q.    But the intelligence was that they were

6    trying -- potentially trying to get on the

7    interstate at the Government Street exit?

8        A.    Somewhere around Government, yes.  If I

9    recall correctly, we had a contingency of officers

10   at the entrance/exit ramps there as well as the

11   ones going off of -- I don't know if it's St.

12   Philip.  Which one goes to the bridge?

13       Q.    We have a --

14       A.    Entrance ramp to the Mississippi River

15   Bridge, so we had people there as well.

16       Q.    Let me just stop sharing this.  We'll

17   come back to that.  We have another exhibit which I

18   guess will be 21 for today.  We've shared this

19   previously, Exhibit LL, just so we're clear here.

20   You see that map?

21       A.    Yes, sir.

22       Q.    Unfortunately, I don't think the name of

23   the street is on this map.  You see where my cursor

24   is?

25       A.    Yes, sir.

1      Q.    Is that Government Street?

2      A.    Yes, sir.  I believe that's Government

3  Street.

4      Q.    So you had one -- and this looks like

5  where the interstate -- is this the ramp you are

6  talking about, this one or this one?

7      A.    Let's see.  Yes.  There are several

8  entrance/exit ramps.  This one off of 10th. See, we

9  didn't just have to contend with the ramps to get

10  on the interstate, because vehicles get on the

11  correct direction. When you are on foot, I have to

12  take into account entry and exit ramps.  Any ramp

13  that comes down off of an elevated portion is a

14  possibility.

15      Q.    So you had -- there were units at each

16  one of these three?  Is that what you are saying?

17      A.    Correct.  There was also one close to the

18  Mississippi River Bridge.

19      Q.    Over here?

20      A.    It would be -- yes, sir.  Down in that

21  bottom left corner.

22      Q.    Okay.  Got it.  Just wanted to be clear

23  about that.  Let's go back to Exhibit four Zs.

24  Hopefully, the audio is still coming through.

25  Okay.  I'm just going to go through this.  We'll

1   try to make it as quick as possible, I promise.

2   I'm going to go through this, and we are going to

3   have to sort of piece it together as we go a little

4   bit.  If you know -- if at any point you know, oh,

5   right, this is when I got on shift that day, or I

6   remember this happening, certainly let me know, but

7   I think we can go through this -- just one second.

8   I'm going to hit play at 30 minutes and 48 seconds.

9   I'm hitting play right now.

10                  {AUDIO PLAYED}

11  BY MR. LANSER:

12      Q.    That to me sounded like they said,

13  Operations to Nelson.  Are they trying to occupy

14  Government?  10-4.  Does that sound about right?

15      A.    Yes, sir.

16      Q.    Do you know who that was speaking there?

17      A.    For operations, that was David Wallace,

18  Lieutenant Wallace.

19      Q.    Do you know who the other person was?

20      A.    Yes.  I think he was -- I don't know if

21  he was a sergeant or a lieutenant but Gerrick

22  Nelson.

23      Q.    Okay.  Great.  So during this time you

24  said David Wallace passed off intel to you when you

25  came out, so this is probably before you arrived?

1        A.   We are still in control.  I don't know.

2        Q.   Do you remember when protesters were

3   trying to occupy Government?

4        A.   Do I remember when?

5        Q.   Yeah.  Like were you there when they were

6   trying to do that or allegedly trying to do that?

7        A.   Oh, they did it, but if I wasn't there

8   before.  I was there shortly after.

9             THE COURT REPORTER:

10                 Can we take a short break soon?

11             MR. LANSER:

12                 Oh, yeah.  I have a few to go

13                 through.  Maybe now is a good time.

14                 Five minutes enough for everybody?

15                 {BRIEF RECESS, 2:55-3:00}

16   BY MR. LANSER:

17        Q.   I'm going to keep moving through this

18   Exhibit four Zs, the radio communications.  Right

19   now I'm about to hit play at 39 minutes and 13

20   seconds.

