UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


BLAIR IMANI, ET AL

                    DOCKET NO.
                    17-cv-00439-JWD-EWD

VERSUS


CITY OF BATON ROUGE,
ET AL


           Deposition of MYRON DANIELS,
taken on June 18, 2021, via Zoom
Videoconference.

```
 1   APPEARANCES:
 2   MOST & ASSOCIATES
     BY: WILLIAM MOST, ESQ.
 3   DAVID LANSER, ESQ.
     201 St. Charles Avenue
 4   Suite 114, #101
     New Orleans, Louisiana  70170
 5   Phone: (504)533-4521
     Email: david.lanser@gmail.com
 6       REPRESENTING PLAINTIFFS
     (IMANI V. CITY OF BATON ROUGE)
 7
 8
     RODERICK AND SOLANGE
 9   MacARTHUR JUSTICE CENTER
     BY:  ERIC FOLEY, ESQ.
10   JIM CRAIG, ESQ.
     HANNAH LOMERS-JOHNSON, ESQ.
11   MANDISA MOORE-O'NEAL, ESQ.
     4400 S. Carrollton Avenue
12   New Orleans, Louisiana  70119
     Phone: (504)684-2364
13   Email: eric.foley@macarthurjustice.org
         REPRESENTING PLAINTIFFS
14   (SMITH V. CITY OF BATON ROUGE AND
     BATISTE-SWILLEY V. CITY OF BATON ROUGE)
15
16
     DEELEE MORRIS, ESQ.
17   JOSEPH SCOTT, ESQ.
     222 St. Louis Street
18   Baton Rouge, Louisiana  70802
     Phone: (225)389-3114
19   Email: dsmorris@brla.gov
         REPRESENTING BATON ROUGE CITY
20   POLICE DEPARTMENT OFFICERS
21
22
23
24
25
```

1   APPEARANCES (CONTINUED):

2   BURGLASS & TANKERSLEY.
    BY:  GREGORY FAHRENHOLT, ESQ.
3   5213 Airline Drive
    Metairie, Louisiana  70001
4   Phone: (504)836-0408
    Email: gfahrenholt@burglass.com
5       REPRESENTING INDIVIDUAL
    STATE POLICE TROOPERS
6

7

8   ALSO PRESENT:

9   Chase Gunter
    Megan Koilparampil
10

11

12  REPORTED BY:

13  Cecilia M. Henderson
    Certified Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25

4

1

2                    EXAMINATION INDEX

3                                              Page

4    MR. LANSER ...............................7
     MS. JOHNSON ...........................126

5

6           E X H I B I T   I N D E X

7                                              Page

8    Exhibit B ................................40
     Exhibit CCCCC ...........................55
9    Exhibit BBBBB ...........................59
     Exhibit YYYY ............................64
10   Exhibit 4 ..............................133
     Exhibit 5 ..............................136
11   Exhibit 6 ..............................140
     Exhibit 7 ..............................146
12   Exhibit 8 ..............................149
     Exhibit 9 ..............................155
13   Exhibit 10 .............................156
     Exhibit 11 .............................183
14   Exhibit 12 .............................185
     Exhibit 13 .............................187
15   Exhibit 14 .............................189
     Exhibit 15 .............................190
16   Exhibit 16 .............................190
     Exhibit 17 .............................199

17

18

19

20

21

22

23

24

25

1                S T I P U L A T I O N

2

3          It is stipulated and agreed by and

4    between counsel that the deposition of MYRON

5    DANIELS is hereby being taken under Article

6    1421, et seq, Louisiana Code of Civil

7    Procedure for all purposes in accordance with

8    law;

9          That the formalities of filing and

10   certification are hereby waived; that the

11   formalities of reading and signing are hereby

12   specifically not waived;

13         That all objections, except those as

14   to the form of the question and/or

15   responsiveness of the answer, are hereby

16   reserved until such time as this deposition or

17   any part thereof may be used in evidence.

18              *   *   *   *   *   *   *   *

19         CECILIA M. HENDERSON, Certified Court

20   Reporter, in and for the State of Louisiana,

21   officiated in administering the oath to the

22   witness.

23

24

25

```
 1            MR. LANSER:
 2                 This is Dave Lanser for the
 3            plaintiffs in the Blair Imani case
 4            and all those stipulations sound fine
 5            to me.
 6            MS. LOMERS-JOHNSON:
 7                 This is Hannah Lomas-Johnson.
 8            I'm going to be representing the
 9            plaintiffs today from the Tennart,
10            Smith, Batiste-Swilley and A.R.
11            cases.  I'm also here with Mandisa
12            Moore-O'Neal and Eric Foley from our
13            office also be joining us in about
14            half an hour.  And we also agree to
15            the remote oath.
16            MR. SCOTT:
17                 Joseph Scott for the City of
18            Baton Rouge and Myron Daniels, Baton
19            Rouge Parish Attorney's Office.  And
20            the stipulations are acceptable to us
21            as well.
22            MR. FAHRENHOLT:
23                 This is Greg Fahrenholt on
24            individual Louisiana State Police
25            Troopers in prior lawsuits.  We agree
```

1          to those stipulations as well.

2                  MYRON DANIELS, 9000 AIRLINE

3    HIGHWAY, BATON ROUGE, LOUISIANA , AFTER FIRST

4    BEING DULY SWORN IN THE ABOVE-ENTITLED MATTER,

5    DID TESTIFY AS FOLLOWS:

6                      EXAMINATION

7    BY MR. LANSER:

8        Q    Good morning, Mr. Daniels.  My name

9    is Dave Lanser.  I'm one of the attorneys for

10   the plaintiffs in the Blair Imani case.

11           MR. LANSER:

12               Real quick, Mr. Scott, can we

13           also stipulate that the deposition

14           was properly noticed and the court

15           reporter is duly qualified?

16           MR. SCOTT:

17               I agree with that.

18   BY MR. LANSER:

19       Q    Mr. Daniels, can you just state and

20   spell your name for the record for me?

21       A    Yes, sir.  Myron Daniels, M-Y-R-O-N

22   D-A-N-I-E-L-S.

23       Q    Great.  And what's your current title

24   at the Baton Rouge Police Department?

25       A    Currently, I am the Deputy Chief of

1    Administration, the Chief of Staff.

2        Q    Great.  And is there -- certainly,

3    you want me to refer to you today,

4    Mr. Daniels, Officer?

5        A    I'm not picky; however you choose.

6        Q    Okay.  Great.  You can just call me

7    Dave, if it ever comes up.

8        A    Okay.

9        Q    Have you ever given a deposition

10   before?

11       A    Yes, sir, I have.

12       Q    How many previous depositions have

13   you given?

14       A    I've given a few.  I can't give you a

15   specific number.

16       Q    Sure.  More than five?

17       A    Five or less.

18       Q    Five or less.  I'm just going to go

19   over the basic set of deposition rules and

20   questions, just so we're on the same page and

21   we have it on the record.  You do realize

22   you're under oath today, correct?

23       A    Yes, sir.

24       Q    And you realize your answers here

25   today are the same force as if we were in a

```
1    courtroom with a judge and jury?
2         A    Yes, sir.
3         Q    Is there anything today that will
4    prevent you from giving me your full
5    attention?
6         A    No, sir.
7         Q    Are you taking any medications or
8    anything like that that might impact your
9    memory or understanding of the questions?
10        A    No, sir.
11        Q    Have you ever been arrested?
12        A    No, sir.
13        Q    Okay.  So throughout this whole
14   deposition, just -- if you ever need to take a
15   break at any time, just let us know and we're
16   happy to take a break.  I would ask, if we're
17   in the middle of a question or something, we
18   might have you finish answering the question
19   before taking a break.  Does that sound all
20   right?
21        A    Yes, sir.
22        Q    Great.  And this is true in any
23   deposition, but especially when we're on Zoom
24   and it's easy to talk over each other.  I'm
25   sure the court reporter will appreciate if --
```

1    any time I ask a question, please wait until

2    I'm done asking before you start to answer and

3    I'll wait to ask a new question before you're

4    done answering.  Does that sound all right?

5         A    Yes, sir.

6         Q    And if at any point you don't

7    understand the question or you want some

8    clarification on the question, I would much

9    rather you just ask me to repeat it or

10   rephrase it or whatever the case may be rather

11   than trying to guess at it.  Does that sound

12   all right?

13        A    Yes, sir.

14        Q    Okay.  And you understand that a

15   transcript is being made of this deposition?

16        A    Yes, sir.

17        Q    And that a judge or potentially or a

18   jury might later rely on that transcript?

19        A    Yes, sir.

20        Q    Okay.  And then, also, just because

21   we're on Zoom here, if at any point someone

22   else other than Mr. Scott is in the room or

23   attempts to contact you in any way, could you

24   just let us know?

25        A    Yes, sir.

1      Q     Okay.  Do you know what cases you're

2   here for today?

3      A     Yes, sir, I have an idea.

4      Q     Okay.  And you understand you're a

5   defendant in those cases?

6      A     Yes, sir.

7      Q     Can you tell me what you did to

8   prepare for this deposition?

9      A     The only thing I did was read a

10  report that I authored the day or days

11  following the incident.

12     Q     Okay.  Do you have that report with

13  you today?

14     A     Yes, sir.

15     Q     Great.  Did you take any additional

16  notes or anything while you were preparing?

17     A     No, sir.

18     Q     Okay.  How long have you been with

19  the Baton Rouge Police Department?

20     A     Approximately 23 years right now.

21     Q     What did you do prior to joining

22  BRPD?

23     A     I was a gaming agent and at a casino

24  and I was in the Marine Corps Reserves.

25     Q     Great.  As I'm sure you know, the

1    lawsuits we're here for today go back to July
2    2016.  What was your rank and title in July of
3    2016?
4        A    July 2016, my rank would have been
5    Sergeant and my title -- I work full time
6    Special Response Team, and I was the team
7    leader for Bravo Company.
8        Q    Okay.  And what were just kind of
9    your general job responsibilities in that
10   role?
11       A    On a daily basis, it was supervising
12   those subordinates that worked in the Special
13   Response Team.  We responded to everything
14   from high risk search warrants to fugitive
15   apprehension to dignitary protection, a host
16   of things.
17       Q    Great.  And do you -- specifically,
18   we're going to ask a lot of questions today
19   about the July 10th, 2016 protests.  Do you
20   remember those July 10 protests, specifically?
21       A    Yes, sir.  I have somewhat of a
22   memory of them, yes, sir.
23       Q    Before we get into sort of the nitty
24   gritty of that, I want to pull up a document
25   here.  Give me one second.  It's taking a

```
 1   minute to load, for some reason.  We've had a
 2   good run of avoiding technology issues.
 3   Hopefully, it doesn't start now.  Here we go.
 4   Okay.  I'm going to share my screen in one
 5   second.  Okay.  Let me know -- okay.  Can you
 6   see the Affidavit of Probable Cause on the
 7   screen?
 8        A    Yes, sir, I do.
 9        Q    Okay.  Sir, are you familiar with
10   these types of documents -- not necessarily
11   this specific one, but Affidavits of Probable
12   Cause?
13        A    Yes, sir, I am.
14        Q    Okay.  Can you explain to me just
15   what an Affidavit of Probable Cause is used
16   for?
17        A    It's a document submitted to the
18   courts to -- based off of facts of a
19   circumstance where an officer believes someone
20   violated a law or ordinance.
21        Q    Is an Affidavit of Probable Cause
22   necessary in order to arrest somebody?
23        A    To process them into Parish Prison,
24   it is, yes, sir; either that or a warrant.
25        Q    Great.  So you either need an
```

1   Affidavit of Probable Cause or a warrant in
2   order to process someone into prison, correct?
3       A    Yes, sir.
4       Q    And these affidavits -- these are --
5   these are created under oath; is that correct,
6   signed under oath?
7       A    Yes, sir.
8       Q    And they're presented to the Court,
9   correct?
10      A    They -- eventually, they are, yes,
11  sir.
12      Q    So who -- if someone is going to make
13  an Affidavit of Probable Cause, who's the
14  person who fills out the affidavit?
15      A    Often times it's either the arresting
16  officer and someone who is assisted in the
17  arrest process.
18      Q    When you say:  "Assisted in the
19  arrest process," can you be more specific
20  about that?  Is that someone who, you know,
21  was on scene during the arrest or is it
22  someone just somewhere along in the process?
23      A    No.  In most cases, it's someone who
24  was on scene during the arrest.
25      Q    Okay.  And you said:  "Most cases."

1   What sort of cases might occur where it

2   wouldn't be someone who was on scene during

3   the arrest?

4      A   I think I'm pretty familiar with -- I

5   think Affidavits of Probable Cause during some

6   of the protests may have been completed by a

7   team that was put in place to handle the

8   actual process.

9      Q   Okay.  Is that something that happens

10   outside of the context of protests?  Are there

11   other scenarios where there might be a team

12   set up like that?

13      A   No, sir.  Those protests and things

14   that we were dealing with were, at that time,

15   a once-in-a-lifetime thing for us.  So, no

16   it's very unusual that we would have to deal

17   with those types of things.

18      Q   Okay.  And so these affidavits are

19   meant to be specific to each arrestee; is that

20   correct?

21      A   Yes.  In my opinion, they should.

22      Q   And so it's supposed to be an

23   accurate portrayal of what led to that

24   specific arrest, correct?

25      A   I would think so, yes.

1       Q    So looking at this one -- and I'll
2   just mention to you this is about Raae
3   Pollard, who is one of the plaintiffs in the
4   Blair Imani case from July 10th.  So looking
5   at this one, can you tell me what date this
6   was filled out on, just by looking at it?
7       A    It was July 10th, and it was
8   notarized on July 10.
9       Q    2016?
10      A    2016, yes, sir.
11      Q    And so in looking at it, I see part
12  of it is handwritten and part of it is typed
13  up.  Do you know why that might be?
14      A    I can only speculate.  But, no, sir,
15  I don't know the specific reason for it.
16      Q    Okay.  Do you have any idea if these
17  were sort of printed ahead of time?
18      A    I am not sure.  I had no dealings
19  with the prisoner processing portion of the
20  incidents.
21      Q    Okay.  So I take it you did not --
22  you didn't fill out any of these for the
23  July 10th protest?
24      A    No, sir.
25      Q    That's fine.  I do want to go through

1  this a little further, though.  Bear with me

2  for a minute here.  I'm just going to read the

3  "Synopsis of Probable Cause" real quick.  And

4  please follow along and let me know if I have

5  any of this incorrect.

6         MR. SCOTT:

7              I have a question here.  He's

8              told you that he didn't fill any of

9              them out and that he had no contact

10             with the prisoner processing portion.

11             Questioning him about a document that

12             he had no contact with appears to be

13             improper.

14         MR. LANSER:

15             Okay.  That's noted.  I just

16             want to question him about the

17             synopsis real quick here.

18  BY MR. LANSER:

19     Q    This states:  "The affiant stated to

20  the Court that on this 10th day, July 2016,

21  the defendant did knowingly and feloniously

22  violate LRS 14:97, simple obstruction of a

23  highway of commerce, and that they

24  intentionally placed themselves in the

25  roadway, thus rendering movement thereon more

1  difficult and LRS 14:108, resisting an

2  officer, and that the defendant actively

3  attempted to prevent their lawful arrest after

4  being placed under arrest.  This occurred

5  within the City of Baton Rouge, Parish of East

6  Baton Rouge."

7           "To wit:  On the above listed date,

8  numerous Baton Rouge Police Department

9  officers were assigned to provide security for

10  a peaceful protest at and in the vicinity of

11  Baton Rouge Police Department Headquarters

12  located at 9000 Airline Highway.  Protesters

13  assembled at provided parking areas and in

14  surrounding parking lots.  Protesters were

15  advised by loud speaker to remain on private

16  property and be on the curb.  They were

17  further advised to stay out of the roadway and

18  to not impede the flow of traffic.  These

19  announcements were made frequently via loud

20  speakers and by individual police officers on

21  the scene."

22           "During the protest, the defendant

23  entered the roadway and was provided another

24  verbal order to exit the lanes of travel.

25  Moments later the defendant entered the

1    roadway again and was taken into custody by

2    officers on the scene.  And after being

3    advised that they were under arrest, the

4    defendant did actively attempt to prevent

5    being taken into custody and completion of the

6    arrest process."

7             Is that an accurate reading of the

8    synopsis?

9        A    Yes, sir, it is.

10       Q    Okay.  I just want to kind of ask

11   generally -- because you were out there that

12   day.  Is this sort of an accurate portrayal of

13   what happened during the protest, that

14   synopsis?

15       A    That is a -- I guess you could say

16   that everyone that was there, I wouldn't said

17   had or completed those violations, but --

18   because there were some people who were

19   peaceful and were law abiding throughout the

20   protest, and we encouraged that.  And so I

21   can't allow this -- I can't state in fact that

22   this affidavit against this one person

23   categorized everyone that was out there.

24       Q    Okay.  So without knowing the details

25   of Raae Pollard or why she was arrested or

1    anything like that, you're saying this might

2    be accurate to her, but it's not accurate to

3    every protester who was there, correct?

4        A    Correct.

5        Q    A couple of small details I want to

6    mention in here.  It does say that the

7    protester in the vicinity of Baton Rouge

8    Police Department Headquarters.  Were you

9    aware of any protest that day in the vicinity

10   of the Baton Rouge Police Department

11   Headquarters?

12       A    I don't specifically recall.  It was

13   pretty constant.  We were dealing with

14   protests varying in size and things, either at

15   headquarters -- there were some downtown.

16   There were -- there were so many scheduled

17   protests, so I can't say specifically.

18       Q    Okay.  And the headquarters are

19   located at 9000 Airline Highway, correct?

20       A    Yes, sir, it is.

21       Q    And you don't recall whether there

22   were protests actually at 9000 Airline

23   Highway?

24       A    Unfortunately, those days kind of ran

25   together.  Because they were very long, hot

```
 1   days and we had protests continuously for

 2   days.  So I can't specifically say yea or nay.

 3        Q    I much rather you tell me you can't

 4   remember than trying to guess at it.  So I

 5   appreciate that.  It also mentions protesters

 6   assembled at provided parking areas and in

 7   surrounding parking lots.  Do you remember

 8   what that might be referencing?

 9        A    Not exactly, but there were parking

10   areas or businesses where cars were parked.

11   There was also a park across the street from

12   headquarters as well where many protesters and

13   onlookers parked.

14        Q    Okay.  It also says:  "Protesters

15   were advised by loud speaker to remain on

16   private property and on the curb."

17             Do you remember them being told to

18   stay on private property and on the curb?

19        A    Again, I'm not sure of the exact date

20   that you're speaking of.  But, yes, throughout

21   the protest -- throughout the entire process,

22   it was repeated often and frequent for

23   protesters to remain outside of the roadway

24   and on private property.

25        Q    So if someone had been standing on
```

1    private property, this Affidavit of Probable

2    Cause wouldn't apply to them, correct?

3        A    If they were only standing on -- in

4    the designated areas, it would not, if they

5    were only standing in those designated areas.

6    But if they -- as this affidavit states --

7    they were in the roadway and ignored numerous

8    attempts or warnings, then, yes, I think it

9    would apply.

10       Q    Sure.  That makes sense.  But if they

11   had been on private property or on the curb,

12   then they would have been complying; is that

13   correct?

14       A    It depends on -- again, to me, it

15   depends on if they completed these other

16   things, they violated the law.  If they never

17   would have completed the alleged charges, then

18   I don't think that they should have been

19   arrested.

20       Q    Okay.  And so -- great.  And let's

21   say there's -- you know, because this was a

22   protest, we had groups of people around.  If

23   there's a group of people -- and let's say

24   some of them might be standing on the street

25   and some of them standing on private property.

1    Is it proper to arrest all of them or just the

2    people in the street?  What's the procedure

3    there?

4         A    So that leads to a little

5    interpretation.  Can you clarify that, your

6    question, a little bit more?

7         Q    Sure.  If there's a group of

8    people -- and let's say most of them are

9    standing on private property, complying with

10   orders and some of them are in the street

11   blocking traffic or not complying in some

12   other way.  Is it proper to arrest all those

13   people in the group or just the people that

14   aren't complying?

15        A    So it kind of goes back to the

16   probable cause affidavit.  If at any point

17   they violated the law, I think then and only

18   then should they have been arrested or

19   charged.

20        Q    Okay.  Let me ask you this, then:

21   Let's say someone had been standing in the

22   street and arguably violated the law.  If they

23   were then told to get out of the street and

24   did, even though they had been standing in the

25   street earlier, are they subject to arrest at

1   that point?

2       A     That would depend on the arresting

3   officer.  I think -- so I don't want to --

4   that question is kind of ambiguous to me.  I

5   think if I say yes to a certain portion of it,

6   it could be applied to the whole thing.  And

7   it could be yes and no answer.  But if I was

8   giving you a specific, I would say that if

9   someone violated the law and an officer

10  decided to arrest them, I would have to just

11  lean on that officer's determination to make

12  that arrest.

13      Q     Okay.  Did you personally make any

14  arrests on July 10th, 2016?

15      A     No, sir.  I don't remember effecting

16  any arrests.

17      Q     All right.  I will stop sharing this

18  for a minute.  Backing up a little bit, I'm

19  curious what -- you said you've been at Baton

20  Rouge Police Department for 23 years.  During

21  that time, what sort of training did you

22  receive on policing protests?

23      A     Quite a bit.  I was -- typical

24  academy training, 20 some odd weeks at the

25  actual academy; another 16 weeks in the Field

```
1    Training Officers Program; your annual
2    in-service trainings every year.  I've always
3    kind of been a student, so I've always sought
4    other trainings outside (INAUDIBLE).  If you
5    can categorize me as a (INAUDIBLE) --
6              THE COURT REPORTER:
7                   I'm sorry, sir.  You just broke
8              up.  "Sought other trainings
9              outside -- if you can categorize" --
10             and I didn't quite understand what
11             you said.
12             THE WITNESS:
13                  You can categorize me as a nerd.
14             I'm constantly seeking training and
15             things along those lines.  It
16             intrigues me, so.  I was a field
17             training officer for many years.  I
18             then left the Uniform Patrol Division
19             and I was actually one of the lead
20             instructors at our training academy
21             for many years, as well.  So I have
22             quite a bit of training.
23   BY MR. LANSER:
24        Q    What years were you an academy
25   instructor?
```

1    A    2005 to approximately 2011, if I
2    remember correctly.
3    Q    Okay.  And while you were an
4    instructor -- really any point during your
5    Baton Rouge Police Department training, were
6    you ever trained on deescalation procedures in
7    a group setting?
8    A    Yes, sir.
9    Q    What sort of deescalation procedures?
10    A    In most Defensive Tactics courses,
11    there's always deescalation.  That is
12    something we worked on continuously.  Not just
13    use of force courses, but also in courses just
14    dealing with the public.  It's always best to
15    attempt to resolve it through deescalation
16    versus having to escalate to effect an arrest
17    or to get compliance.
18    Q    Sure.  So what sort of deescalation
19    tactics does Baton Rouge Police Department
20    use?
21    A    Are you referring at that time?
22    Q    2016.
23    A    2016, I would say that going back to
24    our Defensive Tactics training, that portion
25    was always in there.  We also had a course

1    which dealt with your contact with the public.

2    It was referred to as Verbal Judo in efforts

3    to help with the deescalation piece.

4        Q    Can you explain Verbal Judo to me?

5        A    Basically, the use of words to gain

6    compliance, if I had to put it in short form.

