UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


BLAIR IMANI, et al.                    DOCKET NO.

      Plaintiffs,              17-cv-00439JWD-EWD

   V.


CITY OF BATON ROUGE, et al.

      Defendants.



    DEPOSITION OF SERGEANT MARK LOUIS DENNIS,
given in the above-entitled cause, via Zoom
videoconferencing, pursuant to the following
stipulation, before Sandra P. DiFebbo, Certified
Shorthand Reporter, in and for the State of
Louisiana, on the 28th day of June 2021, commencing
at 9:30 AM.

```
 1    APPEARANCES (Via Zoom):
 2    REPRESENTING THE PLAINTIFFS:
      (Imani v. City of Baton Rouge)
 3
                  MOST & ASSOCIATES
 4                BY:  DAVID LANSER,
                  ATTORNEY AT LAW
 5                201 St. Charles Avenue
                  Suite 114 #101
 6                New Orleans, Louisiana  70170
 7                JOHN ADCOCK,
                  ATTORNEY AT LAW
 8                P.O. Box 750621
                  New Orleans,  Louisiana  70175
 9
      REPRESENTING THE PLAINTIFFS:
10    (Smith v. City of Baton Rouge)
      (Batiste-Swilley v. City of Baton Rouge)
11    (Tennart v. City of Baton Rouge)
12                MACARTHUR JUSTICE CENTER
                  BY:  JIM CRAIG, ATTORNEY AT LAW
13                ERIC FOLEY, ATTORNEY AT LAW
                  HANNAH LOMMERS-JOHNSON, ATTORNEY AT LAW
14                MANDISA MOORE-O'NEAL, ATTORNEY AT LAW
                  4400 S. Carrollton Avenue
15                New Orleans, Louisiana  70119
16    REPRESENTING THE CITY/PARISH OF BATON ROUGE AND
      BATON ROUGE CITY POLICE OFFICERS:
17
                  EAST BATON ROUGE PARISH ATTORNEY'S OFFICE
18                BY:  JOSEPH K. SCOTT,
                  ATTORNEY AT LAW
19                Suite 902
                  222 St. Louis Street
20                Baton Rouge, Louisiana  70802
21    REPRESENTING THE LOUISIANA STATE POLICE AND
      INDIVIDUAL STATE POLICE TROOPERS:
22
                  BURGLASS & TANKERSLEY, LLC
23                BY:  GREGORY FAHRENHOLT,
                  ATTORNEY AT LAW -AND- LAURA ELLENDER,
24                ATTORNEY AT LAW
                  5213 Airline Drive
25                Metairie, Louisiana  70001-5602
```

3

```
1   E X A M I N A T I O N           I N D E X
2
3                                      Page
4   BY MR. LANSER:                      5
5   BY MS. LOMMERS-JOHNSON:             64
6   BY MR. FOLEY:              92
7
8
9   E X H I B I T                 I N D E X
10                        Page
11
    Exhibit 1(LL)                 31
12  Exhibit 2(GGGG)                 37
    Exhibit 3(DDDDD)                39
13  Exhibit 4(OOOOOO)               40
    Exhibit 5(WWWW)                 43
14  Exhibit 6(EEEEE)                51
    Exhibit 7(A)                    55
15  Exhibit 8(XXXXXX)               57
    Exhibit 9(YYYYYY)               64
16  Exhibit 10(ZZZZZZ)              68
    Exhibit 11(AAAAAAA)             70
17  Exhibit 12(BBBBBBB)       74
    Exhibit 13(TTTTT)               74
18  Exhibit 14(QQQQQ)               76
    Exhibit 15(QQQQQQ)              78
19  Exhibit 16(HHHH)                79
    Exhibit 17(CCCCCCC)       81
20  Exhibit 18(RRRRRR)              84
    Exhibit 19(IIIII)               89
21  Exhibit 20                      90
22
23
24
25
```

```
 1                S T I P U L A T I O N

 2

 3              It is stipulated and agreed by and

 4   between Counsel for the parties hereto that the

 5   deposition of SERGEANT MARK L. DENNIS is hereby

 6   being taken pursuant to the Federal Rules of Civil

 7   Procedure for all purposes in accordance with law;

 8              That the formalities of reading and

 9   signing are specifically reserved;

10              That the formalities of sealing,

11   certification, and filing are hereby specifically

12   waived.

13              That all objections, save those as to

14   the form of the question and responsiveness of the

15   answer are hereby reserved until such time as this

16   deposition or any part thereof is used or sought to

17   be used in evidence.

18                    *  *  *  *  *

19              Sandra P. DiFebbo, Certified Shorthand

20   Reporter, in and for the State of Louisiana,

21   officiated in administering the oath to the witness

22   via Zoom.

23

24

25
```

 1          SERGEANT MARK L. DENNIS, having been first
 2      duly sworn, was examined and testified on his
 3      oath as follows:
 4              MR. LANSER:
 5                  Good morning, Officer Dennis.  My
 6                  name is Dave Lanser.  I'm one of the
 7                  attorneys for the plaintiffs in the
 8                  Imani v. Baton Rouge case.  First off,
 9                  just a quick note for your attorney,
10                  Mr. Fahrenholt.  I assume we can
11                  stipulate to all the usual stipulations
12                  we've been doing, proper notice, court
13                  reporter is qualified, and all the
14                  remote swearing stipulations?
15              MR. FAHRENHOLT:
16                  Yes.  That's fine.
17      EXAMINATION BY MR. LANSER:
18          Q.   First of all, can you just tell us what
19      is your current rank and title at the Louisiana
20      State Police?
21          A.   I'm a sergeant.
22          Q.   Have you ever given a deposition before?
23          A.   Not -- well, as a witness, yes, sir.
24          Q.   So just as a fact witness, not as a
25      police officer?

1      A.    Crashes and -- mostly crashes, other

2  sorts of civil issues, but all crashes that I

3  investigated.

4      Q.    Do you know, just a ball park,

5  approximately how many of those depositions you've

6  given?

7      A.    Maybe two or three.  Not very many.

8      Q.    I'm going to just go over the basic rules

9  of questions we ask at the start of every

10 deposition just so we're on the same page and just

11 because, especially over Zoom, some of the

12 deposition logistics are a little different from

13 the usual.

14     A.    Right.

15     Q.    Hold on.  I'm just trying to -- Okay.

16 You realize that you are under oath today?

17     A.    Yes, sir.

18     Q.    And you realize that your answers here

19 today have the same force as if they were in a

20 courtroom with a judge and jury and all of that?

21     A.    Yes, sir.

22     Q.    Is there anything that will prevent you

23 from giving me your full attention throughout this

24 morning?

25     A.    No, sir.  There is a little lag in the

1    WiFi, so I'm trying to catch up with you sometimes,
2    but it's okay.
3          Q.    Yeah.  To that point, if there is -- this
4    is true in any deposition but certainly when we're
5    over Zoom.  If you ever want me to repeat something
6    or clarify something, I'm happy to do that.  I'd
7    much rather make sure that, you know, we are on the
8    same page and hearing the same information than you
9    trying to guess at what I'm trying to get at.  Does
10   that sound all right?
11         A.    Yes.
12         Q.    I'm sure that will help the court
13   reporter.  Are you taking any medications or
14   suffering from any illness that will prevent you
15   from understanding my questions or answering them
16   fully?
17         A.    No, sir.
18         Q.    I believe Mr. Fahrenholt and Miss
19   Ellender, I think it was, are in the room with you.
20   No one else is in the room with you; is that
21   correct?
22         A.    That's correct.
23         Q.    If at any point -- usually, we would be
24   sitting in the same room together, but since I
25   can't see everything going on over there, if anyone

```
 1   else comes in the room or anyone tries to contact
 2   you in any way throughout the deposition, can you
 3   just let us know when that happens?
 4        A.   Okay.
 5        Q.   Also, at any time throughout the
 6   deposition, if you ever need a break, we can always
 7   take a break.  The one thing I'd ask is just if
 8   we're in the middle of answering a question or
 9   something like that, we might have you finish
10   responding to the question, and then we can go on
11   and take a break any time you need.  Does that
12   sound all right?
13        A.   Yes.
14        Q.   And then one more thing.  This is
15   another, especially over Zoom, issue.  Especially
16   because we're having a transcript made of this --
17   Wait.  One second.  I meant to be recording this.
18   Let me hit record.  Sorry about that.  What I was
19   saying was throughout the deposition, it will be a
20   lot easier for us to understand each other and a
21   lot easier for the court reporter to make the
22   transcript if you wait for me to finish my question
23   before you start answering, and I'll also wait for
24   you to finish answering before I start asking
25   another question.  So with all of that behind us,
```

```
1    do you know which cases you are here for today?
2         A.    No.
3         Q.    There is a number of cases involving the
4    July 9th and July 10th, 2016 protests in Baton
5    Rouge.  Is that familiar to you?
6         A.    Yes.
7         Q.    So we have -- there is a few different
8    attorneys on here from different cases, and when
9    I'm done, another attorney representing some other
10   plaintiffs might jump on and ask you questions as
11   well about their specific case, but it's all
12   generally going to be about the July 9th and 10th
13   protests.  What did you do to prepare for this
14   deposition?
15        A.    My attorney sent me a video and three
16   still images.  That's about it.
17        Q.    A video and three still images.  Do you
18   know if they have like a specific name or anything?
19        A.    I don't know.
20        Q.    I am assuming these are video images from
21   the July 9th and/or 10th protests?
22        A.    I believe it was the 10th.
23        Q.    Did you take any notes to prepare?
24        A.    No, sir.
25        Q.    So you are currently a sergeant with the
```

1    Louisiana State Police; is that what you said?

2        A.    Yes, sir.

3        Q.    How long have you been with the Louisiana

4    State Police?

5        A.    Seventeen and a half years.

6        Q.    What did you do prior to joining the

7    state police?

8        A.    Five years prior to the state police I

9    worked for the West Monroe Police Department.

10       Q.    Just as a regular law enforcement officer

11   there?

12       A.    Just a police officer, yes, sir.

13       Q.    What was your -- in July 2016, what was

14   your rank and title?

15       A.    I'm sorry. You asked my rank and title?

16       Q.    In July of 2016.

17       A.    I was a sergeant then as well.

18       Q.    As a sergeant in the state police, what

19   are sort of your general day-to-day job

20   responsibilities?

21       A.    I guess it depends on where you are

22   assigned.  Currently, I am the administrative

23   sergeant at Troop F, so I just have an

24   administrative role primarily.

25       Q.    What about in 2016?  Were you

1    administrative then, too?

2         A.    I was a shift sergeant then.

3         Q.    What is the general responsibilities of a

4    shift sergeant?

5         A.    Day in, day out I supervise -- I guess

6    assist supervising of a shift made up of a

7    lieutenant, two other sergeants, and a number of

8    troopers.  So my duties could be anything from

9    field supervision to working the desk, assigning

10   calls, answering phones.

11        Q.    As a state police, I imagine you can be

12   assigned to different duties across the entire

13   State of Louisiana?

14        A.    That's correct.

15        Q.    While at the state police, did you

16   receive any training about specifically how to

17   police protests?

18        A.    Yes.

19        Q.    What sort of training did you receive?

20        A.    I currently am on the Mobile Field Force,

21   and that is pretty much everything we train for, is

22   -- I just lost something.  I lost part of an image.

23   I'm sorry.

24        Q.    I think we're still going here.  I was

25   asking specifically what type of training you got

1    about policing protests.

2        A.    I've been on the Mobile Field Force since

3    I was promoted in 2012 as a sergeant, and that's

4    what we train for, one of the issues we train for.

