UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


BLAIR IMANI, ET AL

DOCKET NO.
17-cv-00439-JWD-EWD

VERSUS


CITY OF BATON ROUGE,
ET AL




Deposition of WILLIE WILLIAMS,
taken on June 9, 2021, via Zoom
Videoconference.

```
1    APPEARANCES:
2    MOST & ASSOCIATES
     BY: WILLIAM MOST, ESQ.
3    AND DAVID LANSER, ESQ.
     201 St. Charles Avenue
4    Suite 114, #101
     New Orleans, Louisiana  70170
5    Phone: (504)533-4521
     Email: david.lanser@gmail.com
6        REPRESENTING PLAINTIFFS
     (IMANI V. CITY OF BATON ROUGE)
7
8
     RODERICK AND SOLANGE
9    MacARTHUR JUSTICE CENTER
     BY:  ERIC FOLEY, ESQ.
10   JIM CRAIG, ESQ.
     HANNAH LOMERS-JOHNSON, ESQ.
11   MANDISA MOORE-O'NEAL, ESQ.
     4400 S. Carrollton Avenue
12   New Orleans, Louisiana  70119
     Phone: (504)684-2364
13   Email: eric.foley@macarthurjustice.org
         REPRESENTING PLAINTIFFS
14   (SMITH V. CITY OF BATON ROUGE AND
     BATISTE-SWILLEY V. CITY OF BATON ROUGE)
15
16
     DEELEE MORRIS, ESQ.
17   DAVID LEFEVE, ESQ.
     JOSEPH SCOTT, ESQ.
18   222 St. Louis Street
     Baton Rouge, Louisiana  70802
19   Phone: (225)389-3114
     Email: dsmorris@brla.gov
20       REPRESENTING BATON ROUGE CITY
     POLICE DEPARTMENT OFFICERS
21
22
23
24
25
```

```
1    APPEARANCES (CONTINUED):

2    BURGLASS & TANKERSLEY.
     BY:  GREGORY FAHRENHOLT, ESQ.
3    5213 Airline Drive
     Metairie, Louisiana  70001
4    Phone: (504)836-0408
     Email: gfahrenholt@burglass.com
5        REPRESENTING INDIVIDUAL
     STATE POLICE TROOPERS
6

7

8    ALSO PRESENT:

9    Chase Gunter
     Megan Koilparampil
10

11

12   REPORTED BY:

13   Cecilia M. Henderson
     Certified Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1

 2                    EXAMINATION

 3                                        Page

 4   MR. MOST ................................8
     MR. FOLEY ..............................60
 5   MS. MORRIS ............................74
     MR. MOST ..............................78

 6

 7          E X H I B I T   I N D E X

 8                                        Page

 9   Exhibit B .............................16
     Exhibit A .............................18
10   Exhibit K .............................32
     Exhibit C .............................34
11   Exhibit O .............................44
     Exhibit F .............................57
12   Exhibit V .............................66
     Exhibit U .............................70

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              S T I P U L A T I O N

2

3              It is stipulated and agreed by and

4   between counsel that the deposition of WILLIE

5   WILLIAMS is hereby being taken under Federal

6   Rules of Civil Procedure for all purposes in

7   accordance with law;

8              That the formalities of filing and

9   certification are hereby waived; that the

10  formalities of reading and signing are hereby

11  specifically not waived;

12             That all objections, except those as

13  to the form of the question and/or

14  responsiveness of the answer, are hereby

15  reserved until such time as this deposition or

16  any part thereof may be used in evidence.

17             *  *  *  *  *  *  *  *

18             CECILIA M. HENDERSON, Certified Court

19  Reporter, in and for the State of Louisiana,

20  officiated in administering the oath to the

21  witness.

22

23

24

25

```
 1              MR. MOST:
 2                   We can stipulate that the
 3              deposition is properly noticed and
 4              the court reporter is duly qualified.
 5     BY MR. MOST:
 6         Q    Good morning, Mr. Williams.  How are
 7     you today?
 8         A    I'm okay.
 9         Q    My name is William Most.  I'm an
10     attorney.  I represent the plaintiffs in the
11     case we're here for today, which is Imani V.
12     Baton Rouge.
13              Officer, what's your current rank?
14         A    I'm a Detective.
15         Q    Would you prefer that I call you
16     Detective Williams, Officer Williams,
17     Mr. Williams; do you have a preference?
18         A    Detective is fine.  (INAUDIBLE).
19              THE COURT REPORTER:
20                   Mr. Williams, can I ask you to
21              get a little bit closer to the phone,
22              maybe?  Is it the phone that's
23              recording you -- I mean, that the
24              audio is coming?
25              THE WITNESS:
```

```
 1                  Okay.
 2          MS. MORRIS:
 3                  I think that -- he's on the
 4          phone.  The phone is right next to
 5          the computer.
 6          THE COURT REPORTER:
 7                  Okay.
 8          MR. MOST:
 9                  Deelee, can you turn the volume
10          off on the computer?  Because we're
11          getting feedback.
12          MS. MORRIS:
13                  Let's try that.  Oops.
14          MR. MOST:
15                  We can hear you.
16          MS. MORRIS:
17                  I can't see you, though.  All
18          right.
19   BY MR. MOST:
20       Q   Detective Williams, is Willie your
21   formal first name or is it short for William?
22       A   It's my first name.  Willie is my
23   first name.
24       Q   Got it.  And, Detective, have you
25   ever given a deposition before?
```

1      A    Yes.

2      Q    What kind of case was that in?

3      A    I can't recall.  It's been a little

4   minute ago.

5      Q    Have you given --

6           MS. MORRIS:

7                Hey, William, I'm sorry.  Did

8           the court reporter swear him in?

9           THE COURT REPORTER:

10               I'm sorry.  I did not.  Thank

11          you.

12          MR. MOST:

13               Good catch.

14               WILLIE WILLIAMS, 9000 AIRLINE

15   HIGHWAY, BATON ROUGE, LOUISIANA  70815, AFTER

16   FIRST BEING DULY SWORN IN THE ABOVE-ENTITLED

17   MATTER, DID TESTIFY AS FOLLOWS:

18                   EXAMINATION

19   BY MR. MOST:

20      Q    Detective, have you given more than

21   one deposition in the past?

22      A    Yes.

23      Q    Approximately, how many depositions

24   would you say you've done?

25      A    I couldn't tell you.

1        Q     Less than five?

2        A     Probably so, yeah.

3        Q     Were they in cases where you were a

4   party to the case?

5        A     Where I was a party?  Where I was

6   working the case, basically?

7        Q     Were you a plaintiff or defendant in

8   these cases or you were a witness in these

9   cases where you were deposed?

10        A     I was working the cases, basically.

11        Q     Okay.  Were any of those cases Civil

12   Rights cases about your role as an officer?

13        A     No, never had a Civil Rights case

14   before.

15        Q     So since you've given depositions

16   before, you understand that you're under oath

17   today, correct?

18        A     Yes.

19        Q     You understand that your answers here

20   today have the same force as if we were in a

21   courtroom with a judge and jury?

22        A     Yes.

23        Q     Is there anything today that would

24   prevent you from giving your full attention to

25   the questions and providing complete and

1    truthful answers?

2        A    No.

3        Q    Are you taking any medications or

4    suffering from any illness that would prevent

5    you from understanding my questions or

6    answering them fully and truthfully?

7        A    No.

8        Q    We're going to be doing this

9    deposition, but it doesn't have to be

10   continuous.  So at any point, you need to take

11   a break, please just let Ms. Morris and myself

12   know and we'll take a break.  All right?

13       A    Okay.

14       Q    And something that you, like the

15   previous deponent, are already doing well is

16   for the clarity of the record, please wait

17   until I'm done with any questions before you

18   answer.  And in response, I will try and do

19   the same thing and wait until your answer is

20   complete before I ask the next question.  Is

21   that all right?

22       A    That's fine.

23       Q    Okay.  And if I ask a question that

24   you don't understand, will you agree to tell

25   me that you don't understand, rather than

