UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


BLAIR IMANI, ET AL

DOCKET NO.
17-cv-00439-JWD-EWD

VERSUS


CITY OF BATON ROUGE,
ET AL


30(b)(6) Deposition of the City of Baton Rouge through its designated representatives, MICHAEL BARROW and JAMES DARRON LEACH, taken on August 18, 2021, via Zoom Videoconference.

```
 1   APPEARANCES:
 2   MOST & ASSOCIATES
     BY: WILLIAM MOST, ESQ.
 3   AND DAVID LANSER, ESQ.
     201 St. Charles Avenue
 4   Suite 114, #101
     New Orleans, Louisiana  70170
 5   Phone: (504)533-4521
     Email: david.lanser@gmail.com
 6       REPRESENTING PLAINTIFFS
     (IMANI V. CITY OF BATON ROUGE)
 7
 8
 9   RODERICK AND SOLANGE
     MacARTHUR JUSTICE CENTER
10   BY:  ERIC FOLEY, ESQ.
     JIM CRAIG, ESQ.
11   HANNAH LOMERS-JOHNSON, ESQ.
     MANDISA MOORE-O'NEAL, ESQ.
12   4400 S. Carrollton Avenue
     New Orleans, Louisiana  70119
13   Phone: (504)684-2364
     Email: eric.foley@macarthurjustice.org
14       REPRESENTING PLAINTIFFS
     (SMITH V. CITY OF BATON ROUGE AND
15   BATISTE-SWILLEY V. CITY OF BATON ROUGE)
16
17   JOSEPH SCOTT, ESQ.
     222 St. Louis Street
18   Baton Rouge, Louisiana  70802
     Phone: (225)389-3114
19   Email: dsmorris@brla.gov
         REPRESENTING BATON ROUGE CITY
20   POLICE DEPARTMENT OFFICERS
21
22
23
24
25
```

3

```
1    APPEARANCES (CONTINUED):

2    BURGLASS & TANKERSLEY.
     BY:  GREGORY FAHRENHOLT, ESQ.
3    5213 Airline Drive
     Metairie, Louisiana  70001
4    Phone: (504)836-0408
     Email: gfahrenholt@burglass.com
5        REPRESENTING INDIVIDUAL
     STATE POLICE TROOPERS
6
7    RODNEY & ETTER
     BY: JOHN ETTER, ESQ.
8    935 Gravier Street
     Suite 2110
9    New Orleans LA, 70112
     Phone: (504) 483-3224
10   Email: rjr@rodneylaw.com
         REPRESENTING MAX GELLER
11
12
13
14
15   REPORTED BY:

16   Cecilia M. Henderson
     Certified Court Reporter
17
18
19
20
21
22
23
24
25
```

4

1              E X H I B I T    I N D E X

2                                              Page

3    Exhibit GGGGGGG ..........................13
     Exhibit K ................................15
4    Exhibit L ................................34
     Exhibit ZZZZZZZ ..........................40
5    Exhibit AAAAAAAAA .......................140
     Exhibit LLLLLLL .........................232
6    Exhibit AAAAA ...........................241

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

S T I P U L A T I O N

It is stipulated and agreed by and between counsel that the 30(b)(6) deposition of CITY OF BATON ROUGE through its designated representatives, MICHAEL BARROW an JAMES DARRON LEACH, is hereby being taken under Federal Rules of Civil Procedure for all purposes in accordance with law;

That the formalities of filing and certification are hereby waived; that the formalities of reading and signing are hereby specifically not waived;

That all objections, except those as to the form of the question and/or responsiveness of the answer, are hereby reserved until such time as this deposition or any part thereof may be used in evidence.

*   *   *   *   *   *   *   *

CECILIA M. HENDERSON, Certified Court Reporter, in and for the State of Louisiana, officiated in administering the oath to the witness.

```
 1              MICHAEL BARROW, 9000 AIRLINE
 2    HIGHWAY, BATON ROUGE, LOUISIANA, AFTER FIRST
 3    BEING DULY SWORN IN THE ABOVE-ENTITLED MATTER,
 4    DID TESTIFY AS FOLLOWS:
 5              MR. MOST:
 6                   Good morning, everybody.  Joe,
 7                   can we stipulate that this 30(b)(6)
 8                   deposition was properly noticed and
 9                   the court reporter is duly qualified?
10              MR. SCOTT:
11                   We'll join in that stipulation
12                   for purposes of this deposition.
13              MR. MOST:
14                   Thank you.
15                        EXAMINATION
16    BY MR. MOST:
17        Q    Good morning, Lieutenant Barrow.  My
18    name is William Most.  I'm an attorney with --
19    that's representing the plaintiffs in the
20    Imani case, and I'm joined here by two
21    attorneys representing other plaintiffs in
22    other cases and an attorney for the State
23    Police defendants.
24              I'll be asking you some questions,
25    and then with each topic -- what I'm thinking
```

1    is, we'll cover each topic.  I'll ask the
2    questions.  I'll hand it over to any other
3    attorneys to ask any questions on that topic,
4    and then we'll move it on to the next topic,
5    unless anyone has a better plan.
6              Lieutenant, could you give us your
7    full name and rank for the record?
8         A    Lieutenant Michael Barrow, Baton
9    Rouge Police Department.
10         Q    Great.  Lieutenant, have you ever
11    given a deposition before?
12         A    No.
13         Q    Do you understand that the answers
14    you give here today are under oath and have
15    the same force and effect as if we were in a
16    courtroom with a judge and jury?
17         A    Yes.
18         Q    And is there anything today --
19    whether it's illness, medication you're
20    taking, fatigue or anything else -- that would
21    prevent you from giving truthful and complete
22    answers to our questions?
23         A    No.
24         Q    And this is a deposition.  We'll be
25    asking you questions for a while, but it

```
 1    doesn't have to be continuous.  We can take
 2    breaks.  So if you need to take five, take ten
 3    to use the restroom, get a drink of water,
 4    that's perfectly okay.  Please just let your
 5    attorneys know, or me, and we'll take a short
 6    break.  However, I'll tell you in advance that
 7    my practice is, after each break, to ask you
 8    who you talked to -- even if it's your
 9    attorney -- and what you talked about, even if
10    it's your attorney, and what documents did you
11    reviewed during the break.  So that's a
12    heads-up.
13         A    I understand.
14         Q    One thing that is important is that,
15    if I or another attorney asks a question that
16    is not clear or you don't understand the
17    question, will you agree to let us know that
18    that's the case, rather than just trying to
19    answer it anyway?
20         A    Yes.
21         Q    And do you have a general sense for
22    what cases you're here for today?
23         A    No, I don't.  I understand it's
24    multiple people, but I don't know who.
25              MR. SCOTT:
```

```
 1              (INAUDIBLE)
 2         THE COURT REPORTER:
 3              I'm sorry.  I'm not hearing you.
 4         MR. SCOTT:
 5              I'm asking him if he knows what
 6         time period or events these cases
 7         relate to?
 8         THE WITNESS:
 9              No, I don't.  I strictly worked
10         1800 to 0600 for all the events that
11         happened during that time.
12         MR. SCOTT:
13              Would that be July of 2016?
14         THE WITNESS:
15              Yes.
16 BY MR. MOST:
17    Q    So you understand, Lieutenant, that
18 you're here for a number of cases in which
19 protesters are suing the City of Baton Rouge
20 and other defendants for the events of
21 July 2016; do you understand that?
22    A    Yes.
23    Q    And this is -- this deposition is a
24 little different than some depositions.  Some
25 depositions, we're asking questions of a
```

```
 1    person, and they give their own answers.  Like
 2    you know, if I'm deposed, I'll be giving
 3    answers for William Most.  However, this is
 4    what's called a 30(b)(6) deposition.  And so
 5    we are deposing the City of Baton Rouge.  Of
 6    course, that's not a person.  The City has
 7    designated you to give answers for the City of
 8    Baton Rouge.  Do you understand that?
 9        A    Yes.
10        Q    So when I ask a question today -- or
11    one of the other attorneys ask a question --
12    if we ask a question to you, Lieutenant, we're
13    really asking a question to the City Baton
14    Rouge.  Do you understand?
15        A    Yes.
16        Q    And when you give an answer, you're
17    not just giving the answer for Lieutenant
18    Barrow; you're giving the answer for the City
19    Baton Rouge.  Do you understand that, as well?
20        A    Yes.
21        Q    And if I say, "You" today, what I
22    really mean is the City Baton Rouge.  Will you
23    understand that?
24        A    Yes.
25        Q    And one other way that this is a
```

1    little different than a normal deposition is

2    that a normal deposition, "I don't know" is a

3    perfectly good answer.  Because people

4    sometimes don't have recollections of things.

5    However, in a 30(b)(6) deposition, the City is

6    obligated to provide someone who has looked

7    into the answers and figured it out, using

8    some diligence.  And so, generally, "I don't

9    know" is not typically a sufficient answer in

10   a 30(b)(6) deposition.  Do you understand

11   that?

12        A    Yes.

13        Q    Lieutenant, aside from talking to

14   attorneys, did you talk to anyone to prepare

15   for this deposition?

16        A    No.

17        Q    And did you look at any documents to

18   prepare for this deposition?

19        A    No.

20        Q    Okay.  So did you do anything to

21   prepare for this deposition?

22        A    No.  Like I said, I really don't know

23   what I'm testifying to or what, I guess.  I'm

24   waiting to hear the questions.  I'm not sure

25   what's asked of me.

```
 1        Q    Okay.  So if I understand you
 2   correctly, you've done no preparation in
 3   anticipation of this deposition, agreed?
 4        A    Agreed.
 5             MR. SCOTT:
 6                  Well, he did speak to his
 7             attorneys.
 8   BY MR. MOST:
 9        Q    Okay.  That's fair.  I won't ask you
10   the context of the communications with your
11   attorneys.  But did you talk to some attorneys
12   to prepare today?
13        A    Yes.
14        Q    Approximately, how long did that
15   take?
16        A    About ten minutes.
17        Q    So if I understand you correctly, the
18   only preparation you've done for this
19   deposition today is approximately ten minutes
20   of discussion with attorneys, agreed?
21        A    Agreed.
22        Q    Do you know what topics you're here
23   to testify about?
24        A    I know crowd control.  I think he
25   mentioned something about kettling, which I'm
```

1    not familiar with.

2         Q    I'm going to pull up Exhibit GGGGGGG.

3    This is a notice of deposition.  Have you ever

4    seen this document before, Lieutenant?

5         A    No.

6              MR. MOST:

7                   Okay.  All right.  So taking the

8              first topic -- and just for the

9              record, before we went on the record,

10             Joe Scott represented to us that

11             Lieutenant Michael Barrow would be

12             prepared to testify about Topics 2F,

13             as in Frank; 8D, as in dog; 9A, as in

14             apple; and, perhaps, 9C, as in cat.

15             Is that your understanding,

16             Mr. Scott?

17             MR. SCOTT:

18                   Those are the ones I think he's

19             qualified to speak to.  And as I

20             said, I'm not entirely clear on

21             kettling, but we can try.

22   BY MR. MOST:

23        Q    Going back to Document GGGGGGG, Topic

24   2F is "Policies and Procedures regarding any

25   of the following topics:  Crowd control."

1          Lieutenant Barrow, are you prepared
2   today to testify about that topic?
3      A    Yes.
4      Q    And, Lieutenant, what is your current
5   role with the Baton Rouge Police Department?
6      A    I'm the Violent Crimes Unit
7   Commander.
8      Q    How long have you been with the Baton
9   Rouge Police Department?
10     A    Twenty-eight years.
11     Q    Have you served with any other law
12  enforcement departments beside Baton Rouge
13  Police Department?
14     A    East Baton Rouge Sheriff's Office.
15     Q    How long were you an officer with the
16  East Baton Rouge Sheriff's Office?
17     A    Two years.
18     Q    Did you work with any other law
19  enforcement offices?
20     A    No.
21     Q    This is a question that I ask to
22  every deponent.  It's not specific to you.
23  Lieutenant, have you ever been arrested
24  before?
25     A    No. (INAUDIBLE)

1          MR. SCOTT:

2               Object.  As you pointed out,

3          this is a 30(b)(6).

4          MR. MOST:

5               Sure.  Objection noted.

6   BY MR. MOST:

7      Q    Was your answer no, Lieutenant?

8      A    Yes.

9      Q    Okay.  So, Lieutenant, crowd control

10  is something that Baton Rouge Police

11  Department has to be prepared for, correct?

12     A    Yes.

13     Q    Baton Rouge is a relatively large

14  city and it hosts large events, including

15  sporting events, correct?

16     A    Correct.

17     Q    So crowd control is something that

18  the Baton Rouge Police Department has policies

19  and procedures in place to deal with, correct?

20     A    Yes.

21     Q    I'm going to pull up Exhibit K.  This

22  is the "Baton Rouge Police Department Policy

23  and Procedure Manual," correct?

24     A    Yes.

25     Q    So this document is what contains

1    official Baton Rouge Police Department policy

2    about various topics, correct?

3        A    Yes.

4        Q    And Baton Rouge is home to LSU,

5    correct?

6        A    Yes.

7        Q    And LSU frequently has football games

8    with crowd attendance of -- I don't even know.

9    Is it thousands or tens of thousands?

10       A    I'm not sure on that.  I know it's

11   thousands.

12       Q    Okay.  So Baton Rouge is frequently a

13   host to very large events every year, correct?

14       A    Yes.

15       Q    And sometimes LSU games, if there's a

16   substantial victory or substantial loss, can

17   result in sometimes unruly crowds, correct?

18       A    Yes.

19       Q    Those crowds sometimes flow into the

20   streets of Baton Rouge, correct?

21       A    Sometimes, yes.

22       Q    Sometimes those crowds block the

23   streets of Baton Rouge, correct?

24       A    No.

25       Q    So it's your testimony that an LSU

1    game crowd has never blocked a street of Baton
2    Rouge?
3        A    Not to my knowledge.
4        Q    Has an LSU game crowd ever blocked a
5    public passageway, other than a street;
6    perhaps, a sidewalk?
7        A    That -- it's possible.  Like I say,
8    I'm not sure if they did.  If they did, it was
9    not that serious.
10       Q    So you're not sure if an LSU crowd
11   has ever blocked a sidewalk ever?
12       A    It's just a lot of them walking, so
13   it's a possibility they have.
14       Q    Okay.  Are Baton Rouge Police
15   Department officers deployed to do crowd
16   control for LSU games?
17       A    If it gets to where the crowd is
18   uncontrollable, they are -- they will be.
19   They're on standby for that.  They can get
20   called out just in case they have to deal with
21   a crowd at LSU or any other event that's
22   hosted at Baton Rouge.
23       Q    So whenever there's an LSU game,
24   Baton Rouge Police Department is on standby
25   for crowd control and prepares to do crowd

1   control; is that correct?

2       A    That's correct.

3       Q    And what steps does that preparation

4   take for Baton Rouge Police Department?  Do

5   they -- what do they do to get prepared to be

6   on standby for crowd control?

7       A    Whoever is in charge from the Command

8   Center out there, if they see a need for it,

9   they'll give a call to the Mobile Field Force

10  Commander and say:  Hey, we have a crowd out

11  here that has the potential -- that we can't

12  move them.  With the officers out there, being

13  to the point where those officers can't handle

14  the situation, as a last resort, they'll call

15  Mobile Field Force.

16      Q    I understand.  So whenever there's an

17  LSU game, some Baton Rouge police officers are

18  there, correct?

19      A    Yes.

20      Q    And then more officers are on standby

21  in case backup is needed to do crowd control,

22  correct?

23      A    Yes.

24      Q    And the officers who are there for

25  each LSU game, they're there to provide

```
 1   security and to do some traffic or crowd
 2   control to the extent of their abilities,
 3   correct?
 4        A    Correct.
 5        Q    And so every -- it sounds like -- let
 6   me back up.  You're saying the Mobile Field
 7   Force is on standby for every LSU game?
 8        A    They got days that they're on-call.
 9   They make their on-call for two weeks, meaning
10   it's not just LSU games.  Anything Baton Rouge
11   hosts, there's a team on standby, just in
12   case.
13        Q    Yeah.  I understand.  So every time
14   there's a large event in Baton Rouge,
15   including LSU games, there is a contingent of
16   Mobile Field Force that is prepared and on
17   standby in the event that crowd control is
18   needed; is that accurate?
19        A    Yes.
20        Q    And that preparation that the Mobile
21   Field Force does for each of those events,
22   does it include printing up pre-prepared
23   Affidavits of Probable Cause?
24        A    No.
25        Q    Okay.  Does it involve the preparing
```

1    of an LRAD device?  Are you familiar with that
2    what is?
3        A    I've heard it, but it's been a while,
4    so I'm not sure.  Because I hadn't been on the
5    team in four years.  I'm not remembering
6    exactly what it is.
7        Q    Okay.  If I told you that the LRAD
8    device was a device that has been mounted on
9    top of a BearCat that emits a loud noise to
10   disperse people, would that remind you of what
11   that is?
12       A    It reminds me.  That's something
13   that's not controlled by the Mobile Field
14   Force team.  That's controlled by the
15   Department of Special Response, the SWAT team.
16   They have all that.  They can give commands to
17   deploy that.
18       Q    Is the SWAT team put on standby every
19   time there's a special event or LSU game in
20   Baton Rouge?
21       A    They're just like the Mobile Field
22   Force Unit.  Every day of the week, there's
23   somebody on-call for SWAT and Mobile Field
24   Force.
25       Q    Do you know anything about what the

1    SWAT team's preparation is to be on standby

2    for special events?

3             MR. SCOTT:

4                  William, I have proffered

5             Lieutenant Barrow because he was

6             Commander of Mobile Field Force in

7             2016.  I believe that the next

8             deponent is more qualified to respond

9             to SRT and SWAT questions.

10            MR. MOST:

11                 Okay.  We'll circle back to

12            that.

13   BY MR. MOST:

14       Q    Okay.  I'm looking at page 657 of

15   Exhibit K.  This is the Baton Rouge Police

16   Department Policy on special events, agreed?

17       A    Yes.

18       Q    It says:  "For the purpose of this

19   order, a special event is any planned event

20   likely to draw large crowds necessitating

21   police manpower dedicated specifically to

22   control traffic and/or provide security,"

23   correct?

24       A    Correct.

25       Q    So a large protest would fall under

1    the definition of a special event here,
2    correct?
3          A    Yes.
4          Q    So the Baton Rouge Police Department
5    policy on special events should apply to
6    protests, correct?
7          A    Yes.
8          Q    Subsection VI of this policy
9    describes an "After-action Critique."  Do you
10   see that?
11         A    Yes.
12         Q    Do you see it requires the incident
13   commander and his commanders to conduct a
14   post-incident review after a special event
15   deployment?
16         A    Yes.
17         Q    I don't think we specifically talked
18   about it.  You understand that there were
19   protests in July of 2016 in Baton Rouge?
20         A    Yes.
21         Q    And you were -- do you I understand
22   that you were the head of Mobile Field Force
23   at that time?
24         A    Yes.
25         Q    Was a post-incident review or

1    after-action critique conducted after the 2016

2    protests?

3        A   I was the Mobile Field Force

4    Commander.  I was not the incident commander.

5    That's a separate entity.  The incident

6    commander, he controlled everything.  He

7    called all the shots.  And after that, he took

8    the notes from whatever was done and he had

9    the after-action critique with the higher-ups.

10   It was not something that I was involved in.

11       Q   Okay.  But you're aware that you're

12   -- you're telling me there was an after-action

13   critique?

14       A   Yes.

15       Q   And was there a written document that

16   after-action critique -- was there something

17   written up to do that after-action critique?

18       A   Not being a part of it, I can't

19   answer to say if it was or wasn't.

20       Q   This Subsection VI (A), it says:

21   "Any suggestions for improvement shall be

22   forwarded through the chain of command in

23   writing to the Chief of Police."  Do you see

24   that?

25       A   Yes, sir.

1      Q     So that suggests that, if there were
2   any suggestions for improvement for this
3   after-action critique, that would be in
4   writing, agreed?
5      A     Agreed.
6      Q     Do you know if there was any sort of
7   after-action report that you ever saw?
8      A     I have not.
9          MR. SCOTT:
10              For clarification, you didn't
11          see one?
12          THE WITNESS:
13              I didn't see one.
14   BY MR. MOST:
15      Q     So Baton Rouge Police Department also
16   has -- well, let me back up.  So we've
17   established that the Special Event Policy
18   covers protests, agreed?
19      A     Yes.
20      Q     And the Special Event Policy covered
21   the July 2016 protest, agreed?
22      A     Yes.
23      Q     Baton Rouge Police Department also
24   has a policy on civil disorder.  That's page
25   430 of Exhibit K.  Do you see this?

1       A    Yes.

2       Q    And this talks about a civil

3   disorder, riot, which is "A public disturbance

4   that results in injury or damages to persons

5   or property and creates a clear and present

6   danger or injury or damage to persons or

7   property."  Do you see that?

8       A    Yes.

9       Q    And I want to ask about a particular

10  part of the protests in July of 2016.  Do you

11  recall that on Sunday, July 10th, 2016, there

12  was a group of protesters in the vicinity of

13  East and France Streets?

14      A    I wasn't there, but I do recall that.

15      Q    So you're aware of that East and

16  France Street protest?

17      A    Yes.

18      Q    Okay.  Did that East and France

19  Street protest trigger the Civil Disorder

20  Policy or was it -- or did it only fall under

21  the Special Event Policy?

22      A    I would say it would be the Civil

23  Disorder Policy.

24      Q    What would you lead to that

25  conclusion?

```
 1        A    Because of the incident that unfolded
 2   out there -- like I said, I wasn't there, but
 3   being told about some of the unruliness of the
 4   crowd.
 5        Q    What unruliness are you talking
 6   about?
 7        A    Them trying to take over the
 8   interstate.
 9        Q    Okay.  So let's suppose that that
10   crowd did not ever make it to the interstate.
11   Would it fall under the Civil Disorder Policy?
12        A    I would still say it will, yeah,
13   because it has that potential.
14        Q    So you're saying, any protests that
15   could potentially go to the interstate --
16        A    I'm not saying any protest.  I'm
17   saying that one.
18        Q    So solely based on its proximity to
19   the interstate?
20        A    The proximity and them wanting to do
21   it.
22        Q    So even if the interstate was made
23   inaccessible to that crowd -- well, let me
24   back up.  Let's say the interstate had been
25   made inaccessible to that crowd.  Would it
```

```
1    still count as civil disorder?
2         A    Yeah.  In my opinion, I would say it
3    would.
4         Q    Okay.  So even if the interstate was
5    inaccessible, based on the proximity to the
6    interstate, it would be a civil disorder, even
7    if it was otherwise peaceful?
8              MR. SCOTT:
9                   That was not the testimony.  The
10             testimony was proximity and the
11             intentions of the crowd.
12             MR. MOST:
13                  So, Joe, that is a speaking
14             objection.  If you'd like to make a
15             form objection, saying, "Form
16             objection," that's sufficient.  I was
17             asking him a question.  I wasn't -- I
18             was asking him a question.
19             MR. SCOTT:
20                  I'm sorry.  I thought you were
21             characterizing the testimony.
22             MR. MOST:
23                  Well, fortunately, what I say is
24             not anybody's testimony here, only
25             what Lieutenant Barrow testifies to.
```

BY MR. MOST:

Q    So, Lieutenant Barrow, do I understand you correctly that, even if the interstate was made inaccessible to the protesters at East and France, and even if they were otherwise peaceful, solely their proximity to the interstate and the intentions of some protesters to go to the interstate made them a civil disorder?

A    In my opinion, I would say, yes, it was civil disorder, because it was not a special event.  Our special events are, like, concerts, games, parades.  That's special events.  That was not a special event.  They gathered for a specific purpose.

Q    What was the purpose?

A    It was a protest purpose.

Q    Right.  So it was a protest for them to speak out against perceived misconduct by the Baton Rouge Police Department, agreed?

A    Agreed.

Q    And so that made it not fall under the Special Event Policy?

A    Correct.

Q    And instead fall under the Civil

1    Disorder Policy?

2        A    Correct.

3        Q    So by contrast, if they had gathered

4    together, say, for a church event or to talk

5    about sales of water skis, that would fall

6    under a special event?

7        A    Yes.

8        Q    And so because of that, the City

9    Baton Rouge treated this group at East and

10    France under General Order 291, rather than

11    the Special Event Policy, agreed?

12        A    Yes.

13        Q    All right.  I'm going down to -- so

14    we saw that the Special Event Policy does not

15    directly address specific levels of force,

16    correct?

17             We can go back and look, if

18    necessary.  Let's see, 657.  I'm looking now

19    at now the Special Event Policy.  I'm going

20    through it.  I don't see any headings for

21    specific "Use of Force," do you?

22        A    I don't.

23        Q    By contrast, the Civil Disorder

24    Policy explicitly addresses the potential for

25    non-lethal force and use of deputy force,

1   agreed?

2        A    Agreed.

3        Q    And the Civil Disorder Policy lays

4   out a procedure that is to be followed,

5   correct?

6        A    Yes.

7        Q    And once the first supervisor on

8   scene arrives, they are to there to assist the

9   immediate situation, correct?  That's Step A?

10       A    Correct.

11       Q    And then Step B is:  "If the

12  disturbance is minor or peaceful in nature and

13  adequate resources are available, efforts

14  should be made disperse the crowd," correct?

15       A    Correct.

16       Q    So even if it's a peaceful

17  assemblage, this policy directs the first

18  supervisor to disperse the crowd, correct?

19       A    If he sees the need to disperse it,

20  yes.

21       Q    It doesn't say:  If the need is

22  there.  It says:  "If the disturbance is

23  minor/peaceful in nature and adequate

24  resources are available, efforts should be to

25  made to disperse the crowd."

1              That's a directive to disperse the
2    crowd, correct?
3         A    Yes.
4         Q    So once an assemblage falls under the
5    Civil Disorder Policy, the first supervisor is
6    directed to disperse the crowd, even if it is
7    minor/peaceful in nature, agreed?
8         A    Agreed.
9         Q    All right.  And then after those
10   efforts to disperse the crowd, there's the
11   capacity to apply escalating series of
12   resources to disperse, correct?
13        A    Correct.
14        Q    And I don't see anything in here that
15   gives the supervisor on scene the ability to
16   just leave them alone.  There's a directive to
17   take action, agreed?
18        A    Agreed.
19        Q    Section VII of this civil disturbance
20   policy contemplates mass arrests, correct?
21        A    Correct.
22        Q    So whenever a Baton Rouge has
23   identified -- has characterized an assemblage
24   as civil disturbance, it prepares to conduct
25   mass arrests; would you agree?

1      A     Yes.

2      Q     And you see under Section 4-B, this

3  policy requires that the Incident Commander or

4  other authority to establish communications

5  with demonstration leaders?

6      A     Yes.

7      Q     And it talks about demonstration

8  leaders.  That explicitly anticipates that a

9  demonstration may be a civil disturbance,

10 agreed?

11     A     Agreed.

12     Q     And so -- presumably the supervisors

13 on scene at a civil disturbance are to give

14 orders to the crowd to disperse; is that

15 accurate?

16     A     Yes.

17     Q     Okay.  Should they first try and

18 clear the streets by directing people to clear

19 the streets?

20     A     Yes.

21     Q     And let's suppose people do clear the

22 streets.  Should the person -- should that be

23 sufficient?

24     A     I mean, I'm not -- just as long as

25 they clear the street, is that sufficient?

```
 1        Q    Correct.
 2        A    If they clear the streets and stay
 3   out, yes.
 4        Q    So if protesters clear the streets
 5   after being given a command to clear the
 6   streets, there's not the justification to
 7   sweep in and make arrests, agreed?
 8        A    Agreed.
 9        Q    And so any protesters who complies
10   with an order to clear the streets should not
11   be arrested by Baton Rouge Police Department,
12   agreed?
13        A    Agreed.
14        Q    And so if there's an order by Baton
15   Rouge Police Department to clear the streets
16   and then protesters move back on to the
17   sidewalks and private property and clear the
18   streets, Baton Rouge Police Department should
19   not say: "Where you're standing isn't good
20   enough," should it?
21        A    If it's not affecting the area that
22   we needed clear, correct.
23        Q    Right.  So if people haven't cleared
24   the streets, Baton Rouge Police Department
25   could say:  "That's not good enough."  But if
```

1    they have moved back on to -- and cleared the

2    streets, Baton Rouge Police Department should

3    not say:  "That's not good enough."  Agreed?

4        A    Agreed.

5        Q    All right, Subsection V of this

6    policy says:  "When physical arrests of

7    identified leaders and agitators fail to

8    disperse the crowd."  Do you see that?

9        A    Yes.

10       Q    Then it seems to me to suggest that

11   it's BRPD policy to first target identified

12   leaders and agitators, agreed?

13       A    Yes.

14       Q    I'm going to pull up Exhibit L.  Do

15   you see that this is Responses to Discovery

16   Requests in the Imani case?

17       A    Yes.

18       Q    And a number of these responses --

19   you can see, for example, I'm looking at

20   Response to Request Number 7.  It says:  "Law

21   enforcement targeted agitators (persons

22   encouraging others to upset the status to

23   further their cause) and those breaking the

24   law."  Do you see that?

25       A    Yes.

1      Q    Is that a truthful description of the
2  way BRPD acted during the 2016 protests?
3      A    I'd say we talked with those in the
4  crowd breaking the laws and trying to incite,
5  yes.
6      Q    So I understand that it's BRPD policy
7  to target leaders and agitators at a --
8      A    It's not policy.  I mean, but if we
9  find somebody in the crowd that's breaking the
10 law, yeah, we identify them and arrest them
11 and get them out of there.
12     Q    Right.  I'm looking at page 432 of
13 Exhibit K, the Civil Disturbance Policy.  The
14 policy itself talks about identified leaders
15 and agitators, right?
16     A    Yes.
17     Q    So it is BRPD policy to target
18 identified leaders and agitators, agreed?
19     A    Yes.
20     Q    Okay.  And then this other document
21 that we received provides more explanation for
22 what agitators are.  It says:  "Persons
23 encouraging others to upset the status quo to
24 further their cause."  Do you see it?
25     A    I see it.

