UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


BLAIR IMANI, et al

        Plaintiffs

V.                   Docket No. 17-cv-00439-JWD-EWD


CITY OF BATON ROUGE, et al

        Defendants


     DEPOSITION OF DETECTIVE ALEX T. BELL, given via Zoom Videoconferencing in the above-entitled cause, pursuant to the following stipulation, before Raynel E. Schule, Certified Shorthand Reporter in and for the State of Louisiana, commencing at 11:35 o'clock a.m., on Thursday, the 12th day of August, 2021.

```
 1                    EXAMINATION INDEX

 2                                        Page

 3   Caption                              1
     Appearances                          3
 4   Agreement of Counsel                 4
     Examination
 5        MR. MOST                        6
          MR. CRAIG                      56
 6   Reporter's Certificate              72

 7

                      EXHIBIT INDEX
 8
     EXHIBIT BB                          29
 9   EXHIBIT C                31
     EXHIBIT WWWWW                       44
10   EXHIBIT WWWWWWW                     44
     EXHIBIT C                           50
11   EXHIBIT D                           52
     EXHIBIT B                           55
12   EXHIBIT JJJJJ                       61

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   APPEARANCES (Via Videoconferencing):
 2   For the Plaintiffs (Imani v. City of Baton
          Rouge):
 3
     LAW OFFICES OF WILLIAM MOST
 4   Attorneys at Law
     BY:  WILLIAM MOST, ESQ.
 5        DAVID LANSER, ESQ.
     201 St. Charles Avenue, Suite 114#101
 6   New Orleans, Louisiana   70170
     Email:  david.lanser@gmail.com
 7
     For the Plaintiffs (Smith v. City of Baton
 8        Rouge, Batiste-Swilley v. City of Baton
          Rouge, and Tennart v. City of Baton
 9        Rouge):
10   RODERICK AND SOLANGE MacARTHUR JUSTICE CENTER
     Attorneys at Law
11   BY:  JIM CRAIG, ESQ.
          ERIC FOLEY, ESQ.
12        MANDISA MOORE-ONEAL, ESQ.
     4400 S. Carrollton Avenue
13   New Orleans, Louisiana   70119
     Email: eric.foley@macarthurjustice.org
14
     For City/Parish of Baton Rouge and Baton Rouge
15        City Police Department Officers:
16   OFFICE OF THE EAST BATON ROUGE PARISH ATTORNEY
     Attorneys at Law
17   BY:  JOSEPH SCOTT, ESQ.
     222 St. Louis Street, 9th Floor
18   Baton Rouge, Louisiana   70802
     Email:joseph@josephscott.com
19
     For Louisiana State Police and Individual State
20        Police Troopers:
21   MESSRS. BURGLASS & TANKERSLEY
     Attorneys at Law
22   BY:  GREGORY FAHRENHOLT, ESQ.
     5213 Airline Drive
23   Metairie, Louisiana   70001-5602
     Email:  gfahrenholt@burglass.com
24
     Reported By:  Raynel E. Schule
25                 Certified Shorthand Reporter
```

1                    S T I P U L A T I O N

2           It is stipulated and agreed by and

3    among Counsel for the parties hereto that the

4    deposition of DETECTIVE ALEX T. BELL is hereby

5    being taken pursuant to the Federal Rules of

6    Civil Procedure for all purposes in accordance

7    with law;

8           That the formalities of reading and

9    signing are not specifically waived;

10           That the formalities of sealing,

11    certification, and filing are hereby

12    specifically waived.

13           That all objections, save those as to

14    the form of the question and responsiveness of

15    the answer, are hereby reserved until such time

16    as this deposition or any part thereof is used

17    or sought to be used in evidence.

18                    *  *  *  *  *

19           Raynel E. Schule, Certified

20    Shorthand Reporter in and for the State of

21    Louisiana, officiated in administering the oath

22    to the witness.

23

24

25

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

```
 1                    PROCEEDINGS
 2           THE COURT REPORTER:
 3               Would counsel please identify
 4           themselves and their affiliations
 5           and also stipulate that by agreement
 6           of all parties, this deposition is
 7           being held via videoconferencing,
 8           and there is no objection to the
 9           witness being sworn in remotely.
10           MR. MOST:
11               This is William Most.  I have
12           with me Dave Lanser.  We represent
13           the Imani Plaintiffs, and we agree
14           to that stipulation.
15           MR. CRAIG:
16               My name is Jim Craig.  I
17           represent the Plaintiffs in the
18           Tennart, Smith, and Batiste-Swilley
19           cases.  My colleague, Eric Foley is
20           also appearing in this deposition.
21           We have no objections with the
22           proposed stipulations.  Thank you.
23           MR. FAHRENHOLT:
24               This is Greg Fahrenholt.  I
25           represent Louisiana State Police
```

```
 1              employees in five different
 2              lawsuits.  We have no objections to
 3              the stipulation.
 4                   MR. SCOTT:
 5                   Joseph Scott for the City of
 6              Baton Rouge, Parish of East Baton
 7              Rouge, Baton Rouge Police
 8              Department, approximately 184
 9              individual officers, including Alex
10              Bell.  We accept that stipulation
11              for purposes of today's deposition.
12              DETECTIVE ALEX T. BELL, having been
13       first duly sworn by Raynel E. Schule,
14       Certified Shorthand Reporter, was examined
15       and testified on his oath as follow:
16                   MR. MOST:
17                   Great, and while we're in the
18              stipulating phase, Joe, can we
19              stipulate that this deposition was
20              properly noticed, and the Court
21              Reporter is duly qualified?
22                   MR. SCOTT:
23                   Yes, we can do that.
24                        EXAMINATION
25       BY MR. MOST:
```

```
1   Q.   All right.  Good morning, Mr. Bell.  How
2        are you?
3   A.   I'm good.  How are you?
4   Q.   Doing all right.  Mr. -- Mr. Bell, could
5        you give us your full name and title for
6        the -- the court reporter.
7   A.   Yes, Alex Tremaine (phonetic) Bell, Baton
8        Rouge Police Department, Homicide Division,
9        Detective.
10  Q.   Okay, and Detective, would you like me to
11       call you Detective Bell, Officer Bell, Mr.
12       Bell?  Do you have a preference?
13  A.   I don't.
14  Q.   Okay.  I'll -- I'll probably most likely
15       call you Detective or Officer since that
16       comes most naturally to me.  You're a
17       little bit faint, so perhaps if you move a
18       little closer to the mic and -- and just
19       make an effort to -- to speak up, it will
20       make easier for our court reporter today.
21  A.   All right.
22  Q.   That's better.  Detective, have you ever
23       given a deposition before?
24  A.   I haven't.
25  Q.   Okay.  So a deposition that we are taking
```

```
 1         is -- is under oath, and -- and you just
 2         swore an oath to tell the truth, correct?
 3    A.   Correct.
 4    Q.   So you understand that your answers here
 5         today are sworn testimony and have the same
 6         force as if we were in a courtroom with a
 7         Judge and Jury?
 8    A.   Correct.
 9    Q.   And because it's sworn testimony, you
10         understand that it's subject to penalty of
11         perjury?
12    A.   Correct.
13    Q.   Okay, and is there anything, an illness,
14         medication, anything else that will prevent
15         you from giving us your full attention and
16         truthful and complete answers today?
17    A.   No, sir.
18    Q.   All right, and since you haven't taken a
19         deposition before, you may not know that we
20         will be asking questions.  I will ask you
21         some questions.  Some representatives from
22         the MacArthur Justice Center may ask some
23         questions, but this does not have to be
24         continuous.  We can take breaks.  So if at
25         any point you need to take a break to get
```

1      some water, use the restroom, anything
2      else, just let Mr. Scott or myself know,
3      and we will take a break; however, I will
4      tell you in advance that after any break, I
5      will ask you who you talked during the
6      break and whether you looked at any
7      documents, and I will ask you about the
8      contents of your conversation even if it's
9      with your attorney.  Is that -- you get all
10     that?
11  A.   Yes, sir.
12  Q.   Got you, okay.  And Detective, one thing
13     you are already doing well is waiting until
14     I finish the question before providing your
15     answer, and I will try and do my best to --
16     to return that courtesy to you by waiting
17     until you're finish speaking before I ask
18     the next question.  That way we'll work
19     together to create a clean transcript for
20     our court reporter, all right?
21  A.   Yes, sir.
22  Q.   One thing that is important is, if I ask a
23     question and I'm not clear or you don't
24     understand my question, will you agree to
25     let me know that it's not clear or you

1     don't understand rather than just trying to
2     answer it anyway?
3  A.  I will.
4  Q.  Thank you.  Also, because this is a Zoom
5     deposition, we can't see the entire room
6     that you're sitting in.  Is there anyone in
7     the room besides you and Mr. Scott right
8     now?
9  A.   No, sir.
10 Q.  Okay, and -- and we also can't see if
11    anyone tries to communicate with you
12    necessarily.  I don't expect that to be a
13    problem; however, I'll -- just in an
14    abundance of caution, I'll ask you will you
15    agree to tell us if anyone tries to
16    communicate with you during this deposition
17    either by hand signal, a passed piece of
18    paper, text message, phone call, anything
19    like that?
20 A.   I will.
21 Q.  Thank you.  All right.  Detective, do you
22    know what -- what cases you're here for
23    today?
24 A.   I'm aware of two individuals, yes, Blair
25    Imani.  I can't remember the other person's

1         name.

