UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


BLAIR IMANI, et al.                      DOCKET NO.

       Plaintiffs,              17-cv-00439JWD-EWD

   V.


CITY OF BATON ROUGE, et al.

       Defendants.



    DEPOSITION OF LIEUTENANT JEFFREY D. PITTMAN, given in the above-entitled cause, via Zoom videoconferencing, pursuant to the following stipulation, before Sandra P. DiFebbo, Certified Shorthand Reporter, in and for the State of Louisiana, on the 23rd day of June 2021, commencing at 9:30 AM.

```
1    APPEARANCES (Via Zoom):
2    REPRESENTING THE PLAINTIFFS:
     (Imani v. City of Baton Rouge)
3
                MOST & ASSOCIATES
4               BY:  DAVID LANSER,
                ATTORNEY AT LAW
5               201 St. Charles Avenue
                Suite 114 #101
6               New Orleans, Louisiana  70170
7    REPRESENTING THE PLAINTIFFS:
     (Smith v. City of Baton Rouge)
8    (Batiste-Swilley v. City of Baton Rouge)
     (Tennart v. City of Baton Rouge)
9
                MACARTHUR JUSTICE CENTER
10              BY:  ERIC FOLEY, ATTORNEY AT LAW -and-
                JIM CRAIG, ATTORNEY AT LAW
11              4400 S. Carrollton Avenue
                New Orleans, Louisiana  70119
12
     REPRESENTING THE CITY/PARISH OF BATON ROUGE AND
13   BATON ROUGE CITY POLICE OFFICERS:
14              EAST BATON ROUGE PARISH ATTORNEY'S OFFICE
                JOSEPH K. SCOTT,
15              ATTORNEY AT LAW
                Suite 902
16              222 St. Louis Street
                Baton Rouge, Louisiana  70802
17
     REPRESENTING THE LOUISIANA STATE POLICE AND
18   INDIVIDUAL STATE POLICE TROOPERS:
19              BURGLASS & TANKERSLEY, LLC
                BY:  GREGORY FAHRENHOLT,
20              ATTORNEY AT LAW
                5213 Airline Drive
21              Metairie, Louisiana  70001-5602
22
     Reported By:
23
                Sandra P. DiFebbo, CSR
24
25
```

3

```
1    E X A M I N A T I O N          I N D E X

2

3                                    Page

4    BY MR. FOLEY:                   5, 72

5    BY MR. LANSER:                  57

6    BY MR. SCOTT:          71

7

8

9    E X H I B I T                I N D E X

10                      Page

11
```

```
     Exhibit 1                       13
12   Exhibit 2                       21
     Exhibit 3              21
13   Exhibit 4                       21
     Exhibit 5              27
14   Exhibit 6              27
     Exhibit 7              30
15   Exhibit 8(FF)                   38
     Exhibit 9              39
16   Exhibit 10(PPPPP)(QQQQQ)        42
     Exhibit 11                      42
17   Exhibit 13                      43
     Exhibit 15                      45
18   Exhibit 16(V)                   47
     Exhibit 17                      48
19   Exhibit 19(A)                   61
     Exhibit 20(C)                   63
20   Exhibit 21(WWWW)                65
     Exhibit 22(GGGGGG)              67
```

```
21

22

23

24

25
```

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

```
 1            S T I P U L A T I O N

 2

 3            It is stipulated and agreed by and

 4   between Counsel for the parties hereto that the

 5   deposition of LIEUTENANT JEFFREY D. PITTMAN is

 6   hereby being taken pursuant to the Federal Rules of

 7   Civil Procedure for all purposes in accordance with

 8   law;

 9            That the formalities of reading and

10   signing are specifically reserved;

11            Exh the formalities of sealing,

12   certification, and filing are hereby specifically

13   waived.

14            That all objections, save those as to

15   the form of the question and responsiveness of the

16   answer are hereby reserved until such time as this

17   deposition or any part thereof is used or sought to

18   be used in evidence.

19                    *  *  *  *  *

20            Sandra P. DiFebbo, Certified Shorthand

21   Reporter, in and for the State of Louisiana,

22   officiated in administering the oath to the witness

23   via Zoom.

24

25
```

```
 1          LIEUTENANT JEFFREY D. PITTMAN, having been
 2      first duly sworn, was examined and testified on
 3      his oath as follows:
 4  EXAMINATION BY MR. FOLEY:
 5      Q.    Good morning, Officer Pittman.  How are
 6  you?
 7      A.    Good morning.  Real fine.  Thank you.
 8      Q.    My name is Eric Foley.  I'm one of the
 9  attorneys representing the plaintiffs in two cases
10  that we call Smith v. City of Baton Rouge and the
11  other Batiste-Swilley v. City of Baton Rouge.  So
12  I'm here today to ask you some questions about the
13  weekend of July 9th and 10th, 2016, particularly on
14  the Alton Sterling protests.  And then when I
15  finish up, Dave Lanser, I believe, is going to ask
16  you some questions, also, about that time frame for
17  a different case, for a different set of plaintiffs
18  that he represents.
19          MR. FOLEY:
20              So before we start, Mr. Scott, I
21              just wanted to confirm that we're using
22              the same stipulations as the last time,
23              which would be that this deposition is
24              going to be pursuant to the Federal
25              Rules of Civil Procedure; that you are
```

```
 1              not waiving reading and signing; and
 2              that we are waiving any objection to
 3              this deposition being taken by
 4              videoconference and the witness being
 5              sworn remotely.  Is that correct?
 6          MR. SCOTT:
 7              That is correct.
 8          MR. FOLEY:
 9              Great.
10  BY MR. FOLEY:
11      Q.   Officer Pittman, could you start off by
12  giving us your name for the record, your full name.
13      A.   Full name is Jeffrey.  Last name is
14  Pittman, P-I-T-T-M-A-N.
15      Q.   Officer Pittman, have you been deposed in
16  a civil suit before?
17      A.   In this civil suit?
18      Q.   in Any civil suit.
19      A.   Yes.
20      Q.   So this is going to be a bit of old hat
21  for you, but I'll run through a few pointers before
22  we start.  Most importantly, since we're doing this
23  remotely, it becomes even more important than usual
24  that we not talk over each other.  So I'm going to
25  do my very best not to interrupt you when you are
```

1    in the middle of an answer, and I would ask the

2    same.  If I'm trying to finish a question, just let

3    me get that out before you start answering.  Also,

4    if you can get as close to the mic as possible,

5    that will be helpful for the court reporter I'm

6    sure.  And, of course, if you are going to answer

7    in an affirmative or a negative, please, vocalize

8    that.  A head shake is hard to record.  So a yes or

9    no would be preferred.  I'll ask you do you under-

10   stand that the oath you've just taken requires you

11   to tell the truth during this deposition?

12        A.   Yes, I do.

13        Q.   I'm going to ask that if I ask you a

14   question that is either confusing or that you need

15   a clarification on, please, just ask me to rephrase

16   or ask if there is more detail I could give you,

17   and I'm happy to do so.  You are allowed to take a

18   break at any time during this process.  The only

19   caveat is that we ask that you finish answering

20   whatever question has been posed to you before

21   taking a break.  And, similarly, if you want to

22   pause to speak to your attorney, the same ground

23   rules would apply, that you finish answering the

24   question first before taking a break to consult

25   with your attorney.  And, also, be aware that when

```
 1   we do take breaks, I may ask you if there was
 2   anything discussed during the break or any
 3   documents reviewed while we were on a break.  And
 4   the last bit of preliminary business I have is to
 5   ask if there is any reason, whether it be like
 6   medical treatment or prescription medication, any
 7   kind of a medical condition that would affect you
 8   today and prevent you from being able to give full
 9   and complete testimony?
10        A.    No.
11        Q.    So I'll start off by asking first when
12   did you find out that you had been made a defendant
13   in these cases?
14        A.    It was several years ago.  I don't recall
15   the date.
16        Q.    How did you find out?
17        A.    Through our legal advisor at the Baton
18   Rouge Police Department.
19        Q.    Was that Brandy at that time or was that
20   Deelee?
21        A.    It may have been Deelee, but I don't
22   recall specifically.
23        Q.    To kind of facilitate some of this
24   background and history that we tend to ask, I'm
25   going to show you a document here on the screen
```

1    share.  It's just one page, so I'll just ask you to
2    review it and let me know once you've been able to
3    look it over.  I'm going to shrink it down a bit so
4    it's a little more visible.  It looks like you've
5    got a paper copy there.
6            A.   Yes.
7                 MR. SCOTT:
8                      You send it to me the day before, it
9                  makes it a lot easier to print them all
10                 out in a hurry.
11                MR. FOLEY:
12                     Got you.
13   BY MR. FOLEY:
14        Q.   Officer Pittman, do you recognize this?
15   Have you seen it before?
16        A.   Yes, I've seen it.
17        Q.   So just for our purposes today, do you
18   have any reason to believe that these dates are
19   inaccurate?
20        A.   They appear to be correct.
21        Q.   So from this document, it looks like you
22   would have started as a probational officer in 1994
23   and then completed the Academy and became a regular
24   police officer in '95; is that right?
25        A.   Yes.

1      Q.    What did you do before joining as a

2    probationary police officer in '94?

3      A.    I was working at a video store.

4      Q.    Had you done any secondary education,

5    whether it would be college, vocational training,

6    or anything like that?