21                 {AUDIO PLAYED}

22   BY MR. LANSER:

23        Q.   That sounded to me along the lines of, I

24   spoke with their leader, trying to get them out of

25   the roadway, but they're real agitated, and they're

```
 1    not going to listen.  Someone else responds, That's
 2    fine.  Just try to hold them up and get resources
 3    there.  Does that sound about right?
 4         A.   Yes, sir.
 5         Q.   I believe we had some testimony from
 6    another deponent.  I believe that was Lorenzo
 7    Coleman and David Wallace speaking.  Does that
 8    sound right?
 9         A.   That is 100-percent accurate, yes, sir.
10         Q.   Fantastic.  I believe this would have
11    been right around the part of the day where maybe
12    they were moving towards East and France.  Do you
13    know what they were talking about here with their
14    leader, who their leader might be?
15         A.   I don't remember who was organizing the
16    march down Government Street toward the interstate.
17    I have no idea.
18         Q.   You don't know -- you don't have any idea
19    what Officer Coleman is talking about there?
20         A.   That he spoke with someone, I guess, to
21    try to have them peacefully disperse and to clear
22    the roadway, and, obviously, that didn't work.
23         Q.   I'm going to jump ahead.  I'm going to
24    hit play again at 43 minutes and 52 seconds.
25                    {AUDIO PLAYED}
```

BY MR. LANSER:

    Q.   So that last part sounded like, There is a Caucasian male with a tie-dyed shirt and red hair in the front.  He is the one directing them which way to walk, and then someone else says 10-4.  That will be the first one we arrest.  Does that sound about right?

    A.   Yes, sir.

    Q.   That was Tyronne Honore and David Wallace speaking?

    A.   Correct.

    Q.   Do you know -- do you remember anything about a Caucasian male with a tie-dyed shirt and red hair?

    A.   No, sir.

    Q.   I know you were not out on the scene so you wouldn't have seen him anywhere, right?

    A.   No, sir.  The only ones that stick out in my mind are the Panthers and it is probably because of the guns.  So everyone else was the same to me.

    Q.   Just to clarify.  This is July 10th.  I'm not sure if the Panthers were in the area at the time on July --

    A.   I'm just saying that's the only ones that stick out in my mind.  Everyone else is kind of

```
1   like --
2        Q.    Yeah.   From the whole weekend?
3        A.    Yes, sir.
4        Q.    Got it.   I'm going to jump ahead to 45
5   minutes and 16 seconds.   I'm hitting play.
6                      {AUDIO PLAYED}
7   BY MR. LANSER:
8        Q.    Just to repeat what it sounded to me like
9   he said, it was, You've got one of the leaders
10  requesting to walk on the sidewalk past France.
11  Someone else responds, It's too late.   Then 10-9.
12  Then responds, Too late.   Everyone has violated.
13  Everyone is under arrest.   Those who can safely
14  apprehend violators must do so.   Primary targets
15  are the white male, red hair, tie-dyed shirt, and
16  everyone else who is violating, which is everybody
17  out there.   Does that sound about right?
18       A.    Yes, sir.
19       Q.    Did that sound like David Wallace and
20  Vincent Liberto?
21       A.    It was David Wallace.   Who did you say
22  was the second one?
23       Q.    Vincent Liberto.   Does that sound right?
24       A.    I know a Vincent Liberto.   I don't know
25  if that was his voice or not.
```

1       Q.    You didn't recognize it as anyone else,

2    though?

3       A.    No, sir.

4       Q.    So at this point he says you've got one

5    of the leaders requesting to walk on the sidewalk

6    past France.  I am assuming this is when they're at

7    East and France. Does that sound about accurate,

8    best as we can guess?

9       A.    It would be a guess, but I --

10       Q.    Assuming that's accurate, this would have

11    been -- Sorry.

12       A.    They would have to have been walking

13    south from Government Street.

14       Q.    Correct.

15       A.    The entirety of it, that tells me that,

16    from the video and all the information they had,

17    that they occupied the roadway to get to that

18    location and then decided to get on the sidewalk at

19    that point, which does not negate the obstruction,

20    simple obstruction, leading up to that location in

21    that clip.

22       Q.    So from all of that, presuming they're

23    walking down East going past France, you would have

24    likely been on -- you would have been on the job at

25    this point?

1    A.    Yes.

2    Q.    So you are on the radio at this point?

3    A.    Probably not.  As I explained earlier,

4  when we arrived, when an incident is ongoing, we

5  can't just come in and take over.  So there has to

6  be a smooth transition, so, therefore, there may

7  come a point during this incident where I am able

8  to do one thing, and then maybe I'll take over a

9  second thing.  But just an abrupt transition would

10  not work, because I was not spun up on the exact

11  details and what had transpired leading up to it.

12  I was present while the decisions and things were

13  being done, and I was monitoring what was going on.

14  I was seeing it.  I was just not at a point where I

15  was on the radio and directing our officers,

16  because I wasn't going to mess up something that

17  was ongoing.