7    It helped with communicating with the public,

8    giving them options, giving them

9    opportunities.  But those were the basics of

10   it.  And instead of allowing someone's words

11   to attack you, you reversed it almost with

12   kindness to gain compliance.

13       Q    Can you give me, like, a specific

14   example of how Verbal Judo -- what's, like, a

15   specific example of a phrase you might use or

16   something in a protest scenario?

17       A    So Verbal Judo was not protest

18   specific, just general law enforcement.  For

19   example, one of the things I would say is from

20   the standpoint of making a traffic stop, your

21   introduction to that person can kind of guide

22   the rest of it, also -- so:  Good morning,

23   sir.  My name is Sergeant Myron Daniels.  The

24   reason I pulled you over is because you

25   violated this statute.  Was there any lawful

1    reason why you failed to stop at the stop
2    sign?  And even if that person decided anger
3    or to take it to another level, then from a
4    Verbal Judo standpoint, my next response would
5    be something along the lines of acknowledging
6    their frustration, but also stating that the
7    law requires us to sometimes, you know,
8    enforce traffic laws, as well.  So it was just
9    one of those -- like I said, the use of words
10   and better options of communication.
11       Q    Sure.  What were you trained on as
12   far as specific rights of protesters in the
13   midst of a protest?
14       A    I go back to our law and legal
15   classes when we were in the academy.  Protests
16   were something that would come up during
17   unusual occurrences, that course.  And it
18   basically gave the description of a crowd
19   versus a mob.  It also talked about, of
20   course, First Amendment rights to gather.  But
21   those are most of the -- the general things
22   that we would cover during such class.
23       Q    Sure.  You mentioned crowd versus
24   mob.  Can you go into -- explain sort of what
25   that distinction might be?

1        A    A crowd that's gathered, for example,
2    LSU football game, you may have a crowd of
3    100,000 people.  And -- but the difference
4    would be a crowd of 100,000 people versus a
5    mob where they turn violent, law breaking.  So
6    that's the distinction between the two, in my
7    opinion.
8        Q    Okay.  So the distinction is when
9    they become violent and start breaking laws?
10       A    And the breaking of laws, yes.
11       Q    What about -- I've been to a couple
12   of LSU games.  I know some of those crowds can
13   get unruly at times, I'd say.  Is that
14   accurate to say?
15       A    Yes.  We are very passionate people
16   here in Tiger Land.
17       Q    That's a great way to put it.  I
18   couldn't have said it better, myself.  So what
19   happens if you -- let's say you're at an LSU
20   game or you're working an LSU game and, you
21   know, a fight breaks out or something like
22   that.  Is that something that would, you know,
23   prevent it from being a crowd at that point
24   and maybe towards mob, because a few people
25   are fighting?

1      A    No.  I would say that that is not a

2  mob at that point.  The individuals in that

3  case would be the ones who violated the law

4  and those two individuals -- or whatever that

5  group is -- would then be arrested.

6      Q    Okay.  So even if that scenario when

7  there's a crowd of 100,000 people, if a couple

8  of people are breaking the law, they're

9  distinct from the rest of that crowd, as far

10  as a policing standpoint goes?

11      A    I think so.  But if it's a group of

12  100 people and you have 50 to 100 people

13  fighting, I think that -- particularly, that

14  fight is turned towards a particular group,

15  whether it's law enforcement or some other

16  form of authority, I think it becomes a mob.

17      Q    Sure.  What about rights of

18  journalists on a protest?  Do you do any

19  training on rights of a journalist,

20  specifically?

21      A    I won't say specifically.  I can't

22  recall specifically, no.

23      Q    In your opinion, are journalists --

24  do they have different First Amendment rights

25  than other protesters?

1    A    As long as they are abiding by the

2  lawful orders, I think their rights are just

3  -- are equal to any other person that are on

4  the scene.

5    Q    So as a police officer on the scene

6  at a protest, you wouldn't draw a distinction

7  between that's a journalist at the protest

8  versus that's a protester?

9    A    And I'll answer with a little

10  explanation.  No, I would not.  We work very

11  well with journalists and those from the

12  media; very familiar with quite a few.  We

13  understand that they're trying to do a job and

14  document.  And so in most cases, we would

15  actually guide them where to go, whether it's:

16  Hey, I understand you're recording.  Just step

17  back over in that area, that type of thing.

18  Like I said, we work very well with media and

19  journalists.

20    Q    So if there's a journalist and, you

21  know, you're trying to let them do their job.

22  You tell them to step away -- just as an

23  example, record from over there or whatever it

24  might be -- in that instance where you tell

25  them:  Please step back.  If they don't step

1    back, then basically they're not complying in

2    the same way a protester might not be

3    complying?

4        A    In my opinion, yes, sir.

5        Q    And according to the training, when

6    does it become permissible to arrest a

7    protester?

8        A    Well, I don't think that you can

9    really distinguish between protester and any

10   other individual, whether it's one or one

11   thousand.  I think that if laws are broken,

12   then that -- an officer should and could make

13   an arrest.

14       Q    Okay.  So whether or not a protest is

15   happening -- and these are protesters that

16   you're potentially arresting -- that's not

17   really relevant; it's just a matter of were

18   laws broken or were laws not broken?

19       A    I'm sorry.  Can you rephrase your

20   question?

21       Q    Yeah.  Sorry.  That was a little

22   confusing, also.  So from what you just said,

23   it sounds to me like -- let's say a protest is

24   happening.  The fact that there's a protest

25   going on is irrelevant as to whether or not

1    this person needs to be arrested, because the

2    relevant question is whether or not they broke

3    the law.

4        A    So that's kind of those questions

5    that I could probably answer both says, so

6    I'll give explanation.

7        Q    Sure.

8        A    So a protest -- again, we support,

9    100 percent -- I actually take any son to some

10   of the marches and things.  So I support it;

11   understand it.  You know, that's why I joined

12   the military.  People have a right to gather

13   and to protest.  That's fine.  When a protest

14   becomes unlawful and turns violent, I think it

15   does change quite a few things.  I do not

16   think that anyone who has not violated the law

17   should be arrested.

18       Q    Okay.  Can you tell me a little bit

19   about the Use of Force training you received

20   or, maybe, Use of Force training you provided

21   as an instructor, specifically in a protest

22   perspective?

23       A    Our Use of Force -- like I said, it

24   deals with more of everyday law enforcement.

25   There is Mobile Field Force training that

1   would normally take place, which would provide

2   tactics or training on how to effect arrests

3   in those situations.  Because it's very

4   different than effecting arrests one on one or

5   with only a few people.  You're dealing with a

6   multitude of people and it changes the

7   dynamics.

8       Q    Okay.  And did you -- you mentioned

9   the Mobile Field Force training.  Did you

10  receive Mobile Field Force training at any

11  point?

12      A    Yes, it's a standard training in the

13  training academy.

14      Q    Great.  Were you ever retrained on it

15  at any point throughout your career?

16      A    I do remember refresher courses, but

17  I don't know how often that was over my

18  career.  It's been a lot more frequently over

19  the last few years because of protests, and

20  they seem to have increased quite a bit over

21  the last several years.

22      Q    Have you ever heard -- it's called

23  the Miami Model of policing protests.  Does

24  that ring a bell at all?

25      A    No, sir, it doesn't.

1      Q    Were you ever trained on using

2  targeted arrests of specific protesters as

3  part of the training, in order to control a

4  crowd?

5      A    And this is -- like I say -- a while

6  back.  But, yes, at some points, those who,

7  again, were leading and breaking those laws --

8  as I kind of stated before -- those, again,

9  would be taken into custody versus just

10  grabbing general people.  So, yes,

11  identification of those lawbreakers would take

12  place.  And those officers who identified them

13  would absolutely take those people into

14  custody.

15      Q    Okay.  How do you identify -- I

16  believe you used the word, "Leader."  How do

17  you identify a leader in those cases, that

18  would be a target (INAUDIBLE) --

19          THE COURT REPORTER:

20              "That would be a targeted" --

21          I'm sorry.

22          MR. LANSER:

23              Target for arrest.

24          THE WITNESS:

25              Can I speak?

1              THE COURT REPORTER:
2                   Yes -- I'm sorry.
3              THE WITNESS:
4                   No, ma'am.  I'm a rule -- I
5              believe in obeying the rules.
6                   So when we -- for instance, if
7              I'm down and I'm looking at a group
8              of 100 people or so and there's
9              someone stepping out in front of the
10             group or who's a main violator of
11             that law.  That's how I would
12             identify them.  They kind of identify
13             themselves, often times.
14     BY MR. LANSER:
15         Q    Okay.  I know often in these crowd
16     situations, you see officers in -- how I would
17     describe it as -- riot gear with shields and
18     helmets.  Maybe that's not the right term.
19     I'm not sure.  But is that part of Baton Rouge
20     Police Department's policy, to have officers
21     arrive at protests wearing that gear?
22         A    So there is a group of officers who
23     are specifically trained in Mobile Field Force
24     who will be issued that protective equipment
25     that you just described and who will have

1    advanced training versus the little training I

2    got in the academy on Mobile Field Force 23

3    years ago.  So, yes, there are certain

4    individuals who have that advanced training

5    who will display the gear that you describe.

6        Q    What about the use -- I believe it's

7    called a BearCat.  What goes into the decision

8    to use a BearCat in a protest?

9        A    A BearCat is used quite often.  It's

10    just a protective piece of equipment.  So my

11    description of a BearCat -- and people see

12    them every day.  They just recognize that it

13    is what it is.  It's a Brinks truck that's all

14    it is.

15              THE COURT REPORTER:

16                   I'm sorry.

17              THE WITNESS:

18                   A Brinks or an armored truck,

19              the same that carries money from bank

20              to bank.  BearCat is actually the

21              name of the company that creates that

22              vehicle.  That's very popular.  As

23              far as using it in protests or -- we

24              use them for warrants all the time.

25              It's an armored personnel carrier.

```
 1              It allows us to get from Point A to
 2              Point B safely.  And it even --
 3              because it sits a little higher, it
 4              gives us a better vantage point to be
 5              able to see and direct.  So those are
 6              just some of the purposes.  It's not
 7              specifically for a protest.
 8   BY MR. LANSER:
 9        Q    Great.  And what about a Long Range
10   Acoustic Device -- I believe is the phrase --
11   an LRAD?  When are those used?
12        A    Those are, at the time, were very new
13   to us.  We didn't even have an LRAD.  We had
14   to borrow one from -- I want to say a state
15   police.  I'm not a hundred percent sure.  But
16   I know we had to borrow an LRAD.  LRAD,
17   basically -- in the manner in which we used
18   it, was a PA system that broadcasted messages
19   to disperse and -- yeah, that's that was the
20   primary use that I recall of it.
21        Q    So you used it to project messages to
22   the crowd.  It also has -- isn't there another
23   setting where it just emits, like, a
24   high-pitched tone?
25        A    Yes, from my understanding it is -- I
```

1    was out there when -- during its use, and it
2    had no effect on me.  So I'm not sure if I can
3    give it a lot of credibility.
4         Q    Sure.  That's fine.  Have you ever
5    heard of a Supreme Court case called Cox V.
6    Louisiana?
7         A    No, sir, I have not.
8         Q    It's just a case about a Baton Rouge
9    protester from back in the '60s, I believe.
10   This wasn't mentioned in any of your trainings
11   or anything like that?
12        A    I can't recall that, sir.
13        Q    That's fine.  I want to get back to
14   July 10, 2016, specifically.  I'm going to try
15   sharing my screen again.  Give me one second.
16   Can you see the map right now?
17        A    Yes, sir.  I see the map.
18        Q    Okay.  For the July 10th, 2016
19   protest, can you tell me where on here you
20   would have been stationed?
21        A    I do see your map, but I don't see it
22   clear enough to identify streets.
23             MR. SCOTT:
24                  Dave, I printed out a copy.  Do
25             you mind if we use the hard copy?

1        MR. LANSER:

2            Yeah, that's fine.  So this is

3        Exhibit B we're looking at.  And,

4        yeah, that's fine if he wants to look

5        at the hard copy.

6        THE WITNESS:

7            So you mentioned the 10th of

8        July, 2016?

9   BY MR. LANSER:

10       Q    Correct.

11       A    Which time are we talking?  We were

12  downtown providing cover and support for a

13  protest or a march from a church to the

14  Capitol, so we kind of moved around quite a

15  bit.

16       Q    Okay.  Well, what time did you get

17  downtown on July 10th?

18       A    I don't remember the specific time.

19  It was afternoon, if I remember correctly.

20       Q    Okay.  And you were originally there

21  just to provide support for one march.  You

22  said from a church to the Capitol; is that

23  what I heard?

24       A    Yes, sir.  There's a Methodist

25  Church.  I think it's Wesley Methodist.  It's

```
 1   on Government Street.  They had a planned
 2   march from there to the Capitol.  And so we
 3   had prior knowledge of it and actually
 4   assisted with escorting them from there to
 5   ensure that they got through the city streets
 6   safely.  So our traffic division provided
 7   escorts to block off roadways for them.  I
 8   remember making sure we had an EMS truck in
 9   the area.  Because it was -- if you're not
10   familiar with summers in Baton Rouge, they're
11   brutely hot.
12        Q    I know.
13        A    We ensured they got to the Capitol.
14   They got to the Capitol.  They had their --
15   they had a little -- I guess you could say
16   program that they went through
17   several (INAUDIBLE) --
18             THE COURT REPORTER:
19                  I'm sorry.  "Program they went
20             through, several" --
21             THE WITNESS:
22                  With several speakers.  And once
23             that program concluded at the
24             Capitol, we realized that there were
25             a few people who had arranged rides
```

```
 1                    from the Capitol, but there were
 2                    quite a few who had parked at the
 3                    original starting point.  So we chose
 4                    not to just leave them there.  We
 5                    actually provided them an escort back
 6                    to ensure that they got back to the
 7                    church safely.
 8     BY MR. LANSER:
 9          Q    And you said that church was on
10     Government Street?
11          A    Yes, sir.
12          Q    Looking at -- if you look at the map
13     Exhibit B, it looks like right in the middle,
14     all the way to the left, Government -- and it
15     looks like the closest intersection is
16     Government and Napoleon.  It says:  "Wesley
17     United Methodist Church."  Is that the church
18     you're talking about?
19          A    Yes, sir, it is.
20          Q    Okay.  So what -- what were your,
21     like, specific orders for that day; just to --
22     was it just escort them to the Capitol and
23     back?  Were there any other orders that you
24     had?
25          A    No, it was a multiple, little small
```

1    things or groups working together.  So the

2    traffic officers, that was your job to

3    actually take care of the escort.  I mentioned

4    EMS on scene, just in case there were any

5    medical issues.  From my standpoint, we were

6    in unmarked units and we were -- we truly

7    stayed off the path, just in case there was an

8    issue we could respond to help provide

9    protection for those who were marching that

10   day.

11        Q    Okay.  What sort of planning went

12   into preparing for July 10th; did you have any

13   meetings ahead of time?

14        A    A lot of this was very fluid.  Yes, a

15   lot of impromptu meetings.  It wasn't -- we

16   didn't get a lot of notice.  They were popping

17   up, literally, within hours.  Because we did

18   have notice, it doesn't require a whole of

19   planning for those motor guys.  That's their

20   expertise.  They escort every day.  There was

21   a route that was determined, because -- let me

22   back up a little bit.  When we started

23   learning of those who wanted to have these

24   rallies and these marches, we asked that they

25   communicate with us.  And we actually planned

1   a route for them to safely get there, the most

2   efficient route for them.  They actually --

3   when it started, I'm pretty sure -- if I

4   remember correctly -- they took a different

5   path.  And we just suggested on the fly to get

6   them there.  But, no, there were some meetings

7   just to coordinate:  Hey, this is what we're

8   doing.  When I say meetings, it literally

9   could be pulling up in a parking lot saying:

10  Hey guys, we're going to do this.  We're going

11  to back up this time for this.  And this is

12  what they have going on.  This is what they're

13  anticipating.  When we had meetings, those

14  were the kind of meetings we would have.

15       Q    Sure, so who -- were there other law

16  enforcement agencies besides the Baton Rouge

17  Police Department involved that day?

18       A    With the Wesley -- the march from

19  Wesley United to the Capitol, no.  I don't

20  remember any other law enforcement agencies.

21  We had the manpower.  And, again, it was

22  brought to us as a very peaceful march, just

23  to -- just to provide them an opportunity to

24  voice their concerns or their constitutional

25  rights.

1      Q    After -- towards the end of that
2    march, other law enforcement agencies did show
3    up at that point, correct?
4      A    Yes, sir.  I do remember once -- the
5    march had actually ended and, again, I kind of
6    had to escort them back to their cars.  Most
7    of those who were in that initial protest,
8    they left or they were in the process of
9    leaving.  But there was another group who
10   came.  And just everything about this group
11   was totally different from what we had just
12   escorted.  They were a little bit more -- they
13   were more aggressive.  They were -- their
14   disposition was totally different when they
15   showed up.  So it was only after that group
16   began to start to move toward the interstate,
17   that -- we rounded all the BRPD that we could.
18   And when it was so great, we did have to call
19   in the other agencies that we were working
20   with.
21     Q    Okay.  So those other agencies
22   weren't involved at all until this moment
23   you're talking about where you had to call
24   them in?
25     A    Yeah.  I don't recall them being

1    involved in the initial march from the church
2    to the Capitol.
3         Q    There wasn't any planning with these
4    other agencies ahead of July 10th or the
5    morning of July 10th?
6         A    Well, there's always going to be
7    briefings.  We had experienced every protest
8    before that.  That is why those other agencies
9    were on standby to assist us.
10        Q    And what was -- how do you
11   communicate with the other BRPD officers or
12   officers from other agencies during this sort
13   of situation?
14        A    We always had designated radio
15   channels.  But, then, we also had an Incident
16   Command set up at the -- at EOC, our Emergency
17   Operations Center, where our dispatch and
18   Homeland Security is all located on Harding
19   Boulevard.
20             THE COURT REPORTER:
21                  On what boulevard?  What was
22             that --
23             THE WITNESS:
24                  Harding, H-A-R-D-I-N-G.
25             THE COURT REPORTER:

```
 1                    Thank you.
 2             THE WITNESS:
 3                    Yes, ma'am.
 4   BY MR. LANSER:
 5        Q    So there is the regular radio
 6   channels and there is also this other Incident
 7   Command area?
 8        A    Well, Incident Command is actually
 9   those who are specifically monitoring all of
10   the radio -- the specific radio channels that
11   we're using.
12        Q    Were you involved with the radio
13   communications, personally?
14        A    Yes, sir.  At some point, I did get
15   on the radio and -- to (INAUDIBLE) resources.
16             THE COURT REPORTER:
17                    I'm sorry.  I'm sorry.  You did
18             get on the radio and -- I didn't hear
19             what you said before "Resources."
20             THE WITNESS:
21                    At point in time I did get on
22             the radio to request resources or to
23             inform officers of things that may
24             have been passed on to me or that I
25             was observing, myself.
```

1    BY MR. LANSER:

2       Q    Was there -- is there, like, a

3    specific chain of command during a protest?

4       A    Initially, there is normally somebody

5    that's on scene or on the ground at the

6    location that will be the lead at that point.

7    At some point, I end up taking the lead and,

8    like I said, requesting those additional

9    resources.

10      Q    And then -- do you remember about

11   when, approximately -- not the time of day

12   necessarily, but when during this whole event

13   you became the lead, as you put it?

14      A    Yes, sir.  It was when -- after the

15   lawful march to and from the Capitol, it was

16   only after the chaos had began where they had

17   moved down Government Street towards East

18   Boulevard and the interstate to take the

19   interstate.  That's about the time where I was

20   able to get on the radio and formally say that

21   I will take command at this point.

22      Q    Okay.  And you mentioned getting on

23   the interstate.  Did the -- were the

24   protesters chanting about getting on the

25   interstate?  Where did you get the impression

1    they were trying to get on the interstate?

2        A    I don't remember there being

3    organized chants.  But, yes, there were

4    messages being relayed by several of those in

5    the group that that's where they were headed

6    to take over the interstate.

7        Q    Okay.  So certain protesters actually

8    in the group announced that they were going to

9    take over the interstate; is that what you're

10   saying?

11       A    Yes, sir.

12       Q    Specifically to law enforcement or is

13   this just them speaking to each other?

14       A    It was more them speaking to each

15   other.  It was not directed toward law

16   enforcement.  But because of the large group,

17   they were loud enough so that everyone could

18   hear.  It was only after that message had been

19   relayed to them, did they move from the

20   Government Street by the church toward East

21   Boulevard and the interstate.

22       Q    Okay.  Looking back at this map real

23   quick, do you remember a specific part of this

24   protest that occurred at East Boulevard and

25   France Street?  Do you see that intersection?

1       A    Yes, sir, I do.

2       Q    Could you sort of walk me through

3   what happened at East and France?

4       A    At some point that's where law

5   enforcement was able to get in to intercept or

6   get in between the path of the protesters and

7   the interstate.  And that's where we were for

8   quite a while.  Quite a bit happened.  If you

9   walk me through it, I can probably give you

10  specifics.

11      Q    Sure.  So law enforcement set up,

12  basically, a line there, is what you're

13  saying, between them and the interstate so

14  they couldn't pass that point; is that

15  correct?

16      A    Yes, sir.

17      Q    How did protesters react to that line

18  being setup?

19      A    Again, I have to distinguish between

20  those original protesters that went from the

21  church to the Capitol to the disposition of

22  this group.  And this group was pretty hostile

23  in their approach.  There was quite a bit of

24  yelling.  There was quite a bit of cursing.

25  It was -- and it only escalated after that.

```
 1        Q    When you say escalated, what do you
 2   mean by that?
 3        A    Of course, the people got more
 4   aggressive, taunting, coming up toward
 5   officers.  That, we expect.  That's common.
 6   But it changed even more at one point, and
 7   they started throwing items, frozen water
 8   bottles, water bottles, rocks, picking up
 9   concrete, even a trash can.  They were
10   throwing and pelting officers with all types
11   of items.
12        Q    So you personally saw them throwing
13   these items?
14        A    Yes, sir, I did.
15        Q    Do you remember specific protesters
16   that had been throwing items?
17        A    No, sir.  I was not on the front
18   line, so I didn't have the best view of the
19   individual protesters who were throwing them,
20   but where my position was, I had to duck quite
21   a few.  Traditionally, in most cases of
22   crowds, we don't wear protective helmets.  But
23   that day, I put my protective helmet, which
24   has a face shield on it, a ballistic face
25   shield for all of my SWAT operations because
```

1  of what we saw of them as far as them throwing

2  things at officers.

3       Q    Was there some point during the day

4  where you hadn't been wearing your helmet and

5  went and got it or did you show up with your

6  helmet?

7       A    Do, I did not have it on.  Of course,

8  it was in my unit with my gear as we patrolled

9  to provide that security for the initial

10  march.  It was only then did I run to my unit

11  and retrieve it.

12       Q    Are you aware, you know, how much

13  overlap there was between the -- as you phrase

14  it -- the protesters in the initial march and

15  these protesters we're talking be about at

16  East and France?

17       A    It was -- it was -- I can't give you

18  a specific, but it wasn't long.  It was

19  within, you know, a 30-minute period of the

20  return back to the church and everyone there.

21       Q    So it's possible some of the same

22  protesters from earlier were still around?