5        Q.    The Mobile Field Force, do they have sort

6    of like Academy style training or what sort of

7    training has to happen before you get on the Mobile

8    Field Force?

9        A.    Now or then?

10        Q.    Then.

11        A.    I'm not sure when the 40-hour basic was

12    instituted by date, but now there is a 40-hour

13    basic course that all operators must go through.

14    Then it was just training quarterly, I believe.

15        Q.    What sort of -- were there specific

16    topics covered in the quarterly training or was it,

17    you know, going over the same topics every time?

18    Like tell me sort of what goes into the quarterly

19    training.

20        A.    Mostly it's just refreshing on line

21    movements, how to move in and around barriers,

22    obstacles, things of that nature, how to engage a

23    formation and how to move it.  Pretty much what we

24    do most of the time.

25        Q.    When you say engage a formation, what do

1    you mean by formation?

2        A.    So you may have, depending on what size

3    element you have, you may have ten to 30 operators

4    in an element, and you have to move them as an

5    orderly group, so that takes some practice.

6        Q.    Sure.  Did it include any training about

7    sort of the First Amendment rights of protesters or

8    anything like that?

9        A.    Does it include training regarding the

10   First Amendment rights?

11       Q.    Yes. Like any --

12       A.    (Inaudible.)

13           THE COURT REPORTER:

14               Repeat your answer.

15           THE WITNESS:

16               We discuss it.  I don't know what

17           kind of training he is asking about.

18   BY MR. LANSER:

19       Q.    Yeah.  Just I'm asking about discussions.

20   I guess that's probably a better word for it.  What

21   sort of First Amendment right discussions do you

22   have at the training?

23       A.    So as a general rule, I guess you are

24   asking if we support the First Amendment right?

25       Q.    No.  I'm asking specifically is First

```
 1    Amendment rights covered in the quarterly training
 2    session?
 3         A.   I don't know.
 4         Q.   So is there anything about, you know, how
 5    maybe -- well, let me back up.  Did you receive any
 6    training -- specifically with Mobile Field Force,
 7    do you receive any training about the use of force
 8    and when it's proper and when it's improper?
 9         A.   Specifically from Mobile Field Force, on
10    occasion, yes, sir, we talk about that.
11         Q.   What's your understanding of sort of when
12    force is necessary or used in a crowd situation?
13         A.   I'm sorry.  You broke up.  You asked --
14    can you ask it one more time?
15         Q.   Yeah.  I'm asking based on your training
16    what -- like what were you trained on as far as
17    when use of force is appropriate in a crowd
18    scenario?
19         A.   When it's necessary.
20         Q.   When does it become necessary?
21         A.   It becomes necessary when it's no longer
22    lawful.
23         Q.   So any time a crowd or a protest becomes
24    unlawful, then force is necessary?
25         A.   No, not always.
```

1    Q.    So that's what I'm asking, which

2   scenarios.  So which scenarios in an unlawful

3   protest would force be necessary?

4    A.    Which scenarios?

5    Q.    Correct.

6    A.    I think that's too broad of a question

7   for me to answer.  If someone is throwing a rock at

8   me, there may be force necessary to counteract

9   that.

10    Q.    Does it require -- so if there is

11   violence from the crowd, I imagine that would be a

12   scenario where force may be necessary?

13    A.    Maybe.  Yes, sir.

14    Q.    Are there any scenarios where a crowd is

15   not using violence where a force might still be

16   necessary?

17    A.    No.

18    Q.    So in regard for a proper use of force by

19   the Mobile Field Force, according to the training,

20   you would need an unlawful protest where violence

21   is occurring or something similar to that?

22    A.    Where violence is occurring or the

23   potential for it to occur may exist or any other

24   type of injury could occur, yes.

25    Q.    Did you receive any training about the

1    duty to intervene if you see another officer

2    breaking the law or violating rights?

3        A.    I don't know if I've had a specific

4    training class, but I know that's my duty.

5        Q.    What is the extent of that duty?  Like if

6    you see an officer breaking the law in a crowd

7    situation, what is your duty to intervene there?

8        A.    I guess I still don't understand the

9    question.  You are asking what is my duty to

10   intervene?

11       Q.    Yeah.

12       A.    I would have to stop the behavior, stop

13   the action, if it is within my abilities to do so.

14       Q.    Did you receive any training or have any

15   discussions as part of the Mobile Field Force about

16   the role of journalists at a protest?

17       A.    No, not that I recall.

18       Q.    Have you ever heard of something called a

19   Miami Model for policing protests?

20       A.    No, sir.

21       Q.    I know often at protests or any other

22   crowd situations, Mobile Field Force officers, and

23   correct me if I'm wrong, often come out in what I

24   would at least term as riot gear with sort of, you

25   know, the shields and helmets and all of that.

1    There may be another term for it.  Is riot gear

2    something that is used any time there is a protest

3    or when is the decision for when riot gear would be

4    employed?

5         A.    Your definition of riot gear is impact

6    protection type equipment, helmets?

7         Q.    Yes.

8         A.    We don't carry shields anymore. Yes. We

9    wear the impact protection equipment, and since

10   2016, we've actually transitioned to ballistic

11   protection.  But, yes, we would always respond with

12   that gear on in anticipation of not wanting to get

13   hit with anything, wherein -- I guess that's the

14   wrong word.

15        Q.    When you say you'd always respond to

16   that, you mean always to any protest or always just

17   to any time there is a protest, if you are assigned

18   as Mobile Field Force to be there, you would wear

19   the protective gear?

20        A.    If we were responding to the scene of a

21   protest that required us to respond to, yes, we'd

22   have that protective gear on.

23        Q.    Does Mobile Field Force ever respond to

24   -- would Mobile Field Force ever be sort of

25   proactively present at a protest, or is it

1    specifically if a protest gets out of hand, Mobile

2    Field Force would respond?

3        A.    We may stage up near a peaceful

4    demonstration, but we wouldn't protest anything

5    that wasn't bordering unlawful or actually

6    unlawful.

7        Q.    When you say stage up, you mean wait a

8    few blocks away, be in the area?

9        A.    Yes, sir, just observing.

10        Q.    As a state police officer, did you ever

11    -- do you ever get assigned to like parades or LSU

12    games or anything else like that where they have a

13    big crowd?

14        A.    I've worked parades like Bourbon Street.

15        Q.    What sort of training do you have --

16    Bourbon Street is a great example.  I know Bourbon

17    Street you got a lot of people walking around.

18    There can be -- people can get out of hand, that

19    sort of thing.  What sort of training did you

20    receive about how to keep Bourbon Street or a

21    similar situation from getting out of control?

22        A.    No specific training for that, that I can

23    recall.

24        Q.    Did you ever see violence on Bourbon

25    Street?

1       A.    I'm sorry.  Ask that again.

2       Q.    While you have been stationed on Bourbon

3   Street, have you ever -- has violence ever broken

4   out on Bourbon Street?

5       A.    Yes.

6       Q.    How do you -- what is the -- what is sort

7   of the process for reacting to that circumstance?

8       A.    It just depends on the situation.  Most

9   of the time it's localized.  It's between one or

10  two individuals.

11      Q.    I want to switch over to -- let me ask

12  you specifically about the July 10th protest for a

13  while.  Do you remember the July 10th protest

14  specifically?

15      A.    I do.

16      Q.    I believe there was a number of protests

17  between July 5th and 10th.  Were you present at any

18  of those previous protests?

19      A.    The 9th I think is the date that we first

20  got there.  I don't recall a specific date, but it

21  was either the 8th or the 9th when we arrived in

22  Baton Rouge.

23      Q.    Do you recall what they were protesting?

24      A.    No, sir.

25      Q.    You don't know why they were out there?

1      A.    Specifically?

2      Q.    Right. Like why were there protests out?

3      A.    My understanding it was the Alton

4 Sterling police officer involved shooting.

5      Q.    You think by the 10th they had sort of

6 gotten their point across about all of that?

7      A.    It's not for me to say.

8      Q.    You think there is a point where people

9 have been protesting for days or weeks, and at that

10 point, you know, it's just too many protests?

11      A.    It's not for me to say either.

12      Q.    What was your specific role on July 10th?

13      A.    I was a squad leader for the Third

14 Platoon, which is a platoon out of North Louisiana.

15 I'm one of three squad leaders for that platoon.

16      Q.    Are you sort of -- are you assigned out

17 of North Louisiana?  Like is that where your main

18 headquarters are? (Inaudible.)

19      A.    I'm sorry.  There was some interference.

20      Q.    I was just asking if like do you always

21 -- are you always like assigned out of North

22 Louisiana? Is that sort of your home base?

23      A.    I'm stationed -- I guess you'd call it

24 that's where I live, which is in Monroe, but I can

25 respond anywhere in the state.

1        Q.    That's all I was asking.  So as a squad

2    leader, on July 10th, how many people were under

3    your command?

4        A.    I don't recall specifically.  It's

5    usually around ten troopers.

6        Q.    Do you remember who those people were

7    that day?

8        A.    Not specifically, no, sir. I am sure I

9    could recall a handful of them, but there is a lot

10   of turnover on the team.

11       Q.    What was sort of the squads?  What were

12   your orders for the day?

13       A.    You have to be little bit more specific,

14   sir.  We initially responded to that location,

15   because we had reports that there was a crowd

16   trying to get on the interstate.  That's the

17   original reason we responded to the location, as I

18   recall it.

19       Q.    I take it you were staging somewhere in

20   the area, waiting to respond, and you heard there

21   were protesters getting on the interstate or trying

22   to?

23       A.    We were staged at the state police

24   headquarters.

25       Q.    Where are the state police headquarters?

1      A.    It's on Independence Boulevard just down
2  from this location off of Government.
3      Q.    Then you heard -- there was a report that
4  they might be trying to get on that interstate, and
5  that's when you mobilized to that area, my
6  understanding?
7      A.    That's when we responded, yes, sir.
8      Q.    Do you know where that report came from?
9      A.    No, sir.
10     Q.    Do you know who made that report to the
11 Louisiana State Police?
12     A.    No, sir.
13     Q.    Do you know the basis for that belief
14 that they were getting on the interstate?
15     A.    No, sir.
16     Q.    I'm going to pull up a map.  I'm going to
17 share my screen here.  Do you see that map on your
18 screen right now?
19              MR. FAHRENHOLT:
20                  Can you make it a little bigger?
21 BY MR. LANSER:
22     Q.    Is that better?
23     A.    That's a little better, yes, sir.
24     Q.    Do you remember where, and it might not
25 be exactly on here, but do you remember where the

1    staging area was?

2        A.    When we first responded?  Where we

3    staged?

4        Q.    Yes.

5        A.    It was at the entrance ramp, which I'm

6    thinking is South 10th at France or right in that

7    area.  I'm not real familiar with the area.  I'm

8    just looking at your map.

9        Q.    Sure.  Do you see where my cursor is?

10       A.    Yes, sir.

11       Q.    Does that look about right, from what you

12   recall?

13       A.    From what I remember, it was near the get

14   on ramp.  If that's the only entrance ramp, then

15   that would be the general area.

16       Q.    I believe there is also -- this might --

17   I think this might be an exit ramp and so is this

18   one up here, if I recall.  And then this is the

19   entrance ramp down here.

20       A.    Well, at the point that you are concerned

21   with pedestrians getting on, it doesn't really

22   matter if it's an entrance or an exit.  They can go

23   either way, but I'm thinking it's that one that you

24   are looking at there.