```
 1    trying to answer it anyway?
 2        A    Yes, I will tell you that I don't
 3    understand.
 4        Q    Since this is a Zoom deposition,
 5    rather than an in-person one, we can't see
 6    much around you, except your face and
 7    Ms. Morris.  So if anyone tries to communicate
 8    with you during this deposition, whether by a
 9    passed note or a head signal or a text message
10    or anything, would you agree to let me know?
11        A    Yes.
12        Q    Detective, do you know what case
13    you're here for today?
14        A    Yes.
15        Q    What's your understanding of that
16    case?
17        A    Basically, I'm here for the deal with
18    the protest.  That's pretty much it.
19        Q    Do you understand that you are a
20    defendant in that case?
21        A    Yeah, I've learned.
22        Q    When did you learn that you were a
23    defendant in that case?
24        A    When I started getting the emails a
25    while back; that we've been dealing with this
```

1    since 2016.  Yes.

2         Q    When you say when you got the emails

3    a while back, was that emails about this

4    deposition?

5         A    It was just email stating this was

6    just ongoing basically.  That's it.  That's it

7    normal emails; nothing other than that.

8         Q    And that at no point during this

9    deposition, do I want you to tell me anything

10   about your communications with your lawyer.

11   So please don't tell me anything about what

12   you and Ms. Morris have discussed.

13        A    I won't.

14        Q    When did you -- approximately when

15   did you find out you would be doing this

16   deposition?

17        A    A couple of days ago, I guess.  Just

18   a couple of days ago.

19        Q    Did you do anything to prepare for

20   this deposition?

21        A    I read over -- just try to think

22   about what happened.  That's it.  It's been so

23   long ago.

24        Q    Okay.  So you read some documents and

25   you sort of went back in your mind to remember

1    what happened; is that accurate?

2        A    I basically I tried to think about

3    what happened.  It's been so long ago.  That's

4    basically it.

5        Q    What documents did you look at to

6    prepare for this deposition?

7        A    Basically, like I said.  There's

8    nothing I can really look at to prepare.  I

9    just thought back to see if there's anything I

10   can recall.  Like I said, it's been so long

11   ago.

12       Q    Maybe I misheard you.  I thought you

13   said something about reading over things?

14       A    No, there's nothing really to read

15   over.

16       Q    Okay.  Just so I'm crystal clear, you

17   did not look at any documents at all in

18   preparing for this deposition, correct?

19       A    I feel like -- I just thought

20   about -- like I'm just looking to see -- like

21   thinking in my mind to see what went on.  Like

22   I said, that's pretty much it.  There's

23   nothing else to prepare me for it.  It was,

24   you know -- it was just chaos on the other end

25   from your people.  Okay.

1     Q    Okay.  It'll just help the clarity of
2  the record if it's a yes or no answer.  Did
3  you look at any documents to prepare for this
4  deposition?
5     A    No.
6     Q    Detective, how long have you been a
7  law enforcement officer.
8     A    About 15, 16 years.
9     Q    Is all that time with the Baton Rouge
10  Police Department?
11     A    Yes, sir.
12     Q    You're currently a detective; what's
13  your current assignment?
14     A    I'm a detective of misdemeanor
15  investigations.
16     Q    What was your rank in July of 2016?
17     A    The same.
18     Q    What was your job assignment in July
19  of 2016?
20     A    My job assignment?  You mean out
21  there or what do you mean?
22     Q    Sure.  My understanding is you have a
23  rank.  You're currently a detective and
24  generally your assignment is, you investigate
25  misdemeanors.

```
 1        A     Yeah.
 2        Q     Your rank in July 2016 was detective
 3   also.  Was your general job assignment the
 4   same, as well?
 5        A     The same.
 6        Q     So this case, the case where I
 7   represent parties, is about the protest of
 8   July 10th, 2016, a Sunday.
 9        A     Yes.
10        Q     Do you recall that day?
11        A     Not really.  I remember what I recall
12   what happened, but I can't remember everything
13   verbatim.
14        Q     Yeah.  Do you recall that there was a
15   protest in the area of East and France
16   Streets?
17        A     Yes.
18        Q     On that Sunday, July 10, 2016, were
19   you in that area?
20        A     Yes, I was on Government Street,
21   general area, Government Street.
22        Q     What was your role that you were
23   doing there on Government Street on that day?
24        A     The only thing I did was help out
25   with paperwork.  Can you hear me?
```

1    Q    Described as a processing team; is

2  that right?

3    A    Yeah, basically pretty much that's

4  it.  Yes, sir.

5    Q    I'm going to pull up a map so you can

6  show us where you are positioned.  Can you see

7  this map, which is Exhibit B?

8    A    Yeah.

9    Q    Okay.  And so your processing area

10  was on Government Street, correct?

11    A    Yeah, I was somewhere right there on

12  Government Street.  I can't remember the -- it

13  was right close to all the foolishness that

14  was taking place.

15    Q    Was it between East and Tenth Street?

16    A    I don't know.  I know it was on

17  Government Street.  I can't give you exact --

18  I don't remember that.  It was on Government

19  Street.  We were close by the stuff that was

20  going on.

21    Q    From where -- was that where you were

22  positioned the entire time that you were in

23  this area?

24    A    Yes.

25    Q    Okay.  Could you see the protesters

1    at East and France from where you were

2    positioned?

3        A    I could -- they had protesters

4    everywhere, so it was pretty much -- they were

5    pretty much in both roadways all around

6    cutting up.  So I say a lot going on.

7        Q    Okay.  So you saw protesters -- you

8    could see protesters on Government Street?

9        A    They had protesters on Government

10   Street at one point.  And they had them in

11   other places, like right around there.  I

12   can't recall everything, but I remember seeing

13   that.  That's the reason why we were there.

14       Q    Uh-huh.

15       A    Uh-huh.

16       Q    Could you -- do you know -- if I say

17   Ms. Batiste's yard, do you know what that is?

18       A    No.

19       Q    Ms. Batiste is a woman who lived at a

20   property at East and France.  Actually, I'll

21   just show you.  I'm now looking at Exhibit A.

22   Do you see this Figure 10 on page 29 of

23   Exhibit A?  This is the corner of East and

24   France.  Were you able to see this area from

25   where you were positioned that day?

```
 1        A    Like I said, the only thing I was
 2   doing was the paperwork.
 3              MS. MORRIS:
 4                   Wait a second.  You're pulling
 5              up a picture, right?  You said Figure
 6              10?
 7              MR. MOST:
 8                   Yeah, Figure 10 on page 29 of
 9              Exhibit A, Third Amended Complaint.
10              MS. MORRIS:
11                   Give us a second.  We're
12              buffering.  We were connecting.  I
13              have the hard copy.
14                   This is what he's talking about.
15              Don't answer yet until we get back on
16              the screen.
17              THE WITNESS:
18                   Okay.
19              MS. MORRIS:
20                   We're also being recorded on the
21              phone --
22              THE COURT REPORTER:
23                   I'm sorry, ma'am.  I'm not
24              hearing your comments to the witness.
25              MS. MORRIS:
```

```
 1              I was just explaining to wait to
 2         answer the question before.  We were
 3         trying to connect through the video,
 4         but I was explaining.  They can hear
 5         us through the phone.  Okay.  We're
 6         back on the video.
 7  BY MR. MOST:
 8     Q    Do you see this image Figure 10 of
 9  the corner of East and France Streets?
10     A    Yes.  I see it.
11     Q    From where you were positioned on
12  Government Street, could you see this area
13  depicted in this picture (Indicating)?
14     A    I can't recall.  I don't know.  Like
15  I said, they had so many protesters out there
16  on all sides.  I don't know.
17     Q    Okay.  Did you personally cause
18  anyone to be arrested on that day?
19     A    No, I did not.
20     Q    Okay.  Your only role that day was
21  just processing paperwork?
22     A    Paperwork, that's it.
23     Q    And what kind of paperwork were you
24  processing?
25     A    The officer's arrest paperwork.
```

```
 1        Q    Okay.  So that's Affidavits of
 2   Probable Cause?
 3        A    Yes, sir.
 4        Q    Any other documents?
 5        A    That's all I can recall.
 6        Q    Were you set up with tables or were
 7   you walking around with paper?
 8        A    I forgot how it was set up.  We were
 9   on Government Street.  I don't remember.  We
10   didn't have -- I don't think we had a table.
11   I don't know.  I don't think we had time to
12   put up a table with them acting like that.  I
13   don't think we had time for that.
14        Q    When you say, "Them acting like
15   that," what do you mean?
16        A    Chaos, confusion, cutting up; you
17   understand, like that.  That's what I'm
18   talking about.
19        Q    So when you say, "Cutting up," did
20   you witness people cutting up?
21        A    I saw people on Government Street
22   when I was there; just wouldn't move; wouldn't
23   let vehicles by.  It was just horrible.  You
24   have to put yourself in those shoes and
25   understand how it was.
```

1      Q    Okay.  Did you see any protesters
2  engage in acts of violence?
3      A    I saw some look like they were trying
4  to hit the cops.  Like I said, I was
5  processing.  I had to watch my back and make
6  sure that I'm straight, you know, basically,
7  I'm going home that evening.  Okay?
8      Q    Yeah.  I understand.  All I want to
9  know is what you personally witnessed with
10  regard to that?
11      A    Yeah, I saw acts of violence, yes,
12  sir.
13      Q    What did you see?
14      A    I saw acts of violence.  Just, them
15  going at officers and stuff, yes.
16      Q    Describe one of the -- the first of
17  those acts of violence you saw?
18      A    I saw it looked like they were trying
19  to fight officers.  I say -- you know, there
20  was a lot going on.  That's pretty much what I
21  saw.  It was just general, just get out the
22  roadway.  That's it.  Other than that, that's
23  it.
24      Q    Okay.  So you saw a protester trying
25  to fight an officer?

1        A     Uh-huh.  I can't tell you who or

2    what.  It was so many people out there, it was

3    just ridiculous.  That's it.

4        Q     Okay.  What specific acts of violence

5    did you see the protester do?

6        A     Like I told you, try to fight the

7    officer.  You just asked me that.  That's what

8    I was telling you.  Basically, that's it.

9        Q     I don't know what -- what do you mean

10   by, "Trying to fight an officer."  Do you mean

11   you saw a protester pull a gun on an officer?

12       A     I saw trying to hit the officer, look

13   like it, basically.  It was a lot of chaos and

14   confusion.  That's what I said at the

15   beginning.

16       Q     Can you remember a particular

17   protester that tried to hit --

18       A     I can't.  I can't.  There's no way I

19   can.  I can't.  There's no way.

20       Q     So you just have a general

21   recollection of an impression that protesters

22   were trying to fight officers, but you can't

23   recall a particular incident; is that fair?

24       A     I know what I saw.  I know what I

25   saw.