1     Q    Is that an accurate description of
2  what agitators means in this context?
3     A    Yes.
4     Q    And so request for 57 -- Response for
5  Request Number 57 describes two groups of
6  people that were targeted; one is agitators,
7  and two is those breaking the law, agreed?
8     A    Agreed.
9     Q    And so when we talked about persons
10  encouraging others to upset the status quo to
11  further their cause, we might -- that could
12  include -- or that would include persons
13  leading chants, agreed?
14          MR. SCOTT:
15              Objection.  I think you're
16          calling for a legal conclusion from
17          Lieutenant Barrow.
18          THE WITNESS:
19              What was the question?
20  BY MR. MOST:
21     Q    Lieutenant Barrow, it says:  "Persons
22  encouraging others to upset the status quo,"
23  would that include persons leading chants at a
24  demonstration?
25     A    Not particularly.  Like I say, some

```
 1    were just chanting.  I mean, that's not
 2    breaking the law.  That's not agitating the
 3    crowd.  It depends on what's being chanted.
 4         Q    What's an example of -- if someone
 5    was chanting --
 6         A    You had them chanting:  "No justice;
 7    "no peace."  That's not agitating the crowd.
 8    But if you have them start with:  "Burning
 9    down the city," yeah, that's a threat.  And we
10    will remove them from the crowd.
11         Q    Okay.  It would have to be a specific
12    threat of violence?
13         A    Yes.
14         Q    It says:  "Persons encouraging others
15    to upset the status quo."  So that would
16    mean -- I'm trying to understand what that
17    means.  "Upset the status quo," meaning
18    calling for a major change to things?
19              MR. SCOTT:
20                   Same objection, William.  You're
21                   trying to get his legal conclusion as
22                   to a document that you haven't laid
23                   any foundation for him to have
24                   personal knowledge of.
25
```

1  BY MR. MOST:

2      Q    Right.  Lieutenant Barrow, I'm just

3  asking you what's your understanding of what

4  this means?  It says:  "Person encouraging

5  others to upset the status quo."  Would you

6  understand that to mean, people calling for a

7  serious change?

8      A    I would assume when they say, "Status

9  quo," yes.

10     Q    So, like, want to see a major change

11  in the politics of Baton Rouge, for example,

12  agreed?

13     A    Agreed.

14     Q    I'm looking at Exhibit K, which is --

15  this is the Baton Rouge Policy and Procedure

16  Manual, right?

17     A    Yes.

18     Q    I'm going to do Control F and I'm

19  going to look up the word "Protests."  Okay.

20  Do you see that the word, "Protests" only

21  appears once in this entire 904-page manual?

22     A    Yes.

23     Q    Okay.  And it's in Policy Number

24  502/01-2, Prisoner Transport Vans.

25     A    Yes.

1      Q    And in the purpose of this policy, it
2   says:  "The prisoner" -- it says:  "The vans
3   may also be used in situations where there are
4   or anticipated to be many arrestees, such as
5   civil disturbances, protests or the service of
6   search and arrest warrants."  Do you see that?
7      A    Yes.
8      Q    It looks like to me, there are three
9   situations in which there are anticipated to
10  be many arrestees; one is civil disturbances,
11  two is protests, and the third is the service
12  of search and arrest warrants?
13     A    Yes.
14     Q    So as far as I can see, the only
15  treatment -- at least the word, "Protest" in
16  this entire manual is in the context of
17  anticipating many arrestees, agreed?
18     A    Yes.
19         MR. MOST:
20             I think this wraps up my
21         questioning for Topic 2-F.
22             Would the MacArthur team have
23         any questions for this?
24         MS. LOMMERS-JOHNSON:
25             Thanks, William.  You've been

```
1              very thorough.  We don't have many
2              questions here, but I do have a
3              couple.  I just want to go back to
4              the General Order 291.  I'm going to
5              share my screen.  Actually -- you
6              know, I'm going to take a 60-second
7              break.  Sorry to make everyone wait
8              while we go off the record for a
9              second.  I have a someone who has
10             come into the room.  I'm going to
11             clear the room and I'll be right
12             back.
13                  (BRIEF RECESS)
14                    EXAMINATION
15    BY MS. LOMMERS-JOHNSON:
16        Q    I'm going to share my screen back to
17    General Order 291 that William was asking
18    about.  Can you see that on my screen?
19        A    Yes.
20        Q    Okay.  Great.  I think for the
21    record, this is Exhibit ZZZZZZZ in the
22    continuing list.  And I'm actually -- you
23    recognize this as the same document that you
24    were looking at with William, correct?
25        A    Yes.
```

1      Q    Okay.  Perfect.  I'm just going to

2   take us down to page 2.  I have a couple of

3   questions there.  So on page 2, I direct your

4   attention to Paragraphs D and E.  And so this

5   is falling under the category of, you know,

6   procedures, first officer on scene and first

7   supervisor on scene.  And I just want to ask

8   generally.  Once an event has been deemed by

9   Baton Rouge Police Department to be a civil

10  disturbance, the rest of these procedures are

11  authorized; is that correct?

12      A    Yes.

13      Q    And so going down to page 2, D and E,

14  the first supervisor is directed by D to

15  determine if the situation requires the SRT,

16  Special Response Team, being called out.  Do

17  you see where I'm indicating there?

18      A    Yes.

19      Q    And so my understanding of what this

20  policy means is that, when an event has become

21  -- is deemed a civil disturbance by a Baton

22  Rouge Police Department, the supervisor on

23  scene is authorized to deploy the Special

24  Response Team; is that accurate?

25      A    Yes.

1    Q    And then looking, again, at E, this
2    says, you know, the same, if the SRT -- if the
3    Special Response Team is needed, advise
4    communications to notify the Incident
5    Commander and then the Incident Commander will
6    then inform communications to dispatch the
7    necessary authority.
8              Here, again, that means that the
9    Incident Commander has the authority to
10   dispatch the Special Response Team once an
11   event has been deemed a civil disorder by the
12   Baton Rouge Police Department.  Is that
13   accurate?
14   A    Yes.
15   Q    And during the 2016 protests, when
16   SRT was given the order to deploy, that was
17   pursuant to this policy; is that correct?
18   A    Correct.
19        MS. LOMMERS-JOHNSON:
20              Okay.  And I also -- I have a
21         couple more questions.  They're
22         overlapping with the topic of
23         formations.  I think that to the
24         extent that they do involve this
25         policy, I'm just going to go ahead

1          and ask those right now.  If anyone

2          has any objection to that, let me

3          know.

4               Hearing none, I'd like to, then,

5          look back at Section 3-A of this

6          policy.  I'll pull it back up, since

7          I see you don't have it in front of

8          you.

9  BY MS. LOMMERS-JOHNSON:

10      Q    Okay.  So this is the same document

11  going to Section 3-A.  Can you see Section 3-A

12  here?

13      A    Yes.

14      Q    Okay.  So here it says:  "Once the

15  Incident Commander or SRT Commander assumes

16  the responsibility for the incident, he will

17  ensure" -- and then under Subsection Number 3

18  -- "the appropriate use of tactical

19  formations."

20          So my question here is, according to

21  this policy, once an event has been deemed a

22  civil disturbance by the BRPD, the Incident

23  Commander is authorized to use the tactical

24  formations that he or she deems appropriate;

25  is that correct?

```
 1        A    Yes.
 2        Q    What are the tactical formations, in
 3   your understanding, that are deemed
 4   appropriate in a protest response situation?
 5        A    In my opinion, tactical formation
 6   would be a line formation between whatever
 7   group and whatever we were trying to keep them
 8   from.
 9        Q    Okay.  And what I heard you say was a
10   line formation.  Is that accurate?
11        A    Yes.
12             MS. LOMMERS-JOHNSON:
13                  I do have a couple more
14             questions about formations in general
15             that don't have to do with this
16             policy.  So I'm going to hold those
17             and pass it back to William and then
18             I'll ask those questions once we move
19             on to Topic 9.
20             MR. MOST:
21                  Would you toss me the host?
22                     EXAMINATION
23   BY MR. MOST:
24        Q    The next topic I have for you,
25   Lieutenant, is 8-D, which is "Equipment used
```

```
 1   during BRPD response to protests, including
 2   the acquisition of equipment related to follow
 3   tactics, determination to use the following
 4   tactics, the designation of authority to
 5   deploy the following tactics and description
 6   of BRPD-authorized use of the same; shields,
 7   batons, helmets and vests."
 8             Are you prepared to testify about
 9   that topic, Lieutenant Barrow?
10        A    Yes.
11        Q    So shields, batons, helmets and
12   vests, I suspect that vests -- by vests, we
13   mean bullet proof vests; is that correct?
14        A    Out there, they had make you wear
15   they were bullet proof vests.  If they wanted
16   you could wear the impact resistance vest.
17             THE COURT REPORTER:
18                  I'm sorry.  Could you repeat
19             that answer?
20             THE WITNESS:
21                  The ballistic vests, the bullet
22             proof vests or the impact resistance
23             vests.
24   BY MR. MOST:
25        Q    So the impact resistance vest, that's
```

1    different than a bullet proof vest.  That's

2    sort of a hard covering to protect from knives

3    or --

4        A    Not knives, against blunt objects,

5    sticks, bottles, rocks, stuff like that.

6        Q    Okay.  So -- and then shields, batons

7    and helmets, that's part of the standard

8    equipment of an everyday officer, agreed?

9        A    Agreed.

10       Q    So shields, batons and helmets are

11   deployed when there is a special need,

12   correct?

13       A    Correct.

14       Q    And shields, batons and helmets were

15   deployed at the 2016 July protests, agreed?

16       A    Yes.

17       Q    Were they deployed at the July 2016

18   protests because BRPD had classified those

19   protests as a civilian disturbance?

20       A    Yes.

21       Q    Was there any other reason that they

22   were deployed?

23       A    Also for officer protection.

24       Q    Right.  I understand they serve the

25   purpose of officer protection.  But the reason

1    why a supervisor gave the order to deploy

2    shields, batons and helmets was because the

3    protest had been classified as a civilian

4    disturbance, agreed?

5        A    Yes.

6        Q    Any other reason the supervisor chose

7    to do that?

8        A    No.

9              MR. MOST:

10                   And John Etter, an attorney, is

11             joining us.  He is an attorney for

12             another lawsuit, related lawsuit.

13             Welcome, John.

14             MR. ETTER:

15                   Thank you.

16             MR. MOST:

17                   We're on topic 8-D, which is

18             shields, batons and helmets.  That's

19             my only questions about shields,

20             batons and helmets.

21                   MacArthur Team, do you have any

22             questions about those?

23             MS. LOMMERS-JOHNSON:

24                   No, we don't have any questions

25             about shields, batons and helmets.

```
1              MR. MOST:
2                   And, Greg, I won't ask you each
3              time, but at any point you'd want to
4              ask questions, please just jump in.
5                   John, do you have any questions
6              about shields, batons, helmets and
7              vests?
8              MR. ETTER:
9                   I do not at this point.  Just a
10             comment.  I'm having issues with my
11             computer, so I'll be here without
12             video.  I will put my information in
13             the chat box for the court reporter.
14             MR. MOST:
15                  Thank you.
16   BY MR. MOST:
17        Q    Okay.  Moving on to the next topic,
18   which is 9-A.  Topic 9-A is "Tactics used
19   during BRPD response to protests, including
20   the decision to use the following tactics,
21   the designation of authority to deploy the
22   following tactics and description of BRPD
23   authorized use of same;" specifically, "Crowd
24   control."
25                  Are you prepared to testify about
```

1    that topic, Lieutenant?

2        A    Yes.

3        Q    Now, we've already covered some

4    elements of this.  But specifically I want to

5    talk about one tactic of crowd control, which

6    is -- we did see that the civilian disturbance

7    policy contemplates the possibility of mass

8    arrests, correct?

9        A    Yes.

10       Q    And one way to facilitate mass

11   arrests is to print the Affidavits of Probable

12   Cause in advance, correct?

13       A    Yes.

14       Q    And that was done at the 2016 July

15   protests, agreed?

16       A    Yes.

17       Q    And when I asked you questions about

18   the 2016 July protests, I'm assuming your

19   answers apply to each of the days and

20   incidents of those protests, unless you tell

21   me otherwise.  Are we agreed on that?

22       A    Yes.

23       Q    In your career as a law enforcement

24   officer, have you ever seen your agency use

25   preprinted Affidavits of Probable Cause, other

1    than at the July 2016 protests?

2         A    No.

3         Q    My understanding is that the

4    preprinted Affidavits of Probable Cause listed

5    a couple of different crimes that protesters

6    were potentially to be arrested pursuant to.

7    The first being 14:97.  Are you familiar with

8    that statute, obstruction?

9              MR. SCOTT:

10                  William, I'm lodging an

11             objection here.  I didn't designate

12             him for Affidavits of Probable

13             Cause -- and these seems to exceed

14             the scope of it.

15             MR. MOST:

16                  I'll just ask him a couple of

17             questions about this and we can

18             always follow up with another

19             deponent.

20    BY MR. MOST:

21         Q    Lieutenant Barrow, are you familiar

22    with 14:97, obstruction of a highway?

23         A    Yes.

24         Q    In your career as a law enforcement

25    officer, can you recall any instance, other

1    than the July 2016 protests, where you

2    arrested for a 14:97?

3          MR. SCOTT:

4               Objecting to the form.  You're

5          asking him about his personal

6          experience as law enforcement officer

7          as opposed the City.

8          MR. MOST:

9               Yes.  I'll refer you to -- Joe,

10         to Detoy V. City & County of San

11         Francisco.  That's 196 F.R.D. 362,367

12         N.D. Cal 2000.  "If defendants have

13         objections to either questions

14         outside of the scope of a 30(b)(6)

15         deposition ... counsel shall state

16         the objection on the record and the

17         witness shall answer the question to

18         the best of the witness's ability."

19              You're correct, Joe, that any

20         questions outside the scope of

21         30(b)(6) topics may not bind the

22         City, however they are to be

23         answered.

24         MR. SCOTT:

25              I've made my record.  You can go

```
 1              ahead and answer.
 2              MR. MOST:
 3                   Would you like me to repeat the
 4              question?
 5              THE WITNESS:
 6                   Repeat the question.
 7    BY MR. MOST:
 8         Q    So in your career as a law
 9    enforcement officer, can you recall any
10    particular instance, other than the July 2016
11    protests, in which you arrested someone for a
12    14:97 violation?
13         A    No.
14         Q    Are you familiar with 14:100.1, which
15    is obstruction of a public passageway?
16         A    Yes.
17         Q    In your career as a law enforcement
18    officer, have you ever -- can you recall any
19    particular instance in which you arrested
20    someone for a 14:100.1?
21         A    No.
22              MR. MOST:
23                   Those are my questions for topic
24              9-A.  MacArthur, do you have
25              questions for Topic 9-A?
```

1              MS. LOMMERS-JOHNSON:

2                   I do.  Thank, you William.

3                        EXAMINATION

4    BY MS. LOMMERS-JOHNSON:

5         Q    So I want to go back and sort of talk

6    a little bit more about the formations that

7    were used or that are authorized to be used

8    for crowd control.  And so I think -- stepping

9    back a second, you testified that you were the

10   commander of Mobile Field Force in 2016 during

11   the protests; is that correct?

12        A    Yes.

13        Q    When did you become Commander of the

14   Mobile Field Force?

15        A    I think it was around 2014.

16        Q    So you had been Mobile Field Force

17   Commander for about two years prior to the

18   deployment of Mobile Field Force at the Baton

19   Rouge protests in 2016?

20        A    Yes.

21        Q    My next question is:  What are the

22   tactical formation options that an incident

23   commander is authorized to deploy during a

24   protest?

25        A    You got different types of formation,

1    line, wedges, echelons, bees.  But it depends

2    on the crowd and which way you want the crowd

3    to move.  It can be any one of them.

4         Q    Okay.  And am I correct that the

5    Incident Commander, once an event has been

6    deemed a civilian disturbance, is authorized

7    to deploy any of those formations that he

8    deems appropriate?

9         A    Yes.

10        Q    And which of those formations were

11   deployed during the Baton Rouge protests in

12   2016?

13        A    All of the formations that I was

14   familiar with that were employed were line

15   formations.

16        Q    Did I hear you correctly?  Can you

17   repeat that one for time?

18        A    I said that all the formations that

19   I'm familiar with that was used out there was

20   a line formation.

21        Q    And can you tell me a little bit more

22   about what a line formation is and how it

23   operates?

24        A    That's just forming a straight line

25   between the crowd and the area we want to keep

```
1   them out of.  That's a line formation, just
2   putting ourselves between them and where we
3   don't want them to be.
4        Q    Okay.  And what is the primary
5   purpose of a line formation?
6        A    To prevent the crowd from advancing
7   -- it's to keep them out of the area we don't
8   want them in.  That's the purpose of it.
9        Q    And my understanding from General
10  Order 291 and some of the things that we've
11  seen in the videos having to do with the
12  July 2016 protests, is that the line formation
13  was also used in conjunction with arrest teams
14  and the operation of those arrest teams; is
15  that accurate?
16       A    Yes.
17       Q    Can you tell me, at the point when a
18  line formation is used and the Incident
19  Commander orders the line to advance, how that
20  is supposed to operate, according to Baton
21  Rouge Police Department Policy?
22       A    Regarding the BRPD, if it's
23  determined that we need to go ahead and clear
24  the crowd out, we need to get everybody out,
25  then an order can be given for the line to
```

1    start advancing forward, giving demands for

2    the crowd to move back.

3        Q    Okay.  And how do the arrest teams

4    interface with the line formation moving

5    forward; how does that work, according to

6    Baton Rouge policy?

7        A    The arrest teams are behind the line

8    formation and they are identifying any

9    problems.  And what they do, they move between

10   the line to whatever, agitator or somebody

11   breaking the law that has been identified and

12   they pull them back to arrest them.

13       Q    And so as far as I understand it from

14   your testimony, the line officers in front is

15   not comprised of the arrest team; the arrest

16   team is located behind the initial line of

17   officers?

18       A    That's correct.

19       Q    And who is responsible for

20   identifying people that need to be arrested?

21       A    The arrest team.  The arrest team

22   is -- it should be three officers.  It should

23   be four officers back there.  One is directing

24   the arrest team which way to move and that

25   particular officer, or whoever is designated,

1    he identifies the agitators.  Or we also have

2    observers in the crowd that will raise their

3    hand and say:  Hey, this guy over here is

4    agitating the crowd.  They point them out to

5    them.  They point it out to the arrest team,

6    and the arrest team moves in and arrests them.

7         Q    And when a line formation is made and

8    deployed, is there always an arrest team

9    moving in conjunction with the line formation?

10        A    Yes.

11        Q    So at the time that an Incident

12   Commander or SRT Commander orders officers to

13   deploy in a line formation, the arrest team is

14   deployed at the same time?

15        A    Yes.

16        Q    And so at the point -- at the point

17   that a line advances on a crowd of protesters,

18   officers are trained to begin to identify

19   agitators and begin to arresting some of those

20   protesters at that point; is that correct?

21        A    Yes.

22        Q    After the arrest team comes through

23   the line to arrest people who have been

24   identified as agitators at a protest, what

25   happens next?

1      A     After they arrest them, they move

2    them back and then they hand them off to the

3    UP prisoner transportation guys, and they take

4    it from there.

5      Q     You said the UP prisoner

6    transportation guy.  Can you tell me what --

7      A     Uniform Patrol.

8      Q     Okay.

9      A     Is that what you're referring to?

10      Q     Yes.  Okay.  And so, am I correct

11    that if the system is operating as it's

12    supposed to, according to BRPD training and

13    policy, the arrest team will come through,

14    arrest the person who has been identified as

15    an agitator and then take them to the prisoner

16    processing area and hand them off to the

17    individual staffing from Uniform Patrol; is

18    that accurate?

19      A     Yes.

20      Q     So the people -- here we're sort of

21    have been talking about the arrest teams and

22    the line.  Those -- when we talk about the

23    arrest team and the line formation, are those

24    comprised of officers who are in the Mobile

25    Field Force?

1      A    With BRPD?  No.  Because we have a

2   small team.  The arrest people -- our arrest

3   team is comprised of our Street Crimes Unit.

4      Q    Okay.  So it's going to be the line

5   formation and the arrest teams.  They're going

6   to be made up, not just of Mobile Field Force

7   members but also the Street Crimes Unit

8   members?

9      A    Correct.

10     Q    What about the people who are

11  stationed at prisoner processing; are those

12  people going to be members of Mobile Field

13  Force or the Street Crimes Unit?

14     A    No, that's Uniform Patrol officers.

15     Q    Okay.  It's those officers who are

16  then responsible for completing the booking,

17  paperwork and the probable cause affidavits

18  for the arrest of the protesters made by the

19  arrest teams; is that accurate?

20     A    Yes.

21     Q    And so if everything is working

22  according to, you know, the Baton Rouge Police

23  Department's system, the way officers have

24  been trained, it's not ever going to be the

25  arrest teams who are making the arrests who

```
 1    are filling out the probable cause affidavits?
 2         A    Yes.
 3         Q    And I just -- you were the Mobile
 4    Field Force Commander since 2014, I
 5    understand.  But I also understand that you
 6    were within the Baton Rouge Police Department
 7    for much longer than that.  Can you tell me
 8    when the Baton Rouge Police Department first
 9    started implementing policy and training about
10    this system of using arrest teams?
11         A    The department didn't have a Mobile
12    Field Force team until 2014.  But they trained
13    the officers in-service to deal with crowds.
14    We had equipment that was in the trailer, so
15    if we had an incident, whatever district area
16    it was in, Uniform Patrol officers from what
17    area would get the equipment and go to
18    wherever they needed to be and act as Mobile
19    Field Force.  It wasn't until 2014 that they
20    actually started trying to put a team
21    together.
22         Q    Okay, I have a couple of more
23    questions about that.  What spurred the
24    creation of Baton Rouge Police Department's
25    dedicated Mobile Field Force Unit?
```

1      A    Due to the increase in the events

2    that the City has starting to have -- I mean,

3    with the -- picking up.  We picked up a lot

4    more parades and stuff like that.  And then to

5    top it off with a lot of the unrest that had

6    been happening around the country.

7      Q    Am I correct in understanding that

8    when Mobile Field Force was formed in Baton

9    Rouge about 2014, it was formed because there

10   had been an uptick events in Baton Rouge and

11   an uptick in unrest around the country.

12     A    Correct.

13     Q    I guess in terms of the unrest around

14   the country that helped spur the creation of

15   Baton Rouge's dedicated Mobile Field Force

16   Unit.  Can you tell me a little bit more about

17   what you're referring to there?

18     A    You're talking about the unrest

19   around the country?  I'm not understanding.

20     Q    Yeah.  I'm just asking, you know, for

21   more specifics about what you mean by that.

22     A    In light of the different events that

23   were happening around the country.  I don't

24   know how to go much further into that.  I

25   mean, it was a lot of stuff happening in the

1    country that had potential to happen in Baton

2    Rouge.  You never know.  I mean, like I say,

3    we had all kinds of -- we even had -- on LSU's

4    campus, we had somebody who wanted to do a

5    flag-burning that we were not prepared for and

6    stuff like that.  They decided:  Hey, we need

7    to get ready for all of this.

8         Q    Okay.  And so I am not trying to ask

9    you questions that you don't know the answer

10   to at all.  But that help clears things up for

11   me a little bit.  I guess in terms of the

12   unrest in other areas of the country that

13   helped spur the BRPD's creation of the Mobile

14   Field Force Unit, can you give any sort of

15   examples of things that come to mind that were

16   going on during that time?

17        A    No, I can't.  I just know it was

18   different stuff going on.  I can't give one

19   particular incident, no.

20        Q    Okay.  I think some -- you know, I've

21   heard discussion elsewhere about events like

22   Ferguson.  I'm not trying to put words in your

23   mouth.  But is that the kind of civil unrest

24   that you're referring to?

25        A    Yes.

1      Q    Is it primarily demonstrations having

2  to do with civil rights protests?

3      A    No.  Like I said, we've had -- we've

4  had other incidents.  We had one parade in

5  Spanish Town.  At the end of that parade,

6  there's always a problem getting the crowd to

7  clear.  It's just different stuff, not just

8  one thing specific.

9      Q    Okay.  And so after the Mobile Field

10  Force Unit in Baton Rouge was created in 2014,

11  were Mobile Field Force trainings started

12  immediately?

13      A    Yes.

14      Q    And how large was the initial Mobile

15  Field Force Unit that was created?

16      A    It was only 20 officers; 20 officers

17  were actually online and myself, made 21.

18      Q    And by the time of the Baton Rouge

19  protests in July of 2016 had the Mobile Field

20  Force unit increased in size at all?

21      A    Yes, it had increased to 40 officers.

22      Q    Forty officers?

23      A    Yes.

24      Q    Did Mobile Field Force Trainings --

25  were those -- obviously, Mobile Field

1    Force officers were given specific MFF

2    training.  My question is whether other Baton

3    Rouge Police Department officers who were not

4    in the Mobile Field Force were given Mobile

5    Field Force Training?

6        A    Yes, we have a -- every officer has

7    to go through in-service training every year

8    in the month of their birthday.  Some of that

9    training within that involved some hours of

10   Mobile Field Force training, just in case they

11   had to fill in.

12       Q    I understand.  So at the yearly

13   in-service training that every BRPD is going

14   to attend, they are given some level of Mobile

15   Field Force training?

16       A    Yes.

17       Q    Including crowd control?

18       A    And I think it's done when they come

19   through the academy now, they touch on it.

20       Q    In 2016, would BRPD officers coming

21   through the academy also have received Mobile

22   Field Force training as part of the academy?

23       A    Not in 2016.  It started after 2016;

24   probably around 2017.

25       Q    Okay.  And so in 2016, the BRPD

1    officers who were deployed at the Baton Rouge

2    protests in July of 2016, they would have

3    received Mobile Field Force training during

4    their in-service trainings but not during the

5    academy; is that accurate?

6        A    Yes.

7        Q    And it's during those, you know,

8    yearly in-service trainings that they would be

9    taught how to interface with Mobile Field

10   Force and participate in this arrest team

11   system and the line formation; is that right?

12       A    Yes.

13       Q    When was the first time that the

14   Mobile Field Force Unit in Baton Rouge was

15   deployed?

16       A    First time it had to be deployed was

17   2016 protests.

18       Q    Were you referring to the deployment

19   during the July 2016 protests in Baton Rouge

20   as the first time that Mobile Field Force

21   deployed in Baton Rouge?

22       A    Yes.

23       Q    And since that first deployment, on

24   what other occasions has Baton Rouge's Mobile

25   Field Force Unit deployed?

1       A    Since the 2016 protest, they have not

2  been deployed, but they have been on standby

3  for other events, but it never escalated to

4  where they had to be deployed.

5             MS. LOMMERS-JOHNSON:

6                  So I think those are going to be

7             my all my questions for 9-A.  So I

8             can pass it to -- I don't know if --

9             John, did you have any questions for

10            9-A?

11            MR. ETTER:

12                 Yes, I do.  I have a few

13            questions for the Lieutenant.

14                      EXAMINATION

15  BY MR. ETTER:

16      Q    First in July of 2016, am I correct

17  that Louisiana State Police troopers were

18  deployed at the -- on July 10th at East and

19  France?

20      A    Yes.

21      Q    And under whose command were those

22  Louisiana State Police officers?

23      A    The BRPD Incident Command.

24      Q    And who was the Incident Commander on

25  that day?

1      A    I'm not sure, because they rotated

2  out.  I'm not sure who was there that specific

3  day, sir.

4      Q    And do you know who was in command at

5  between 5:00 p.m. and 7:00 p.m. on July 10th

6  at East and France?

7      A    I'm not sure.  I would be guessing.

8  I know, like, Captain J.D. Leach worked 1800

9  to 0600 and Lieutenant David Wallace, I know

10  he was part -- he worked from 0600 to 1800.

11  They could have been overlapping.  But like I

12  say, I'm not sure who was actually in Incident

13  Command at that time.

14      Q    Were you on the scene at East and

15  France at that time?

16      A    No, sir, myself and the Baton Rouge

17  Police Department Mobile Field Force Team has

18  specific hours.  We only work 1800 to 0600 at

19  9000 Airline and Goodwood.  Those were the

20  hours we worked.

21      Q    Do you have knowledge regarding the

22  arrest team at East and France on July 10th,

23  2016 between 5:00 p.m. and 7:00 p.m.?

24      A    No, sir.

25      Q    Would Baton Rouge Police Department

1   policy at that time have permitted an arrest

2   team to be composed of Louisiana State Police

3   troopers and Baton Rouge Police Department

4   officers?

5        A    Yes.

6        Q    And do you have any knowledge of

7   the -- regarding the arrest team that arrested

8   Max Geller on that date?

9        A    No.

10       Q    I will say that arrest team included

11  Trooper Jacob Brown.

12       A    No, I do not.

13       Q    And do you have any knowledge of who

14  ordered -- gave the order that the arrests on

15  July 10th, 2016 were to be for violation of

16  14:97?

17       A    No, I do not.

18       Q    I understand you are familiar and

19  here to testify about the training provided to

20  the Mobile Field Force.

21       A    Yes, to BRPD's Mobile Field Force,

22  yes, sir.

23       Q    All right.  And has the Mobile Field

24  Force ever received training regarding the

25  U.S. Supreme Court case of Cox versus

1    Louisiana, which was issued in 1965?

2        A    No.

3        Q    And that's a decision that involved

4    -- that held that arresting protesters for

5    obstructing streets near the capitol building

6    was unconstitutional.

7        A    No, they didn't train on that.

8        Q    Have you ever -- what training has

9    the Mobile Field Force received regarding the

10    constitutional rights of people to peacefully

11    assemble and protest?

12        A    They were trained to let them protest

13    as long as it's peaceful and not out of hand.

14        Q    What training has Mobile Field Force

15    received as to how to determine if people were

16    out of hand?

17        A    By their actions.  I mean, if they're

18    trying to incite the crowd to do something

19    against the law and evidence of them,

20    themselves, of doing something against the

21    law; just observing them.