2    Q.   Sure.  So by, "Blair Imani," you may be

3         referring to the case that I'm an attorney

4         on, which is the Imani v. City of Baton

5         Rouge case.  Do you understand that that's

6         a case about a number of protestors who

7         were arrested during the July 2016

8         protests?

9    A.   Yes, sir.

10   Q.   Okay, and Mr. Craig and Mr. Foley represent

11        some other cases, some other protestors in

12        other cases that they may articulate later,

13        and Mr. Fahrenholt represents the State

14        Police Trooper Defendants.  Detective Bell,

15        do you understand that you are a defendant,

16        in other words, one of the people being

17        sued in at least some of these cases?

18   A.   Correct, I do.

19   Q.   Okay.  Was today the first time you learned

20        that you were being sued in one or more of

21        these cases?

22   A.   No, sir.

23   Q.   Okay, and did you do anything to prepare

24        for this deposition?

25   A.   I looked over the cases that I wrote for

```
 1        the -- for this incident.
 2   Q.   Okay.  Aside from your attorney, did you
 3        talk to anyone about anything to prepare
 4        for this deposition?
 5   A.   No, sir.
 6   Q.   Okay, and when you say you -- you looked at
 7        the cases you wrote, what documents are you
 8        -- are you describing there?
 9   A.   A report on the report writing system we
10        had at the time.  I just looked up the file
11        number and looked over what I did on that
12        date.
13   Q.   Okay.  So you looked it up in the Baton
14        Rouge Police Department computer system?
15   A.   Correct.
16   Q.   Okay, and -- and was it for one arrestee or
17        -- or multiple arrestees?
18   A.   I just remember one that was in the report
19        writing system.
20   Q.   Okay, and do you know the name of that
21        person?
22   A.   I -- I don't recall.
23   Q.   Okay.  If I said Daniel Liebeskind, would
24        that -- would that ring a bell?
25   A.   Yes.
```

1    Q.    Okay.  So was it Daniel Liebeskind's report
2          that you read in preparation for this
3          deposition?
4    A.    Yes, sir.
5    Q.    Okay, and -- and when you say you looked up
6          in the system, you looked at the Incident
7          Report.  Is that right?
8    A.    Correct.
9    Q.    Did you look at any other documents in
10         addition to the Incident Report to prepare
11         for this deposition?
12   A.    No, sir.
13   Q.    Okay.  Did you look at the Affidavit of
14         Probable Cause for Mr. Liebeskind?
15   A.    Yes, sir, I looked at the narrative part,
16         which would be the PC evidence of what I
17         wrote.
18   Q.    Okay.  Did you look a -- a  --
19                MR. SCOTT:
20                Narrative on your report or the
21             narrative on the Affidavit of
22             Probable Cause?
23                THE WITNESS:
24                It was the report on the system.
25   BY MR. MOST:

1    Q.   Okay, and -- and that's an electronic

2         document.  It's not something physically

3         signed.  Is that correct?

4    A.   Correct.

5    Q.   Okay.  Did you look at anything with your

6         physical signature on it to prepare for

7         today's deposition?

8    A.   I did look at some documents, but over the

9         time I was given some documents through

10        emails of what we --

11   Q.   Okay.

12   A.   So I did see them.

13   Q.   Okay.  So can you tell me what are those

14        documents that you looked at.

15   A.   It was a rap -- it was the PC that --

16        Affidavit that we wrote.  Pretty much it

17        had the PC data.  You want me to get one or

18        you just want me to tell you what I

19        remember from it?

20   Q.   No.  I -- I'm just trying to figure out

21        what are the documents.  So just as an

22        initial matter, I'm just trying to figure

23        out what is the universe of documents you

24        looked at to prepare for this deposition.

25        So I think we've got you looked up the

```
 1          Incident Report on the electronic system.
 2    A.    Yes.
 3    Q.    You looked -- you looked at an Affidavit of
 4          Probable Cause for Liebeskind.  Is that
 5          right?
 6    A.    Correct.
 7    Q.    Any other documents you looked at?
 8    A.    No, sir, not that I can remember.
 9    Q.    Okay, and are there any documents on the
10          table in front of you for you to reference
11          during this deposition?
12    A.    There are.
13    Q.    Okay.  What are those documents?
14                  MR. SCOTT:
15                  William, I've -- I've got all the
16              documents -- well, they're scattered
17              all over the place, but they are not
18              immediately adjacent to Detective
19              Bell, and I grabbed some that I
20              thought you might ask about.
21                  MR. MOST:
22                  Okay.  Let's just keep those sort
23              of, you know, turned over, and then
24              if -- if you want to show him
25              something, we'll just address it
```

```
 1            when that happens.
 2   BY MR. MOST:
 3   Q.   So Detective, are -- are there any
 4        documents you can currently read on the
 5        table?
 6   A.    No, sir.
 7   Q.   Okay, great.  And -- and Detective Bell, a
 8        -- a deposition is not a pop quiz, so we
 9        will be looking at documents to -- you
10        know, to determine what happened and your
11        involvement.  So we'll be asking you
12        questions about what you remember.  We'll
13        be looking at documents, and we'll take it
14        from there.  All right.  So Detective, you
15        are currently an officer with the Baton
16        Rouge Police Department?
17   A.    Currently, yes, sir.
18   Q.   Okay.  Could you give me the very short
19        version of your educational and
20        professional background, please.
21   A.    From Baton Rouge.  I went to Baton Rouge
22        Community College, have a two-year degree
23        in business.  I became an officer in 2015,
24        worked on the street for three years,
25        worked in Uniform Patrol for three years,
```

```
1          became a detective the fourth year, worked
2          in Major Assaults dealing with non-fatal
3          shootings and other crimes.
4     Q.   I'm sorry.  Our court reporter is -- is
5          signaling that she's having a little
6          trouble hearing you.
7                    THE COURT REPORTER:
8                    "The fourth year, worked in the
9               major"  something.  I couldn't hear.
10                   THE WITNESS:
11                   Major Assaults -- worked in Major
12              Assaults Division --
13                   THE COURT REPORTER:
14                   Okay.
15                   THE WITNESS:
16                   -- for two -- for two years, and
17              I recently transferred to Homicide
18              in March of 2021.
19    BY MR. MOST:
20    Q.   So you've been a Baton Rouge Police Officer
21         for six years?
22    A.   Correct.
23    Q.   Okay.  Were you a law enforcement officer
24         at any other law enforcement agency?
25    A.   No, sir.
```

1    Q.    Okay, and -- and what was your -- did you
2          go straight from school to being an officer
3          or did you have another career prior to
4          being an officer?
5    A.    I worked at Target for eight years.  I did
6          different positions.  The last position I
7          did was Loss Preventions.
8    Q.    Okay, and this is a question I ask of every
9          person at a deposition.  It's not specific
10         to you, but have you ever been arrested?
11   A.    No, sir.
12   Q.    Okay.  So you're currently a Homicide
13         Detective, correct?
14   A.    Correct.
15   Q.    What was your role in July of 2016?
16   A.    Uniform Patrol Officer.  I worked at First
17         District.
18   Q.    And do you recall that there were protests
19         in Baton Rouge in July of 2016?
20   A.    I am aware.
21   Q.    Okay, and were you -- as an officer were
22         you assigned to work at any of those
23         protests in July of 2016?
24   A.    I was.
25   Q.    Do you recall in particular Sunday, July