7      A.    Prior to that, I attended a couple of

8    years of college at Southeastern Louisiana

9    University.

10      Q.    Had you had any other jobs in law

11    enforcement prior to joining the Baton Rouge Police

12    Department?

13      A.    No.

14      Q.    And then this is going to sound like a

15    funny question, because it's the same name.  I

16    wanted to ask if you had ever worked for the Lake

17    Charles Police Department?

18      A.    No, I have not.

19      Q.    There is a Jeff Pittman who is in a suit

20    in the Fifth Circuit out of the Lake Charles Police

21    Department in the early 2000s, and I just wanted to

22    make sure you're not the same person.

23      A.    Not the same person.

24      Q.    So in the Academy, in '94, what sort of

25    training did you have on respecting constitutional

1    rights in an arrest, particularly anything having
2    to do with protesters or demonstrations?
3         A.    We received training.  I don't recall the
4    specifics. That was 27 years ago, approximately.  I
5    don't recall the specifics, but we did receive
6    training on that type of stuff.
7         Q.    Who gave you the training?
8         A.    Various instructors.  I don't recall who
9    the instructors were.  I know our legal advisor at
10   that time was Georgia Wileman, and she instructed
11   us on legal issues.
12        Q.    How do you spell that last name?
13        A.    W-I-L-E-M-A-N, I believe.  That could be
14   incorrect.
15        Q.    Thank you.  In the Academy, did you
16   receive any Mobile Field Force training?
17        A.    We received some crowd control training,
18   yes.
19        Q.    Do you know who taught that?
20        A.    At the time, if I can recall correctly,
21   it would have been Wally or Wallace Peyroux.  I'm
22   not sure on the spelling on that one.  And Nelda
23   Starkey.
24        Q.    Wallace Peyroux and Nelda Starkey?
25        A.    Yes.

1      Q.   How long was that training?

2      A.   I don't recall.  It was several days.  I

3  don't recall exactly how long it was.

4      Q.   During the Academy, did you have any

5  training on a duty to intervene to prevent other

6  officers from either violating the law or violating

7  someone's constitutional rights?

8      A.   Yes.

9      Q.   How did you receive that training?  Was

10  that part of the general kind of legal training

11  that you mentioned from Ms. Wileman?

12      A.   I don't recall if it was Ms. Wileman or

13  whether it was from Internal Affairs.  It could

14  have been both.

15      Q.   Can you tell us what the duty is to

16  intervene or how they had instructed you at that

17  time?

18      A.   As I recall, if you saw an officer

19  obviously violating somebody's rights, you had a

20  duty to stop them.

21      Q.   What were the consequences if someone

22  didn't intervene?

23      A.   I don't recall specifically what the

24  consequences are, but if you don't stop an obvious

25  violation of somebody's rights or law, then you are

1    basically a willing participant is the way it would

2    be seen.

3        Q.    Last question on this academy training.

4    Do you recall receiving any instruction on

5    statutes, like obstruction of a public passageway,

6    1497 or similar kind of trespassing statutes as

7    well?

8        A.    In the Academy, no.  In the police

9    academy, no, we have not received any training on

10   those specific statutes.

11       Q.    Before we leave this document here, which

12   I'm going to submit as Exhibit 1, can you just kind

13   of give us a brief walk-through of your career from

14   '95 onward?  What units and divisions were you in?

15       A.    From '95 to '99, I worked in the Uniform

16   Patrol Division.  From '99 to 2000, I worked in the

17   Special Investigations Division, which is a

18   division that handled any internal thefts, felony

19   thefts, felony damage of properties, and any

20   investigations designated by the chief of police or

21   the mayor of the city.  I then transferred to --

22   from 2000 -- 2000 to 2002 I was in the Felony Theft

23   Division which handled felony thefts and felony

24   damage to properties.  And from 2002 until 2021 I

25   was assigned to the Narcotics Division, and I am

1    currently assigned to the Uniform Patrol Division.

2         Q.   One question on the Special

3    Investigations Unit.  Was that a subdivision of

4    Internal Affairs or was it some kind of stand

5    alone?

6         A.   It was a stand-alone division at that

7    time.  It does not exist anymore.

8         Q.   Do you know when that ceased to exist?

9         A.   Mid to late 2000s.

10        Q.   Is that function now taken over by

11    Internal Affairs or someone else?

12        A.   It's taken over by Internal Affairs --

13    not necessarily Internal Affairs.  If it's a

14    criminal investigation, it would be whoever the

15    chief -- whatever division the chief designates to

16    investigate that based upon the crime.

17        Q.   So you became a sergeant in 2012.  At

18    that time, as you just stated, you were with the

19    narcotics unit, and you said at 2021 you

20    transferred to Uniform Patrol Division.  Are you

21    still a sergeant with Uniform Patrol Division or a

22    different rank?

23        A.   No.  I'm a lieutenant.

24        Q.   Did you become a lieutenant before you

25    moved over to uniform patrol?

1          A.    Yes.  I became a lieutenant in 2018.

2          Q.    I'm going to share a different document

3     here.  This will be the training document.  I don't

4     know if you can see that on the screen.  Have you

5     ever seen this document before, Officer Pittman?

6          A.    Yes.

7          Q.    I would just ask you to take a brief look

8     over it.  I have just a couple of questions on some

9     of the trainings you received over the years.  And

10    whenever you feel you had a sufficient opportunity

11    to review it, let me know.

12         A.    I'm ready.

13         Q.    So on the first page, midway down, I see

14    that in November of 2001 there was a Mobile Field

15    Force Cycle 3 training of what appears to be eight

16    hours.  I'm assuming that's what the number there

17    in the far column represents. Is my assumption on

18    the hours, is that correct, or is that number a

19    different --

20         A.    That appears to be what it is.

21         Q.    What is the significance of Cycle 3?

22         A.    I do not know.  I don't know if we

23    received different cycles in the training academy.

24    I'm not sure what that means.

25         Q.    So this would have been about, what,

1   about six or seven years after the Academy, right?

2       A.   Yes.

3       Q.   In that time, were you a part of the

4   Mobile Field Force or were you just receiving

5   training on Mobile Field Force tactics?

6       A.   I was not a part of Mobile Field Force

7   and have never been a part of Mobile Field Force.

8   I was just receiving training.

9       Q.   So, similarly, on the third page, there

10  is another entry in 2015 for Taser and Mobile Field

11  Force with some ten hours of training.  So the

12  question there would be do you recall any training

13  in between those two dates, 2001 and 2015?  Were

14  there any further Mobile Field Force trainings?

15      A.   I don't recall.

16      Q.   For the 2015 training, who was it that

17  gave you that in-service training?

18      A.   I do not recall.

19      Q.   What topics were covered during the

20  training?

21      A.   I do not recall specifically, any

22  specific details of the training.

23      Q.   Same questions as to the 2001 training.

24  Do you know who gave that training?

25      A.   I do not recall that either.

1    Q.    And the subject matter covered?

2    A.    I do not recall.

3    Q.    On those three pages worth of trainings,

4  are there any trainings either on Mobile Field

5  Force or crowd control or demonstrations that you

6  would have had that are not reflected in that, in

7  those three pages?

8    A.    No, unless there is something missing.

9    Q.    Does there appear to be something missing

10 from your review today?

11   A.    Well, the only thing I notice is there is

12 a gap on Page 2.  They show receiving training in

13 2011 and 2013.  I would have received some type of

14 in-service training in 2012 as well.  I don't know

15 why it's not listed here.

16          MR. SCOTT:

17               Then it skips to 2015, too.

18          THE WITNESS:

19               Yeah.  It skips to 2015, so it's not

20            completely accurate.

21 BY MR. FOLEY:

22   Q.    There were trainings during those years

23 that are not reflected on here.  We don't know what

24 they were?

25   A.    Yes.

18

1      Q.   For the years that are on these pages, is
2   there anything standing out at you that would have
3   been missing in that time that you remember having
4   training in as either, again, protests,
5   demonstrations, First Amendment rights?
6      A.   No.
7      Q.   I wanted to show you another document.
8   This is an organizational chart.  I'll try to get
9   as much of this on the screen as I can.  It's a
10  two-page document.  One has a notation of a
11  revision in August of 2016.  That's on the first
12  page, and the second page is has been revised as of
13  May 4th.  So I wanted to ask you a couple of
14  questions about the Criminal Investigations Bureau
15  hierarchy as of that time.  Again, we're concerned
16  with July 2016.  So my first question to you would
17  be in July of 2016, does it look like the second
18  page organizational chart would have been accurate
19  for that time?
20     A.   It appears to be.
21     Q.   Can you tell me what is the significance
22  of HIDTA?
23     A.   That is a part of the DEA Task Force.
24  That's the High Intensity Drug Trafficking Area.
25     Q.   I'm going to zoom in on that just a bit

1   here.  You said high Intensity Drug Trafficking

2   Enforcement Area?

3       A.   Yes.

4       Q.   There is a second box here for DEA Task

5   Force.  So there were two DEA Task Force

6   subdivisions?

7       A.   Yes.

8       Q.   Can you explain to me briefly what are

9   the differences between those two divisions, the

10  kind of work that they do?

11      A.   Well, part of HIDTA works interstate as

12  far as handling interstate drug traffic.  Part of

13  the DEA Task Force handles like diversion type

14  stuff, like illicit prescriptions and things of

15  that nature.

16      Q.   Which of those divisions would you have

17  been a part of?

18      A.   At that time, I was a part of the

19  Narcotics Division, which was -- I was not part of

20  the DEA Task Force or HIDTA group.

21      Q.   So those were autonomous divisions?

22      A.   Yes.  There is a city side of narcotics

23  that handles just state and city cases.  Then there

24  is a DEA Task Force, HIDTA group, but that's all

25  under the umbrella of the Narcotics Division.