18    Q.    Got it.  So were you part of that

19  decision to -- you know, it says, in that part of

20  the radio communications, they mention not allowing

21  the protesters past France.  Were you a part of

22  that decision to not allow protesters past France?

23    A.    I don't remember if I was part of that

24  decision or not.

25    Q.    Is it accurate --

1          A.    I think it was the right decision.

2          Q.    Why do you believe that?

3          A.    Because if you get to France or the next

4     street and continue one block east, that is the

5     entrance ramp that would put you on the interstate

6     at I-110 and I-10 next to the bridge, where you

7     come off the bridge, and that would have been a

8     horrible incident with the amount of traffic that

9     comes through there.

10         Q.    I'm trying to cut out as many of these as

11    possible so we don't have to listen to every single

12    one of them.  I'm going to hit play at 46 minutes

13    and 36 seconds.

14                    {AUDIO PLAYED}

15    BY MR. LANSER:

16         Q.    Did you recognize that voice?

17         A.    I did.

18         Q.    Who is that?

19         A.    Dustin McGinnis.

20         Q.    He mentions -- it sounds like what he was

21    saying was, On East Boulevard have them go to the

22    on-ramp right there at Mayflower.  They look like

23    they are about to take a run that way.  Right now

24    they're holding on East Boulevard and France.  There

25    is a lot of interstate access right here.  Does

1   that sound correct, more or less?

2        A.   Yes, sir.  I believe the entrance ramp he

3   is referring to, the entrance ramp to get onto

4   I-110 South, immediately turns into I-10 East right

5   there, less than a hundred yards north of

6   Mayflower.

7        Q.   Sure.  So this is basically the scenario

8   you were just explaining when we were talking about

9   that last one, why there is a line on France?

10       A.   Yes, sir.

11       Q.   All right.  I'm going to jump ahead.  I'm

12   going to start playing at 57 minutes and 58

13   seconds.

14                 {AUDIO PLAYED}

15   BY MR. LANSER:

16       Q.   That sounds like, I need somebody to call

17   me on my cell phone ASAP, 636-3004.  Does that

18   sound right?

19       A.   Yes, sir.

20       Q.   Do you know who that is?

21       A.   I believe that that is retired deputy

22   Chief Robert McGarner.

23       Q.   I think you might have got into this a

24   little bit with Mr. Craig earlier, so I won't

25   belabor the point.  Do you know if that was -- were

1  people, in addition to the radio communications,

2  were they also communicating on cell phones?

3       A.   Yes, sir.

4       Q.   Those were both personal cell phones and

5  issued cell phones?

6       A.   Yes.  That is correct.

7       Q.   What is the reason why someone might be

8  using their cell phone instead of radio?

9       A.   With all of this going on, the traffic

10 that you put over interop, over the radio, needs to

11 be as short and concise as possible.  If there is a

12 lot of information or something that needs to be

13 explained, it is done over the cell phones or land

14 line, or whatever, so that you don't tie up in case

15 there is emergency traffic that needs to go out,

16 because only one person can talk on the radio at

17 the time.

18      Q.   That makes sense. I'm going to jump

19 ahead.  This will be one hour, one minute, and 25

20 seconds.

21                {AUDIO PLAYED}

22 BY MR. LANSER:

23      Q.   That sounded like, As soon as you can,

24 extract that person from the crowd.  Does that

25 sound right?

1        A.    Yes, sir.

2        Q.    Do you know who that was who was

3   speaking?

4        A.    David Wallace.

5        Q.    Do you have any idea what person he is

6   talking about?

7        A.    No, sir.  Not specifically, but I can

8   tell you that from the officers being out there,

9   from the intelligence that we got from all kind of

10   things, is that we would identify leaders that were

11   antagonizing people or getting people to follow

12   them to do things that were unlawful, and once we

13   determined who that was, instead of our Mobile

14   Field Force standing out there for hours in the

15   heat, getting things thrown at them, getting cussed

16   at, getting belittled, that we tried to limit

17   face-to-face contact.  Once someone was identified,

18   Mobile Field Force would move out, and they would

19   open up.  We would distance that person from the

20   crowd that was a leader.  Mobile Field Force would

21   surround them.  We would bring them back out, and

22   we would leave.  And then someone else would step

23   up as a leader, and once they stepped up, and they

24   were identified, we would repeat it.  And after

25   several times, nobody wanted to step up and be a

1   leader, and the crowds dispersed.

2       Q.   You mentioned leaders antagonizing.  What

3   sort of goes into the process of identifying who a

4   leader is and if they're an antagonist?