23       A    Yes, sir, it is possible.

24       Q    Can you, on this map, just tell me,

25  when things stopped at East and France, where

1    exactly were you standing during that?  You

2    said you weren't in the front line.

3         A    No.

4         Q    You were at that intersection,

5    though?

6         A    Yes.  I kind of moved all over.

7    Because I wanted to be able to have a view of

8    everything that was going on.  But, yes, I

9    remember parking my unit around Government and

10   10th Street and I had remember walking up --

11   there's a parking -- there's a business right

12   there at France and East Street that does

13   window tint.  And I remember walking up to

14   that business to start my observations.

15        Q    Okay.  And once you got to East and

16   France, you sort of hung back in the back

17   line?

18        A    Yes.  You can't be out front and

19   guide the whole operation at the same time.

20   So, yes, I was a little further back than the

21   front line.

22        Q    And then we talked earlier a little

23   bit about some commands that were given to the

24   crowd, such as:  Stay on private property.

25   Who was giving those commands?

1      A    I don't remember it being "Stay on
2  Private Property" at this incident.  I
3  remember the commands being -- for them to
4  clear the roadway and sidewalk areas;
5  basically, all the public passages.  I do
6  remember multiple officers giving those
7  commands.  But at one point in time, I
8  remember appointing -- he was corporal then --
9  Sergeant Thomas Morse, M-O-R-S-E, appointing
10  him to get on the PA or the LRAD's PA to
11  provide guidance to those that are in protest.
12      Q    Great.  Correct me if I'm wrong.
13  There's two Thomas Morses, right, a senior and
14  a junior?  Is that correct?
15      A    I only know -- his dad, if I remember
16  correctly, is a senior, but he is not a member
17  of the police department.
18      Q    Right.  So this would have been
19  junior?
20      A    Yeah, we refer to Corporal Morse or
21  Sergeant Morse now as T.J.
22      Q    T.J.  Great.  And so the commands
23  that T.J. or other officers gave the crowd
24  were:  Stay out of the roadway; stay off of
25  the sidewalks -- from what you remember?

1      A    To stay out of the roadway and not to
2  obstruct any other public passages, yes.
3  Those were the initial commands.
4      Q    Sure.  Did you see anyone that you
5  would term as an agitator at East and France?
6      A    There were several people out there.
7  I couldn't identify or point out anyone --
8  again, my role was more of control of the
9  overall incident and not specifically
10  individuals.
11     Q    Sure.  One second.  I'm going to pull
12  up another document here.  We're up to Exhibit
13  CCCCC -- five Cs, if you can believe it.  So
14  what I just pulled up here is the -- as you
15  can see from this -- is the "City of Baton
16  Rouge's Responses to Requests for Admissions."
17  I believe -- am I right in saying that you've
18  helped in creating some of the responses to
19  some of our discovery requests?
20     A    I can speak specifically to the --
21  yes, I helped create some of the responses.
22     Q    Do you remember if you helped create
23  some of the responses to the Requests for
24  Admissions?
25     A    I don't recall.

1     Q    Do you know what requests for
2  admissions are?  Have you dealt with these
3  before?
4     A    I'm not a hundred percent sure
5  exactly, the purpose of them.
6     Q    Okay.  That's fine.  I'm going to
7  scroll down here to -- I believe it's on page
8  -- yes, starting on page 16.  I'm looking at
9  Requests for Admission Number 56.  I'm just
10  going to read the request and the City's
11  response real quick.
12        The request was:  "On July 10th, 2016
13  law enforcement targeted protesters for
14  arrests who they considered to be or who
15  appeared to be leaders."
16        And the City's response is:  "Denied
17  as written.  Law enforcement targeted
18  agitators."  And then in parentheses:
19  "Persons encouraging others to upset the
20  status quo to further their cause," end
21  parentheses, "And those breaking the law."
22        Do you remember working on this
23  request at all?
24     A    No, I don't remember working on that
25  request.  I think I've answered questions

```
 1  repeatedly.  I'm not sure how those documents
 2  or who created those documents.
 3       Q    Sure, sure.  So it says in here:
 4  "Law enforcement targeted agitators."
 5            Do you know who is meant by,
 6  "Targeted" in this context?
 7       A    No, sir.  I didn't author the
 8  document.  I'm not sure what the author meant
 9  specifically by that.
10       Q    So the author of this document also
11  defined agitators -- as you can see -- as:
12  "Persons encouraging others to upset the
13  status quo to further their cause."
14            Does that sound accurate to you, as
15  an accurate definition of agitator?
16       A    From my definition of agitator out
17  there that day, it was someone who was
18  repeatedly -- as you said -- encouraging
19  others to break the law, but who was also
20  breaking the law at that time.
21       Q    Okay.  So not just encouraging
22  others, actively breaking the law?
23       A    Not -- and, again, I didn't author
24  that.  But not from my opinion.  Agitators
25  were those who were breaking the law and also
```

1    encouraging others to do the same.

2        Q    Okay.  Let's see, when you say,

3    "Encouraging others" -- and that's something

4    that's in your personal definition, as well as

5    the City's definition here.  What does that

6    look like in practice?

7        A    Speaking for myself, encouraging

8    others, there were people out there who was --

9    as I described before -- breaking the law,

10   standing in the streets, encouraging others to

11   do the same; even saying that, if they all do

12   it, they can't take us, that type of thing.

13   So those would be what I'd describe as an

14   agitator.

15       Q    So, basically, it's people using

16   their words to get others to break the law

17   with them?

18       A    Yes, sir.

19       Q    And so just looking at this

20   definition here, the City's definition --

21   whether you agree with it or not -- this is

22   the City's definition.  "Persons encouraging

23   others to upset the status quo to further

24   their cause."

25            Is upsetting the status quo, is that

1    a crime, from your understanding?

2         A    I would have to look at the specific

3    laws, but I do -- I would have to look at the

4    specific laws.  I know there are times where,

5    yes, encouraging criminal behavior is a crime.

6         Q    And then it also says:  "To further

7    their cause."  I guess this is referring to

8    the cause of the protesters who were out there

9    that day, correct?

10        A    Again, I would have to distinguish

11   between those who were peacefully protesting

12   earlier and those who turned violent and

13   attempted to take over the interstate.  I

14   think it's -- you have to distinguish between

15   the two, yes.

16        Q    Okay.  I'm also just briefly going to

17   look at Exhibit -- this is five Bs.  This is

18   "Answers to Plaintiff's Second Set of

19   Interrogatories" to the City of Baton Rouge.

20   Do you recall working on responses to these at

21   all?

22        A    Again, none of the former documents

23   that you have shown me, as far as what was

24   submitted by an attorney, I -- like I said,

25   I've answered questions quite a bit.  I'm not

1    going to know if some of my answers went into

2    this document.

3         Q    Okay.  So I'm down here on

4    Interrogatory Number 20.  Interrogatory Number

5    20 says:  "Identify which officers targeted

6    agitators, persons encouraging others to upset

7    the status quo to further their cause."

8              And the City's answer to that is as

9    follows:  "The City of Baton Rouge objects to

10   this interrogatory on the grounds of vagueness

11   and ambiguity.  The term 'targeted' has not

12   been defined and is subject to multiple

13   interpretations.  Subject to this objection,

14   Sergeant Myron Daniels can provide testimony

15   regarding BRPD's actions towards agitators and

16   those breaking the law.  The City/Parish will

17   supplement this response upon discovering any

18   new or additional information."

19             So were you aware that they said you

20   would be able to provide testimony regarding

21   agitators?

22        A    I wasn't aware that they said that I

23   could, but absolutely, I could.  Just as I've

24   just described to you, that would be my

25   definition of the agitators.

1        Q    So your definition of agitators
2   differs from what the City definition is?
3        A    I would say they are very similar.  I
4   think there may have been an "Or" in theirs.
5   And with me it was both, it was "And."
6        Q    Okay.  Just to make sure we have it
7   right.  Let me go back to Exhibit -- with the
8   five Cs, Exhibit CCCCC.  Just to see -- so
9   their response, again -- let me know if I'm
10  not reading this correctly.
11            "Persons encouraging others to upset
12  the status quo to further their cause."  Is
13  that correct?
14       A    That is for 56.  Yes.
15       Q    And if I scroll down, you can see --
16  don't worry.  I won't read all of these.  It
17  appears to be the same definition in 57, 58
18  and 59; is that correct?
19       A    There's mention of "Targeted
20  agitators" and "Upsetting the status quo" in
21  all of those.
22       Q    But each one is --
23       A    And breaking the law.
24       Q    Looking at the responses here, just
25  the responses.  I'm looking at this part in

1    the parentheses.  I don't know if you can see

2    when I highlight on here or not.  Each one

3    says:  "Persons encouraging others to upset

4    the status quo to further their cause,"

5    correct.

6         A    The highlighted portions does.  And

7    immediately after it says:  "And those

8    breaking the law."

9         Q    Right.  But those are -- the way it's

10   written are two separate things; there's

11   agitators -- which is defined in the

12   parathesis -- and people breaking the law,

13   which could be the same people, too; two

14   separate categories.  Am I reading that

15   correctly?

16        A    I agree.  It could be the same

17   people.

18        Q    But there's also room in there for --

19   it's possible to have someone who is an

20   agitator, but they're not necessarily breaking

21   the law; is that correct?

22        A    Again, not from my interpretation of

23   what took place out there that day.

24        Q    Okay.  So it's impossible for an

25   agitator to be complying?

63

1     A    Again, not -- from my definition from

2  being out there that day, the agitators were

3  actually breaking the law.

4     Q    Sure.  So this definition,

5  "Encouraging others to upset the status quo to

6  further their cause," you have the same

7  definition, except you would add:  "And

8  breaking the law" to it?

9     A    Yes.

10    Q    Okay.  That's -- I did -- we

11 mentioned a little bit earlier about the radio

12 communications.  And just to clarify the

13 individuals on the radio channel that you were

14 on, it was all Baton Rouge Police Department

15 or did it span multiple agencies?

16    A    I'm not totally sure of that.  I

17 don't remember the actual channel we were on

18 and all of those who were on that channel.

19    Q    Okay.  Let's say there's, you know,

20 an order that goes out over the radio.  How

21 does that get communicated to officers on the

22 ground?

23    A    Well, it depends.  The orders or

24 information could be sent from those in our

25 Command Center or it could be an officer on

```
 1    the ground broadcasting it out to all of those
 2    who are there present.
 3         Q    Okay.  Do you recall how many
 4    different radio channels were being used at
 5    that protest?
 6         A    No, sir, I don't.
 7         Q    It was more than one, though?
 8         A    I'm not sure.  My radio would have
 9    only been on one channel.
10         Q    And which channel was that?
11         A    I don't remember the specific
12    channel.
13         Q    Okay.  Let me pull up another
14    document here, this is Exhibit YYYY, four Ys.
15    Does this look familiar to you at all?  Can
16    you tell me --
17         A    No, sir.
18              THE COURT REPORTER:
19                   No, sir?
20              THE WITNESS:
21                   No, sir.
22    BY MR. LANSER:
23         Q    If I told you this was given to us by
24    the City as a log of one of the radio
25    channels, would that make sense to you at all?
```

```
 1        A    It very well could be, but I've not
 2   seen it and I'm not familiar with it.
 3        Q    That's fine.  Do you -- even though
 4   you're not familiar with the exact document,
 5   do you know what this "Unit ID" column might
 6   mean?
 7        A    No, sir, I don't.
 8        Q    What about the "Individual Alias"
 9   column?
10        A    No, sir, I don't.
11        Q    Just looking at the "Individual
12   Alias" column, I see a combination of these
13   different letters, "CBRHQ73, CBRN537."  But
14   then there's individual people's names on
15   here, such as "Owens, Jeremy; Haney,
16   Brittany."  Do you see those?
17        A    I do.
18        Q    Do you know who those people are?
19        A    No, sir, I don't.
20        Q    You don't recognize any of those
21   names?
22        A    No, sir.
23        Q    And you don't have -- do you have,
24   like -- when you're on the radio, do you have
25   a specific, you know, identification that --
```

1   like your radio might have a specific serial
2   number or something like that?
3       A    I have a specific call number.  At
4   that time, I think I was SR25.  It's been a
5   while, but --
6       Q    Okay.  To the best of your
7   recollection, SR25 in July 2016?
8       A    Yes.
9       Q    Do you remember -- if it's not SR25,
10  do you remember any other ones it might have
11  been at the time, yours?
12      A    No, sir.
13      Q    I'm going to switch over to another
14  exhibit.  This is Exhibit ZZZZ, four Zs, as in
15  zebra.  This is an audio recording that was
16  provided to us from the City in discovery of
17  one of the channels.  It's two hours and
18  fifteen minutes, so don't worry.  I'm not
19  going to make you listen to the whole thing.
20  But there are some specific things I want to
21  go through.
22           First of all, starting at -- right at
23  the zero mark of this -- let me know if you
24  can hear this, and we'll circle back on.  I
25  want make sure the audio is working, though.

67

```
1   Let me know if you can hear this when I hit
2   "Play."
3              (AUDIO PLAYED.)
4   BY MR. LANSER:
5       Q    Could you hear that?
6       A    No, sir.
7       Q    Let's see.  It might be a Zoom issue
8   here.  Share sound.  Sorry, one second.  I'm
9   going to start it over, playing from zero
10  again.  Let me know if you can hear this.
11             (AUDIO PLAYED.)
12             THE WITNESS:
13                  Yes.
14  BY MR. LANSER:
15      Q    Great.  Okay.  I'm going to --
16  because I know you've never listened to this
17  before.  I'm just going to fast forward to the
18  time here.  Let's just go with 15 minutes and
19  16 seconds.  I'm just going to play a little
20  bit, just so, you know, we can kind of get
21  oriented with what this is.  I'm not sure
22  exactly what this part is.
23             (AUDIO PLAYED.)
24  BY MR. LANSER:
25      Q    I'm stopping at 15 minutes and 33
```

1    seconds.  Does this sound like the radio
2    communication from July 10th?
3        A    I am not sure if it was or wasn't.
4        Q    But this is what, you know, radio
5    communications would sound like?
6        A    Yes, it could.
7        Q    Okay.  Let me go back to the start
8    here.  I'm going to play just the first few
9    seconds.
10            (AUDIO PLAYED.)
11   BY MR. LANSER:
12       Q    What I heard there was -- it sounded
13   like, "McCloskey to Daniels" and then someone
14   else says, "Go ahead."  Is that what you
15   heard?
16       A    Yes, sir.
17       Q    And Daniels, is that you, do you
18   believe?
19       A    Yes, sir.  I'm the only Daniels on
20   the Baton Rouge Police Department or -- only
21   one that was out there.
22       Q    Yeah.  Only one on the radio that
23   day?
24       A    Yes, sir.
25       Q    Okay.  Do you know who McCloskey is?

1        A     Yes, sir.  He used to be one of my

2   subordinates on Bravo.

3        Q     Great.  So we know that's you as

4   Daniels on here, so I think -- we know this is

5   a radio -- whatever radio channel you were on

6   that day, this seems to be that radio channel,

7   correct?

8        A     Correct.

9        Q     I'm going to go ahead to 30 minutes

10  so, this is -- because of how Zoom works and

11  trying to get all of these in, this is going

12  to be a little tedious, so I apologize, but --

13  we'll get through it.  So I'm starting at 30

14  minutes and 51 seconds.  I want you to listen

15  to it and I am going to repeat what I hear and

16  then just let me know if that's -- if I'm

17  repeating it correctly or if you want to

18  re-listen to it, go right ahead or we can do

19  that.

20            (AUDIO PLAYED.)

21  BY MR. LANSER:

22        Q     So stopping at 31:03.  It sounds to

23  me like someone says:  "Operations to Nelson."

24  Another person says:  "Are they trying to

25  occupy Government?"  And they say, "10-4."

```
1    Does that sound accurate?
2         A    Yes, it does.
3         Q    Do you know who "Operations" is in
4    this context?
5         A    It sounds like Lieutenant
6    (INAUDIBLE).
7              THE COURT REPORTER:
8                   I'm sorry.  Lieutenant --
9              THE WITNESS:
10                  Wallace, W-A-L-L-A-C-E.
11   BY MR. LANSER:
12        Q    And that's David Wallace; is that
13   correct?
14        A    Yes, sir.
15        Q    So he was running Operations that
16   day?
17        A    No, sir.  He was assisting in
18   Operations that day.  I'm not sure if Captain
19   Martin was in charge that day.  But it was
20   normally -- it's more than one person there
21   and normally he would be an assistant.
22        Q    Okay.  Do you know who Nelson is?
23        A    That would be Lieutenant Gerrick,
24   G-E-R-R-I-C-K, Nelson.  He's our Assistant
25   Traffic Commander right now.
```

```
 1            THE COURT REPORTER:
 2                 Did you say Gerrick with a G or
 3            Derrick with a D?
 4            THE WITNESS:
 5                 Gerrick with a G.
 6    BY MR. LANSER:
 7       Q    I'm going to skip ahead to -- it says
 8    31:33.  Although, I'm concerned with -- I'm
 9    going to play from here just a little bit
10    again.  Pay attention, and I'll repeat it
11    again.  And let me know if wow want me to
12    replay it.
13                 (AUDIO PLAYED.)
14    BY MR. LANSER:
15       Q    Is what I heard there:  "After
16    Operations go" was "I just talked to one of
17    them and they were under the assumption they
18    could occupy Government.  I told them that
19    they had to get out of the street and they're
20    attempting to move them out of the street
21    now."
22                 Does that sound correct?
23       A    Yes, sir, it does.
24       Q    Do you know who said that?
25       A    Again, that sounded like Lieutenant
```

1    Nelson.
2        Q    Okay.  And then -- you know, I'm
3    trying to orient us as to where we are during
4    the day.  Is this -- they mentioned
5    "Government."  Do you know which part of the
6    day this might have occurred at?
7        A    No, sir, I don't.
8        Q    Is it fair to say it's before they
9    got to East and France, though?
10       A    I'm not sure.  I'm not sure if it was
11   during the move over or if it was -- it
12   occurred afterwards.  I'm just not sure.
13       Q    Okay.  I'm going to skip ahead to --
14   this is 34 minutes and 50 seconds.
15           (AUDIO PLAYED.)
16   BY MR. LANSER:
17       Q    Okay.  What I heard there was:  "Take
18   all of your assets and get between them and
19   the interstate and let's keep them from
20   advancing any further."
21           Does that sound correct?
22       A    Yes, sir.
23       Q    Do you know who said that?
24       A    That sounded like Lieutenant Wallace.
25       Q    And what are the assets that he

1    refers to there?

2        A    It would be the officers that were --

3    so Lieutenant Nelson, again, is the traffic

4    commander, so he would have been the one

5    helping coordinate the escort from the church

6    to the Capitol.  His assets would have been

7    all of those who were assisting with that

8    escort and those officers that would have been

9    part of that process.

10       Q    When we say, "Between them and the

11   interstate," is that what we were talking

12   about earlier where they formed that line on

13   East and France?

14       A    Yes, sir.

15       Q    Okay.  I'm going to go ahead just a

16   little further to 35 minutes and 52 seconds.

17   Same deal here.  I hit "Play."

18            (AUDIO PLAYED.)

19   BY MR. LANSER:

20       Q    So that sounded to me like:  "Can you

21   send your team to Government Street by East

22   Boulevard?  We've got a group of about 500

23   traveling eastbound on Government by Channel 9

24   and we have a feeling they're going to try and

25   occupy 110."  Does that sound correct?

1      A     Yes, sir, it does.

2      Q     Do you remember the group being

3   around 500?

4      A     I would have probably said it was a

5   higher number, but it was a large group.

6      Q     Okay.  So at this point where they're

7   traveling eastbound at Government and they're

8   trying to set up this -- get between them and

9   the interstate, where were you at that point;

10  was this after you had arrived near East and

11  France?  Do you remember?

12     A     I am pretty confident I had not

13  arrived at East and France at that point in

14  time.

15     Q     Okay.  But you don't remember exactly

16  where you were?

17     A     No, sir.

18     Q     And he says:  "We have a feeling

19  they're going the try and occupy 110."

20         Do you know where that feeling came

21  from?

22     A     No, sir, I do not.

23     Q     Let me skip ahead, again.  This is

24  going to be 39 minutes and ten seconds.

25         (AUDIO PLAYED.)

Case 3:17-cv-00439-JWD-EWD    Document 297-20    09/28/21    Page 75 of 203

75

BY MR. LANSER:

Q    So that sounded to me like:  "I spoke
with their leader.  Trying to get them out of
the roadway, but they're real agitated and
they're not going to listen."

Someone else says:  "That's fine.
Just try and hold them up and get resources
there."  Does that sound correct?

A    Yes, sir, it does.

Q    Can you identify those voices?

A    Again, Lieutenant David Wallace and I
think the other voice may have been Lorenzo
Coleman.

Q    Lorenzo Coleman.  Okay.  Do you know
-- they refer to their leader.  Do you know
who that might have been?

A    No, sir, I don't.

Q    I know we aren't sure exactly where
you are at this point.  But when you arrived
at East and France, you said you were there
for a while; is that correct?

A    Yes, sir.  We stood out there for
quite a while.

Q    Do you remember approximately how
long you were out there?

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

```
 1         A    I would say hours.

 2         Q    Hours?

 3         A    Yes, sir.

 4         Q    During that time when you were out

 5    there, did you identify anyone as, like, the

 6    group leader while you were on scene?

 7         A    No, sir, I did not.

 8         Q    Do you know how they got to the --

 9    came to the conclusion here:  "They aren't

10    going to listen"?

11         A    No, sir, I do not.

12         Q    Okay.  Let me move to -- sorry.  Give

13    me one second.  Okay.  This is 42 minutes and

14    seven seconds.

15              (AUDIO PLAYED.)

16    BY MR. LANSER:

17         Q    So that last person who was talking,

18    it sounded like:  "Officers in uniform units

19    responding.  Once you get your equipment, go

20    ahead and take the front lines.  As soon as we

21    can start effecting arrests, must do so."

22    Does that sound right?

23         A    Yes, sir, it does.

24         Q    Who is that speaking?

25         A    That would be Lieutenant Wallace.
```

1      Q     And you're on the radio throughout,
2   even though you might not be at East and
3   France, yet you've been on the radio this
4   whole time, correct?
5      A     I heard the part that you played at
6   the beginning.  But, yes, I probably am.
7      Q     Okay.  If you are assigned to work
8   radio communications, you hear the lieutenant
9   say:  "Take the front lines."  What is meant
10  by, "Take the front lines"?
11     A     It sounded like he was directing
12  those who had protective gear to place it on
13  and to step up, because most of the other
14  officers did not have that type of gear.
15     Q     Okay.  And so this is -- as far as
16  you know -- prior to you arriving at East and
17  France, correct?
18     A     Not sure, again.
19     Q     Okay.  But he does say:  "As soon as
20  we can start effecting arrests, must do so."
21           So is it fair to say at this point,
22  they had decided this protest had turned
23  into -- what was the phrase you used before,
24  mob?
25     A     I would say it definitely had turned

1    into a unusual occurrence where there were

2    several people violating the law.

3        Q    And the phrase, "Unusual occurrence,"

4    that's part of -- that's like an official

5    Baton Rouge Police Department phrase, right?

6    That's in the policy manual?

7        A    Yes.

8        Q    What's the definition of unusual

9    occurrence?