25       Q.    Down by Mayflower?

```
1        A.    No, no, by France.

2        Q.    France?

3        A.    Yes, sir.

4        Q.    Then when you heard the report that the

5   protesters might be trying to get on the

6   interstate, what happened then?

7        A.    We responded and staged up in that

8   location, and that's pretty much it, I guess.

9        Q.    You heard the report.  You staged here

10  and just sort of waited to see what developed?

11       A.    We moved our formation out of, I guess,

12  France Street or right in that area towards East

13  Boulevard.

14       Q.    So as far as this intersection here?

15       A.    I think so.

16       Q.    Do you remember if East and France is

17  where the protesters were at that point?

18       A.    It looks like that's where it was, yes,

19  sir.

20       Q.    Do you remember approximately what time

21  of day this happened where you started responding?

22       A.    No, sir.  I remember it was hot.

23       Q.    Probably in the afternoon?

24       A.    I really don't remember what time of day

25  it was.  It was light out, though.
```

1    Q.   As a squad leader, how were you inter-

2    acting with other Louisiana State Police units or

3    other law enforcement agencies?

4    A.   As a squad leader, I would just echo

5    commands to control the line movement as we moved.

6    I specifically recall just checking on all of the

7    guys one by one, because it was so hot that day.

8    Q.   You say you were relaying those commands.

9    Where were those commands coming from?

10    A.   I don't specifically recall who was

11    delivering the commands, but it would be from the

12    platoon or the element leader.

13    Q.   Someone higher up in the state police?

14    A.   Right.

15    Q.   Did you have any interaction at all with

16    Baton Rouge Police Department or any other law

17    enforcement agency?

18    A.   They were there with us.  They were on

19    our flanks.

20    Q.   But not as far as like radio

21    communications or anything like that?

22    A.   No, sir.

23    Q.   Did you do any planning with law

24    enforcement agencies before July 9th and 10th?

25    A.   I did not.

1    Q.   What about planning with other state
2    police, like with the platoon or with other squads?
3    Did you have any planning meeting ahead of July
4    10th?
5    A.   I don't know what you are referring to as
6    a planning meeting.
7    Q.   Sure.  Like did you, prior to deploying,
8    did you have -- did you sit down with the platoon
9    leader and other squad leaders and talk about kind
10   of the plan for the day?
11   A.   Not that I recall, no, sir.  We didn't
12   know this was going to happen.
13   Q.   When did you first -- you said you first
14   got to Baton Rouge on the 8th or the 9th; is that
15   right?
16   A.   Yeah.  One of those days, sir.  I don't
17   remember exactly.
18   Q.   By the 10th, you were just sort of
19   stationary, indefinitely waiting until you got your
20   next orders?
21   A.   Yes, sir.
22   Q.   Did you personally arrest anyone on July
23   10th?
24   A.   No, sir.
25   Q.   What about any of the state police

1    officers in your squad?  Did they arrest anybody?

2         A.   I'm sure they did.  Yes, sir.

3         Q.   What was the procedure for handling

4    arrests on July 10th?

5         A.   On July 10th of that year, the way it's

6    supposed to work is we have our regular line

7    element.  We have arrest team elements behind that

8    line.  The general plan in place was to, if we made

9    any arrests, to then hand them off to another

10   agency, whether it be Baton Rouge Police or other

11   support agencies for the processing of the arrests

12   because of manpower issues.

13        Q.   So state police would be in that front

14   line.  They would make arrests and then hand the

15   arrested individual to another agency to process?

16        A.   That was the process at the time, yes,

17   sir.

18        Q.   You said that is how it was supposed to

19   work.  Is that how it did work on July 10th?

20        A.   No, sir.

21        Q.   How did it work on July 10th?

22        A.   We ran out of people.

23        Q.   Can you explain what you mean by that?

24        A.   So when the final command of -- when it

25   was finally determined this was no longer a

```
 1   peaceful assembly, we began moving our lines.  As
 2   arrests were made and the line continued to move,
 3   we ran out of people.  We ran out of arresting
 4   elements.  We ran out of support elements.
 5        Q.   When you run out of those elements, what
 6   was the next -- what happens then?
 7        A.   Well, we'd like to bring in additional
 8   support elements, which, again, we were just over-
 9   whelmed by the sheer numbers on this particular
10   day.
11        Q.   So when arrests were made, and those
12   individuals were handed off to another agency, I
13   think you said Baton Rouge Police Department, what
14   -- is there any sort of interaction between the
15   arresting officer and the person they're handing
16   them off to?
17        A.   At the time, no.
18        Q.   They don't explain who the person is or
19   why they're arrested?
20        A.   No, sir.  Not at the time.
21        Q.   The arresting officers, were they
22   supposed to follow up later, and, you know, work
23   with the processing team to help with the
24   processing?
25        A.   Sorry.  We are trying to fix the screen
```

1  here.

2           MR. FAHRENHOLT:

3                Dave, can you take the map off the

4            screen?

5           MR. LANSER:

6                Yeah. Sorry about that.

7           MR. FAHRENHOLT:

8                He is trying to focus.

9           THE WITNESS:

10               Ask the question again, please.

11  BY MR. LANSER:

12      Q.   Yes.  So there wasn't any interaction

13  between the arresting officer and the person they

14  handed them off to, correct?

15      A.   I mean, there may have been some, but I

16  don't know specifically.  It wasn't the practice at

17  the time.

18      Q.   So it was not the practice at the time

19  for the arresting officer to tell the transport

20  officer any information about the individual?

21      A.   If I'm understanding the question, at the

22  time, no, that was not necessarily common practice

23  or what we were trained to do.

24      Q.   Was there any point where -- so the state

25  police officer makes an arrest, hands it off to

```
 1   someone from another agency who transports them to
 2   processing.  Would the state police officer ever
 3   meet back up with the processing team or anything
 4   like that to discuss the arrest?
 5        A.   Not then, no, sir.
 6        Q.   Now, though, they would do that, though?
 7        A.   Now we have a dedicated arrest processing
 8   team that would interact and report all of that
 9   information, and the actual trooper, officer,
10   whoever made the arrest, would complete the
11   affidavit.
12        Q.   So in July of 2016 --
13        A.   Was that -- I'm sorry.  At a later time.
14        Q.   Okay.  But in July of 2016, the state
15   police officer who made the arrest would not fill
16   out the affidavit?
17        A.   Those processes were not in place then,
18   no, sir.
19        Q.   They wouldn't have any conversation with
20   the person who did fill out the affidavit?
21        A.   Not necessarily.
22        Q.   But the procedure didn't involve them
23   following up and having a conversation?
24        A.   That's correct.
25        Q.   I'm going to pull up the map one more
```

```
 1    time.  I think I forgot to say this last time, when
 2    I pulled it up.  I'll get rid of it when we are
 3    done with it so you'll have your whole screen back.
 4    I know it's tough dealing with this technology.  I
 5    should have mentioned this the last time we pulled
 6    it up.  This is Exhibit 1 for today, but I think in
 7    our -- we have a sort of continuing running list of
 8    exhibits for all of the depositions.  In that one I
 9    believe this is Exhibit LL, two Ls. So looking at
10    this map again, do you remember when you got to
11    East and France, where the protesters were, do you
12    remember where the protesters were when you got
13    there?
14         A.    They were on East Boulevard.
15         Q.    Right in the intersection?
16         A.    Pretty much, yes, sir.
17         Q.    Do you remember them moving off the
18    intersection into a yard?
19         A.    Well, they occupied more than just a
20    yard.  They occupied most of that block back to the
21    -- I guess that's Government Street, 73.  Towards
22    Europe Street.  I mean, they occupied probably half
23    a block in either direction of that.
24         Q.    So up in this area where my cursor is?
25         A.    That's pretty accurate, yes, sir.
```

1    Q.    Were they on sidewalks there, or where
2    were they?
3        A.    Both.
4        Q.    Do you remember if any of these streets
5    around this area were blocked off by law
6    enforcement?
7        A.    France to the -- on that side was blocked
8    by us, and France on the other side was blocked by
9    protesters.
10       Q.    Where my cursor is here between East and
11   10th on France?
12       A.    That was mostly police.
13       Q.    What about -- was East Boulevard blocked
14   in either direction?
15       A.    Initially, it was blocked by protesters,
16   but they moved out of that and moved towards France
17   Street on the other side of the road.
18       Q.    And when they did that, did police occupy
19   that area?
20       A.    Police occupied the area on the -- near
21   where you have your cursor right now.  On that side
22   of East Boulevard.  Neither the police or the
23   protesters were really in the road at that point I
24   don't think.  I think it was all sidewalks and
25   France Street.

1        Q.    What was sort of the chain of command you

2    were operating under on the 10th?  You reported to

3    a platoon leader, I take it?

4        A.    I would report to a platoon leader who

5    would report to, at the time, probably the Mobile

6    Field Force commander, who then reports to a

7    captain or major or lieutenant colonel or colonel

8    on up.

9        Q.    Do you remember who some of those

10   individuals were on July 10th?

11       A.    My platoon commander was John Clary.  The

12   Mobile Field Force commander would have been Beau

13   Comeaux at the time. I'm sure there are some

14   others.

15       Q.    Okay.

16       A.    That would be your immediate chain of

17   command.

18       Q.    So your immediate supervisor that day was

19   John Clary?

20       A.    Correct.

21       Q.    What sort of -- how were you in

22   communication with John Clary?

23       A.    At the protest?

24       Q.    Yes.

25       A.    Just verbal.  Radio communication was not

1   very effective.

2        Q.   So he was right there with you?

3        A.   Close.  Yes, sir.

4        Q.   Do you know how many squads John Clary

5   was overseeing on July 10th?

6        A.   No, sir.  Normally, it would be three,

7   but I don't know how many it was that day.

8        Q.   You think it might have been more than

9   three or less than three?

10        A.   I have no idea.

11        Q.   Do you remember any specific commands or

12   instructions you got from Jonathan Clary throughout

13   -- after you arrived at East and France?

14        A.   No, sir.

15        Q.   What is sort of the general goal of law

16   enforcement (inaudible.)

17             THE COURT REPORTER:

18                 What was the end of your question?

19   BY MR. LANSER:

20        Q.   What is the general goal of law

21   enforcement at a protest such as this one?

22        A.   To maintain order.  To allow for the

23   peaceful protest.

24        Q.   What about protecting the protesters

25   themselves?  Is that part of law enforcement's

1    duty?

2        A.    Absolutely.

3        Q.    Do you remember what commands, just

4    speaking at the East and France intersection, do

5    you remember what commands were given to

6    protesters?

7        A.    Not specifically.  I know they were given

8    an order to disperse once it became violent and

9    tumultuous.

10        Q.    Do you remember who was giving those

11    commands?

12        A.    Baton Rouge PD.

13        Q.    Do you remember how they were relaying

14    those commands to protesters?

15        A.    I believe it was over LRAD, which is a

16    long range acoustical device with a speaker.

17        Q.    So an LRAD is a big speaker.  Am I right

18    in saying that it also can be used to emit like a

19    loud, piercing noise?

20        A.    It's pretty loud, yes, sir.

21        Q.    That noise is meant to disrupt the

22    crowds?

23        A.    I don't have any specific training in

24    disrupting a crowd with an LRAD.

25        Q.    Do you know where that LRAD was used that

 1   day came from?

 2        A.   I believe it was Baton Rouge PD.

 3        Q.   Do you remember commands being given to

 4   protesters to get off the street and onto the

 5   sidewalk or private property?

 6        A.   No, sir.

 7        Q.   You mentioned violence from protesters on

 8   July 10th.  Do you remember -- what sort of

 9   violence are you talking about?