```
 1        Q    Okay.  What did you see?
 2        A    I can't recall the protesters.  I
 3   don't know them by name or know --
 4        Q    Okay.  But you have a clear
 5   recollection of a particular protester
 6   engaging in an act of violence?
 7        A    It was a lot of protesters going
 8   haywire, I guess you could say.  It just --
 9   that's just it.
10        Q    Okay.  Can you -- can you recall one
11   of those protesters in your memory?
12        A    No, I can't.
13             MS. MORRIS:
14                  Object to the form; asked and
15             answered.
16   BY MR. MOST:
17        Q    So if I'm understanding you
18   correctly, your testimony is that you recall
19   lots of protesters trying to fight officers
20   but you cannot recall any specifics about any
21   specific protester, correct?
22        A    Yes.
23        Q    Okay.  So I'd like to ask you about
24   how the processing of paperwork happened.  So
25   you were positioned on Government Street,
```

1    correct?

2        A    Yes, sir.

3        Q    You had some papers in your hand?

4        A    No.  The officers would -- the

5    officers would bring the papers to us as they

6    did what they needed to do.  I don't know.  I

7    think they would load the people up.  They had

8    somebody on transporting and they were doing

9    that.  That's all I can recall.  I don't

10   know -- I can't recall everything out there.

11   It's been so long ago.

12       Q    Sure.  But you were signing

13   paperwork, correct?

14       A    Sir?

15       Q    You were signing paperwork?

16       A    Checking the paperwork.  Like I said,

17   I probably sign something, as far as that,

18   yeah, I guess.

19            MR. MOST:

20                 Sorry.  I'm back.

21            THE WITNESS:

22                 Okay.  Because I'm looking over

23            here.  I'm, like, okay.

24   BY MR. MOST:

25       Q    You were signing probable cause

1    affidavits?

2        A    I don't know.  I don't know.  I think

3    they had a sergeant or lieutenant out there

4    signing something.  I don't know.  I can't

5    recall.

6        Q    Do you recall signing anything at all

7    that day?

8        A    I can't recall.

9        Q    That's okay.  Look, "I don't recall"

10   is an okay answer.  It's been five years.  I'm

11   just trying to understand what you do

12   remember.

13       A    Yes.

14       Q    So you were positioned on Government

15   Street.

16       A    Yes.

17       Q    Arresting officers would bring the

18   arrestee to you?

19       A    No, he wouldn't bring the arrestee to

20   me.  The only thing I did was the paperwork.

21   I was putting the paperwork where it needed to

22   be, basically.  That's all I did.  That's it.

23   I was just the paperwork guy.  You understand?

24   I dealt with the paperwork as they did.  They

25   had another officer they were taken to.  I

```
 1    didn't deal with any of that stuff.  They
 2    would do that, and then they would give us the
 3    paperwork.  And we would just:  Hey, here you
 4    go, like that.  Just make sure the paper work
 5    was done.  That's it.
 6         Q    So the officer would hand paperwork
 7    to you and then you would put it in a
 8    particular area; is that correct?
 9         A    I guess, yes, yeah.
10         Q    Did you -- would you have a
11    conversation with the officer about the
12    contents of the paperwork?
13         A    No.  I can't recall.  I can't recall
14    on that.
15         Q    Okay.  So you weren't asking the
16    arresting officer any questions about it.  You
17    were just taking the paperwork and putting it
18    somewhere else, correct?
19         A    Yeah, that's it.  And they had other
20    people processing and doing everything else,
21    too.  So it was just a lot going on, a lot of
22    moving parts.  Okay?
23         Q    Yeah.  I understand.  And I
24    understand that you had -- your testimony is
25    you had a very limited role that day --
```

```
 1              THE COURT REPORTER:
 2                   I'm sorry, Mr. Most.  I think I
 3          lost you.
 4              THE WITNESS:
 5                   Yeah.  Go ahead, sir.
 6  BY MR. MOST:
 7      Q    So your role on July 10, 2016, it
 8  sounds like it was very limited.  All you did
 9  is receive paperwork from arresting
10  officers --
11      A    Yeah.
12      Q    -- place it in a particular place and
13  not ask those officers any questions about the
14  contents of the paperwork; is that correct?
15      A    Yeah, we had so many other -- yeah,
16  we had so many other people doing
17  stuff with -- paperwork was just, like:  Hey,
18  here.  And you reaching down; however it went,
19  like that.  It wasn't like -- that's it.  I
20  didn't have time to ask any questions, you
21  know, as far as that.  That's it.
22      Q    Okay.  So my description was
23  accurate?
24      A    Yeah.
25      Q    Okay.  Do you know if there was an
```

1  officer there who was notarizing documents?

2      A    They had to have somebody notarizing

3  them, because I wasn't a notary at that time.

4  So I couldn't notarize it so they had to

5  have -- I don't know who -- they had so much

6  going on.  It was either a lieutenant or

7  sergeant that had a notary capability or

8  something, I'm guessing.  Uh-huh.

9      Q    Okay.  I want to talk to you a little

10  bit about your understanding about what a

11  probable cause affidavit is.  My understanding

12  is a probable cause affidavit is also called

13  an arrest affidavit; is that correct?

14      A    Yeah, pretty much.  Yeah.

15      Q    And what is an arrest affidavit?

16      A    What is an arrest affidavit?

17      Q    (Nods head.)

18      A    Basically, when you using it to

19  arrest somebody, I guess.  I don't know.  I

20  don't know what terms you want.  But that's

21  basically it.

22      Q    The criminal Code describes it as,

23  quote:  "An affidavit is a written accusation

24  of a crime made under oath and signed by the

25  affiant," end quote.  Does that sound accurate

1    to you?

2        A    Yes.

3        Q    So an affidavit has to be a truthful

4    description of probable cause for someone's

5    arrest, correct?

6        A    Yes.

7        Q    It has to detail the facts of the

8    crime that person is being arrested for,

9    correct?

10       A    Uh-huh.

11       Q    And it has to explain why this

12   particular person is being accused of this

13   particular crime on this particular date,

14   correct?

15       A    Yes.

16       Q    And the arrest affidavit is what

17   justifies the arrest, correct?

18       A    Yes, yes.

19       Q    It tells you whether you have a

20   justified arrest or unjustified arrest,

21   correct?

22       A    Yes.

23       Q    And it's something that is submitted

24   to the Court, correct?

25       A    Uh-huh.

1      Q    It will help if you say "Yes" or
2   "No," because "Uh-huhs" are hard for the court
3   reporter.
4      A    Yes.  I got you.
5      Q    So if an affiant makes up information
6   in an arrest affidavit, they're manufacturing
7   false evidence, correct?
8           MS. MORRIS:
9                Object to the form.  It calls
10              for a legal conclusion, but you can
11              answer.
12          THE WITNESS:
13                I guess.  I don't know.
14  BY MR. MOST:
15     Q    But an arrest affidavit has got to be
16  truthful, correct?
17     A    Yes.
18     Q    And in order to book someone into the
19  East Baton Rouge Parish Prison?
20          THE COURT REPORTER:
21                I'm sorry, Mr. Most.  I lost
22              you.
23          MR. MOST:
24                I'll repeat.
25

```
 1   BY MR. MOST:
 2        Q    For an arrestee to be booked into the
 3   East Baton Rouge Parish Prison, there has to
 4   be a signed probable cause affidavit for that
 5   arrestee, correct?
 6        A    Yes. (INAUDIBLE)
 7        Q    Sorry.  So an officer cannot book an
 8   arrestee into the parish prison without an
 9   arrest affidavit, correct?
10        A    No.
11        Q    And filling out the Affidavit of
12   Probable Cause is it the duty of the arresting
13   officer, correct?
14        A    I guess it depends, I guess.
15        Q    Well, the Affidavit of Probable Cause
16   has to be based on the things the affiant
17   witnessed, correct?
18             MS. MORRIS:
19                  Object to the form.  It calls
20             for a legal conclusion.  You can
21             answer.
22             THE WITNESS:
23                  Yeah.
24   BY MR. MOST:
25        Q    So what's your answer, Detective?
```