22        Q    Going back to a little bit of your

23    use of the arrest teams and then the Uniform

24    Patrol officers to complete the Affidavits of

25    Probable Cause.  In the way that was done in

1    July 2016, was it possible for the officer who

2    completed the Affidavit of Probable Cause to

3    have witnessed the arrestee's contact?

4        A    The way they were situated, I would

5    say, no, it wasn't.

6        Q    Are you aware that in these cases,

7    the officers who have completed the Affidavits

8    of Probable Cause attested that they had

9    witnessed the particular person's conduct?

10            MR. SCOTT:

11                Object to form.  If you can

12            answer, answer it.

13            THE WITNESS:

14                No, I was not aware of it.

15    BY MR. ETTER:

16        Q    You stated that there was an incident

17    at Baton Rouge regarding -- at LSU regarding

18    people who were intending on burning a flag.

19    Did I correctly note your testimony?

20        A    Yes.

21        Q    And do you recall approximately when

22    that incident occurred?

23        A    No, I don't.  I just remember it

24    occurring.  I can't tell you exactly.

25        Q    Is it the policy of the Baton Rouge

1    Police Department that burning a flag -- a
2    United States flag is illegal?
3        A    No, it's not a policy, but when that
4    particular individual upsets that crowd and
5    there's a potential to get violent, yes,
6    that's an involvement for the police
7    department.
8        Q    What is -- what training is provided
9    to the Mobile Field Force regarding
10   neck-holds?
11            MR. SCOTT:
12                Regarding what?
13            MR. ETTER:
14                Neck-holds.
15            THE WITNESS:
16                We do not train in neck-holds.
17   BY MR. ETTER:
18       Q    Do you train that neck-holds are
19   prohibited?
20       A    That's not part of Mobile Field Force
21   at all.  The only hands-on at Mobile Field
22   Force are the arrest teams.  Other than that,
23   it's strictly using the shields between them
24   and the crowds.  They're not trained to do any
25   neck-holds or anything like that.

```
 1        Q    Are members of the Mobile Field Force
 2   trained to intervene if they see another law
 3   enforcement officer applying a neck-hold to an
 4   arrestee?
 5        A    No.
 6        Q    Based on your review of the Baton
 7   Rouge Police Department records, do you know
 8   who identified Max Geller as a person to be
 9   arrested?
10        A    No, I do not.
11             MR. ETTER:
12                  That's all my questions.  I will
13             pass the witness.
14             MR. MOST:
15                  I'll just ask a few followup
16             questions about this and then we can
17             move to the next topic.
18                       EXAMINATION
19   BY MR. MOST:
20        Q    Regarding the flag-burning
21   incident -- and I'm trying to understand your
22   testimony, Lieutenant Barrow.  It sounds like
23   the flag-burning incident was one of the
24   events that precipitated the creation of the
25   Mobile Field Force; is that right?
```

1      A      Yes, it was events like that, yes.

2      Q      Including that event, correct?

3      A      Yes.

4      Q      And the relevance of that event was

5  that the Mobile Field Force might need to be

6  deployed to prevent the flag-burning; is that

7  correct?

8      A      Not to prevent the flag-burning.  It

9  was one individual who wanted to burn a flag,

10  but you had multiple individuals out there

11  protesting that that were violent towards him.

12  It was more for this protection.  It would

13  have been more for this protection.

14      Q      I see.  So the need for the Mobile

15  Field Force might be to control the people who

16  were opposed to flag-burning; is that

17  accurate?

18      A      That's accurate, yes, sir.

19      Q      And then, just a few questions about

20  the process of the handoff between the arrest

21  team and the processing team at the July 16,

22  2000 -- I'm sorry.  The July 2016 protests.

23  All right?

24      A      Okay.

25      Q      So it's my understanding that the

1    arrest team is sort of on the front lines.
2    They physically seize them and hand an
3    arrestee off to the processing team for
4    processing and then return to the front lines,
5    correct?
6         A    Correct.
7         Q    And the goal is to have that process
8    be as quick and efficient as possible so that
9    the arrest team can return to the front lines;
10   is that accurate?
11        A    That's correct, yes, sir.
12        Q    Okay.  So it's BRPD policy that the
13   arrest team should not stop and have a
14   conversation with the processing team?  They
15   should simply hand off the arrestee and return
16   to the front lines, correct?
17        A    Correct.
18        Q    Okay.  That covers -- we were on --
19   that was 9-A topic.  Moving on to topic 9-C.
20   "Tactics used during BRPD response to
21   protests, including the decision to use the
22   following tactics, the designation of
23   authority to deploy the following tactics and
24   the description of the BRPD-authorized use of
25   same.  Kettling of protesters (surrounding

1    protesters so they can't leave)."

2            Are you prepped to talk about that

3    topic, Lieutenant?

4            MR. SCOTT:

5                    When I was going through the

6                    topics with the Lieutenant, he was

7                    not familiar with the phrase

8                    "Kettling."  If you want --

9            MR. MOST:

10                   Sure.

11           MR. SCOTT:

12                   If you want ask him something,

13                   it might be worth a try.  It wasn't a

14                   phrase used in their training.

15           MR. MOST:

16                   Fair enough.

17   BY MR. MOST:

18       Q    I represent to you, Lieutenant, that

19   I understand kettling to mean law enforcement

20   officers surrounding protesters so they can't

21   leave.  Will you understand what I mean by

22   kettling?

23       A    Yes.

24       Q    Kind of kettling fish in a pot, for

25   example?

1       A      Okay.  Yes.

2       Q      With that understanding of the term

3  "Kettling," are you prepared to testify about

4  that topic?

5       A      Yes.

6       Q      So you testified earlier about the

7  line formation being used by BRPD officers

8  during the July 2016 protest, correct?

9       A      Yes.

10      Q      And that was sometimes in conjunction

11 with other agencies forming lines and coming

12 from other directions, correct?

13      A      Correct.

14      Q      For example, at the East and France

15 Street protests, multiple lines of officers

16 surrounded protesters from multiple

17 directions, correct?

18      A      Correct.

19      Q      So the purpose of that was to

20 restrict the avenues for protesters to leave

21 the area, correct?

22      A      Correct.  Well, not to leave the

23 area, but leave in a direction that the police

24 wanted them to go.  It wasn't designed to keep

25 them in that area.  It was designed to keep

1  them from getting into specific areas.

2      Q    Okay.  At any point during the

3  July 2016 protest, did BRPD engage in actions

4  to try and prevent protesters from leaving?

5      A    No.  Like I say, not to my knowledge.

6  Like I said, here at 9000 Airline where I

7  worked, that did not happen.  And they're not

8  trained to do that.  They're trained to

9  prevent them from getting to one place and to

10 move them out of the area.  It was never

11 designed to keep them from leaving an area.

12     Q    I understand.  At certain protests in

13 July 2016, protesters were told to clear the

14 streets to not enter the roadway, agreed?

15     A    Yes.

16     Q    And so that's an order saying those

17 protesters can't go in the streets?

18     A    Correct.

19     Q    So if there's a group of protesters

20 and they have officers coming at them from

21 three sides and then on the fourth side

22 there's a street and they've been told not to

23 go into the street, all their avenues of exit

24 have been restricted, agreed?

25     A    Yes.  If that's the way it happened,

1    yes.

2            MR. MOST:

3                    That's the questions I have for

4            9-C.  MacArthur, do y'all have any

5            questions about topic 9-C?

6            MS. LOMMERS-JOHNSON:

7                    No, we don't have any more

8            questions about kettling.

9            MR. MOST:

10                   Mr. Etter, do you have any

11           questions about this Topic 9-C,

12           kettling?

13           MR. ETTER:

14                   No, I'll move -- you can move on

15           to the next topic.

16           MR. MOST:

17                   So, Joe, that's the topics I

18           have listed as Lieutenant Barrow

19           being able to testify about.  Maybe

20           we can just look at the notice real

21           quick and see if there's anything

22           else you want him to testify about.

23           MR. SCOTT:

24                   I went through it with him

25           before we got started.

```
 1          MR. MOST:
 2               Okay.  So would you like to
 3          bring in the next witness?
 4          MR. SCOTT:
 5               I'd like to take, like, a
 6          ten-minute break.
 7          MR. MOST:
 8               Sure.
 9          MR. SCOTT:
10               And I will bring in the next
11          witness.
12          MR. MOST:
13               We'll reconvene at 11:00 a.m.
14          MS. LOMMERS-JOHNSON:
15               Before you go -- and apologies
16          if this was already discussed, but
17          are we going to wait to hit -- let's
18          see what it is -- surveillance -- I'm
19          not sure subsection under 9 that is.
20          Are we waiting for 9-B?
21          MR. SCOTT:
22               I think I've got Topic 9 pretty
23          well covered with Captain Leach, but
24          we'll find out.
25          MS. LOMMERS-JOHNSON:
```

1          Okay.  I just wasn't sure if we
2     were covering 9-B with Lieutenant
3     Barrow.  But that sounds good.
4     MR. MOST:
5          We'll reconvene at 11:00 a.m.
6     Thank you.
7          (BRIEF RECESS)
8     MR. MOST:
9          Let's go on the record.  For
10    planning purposes, Joe, which topics
11    is Lieutenant Leach going to cover?
12    MR. SCOTT:
13         2-H, K, L, P through T.  I
14    believe he can speak to Subject 7, 8
15    and 9, which was Incident Command, I
16    believe on the overnight shift during
17    the 2016 protests, SWAT Commander and
18    was Director of the Training Academy
19    in 2016.
20    MR. MOST:
21         Highly qualified witness.
22    Fantastic.
23         CAPTAIN JAMES DARRON LEACH, 9000
24 AIRLINE HIGHWAY, BATON ROUGE, LOUISIANA, AFTER
25 FIRST BEING DULY SWORN IN THE ABOVE-ENTITLED

1    MATTER, DID TESTIFY AS FOLLOWS:

2                        EXAMINATION

3    BY MR. MOST:

4        Q    Would you give your full name and

5    rank for the record, please?

6        A    Captain James Darron Leach.

7        Q    Captain, my name is William Most.

8    I'm an attorney for the plaintiffs in the

9    Imani case, and we have with us here today

10   some attorneys for other plaintiffs in other

11   related cases, as well as an attorney for the

12   State Police defendants.  And so the way this

13   will work is, we'll go topic by topic and I'll

14   ask you questions, and then I'll hand it off

15   to our colleagues as needed.  There may be

16   followup, and then we'll move on and sort of

17   handle it like that.

18       A    Okay.

19       Q    Captain, have you ever given a

20   deposition before?

21       A    Yes, I have.

22       Q    Approximately how many have you

23   given?

24       A    Through my career, a dozen or more,

25   maybe.  My last one was about five hours, so

1   hopefully this one doesn't take that long.
2   I'm experienced with them.
3        Q    All right.  So you understand that
4   your answers here today are under oath and
5   have the same force as if we're in a courtroom
6   with a judge and jury.
7        A    I do.
8        Q    Is there anything, any medication,
9   illness, fatigue or anything else that will
10  prevent you from giving us your attention and
11  complete and truthful answers?
12       A    No, I'm good.
13       Q    Great.  As you know, we can take a
14  break at any time.  Just let me and your
15  attorneys know, and we'll take a break.
16  Although, I'll warn you in advance, it's my
17  practice to ask, after each break, what you
18  talked about, even if it's your attorneys, and
19  any documents that you reviewed during the
20  break.  All right?
21       A    Okay.
22       Q    One thing that is important is, if
23  any of the attorneys ask you a question that
24  is unclear or you don't understand, will you
25  agree to tell us that, rather just trying to

```
1    go ahead and answer it?
2         A    Absolutely.
3         Q    Thank you.  Do you have a broad sense
4    of what kind of cases you're here for today?
5         A    I do.  I think I understand it.
6         Q    Okay.  So you understand that we're
7    here today about a number of cases that deal
8    with the July 2016 protests?
9         A    Yes, sir.
10        Q    And I don't know if you've done a
11   deposition like this one before, but this is a
12   little different than a normal deposition.
13   It's what's called a 30(b)(6) deposition.  So
14   today you are here appearing and giving
15   answers but you're doing it on behalf of the
16   City Baton Rouge.  Do you understand that?
17        A    I do.
18        Q    So when I ask you a question or
19   another attorney asks you a question, we're
20   asking you questions of the City of Baton
21   Rouge, agreed?
22        A    Agreed.
23        Q    And your answers are not just the
24   answers of Captain Leach, they're the answers
25   of Baton Rouge.  Agreed?
```

1    A    Agreed.

2    Q    And so if I refer to you, I really

3  mean the City Baton Rouge.  Will you

4  understand that?

5    A    I do understand.

6    Q    Okay.  And one way that this

7  deposition is a little different than a normal

8  one is that, in a normal deposition, "I don't

9  know" or "I don't remember" is a perfectly

10  good answer.  However, at a 30(b)(6)

11  deposition like this one, the City is

12  obligated to provide someone who has looked

13  into the issues and has become knowledgeable.

14  So in most circumstances, "I don't know" or "I

15  don't recall" is generally not a sufficient

16  answer today.  Do you understand that?

17    A    I will answer to the best of my

18  knowledge.

19    Q    All right.  And you understand that

20  the City had an obligation to provide someone

21  knowledgeable, so you understand that general

22  obligation?

23    A    I understand.

24    Q    And besides talking to your

25  attorneys, did you talk to anyone to prepare

1    for today's deposition?

2         A     I did not.

3         Q     Did you look at any documents to

4    prepare for today's deposition?

5         A     I have not.

6         Q     I don't want to know anything about

7    the contents of your communications with the

8    attorneys, but did you talk to attorneys to

9    prepare for this deposition?

10        A     Only just this morning when I got

11   here.

12        Q     And approximately how long did you

13   talk to the attorneys to prepare for this

14   deposition?

15        A     Maybe ten minutes.

16        Q     Captain, how long have you been with

17   the Baton Rouge Police Department?

18        A     Twenty-nine years.

19        Q     Have you served with any law

20   enforcement department, other than BRPD?

21        A     I served with a small department in

22   Hodge, Louisiana.  It's in the northern part

23   of Louisiana -- for a year, seven or eight

24   months prior to coming to Baton Rouge.

25        Q     So you've been in law enforcement for

1    approximately 30 years; is that accurate?

2        A    That is correct.  November, it will

3    be 31 years.

4        Q    All right.  And what's your current

5    job responsibility or role?

6        A    I'm a Commander over our Special

7    Operations Division in the police department.

8        Q    And Special Operations, is that the

9    same thing as SWAT or are those different

10   things?

11       A    Special Operations is sort of a big

12   umbrella the SWAT falls underneath.  There are

13   other divisions.  We have our K9 Division, our

14   Air Support Division, our Mounted Division,

15   our EOD Division.  And we have part-time

16   division, such as Mobile Field Force, a dive

17   team, a boat operation team, for rescue and

18   things like that.

19       Q    So if I understand it correctly,

20   Special Operations handles most of the things

21   that are not everyday Uniform Patrol stuff?

22       A    Yes.

23       Q    And within that is SWAT?

24       A    Yes, sir.  I am the Incident

25   Commander over SWAT, as well.  You have the

1    big umbrella that everything falls underneath,

2    but I'm the Incident Commander for SWAT.

3        Q    And I heard the phrase "SRT."  Is

4    that the same thing as SWAT or is that a

5    different thing?

6        A    It's the same thing.  It's sort of

7    used universally.  Special Response Team is

8    the SWAT team.

9            MR. MOST:

10               Okay.  Let's jump into our first

11               topic that you've been designated

12               for, which is 2-H.

13               So 2-H is "Passive Resistance."

14               I thought this had already been

15               covered in a previous 30(b)(6), but I

16               wasn't present for it.  Do I have

17               that wrong, anybody?

18           MR. SCOTT:

19               I don't know.  I think Wallace

20               Britton from the training academy did

21               a pretty good job.  I don't know if

22               plaintiffs' counsel want to talk

23               about to anybody additionally about

24               "Passive resistance."

25           MS. MOORE-O'NEAL:

```
 1              Myself and Dave covered it --
 2         Mr. Lanser -- excuse me -- pretty
 3         thoroughly.  As I remember, it wasn't
 4         "Passive Resistance" that we had
 5         further questions on.  As I remember,
 6         it was not "Passive Resistance" that
 7         we had further questions on.  I don't
 8         want to speak for the Imani team, of
 9         course.
10    MR. MOST:
11              That reflects my notes, as well.
12         Although, I wasn't present.  In the
13         interest of efficiency, let's move on
14         to -- actually, I have the same thing
15         for K, that "First Aid or Medical
16         Training" was covering in that, as
17         well.
18              Do you think that's right,
19         Mandisa?
20    MS. MOORE-O'NEAL:
21              Hannah, what do you think?  I
22         remember that being an area that we
23         didn't think needed more testimony.
24    MS. LOMMERS-JOHNSON:
25              I agree.
```

BY MR. MOST:

Q    We'll move on.  The next one is "First Amendment Rights," which I don't believe has been covered.  So that topic is Topic 2-L, "Policies and Procedures regarding any of the following topics:  First Amendment Rights."

Captain, are you prepared to testify today about that topic?

A    Yes.

Q    So starting with the big picture, the City of Baton Rouge and the Baton Rouge Police Department are bound of the U.S. Constitution and the Louisiana Constitution, right?

A    Correct.

Q    And the U.S. Constitution has a First Amendment, which is mirrored partially by the Louisiana Constitution, agreed?

A    Yes.

Q    And when we say First Amendment Rights, we mean things including the right to free speech, the right of assembly, the freedom of the press and religion liberties, agreed?

A    Correct.

1    Q    And so for the Baton Rouge Police
2    Department, to comply with its obligations
3    under those constitutional provisions, has an
4    understanding of what the Supreme Court has
5    ruled in those areas, right?
6    A    Correct.
7    Q    And officers in Baton Rouge are
8    trained on certain Supreme Court cases, like,
9    for example, like Miranda, agreed?
10    A    Yes.
11    Q    So when there's big U.S. Supreme
12    Court cases that touch on officers'
13    activities, they need to be trained on those,
14    agreed?
15    A    Yes.
16    Q    One case of particular interest here
17    is a case called Cox v. Louisiana from 1965
18    that involved the arrest of a protester in
19    Baton Rouge Louisiana.  Have you ever heard of
20    that case?
21    A    I don't recall that case.
22    Q    If I told you it was a case involving
23    a protester who was arrested in Baton Rouge,
24    Louisiana and the Supreme Court held that his
25    First Amendment rights had been violated,

1    would that ring any bells for you?

2        A    It doesn't.

3        Q    So to your knowledge -- well, let me

4    back up.  Is there any training on this case,

5    as far as you know, in any of the training

6    provided to Baton Rouge police officers?

7        A    I'm not familiar with that case or it

8    is part of the training curriculum at all.  I

9    haven't heard that case.

10        Q    Does BRPD have a specific written

11    policy about First Amendment Rights, to your

12    knowledge?

13        A    I'm not a hundred percent on how it's

14    worded, but it definitely talks about voting,

15    the constitution and protecting the civilian

16    rights as a part of being a law enforcement

17    officer, it's a very important part of what we

18    do.

19        Q    So, for example, the Baton Rouge

20    Police Department Code of Ethics requires

21    officers to uphold the constitution?

22        A    Yes.

23        Q    But to your knowledge, there's no

24    specific policy related to First Amendment

25    Rights, agreed?

1       A    I'm not certain if there is.  I
2   would --
3       Q    So I haven't been able to find a
4   particular policy related to First Amendment
5   Rights in the Baton Rouge Police Department
6   Policy and Procedure Manual.  Are you aware of
7   any particular policy that specifically
8   addresses First Amendment Rights?
9       A    No, I'm not.
10      Q    Is the Baton Rouge Police Department
11  aware that streets and sidewalks are generally
12  considered to be public forums for speech and
13  assembly.
14      A    Of course, as long as it's in public
15  safety and safely to operate there, of course.
16      Q    Right.  So if people are assembled on
17  a sidewalk, for example -- or are private
18  property -- so long as it's safe, if they're
19  exercising their First Amendment Rights to
20  speech, they should not be arrested, agreed?
21      A    Agreed.  As long as there's nothing
22  other -- illegal activity goes on, of course.
23      Q    Does the City or Baton Rouge
24  Department have any ordinance or policies
25  specifically limiting how long a protest can

1    last?

2        A    No, not that I'm aware of.

3        Q    If the City is aware -- I'm sorry.

4    Let me back up.  Is the City aware that, if a

5    protest has been directed to go to a

6    particular area, it may be subsequently a

7    violation of those people's rights if they're

8    then ordered to disperse and arrested for

9    failing to disperse?  Does the City have any

10   awareness of that sort of structure?

11            MR. FAHRENHOLT:

12                Object to the form of the

13            question.

14            MR. MOST:

15                Can you answer that, Captain?

16            THE WITNESS:

17                I didn't understand what the

18            comment was after your question.

19            MR. SCOTT:

20                It sounds like it calls for a

21            legal conclusion from Captain Leach

22            who is very well-versed in these

23            things, but not an attorney or a

24            judge.

25            MR. MOST:

```
 1                  Sure.
 2                  Can you answer the question,
 3          Captain, or would you like me to
 4          rephrase it?
 5          THE WITNESS:
 6                  Please rephrase.
 7          MR. MOST:
 8                  Sure.
 9   BY MR. MOST:
10       Q    So let's say there's a group of
11   protesters.  All right?
12       A    Okay.
13       Q    And they have been directed to clear
14   the streets, and they do clear the streets.
15   They retreat to sidewalks and private property
16   and continue their protests.  Okay?
17       A    Okay.
18       Q    So far what we're describing, they're
19   doing lawful things, right?  They're
20   protesting and they've complied with a police
21   order to clear the streets.  Agreed?
22       A    Okay.
23       Q    Do you agree with me?
24       A    I do.
25       Q    So at that point, it would not be
```

```
1    lawful for police officers to sweep in and
2    arrest them, agreed?
3              MR. FAHRENHOLT:
4                   Objection to form.  Subject to
5              that, you can answer.
6              THE WITNESS:
7                   I would agree with you, as long
8              as they comply with the order to
9              disperse and they're gathered
10             peacefully, there's no problem.
11   BY MR. MOST:
12        Q    Yeah.  Just to be clear, the order in
13   this hypothetical is an order to clear the
14   streets and they've complied with that.  Would
15   your answer be the same?
16        A    Yes.
17        Q    So these protesters who have been
18   issued an order to clear the streets and who
19   have complied with it, does the City have any
20   understanding of whether they
21   can thereafter -- were to disperse and
22   completely clear the area?
23        A    It depends on what order that they
24   were given.  If they're given an order to
25   disperse, it's because there's been violence
```

1    or another reason for that to happen.  If it's

2    just a simply clear the streets and they

3    comply, there's no need for arrests.

4         Q    Okay.  Let's move on to the Freedom

5    of the Press.  So I imagine the City Baton

6    Rouge -- let me back up.  Freedom of the Press

7    includes journalists and photographers, right?

8         A    Okay.

9         Q    I'm sorry.  I didn't quite hear your

10   answer.

11        A    Yes.  Okay.

12        Q    And so journalists and

13   photographers -- it's not lawful for them to

14   arrest them just for doing their job and

15   taking pictures, right?  They'd have to -- or

16   reporting?  They'd have to commit an

17   independent crime to be arrested, agreed?

18        A    Agreed.

19        Q    So if journalists and photographers

20   are present at an event, taking pictures,

21   conducting reporting, unless they're

22   obstructing police activity, they should not

23   get arrested, agreed?

24        A    Agreed.

25        Q    I want to talk next about religion

1    rights, Freedom of Religion.  When someone is

2    arrested -- I haven't seen anything in the

3    policy manual that requires the arresting

4    officer to immediately remove that person's

5    hat.  Is there any such policy?

6         A    Not particularly on that, unless

7    they're going to photograph that person.

8         Q    Right.  And it's not BRPD practice to

9    remove someone's hat as soon as they're

10   arrested, unless for the purpose of

11   photography, agreed?

12        A    It might be an officer safety issued

13   if they think they could have a weapon under

14   their hat, I'm sure they would be searched.

15   That would be standard.

16        Q    Sure.  So, for example, if someone

17   was -- do you know what a yamaka is?

18        A    Yes.

19        Q    If someone was arrested with a

20   yamaka, the officer shouldn't just immediately

21   pull off that person's yamaka, correct?

22        A    I wouldn't think so.  It would be

23   hard to hide a weapon underneath one.  If that

24   happened, I'm not aware or what officer's

25   reasons would have been.

1    Q    Right.  If officers were just
2    removing people's yamaka's immediately upon
3    arrest, without the need for some officer
4    safety issue, it could be a violation of that
5    person's religion freedom, agreed?
6    A    You're asking me a hypothetical.  If
7    it happened, I don't know if an officer would
8    have a reason.  It could be they're thinking
9    about it like any other hat or cap, and
10   they're going to check underneath it as part
11   of the search.
12   Q    Okay.  But in the absence of those
13   needs, it could be a religion freedom
14   violation, agreed?
15   A    Okay.
16   Q    Do you agree?
17   A    I don't --
18        MR. SCOTT:
19             I'm going to object for asking
20        for agreement on a hypothetical that,
21        as far as I know, has no application
22        to any of the fact patterns presented
23        by these cases.
24        MR. MOST:
25             Okay.  Objection noted.

1    BY MR. MOST:

2         Q    Officer, would you agree with me?

3         A    I honestly don't know that that falls

4    under violating his religion freedom or not.

5    It's his right to wear it, so I suppose.

6         Q    Okay.  And do you what a hijab is?

7         A    Yes.

8         Q    That's a head covering for some

9    Muslim women, correct?

10        A    Yes.

11        Q    Just like a yamaka -- someone has a

12   right to wear a yamaka -- people have a right

13   to wear a hijab, agreed.

14        A    Agreed.

15        Q    Do you know if, in the absence of a

16   need for an immediate search for weapons,

17   would there be any justification for removing

18   a Muslim woman's hijab when seizing them?

19        A    You could definitely hide things

20   under there, so I would imagine that would be

21   an officer safety issue.

22        Q    Are you saying officers should remove

23   people's hijab's upon seizing them?

24        A    I've seen weapons hidden in a lot of

25   places.  I would definitely search that

```
1   person, yes.
2       Q    Okay.  So a hijab might need to be
3   removed pursuant to a search.  But other than
4   pursuant to a search, would there be any
5   reason to remove a hijab from an arrestee?
6       A    No, I think not.
7            MR. MOST:
8                Okay.  We talked about -- I
9            think we covered that.  Okay.  Those
10           are my questions, although there may
11           be the need for followup.
12               MacArthur, would like to ask any
13           questions about this topic of First
14           Amendment, 2-L?
15           MS. MOORE-O'NEAL:
16               Yes.
17                   EXAMINATION
18  BY MS. MOORE-O'NEAL:
19      Q    Hi, I'm Mandisa Moore-O'Neal.  I'm
20  one of the plaintiffs' attorneys in the
21  Tennart, Smith and Batiste-Swilley cases, and
22  I have a few more questions about First
23  Amendment trainings.
24      A    Okay.
25      Q    I know earlier it was mentioned that
```

1   education and trainings on First Amendment

2   Rights is a part of what every officer

3   undergoes.

4        A    Yes, ma'am.

5        Q    I'm curious.  How long is that

6   training?

7        A    There are several subjects or subject

8   matter in the academy that is taught that

9   involves civilian rights, such as, they go

10  through their law class in one of them.  We

11  talk about Mobile Field Force or crowd control

12  is a big component of that class.  First

13  Amendment Rights and recognizing that right to

14  free speech and gathering and such.

15       Q    Is there any specific written

16  training material?  I'm not talking about,

17  like, policies and procedures.  But is there

18  anything else that's written on First

19  Amendment Rights?

20       A    Yes.  When you go through law class,

21  there's a section on that where it talks about

22  the civil rights.  And also, as I mentioned in

23  the Mobile Field Force class and the civil

24  disturbance class, there's written material

25  for the class on that.

```
 1        Q    Thank you.

 2        A    Yes, ma'am.

 3        Q    So in addition to what's written in

 4   these classes, is there any scenario planning

 5   that happens?

 6        A    Yes.  In the Mobile Field Force

 7   class, there's actually hands-on part of it.

 8   So we have role players that will, you know,

 9   confront the group, distance training, so they

10   have to recognize, you know, the right for

11   them to be there.  It is a hands-on section.

12   It would fall under type of scenario training.

13             MR. SCOTT:

14                  Mandisa, are you asking about

15             the current practice or the practice

16             in 2016?

17             MS. MOORE-O'NEAL:

18                  I'm just asking in general.  I'm

19             actually moving into 2016 now.

20             THE WITNESS:

21                  Right.  It was something that

22             was taught in 2016.  As far as I

23             know, it still is taught here.

24   BY MS. MOORE-O'NEAL:

25        Q    So who was responsible for these
```

1    trainings in 2016?

2         A    I was the Director of Training for

3    the police department then.

4         Q    Okay.  So you were the one who would

5    teach, like, these law classes and the

6    scenarios?

7         A    I was responsible for scheduling and

8    getting instructors.  We had instructors

9    within the department.  We had (INAUDIBLE)

10   instructors that would come in and teach the

11   certain classes.

12              THE COURT REPORTER:

13                   We had -- I'm sorry.  Wait.

14              Wait.  You had what kind of

15              instructors to come in to teach the

16              classes?

17              THE WITNESS:

18                   The person who taught our law

19              class is a civil attorney, who would

20              come in from outside the department

21              to teach.

22              MS. MOORE-O'NEAL:

23                   Thank you.

24              THE WITNESS:

25                   Yes, ma'am.

```
 1          MS. MOORE-O'NEAL:
 2              Do you have any further
 3          clarifying questions, Ms. Henderson?
 4          THE COURT REPORTER:
 5              No.
 6          MS. MOORE-O'NEAL:
 7              Did you ever have any professors
 8          from -- John, if you could go on
 9          mute?  Is everyone able to hear me
10          and is there still an echo?
11          MR. SCOTT:
12              No, go ahead.
13  BY MS. MOORE-O'NEAL:
14      Q    I was asking if you ever had any law
15  professors from LSU Law School or Southern Law
16  School?
17      A    No, ma'am.  That would have been
18  great, but not from either one of those
19  schools, no.
20      Q    Okay.  And thinking of 2016 in
21  particular, would you say that the July 2016
22  protests that were in response to the killing
23  of Alton Sterling were First Amendment
24  protests?
25      A    I believe any protest is a First
```

Amendment protest.