1       10th, 2016, a protest in the vicinity of
2       East and France Streets?
3   A.   I'm aware of it, yes, sir.
4   Q.   Okay.  Do you recall that -- that protest?
5   A.   I do.
6   Q.   Okay, and so if I talked about the East and
7       France Street protest, that's what I'll be
8       describing today.  Will you understand
9       that?
10  A.   Yes, sir.
11  Q.   Okay.  What was your role or assignment on
12      that day at the East and France Street
13      protests?
14  A.   It was -- it was paper processing.  Pretty
15      much the officers would get whoever
16      violated the crime, they would bring them
17      to us, and we would write up the paperwork.
18  Q.   Okay, and -- and was that a -- we've heard
19      testimony that there was a sort of a
20      paperwork processing area set up on
21      Government Street.  Is that where you were?
22  A.   Right.
23  Q.   Okay.  So your role that day was to receive
24      arrestees who had been arrested by other
25      Officers and process their paperwork?

```
1   A.   Correct.
2   Q.   Okay.  So you didn't personally cause
3        anyone to be arrested that day.  Is that
4        accurate?
5   A.   No, sir, I didn't.
6   Q.   Okay.  You didn't witness the specifics of
7        -- of what anyone was alleged to have
8        committed any crime that day.  Is that
9        correct?
10  A.   No, sir, I did not witness.
11  Q.   Okay, and so just so I understand how this
12       works, I understand where you were on
13       Government Street, you couldn't -- you
14       weren't within eyesight of East and France
15       where most of the protestors were, correct?
16  A.   I could see people in the street and
17       everything.  I could see -- I could see
18       stuff going on, yes, sir.
19  Q.   Okay, but -- but you couldn't see where
20       people were actually being put into cuffs,
21       that area?
22  A.   Don't recall.
23  Q.   Okay, but you -- you do recall that people
24       were brought to you in handcuffs by
25       arresting officers, and then you would do
```

```
 1        their paperwork, right?
 2   A.   Correct.
 3   Q.   Okay.  So an officer would bring you an
 4        arrestee, and then would they drop that
 5        arrestee off and then return to kind of
 6        where the action was?
 7   A.   Correct.
 8   Q.   Okay, and did you have a -- a -- would you
 9        have a conversation with that arresting
10        officer or the officer that brought you the
11        arrestee about the arrestee?
12   A.   No, sir.  Only thing I can remember is, you
13        know, they bring them to us.  If they had
14        an ID, we got the ID and did the paperwork.
15        Like I said, that's all -- that's all I
16        remember.
17   Q.   Okay.  So you don't recall any, like,
18        discussions with those officers about the
19        specifics of what any particular arrestee
20        did that was illegal, right?
21   A.   No, sir.
22   Q.   And by, "No, sir," you mean you don't have
23        any recollection of any such conversation,
24        correct?
25   A.   Correct, I don't recall what --
```

1    Q.    Yeah.

2    A.    -- what -- what conversation took place.

3    Q.    Okay, but it sounds like if there was any

4          conversation that took place, it was sort

5          of limited to determining the identity of a

6          particular arrestee.  Is that right?

7    A.    Possibly, yes, sir.

8    Q.    Okay.

9    A.    To found out who the person was to write

10         their name down.  That's it.

11   Q.    But at no point did you ever have any

12         lengthy conversation with any officer about

13         the specifics of a particular arrestee,

14         correct?

15   A.    Correct.

16   Q.    Okay, and so the Affidavits of Probable

17         Cause -- actually, let me back up a second.

18         When you say you were doing the paperwork

19         for arrestees, what kind of paperwork are

20         you talking about?

21   A.    The Affidavit, the arrest form.

22   Q.    Okay.  Is that two different documents or

23         are you talking about one document?

24   A.    One document, the probable cause sheet.

25   Q.    Okay, and -- and that's the Affidavit of

```
 1          Probable Cause?
 2    A.    Correct.
 3    Q.    Okay, and on July 10th, 2016, you had been
 4          supplied with preprinted Affidavits of
 5          Probable Cause, correct?
 6    A.    Correct.
 7    Q.    Okay, and so these preprinted Affidavits of
 8          Probable Cause already had a pre-written
 9          synopsis and the crime identified in
10          advance, but had a blank for the arrestee's
11          name, correct?
12    A.    Correct.
13    Q.    Okay, and then you would sign these
14          Affidavits as the affiant, correct?
15    A.    Correct.
16    Q.    And then another officer would notarize
17          your signature.  Is that correct?
18    A.    Yes, sir.
19    Q.    And -- and -- and how did that work?  Would
20          you stand in front of the -- the Notary,
21          and they would watch you sign it or would
22          you, like, sign it and then hand it off to
23          the Notary, and, you know, and -- and they
24          would look at it?
25    A.    We would just sign.  We did our part of the
```

```
 1        paperwork, and I believe it was passed down
 2        and just let the Notary sign it.
 3   Q.   Okay.  So you weren't signing it physically
 4        in front of the Notary, then.  Is that
 5        correct?
 6   A.   No, sir, not that I can recall.
 7   Q.   By, "No, sir," you mean I'm correct in
 8        saying --
 9   A.   Yeah, I don't -- I don't remember if a
10        Notary was there present or not.
11   Q.   Okay.  Were there any printers present to,
12        like, print out new Affidavits of Probable
13        Cause?
14   A.   Not that I can recall.
15   Q.   Yeah.  Were there any blank Affidavits of
16        Probable Cause that had no synopsis that
17        could be filled in?
18   A.   Not that I observed.
19   Q.   Okay, and what -- what were your orders
20        that day?  Were you to receive arrestees
21        and you were told to fill out these
22        Affidavits of Probable Cause for them?
23   A.   Correct.
24   Q.   Okay.  So I want to ask a few questions
25        about what is an Affidavit of Probable
```

1          Cause so we're on the same page about what
2          that document is and what it means, all
3          right?
4     A.   All right.
5     Q.   So the Code of Criminal Procedure describes
6          an Affidavit of Probable Cause -- this is
7          Code of Criminal Procedure, Article 385 as
8          quote, "An Affidavit is a written
9          accusation of crime made under oath and
10         signed by the Affiant."  Does that sound
11         about right as -- as your understanding of
12         what an Affidavit of Probable Cause is?
13    A.   Yes, sir.
14    Q.   Okay.  So an Affidavit of Probable Cause,
15         it has to be a truthful description of the
16         reason that someone is being arrested,
17         correct?
18    A.   Yes.
19    Q.   It has to truthfully detail the facts of
20         what they did that was wrong and caused
21         them to be arrested, correct?
22    A.   Correct.
23    Q.   It has to essentially say this particular
24         arrestee at this time and place did this
25         illegal thing, correct?

26

```
 1   A.   Right.
 2   Q.   Okay, and the Affidavit of Probable Cause
 3        therefore is -- it's the document that
 4        justifies the arrest, that tells you
 5        whether you have a justified arrest or a
 6        false arrest, correct?
 7   A.   Explain that.
 8   Q.   Sure.  So let's say there was an Affidavit
 9        of Probable Cause that was full of
10        completely made-up facts.  If -- if someone
11        was arrested and a completely made-up facts
12        Affidavit was filled out for them, and then
13        that was used to book them into prison,
14        that would be a false arrest, correct?
15   A.   Correct.
16   Q.   Okay, and -- and if an officer were to just
17        sign their name to made-up facts or -- or
18        false facts in an Affidavit of Probable
19        Cause, that would be the manufacturing of
20        false evidence, correct?
21   A.   Right.
22   Q.   Okay, and one of the reasons an Affidavit
23        of Probable Cause is important from a
24        police officer's perspective is you have to
25        have one filled out and executed before you
```

```
 1          can book an arrestee into the East Baton
 2          Rouge Parish Prison, correct?
 3     A.    Right.
 4     Q.    So if an officer were to put false facts
 5          and -- and swear to the truth of them in an
 6          Affidavit of Probable Cause and then send
 7          them off to the East Baton Rouge Parish
 8          Prison with that false Affidavit, that
 9          would be false imprisonment, correct?
10     A.    Depend on the circumstances.  It just
11          depends.
12     Q.    Okay.  Under what circumstances, would that
13          not be false imprisonment?
14     A.    You're saying if an officer arrests someone
15          that doesn't have the correct facts in the
16          PC?
17     Q.    Right.  So if an officer signs an Affidavit
18          of Probable Cause under oath, and it has
19          got false facts in it and then they use
20          that to send someone off to the -- the
21          prison, it seems to me that would be false
22          imprisonment.  Would you agree?
23                    THE WITNESS:
24                    Answer?
25                    MR. MOST:
```

```
1                    Hold on one second.
2                    MR. SCOTT:
3                    I'm not allowed to consult --
4                    THE WITNESS:
5                    All right.  All right.
6                    MR. SCOTT:
7                    -- with you in the middle of a
8           question.
9                    THE WITNESS:
10                   Let's look up false imprisonment.
11   BY MR. MOST:
12   Q.   I'm sorry.
13   A.   Let's -- let's look up false imprisonment.
14   Q.   Okay.  You know, we don't have to look up
15        the law.  I'm just trying to get your sense
16        of things.
17   A.   Got you.  It's -- my thing is false
18        imprisonment is holding -- one definition
19        that I know is holding someone against
20        their will or holding them -- that's the
21        false imprisonment that I know of.  Not
22        necessarily false facts that can put
23        somebody in prison.  That's -- that's --
24        and I don't know that part of it if it is.
25   Q.   Okay, and filling out an Affidavit of
```