1      Q.    So you were part of a larger division
2   under which those two were --
3      A.    Yes.  There is an overall commander of
4   narcotics.  That's who the supervisors from the DEA
5   Task Force and HIDTA group and Narcotics Division
6   answer to.
7      Q.    Who would that overall supervisor have
8   been in July of 2016?
9      A.    In July of 2016, that would have been
10  Raymond Brashier.
11     Q.    Is he also known as Wayne?
12     A.    Yes.
13     Q.    And then what would the kind of chain of
14  command have been from Wayne Brashier to you?
15     A.    It was a direct -- he was my direct
16  supervisor.
17     Q.    Were there any other sergeants in the
18  Narcotics Division that were of equal rank to you
19  that answered directly to Wayne Brashier?
20     A.    Yes.  At that time, Sergeant Shane Mouch,
21  M-O-U-C-H, and Sergeant Dennis Smith.
22     Q.    The second you said was Dennis Smith?
23     A.    Yes.
24     Q.    At that time, how many people reported
25  you?

1          A.    At that time, six or seven, maybe.  I
2    don't recall the exact number.
3          Q.    When you said earlier that you were, at a
4    certain point, promoted to lieutenant, I believe
5    you said in 2018, did that mean you took over the
6    Narcotics Division at that point?
7          A.    Yes, I did. I actually took over prior to
8    making lieutenant, but it was in 2018.
9          Q.    What were the circumstances of that
10   promotion?  Did Officer Brashier retire or move on
11   or take a different position?
12         A.    Retired. I don't know if you have this
13   knowledge or not, but Lieutenant Kenneth Brewer was
14   in charge of the HIDTA and DEA Task Force.  He
15   answered to Brashier as well.
16         Q.    I'm actually going to show you another
17   document for the express purpose of trying to suss
18   out where everyone was.  We've already done a bit
19   of it, but I want to show you a document here that
20   is an e-mail.  The file itself is titled, "June --"
21   I'm sorry.  "201607.07 June and Second Quarter
22   Totals" e-mail.  So this would be Exhibit 4.  I'm
23   sorry.  The previous org chart will be Exhibit 3,
24   and the training document would be Exhibit 2.  So
25   if you have -- I don't know if you have that paper

```
 1   in front of you.  It looks like you do.  Would you
 2   be able to take a minute and just look over that
 3   and let me know when you have had a sufficient
 4   opportunity to review it?
 5        A.   I read it.
 6        Q.   I am interested in Page 2 here with the
 7   listing of officers.  I'm curious as to who, among
 8   that group, if any, would have reported to you.
 9        A.   I don't specifically recall our squads at
10   that time.  At one point or another, everyone on
11   this list has reported to me.  They've been moved
12   to different squads, but I don't recall the exact
13   makeup of what squad reported to me at that time.
14   I don't know want to belt out a bunch of names and
15   be wrong.
16        Q.   That's perfectly fair.
17        A.   But like I have supervised directly
18   everybody on this list at some point.
19        Q.   Let me ask a more basic question then
20   from my understanding.  When you mentioned the
21   different squads and kind of division between Shane
22   Mouch and Dennis Smith, how did y'all divide that
23   up?  Was that by like day and night shift or was
24   there another --
25        A.   Sergeant Dennis Smith was in charge of
```

1    our parcel interdiction.  He did not have anybody

2    on -- he was stand alone.  He did not supervise

3    anybody directly.  Sergeant Shane Mouch at this

4    time was a supervisor, such as myself, and he

5    supervised a squad, but we were -- in our regular

6    narcotics activities, we worked the same shift.

7    Most squads worked the same shift.  We were on a

8    split when it came -- at least partially when it

9    came to the protest period.  Not specifically split

10   as far as squads.  It was split kind of talking to

11   people who can work a day shift, who can work a

12   night shift, that kind of --

13        Q.   Right.  I think we have a document coming

14   up that will address that point about the protest

15   itself and the splitting of units there.  A

16   question for you just before we leave kind of this

17   talk of training and organization and stuff.  I

18   meant to ask if during your tenure at BRPD, you,

19   yourself, have ever been in the role of an

20   instructor either at the Academy or during like any

21   other in-service training that might be presented?

22        A.   No.

23        Q.   I'm going to switch to another document.

24   It is an e-mail with the title "Wyndam

25   Assignments."  I'm going to -- give me just one

```
 1    second to pull that up.  It's on a different part
 2    of the screen here.  Here it is.  This is a
 3    document which appears to be an e-mail from Wayne
 4    Brashier to yourself, Shane Mouch, and Kenneth
 5    Brewer with the subject titled "Forward CIB Work
 6    List."  Do you recognize this document, Officer
 7    Pittman?
 8         A.   Yes, I do.
 9         Q.   I want to ask you a few questions about
10    this.  If you need a minute to review, let me know.
11    If you already reviewed it, I'll just jump in.
12         A.   I've read it.
13         Q.   I note that your -- the e-mail refers to
14    lead contacts in the divisions as being highlighted
15    in the attached list, and your name was high-
16    lighted.  So a very basic question is were you
17    contacted as a lead contact within the meaning of
18    this e-mail and who contacted you, how and when?
19         A.   I don't recall exactly who contacted me.
20    My immediate supervisor, Wayne Brashier,
21    communicated to us, with us, what our duties and
22    responsibilities would be.
23         Q.   What were the duties that Wayne Brashier
24    communicated to you that would need to be fulfilled
25    during the response to the protests?
```

1      A.   Ultimately, we were put under direction

2   of our SRT, our squat team.  We were to assist in

3   surveillance and gathering intelligence related to

4   the protests.

5      Q.   Was that constant throughout -- well, at

6   least for our purposes, throughout the weekend of

7   July 9th and the 10th?  Would those have been the

8   same duties?

9      A.   Yeah.  Those were the same duties.  The

10  only deviation is the July 10th date when everyone

11  was ordered to that area.

12     Q.   When you say that was a deviation, can

13  you explain more about how that deviated from other

14  your practice?

15     A.   It was a deviation because up until that

16  point, we had not been directed to assist Mobile

17  Field Force or anything like that.  If anyone did,

18  it was of their -- they decided or made the

19  decision that they needed to help.  We were not

20  directed to, that I'm aware of, as far as my shift,

21  to assist Mobile Field Force until that date.

22     Q.   And how was it that you were directed to

23  assist Mobile Field Force on July 10th?

24     A.   There was a command issued over the

25  radio.  I don't recall who -- at this point, I

1    don't recall who it was that advised all officers

2    to respond to that area.

3        Q.   We'll talk a little bit more about that

4    in a few minutes.  Before we leave this document

5    here, I wanted to ask.  It mentions a CIB

6    commander's briefing occurring in the mornings at

7    9:00 AM.  Did you attend any of those briefings?

8        A.   No, I did not.  That would have been

9    Wayne Brashier.  He would relay any kind of

10   information, if there was any, to us.

11       Q.   Moving to the attached pages.  I see that

12   between Pages 3, 4, and 5, the Narcotics Division

13   seems to be broken down into days and dogs.  Can

14   you explain to me what that means?

15       A.   It would have been day -- one would have

16   been day shift, and then one would have been night

17   shift.  We were initially broken down that way.  We

18   eventually -- I don't remember at which point, but

19   at some point we were brought as one.  We worked

20   more of a hybrid shift.

21       Q.   In those days in which -- before that

22   happened, before the hybrid shifts, when it was

23   kind of a clear demarcation between days and dogs,

24   I see that both you and Captain Brashier would have

25   been on days.  So my question for you is for the

1    folks on dogs, who would have been the, you know,

2    the commanding officer among that group?

3         A.    Lieutenant Kenneth Brewer and Sergeant

4    Shane Mouch.  Excuse me.  Sergeant Shane Mouch was

5    assigned to the SWAT team at that time, because he

6    was a member of the SWAT team, so he wasn't

7    participating in any of our operations.

8         Q.    So then Kenneth Brewer would have been

9    the person?

10        A.    Yes.

11        Q.    One more document before we start talking

12   about July 9th or July 10th itself.  There is an

13   e-mail.  The file name is 201607.08, Person of

14   Interest, e-mail Banks to Pittman.  It appears to

15   be an e-mail from Thomas M. Banks sent to you.  I'm

16   going to submit this as Exhibit 6, and the previous

17   e-mail from Wyndam regarding assignments would be

18   Exhibit 5.  I should have said that earlier.

19   Officer Pittman, have you had a chance to refer to

20   Exhibit 6?

21        A.    Yes.

22        Q.    Do you recognize this document?

23        A.    I recall it.

24        Q.    I have a couple of baseline questions for

25   you.  Can you explain to me what the EBRA Crime

1    Strategies Unit is?

2         A.    That is a unit that assembles

3    intelligence and disseminates that, whether it be

4    statistical data or information on wanted subjects,

5    that disseminates that out to the police department

6    and whatever agencies need it.

7         Q.    Is that a -- Detective Banks is

8    forwarding this from Jeff Malone.  Is Jeff Malone

9    an employee of either BRPD, the law enforcement

10   agency, or is he strictly an employee of the

11   district attorney?

12        A.    An employee of the district attorney.

13        Q.    So that Crime Strategies Unit that he is

14   working for is housed entirely in the DA's office?

15        A.    Yes. Excuse me. It is housed at the Baton

16   Rouge Police Department.  There is an assistant

17   district attorney there along with investigators,

18   members of the National Guard, members of the Baton

19   Rouge Police.  It's a multi-agency deal.

20        Q.    So that was in place in July of 2016?

21        A.    Yes.  It was relatively new at that

22   point, if I can recall correctly.