5       A.   I guess the most boisterous.  The ones

6   that are obviously out there directing people to

7   walk down the middle of the roadway, or they make

8   utterances that they were going to take the

9   interstate.  There was so much intelligence coming

10  in from so many different directions, it didn't

11  take long to determine who was leading certain

12  little groups.

13      Q.   Let me jump over to a different exhibit

14  real quick.  This one has previously been used.  I

15  believe it's five Cs.  I think we are up to 21 for

16  today.  So what we're looking at here I'll just

17  tell you is the --

18           MR. SCOTT:

19               Dave, 22.

20  BY MR. LANSER:

21      Q.   22.  I'm sorry.  What we're looking at

22  here is the City of Baton Rouge -- some discovery

23  responses from the City of Baton Rouge.  Did you

24  have any part in responding to these? I don't know.

25  You might not have been a part of this process at

1    all.  I'm just curious if you helped draft these at

2    all.

3         A.   No, sir.  I've never seen this.

4         Q.   I'm just going to scroll down.  One of

5    the questions we asked, looking at Request for

6    Admission 56.  On July 10th, 2016, law enforcement

7    targeted protesters for arrest who they considered

8    to be or who appeared to be the leaders.  Is that

9    what we were just talking about, basically?

10        A.   Yes.

11        Q.   And the response was, "Denied as written.

12   Law enforcement targeted agitators," and then,

13   parenthetically, "they define agitators as persons

14   encouraging others to upset the status quo and

15   further their cause.  End paragraph, or end

16   parenthetical, "and those breaking the law."  So I

17   just wanted to pull this up real quick.  This

18   definition here, persons encouraging others to

19   upset the status quo to further their cause, does

20   that sound accurate as far as what you were looking

21   for when you were trying to identify a leader?

22        A.   Yes, sir. I don't do the legal terms.

23   Yes, yes.  That is one and the same, in my opinion.

24        Q.   Let's go back to everyone's favorite

25   exhibit, four Zs.  Back on the radio.  I am going

1    to jump to one hour, five minutes, and 22 seconds.

2                        {AUDIO PLAYED}

3    BY MR. CRAIG:

4        Q.   That sounded like make announcements to

5    get out of the road.  If they don't get out of the

6    road, they will be arrested.  Does that sound

7    right?

8        A.   Yes, sir.

9        Q.   Do you know who that was?

10       A.   Yes, sir.  That was Michael Walker

11   speaking to T.J. Morris.

12       Q.   Speaking with T.J. Morris?

13       A.   Yes.

14            MR. SCOTT:

15                 You've got Morris scheduled for the

16          16th.

17            MR. LANSER:

18                 Right.  Thank you.

19   BY MR. LANSER:

20       Q.   Real quick.  One hour, six minutes, and

21   35 seconds.

22                        {AUDIO PLAYED}

23   BY MR. LANSER:

24       Q.   That sounded like move forward and make

25   the arrest.  Is that accurate?

1      A.   Yes, sir.

2      Q.   Do you know who that was?

3      A.   Could you play it one more time so I can

4   hear it over? Sorry about that.

5      Q.   That's fine.

6                {AUDIO PLAYED}

7   BY MR. LANSER:

8      Q.   Did that help at all?

9      A.   Not a hundred percent, but it sounds like

10  Myron Daniels to me.

11     Q.   Do you remember -- I imagine now we're

12  getting more into the thick of it when you have

13  been on the radio.  Do you remember these

14  conversations happening?

15     A.   Specifically, no.  I can tell you I was

16  present in EOC when this entire thing went down.

17  My exact actions I don't know.

18     Q.   Okay.  I'm going to hit play at one hour

19  and nine minutes and 51 seconds.

20                {AUDIO PLAYED}

21  BY MR. LANSER:

22     Q.   Did you recognize those voices?

23     A.   Initially it sounded like Michael Walker,

24  and then Tim Browning said there was no paperwork,

25  and I believe that was me at that point.

1    Q.    Which part were you talking on?  Did you

2    say there is no PC paperwork out here?

3    A.    Tim Browning said there was no PC

4    paperwork out there.  Can we get some run to us or

5    something.  I don't remember, but that conversation

6    about the paperwork involved he and I. Again, Tim

7    Browning was a night shift guy, so that would make

8    sense.

9    Q.    When you say PC or -- I guess when he

10    says PC paperwork, you understood that to mean the

11    Affidavits of Probable Cause?

12    A.    Affidavits of Probable Cause and the rap

13    sheets, yes, sir.  Booking documents.