10       A    Unusual occurrence can take on many

11   things.  It could take on riots.  It could

12   take on bomb threats.  It could take on a host

13   of things.  It's a general term that don't

14   normally happen.  That's the layman's

15   definition.

16       Q    Would a lawful protest be an unusual

17   occurrence?

18       A    Not in my definition, no.  Lawful

19   protest, people gather all the time.  We're

20   used to it.  We're the Capitol city, so

21   there's always gatherings at the Capitol or at

22   one of the universities here.

23       Q    Okay.  Let me skip ahead again.  This

24   is 43 minutes and 51 seconds.  I'm going to

25   hit "Play" again.

```
 1              (AUDIO PLAYED.)
 2    BY MR. LANSER:
 3         Q    I believe what they said was:
 4    "There's a Caucasian male with red hair with a
 5    tie-dyed shirt in the front.  He's the one
 6    directing them which way to walk."  The other
 7    person says:  "10-4.  That will be the first
 8    one we arrest."
 9              Does that sound correct?
10         A    Yes, sir, it does.
11         Q    Can you identify those two voices?
12         A    Lieutenant Wallace and Sergeant
13    Tyrone Honore.
14         Q    And Lieutenant Wallace was the one
15    who says:  "There's a Caucasian male," et
16    cetera.  Honore, is the one who says:  "10-4.
17    That will be the first one we arrest"?
18         A    The opposite.  Sergeant Honore was
19    providing a description to Lieutenant Wallace.
20         Q    Got it.  So Lieutenant Wallace said:
21    "10-4.  That will be the first one we arrest,"
22    correct?
23         A    Yes.
24         Q    Do you remember there being a
25    Caucasian male with red hair and a tie-dyed
```

1    shirt?

2         A    No, sir, I don't.

3         Q    And it sounds like Honore says:

4    "He's the one directing them which way to

5    walk."  So if he is -- if that was all he was

6    doing, if he was being vocal and directing

7    them which way to walk, would he be considered

8    an agitator?

9         A    If he was violating the law by

10   illegally occupying that public passage or

11   roadway, then I would say yes.

12        Q    So is it just the people directing

13   them which way to walk in the roadway that is

14   an agitator or is everyone out there an

15   agitator?

16        A    No, sir.  Kind of like I said before.

17   If someone is violating the law and is

18   encouraging others or leading others to do the

19   same, I would equate them or give them that

20   definition as an agitator.

21        Q    Okay.  I'm just going to hit play

22   again.  I'm not going forward at all.  We are

23   at 44 minutes and nine seconds.  So this is

24   coming straight out of that last one we

25   listened to.

```
 1              (AUDIO PLAYED.)
 2    BY MR. LANSER:
 3         Q    So that last part, I believe they
 4    said:  "Any unit that can effect the arrest of
 5    the white male with the red hair and tie-dyed
 6    shirt, snatch him up.  We have charges on
 7    him."  Does that sound correct?
 8         A    Yes, sir.
 9         Q    And you don't have any idea what
10    those charges might have been?
11         A    No, sir.
12         Q    Give me one second.  I'm going to
13    fast forward to 30 seconds or so.  This is 45
14    minutes and 14 seconds.
15              (AUDIO PLAYED.)
16    BY MR. LANSER:
17         Q    Let me repeat that.  I believe what
18    they said -- the first person says:  "You got
19    one of the leaders requesting to walk on the
20    sidewalk past France."  Someone else says:
21    "It's too late."  He says:  "10-9."  Same
22    person says:  "Too late.  Everyone has
23    violated.  Everyone is under arrest.  Those
24    who can safely apprehend the violators must do
25    so.  Our primary target to white male, red
```

1    hair, tie-dyed shirt and everyone else who is

2    violating, which is everybody out there."

3         Does that sound correct?

4    A    Yes, sir, that's what was said.

5    Q    Does this sound like the scenario you

6    observed at East and France?

7    A    Again, not knowing the exact portion

8    of it, but what I gathered from what was said

9    over the radio recording was:  Arrest those

10   who had violated the law.

11   Q    Okay.  And who was that giving that

12   order?

13   A    That was Lieutenant Wallace.

14   Q    Lieutenant Wallace.  And he says --

15   if I'm not mistaken -- "Everybody out there is

16   violating the law."  Is that correct?

17   A    I did hear that.

18   Q    Is that your understanding of what

19   happened at East and France?

20   A    I don't think they were on East and

21   France when that comment was made.  But I will

22   not say everybody that was out there at East

23   and France was a violator.  Like I said, there

24   were people who were obeying our orders and

25   requests to clear public passages, and they

1    were not throwing anything.  At one point,

2    there was an order to disperse that occurred.

3    And after that point, then there were

4    additional violators.

5        Q    Let me back up one second.  Let me

6    pull up that map again.  I think that might be

7    helpful here.  Sorry.  Give me one second.

8    Okay.  Okay.  So, I pulled up the map.  This

9    is Exhibit B.  I believe you have a hard copy

10   in front of you, still, right?

11       A    Yes, sir.

12       Q    From what you recall -- can you

13   remind us, after they got back to the church

14   at Government and Napoleon, do you remember

15   what route they took at that point to East and

16   France?

17       A    They moved east on Government Street

18   to East Boulevard.

19       Q    Okay.  So they moved straight east on

20   Government Street until they hit the

21   intersection of Government and East Boulevard

22   and they went south on East Boulevard; is that

23   correct?

24       A    From my recollection, yes.

25       Q    And then one block south, once they

1  made that turn going south on East Boulevard,

2  that's when they hit France Street, correct?

3       A    Yes, sir.

4       Q    Let's hop back real quick to Exhibit

5  ZZZZ, four Zs, the radio communications.  I

6  can replay it again.  Let me just replay one

7  portion of that real quick again.  Hitting

8  "Play" at 45 minutes and 14 seconds.

9            (AUDIO PLAYED.)

10  BY MR. LANSER:

11       Q    So like we said before -- I believe

12  you said it was Officer Honore starts off

13  saying:  "You have one of the leaders

14  requesting to walk on the sidewalk past

15  France," correct?

16       A    I'm not sure if that's Officer

17  Honore.  If I remember correctly, Officer

18  Honore was the officer that described the

19  gentleman with the red hair and tie-dyed

20  shirt.

21       Q    You're right.  I'm sorry.  Do you

22  know who it is that says:  "You've got one of

23  the leaders requesting to walk on the sidewalk

24  past France"?

25       A    No, sir.  I didn't recognize the

1   voice.

2       Q    So if they're on East Boulevard and

3   -- this must have been when they turned south

4   on East Boulevard.  They were trying to go

5   past that line on France.  Does that sound

6   right?

7       A    I'm not sure, sir.

8       Q    Do you know any other point during

9   the day when they might have been near France

10  Street?

11      A    No, sir.  I (INAUDIBLE) --

12           THE COURT REPORTER:

13               I'm sorry, sir.

14           THE WITNESS:

15               I do not know of any other point

16           that they may have been.

17  BY MR. LANSER:

18      Q    Okay.  All right.  Let me move ahead

19  about ten minutes to 56 minutes and 31

20  seconds.  And I'm hitting "Play."

21           (AUDIO PLAYED.)

22  BY MR. LANSER:

23      Q    Okay.  So that sounded like:

24  "Operations Louisiana State Police Mobile

25  Field Force, we need you on France and South

1    10th.  They're going to move west on France to

2    East Boulevard.  Have your arrest elements

3    start effecting arrests."

4            Does that sound correct?

5    A    Yes, sir, it does.

6    Q    And whose voice is that?

7    A    Lieutenant Wallace.

8    Q    And he mentions the Louisiana State

9    Police Mobile Field Force.  Does that jog your

10   memory at all that maybe Louisiana State

11   Police had at least someone on the radio

12   communications, as well?

13   A    I'm not sure if they were on the

14   radio communications, but it's very well

15   possible.

16   Q    It's sounds like he's speaking to

17   Louisiana State Police here, though, right?

18   A    Yes.

19   Q    And so he's telling them to move on

20   to France and East Boulevard, correct?

21   A    It seems like he's directing LSP to

22   move and providing them a route to move.  I

23   didn't hear an acknowledgement.  That's why I

24   didn't know if anybody was on there.

25   Q    So if this is the point in the day

1    when the Mobile Field Force is arriving at

2    East and France -- assuming that's what's

3    happening, then -- would you have been on

4    scene at East and France around that time?

5        A    About that time, I should have been

6    in the area, yes.

7        Q    And Lieutenant Wallace says:  "Have

8    your arrest elements start effecting arrests,"

9    correct?

10       A    Yes, he did.

11       Q    Let me move ahead to 57 minutes and

12   54 seconds.  And I'm hitting "Play" now.

13            (AUDIO PLAYED.)

14   BY MR. LANSER:

15       Q    So that last part there, someone is

16   saying:  "I need somebody to call me on my

17   cellphone ASAP."  And then they say the

18   number; is that correct?

19       A    Yes.

20       Q    Do you know who that person is?

21       A    That sounds like -- and I don't

22   remember what his rank was at that time --

23   Robert McGarner.

24            THE COURT REPORTER:

25                McGarner?  I'm sorry.  Did you

1          say, "McGarner"?

2          THE WITNESS:

3               Yes, ma'am.

4     BY MR. LANSER:

5          Q    Was that typical in these sort of

6     situations to sort of go off of communications

7     and talk on cellphones as well?

8          A    I'm not sure why he put his cellphone

9     number out there, but it's possible, I guess,

10    if somebody needed to have a detailed

11    conversation or a conversation that's going to

12    be longer than an average radio broadcast.

13    Because you don't want to tie up the radio

14    with information -- with -- tie up the radio

15    just generally talking when others who may be

16    on scene may actually need it for emergency

17    purposes.  So, yeah, it wouldn't surprise me

18    that he gave his cellphone number.

19         Q    Okay.  That makes sense.  On

20    July 10th, did you ever use your cellphone to

21    communicate with other law enforcement?

22         A    I don't recall.  I don't recall.

23         Q    And move ahead a little more to --

24    it's tough to pick out these exact spots on

25    here.  All right.  This is one hour zero

1    minutes and 40 seconds.  And I'm hitting
2    "Play" now.
3              (AUDIO PLAYED.)
4    BY MR. LANSER:
5         Q    So that last part I heard was:  "The
6    biggest instigator on Government" -- excuse
7    me.  Let me start over -- "The biggest
8    instigator on Government and East is going to
9    be a black male wearing up a white button-up
10   shirt, black tie, gray vest, khaki pants and a
11   tan fedora."
12             Someone else says:  "As soon you can
13   get a small element, effect an arrest of him."
14   Does that sound right?
15        A    Yes, sir.
16        Q    Who were those individuals talking?
17        A    Lieutenant Wallace, and it sounded
18   like now Sergeant Brandon Blust, B-L-U-S-T.
19        Q    Great.  Do you remember -- I know
20   this is Government and East and we were just
21   talking about East and France.  But do you
22   remember a black male wearing a white
23   button-up shirt, black tie, gray vest, khaki
24   pants and a tan fedora?
25        A    I can't say 100 percent I do.

1    Q    It doesn't ring a bell, though?

2    A    There were several individuals -- I

3  would say -- dressed -- their dressed didn't

4  fit the weather.  Because most people had

5  shorts and things on.  This was more of a

6  business/causal type wear.  So it was several

7  people.  I can't point out that one person,

8  though.

9    Q    Okay.  Let me move ahead again to --

10 this will be one hour, four minutes and 49

11 seconds.  And I'm hitting "Play" now.

12         (AUDIO PLAYED.)

13 BY MR. LANSER:

14    Q    So what I heard was:  "Units in the

15 BearCat, make the announcement to clear the

16 street or they will be taken into custody."

17 Is that correct?

18    A    Yes, sir, it is.

19    Q    And do you know who that was

20 speaking?

21    A    As strange as it is, I think it's me,

22 but because I don't listen to my own voice

23 very often, it's hard to say for sure.  But

24 I'm pretty sure it was me.

25    Q    Yeah.  Now, it's always strange

1  listening to your own voice in a recording.  I
2  hate it.  Do you want to listen one more time
3  to make sure or are you pretty confident it's
4  you?
5      A    I don't think listening to it again
6  would change my thoughts.  I think it was me.
7      Q    Okay.  What you said was:  "Make the
8  announcement to clear the street or they will
9  be taken into custody."  Do you remember sort
10  of -- can you describe the scene at East and
11  France when you said this.  Do you remember?
12      A    So we may have to listen to it again,
13  but I think I said to make the announcement.
14  And if they did not clear the street, then we
15  would make the arrest.
16      Q    Yeah.  I think that's correct.  So
17  it's fair to say, at this point -- which I
18  started playing at one hour, four minutes and
19  49 seconds -- there were people in the street,
20  presumably, at that point?
21      A    Yes, sir.
22      Q    Do you remember if everybody was in
23  the street or was it sort of half in the
24  street, half sidewalk?  Do you recall at all?
25      A    It was a large number of people in

```
 1    the street.  I don't recall percentage-wise.
 2    But it was pretty packed.
 3        Q    Do you remember what happened --
 4    well, let's move forward just a little bit.
 5    Again, this is one hour, five minutes and 21
 6    seconds.  And I'm hitting "Play."
 7            (AUDIO PLAYED.)
 8    BY MR. LANSER:
 9        Q    So that last part I heard was "Make
10    announcements to get out of the road.  If they
11    don't get out the road, they will be
12    arrested."  Is that correct?
13        A    Yes, sir.
14        Q    And who was that talking?
15        A    I couldn't make out that voice.
16        Q    Okay.  So we have two in just a few
17    seconds.  We have two calls on the radio
18    telling them to make announcements to get out
19    of the road.  Do you remember what -- those
20    announcements did happen; they did make an
21    announcement to get out of the record?  Is
22    that correct?
23        A    There were repeated announcements
24    made, so, yes, sir.
25        Q    And what happened when those
```

1    announcements were made?

2        A    In general, they were ignored.

3        Q    Okay.  But some people complied and

4    others ignored them?

5        A    In general, the majority ignored

6    those commands.  That would be about the most

7    accurate statement I can make.

8        Q    Okay.  But there were some people who

9    complied?

10       A    I would be assuming.  Because I

11   focused on the majority, which remained in the

12   roadway.  I would not be so dead set to say

13   that there were not some who did comply.

14       Q    Okay.  Let me move ahead to -- this

15   is going to be one hour, nine minutes and 51

16   seconds.  I'm going to hit "Play."

17           (AUDIO PLAYED.)

18   BY MR. LANSER:

19       Q    So I believe what was said -- first

20   person says:  "There are no" -- "There's no PC

21   paperwork out here on scene on Government, so

22   if we could get somebody to run us some from

23   Headquarters."

24           Next person says:  "Copy.  There's

25   nothing in the van."

1          The first person again says:  "We
2    have just the rap.  If we're going to rap them
3    and bring them back there for PCs, we can do
4    that."  Does is that sound correct?
5          A    Yes, sir, it did.
6          Q    Do you recognize those voices?
7          A    One of those voices was Bryan Taylor.
8    The other appeared to be Craig Tibbits.  I'm
9    not a hundred percent on the other.  And the
10   one that was Craig Tibbits would have been the
11   one who made the statement about the rap and
12   PCs and needing them.
13         Q    Okay.  And when they say, "PCs," is
14   that referring to the Affidavits of Probable
15   Cause that we talked about earlier?
16         A    Yes, sir.
17         Q    Okay.  And he also mentions:  "We
18   have just the rap."  Can you explain what that
19   means?
20         A    A rap sheet is -- it's basically a
21   detailed fact sheet on that person, name, date
22   of birth, address.  It will have the charges
23   on it, as well.  But that's a basic rap sheet.
24         Q    And are -- I believe you said earlier
25   Affidavits of Probable Cause -- unless if

1    there's a warrant -- Affidavits of Probable

2    Cause are necessary to effect an arrest,

3    correct?

4        A    Correct.  And with both of those

5    documents, whether it's a warrant or a

6    probable cause -- Affidavit of Probable Cause,

7    they both require a rap sheet to be attached

8    and submitted with them.

9        Q    Okay.  So just like the Affidavit of

10    Probable Cause, a rap sheet is necessary to

11    process these people into the jail or complete

12    the arrest, basically?

13        A    Yes, sir.

14        Q    So if anyone was arrested out there

15    that day and they don't have an Affidavit of

16    Probable Cause, that's a problem, right?

17        A    If they were arrested, there would

18    have had to be an Affidavit of Probable Cause,

19    if they were booked into the Parish Prison.

20        Q    Okay.  So every single person that

21    got booked into the prison, there must have

22    been an Affidavit of Probable Cause at some

23    point?

24        A    Yes.

25        Q    Prior to them being booked into the

1    prison, correct?

2        A    Correct, yes, sir.

3        Q    And the same thing with the rap

4    sheet.  Everyone who was booked into the

5    prison must have had a rap sheet created at

6    some point prior to them being booked?

7        A    Yes, sir.  That's required

8    documentation.

9        Q    Okay.  I'm going to move forward just

10   a few seconds.  This is one hour, ten minutes

11   and 22 seconds.  And I'm hitting "Play."

12           (AUDIO PLAYED.)

13   BY MR. LANSER:

14       Q    So that last person who's speaking, I

15   believe what he said was:  "What's holding us

16   up now is we don't have anywhere to put our

17   fifteens.  When we get a bus here, we can

18   start effecting arrest for all of these people

19   who refused to get out of the roadway."  Is

20   that correct?

21       A    Yes, sir.

22       Q    When he says fifteens, what's he

23   referring to?

24       A    A -- so 10 dash codes -- you may hear

25   10-4, which is probably the most common one

```
 1    that most people know.  10-15 is a dash code
 2    for an arrestee.
 3         Q    So when they say:  "We don't have
 4    anywhere to put our fifteens," you're saying
 5    we don't have anywhere to put anyone we
 6    arrest, physically put that person?
 7         A    Yes.
 8         Q    Okay.  Then they refer to -- they
 9    say:  "When we get a bus here, we can start
10    effecting arrests," presumably because then
11    they'll have somewhere to put the arrestees,
12    correct?
13         A    Correct.
14         Q    Is it fair to say that if the bus had
15    gotten there sooner, arrests would have
16    happened sooner?
17         A    Yes, sir.
18         Q    Okay.  I'm going to hit "Play" again.
19    We're at one hour, ten minutes and 35 seconds.
20              (AUDIO PLAYED.)
21    BY MR. LANSER:
22         Q    So that sounded like:  "Command to
23    Browning.  Just hand them over.  Let us
24    identify them and we will sort that out later.
25    Too much going on."  Does that sound correct?
```

1      A      Yes, sir.

2      Q      And who was that speaking?

3      A      That would be Lieutenant Bryan

4  Taylor.

5      Q      When you say Bryan Taylor -- you

6  mentioned him earlier, too.  Do you know -- is

7  his full name Christopher Bryan Taylor?

8      A      Yes, sir, absolutely.  He goes by

9  Bryan.  I'm sorry.

10     Q      So that's the same -- Christopher

11  Taylor, Christopher Bryan Taylor and Bryan

12  Taylor, that's all the same person?

13     A      Yes, sir.

14     Q      Do you know what he's talking about

15  here where we says:  "We will sort that out

16  later"?

17     A      I can only assume the paperwork

18  portion of the arrest.

19     Q      Okay.  So assuming that's what he's

20  talking about, the process he's talking about

21  is:  Once someone has been arrested, hand them

22  over to Browning.  They'll identify them and

23  we'll sort out the paperwork later; is that

24  accurate?

25     A      I'm not sure.

```
 1       Q    Do you know -- okay.  That's fine.
 2  We only have a few more of these left.  I
 3  promise.  Don't worry.  Like I said, it's a
 4  little tedious.  Let me go forward again.
 5  This is one hour, twelve minutes and seven
 6  seconds.
 7              (AUDIO PLAYED.)
 8  BY MR. LANSER:
 9       Q    That sounded to me like:  "Is there
10  any way we can get an EMS van or medic down
11  here to where we're at Government and South
12  10th?  We have a couple of demonstrators who
13  are hurt."  Is that correct?
14       A    Yes, sir.
15       Q    Do you remember demonstrators being
16  injured during the protest?
17       A    I have no specific knowledge of it,
18  no, sir.
19       Q    So you don't know how they got
20  injured?
21       A    No, sir.
22       Q    Jumping ahead -- this is going to be
23  one hour, 15 minutes and 34 seconds.
24              (AUDIO PLAYED.)
25
```

BY MR. LANSER:

    Q    So that last snippet there, it
sounded like he said: "SWAT Team 4 and Sniper
Team 4."  Did that sound correct?

    A    Yes, sir.

    Q    Do you know what "SWAT Team 4" refers
to?

    A    From memory -- I described to you
earlier that we were providing protective
cover over the march.  And a team would have
-- if I recall -- consisted of two to four
SWAT officers in an unmarked vehicle and it
sound like he was guiding them or directing
them to a certain place.

    Q    Do you know what their involvement
was during the East and France portion of the
day?

    A    It varied.  It was quite a few of us,
like I said.  I was on ground and several --
most of us from the earlier portion were on
ground.  Eventually, you started having others
show up, because we work 12-hour shifts.  And
I think we were getting off around
6:00 o'clock.  So you would hear some of those
who would be relieving us actually being

```
 1    called out as a resource, because this was so
 2    massive.
 3        Q    So were you done -- did your shift
 4    end at 6:00 o'clock that day?
 5        A    I wish, sir.  We stayed until
 6    everything was peaceful, so we stayed out
 7    there quite a bit.
 8        Q    Do you recall approximately how long
 9    that was?
10        A    I don't.  Hours after our anticipated
11    or scheduled time to be off.
12        Q    We're talking -- was it dark out; was
13    it, like, 10:00 P.M., midnight?
14        A    It was very dark out.  It was into
15    the night.
16        Q    Okay.
17        A    I don't remember if it was 10:00 or
18    11:00 or 12:00, but it was late.
19        Q    Okay.  On that last snippet we
20    listened to, they also refer to "Sniper Team
21    4."  Do you know what their role was that day?
22        A    I don't recall.  I don't recall who
23    that was or if they were even part of Bravo.
24    I don't think they were part of my team.  My
25    team was pretty much handling the main contact
```

1    with those protesters.

2         Q    Do you remember any -- whether it's

3    Sniper Team 4 or whoever -- do you remember

4    any sniper teams or units out there that day?

5         A    And just to give you -- put it into

6    context, several SWAT officers are also

7    certified snipers.  So I'm not sure.  But I

8    don't remember teams being out there or

9    deployed.

10        Q    Let me move ahead here again.  This

11   is going to be one hour, 18 minutes and 42

12   seconds.  I'm hitting "Play."

13             (AUDIO PLAYED.)

14   BY MR. LANSER:

15        Q    So that sounded like:  "Operations to

16   McGinnis.  Once LSP has got what they need,

17   even though they're in people's yards.  This

18   is not a peaceful protest any more.  Make the

19   announcement over the BearCat that this is not

20   a peaceful protest any more.  Your protest is

21   over and you will be arrested.  And then go

22   make arrests, whether they're standing in the

23   yard or not."  Is that correct?

24        A    Yes, sir.

25        Q    Who is that speaking?

1        A      That would be Sergeant Mike Walker.

2        Q      Is who McGinnis?

3        A      He's actually -- he was my assistant

4    at the time, my assistant team leader.