10        A.   I personally got hit by a frozen water

11   bottle.  I saw a chunk of concrete flying towards

12   police officers.

13        Q.   Did you see who threw either of those

14   items?

15        A.   No.

16        Q.   I know you said you didn't make any

17   arrests on July 10th.  Did you help arrest anyone

18   else or help anyone else arrest any protesters on

19   July 10th?

20        A.   I helped detain one woman, and I

21   understand she was later arrested, but I don't know

22   that we arrested her.

23        Q.   Do you remember who that was?

24        A.   Not by name, no, sir.

25        Q.   Do you remember what she looked like?

1        A.    Not independently, no, sir.

2        Q.    I'm going to pull up a few more exhibits

3    here.  This first one this will be Exhibit 2 for

4    today.  I'll pull up first the video.  I'm going to

5    share this.  Can you see that frame on your screen?

6        A.    Yes, sir.

7        Q.    This is a video.  I'll play it in a

8    second.  It's only 18 seconds.  I'll play the whole

9    thing.  It's been previously introduced as

10   quadruple G, four Gs, but today it will be Exhibit

11   2.  I'm just going to play this, the whole 18

12   seconds, and just -- I'll have some follow-up

13   questions.

14                    {VIDEO PLAYED}

15   BY MR. LANSER:

16       Q.    Were you able to see that video?

17       A.    Yes, sir.

18       Q.    Do you know where this was taking place?

19       A.    I'm having a hard time orienting which

20   direction that is.

21       Q.    Best you can tell, is it fair to say this

22   is East and France?

23            MR. FAHRENHOLT:

24                 Object.

25            THE WITNESS:

1          It looks like East and France, yes,

2      sir.

3  BY MR. LANSER:

4      Q.   It appears to me this line of officers

5  here appears to be at least substantially state

6  police officers.  Does that look accurate?

7      A.   No, sir.  The green in the back are state

8  police SWAT.  All the blue up front I don't know

9  what agency that is.  It looks like BRPD.  I could

10 be wrong.

11     Q.   So these ones in blue would be BRPD,

12 green in the back, it looks like there is at least

13 a few state police officers?

14     A.   Right.

15     Q.   Do you recognize any of these officers?

16 I can hit play again, if that's easier.

17     A.   Are you going to hit play?

18     Q.   I'm sorry.  Yes.

19              {VIDEO PLAYED}

20          THE WITNESS:

21              I didn't recognize any of them.

22 BY MR. LANSER:

23     Q.   So it's fair to say this is not part of

24 your squad?

25     A.   No.  That's not my squad.

 1      Q.    Let me pull up another video.  Do you see
 2  that new video on the screen?
 3      A.    Yes.
 4      Q.    So this has previously been introduced as
 5  Exhibit 5 Ds.  It will be Number 3 today.  It is 12
 6  seconds.  I'm just going to hit play.
 7                  {VIDEO PLAYED}
 8  BY MR. LANSER:
 9      Q.    Were you able to see that 12 seconds?
10      A.    Yes, sir.
11      Q.    Let me pull up just some stills.  I see
12  in the still here it appears on the right side of
13  the screen what looks like a line of blue uniformed
14  officers, correct?
15      A.    Correct.
16      Q.    I'm assuming that's not state police?
17      A.    That's not state police.
18      Q.    Then I'm going to forward to six seconds.
19  I know it's blurry.  Can you tell if there is state
20  police in this lineup of officers we're looking at?
21      A.    It's extremely blurry, but I think that's
22  state police, mostly.
23      Q.    Do you remember if you were in this area?
24      A.    I was near this area.  I believe I was to
25  the -- as I'm looking at the picture, to the right.

1    Q.    Maybe somewhere in here? We were looking
2    at five seconds.
3    A.    More of the left of where you just had
4    your cursor.  Probably in the back.  Back there,
5    yes, sir.
6    Q.    It looks like there is one more sort of
7    grouping.  These officers here, do those look like
8    state police officers?
9    A.    No.  We don't carry shields.
10    Q.    Can you tell from this video -- I can
11    play it again, if like, look where the protesters
12    are located?
13    A.    I really can't tell from a video.  I know
14    where they are from independent recollection.
15    Q.    Where were they at this point?
16    A.    They were on France Street in the yard of
17    that residence right there and the sidewalk across
18    the intersection the other way, different from this
19    image you have.
20    Q.    I think we have actually another photo.
21    Let me pull that up.  Let me share this.  Can you
22    see that photo?
23    A.    Yes.
24    Q.    This is Exhibit 4 for today's purposes,
25    previously introduced as Exhibit -- I believe there

```
1    are six Os.  It is titled DSC_2008.  Does this look
2    to be about the scene you were just telling me
3    about with the protesters in the yard and
4    protesters on the sidewalk across the street?
5         A.    At that point of that video, yes, sir.
6         Q.    Do you see state police in this photo?
7         A.    The front line I see green.  That's state
8    police in the front.
9         Q.    These guys in green we know are state
10   police.  I also see in the front -- there is
11   another group of people there in like a darker blue
12   uniform.  Is that state police?
13        A.    That's Mobile Field Force for state
14   police.
15        Q.    So the green uniforms I think you said
16   were SWAT state police?
17        A.    SWAT, right.
18        Q.    And the dark blue in the front row here,
19   those would be Mobile Field Force state police?
20        A.    Correct.
21        Q.    I'm assuming you don't recognize anyone
22   in this photo, because they have their backs to
23   you.
24        A.    I see the back of everybody's head.
25        Q.    Do you remember, though, if this is -- is
```

1    this your squad or someone else's squad that was

2    stationed in this location?

3        A.    Once we're in a formation like that, it

4    is really not my squad or his squad.  We just have

5    a general area of responsibility, but those would

6    be operators from my team.

7        Q.    So that's from your team.  So if you say

8    it's not really -- at that point, the squads kind

9    of become part of one unit?  Is that sort of what

10   you are saying?

11       A.    That's one way to look at it, yes, sir.

12       Q.    So then with that, would their specific

13   orders be coming from John Clary then instead of

14   you or is still through John Clary?

15       A.    It's through the chain of command,

16   however it's delivered.

17       Q.    I know this is just one snapshot here,

18   but looking at where the protesters are at this

19   moment, do they appear to be breaking the law?

20       A.    You are asking a very broad question.

21   They're obstructing the sidewalk which is

22   technically breaking the law.

23       Q.    Some of them are obstructing the

24   sidewalk, and some of them are in the yard; is that

25   correct?

1     A.    Yes.

2     Q.    If you have a situation like this where

3   some, whether it's a protest or another large

4   crowd, or whatever the case may be, if you have

5   some individuals standing in the road or a sidewalk

6   or something like that and others not, is everybody

7   obstructing a public passageway in that instance or

8   just the individuals standing in the road?

9     A.    It would just be that individual.

10    Q.    Just because someone else in the group

11  might be obstructing public passageway doesn't mean

12  that every person here is obstructing public

13  passageway?

14    A.    For that particular law that you're

15  citing, that would be correct.

16    Q.    I'm going to pull up another video here

17  in a second.  Do you see the new video on your

18  screen?

19    A.    Yes.

20    Q.    This is Exhibit 5 to this deposition.

21  This one has previously been introduced as Exhibit

22  WWWW, four Ws. This one is another short one, just

23  23 seconds.  I'm just going to go ahead and play

24  it.

25                {VIDEO PLAYED}

BY MR. LANSER:

Q.    Okay.  Were you able to see that video?

A.    Yes.

Q.    Just pausing it here at the very first screen, it appears that there is a number of state police officers sort of in this area and over here where my cursor is.  Does that look about right?

A.    It looks like state police uniforms.

Q.    They appear to be in what you can call like the front line moving into the yard; is that correct?

A.    I don't know if that's the front line or not.  It looks like more the back of it. So all your guys in blue jeans and all of that would all be support elements, so the front line has already passed through at this point.

Q.    You see where my cursor is here?

A.    I do.

Q.    Could that maybe be the front line?  Is that what you are talking about?

A.    It may be a residual of it, but that's not the entire front line.

Q.    It appears there are still protesters up here; is that right?  And over here?

A.    That's correct.

1        Q.    Let me ask you.   I'm going to move

2   forward a little bit.   Do you remember sort of when

3   this is happening, when this individual is being

4   taken, do you know where you were at this point?

5   Did you move forward with them or did you hang back

6   behind?

7        A.    I was forward with them.

8        Q.    Do you remember like where in here you

9   might be?

10        A.    Somewhere in that general area, but I

11   don't see myself.

12        Q.    I know it can be tough on these videos.

13   You didn't see yourself at any point throughout the

14   whole video?

15        A.    Not this video, no, sir.

16        Q.    What about the previous video?

17        A.    No, sir.

18        Q.    Let me go ahead just a little bit more.

19   When you said these individuals with the jeans were

20   support elements, that's not state police, correct,

21   or is that --

22        A.    That's not state police.   Those aren't.

23   I'm not saying we didn't have some there that were

24   in support roles, but those aren't.

25        Q.    Do you see this individual here where my

1    cursor is?

2        A.    I do.

3        Q.    This is 16 seconds in, sort of bottom of

4    the screen just to the right of the middle.  Does

5    that appear to be state police?

6        A.    That's state police.  I can see the

7    patch.

8        Q.    Do you know who that -- I know you can't

9    see his face, but just --

10       A.    I can't see his face.

11       Q.    It appears he has some sort of --

12       A.    Looks like a gas gun.

13       Q.    Gas gun?  Is that what that is?

14       A.    Uh-huh, which means that's definitely the

15    back of this line.

16       Q.    Do you recognize any protesters in this

17    video at all?

18       A.    No, sir.

19       Q.    Let me pull up --

20       A.    I believe that's me to the left.  Go

21    further.  Further, further.  Right there.

22       Q.    This one right here?

23       A.    I think that's me.

24       Q.    Let me back this up a little bit, see

25    when you come into frame.  Watch that left side, if

```
1    you don't mind.  I'll hit play.  It might be easier
2    when it's moving versus still.
3                    {VIDEO PLAYED}
4           THE WITNESS:
5               Yeah.  It got real digitized at the
6             end.
7           MR. FAHRENHOLT:
8               Dave, just for the record, all these
9             videos are very choppy on this end.
10          MR. LANSER:
11              That's fine.  Do you have --
12            Mr. Fahrenholt, I'm getting all of
13            these out of that shared Dropbox
14            folder.  Do you think it would be
15            worthwhile to pull it up straight from
16            there, for the choppiness, or is that
17            not --
18          MR. FAHRENHOLT:
19              It's possible that I could.  This is
20            a personal laptop that I don't think I
21            have direct access to my work e-mail,
22            but if you could send me a video to my
23            personal Gmail, I could probably pull
24            it up.
25          MR. LANSER:
```