```
 1              MS. MORRIS:
 2                   We are out.  Hold on.  I think
 3              we're timed out.  Give us one second.
 4                   All right.  We are back online.
 5              You can answer his question.
 6              THE WITNESS:
 7                   I don't know.  Is it muted or
 8              something?
 9              MS. MORRIS:
10                   Y'all can hear us, right?
11              MR. MOST:
12                   Yes.
13      BY MR. MOST:
14          Q    So you're not sure if the arresting
15      officer is responsible for the Affidavit of
16      Probable Cause; is that correct?
17          A    No.  Yes, I'm not sure.
18          Q    I'm going to share a document which
19      is Exhibit K at page 253.  And do you see
20      under where it says -- this is "Baton Rouge
21      Police Department Operations Manual," correct?
22          A    Uh-huh.
23          Q    And you see that this is General
24      Order Number 203?
25          A    Yes.
```

1      Q    Do you see under 3-C it says:  "The
2  arresting officer must complete Arrestee
3  Information Form, probable cause affidavit and
4  have the NCIC hit confirmation."
5           Do you see that?
6      A    Uh-huh.
7      Q    Does that refresh your memory as to
8  whether it's the arresting officer's duty to
9  do the probable cause affidavit?
10     A    Yeah, I guess.  Yeah.
11     Q    Okay.  So it's your understanding
12 that it's the arresting officer's duty to
13 complete the probable cause affidavit; is that
14 correct?
15     A    Let me read this one more time.  You
16 said C, correct?
17     Q    Yes, Section 3-C.
18     A    Yeah.  That's what it states.
19     Q    So is it your understanding that the
20 arresting officer is the one who is supposed
21 to fill out the Affidavit of Probable Cause?
22     A    That's what it states.
23     Q    Okay.  Do you have a different
24 understand than this general order?
25     A    No.  That's what it states.  I'm

1  saying:  Yes, that's what it states.

2       Q    And, Detective, your badge number is

3  P-10178, correct?

4       A    Uh-huh.

5       Q    I'm pulling up Exhibit C at page 13.

6  Do you see this Affidavit of Probable Cause?

7       A    Yeah.

8       Q    This is for an arrestee, Antonio

9  Castanon.

10      A    Yes.

11      Q    Do you see here where it says:

12  "Affiant"?  Is that your signature?

13      A    Yeah, that is my signature.

14      Q    Okay.  So you signed this Affidavit

15  of Probable Cause?

16      A    Like I said, I must have signed it.

17  Everything that was going on, the officer must

18  have brought the information to us, I guess.

19  The officer must have brought the paperwork to

20  us.  And yeah.  That's my signature.  What

21  else you need to know?

22      Q    Okay.  But you didn't personally

23  arrest Antonio Castanon, right?

24      A    No.

25      Q    You didn't cause his arrest, did you?

1      A     No, sir.

2      Q     You signed this document under oath,

3  correct?

4      A     Yeah, I guess, yeah.

5      Q     You see at the bottom where it says:

6  "Sworn and subscribed to me" -- I'm sorry.

7  "Sworn to and" --

8      A     That's not my signature down there.

9  That's a sergeant's signature.

10     Q     Yeah, I understand.  But That's the

11 sergeant who notarized this document, right?

12     A     Yeah.

13     Q     And it says:  "Sworn to and

14 subscribed before me."  That's referring to

15 you; you swore to the truth of his document,

16 right?

17     A     The officer -- I'm going off what the

18 officer did and gave the paperwork, basically.

19 So I'm going off of him and that's it.  Yeah.

20 Okay.  Yeah.

21     Q     So you signed this document under

22 oath, correct?

23     A     Yeah.  Yes, sir.

24     Q     Yes or no or something else?

25     A     Yes, yes, yeah.

```
 1      Q    That's a question.  Do you understand
 2   that when you swear to the truth of a
 3   document, you're doing it under potential
 4   penalty of perjury?
 5           MS. MORRIS:
 6                Object to the form.  It calls
 7                for a legal conclusion and
 8                speculation.  You can answer.
 9           THE WITNESS:
10                No, I did not know.
11   BY MR. MOST:
12      Q    You didn't know that when you swear
13   to a document under oath, it's under penalty
14   of perjury?
15      A    The officer brought us the thing and
16   apparently he didn't sign it or something.  I
17   guess that's how that happened.  I don't know.
18   I can't recall.  Like I said, it's been so
19   long ago.
20      Q    Okay.  But, generally, do you
21   understand that when you swear to a truth of a
22   document, you're doing it under the penalty of
23   perjury, just in general?
24      A    Uh-huh, yeah.
25      Q    So we already established you did not
```

1  cause the arrest of Antonio Castanon, correct?

2      A    No, I did not.

3      Q    Do you see that sort of the first

4  paragraph under where it says:  "Affidavit of

5  Probable Cause"?  It says:  "The undersigned

6  law enforcement officer caused the arrest of

7  the following listed defendant."

8      A    Yes.

9      Q    So that part is not truthful,

10 correct?

11         MS. MORRIS:

12             Object to the form.  Actually,

13         I'm not going to -- I don't want him

14         to answer that.

15         MR. MOST:

16             What's the basis for you

17         instructing him not to answer,

18         Ms. Morris?

19         MS. MORRIS:

20             You're stating he can be

21         found -- implicating some kind of

22         perjury.  And so I don't want him to

23         testify about anything that he'd be

24         criminally accounted for.

25         MR. MOST:

```
 1              Okay.  So you're instructing him
 2         to plead the Fifth to this question
 3         or you're suggesting that he plead
 4         the Fifth?
 5    MS. MORRIS:
 6              What was the question, again;
 7         tell me again?
 8    MR. MOST:
 9              The question is, where it says
10         that "The undersigned law enforcement
11         caused the arrest of the following
12         listed defendant," is that part
13         truthful?  Please don't talk with
14         Ms. Morris.
15    MS. MORRIS:
16              No.  I'm just saying, where it
17         does say that?
18    MR. MOST:
19              If you look under "Affidavit of
20         Probable Cause" and I quote, "Before
21         me personally appeared that the
22         undersigned law enforcement officers
23         depose that the following recited
24         facts are true and correct to the
25         best of his knowledge."
```

```
 1              MS. MORRIS:
 2                   I got it.  I was looking at the
 3              synopsis.  I apologize.
 4              THE WITNESS:
 5                   Where is that?
 6              MS. MORRIS:
 7                   It's up at the top.
 8    BY MR. MOST:
 9         Q    Do you see the part, Detective, where
10    it says he caused the arrest?
11         A    Yeah, I see it.
12         Q    So that part is not truthful, right?
13         A    I plead the Fifth.
14              MS. MORRIS:
15                   No.  Okay.  I'm going to object
16              to the form of the question as far
17              as -- well, I'm going to tell him to
18              take the Fifth to the extent that
19              you're implicating that he perjure
20              himself.  I don't want him to comment
21              on that.
22    BY MR. MOST:
23         Q    So, Detective, you're taking your
24    lawyer's advice and pleading the Fifth to that
25    question?
```

```
1        A    Yes.
2        Q    Do you see the part where it says:
3   "The defendant did knowing and feloniously
4   violate Louisiana Revised Statute 14:100.1."
5        A    Uh-huh.
6        Q    Do you know what 100.1 is?
7        A    Resisting an officer.
8        Q    14:100.1, that's resisting an
9   officer?
10       A    Oh, obstruction of a passage.  Go
11  ahead.  I'm sorry.
12       Q    Have you ever heard of the crime of
13  obstruction of a public passage?
14       A    Uh-huh.
15       Q    Is it your testimony that Antonio
16  Castanon feloniously violated 14:101.1?
17            MS. MORRIS:
18                 I'm sorry.  Can you repeat the
19            question?
20            MR. MOST:
21                 Yeah.
22  BY MR. MOST:
23       Q    It says here that Antonio Castanon
24  knowingly and feloniously violated 14:100.1,
25  right?
```

1        A       Yes.

2        Q       And you signed this probable cause

3    affidavit, right?

4        A       Uh-uh.

5        Q       So did you observe Mr. Castanon

6    committing that crime?

7        A       I'm just going off what the

8    officer -- when the officer brought the

9    paperwork, you can look at the file number

10    that the officer wrote the report under.

11        Q       Is it your handwriting at the top

12    where it says, "Antonio Castanon"?

13        A       No, that's not my handwriting.

14        Q       Is your handwriting on this document

15    anywhere except for your signature?

16        A       Just my signature.  That's it.  I

17    don't write that.

18        Q       So the another officer filled in the

19    "Antonio Castanon, 10th of July."

20        A       The arresting officer, I think he

21    didn't sign it as affiant.  That's what

22    happened.

23        Q       Okay.  Did you have a conversation

24    with that officer about the contents of this

25    affidavit?

1      A    No, it was too much going on, no.

2      Q    I'll repeat the question.  Detective,

3   you didn't have any way of knowing what

4   Mr. Castanon did or didn't do on July 10,

5   2016; is that correct?

6      A    I'm going off of the officer bringing

7   him there and basically his paperwork.  That's

8   it.  That's it.  So you would have to talk to

9   him.

10     Q    Who was that officer?

11     A    You'd have to look up the report.

12  I --

13     Q    And if there is no report that's been

14  provided to us, how would we know who that

15  officer was?

16     A    Sir, I don't know.  I have no idea.

17  This was in 2016.

18     Q    So you just took this piece of paper

19  and signed it without asking any questions,

20  correct?

21         MS. MORRIS:

22             Object to the form.

23         Mischaracterizes his testimony.  You

24         can answer.

25