Q    Okay.  Thank you.  And prior to the deployment of BRPD officers to the protest, were the officers given any sort of refreshment training on First Amendment Rights?

A    Yes, ma'am.  We, you know, as a department -- after the first events in 2014, we kind of recognize the step-up of training in that type of situation.  We had other training at the time.  We implemented a refresher course that was required by all officers in our department to go through a refresher course in Civil Rights and Mobile Field Force type.  To be more specific on your question, to answer it, before our officers were deployed from Emergency Operation Center to confront any protester, they were all briefed on what was expected of them and the rights of the civilian was something that we have to protect.

So, yes, they were trained through in-service training and they were briefed before deployment from Emergency Operations Center.

1    Q    Thank you.  And I understand it was

2    the briefing.  I'm curious about the -- how

3    long were those briefings?

4    A    The particular ones that I'm talking

5    about were actually the officers that were

6    assigned to Emergency Operations, because the

7    department -- the manpower was sort of divided

8    to still answer public service calls and calls

9    of emergency services, and some officers were

10    assigned to the response to civil unrest.

11         So those briefings were, you know,

12    probably 15 to 30 minutes.  I'm just guessing.

13    It's been a few years back.  But before their

14    deployment, there was also a briefing and then

15    we would always discuss anything afterwards in

16    a debrief to see what we could improve, you

17    know, and do things better.

18    Q    Thank you.  So in the debriefs

19    afterwards, how long after, say, someone is --

20    I'll just say -- if an officer is deployed to,

21    say, Airline and Goodwood, where a lot of the

22    protests happened and they are leaving.  How

23    long after they have left the scene does the

24    debrief occur?

25    A    Well, the debrief might have occurred

1    just between the supervisors and the emergency

2    operations, just to gather what had happened

3    during the hours of operation, any lessons

4    learned, any improvements, any shortages,

5    logistical operations, anything like that, so

6    we could try to improve on the Operations.

7        Q    And then once this information is

8    given to the supervisors, is it given to their

9    supervisor?

10       A    No.  Initially, it would be kind of

11   passed off.  Under Unified Command, I was in

12   charge of it, but there are many levels.  But,

13   certainly, it was passed up to me, because

14   after the night's events, you know, there was

15   always a briefing from the Chief's office for

16   the next morning as to what had happened and

17   what was expected to happened during the

18   daytime.  So those debriefs were passed up and

19   compiled into a briefing for to the chief and

20   his administrators.

21       Q    Just to confirm, is this written?

22       A    No, ma'am.  It was just usually

23   verbal.  Sometimes we would meet at the end of

24   our shift or sometimes if it was a busy night,

25   we could get a phonecall briefing.  The

1  briefings were given in person to the chief's

2  office.

3       Q    Thank you.

4       A    Yes, ma'am.

5       Q    Still staying with 2016, I imagine

6  that in the course of your 30 plus years,

7  there's been something that in the last

8  several years is fairly new.  And that is,

9  civilians filming officers.  You know, like

10 with the cellphone camera or tablet camera.

11 Like I imagine that 30 years ago, that wasn't

12 really something that existed.

13      A    Right.  No, I mean, probably, the

14 past ten years from the first iPhone, you

15 know.  But the first two-thirds of my career,

16 you didn't see much of that.

17      Q    Exactly.  It's like a news camera.

18      A    Right.

19      Q    So given this newer sort of way, has

20 there been -- in 2016 was there any training

21 for officers on how to engage with civilians

22 filming?

23      A    Yes, ma'am.  By 2016 every officer

24 was training to know:  Well, it's within

25 someone's right to interview.  They should

1  ignore that unless or it's impeding

2  investigation or something, if there was some

3  reason.  Certainly, it's something that we

4  tell our officers:  Just expect.  Someone is

5  always filming it.  And when brought about

6  body cameras, that was something, I think, our

7  department accepted quite well.  Because we

8  were already under the impression, we're

9  already being filmed anyway.  So we might as

10  well film ourselves.

11       Q    And so there have been any training

12  or discussions on filming in the context of

13  First Amendment Rights?

14       A    I believe we're following, not only

15  your First Amendment Rights -- like I said, if

16  you're being lawful and you're not impeding

17  the investigation, it's within your rights to

18  stand there with your cellphone and film.

19            MS. MOORE-O'NEAL:

20                 Thank you so much.

21            THE WITNESS:

22                 Yes, ma'am.

23            MS. MOORE-O'NEAL:

24                 At this time, I don't have any

25                 further questions.  But I want to

```
 1              turn it over to John or, you know, if
 2              William has any more.
 3         MR. MOST:
 4              Go ahead, John.
 5         MR. ETTER:
 6              I have just a couple of
 7         followups here.
 8         THE WITNESS:
 9              Okay.
10                   EXAMINATION
11    BY MR. ETTER:
12       Q    First you have to -- Captain, was
13    there -- to your knowledge, was there any
14    training specifically regarding arresting
15    people pursuant to statute 14:97 for
16    obstructing a street prior to 2016?
17       A    Not specifically, I wouldn't think.
18       Q    Do you recall any -- was there at any
19    training at all regarding violation of
20    statutes for obstructing a street or highway?
21       A    I don't think there was any specific
22    training on one specific law.
23         THE COURT REPORTER:
24              Wait.  Wait.  I'm sorry.
25         There's a lot of feedback coming
```

```
 1              through.  Could you repeat your
 2              answer, please?
 3              THE WITNESS:
 4                   I think it's going to
 5              continue --
 6              MR. MOST:
 7                   John, if you have headphones or
 8              try and separate your speaker and
 9              audio.
10              THE WITNESS:
11                   He's muted.  My answer was, I
12              don't think there was any specific
13              training on that one statute, no.
14     BY MR. ETTER:
15         Q    You mentioned that there had been
16     refresher training regarding First Amendment
17     Rights that occurred between 2014 and 2016.
18     Am I correct?
19         A    That's correct.
20         Q    And were there specific materials
21     used for that training?
22         A    Yes, sir.  There was a class that was
23     presented all of our police officers through
24     in-service, in their required in-service
25     training, so there was a class with training.
```

```
 1      Q    Doe you or your counsel --
 2           THE COURT REPORTER:
 3                Is anybody else getting -- I'm
 4           hearing --
 5           MR. MOST:
 6                You have a feedback loop going
 7           on where your audio is going into
 8           your speakers.  So we're hearing
 9           everything multiple times
10           overlapping.
11           MR. ETTER:
12                Sorry.  I'm not quite sure.
13           MR. MOST:
14                One solution would be to use
15           head phones.  Another would be to
16           somehow move your microphone and your
17           speakers further apart from each
18           other.
19           MR. ETTER:
20                Yeah.  I'm trying to.
21           MR. MOST:
22                Let's go off the record while we
23           address this.
24                (BRIEF RECESS)
25           MR. MOST:
```

1              Back on the record.  Until John

2          comes back, I've just got one

3          followup, which is:  You were talking

4          about sort of refresher trainings

5          about First Amendment Rights that

6          were given before or in anticipation

7          of the July 2016 protests.  Is that

8          right?

9          THE WITNESS:

10             Yes.

11  BY MR. MOST:

12      Q    If there was a U.S. Supreme Court

13  case about protesters in Baton Rouge and about

14  whether it was lawful for Baton Rouge Police

15  Department to arrest them for a 14:97, that's

16  the kind of thing that should have been in

17  that training; agreed?

18      A    I wish I would have known about that

19  '65 case that you mentioned.  That would have

20  been a great example.

21      Q    So that case, if there's a case like

22  what I'm describing, that's the kind of thing

23  that should have been in that training,

24  agreed?

25      A    It would have been nice to have

```
 1    known.  It would have fit right in, yes.
 2         Q    More than nice to have.  If there's a
 3    case by the U.S. Supreme Court about this
 4    city, this topic and this police department,
 5    that's the kind of thing you would expect to
 6    have and should have in a training on that
 7    topic, agreed?
 8         A    I tell you that, if it had been
 9    known, it would have been in there.  But you
10    can't include something you didn't know about.
11              MR. MOST:
12                   Okay.  That's my question.
13              MR. SCOTT:
14                   You're asking for legal
15              conclusions and --
16              MR. ETTER:
17                   I'm back.  Is this better?
18              MR. MOST:
19                   Yes.
20              MR. ETTER:
21                   I switched to doing this through
22              my phone instead of through the
23              laptop.
24    BY MR. ETTER:
25         Q    Captain, do you now have the training
```

```
1    materials from that refresher course on the

2    First Amendment being produced to the

3    plaintiff's counsel in these cases?

4        A    I suspect that it has.  I can't say

5    100 percent.  I know that the academy has

6    given everything that they've been asked of.

7    And over the past five years, that should have

8    been included, I would think.

9              MR. ETTER:

10                  Mr. Scott, plaintiffs are

11             calling for the production of those

12             materials -- the training materials

13             from that refresher course, if they

14             have not been previously produced.

15             MR. MOST:

16                  Moving on to topic 2-P, as in

17             Paul.

18             MR. FAHRENHOLT:

19                  William, I actually have some

20             questions on the topic.

21             MR. MOST:

22                  Yeah, you're good.

23             MR. FAHRENHOLT:

24                  No problem.

25                     EXAMINATION
```

1   BY MR. FAHRENHOLT:

2       Q    Is it the City's position that the

3   First Amendment gives people an absolute right

4   to protest anywhere they want at any time they

5   want?

6       A    It would have to follow within the

7   safety guidelines, of course.  But there are

8   no time restraints on anything.

9       Q    Is it ordinary for the City to

10  encounter protests that are in residential

11  areas?

12      A    Well, then that would fall in

13  violation of noise ordinance, so that might be

14  -- that could be something that would not be

15  allowed.

16      Q    Is it the City's position that a law

17  enforcement officer does not have the ability

18  to give the crowds commands to disperse if the

19  officer believes a riot is occurring or is

20  likely going to occur?

21      A    If he believes there's going to be

22  violence, yes, they would give an order to

23  disperse, if they couldn't bring about a

24  peaceful solution for the protesters.

25      Q    If an event is occurring on private

1    property and the police officer believes

2    there's a violation of the law, would the

3    police officer have the ability to command a

4    crowd to disperse from private property?

5        A    Like I said, unless they're violating

6    some other type of ordinance, then they would

7    be fine there.

8        Q    Let me give you a hypothetical.

9    Let's say someone is having a very large house

10   party in their yard with hundreds of people

11   and that party becomes unruly.  Is it the

12   City's position that, because those people are

13   in a private yard, that a police officer could

14   not tell those people to disperse and go home?

15       A    No, that happens all the time around

16   LSU.  There are college parties broken up, if

17   they're disturbing the peace of the neighbors

18   around them, it's perfectly within that

19   officer's right to give that order to

20   disperse.

21       Q    So for the example you just gave, if

22   there's large party at LSU, Baton Rouge police

23   officers have commanded people to leave those

24   parties, even if the party was happening on

25   private property, correct?

```
 1        A    That's correct.  That's happened
 2   before, and it will probably happen many more
 3   times.  If it's a disorderly crowd and
 4   disturbing another person's peace, then, yes,
 5   they will give that order.
 6              THE COURT REPORTER:
 7                   I need one second, please.
 8                   (OFF-THE-RECORD DISCUSSION)
 9              MR. MOST:
10                   Let's go back on the record.
11              All right.  Topic -- moving on to
12              Topic 2-P, as in Paul, which is
13              policies and procedures regarding any
14              of the following topics:  "Peaceful
15              versus non-peaceful protests."
16              MR. SCOTT:
17                   Do plaintiffs' counsel feel that
18              we've adequately addressed 2-N,
19              2-November.
20              MR. MOST:
21                   N as in Nancy?
22              MR. SCOTT:
23                   Whatever N you want.
24              MR. MOST:
25                   No, N as in neck is not on my
```

1          list as ones that were already done,

2          which is BearCats and other vehicles

3          primarily deployed for crowd control.

4          Although, my questions about that

5          would be super brief.  So if we'd

6          like to address that now, I'm fine

7          with that.

8          MR. SCOTT:

9               Just trying to be more orderly.

10         MR. MOST:

11              Yeah.  Let's try it out.  Let's

12         try and do 2-N as in neck.

13                    EXAMINATION

14    BY MR. MOST:

15      Q    All right.  That topic is:  "Policies

16    and procedures regarding any of the following

17    topics:  Use of BearCats or other vehicles

18    primarily deployed for crowd control."

19         Captain, are you prepared to testify

20    about that topic?

21      A    Yes, sir.

22      Q    So it's my understanding that a

23    BearCat was deployed to the July 2016 protest.

24      A    Yes, BearCats were used regularly,

25    yes.

1      Q    By BearCat, we mean a large
2  military-style vehicle that is owned by the
3  City of Baton Rouge?
4      A    Yes, it's an armored vehicle made by
5  a company called Lenco out of Massachusetts.
6      Q    Was that a military vehicle that
7  Baton Rouge Police Department obtained in some
8  fashion?
9      A    No, it's not a military vehicle at
10  all.  It's just an armored truck.
11      Q    Okay.  That was a vehicle on which an
12  LRAD device was mounted; is that correct?
13      A    On one occasion, yes.
14      Q    Okay.  And that occasion was the
15  protests at East and France Streets on
16  July 10th, 2016?
17      A    That's correct.
18      Q    But the BearCat was deployed to other
19  protests in July 2016 without the LRAD?
20      A    Yes.  BearCat was deployed simply for
21  overwatch in case there was violence --
22  related violence, such as the attack in Dallas
23  at the protest that killed five officers.
24  But, also, not just for officer safety, in
25  case there's an active shooter, for civilian

1   safety.

2        Q    All right.  Can you recall other

3   times the BearCat has been deployed, other

4   than July 2016?

5        A    Can you be more specific?  Because

6   it's used quite frequently.

7        Q    What other context is the BearCat

8   used?

9        A    As transport for our SWAT operators.

10  It's used on every warrant that we do, every

11  call-out that we have.  Anytime there's a

12  danger, there's a need for a good solid cover

13  vehicle, it's brought out and utilized.  We

14  use it to rescue victims, flood victims around

15  here on many occasions.

16       Q    And is it proper to use the BearCat

17  to drive at people who are standing in place

18  to try and push them back?

19       A    No, it wouldn't be utilized in that

20  fashion for that reason, no.

21       Q    Should it be driven at people who are

22  standing in place and not moving?

23       A    I know the particular incident you're

24  talking about.  The crowd was refusing to move

25  and they were trying to position the LRAD to

```
 1   be more effective.  They weren't trying to run
 2   over people.
 3       Q    Yeah.  I don't even think that they
 4   were trying to run over people.  I guess what
 5   I'm asking, is it proper to drive at
 6   stationary people?
 7       A    No.
 8            MR. MOST:
 9                 Okay.  Those are my only
10            questions about the BearCat for topic
11            2-N.  MacArthur, do you have any
12            questions about that?
13            MS. LOMMERS-JOHNSON:
14                 Just a few questions about the
15            BearCat.
16                      EXAMINATION
17   BY MS. LOMMERS-JOHNSON:
18       Q    Good afternoon.  My name is Hannah
19   Lommers-Johnson.  I'm with the MacArthur
20   Justice Center.  And today on this conference,
21   Mandisa Moore-O'Neal and myself represent the
22   plaintiffs from the Tennart, Smith and
23   Batiste-Swilley cases.
24                 You discussed what a BearCat looks
25   like a little bit in your testimony with
```

1  William just now.  I just wanted to confirm,

2  so the armored vehicle called the BearCat has

3  a turret similar to a tank; is that accurate?

4      A    It is called a turret.  You are

5  correct.  Unlike the military, ours doesn't

6  have a machine gun poking up out of it.  We

7  will use it for cover for officers and for

8  civilians because it's mounted.  Once you

9  stand up, you can see over a lot of people in

10 the crowd.  So it's used to be a covered

11 vehicle in case there is that active threat,

12 like an active shooter threat.

13     Q    And is the BearCat deployed every

14 time the Special Response Team is deployed?

15     A    Yes, ma'am, pretty much.  We would

16 always like to have it close by if we're not

17 deploying it, just in case it's needed.  And

18 it is a way -- it will haul about --

19 comfortably, it will haul ten operators and

20 gear.

21     Q    Do you know, during the Baton Rouge

22 protests in July of 2016, did -- was the

23 BearCat used for transport during that time?

24     A    It was.  We use it to transport

25 officers in during the protest and other

```
 1    times.
 2              THE COURT REPORTER:
 3                   I need one second.
 4                   (OFF-THE-RECORD DISCUSSION)
 5              MS. LOMMERS-JOHNSON:
 6                   Okay.  Back on the record.
 7    BY MS. LOMMERS-JOHNSON:
 8         Q    We were looking earlier today at
 9    General Order 291.  This is the policy on
10    civil disorder.  Are you familiar with that
11    policy?
12         A    Yes, ma'am.  I haven't read it in a
13    file, but I am familiar with it.
14         Q    I can -- here.  Let me bring it up on
15    the screen so we can see it while we're
16    chatting about it.  Can you see my screen now,
17    Captain Leach?
18         A    Yes, ma'am.
19         Q    And so this has been entered into the
20    record as Exhibit ZZZZZZZ.  It's the civil
21    disorder policy.  My understanding is that
22    this was in place at the time of the July 2016
23    protests; is that accurate?
24         A    I assume it was.  I'm not certain
25    that revised date is the last one or not.  I
```

1  see renewed -- I guess it was, yes, ma'am.

2      Q    And I'll just try to scroll through

3  this policy briefly down to, you know, the

4  responsibilities and obligations of the

5  Incident Commander.  My understanding of this

6  policy is that, once an event has been deemed

7  by BRPD to be a civil disorder policy, the

8  Incident Commander is at that point authorized

9  to order the Special Response Team to deploy.

10  Is that correct?

11      A    It would cover under this.  It would

12  cover also Mobile Field Force.  You're

13  correct, whatever is needed, yes.

14      Q    So at the point that BRPD has deemed

15  an event a civil disturbance, at that point

16  the Incident Commander is authorized by this

17  policy to deploy Special Response Team and/or

18  Mobile Field Force?

19      A    Correct.

20      Q    And my question here with regard to

21  the BearCat is just -- I think you testified

22  that the BearCat is deployed along with

23  Special Response Team, whenever they deploy.

24  And so when an Incident Commander orders

25  Mobile Field Force and the Special Response

1    Team to deploy at a protest, they're aware
2    that a BearCat will be arriving on scene, as
3    well?
4        A    Yes, ma'am.
5        Q    And I know you said the BearCat is
6    not equipped with a gun in the turret area.
7        A    Correct.
8        Q    Okay.  My question here is, what
9    equipment is contained within the BearCat as
10   part of this standard equipment?
11       A    Okay.  There are quite a number of
12   items.  Each officer is going to be, you
13   know -- and, of course, protective gear,
14   heavier level than your normal uniform officer
15   would wear.  They will have a pistol and a
16   riffle as standard issued.  Once inside the
17   BearCat, there will be breaching tools, such
18   as a ram or even a shield, you know, a
19   handheld shield.  There will be some kind of
20   bolt cutters for breaching as well, a sledge
21   hammer, a Halligan tool, which is used to pry
22   open doors.  Those would be certain things
23   each officer would also be equipped.  They're
24   supposed to have all of their protective gear,
25   in addition, their gas mask, if needed.

1    Things like that will be standard issue

2    equipment in a BearCat.

3         Q    And I understand that the turret on

4    the BearCat is not equipped with a gun itself.

5    But is it the practice of BRPD at some point

6    to have an officer standing up in the turret

7    and have that officer armed with a pistol or

8    other weapon?

9         A    At some point, yes.  If it's deemed

10   to be a cover situation where you're covering

11   a team's movement or you're on a watch for

12   threat, it could be where an officer would be,

13   you know, even with a rifle in a turret.

14        Q    Okay.  And are you aware of an

15   incident during the July 2016 protests when

16   the BearCat and the Special Response Team were

17   deployed to the area of the mayor's house.

18        A    I do remember -- if you say the

19   BearCat was there, I don't recall if it was or

20   not.  I do know, you know, that SRT or our

21   response guys we were out there that evening.

22   I'm not sure how they were transporting those

23   teams, because we would also operate in what

24   we call QRF.  It's just a Quick Response

25   Force.  It's usually two guys in a Tahoe.  I'm

1    not sure if the BearCat was there or not.

2          THE COURT REPORTER:

3              I'm sorry.  "Two guys and a"

4          what?

5          THE WITNESS:

6              In a Tahoe, Chevrolet Tahoe.

7          It's unmarked.  It's what most of the

8          guys drive.

9    BY MS. LOMMERS-JOHNSON:

10       Q    If the BearCat were on scene at the

11   mayor's house during the July 2016 protests,

12   it wouldn't be, you know, a violation of BRPD

13   practice or policy to have an officer armed

14   with a rifle standing up, looking out of the

15   turret; is that correct?

16       A    Yes, ma'am.  You're correct.  It's

17   not a violation of policy.

18       Q    And I think you testified previously

19   that the BearCat has been deployed at several

20   different types of events previously.  I think

21   you mentioned flood response, different types

22   of disaster responses.  My question is:  What

23   other events related to demonstrations or

24   crowd control has the BearCat been deployed to

25   respond to?

1     A    Specifically, I can't really answer
2  that.  I would say most of them, because of
3  the advantage that it brings if that solid
4  structure -- that covered structure is needed,
5  it's going to be close by.  Whether it's
6  actually deployed or not, it's probably going
7  to be on scene somewhere.  If it's a large
8  crowd that has gathered, sometimes it used
9  just for the observation point, because it's
10  relatively tall compared to other vehicles,
11  and you can see further over into the crowd.
12  So it's utilized like that, as well.
13     Q    And can you remember or are you aware
14  of the BearCat being deployed to any events
15  with crowds that are not protest-related?
16     A    Yes, ma'am.  We use it for all of our
17  festivities.  Of course, we just had a big
18  Fourth of July fireworks display.  The BearCat
19  was prominently displayed, as well.  It's on
20  the scene just in case, you know, things go
21  bad.  Bad things happen in good places all the
22  time, so we just try to be prepared.
23     Q    When the BearCat is deployed at an
24  incident that the BRPD has determined to fall
25  under this Civil Disturbance Policy, who is

```
 1    responsible for directing the BearCat where to
 2    go?
 3         A    That would just fall on whoever is
 4    the ground command at the time, I suppose.  If
 5    the BearCat -- if it was an unplanned event --
 6    so if the BearCat was called to an event -- I
 7    guess you're kind of talking hypothetically
 8    now.  It would be whoever is in charge on the
 9    ground, boots-on-the-ground type of thing as
10    to where the BearCat would be.
11              MS. LOMMERS-JOHNSON:
12                   Those are all my questions on
13              Topic 2-N.  I'll pass it to -- John,
14              did you have questions on 2-N?
15              MR. ETTER:
16                   No questions.
17              MR. MOST:
18                   Greg, just jump in wherever you
19              want to.  So then we'll move on --
20              MR. SCOTT:
21                   I just wanted to ask one
22              question.
23              MR. MOST:
24                   Oh, sure.
25
```

```
 1              MR. SCOTT:
 2                   Captain Leach, does the BearCat
 3         that BRPD owns have any --
 4         THE COURT REPORTER:
 5                   I'm sorry.  I'm having a hard
 6         time hearing you, Mr. Scott.  Can you
 7         talk to him but face the mic, please?
 8         MR. SCOTT:
 9                   Yes, ma'am.
10                   Does BRPD have any intergraded
11         weapons symptoms, whether they're in
12         the turret or not?
13         THE WITNESS:
14                   No, it has nothing that's
15         integrated on the vehicle, no.
16         MR. MOST:
17                   So I wonder if -- there's a
18         separate topic for the LRAD device.
19         Since we're close to that
20         conceptually, is that something that
21         Leach would want to testify about,
22         Joe, or is that something you'd like
23         to have someone else for?
24         THE WITNESS:
25                   I can talk about it, certainly.
```

1          MR. MOST:

2                So this is Topic 8-A, "Equipment

3          used during BRPD response to protest,

4          including the acquisition of

5          equipment related to the following

6          tactics; determination to use the

7          following tactics; the designation of

8          authority to deploy the following

9          tactics; and the description of the

10         BRPD authorized use of the same,

11         Subsection B, LRAD."

12               Are you prepared to testify

13         about that, Captain?

14         THE WITNESS:

15               Yes, sir.

16                    EXAMINATION

17   BY MR. MOST:

18     Q    Okay.  So the LRAD device, that's an

19   acronym that stands for Long Range Acoustical

20   Device?

21     A    Correct.

22     Q    And that is -- would you consider it

23   to be a nonlethal weapon that's attached to

24   something?

25     A    It is a nonlethal weapon.  It's not

133

1    attached to anything.  The one that was used

2    in 2016 was mobile and relatively small.  I

3    can't remember the decibel level, but it's

4    basically a big speaker.  We didn't own it at

5    the time.  We borrowed one from the State

6    Police.  It wasn't attached to anything.  And

7    to be quite honest, it was very directional.

8    If you're not directing it in the exact area,

9    it's not that effective.

10        Q    Okay.  So just backing up a little

11   bit for context.  It's my understanding that

12   your testimony is that in July of 2016, BRPD

13   borrowed an LRAD from the State Police and

14   used it at the protests on July 10th on East

15   and France Street; is that right?

16        A    That's correct.

17        Q    And it was -- the person operating it

18   was in the turret of the BRPD BearCat?

19        A    Yes, sir.

20        Q    And you said that the LRAD was

21   directional.  Was it something that officer

22   was holding and moving around or was it fixed

23   so that it's pointed forward or in a

24   particular direction?

25        A    Well, the officers standing up there

1    and, you know, they moved -- they moved it

2    very little.  And they thought that they'd get

3    closer.  I think that was where the BearCat

4    was trying to position whenever -- that's how

5    they chose to move it, I suppose.

6        Q    So when you say they moved it very

7    little, so it's mostly pointed forward; is

8    that correct?

9        A    Correct.  I think it was pointed

10   forward and the projection from -- I wasn't on

11   scene -- but the projection -- well, from what

12   I've seen, would have been kind of ineffective

13   for what it's designed for.

14       Q    And it's designed to make standing in

15   one place so uncomfortable because of the

16   noise that people leave?

17       A    That's correct.  It's also used to --

18   you can use it as a speaker, whereas you're

19   giving commands, commands to disperse can be

20   given, or it can be directed and understood

21   over a lot of noise or you can really put it

22   on this uncomfortable setting where you just

23   don't want to stand there and listen to it.

24   It makes you really nauseated.  It can make

25   you nauseated, a little bit.  But it's less

1    lethal.  We've trained with it and used it

2    multiple times on each other.  But it is

3    directional.  If you just put it up there and

4    expect it to work, it's not going to be

5    effective.

6         Q    Okay.  Just so I understand, there's

7    at least two settings for it; one is to use

8    the LRAD as a speaker; the other is to use it

9    as a nonlethal weapon for the purpose of

10   making people move, because it is so loud and

11   it causes someone to might have nausea,

12   correct?

13        A    It can, yes.

14        Q    And so what unit within the Baton

15   Rouge Police Department borrow this LRAD; was

16   it the SWAT team or SRT team?

17        A    Yes.

18        Q    So you were in charge of that unit in

19   July of 2016?

20        A    I was.

21        Q    So you know some of the information

22   about the circumstances of borrowing the LRAD?

23        A    Yes.  We had multiple agencies in

24   town as part of the unified command system, so

25   it was quite common to share equipment or

1    whatever was needed.

2        Q    Right.  Had Baton Rouge Police

3    Department ever used an LRAD before July 10th,

4    2016?

5        A    We had not.

6        Q    Has Baton Rouge Police Department

7    ever used an LRAD since July 10, 2016.

8        A    To my knowledge, we haven't.  We have

9    our own now and we've trained on multiple

10   occasions.  To my knowledge, we've never

11   deployed the use.

12       Q    Okay.  So the only time, as far as

13   you know, the Baton Rouge Police Department

14   has ever used an LRAD device on people was

15   July 10, 2016 at East and France Streets,

16   agreed?

17       A    And it was used as a device to move

18   people there.  I believe it was used as a

19   speaker to give commands during the protest

20   and some on Airline Highway, as well.  I can't

21   say on what date.  I know it was out there.  I

22   know commands were given.  It's louder than a

23   P.A. would be on a police car or a BearCat.

24       Q    Okay.  So to your knowledge -- just

25   to be more specific -- the only time that the

1     BRPD has used an LRAD device in its capacity

2     as a less-than-lethal weapon on people was at

3     the -- aside from training -- was at the East

4     and France Street protest on July 10, 2016,

5     agreed?

6          A     Agreed.

7          Q     And so at that protest, there was an

8     LRAD because the Baton Rouge Police Department

9     had borrowed it from State Police.  Did the

10    State Police give any training on the safe

11    operation of the LRAD to Baton Rouge Police

12    Department personnel before it was used at

13    East and France?

14         A     They showed our operators how to use

15    it and switch it from a speaker to this

16    disturbing sound or whatever.  They gave them

17    brief instruction, yes.

18         Q     They gave them brief instruction

19    about the actual -- like how to operate the

20    device, right?

21         A     Correct.

22         Q     Did they give them any instruction

23    about -- in what circumstances the device

24    would be safe to use on people?

25         A     I don't know anything specifically

1    outside of just the operations of it.

2        Q    Okay.  So you don't know if any

3    training or instruction Baton Rouge Police

4    Department received before using it on

5    July 10th about, say, how close to someone the

6    device could be safely used, correct?

7        A    I don't know of any.

8        Q    And do you know of any training that

9    was given to Baton Rouge Police Department

10   personnel before they used it on July 10th

11   about at what decibel levels the device could

12   be safely used on people?

13       A    I don't know if that was covered or

14   not.