1    Probable Cause, that's a duty of the
2    arresting officer, correct?
3  A.   Yes.
4  Q.   Okay.  That's the duty of the officer who
5       caused the arrest of a particular arrestee?
6  A.   Correct.
7  Q.   Okay.  All right.  So let's look up --
8       well, let's first start with -- okay.  I'm
9       going to share a document with you.  Okay.
10      This is "Exhibit BB."  Do you see, Officer
11      Bell, this -- this document that's on the
12      screen right now?
13 A.   I do.
14 Q.   And do you see that these were discovery
15      responses provided on -- on your behalf by
16      the lawyers on your side?
17 A.   I do.
18 Q.   Okay.  I'm going to skip down to Page 23 of
19      "Exhibit BB" and -- and do you see that
20      these were the questions particularly
21      directed to you?
22 A.   I do.
23 Q.   Okay, and you see Request For Admission 1
24      asks you to admit that you signed the July
25      10th, 2016, Affidavit of Probable Cause for

1        Plaintiff Daniel Liebeskind.  You see that
2        question?
3   A.   I do.
4   Q.   And -- and you see that that's admitted?
5   A.   Correct.
6   Q.   Okay.  That --
7                  MR. SCOTT:
8                  You said admitted?
9                  MR. MOST:
10                 Admitted.
11                 THE WITNESS:
12                 No.  Yes, sir.
13  BY MR. MOST:
14  Q.   Right.  It's admitted because you did sign
15       Mr. Liebeskind's Affidavit of Probable
16       Cause, right?
17  A.   Correct.
18  Q.   All right.  That's the document you looked
19       at before this deposition?
20  A.   On the -- on the email, yes, sir.
21  Q.   Sorry.  What do you mean from the email?
22  A.   When we received the emails, the questions
23       and everything of what we signed and if --
24       you know, if this is our document, did we
25       sign this document, that's when I observed

1      that document.

2    Q.    I've got you.  Okay.  So and I -- I don't

3          want to ask any questions about your

4          communications with your lawyer, but it

5          sounds like you were involved in providing

6          the answers to these questions, right?

7    A.    Correct.

8    Q.    Okay, and so these are -- these are

9          truthful answers to these questions, the

10         answers here to the Alex Bell questions?

11   A.    Correct.

12   Q.    Okay, and so then Request for Admission No.

13         2 I think is basically what we already

14         discussed that you didn't personally

15         witness the events described in the July

16         10th, 2016, Affidavit of Probable Cause for

17         Plaintiff Daniel Liebeskind, correct?

18   A.    Correct.

19   Q.    Okay.  Okay.  So I'm going to pull up

20         "Exhibit C," Page 11.  Do you see this --

21         this document here, Detective?

22   A.    I do.

23   Q.    Okay, and so this is the Affidavit of

24         Probable Cause for -- for -- I'm going to

25         call him Dr. Liebeskind, because he has

```
1           actually received his doctorate degree, so
2           Dr. Liebeskind.  Do you see that?
3    A.     I do.
4    Q.     Okay, and -- and this is your signature at
5           the bottom of this?
6    A.     It is.
7    Q.     Okay, but we've already established you
8           didn't personally cause the arrest of -- of
9           Dr. Liebeskind, correct?
10   A.     No, sir, I didn't detain him myself, no,
11          sir.
12   Q.     Right, nor did you cause his arrest,
13          correct?
14   A.     Explain what you mean by, "cause his
15          arrest."
16   Q.     Well, sure.  Did you do anything to cause
17          him to be arrested, point him out, grab
18          him, or do any other act to cause the
19          arrest of Dr. Liebeskind?
20   A.     No, sir.
21   Q.     Okay.  Nor did you witness what happened to
22          Dr. Liebeskind as described in the synopsis
23          here, right?
24   A.     Correct, I didn't witness anything.
25   Q.     Right.  An officer brought Dr. Liebeskind
```

1          to you, had a brief conversation perhaps
2          that would have been limited to identifying
3          him, and then that officer walked off, and
4          then you processed Dr. Liebeskind, correct?
5    A.    Correct.
6    Q.    Okay, and -- and your I -- ID Number is
7          P10508?
8    A.    Correct.
9    Q.    Okay, and you signed this document under
10         oath, correct?
11   A.    I did.
12   Q.    You swore that the -- the contents of it
13         were true and correct, right?
14   A.    Based on the information that I received,
15         yes.
16   Q.    Okay, and the information you received was
17         what?
18   A.    Just based on the PC itself just being in
19         the roadway and causing obstruction to the
20         roadway.
21   Q.    Right.  So when you say, based on the
22         information you received, you mean this
23         preprinted Affidavit you received, correct?
24   A.    Correct.
25   Q.    Okay, and -- and not any other information,

1      correct?

2  A.    Right.

3  Q.    Right.  So -- so the -- we're talking about

4        the contents of this preprinted Affidavit

5        that had some filled-in information, but --

6        but not Dr. Liebeskind's name or birth date

7        or anything like that, correct?

8  A.    Correct.

9  Q.    Okay, and you signed your name here because

10       you're not allowed to sign another

11       officer's name to an Affidavit of Probable

12       Cause, correct?

13  A.    Right.

14  Q.    If -- if one officer signed some other

15       officer's name on an Affidavit of Probable

16       Cause, that would be forgery, correct?

17  A.     Yes, sir.

18  Q.    Okay.  That -- that would be a criminal act

19       to falsify another officer's name?

20  A.   Well, it depends on if the officer is

21       involved in the same incident with the

22       arrestee.  If two officers working on a

23       case and they both see what happened in

24       that incident, they both observed what took

25       place to write a PC.

1   Q.   So you're saying there's some circumstances

2        in which one officer can sign another

3        officer's name to an Affidavit of Probable

4        Cause?

5   A.   No.  I'm saying something else, man.

6   Q.   Right.  I mean, right.  If two officers see

7        something, they could each write up an

8        Affidavit of Probable Cause with their name

9        on it, but Officer A can't write Officer

10       B's name on something, right?

11  A.   Right.

12  Q.   Right.  Okay, and -- and to be clear, we're

13       not accusing you of doing that.  All right.

14       So and -- and this is a -- this is a

15       document, this Affidavit of Probable Cause

16       is a document that's filed with the East

17       Baton Rouge Court, correct?

18  A.   Yeah, filed in the 19th Judicial District

19       Court, yes.

20  Q.   Yeah, and -- and under, "Synopsis of

21       Probable Cause," it says, "The Affiant

22       stated to the court."  So this is a

23       statement that you're making under oath to

24       the court, correct?