23        Q.    Does that still exist?

24        A.    Yes, it does.

25        Q.    Further background information.  Can you

 1   explain to us who Webbie, Trill and Little Boosie

 2   are?

 3       A.    Webbie and Little Boosie are rappers.

 4   They are from Baton Rouge.  Trill.  I remember

 5   there was a Trill Entertainment.  There was a

 6   record company several years ago.  I don't know if

 7   that's who they are speaking of at this point, or

 8   if there was a rapper named Trill.  I don't recall.

 9       Q.   So after you received this e-mail, what

10   actions, if any, did you take?

11       A.   I just advised -- when I received this

12   e-mail, I notified all of my people of the e-mail.

13   They would have reached out to any informants or

14   anything to see if they had heard anything or seen

15   this guy. It was in case we see him or to notify

16   them.

17       Q.   I apologize for interrupting you.

18       A.   I apologize for interrupting you as well.

19       Q.   Did you have any conversations with

20   Captain Brashier at the time about this e-mail or

21   about the New Black Panther parties?

22       A.   I don't recall anything specific.  I may

23   have.  I don't remember anything specific, you

24   know, about the Black Panther party.  I know we

25   were sent several times when the police department

1    would receive a tip or someone would call in and
2    say they thought they saw Black Panthers.  We even
3    went chase -- on a lot of wild goose chases.  We
4    were sent to go see, and it turned out to be
5    nothing, but, no, I don't recall anything specific
6    about this.
7        Q.    Throughout the course of the protests,
8    did you, yourself, detain or arrest any members of
9    the New Black Panther Party?
10        A.    No, I did not.
11        Q.    And would there be any other documents of
12    any follow-up investigation that resulted from this
13    e-mail?
14        A.    Not that I'm aware.  Not from me.
15        Q.    So that was Exhibit 6.  I'm going to move
16    on from that document and display another document
17    for you, which is a duty roster.  I just have a
18    couple of questions about that, about the hours on
19    July 9th and July 10th.  Just one minute.  That's a
20    file called Narcotics Roster, July 9th to 15, 2016.
21    pdf.  I am going to direct your attention to Page 7
22    and Page 8 and ask -- first, it appears, if I'm
23    reading this correctly, that your hours on
24    Saturday, July 9th, would have been 6:00 AM to 7:00
25    PM, and on July 10th, 9:00 AM to 9:00 PM.  Do those

1  hours as reflected on this form, are those

2  accurate, to your memory?

3          A.    To my memory, they appear to be accurate.

4          Q.    On July 9th, do you recall staying any

5  later than 7:00 PM and being on duty?

6          A.    It says I stayed an extra hour, but I

7  don't specifically recall what the reason was for.

8          Q.    Earlier, when you said that July 10th was

9  kind of an exception and that you were, if I'm

10 summarizing your testimony correctly, that you were

11 called out specifically to assist the Mobile Field

12 Force, how would your duties have been different on

13 that Saturday, the day before July 9th?

14         A.    On July -- any other time besides that,

15 my duties were only to supervise my people that

16 worked for me, but we were only gathering

17 intelligence and only when tips came in or the SRT

18 or SWAT team would say, hey, we got a tip about

19 something happening at this location.  Could y'all

20 go look at it and see if anything is happening.

21 One time we got sent across the river to Port

22 Allen, Louisiana, that there were a bunch of buses

23 there, and they believed that they were full of

24 people coming and cause unrest, so we went over

25 there, and it was not anything like that.  It was

```
 1   just were constantly being sent to check for tips
 2   so they wouldn't tap any personal going to -- you
 3   know, it was our job to go investigate that and see
 4   if there was anything to it.
 5        Q.   So on that Saturday, July 9th, were you
 6   involved in any like physical detentions of a
 7   protester?
 8        A.   No, no.  I was not.
 9        Q.   At the end of your shift on July 9th, who
10   was it that would have taken over for you as
11   supervisor of the narcotics officers who were on
12   the scene?  Would that have been Kenneth Brewer
13   again?
14        A.   Yeah, if we was still split on shifts, it
15   would have been Lieutenant Kenneth Brewer.
16        Q.   I'm wondering if you could explain to me
17   as if you were going to explain to a lay person, or
18   someone with no law enforcement experience, what is
19   a Mobile Field Force?
20        A.    To a lay person, I would describe it as a
21   group of people who stand together and control
22   crowds.
23        Q.   On July 10th, when you were -- you and
24   your officers were deployed to assist the Mobile
25   Field Force, what were the duties that you had in
```

1    assisting them in controlling a crowd?

2        A.    I was advised that if Mobile Field Force

3    arrested someone, that I was to walk that person

4    back to a staging area where a prisoner transport

5    van was located.

6        Q.    And who was it that advised you of that?

7        A.    It would have been a member of the SWAT

8    team.  I don't recall.  It was kind of chaotic when

9    we first arrived there, and once we got everyone

10   there, they kind of advised us what our duties

11   would be.  I don't specifically recall who it was.

12       Q.    And just so the record is clear, is SWAT

13   and SRT co-extensive?

14       A.    Yeah.  It's the same thing.  I'm trying

15   to -- most people call it a SWAT team, the Special

16   Response Team in Baton Rouge.

17       Q.    So on July 10th, that Sunday, July 10th,

18   2016, SRT or a member of SRT would have been your

19   commanding officer for that protest response?

20       A.    Yeah.  Any protest response, the SRT,

21   whoever was in command at that point, would have

22   been charged with the whole operation.

23       Q.    And you don't recall who, among those SRT

24   officers, it was that was in command?

25       A.    Well, on July 10th, at that time, it was

1    Sergeant -- I believe it was Sergeant Myron

2    Daniels.  It might not have been a sergeant, but he

3    was our current deputy chief.  He was in charge on

4    July 10th relative to the Downtown operations. He

5    did not directly tell me what my duties would be.

6    It was another member that directed that.

7        Q.   So when you mentioned your duty being

8    probably to assist with walking people to transport

9    vans and I believe did you say prisoner processing

10   as well?

11       A.   Yes.  I'm not sure what was there.  It

12   was a staging area.  They had a van set up, and I

13   turned them over to whoever was standing there.

14       Q.   Let's assume I was one of the folks who

15   was detained by some member of Mobile Field Force.

16   I'm handed off to you.  You walk me to the prisoner

17   processing team, and then you said you hand me over

18   and what happens?

19       A.   I return to where Mobile Field Force is

20   located.

21       Q.   Did anyone at the prisoner processing

22   team have you fill out any paperwork?

23       A.   No, they did not.

24       Q.   Did they ask you any questions about the

25   individual arrestees?

1      A.    No, they did not.

2      Q.    I want to ask you some more detailed

3   questions about July 10th.  Before I do, though,

4   there was two questions I meant to ask you about

5   July 9th.  I suspect I know the answer, but I just

6   want to be clear.  Did you at any point deploy to

7   the 200 block of Rivercrest Avenue to a protest in

8   front of the mayor's house?

9      A.    No.

10      Q.    Turning back to July 10th, would it be

11   fair to say that at some point you were deployed to

12   the vicinity of East and France where protesters

13   had gathered somewhere on the front lawn of a

14   private residence?  Does that sound familiar?

15      A.    Yes.  When I arrived there, they were in

16   the street, yes.

17      Q.    Can you tell me a little bit about how

18   y'all were called out to that protest?  I know you

19   said it was sort of out of the ordinary, like

20   everyone was --

21      A.    I don't recall specific words.  I don't

22   recall who specifically said, but we were advised

23   to, over the radio, to respond to the area, because

24   they believed that a large group of unruly

25   protesters were trying to take the interstate.  In

```
 1   other words, trying to get on the interstate and
 2   block the interstate.  So we were advised to
 3   respond and assist the officers who were already
 4   down there and being overwhelmed.
 5        Q.   So prior to that call, where had you and
 6   your officers been stationed?
 7        A.   I was at 9000 Airline, headquarters.
 8        Q.   About what time did that order come
 9   through?
10        A.   I don't recall.
11        Q.   How many officers were you in command of
12   that day?
13        A.   I don't recall specifically the amount of
14   officers.  It was -- all of us were present.  The
15   whole -- the entire division.
16        Q.   So it wasn't divided into dog, days,
17   everyone was --
18        A.   No.  Everyone was there when we
19   responded.  I don't know.  I don't recall if it was
20   because we had an overlap between the two, and we
21   may have, but everyone was present when we
22   responded.
23        Q.   So if my understanding is correct, the
24   moment you arrived to that area of East and France
25   or Government Street generally, at that point,
```

1   command is held by Myron Daniels or someone at SRT

2   over that situation or does that develop after you

3   arrive?

4        A.   Once we arrived down there, yes.  The

5   SWAT team was already present, and they were in

6   command.

7        Q.   So when you arrived, where were the

8   protesters?

9        A.   The protesters were in the street when I

10  arrived.  I remember, as I was walking up with

11  multiple other officers, I saw a piece of a brick,

12  I don't know, three or four inches, fly over the

13  top of several people.  Everybody was telling

14  everybody to watch out, keep your head on swivel,

15  look, you know, because some people are throwing

16  objects.

17       Q.   So can you tell me what your approach was

18  from?  Were you coming from Government Street or

19  were you walking up France towards the river?

20       A.   I parked on Government Street then walked

21  parallel to the interstate to France Street and

22  then France Street to the location of the

23  protesting.