14    Q.    And then it sounds like Tim Browning says

15    -- I believe that last line he said was we have

16    just the rap.  We are just going to rap them and

17    bring them here for the PCs.  We can do that.  What

18    is he talking about there?

19    A.    I don't recall if it means that the

20    arrestees would be transported back to headquarters

21    or if they were going to go straight to parish

22    prison and the paperwork be taken care of.  I'm not

23    sure.

24    Q.    Is that common practice to take them to

25    prison and then take care of the PC paperwork?

1      A.    No, sir, but it's not a practice to

2    arrest that many people at one time either.

3      Q.    That's fair.

4      A.    Look, no one was prepared for it.  It's a

5    logistical nightmare.

6      Q.    In that same vein, let's do one hour, ten

7    minutes, and 32 seconds.

8                    {AUDIO PLAYED}

9    BY MR. LANSER:

10      Q.    It sounded like, Commander Browning, just

11    hand them over.  Let us identify them, and we'll

12    sort that out later.  Too much going on.  Is that

13    accurate?

14      A.    That is correct.

15      Q.    That was you talking?

16      A.    That was me.

17      Q.    That's what you are talking about here

18    where, you know, it was just a logistical

19    nightmare, and you had to get everyone rounded up

20    first and then figure out the paperwork?

21      A.    What was going on there is there had

22    already been multiple arrests which takes manpower

23    away from what is going on, on East Boulevard, on

24    France, on Government Street, protecting the

25    interstates.  So it was have those prisoners -- I

1    believe at that point we had either vans or buses

2    from the sheriff's office so we could secure the

3    arrestees and getting them back out onto the street

4    to control that situation as quickly as possible,

5    because we were severely outmanned.

6         Q.   Was there any plan with the PC paperwork

7    about who was going to fill it out and when they

8    fill it out?

9         A.   We didn't expect, again, the amount of

10   arrests that were going to happen.  I know people

11   were passed off.  We have since, after this, we

12   have had repeat situations pertaining to this same

13   incident, not on that large a scale, but we have

14   really streamlined our process, changed the way we

15   do our paperwork.  We actually have cards now that

16   we can bring out and use during these types of

17   instances that have the probable cause affidavit

18   lines on the back with something else on the front,

19   and you would have to fill out at least the

20   suspect's name and your name, and it stays with

21   them so they would know to come back once every-

22   thing calms down, and it is safe to do so and

23   complete the probable cause on the back.

24        Q.   So that's the current procedure but not

25   the procedure in 2016?

1        A.    That is correct.

2        Q.    When did that go into effect,

3    approximately?

4        A.    Once we started doing meetings, after-

5    action meetings, after this, to streamline the

6    logistical.  We had meetings with sheriff's office,

7    with state police, to try to streamline how this

8    would occur, if it ever happened again.  We had

9    numerous meetings with the district attorney's

10   office so that they could clarify exactly what they

11   would like us to do so that there was things put in

12   place to make prosecution easier.

13       Q.    Sure.  Is it fair to say those changes

14   came about because of how things are handled this

15   weekend, on July 10th?

16             MR. SCOTT:

17                  Dave, I am objecting to the form

18                just because it is remedial activities,

19                and I think it's -- where is that one

20                excluded?  Somewhere around 406, 407.

21             MR. LANSER:

22                  Something like that.

23   BY MR. LANSER:

24       Q.    Okay.  Objection has been noted, but you

25   can go ahead and answer. Let me restate it. I am

1    assuming I might get the same objection.  I didn't
2    state it very clearly anyways.  My question is, did
3    those -- did the changes in the PC paperwork policy
4    come about because of the protests in July 2016?
5                MR. SCOTT:
6                     Objection.  Go ahead and answer.
7                THE WITNESS:
8                     We were not prepared for the
9                logistics, therefore, we streamlined
10               our process after this so that we would
11               be better prepared when and if it
12               occurred again.
13   BY MR. LANSER:
14        Q.   Great.  Thank you.
15        A.   Everything that was done at the time was
16   done in good faith, and, again, logistically, when
17   it came down to the paperwork side, that was not
18   our main focus.  The three things that I've said
19   over and over again were our main focus.  This was
20   an addition that we did not have ironed out at the
21   time.  If we would have known the probable cause
22   stuff then, we would not have done it that way.  It
23   would have been done differently.
24        Q.   Sure.  In what way would it have been
25   done differently?

```
1          A.   It would have been unique probable causes
2     with specific identifiers, more specific
3     identifiers other than name, date of birth, Social
4     Security number.
5          Q.   What sort of issues might come about if
6     you don't have those unique personal identifiers?
7          A.   They are thrown out of court en masse.
8          Q.   Fair enough.
9          A.   I don't know anything else.  I just know
10    what happened here.
11         Q.   Not supposed to be a pop quiz.  Don't
12    sorry.  Let's move forward.  I'm going to hit play
13    at one hour, 12 minutes, and five seconds.
14                    {AUDIO PLAYED}
15    BY MR. LANSER:
16         Q.   That sounded like, Is there any way we
17    can get an EMS van or medic down here to where
18    we're at on Government and South 10th?  We got a
19    couple of demonstrators here who are hurt.  Does
20    that sound about accurate?
21         A.   Yes, sir.
22         Q.   Do you know who that was speaking?
23         A.   I do not.
24         Q.   Do you recall any demonstrators getting
25    hurt on July 10th?
```