5        Q      McGinnis was?

6        A      Yes, Dustin McGinnis.

7        Q      Dustin McGinnis.  Okay.  And so

8    Officer Walker says:  "This is not a peaceful

9    protest any more."  Do you know when it

10   stopped being a peaceful protest and became

11   whatever it was at this point?

12       A      That would be the time where they

13   started throwing those items that I described

14   before, the pieces of concrete, the bricks,

15   the trash can, the rocks that they would pick

16   up.  Like I said, we were being pelted with

17   items.

18       Q      And was everyone out there throwing

19   items?

20       A      I cannot say that every person was

21   throwing items, but there were several items

22   being thrown.

23       Q      And he also says:  "Whether they're

24   standing in the yard or not."  Do you know

25   what's that referring to?

1      A    Some of the items that we're thrown
2  came from the area that he described, the
3  yard.  There was a house on that corner of
4  France and East Boulevard and that yard was
5  basically overtaken.  It was hundreds of
6  people in -- it was a female's yard, because I
7  remember having brief contact with her.  So
8  that would be the yard that I would think he's
9  talking about.
10      Q    Can you explain -- you said you had
11  brief contact with her.  I believe if we're
12  talking about the same person, it was Lisa
13  Batiste.  Can you just explain what that brief
14  contact with her was?
15      A    I never identified her with
16  everything that was going on.  So I'm not sure
17  if that's her name or not.  It was a black
18  female, probably in her 30s at the time and
19  that brief contact was after we started
20  dispersing the crowd, she did make it known
21  that that was her property.
22      Q    Okay.  Do you know if she told
23  protesters they could say on her property?
24      A    I'm not 100 percent sure if she told
25  me that.  I do remember -- I do remember not

1    proceeding forward with charging her because I

2    felt like she may have been under duress.   It

3    was quite hectic and a female just at the

4    house can't control that large crowd.   And if

5    they were throwing those items at the police,

6    I didn't know if she feared that they would

7    turn on her.   So that's kind of what was my

8    thought process during that initial contact

9    with her.

10        Q    So at this point, they had been told

11   to leave the street and leave the sidewalk; is

12   that correct?

13        A    Yes.   It's safe to say we had made

14   several announcements to clear the streets and

15   the public passage, yes.

16        Q    So putting aside these other concerns

17   you had about, you know, the woman whose

18   property it was, whether she was under duress

19   or not, just as far as looking at that order

20   to get out of the street and off the sidewalk,

21   if protesters were on her property, they were

22   complying with that order, correct?

23        A    Yes.   At some point they were

24   complying with that order.   The issue became

25   when we started receiving the attacks with the

1   items that were thrown at us from that area.

2   At that point, it was not lawful.

3        Q    So the reason it became not lawful

4   was because of the thrown items?

5        A    Yes, sir.

6        Q    So the law that was being broken at

7   that point had to do with the items being

8   thrown, not with where they were standing?

9        A    They were -- I was speaking

10  specifically on those who did move off of the

11  streets and into her yard.  But, yet, there

12  were still people occupying the streets who

13  were in violation of the law, but as it

14  pertained to the yard, that home, those items

15  being thrown made that an unruly crowd.  And

16  they were orders issued to disperse that

17  crowd.

18       Q    Okay.  So if someone had been

19  arrested in her yard, they would have been

20  arrested for throwing the items, not for

21  obstructing a public passageway or whatever?

22       A    No, obstructing a public passage

23  wouldn't have applied being in her yard.

24       Q    So if someone was arrested in her

25  yard and their Affidavit of Probable Cause

1   said, "Obstruction of a public passageway,"

2   would that be inaccurate?

3         A     No, I think that's one of those

4   questions that could be yes or no.  For

5   example, if they were obstructing a public

6   passage, they were throwing items and they

7   walked in her yard and that just so happens to

8   be the point of arrest, they still violated

9   those laws, they just moved their location.

10  So, absolutely, I think arrest is justifiable

11  at that point.

12        Q     Would it be strange, though, in that

13  circumstance -- if the Affidavit of Probably

14  Cause doesn't mention -- or they don't get

15  charged with throwing items, how would that

16  play out?  You would think if they're throwing

17  items and they see them throwing items and

18  arrest them, that would be one of the charges

19  on the Affidavit of Probable Cause, correct?

20        A     I would have to refer to the officer.

21  And it's safe for me to say that every single

22  person was not throwing items.  So whatever

23  that officer who identified that arrestee to

24  be, I would have to defend or go with whatever

25  they saw.  I'm not sure about that part.

1    Q    Sure.  So if there had been people

2  who were in the street, they were told to get

3  out of the street, they get in the yard and at

4  no point threw any items at the police or

5  otherwise, those people were compliant at that

6  point?

7    A    That's kind of like my last answer.

8  So if I recall correctly, there was a delay in

9  some arrests and those delays were because

10  there was not a place to actually take those

11  people into custody and have a quick

12  turnaround to bring the forces back to set up

13  the line.  So there was a delay in the

14  arrests, waiting for the Sheriff's Office to

15  bring a bus for transport.  So I think if

16  those people had broken the law, just because

17  they relocated, I don't think that alleviates

18  them from the law that they broke, if that

19  makes sense.

20    Q    Sure.  But if they -- let's say they

21  were standing in the street.  The police

22  ordered them out of the street, so they move

23  out of the street.  Are they breaking the law

24  in that case?

25    A    They may not be breaking the law at

```
 1    that exact moment, but they broke the law in
 2    that officer's presence.  You know, it's kind
 3    of like stopping for a stop sign.  You know,
 4    if you run this stop sign and stop at the
 5    next, yeah, you didn't violate it there, but
 6    you did violate it at the first one, so I can
 7    write you that citation because you violated
 8    the law.  I think -- that's how I look at it.
 9        Q    So moving ahead, again.  We're going
10    to be at one hour, 24 minutes, 57 seconds.
11             (AUDIO PLAYED.)
12    BY MR. LANSER:
13        Q    So that sounded like:  "Daniels to
14    Command.  Also, note that the arrests will be
15    for obstruction of a public passage,
16    obstruction of a public passage."  Is that
17    correct?
18        A    Yes, sir.
19        Q    And "Daniels to Command," that's you
20    speaking there?
21        A    Yes, sir.  Even though it doesn't
22    sound 100 percent like me, but, yes, it was me
23    on the radio.
24        Q    I understand.  Okay.  Seriously, what
25    message were you relaying this -- sending that
```

1    out on the radio?

2        A    Those were -- as I spoke before, that

3    was one of the violations that occurred out

4    there at that scene, the obstruction of that

5    public passage of blocking the roadway, as

6    well as the sidewalks.

7        Q    So what you're saying here is every

8    single person out there is subject to arrest

9    for that, for obstruction a public passage?

10       A    So I don't recall if we had issued

11   the disperse -- and I'm pretty sure we did.

12   We had issued the disperse.  This is no longer

13   a peaceful protest, and we dispersed the

14   crowd.  At that point, all had to leave, yes.

15       Q    Okay.  So everyone had to leave, even

16   if they were on private property, correct?

17       A    Not if they lived at that residence

18   or if they could go in, that's fine.  But like

19   I said, when they were on private property,

20   that was the location we were receiving some

21   of the objects being thrown from us -- or

22   thrown at all us.

23       Q    Sure.  But if someone was on the

24   private property, not throwing objects, they

25   were still breaking the law at that point and

1    had to disperse?

2        A    Yeah.  We were dispersing the crowd.

3        Q    And if someone was inside the house,

4    did they have to disperse?

5        A    No.  No, sir, not at all.

6        Q    Okay.  Moving forward to one hour, 37

7    minutes and 36 seconds.  I'll hit "Play."

8            (AUDIO PLAYED.)

9    BY MR. LANSER:

10       Q    Just that last little snippet they

11   say:  "We are moving."  Does that sound right?

12       A    Yes, sir, it did.

13       Q    Do you know who said that?

14       A    I think the person said:  "McGinnis

15   to Operations."  I'm not a hundred percent

16   sure, but that's what it sounded like.

17       Q    When they say:  "We are moving," is

18   this when officers moved on the lawn, do you

19   think?

20       A    I'm not a hundred percent sure.

21       Q    You're not sure what that's referring

22   to?

23       A    I'm not a hundred percent sure that

24   that's where officers moved and started to

25   effect arrests.

1      Q     Okay.  I'm going to jump ahead to one

2  hour, 42 minutes and 16 seconds.  And I'll

3  warn you.  I think you're going to hear your

4  voice again, whether you like it or not.  Let

5  me hit "Play" here.

6             (AUDIO PLAYED.)

7  BY MR. LANSER:

8      Q     So that sounds like:  "Daniels to all

9  forces.  Make whatever arrests you can make at

10  this point and then hold; whatever arrests you

11  can make at this point and then hold."  Does

12  that sound right?

13     A     Yes, sir.

14     Q     And that's you speaking?

15     A     Yes, sir, it sounded like me.

16     Q     And what do you mean by:  "Make

17  arrests and then hold"?

18     A     At some point, we did disperse the

19  crowd.  And during those dispersals, we were

20  just moving along to move the crowd past.  And

21  at some point we couldn't just walk all the

22  way back to the church or whatever.  We had

23  cleared them from that area, and we were

24  holding, not to advance or proceed any

25  further.  (INAUDIBLE).

```
 1              THE COURT REPORTER:
 2                   I'm sorry.  I didn't hear what
 3              you just said.
 4              THE WITNESS:
 5                   We were not going to advance any
 6              further down the roadway.  We had
 7              dispersed the crowd.  And I told
 8              officers, if they were going to make
 9              any more arrests, make those arrests
10              and hold, not to advance any further.
11    BY MR. LANSER:
12         Q    I'm going to pull up Exhibit B again,
13    which is the map, which I believe you have in
14    front of you.  Okay.  So all this --
15    everything with the yard and all of that
16    happened at East Boulevard and France Street,
17    correct?
18         A    Correct.
19         Q    And then when you say, "Hold," where
20    were you holding?
21         A    If I recall, it was at on France
22    Street around St. Joseph.
23         Q    Okay.  France and St. Joseph?
24         A    Yes, sir.
25         Q    So is it -- if you went two blocks,
```

1    it looks like, down France Street from East

2    Boulevard, is that the direction that the

3    protesters went?

4        A    Yes.  Most of them went in that

5    direction, yes, sir.

6        Q    When you say, "Hold," does that mean

7    you're setting up another line like you did at

8    East and France, another line at St. Joseph?

9        A    There wasn't another line.  We had

10   actually moved to that location on France at

11   St. Joseph.

12       Q    Okay.  And then you decided, once you

13   hit St. Joseph, anyone at this point who's on

14   the other side of St. Joseph, they've

15   officially dispersed, in your view?

16       A    Yes, sir.

17       Q    Okay.  So anyone in that block with

18   the McDonald's, they've -- whatever happened

19   earlier at that point, once they've hit that

20   McDonald's, they've basically complied?

21       A    I won't draw a line and say that's

22   exactly where it ended.  I mean we had

23   dispersed other pockets of gatherers, but I

24   don't recall being in that general area when

25   it happened, say, that specific line.

1      Q    Sure.  But you're saying -- when you

2   say, "Hold" there you're saying:  Let's stop

3   the general pursuit after the protesters and

4   keep this area.  Is that how I'm understanding

5   it?

6      A    Can you -- I'm sorry.  Can you

7   explain what you're saying?

8      Q    Sure.  So you -- from what you're

9   saying, I understand you moved from East

10   Boulevard down France Street to St. Joseph.

11   You kind of followed the protesters that way;

12   is that correct?

13      A    Yes, sir.

14      Q    And once you got to St. Joseph, you

15   decided:  Okay, we're just going to hold this

16   spot.  We're not going to keep following them

17   past this point, right?

18      A    Yes.  We had decided we had dispersed

19   crowd and they were complying and we weren't

20   going to move any further.  There was no need.

21      Q    That's all I was trying to figure

22   out.  Thank you.  Okay.  I'm going to jump

23   back just one more piece of audio I want to

24   show you, and then we'll be done with that.

25   So I'm jumping back to Exhibit ZZZZ.  Last

```
 1   piece I'll do for now, I promise.  And we're
 2   getting near the end here.  Okay.  This is one
 3   hour, 44 minutes and 52 seconds.  I'm hitting
 4   "Play" right now.
 5              (AUDIO PLAYED.)
 6   BY MR. LANSER:
 7      Q    I sounded to me, two people talking.
 8   One said:  "Check that vehicle from that last
 9   female."  Says:  "There's a child in that
10   car."  The other persons responds:  "I do.  I
11   got the child and the dog."  Is that accurate?
12      A    Yes, sir.
13      Q    And do you know who those two people
14   were?
15      A    No, sir.
16      Q    Do you know anything about this
17   female that they're referring to?
18      A    No, sir.
19      Q    Or the child and the dog, you don't
20   know about that?
21      A    No, sir.
22      Q    Okay.  Great.  Okay.  So stepping
23   back just a little bit, we talked about
24   different deescalation tactics that you were
25   trained on and that you trained other people
```

1   on, including Verbal Judo and some other

2   things.  What sort of deescalation tactics did

3   you use on July 10, if anything?

4       A     Specifically, that was portions of

5   some of the officers out there talking with

6   who they described as leaders and asking them

7   to try and convince those that were gathered

8   to be lawful.  The other part would be the

9   numerous commands that were given, as far as

10  directing them how to be lawful, meaning clear

11  the roadways, stay on private property or step

12  off of those public passages.  And I think the

13  thing was, after it turned violent by those

14  who were there, throwing things at officers

15  and being quite hostile, we still gave them

16  warnings, again, that if they did not disperse

17  and notified them that what they were doing

18  was unlawful.  I think all of that is a form

19  of deescalation and not wanting to have to

20  move to physical arrest.

21      Q     Now that we've gone through all of

22  that, I'm going to go back to Exhibit C, the

23  Affidavit of Probable Cause.  Do you see that

24  on the screen?

25      A     Yes, sir, I do.

1    Q    When we talked about this earlier,
2  you weren't quite sure of some of the details
3  in the synopsis.  Don't worry.  I'm not going
4  to read it all, again.  But this is that same
5  page with Raae Pollard that we're looking at
6  before; is that right?
7    A    Yes, sir, it appears to be.
8    Q    Now, after we've gone over this a
9  little bit, is there anything in this synopsis
10  you think is not accurate?
11    A    Again, I didn't write it and I did
12  not witness the arrest of Ms. or Mrs. Pollard,
13  so I wouldn't be able to critique whether it
14  was accurate or inaccurate.
15    Q    Okay.  Fair enough.  What about --
16  just one thing I'll mention.  The portion
17  where it says:  "Protests at and in the
18  vicinity of Baton Rouge Police Department
19  Headquarters located at 9000 Airline Highway,"
20  is that accurate, as far as you know?
21    A    Again, I don't know if that arrest
22  was made at Headquarters during one of the
23  protests or made downtown on France or in that
24  area.  So I wouldn't want to state --
25    Q    If -- I'm sorry.  I was talking over

1    you.  If she had been arrested at East and

2    France, that part would not be correct,

3    though, right?

4         A    If she was not arrested at East and

5    France, correct, that would not be accurate.

6         Q    I do just want to quickly show you

7    another Exhibit here.  Give me one second to

8    pull it up.  And we are just about done, I

9    promise.  This is Exhibit DDDDD, five Ds.  Let

10   me pull it up.  It's very quick; just an

11   eleven-second video.  Exhibit DDDDD.  And this

12   is -- it's titled "From Fin-VID_"-- and then a

13   bunch of numbers.  I'm going to play it real

14   quick.  It's only eleven seconds long and then

15   we'll talk about this for a second.  Let me

16   know if you can see it.

17              (AUDIO PLAYED.)

18   BY MR. LANSER:

19        Q    Were you able to see that video?

20        A    Yes, sir.

21        Q    Was the audio coming through, too?

22        A    Yes, sir.

23        Q    Okay.  And is it accurate to say this

24   is the East and France location we were

25   talking about before?

1          A     Yes, sir, it's in that general area.

2          Q     And it sounded like -- I'm just going

3     to play it one more time.  And ask you to take

4     specific notice of the command that's

5     happening there.

6                (AUDIO PLAYED.)

7     BY MR. LANSER:

8          Q     He says:  "Where you are standing is

9     not good enough."  Did I hear that correctly?

10         A     Yes, sir.

11         Q     And do you know who that is giving

12    that announcement?

13         A     That would be currently Sergeant T.J.

14    Morse.

15         Q     T.J. Morse.  And is that through that

16    BearCat LRAD system like we were talking about

17    before?

18         A     I'm not sure if it's through the LRAD

19    system -- because that was a portable system

20    that someone loaned to us -- or through the

21    BearCat PA system.

22         Q     Okay.  I'm going to play this one

23    more time and I'm just going to ask you -- I

24    understand there is a lot going on prior to

25    this and all this.  But at this moment, I'm

 1   just curious, according to the video, if you
 2   see any one of the protesters obstructing a
 3   public passage.
 4            (VIDEO PLAYED).
 5   BY MR. LANSER:
 6        Q    I understand it doesn't show the
 7   whole scene.  But just from that video, did
 8   you see anyone that would fit your definition
 9   of obstructing a public passage?
10        A    No, sir.  Based on that 12 seconds
11   and the angles that were just shown, I do not
12   see anyone obstructing a public passage at
13   that specific moment.
14        Q    Okay.  I'm going to pull up one more
15   video.  And this is EEEEE, five Es.  And the
16   file name is "Number 5, Baton Rouge Police
17   attack peaceful protesters for Alton
18   Sterling."
19            This one is two minutes and twelve
20   seconds.  I'm only going to play the first
21   portion, if that's all right.  I don't think
22   we need to do the whole thing. I'll get it
23   going here.
24            (AUDIO PLAYED.)
25

BY MR. LANSER:

Q    We'll stop it there at 52 seconds.
Was that video playing with the audio?

A    Yes, sir.

Q    Can you sort of explain -- like walk
me through what was going on there.

A    That would be about the time we
dispersed the crowd.

Q    Is it fair to say, at least from
what's shown on the video, everyone was on
private property at that time?

A    At that time, yes.  Well, I wouldn't
say everyone, because I still saw a few people
on the sidewalk from that little small angle
that was shown.

Q    The vast majority of people were on
private property, though; is that accurate?

A    Yes, they were outside of the public
passages, yes.

Q    Okay.  And where we have this screen
stopped right now, you see a number of people
on the front porch.  Is that correct?

A    Yes, sir.

Q    And none of them are obstructing a
public passage at that point, I'm guessing.

1        A    Not at that point, no, sir.

2        Q    Between these two videos -- and I'm

3   just talking about this moment when law

4   enforcement enters the yard.  Is there

5   anything that's not accurately portrayed on

6   these videos, from your memory?

7        A    Looking at the videos, I would only

8   -- I would have to say -- I'm not -- let's

9   clarify.  What do you mean by, "Accurately

10  portrayed."  I don't know what I'm looking

11  for.

12       Q    Yeah.  What -- is there anything

13  these videos failed to capture from this

14  moment?

15       A    Well, we were out there for hours,

16  sir.  So quite a bit that wasn't captured on

17  the first 12 seconds and would be this two

18  minutes.

19       Q    Sure.  Would you say --

20       A    However, we did record the incident.

21  I remember having crime scene out there

22  recording the incident.  And I'm sure we have

23  video of that.

24       Q    Yeah, I believe we have copies

25  of (INAUDIBLE) --

```
 1              THE COURT REPORTER:

 2                   I'm sorry.  "I believe we have

 3              copies of" -- I didn't hear the last

 4              part you said.

 5              MR. LANSER:

 6                   Much of what he's -- much of

 7              that.

 8              THE COURT REPORTER:

 9                   Thank you.

10              MR. LANSER:

11                   Let me see if I have anything

12              else.  I am sure some of the other

13              attorneys might have questions for

14              you.  If you could just give me one

15              second just to look over this to see

16              if I'm missing anything.  Just give

17              me one minute.

18                   Okay.  I think that's all I

19              have.  So I'll pass this over to

20              MacArthur, if anyone from MacArthur

21              has anything.

22              MS. LOMERS-JOHNSON:

23                   Yeah.  This is Hannah

24              Lomers-Johnson for MacArthur.  I do

25              have quite a few questions.  I'm
```

```
 1            going to try to eliminate from my
 2            questions anything that David already
 3            covered.  But I'm wondering if you
 4            would like to take a quick break
 5            before I start or if you'd like to
 6            just head right in?
 7       THE WITNESS:
 8            I'm fine.  But I'd ask my
 9       representative here if he wants a
10       break.
11       MR. SCOTT:
12            Hannah, I could use a few
13       minutes.
14       MS. LOMERS-JOHNSON:
15            Okay.  So I think my computer
16       shows it's 12:24 right know.  Shall
17       we just say, meeting back here at
18       12:35?
19       MR. SCOTT:
20            That's fine.  Thank you.
21       MS. LOMERS-JOHNSON:
22            I'll stop the recording for our
23       break.
24            (BRIEF RECESS)
25       MR. SCOTT:
```

```
 1              My assistant figure that, you
 2         know, three and a half hours for a
 3         deposition would be enough time and
 4         double booked the conference room, so
 5         I have relocated.
 6    MS. LOMERS-JOHNSON:
 7              Sounds good.  So, Eric -- we're
 8         having, like, a little bit of
 9         computer issues over here.  Eric is
10         going to be doing the record function
11         now and he just ran to grab a glass
12         of water.
13                   EXAMINATION
14    BY MS. LOMERS-JOHNSON:
15       Q    Mr. Daniels, I know you went over
16    this a little bit earlier.  Can you refresh me
17    on what your current rank is right and how I
18    should address you?
19       A    I'm the Deputy Chief of
20    Administration, and Myron, Deputy Chief.  It
21    doesn't matter.  Either works for me.
22       Q    Okay.  Perfect.  So I am going to
23    start with some questions about Saturday,
24    July 9th before we go back to talking about
25    the 10th.  Actually, just briefly before we
```

1    hit on the 9th, you talked earlier with

2    Mr. Lanser about your experience being trained

3    and giving training at BRPD.  Can you tell me,

4    did you ever receive training on the

5    obligation of officers to intervene when they

6    see another officer violating someone's

7    constitutional rights?

8         A    That is a very popular topic today.

9    As far as -- particularly, the language you

10   use.  But as far as our training, I won't say

11   that it was official back in '98 when I became

12   a policer officer or during that time of being

13   at the training academy.  But, absolutely,

14   that was one of the things that we always

15   focused on.  We realized that sometimes an

16   officer who may not be in the best position to

17   make a decision at that time.  Somebody had

18   made -- had arrived afterwards who had been in

19   a fight -- had to deal with it.  But, yeah,

20   we've always done what we could to ensure that

21   none of our officers go overboard.  So,

22   absolutely.  I really don't think it has to be

23   trained.  I think it's a human thing, yes.