48

```
 1           Do you think it's Zoom that is the
 2       issue with the choppiness?
 3   MR. FAHRENHOLT:
 4           I think it is, yeah.  It's not like
 5       a smooth running video.  So if it is
 6       smooth on your end, it's every second
 7       or two it's like just a still image and
 8       then a pause, a still image, a pause, a
 9       still image, a pause.
10   MR. LANSER:
11           Okay.  If you don't mind, I think it
12       might be worthwhile for all of us so
13       we're not just looking at this choppy
14       video.  I'm going to forward you a
15       Dropbox link again.  I know you have
16       this somewhere.  Shall we take a quick
17       break so we can figure this out, maybe?
18   MR. FAHRENHOLT:
19           Yeah, because, again, we're -- it's
20       sort of a low-tech environment.  It's
21       going to take me a minute to get it to
22       where I need it to be to pull it up.
23   MR. LANSER:
24           Let's take a five-minute break.
25       Sounds good.
```

```
 1            MR. FAHRENHOLT:
 2                 Yeah.  That's fine.
 3                 {BRIEF RECESS, 10:35-10:40}
 4            MR. LANSER:
 5                 So, Mr. Fahrenholt, pull up the
 6              video.  This is WWWW.
 7            MR. FAHRENHOLT:
 8                 Do you want me to play the entire
 9              thing?
10            MR. LANSER:
11                 It is just 23 seconds.  If don't
12              mind just playing the whole thing.
13            MR. FAHRENHOLT:
14                 Sure.
15                 {VIDEO PLAYED}
16            MR. FAHRENHOLT:
17                 We're done.
18  BY MR. LANSER:
19       Q.   Were you able to see that a little
20  clearer?
21       A.   Yes, sir.
22       Q.   Let me, just for the sake of getting --
23  making sure we are getting the right screen shots
24  and everything, I believe -- I'm moving ahead to 21
25  seconds in here.  Was it this individual you
```

```
 1   thought was you?
 2        A.   I can't tell on that image, but I think
 3   that's me.
 4        Q.   But could you tell on the clearer video
 5   if you popped in on the left?
 6        A.   At 22 seconds.
 7             MR. FAHRENHOLT:
 8                  We can look at it again.
 9             MR. LANSER:
10                  Yeah.  It's right in that 21, 22
11               seconds.
12                  {VIDEO PLAYED}
13             THE WITNESS:
14                  Yeah.  That's me.
15   BY MR. LANSER:
16        Q.   Then after watching the clearer version
17   or the less choppy version, does that change
18   anything, any of your testimony earlier about who
19   any of these individuals are, like whether this is
20   state police, front line, back line, anything like
21   that, or is all of that still the same?
22        A.   Still the same.  That's still probably
23   the back part of our formation.
24        Q.   I'm going to pull up another one.  This
25   is going to be -- I'll pull it up and share my
```

```
 1   screen, but, Mr. Fahrenholt, if you want to do the
 2   same.  This is going to be Exhibit -- let me pull
 3   it up first.  Okay.  So this is going to be Exhibit
 4   6 for today, and it is previously EEEEE, five Es,
 5   labeled Number 5 Baton Rouge Police Attack Peaceful
 6   Protesters.  It goes on from there.
 7               MR. LANSER:
 8                   Can you pull that up directly,
 9               Mr. Fahrenholt?
10               MR. FAHRENHOLT:
11                   I sure can.
12               MR. LANSER:
13                   I can try playing it on here, if you
14               want, if it is easier.
15               MR. FAHRENHOLT:
16                   It would probably be better to just
17               do it this way. Tell us which parts you
18               want him to watch or the whole thing.
19               MR. LANSER:
20                   I don't think we need the whole
21               thing.  Why don't you play, if you
22               don't mind, the first minute.
23               MR. FAHRENHOLT:
24                   The first minute?
25               MR. LANSER:
```

```
 1              Yeah.
 2         MR. FAHRENHOLT:
 3              Just to one minute.  Okay.
 4              {VIDEO PLAYED}
 5         MR. FAHRENHOLT:
 6              Okay.  We've reached a minute.
 7         MR. LANSER:
 8              Now that I think about it, I wonder
 9           if it would make more sense, if you are
10           able to pull these up, if I make you
11           the host, and you share the screen, and
12           then we can see exactly.
13         MR. FAHRENHOLT:
14              Okay.  Yeah.  That's fine.
15         MR. LANSER:
16              Let me stop sharing this.  That
17           would probably make a lot more sense.
18         MR. FAHRENHOLT:
19              You want me to play the first
20           minute?
21         MR. LANSER:
22              No.  That's okay.
23         MR. FAHRENHOLT:
24              We can look at the rest of the
25           exhibits like this.  This is fine.
```

```
 1              MR. LANSER:
 2                   Could you go to, let's say, 18
 3                seconds then, just a still shot.
 4                Sergeant Dennis, thanks for bearing
 5                with us dealing with this technology.
 6              THE WITNESS:
 7                   That's okay.
 8    BY MR. LANSER:
 9         Q.   Does this appear to be Louisiana State
10    Police officers?
11         A.   It does.
12         Q.   Do you know if that is the front line you
13    were talking about or if it's the second line?
14         A.   At this point, that's probably your front
15    line operators.
16         Q.   Yeah.  We can watch some more of the
17    video, if it's helpful.  It seemed to me this is
18    kind of a first wave coming through.  Is that
19    right?
20         A.   Right.
21         Q.   So it likely would be the first line?
22         A.   Right.
23         Q.   Is this your squad?
24         A.   I don't know.  This is my unit.
25         Q.   Your unit.  Okay.
```

```
 1              MR. LANSER:
 2                   Mr. Fahrenholt, if you could go to
 3              32 seconds.  This is just -- we can
 4              watch the video, if it's helpful, but
 5              the camera kind of panned over to the
 6              right a little bit so we are more in
 7              the yard here.
 8    BY MR. LANSER:
 9         Q.   These also look like Louisiana State
10    Police officers?
11         A.   They do.
12         Q.   And your unit likely?
13         A.   Yes.
14         Q.   You're not visible in here yet?
15         A.   I don't think so.
16              MR. LANSER:
17                   Mr. Fahrenholt, if we could go to 38
18              seconds.
19    BY MR. LANSER:
20         Q.   Do you recognize that individual?
21         A.   That's very blurry.
22              MR. LANSER:
23                   Mr. Fahrenholt, if you could back it
24              up a second or two and just play five
25              seconds.  That's good.
```

```
 1                    {VIDEO PLAYED}
 2    BY MR. LANSER:
 3         Q.    Did you recognize then?
 4         A.    I couldn't see who that was.  It did
 5    appear to be state police, though.
 6              MR. LANSER:
 7                   I'm flipping through to see if there
 8                is anything else.  Mr. Fahrenholt, if
 9                you could pull up Exhibit A, the
10                complaint, and go to Page 36.  I'm just
11                using a photo.  This will be Exhibit 7
12                for today, previously Exhibit A.
13    BY MR. LANSER:
14         Q.    Sergeant Dennis, I'll represent to you
15    this is the complaint in the Blair Imani case.
16              MR. LANSER:
17                   Once that loads, Mr. Fahrenholt,
18                zoom in on that photo a little bit.
19    BY MR. LANSER:
20         Q.    Do you recognize what is going on in this
21    photo?
22         A.    What do you mean?
23         Q.    Does it appear to be part of that same
24    scene on East and France?
25         A.    Yes.
```

1        Q.    Do there appear to be Louisiana State
2    Police officers in that video or in this photo?
3        A.    Yes.
4        Q.    Does that include these three individuals
5    around this woman?
6              MR. FAHRENHOLT:
7                    You are talking about her, right?
8              MR. LANSER:
9                    I forget you can't see my cursor.
10          I'm sorry.
11              MR. FAHRENHOLT:
12                    We don't have the cursor.
13              THE WITNESS:
14                    Those appear to be state police.
15              That appears to be another agency.
16    BY MR. LANSER:
17        Q.    Do you recognize either of those state
18    police officers?
19        A.    I can't see who that is.
20        Q.    Do they appear to be other state police
21    officers in the photo as well?
22        A.    There is one there.  I can't make out who
23    that is.  That's one of our helmets there.  Maybe
24    there.
25        Q.    Do you recognize the woman being

```
 1   arrested?
 2        A.   No, sir.
 3        Q.   You don't recall this specific arrest
 4   happening on July 10th?
 5        A.   No, sir.  I've previously seen the
 6   photos, but that's it.
 7        Q.   One more video, if you don't mind pulling
 8   it up.  This one will be Exhibit 8 for today, and
 9   this has not been -- I believe we are all the way
10   up to, let's see, six X's.  So if you could in that
11   shared Dropbox.  It's just a video titled 22C.
12             MR. FAHRENHOLT:
13                  You really should have thought about
14               the exhibit numbering system.
15             MR. LANSER:
16                  I know.  It's gotten so ridiculous.
17               This is only 35 seconds.  If you don't
18               mind just playing the whole thing.
19                  {VIDEO PLAYED}
20   BY MR. LANSER:
21        Q.   Thank you.  You were able to see that
22   video clearly?
23        A.   Yes.
24        Q.   A lot of this video is tough to see.
25   Let's move forward to -- please go to 20 seconds
```

1    in.  Hit play real quick.
2                  {VIDEO PLAYED}
3              MR. LANSER:
4                  Can you pause it on those officers?
5              It's kind of hard to tell.  Okay.
6              Right there.  Actually, that's perfect.
7              You can pause it there.  Back up one
8              second.
9              MR. FAHRENHOLT:
10                 I can try.
11             MR. LANSER:
12                 A little more.  Right there.  Great.
13   BY MR. LANSER:
14        Q.   Do you see these --
15        A.   That is state police, but I don't know
16   who it is.
17        Q.   And this appears to be the front line?
18        A.   This would more than likely have been an
19   arrest team that was sent out from behind the
20   front, which is how we would do that, given the
21   manpower, if we had.
22        Q.   Do you recognize either of these two
23   protesters?
24        A.   No, sir.  No, sir.
25             MR. LANSER:

```
 1                  Mr. Fahrenholt, if you could back up
 2             just a second or two and hit play for a
 3             few seconds. That's fine.
 4   BY MR. LANSER:
 5        Q.   Did you have anything to do with the
 6   arrest team or is that part of a different --
 7        A.   With that arrest team?
 8        Q.   Yeah.  That one.
 9        A.   I don't know who that was.  I don't
10   remember specifically sending out an arrest team at
11   all at this location.
12        Q.   It might have been a different squad in
13   the same platoon?
14        A.   It could have been a different squad
15   leader within the same platoon or a different area
16   of responsibility.
17             MR. FAHRENHOLT:
18                  Are we done with this?
19             MR. LANSER:
20                  Yeah, we're done.  Thanks.
21   BY MR. LANSER:
22        Q.   In all of those videos or at least the
23   last few videos, it looked like Louisiana State --
24   is it fair to characterize it as Louisiana State
25   Police was part of the front line sort of moving in
```

60

1    to arrest protesters on the lawn?

2         A.    Yes.

3         Q.    Do you remember what led to that?  Like

4    was there a specific order that went out saying,

5    okay, move in, arrest now?

6         A.    Once the command to disperse was given,

7    after it was deemed an unlawful assembly, that's

8    when they moved in.  I don't know who gave the

9    specific order to begin moving the formation, but

10   it would be someone within the chain of command.

11        Q.    Sure. So if they had sort of worked with

12   other law enforcement agencies, that would be

13   someone ahead of you, higher up than you in the

14   chain of command?  You would not have been privy to

15   that conversation?

16        A.    That's correct.

17        Q.    So you just received that order to move

18   in and arrest, or do you --

19        A.    We received the order, and, hopefully,

20   just move in and move the protesters.  The goal is

21   not necessarily to arrest.  It's just to disperse

22   the crowd, but those that remained usually are

23   arrested.

24        Q.    Even if they're on private property?

25        A.    A drunk driver pulling into his driveway

1   still gets arrested.

2        Q.   I know -- I believe you said earlier

3   there was maybe one protester who you helped

4   arrest.  Do I remember that correctly?

5        A.   There was one that a trooper had helped

6   up.  All I remember him saying specifically is that

7   she was on the ground.  The way I recall was we

8   helped her up.  Whether she was arrested or not, I

9   don't know.

10       Q.   You didn't see her in any of these

11  videos?