```
 1   BY MR. MOST:
 2       Q    What's wrong about my statement,
 3   Detective?
 4       A    I don't know.  I don't know.
 5       Q    Okay.  Maybe I misunderstood you.  My
 6   question was:  You just received this piece of
 7   paper and signed it without asking any
 8   questions of the officer who handed it to you;
 9   am I correct.
10       A    I guess.  I can't recall.  I can't
11   recall all of that.  There's no way.
12       Q    So when it says here that
13   Mr. Castanon actively attempted to prevent the
14   lawful arrest after being placed under arrest,
15   you don't know what the facts are that would
16   describe that, correct?
17       A    I can't recall.  You'd have to ask
18   the officer who (INAUDIBLE) --
19            THE COURT REPORTER:
20                 "The officer who" -- I'm sorry.
21            THE WITNESS:
22                 The officer who brought the
23            paperwork.  I don't know.
24            THE COURT REPORTER:
25                 You're trailing off at the end.
```

```
 1              So just if you can --
 2              THE WITNESS:
 3                  Officer who brought the
 4              paperwork.  I don't know.
 5    BY MR. MOST:
 6        Q    This says that Mr. Castanon
 7    feloniously violated 14:100.1.  Do you see
 8    that?
 9        A    Yes.  You showed it to me.  Yes.
10        Q    Do you know if 100.1 is a misdemeanor
11    or a felony?  I'm pulling it up right here.
12    This is 14:100.1.  This is Exhibit O.  Do you
13    see under Section B here that 100.1 is a
14    misdemeanor.
15        A    Yeah, I'm reading it right here,
16    yeah.
17        Q    Okay.  Do you have an answer to that
18    question, Detective?
19        A    I didn't hear you say anything.  Your
20    computer --
21        Q    Oh, I'm sorry.  I apologize.  100.1
22    is a misdemeanor and so there's no way that
23    Mr. Castanon could have feloniously violated
24    100.1, correct?
25        A    I don't know.
```

45

```
 1        Q    You signed your name to this document
 2   and swore it was true, correct?
 3             MS. MORRIS:
 4                  I'm going to, I guess, object,
 5             again and out of an abundance of
 6             caution have him not answer.
 7             MR. MOST:
 8                  You're going to instruct him to
 9             plead the Fifth to that question,
10             Ms. Morris?
11             MS. MORRIS:
12                  Say the question again?
13             MR. MOST:
14                  Sure.
15   BY MR. MOST:
16        Q    Detective, you signed this document
17   and swore that the contents of it were true,
18   correct?
19        A    I'm going to plead the Fifth.
20             MR. MOST:
21                  Okay.  And I'll just advise
22             Ms. Morris that, unlike a criminal
23             case, there can be consequences for
24             pleading the Fifth in a civil matter.
25             I'll state that for the record.
```

```
 1            MS. MORRIS:
 2                  (INAUDIBLE).
 3            THE COURT REPORTER:
 4                  I'm sorry, ma'am.
 5            MS. MORRIS:
 6                  I'm not making an objection to
 7            that question.  He can answer.
 8    BY MR. MOST:
 9       Q    Okay. Detective --
10       A    What was the question, again?
11       Q    Sure.  The question was:  You signed
12    this document and swore that the contents were
13    truthful, correct?
14       A    Yeah, I guess.  Like I said, it came
15    from another officer.  I'm going off --
16    bouncing off of what he did.  If he said this
17    happened, this is him.  You have something,
18    you know, in place.  Basically, you're
19    supposed to be truthful and you're supposed to
20    be able to believe the fellow officer.  I'm
21    guessing, yeah.  Okay, yeah.
22       Q    So the answer to my question is:
23    Yes, you signed this document and swore that
24    it was truthful, correct?
25       A    Yes.
```

```
 1          MS. MORRIS:

 2               Can we take a break?

 3          MR. MOST:

 4               Yeah.  I will advise you I will

 5          ask you who you talked to during the

 6          break and what you talked about, even

 7          if it's your attorney.  So just

 8          please be cautious about what you

 9          discuss or look at during the break.

10          How much time would --

11          THE WITNESS:

12               I need a five-minute break.

13          MR. MOST:

14               Sure.  That's great.  We'll

15          reconvene at 12:43.

16               (BRIEF RECESS)

17          MR. MOST:

18               Do you have anything to report,

19          Deelee?

20          MS. MORRIS:

21               Meaning, like, what?  Like if I

22          had any conversation with him?

23          MR. MOST:

24               No.  You went off to confer

25          about something.  I don't know if
```

```
1              there's anything you want to discuss.
2              MS. MORRIS:
3                   No, we're good.
4    BY MR. MOST:
5         Q    Detective, I think you were in the
6    room that whole time.  Did you talk to anyone
7    during that break?
8         A    No, sir.  I just sat here, man.
9    That's it.
10        Q    I understand.  Did you look at any
11   documents during the break?
12        A    No.
13        Q    We're going to continue looking at
14   Exhibit C, page 13.  Do you know anything
15   about Antonio Castanon, besides what's
16   written --
17        A    I don't know anything about him.
18   Like I said, the officer must hadn't signed.
19   That's the only reason why my signature was on
20   this paper.  We were just processing
21   paperwork.  There's nothing more, nothing
22   less.  That's it.  I don't know anything about
23   him.  I didn't handle him or anything like
24   that; nothing out of that.  That's the only
25   thing that happened.  That's it.
```

```
 1        Q    So just to clarify, you don't know
 2   anything about him today?
 3        A    No, sir.
 4        Q    And you didn't know anything about
 5   him on July 10, 2016, correct?
 6        A    Not as far as -- no, no, sir.
 7        Q    Within this document, it says --
 8   right after the sort of handwritten, "500 East
 9   Boulevard," the next sentence says:
10   "Protesters assembled at provided parking
11   areas and in surrounding parking lots."
12             Is that part of the affidavit true?
13             MS. MORRIS:
14                  Object to the form, but you can
15             answer.
16             THE WITNESS:
17                  I'm assuming.  Yeah, I'm
18             assuming, yes.
19   BY MR. MOST:
20        Q    Why are you assuming that?
21        A    Because it was -- you said
22   protesters.  There were protesters.  It was
23   loud noise.  Everything was going on out
24   there.  Like I said, at the beginning, it was
25   just chaos and confusion.
```

```
 1        Q    Right.  But what caused you to
 2   testify that "Protesters assembled at provided
 3   parking areas and in surrounding parking
 4   lots," that part of that?
 5        A    They were in the streets.  They were
 6   in the parking lot.  They were everywhere out
 7   there.  So that's it.
 8        Q    It says:  "Provided parking areas."
 9   Does that mean that the police provided
10   parking areas to protesters to assemble in?
11        A    I don't know.  I don't know.  I think
12   -- I don't think they even had -- I think
13   they're supposed to have a -- I can't even
14   think of it now.  Supposed to have something
15   to protest.  Don't you have to fill out
16   something in order to protest, I thought?  I
17   don't know.  I'm asking you.
18             MS. MORRIS:
19                  It doesn't go that way.
20             THE WITNESS:
21                  Sorry.  I don't know.  I'll say
22             I don't know.
23   BY MR. MOST:
24        Q    So you don't have any basis to
25   believe that was a truthful statement,
```

1    correct?

2          MS. MORRIS:

3                Object to the form.

4          THE WITNESS:

5                I don't know.

6    BY MR. MOST:

7    Q    The next thing says:  "Protesters

8    were advised by loud speaker to remain on

9    private property and on the curb."

10          Do you see that part?

11   A    Yeah, I see it.

12   Q    Is that part truthful?

13   A    I don't know.  I don't know.  I can't

14   remember everything that went on at all.

15   Q    Put says that the protesters were

16   told to stay on private property and on the

17   curb, right?

18   A    Sir, again, I don't know.

19   Q    But that's what this says, right?

20   A    Yeah, that's what this says, yeah.

21   Q    So if Mr. Antonio Castanon was

22   standing on the curb, he shouldn't have been

23   arrested, because that's where he was told to

24   be, right?

25   A    I'm assuming.  I don't know if he was