15       Q    And do you have any knowledge as to

16   what decibel level the device was used in

17   less-than-lethal weapon mode on protesters on

18   East and France Street?

19       A    I don't know.  It's a smaller unit,

20   but I'm not sure of the maximum decibel rating

21   for it.

22       Q    Okay.  So it sounds to me like, as

23   far as you know, City Baton Rouge doesn't know

24   anything about that device, how close to

25   people it could be safely used, at what

1    decibel it could be safely used or at what
2    decibel level it was actually was used on
3    people, agreed?
4        A    I agree.  We had no formal training
5    on it.  But I'm not sure what they were
6    briefed on or instructed on once they took
7    possession of it.  There was no formal
8    training on the device.
9        Q    Did the State Police, when they
10   handed over the device to the Baton Rouge
11   Police Department, hand it over with any
12   paperwork or documentation, an owner's manual,
13   a safety manual or anything like that?
14       A    Not that I recall.
15       Q    And the device was used on July 10th,
16   2016 within close range to protesters, agreed?
17       A    I don't think it ever left the
18   BearCat.  I think it stayed on top of the
19   BearCat, to my knowledge.
20       Q    When I say close range, I mean less
21   than 30 feet.  Would you agree it was used
22   close range under that definition?
23       A    Yes.  Less than 30 feet, I would
24   agree with that.
25       Q    I'm going to pull up a video.  This

1   is going to be Document AAAAAAAAA.  Can you

2   see this video here?

3         A    Yes.

4         Q    I'm going to press "Play" for the

5   first few seconds of that.

6              (VIDEO PLAYED)

7   BY MR. MOST:

8         Q    Can you hear that noise that we can

9   hear in the first few seconds of this video?

10        A    Yes.

11        Q    That's the LRAD being used in its

12  less-than-lethal weapon mode, correct?

13        A    Correct.

14        Q    And you can see it's being operated

15  while -- at least one protester physically has

16  their hands on the vehicle, correct?

17        A    Yes.

18        Q    And the distance between the front of

19  the vehicle and that LRAD device is probably

20  what?  Maybe six or eight feet, agreed?

21        A    Yeah.  Probably no less than that.

22  Probably around that, ten, maybe, max to be

23  used as a deterrent.

24        Q    So the LARD device we can see is

25  being used on protesters at a range of ten

```
1    feet or less, agreed?
2         A    I'd agree with that.  It is
3    directional and the failure of the --
4              THE COURT REPORTER:
5                   I'm sorry.  Can you repeat that?
6              THE WITNESS:
7                   I was saying the device is very
8                   directional, so -- what you're seeing
9                   on top of the BearCat, basically --
10                  it wasn't useful because they weren't
11                  directing it down at the protesters
12                  in front of the BearCat.  It was
13                  basically going over the crowd, the
14                  level they had it was mounted at --
15                  or sitting.  It wasn't mounted.  They
16                  had it sitting there.
17   BY MR. MOST:
18        Q    So it's your testimony that the
19   device was not pointed at the protesters?
20        A    That's what I'm saying, yes.  It was
21   sitting on top of the BearCat, which the
22   elevation would have been -- the directional
23   elevation be would have been projecting that
24   horrible noise over the crowd.  And that's why
25   it wasn't effective.  If they had turned the
```

1   LRAD down on it, they would have actually

2   positioned it physically, picked it up or

3   leaned it down towards that protester, she

4   would not have stood there, in my opinion.

5        Q    Because it would have been such a

6   significantly impacted less-than-lethal weapon

7   that it would have --

8        A    It's very uncomfortable.  I don't

9   think anybody would have stood there.

10       Q    Officer, you understand that very

11  loud noises at high decibel levels can cause

12  injury to people's ears, eardrums and hearing,

13  agreed?

14       A    I agree.

15       Q    And it sounds to me like, prior to

16  the use of this LRAD device on July 10, 2016,

17  BRPD had not done -- to your knowledge -- any

18  training or investigation into the safety use

19  of this LARD device in a manner to prevent

20  injury, agreed?

21       A    Agreed.

22            MR. MOST:

23                 That's all my questions about

24            the LRAD device.  MacArthur, are you

25            guys interested in the LRAD?

```
 1            MS. LOMMERS-JOHNSON:
 2                 Very interested, but we don't
 3            have any questions about the LRAD
 4            today.  Thank you.
 5            MR. MOST:
 6                 John?
 7            MR. ETTER:
 8                 No questions about the LRAD.
 9            MR. FAHRENHOLT:
10                 I have a couple of questions to
11            jump in.
12            MR. MOST:
13                 Sure.
14                      EXAMINATION
15    BY MR. FAHRENHOLT:
16        Q    Were you actually at the scene of the
17    protest at East and France on July 10th?
18        A    No.
19        Q    But you testified that the LRAD could
20    be used as a speaker, correct?
21        A    Yes.
22        Q    Do you know if it was used as a
23    speaker on that day?
24        A    I'm not certain.  I think that it
25    was, but I'm not certain.  I'm don't know if
```

```
 1   they used the PA in the BearCat or the LRAD.
 2   I'm not certain.
 3              MR. FAHRENHOLT:
 4                   I'm going to share -- I think
 5              it's the same -- is there a way that
 6              I can share my screen, William?
 7              MR. MOST:
 8                   You should have permission to
 9              share now.
10              MR. FAHRENHOLT:
11                   Thank you.
12   BY MR. FAHRENHOLT:
13        Q    I'm going to show you -- okay.  I'm
14   going show you what was just discussed as
15   Exhibit AAAAAAAAA.  Let me see if this is --
16   okay.  I'm going to jump ahead to the
17   one-minute mark.  Do you have sound?
18        A    Yes.
19        Q    Just listen for the next, say, 15
20   seconds or so, and then I have a question for
21   you.
22        A    Okay.
23             (VIDEO PLAYED)
24             MR. FAHRENHOLT:
25                   It may be a little longer.
```

```
 1              MR. SCOTT:
 2                   Greg, I don't think we're
 3              getting the audio from your video
 4              tape.  We can hear you talking, but
 5              there's --
 6   BY MR. FAHRENHOLT:
 7        Q    Did you hear that command being given
 8   over the LRAD?
 9        A    No, we didn't hear it on this end.
10        Q    You don't have sound?
11              MR. SCOTT:
12                   We can hear you talking, but
13              we're not getting --
14              MR. MOST:
15                   Alternatively -- can we go off
16              the record for a second?
17              MR. FAHRENHOLT:
18                   Sure.
19         (OFF-THE-RECORD DISCUSSION)
20              MR. MOST:
21                   This is William Most.  I'm going
22              to be playing Exhibit AAAAAAAAA
23              starting at one minute, 31 seconds
24              for about 15 seconds.
25                   (VIDEO PLAYED)
```

1          MR. FAHRENHOLT:

2               You can stop it there, William.

3     BY MR. FAHRENHOLT:

4      Q    I have a question.  Is it the City's

5     understanding that that order to disperse

6     meant that the protesters could stay nearby,

7     as long as they were on a residential

8     property?

9      A    They were given an order to disperse.

10    That means they had to leave.  They had

11    displayed acts of violence.  It was determined

12    it was no longer a lawful assembly.  If they

13    gave an order to disperse, that means they

14    were supposed to leave.

15     Q    What does an order to disperse mean?

16     A    It means they're supposed to leave.

17     Q    Does that mean cross the street and

18    stay there or leave the area?

19     A    It means leave the area.

20          MR. FAHRENHOLT:

21               William, can you just play that

22          video again?  I think it's a

23          three-minute mark, and play it for a

24          bit.  Thank you for in indulging my

25          technical difficulties.

```
 1          MR. MOST:
 2              I'm sorry.  You said the
 3          three-minute mark?
 4          MR. FAHRENHOLT:
 5              At three minutes exactly, yes.
 6          Thank you.
 7          MR. MOST:
 8              We're at three minutes, Exhibit
 9          AAAAAAAAA.
10          MR. FAHRENHOLT:
11              That's fine.
12              (VIDEO PLAYED)
13          MR. FAHRENHOLT:
14              You can pause it there, William?
15   BY MR. FAHRENHOLT:
16      Q    Captain, did you hear that portion of
17   the audio?
18      A    Yes.
19      Q    Was that, again, an order given by
20   Baton Rouge over the LRAD to disperse the
21   area?
22      A    I'm not sure they were using the
23   PA or the LRAD.
24      Q    Okay.  But it was over some sort of
25   public address system, correct?
```

```
 1        A    Correct.
 2        Q    And you heard an order to disperse,
 3    correct?
 4        A    Yes, sir.
 5             MR. FAHRENHOLT:
 6                  William, one last thing.  If you
 7             could pull up -- it's the next
 8             Exhibit in your list.  It's
 9             AAAAAAAAAA.
10             MR. MOST:
11                  This one here (Indicating)?
12             MR. FAHRENHOLT:
13                  Yes.
14    BY MR. FAHRENHOLT:
15        Q    Captain, again, I'd like to have you
16    listen to the audio from this video and then
17    answer a question for me.
18             (VIDEO PLAYED)
19    BY MR. FAHRENHOLT:
20        Q    Captain, did you hear that audio?
21        A    Yes, sir.
22        Q    Would you consider that to be an
23    order to disperse?
24        A    It is.
25        Q    And, again, under the City's
```

```
1   understanding of an order to disperse given by
2   a Baton Rouge police officer, would just
3   remaining in place on a private property be
4   dispersing?
5        A    No, it would not.
6             MR. FAHRENHOLT:
7                 That's all the questions I have
8             about the LRAD.  Thank you.
9             MR. MOST:
10                It's 12:40.  Does anybody need
11            to quick break for lunch or anything
12            before we move to the next topic?
13            MR. SCOTT:
14                Okay.  So it looks like we got
15            through a few of the topics, but
16            there are substantial topics left
17            over.  I have somebody on deck to
18            start at 2:00.  But I had kind of
19            planned to go until 1:00 o'clock.  If
20            we could take a break at 1:00.
21            MR. MOST:
22                Sure.
23                Okay, so moving on to the next
24            topic for Captain Leach, which I have
25            as Topic P, as in Paul, which Is
```

```
 1                "Policies and procedures regarding

 2                any of the following topics:"

 3                Subsection P is:  "Peaceful versus

 4                Non-peaceful protests."

 5                     Captain Leach, are you prepared

 6                to talk about that topic?

 7                THE WITNESS:

 8                     Yes, sir.

 9                        EXAMINATION

10      BY MR. MOST:

11          Q     All right.  So the topic is "Peaceful

12      versus Non-peaceful protests," right?

13          A     Okay.

14          Q     Does Baton Rouge Police Department

15      distinguish between peaceful and non-peaceful

16      protests; does it treat them definitely?

17          A     I would think so.  If you're

18      peaceful, it's your right to be there, civil

19      and have your voice heard.  If it's not

20      peaceful, if there's violence or there's

21      illegal activities, then, certainly, we treat

22      it differently.

23          Q     You said -- okay.  So what makes a

24      non-peaceful protest is -- I think I heard you

25      say either violence or illegal activity; is
```

1    that correct?

2        A    A couple of things, yes.

3        Q    Could anything else make a protest

4    not peaceful?

5        A    I don't know.  I suppose if there

6    were certain types of threats that might be

7    known or, perhaps, if there's -- of course, if

8    they're illegal activity, if they were

9    occupying a roadway and they're told to move,

10    that's still illegal activity.  I guess that

11    would cover it.

12        Q    So, for example, chanting slogans,

13    unless they are a true threat, would not make

14    a protest into a non-peaceful protest, agreed?

15        A    Agreed.

16        Q    And you said that illegal activity

17    can make a protest not peaceful; is that your

18    testimony?

19        A    Correct.

20        Q    Does it have to be -- can, like, one

21    illegal act make an otherwise peaceful protest

22    non-peaceful?

23        A    It should not.  One illegal action

24    could be addressed.  If the rest of the crowd

25    is peacefully protesting, then they should be

1    able to continue with their protest.

2        Q    Right.  I agree with you.  So it

3    sounds to me like, you can't just lump all

4    protesters together.  If some of them are

5    committing illegal acts and some are not,

6    Baton Rouge Police Department has to treat

7    those groups of protesters independently,

8    agreed?

9        A    It possible, yes.

10       Q    So if there's a group of -- let's say

11   there's an order to clear the streets and some

12   protesters comply and others do not.  Baton

13   Rouge Police Department has to treat those

14   groups differently, agreed?

15       A    If they can, for sure.  If they know

16   who left or who didn't, yes.

17       Q    And when you say illegal activity can

18   make a protest not peaceful -- okay -- does it

19   have to be violent illegal activity?

20       A    That's the one where -- at that point

21   they make it not a peaceful protest, but it

22   could be simple obstruction of a highway and

23   refusing to move.  It could be that illegal

24   activity.  The problem with having one or two

25   people that are committing illegal acts, it

1    usually instigates the crowd to follow.

2    That's pretty much what you see in a lot of

3    protests.  If you could target the illegal

4    activity individually, it's much better to do

5    so.

6         Q    Right.  I'm guess I'm trying to

7    figure out what makes a peaceful protest into

8    a not peaceful protest.  For example, let's

9    say, you've got a protest that's otherwise

10   peaceful, but you have some people smoking

11   marijuana.  Would you class that as not

12   peaceful?

13        A    No.

14        Q    So it has to be an illegal act that

15   is not-peaceful illegal act, agreed?

16        A    Agreed.

17        Q    So, for example, just standing on a

18   sidewalk is not a not-peaceful illegal

19   activity, agreed?

20        A    Agreed.  That's a lawful act.

21        Q    Or just standing on private property

22   if they have permission to be there, that's

23   not a non-peaceful illegal act, agreed?

24        A    I will agree.  And if you're speaking

25   of France Street, they had already committed

```
 1    the crime.  It was -- you can't undo what you
 2    did.  You can't rob a bank and give the money
 3    back.  If you're told to disperse and you
 4    don't disperse, you can still get arrested for
 5    it, even if the property owner says you can be
 6    there.  The problem the guys faced on France
 7    Street was -- the crowd -- well, first off, it
 8    started as a peaceful march.  It was
 9    un-permitted.  It was led by our traffic
10    division and went to the state capitol and
11    back to a local resident, a local church.  And
12    then the crowd or certain members of the crowd
13    decided they wanted to overtake the interstate
14    system.  They failed to disperse after given
15    orders.  There was limited manpower there to
16    make arrests.  Once the manpower got there,
17    the arrests began to be made.  It looks like
18    protesters were just hanging out at some
19    unknown person's house with permission, but
20    that wasn't the case at all.  They committed
21    the crime.  And once the resources got there
22    to make arrests, arrests were made.
23        Q    So those people standing in that
24    private property at East and France and on the
25    sidewalks, were they engaged in a non-peaceful
```

155

1    protest?

2         A    They had been, yes.

3         Q    When had they been?

4         A    When they refused to disperse and

5    remove themselves from the roadway.

6         Q    So it's your testimony that a refusal

7    to disperse is a non-peaceful illegal

8    activity?

9         A    They were told to disperse because

10   they were occupying a roadway trying to make

11   their way to the interstate system, which

12   would have been dangerous for everyone.

13        Q    So are you saying the non-peaceful

14   act was standing in a roadway or attempting to

15   get on the interstate, which was it?

16        A    Non-peaceful act was standing into

17   the roadway.  And that's what led to the

18   disperse order.  And that -- there were other

19   items thrown at officers out there that day,

20   items like pieces of concrete -- which is the

21   first day of actually someone caught it on

22   film and it made television.  So those were

23   unlawful acts and an order to disperse was

24   given.

25        Q    Did you have any knowledge of any

156

1    pieces of concrete thrown on the July 10th,

2    2016?

3        A    That's the incident I was speaking

4    of.  It was shown on the local news, even.

5        Q    So you've seen video of concrete

6    being thrown?

7        A    I did see a video, yes.  It's been

8    many years ago, but, yes.

9        Q    Okay.  Do you know what television

10   station that was?

11       A    We only have a couple over here, but

12   I don't remember which one it was.

13       Q    Okay.  So the protesters who were

14   standing on the private property or sidewalks

15   at East and France, I'm trying to understand

16   the non-peaceful act that they had committed

17   and that made it a not-a-peaceful protest was

18   that they had been standing earlier in the

19   roadway?

20       A    They had been standing in roadway in

21   anticipation of overtaking an interstate

22   system, yes.

23            MR. MOST:

24                Those are my questions about

25                peaceful versus non-peaceful.

```
 1              MacArthur?
 2                   John, do you have any?
 3          MR. ETTER:
 4                   No, I do not.
 5          MS. LOMMERS-JOHNSON:
 6                   Sorry, William.  Let me just
 7          confirm.  I think, but I'm not sure
 8          if Ms. Moore-O'Neal has questions.
 9          Oh, never mind.
10                   I don't have -- I guess my one
11          question, Captain Leach, is at the
12          point that Baton Rouge Police
13          Department determines that a protest
14          is no longer peaceful, does that mean
15          that the protesters who remain are
16          subject to arrest at that point?
17          THE WITNESS:
18                   Yes, ma'am.  Simply put, it is,
19          yes.
20          MS. LOMMERS-JOHNSON:
21                   Okay.  Am I -- you know, I think
22          we looked earlier at General Order
23          291 -- and I can pull it up again.
24          But in your understanding, is it
25          General Order 291 that gives
```

```
 1          authorization for that?
 2          THE WITNESS:
 3               I think it would fall under that
 4          order.  I think you're correct.
 5          MS. LOMMERS-JOHNSON:
 6               Okay.  And just so I'm
 7          completely sure that I understand
 8          your testimony, General Order 291 on
 9          civil disturbances would give the
10          authorization for arrests of any
11          remaining protesters to be made after
12          BRPD has deemed a protest to be no
13          longer peaceful?
14          THE WITNESS:
15               Correct.
16          MS. LOMMERS-JOHNSON:
17               I think that's the only question
18          I have for this topic.
19          MR. MOST:
20               Great.
21          MR. FAHRENHOLT:
22               I have a few.
23          MR. MOST:
24               Sure.
25                    EXAMINATION
```

BY MR. FAHRENHOLT:

    Q   It's my turn.  Captain, is it safe understanding that if protesters were in fact blocking the lanes of traffic on I-110, that would not be a peaceful protest?

    A   It would be very unpeaceful, yes, sir.

    Q   And this is probably obvious, but is it the City's position that protesters blocking off an interstate highway would be a danger both to protesters and for other members of the public?

    A   Yes, sir.  That was our fear that day.  And they came really close -- were actually about to go up an entrance ramp from Government Street when a motorman asked them not to.  Because he told them he was going to shut the interstate off for them.  We knew what they were trying to do.  That's when we got more personnel there to deal with the situation.  They believed we were shutting off the interstate for them.  It's extremely dangerous, especially in that location.  The traffic speeds and it's sort of a blind curve in the interstate there.  It would have been

1   disastrous.

2        Q    The corner of East and France, that's

3   pretty close to the interstate, correct?

4        A    Yes, sir.

5        Q    And I think there might be either an

6   exit ramp or an entrance ramp about a block

7   away from that location; is that correct?

8        A    It's close, yes, sir; a block or

9   maybe two at the most.

10       Q    Is it the City's position that the

11  officers on the scene had a reasonable belief

12  that if they had allowed these protesters to

13  stay at the corner of France, that they would

14  eventually enter the interstate?

15       A    It was a known fact, because

16  communication with protesters -- because the

17  intelligence officer in the crowd, we knew

18  exactly what their intentions were.  So yes,

19  sir, it was a fact.

20       Q    And I know that when protesters were

21  arrested, they were charged with obstruction

22  of a roadway or a public passageway.  Wasn't

23  it the City's real concern that these

24  protesters weren't an imminent threat to take

25  over the interstate?

 1       A     Yes, sir.  That was the main concern,
 2   yes, sir.
 3       Q     And if orders were made by Baton
 4   Rouge police officers to disperse from the
 5   area, those orders were given because officers
 6   believed that those protesters were going take
 7   over the interstate, correct?
 8       A     That's correct.  You can't just stay
 9   there if there doesn't effectively fix the
10   situation and all.  They had to disperse.  We
11   weren't going to allow them to take the
12   interstate.
13       Q     Other than the interstate at the
14   corner of East and France, there any other
15   major public monuments or city-owned buildings
16   or anything like that at that corner?
17       A     At that particular corner, no, sir.
18   And we've given up roadways for protesters
19   many times and will continue to do so, as long
20   as it's a peaceful protest and we can safely
21   mitigate it.  But knowing the intentions of
22   the protesters on that day, they had to
23   disperse.  It was the only option of
24   protecting them from themselves, if they took
25   the interstate.

1    Q    Is it your understanding that
2  protesters were given at least an hour or more
3  between the point when they were first
4  directed at the corner of East and France to
5  leave the scene?
6    A    That's correct.  It took a while to
7  deploy two Mobile Field Force units to get
8  there.  It probably was an hour.
9    Q    To the extent that the Baton Rouge
10 police officers gave orders to disperse, is it
11 the City's position that those orders were
12 lawful?
13   A    Yes.
14   Q    And any protesters who didn't respond
15 to that order, regardless of whether they were
16 being violent or not violent, they were
17 disregarding those orders, correct?
18   A    Correct.
19       MR. FAHRENHOLT:
20            I have no other questions.
21       Thank you.
22       MR. MOST:
23            Sure.  Just a couple of
24       followups there.
25                 EXAMINATION

1    BY MR. MOST:

2        Q    Captain, you testified that dispersal

3    was the only option to prevent the protesters

4    from getting on the interstate.

5        A    Yes.  They had to leave the area.

6        Q    Okay.  And would that be true after

7    the interstate had been secured and made

8    inaccessible to protesters?

9        A    How can you do that?  You can't stop

10   a crowd if they want to take it.  If the crowd

11   is still there, then you can still lose the

12   interstate.  We don't have enough police

13   officers to block of entrance ramps.  There's

14   at least two in that area right there.  But if

15   a crowd wants it, they're going to run right

16   by whatever you try to put in place if they're

17   still there and able to do so.  That was the

18   feeling that day.  That was the decision that

19   was made.

20       Q    And the protesters never made it to

21   the interstate, correct, that day?

22       A    Correct.  There's a main crowd.

23   There was a group, as I mentioned, that was

24   confronted by a motorcycle officer as they

25   were approaching an entrance ramp at

1    Government Street.  And he talked them into

2    stopping -- letting us stop traffic for them

3    on the interstate.  By that time we were

4    rolling in the necessary backup to deal with

5    the crowd.  So, yes.  I think if that group

6    would have continued, we would have lost the

7    interstate and perhaps have somebody injured

8    or killed that day.

9         Q    So my question, Captain, was:  Did

10   the protesters ever make it to the interstate

11   on July 10, 2016?

12        A    They never did.

13        Q    Okay.  So the primary concern that it

14   was the basis for the arrests of protesters at

15   East and France was the possibility that they

16   might have continued on to the interstate,

17   correct?

18        A    Yes.

19        Q    And if something is to -- that was

20   the primary reason for their arrest?

21        A    That was the concern, because we knew

22   what their intentions were.  Their arrests, as

23   they were charged, was failure to disperse or

24   occupying the roadway.

25        Q    Okay.  But the primary cause for the

165

```
 1   arrest was to prevent them from accessing the
 2   interstate; is that accurate?
 3        A    That was a primary objective, yes.
 4        Q    And if something is the primary
 5   objective for someone's arrest, should that be
 6   reflected in their Affidavit of Probable
 7   Cause?
 8        A    That might have not been understood
 9   on the level of the arresting officer.  But it
10   was understood from the level of command.
11            MR. MOST:
12                 Okay.  Fair enough.  That's all
13            my questions for that one.  It's
14            1:00 o'clock exactly.
15                 Joe, do you want to take the
16            break that you anticipated at
17            1:00 p.m.?
18            MS. LOMMERS-JOHNSON:
19                 I have just one followup before
20            we break.  It's super short.
21                 EXAMINATION
22   BY MS. LOMMERS-JOHNSON:
23        Q    When you testified that the order to
24   disperse was given and at the point that
25   protesters remained and did not disperse, they
```

1    were subject to arrests.  You referenced
2    command giving that order to disperse.  I'm
3    wondering how far up the chain of command the
4    order to disperse came from?
5         A    It came from the Unified Command.  It
6    came from members of the Operations Center.
7    So it came from the top.  It's not the Chief
8    of Police, but certainly the Unified Command.
9         Q    And it's my understanding that under
10   the General Order 291, BRPD policy gives
11   authority to Unified Command and the Incident
12   Commander to make those orders that would
13   normally need to come from the Chief of
14   Police; is that correct?
15        A    Yes, ma'am, you're understanding that
16   correctly.  Not everything goes directly to
17   Chief.  Obviously, he's got to trust his
18   commanders.  Yes, that ordinance covers that.
19   The Chief of Police cannot make every single
20   decision in an operation.  That's why he has
21   to trust his commanders.  That particular
22   ordinance we were discussing covers that.
23        Q    And here we're talking just about
24   general Order 291 specifically giving that
25   authority, correct?

```
 1      A     Yes.
 2            MS. LOMMERS-JOHNSON:
 3                  That's my only question here.
 4            Thanks.
 5            MR. MOST:
 6                  Joe, how would you like to
 7            proceed?  Shall we continue with the
 8            Captain?  Take a break?  Bring in
 9            someone new?  What would you like to
10            do?
11            MR. SCOTT:
12                  I'd like to take a break.  I'll
13            consult with Captain Leach, whether I
14            need to bump Sergeant Jones off this
15            afternoon or reproduce Captain Leach
16            tomorrow.  Let me get that squared
17            away.
18            MR. MOST:
19                  Let's go off the record.
20            (LUNCH RECESS)
21            MR. MOST:
22                  I think we've got everyone back
23            that we need to have back.  And it
24            looks like you still have Captain
25            Leach with you.  So we're going to
```

168

```
 1              continue with Captain Leach; is that
 2              right?
 3              MR. SCOTT:
 4                   Yes, sir.
 5              MR. MOST:
 6                   Great.  I was just saying to
 7              Greg over the break.  I was kind of
 8              looking over the topics.  And I think
 9              the most important ones, from my
10              perspective, to get done by the close
11              of Imani -- for discovery are 10
12              through 12, Topics 10, 11 and 12
13              because those are going to be the
14              ones specific to Imani plaintiffs.
15              If it's possible to prioritize those,
16              Joe, I think that would be helpful.
17              MR. SCOTT:
18                   I'm doing as much as I can.
19              MR. MOST:
20                   Okay.  Let's go back on the
21              record.
22                        EXAMINATION
23       BY MR. MOST:
24            Q    Good afternoon, Captain Leach.
25       During your break, did you talk to anyone
```

1      about this deposition or these cases?

2          A    No, I did not.

3          Q    Even the attorneys?

4          A    Not even the attorneys.  We went to

5      lunch.

6          Q    And did you look at any documents

7      relevant to this deposition or these cases

8      during the break?

9          A    No.

10         Q    The next topic I have you identified

11     is Topic 2-P, as in Paul.  No, we did that

12     one.  So the next one is 2-Q, which is

13     "Policies and procedures regarding any of the

14     following topics."  And Subsection Q:

15     "Searches and seizures, including searches and

16     seizures of vehicles."

17              Are you prepared to testify regarding

18     that topic today?

19         A    I mean, I can.  I'll do my best.

20         Q    And the good news, I don't have much

21     about this.  There was an issue about a search

22     of a vehicle in this case, but that -- in my

23     case -- and that one has resolved.

24              So I'll just ask you briefly about

25     seizures.  At the July 2016 protests, officers

```
 1   were only effecting seizures of protesters
 2   insofar as they were only effecting arrests,
 3   agreed?
 4        A    Yes.
 5             MR. MOST:
 6                  So I think that most of my other
 7             questions have been addressed under
 8             other topics.
 9                  MacArthur, do you have any
10             search or seizure specific questions?
11             MS. LOMMERS-JOHNSON:
12                  We don't.
13             MR. MOST:
14                  John or Greg?
15             MR. FAHRENHOLT:
16                  No, thank you.
17             MR. ETTER:
18                  No.
19   BY MR. MOST:
20        Q    2-Q is done.  The next one is
21   "Policies and procedures regarding any of the
22   following topics:  Identification of threats
23   and/or agitators in the crowd."
24                  Are you prepared to talk about that
25   topic, Captain?
```

1      A    Yes, sir.

2      Q    I believe, if I recall right, that

3  you testified earlier that the Baton Rouge

4  Police Department had contemporaneous

5  intelligence regarding the intent of

6  protesters in the East and France group, based

7  on an officer deployed within that group; is

8  that accurate?

9      A    Giving away our secrets, but, yes,

10 sir.

11     Q    Okay.  So it is not a secret that

12 sometimes law enforcement agencies deploy

13 undercover police officers to infiltrate

14 protester groups that is -- I don't think is

15 secret, but that is something that BRPD did on

16 the July 2016 protest, right?

17     A    It is.

18     Q    According to you, an undercover

19 officer reported back to superiors that some

20 protesters in the East and France group had

21 expressed an intent to go onto the interstate,

22 correct?

23     A    Correct.

24     Q    Now, there were hundreds of

25 protesters there at East and France, agreed?

1          A     Yes.

2          Q     Did the undercover officer indicate

3     that he or she had surveyed the intent of all

4     the protesters there or some subset of them?

5          A     No.  As I mentioned earlier, the

6     group started off as a very peaceful,

7     unplanned, un-permitted, but we watched

8     streets and led their protest.  Once it

9     returned to the starting point, many of the

10    protesters got in the cars and left.  And then

11    a certain group that you've seen on France

12    Street were the ones that our intelligence

13    officer was infiltrated into and was hearing

14    the talk as they're marching:  Where we're

15    going?  Where we're going?  What we're doing?

16    That group.  Certainly, not everyone.  Maybe

17    some people in the group didn't know where

18    they were going.

19         Q     Sure.  So an undercover officer had

20    some intelligence about the intent of some

21    protesters, but unclear or if that reflected

22    the intentions of the entire group, agreed?

23         A     Correct.

24         Q     And then that group sort of stopped

25    at East and France Street, right, for some

1   extended period of time?

2        A    Correct.

3        Q    And some people may have joined that

4   group after it stopped, agreed?