25  A.   Correct.

1   Q.   Okay.  So it's really important that
2        everything in here be truthful, correct?
3   A.   Correct.
4   Q.   Yeah.  So Detective, this is where we get
5        into the hard part, which is you swear that
6        -- you -- you signed your name to this
7        swearing under oath that the contents of
8        this were -- were truthful, correct?
9   A.   Yes.
10  Q.   And -- and you've told us today you did not
11       cause Dr. Liebeskind's arrest or witness
12       the events of his arrest, correct?
13  A.   Correct.
14  Q.   Okay.  It does say on this document if you
15       will read along with me, "Before me,
16       personally appeared the undesigned law
17       enforcement officer," and then it says
18       below that, "based upon these facts he
19       caused the arrest of the following listed
20       defendant for the listed offenses."  You
21       see that part?
22  A.   I do.
23  Q.   Now, that part is not accurate, because you
24       didn't cause Dr. Liebeskind's arrest,
25       correct?

```
1    A.    Correct, I did not.
2    Q.    All right.  So at least that -- that piece
3          of this is -- is false, agreed?
4    A.    Based upon if I observed him or caused his
5          arrest, no, I didn't cause his arrest so --
6    Q.    Right, right.  So at least this part of
7          this sentence on this document is false?
8    A.    Yes.
9    Q.    Okay, and then this synopsis provides a lot
10         of detail.  It talks about what protestors
11         were advised, and then at the last
12         paragraph, it says, "The defendant entered
13         the roadway, was provided another verbal
14         order to exit the lanes of travel.  Moments
15         later, the defendant entered the roadway
16         again, was taken into custody by officers
17         on the scene.  After being advised that
18         they were under arrest, the defendant did
19         actively attempt to prevent being taken
20         into custody and completion of the arrest
21         process."  So that's a lot of detail about
22         what this defendant specifically did,
23         correct?
24   A.    It is.
25   Q.    But you didn't have a basis to know if Dr.
```

```
 1          Liebeskind actually did any of these things
 2          because other than a preprinted Affidavit,
 3          you didn't have any information about
 4          specifically what he did, correct?
 5   A.     Correct.
 6   Q.     Okay.  So you didn't have a way of knowing
 7          whether these statements were true about
 8          Dr. Liebeskind or false about Dr.
 9          Liebeskind, correct?
10   A.     Myself, no, I did not.  I did not know if
11          they were true or not.
12   Q.     Okay, and when you signed it, you didn't
13          know if they were true or not?
14   A.     Correct.
15   Q.     So Officer Bell, I -- I appreciate your
16          candor to these questions.  I do wonder how
17          if -- if you didn't know whether these
18          facts were true and correct at the time,
19          why did you sign your name under oath
20          saying that they were true and correct?
21   A.     Just based on the officers who were out
22          there on the street who did observe this,
23          and they brought -- they brought us that
24          prisoner, brought us the arrestee.
25   Q.     Okay.
```

```
 1   A.    It was -- it was information that was --
 2         was just given to us.  Based on the -- the
 3         content that's there, we gave loud verbal
 4         commands for them to stay out the roadway.
 5         If they did not stay out the roadway, they
 6         would be arrested.  So therefore, their
 7         actions caused them to get arrested, and
 8         that's how he was brought to me.
 9   Q.    Okay.
10   A.    So someone did observed him in the roadway.
11   Q.    Okay.  So you were kind of assuming that
12         this was true without actually having a
13         personal knowledge of it, correct?
14   A.    Correct.
15   Q.    Okay, and you were -- were taking these
16         steps because this is what your superiors
17         told you to do?
18   A.    That was my assignment, yes, sir.
19   Q.    Yeah.  So I'm going to ask you a couple of
20         questions about whether your behavior, the
21         actions that we've -- we've discussed here
22         constituted certain crimes, and I'm -- I'm
23         going to pause after I ask each question in
24         case your attorney wants to give you any
25         advice or lodge an objection, but I'll take
```

```
 1        it one -- one at a time.  So --
 2                  MR. SCOTT:
 3                  Before you launch into your
 4           question --
 5                  MR. MOST:
 6                  Sure.
 7                  MR. SCOTT:
 8                  -- I'd like to take a couple of
 9           minutes to consult with my client.
10                  MR. MOST:
11                  Sure.  Yeah, let's -- let's
12           pause.  How much time do you need or
13           do you want to just come back on
14           when you're ready?
15                  MR. SCOTT:
16                  I -- I wouldn't expect more than
17           five minutes.
18                  MR. MOST:
19                  Okay.
20                  (Break in proceedings.)
21    BY MR. MOST:
22    Q.   Are you prepared to -- to resume
23         questioning, Mr. Bell?
24    A.   I am.
25    Q.   Okay.  So Detective Bell, I'm -- I'm going
```

```
 1          to ask you a couple of questions about
 2          whether your conduct constitutes specific
 3          crimes and -- and before you answer, we'll
 4          -- we'll leave a pause in case there's any
 5          objection, and then if there's no
 6          objection, you can answer.  So Detective
 7          Bell, when you signed the Affidavit of
 8          Probable Cause for Dr. Liebeskind, were you
 9          committing perjury?
10    A.    No, sir, I wasn't.  Based upon the beliefs
11          and the actions that were taking place at
12          that time, it was -- a crime did -- a crime
13          was -- or did occur, and it wasn't my
14          intent to -- it wasn't intentionally to --
15          to anyone or to arrest anyone.
16    Q.    Sorry.  What is that about not your intent
17          to arrest anyone?
18    A.    Based on the crime that occurred, there was
19          belief and the contact that was made
20          between myself and the arresting officer
21          that a crime did occur.  So based on that,
22          that's why I signed the document.
23    Q.    Okay.  By signing the Affidavit for Dr.
24          Liebeskind, were you committing the crime
25          of manufacturing of false evidence?
```

1          MR. SCOTT:

2          Okay.  William --

3          MR. MOST:

4          Yeah.

5          MR. SCOTT:

6          -- where is that in Title XIV?

7          MR. MOST:

8          We -- we can -- okay, I'll

9      rephrase.

10 BY MR. MOST:

11 Q.  When you signed the Affidavit of Probable

12     Cause for Dr. Liebeskind, were you

13     committing any sort of crime related to the

14     manufacturing of false evidence?

15 A.  No, sir.

16 Q.  Okay, and when you signed the Affidavit of

17     Probable Cause for Dr. Liebeskind, were you

18     committing the crime of false imprisonment?

19 A.  No, sir.

20 Q.  Okay.  Okay.  So one thing we see in this

21     Affidavit is that it -- it specifically

22     describes that he was told to clear the

23     streets, and then he returned to the

24     streets, right?

25 A.  According to the Probable Cause, yes.

43

```
 1   Q.   Right, and -- and, in fact, it says that he
 2        was arrested moments after returning to the
 3        street, right?
 4   A.   Correct.
 5   Q.   So if he had been part of the group of
 6        protestors who obeyed police orders and
 7        retreated to sidewalks or private property,
 8        he should not have been arrested, correct?
 9   A.   Correct.
10   Q.   Okay, and -- and so if -- if we have video
11        that shows that Dr. Liebeskind was, in
12        fact, in the moments before his arrest on
13        private property or on the sidewalk, then
14        he shouldn't have been arrested, correct?
15   A.   Correct.
16   Q.   Okay.  Can you see this -- this video here?
17   A.   I can.
18   Q.   Okay.  I'm going to press "Play."
19                  (Video played.)
20   BY MR. MOST:
21   Q.   Do you see that the person taking this
22        video is well back from the street?
23   A.   I really can't tell.  I mean, I don't know
24        where they're standing.
25   Q.   Like, can you see the vehicle in the street
```

1      here at 13 seconds?

2   A.    I do.

3   Q.    Yeah.  And we're looking at "Exhibit

4      WWWWW," that's five Ws.

5   A.    Huh-huh.

6   Q.    So based on this vehicle in the street, can

7      you now ascertain that the -- the person

8      taking this video is well back from the

9      street?

10  A.    Yes.

11  Q.    Okay.  So if this was video taken by Dr.

12     Liebeskind, it looks like he had retreated

13     and was standing well back from the street,

14     correct?

15  A.    Correct.

16  Q.    Okay, and so if this shows the time shortly

17     before his arrest, he shouldn't have been

18     arrested, right?

19  A.    I can't determine that.  I mean, I don't

20     see the whole thing.

21  Q.    Okay.  Okay.  I'm going to show another

22     video here.  This is another video, and

23     this is "Exhibit" seven Ws, "WWWWWWW."

24              (Video played.)