24       Q.   And once you got there, did you have any

25  sort of kind of briefing or sort of a roll call

1    with your law officers that you were supervising at

2    that time?

3        A.    No, we did not.  It was get to that

4    location as fast as possible.  There was a lull

5    when we arrived.  There was an officer passing out

6    gas masks, advising everybody to put them on and

7    work together.

8        Q.    Was the intention that tear gas was going

9    to be deployed at that point?

10       A.    We were not sure.  The officer that

11   passed out the gas masks said it was a possibility.

12   Ultimately, they told us to remove the gas masks,

13   they weren't going to need them.

14       Q.    I'm going to share with you a brief clip

15   of a video so we're oriented to the same location

16   and time, and then I'm going to ask you some

17   specific questions about my client.  Once we get

18   through with that, I'll turn it over to Dave.  So

19   bear with me one moment while I load up a video for

20   us here.  So this is going to be Exhibit 8 for

21   purposes of this deposition.  It's currently in the

22   record of our joint depositions as Exhibit FF. It's

23   a file entitled, "MFF Downtown."  Sorry for the

24   delay.  This should be appearing on your screen

25   momentarily.  If it doesn't, I'm going to throw

1    this laptop through the wall, but, hopefully, it

2    does.  Is that visible?

3        A.    Yes.

4        Q.    So this is a rather long video.  I'm

5    going to advance it to about the three-minute mark

6    and play it for about 20 seconds, just so we're on

7    the same page and time frame we're talking about

8    here, and then I'll come back and ask you a few

9    more questions about this video and some additional

10    photos and videos that we have.

11                      {VIDEO PLAYED}

12    BY MR. FOLEY:

13        Q.    I'm going to rewind this just a few

14    seconds, and although it may be difficult to see,

15    is this you here in the -- where my cursor is

16    indicating, Officer Pittman?

17        A.    Yes.

18        Q.    And so do you recall this scene here at

19    the corner of France and Government?

20        A.    Yes.

21        Q.    I want to show you an exhibit that we're

22    going to mark as Exhibit Number 9.  It is an image

23    called Kosofsky arrest Chicago Tribune.  Has that

24    image appeared on your screen, Officer Pittman?

25        A.    Yes.

1      Q.   Have you ever seen this photo before?

2      A.   Yes, I have.

3      Q.   If you recognize anyone in the frame, can

4  you please identify them for me?

5      A.   The officer behind me, the female

6  officer, is Alaina Mancuso.

7      Q.   That would be the officer that looks to

8  be in the purple shirt?

9      A.   Purple shirt, yes.  The officer in the

10 black shirt, white male in the background, that's

11 Lieutenant Kenneth Brewer, and I don't know the

12 uniformed officers.

13     Q.   And then I will -- this is you here in

14 the gray T-shirt in the foreground; is that right?

15     A.   Yes.

16     Q.   I'll represent to you that the lady that

17 your are escorting in that moment is our client,

18 Miss Sophie Kosofsky in the black shorts and gray

19 top.  Do you recall any of your interactions with

20 Ms. Kosofsky that day?

21     A.   Yes, I do. She was different than the

22 first person I escorted.  She was very cooperative,

23 but she would not speak.  I was generally having

24 conversations with people, like where you from, you

25 know just curious, but she was would not talk.  So

1    I just walked her to the designated area, and that

2    was it.

3          Q.    And you said she was cooperative; is that

4    right?

5          A.    Oh, yes, yes.  Once I was walking her.  I

6    don't know what occurred before, but once I was

7    walking her, she was cooperative.

8          Q.    There was no resistance put up by her?

9          A.    Right.

10         Q.    In your experience with her?

11         A.    No.

12         Q.    As we discussed earlier then, once you

13   dropped her off at prisoner processing/the

14   transport area, did you have any further contact

15   with her?

16         A.    No.

17         Q.    I'm going to quit sharing this for a

18   moment and display another series of photos.  This

19   one here is going to be, as I said, Exhibit 9.  The

20   next three photos, two of them have already been

21   introduced in our series of joint depositions as

22   Exhibit Quintuple P and Quintuple Q, and so I will

23   load those up here.  Did that new image appear or

24   is it still the same one on your screen, Officer?

25         A.    Same.

1    Q.   All right.  Let me adjust that.  Okay.

2    How about now?

3    A.   I see that new one.

4    Q.   Can you identify for me this officer in

5    the foreground of the left?  An African-American

6    female it appears to be.

7    A.   Yes.  That was a crime scene officer, but

8    I can't recall her name right off the top of my

9    head.

10    Q.   And then I'm going to zoom in slightly on

11    the background here.  Does that appear to be Miss

12    Kosofsky where my cursor is pointed at the moment?

13    A.   It appears to be.

14    Q.   Do you recognize any of the officers

15    surrounding her?

16    A.   Those appear to be Louisiana State

17    Troopers, but I do not recognize them.

18    Q.   I'm going to display another image for

19    you in the same vein.  This is -- I'm sorry.

20    MES70567-10-16(126).  This will be marked as

21    Exhibit 11.  The previous exhibit will be Exhibit

22    10.  Exhibit 10 was also marked in our earlier

23    depositions as Quintuple P.  This image I do not

24    believe had been introduced in the earlier

25    depositions.  Are you able to see any more clearly

```
 1   who these two officers are, Officer Pittman?
 2        A.   They're Louisiana State Police, but I do
 3   not know them.
 4        Q.   There is one other image here, Quintuple
 5   Q.  I'm going to forgo showing that to you, because
 6   I think you already covered that.  Do you remember,
 7   were those the officers who handed Ms. Kosofsky to
 8   you?
 9        A.   As I recall, like I said, maybe there is
10   a video somewhere, but I don't recall specifically.
11   I would assume so.
12        Q.   So I have a couple of videos that might
13   help with that.  Let me try -- so this has
14   previously been entered as Quadruple H.  For the
15   purposes of this deposition, I'm going to refer to
16   it as Exhibit 13.  It's a file called KMW8 --
17             MR. SCOTT:
18                  Eric, you didn't introduce your
19                  original 12.  Do you want to skip 12
20                  and go straight to 13?
21             MR. FOLEY:
22                  Yeah, I am, just because I've
23                  already got the others numbered.  At
24                  the risk of not screwing myself up in
25                  the numbering later, I'll just skip 12.
```

44

```
 1          MR. SCOTT:
 2               That's okay.  I just wanted to make
 3          sure.
 4          MR. FOLEY:
 5               I appreciate that.
 6  BY MR. FOLEY:
 7     Q.   Yes.  So this is KMW827307-10-16(38). Are
 8  you able to see that video on the screen now,
 9  Officer Pittman?
10     A.   Yes.
11     Q.   I'm going to forward this video to around
12  the one minute and 45 second mark.  Actually,
13  before I do, is this you here in the image on the
14  right?
15     A.   Yes.
16     Q.   Would this woman here have been the first
17  arrestee that you mentioned?
18     A.   Yes.
19     Q.   Who is this officer on the left?
20     A.   That is Jason Dohm, D-O-H-M.
21     Q.   I'm going to play this for just about ten
22  or 15 seconds and ask you a quick question on that.
23               {VIDEO PLAYED}
24  BY MR. FOLEY:
25     Q.   I'm actually going to show you another
```

1    video in conjunction with that and then ask my

2    question, because I think the two together might

3    help us constructing a timeline here.  So this is

4    going to be Exhibit 15.

5            MR. FOLEY:

6                    I know, Joe, we just skipped 14.

7                We're going to hit 14 in a second.  I

8                think it will be a little clearer if we

9                hit 15 first.  It is called Kelly

10               Orians.  Sorry. 2016.7.10 video by

11               Kelly Orians www.facebook.com.

12                   {VIDEO PLAYED}

13   BY MR. FOLEY:

14       Q.   Are you able to see that?

15       A.   Yes.

16       Q.   I'll pause it for a second and advance it

17   to the three-minute mark and play that for a few

18   seconds and ask you if you are able to identify

19   yourself in the frames.

20                   {VIDEO PLAYED}

21   BY MR. FOLEY:

22       Q.   Officer Pittman, are you able to identify

23   yourself in any of the footage that we've just

24   watched?

25       A.   Yes.  That was kind of blurry, but that

1    was me.

2         Q.   Let me rewind that and get this in the

3    frame here.  Would it be this figure here that my

4    cursor is indicating?

5         A.   It's hard to tell, but when it was

6    moving, it appeared to be me.

7         Q.   It's a little easier when it is moving.

8    I'll rewind just a little bit and play it.

9                   {VIDEO PLAYED}

10   BY MR. FOLEY:

11        Q.   So that figure is you; is that correct?

12        A.   Yes.

13        Q.   So as we discussed before, you would have

14   taken Ms. Kosofsky back up France towards the

15   interstate; is that right?

16        A.   That's correct.

17        Q.   And then, as we said before, you would

18   have dropped her off, and there wouldn't have been

19   any further contact with her, no conversations?

20        A.   No.  Like I said, I had just general

21   conversation with her, but she did not want to

22   talk.

23        Q.   I want to show you one document which is

24   Ms. Kosofsky's Probable Cause Affidavit.  It's

25   currently in the record as Exhibit V.  For our

1   purposes today, I was going to mark it as Exhibit

2   16.  I'm going to share that to the screen.  I'll

3   zoom out so it's a bit more legible.  Officer

4   Pittman, once you had a chance to review that, let

5   me know, and I'll begin with my questions.

6        A.    Yes.

7        Q.    So very basic questions.  Are either the

8   signature of the affiant or the notary public yours

9   on this form?