1        A.    No, sir.  Nothing specific.

2        Q.    In general?

3        A.    I would assume there was some bumps and

4   bruises.  Nothing a Band-Aid and an aspirin

5   wouldn't take care of.  I do know as soon as I

6   heard that, it made me think about speaking with

7   our Mobile Field Force guys, especially with state

8   police.  It was very, very hot, so I'm wondering if

9   that had anything to do with the climate, because

10  we had people that were hurting.  They were about

11  to drop due to the equipment that they were

12  wearing, the physical activity, and the sheer heat

13  and humidity at the time.

14       Q.    Yeah.  Baton Rouge in July.  It could do

15  that.

16       A.    Correct.  I was specifically trying to

17  get someone to get them water as fast as we could.

18  They even opened up the funeral home right there on

19  Government Street after it all subsided to get them

20  inside into the air-conditioning, a safe place so

21  they could take some of their gear off and hydrate,

22  because were about to start -- the guys out there

23  were about to start dropping like flies.

24       Q.    When you say get them water, I assume you

25  are talking about your own units, not get

1    protesters water?

2         A.    What I was just speaking of, yes.

3         Q.    I'm going to move ahead to one hour, 15

4    minutes, and 42 seconds.  Just a quick one here.

5                    {AUDIO PLAYED}

6    BY MR. LANSER:

7         Q.    A little too far ahead.  Let me jump

8    back.  We will start it at one hour, 15 minutes,

9    and 34 seconds.

10                    {AUDIO PLAYED}

11   BY MR. LANSER:

12        Q.    Just those last two little bits.  I hear

13   SWAT Team 4 and Sniper Team 4. Does that sound

14   right?

15        A.    Yes, sir.

16        Q.    Do you know who SWAT Team 4 is?

17        A.    No, sir, I do not.  They were broken up

18   into smaller elements.  I don't know who was who.

19        Q.    What about Sniper Team 4?

20        A.    I do not know.

21        Q.    Do you recall, were there any snipers

22   around on July 10th?  Like were there any snipers

23   actually deployed on July 10th?

24        A.    Not to my recollection.

25        Q.    Do you know who that was talking?

1          A.    It sounded like Chris Polito.

2          Q.    We're getting close.  Don't worry.  I'm

3    going to start one hour, 15 minutes, and 53

4    seconds.

5                      {AUDIO PLAYED}

6    BY MR. LANSER:

7          Q.    I heard, State police says another group

8    of guys is about to show up, and then we're going

9    to collapse the group on themselves and start

10   effecting arrests.  Does that sound right?

11         A.    Yes, sir.

12         Q.    Who was that speaking?

13         A.    That was Dustin McGinnis.

14         Q.    When he says another group of guys, I

15   assume it's another group of law enforcement there,

16   manpower support sort of thing?

17         A.    As I appreciate the way he worded it is

18   that he got information from state police that

19   another group of guys was coming to them, so as I

20   was listening to that, I appreciate that as more

21   state police were coming to them.  Once they got

22   grouped up together, then we would start effecting

23   arrests.

24         Q.    At this point in the day, if you had had

25   the resource power, you would have already started

1    effecting arrests at this point?  That was the

2    holdup?

3         A.   I believe they had probably already made

4    some arrests, but, yes.

5         Q.   I'm going to go ahead to one hour and 19

6    minutes and 39 seconds.

7                   {AUDIO PLAYED}

8    BY MR. LANSER:

9         Q.   So what I heard is, Command to all units.

10   Be advised that this is not, I repeat, this is not

11   a peaceful demonstration.  Once LSB has their

12   contingency and begins their actions, assist them

13   in any manner.  Again, this not a peaceful

14   demonstration, so act accordingly.  Does that sound

15   about right?