24        Q    And is that one of the topics that

25   you, yourself, gave training on when you're

```
 1   one of the lead trainers?
 2        A    No.  I don't recall, like I said,
 3   that training.  Like I said, today's topics
 4   are -- in today's time, that's a major
 5   discussion and major talking point in law
 6   enforcement and training all around the
 7   country.  And there are reforms that are
 8   taking place that actually address that a lot
 9   clearer.  I don't remember a specific class or
10   training that associated it.
11             THE COURTR REPORTER:
12                  Deputy, I'm having -- you're
13             trailing off a little bit.  You're in
14             a different position, almost, so if
15             you could get a little bit closer to
16             the microphone.  Thank you.
17             THE WITNESS:
18                  Yes, ma'am.
19   BY MS. LOMERS-JOHNSON:
20        Q    And then, just talking a little bit
21   more about when it's possible to intervene,
22   just in your estimation, what are the
23   different possible ways that an officer could
24   step in to stop a constitutional violation
25   from happening, if they observed it?
```

1        A     That is -- so if there is an observed

2    constitutional violation where an officer is

3    using excessive force or something along those

4    lines, it is easy for an officer to step in

5    and basically just say:  Hey, I got it, or

6    I'll take this person and direct the other

7    person to do something else.  But, again, I'm

8    -- unfortunately, I'm only thinking along the

9    lines of today's time and this is -- I think

10   we talk about this every day now.

11       Q     And I guess it's fair to say from

12   what you have expressed, that prior to 2016,

13   there was not as much training -- or not any

14   training, that you can remember, about the

15   obligation to intervene?

16       A     I don't think that there was a

17   specific class or training that dealt with a

18   duty to intervene.  Again, that's more of a

19   topic today during police reform.

20       Q     And in terms of a situation where it

21   would be feasible for you to intervene if you

22   thought a constitutional violation being

23   committed by another officer, would it be fair

24   to say that you could intervene to stop the

25   constitutional violation if you were, say,

1    ten yards away and could run over and

2    physically stop a violation from happening.

3    Would that be reasonable to say?

4        A    I think, first, we have to determine

5    that there has been a violation.  And I guess

6    we're speaking on what we've been speaking on

7    all morning.  So a lot of things going on, a

8    lot of things being seen.  And I think it will

9    be hard to pinpoint exactly who saw what and

10   their interpretation or knowledge of something

11   going on, unless it was latently obvious;

12   meaning somebody is being beaten or stomped or

13   something that it's nowhere in policy or a

14   clear violation of law.

15       Q    And that's completely fair.  I guess

16   in the instance where you do see something and

17   it is clearly a constitutional violation,

18   you've already made that decision, that

19   observing this example of behavior is a clear

20   constitutional violation.  So from that

21   standpoint, if you see a constitutional

22   violation being committed by another officer,

23   it would be feasible to run over and

24   physically intervene, right?

25       A    Yes, I would say, if it's feasible,

1    that duty to intervene that we all discussed

2    today, I think it applied back then, as well.

3         Q    And going back to July 9th -- so

4    that's Saturday, July 9th.  You were on duty

5    that day, as well, correct?

6         A    Yes.  Yes, ma'am, I was.

7         Q    I am going to share screen to show

8    you a document.  I think right now we have

9    Exhibit A is the PC affidavit we looked at

10   that.  Exhibit B is the map of downtown and

11   Exhibit -- I think if it's okay with everyone

12   else, I'm just going to call the Interop

13   recording that was played earlier Exhibit C

14   for the purposes of Myron Daniels deposition,

15   which brings us to Exhibit D.  David, feel

16   free to interact if I feel like I missed an

17   exhibit?

18              MR. LANSER:

19                   Is this a new exhibit?

20              MS. LOMERS-JOHNSON:

21                   Yeah.

22              MR. LANSER:

23                   If you want to continuing the

24              lettering it would be SSSSS.

25              MS. LOMERS-JOHNSON:

```
 1              I'm going to admit to you that
 2         I -- that is super confusing to me.
 3         If it's fine with you, if I could
 4         just refer to you -- refer to the
 5         exhibits today as A, B, C, D, just
 6         for the Myron Daniels deposition and
 7         we can also call it SSSSS if we want
 8         to double flag it for the continuing
 9         exhibit numbers or letters for you.
10         Does that work?
11         MR. LANSER:
12              Yeah, that's fine.  That's fine
13         by me.
14         MS. LOMERS-JOHNSON:
15              And because we're going to do
16         the -- I'm going to show you a
17         document for the depositions in total
18         is going to be SSSSS in a row and
19         what I'm going to refer to, just for
20         my own personal purposes for today,
21         one, two, three, four -- so it's
22         going to be Myron Daniels MacArthur
23         Exhibit Number 4 and then the general
24         Exhibit Number of SSSSS.  I'm going
25         to share screen.
```

1          Can everyone see that?

2     BY MS. LOMERS-JOHNSON:

3          Q    So this document, Chief Deputy

4     Daniels, that we have just labeled Exhibit 4

5     for your deposition at the top I believe it

6     says:  "Baton Rouge Police Department Duty

7     Roster."  Do you recognize this to be a "Baton

8     Rouge Police Department Duty Roster" from

9     2016?

10         A    Yes, ma'am, I do.

11         Q    And going down to find your name -- I

12    think it lists each of the days here, I think.

13    Tell me if I'm wrong.  I believe that this

14    indicates that you worked 17 hours on

15    July 17th and 16 hours on July 10th.  Is that

16    accurate?

17         A    That is accurate.

18         Q    And I'm moving to the second page of

19    the document now.  It's two pages total.  And

20    finding your name, I think going across here

21    this indicates that on Saturday, July 9th, you

22    began work at 6:00 in the morning.  Is that

23    right?

24         A    Yes.

25         Q    Okay.  And you ended at 11:00 P.M.?

1      A      Yes.

2      Q      Okay.  Perfect.  And is that what you

3  remember being accurate for what actually

4  happened on July 9th?

5      A      I am going to say yes.

6      Q      And when you were on duty on

7  Saturday, July 9th, you were assigned to SRT;

8  is that accurate?

9      A      That is accurate.

10     Q      And then you talked a little bit

11 earlier about what SRT does in general.  Can

12 you tell me for July 9th, did you being

13 assigned as part of the SRT unit mean anything

14 specifically as far as what your duties at the

15 protest were?

16     A      My duties varied.  But like I said,

17 as a team leader, I would plan the -- or

18 assign teams or those personnel to teams.  If

19 we knew of any planned protests, we would

20 always have override to be able to provide

21 security for officers responding to it.

22 Specifically on that date, I don't remember

23 exactly what we did.  Like I said, a lot of

24 this runs together.

25     Q      That makes sense.  Can you remember,

1    after you reported for duty that day, which
2    location were you assigned to at first?
3         A    So our -- you are speaking of the
4    9th, correct?
5         Q    Yes, Saturday, July 9th.
6         A    We operated out of our Headquarters
7    building at 9000 Airline.  That's where we
8    showed up.  That's where we briefed.  That was
9    where we were until we had to move other
10   places.
11        Q    Okay.  And so you showed up, reported
12   for duty at Baton Rouge Police Department
13   Headquarters?
14        A    Yes, we did.
15        Q    Okay.  From there, do you remember
16   the next location that you reported to?
17        A    No, ma'am.
18        Q    Do you remember going out on -- in
19   the area of Goodwood and Airline that day,
20   around the Baton Rouge Police Department
21   Headquarters?
22        A    I remember spending quite a bit of
23   time out there.  I made it my point to be one
24   of the contact people.  I would go out, talk
25   with some of the -- those who were gathered to

1    exercise their constitutional rights, you

2    know, just give them some guidelines.

3    Because, again, we supported those rights.

4         Q    I appreciate that.  I am going to

5    show you a map.  I believe that Mr. Scott has

6    this map already printed out for you, but I'm

7    going to share on the screen as well, so we

8    can figure out if it's the same one.  Okay.

9    So I'm going to share screen now and ask you

10   to look at the printed copy in addition to

11   what I have up here on the screen.  I'm going

12   to mark this as Myron Daniels Deposition

13   Exhibit Number 5 for MacArthur purposes, which

14   is, I think according to the other naming

15   convention, GGGGG.  And, Deputy Daniels, is

16   this the same map that you have in front of

17   you?

18        A    It is.

19        Q    Okay.  Perfect.  Are you able to see

20   clearly enough on this map to mark generally

21   the area that you were first located at on

22   Saturday, July 9th?

23        A    At our police headquarters, which if

24   you go up to Airline and Goodwood, you'll see

25   a park on your right.  Well, on the other side

```
 1    of Airline, that big open space, that appears
 2    to be police headquarters, right there
 3    (indicating).
 4         Q    Okay.  Can you go ahead and just mark
 5    with a pen on that map MD 1 for your location
 6    that day?
 7         A    That would be almost impossible
 8    because, again, we worked the entire compound.
 9    Are you only referring to headquarters in
10    general?
11         Q    If possible, what I would like for us
12    to do is just go ahead and mark all the
13    locations that you do remember sort of going
14    around that day.  So if you could generally
15    mark MD 1 where you started out and then mark
16    MD 2 where you went next, understanding that
17    you might not remember the exact order of your
18    path.  But that's what I'd like to see if we
19    could do.
20         A    I'm going to give it a shot.  But I
21    walked the compound multiple times throughout
22    the process, so it's going to be a circle.
23         Q    Okay.
24         A    And you wanted me to label that MD 1,
25    correct?
```

1    Q    You can label MD 1 where you think

2    you started out.  And then from there, if you

3    can remember a path of positions that you

4    walked around, you could label the other

5    numbers 2, 3, 4 and so on, understanding that

6    you might not remember every location that you

7    stopped in.

8    A    I can only mark MD 1.  I know where

9    we met for roll call, but throughout that day,

10   again, I walked quite a bit.

11   Q    I can understand that.  I'm going to

12   stop the screen share and you can just keep

13   your map in front of you there.  Were you able

14   to draw a line starting from MD 1 across your,

15   sort of, general path that you went that day

16   or the general circumference of areas that you

17   covered?

18   A    Yes.

19   Q    Thank you so much.  When you first

20   went out on -- in front of the Baton Rouge

21   Police Department Headquarters that day, do

22   you remember what officers -- what other

23   officers you were generally around at your

24   first location?

25   A    No, ma'am.  I don't remember those

1    specific officers.

2         Q    Do you remember seeing any arrests

3    occur on Saturday, July 9th?

4         A    I'm pretty confident that I did see

5    arrests that occurred that day.

6         Q    Did you participate in any of the

7    arrests on Saturday, July 9th?

8         A    I do not recall physically arresting

9    anyone on those dates.  Again, our main

10   purpose was to provide overwatch for those

11   other line officers.

12        Q    Is the other SRT officers that were

13   on duty with you, did you travel with them as

14   a group on Saturday, July 9th?

15        A    Sometimes we would.  Again, we had

16   teams.  So there -- it varied.  I'm not sure

17   if we were ever in a total group or how it

18   was.

19        Q    Okay.  And at any point on Saturday,

20   July 9th, did you travel towards the area on

21   the map where Gwenadele is located just off

22   Airline?

23        A    If I'm referring, correctly, yes, we

24   did because there was a group that was trying

25   to take over the interstate again, or that

```
1   night.
2        Q    Sorry.  You said that night?
3        A    Yes.  And then it happened again on
4   that Sunday, which is what we discussed the
5   first part of this deposition.
6        Q    Okay.  And when you were in the area
7   of Gwenadele on Saturday, July 9th, you would
8   say that was after dark?
9        A    Yes, ma'am.
10       Q    Now, I'd like to show you a video.
11  I'm going to mark that as Exhibit 6 for the
12  purposes of MacArthur numbering for this
13  deposition.  Do you see that on the screen?
14       A    No.  I can now.
15       MS. LOMERS-JOHNSON:
16            I'm going to play that video and
17            then pause after about 30 seconds.
18       MR. FOLEY:
19            Hannah, we can't hear you.
20       MS. LOMERS-JOHNSON:
21            Thanks.  So I'm going to go back
22            about minute 15 and play a short clip
23            again.
24                 (VIDEO PLAYED.)
25
```

1   BY MS. LOMERS-JOHNSON:

2      Q   Okay.  And so I want to ask you about

3   whether you recognize yourself in this video,

4   starting -- I'll start it a few seconds before

5   Second 19, and I will just direct you to watch

6   the individual at the left side of the frame

7   as the camera passes him.

8          Here, I'll play that.

9          (VIDEO PLAYED.)

10   BY MS. LOMERS-JOHNSON:

11      Q   Did you get a chance to see that,

12   Chief Deputy?

13      A   I cannot tell.  I'm not sure, based

14   off of that angle.  Does that person have a

15   tattoo on this right arm?  I'm guessing you're

16   talking about --

17      Q   I can go back one more time -- it is

18   a fast clip.

19          (VIDEO PLAYED.)

20   BY MS. LOMERS-JOHNSON:

21      Q   Were you able to catch that at all?

22      A   No, ma'am.  I can't make out from

23   that video.

24      Q   Okay.  Okay.  And so, going back to

25   the day on Saturday, July 9th.  Do you

142

1    remember who the Incident Commander was at the
2    time?
3        A    No, ma'am, I do not.
4        Q    Who did you directly report to on
5    Saturday, July 9th?
6        A    I don't recall if it was Lieutenant
7    Polito.  I'm not sure.
8             THE COURT REPORTER:
9                 I'm sorry.  What was his name?
10            THE WITNESS:
11                 Lieutenant Polito, P-O-L-I-T-O.
12   BY MS. LOMERS-JOHNSON:
13       Q    At that time, do you know who
14   Lieutenant Polito directly reported to for
15   Saturday, July 9th?
16       A    I don't.  I don't know if it was
17   Lieutenant Wayne Martin.  I don't recall
18   exactly who our chain was at that point.
19            THE COURT REPORTER:
20                 Did you say Wayne Martin?
21            THE WITNESS:
22                 Yes, ma'am.  Kenneth Wayne
23            Martin.
24            MS. LOMERS-JOHNSON:
25                 Okay.  I warned you guys I was

```
 1               having computer trouble today.  So I
 2               am now switching computers really
 3               quickly.  Let's see if I can pull it
 4               up.
 5    BY MS. LOMERS-JOHNSON:
 6         Q    Deputy Chief Daniels, can you still
 7    hear me?
 8         A    Yes, I can.
 9         Q    So I know you said you couldn't
10    remember specifically whether Lieutenant
11    Polito was your direct commanding officer
12    directly above you that day.  But can I ask in
13    general, how did your commanding officer relay
14    orders to you on Saturday, July 9th?
15         A    If I had to guess, it would be by
16    radio.
17         Q    And would that be one of the -- on
18    one of the Interop channels or would that be
19    directly to you?
20         A    It would have to be on one of the
21    Interop channels.
22         Q    And on Saturday, July 9th, did you
23    ever leave the Goodwood or Airline
24    neighborhood?
25         A    I don't recall.
```

1    Q    I'm specifically wondering whether

2    you ever reported to the River Crest

3    neighborhood where the mayor lived?

4    A    No, ma'am, I never did.

5    Q    My understanding is -- so you were on

6    Bravo team.  That's your designation no matter

7    what the day; is that correct?

8    A    Correct.

9    Q    Okay.  And so my understanding that

10   the Alpha Team may have reported to the

11   mayor's neighborhood.  Is that accurate?

12   A    It would have to be more -- it would

13   have to be accurate, because I don't remember

14   reporting or sending anybody to report to the

15   mayor's neighborhood.

16   Q    And so the rest of the members of the

17   Bravo team, they also would never have

18   reported to the mayor's neighborhood; they

19   would have stayed in the area that you were

20   in; is that correct?

21   A    Yes, I don't recall reporting or any

22   of us having to report to the mayor's

23   neighborhood.

24   Q    Gotcha.

25        MR. SCOTT:

1            Ten seven point 300.

2        THE COURT REPORTER:

3            I'm sorry.  What was that

4        comment?  I don't know who made that

5        comment.

6        MR. SCOTT:

7            I'm sorry.  It's the invisible

8        lawyer just suggesting to Hannah if

9        she looked at the CAD screen that we

10       provided in previous depositions.

11       Chief Daniels was off work at

12       11:00 P.M. and the first call on that

13       came out something like 2315 hours.

14       He would have been off duty already.

15       MS. LOMERS-JOHNSON:

16           Thanks, Joe.

17   BY MS. LOMERS-JOHNSON:

18       Q    And now continuing with Saturday,

19   July 9th, we would like to show you a couple

20   of videos to see if you remember those

21   locations from Saturday night.

22       MS. LOMERS-JOHNSON:

23           Eric?

24       MR. FOLEY:

25           Yes.

```
 1              MS. LOMERS-JOHNSON:
 2                   If we could start with the
 3              Stewart 6 video.
 4                   (VIDEO PLAYED).
 5    BY MS. LOMERS-JOHNSON:
 6         Q    Okay.  Can you see this is a video
 7    that for our purposes we're going to call
 8    Exhibit 7 from today's deposition.
 9              Can you see that, Deputy Chief
10    Daniels?
11         A    Yes, ma'am, I can.
12         Q    And do you -- from this freeze frame
13    here at second 37, do you recognize any of the
14    officers in this shot?
15         A    Not particularly.  I'm sure I know
16    every BRPD officer, but I don't recognize
17    anyone based on that --
18              THE COURT REPORTER:
19                   "Based off of that" -- I'm
20              sorry.  I didn't hear the last word.
21              THE WITNESS:
22                   Picture.
23              THE COURT REPORTER:
24                   Thank you.
25              THE WITNESS:
```

```
1                    You're welcome.
2      BY MS. LOMERS-JOHNSON:
3           Q    And so Eric is going to hit "Play"
4      and we're just going to play this for you for
5      about ten to fifteen seconds.  I would just
6      ask that you keep your eyes on some of these
7      officers and see if you do recognize them
8      after we get a little bit closer to them.
9           A    Okay.
10               (VIDEO PLAYED.)
11     BY MS. LOMERS-JOHNSON:
12          Q    Okay.  First I'll ask about the
13     officers on either side of the man in the
14     white shirt and the blue jeans, who I can
15     represent to you is one of our clients.  Do
16     you recognize either of those officers who are
17     walking him off?
18          A    I'm not sure if that's Walter
19     Edwards, which would be on his right side --
20     I'm sorry.  It's left side, right of the
21     screen, the taller of the two with the
22     baseball cap.  I don't know the name of the
23     other shorter young man with the sunshades on,
24     the darker sunshades.
25          Q    Okay.  I'm also wondering if you know
```

```
1   the identity of this man who is on the left
2   side of our screen who is wearing the Police
3   Street Crimes Unit vest with the yellow
4   writing on it.
5        A    Yes, that's Robert McGarner.
6        Q    As you watch this video, were you
7   able to recognize any other of those officers
8   standing around?
9        A    I recognize Lorenzo Coleman.
10       Q    And can you -- we'll try to sort of
11  back up a little bit.  In what area was
12  Lorenzo Coleman standing in?
13       A    He was, I guess, on the far right
14  side.  If you stop right there.  That is
15  Lorenzo Coleman where your arrow was, the
16  African-American male.  Yes.
17       Q    Okay.  Perfect.  Thank you.
18       A    You're welcome.
19       Q    And did you recognize any additional
20  officers in any of the frames?
21       A    I did not.  I couldn't definitively
22  identify any other people.
23       Q    Okay.  Thank you for that.
24       A    You're welcome.
25       Q    Now, I'm going to move on to another
```

1  video.  This video is going to be Exhibit 8
2  for MacArthur purposes for this deposition.
3  And it is a cellphone video.  I can represent
4  to you that it's from one of our clients,
5  Tommy Hutcherson.  And Eric will bring it up
6  in a second.  Okay, perfect.
7                  (VIDEO PLAYED.)
8  BY MS. LOMERS-JOHNSON:
9      Q    What I will ask you is, if you
10  recognize anyone in this video as we're
11  watching it, if you could just call it out and
12  we'll stop it.
13                  (VIDEO PLAYED.)
14                  THE WITNESS:
15                      Okay.  Right there in that
16                  previous frame was Nick Collins.
17                  THE COURT REPORTER:
18                      Mick Collins?
19                  THE WITNESS:
20                      Nicholas Collins I think is his
21                  real name.  That would be him, yes.
22  BY MS. LOMERS-JOHNSON:
23      Q    A minute 38 -- excuse me.  Second 38
24  in the middle of this screen is Nick Collins.
25  Okay.  Thank you.

1    A    You're welcome.  Jesse Barcelona,
2   he's the short male right there speaking with
3   that gentleman.
4    Q    So at minute -- I keep saying minute.
5   At second 41, we have Jesse Barcelona, who is
6   the shorter officer speaking with the man in
7   the red hat?
8    A    Correct.
9    Q    Okay.  Thank you.
10    A    That would have been -- I want to say
11   Brad Ford.  That looks like Brad Ford where
12   your arrow is.
13    Q    And is that Brad Ford at second 53
14   who is the officer directly in front of the
15   Shell station?
16    A    Where the curser is right now, the
17   shorter male, that appears to be Brad Ford and
18   it appears to be David Kennedy, the short male
19   in front of him.
20    Q    Okay.  So David Kennedy is the
21   officer at second 53, who is in front and to
22   the right, sort of underneath the billboard in
23   our view screen?
24    A    Yes, that's correct.
25         MR. SCOTT:

```
 1              Hannah, just to note, Brad Ford
 2         is also identified as John Ford or
 3         John B. Ford.
 4         MS. LOMERS-JOHNSON:
 5              Thanks, Joe.  I appreciate that.
 6         That's really helpful.
 7    BY MS. LOMERS-JOHNSON:
 8    Q    Okay, perfect.
 9    A    That is Montrel Jackson.  Let's back
10    up.  Right there, the taller black a male.
11    Q    So at minute 107, it's -- he is the
12    individual -- the black gentleman in the
13    center of the screen?
14    A    That is the one that was assassinated
15    the week following.
16         MS. LOMERS-JOHNSON:
17              Okay.  Thank you for that.  And
18         at this point, Eric, if it's possible
19         to start sharing your sound, that
20         would be great.
21         MR. FOLEY:
22              I apologize.  I thought it was
23         already shared.  Let me change the
24         setting here.
25              (VIDEO PLAYED).
```

```
 1              MR. FOLEY:
 2                   Were you able to hear that?
 3              MS. LOMERS-JOHNSON:
 4                   No.
 5              MR. FOLEY:
 6                   Okay.  Can you hearing audio
 7              now?
 8              MS. LOMERS-JOHNSON:
 9                   No audio now.
10              MR. FOLEY:
11                   That's interesting.  I'm going
12              to try one more thing.
13                   (VIDEO PLAYED.)
14              MR. FOLEY:
15                   Did that work?
16              MS. LOMERS-JOHNSON:
17                   Yes.  Thank you.
18              MR. FOLEY:
19                   Thank God.
20    BY MS. LOMERS-JOHNSON:
21         Q    Were you able to recognize any of the
22    other officers in that shot?
23         A    At one time, I saw Philip
24    Brownleader.
25         Q    Where was he located?
```

```
 1        A    Prior to -- if you go back to that
 2   last shot, that's him, the Caucasian
 3   gentleman, kind of heavy.  VIDEO PLAYED.)
 4             That guy in the helmet appears to be
 5   James Christopher, right where that arrow is
 6   pointing right now.  And then the gentleman --
 7   the bill of the female's hat is partially
 8   blocking his face, is Brownleader.
 9        Q    Okay.  Thank you.
10             (VIDEO PLAYED.)
11             THE WITNESS:
12                  That's Brownleader where your
13                  arrow is.  To the left, the
14                  baldheaded gentleman, Hudson Tabor,
15                  T-A-B-O-R.  To the right of
16                  Brownleader is Brett Magee.  And to
17                  the left of Brett Magee is Laddey
18                  Osby, O-S-B-Y.
19   BY MS. LOMERS-JOHNSON:
20        Q    Sorry.  Do you know how Laddey is
21   spelled?  Is that L-A-D --
22        A    I think it's L-A-D-E-Y.  I'm not a
23   hundred percent.
24        Q    I appreciate it.
25        A    I'm a horrible speller.
```

```
 1              (VIDEO PLAYED.)
 2    BY MS. LOMERS-JOHNSON:
 3         Q    And as we approach these three
 4    officers here, do you recognize any of them?
 5         A    No, not based off of just that
 6    picture.
 7         Q    Gotcha.
 8              (VIDEO PLAYED.)
 9              MR. FOLEY:
10                   (INAUDIBLE) -- show any one to
11                   any point in the video?
12              MS. LOMERS-JOHNSON:
13                   I do have one question if you
14                   could go to minute 119, back there.
15                   And just advance forward a couple of
16                   frames, if possible.
17    BY MS. LOMERS-JOHNSON:
18         Q    This individual in the frame at 120,
19    he appears to be Caucasian and wearing a
20    baseball hat.  Do you recognize him at all?
21         A    The face looks familiar.  I just
22    don't know a name.
23         Q    Gotcha.  Do you know what unit or
24    division at all he would be in?
25         A    No, ma'am.  I don't know if -- I'm
```

```
1    looking at the hat.  Is it a clear picture of
2    the hat to determine if it's a Baton Rouge
3    Police Department's hat or if that's a circle
4    designation.  If it's a circle, it shouldn't
5    be one of ours.  He looks like an officer that
6    we have on the police department.  I just
7    don't know a name.
8         Q    Okay.
9         A    Yes, that looks like one of our --
10   like a fleur de lis.
11        Q    Okay.  I appreciate that.
12        A    Sure.
13             MS. LOMERS-JOHNSON:
14                  So now I think we can go to our
15             next video.  It's a different angle
16             of the same incident.  And so this
17             video is called -- it will be our
18             Exhibit 9 for MacArthur numbering of
19             the Myron Daniels deposition.  And
20             it's the TNT video.  This one is only
21             going to be a couple of seconds long.
22             And we can -- we don't need sound for
23             this video.  If that makes it easier.
24             (VIDEO PLAYED.)
25
```

BY MS. LOMERS-JOHNSON:

Q    So that is our short little clip
there.  I'm particularly curious about whether
you recognize any of the officers who have the
man who I can represent to you is our client
on the ground at the beginning of that video.