12       A.   No.

13       Q.   Would you recognize her if you did see

14  her?

15       A.   I would recognize me, but I wouldn't

16  recognize her.

17       Q.   You also mentioned at the start you

18  reviewed a video and three still images prior to

19  coming here, correct?

20       A.   Correct.

21       Q.   Was the video or the still images, was

22  that included at all in what we watched?

23       A.   No, sir.

24       Q.   Do you remember what photograph?

25            MR. FAHRENHOLT:

```
 1                It's a video and photographs that I
 2           received from Eric Foley.  I believe it
 3           was not this past Friday but the Friday
 4           before that.
 5      MR. LANSER:
 6                Are they part of the joint exhibits?
 7           Do you know?
 8      MR. FAHRENHOLT:
 9                I think it's been shown at least
10           once during the Baton Rouge
11           depositions, but I couldn't tell you
12           the number.
13      MR. SCOTT:
14                If it was last Friday, it would have
15           been an exhibit from Myron Daniels.
16      MR. FAHRENHOLT:
17                Yes.  I believe it was during the
18           deposition of Myron Daniels.
19      MR. LANSER:
20                It might be a losing battle trying
21           to check.
22      MR. FAHRENHOLT:
23                It was depicting a plaintiff in the
24           Nikole Smith case.
25  BY MR. LANSER:
```

```
 1        Q.    We will leave that alone.  I'm just
 2   wrapping up my section.  Do you have any idea
 3   whether protesters had permission to be on that
 4   lawn?
 5        A.    I don't know.
 6        Q.    You were not told one way or another?
 7        A.    No, sir.
 8        Q.    You said earlier you were not -- you
 9   didn't have access or weren't part of any inter-
10   agency radio communications?
11        A.    No, sir.
12        Q.    Did you or the state police generally use
13   any deescalation tactics on July 10th?
14        A.    I did not.
15        MR. LANSER:
16              Let me look over my notes real
17              quick.  I might be done. That's all I
18              have.  I believe Miss Lommers-Johnson
19              has some questions on behalf of some of
20              the other plaintiffs.  I'm going to
21              pass it over to her.  Is that all
22              right, Hannah?
23        MS. LOMMERS-JOHNSON:
24              Yeah.  Thanks, Dave.  Before I get
25              started, does anyone need a restroom
```

```
 1              break?  Okay.
 2          MR. LANSER:
 3              Thank you, Sergeant Dennis.
 4          THE WITNESS:
 5              Thank you, sir.
 6  EXAMINATION BY MS. LOMMERS-JOHNSON:
 7      Q.   Sergeant Dennis, my name is Hannah.  I
 8  work at the MacArthur Justice Center.  Before we
 9  get started, is my audio on a delay for you?  I'm
10  doing it by phone.
11          THE COURT REPORTER:
12              It doesn't sound very good.
13          MS. LOMMERS-JOHNSON:
14              Let us take a two-minute break until
15              11:06.  I'm going to try to switch my
16              audio back to the computer to see if
17              that's any better for y'all.
18              {BRIEF RECESS, 11:03-11:06.}
19  BY MS. LOMMERS-JOHNSON:
20      Q.   I'd like to ask you a couple more
21  questions about the 10th.  First, I'd like to pull
22  up a document that I'm going to mark Exhibit 9 for
23  today's purposes.  It's going to be six Ys for the
24  running list.
25          MS. LOMMERS-JOHNSON:
```

```
 1                    Let me see if I can share my screen.
 2               Dave, do you mind enabling screen
 3               sharing for me?
 4          MR. LANSER:
 5               Greg is the host.
 6          MR. FAHRENHOLT:
 7               How do I do that?  How do I make you
 8               the host?  I have no idea.
 9               {OFF-THE-RECORD DISCUSSION}
10     BY MS. LOMMERS-JOHNSON:
11          Q.   Thank you so much.  Sergeant Dennis, can
12     you see this document I've pulled up on the screen?
13          A.   I can.
14          Q.   Perfect.  Do you recognize this as a time
15     sheet for Troop F from approximately the dates of
16     July 4th to July 17th?
17          A.   I do.
18          Q.   Perfect.  So I know it's a little fuzzy
19     in parts.  I'm going to try to zoom in a little bit
20     so we can look at the dates of July 9th and 10th.
21     I'm not sure you can see my cursor.  Do you see
22     where I'm indicating?
23          A.   Right.  That's July 9th.
24          Q.   Okay.  Perfect.  So on July 9th, it looks
25     to me like you worked for 20 hours; is that
```

1    accurate?

2        A.    That would be accurate.

3        Q.    Then, on July 10th, it looks like you

4    worked for 24 hours; is that accurate?

5        A.    That's correct.

6        Q.    Were you actually working that many hours

7    those days consecutively?

8        A.    Those were just hours that were included

9    in the total time we were there, because we were,

10    for lack of a better term, confined.  We were not

11    allowed any liberties or anything.  We were on call

12    nonstop.

13        Q.    So you were not necessarily at the

14    protest for 24 hours straight?

15        A.    No, no.

16        Q.    Do you remember from the 10th

17    specifically about what time you went on duty that

18    day?

19        A.    I was on duty the night before, and we

20    had rotating schedules of being on and being off,

21    but I guess we were still on just standby.  So I

22    don't particularly remember any time that we went

23    anywhere or did anything.

24        Q.    I guess in terms of when you showed up to

25    the area around East and France on July 10th, do

1    you remember about what time that was?

2        A.   I don't.

3        Q.   Sometime in --

4        A.   It was daytime, and it was hot.  That's

5    what I recall.

6        Q.   I know you said that you couldn't

7    remember, you know, what specific orders you got

8    that day.  You received a number of orders.  Can

9    you tell me when you initially arrived in the East

10   and France location, after moving from where you

11   initially were located, closer to the interstate,

12   what was the first order you received then?

13       A.   I don't know that I directly received any

14   order.  We formed up across the street, but no

15   direct orders necessarily.

16       Q.   And when you say you formed up across the

17   street, can you tell me what you mean by that?

18       A.   Our standard Mobile Field Force formation

19   would be our line elements and the support

20   personnel behind them.  So you have your line

21   elements.  You have your less lethal operators,

22   your arrest teams, your SWAT element, and then you

23   have, of course, your command and control elements.

24   All of that is kind of staggered in stages.  In a

25   perfect environment, of course.

1    Q.    So you remember when you arrived at the

2    intersection of East and France pretty immediately

3    you formed up into one of these lines?

4    A.    We came in mostly a column of twos, so

5    two columns of officers behind a -- I believe it

6    was the LRAD or the Baton Rouge vehicle, whatever

7    vehicle that is, and then formed up basically a

8    line across the street from the protesters.

9    Q.    How long would you say you staged in that

10   line before moving in and approaching the yard

11   where the protesters were located?

12   A.    I don't have a time estimate.  I remember

13   having to wait for additional resources, so it was

14   other police officers.  I remember it being a

15   significant amount of time.

16   Q.    Now I'm going to pull up a picture.  I'm

17   going to mark this Exhibit 10.  It's going to be

18   six Zs for the continuing list.  Sergeant Dennis,

19   can you see the Exhibit 10 picture that I pulled

20   up?

21   A.    Yes.

22   Q.    Okay.  Perfect.  Does this picture depict

23   one of the lines of Louisiana State Police officers

24   across from the yard where the protesters were

25   located?

1      A.    It does.

2      Q.    And I'm not sure.  I can zoom in a little

3  bit on this picture.  Can you tell from looking at

4  this picture whether you are here?

5      A.    Not from the picture, but as memory

6  serves, I was in this group towards the back.

7      Q.    I think that you had indicated earlier

8  that you were wearing one of these dark blue/black

9  uniforms on Sunday, July 10th?

10      A.    Correct.

11      Q.    I believe that you were staged in this

12  area of the intersection of East and France.  I

13  think this was along East Boulevard.  Can you

14  remember whether at that point the road had been

15  blocked off from (inaudible.)

16      A.    You broke up at the end.

17      Q.    At the point that this depicts where you

18  were located along East Boulevard across from the

19  yard of protesters, can you remember whether the

20  street had been blocked off from vehicle traffic?

21      A.    I don't know.

22      Q.    To your recollection, was anyone staged

23  on France Street?

24      A.    I'm sure there was on that side of -- on

25  our side of France, I guess.

1        Q.    Next I'm going to pull up a picture. This

2    one I believe is Exhibit 11, which brings us around

3    to seven A's in the continuing exhibit list.

4    Sergeant Dennis, can you see this picture that I

5    have pulled up and marked Exhibit 11?

6        A.    Yes, ma'am.

7             MR. FAHRENHOLT:

8                  Can you make that a little bigger?

9    BY MS. LOMMERS-JOHNSON:

10       Q.    Can you see the image maximized now?

11       A.    I can.

12       Q.    Looking at this picture, my understanding

13   is it depicts East Baton Rouge Sheriff's Department

14   individuals with shields in the front.  Is that

15   accurate?

16       A.    I don't know which agency that is, ma'am.

17       Q.    Okay. Here what we're seeing is a line of

18   perhaps multiple law enforcement agencies,

19   officers, across East Boulevard in front of France

20   Street.  Is that accurate?

21       A.    Yes, ma'am.

22       Q.    So at the point that deputies staged or

23   -- I'll go back.  At the point where law

24   enforcement officers staged this line across East

25   Boulevard in front of France Street, the road was

1    blocked from vehicle traffic at this point?

2        A.   From France Street?

3        Q.   At least across East where we're looking

4    at in this picture.  Is that fair?

5        A.   I don't know if it was blocked on either

6    end or not, ma'am.

7        Q.   So I guess the image here, Exhibit 11,

8    does this depict the road being blocked off here?

9        A.    It depicts France.  I guess that's France

10   I'm seeing on that street sign behind it being

11   blocked.

12       Q.   You talked a little bit about the chain

13   of command that was in place on July 10th.  I just

14   have a couple more questions about that.  I think

15   you testified earlier that your direct supervising

16   officer that day was platoon leader John Clary; is

17   that accurate?

18       A.   Yes, ma'am.

19       Q.   I know you talked about the Mobile Field

20   Force commander being Beau Comeaux.  I'm wondering

21   who was in the chain of command between the platoon

22   leader, John Clary, and the Mobile Field Force

23   commander, Beau Comeaux?

24       A.    Between those? There may be other platoon

25   commanders, but at the time it was set up, it was

1    the Mobile Field Force supervisor and then the next

2    person in the chain of command would be the platoon

3    commander.  I think there was an assistant at this

4    point.  They have restructured the Mobile Field

5    Force since this time to include a secondary or a

6    lieutenant and a sergeant, but that wasn't in place

7    in 2016, I don't think.

8         Q.   So in 2016, it would have been the

9    platoon leader, here being John Clary, and then

10   above him there would have been platoon commanders?

11        A.   I don't know if that's the terminology or

12   not they used at the time, but that would be

13   correct.

14        Q.   And those platoon commanders, would they

15   then report directly upward to the Mobile Field

16   Force commander?

17        A.   No.  We missed a step.  So start with

18   Mobile Field Force commander.  The next one down

19   would be your platoon leader or commander, and then

20   they would go into the squad leaders from there.

21   That would be your basic structure in 2016.  The

22   Mobile Field Force commander, the platoon leader,

23   and then the squad leaders.