```
1    on the curb.  I don't know.  You understand?
2    I wasn't the arresting officer.
3         Q    Right.
4         A    I don't know.
5         Q    I get that.  But this is saying that
6    protesters were told to be on the curb.  So if
7    Antonio was on the curb, he should not have
8    been arrested, correct?
9         A    Assuming -- like, again, I don't
10   know.  Maybe he wasn't on the curb.  I don't
11   know.
12        Q    But if he was on the curb, that's
13   where he was supposed to be, correct?
14        A    That's what this says, yes, sir.
15        Q    And so if he was on the curb, he
16   should not have been arrested, correct?
17        A    I guess, yeah.
18        Q    Okay.  Do you see the next paragraph
19   says:  "During the protest, the defendant
20   entered the roadway; was provided another
21   verbal order to exit the lanes of travel.
22   Moments later, the defendant entered the
23   roadway again and was taken into custody by
24   officers on the scene."
25             Is that part of the affidavit
```

1    truthful?

2        A    Yes, I'm assuming so.

3        Q    Why are you assuming so?

4        A    Because that's what the officer --

5    that's what the officer, I guess, brought his

6    paperwork and stuff.  I'm going off what they

7    did.

8        Q    And you can't tell me if it's true or

9    not, correct?

10        A    Sir, I don't know.

11        Q    You don't know.  Okay.  This also

12    says:  "Antonio Castanon resisted arrest."

13            Is it true that he resisted arrest?

14        A    I don't know.

15        Q    You don't know?

16        A    No.  (INAUDIBLE)

17        Q    So you swore under oath that he

18    resisted arrest, but you don't know if that's

19    true or not, correct?

20        A    I don't know.

21        Q    These documents were printed prior to

22    the protest, correct?

23        A    I have no idea.

24        Q    Okay.  Were there typewriters or

25    computers that the officers carried at the

1    protest.

2        A    I don't know.  In their units.

3        Q    So you don't know if this was typed

4    up and printed out at the protest or before?

5        A    No, I don't know.

6        Q    Have you, at any point while being a

7    Baton Rouge police officer, received any

8    training about how to handle protests?

9        A    Yes.

10       Q    What was your training on that topic?

11       A    We just received training on how to

12   deescalate protests, basically; an in-service

13   or something.  That's it.

14       Q    Was it a specific unit on dealing

15   with protesters or it was --

16       A    Mobile Field Force.

17           THE COURT REPORTER:

18               I'm sorry.

19           THE WITNESS:

20               Mobile Field Force.

21           THE COURT REPORTER:

22               Mobile --

23           THE WITNESS:

24               Mobile Field Force.

25

1    BY MR. MOST:

2        Q    So part of your Mobile Field Force

3    training dealt with how to address protesters,

4    correct?

5        A    Yeah.

6        Q    And did that training say that

7    peaceful protesters can be arrested?

8        A    No, I don't think so.  But, again, I

9    don't know if they were peaceful.

10        Q    Right.  But if they were peaceful,

11    they shouldn't have been arrested, correct?

12        A    Yes, sir.

13        Q    And in order to arrest a protester

14    for not being peaceful, it has to be that

15    particular protester that was violent, not

16    some other protester, right?

17        A    Yes.  I'm assuming so, yes.

18        Q    You're assuming so or the answer is

19    yes?  You're an officer.

20        A    Yes.

21        Q    Okay.  Are you aware that protesters

22    have a First Amendment right to protest?

23        A    Yes.

24        Q    Do you have any awareness of a case

25    from the 1960s, a Supreme Court case about

1  protesters' rights to protest in Baton Rouge?

2      A    No, no.

3      Q    Was that case ever part of your

4  training?

5      A    I can't recall.  It probably -- I

6  can't recall.

7      Q    So we talked about the statute R.S.

8  14:100.1, which is obstruction of a public

9  passageway.

10     A    Uh-huh.

11     Q    Have you ever arrested someone for

12 violation of that statute?

13     A    I can't recall.

14     Q    Okay.  So -- and you've been an

15 officer for --

16     A    Sixteen years.

17     Q    Since 2003, so almost 18 years,

18 right?

19     A    No, not 2003.

20     Q    I'm sorry.

21     A    Wrong person.  2006, so about 15, 16

22 years, something like that, sir.

23     Q    So in your 15 or 16 years as an

24 officer, you can't remember any time where you

25 arrested someone for R.S. 14:100.1?

57

```
 1        A    I can't recall.

 2        Q    Are you familiar with R.S. 14:97,

 3   obstruction of a highway of commerce.

 4        A    I'm not familiar with it, no.

 5        Q    In your 15 or 16 years as an officer,

 6   can you recall ever arresting someone for a

 7   violation of R.S. 14:97, obstruction of a

 8   highway of commerce?

 9        A    Not as I can recall.

10             You said something?  I can't hear

11   you.

12        Q    I hadn't spoken yet.

13        A    Oh, I thought you were saying

14   something.

15        Q    I'm showing Exhibit F at page 5.

16   This is a document that was provided to us in

17   response to a subpoena.  On page 6 you can

18   see, it says -- you signed the probable cause

19   affidavit for Antonio Castanon, right, which

20   we already looked at, correct?

21        A    Uh-huh.

22        Q    It also says you signed a probable

23   cause affidavit for a man named Victor Onuoha?

24   Do you remember signing a probable cause

25   afterward for Victor Onuoha.
```

1        A    I can't recall.

2        Q    We don't have a copy of it.  We

3    haven't been provided a copy of it.  Would it

4    look the same as Antonio's?

5        A    Sir, I don't know.  I can't recall.

6        Q    Do you recall how many Affidavits of

7    Probable Cause, approximately, you signed on

8    July 10, 2016?

9        A    Hopefully, it was just those two.  I

10    don't know.  I don't know, sir, but I

11    didn't -- it was because the officer didn't

12    sign it or something, basically.  But I don't

13    know.  I don't know.

14        Q    And just going back to Exhibit C at

15    page 13, briefly.  Do you see where the

16    narrative starts under, "Synopsis of Probable

17    Cause."  It says:  "The affiant stated to the

18    Court."  Do you see that part?

19            MS. MORRIS:

20                It hasn't loaded yet.

21            MR. MOST:

22                Oh, okay.  Has the probable

23            cause affidavit loaded?

24            MS. MORRIS:

25                Yes.

1    BY MR. MOST:

2        Q    Do you see "Synopsis of Probable

3    Cause" where it says:   "The affiant stated to

4    the Court"?

5        A    Yes.

6        Q    And you're the affiant for this

7    document?

8        A    Yeah, I signed it, yeah.

9        Q    So this is a statement you're making

10   to the Court, correct?

11       A    Yeah, the officer didn't sign here.

12       Q    Sorry.  Is that a yes or no?

13       A    Yeah.

14       Q    Good news is, we may be close to the

15   end of my questions.

16            In your 15 or 16 years as an officer,

17   have there ever been times where you were

18   provided with preprinted Affidavits of

19   Probable Cause before the alleged crime

20   occurs?

21       A    No, sir.

22            MR. MOST:

23                Okay.  Detective, those are my

24                questions.  Unless I've got any to

25                respond to any that anyone else has

```
 1              any questions.

 2                   Eric or any other plaintiffs

 3              counsel, would you like to ask any

 4              questions?

 5              MR. FOLEY:

 6                   Yes, yes.  This is Eric Foley

 7              from plaintiff's counsel.  Just a

 8              moment as I cue this up.

 9                        EXAMINATION

10  BY MR. FOLEY:

11      Q    Good afternoon, Officer Williams.  I

12  represent a plaintiff in a different case, but

13  arising from the same events, so the protests

14  on July 10th downtown.  I represent a woman

15  named Sophie Kosofsky.  So I want to ask you a

16  few questions about what happened to her that

17  day.  I'm going to start by showing you a

18  document.  I'm going to screen share here

19  and -- if you do me a favor and just let me

20  know if you see a document on the screen of

21  Affidavit of Probable Cause?

22      A    Uh-huh, I see it.

23      Q    Okay.  I'm going to zoom in, so it's

24  easier to see.  But I just wanted to zoom out

25  first, so you can see the entire document.
```

```
 1    It's a one-page document here.  I'm going to
 2    zoom in, since it's easier to see.  The first
 3    question I just want to ask is, this area here
 4    where it says, "Sofie A. Kosofsky," all of
 5    this part that's handwritten in here, do you
 6    recognize this handwriting?
 7         A    Yeah, it looks like my handwriting.
 8         Q    Okay.  All right.  And then down at
 9    the bottom here where it says, "Affiant," it's
10    printed "W. Williams."  Is that your
11    handwriting there, as well?
12         A    Yes, sir.
13         Q    The signature on the notary public,
14    is that Sergeant Derrick Williams?
15         A    Yes.
16         MS. MORRIS:
17              Hold on.  Hold on.  We have no
18         video.
19         MR. FOLEY:
20              Oh, I apologize.
21         MS. MORRIS:
22              That's okay.
23         MR. FOLEY:
24              Is it backing up?
25         MS. MORRIS:
```