5        A    Possible.

6        Q    Okay.  And so those persons who

7   joined the group after it stopped, any

8   intelligence about the intent to go on the

9   freeway would not necessarily apply to those

10  persons, agreed?

11       A    Correct.  I couldn't speak to what

12  they would have had knowledge of.

13       Q    Sure.  Okay.  I'm going to pull up a

14  document.  The other aspect to this topic is

15  "Identification of threats and/or agitators in

16  crowd."

17            So we heard from an earlier deponent,

18  I believe, that Baton Rouge Police

19  Department -- its policy is to identify and

20  target for arrest agitators; is that your

21  understanding as well?

22       A    That's correct.  It's always our

23  intent is to not punish the crowd for a few

24  people who are agitating.

25       Q    I'm going to pull up Exhibit L.  Do

1    you see this document here?

2         A    Yes.

3         Q    Do you see that this appears to be

4    responses from City Baton Rouge defendants to

5    requests for discovery in this case?

6         A    Yes.

7         Q    Skipping down to the Response to R --

8    Request for Admission Number 57 on page 17 of

9    Exhibit L, I think this provides us with some

10   more understanding of what agitator means,

11   according to the City Baton Rouge, and I

12   wanted to see if you agree.

13        A    I agree with that.

14        Q    You'd agree with it where it says:

15   "Law enforcement targeted agitators" -- by

16   which it describes as "Persons encouraging

17   others to upset the status quo to further

18   their cause."

19             Do you agree with that?

20        A    And/or breaking the law, as it

21   states.

22        Q    Sure.  So agitators -- so this

23   defines two kinds of agitators; persons

24   breaking the law or persons encouraging others

25   to upset the status quo to further their

1   cause, correct?

2       A    Correct.  Those people were trying to

3   get them to throw objects at the police or get

4   them to overtake a roadway.  On France Street,

5   in another case, they were jumping on cars or

6   trying to (INAUDIBLE) --

7       Q    But this is at least -- what we read

8   here -- is how Baton Rouge Police Department

9   -- what Baton Rouge Police Department

10  understands an agitator to be, agreed?

11      A    Agreed.

12      Q    And one element of this is -- one

13  element is encouraging others, right?

14      A    Right.

15      Q    The second element is to upset the

16  status quo?

17      A    Correct.

18      Q    And then the third element is to

19  further their cause, agreed?

20      A    Correct.

21      Q    So when -- so Baton Rouge Police

22  Department is assessing what people's cause is

23  when it's determining whether or not they're

24  an agitator, right?

25      A    Correct.

```
 1        Q    And then targeting them for, you
 2   know, being in the first group to be arrested,
 3   depending on that analysis, agreed?
 4        A    Correct.
 5             MR. MOST:
 6                  That is my questioning about
 7             that topic, although I might have
 8             followup.
 9                  MacArthur, any questions on
10             "Identification of threats and/or
11             agitators in crowd"?
12             MS. LOMMERS-JOHNSON:
13                  Yes, just a couple followup
14             questions.  I'm going to share my
15             screen.
16                  William, if you wouldn't mind
17             enabling me -- thank you.
18                  I'm going to try to pull up
19             Exhibit ZZZZZZZ again, so we can look
20             back at that.  Okay.
21                       EXAMINATION
22   BY MS. LOMMERS-JOHNSON:
23        Q    Captain Leach, can you see the
24   exhibit on my screen?
25        A    Yes.
```

1          Q     Perfect.  So, again, just looking

2    back at General Order Number 291, my

3    understanding is that what we've been talking

4    about with identifying agitator is somewhat

5    encompassed in this Section 4 that's titled

6    "General" on page 3 of General Order 291.  In

7    B here -- I'll just read the whole thing.  It

8    says:  "The Incident Commander or authority in

9    charge will establish communication with

10   demonstration leaders as soon as conditions

11   permit as a means of obtaining firsthand

12   knowledge of crowd mood and as a tool to

13   facilitate negotiations and maintain the

14   peace.  If demonstration leaders refuse to

15   communicate and they violated the law, they

16   will be the first group of persons to be

17   arrested."

18          My question here is:  Does this mean

19   that -- I guess, first of all, how are BRPD

20   officers trained to identify demonstration

21   leaders?

22        A    It's quite simple that -- to be the

23   person that's in the crowd that's encouraging

24   the civil disorder continue or amplify.  It's

25   quite easy that anybody that's in the crowd

1    will know who's the ones encouraging to do

2    unlawful things.

3         Q    Here is the definition confined to

4    demonstration leaders who encourage crowd

5    members to do unlawful things or is it also

6    encompassed in demonstration leaders, people

7    who are encouraging others to protest or

8    leading chants?

9         A    Chanting is not a problem.  That's a

10   part involved in the civil rights that they

11   can do.  They can say what they want the say,

12   but if they're encouraging to break the law or

13   to participate in something that someone could

14   be injured, then that person is probably going

15   to be removed first.

16        Q    Okay.  When it says:  "If

17   demonstration leaders refuse to communicate

18   and they violate the law, they will be the

19   first group of persons to be arrested," that

20   doesn't apply to leaders who are helping

21   organize --

22        A    No, ma'am.

23        Q    -- organize the protest?

24        A    Absolutely not.  As I mentioned,

25   France Street began a peaceful march.  We

1    waives the permit, we sent motors to them, we

2    led.  We would always meet with organizers.

3    When it was here in our headquarters, we would

4    go out and make signs of what was lawful and

5    what was expected.  We brought waters.  We

6    were always making those kind of

7    communications, you know, when the protest

8    started and recognizing their right to be

9    there and to do that.

10        Q    And I guess going down to this

11   Section here, 5, if you can see it on the

12   screen "Nonlethal Force," where it talks about

13   physical arrests of identified leaders and

14   agitators there, what is being referred to as

15   identify leaders?

16        A    Right.  What was your question?

17        Q    I just wanted to know under Section

18   5, "Nonlethal Force" when it refers to

19   physical arrests of identified leaders and

20   agitators failing to disperse the crowd, who

21   is being referred to as identified leaders in

22   this provision?

23        A    That would be whoever is encouraging

24   people to do things that may get them injured

25   or unlawful anythings.  The policy doesn't

1    specify that.  That's the determining factors
2    of the investigators on the scene.
3              THE COURT REPORTER:
4                   I'm sorry, sir.  Can you repeat
5              what you just said?
6              THE WITNESS:
7                   The policy can't be that
8              specific as to tell you who the
9              identified leaders are.  That's up to
10             the investigator on the scene as to
11             who is trying to facilitate unlawful
12             activity or unsafe activity.
13   BY MS. LOMMERS-JOHNSON:
14        Q    And I guess specific -- and here I'm
15   thinking of some of the events on Airline, not
16   specifically at East and France.  But when
17   officers there and the command structure
18   identify the leaders on Airline, is it your
19   testimony that they were only identifying
20   leaders who they believed to be encouraging
21   others to break the law?
22        A    That's correct.  So the organizers
23   were normally the people who wanted the
24   agitators removed.  And we actually even had
25   then encouraging people to remain calm and to

1   be lawful.  It was quite a few times when we

2   removed agitators that the crowd actually

3   cheered for the police officers.  They don't

4   want that trouble.  Most of them are there

5   peacefully.

6        Q    With regard to the charge inciting a

7   riot, what's your understanding under Baton

8   Rouge Police Department policy of what would

9   constitute inciting a riot?

10       A    That's encouraging violence towards

11  law enforcement officials or encouraging

12  property damage, you know, any of those

13  things.  Become disorderly, have potential to

14  be life-threatening, even, when it comes to

15  that.

16       Q    And so encouraging others to protest,

17  encouraging others to join the protest and

18  join in on chanting, none of that alone

19  constitutes inciting a riot?

20       A    That's not even close.

21       Q    Is it the position of the City and

22  the BRPD that inciting violence is the key

23  part of inciting a riot?

24       A    Yes, ma'am.

25            MS. LOMMERS-JOHNSON:

1           Okay.  I think that's all the
2       questions that I have here.
3           John, do you have any followup
4       questions?
5       MR. ETTER:
6           Yes.
7       MS. LOMMERS-JOHNSON:
8           And I'll just note, it looks
9       like the recording has been paused.
10      MR. MOST:
11          You're the host, so you could
12      probably restart it.  Thank you.
13      MS. LOMMERS-JOHNSON:
14          I turn it to you, John.
15      MR. ETTER:
16          Yes.
17              EXAMINATION
18  BY MR. ETTER:
19      Q   Captain Leach, as regarding inciting
20  or agitating, is it the position of the Baton
21  Rouge Police Department that Max Geller was an
22  agitator?
23      A   I'm not familiar with who that is.
24      Q   All right.  He was the relatively
25  thin white man who was one of the first

```
 1   targeted, assaulted and arrested during the
 2   July 10th protest at East and France.
 3        A    I'm not familiar with that particular
 4   arrest.
 5             MR. MOST:
 6                  John, if it's helpful, you might
 7             be able to circle back to that in
 8             Topic 12, which details particular
 9             plaintiffs.  Not to stop you from
10             asking questions, but just a friendly
11             suggestion.
12             MR. ETTER:
13                  I appreciate the suggestion.  I
14             will actually, then, pass on this
15             topic.
16             MR. MOST:
17                  Okay.  So that was to Topic R.
18             MR. SCOTT:
19                  Can I follow up?
20             MR. MOST:
21                  Of course, Joe.  Thank you.
22                       EXAMINATION
23   BY MR. SCOTT:
24        Q    Captain Leach, apart from the
25   undercover officer in the group on East and
```

1    France, did you also have intelligence from

2    one of the motorcycle officers?

3        A    That's correct.

4        Q    Any other officers on the scene, if

5    you recall corroborate, as well?

6        A    None that I recall.

7             MR. SCOTT:

8                  Thank you, sir.

9             MR. MOST:

10                 All right.  And moving on to the

11            Topic 2-S, which is:  "Policies and

12            procedures regarding any of the

13            following topics.  Subsection S,

14            accommodating Second Amendment

15            Rights."

16                 That's not something I think I

17            have questions about.  Does MacArthur

18            have question on that topic?

19            MS. LOMMERS-JOHNSON:

20                 No, we don't.  Thank you.

21            MR. MOST:

22                 John, there may be a dog in your

23            background.  Do you have any Second

24            Amendment questions?

25            MR. ETTER:

```
 1              No, I do not have a Second
 2         Amendment question.  The dog is
 3         barking at the garbage truck.
 4    MR. MOST:
 5              Okay.  That crosses off Topics
 6         S.  And then Topic T, which I do
 7         expect there will be more questioning
 8         about is "Policies and procedures
 9         regarding any of the following
10         topics."  Subsection T is "Entry of
11         private property to make arrests."
12              Are you prepared to testify
13         about that topic today, Captain.
14    THE WITNESS:
15              I think so.
16    MR. MOST:
17              And, MacArthur, this might be
18         most relevant to y'all's case.  Would
19         you like to take the lead on this and
20         I'll follow you or would you like me
21         to start?
22    MS. LOMMERS-JOHNSON:
23              Either way, William.  Whatever
24         you prefer.  We don't have a
25         preference.
```

```
 1            MR. MOST:
 2                 I'll get started and then I'm
 3            sure you can correct any errors that
 4            I make.
 5                      EXAMINATION
 6   BY MR. MOST:
 7       Q    We talked earlier, Captain, about the
 8   East and France protests and certain
 9   protesters who were standing on the sidewalks
10   or private property there.
11       A    Yes.
12       Q    And some of those protesters were
13   standing on private property at the time of
14   their arrest, agreed?
15       A    Yes.
16       Q    And those protesters had permission
17   from either the property owner or tenant of
18   that property to be present on that property,
19   agreed?
20       A    You're telling me that?  I don't know
21   if they did or not.  Okay.
22       Q    Does the City have any reason to
23   think that those protesters standing on
24   private property at East and France Street did
25   not have permission to be there?
```

1        A    No.

2        Q    Generally, the general rule is that

3    law enforcement officers have to have a

4    warrant to effect an arrest of a person on

5    private property, correct?

6        A    It's always best.

7        Q    More than best.  It is the general

8    rule -- unless an exception applies, it's a

9    constitutional requirement, agreed?

10       A    Unless it's a hot pursuit of an

11    arrest, warrant is necessary, right.

12       Q    Exactly.  So unless it's hot pursuit

13    or another specific exception, law enforcement

14    has to have a warrant to effect an arrest on

15    private property, agreed?

16       A    I'll agree.

17       Q    The officers who made arrests on

18    private property on East and France did not

19    have warrants for the arrest of the persons on

20    that private property, agreed?

21       A    Agreed.

22       Q    Was there an exception to the warrant

23    requirement that applied to the arrest of

24    those persons?

25            MR. SCOTT:

```
 1              I'm going object to the form of
 2         the question.  Calls for legal
 3         opinion.
 4         MR. MOST:
 5              Acknowledging that objection,
 6         you can answer that question,
 7         Captain.
 8         THE WITNESS:
 9              Yes, sir.  To my knowledge, the
10         arrests were made on those
11         properties.  They were done because
12         they witnessed that person commit a
13         crime and they were fleeing at the
14         time that they were arrested.  They
15         were trying hide from the arresting
16         officers.
17    BY MR. MOST:
18         Q    So it's the City's position that
19    anyone arrested at East and France on private
20    property was -- at the time of their arrest --
21    fleeing and hiding; is that the City's
22    position?
23         A    It's my position, yes.
24         Q    Okay.  But it's also -- you're
25    speaking for the City today.
```

```
1        A    I get it.  Yes, sir.
2        Q    We had a little cross-talk.  That's
3   the City's position, agreed?
4        A    Yes, sir.
5        Q    Someone who is just standing still in
6   plain sight, not obstructed by anything, is
7   not fleeing, agreed?
8        A    That would be passively resisting;
9   but, yes, they're not fleeing.
10            MR. MOST:
11                 Okay.  I think that's the
12            questions I have.
13                 MacArthur, would you like to
14            follow up?
15            MS. LOMMERS-JOHNSON:
16                 Yes.  Thank you, William.
17                 EXAMINATION
18   BY MS. LOMMERS-JOHNSON:
19        Q    And so, correct me if I'm wrong,
20   Captain Leach, my understanding is that your
21   testimony is that the protesters that were
22   arrested in the yard at East and France were
23   arrested pursuant to hot pursuit?
24        A    When we refer to that is, in the
25   cases where you enter private property or a
```

1    structure without a warrant, because the

2    officer had witnessed that person committed a

3    crime.

4        Q    And in terms of those protesters that

5    were arrested on private property on

6    June 10th, is it the City's position that the

7    officers were authorized to do so because they

8    were in hot pursuit?

9        A    Yes.  That's the term, right.  So

10   they were on scene.  And once we had enough

11   manpower there to effectively make arrests to

12   those refusing to disperse, they basically

13   walked a few feet to arrest the people.  There

14   was no running pursuit, as it references it.

15   But, yes, it's just a term.

16       Q    Okay.  I guess from the testimony

17   earlier, I think when Greg was questioning

18   you, you testified that there was about an

19   hour's worth of time when protesters were

20   gathered on the property at 602 East Boulevard

21   where they just stayed standing on the

22   property, correct?

23       A    Correct.  I believe that was his

24   time.  I agreed it could be around that much

25   time because our responsive elements came from

1  across the city.  So I imagine it could take

2  that time.  And after talking to our motor

3  officer, the protesters for sometime, anyway,

4  believed that we were shutting off the

5  interstate so they could occupy it.  So they

6  were content to stand there or a while.

7       Q    They believed that you were helping

8  close down the interstate so that they would

9  be allowed to walk on the interstate?

10      A    Yes, ma'am.

11      Q    They were under the impression -- or

12  your understanding is that many of the

13  protesters were under the impression that they

14  would be allowed to go on to the interstate?

15      A    They were told that directly, yes.

16      Q    Who told them directly that they were

17  going to be allowed to walk on to the

18  interstate?

19      A    I don't know the officer, but it was

20  one of our motor units that saw the group

21  going towards the entrance ramp.  He just

22  pulled in front of them and asked them what

23  they were doing.  And they told him we're

24  going to go take the interstate.  He said

25  that's really dangerous.  Don't do that.

1    You're going to get run over.  I'm going to

2    get some my guys and we'll get up there and we

3    can stop traffic so that y'all can safely

4    occupy.  They said okay.  They kind of waited.

5    The crowd was really big.  So he radios in and

6    we're going to have a major problem here.  And

7    that's whenever the resources started to be

8    notified and respond.

9        Q    Okay.  So BRPD had notified the

10   protesters that they were going to allow them

11   to walk on the interstate and the protesters

12   were waiting after hearing that?

13       A    Right.  There was a group of them.

14   I'm sure it wasn't all the hundreds that were

15   there, but, yes.

16       Q    Okay.  And after being told that they

17   would be allowed to enter the interstate with

18   the help of BRPD, they didn't try to get

19   around BRPD, they were actively waiting?

20       A    They were waiting, yes, ma'am.

21       Q    Okay.  And in terms of -- you know,

22   after whenever length of time it was -- I

23   think you had said you agreed it could be

24   close to an hour where protesters were waiting

25   and standing in the yard at 602 East

1  Boulevard.  At the point when officers

2  approached the yard and began to arrest those

3  protesters, what was the BRPD's position about

4  what crime these protesters were being pursued

5  on to private property for committing?

6      A    They at that time were ordered to

7  disperse after being unruly and occupying the

8  roadway when asked to leave.  They would have

9  been -- most were charged with -- I don't know

10  if some others were charged with other things.

11  That primarily was the thing.

12      Q    I think -- and so I'm going go to go

13  back to the Policy Manual here.  I'm going to

14  try to share my screen, if I can.  And the one

15  that I'm going to pull up here is just an

16  arrest policy.  Can you see it now?

17      A    Yes.

18      Q    Okay.  Perfect.  So this is page

19  Number 276 of the Policy and Procedure Manual.

20  And it's under -- here I'm looking at

21  Subsection 3 of the General Order Number 209

22  on arrests.  And my questions are going to be

23  about arrests without a warrant in Subsection

24  3.  Here it says:  "Officers may arrest a

25  person without a warrant when the officer

1    observed the offense, whether it's a

2    misdemeanor or a felony.  Misdemeanor arrests

3    should be made immediately or upon close

4    pursuit."  Then it says:  "Officers may arrest

5    a person who has committed a felony, even

6    though the officer did not witness the crime."

7         My question here is:  Am I correct

8    that Subsection 3 of General Order Number 209,

9    that I just read, indicates that officers are

10   not authorized to arrest without a warrant in

11   normal situations where the officer did not

12   witness the commission of a misdemeanor.

13       A    That's not exactly what it says.

14   You're kind of reading into that.  You can

15   make the arrest whenever safely to do so.  In

16   that case on France Street, they have enough

17   manpower to make the arrest immediately.  I

18   imagine some of them -- a lot probably didn't

19   get arrested because they changed their mind

20   by the time other officers did get there.  We

21   had some people decide to go to their cars and

22   leave.  So whenever the final command was

23   given -- and the command was given to make the

24   arrests of those still there -- it had been a

25   little while, but the officers there had

1    witnessed the people that they placed under

2    arrest.

3        Q    I think part of my confusion here is

4    that the video footage that we've seen is of

5    officers approaching and entering the yard and

6    arresting all those protesters that remains in

7    the yard.  And my understanding is that there

8    wasn't specific identification by any BRPD

9    officers of protesters who had been standing

10   in the roadway or committing obstruction of a

11   public passageway.  Those people weren't

12   specifically identified.  So an hour later, or

13   whatever length of time similar to an hour

14   later when officers entered the yard and began

15   to arrest all the protesters who remained

16   there, there was no identification of which

17   protesters had actually committed the crime of

18   obstruction a public passage way.

19       A    How do you know that?  How do you say

20   that?  That's the arresting officer is the

21   only person who knows that.  How can you say

22   that?

23       Q    Yeah, I guess -- my question for you

24   is, is it your understanding, as a

25   representative of the City here today, that

1    the protesters who were arrested in the yard

2    at 602 East Boulevard were those who had been

3    identified by some officer on the ground as an

4    hour earlier having been in the roadway?

5        A    Well, the timeframe was an hour

6    total.  Let's just say we are all agreeing it

7    took a while.  You can see that the orders

8    were given and given and given.  As some point

9    the people fled to the yard when they realized

10   they were about to get arrested.  That's only

11   minutes, if not less than minutes.  It wasn't

12   like they were setting up on somebody's porch

13   for an hour and the officer went up there and

14   snagged them off of it.  Once they realized:

15   Oh, we're so serious.  You're about to get

16   arrested.  Then fled to people's front

17   porches.  It was only in minutes.

18       Q    Am I correct in understanding your

19   testimony now that the protesters were in the

20   yard for 602 East Boulevard for only a matter

21   of minutes?

22       A    That's a large crowd.  Some may have

23   been standing there for an hour.  I'm not

24   saying that.  I'm saying the ones that were

25   placed under arrest were seen by the arresting

1    officers committing a crime and fled to evade
2    arrest.
3         Q    Okay.  And just so I'm clear on your
4    testimony, you're not contending that all of
5    those protesters who were arrested within the
6    yard were specifically identified by officers
7    on the ground as having committed a crime
8    prior to entering the property at 602 East
9    Boulevard?
10        A    They were witnessed committing a
11   crime or they wouldn't -- they were still
12   committing a crime because they were failing
13   to disperse.  We already agreed you were told
14   to leave.  It doesn't matter where you're at,
15   you were still told to leave.  The group was
16   not going to be left there.  They still failed
17   to disperse.
18        Q    Okay.  I do have a couple of followup
19   questions on that, as well.  I hear you
20   referencing a crime of failing to disperse.
21   Can you direct me to a specific revised
22   statute or ordinance that you're reverencing
23   there?
24        A    I don't know the revised statute
25   number, but it is an ordinance.

```
 1        Q    Sorry.  I think I didn't hear your
 2    complete answer.  Were you concluded?
 3        A    Yes, ma'am.  I said I don't know the
 4    exact ordinance number on it.  There is an
 5    ordinance.
 6        Q    But none of the protesters arrested
 7    at East and France were arrested for failure
 8    to disperse, correct?
 9        A    I don't know.  Are you telling me
10    that?  I'm not sure of the charges.  It's been
11    five years.  I honestly don't remember that.
12            MR. SCOTT:
13                 Would you like me to provide the
14            Title 14 citation for you?
15            MS. LOMMERS-JOHNSON:
16                 You know what, if -- I think
17            that's okay.  If Captain Leach has
18            indicated that he doesn't know it off
19            the top of his ahead, that's fine.
20            We can look into that later and look
21            back.  But I do appreciate it, Joe.
22            MR. SCOTT:
23                 I mean, I could point him to
24            part of the book.
25            THE WITNESS:
```

```
 1            I'm sorry.  I don't memorize --
 2       MS. LOMMERS-JOHNSON:
 3            You're good.  I think it's
 4       relevant to the extent if anyone was
 5       charged with failure to disperse.  My
 6       understanding is that nobody was
 7       charged with failure to disperse and
 8       so the City representative doesn't
 9       have a different understanding there,
10       then I'm not going to take us down
11       the pathway of looking into the
12       specifics of a charge that no one was
13       charged with.  But if I turn out to
14       be wrong on that or if there was a
15       failure to disperse charge that
16       anyone else knows of, then we can
17       definitely get more involved with
18       that statute.
19            I think that those are all of my
20       questions on private property or on
21       -- sorry.  On this subsection.  I
22       forget which topic subsection letter
23       we're on.
24            John, do you have any questions
25       on this subsection?
```

```
 1            MR. ETTER:
 2                 No, I do not.
 3            MS. LOMMERS-JOHNSON:
 4                 Okay.  Perfect.  Greg?
 5            MR. FAHRENHOLT:
 6                 I have a few.
 7    BY MR. FAHRENHOLT:
 8        Q    Captain, when you were being
 9    questioned by Mr. Most, you were discussing
10    some exceptions to the requirements for a
11    warrant and I wanted to ask you:  Are you
12    familiar with there being what's called a
13    plain view exception in obtaining a warrant?
14        A    Yes, sir.
15        Q    What is your understanding of what
16    the plain view exception entails?
17        A    There's a couple.  The subject
18    incident to arrest of searching someone's
19    vehicle or the home where arrestee was or the
20    plain view or this witness that there's
21    evidence that could be part of the crime.  You
22    could control that or access that without a
23    warrant.
24        Q    Are you aware, or is the City aware
25    of whether the law allows a police officer to
```

1    arrest someone on private property if there is

2    probable cause for the arrest and the person

3    is in plain view of the police officer?

4         A    Yes, sir.  That's completely lawful.

5         Q    I believe you testified that you are

6    familiar with there being either a City

7    ordinance or a Louisiana Revise Statute which

8    makes it a crime to fail to disperse when

9    commanded to do so by police officers; is that

10   correct?

11        A    Correct.

12        Q    I'm going to read you a section of

13   what is Louisiana Revise Statute 14:329.3.

14   I'm going to read to you the sentence from the

15   statute and I'm going to ask you if it's the

16   City's position that this statute could have

17   been applied to anyone standing on the

18   property at East and France.

19             Statute states:  "Any law enforcement

20   or peace officer or public official" -- excuse

21   me -- "public official responsible for keeping

22   the peace may issue a command to disperse

23   under the authority of R.S. 14:329.1 through

24   329.8 if he reasonably believes that riot is

25   occurring or about to occur, the command to

1    disperse shall be given in a manner reasonably

2    calculated to be communicated to the

3    assemblage."

4              Do you understand what I just told

5    you?

6         A    Yes, sir.

7         Q    We discussed earlier that commands to

8    disperse were given to the protesters at the

9    corner of East and France, correct?

10        A    Yes.

11        Q    And I'm not going to read you the

12   riot statute.  Is it the City's position that

13   officers on the scene had probable cause to

14   believe that those protesters -- scratch

15   that -- that the officers reasonably believed

16   that a riot was occurring or about to occur?

17        A    Yes.

18        Q    Is it the City's position that

19   protesters taking over the interstate and

20   blocking the interstate would fit the

21   definition of a riot?

22        A    Yes.

23        Q    We've talked about charges that were

24   made against some of the protesters.  Can

25   someone commit a crime without being charged

1    for it?

2       A    I suppose they could if the officer

3    didn't arrest them.

4       Q    Let me ask it this way:  If someone

5    is arrested and charged with one crime, does

6    that mean that they did not commit any other

7    crime for which probable cause might have

8    existed to arrest that person?

9       A    No, it doesn't mean that.  It just

10   means they were lucky or fortunate enough not

11   to be charged on anything.

12            MR. FAHRENHOLT:

13                Those are all questions I have

14            on that topic.

15            MR. MOST:

16                One followup.  Oh, Joe, you've

17            got some questions?

18            MR. SCOTT:

19                Yes, I don't know who the host

20            is, but if the host could pull back

21            up the arrest policy, General Order

22            209.

23            MR. MOST:

24                Sure.  This one here?

25            MR. SCOTT:

1           Yes, sir.  The next page,

2        Section 3 is at the top of the page.

3                 EXAMINATION

4  BY MR. SCOTT:

5     Q    Captain Leach, do you see Section 3,

6  "Arrests without a warrant"?

7     A    Yes, sir.

8     Q    Would you read out loud 3-A.3.

9     A    "Officers may make arrests without

10  warrants based on probable cause."

11     Q    How rigorous is this demand of

12  probable cause?

13     A    The officer has to believe that the

14  person has committed crime.

15        MR. SCOTT:

16             That's all I'm getting from that

17        one.  Thank you, William.

18  BY MR. SCOTT:

19     Q    I understand it's been a long time

20  since you had to write a misdemeanor Affidavit

21  of Probable cause.

22     A    It's been a minute.

23     Q    Did you ever write a misdemeanor

24  affidavit of probable cause and go to court

25  and find out the prosecutor had changed the

1   charges around?

2        A    That's quite common, yes, sir.

3        Q    Does that make it an invalid arrest?

4        A    No, it's just the prosecutor may

5   choose a charge that better fits the crime

6   that the officer did.

7             MR. SCOTT:

8                  Those are all my questions.

9             Thank you, sir.

10                 EXAMINATION

11  BY MR. ETTER:

12       Q    Captain, is it the policy of the

13  Baton Rouge Police Department to determine the

14  crime that will be charged before the person

15  actually commits the act that they're charged

16  with?

17       A    I don't think I understand your

18  questioning there.

19       Q    Let me try going back.  Are you aware

20  that in this case, Affidavits of Probable

21  cause were preprinted, listing the charges as

22  violations of R.S. 14:97 and for people --

23  another version listing 14:97 and 14:101.

24       A    I do know that some of the probable

25  causes would have had the date and the

1    location on it.  As far as having a charge on

2    it, I'm not aware that they were pre-written

3    charges.  Although, it might have been common

4    charges.  I'm aware of date and location, but

5    not anything else.

6         Q    Is it the policy of -- if I tell you

7    that there were emails addressed throughout

8    BRPD, that the arrests will be for violation

9    of 14:97 and if those emails were sent as

10   early as July 9th, would that be in compliance

11   with the BRPD policies and practices?

12        A    It may have been advice, legal

13   advice, that the charges better fit, similar

14   as to the prosecutor changing the charges of

15   the arresting officer.  It may have been

16   determined that was a better charge to use.

17        Q    Is it consistent with BRPD policy and

18   practice for an officer in charge to announce

19   over the radio that all arrests will be

20   pursuant to the 14:97?

21        A    I don't know that particular incident

22   that you're referring to, but, no, it wouldn't

23   be policy to tell officers what the arrest is

24   for.  Like I said, the only thing I can think

25   would be when the arrests were made, our legal

1    advisor would have been advising us of a

2    better charge instead of what was used.  But,

3    no, there's no blanket policy saying this is

4    what you arrest people for.

5        Q    We heard testimony earlier today from

6    another representative of the Baton Rouge

7    Police Department that, as to the arrests at

8    East and France, that an arrest team would

9    have seized the person and then turn them over

10   to another officer or group who were

11   processing, who then completed the Affidavits

12   of Probable cause without actually witnessing

13   what the arrestee's conduct had been.  Are you

14   aware of that?