25  BY MR. MOST:

```
1   Q.   And going to eight seconds of this video,
2        you can see the line of police officers
3        there across the street?
4   A.   Correct.
5   Q.   Okay.  You can see that whoever took this
6        video is standing back from the street
7        either on the sidewalk or private property?
8   A.   Possibly, yes, sir.
9   Q.   Okay.  So if this video was taken by Daniel
10       Liebeskind, it certainly looks like he did
11       what the officer said and -- and cleared
12       the streets and was on private property or
13       the sidewalk, correct?
14  A.   Correct.
15  Q.   Okay, and should not have been arrested if
16       -- if that was the case?
17  A.   If there's a video to show leading up to
18       his arrest.  I mean, I can't determine that
19       from this video.
20  Q.   Okay, and you've been an officer for
21       approximately six years in different
22       capacities, correct?
23  A.   In different what?  I didn't hear you.
24  Q.   Sorry.  Different capacities, different
25       roles.
```

```
1   A.    Correct.
2   Q.    And -- and you went through training as a
3         BRPD officer?
4   A.    I did.
5   Q.    Did you receive any training about -- about
6         when it's appropriate or lawful to arrest
7         protestors?
8   A.    Went through a training of being on the
9         front line.
10  Q.    Was that a training specifically about what
11        to do in the context of a protest?
12  A.    Correct.
13  Q.    Okay.  Was that before or after the July
14        2016 protests that you had that training?
15  A.    Before.
16  Q.    Okay, and was there -- was that part of a
17        module or specific training?  What would we
18        call that training if we had to refer to
19        it?
20  A.    Mobile Field Force training.
21  Q.    Okay, and the portion of it that was about
22        how to deal with protests, did they have,
23        like, a PowerPoint presentation or a
24        handout or any sort of document that sort
25        of provided the instructions?
```

```
 1   A.   I can't recall any documents.  I know we
 2        hands on went on the street and held the
 3        shields and everything and physically did
 4        it.
 5   Q.   Okay.  So you practiced forming a defensive
 6        line sort of?
 7   A.   Correct.
 8   Q.   Did that -- did that training discuss when
 9        it's appropriate or lawful to arrest a
10        protestor as -- as opposed to just being a
11        defensive line?
12   A.   I don't recall.  I mean, it was just more
13        so doing the line as you say.
14   Q.   Okay, and in your training as a BRPD
15        officer, you must have discussed certain
16        specific Supreme Court Cases, like,
17        Miranda, for example, correct?
18   A.   Discuss as far as the training or --
19   Q.   Right, in training.
20   A.   Yes.
21   Q.   Okay.  Was a -- a case called Cox v.
22        Louisiana ever discussed?  That's C-o-x v.
23        Louisiana.
24   A.   I can't recall.
25   Q.   Yeah.  It may help refresh your memory
```

1    perhaps, it's -- it's an U.S. Supreme Court
2    case about a -- a protestor who was
3    arrested in Baton Rouge, Louisiana, and the
4    Supreme Court found that it was a clear
5    violation of his First Amendment Rights.
6    Does that ring a bell as a case that was
7    ever discussed in training?
8    A.  Possibly was.  Like I say, I -- I don't
9    recall.  I mean, if it was a part of the
10   training, then we received it, so if it --
11   Q.  Okay.
12   A.  I -- I don't recall.
13   Q.  And -- and you've been an officer for six
14   years including a fair amount of time
15   working on the streets, correct?
16   A.  Correct.
17   Q.  And the Affidavit of Probable Cause for Dr.
18   Liebeskind shows that he was arrested for a
19   14:97.  Is that right?  I -- I can pull it
20   back up if that's helpful.  Let's see.  I
21   take it back.  It looks here that, like,
22   Dr. Liebeskind was arrested for a 14:100.1.
23   obstruction of a public passage.  You see
24   that?
25   A.  Correct, I do.

```
1   Q.    Okay.  That's a misdemeanor offense,
2         correct?
3   A.    I'd have to read the statute to determine,
4         but yeah, you know--
5   Q.    Yeah.
6   A.    -- to make sure.
7   Q.    This says, "feloniously" here.  You can't
8         feloniously violate a misdemeanor, can you?
9   A.    I'd have to read the statute to determine.
10        I mean, it could be a -- a felony and it
11        could -- could be misdemeanor or it could
12        be both so --
13  Q.    Sure, but feloniously means, like, a fel --
14        felony violation of a statute, right?
15  A.    Correct.
16  Q.    Right.  So 14:100.1 is obstruction of a
17        public passage.  You see that here?
18  A.    I do.
19  Q.    Can you recall any time in your career as a
20        BRPD Officer other than the July 2016
21        protests that you've arrested someone for a
22        14:100.1?
23  A.    I've never done it.
24  Q.    Okay.  Some other protestors -- I'll give
25        you example, here on Page 10 of "Exhibit C"
```

1       were arrested for 14:97, simple -- simple

2       obstruction of a highway of commerce.  Do

3       you see that?

4   A.  I see it, yes, sir.

5   Q.   In your career as a BRPD Officer, have you

6       ever arrested someone for a 14:97?

7   A.   No, sir.

8   Q.   Okay, and one thing I imagine that BRPD

9       Officers have to be prepared for is rowdy

10      or unruly crowds sometimes in the streets

11      because of LSU games, right?  LSU games are

12      frequent, and they often involve if there's

13      a dramatic victory or lost, rowdy crowds in

14      the street, correct?

15  A.   I wouldn't -- I wouldn't compare that with

16      a -- a riot or a protest.

17  Q.   Okay, but without comparing it, would --

18      would you agree that LSU games sometimes

19      revolve -- involve -- result in rowdy and

20      sometimes law-breaking crowds in the

21      streets?

22  A.   Yeah.

23  Q.   Okay.  To your knowledge have you ever

24      worked one of those LSU games?

25  A.   I have.

```
1    Q.   Okay.  In advance of any LSU game, were you
2         provided with preprinted Affidavits of
3         Probable Cause to -- to use on people --
4         for people?
5    A.   No, sir.
6    Q.   Okay.  Have you ever received preprinted
7         Affidavits of Probable Cause with the crime
8         and synopsis already filled in other than
9         in July 2016?
10   A.   No, sir.
11   Q.   Okay, and you characterized the -- are you
12        characterizing the East and France Street
13        protest as a riot?  Is -- is that the word
14        you used?
15   A.   Yeah, I didn't mean a riot, but it still
16        was a protest.
17   Q.   Okay.  It -- it was a protest, but you
18        didn't witness any acts of violence by
19        protestors, did you?
20   A.   I didn't.
21   Q.   okay.  I'm just looking over my notes here.
22        I -- I may be close to the end of my
23        questioning, although I may have some
24        clean-up questions at the end.  If I don't
25        have any more right now, I'll hand it over
```

```
 1         to -- to one of our colleagues.  Our court
 2         reporter will have to take a short break at
 3         just before 12:45 in order to -- to do a
 4         quick task, but let me just look over here.
 5          I want to look briefly at the Incident
 6         Report for -- for Dr. Liebeskind.  Let me
 7         pull it up here.  This is going to be
 8         "Exhibit D" at Page 13.  Stand by.
 9                   MR. MOST:
10                   And Raynel, just let us know when
11              you need to take a quick break.
12    BY MR. MOST:
13    Q.   Is -- is this the Incident Report --
14         "Exhibit D," Page 13, the Incident Report
15         for Dr. Liebeskind that you were
16         describing?
17    A.   Correct.
18    Q.   And you wrote this up?
19    A.   Yes.
20    Q.   Okay, and some of text of this matches
21         verbatim other Incident Reports by other
22         officers.  So were you using sort of pre-
23         prepared standard language to plug into
24         these Incidents Reports?
25    A.   A template, just copy and paste?
```

```
 1    Q.    Yeah.  Sorry.  Are you saying you did use a
 2          template and copy and paste?
 3    A.    Yes.
 4    Q.    Okay, and so you changed some of the names
 5          and maybe the date, but not the -- the rest
 6          of the specifics of it?
 7    A.    Correct.
 8    Q.    Okay, and you didn't have some new source
 9          of information when you wrote this up?  You
10          had the same information you had when you
11          signed the Affidavit of Probable Cause,
12          correct?
13    A.    Correct.
14    Q.    Okay.  Some protestors were arrested for a
15          14:97; some were arrested for a 14:100.1.
16          Do you have any idea why some had one, some
17          had the other?
18    A.    I'm not sure about that.
19    Q.    It might have been just whichever stack of
20          paper you picked up the Affidavit of
21          Probable Cause from?
22    A.    I'm not sure.
23    Q.    Okay, but -- but that wasn't, like, a -- a
24          decision you made that this is a 14:97 or
25          this is a 100.1, correct?
```

```
1    A.   Correct.
2               MR. MOST:
3               Okay.  All right.  Well, then why
4         -- why don't we take a ten-minute
5         break.  Will that be enough time,
6         Raynel, for you?  Okay.  We'll take
7         ten minutes.  We'll reconvene at --
8         at 12:50, and at that point I will
9         hand over the questioning to our
10        colleagues at the MacArthur Justice
11        Center, who have follow-up questions
12        for you, Mr. Bell.
13              THE WITNESS:
14              All right.  Thanks.
15              MR. MOST:
16              Thank you.
17              (Break in proceedings.)
18              MR. MOST:
19              All right.  I'm back.  Thank you.
20        I'll hand off control to Jim if you
21        would like to take over the
22        questioning.
23              MR. CRAIG:
24              Yes, please.
25              THE COURT REPORTER:
```

```
 1                    Thank you, everybody.
 2                    MR. MOST:
 3                    Of course.
 4                    MR. CRAIG:
 5                    Sure.  You're welcome.
 6                    EXAMINATION
 7    BY MR. CRAIG:
 8    Q.   Detective Bell, my name is Jim Craig, and
 9         two of my colleagues, Eric Foley and
10         Mandisa Moore-O'Neal are on this deposition
11         with me.  We represent a number of folks in
12         three cases that are relevant to your
13         testimony today, those being Tennart,
14         Smith, and a third case, Batiste-Swilley,
15         and some of them have to do with the 9th,
16         that Saturday and some of them have to do
17         with the 10th.  I'm going to actually start
18         with the 10th because that's -- because
19         that's what Mr. Most has been asking you
20         about and you're maybe focused on it.  One
21         thing I would like to know is, what's --
22         will, first thing I'm going to do is call
23         up a map.  I'm going to share it.  It is
24         "Exhibit B," and it's called, "Map of East
25         and France."  Do you see that there?
```

```
 1   A.    I do, yes, sir.
 2   Q.    Super, thanks.  And I believe we have been
 3         talking about primarily this area that is
 4         the intersection of East Boulevard and
 5         France Street.  Do you agree with me about
 6         that?
 7   A.    Correct.
 8   Q.    Did you say, "sort of"?
 9   A.    No.  I said, "Correct."
10   Q.    Oh, okay.  I know what's going on.  I've
11         got all this -- pro tip, if you have your
12         headphones on, but you don't have them
13         plugged into the laptop, it actually is
14         harder to hear.  Okay.  Thanks.  So you
15         said yes.  I appreciate that.  What is the
16         -- what's the closest that you got in -- to
17         the intersection of East and France, you
18         personally that day?
19   A.    As I recall, I remember being on Government
20         Street.  I -- that's all I recall.  I don't
21         -- I don't remember how close I got -- I --
22         I was.
23   Q.    Okay.  Where -- the best you can remember,
24         where were you when you were involved in
25         the doctor's deposition -- doctor's arrest
```