10       A.    No.

11       Q.    Did you have any role in filling this

12  form out?

13       A.    No, I did not.

14       Q.    And no officer asked for your input or

15  for an explanation from you?

16       A.    No, and I did not witness Ms. Kosofsky.

17  I only came back, and she was already in custody.

18  I didn't witness her -- what goes with what she

19  did.

20       Q.    I'm going to share another document here

21  which is going to be the arrest report, which is

22  titled, conveniently enough, Kosofsky Arrest

23  Report.

24            MR. SCOTT:

25                 Are we back to sequential numbering?

```
 1            MR. FOLEY:
 2                    This will be 17, yes. Back to the
 3                 land of sequential numbering and all
 4                 its comfort.
 5      BY MR. FOLEY:
 6           Q.   Officer Pittman, once you had a chance to
 7      look that over, let me know.  I'll direct your
 8      attention to the last page of this supplemental
 9      report.
10           A.   Yes.  I'm ready.
11           Q.   I misspoke.  Before I direct your
12      attention to the last page, on I believe the first
13      page here, the report officer listed is Alaina
14      Mancuso.  Is that right?
15           A.   Yes.
16           Q.   On the second -- sorry.  At the bottom of
17      that first page there is a notation here that
18      report approved by Jeffrey Pittman on July 13th,
19      2016.  Do you recall reviewing this report or
20      approving it?
21           A.   I don't recall specifically, but, yeah, I
22      approved it.
23           Q.   Did Officer Mancuso ask you for any input
24      in this report or otherwise have you assist in its
25      preparation?
```

1    A.    No.

2    Q.    Do you have any reason to believe that
3    this second paragraph regarding Ms. Kosofsky's
4    arrest is accurate, and, in particular, I'm
5    referencing the second sentence that begins with,
6    "While grabbing Kosofsky's right hand, she began to
7    pull away from me.  After a short struggle, I was
8    able to place Kosofsky's hands behind her back
9    without further incident.  I placed Kosofsky into
10   flex cuffs, and she was transported, Kosofsky, to a
11   nearby bus."

12   A.    I did not witness the incident.  When I
13   got back, she was already in custody, and I just
14   walked her to the back.

15   Q.    Did you ever witness Alaina Mancuso in
16   any physical contact with Sophie Kosofsky?

17   A.    No.

18   Q.    On that day, was there any point at which
19   you would have entered onto the front lawn of the
20   home at the corner of East and France Boulevard
21   where the protesters had gathered?

22   A.    I recall that I did.  Yeah.  I might have
23   been on the edge of it, but I don't specifically
24   recall exactly where I was standing.

25   Q.    How long were you and your officers you

1    were supervising in the Narcotics Division out

2    there in Downtown performing this function of

3    transporting arrestees to the processing area?

4         A.   I don't recall.  We were down there until

5    we were released by Myron Daniels, by SRT, once the

6    protesters dispersed.

7         Q.   I have a couple of final questions.  I

8    use the word "final" loosely.  I have a few more

9    questions before I turn over to Mr. Lanser.  I

10   wanted to share another document with you which I

11   suspect Mr. Scott has already printed out.  It is

12   the Pittman, Jeffrey underscore ia.pdf.  I would

13   ask you to review that for a moment and let me know

14   when you've had a chance to fully review the

15   document.

16        A.   I'm ready.

17        Q.   So what I'd like to know is the incidents

18   listed here, if you can provide us with detail on

19   what happened here.  We're just given kind of a

20   bare description.  So, for example, this August

21   26th, 2009 event was use of force, accidental

22   discharge.  Can you tell us what that was?

23        A.   Yes.  If I'm remembering correctly, this

24   is when we were executing a search warrant.  We had

25   completed and secured that residence, and I was

1  trying to instruct another officer on how to

2  properly use the ram, and I leaned my shotgun up

3  against the wall, and it fell and discharged into

4  the ground.

5      Q.    The disposition on this was not

6  sustained, so no disciplinary action would have

7  resulted from that?

8      A.    Yes.

9      Q.    Was anyone injured during that event?

10     A.    No.

11     Q.    This next one in sequence here, July 1st,

12  2010, allowing escape, which appears to be have

13  sustained/conference worksheet.  Can you tell me

14  about that event?

15     A.    Yes.  Another officer had made an arrest,

16  and they were -- it was a newer detective.  They

17  needed to apply for a search warrant for a vehicle

18  that was at the scene.  I was instructed by my

19  supervisor to go to the office and type the search

20  warrant for the officer, because he was

21  inexperienced.  So I was typing the search warrant

22  when the officer's prisoner escaped.  I had no

23  contact with the prisoner; however, I was given a

24  conference worksheet, which is like an in-house

25  discipline for the prisoner's escape.

1    Q.   So what is the effect of a conference
2  worksheet?
3    A.   It's just basically stays in-house.  I
4  think it stays with your supervisor for a year and
5  then is discarded.  I had no fault in it.  I was
6  sitting at a computer typing a search warrant, but
7  they deemed it necessary to give me a conference
8  worksheet.
9    Q.   So this third event here, July 21st,
10  2011, damaging department equipment, that results
11  in a letter of caution.  What was that?
12    A.   A traffic accident.
13    Q.   July 26th, 2012.  Was that also an
14  accident or what was that from?
15    A.   Yeah.  That would have been an accident,
16  traffic accident.
17    Q.   Did any injuries arise from these traffic
18  accidents?
19    A.   I know on one there was injuries.  Well,
20  it wasn't injuries apparent at the scene, but later
21  they filed a civil suit regarding this.
22    Q.   Did that end up resulting in a
23  settlement?
24    A.   I don't remember whether it settled.  I
25  did participate in a deposition regarding that, but

```
1    I don't know what the outcome was.
2         Q.   You never had to show up at a trial?
3         A.   No.
4         Q.   Date Number 5 here.  I'm not really sure
5    what that means.  Info only money count discrepa.
6    I suppose that would be discrepancy.  Can you tell
7    us what that event --
8         A.   Yes.  When the money is counted that is
9    being seized, it's placed into evidence, and then
10   Internal Affairs goes in and counts that money
11   again prior to placing it into an escrow account.
12   Sometimes, and this is prior to us, I believe,
13   having a money counter, we counted it by hand.  So
14   sometimes you might have been over on your amount,
15   and it was actually a less amount of money, or you
16   might be $20 short.  So, obviously, this was a
17   money count discrepancy either over or under what
18   the amount listed on the evidence bag was.
19        Q.   How much was it over or under by?
20        A.   Oh, I don't recall specifically what this
21   one was, but I wasn't contacted.  Basically, I was
22   contacted -- I counted the money and was contacted
23   and advised it was over or under, and we had to
24   have the detective supplement the report to
25   indicate that.
```

1    Q.    The disposition listed here is just

2    office investigation.  What does that mean?

3    A.    I do not know what that means.

4    Q.    Has there been any other resolution of

5    this claim that you are aware of?

6    A.    No.  There was no -- I know there were no

7    complaints made against me regarding this.

8    Q.    The second page is going further back.

9    This one says Special Investigation.  What would

10   that have been from July of '96? It appears there

11   is two right in a row.  July '96 and then August

12   '96, both listed as Special Investigation and both

13   appear to be sustained.

14   A.    Yeah.  I recall that was kind of part of

15   one investigation.  It was relative to -- I was off

16   duty, went to a bar, and one of the persons riding

17   with me had a fake ID that I was unaware of, and so

18   I was investigated and advised that I should check

19   everybody's ID that get in my vehicle.

20   Q.    Date Number 3 on that same page is

21   December '97, shirking duties. Do you recall the

22   circumstances of that, the complaint?

23   A.    That one I do not remember at all.

24   Shirking duties.  I don't recall that at all.

25   Q.    Moving on to the next page and last page

1   of this document, there is a complaint at Date 7,

2   February 13, 2003, use of force.  What were the

3   circumstances of that use of force?

4       A.   That was relative -- that was an

5   investigation, if I recall correctly, relative to

6   another detective in the Narcotics Division.  There

7   was a complaint made against him for use of force.

8   It was on an operation.  There was multiple people

9   interviewed along with myself.  There was use of

10  force during an arrest but not specifically against

11  me.

12      Q.   Do you know how that was resolved against

13  the other officers?  I see it's not sustained

14  against you.

15      A.   That officer is currently employed by the

16  Federal Government with the DEA, so I assume that

17  it was resolved, and he was able to be hired by the

18  DEA.

19      Q.   July 2004 use of force.  Do you recall

20  the circumstances there?

21      A.   No, I do not.  I don't.

22      Q.   Date Number 10, June 7th, 2005, use of

23  force shooting, noncontact -- I don't know if

24  that's contact or how that's --

25      A.   Yeah, it's noncontact.  I shot at a

```
 1   pitbull during an execution of a warrant, and I
 2   missed the pitbull.
 3              MR. SCOTT:
 4                   It's a small target.  They move
 5              fast.
 6   BY MR. FOLEY:
 7        Q.   Okay.  That's all the questions I have
 8   for now on this document.  Before I turn it over to
 9   Dave, I just wanted to ask one follow-up on a
10   conversation we had earlier on training for duty to
11   intervene.  I realized I asked you about
12   specifically about the Academy, but I didn't ask
13   you about later in-service trainings or any
14   training since then on duties to intervene.  Can
15   you recall any times that you've had trainings on
16   duty to intervene?
17        A.   I don't recall specifically.  There may
18   have been something covered, but I don't recall
19   specifically.
20        Q.   Okay.  Is it your understanding that the
21   duty to intervene extends to all law enforcement
22   officers?
23        A.   I would believe so.
24        Q.   Is it your understanding that you would
25   have a duty to intervene to prevent a law
```

1 enforcement officer of another agency from

2 violating someone's rights or from violating the

3 law?