16        A.   Yes, sir.

17        Q.   Do you know who that was speaking?

18        A.   That would be me.

19        Q.   That was you.  You said this is not a

20   peaceful demonstration.  What led you to that

21   conclusion?

22        A.   Terminology.  For them I would call it

23   now an unlawful assembly, because the group that

24   was there was actively violating the law by

25   obstructing the roadway.

1      Q.   Do you know if at this point they were in
2   the road or if they were in the yard?
3      A.   There was so many people down there they
4   were probably in both locations.
5      Q.   You said actively violating the law.  I
6   know, you know, there is a question about if they
7   had violated earlier, it doesn't really matter, but
8   as far as people actively violating, was everyone
9   actively violating at this time?
10      A.   I'm trying to figure out how to word
11   this.  At some point they had all violated the law.
12   At this point, I also believe that they were
13   throwing things.  And it's no different than I go
14   steal something, and you catch me, and I say, here,
15   I give it back.  It doesn't negate the theft.  So
16   we're here in the same manner.  They had overtaken
17   the roadway.  Obviously, from earlier, in talking
18   to or listening to the stuff with Lorenzo Coleman,
19   they tried to talk to them and convince them not to
20   do what they were doing, and they continued.  I
21   think they were given ample opportunity to stop
22   what they were doing, and the only way to go in and
23   safely make arrests on that scale is we had to have
24   enough manpower there.
25      Q.   I'm looking at the rest of my notes here.

1    I'm jumping ahead here.  This is one hour, 43

2    minutes, and 34 seconds.

3                    {AUDIO PLAYED}

4    BY MR. LANSER:

5        Q.    Wait.  I'm sorry.  That is the wrong one.

6    My apologies.  What I meant to say was one hour, 44

7    minutes, and 47 seconds.

8                    {AUDIO PLAYED}

9    BY MR. LANSER:

10       Q.    That last part.  Sounded like, Check that

11   vehicle from the last female.  Says there is a

12   child in that car, and then another person

13   responds, I do.  I got that child and a dog.  Does

14   that sound right?

15       A.    Yes, sir.

16       Q.    Do you know who either of those people

17   were speaking?

18       A.    The one that said they had the child and

19   the dog, the higher-pitched one is Reab Simoneaux.

20   I'm not sure who the other person was.

21       Q.    Do you know what Officer Simoneaux is

22   talking about with the child and the dog in the

23   car?

24       A.    First I've heard of that.  No, sir.

25       Q.    No problem.

```
1         A.    Do you know how much radio traffic --
2         Q.    I'm sure.
3         A.    -- I barely know when I'm talking so.
4         Q.    Yeah.  That might be it for my radio
5    questions.  Let me just double-check here.  Let me
6    stop sharing that.  Believe it or not, I know it's
7    been a long day.  That might be everything I have
8    for you.  Give me one minute here.
9         A.    Don't get my hopes up.
10        Q.    Yeah.  Just 11 or 12 more videos.  No.
11   just kidding.
12             MR. FOLEY:
13                  Dave, that's my line.
14             MR. LANSER:
15                  That's right.  That's from the Eric
16               Foley playbook.
17             THE WITNESS:
18                  I'm trying to break the record
19               anyway.
20             MR. LANSER:
21                  I think you have the record as far
22               as this litigation goes.  We beat
23               yesterday by an hour, I think.  Maybe
24               not quite.  That's all I have.
25                  Mr. Craig, I don't know if you have any
```

1              more redirect or Fahrenholt.

2              Mr. Scott, do you have any?

3    BY MR. CRAIG:

4         Q.   I actually just have one question just

5    kind of in the middle of all of this stuff that

6    Mr. Lanser was asking.  Was there a particular --

7    was there any chain of command, or, you know,

8    person in charge of getting intelligence reports to

9    you at the EOC, lieutenant?

10        A.   Someone was there receiving the reports.

11   I don't know exactly how, because some things came

12   through state police through the fusion center, and

13   we received it.  I believe all intel -- I was

14   getting e-mails constantly about intel, and so many

15   so that I may wake up and have 90 e-mails without

16   time to look through them.  By the time you get up,

17   get dressed, get to work, all of this is going on.

18   By the time you read these, they're outdated.  So

19   since then I know that we have assigned someone to

20   kind of triage some of that information, but I

21   don't recall if we had anyone at that time.