            (VIDEO PLAYED.)

            THE WITNESS:

                I do not.

BY MS. LOMERS-JOHNSON:

Q    Were you able to recognize the
individual who appears to me to be Caucasian
who's kind of, like, leaning down in the
background at all?

A    I don't.  I was -- initially when
they showed the video -- I'm looking at --
he's sergeant in rank, based off of his
uniform, but I cannot tell exactly who he is.

Q    And so our last of these set of
videos is going to be Exhibit 10.  And it's a
file -- it represents a person who I can
represent to you is our client, Sean Benjamin.
And the file name is 2016.07.11.  The title of
it starts with the words, "Protest Brew."

            (VIDEO PLAYED.)

1  BY MS. LOMERS-JOHNSON:

2     Q    Right here where we have it paused

3  at, sixteen seconds.  I'm wondering if you

4  recognize either of these officers on either

5  side of Mr. Benjamin?

6     A    The shorter gentleman is Frederick

7  Thornton.  And the person on the left of the

8  taller gentleman, screen right, would be -- it

9  looks like Nick Collins.  And the person

10 that's standing in front of them looks like

11 Sergeant Fairbanks, yes.

12    Q    Okay.  Thank you, sir.  Okay.  So now

13 I want to move back to Sunday, July 10th and

14 ask a couple of followup questions.  Where did

15 you -- so on Sunday, July 10th, did you first

16 report to duty at the Baton Rouge Police

17 Department Headquarters?

18    A    Yes, ma'am.

19    Q    Okay.  And at some point in the day,

20 you went to the downtown area when you

21 participated in escorting the march, correct?

22    A    Correct.  We didn't -- I didn't

23 actually escort it.  I was there to provide

24 security for the march.  We stayed on the

25 parameters of the march.

```
 1      Q    Okay.  And I'm wondering, to the
 2  extent that you can remember, what time you
 3  arrived at the area around the intersection of
 4  East and France?
 5      A    I don't remember the time.
 6      MS. LOMERS-JOHNSON:
 7           Okay.  And for this, I'm going
 8           to pull up the Interop reporting,
 9           because I've had a little bit of
10           computer couple and had to switched
11           computers here.  I am going to take
12           just two minutes to pull that up.  So
13           I am going to ask that we take a
14           three-minute break and come back at
15           36 minutes after the hour, if that
16           works for everyone else?
17      MR. SCOTT:
18           We've come this far.
19      MS. LOMERS-JOHNSON:
20           Okay.  Perfect.  Thank you all.
21           (BRIEF RECESS)
22      MS. LOMERS-JOHNSON:
23           It looks like everyone is back
24           right now.  Perfect.  So I think we
25           can go back on the record.
```

1    BY MS. LOMERS-JOHNSON:
2        Q    In terms of trying to sort of figure
3    out a little bit at what time in the day you
4    ended up at East and France.  I'm wondering at
5    the point where you became command on scene,
6    were you already at the area of East and
7    France, then?
8        A    Yes.
9        Q    Okay.  And for about how long would
10   you say you had been at the area of East and
11   France before becoming command on scene?
12       A    That, I'm not sure of.  I'm not sure
13   of that.
14       Q    Not to trip you up, but just to short
15   of, like, get an idea, would you say it was,
16   you know, more in the range of minutes or more
17   in the range, like --
18            MR. SCOTT:
19                We did this for an hour with
20            Lanser.
21            MS. LOMERS-JOHNSON:
22                So I have my own questions,
23            unfortunately.  I am going to try to
24            whip through them as quickly as
25            possible.

1    BY MS. LOMERS-JOHNSON:

2        Q    But, yeah, just to give me sort of,

3    like, a general idea whether you had been

4    there sort of for, like, a couple of hours at

5    that point or maybe just a couple of minutes

6    or somewhere in between?

7        A    It would definitely be somewhere in

8    between.  It was definitely not showing up and

9    making that statement, "Captain says," and see

10   if someone had already established command.

11   So it was definitely not show up, make the

12   decision and move on from there.

13       Q    Perfect.  Okay.  And before you were

14   assigned to be command on scene, do you know

15   who was in command?

16       A    I think it was pretty fluid at that

17   time.  I don't think that anyone had truly

18   established command at that point.

19       Q    Okay.  And my understanding is that

20   when we heard that Interop radio recording

21   earlier today, we heard the Operations call

22   sign frequently.  Does that refer to the

23   people who were at MOHSEP communicating from

24   there?

25       A    Yes, it would have been those at

1    MOHSEP.

2         Q    And so that would have been Martin

3    and Walker at MOHSEP; is that correct?

4         A    He -- I'm not sure if -- yeah, I do

5    think Mike Walker might have been at MOHSEP.

6    But David Wallace was the one that was on the

7    radio quite a bit, so --

8         Q    And can you give me the chain of

9    command of those individuals who were at

10    MOHSEP.  Was Wallace over Walker?

11        A    No.  It would have been -- Walker

12    would have been over Wallace and Martin would

13    have been over both of them.

14        Q    Okay.  And once you took charge of

15    command on scene, for the purposes of Sunday,

16    July 10th, you were the highest ranking

17    officer on scene for this operation; is that

18    correct?

19        A    No.  I was not the highest ranking

20    officer, but I was the command at that point.

21        Q    You were command at that point.  So

22    you were the highest in the chain of command

23    for the July 10th East and France situation?

24        A    No.  So -- maybe this will kind of

25    help understand.  There were people who were

```
 1   senior to me and any other, but -- you may
 2   have the coach, but the quarterback is the
 3   commander on the field.  So I was quarterback.
 4        Q    Okay.  That is helpful.
 5        A    Yes.
 6        Q    And when people are on the Interop
 7   recording and on the radio refer to "Command,"
 8   who were they referring to?
 9        A    That would be those at MOHSEP.
10        Q    Okay.  And so I'd like to go to the
11   Interop at a minute 46 -- approximately minute
12   46 and 40 seconds.
13             (AUDIO PLAYED.)
14   BY MS. LOMERS-JOHNSON:
15        Q    In that clip when he said that
16   they're holding at East and France.  Do you
17   know to what he was referring to?
18        A    I'm not sure he meant officers or
19   protesters.  I'm not sure.
20        Q    Okay.  And if we could go to minute
21   -- sorry.  One hour and four seconds.  I think
22   that's the minute mark at which we heard that
23   you became command on scene.  And I just want
24   to confirm that.
25             MR. FOLEY:
```

```
 1                    I'm sorry.  One hour four
 2            seconds or one hour, four minutes?
 3            MS. LOMERS-JOHNSON:
 4                    I apologize.  One hour four
 5            minutes.
 6                    (VIDEO PLAYED.)
 7    BY MS. LOMERS-JOHNSON:
 8        Q    Okay.  And so just to confirm, that's
 9    the point at which you took command of the
10    scene, correct?
11        A    Yes, ma'am.
12        Q    And part of that meant that you
13    coordinated where all the law enforcement
14    units would stage; is that right?
15        A    Yes, that was part of it.
16        Q    Okay.  And you also made the decision
17    of sort of where to push the crowd of
18    protesters using the law enforcement units
19    that were out on the scene; isn't that
20    correct?
21        A    Yes.
22        Q    Okay.  I'm wondering about if we
23    could play at the one hour mark at one hour 13
24    minutes and play through to 14.  My questions
25    here are going to be partially about the term,
```

1    "Fifteen," which we heard about earlier.  If

2    we could play, again, starting at one hour and

3    13 minutes and let it roll through 14.

4             (AUDIO PLAYED.)

5    BY MS. LOMERS-JOHNSON:

6        Q    And so I think what was said there --

7    and please correct me if I make any

8    mistakes -- is that you were going to make the

9    call where to move the crowd and there was a

10   reference to once we start Fifteening people.

11   Can you tell me what that means?

12       A    That is the code for arrest.

13       Q    And so that indicated that a decision

14   had been made that you all were going to start

15   arresting people at some point and you were

16   waiting for the order to do so; is that

17   accurate?

18       A    Not for the order to do so.  We would

19   have made the arrests a lot sooner if we had

20   the resources in place.  At one time we were

21   waiting for -- the Sheriff's Office always

22   supplies us with a van -- excuse me -- a bus

23   for these operations.  The other part we had

24   to do was ensure that all of the people,

25   resources from law enforcement were in place.

1    If we start to disperse the crowd and we don't
2    channel them into a certain area away, we
3    actually lose greater control, because they
4    can circle behind us and it creates a bigger
5    safety issue.  It takes a little bit to get
6    these different resources in place.  So that's
7    what we were waiting on.
8         Q    Thank you for that.  That makes
9    sense.  At this point, protesters were
10   gathered in the yard at the intersection of
11   East and France, that property that we've been
12   referencing; is that correct?
13        A    I would have to say yes.
14        Q    Okay.  And my understanding is that
15   protesters stayed in the yard for an extended
16   amount of time as officers stood in the
17   street; is that accurate?
18        A    Can you explain what "Extended" is,
19   your interpretation?  I'm sorry.
20        Q    I'll just change it into a question.
21   About how long would you say that protesters
22   were staged in the yard while officers were
23   staged on the surrounding streets?
24        A    I don't recall a specific time.
25   Unfortunately, those situations are so intense

1    that even thirty seconds may seem like 30

2    minutes and vice versa.  So I can't kind of

3    put it into context.  But I'm sure, again -- I

4    do recall recording it and we probably will

5    look at it and determine the exact time.

6        Q    And after you -- let me rephrase

7    that.  You had at that point requested

8    assistance from other law enforcement agencies

9    to come to the area before arrests began; is

10   that correct?

11       A    I think they had already been set in

12   motion to head our way after the commotion was

13   heard from the various broadcasts of other

14   officers.  I think that had already been set

15   in place, but I was waiting on them to get in

16   place to direct them where to go.

17       Q    Okay.  And now I'd like to move

18   forward to one hour, 19 minutes and 30

19   seconds.

20            (AUDIO PLAYED.)

21   BY MS. LOMERS-JOHNSON:

22       Q    And so the voice on the radio there

23   who directed that there's going to be a line

24   on the East side of East Boulevard and the

25   north and south border, whose voice was that?

```
1      A    That was my assistant.  That was
2  Dustin McGinnis.
3      Q    Okay.  Dustin McGinnis.  Was he
4  relaying a plan that you had all had come up
5  with together or was just his own plan that he
6  was dictating?
7      A    No.  Like I said, he was assisting
8  me.  It's kind of a few things going on at
9  once.  So I'm talking to multiple people.  We
10 talked, came up with a plan.  He was conveying
11 that while I was care of some
12 other (INAUDIBLE) --
13          THE COURT REPORTER:
14              I'm sorry.  What was the last
15          sentence you said?
16          THE WITNESS:
17              He was relaying information that
18          he had and I had discussed prior
19          while I was still dealing with
20          another small area while there on
21          scene.
22 BY MS. LOMERS-JOHNSON:
23     Q    And just so that I fully understand
24 the plan and what was said.  It seems like
25 there was a plan to form a line on East
```

1    Boulevard directly across from the protesters

2    and then on the north and south border, so

3    that the area that the protesters were in at

4    that corner of the East and France

5    intersection, that they would be surrounded.

6    Is that accurate?

7        A    No, they would not be surrounded.

8    If, in essence, there were -- think of a

9    square.  We had three sides of it.  It gave

10   complete access to move west on France.  And

11   that was the plan, to contain them, not to get

12   behind them and create safety issue for the

13   officers.

14       Q    And I guess my -- related to that, my

15   other question stems from the Interop video at

16   minute 45.  And here I think we have what we

17   can -- if Eric gets a chance, he can play it.

18             (AUDIO PLAYED.)

19   BY MS. LOMERS-JOHNSON:

20       Q    So my question there -- I think you

21   had said previously about the person speaking

22   who said:  "Everyone is under arrest" is

23   Lieutenant Wallace; is that correct?

24       A    That is correct.  And after listening

25   to this again, it sound like he was talking to

1   Vincent Liberto.

2       Q    Vincent Liberto.  And would Vincent

3   Liberto have been on scene?

4       A    It was quite -- I'm pretty that he

5   may have been.  It's a distinctive name and

6   there was only one on the police department at

7   that time.

8       Q    Okay.  And at that point -- so this

9   is a minute 45.  The order had been given by

10  Lieutenant Wallace that everyone at the

11  protest was considered to be under arrest; is

12  that correct?

13      A    Yes.  That's what Lieutenant Wallace

14  stated, to arrest all violaters.

15      Q    Okay.  And I think he also stated --

16  and I don't want to mischaracterize this, so

17  correct me if I'm wrong -- but that everyone

18  who is out there is violating or in violation.

19  Is that accurate?

20      A    I don't want to interpret his words.

21  I didn't necessarily get that.

22          MS. LOMERS-JOHNSON:

23              Okay.  Maybe let's jump back and

24          just play it again, Eric, so I'm not

25          mischaracterizing.

```
 1                    (AUDIO PLAYED.)
 2    BY MS. LOMERS-JOHNSON:
 3        Q    So what I heard is that -- the
 4    direction was to arrest everyone who is
 5    violating, which is everybody out there.  Is
 6    that accurate?
 7            MR. SCOTT:
 8                 Hannah, the recording is the
 9            best evidence of its contents.  You
10            can ask the witness what he did with
11            this information or what he did with
12            these instructions, but we're not
13            going to get bogged down in this for
14            a fourth time.
15            MS. LOMERS-JOHNSON:
16                 So I'm going to continue with my
17            questions.
18    BY MS. LOMERS-JOHNSON:
19        Q    At this point, was it your
20    appreciation that you had probable cause to
21    arrest any protester who remained on scene?
22        A    I don't think that that was my
23    interpretation.  And to be frank with you, I
24    don't remember hearing this specific
25    transmission.  I do have a question -- and
```

```
 1    maybe you can guys can clarify.  It sounds
 2    like there are more than one channel that's in
 3    this sequence.  Because I know McGinnis was on
 4    a certain channel that was I was not on.  So I
 5    couldn't necessarily hear those transmissions
 6    and I don't know if I heard that (INAUDIBLE).
 7              THE COURT REPORTER:
 8                   I'm sorry, sir.  I'm losing you
 9              at the end.  "I don't know if I heard
10              that" and I didn't hear the rest of
11              your sentence.
12              THE WITNESS:
13                   I am not sure if I heard that
14              exact transmission, because it
15              appears that there are multiple
16              channels that are recorded.  I was
17              only on one.  I wasn't scanning two
18              and that's why I'm pretty sure now,
19              hearing it, it kind of makes sense.
20              You'll hear Lieutenant Taylor talking
21              to me and then you'll hear Lieutenant
22              Walker talking to my assistant,
23              Dustin McGinnis.  We were on separate
24              channels because there's a lot to
25              coordinate, if that makes sense.  I'm
```

```
 1            not sure I even heard this to apply
 2            it.
 3   BY MS. LOMERS-JOHNSON:
 4       Q    I can understand that.  Can you tell
 5   me, were you on Interop 1 or 3?
 6       A    I do not remember.  I'm sorry.
 7       Q    And so part of the Interop recording
 8   that you were on, we heard the direction that
 9   you gave to arrest protesters for obstruction
10   of a public passage.  Is that correct?
11       A    Yes.
12       Q    Okay.  And it was your call that that
13   would be the statute under which people were
14   arrested in the area of East and France; is
15   that correct?
16       A    No, ma'am.  So the determination is
17   the arresting officer.  I did not identify
18   those who had specifically violated, but those
19   who had remained and stayed in the roadway or
20   on the sidewalks or those public passages,
21   yes, that would be one of the charges that are
22   violations that I observed.  As far as those
23   throwing things, as far as those who did other
24   things, I'm not sure -- I did not and cannot
25   dictate their arrests, as far as what they
```

1    charged those individuals with.  They make
2    that individual determination.
3         Q    And my understanding from our
4    discussion in Interop is that you waited for
5    LSP and East Baton Rouge and Calcasieu to
6    arrive and get in position before making the
7    push to arrest protesters and advance on the
8    yard.  Is that accurate?
9         A    That is accurate.
10        Q    Okay.  And when Calcasieu and LSP and
11   EBR were all staged and ready, did the push to
12   arrest and the push forward to advance on the
13   yard, was on your command?
14        A    I'm not a hundred percent sure if I
15   put it over the radio or if I was
16   communicating with those other commanders who
17   were around me, which would have been LSP or
18   Louisiana State Police commander or a East
19   Baton Rouge Parish commander, but it was
20   coordinated, if that helps.
21        Q    Yeah, it does.  I appreciate that.
22   I'm trying to use as little Interop as
23   possible, but for this one, we will go to one
24   hour and 36 minutes.
25             (AUDIO PLAYED)

1    BY MS. LOMERS-JOHNSON:

2        Q    Just stopping there, is it you who

3    said:  "Go ahead and initiate"?

4        A    I don't think that is me.

5        Q    Okay.  Do you know who was giving

6    that order, or communicating that order?

7        A    I'm not sure.

8        Q    Okay.  And I think in the recording

9    that we just heard -- we heard a little bit

10   more of it earlier today.  Do you recall the

11   statement to start arresting protesters and

12   that sidewalks are included?  Do you recall

13   that from earlier today?

14       A    No, I don't.

15            MS. LOMERS-JOHNSON:

16                If we could just play just a

17            little bit more, Eric.

18                (AUDIO PLAYED.)

19   BY MS. LOMERS-JOHNSON:

20       Q    Did you hear the voice that said:

21   "Sidewalks are included.  Obstruction of

22   public passageway"?

23       A    Yes.

24       Q    Do you recognize that voice at all?

25       A    It could possibly be me, but, again,

1    I'm not a hundred percent sure.

2        Q    Okay.  To your understanding, what

3    did it mean that sidewalks are included?

4        A    The obstruction of a public passage,

5    the law itself, or ordinance, reads sidewalks,

6    roadways and other public passages.  I don't

7    have it in front of me.  Sorry.

8        Q    And did you understand that to mean,

9    then, that protesters who were at that time on

10   the sidewalk should also be arrested for

11   obstruction of a public passageway?

12       A    If they were in violation of this

13   ordinance after we gave the command to

14   disperse, yes, ma'am.

15       Q    Okay.  And for those individuals

16   standing on a sidewalk, do you recall ever

17   observing anyone trying to get by on the

18   sidewalk that was blocked from passing the

19   sidewalk?

20       A    That would be -- absolutely.  As

21   people moved, it was -- it's kind of hard to

22   describe.  It was such a congested area of

23   people and people were moving in the process,

24   but it would not allow for the normal flow of

25   movement in the roadway or on a sidewalk.

1        Q    That makes sense.  My -- I guess what
2    I'm wondering is, while you out there at East
3    and France during this time period, did you
4    see anyone trying to get by on the sidewalk,
5    you know, as part of the -- not a part of the
6    protest that was unable to proceed because of
7    the sidewalk being blocked?
8        A    I can't say that I can -- no, I
9    cannot say that I did.  I really wasn't
10    focused on that point at that point in time.
11        Q    And at this point, was East Boulevard
12    open to vehicle traffic?
13        A    No, it was not.  It was -- that part
14    of the obstruction that was -- it was not and
15    could not be open to vehicle traffic.
16        Q    And from the time that the
17    coordinated approach to the yard just begin
18    arresting protesters started, how much time
19    would you say it took from that point until
20    the yard was cleared?
21        A    It's kind of like the description I
22    gave before.  You know, one minute seemed like
23    ten and vice versa, so I'm not sure.
24        Q    And I'm going to breeze through this
25    because this was covered -- some of this was

1    covered earlier today.  I think earlier today

2    you said that you had observed some people

3    throwing things and that, I think, when asked,

4    you described the number of people throwing

5    things as several people.  Is that accurate?

6         A    Yeah, there were multiple people

7    throwing objects.

8         Q    Okay.  And I think you also said

9    earlier that, in your estimation about

10   hundreds of people were in the yard at the

11   intersection of East and France, on the corner

12   there; is that right?

13        A    In that general area, yeah, it was

14   quite -- it was quite compact.  It was quite a

15   few people in a very small area.

16        Q    Okay.  And so, it was not the case

17   that the majority of the people in that area

18   were throwing things, as far as you observed?

19        A    I will not say that the majority were

20   throwing things, but things were being thrown

21   from that area where the majority of the

22   people were located.

23        Q    So the majority of the people were

24   located in that area, but only a portion of

25   those people were engaged, as far as you

1    observed, in throwing things?

2        A    And I can tell you, it's only from

3    recently, as far as -- because I didn't see

4    individuals throwing things.  I witnessed

5    things being launched from that area towards

6    us.  So it's kind of hard to -- I cannot say

7    every person who threw an object, that's for

8    sure, but they were coming from that area.

9        Q    Okay.  And so because you didn't see

10   any particular person throw the object

11   themselves, it's possible that it was, you

12   know, five or fewer people who were throwing

13   things and were just doing so repeatedly?

14       A    I would somewhat beg to differ,

15   because there were multiple things being

16   thrown in excess of the number you gave from

17   very different locations.  So, no, I would say

18   it was quite a few people or it was more than

19   five.

20       Q    More than five.  At what point after

21   the approach -- I guess -- let me step back

22   for a second.  When you all engaged in the

23   approach to the yard, did you participate in

24   going into the yard and assisting with that

25   approach?