24        Q.   And so your chain of command, and correct

25   me here if I'm wrong, your chain of command on July

1   10th was you, as a squad leader, reporting to John

2   Clary, as the platoon leader, who reported to Beau

3   Comeaux, as the Mobile Field Force commander?

4       A.   That's the way I understand it, yes.

5   Very good.

6       Q.   Thank you.  I think we may have addressed

7   this earlier.  I just want to make sure I'm fully

8   understanding.  Was it Platoon Leader John Clary

9   who communicated to you the order to advance on the

10  protesters on July?

11      A.   I don't know who gave that order.

12      Q.   I'm going to move on to play a couple of

13  videos.  What I would ask is from here on out in

14  the deposition if you see any of those images that

15  you were shown earlier today that we were kind of

16  searching for earlier in Dave's questioning, just

17  flag it for me so I know.  Okay.  Can you see the

18  screen now, Sergeant Denis?

19      A.   Yes, ma'am.

20      Q.   I'm going to play this video here for 40

21  seconds and ask just do you see yourself anywhere

22  in this video?

23                  {VIDEO PLAYED}

24  BY MS. LOMMERS-JOHNSON:

25      Q.   I know the video is pretty quick and a

1    little shaky, but do you generally recognize this
2    as footage from East and France on July 10th?
3         A.   Yes.
4         Q.   Did you happen to see yourself anywhere
5    in that footage?
6         A.   No, ma'am.
7         Q.   Would it be accurate to say that this
8    footage is, you know, showing part of the approach
9    to the yard of protesters on July 10th?
10        A.   Yes, ma'am.
11        Q.   Now I'm going to move to a still image,
12   and hopefully that will be a little bit easier for
13   us to see.  I don't think I marked this video, so
14   this video is going to be Exhibit 12 for today's
15   purposes.  It's going to be seven Bs for the
16   continuing deposition list.
17             MR. SCOTT:
18                  Hannah, I think you are at 13, and
19               the DeSalvo video you just played would
20               be 12.
21             MS. LOMMERS-JOHNSON:
22                  Perfect.  Thank you, Joe.
23   BY MS. LOMMERS-JOHNSON:
24        Q.   So this is going to be Exhibit 13, as Joe
25   noted.  This has been previously introduced as

```
 1    Exhibit 5 Ts.  Now, Sergeant Dennis, can you see
 2    the image on my screen now?
 3         A.   Yes, ma'am.
 4         Q.   This picture shows I think one individual
 5    in the front here being led away by officers.  My
 6    question for you is do you see the woman in the tan
 7    scarf in the background?
 8         A.   Yes, ma'am.
 9         Q.   The woman with the tan scarf here is
10    standing, roughly, between these two bushes in the
11    yard.  Is that accurate?
12         A.   Yes, ma'am.
13         Q.   There is a number of people sort of
14    standing in the background here, but immediately
15    next to this woman I think we see two individuals
16    wearing Louisiana State Police uniforms.  Is that
17    accurate?
18         A.   Yes, ma'am.  The one on the left is me.
19         Q.   Are you right here where I'm indicating
20    with the cursor?
21         A.   Yes, ma'am.
22              MR. FAHRENHOLT:
23                   Hannah, that is one of the three
24                photographs he --
25              MS. LOMMERS-JOHNSON:
```

1           Thanks, Greg.

2   BY MS. LOMMERS-JOHNSON:

3       Q.    I'm going to move now to what I think

4   probably is another photograph that you looked at

5   earlier today.  This next one I'm going to mark as

6   Exhibit 14.  It's been previously introduced as

7   Exhibit 5 Qs.  Can you see this image that I

8   brought up on the screen and marked Exhibit 14?

9       A.    Yes, ma'am.

10      Q.    Again, the image in Exhibit 14 shows a

11  sort of closer up image of you next to the woman in

12  the tan scarf.  Is that accurate?

13      A.    Yes, ma'am.

14      Q.    Do you know who this officer is to the

15  right as we're looking at the picture?  To the

16  right of the woman in the tan scarf?

17      A.    I do.

18      Q.    Who is that?

19      A.    Kory York.

20      Q.    Do you mind repeating that again?

21      A.    Kory York.

22      Q.    Kory York?

23      A.    K-O-R-Y.

24      Q.    Thank you. Looking at this picture, it

25  appears that you and Kory York are detaining this

1    woman in the tan scarf.  Would that be accurate?

2          A.    She is obviously being detained, yes,

3    ma'am, but this was the one that he had helped up,

4    is what he told me.

5          Q.    So Kory York had indicated to you on July

6    10th that he had helped this woman in the tan scarf

7    up off the ground?

8          A.    I don't remember the exact context, but,

9    yes, he told me she was on the ground.

10          Q.    On July 10th, do you remember seeing this

11    woman on the ground at all?

12          A.    I don't remember it.

13          Q.    Just to clarify, when he told you that he

14    had helped this woman up, it was in the context of

15    you not having observed her on the ground or him

16    helping her up?

17          A.    I don't remember.

18          Q.    Was Kory York a sergeant?

19          A.    Trooper.

20          Q.    When Trooper York stated to you that he

21    had helped this woman in the tan scarf up off the

22    ground, was it your understanding that someone else

23    had caused her to be on the ground or that he just

24    came across her while she was on the ground?

25          A.    I don't know.

1        Q.    Did you ever see this woman in the tan

2    scarf standing in the roadway at any time?

3        A.    No, ma'am.  Not that I recall.

4        Q.    So now I'm just going to jump a couple of

5    seconds forward to an image that I'll mark Exhibit

6    15 for today's purposes.  This image has been

7    previously introduced as six Qs.  Sergeant Dennis,

8    can you see the picture that I pulled up and marked

9    Exhibit 15?

10        A.    Yes, ma'am.

11        Q.    This image shows the same woman with the

12    tan scarf being detained; is that accurate?

13        A.    Yes, ma'am.

14        Q.    At this point, we see now she has her

15    hands behind her back, and it looks to me like

16    Trooper York is putting her into flex cuffs.  Is

17    that a fair characterization of this image?

18        A.    Yes.

19        Q.    In this picture, are you the individual

20    directly behind the woman in the tan scarf?

21        A.    Yes.

22        Q.    I see that Trooper York has a fair number

23    of white flex cuffs attached to his backpack as

24    well.  Do you see where I am indicating there?

25        A.    Yes.

1      Q.   Did you all arrive on the scene with the

2  flex cuffs as part of your standard supply or were

3  these supplied to you by any of the other agencies?

4      A.   I don't remember on this particular

5  incident where we got those.

6      Q.   Do you remember during the Baton Rouge

7  2016 protests in general?

8      A.   A lot of the guys had them on their

9  backpack as part of their normal assembly of their

10  gear.  I don't remember where they were issued to

11  us or how they were issued to us.

12      Q.   Next I'm going to pull up a video.  The

13  video is going to be marked Exhibit 16.  It's been

14  previously introduced as four Hs.  If no one

15  objects, I'm going to advance this video, when it

16  comes up, to minute 1:43.  Can you see the image on

17  my screen now?

18      A.   Yes.

19          MR. FAHRENHOLT:

20              Again, this is the video that we

21           referenced earlier.

22          MS. LOMMERS-JOHNSON:

23              Thanks, Greg.

24  BY MS. LOMMERS-JOHNSON:

25      Q.   So I'm just going to start us here from

 1    minute mark 1:39 of Exhibit 16.  I'm just going to

 2    ask you to look for the woman in the tan scarf

 3    again as well as yourself.

 4                    {VIDEO PLAYED}

 5    BY MS. LOMMERS-JOHNSON:

 6        Q.   Okay.  So I'm pausing here at minute

 7    1:48.  Just prior in the video, did you see the

 8    woman in the tan scarf being detained by yourself

 9    and Trooper York?

10        A.   I'm sorry.  What was the question?

11        Q.   Just prior to the minute 1:48 where we

12    are now, did you see yourself and Trooper York

13    detaining the woman in the tan scarf?

14        A.   Yes.

15        Q.   Now I'm going to keep playing and ask you

16    to keep an eye out for her again.

17                    {VIDEO PLAYED}

18    BY MS. LOMMERS-JOHNSON:

19        Q.   Okay.  Did you see yourself in this video

20    escorting the woman in the tan scarf by the camera?

21        A.   I'm sure that was me, but I didn't see

22    myself.

23        Q.   What I'll do here is take a break from

24    this exhibit and move on to an exhibit that's a

25    freeze frame from this video that I'll mark as

1    Exhibit 17, which is going to be seven Cs for the

2    continuing list.  I can represent to you that the

3    image that I'm going to pull up is a freeze frame

4    taken directly from this video.  Before I exit away

5    from this video, I'll just sort of ask you to look

6    at that cardboard sign that's on the ground just to

7    orient us to where we are so we can see in the next

8    video or in the freeze frame that this is the same

9    shot.  Okay.  Can you see the image that I've

10   marked Exhibit 17 on your screen now?

11        A.    It looks like my backpack.

12        Q.    So here we see the cardboard sign and the

13   backpack.  At this point, do you recognize the

14   person who walked by the screen with the woman in

15   the tan scarf as yourself?

16        A.    That would be me, yes, ma'am.

17        Q.    When I was playing the video, were you

18   able to hear sound at all?

19        A.    No, ma'am.

20        Q.    I'm going to try to see if we can share

21   sound here for a second, just for the end of that

22   video.  I'm going to play it again from about one

23   minute 57 from Exhibit 16.

24                    {VIDEO PLAYED}

25   BY MS. LOMMERS-JOHNSON:

1      Q.    Could you hear that?

2      A.    Take her, too.

3      Q.    Did you discern that was your voice

4   saying, "Take her, too?"

5      A.    I don't remember.  It did sound like me,

6   though.

7      Q.    Can you explain to me, if you know, or if

8   you can surmise from this video and audio what you

9   meant by, "Take her, too?"

10     A.    I don't know for a fact that was me.  It

11  just sounded like my voice, but in that situation,

12  if she had made it that far behind our lines into

13  your command structure, if you will, then she would

14  be removed from the area.  We can't leave an

15  unknown behind our lines.

16     Q.    By behind your line, do you mean at this

17  point, as you all had approached the yard in a

18  line, that at that point, sort of the point of the

19  sidewalk and the road was, in a sense, behind your

20  line?

21     A.    Anywhere that we had advanced forward of

22  would be our line.  Again, the whole point is to

23  move the people to a different location.  At that

24  point in the video, after watching it a few times,

25  we had ended up so far behind that element that I

1   was no longer in the function I was supposed to be

2   in.

3        Q.   Can you tell me a little bit more about

4   what you mean by you not being in the function you

5   were supposed to be in at that point?

6        A.   I am a squad leader.  My job is to

7   control the line movements, to send arrest teams

8   forward, if I need to.  For me to ever have to get

9   to a point where I'm helping someone else take

10  somebody into custody, then the line is not built

11  the way it is supposed to be built at that point.

12       Q.   At this point, we see you helping take

13  the woman in the tan woman in the tan scarf into

14  custody, but that was not supposed to be your role

15  that day?

16       A.   Right.

17       Q.   Is it your understanding that when you

18  said, "Take her, too," was she being passed off to

19  be escorted to a prisoner processing area?

20       A.   Again, you are surmising that I'm the one

21  that said that.  It sounded like my voice, but

22  whatever command was given to tell her to take her,

23  too, I don't know what it was intended to be, other

24  than to remove her from the area.

25       Q.   I know you were functioning as a squad

1  leader that day, not as a member of the arrest

2  team, but can you tell me as the general process,

3  how it was supposed to work that day, that the

4  troopers who were on the arrest teams would detain

5  people and then pass them off to other law

6  enforcement officers to be taken to prisoner

7  processing?