```
1              It's coming on now.  Okay.
2         You're good.
3   BY MR. FOLEY:
4       Q    All right.  I'll repeat my question
5   there.  Officer Williams, do you recognize the
6   signature on the notary public line as
7   Sergeant Derrick Williams?
8       A    Yes, sir.
9       Q    Was he your supervisor at that time?
10      A    Yes, sir.
11      Q    I'm going to further zoom in and I'm
12  just going to ask you to read the "Synopsis of
13  Probable Cause."  When you've completed
14  reading it, can you just let me know when
15  you're done?
16      A    Okay.  You can go ahead.  I'm
17  finished.
18      Q    So I just want to ask you several
19  questions about the synopsis.  Now, do you
20  have any personal knowledge that Ms. Sofie
21  Kosofsky -- and just to clarify, her name is
22  printed here as Kofsky.  It's actually the
23  name Kosofsky.  I just don't want it to be
24  confused as I'm reading that.  And for the
25  court reporter's benefit, that is
```

1    K-O-S-O-F-S-K-Y.

2          Do you have any personal knowledge

3    that Ms. Kosofsky was at a protest on July 10,

4    2016?

5          A    No, sir.

6          Q    Do you have any personal knowledge

7    that she was advised by loud speaker to remain

8    on private property and then on the curb?

9          A    No, sir.

10         Q    Do you have any personal knowledge

11    that she was advised to stay out of the

12    roadway and not to impede the flow of traffic?

13         A    No, sir, other than, like I said, the

14    officer bringing the information.  No, sir, I

15    don't know.

16         Q    So any of these following allegations

17    here, that the announcements were made

18    frequently, that she was provided verbal order

19    or -- also this second to last sentence here,

20    "Moments later the defendant entered the

21    roadway again."  Do you have personal

22    knowledge of any of those allegations?

23         A    Just from the officer giving -- I

24    guess the officer that -- I guess the

25    arresting officer making the arrest, just

1   that.  I don't have any personal knowledge as

2   far as that, no, sir.

3        Q    To clarify, personal knowledge, for

4   purposes of our conversation, I'm asking, did

5   you see it or witness it, yourself?

6        A    No, sir.

7        Q    And that goes for all of the

8   allegations in the synopsis.

9        A    Yes, sir.

10       Q    Okay.  A question on the actual form

11  itself -- because I notice this is slightly

12  different than the form you just saw for

13  Mr. Castanon.  One of the differences being,

14  you see 9000 Airline Highway is crossed out

15  here.  Where on Mr. Castanon's form, there is

16  a blank to be filled in.  Where did you

17  receive these preprinted forms from?

18       A    Sir, I don't know.  The only thing I

19  know -- I don't even recall everything about

20  that.  There was so much going on out there, I

21  couldn't tell you.  I don't know if they are

22  preprinted or what, how they -- I don't know.

23       Q    Okay.  And so -- did you have this

24  form with you when the arrestees would arrive

25  at the processing center or did the officer

1  transporting the arrestee have the form?

2      A    The officers bring -- I guess he

3  brought -- must have brought the

4  identification and the paperwork.  That's all

5  I know.  You know, that's pretty much it.  And

6  they had so much going on, I guess, that they

7  couldn't sign it.  So that's why my signature

8  is on that paper.

9      Q    Okay.  When did you sign this?  Was

10 it in the afternoon when everyone was being,

11 arrested; was it later in the day?  Was it

12 another day?

13     A    Everything was going on at that time.

14 There was so much chaos and confusion,

15 everything was going on at that time.

16     Q    Okay.  Let me ask a different

17 question, then.  Where did you sign these?  Do

18 you remember; was it on the street or was it

19 back in an office or --

20     A    It was on the street.  It was -- all

21 of it was done on the street, on Government

22 Street.

23     Q    Okay.  So this is Government, like,

24 the block before the interstate?

25     A    I don't know where I was standing at

```
 1    that time.  I can't recall.
 2           MR. FOLEY:
 3                  Okay.  I'm going to offer this
 4           as Exhibit -- which I guess -- are we
 5           on V or W now?
 6           MR. MOST:
 7                  V.
 8           MR. FOLEY:
 9                  V as in Victor.  I'll offer this
10           as Exhibit V, the probable cause
11           affidavit for Sophie Kosofsky.  I'm
12           going to stop sharing the screen and
13           I'm going to share a different
14           document quickly.  I just want you to
15           review.  And do me a favor, when the
16           image appears on the screen, please
17           let me know.
18           THE WITNESS:
19                  Okay.
20    BY MR. FOLEY:
21       Q    I just want to ask you, sir, do you
22    recognize the young lady in the foreground
23    wearing the black jean shorts and a gray shirt
24    and a scarf?
25       A    Again, I don't know who that is.  I
```

1    didn't put my hands on anyone.  So, no, sir.

2        Q    You were not present in this scene as

3    she's being led away; is that right?

4        A    No, sir.  I was doing paperwork.

5    That's it.

6        Q    All right.  I want to show you a very

7    brief video.  This is a video file called,

8    "MFF Protest Downtown 7-10-16." I'm going to

9    represent to you that it's video that was

10   provided to us by the East Baton Rouge

11   Sheriff's Office Department from a public

12   records request.  It is about a 13-minute long

13   video.  The portion I want to show you today

14   is just the last 30 or 45 seconds of it.

15            MR. FOLEY:

16                Unless either Mr. Most or

17            Ms. Morris have an objection, I will

18            forward to that portion of the video,

19            rather than play the entire video.

20            Is that acceptable?

21            MS. MORRIS:

22                Yes.

23            MR. FOLEY:

24                I'm going to go ahead and share

25            that screen, if Zoom cooperates with

1          me.  Sometimes it doesn't.  Hold on

2          just a moment.  Okay.  Thanks for

3          bearing with me.  I had so many

4          screens open that it wasn't showing

5          me the one that I wanted to share.

6          Hopefully, y'all can see this screen

7          now.  Please let me know if you can.

8          THE WITNESS:

9              I can see it.

10          MR. FOLEY:

11              Okay.  As I said, I'm going to

12          hit "Play" for about 30 seconds and

13          then once it stops, I'm going to ask

14          you a few questions.

15              (VIDEO PLAYED)

16          MR. FOLEY:

17              That's the whole file there.

18          Officer Williams, did you recognize

19          yourself in any of those images?

20          THE WITNESS:

21              It went so fast.  You want to

22          play it one more time?  I couldn't --

23          MR. FOLEY:

24              I can.

25          THE WITNESS:

```
 1              If I was, I was where I told
 2         you, on the side over there with
 3         paperwork somewhere.  I don't know if
 4         I see myself.
 5    BY MR. FOLEY:
 6         Q   Okay.  I can play it at a slower
 7    speed, as well.
 8         A   Can you do that?
 9         Q   Yeah.
10             (VIDEO PLAYED)
11             THE WITNESS:
12                 I think I see myself.  I'm
13         guessing.  You know, I can't
14         really -- but, yeah, I'm just doing
15         paperwork, like I said.  That's it.
16    BY MR. FOLEY:
17         Q   Okay.  So this is that initial
18    processing area you've been discussing where
19    folks had been brought to you?
20         A   Yeah, the other officers were
21    responsible for dealing with them.  We just
22    did paperwork.  That's it, sir.
23         Q   And, again, Ms. Kosofsky here sitting
24    here on the curb in the gray shirt, you don't
25    recognize her?
```

1      A    No.  I don't even know who that is.

2      Q    Okay.  So if you didn't speak to her

3  or the officer who brought her in?

4      A    No, sir.

5      Q    Okay.

6      A    Just exchanged paperwork.  There was

7  so much going on out there.

8      Q    Understood.  And I believe that we've

9  -- this was previously marked in the preceding

10  deposition as Exhibit U.  I am going to refer

11  to this as Exhibit U.  I'm going to stop

12  sharing here.  I'm going to pull back up the

13  probable cause affidavit.  And I just have one

14  or two more questions, and then I'll be done

15  with you and pass over to Ms. Morris.

16          Officer, can you see that probable

17  cause affidavit, again?

18      A    Yes, sir.

19      Q    And so you see where it says:

20  "Before me personally appeared the undersigned

21  law enforcement officer who deposed that the

22  following recited facts are true and correct

23  to the best of his knowledge, information and

24  belief and that based upon these facts, he

25  caused the arrest of the following listed

```
 1   defendants for the listed offenses."
 2           It's your testimony you did not
 3   personally cause the arrest of Ms. Kosofsky?
 4           MS. MORRIS:
 5               Object to the form.  I think
 6               you're misrepresenting -- the word,
 7               "Caused" can be construed
 8               differently.  I don't know if you're
 9               representing exactly an accurate
10               depiction of what he said when he
11               said, "Caused."
12           MR. FOLEY:
13               I can rephrase.
14   BY MR. FOLEY:
15       Q    Officer Williams, is it your
16   understanding that you caused the arrest of
17   Sofie Kosofsky on that day?
18       A    No, I did not cause the arrest.
19   (INAUDIBLE)
20       Q    I apologize.  I cut you off.  Could
21   you say that again?
22       A    The arresting officer caused the
23   arrest, who wrote the report.
24       Q    Okay.  And so you signed this
25   probable cause affidavit without any personal
```

```
 1    knowledge, even though it was made under oath
 2    and that it was true and correct to the best
 3    of your knowledge; is that right?
 4        A    I'm trusting that the officers -- I'm
 5    trusting the officers.
 6        Q    Okay.  And do you understand that to
 7    be perjury?
 8            MS. MORRIS:
 9                Object to the form.
10            THE WITNESS:
11                No.
12            MS. MORRIS:
13                I mean -- not form.  I'm not
14            going to allow him to answer that
15            one.
16            MR. FOLEY:
17                Just for clarity of the record,
18            you're instructing him to exercise
19            his Fifth Amendment right?
20            MS. MORRIS:
21                Correct.  When it comes --
22            you're asking him directly about some
23            kind of perjury.  I'm instructing him
24            to --
25            THE COURT REPORTER:
```

```
1              I'm sorry, Ms. Morris.  I'm
2         having a hard time hearing you.
3    MS. MORRIS:
4              When we're referring to perjury,
5         I'm instructing the officer to
6         exercise his Fifth Amendment right.
7    MR. FOLEY:
8              Okay.  I would ask y'all's
9         indulgence for about a minute.  I
10        just want to check with co-counsel,
11        if they have additional questions.
12        If not, I'll pass over to Ms. Morris.
13             (BRIEF RECESS)
14   MR. FOLEY:
15             Again, thank you for your
16        patience, there.  I guess my last
17        question is that, in looking at the
18        probable cause affidavit that we've
19        been discussing, by signing as
20        affiant and swearing that this was
21        true, were you lying?
22   THE WITNESS:
23             I plead the fifth.
24   MR. FOLEY:
25             All right.  I guess that's all I
```