15       A    I'm aware of that practice that

16   shouldn't -- now, prisoner processing is

17   responsible for many things, but they're not

18   responsible for writing what had happened or

19   what crime took place.  That should be the

20   arresting officer.  As far as following up and

21   finishing the rest of the paperwork and the

22   booking process, that's what PPT was for.

23       Q    Sir, are you aware that there are

24   more than a hundred essential identical

25   Affidavits of Probable cause, which were all

1    completed by the processing team and not by

2    the officer who actually witnessed the

3    arrestee's conduct?

4         MR. SCOTT:

5              Mr. Etter, I'm going to object.

6              We're supposed to be on subject 2-T,

7              "Entry on to private property."

8              Captain Leach is not designated for

9              Affidavits of Probable Cause.  That

10             that would be Topic 11, I believe.

11        MR. ETTER:

12             Just to respond, he testified to

13             as to -- that the entries on private

14             property and the officers having a

15             basis for entering private property

16             because at some prior knowledge of a

17             violation, so why I think this is an

18             appropriate question.  However, I

19             will defer that question to the

20             representative designated for

21             Affidavits of Probable Cause.

22             That includes my questions on

23             this topic.

24                  EXAMINATION

25

1    BY MR. MOST:

2        Q    All right.  And just a quick

3    followup, while we're talking about different

4    statutes.  Captain Leach, you've been an

5    officer for approximately 30 years, correct?

6        A    Yes, sir.

7        Q    In your 30 years as an officer, can

8    you recall any particular time -- other than

9    the July 2016 protests -- when you arrested

10   someone for a violation of 14:97, obstruction

11   of a highway?

12       A    I cannot.

13       Q    And in your approximately 30 years as

14   an officer, can you recall any particular

15   time, other than the July 2016 protests, that

16   you arrested someone for 100.1, obstruction of

17   a public passageway?

18       A    No.

19       Q    Was that a no?

20       A    No.  Sorry.  Yes, no.

21            MR. MOST:

22                 Okay.  Any other questions on

23            this topic "Entry on Private Property

24            to Make Arrests"?

25                 All right.  Hearing none, we

1    will move on to topic -- next topic I
2    believe you're designated for is
3    Topic 7, which is "Planning and
4    preparation for protests, including
5    the date, attendance and content of
6    planning meetings between Baton Rouge
7    Police Department and other law
8    enforcement agencies from July 5th to
9    July 10, 2016; all aspect of planning
10   of protests response from the time
11   Alton Sterling was killed through
12   July 10, 2016; designation and
13   identification of chain of command
14   for July 9th and 10th, 2016 protests
15   at both Goodwood and Airline and
16   Government Street and downtown, both
17   withing BRPD and between BRPD and
18   other law enforcement agencies;
19   identification of individuals who
20   gave law enforcement -- orders to law
21   enforcement officers."  And finally,
22   "Identification of individuals who
23   gave orders to protesters."
24        That's a lot, but that's all
25   under the heading of Topic 7.  Are

```
 1            you prepared to testify on those
 2            topics?
 3            THE WITNESS:
 4                 Yes.
 5            MR. MOST:
 6                 And, frankly, MacArthur, I feel
 7            like this is something y'all know in
 8            more detail than I.  Would y'all like
 9            you to lead the questioning of this
10            topic?
11            MS. LOMMERS-JOHNSON:
12                 I'm happy to start.  We're
13            actually going to have Jim Craig come
14            on line because he has prepped this
15            topic time.  He just needs like five
16            minutes to switch over from another
17            deposition.  So with that being said,
18            I'm happy to start or you can start,
19            William, and pass to Jim on behalf of
20            MacArthur.  But if --
21            MR. MOST:
22                 Why don't we knock out some of
23            topic 8?  Because I think he's
24            designated, as well, for Topic 8 and
25            we might be able to knock out much of
```

1          8 while we wait for Jim.  How about
2          that?
3          MS. LOMMERS-JOHNSON:
4               Perfect.
5          MR. MOST:
6               That all right with you, Joe and
7          Captain?
8          THE WITNESS:
9               Yes.
10         MR. SCOTT:
11              Yeah, Topic 8 appears to be more
12         discrete and less nebulous.
13         MR. MOST:
14              Yeah.  I think it might be
15         quick.  Topic 8, Captain, is:
16         "Equipment used by BRPD's response to
17         protests, including the acquisition
18         of equipment related to the following
19         tactics; determination to use the
20         following tactics; the designation of
21         authority to deploy the following
22         tactics; and the description of the
23         BRPD authorized use of same."
24              And we've got a couple different
25         discrete items here.  We covered

```
 1              some, but remaining to be covered are
 2              teargas, teargas masks, drones,
 3              listening devices and cameras.
 4                   Are you prepared to testify
 5              about those topics?
 6          THE WITNESS:
 7              Yes.
 8                        EXAMINATION
 9   BY MR. MOST:
10       Q    Great.  All right, in terms of -- we
11   already talked about the BearCat, I think, at
12   some length.  We talked about the LRAD.  The
13   next one up is "Teargas/teargas masks."  My
14   understanding is that teargas masks at least
15   were deployed to BRPD officers responding to
16   the July 2016 protests, agreed?
17       A    Yes.
18       Q    Is that a common kit for BRPD
19   officers or is it particularly triggered by
20   some policy or determination?
21       A    No, it's not -- at that time, it
22   wasn't part of a uniform officer's daily
23   equipment list, no.  It was deployed because
24   of fear of protesting could become violent and
25   a need to deploy gas.
```

1      Q    Was teargas deployed at any point
2    during the July 2016 protests?
3      A    I'm quite proud to say:  No, it was
4    not.
5      Q    But the officers were prepared in the
6    event that they had to, agreed?
7      A    Yes.
8      Q    And so they anticipate the possible
9    need to deploy teargas, agreed?
10     A    Agreed.
11     Q    I'll go through each of these
12   equipment and then hand off to other people,
13   unless anyone wants to go item by item.
14          Drones, were drones deployed at the
15   July 2016 protest?
16     A    No, we have drone programs now, but
17   at the time -- it might have been in the
18   infant stages, but I don't think we had any
19   there.
20     Q    Okay.  Topic -- Subsection F of Topic
21   8 is "Listening devices."  Did BRPD deploy any
22   listening devices during the 2016, July
23   protests?
24     A    No, we didn't have any listening
25   device, other than just the officers that

1    might have been deployed there.

2        Q    So I'm thinking, for example, a long

3    range microphone, parabolic microphone?

4        A    To my knowledge, we don't have one.

5        Q    Have you ever heard of a Stingray

6    device that intercepts cell phone signals?

7        A    Definitely don't have that.

8        Q    Any other sort of electronic

9    monitoring of cell phones or other electronic

10   devices that BRPD used during the July 2016

11   protests?

12       A    No.

13       Q    Topic -- Subsection G is:  "Cameras,

14   including those used from an

15   airplane/helicopter."

16            Maybe we can answer the easier part

17   first.  Did BRPD deploy any airborne cameras

18   during the July 2016 protests?

19       A    We did.

20       Q    Was it via airplane or helicopter?

21       A    We had both.  We had a fixed wing

22   airplane from Calcasieu Parish, I believe it

23   was.  It was able to downlink to EOC to give

24   live feed, where he's able to -- it's call a

25   downlink to link live footage from the

216

1    aircraft to our Emergency Operations Center,

2    so you get live footage.  But at the time I

3    don't believe our helicopter could do that.

4         Q    So during the July 2016 protests,

5    there was a camera in an airplane that was

6    providing live video to BRPD, correct?

7         A    When it was available, yes; not all

8    the time.

9         Q    Sure.  Was that live video recorded

10   in any fashion?

11        A    I don't believe it had that

12   capability.

13        Q    Okay.  And then in terms of other

14   cameras, other than mounted on an airplane,

15   did BRPD deploy officers with cameras or video

16   cameras to document the protests in July 2016?

17        A    I believe we may have sent Crime

18   Scene to record some of the verbiage that was

19   given to the crowd, the order to disperse and

20   such.  We do that now, but I'm certain

21   100 percent we did that in 2016.

22        Q    Yeah.  I'll represent to you that

23   there's been images provided to us from some

24   sort of BRPD photographer.  Do you recall if

25   there were multiple photographers deployed or

1  just one, any idea?

2      A    I don't know.  If it were more than

3  one, it probably wouldn't be more than two.

4  If it was Crime Scene, they might have sent

5  two officers there.

6      Q    Did BRPD receive photographs or video

7  from other agencies, maybe other agencies had

8  photographers out there that they were sharing

9  information from?

10     A    Other than the Calcasieu fixed wing,

11  I don't believe so.  Other than that, I don't

12  think that we had any other footage from

13  anybody else.

14     Q    And any other method or device that

15  BRPD used to document the protests, other than

16  what we've discussed?

17     A    I don't think so.

18         MR. MOST:

19              Okay.  I think those are my

20         questions for Topic 8.

21              MacArthur, is there any Topic 8

22         questions to followup on?

23         MS. LOMMERS-JOHNSON:

24              No, we don't have anything more

25         on Topic 8.  Thanks, William.

```
 1              John, do you?
 2         MR. ETTER:
 3              Yes, I have a couple of
 4         questions on Topic 8.
 5                   EXAMINATION
 6    BY MR. ETTER:
 7         Q    Who gave the order to distribute gas
 8    masks to the officers who responded on
 9    July 10th?
10         A    That's part of their equipment by
11    that point.  I don't know who ordered the
12    masks to be dispersed at any time -- in the
13    beginning, because not everybody had them.  So
14    that order came from above me in the chief
15    administration somewhere.  But that -- once it
16    was distributed to everyone and everyone was
17    equipped with it, it became part of your
18    equipment that you bring in wherever you go.
19    Wherever you're at, you have all of your
20    equipment with you.
21         Q    Did BRPD coordinate with the
22    Louisiana State police for officers to be
23    wearing -- be issued and wearing gas masks?
24         A    If you're -- you're speaking in
25    general terms or on France Street?
```

1    Q    Particularly, East and France.

2    A    France Street, I'm not a hundred

3  percent who gave an order to -- everybody you

4  see that had masks were masked up.  BRPD

5  Mobile Field Force is not present on France

6  Street.  That was Calcasieu Parish and state

7  police.  So I'm assuming somebody in that --

8  you know boots-on-the-ground command would

9  have said:  Hey, everybody put on your gas

10  masks.  To my knowledge, that's how it

11  occurred.

12    Q    And had been -- were BRPD issued

13  teargas on July 10 on East and France?

14    A    Yes, sir.  That's part of what this

15  Special Response Team responsibility, besides

16  coverage, in case there's an active shooter or

17  something like that.  They were the only ones

18  certified to deliver teargas, other than -- I

19  take that back.  For us, for BRPD, they were

20  the only ones.  Our Mobile Field Force wasn't

21  certified in that, but that day, state police

22  were well capable of doing that and I'm sure

23  Calcasieu was, as well.

24            MR. ETTER:

25                Thank you.  That's all I have.

```
1              MR. MOST:
2                  Great.  Well, the next topic
3          that I believe he's designated for is
4          Topic 7, which is generally about
5          planning and preparation for
6          protests.  The witness already
7          testified that he was prepared for
8          this topic.
9                  Jim, you may know this aspect of
10         this best.  Would you like to lead
11         the questioning of Topic 7?
12             MR. CRAIG:
13                 I can do that.  I just need a
14         couple of minutes to pull up my
15         documents because I've been in a
16         deposition in an entirely different
17         case, so I'm just changing just a
18         little bit.  I'll be ready -- if we
19         could just take five and come back
20         and 3:20.  I will not have a lot of
21         questions, but we'll go through what
22         I have.
23             MR. MOST:
24                 Sure.  Why don't we see if we
25         can knock out -- while you're doing
```

1          that, we might be able to knock out
2          Topic 9, which I think is the last
3          one Mr. Leach is designated for.
4          Because I think we've largely covered
5          much of it, if that's all right with
6          everyone.
7      THE WITNESS:
8               Good with me.
9      MR. MOST:
10              Yeah.  I expected you would like
11         to be out of here sooner than later,
12         Captain.
13              All right.  So Topic 9 is
14         "Tactics used during BRPD response to
15         protest, including the decision to
16         use the following tactics, the
17         designation to deploy the following
18         tactics; and the description of the
19         BRPD authorized use of same."
20              And remaining to cover is "The
21         surveillance from operatives within
22         the protest group," and "D,
23         Identification and arrests of protest
24         leaders."
25              Are you prepared to testify

1           about those topics today, Captain?

2           THE WITNESS:

3                Yes.

4                     EXAMINATION

5     BY MR. MOST:

6       Q    So we identified that there was one

7     operative -- one undercover operative deployed

8     within the East and France Street group on

9     July 10th, correct?

10      A    Yes.

11      Q    Were other undercover operatives

12    deployed to other protests in July 2016?

13      A    Yes.

14      Q    And had undercover operatives been

15    deployed to infiltrate the groups by BRPD

16    prior to that, prior to July 2016?

17      A    I can't speak to that.  Our

18    Intelligence Division does try to stay, you

19    know, part of groups that they think they need

20    to be part of, I guess.  So I don't really

21    know how.  I never worked in a division like

22    that.  I'm not sure how their day-to-day

23    operations manages.  But, yes, they stay

24    connected to many groups in the area.

25      Q    Sure.  By stay connected, do you mean

1    send undercover operatives to infiltrate?

2        A    Yes.   There's a public forum type

3    event.   It's common for them to attend those

4    type of events to see what groups or different

5    groups are planning or organizing.

6        Q    And then -- I think we've already

7    talked about identification and arrests of

8    protest leaders.

9            MacArthur team, do you have any

10   questions and Topic 9?

11           MS. LOMMERS-JOHNSON:

12               I have just a couple followup

13               questions on surveillance.

14                   EXAMINATION

15   BY MS. LOMMERS-JOHNSON:

16       Q    I think for the July 10th incident, I

17   think you previously testified that you

18   weren't aware of who was the person embedded

19   within the protest group on July 10th?

20       A    That's correct.   I believe it was our

21   Intelligence Division, but I'm not sure who.

22   And honestly we've used some of our narcotic

23   detectives in those types of roles, as well.

24   So I'm not sure who was there that day.

25       Q    I guess in terms of figuring out

224

1    answers to the questions about who that person
2    was and how many people they had talked to
3    when they received the communication that
4    there was a plan to enter the highway, do you
5    know who the right person would be to talk to
6    get answers to those questions?
7         A    I do not.  Like I said, I don't know
8    who was there that day, as far as who was in
9    command of our Intelligence Division.  I don't
10   even believe they even work here any more.
11   I'm not sure they could even tell you they
12   were there.  I guess, it kind of makes it
13   sound like it was a group talking.  But in
14   this group, word kind of spread what they were
15   doing, what the end goal was.  I think -- most
16   people out there had an idea of what they were
17   doing.  Some may; some may not.  But I think
18   word spreads pretty quick in a group like
19   that.  It wasn't just a select handful.
20        Q    And when you say it wasn't just a
21   select handful who were planning to enter the
22   highway, what do you base that on?
23        A    Like that officer was telling us or
24   relating to emergency operations that day is
25   that:  Hey, people are talking.  This is what

1    we're going to do.  You know, as they moved
2    around through the group, they were hearing
3    that kind of talk.  And that plus, you know,
4    the officer talking to the other group.  So we
5    felt pretty confident what they were doing.
6         Q    And so there I think you're
7    referencing two officers; one was the
8    surveillance officer and is the other one the
9    motorcycle officer?
10        A    Oh, yes.  Sorry about that, yes.
11   Intelligence operators, usually they don't
12   send just one person.  I don't want to
13   misspeak, but I'm almost certain there was
14   more than one intelligence officer out there
15   that day.  He attended the march and stayed
16   with it and reported back, the movements and
17   stuff.
18        Q    And so is it your testimony that the
19   intelligence officer who was, you know, plain
20   clothes officer surveilling the protest group
21   on June 10th, communicated back to BRPD that
22   they had heard people talking about trying to
23   enter the highway, but you're unaware of
24   whether it was two, three, four or more people
25   talking about --

1      A    It was a pretty big consensus from

2    our officer relaying the information on what

3    the group was doing.  I can't put a number on

4    who.  And I'm not going to say every single

5    person knew exactly what they were doing,

6    because they might have been just following

7    them.  I'm sorry.  It sounds like impossible

8    to answer that.

9      Q    It's okay.  And I'm not trying to,

10   you know, get you to answer questions that you

11   don't know the answer to.  Just to the extent

12   that you do know -- I guess what I'm hearing

13   from your testimony is that you don't know how

14   many people your surveillance officer heard

15   that from --

16     A    Correct.

17     Q    -- particularly?

18     A    Right.

19     Q    Would they have written any kind of

20   report after the fact?

21     A    I'm not sure.  I'm not sure what

22   their procedures are, if they -- you know,

23   what's documented and what's not.  I'm sure

24   they don't go write a report of every time

25   they go and attend -- maybe that day.  I had

1    never seen it.

2        Q    Have you been unable to hear their

3    communications directly from the surveillance

4    officer?

5        A    I recall -- this particular protest

6    occurred during a shift change in Emergency

7    Operations Center.  So I can't really -- I

8    kind of came in and it was ongoing.  So I

9    don't really -- I can't tell you, I heard

10   directly from the intelligence officer.  I

11   don't remember where or how we got that

12   information.  It came through them.  I'm not

13   sure through what channel it was.

14       Q    And, in general, how did the

15   intelligence officer at the protest

16   communicate intelligence back to the BRPD?

17       A    They attended something that -- you

18   know, they were give us updates -- like, we

19   knew the progression of the peaceful protest,

20   the march, you know, from the church to the

21   capitol.  And they were giving orders similar

22   to, like:  Okay.  We're at the capitol.

23   Someone is speaking now.  Okay.  We're

24   leaving.  We're marching back to the church.

25   They were giving updates that's quite common

228

1    for any protests or events that we had.  I'm

2    certain on that day they were giving updates

3    as to what they received.

4         Q    Was the course of communication

5    conducted, you know, by phone or text?

6         A    Yeah.  Usually, it's just a

7    phonecall.  They'll call in and that's the

8    quickest way to communicate and to be

9    understood and not to misunderstand a text or

10   something.

11             MS. LOMMERS-JOHNSON:

12                  I think that's all the

13             surveillance questions I have.

14             THE WITNESS:

15                  Okay.

16             MR. ETTER:

17                  I have question, Captain.

18             THE WITNESS:

19                  Yes, sir.

20                     EXAMINATION

21   BY MR. ETTER:

22        Q    Are you aware that the Baton Rouge

23   Police Department was receiving communications

24   from the Governor's Officer of Homeland

25   Security and Emergency Preparedness during the

1   July 2016 protests?

2        A     Like I said, from early on, the

3   governor's office had Unified Command System,

4   a group.  Their command -- their EOC was

5   operational, as well as ours, our Office of

6   Homeland Security.  So there was communication

7   between our group, the Louisiana Sheriff's

8   Office Association and members, the Louisiana

9   Chief of Police Association, so there was

10  massive groups and massive communication

11  between all the groups.

12       Q     Were the -- part of this collective

13  team conducting surveillance of people's

14  emails and websites?

15       A     I don't know of anybody that was

16  monitoring any emails.  They may have been

17  looking at a social media page or something.

18  That's standard for our intelligence group to

19  do.

20       Q     To your knowledge, did members of the

21  Black Panther Party or the New Black Panther

22  Party participate in the July 10 protest?

23       A     I don't believe they were there on

24  France Street, not to my knowledge.  I don't

25  remember the New Black Panther Party being

1    present at that particular protest.

2         Q    Was there surveillance done to

3    determine who were the agitators for the East

4    and France -- to your knowledge, was there

5    surveillance to determine who were the

6    agitators and leaders of (INAUDIBLE) --

7         A    I think your question is, who were

8    agitators?  Were there any intelligence of who

9    the agitators were on protest on France

10   Street?  Was that your question.

11        Q    I started asking if there had been

12   surveillance done to identify the agitators

13   and leaders for the --

14             THE COURT REPORTER:

15                  Mr. Etter, I'm not getting your

16             question.  You broke up.

17             MR. MOST:

18                  As the emcee of this, I'm going

19             to suggest that, John, you save that

20             question for the end and we'll move

21             on to --

22             MR. ETTER:

23                  I have a thunderstorm here.  All

24             right.  I will save that and let you

25             move on.

```
 1              MR. MOST:

 2                   Great.  Thank you.

 3                   Jim, would you like to start

 4         with Topic 7, the planning and

 5         preparation for protests?  Is this a

 6         good time?

 7              MR. CRAIG:

 8                   Yes, sir.  And thank you all for

 9         indulging me.

10                        EXAMINATION

11    BY MR. CRAIG:

12         Q    Captain Leach, we met a while back on

13    another one of these cases.  I'm Jim Craig.

14    I'm with the team representing the plaintiffs

15    in Tennart, Batiste-Swilley and Smith.  And

16    this afternoon, Ms. Lomers-Johnston is my

17    co-counsel.  I am going to start -- well,

18    first of all, I'm questioning on Topic 7,

19    which involves the planning and preparation

20    for the protest response, including planning

21    meetings between the BRPD and other law

22    enforcement agencies starting late on July 5th

23    and going forward.  Is that one of the topics

24    that you were asked to prepare to talk about

25    today.
```

```
 1        A    Yes, sir.  I'm ready.

 2        Q    Okay.  What did you -- besides your

 3   own personal knowledge as a participant in

 4   some of those events, have you done anything

 5   to prepare specifically to talk about this

 6   topic of the planning and preparation?

 7        A    No, sir.  Until I came here today, I

 8   didn't know what type of questions I was going

 9   to be asked.

10        Q    Okay.  Well, this one is about

11   planning.  And I'm going to start with a

12   document.  I'm going to try to share my

13   screen.  This document, I believe, is in the

14   group of Exhibits LLLLLLL, as in Lion,

15   L-I-O-N.  And it is the Operational Log for

16   the Mayor's Office of Homeland Security and

17   Emergency Preparedness.  And I believe we've

18   shown you these in previous depositions.

19        A    Yes, sir.

20        Q    And as you may remember, this

21   particular document in a lot of the logs read

22   in reverse chronological order, so we're

23   starting with the last page, page 9 of 9.  And

24   I'm going to blow it up a little bit, so we

25   can see it better now that we know what we're
```

1    talking about.  You see here that there's a

2    report beginning with July 5, 2016 at

3    12:30 a.m. about the shooting of Alton

4    Sterling?  Do you see that?

5         A    Yes, sir.

6         Q    And then the 4:00 a.m. log says:

7    "Cellphone and surveillance videos were

8    released of the shooting.  The shooting went

9    viral."

10        A    Yes, sir.

11        Q    I'm looking for -- I'm going to skip

12   just for a second to a document -- I don't

13   think you've seen before, but we used it in

14   Chief Dabadie's deposition.  It's a one-page

15   email from Chuck Hurst.  And you know Chuck

16   Hurst as one of the employees of Louisiana

17   Sheriff's Association?

18        A    Yes, sir, I know him.

19        Q    Okay.  And this one is dated in

20   the -- it's dated July 6, 3:12 p.m. and it

21   refers to a meeting that same day, Wednesday

22   July the 6th at 1:00 p.m. of law enforcement

23   officials with the Mississippi State Police,

24   the Baton Rouge Police Department and the East

25   Baton Rouge Sheriff's Office, meeting that

234

1    afternoon, that being the first full day after

2    the shooting of Alton Sterling.  And so my

3    first question to you is:  Do you recall that

4    meeting?

5         A    I believe I remembered vaguely that

6    meeting.  We went -- we had many.  But, yes,

7    that's probably one of the first Unified

8    Command meetings.

9         Q    Right.  So -- and I have also for

10   you -- I don't have the exhibit number for it

11   yet, but it was also used in Chief Dabadie's

12   deposition in this case -- sign-in sheets for

13   the MOHSEP.  I'm going to call it, the acronym

14   for the Mayor's Office of Homeland Security.

15        A    Okay.

16        Q    And this is the sign-in sheet for

17   that same day, July 6, 2016.  I'm just

18   wondering in that first meeting, the first

19   meeting that you all had to set up the Unified

20   Command Structure, who, if anyone, do you

21   remember being present from the various

22   agencies?

23        A    Oh, man.  I don't know -- the

24   leaders, the time -- I'm trying to recall.  I

25   wasn't familiar with them at the time, like I

235

```
 1    was some of the operator, their SWAT guys and
 2    stuff.  So some of the administration guys who
 3    were at that meeting, I would have just met at
 4    that time.
 5        Q    Okay.  Let's look at this sign-in
 6    sheet and see -- I understand -- we had been
 7    told in other depositions, this is the sign-in
 8    sheet for the building.  It's not necessarily
 9    for a sign-in sheet for this particular
10    meeting.  I don't want to mislead you.
11        A    I realize that.
12        Q    Thank you.  I want to go through the
13    people who are designated here as being from
14    one or another law enforcement agencies.  So
15    Joel Calahan, do you know what his role is
16    with the BRPD?
17        A    Yes, sir.  I know him.  And he's a
18    lieutenant, a shift lieutenant right now.
19        Q    So is he Uniform Patrol?
20        A    He is, Third District Precinct.
21        Q    Carl Wilson?
22        A    I believe he retired as a captain a
23    couple of years ago.  At the time he was
24    probably there -- he was probably still a
25    captain then, I would imagine.  He's -- he's
```

1    one of those shift supervisors.

2         Q    But he is also Uniform Patrol?

3         A    Yes, sir, he was.

4         Q    Don -- I'm going to murder his last

5    name, but it looks like Gurzynski.

6         A    Yes.  We just call him Ski because

7    it's much easier.

8         Q    Okay.  What does Ski do?

9         A    Ski is a uniform lieutenant, I

10   believe, now, but at the time he was sergeant

11   in the Traffic Division.

12        Q    Okay.  I'm on page 2 now, Captain.

13   And going back passing the MOHSEP employees,

14   who I assume have to sign in just to get

15   there.  But Chanta Beard of BRPD --

16        A    Yes, sir.  She's a uniform officer.

17        Q    Gabrielle Collins?

18        A    She is -- works in our Street Crimes

19   Division.  At the time, she was probably

20   uniform.

21        Q    Shane Totty, T-O-T-T-Y?

22        A    Yes, sir.  Unfortunately, we lost

23   Shane a few years ago.  He's passed.

24        Q    I'm sorry to hear that.  Mitchin.  I

25   know who Mr. Ramirez is.  He's the Information

```
1    Services Officer for the City Parish.
2    "Mitchin," I think it says.
3         A    Yes, sir.
4         Q    Does he have any particular role or
5    she?
6         A    He does.  He's still currently where
7    he was then.  He basically works our Grant
8    Writing Division.  He works really closely
9    with the Mayor's Office of Homeland Security.
10        Q    Got it's.  David Fauntleroy?
11        A    David was Uniform Patrol.
12        Q    Britt Jones, I think we've met
13   earlier today, or at least you all have.
14             MR. SCOTT:
15                  No, we kind of flipped the
16             schedule around.  We took Mike Barrow
17             this morning.  I get feeling we're
18             not going to get to Britt Jones this
19             afternoon.  We're just going to power
20             through.
21             THE WITNESS:
22                  Britt is -- works in our
23             Accreditation Division and Policy.
24   BY MR. CRAIG:
25        Q    Bryan Taylor.  We have met Mr.
```

```
1    Taylor.  He was -- he ultimately became your
2    assistant as Incident Commander on the 6:00
3    p.m. to 6:00 a.m. shift; is that correct?
4         A    That is correct.
5         Q    Joel Patterson?
6         A    Where did he work at time?  Oh, man.
7    His role was a SWAT Commander or a SWAT
8    Leader.  I'm not sure if he was a commander
9    then or not.
10        Q    Okay.  Cindy Carmack?
11        A    She's a civilian employee that works
12   with the Fusion Center, intelligence gathering
13   center.  She still works for the City in our
14   Realtime Crime Division.
15        Q    Okay.  And then we have a Ralph
16   Williams from East Baton Rouge Sheriff's
17   Office.  Do you remember Mr. Williams?
18        A    Oh, yeah.  I know Ralph.
19        Q    Okay.  Who is Ralph?
20        A    Ralph's role -- I think he was still
21   part of their SWAT time, one of their -- I
22   forget his rank, but one of them is supervisor
23   for East Baton Rouge Parish Sheriff's
24   Department.
25        Q    I promise you I'm not going to go
```

1    through all of these, but we do have -- we're
2    still on that July 6th sign-in sheet.  And we
3    have Adam Albright from the Louisiana State
4    police.
5        A    Yes, sir.
6        Q    Do you know Trooper Albright?
7        A    I know who he is now.  I don't know
8    what his role was there.  He was kind of
9    liaison just to be at our Emergency Operation
10   Center, so between the two agencies.
11       Q    Was that -- at the time, was that his
12   position, even before the protests or was he
13   there in the capacity just for the protest?
14       A    Yes, sir, just for the protest.  I'm
15   not sure of his assignment prior to that.
16       Q    Okay.  And then there's Lawrence
17   McLeary from EBRSO.  Do you know Mr. McLeary?
18       A    I don't remember Mr. McLeary.  Again,
19   his role was probably like a liaison between
20   the departments.  So they would change.
21   Sometimes they would send different people.
22       Q    Looking at this sixth page, I want to
23   go all the way down to the bottom here.  You
24   see -- it this Todd -- would this
25   Captain Todd --

1        A     Todd Weishar.

2        Q     Yeah.

3        A     Yes, sir.

4        Q     And he was involved in the leadership

5    of BRPD during the protest response?

6        A     His role -- I think at the time he

7    was a uniform supervisor.  He went to Health

8    and Safety, but I think at the time he was a

9    uniform supervisor.

10       Q     I'm going to share another document

11   here for -- we're going to talk about some of

12   this information kind of at the same time.  So

13   this document, the first page of it, Captain,

14   this is an exhibit that is five As, AAAAA, and

15   it is the City Parish and Baton Rouge Police

16   Department Answers to the First Set of

17   Interrogatories offered in the Blair Imani

18   case.  I'm going to turn to page 4, which was

19   -- includes Interrogatory Number 1, which

20   starts -- the question:  "Describe any and all

21   meetings you" -- and "You" in this case

22   means -- you know what would say in

23   Mississippi, "All of y'all" -- so all of y'all

24   have worked within the City Baton Rouge --

25   "with any law enforcement agency official or

1   entity other than the BRPD in preparation for

2   anticipated or actual protests in the month

3   after Alton Sterling's death."