1       then that Mr. Most was talking to you

2       about?  Where -- whereabouts were you?

3    A.   Just along Government Street near the

4       Interstate.  That's all I can remember.

5    Q.   Okay.  That's helpful.  Thank you.  So I

6       want to start -- the -- the next set of

7       things I want to ask you about really is to

8       kind of go back just a little bit to the

9       beginning and get an idea of -- of how you

10       were assigned and -- and what your duties

11       were with the protests, and for that

12       purpose, I'm going to share -- here we go.

13       I'm going to share my screen.  This is a

14       document that was produced to us by the

15       City Parish, and it's one of a number of

16       similar pages, but are you familiar with

17       the form of this document?

18    A.   Yes.

19    Q.   What -- what do you refer to this as?

20    A.   It's something for the supervisors.  We

21       don't really look at it, but I've seen it

22       in the -- in the District.

23    Q.   Okay.

24    A.   It's a list -- it's a list of all officers

25       that work on my squad at -- at First

58

```
 1        District on B Shift.
 2   Q.   Great, and -- and you said "B" as in Bob?
 3        That was your shift?
 4   A.   Correct.
 5   Q.   And so I'm going to scroll down here.  You
 6        see where -- and -- and I've got a
 7        black-and-white copy, I'm sorry to say, but
 8        you see where it says the date is 7-9-16?
 9                  MR. SCOTT:
10                  Jim, let me reorganize the screen
11             over here.
12                  MR. CRAIG:
13                  Yeah, sure thing.
14                  THE WITNESS:
15                  Yes, I do.
16   BY MR. CRAIG:
17   Q.   Great.  And then -- I don't know the best
18        way to do this, but what -- does this page
19        show just your B Shift or is it showing
20        more than that?
21   A.   That's just my B Shift.
22   Q.   Okay, and so that Saturday when you were
23        there, all of the folks who have the X
24        checked for "On," they were -- they were
25        there with you on Saturday, July 9th during
```

```
 1         the protests?
 2   A.    That's just the time that they were at
 3         work.
 4   Q.    Okay.  That was the time they were at work.
 5         How were you -- I assume that you showed up
 6         for B Shift and -- and that you came for a
 7         roll call; is that correct or a report --
 8         reporting in some kind of way?
 9   A.    Yes, sir.
10   Q.    And was that at BRPD Headquarters?
11   A.    I can't recall but -- I can't recall where
12         we met at --
13   Q.    Okay.
14   A.    -- during that time.
15   Q.    Okay, sure.  You recall were you sent out
16         to -- to respond to protests with other
17         members of your B Shift from the First
18         District or were sent out with -- with just
19         other officers you didn't ordinarily work
20         with?
21   A.    No.  We were sent out together as a squad
22         as the B shift that I worked with.
23   Q.    Got it, thank you.  And so it says Sergeant
24         Robert Holmes there.  He was one of your
25         sergeants?
```

```
 1   A.   Correct.
 2   Q.   And Sergeant Brent Magee, he was one of
 3        your sergeants?
 4   A.   Correct.
 5   Q.   And Lieutenant -- I think it says Darrin
 6        Hunt, again there's kind of a crease there,
 7        and he was --
 8   A.   Correct.
 9   Q.   -- he was your lieutenant for that shift?
10   A.   Correct.
11   Q.   Okay.  So on that Saturday, do you remember
12        being out at the protest that was happening
13        in the front of the Baton Rouge Police
14        Department at the corner of Airline and
15        Goodwood?
16   A.   I'm sorry.  Was that the 10th?
17   Q.   The 10th was that Saturday.  I'm asking
18        about the 9th.  I mean, I'm sorry.  The
19        10th was a Sunday.  I'm asking about the
20        9th, which was a Saturday.
21   A.   Okay.  Your question was do I remember
22        being at the corner of Airline that night?
23   Q.   Yes, sir.
24   A.   I don't recall because I remember doing
25        paperwork at the Headquarters and on
```

```
1          Government.  I just don't remember the
2          dates or how they went.
3     Q.   That's fair.  What I want to do next then
4          is show you some video, and my main purpose
5          is not -- I don't -- I don't know whether
6          you're actually on these videos, but the --
7          the videos show people around and
8          participating in the arrests of a couple of
9          our clients, and we're -- we have been
10         showing different videos and different
11         pictures to folks and asking if they
12         recognize anybody in the pictures and --
13         and some -- some people have been able to
14         do that; some people haven't.  So -- so
15         that's just the way it is.  Yeah, so I'm
16         going to open this first one, which I think
17         is "Exhibit JJJJJ," five Js, and it's going
18         to be a cell phone video taken actually by
19         one of our clients Mr. Hutcherson when he
20         was being arrested.  So I think the way I
21         have to do this is I have to share that
22         piece of it first and then go --
23                   (Video played.)
24    BY MR. CRAIG:
25    Q.   I've stopped the video right here.  This
```

```
 1        gentleman with the cap and the stripes, is
 2        that a good enough picture for you to be
 3        able to -- to tell me who he is?
 4   A.   I don't know who that is, no, sir.
 5   Q.   Okay.  I'm going to show -- so I showed you
 6        that one picture.  I'm going to a different
 7        video now.  Yeah, I'm sharing.  This one is
 8        going to show you the same arrest, but it's
 9        a news show, and so the -- the camera is a
10        little bit better.  So let's see how we do.
11                  (Video played.)
12   BY MR. CRAIG:
13   Q.   So this is the same -- that gentleman on
14        the ground is the one that was taking the
15        previous cell phone video, and this is not
16        a very long clip, but do you recognize this
17        fellow who is a sergeant in this frame?
18   A.   I don't.
19   Q.   Okay.  So he's not one of the sergeants
20        that was in -- that was on your squad?
21   A.   I can't -- can't determine that.  I can't
22        see him.
23   Q.   Okay.  Let's play it again.
24                  (Video played.)
25   BY MR. CRAIG:
```

1   Q.   How -- how about this gentleman with the
2        bald head whose back is to us right there?
3   A.   No, sir, I don't know who that is either.
4   Q.   Okay.  I'm next going to show you a video.
5        It's also from the 9th, that Saturday.
6        It's also from the Airline and Goodwood
7        area.  The -- the video is called, "MES
8        7056 Protests" and "No. 6," and so this is
9        -- Mindy Stewart is the person with the
10       BRPD who took this video.  So -- so I call
11       it "Stewart Video 6."  So -- so this is
12       going to be a totally different scene.
13       Okay.  Wait a minute.  Hang on.  Is that
14       playing where you-all can see it?
15                  THE WITNESS:
16                  No.
17                  MR. SCOTT:
18                  No.
19  BY MR. CRAIG:
20  Q.   No, I didn't think so because the little
21       red button wasn't correct.  Give me one
22       second.  Okay.
23                  (Video played.)
24  BY MR. CRAIG:
25  Q.   Let me just confirm do you -- that you can