4      A.    Yeah.   If it was egregious, yes.   You

5 would at least need to report it to your

6 supervisors.

7      Q.    Did you make any reports to your

8 supervisors of other law enforcement officers --

9 well, officers of other law enforcement agencies

10 having violated the law or a person's

11 constitutional rights during the protests on July

12 9th and 10th, 2016?

13      A.    No.   Like I advised, I did not witness a

14 specific incident in July.   No reason to believe

15 they were violating anybody's rights.

16           MR. FOLEY:

17                Well, that is all I have for now.   I

18                am going to turn it over to Dave.   I'd

19                also like to reserve five minutes at

20                the end if any additional questions

21                have come up as a result of Dave's or

22                Joe's questionings.

23 EXAMINATION BY MR. LANSER:

24      Q.    Officer Pittman, my name is Dave Lanser.

25 I'm with the attorneys for the plaintiffs in the

58

```
 1   Blair Imani case, which is specifically about the
 2   July 10th protest, so I'm going to be asking you
 3   just a few follow-up questions about July 10th.
 4   First of all -- sorry.  I'm just kind of getting my
 5   notes organized here.  First of all, just to -- I
 6   know you went through this a little bit with
 7   Mr. Foley, but just to clarify.  So the process --
 8   correct me if I have this wrong.  I believe what
 9   you said was the process for making arrests on July
10   10th was that the Mobile Field Force actually made
11   arrests.  They handed them to you, and you escorted
12   them to processing; is that correct?
13        A.   Yeah.  That's generally what happened.
14   There were other arrests made that day by different
15   officers.  I know there were arrests of somebody
16   that had a warrant.  They observed them there,
17   arrested them.  I know that there were officers
18   that made arrests on their own, but our general
19   instructions were if Mobile Field Force made an
20   arrest, then we were to transport them to the
21   processing location.
22        Q.   On July 10th, you didn't personally make
23   any arrests?
24        A.   No, I did not.
25        Q.   How many people would you say you
```

1    transported from Mobile Field Force to processing?

2         A.    I think two.  It could have been more.

3         Q.    So two or three?

4         A.    Yes.

5         Q.    In any of those circumstances, did Mobile

6    Field Force describe the details of the arrest or

7    the reasons the person was being arrested?

8         A.    No, they did not.

9         Q.    So since you didn't have those details

10   described to you, I'm assuming you did not describe

11   those details to the people on the processing team?

12        A.    No, I did not.

13        Q.    You also mentioned to Mr. Foley, I

14   believe you said that when you first arrived at

15   East and France, you observed, I think you said, a

16   three-inch piece of a brick being thrown?

17        A.    Yeah.  It was a partial piece of a brick

18   that came flying over the top.  I didn't see who

19   threw it.  It was seen, and everybody started

20   communicating to watch out.

21        Q.    Did you see anything else thrown or any

22   other violence while you were at East and France?

23        A.    No.  There was later further down on

24   France Street toward the end there was a water

25   bottle thrown, but I did not -- like I said, I did

1  not see who threw that either, but that was the

2  incidences I saw.

3      Q.   That water bottle, that would have been

4  after protesters had started to clear out of that

5  area?

6      A.   Yes.

7      Q.   Do you know if that was down -- I know

8  that protesters were cleared out toward where that

9  McDonald's is.  Is that about where you would have

10 seen that bottle thrown?

11     A.   Yes.  Right around the McDonald's is

12 where I saw the bottle thrown.

13     Q.   But whether the brick or the bottle -- in

14 neither instance, you didn't see who threw either

15 one, correct?

16     A.   No, I did not.

17     Q.   You also mentioned to Mr. Foley you heard

18 on the radio something about the protesters

19 potentially trying to take the interstate.  Is that

20 correct?

21     A.   Yes.

22     Q.   Did you personally hear any protesters

23 discussing taking the interstate?

24     A.   No.  I could not hear.  When I arrived,

25 the Mobile Field Force was mostly in place, and I

1    did not hear anybody yell.  There was a lot of

2    yelling, but I couldn't hear anybody specifically

3    saying that.

4        Q.   So the only information you had on July

5    10th about protesters wanting to take the

6    interstate was through the radio communications?

7        A.   Yes.

8        Q.   I'm going to pull up an exhibit here.  So

9    I think for today's purposes this would be Exhibit

10   19, but this has previously been used in our joint

11   exhibit list, the kind of running list, as Exhibit

12   A.  Let me share my screen real quick.  Can you see

13   this document on the screen?

14       A.   Yes, I can.

15       Q.   I'll represent to you this is a

16   complaint, the complaint filed in the Imani case.

17   I'm going to move ahead to Page 37.  We talked or

18   you talked with Mr. Foley about this individual

19   earlier.  Do you recognize this individual in the

20   middle here?

21       A.   Yes.

22       Q.   Do you remember what her name is?

23       A.   Blair Imani.

24       Q.   That's you on the right here in the gray

25   T-shirt?

1      A.    Yes.

2      Q.    Jason Dohm, if I remember correctly, on

3  the left in the maroon T-shirt?

4      A.    Yes.

5      Q.    Do you recognize anyone else in that

6  photo?

7      A.    I can't see who that is.

8      Q.    Blair Imani is one of the people you

9  described earlier where Mobile Field Force arrested

10  her and handed her to you?

11      A.    Yes.

12      Q.    So you don't know the circumstances that

13  led to her arrest specifically?

14      A.    No, I do not.

15      Q.    Do you remember at this time, when she

16  would have been handed to you, do you remember what

17  the current commands issued to the protesters would

18  have been at East and France?

19      A.    They had been telling them to disperse,

20  that their presence was unlawful for quite some

21  time prior to that, and they said they would be

22  arrested.

23      Q.    When you say dispersed, do you mean

24  dispersed from the area entirely or just off the

25  roadway?

1    A.    The way I understood it was disperse from
2    the area entirely.
3    Q.    So even people that had been standing on
4    that lawn on East and France were ordered to
5    disperse?
6    A.    They were being ordered to disperse.
7    That's all I know.
8    Q.    I'm going to pull up another document
9    here, which for today's purposes will be Exhibit
10    20, but this has previously been used as Exhibit C.
11    Give me one second.  I'm going to go to -- let me
12    find the right page here.  This is Page 5.  Have
13    you seen this document before?
14    A.    No, I have not.
15    Q.    Can you describe what we're seeing here?
16    A.    It's an Affidavit of Probable Cause for
17    Blair Brown.
18    Q.    If I represented to you that Blair Imani
19    also goes by Blair Brown, would you have any reason
20    to dispute that?
21    A.    No.
22    Q.    So looking at this Affidavit of Probable
23    Cause for Blair Brown, otherwise known as Blair
24    Imani, is this your name?  Did you sign this as the
25    affiant or the notary public?

1       A.   No.

2       Q.   Did you make any of these other markings

3   on here, filling out her name or race, file number,

4   anything like that?

5       A.   No.

6       Q.   Do you see in the middle of the synopsis

7   here where 9000 Airline Highway is crossed out and

8   500 East Boulevard is filled in?

9       A.   Yes.

10      Q.   I'm assuming that was not you either?

11      A.   No, it was not.

12      Q.   Did you fill out any portion of this

13  document at all?

14      A.   No, I did not.

15      Q.   Do you remember who you handed Blair

16  Imani off to in the processing area after you

17  transported her?

18      A.   No, I do not.  I don't remember if it was

19  a sheriff's deputy or a Baton Rouge police officer

20  at the staging location.

21      Q.   Do you know -- the way I am reading it,

22  the affiant on here appears to be William

23  Alexander.  Does that name sound familiar to you?

24      A.   It's not a name I know.

25      Q.   Let me pull up another exhibit here. This

1    will be Exhibit 21 for today.  This has previously
2    been used as Exhibit WWWW.  Can you see this screen
3    cap on your screen right now?
4         A.   Yes.
5         Q.   This is only 20 seconds.  I'm just going
6    to play this entire thing.
7                    {VIDEO PLAYED}
8    BY MR. LANSER:
9         Q.   Actually, I'll just pause it there at 14
10   seconds.  I'm going to rewind here.  Okay.  So
11   pausing -- unfortunately, at least on my screen,
12   it's not telling me which time stamp we're at now,
13   but you can see this on the screen right now?
14        A.   Yes.
15        Q.   Does this depict you and Jason Dohm
16   transporting Blair Imani?
17        A.   Yes.
18        Q.   Do you recognize anyone else in this
19   screen cap?
20        A.   The person in the black shirt to the left
21   of the photo is Lieutenant Kenneth Brewer.  Behind
22   me in the gray shirt is Andy Kuber or Chad Kuber is
23   his real name.  He goes by Andy Kuber.
24        Q.   Anyone else?
25        A.   I do not -- everybody else has their back

1    turned.  I do not know who anybody else is.

2         Q.   Let me move forward a little bit.  So is

3    that -- in the middle of the screen here, is this

4    Chad Kuber I think you said who is picking up a

5    sign?

6         A.   Yes.

7         Q.   I'm going to play the first few seconds

8    of this again.  I want you to keep an eye on Blair

9    Imani, if you don't mind.

10                    {VIDEO PLAYED}

11   BY MR. LANSER:

12        Q.   I'm going to back up to just two or three

13   seconds in.  I can play it again, if you need me

14   to.  It appeared that Blair Imani was on the ground

15   at the start of this video.  Is that what it looked

16   like to you, too?