22        Q.   Do you recall if you made any public

23   statements about the -- I mean, do you recall if

24   you made any public statements about the protests

25   after they happened, either personally or in your

```
 1  role as union president?
 2       A.   Yes, sir.  I made several comments.
 3       Q.   In what form would you have made
 4  comments?
 5       A.   Per policy at the time, the only capacity
 6  that I could speak publicly in was as the union
 7  president.  And the one that sticks out is, for
 8  lack of better terms, denouncing one of our
 9  wonderful state representatives for wearing a shirt
10  that had blood stains with Alton Sterling's name on
11  it.  I have publicly supported Blaine Salamoni
12  through the entire thing.  I was not so kind of
13  Hillar for dropping the charges so relatively soon.
14  There may be more.  Those just stand out.
15            MR. CRAIG:
16                 Okay.  That's all I have.  I don't
17              know if Mr. Fahrenholt has any or there
18              is always a chance Mr. Scott will have
19              a load of questions right at the end.
20            MR. FAHRENHOLT:
21                 I have no questions.
22            MR. SCOTT:
23                 I have no questions.
24            MR. LANSER:
25                 I think we're done.  Thank you, sir.
```

1              MR. SCOTT:

2                   I found one.

3    EXAMINATION BY MR. SCOTT:

4         Q.   Your departmental cell phone, when you

5    returned it, did they do any kind of examination?

6         A.   They did an examination prior to me

7    returning it.  I actually had to bring it down

8    there so that they could extract whatever data was

9    on it.

10        Q.   Was that like brought down to Mobile

11   Data?

12        A.   I don't remember if Mobile Data did it or

13   if it went to our high-tech unit.  One of the two.

14        Q.   Do you know the results of those tests?

15        A.   There was nothing on it.

16             MR. SCOTT:

17                  Jim, that was just for you.

18             MR. CRAIG:

19                  Gee, thanks.

20   BY MR. CRAIG:

21        Q.   There were two individuals that you

22   talked about.  You mentioned two departments, the

23   two individuals, lieutenant, that you, when you

24   gave the phone back.

25             MR. SCOTT:

```
 1                    Mobile Data and High-Tech.
 2              MR. CRAIG:
 3                    Yeah.
 4              THE WITNESS:
 5                    I think it was -- the download may
 6                have been done -- no.  It wasn't done.
 7                We had to bring them down there to our
 8                IS Division.  IS did it.  We have --
 9                part of our IS Division, there is a
10                branch of it that is at our police
11                headquarters.
12              MR. CRAIG:
13                    Got it.
14              THE WITNESS:
15                    I believe anyone that had a
16                department phone during a certain time
17                period had to go down there and have
18                their name checked off the list.
19       BY MR. CRAIG:
20            Q.   So that would be Mr. Romero's department?
21            A.   Yes, sir.  I believe so.
22              MR. CRAIG:
23                    Thank you.  No other questions.
24                    [End of deposition, 3:50.]
25
```

WITNESS CERTIFICATE

I, LIEUTENANT CHRISTOPHER B. TAYLOR, have read or have had the foregoing testimony read to me pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and do hereby certify that to the best of my ability and understanding, it is a true and correct transcription of my testimony.

Please check one:

_____Without corrections

_____With corrections (see errata sheet)

_____        _____
LT. CHRISTOPHER B. TAYLOR                  Date

1          C E R T I F I C A T E
2
3              This certification is valid only for
   a transcript accompanied by my original signature
4  and original required seal on this page.
5              I, SANDRA P. DIFEBBO, Certified
   Court Reporter, in and for the State of Louisiana,
6  as the officer before whom this testimony was
   taken, do hereby certify that LIEUTENANT
7  CHRISTOPHER B. TAYLOR, after having been duly sworn
   by me upon authority of R.S. 37:2554, did testify
8  as hereinbefore set forth in the foregoing 172
   pages;
9
             That the testimony was reported by
10 me in stenotype, was prepared and transcribed by me
   or under my personal direction and supervision, and
11 is a true and correct transcript to the best of my
   ability and understanding;
12
             That the transcript has been
13 prepared in compliance with transcript format
   guidelines required by statute or by rules of the
14 board, that I have acted in compliance with the
   prohibition on contractual relationships as defined
15 by Louisiana Code of Civil Procedure Article 1434
   and in rules and advisory opinions of the board;
16
             That I am not related to Counsel or
17 to the parties herein, nor am I otherwise
   interested in the outcome of this matter.
18
19
20
21
   _____
22 Sandra P. DiFebbo,
   Certified Shorthand Reporter
23
   Date:  _____
24
25