1      A     I remember walking through the yard
2   and directing where to funnel people.  But,
3   no, I physically didn't have to touch or move
4   anybody or anything along those lines, that I
5   recall.
6      Q     Okay.  So when you went in the yard
7   at the corner of East and France, you didn't
8   physically apprehend anyone yourself?
9      A     No, I did not.
10     Q     But you did see other people being
11  physically apprehended by the law enforcement
12  officers who were in the yard with you?
13     A     Yes, I did.
14     Q     And at some point -- you mentioned
15  earlier speaking with Ms. Lisa Batiste who was
16  the resident of that property at the corner.
17  Can you tell me at what point you spoke to
18  Ms. Batiste?
19     A     It was truly in passing, because
20  directing people to move -- and, again, I'm
21  not sure if that's her name, the person that I
22  talked to, but she was -- as I described
23  before, African-American female, probably in
24  her 30s at time, medium to brown complexion.
25  But it was more over directing folks around in

1    that contact with her that was -- I don't

2    remember the specifics of it, as far as what

3    was truly discussed.  But there was some

4    people making mention or talking about, we

5    should possibly arrest the homeowner for

6    letting a disorderly place.  And my decision

7    was absolutely not.  Because we did not know

8    whether the homeowner was under duress with a

9    large rowdy crowd, you know, moving on to her

10   property.  So that is the extent of our

11   contact.

12        Q    And can you tell me, Deputy Chief

13   Daniels, what your understanding of the crime

14   letting a disorderly place is?

15        A    Yes.  There's actually a statute for

16   it here in Baton Rouge.  But basically

17   allowing your home or the place that's under

18   your control to -- allowing illegal activity

19   at your home or place at that point in time.

20        Q    Okay.  And is it your understanding

21   that under the statute for letting a

22   disorderly place, that one of the elements is

23   that you have to know that your residence or

24   property would be used as a disorderly place?

25        A    I don't remember that, to be

1    specific.  But I don't want this to come

2    across the wrong way.  But everybody out there

3    knew that this was an illegal activity,

4    because we told them repeatedly over the

5    PA that this was unlawful.  And, you know,

6    so -- I'll just leave it at that.

7        Q    And I guess maybe you can talk a

8    little bit more about that.  I understand that

9    it was announced over the LRAD system that

10   there were orders to disperse and that it had

11   been determined that this was not a peaceful

12   protest.  But at that point, in terms of the

13   people who were inside the yard, it had not

14   been identified that all of those people

15   inside the yard had committed a crime.  Is

16   that accurate?

17       A    So to make a decision about a protest

18   being unpeaceful, in my opinion, it doesn't

19   require that 100 percent of those there have

20   to have been in violation.  When we made the

21   decision to announce that it was an unpeaceful

22   protest and required them to disperse, then at

23   that point in time, I think everybody was

24   obligated to disperse.  Homeowners and those

25   who lived at the home and those invited inside

1    the home, I think that's fine.  But those in
2    that general area who received that
3    announcement, I think lawfully, it was at that
4    point that they should have dispersed.
5        Q    And I think you said that those who,
6    you know, a homeowner or a resident invites
7    inside their home, you know, don't have to
8    disperse.  When someone invites guests into
9    their yard and the police order, you know, a
10   guest to leave their yard, that doesn't mean
11   that the homeowner or the resident who has
12   invited the person into their yard has now
13   committed a crime just because the police have
14   made an order subsequent to them inviting
15   people in?
16       A    I totally agree with you, and that's
17   why Mrs. -- the homeowner wasn't charged with
18   any of this.
19       Q    Just so we can -- I'm going to try to
20   see if we can pull up the report that you
21   wrote.  I'm going share some screen.  But my
22   understanding from Mr. Scott is that he does
23   have a paper copy of this report, as well.
24   I'll put it on the screen to hopefully
25   establish that we're looking at the same thing

```
 1   here.  Can you see the report on my screen?
 2        A    Yes, ma'am.
 3             MS. LOMERS-JOHNSON:
 4                  Scrolling down a little bit.
 5             Eric, please jump in and correct it.
 6             But this Exhibit 11 for the MacArthur
 7             numbering purposes for the Myron
 8             Daniels deposition.
 9   BY MS. LOMERS-JOHNSON:
10        Q    So, Deputy Chief Daniels, do you
11   recognize this document, Exhibit 11, as an
12   incident report from July 11th, 2016 that you
13   authored?
14        A    Yes, ma'am, I do.
15        Q    Okay.  And your name is right there
16   on page 1 under "Report Officer 1."  Does that
17   indicate that you authored this report?
18        A    Yes, ma'am, I did.
19        Q    Okay.  Now I'm going to scroll down
20   to the narrative section.  Okay.  So in --
21   let's see, I think technically this is the
22   third paragraph from the bottom.  I think it
23   says:  "Officers did make contact with a
24   female who identified herself as the
25   homeowner/resident."
```

1          And so looking at that part there,
2    you, yourself, made contact with the resident,
3    correct?
4          A    Yes.
5          Q    Okay.  And you elected at the end of
6    the day not to arrest her for letting a
7    disorderly place.  And I think you indicated
8    to me that that was your decision; is that
9    correct?
10         A    Yes, ma'am, it was my decision.
11         Q    Okay.  And in the second to last
12   paragraph here, it indicates that:  "After
13   several hours, the chaos was eventually
14   brought under control."
15              Would you say that was the length of
16   time that protesters were gathered in the yard
17   at East and France?
18         A    No, ma'am.  I would say it was
19   brought under control -- when I say several
20   hours, we didn't leave out there until late
21   night.  I want to say it looks like -- if I
22   remember from -- it may have been your Exhibit
23   4, which was the duty roster -- I think we
24   worked 16 hours that day, which would have put
25   me working until approximately 10:00 P.M.  So

1   when we say several hours, it started around

2   1700 hours and then took us all the way until

3   10:00 P.M. before we were comfortable enough

4   to release my Bravo Team.

5        Q    Okay.

6        A    And I'm a nerd.  I remember weird

7   little things.  That's why I knew your

8   exhibit.  And I remember the Zs and the five

9   Zs, so forgive me.

10       Q    No, that's wonderful.  I appreciate

11  that.  That's helpful, especially because I do

12  not have that type of recollection.

13       A    Actually, both -- because both of

14  them are exhibits.

15       Q    Okay.  Just a couple more questions.

16  Now I'm hoping that we can bring on to the

17  screen Exhibit 12.  We can mark it as Exhibit

18  12.  And this is going to be a freeze frame of

19  a video that was taken at East and France.

20            MS. LOMERS-JOHNSON:

21                 I'm going to see -- I don't know

22            if you can pull it up, Eric.

23            MR. FOLEY:

24                 Which freeze frame?  The file

25            name, can you read it to me?

```
 1            MS. LOMERS-JOHNSON:

 2                 I will -- let me just open it.

 3            Okay.

 4    BY MS. LOMERS-JOHNSON:

 5       Q    Okay.  Can you see this, Deputy Chief

 6    Daniels?

 7       A    I can.

 8       Q    So we'll call this Exhibit 12 for

 9    this deposition.  It starts with the word "VLC

10    Snap" in the file name.  I can represent to

11    you this was taken as a freeze frame from a

12    video.  I am wondering if the officer

13    indicated with the orange arrow in the

14    picture, if that is you?

15       A    I am not a hundred percent, but it

16    does resemble my stature and build.

17       Q    And I think -- we can also look at

18    the video for this, but that there's a

19    Gatorade in your pocket, if this is you.  I'm

20    not sure if that would help with any sort of

21    recollection.

22       A    It was mid July, so it was quite hot.

23    So I'm sure I had something to hydrate

24    throughout.  And I'm trying to use little

25    clues.  I'm left-handed and my helmet did have
```

1    a face shield on it.  That helmet does have a

2    face shield on it.  But I cannot 100 percent

3    identify, but it does resemble my build.

4        Q    Okay.  And is this is the general

5    area that you entered the yard from on the

6    approach to Ms. Batiste's house at the corner

7    of East and France?

8        A    I'm not sure.  I was all over the

9    place directing.  I'm not sure at which point.

10   Generally, I was behind that original line of

11   officers that went in.

12       Q    I'm going to stop sharing this and

13   switch to a slightly different image.  I'm

14   going to share screen for what will be Exhibit

15   13.  Okay, can you see this picture?

16       A    I can.

17       Q    And this is not perfect, either.  But

18   I'm wondering if the officer on the right side

19   of our screen here, if that is you?

20       A    It absolutely looks like me, my boots

21   as well as my setup on my uniform and my loud

22   mouth yelling.

23       Q    Okay.  I appreciate that.

24       A    And there is a Gatorade bottle in my

25   pocket, right pocket.

1      Q    And looking more at this photograph,

2  I'm wondering if you can tell me who any of

3  the officers in this photo are?

4      A    The officer, sergeant with the hat on

5  pointing, white male is Lieutenant Kirk

6  Grover.  I'm not sure who the officer is

7  making the arrest.  The officer to the left of

8  Officer Grover in plain clothes is Chad Andy

9  Kuber, K-U-B-E-R.

10     Q    That's the one with the jeans?

11     A    Yes.

12     Q    Okay.

13     A    The officer along the pole to the

14  right of it, balding at the top, is

15  Brownleader, again, Philip Brownleader.  And

16  those are about all the officers that I can

17  identify.

18     Q    Gotcha.  I appreciate it.  And would

19  you say that this was at some point after the

20  initial push on to the property had been made?

21     A    I would have to assume.  I'm not

22  sure.

23     Q    Okay.  And do you think that this was

24  after the point that you had talked to

25  Ms. Batiste?

1        A    I'm unable to definitively say that.

2        Q    Okay.  I'm going to now screen

3   share -- and I think Eric might be able to

4   help with this.  It's going to be two photos

5   of a person that I can represent to you is our

6   client, Sophie Kosofsky.  The first picture

7   will be Exhibit 14.  And that's the picture

8   with 123, in the title.  And so our client in

9   this picture is the one that Eric is

10  indicating with the cursor.  She has a scarf

11  on?

12       A    Yes.

13       Q    I'm wondering from this entire

14  picture here whether you can identify any of

15  the officers in this picture?

16       A    No, ma'am, I cannot.

17       Q    Okay.  Do you remember seeing -- I

18  know you said that it was hard to remember or

19  identify individual protesters from that day.

20  But just in case, do you remember seeing

21  Sophie Kosofsky in the scarf that day?

22       A    No, ma'am, I do not.

23       Q    Okay.  And so now we'll go to Exhibit

24  15, which is another picture.  Okay.  So

25  that's a closer-up picture of our client,

```
 1   Sophie.  Can you identify any of the officers
 2   in this picture?
 3        A    No, ma'am.  They don't appear to work
 4   for Baton Rouge Police Department.
 5        Q    Okay.  In terms of the officers who
 6   are on the porch, can you tell me a little bit
 7   about what was going on up there?
 8        A    I'm not a hundred percent sure at
 9   that point.  I'm not sure.
10             MS. LOMERS-JOHNSON:
11                  Thank you, Eric.  I think we'll
12             go to Exhibit 16 now, which I think
13             you have a printed copy of this, as
14             well.  It's a map of the downtown
15             area.  I'm going to pull it up on my
16             screen.
17                  I don't have it on my screen.
18             Eric, if you wouldn't mind pulling up
19             the map of the downtown area, and I
20             think there was a printed copy that
21             you were referencing earlier.  I
22             apologize.  This will not be -- this
23             is Exhibit 3 from earlier today from
24             Dave's questioning.
25
```

1    BY MS. LOMERS-JOHNSON:

2        Q    And so we talked and her -- you know,

3    some recording referencing the various areas

4    where the different law enforcement groups

5    were staged around East and France.  My first

6    question is -- you know, when we heard that

7    Calcasieu is set up and staged or LSP was set

8    up and staged, were they staged in separate

9    areas from each or were they in a line of

10   officers from multiple agencies?

11       A    So, if you think of it as a box or a

12   square, East Boulevard would be one point.

13   And LSP and BRPD, if I recall, was manning

14   that line.  The second line would be north of

15   France, which is over toward -- or an area of

16   Government but north of France, and the

17   Sheriff's -- the East Baton Rouge Parish

18   Sheriff's Office manned that point.  I'm

19   sorry.  Move your curser left.  There we go.

20   We're to the left of that point.  And

21   Calcasieu, they came in from Europe Street,

22   which is south of East Boulevard, south of

23   France Street -- I'm sorry -- on East

24   Boulevard.

25       Q    And just sort of for ease, if you

1    have that paper copy of the map, I'm going to

2    ask you to just make some quick markings on

3    there.  And what I would like to see if you

4    could mark is at the point that everyone was

5    staged and the approach on the yard began, I'm

6    wondering if you can make lines to indicate

7    with initials where the Calcasieu line was,

8    where the LSP staging line was and where the

9    BRPD and EBRSO lines are?

10       A    Before I mark it up, I've already

11   made a couple of little notations.  I'll try

12   to do it around it.

13       Q    I guess -- can you remind me of the

14   notations that you already made?

15       A    It was the general area of where we

16   were staged, we -- myself as a command --

17   general area where we were staged and the

18   direction of travel which we allowed -- we

19   gave the protesters to move past or the avenue

20   of escape, to be able to leave without any

21   obstruction.

22       Q    That would be great if you could, to

23   the extent possible, make those additional

24   markings.  I'm not sure if you maybe another

25   color of pen?

```
 1        A    I'll use red.
 2        Q    Awesome.  So as you do that, perhaps,
 3   you could use like a "C" for Calcasieu, an "L"
 4   for LSP, an "E" for EBRSO and a "B" for any of
 5   the -- a "B" for all of the Baton Rouge Police
 6   Department lines.
 7        A    I've made those notations.
 8        Q    Do you mind holding it up to the
 9   camera to the extent that you can, to see if I
10   understand it.
11        A    (Witness Complies).
12        Q    Okay.  Perfect.  I appreciate that,
13   Deputy Chief.
14        A    Anything I can do to help.
15        MS. LOMERS-JOHNSON:
16             I think we're almost done.  I do
17             need to take a four-minute break
18             here.  I'm going to propose -- my
19             computer says -- let's see.  It's
20             2:40.  I'm going to propose coming
21             back at 2:45, just for final
22             questions for myself.
23        (BRIEF RECESS)
24        MS. LOMERS-JOHNSON:
25             If we're all back, we can go
```

1          back on the record.

2     BY MS. LOMERS-JOHNSON:

3          Q    So just a couple quick more

4     questions.  Earlier today we spoke a little

5     bit about the duty to intervene if you see an

6     officer committing some type of constitutional

7     violation.  My question now is just, you know,

8     if you see an officer from a different law

9     enforcement agency committing a constitutional

10    violation against someone, in your

11    understanding, do you still have a duty to

12    intervene to prevent that constitutional

13    violation?

14         A    Yes.  I think if there's an obvious

15    constitutional violation that's occurring,

16    then, yes.  I don't think that it's restricted

17    to the agency to intervene.  I think it's just

18    a human thing, as I described it before.

19         Q    Okay.  And I'm also curious.  The

20    report that we reviewed earlier today, the

21    report that you authored regarding your

22    interaction with Ms. Batiste, the resident at

23    602, why did you write that report?

24         A    Well, I am a person who believes in

25    documenting.  And so that was the course of my

1    actions throughout that day and it was -- to

2    me, it was significant enough that I thought

3    it needed to be put on paper, so I did.

4         Q    Okay.  And were you involved in any

5    other documentation, any other after-action

6    reports that were written?

7         A    I don't recall.  I do not recall.  I

8    know I was involved in making operation plans

9    pre.  But I don't recall post documentation

10   outside of my report.

11        Q    Okay.  And to the extent that you

12   just said you were involved in drafting

13   operations, plans, prior to the event, were

14   you involved in any of the drafting of

15   operations orders for July 10th?

16        A    I'm not sure.

17        Q    Okay.  Was it part of your regular

18   duty that you assisted with the drafting of

19   SRT operations orders?

20        A    One of my duties, depending on what

21   we -- we had knowledge of prior to the event.

22   So -- for example, the operations order

23   dealing with the march from the church to the

24   Capitol, I do recall writing something up on

25   it.  It was standard form filling it out to

1    note assets and things that we had in place.

2         Q    And did you also participate in

3    drafting operations orders from, say, July 8th

4    and 9th?

5         A    I'm not a hundred percent sure.

6              MS. LOMERS-JOHNSON:

7                   Okay.  And if we could

8              quickly -- Eric, I don't know if you

9              have access to the July 8th

10             operations order.  I'm wondering if

11             we can actually screen share to see

12             if that is one of the orders that you

13             drafted.  So this will be Exhibit 16.

14   BY MS. LOMERS-JOHNSON:

15        Q    First I want to ask you if you

16   recognize this as one of the SRT orders?

17        A    Normally, once there's a spreadsheet

18   that we fill in, I do not -- there's no

19   signature or -- I'm not familiar with that

20   document.

21        Q    With this one?

22        A    No, ma'am.

23        Q    And this is something that you

24   would -- would have been announced at the

25   beginning of your shift?  I guess, maybe, my

1    question is, for these SRT operations orders
2    do these go out to all members of SRT at the
3    beginning of a shift?
4         A    No, not at all.  It's just to
5    document -- that would be only for senior
6    leadership.  The briefing of the officers is
7    just verbal, as well as anything else we may
8    need to pass out.  But, no, this would not go
9    out to everyone.
10        Q    And you don't know who would have
11   drafted this operations order from the 8th?
12        A    I am not sure about that one.
13        Q    One thing I'm curious about on this
14   operations order, if we could go down to the
15   section that looks like -- more like a
16   narrative.  In this operations order, it says
17   under -- I think it's the second paragraph
18   labeled "Concept of Operation."  It says:  "If
19   Airline Highway is blocked with pedestrians,
20   uniformed patrol officers and arrest teams
21   will be utilized to keep the protesters from
22   blocking the roadway and stopping traffic."
23            And then it says:  "14.1001,
24   obstructing public passages will be used for
25   charges if arrests are made."  And this is

```
1    from the 8th.
2            I guess my question for you is
3    whether you had received this sort of
4    instructions on other days of the protest
5    subsequent to the 8th?
6        A    No, I don't -- I don't require
7    receiving instructions to make arrests.  I
8    don't recall that.
9        Q    I know you had said that you don't
10   recall any other sort of notes or records that
11   you made of the July 10th incident, other than
12   the report that we looked at that you had
13   authored.  Do you remember any sort of oral
14   debriefings or other after-action meetings
15   that you had?
16       A    Like I said, I think I did make an
17   operations plan for the Wesley Church, so that
18   was made on that day.  I'm pretty sure -- as
19   far as after-actions, I do remember just a
20   general discussion, but not much after that
21   long of a day.  Our goal was to get our guys
22   home and rested up because we had to come back
23   to relieve Alpha the next morning at
24   6:00 o'clock.
25       Q    I can understand that.  I think we
```

```
 1   will just pull up the July 10 operations order
 2   as Exhibit 17, if I'm not mistaken.  So this
 3   is the operations.
 4         MR. FOLEY:
 5               Just to interject, there's two
 6         from July 10th that we have, so I
 7         wasn't sure which one you wanted.
 8         MS. LOMERS-JOHNSON:
 9               Yeah, I guess --
10         MR. FOLEY:
11               They're both the same documents,
12         so I can --
13         MS. LOMERS-JOHNSON:
14               That will be perfect.  We'll
15         call this document as a whole Exhibit
16         17.
17   BY MS. LOMERS-JOHNSON:
18      Q    At the top it starts with the
19   operations order that describes the situation
20   that Senator Regina Barrows organized
21   demonstration and march.  Did you also draft
22   this operations order?
23      A    I'm not sure.  Can you scroll down a
24   little bit?  Yes, it does look like the ops
25   order that I would have -- yes, it does look
```

1    like it.

2        Q    Okay.  And we can see from this that

3    you're listed in the section that says:

4    "Communications."  It says:

5    "Primary/alternate radiofrequency."  Primarily

6    I think is Interop 1 and then the alternate

7    being Interop 3.

8            With that in mind, can you remember

9    whether you would have been on one or three?

10        A    I'm not sure.  Like I said, I was on

11    one of those channels and my assistant was on

12    the other channel, so I'm not sure which one

13    of us may have switched.  But initially, I

14    would have been on Interop 1.

15        Q    Okay.  And then we'll just scroll

16    down to the second operations order from

17    July 10th.  Okay.  And looking at this one --

18    this one says:  "Rapid/Emergency SWAT

19    Response."  And we can scroll down so you can

20    see it.  Do you think you authored this one,

21    as well?

22        A    Is that the bottom of it?  Yes.

23        Q    You said:  Yes, you think that that

24    one, you authored, as well?

25        A    Yes, I do think I did author it.

1        Q    And then we have a third operations
2   order here from July 10th.  This one is titled
3   "Justice for Alton Sterling Demonstration and
4   March."  It notes the Wesley United Methodist
5   Church as the location.  I think this one, you
6   had earlier referred to as the one operations
7   order that you authored; is that correct?
8        A    Yes, ma'am.
9        MS. LOMERS-JOHNSON:
10            So these three operations orders
11           together in one document will be
12           Exhibit 17.  And I will email that
13           out at the conclusion of today's
14           deposition.  I don't have any more
15           questions for you.  So I will turn it
16           over to Mr. Scott, if he has more
17           questions or if he has any questions
18           for you.
19       MR. SCOTT:
20            I'll pass.  Thanks.
21       MS. LOMERS-JOHNSON:
22            Well, I very much appreciate
23           your patience, Deputy Chief Daniels.
24            And Mr. Lanser, do you have any
25           other questions?

```
 1              MR. LANSER:
 2                  I'm done.  Thank you,
 3         Mr. Daniels.  I appreciate it.
 4         THE WITNESS:
 5                  Thank you.  Thank you both.
 6         MR. LANSER:
 7                  Mr. Fahrenholt?
 8         MR. FAHRENHOLT:
 9                  I have no questions.
10         MS. LOMERS-JOHNSON:
11                  I didn't mean to skip you, Mr.
12         Fahrenholt.
13         MR. FAHRENHOLT:
14                  That's okay.  I've been hiding
15         with the camera off.
16                  *   *   *   *   *
17
18
19
20
21
22
23
24
25
```

```
1              C E R T I F I C A T E

2

3          I, CECILIA M. HENDERSON, Certified
     Court Reporter, in and for the State of
4    Louisiana, as the officer before whom this
     testimony was taken, do hereby certify that
5    MYRON DANIELS  after having been duly sworn by
     me upon authority of R.S. 37:2554, did testify
6    as hereinbefore set forth in the foregoing 201
     pages; that this testimony was reported by me
7    in the stenotype reporting method, was
     prepared and transcribed by me or under my
8    personal direction and supervision, and is a
     true and correct transcript to the best of my
9    ability and understanding; that the transcript
     has been prepared in compliance with
10   transcript format guidelines required by
     statute or by rules of the board, that I have
11   acted in compliance with the prohibition on
     contractual relationships, as defined by
12   Louisiana Code of Civil Procedure Article 1434
     and in rules and advisory opinions of the
13   board; that I am not related to counsel or to
     the parties herein, nor am I otherwise
14   interested in the outcome of this matter.

15

16          Dated this 12th day of July, 2021

17

18

19

20          CECILIA M. HENDERSON, CCR
            CCR #84099
21          STATE OF LOUISIANA

22

23

24

25
```