8       A.   That was my understanding, that normally

9  the arrest team, because there is not very many of

10 them, dealing with a large crowd, they would have

11 to detain someone, pass them off, and that person

12 would transport them or take them to some sort of

13 transport.  That is what practice was in place in

14 2016.

15      Q.   We have been talking a little bit about

16 the audio from this video that you think sounds

17 like your voice but are not sure whether it's your

18 voice.  I just want to clarify that the person we

19 saw past the camera wearing the backpack that said

20 Dennis on it, that is you escorting her, correct?

21      A.   I'm one of the ones escorting her, yes.

22      Q.   So now I'm going to move on to a new

23 video.  So this one is going to be marked Exhibit

24 18 for today's purposes, and it has been previously

25 introduced as Exhibit 6 Rs.  If there are no

1   objections, I'm going to advance this video.  I'm
2   going to try to find the three-minute mark,
3   approximately.  So we're at 3:05 right now.  Can
4   you see the image on my screen?
5        A.   Yes.
6        Q.   I'm going to go ahead and start playing
7   and ask you, again, to look out for the woman in
8   the tan scarf.
9        A.   Okay.
10              {VIDEO PLAYED}
11  BY MS. LOMMERS-JOHNSON:
12       Q.   Now I'm pausing it at minute mark 3:19.
13  At this point, we saw the woman in the tan scarf
14  being escorted away by another officer.  Did you
15  see that?
16       A.   Yes.
17       Q.   Could you tell whether they were a Baton
18  Rouge Police Department officer?
19       A.   I don't know their uniform well enough to
20  really say, but it looked like it.
21       Q.   At this point, you had already transfer-
22  red this woman out of your custody; is that
23  accurate?
24       A.   Yes.
25       Q.   Did you have anything further to do with

1    the arrest or processing of paperwork for this
2    woman in the tan scarf?
3        A.    No, ma'am.
4        Q.    You didn't sign the PC Affidavit for her
5    arrest or anything like that?
6        A.    No, ma'am.
7        Q.    Did you speak with anyone from the Baton
8    Rouge Police Department about what to put in the PC
9    Affidavit for this woman's arrest?
10       A.    No, ma'am.
11       Q.    I can represent to you that the woman in
12   the tan scarf that we've been looking at today in
13   these various videos and images is Sophie Kosofsky,
14   who is a plaintiff in one of the cases that we've
15   been talking about today.  My question for you is
16   in any of these videos or images that we've looked
17   at today, did Ms. Kosofsky appear to be pulling
18   away from you or resisting in any way?
19       A.    No, ma'am.
20       Q.    To your recollection, did Sophie Kosofsky
21   ever try to pull away or resist your detention of
22   her?
23       A.    No, ma'am.
24       Q.    Did you know what Ms. Kosofsky was going
25   to be charged with?

1    A.   No, ma'am.  I didn't know she was going
2  to be charged.
3    Q.   I think I'll stop sharing this.  How many
4  detentions would you say that you participated in
5  on July 10th in the area of East and France?
6    A.   That one.
7    Q.   How many detentions would you say that
8  your squad participated in, to your knowledge?
9    A.   I don't know.  It's probably dozens.
10    Q.   Now I have a couple of questions about
11  Saturday, July 9th.  Do you remember about what
12  time you physically went on duty that day and
13  reported to the area of the protests?
14    A.   No, ma'am.
15    Q.   Was it in the daytime on Saturday, July
16  9th, that you reported?
17    A.   It was daytime.
18    Q.   You stayed there until the nighttime on
19  Saturday, July 9th?
20    A.   I was there the nighttime.  I don't
21  remember if we stayed consistent or if we ever
22  left.  I don't remember.
23    Q.   Understand.  On Saturday, July 9th, were
24  you located in the area of Airline and Goodwood for
25  part of the day?

1       A.    Yes, ma'am.

2       Q.    Were you located in an area of Goodwood

3  on Saturday, July 9th, for part of the evening?

4       A.    Yes, ma'am.

5       Q.    Did you observe any arrests or detentions

6  in the area of Airline and Goodwood on Saturday,

7  July 9th?

8       A.    I relayed an order to make an arrest on

9  that day, and I observed several others.

10      Q.    Can you tell me about the time when you

11  relayed an order to make an arrest on Saturday,

12  July 9th?

13      A.    It was a group of individuals blocking

14  the road.  Actually, the only reason that we went

15  out there is they were blocking Airline Highway,

16  and they had been given an order to disperse.  I

17  ordered the arrest of -- I'm sorry.  I don't know

18  her real name, but it was Sister Krystal is what we

19  called her.  She was one of the leaders of the

20  Black Panther party.

21      Q.    Do you remember about what time that was?

22      A.    No, ma'am.  It was daytime.

23      Q.    Daytime.  At any point in the evening on

24  Saturday, July 9th, were you located nearby the

25  Shell gas station?

1          A.    Across the street from it, yes, ma'am.

2          Q.    I'm going to pull up a video that I'm

3    going to mark Exhibit 19.  It's been previously

4    introduced as Exhibit 5 Is.  For this video, I'm

5    just going to show you images.  You don't have to

6    pay attention to any audio here.

7                     {VIDEO PLAYED}

8    BY MS. LOMMERS-JOHNSON:

9          Q.    So I'm going to pause here at second 51

10   to ask whether you recognize any of the law

11   enforcement officers in this video?

12         A.    I can make out the name on the backpack,

13   but it's a weird tag.  It's not a state police

14   nameplate, but it says Worthington, maybe.  Lane

15   Worthington was on the team at the time.  I don't

16   know if he still is.

17         Q.    I apologize.  I didn't catch the first

18   name of the individual you said.

19         A.    Lane.

20         Q.    Lane?

21         A.    Uh-huh.

22         Q.    Is that L-A-N-E?

23         A.    I think so.

24         Q.    I'm just going to play this video maybe

25   ten or so more seconds.  All I'll ask again at the

1    end of playing it whether you recognize any of the

2    other officers that came onto the screen.

3                    {VIDEO PLAYED}

4    BY MS. LOMMERS-JOHNSON:

5        Q.   Okay.  Did you recognize any of the other

6    officers that you saw in this video?

7        A.   No, ma'am.

8        Q.   I am going to pull up what I think will

9    be our final video from the 9th.  This one we're

10   going to mark as Exhibit 20.  I'm going to ask if

11   you recognize this as being the Shell station near

12   the intersection of Airline and Goodwood?

13       A.   Yes, ma'am.

14       Q.   You were, I think you said, in the

15   general vicinity by the street of the Shell station

16   at some point that evening?

17       A.   We were across the street on the other

18   side.

19       Q.   Do you remember who else was with you

20   that evening across the street from the Shell

21   station?

22       A.   No, ma'am. It would have been most of my

23   team at the time.

24       Q.   So I'm just going to play you a little

25   clip of this video and ask you if you recognize

1    anyone in it.

2                    {VIDEO PLAYED}

3    BY MS. LOMMERS-JOHNSON:

4         Q.    Did you recognize anyone from that scene?

5         A.    No, ma'am.  Those were not state

6    troopers.

7         Q.    On Saturday, July 9th, did you ever

8    report to the area of Rivercrest Avenue?

9         A.    I don't know where that is, but I never

10    reported to any other location except Airline and

11    Goodwood.

12        Q.    Do you remember what time you left the

13    area of Airline and Goodwood on Saturday, July 9th?

14        A.    No, ma'am.  I don't know if we left

15    between the daytime deployment and nighttime

16    deployment.  I know it was nighttime when we

17    finally did leave.

18        Q.    Would you say it was late in the evening

19    when you finally left the area of Airline and

20    Goodwood on July 9th?

21        A.    I don't know, ma'am.  I don't recall.

22             MS. LOMMERS-JOHNSON:

23                  Now I'm just going to ask to take

24             another five-minute break.  I may have

25             a couple more questions for you, but I

1          think I at least am almost done.  So if
2          we could just come back at about, you
3          know, a couple of minutes past 12, that
4          would be perfect.
5          {BRIEF RECESS, 11:58-12:06}
6  BY MS. LOMMERS-JOHNSON:
7      Q.   So my computer just died and rebooted.  I
8  am hopeful that I can get through my next couple of
9  questions before it dies again.  So what I'd like
10  to do is go back to the video we marked Exhibit --
11          MR. FOLEY:
12              Unfortunately, Hannah's computer
13          died again, so I can finish this out, I
14          think.  Dave, would you mind making me
15          host or allow me to screen share?
16  EXAMINATION BY MR. FOLEY:
17      Q.   Officer Dennis, I am Eric Foley.  I am
18  another one of the plaintiffs' attorneys.  I had a
19  question for you on the video you were already
20  shown and Hannah mentioned she was going to pull up
21  right before she got kicked off.  Just on my end,
22  it was really choppy when it was playing, so we
23  just wanted to have a freeze frame of it for you to
24  see if, in particular, the two officers on either
25  side of this man in the white T-shirt, if you are

1  able to identify them.  I was just going to slowly

2  advance from second 55 to 59, because there are a

3  few points in there where it looks like one might

4  be able to so their faces and just ask if you

5  recognize either of those officers.

6                    {VIDEO PLAYED}

7  BY MR. FOLEY:

8       Q.   Officer Dennis, would you be able to

9  identify either of these two individuals after

10 having seen that section of the video?

11      A.   I can't.  I can't see the one on the

12 right very well at all.  The one on the left looks

13 familiar, but I don't know who that is.  I can

14 barely make out his face.  Some kind of glasses.

15           MR. FOLEY:

16                Well, I believe that was the extent

17             of our questions from the Smith and

18             Batiste-Swilley plaintiffs.

19           MR. SCOTT:

20                No questions from the City of Baton

21             Rouge.

22           MR. LANSER:

23                Nothing else for me.

24           MR. FAHRENHOLT:

25                I have no questions.

```
 1              [End of deposition, 12:11]
 2

 3

 4              WITNESS CERTIFICATE
 5

 6

 7

 8              I, SERGEANT MARK DENNIS, have read
 9    or have had the foregoing testimony read to me
10    pursuant to Rule 30(e) of the Federal Rules of
11    Civil Procedure and do hereby certify that to the
12    best of my ability and understanding, it is a true
13    and correct transcription of my testimony.
14

15

16    Please check one:
17
      _____Without corrections
18

19
      _____With corrections (see errata sheet)
20

21

22

23    _____    _____
      SERGEANT MARK DENNIS                Date
24

25
```

1              C E R T I F I C A T E

2

3              This certification is valid only for
a transcript accompanied by my original signature
4 and original required seal on this page.

5              I, SANDRA P. DIFEBBO, Certified
Court Reporter, in and for the State of Louisiana,
6 as the officer before whom this testimony was
taken, do hereby certify that SERGEANT MARK DENNIS,
7 after having been duly sworn by me upon authority
of R.S. 37:2554, did testify as hereinbefore set
8 forth in the foregoing 94 pages;

9              That the testimony was reported by
me in stenotype, was prepared and transcribed by me
10 or under my personal direction and supervision, and
is a true and correct transcript to the best of my
11 ability and understanding;

12              That the transcript has been
prepared in compliance with transcript format
13 guidelines required by statute or by rules of the
board, that I have acted in compliance with the
14 prohibition on contractual relationships as defined
by Louisiana Code of Civil Procedure Article 1434
15 and in rules and advisory opinions of the board;

16              That I am not related to Counsel or
to the parties herein, nor am I otherwise
17 interested in the outcome of this matter.

18

19

20

21 _____
Sandra P. DiFebbo,
22 Certified Shorthand Reporter

23 Date:  _____

24

25

SOUTHERN COURT REPORTERS, INC.
(504)488-1112