```
 1              have, Ms. Morris.  I turn it over to
 2              you.
 3              MS. MORRIS:
 4                   Okay.
 5                        EXAMINATION
 6    BY MS. MORRIS:
 7         Q    Officer Williams, you were aware that
 8    there were large protests going on at the
 9    location of East and France and Government
10    Street, correct?
11         A    Yes, sir --
12         Q    And you --
13         A    Yes, ma'am.  Sorry.
14         Q    And I'm talking over you.  I
15    apologize.
16              MS. MORRIS:
17                   We're buffering, so give us a
18              second on the video.  Okay.  Can
19              y'all hear me?
20              THE COURT REPORTER:
21                   I can hear you.
22              MS. MORRIS:
23                   William, Eric, anybody out
24              there?
25              MR. MOST:
```

```
 1                   Yes, I can hear you.
 2           MS. MORRIS:
 3                   Okay.  Good deal.
 4    BY MS. MORRIS:
 5       Q    So you were aware that there were
 6    large protests in that location, correct?
 7       A    Yes.
 8       Q    And your aware that there were
 9    protesters standing in the roadway obstructing
10    traffic, correct?
11       A    Yes.
12       Q    And you were aware that officers were
13    arresting the protesters that were standing in
14    the roadway obstructing traffic, correct?
15       A    Yes.
16       Q    Based on the circumstances presented
17    that day and your knowledge of the events
18    surrounding your location, did you believe the
19    facts that are contained in these affidavits
20    to be true and correct --
21       A    Yes.
22       Q    -- to the best of your knowledge?
23       A    Yes, I did.
24       Q    Did you rely on the fact that when a
25    fellow officer completed this paperwork and
```

1    brought an arrestee to the processing area,

2    that the facts -- that these facts that are

3    contained in the Affidavit of Probable Cause

4    are true and correct?

5        A    Yes.

6        Q    We talked a little bit about causing

7    an arrest.  Now, I know you said you didn't

8    cause the arrest.  But could you define what

9    you mean by causing the arrest, as you were

10   saying you did not cause the arrest?

11       A    Basically, the officer who had the

12   person, they didn't cause the arrest.  They

13   did their job.  They didn't cause the arrest.

14   The person that didn't comply with everything

15   that's going on caused the arrest.

16       Q    Okay.  Go ahead.  That's fine.  But

17   would you also say that you did not cause the

18   arrest in the fact that you did not -- you

19   were not the first person to place the person

20   in front of you under arrest?

21       A    Yes, yes.

22       Q    But completing paperwork --

23       A    Yeah, completing paper --

24       Q    -- you are participating in --

25       A    Yes.

```
 1        Q     -- taking that person under arrest?
 2        A     Yes.
 3              THE COURT REPORTER:
 4                  I'm just going to ask for you --
 5              could you let her finish her question
 6              first, because you're kind of
 7              answering before she quite finishes.
 8              THE WITNESS:
 9                  Yes, ma'am.
10     BY MS. MORRIS:
11        Q     So when you were talking about, you
12     didn't cause a person's arrest, you meant that
13     you did not physically -- you were not the
14     first person to place that person under
15     arrest, correct?
16        A     Yes.
17              MR. FOLEY:
18                  Deelee, I'm going to object to
19              the form as leading.
20              MS. MORRIS:
21                  Okay.
22     BY MS. MORRIS:
23        Q     Would you like to explain what you
24     meant by causing the arrest --
25        A     Basically --
```

1       Q    -- stating that you did not cause the

2   arrest earlier?

3       A    -- meaning that I was not the first

4   person to respond to that person and put them

5   in handcuffs and arrest them.  All I did was

6   complete paperwork and make sure the paperwork

7   was done.  That's all that I did.  That's what

8   I participated in.

9       Q    But, again, just to reiterate, based

10  upon all of the events and the circumstances

11  presented to you within your knowledge, you

12  believe that the facts contained in the

13  Affidavit of Probable Cause were true and

14  correct?

15      A    Yes.

16           MS. MORRIS:

17               Thank you.

18           MR. MOST:

19               A few followup questions.

20                   EXAMINATION

21  BY MR. MOST:

22      Q    Detective, you repeatedly said you

23  did not cause the arrest of defendants that

24  day, correct?

25      A    Yes.

1       Q   The Affidavits of Probable Cause that

2  you signed, however, said you did cause the

3  arrest, correct?

4       A   Yes, if you -- yes.

5       Q   So when you signed those Affidavits

6  of Probable Cause under oath, were you lying?

7       A   No, I was trusting the officer and

8  doing it in good faith.

9       Q   When you signed the Affidavit of

10  Probable Cause that said you did cause their

11  arrest, were you lying?

12       A   No.

13       Q   Okay.  When you signed the Affidavit

14  of Probable Cause under oath, were you --

15  (INAUDIBLE)

16          THE COURT REPORTER:

17              I'm sorry, Mr Most.  I lost you.

18          Mr. Most?

19          MR. MOST:

20              I'm back.

21          THE COURT REPORTER:

22              What I have is:  "When you

23              signed the Affidavit of Probable

24              Cause under oath, were you" -- and I

25              didn't get whatever else you had to

1              say.
2    BY MR. MOST:
3         Q    Detective, when you signed the
4    Affidavit of Probable Cause and swore that the
5    facts therein were true and correct, were you
6    committing perjury?
7              MS. MORRIS:
8                   I'm going to object to that and
9              I'm going to instruct the officer to
10             plead the Fifth.  You're asking him
11             directly about a criminal violation
12             and I'm not going to allow him to
13             answer that.
14             MR. MOST:
15                  Okay.  Are you going to follow
16             the advice of your counsel and plead
17             the Fifth to that question?
18             THE WITNESS:
19                  Yes.
20    BY MR. MOST:
21        Q    When you signed the Affidavit of
22   Probable Cause under oath saying that the
23   facts therein were true and correct, were you
24   manufacturing false evidence?
25             MS. MORRIS:

```
 1                    I'm going to object, again, to
 2             that question.  He's not going to
 3             answer that.
 4  BY MR. MOST:
 5     Q    Detective, are you going to take the
 6  suggestion of your counsel and plead the Fifth
 7  to that question?
 8     A    Yes.
 9     Q    And, Detective, when you signed the
10  Affidavit of Probable Cause for Antonio
11  Castanon, swearing that the facts therein were
12  true and correct and then that document was
13  used to imprison Mr. Castanon, were you
14  committing false imprisonment?
15             MS. MORRIS:
16                    Again, I'm not going to -- that,
17             A, calls for a legal conclusion.  And
18             to the extent that there's any kind
19             of criminal implications applied to
20             that, I'm going to instruct him to
21             plead the Fifth on that.
22  BY MR. MOST:
23     Q    Detective, are you taking the
24  suggestion of your counsel and pleading --
25  you're pleading the Fifth?
```

```
 1      A      Yes.
 2             MR. MOST:
 3                    No further questions.  Do you
 4             have any followup, Eric.
 5             MR. FOLEY:
 6                    No, we do not.
 7             MR. MOST:
 8                    Detective, thank you very much
 9             for your time today.  I appreciate
10             you coming here today.
11                    *        *        *
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                    WITNESS' CERTIFICATE

2

3            I, WILLIE WILLIAMS, do hereby

4    certify that the foregoing testimony was given

5    by me, and that the transcription of said

6    testimony, with corrections and/or changes, if

7    any, is true and correct as given by me on the

8    aforementioned date.

9

10

11   Dated: _____  Signed:_____

12                            WILLIE WILLIAMS

13

14

15   _____  Signed with corrections as noted.

16

17   _____  Signed with no corrections noted.

18

19

20

21   DATE TAKEN: June 9th, 2021

22

23

24

25
```

84

1              C E R T I F I C A T E

2

3           I, CECILIA M. HENDERSON, Certified
     Court Reporter, in and for the State of
4    Louisiana, as the officer before whom this
     testimony was taken, do hereby certify that
5    WILLIE WILLIAMS  after having been duly sworn
     by me upon authority of R.S. 37:2554, did
6    testify as hereinbefore set forth in the
     foregoing 83 pages; that this testimony was
7    reported by me in the stenotype reporting
     method, was prepared and transcribed by me or
8    under my personal direction and supervision,
     and is a true and correct transcript to the
9    best of my ability and understanding; that the
     transcript has been prepared in compliance
10   with transcript format guidelines required by
     statute or by rules of the board, that I have
11   acted in compliance with the prohibition on
     contractual relationships, as defined by
12   Louisiana Code of Civil Procedure Article 1434
     and in rules and advisory opinions of the
13   board; that I am not related to counsel or to
     the parties herein, nor am I otherwise
14   interested in the outcome of this matter.

15

16          Dated this 30th of June, 2021

17

18

19

20          CECILIA M. HENDERSON, CCR
            CCR #84099
21

22

23

24

25

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**