4           And according to this written answer,

5   you were consulted about the answer to this

6   interrogatory.  And -- here, again, do you see

7   here on the -- it's page 5 of Exhibit AAAAA

8   says:  "Officer J.D. Leach believes that BRPD

9   opened Emergency Operating Command Center on

10  July 6, 2016."

11          Do you see where I'm reading from?

12      A    Yes, sir, I see that.

13      Q    And so that opening of the EOC, was

14  that during that early afternoon meeting on

15  July the 6th that we saw in Mr. Hurst's email?

16      A    Yes, sir.  I believe that would be

17  the same.

18      Q    Okay.  And you list some folks two

19  paragraphs down that were involved in some of

20  these meetings, including Colonel Stanton from

21  the State Police, Mr. Hurst, Lane Bernham with

22  the State Police, you, and Bryan Taylor from

23  the BRPD and Todd Morris with the Sheriff's in

24  East Baton Rouge.  Do you see that?

25      A    Yes, I couldn't remember Colonel

242

1    Stanton's name.  He led the meeting, the first

2    meeting at LSP.

3        Q    Okay.  So yeah.  I'm sorry I

4    scattered shot it.  We went through a lot of

5    names and kind of the purpose of that, in

6    addition just me learning a little bit about

7    them, was maybe to be thinking about seeing

8    some of those folks signed in on the 6th

9    prompts any particular memory on you part

10   about who might have been there for BRPD or

11   East Baton Rouge Sheriff's Office or the State

12   Police?

13       A    Yes, I believe you have an accurate

14   list there in that paragraph.  There were

15   more -- certainly more people there, but I

16   don't recall who or maybe at the time I didn't

17   even know who.  But I was previously familiar

18   with Todd Morris because he was there, the

19   SWAT Commander for East Baton Rouge Parish

20   Sheriff's Department.  So we had trained

21   together and even been on call together, so I

22   was quite familiar with him and a lot of guys

23   I was introduced to that day.

24       Q    Okay.  Thank you.

25       A    Yes, sir.

1    Q    Do you recall was -- in any of those
2    early meetings, either that first one or
3    shortly thereafter, did Mayor Holden
4    participate?
5    A    I couldn't say.  I don't recall him
6    ever attending a meeting that I was at.
7    Q    Thank you.  Chief Dabadie?
8    A    The Chief had sort of his own
9    meetings, and then we were kind of the
10   operational group.  I may have gone to a
11   meeting with Chief Dabadie, but I don't really
12   recall being in a meeting or meeting with him.
13   Q    Okay.  Colonel Mike Edmonson of the
14   state police?
15   A    Again, that's -- talking about this
16   upward administration.
17   Q    Yeah.
18   A    They have their own meetings and us
19   working staff had our own meetings.
20   Q    Got it.  Yeah, okay.  So the meetings
21   that you were in, you were talking about
22   operational issues and that would be in the
23   nature of logistics?
24   A    Yes, sir.  Manpower and logistics is
25   a big part of it.

1        Q    And then it talks about in this

2   document, the Answer to Interrogatory 1,

3   Exhibit AAAAA, that you created a set of rules

4   or suggestions about some of those logistical

5   areas?

6        A    Yes, sir.

7        Q    Do you see that?

8        A    Yes, I do.

9        Q    One of the issues that I would like

10  to talk about is the planning with respect to

11  the processing center.  Is that referring to

12  prisoner processing?

13       A    Yes, sir.

14       Q    What do you remember or what was

15  discussed, to the extent that you know it --

16  or that the City knows it -- in terms of early

17  planning or discussions about how arrestees at

18  the protests would be processed?

19       A    So early on the 6th -- July the 6th

20  of 2016, a protest group had not left North

21  Foster area at that time.  So our operational

22  plan was to be deployed if needed, but to stay

23  out of the area as much as possible.  So we

24  literally shut North Foster off to allow them

25  to protest and -- you know, we understood they

```
1    were upset and angry.  We monitored it and
2    they actually would try to generate calls to
3    have confrontation with police.  We realized
4    that was happening, so we sent undercover cars
5    to check and see if it was actually a real
6    call or not.  I don't want to go too much off
7    the question there.  Early on with prisoner
8    processing, we had so many unknowns, we would
9    stage Mobile Field Force slot, response
10   officers.  Instead of having them on the
11   scene, we would have them staged.  And that
12   would be staged with the prison processing.
13   And if I'm not mistaken, it was one of the
14   buses from EBR Sheriff's Department that we
15   had standing by.  But in those first couple of
16   nights, as a group, didn't have any
17   interactions with the protesters whatsoever.
18   But to answer your question, the Mobile Field
19   -- I mean, the Prisoner Processing Team was
20   set -- I believe it was set by East Baton
21   Rouge Sheriff's Department.  We didn't have a
22   capability -- we didn't have a bus, you know,
23   like the Sheriff's Departments did.
24        Q    Right.  What else do you remember
25   about those early meetings in terms of the
```

1    coordination of the response to the protests?

2        A    Yes, there was a lot to do with

3    assessing everyone's capabilities and their

4    limitations.  We had so much response from own

5    state.  Some departments could send one or two

6    officers.  Some could send a whole SWAT team.

7    Everybody had their different capabilities.

8    So what we would have to do is sit and look at

9    what each agency had and what was still

10   needed.  So a lot of that planning was seeing

11   who brought what to the table.  And then where

12   we were going to put them?  And lucky for us,

13   the State Police runs their own academy.  And

14   they did not have one in session, so they had

15   the room to house our responding help and they

16   had a cafeteria, so they could feed them.  So

17   two big things for us logistically were so

18   because of LSP's availability.

19       Q    Thank you.

20       A    Yes, sir.

21       Q    We heard a fair amount of testimony

22   about this in other depositions in these

23   cases, and in some of the Travis Day case,

24   where you testified.  I'm correct in saying

25   that, because the Baton Rouge Police

1    Department was the law enforcement agency with

2    jurisdiction over the area where the protests

3    were occurring, that you, the BRPD, in effect

4    became the lead agency for the protest

5    response?

6        A    Yes, sir.  I know this is serious,

7    but I always make jokes about it.  At press

8    conferences, law enforcement agencies like to

9    stand behind the mic and take credit for

10   stuff.  I remember early on thinking:  Nobody

11   wants to take the mic now.  Right?  They all

12   thought it was going to crash and burn.  So

13   that was definitely left in BRPD's hands.

14       Q    Right.  They were behind you, but far

15   behind you?

16       A    Far behind.

17       Q    Lawyers have that phenomenon, too.

18   That will be a discussion for another year.

19   And at some point, Chief Dabadie asked you to

20   be one of -- if not the only overall Incident

21   Commander for the law enforcement protest

22   response?

23       A    Yes, sir.  I remember exactly when

24   that was.  I had met with him on the 5th, the

25   morning after the shooting of Alton Sterling.

1    And I think he still thought it was going to

2    end up not really being a major issue.  And so

3    it wasn't until the 6th when we had some

4    protesters show up on Foster on the 5th, the

5    night of the fifth, and we realized that we

6    need to upgrade our response in case it being

7    necessary.  I remember meeting with him on the

8    morning of the 6th.  And, him just

9    specifically pointing to me saying:  "J.D.,

10   you're the Incident Commander.  You've got

11   this.  Anything you need, the department is

12   yours."  I'm like:  "Gee, thanks."

13        Q    And then were you then involved in

14   selecting the rest of the leadership team or

15   was that also designated by the Chief?

16        A    No, that was -- from our department,

17   it was my choice.

18        Q    Okay.  But I think I know the answer

19   to this question, just to be clear I have your

20   testimony, can you describe for us the overall

21   chain of command of Baton Rouge Police

22   Department during the protests?  Obviously,

23   Chief Dabadie is at the top at the high level.

24   But I'm talking about you as Incident

25   Commander back down.

```
 1      A     Well, the Chief, basically --
 2            MR. CRAIG:
 3                  Wait.  I think --
 4            MR. SCOTT:
 5                  Jim, to be clear, you're asking
 6            him about the chain of command for
 7            incident command, and we're not
 8            looking for every shift captain in
 9            five districts?
10            MR. CRAIG:
11                  No, no.  That's right.  Thank
12            you, Mr. Scott.  I'll rephrase my
13            question, Captain.
14    BY MR. CRAIG:
15      Q     What I'm really asking is -- you are
16    the Incident Commander.  Can you tell us who
17    you selected to work with you in leadership of
18    the BRPD's protest response during the
19    protests and basically why you picked those
20    particular people?
21      A     Yeah, that's a very simple answer.
22    The Chief left me in a position where there
23    was no one that could operate any rebuttal to
24    anything that I requested, except for himself.
25    He basically promoted me to his assistant
```

 1    because of the things that I was able to
 2    acquire.  For me, it was quite simple.  I
 3    chose people who I had been in sticky
 4    situations in on SWAT for many years, and that
 5    was I -- I chose as my assistant at night time
 6    to be Bryan Taylor, and I chose -- placed us
 7    on nights because of the following protests
 8    around the country, most of the violence had
 9    been at nighttime, so we chose to work 12-hour
10    shifts from 6:00 p.m. to 6:00 a.m., and then I
11    chose the counterpart for daytime operations
12    to be Wayne Martin.  And, again, because of
13    his leadership capabilities, he had been on
14    SWAT with me for years.  He was one of the
15    leaders on the team.  So it was pretty much
16    no-brainer on who would run the daytime
17    operations.
18         Q    And then did Wayne Martin have
19    someone that filled the role that Bryan Taylor
20    fill for you?
21         A    Yes, sir.  David Wallace is his name.
22         Q    And you referenced other protests
23    across the country.  Were you -- at the point
24    at which the Chief asked you to take over the
25    protest response on behalf of BRPD, did you go

1  looking to see what the trends had been in

2  other locations or was that something that you

3  or others in BRPD had been studying

4  previously?

5       A    Yes, sir.  I think that day he

6  announced me as Incident Commander was kind of

7  like a nightmare come true.  Ever since August

8  of 2014, when I turned on my television to get

9  ready for work and saw Ferguson, Missouri on

10  fire, I was like:  Where is that?  Because I

11  had never heard of it.  It was kind of an

12  awakening for me.  If it can happen there.  It

13  can happen mere.  I can remember talking to

14  Chief Dabadie about it, like:  Hey, are you

15  seeing that?  Of course, you have other cities

16  Baltimore, New York and things.  You see it

17  happening in big places all the time.  And for

18  me seeing Ferguson was a wake-up.  We need to

19  be prepared because something like this could

20  happen here.  So, yeah, for him appointing me

21  to that, it was kind of like something I

22  always felt was coming and basically changed

23  my career.

24       Q    Yes, sir.  So between August 2014 and

25  the activities in Ferguson, Missouri and then

```
 1    July 2016 with the protests after the shooting
 2    of Alton Sterling, what, if anything, did the
 3    police department do to become prepared for
 4    that possibility?
 5        A    Well, for me, I was in a role where I
 6    brought training in to the department, because
 7    I was the Director of Training at the time.
 8    So I made sure, you know, most people had gone
 9    through the civilian disturbances classes if
10    they were in the academy or Mobile Field
11    Force, which our equipment was poor.  And
12    unfortunately, it was poor when this event
13    happened.  But I think this happened
14    before you get the stuff you need a lot of the
15    times, unfortunately.  But we did have a
16    refresher on the training for the entire
17    department.  During that time, between August
18    of 2014 and the protests in 2016, I attended
19    the FBI National Academy.  We had 230 people
20    in my class there.  There were a lot of
21    commanders all over the world.  We had 48
22    state representatives and I believe 17
23    different countries.  So there were a lot of
24    conversations we had, different problems that
25    were developed.  In a leadership classes that
```

1   we would attend, we would talk about a lot of

2   things.  There were a lot of tactics and

3   preparations and, you know, logistical

4   concerns.  For those three months, there was a

5   lot of talk on that.  So I think that kind of

6   helped prepared me for an event like that.

7       Q    In that same time period, August 2014

8   to July 2016, did you, formally or informally

9   discuss, the need to prepare for large scale

10  protests or issues like Ferguson with your

11  counterparts in other capitol area law

12  enforcement agencies?

13      A    Yes, sir.  I remember talking with

14  Major Morris, Todd Morris with the Sheriff's

15  Department about what -- of course, I didn't

16  know a lot of the state police or Louisiana

17  Sheriff's Association, things like that, I

18  didn't know that type of stuff was accessible

19  to us in that manner.  So I prepared, I guess,

20  in my wheelhouse, people that I knew, people

21  that I would be associated with and I would

22  need their support.  They would need ours to

23  happen.  We prepared as much as we could.

24  Unfortunately, the equipment side of it costs

25  money.  Money is not usually spent when it's

254

1    needed.  It's was spent after the fact, where
2    we were able to upgrade equipment and things,
3    but prepare as much as we could.  At the time
4    our Mobile Field Force gear was in a trailer
5    and it was probably about 30 years old.  I'm
6    not exaggerating.  And we didn't even have a
7    commander over the group.  It was going to be
8    like:  Somebody is going to get the trailer.
9    And we're going to roll out there and hand out
10   gear.  I was, like:  No, that's not good
11   enough.  So we had in-service training.
12   Everybody was retrained in the operation of
13   it.  I actually talked Chief Dabadie into
14   appointing a commander over Mobile Field
15   Force, which was Mike Barrow.  And I was able
16   to send -- at the time, I believe, it was four
17   people to become updated and recertified in
18   civilian disturbance and Mobile Field Force
19   operations.  I did what I could to get us
20   prepared.  You just can't make them spend the
21   money when they need to sometimes.
22        Q    Sure.  I understand that.  Who were
23   the four people that you sought to get in
24   civilian disturbance response?
25        A    I knew you were going to ask me that.

1  The nights I remember was one a uniform

2  officer named Don Johnson.  John O'Donohue was

3  one of my trainers at the training academy at

4  the time, and I believe Mike Barrow went

5  through it, himself.  And the fourth name --

6  I'm sorry.  It slips my mind at the moment.

7      Q    That's okay.  I appreciate it.  So at

8  the time when you were meeting with your

9  counterparts in other law enforcement agencies

10  on the logistics or operations side, were you

11  also connecting with your supervisors and the

12  supervisors of those counterparts?  In other

13  words, people like Chief Dabadie or Colonel

14  Edmonson or Sheriff Gautreaux or, for that

15  matter, the mayor or the governor?

16     A    I never attended any of the

17  governor's meetings.  I know they had -- I

18  know they did have meetings.  For me, it was

19  just the report back to Chief Dabadie.  I

20  talked to my counterparts with other agencies.

21  We had liaison officers always assigned to the

22  EOC.  So we always had that open

23  communication.  If there's anything that was

24  needed, you just turn to that person and you

25  ask for it.  We had morning briefings for the

```
 1   Chief and his command staff.  I attended some
 2   of them -- maybe half of them.  I don't know.
 3   Wayne Martin attended the others, because he
 4   was the daytime supervisor doing what I was
 5   doing for nights.  A lot of times -- most of
 6   the, Chief's meetings wouldn't happen until
 7   8:00 o'clock.  I got off at 6:00 a.m.  After
 8   being up all night -- unless it was something
 9   major happen -- I would go home.  And Wayne
10   Martin would give the Chief the briefings from
11   the night before.
12        Q    And there would be -- you might not
13   have been present for them, but there would
14   be, then, briefings on a daily basis in the
15   morning at MOHSEP?
16        A    Yes, sir.  Wayne Martin would have
17   been present, unless he would have been at a
18   Chief staff meeting.
19        Q    You mentioned in your testimony and
20   in your interrogatory answer -- or in the
21   City's interrogatory answer -- pardon me --
22   Colonel Stanton.  What role -- in terms of the
23   work that you were involved with of
24   coordinating operations, what role did Colonel
25   Stanton have?
```

1      A    My first expression that comes to my
2    head is Colonel Stanton was the man.  He was
3    in charge of whatever response Louisiana State
4    Police had at the time.  He led the first
5    meeting.  First time I ever met him.  He left
6    a grand impression, just a really well
7    put-together guy and guy that basically knew
8    what to do or knew what needed to be done.
9      Q    Were there regular meetings of those
10   of you who were the operations leadership of
11   the various law enforcement agencies?
12     A    Yes.  We would meet at EOC.  You
13   know, Todd Morris would stop by daily and
14   things that happened.  There was always end
15   shift change between Wayne Martin and his
16   counterpart and myself and mine, we would
17   meet, brief them on what intelligence had come
18   through, what events had taken place.  And
19   there were other meetings going on.  Louisiana
20   State Police had their own Emergency
21   Operations Center open and we had one of our
22   officers there as a liaison, just like they
23   had at our EOC.  The Governor's office had
24   their own things going on.  There were a lot
25   of moving pieces that -- you know, once the

```
 1    operations started for me, anyway, I was
 2    mostly just at EOC and didn't really attend a
 3    lot of those other meetings.  That information
 4    came to me through the liaison officer or
 5    through the commanders that I was associated
 6    with.
 7        Q    In what form of communication?  How
 8    would you receive the reports about those
 9    meetings?
10        A    Like I said, that normally would be
11    in person.  That would be Todd Morris stopping
12    by or the liaison officer from LSP being there
13    with us.  Sometimes Chuck Hurst would come by.
14    It was usually like an in-person meeting.
15    There were occasions where something may
16    happen or something that we could get
17    intelligence information off that I would call
18    Chief Dabadie about and say:  This what might
19    be happening or this is happening and this is
20    what I'm thinking.  His response was usually:
21    Whatever you think.  Whatever you need to do.
22    So -- but there were phone meetings or
23    in-person meetings.
24        Q    Thank you.  Was there anybody, either
25    you or probably more likely somebody who was
```

259

```
1    on your team that was assigned to take notes
2    or keep any kind of written documentation of
3    what different people were telling you would
4    be needed?
5         A    As far as -- Bryan Taylor would take
6    a lot of information.  If I was on the phone
7    with what command group or whatever or
8    something came through, he would be the guy
9    that would relay it to me.  He would take
10   information -- if I was in not available at
11   the time, he would take information and be the
12   person who relayed that information to me.
13   That was Bryan Taylor.
14        Q    Was there anyone -- I guess I'm
15   thinking, like, Radar O'Reilly in the old
16   "M.A.S.H." series -- which is going to date me
17   and Mr. Scott as people who sought
18   pre-syndication.  That was kind of the person
19   who followed you around and made sure, you
20   know, that there was a checklist of what was
21   to be done.
22        A    Yes, sir.  You mentioned Joel
23   Calahan's name earlier on that log-in.  He was
24   sort of that guy for daytime, and we had Randy
25   Richard for nighttime who would answer the
```

1   phone and jot on a note what came in,

2   something like that.  He would be kind of that

3   person that would document the note or the

4   information.

5        Q    Okay.  And when you were getting

6   information and trying to decide how best to

7   deploy -- or at least request the deployment

8   of the different agencies' resources at a

9   particular moment, did you -- like, did you do

10  all of that in your head or did you have a

11  white board like the one in that room behind

12  you?  How did you -- how did you, like, mark

13  it up to know:  Okay.  LSP will be here and

14  BRPD will be here.  And these other sheriffs

15  will be over here.  How physically what did

16  that look like?

17       A    It was a mess, to be honest.

18       Q    I'm sure.

19       A    That's a great question, Mr. Jim.

20  And the white board like you see behind me was

21  in the EOC room, which is not much bigger than

22  the one I'm sitting in.  White board literally

23  went around the entire room.  Because I

24  remember the second weekend of protests, we

25  really had the most manpower we ever had.  We

1    had over 600 people assigned just to EOC --

2    not out there answering emergency calls --

3    just assigned to EOC.  I remember talking to

4    Bryan Taylor, looking at these white boards,

5    if we have to deploy everybody, how are we

6    going to keep track of everybody?  Right?

7    There's technology that we didn't have at the

8    time that we have now, and it makes it much

9    more simple.  For us, yeah, write this on the

10   white board.  It's easy to wipe it off or

11   change, if you need to.  That was the way we

12   operated, honestly.

13        Q    Was there anyone -- sometimes in

14   meetings involving white boards, somebody is

15   assigned or takes it on themselves to take a

16   picture of the white board so that it can be

17   erased and used for something else.  Do you

18   remember any kind of practice to try to keep

19   up with what was being written on the white

20   board?

21        A    I remember JoAnn Morrow who was in

22   charge of -- who is the Director of Office of

23   Homeland Security at the time.  And if we

24   mentioned running out of space, she came in

25   with another white board, whatever was needed.

```
 1    You need another white board?  Here it is.  It
 2    was one of those type of deals.  She heard
 3    mention -- we didn't have to ask for things.
 4    Sometimes it just showed up.  We really had
 5    everything we needed when it came to that.
 6         Q    So was Ms. Morrow and the other
 7    MOHSEP folks, were they basically the mayor's
 8    liaison with the operations level of the
 9    police department or was there anybody else in
10    the mayor's office who was involved with that?
11         A    No.  I don't recall the mayor,
12    himself, ever coming by.  I'm assuming
13    Ms. JoAnn kept him informed as to the
14    activities.  But to my knowledge, she was the
15    representative for the mayor's office.
16         Q    And you referenced that Baton Rouge
17    Police Department had someone as a liaison,
18    for example, at the State Police's EOC and
19    vice versa.  You know this question is coming.
20    Do you remember who those people were?
21         A    I remember one.
22         Q    Okay.
23         A    John O'Donohue, who I mentioned as
24    being one of my instructors for Mobile Field
25    Force.  I remember he -- I think he served the
```

```
 1   daytime operations there.  I honestly don't
 2   remember who we had at night over there.  But
 3   I know he was within of them.
 4            MR. CRAIG:
 5                 I am going to tender you,
 6            Captain, to either Mr. Etter or
 7            Mr. Most.  And in the meantime, I'll
 8            confer with Ms. Lomers-Johnson if we
 9            have any other questions about Topic
10            7 for our clients.  I don't know
11            which of the two of you lawyers wants
12            to go next, but here you come.
13            THE WITNESS:
14                 Yes, sir.  Mr. Jim, not good
15            circumstances to see you, but good
16            see you.
17            MR. CRAIG:
18                 I told you we'd meet again.
19            We'll probably meet again after this,
20            too.
21            MR. FAHRENHOLT:
22                 If no one else has questions, I
23            actually have a few things I'd like
24            to ask you.
25            THE WITNESS:
```

```
 1                Yes, sir.
 2          MR. CRAIG:
 3                I have to get on camera, so I
 4          can go --
 5          MR. FAHRENHOLT:
 6                There's been a few today, Jim.
 7          You really missed the show.
 8                       EXAMINATION
 9    BY MR. FAHRENHOLT:
10          Q    So you testified in response to
11    questions by Mr. Craig that you had been kind
12    of following the protests that were going in
13    other cities around the country, correct?
14          A    Correct.
15          Q    And to place July 10th into the
16    timeline of what was going on, you know Alton
17    Sterling was killed in Baton Rouge by the
18    police on July 5th, correct?
19          A    Yes.
20          Q    And a day later on July 6 Philando
21    Castile was killed in the Minneapolis,
22    St. Paul area, correct?
23          A    Correct.
24          Q    There were a number of protests going
25    on nationwide involving those two incidents,
```

1    correct?

2        A    Yes, sir.

3        Q    And we've discussed today the issue

4    that there was some belief that some of the

5    protesters in Baton Rouge were going onto the

6    interstate and blocking the interstate.

7        A    Okay.

8        Q    On July 7th, a few days earlier in

9    Oakland, California, protesters blocked the

10   interstate.  Were you aware of that at that

11   time?

12       A    I remember watching it, yes, sir.

13       Q    The night before July 10th, July 9th,

14   in Baton Rouge, there was an effort for

15   protesters to block the I-12 near Airline

16   Highway, correct?

17       A    Yes, sir.

18       Q    In the early morning hours between

19   July 9th and July 10th, were you aware that in

20   Memphis, protesters blocked the interstate?

21       A    Yes, sir.

22       Q    At the same time, late night

23   July 9th, early morning July 10, in Columbia,

24   South Carolina, protesters blocked the

25   interstate.  Were you aware of that?

```
1        A    I don't remember that particular one.
2    I know they were happening everywhere.  I
3    recall watching it on TV.
4        Q    Again, I'll represent to you on late
5    night, July 9th, early morning, July 10,
6    St. Paul, Minnesota, the interstate was
7    blocked.  Were you aware of that?
8        A    I think I remember that one, yeah.
9        Q    In all of these events -- I mean, we
10   live in the age of social media, so all of
11   these events, they're all filmed on cameras;
12   they're all posted on social media.  And word
13   gets around pretty quickly, correct?
14       A    That's correct.  One thing I
15   believe you might may have mention, it wasn't
16   an interstate occupation, but Dallas police
17   were monitoring a peaceful protest, and an
18   active shooter came and murdered five of them.
19   I believe that happened on the 7th.
20       Q    Sure.  There's a lot going on.
21       A    There's a lot of tenson, a lot of
22   nervous people, a lot of scared people.  It
23   was just a boiling point in the United States
24   where -- I mean, the worse thing you could
25   imagine could have happened.
```

1      Q     And you've testified today that

2   through undercover officers -- or whatever

3   means -- Baton Rouge Police Department

4   obtained information and they believed that

5   protesters at the corner of East and France

6   were also going to take the interstate and

7   block it, correct?

8      A     Yes.

9      Q     Did you consider all of these other

10  incidents that were occurring around the same

11  time -- in fact, many of them on the same

12  day -- in determining whether that

13  intelligence or information you were provided

14  might be credible?

15     A     We believed it was, yes.

16     Q     So when you heard this idea that

17  these protesters at East and France might be

18  trying to get on to I-110 to block it, this

19  wasn't some crazy idea that no one had ever

20  heard of, correct?

21     A     No, it was a common practice for

22  protesters to -- I guess to gain attention.

23  So, yes, it was a common practice and we were

24  aware of it.

25     Q     So based on your knowledge -- and

```
 1   this is directed to the City of Baton Rouge.
 2   Based on the City's awareness that all of
 3   these events were happening in these other
 4   cities -- including that it was attempted the
 5   night before -- is it the City's position that
 6   it was reasonable for the department to
 7   believe that there was a credible threat on
 8   July 10th, that the protesters at East and
 9   France were going to attempt to enter and
10   block the I-110?
11              MR. CRAIG:
12                   Object to the form, please.
13              MR. FAHRENHOLT:
14                   You can answer the question.
15              THE WITNESS:
16                   I had no doubt that that's what
17              their intentions were.
18              MR. FAHRENHOLT:
19                   Okay.  I have no other questions
20              on this.  Thank you.
21              MR. MOST:
22                   I'm sorry.  I stepped away, but
23              I'm back.  But I don't have any
24              questions right now.  So.
25              MR. CRAIG:
```

```
 1              Mr. Etter, do you have
 2         questions?
 3              We can't hear you, but it sounds
 4         like you're saying you don't.
 5    MR. ETTER:
 6              I do not have questions at this
 7         point on this topic.
 8    MR. MOST:
 9              I believe that's the last one
10         that the captain was designated for.
11         Is that right, Joe.
12    MR. SCOTT:
13              It is.
14    MR. MOST:
15              Okay.  So then I think we are
16         then likely wrapped for the day.
17         I'll send out an email with
18         tomorrow's link and the topics you
19         identified in your letter, Joe.  And
20         we talked this morning about trying
21         -- that you would try to see if we
22         could cover 10 and 12 tomorrow, as
23         well.
24    MR. SCOTT:
25              I have a plan.  I don't know if
```

1          I have time to implement that plan,

2          but I'm going to try.

3                    *        *        *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                WITNESS' CERTIFICATE

2

3           I, MICHAEL BARROW, do hereby certify

4    that the foregoing testimony was given by me,

5    and that the transcription of said testimony,

6    with corrections and/or changes, if any, is

7    true and correct as given by me on the

8    aforementioned date.

9

10

11   Dated: _____  Signed:_____

12                          MICHAEL BARROW

13

14

15   _____  Signed with corrections as noted.

16

17   _____  Signed with no corrections noted.

18

19

20

21   DATE TAKEN: August 18, 2021

22

23

24

25
```

```
1                    WITNESS' CERTIFICATE

2

3              I, JAMES DARRON LEACH, do hereby

4     certify that the foregoing testimony was given

5     by me, and that the transcription of said

6     testimony, with corrections and/or changes, if

7     any, is true and correct as given by me on the

8     aforementioned date.

9

10

11    Dated: _____   Signed:_____

12                              JAMES DARRON LEACH

13

14

15    _____   Signed with corrections as noted.

16

17    _____   Signed with no corrections noted.

18

19

20

21    DATE TAKEN: August 18, 2021

22

23

24

25
```

1

2                C E R T I F I C A T E

3

4          I, CECILIA M. HENDERSON, Certified
Court Reporter, in and for the State of
5   Louisiana, as the officer before whom this
testimony was taken, do hereby certify that
6   MICHAEL BARROW AND JAMES DARRON LEACH  after
having been duly sworn by me upon authority of
7   R.S. 37:2554, did testify as hereinbefore set
forth in the foregoing 272 pages; that this
8   testimony was reported by me in the stenotype
reporting method, was prepared and transcribed
9   by me or under my personal direction and
supervision, and is a true and correct
10  transcript to the best of my ability and
understanding; that the transcript has been
11  prepared in compliance with transcript format
guidelines required by statute or by rules of
12  the board, that I have acted in compliance
with the prohibition on contractual
13  relationships, as defined by Louisiana Code of
Civil Procedure Article 1434 and in rules and
14  advisory opinions of the board; that I am not
related to counsel or to the parties herein,
15  nor am I otherwise interested in the outcome
of this matter.

16

17         Dated this 22nd day of September, 2021

18

19

20

21         CECILIA M. HENDERSON, CCR
           CCR #84099
22         STATE OF LOUISIANA

23

24

25