64

```
 1        see this, Detective?
 2   A.    I can, yes, sir.
 3   Q.    Okay.  I'm going to -- when I hit, "Play"
 4        again, I'm going to scroll it forward
 5        almost, like, 40 seconds, because the
 6        client of ours that's going to be
 7        retrieved, detained by the State Police and
 8        then handed over to two Baton Rouge Police
 9        Department Officers, he's in this group on
10        the other side of the neutral ground there.
11        So we'll get to him.
12                  (Video played.)
13   BY MR. CRAIG:
14   Q.    Okay.  So this fellow in the white shirt is
15        our client, Zachary Hill, and I'm not
16        asking you about these two gentlemen, but
17        he's going to be handed off here to a
18        couple of members of your department.
19                  (Video played.)
20   BY MR. CRAIG:
21   Q.    So this gentleman here with the short black
22        hair and the sunglasses in the -- in the
23        foreground just behind Mr. Hill at a
24        minute, two seconds of "Stewart Video 6,"
25        do you recognize that man?
```

```
 1   A.   The one with the back facing toward me or
 2        the one that has -- the one that's
 3        arresting him?
 4   Q.   The one that's carrying -- no -- yeah, not
 5        the one with his back to you, but the one
 6        carrying this man.
 7   A.   No, sir, I do not.
 8   Q.   Do you -- do you recognize the gentleman
 9        with his back to you?
10   A.   I do.
11   Q.   Who is that?
12   A.   Demara.
13   Q.   I'm sorry.  Can you say that again.
14   A.   Demara Earnest.
15   Q.   Earnest.  Is he in your -- was he in your
16        squad?
17   A.   Yes.
18   Q.   Okay.  Now, what about this fellow in the
19        cap, whose neck is just a little bit larger
20        than -- than the other fellow's?
21   A.   I don't know who he is.
22   Q.   Okay.  We're -- we're going to just play
23        out the other last ten seconds of this,
24        because maybe you'll get a better look at
25        them, but -- but thank you.
```

```
 1                    THE WITNESS:
 2                    I see his face.  I just don't
 3               know who he is.  I've seen him
 4               before.  I don't his name.
 5                    (Video played.)
 6     BY MR. CRAIG:
 7     Q.   Any -- does that help at all?
 8     A.   I don't his name.
 9     Q.   Oh, do you -- you kind of recognize him by
10          sight, but you don't know his name?
11     A.   Correct.
12     Q.   Do you know -- are we talking about the
13          fellow with the hat or the man without the
14          hat?
15     A.   The one with the hat.
16     Q.   Okay, and what -- do you know him by
17          assignment, like, whether -- like who he
18          works with?
19     A.   I've seen him before on the department.  I
20          don't know exactly his name.
21     Q.   Okay, thank you.  One second here.  Thank
22          you.  I get what I can get.  That's
23          helpful.  I've got one more to show you
24          here I think.  This is going to be a third
25          arrest.  So this is going to be a different
```

1       -- different scene.  Can you see the screen

2       coming up?

3  A.   I do.

4              (Video played.)

5  BY MR. CRAIG:

6  Q.   I'm going to move this up to about the

7       two-minute and a little bit mark because --

8       because that's where in this six-minute

9       video --

10             (Video played.)

11  BY MR. CRAIG:

12  Q.   Yeah, there's it right there. Okay.  I'm

13       going to start at a minute and 50 seconds

14       on the time stamp, and this is "Protests

15       7916 KBH (1), and we're again a minute and

16       50 seconds.  Our client, whose name is

17       Leroy Tennart, is wearing a shirt with kind

18       of blue horizontal stripes, and he'll be on

19       the ground, and there will be a number of

20       officers around him.

21             (Video played.)

22  BY MR. CRAIG:

23   Q.  So I'm going to stop here for a second.

24       We're at 2:02, and this group of officers

25       here (indicating), this is the one that's

1      going to be zoomed in on, and that's --

2      that's who we're interested in.

3                  (Video played.)

4   BY MR. CRAIG:

5   Q.   So this is at two minutes and 47 seconds,

6       and there's three people at least whose

7       heads in this kind of fuzzy stop frame that

8       we can see.  One is the officer at the far

9       right with the short dark hair, and then

10      there are two officers to the left on their

11      knees, both of whom look bald, but one is

12      -- or maybe a little -- a little bit of

13      hair on the lighter skinned officer's head

14      and then a darker skinned officer, who is

15      also bald.  Do you -- just looking at

16      these, do they bring to mind anybody that

17      you know?

18  A.   No, I can't determine from that picture.

19  Q.   Yeah.  I'm going to -- we're going to play

20      this just a little bit here.

21                  (Video played.)

22  BY MR. CRAIG:

23  Q.   Did that help at all?

24  A.   No, sir, I don't know who that is.

25                  MR. CRAIG:

```
 1                    Okay.  Let's go off the record
 2                then for just a couple of minutes
 3                while I touch base with my
 4                colleagues here because I think -- I
 5                don't think I have many more and
 6                possibly no more questions for you,
 7                so give me a second.
 8                    (Break in proceedings.)
 9   BY MR. CRAIG:
10   Q.   Okay.  Detective Bell, thank you very much
11        for your time.  We have no further
12        questions from you -- for you.  Sometimes
13        the lawyers for the officers being sued,
14        either your attorney, Mr. Scott or Mr.
15        Fahrenholt who represents the Troopers,
16        they may have questions, and Mr. Most, who
17        began questioning is entitled to follow up
18        as well, but I doubt I will have any
19        follow-up questions, and so thank you for
20        your time, and I will --
21                    MR. CRAIG:
22                    Who should I pass it to?
23                    MR. MOST:
24                    Greg, do you have any questions?
25                    MR. FAHRENHOLT:
```

```
 1              I do not have any questions.
 2         MR. MOST:
 3              Okay.  Joe, do you have any
 4         questions?
 5         MR. SCOTT:
 6              I don't believe so.  If you've
 7         got any followup, it might provoke
 8         me, but otherwise, no.
 9         MR. MOST:
10              Then I -- I won't provoke you,
11         Joe, and I -- I will not have any
12         further questions.
13              Detective Bell, thank you for
14         taking the time to talk with us
15         today.  We appreciate your time this
16         afternoon.
17              We'll go off the record.
18              (Whereupon, the taking of the
19         witness' testimony was concluded.)
20
21
22
23
24
25
```

```
 1                    WITNESS' CERTIFICATE

 2

 3           I, DETECTIVE ALEX T. BELL, have read

 4    or have had the foregoing testimony read to me

 5    pursuant to Rule 30(e) of the Federal Rules of

 6    Civil Procedure and/or Article 1445 of the

 7    Louisiana Code of Civil Procedure and do hereby

 8    certify that to the best of my ability and

 9    understanding, it is a true and correction

10    transcription of my testimony.

11

12

13    Please check one:

14

15    _____Without corrections

16

17    _____With correction (see errata sheet)

18

19    _____      _____

20    WITNESS' SIGNATURE                   DATE

21

22

23

24

25
```

1            C E R T I F I C A T E
2            THIS CERTIFICATION IS VALID ONLY FOR
A TRANSCRIPT ACCOMPANIED BY MY ORIGINAL
3    SIGNATURE AND ORIGINAL REQUIRED SEAL ON THIS
PAGE.
4
          I, RAYNEL E. SCHULE, Certified Court
5    Reporter, #77005, in good standing, in and for
the State of Louisiana, as the officer before
6    whom this testimony was taken, do hereby certify
that DETECTIVE ALEX T. BELL, after having been
7    duly sworn by me upon authority of R.S. 37:2554,
did testify as hereinbefore set forth in the
8    foregoing 70 pages; that this testimony was
reported by me in stenotype reporting method,
9    was prepared and transcribed by me or under my
personal direction and supervision, and is a
10   true and correct transcript to the best of my
ability and understanding; that the transcript
11   has been prepared in compliance with transcript
format guidelines required by statute or by
12   rules of the Board, that I have acted in
compliance with the prohibition on contractual
13   relationships, as defined by Louisiana Code of
Civil Procedure Article 1434 and in rules and
14   advisory opinions of the Board; that I am not of
counsel, not related to counsel or to the
15   parties herein, nor am I otherwise interested in
the outcome of this matter.
16
17
18   _____   _____
     Date                 Raynel E. Schule, CSR
19                        Certified Shorthand Reporter
                          State of Louisiana
20
21
22
23
24
25