17        A.   Play it again.

18                    {VIDEO PLAYED}

19              THE WITNESS:

20                   She may -- it looks like -- it

21                appears she fell, but I can't tell

22                where she came from prior to falling

23                there.  She was being pushed, you know,

24                brought through the line by the Mobile

25                Field Force.

BY MR. LANSER:

Q.    It appears that as the Mobile Field Force
was handing her back, she fell to the ground?

A.    That's what it appears.

Q.    I can play this again, if you want me to.
When the Mobile Field Force hands her off to you,
did it appear that she was in the roadway at all?

A.    It looks like she was on the sidewalk.

Q.    On the sidewalk.  Okay.  I'm going to
pull up one more video.  This will be Exhibit 22.
I don't believe it has been introduced before.  If
we're still doing the consolidated lettering, I
believe this would put us up to Exhibit Sextuple G.
Let me pull it up.

{VIDEO PLAYED}

BY MR. LANSER:

Q.    Can you see this new video on your
screen?

A.    Yes.

Q.    This is captioned Up to 40 Black Lives
Matter protesters arrested in Baton Rouge.  It's
not the full caption.  I'm going to skip ahead in
this.  For some reason the time is not updating on
my screen, so I can't give you the exact time
stamp, unfortunately, but I believe we are

1    approximately two minutes and 20 seconds into this

2    video.  Do you see the screen cap right now?

3         A.   Yes.

4         Q.   Do you recognize any of the individuals

5    in this screen cap?

6         A.   I do not.

7         Q.   I'm going to hit play for just a few

8    seconds here.

9                   {VIDEO PLAYED}

10   BY MR. LANSER:

11        Q.   Okay.  I'm going to stop it here.  This

12   is a screen shot from that portion I just played.

13   Does this appear to be you and Jason Dohm

14   continuing to lead Blair Imani from East and

15   France?

16        A.   Yes.

17        Q.   I'll play it again for you.  It appears

18   like you have a conversation with someone else

19   possibly off screen and sort of point down the road

20   and give a thumbs-up.  I am wondering if you can

21   give us a little context to that.  So let me play

22   it again.  Pay attention to that, if you don't

23   mind.  Here we go.

24                   {VIDEO PLAYED}

25   BY MR. LANSER:

1    Q.    Okay.  Did you see what I was referring

2  to there?

3    A.    Yes.  It could have been -- the other

4  gentleman behind us was Wayne Brashier, my boss.

5  That could have been who I was speaking to, and I

6  don't specifically recall that, but that could have

7  been who I was talking to.

8    Q.    You said the gentleman behind you is

9  Wayne Brashier.  Is that this person right here in

10  the black shirt?

11    A.    Yes.

12    Q.    I'm playing this again.  I'm going to

13  play it one more time.

14                    {VIDEO PLAYED}

15  BY MR. LANSER:

16    Q.    So talking about Miss Imani here, based

17  on this video, did you see anything in here you

18  would consider resisting arrest?

19    A.    No.  She was, like I said, when I first

20  contacted her, she was screaming.  As soon as we

21  passed the media, she was fine.  She talked to me.

22  She verbalized where she was from.

23    Q.    So once you got to this point, she was

24  complying?

25    A.    Oh, yes, yes.

1      Q.   And what about when she was screaming?
2  Would you consider that to be resisting arrest?
3      A.   No, no.  I felt as though -- to be honest
4  with you, I thought she was acting out in front of
5  the cameras.  I didn't feel she was resisting.
6      Q.   And then I see you walking down -- I
7  believe this is France Street, correct?
8      A.   Yes.
9      Q.   I assume the processing center is down
10 France Street there, and that's why you are walking
11 --
12     A.   Yeah.  You would go down to the end
13 there, which is right at the interstate, take a
14 left, and there was Government Street.
15          MR. LANSER:
16               I believe that is all of the
17          questions I have.  I know Eric had
18          reserved an opportunity to ask some
19          more questions.  Eric, I don't know if
20          you mean after Joe and Greg.
21          MR. FOLEY:
22               Yeah, I can wait, if they have
23          questions.  We are almost at the two-
24          hour mark, if folks want a bathroom
25          break or something.  I only have two

1          question on one video.

2               MR. SCOTT:

3                    Is that the Eric Foley, I have eight

4               questions, but I think it's only two?

5               MR. FOLEY:

6                    No.  I think this is actually only

7               two to three.  There is not going to be

8               eight.

9               MR. LANSER:

10                   Not including subparts, right, Eric?

11              MR. FOLEY:

12                   Of course.  There is always

13              subparts.

14     EXAMINATION BY MR. SCOTT:

15         Q.   What is the primary role of a crime scene

16     officer?

17         A.   To document evidence.

18         Q.   Would the crime scene officers ordinarily

19     be effecting arrests out there?

20         A.   Not normally, no.  They would just be

21     there to photograph and video.

22         Q.   Looking at Exhibit 7, the roster, some of

23     the narcotics squad was also part-time SRT; is that

24     correct?

25         A.   Yes.

1      Q.   If you were part-time SRT during this
2  time period, did you stay with your regular
3  division or were you removed to SRT?
4      A.   You were removed and placed in SRT.
5           MR. SCOTT:
6                That's all my questions.  Greg, do
7             you have anything?
8           MR. LANSER:
9                Greg, do you have anything?
10          MR. FAHRENHOLT:
11               I have no questions.
12  BY MR. FOLEY:
13     Q.   I have just one video, like I said, I
14  wanted to show from July 9th.  I don't believe that
15  it's in our shared exhibits, although, Dave,
16  correct me if I'm wrong, but this one is 201607.09
17  at 0928 PM live.  Huffpost marked voices captioned
18  Protesters gather among heavy police presence, and
19  the title keeps going, but I think we have
20  eliminated that it is any other file at this point.
21               I'm going to share that screen with you
22  for about 15 seconds of footage, Officer Pittman,
23  and then I'll have just a few questions on that.
24  And if you could, just let me know once the image
25  appears on screen to make sure that we've got it

```
 1   there.
 2        A.   Okay.  I see it.
 3        Q.   All right.
 4                 {VIDEO PLAYED}
 5   BY MR. FOLEY:
 6        Q.   Officer Pittman, this was a somewhat, I
 7   guess, notorious image in that it was widely
 8   publicized at the time.  The officer that is
 9   holding what looks to be a long gun there, is that
10   Alaina Mancuso?
11        A.   Yes, it is.
12        Q.   So my questions for you are just since
13   you were in a leadership position in that Narcotics
14   Division at that time, can you tell me was there
15   any sort of disciplinary action taken against
16   Officer Mancuso as a result of the images that were
17   published of her aiming her weapon at these
18   protesters?
19        A.   Not that I'm aware of.
20        Q.   Did you have any discussions with Captain
21   Brashier or any other supervisors in the unit about
22   this incident?
23        A.   Captain Brashier had many discussions
24   about that with Lieutenant Kenneth Brewer, who was
25   in charge of her.  I would not have been in that
```

1    chain of command to -- if there was anything talked

2    about, I wouldn't have been in that line at that

3    particular time.

4        Q.   So you are unaware of any kind of action

5    that was taken against her for this?

6        A.   I'm not aware departmentally or

7    internally.  I don't believe any action was taken

8    against her.

9        Q.   Okay.

10       A.   It was verbally, you know.

11           MR. FOLEY:

12               All right.  That's all I have.

13             Thank you, Officer Pittman.

14           MR. LANSER:

15               I think we're done.

16               [End of deposition, 11:21.]

17

18

19

20

21

22

23

24

25

```
 1                    WITNESS CERTIFICATE
 2
 3
 4
 5              I, LIEUTENANT JEFFREY PITTMAN, have
 6    read or have had the foregoing testimony read to me
 7    pursuant to Rule 30(e) of the Federal Rules of
 8    Civil Procedure and do hereby certify that to the
 9    best of my ability and understanding, it is a true
10    and correct transcription of my testimony.
11
12
13    Please check one:
14
      _____Without corrections
15
16
      _____With corrections (see errata sheet)
17
18
19
20    _____     _____
      JEFFREY PITTMAN                            Date
21
22
23
24
25
```

76

1                 C E R T I F I C A T E

2

3              This certification is valid only for
a transcript accompanied by my original signature
4   and original required seal on this page.

5              I, SANDRA P. DIFEBBO, Certified
Court Reporter, in and for the State of Louisiana,
6   as the officer before whom this testimony was
taken, do hereby certify that LIEUTENANT JEFFREY
7   PITTMAN, after having been duly sworn by me upon
authority of R.S. 37:2554, did testify as
8   hereinbefore set forth in the foregoing 75 pages;

9              That the testimony was reported by
me in stenotype, was prepared and transcribed by me
10  or under my personal direction and supervision, and
is a true and correct transcript to the best of my
11  ability and understanding;

12             That the transcript has been
prepared in compliance with transcript format
13  guidelines required by statute or by rules of the
board, that I have acted in compliance with the
14  prohibition on contractual relationships as defined
by Louisiana Code of Civil Procedure Article 1434
15  and in rules and advisory opinions of the board;

16             That I am not related to Counsel or
to the parties herein, nor am I otherwise
17  interested in the outcome of this matter.

18

19

20

21  _____
    Sandra P. DiFebbo,
22  Certified Shorthand Reporter

23  Date:  _____

24

25