UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


BLAIR IMANI, et al.                    DOCKET NO.

      Plaintiffs,                 17-cv-00439JWD-EWD

   V.


CITY OF BATON ROUGE, et al.

      Defendants.



    DEPOSITION OF LIEUTENANT DAVID WALLACE,
given in the above-entitled cause, via Zoom
videoconferencing, pursuant to the following
stipulation, before Sandra P. DiFebbo, Certified
Shorthand Reporter, in and for the State of
Louisiana, on the 9th day of July 2021, commencing
at 9:15 AM.

```
 1   APPEARANCES (Via Zoom):
 2   REPRESENTING THE PLAINTIFFS:
     (Imani v. City of Baton Rouge)
 3
               MOST & ASSOCIATES
 4             BY:  DAVID LANSER,
               ATTORNEY AT LAW
 5             201 St. Charles Avenue
               Suite 114 #101
 6             New Orleans, Louisiana  70170
 7
     REPRESENTING THE PLAINTIFFS:
 8   (Smith v. City of Baton Rouge)
     (Batiste-Swilley v. City of Baton Rouge)
 9   (Tennart v. City of Baton Rouge)
10             MACARTHUR JUSTICE CENTER
               BY:  JIM CRAIG, ATTORNEY AT LAW
11             MANDISA MOORE-O'NEAL, ATTORNEY AT LAW
               HANNAH LOMMERS-JOHNSON, ATTORNEY AT LAW
12             ERIC FOLEY, ATTORNEY AT LAW
               4400 S. Carrollton Avenue
13             New Orleans, Louisiana  70119
14   REPRESENTING THE CITY/PARISH OF BATON ROUGE AND
     BATON ROUGE CITY POLICE OFFICERS:
15
               EAST BATON ROUGE PARISH ATTORNEY'S OFFICE
16             BY:  JOSEPH K. SCOTT,
               ATTORNEY AT LAW
17             Suite 902
               222 St. Louis Street
18             Baton Rouge, Louisiana  70802
19   REPRESENTING THE LOUISIANA STATE POLICE AND
     INDIVIDUAL STATE POLICE TROOPERS:
20
               BURGLASS & TANKERSLEY, LLC
21             BY:  GREGORY FAHRENHOLT,
               ATTORNEY AT LAW
22             5213 Airline Drive
               Metairie, Louisiana  70001-5602
23
24   Also Present:  Megan Koilparampil
25
26
```

```
1   E X A M I N A T I O N         I N D E X

2

3                                        Page

4   BY MS. LOMMERS-JOHNSON:              5

5   BY MR. LANSER:                       96

6   BY MR. SCOTT:                        120

7

8

9   E X H I B I T                 I N D E X

10                        Page

11
    Exhibit 1                            22
12  Exhibit 2(SSSSSSS)            23
    Exhibit 3                  24
13  Exhibit 4                            26
    Exhibit 5                  34
14  Exhibit 6                  38
    Exhibit 7                            40
15  Exhibit 8                     43
    Exhibit 9                  50
16  Exhibit 10(SSSSS)                    54
    Exhibit 11                           59
17  Exhibit 12(ZZZZ)                     71
    Exhibit 13(YYYY)                     78
18  Exhibit 14                           93

19

20

21

22

23

24

25
```

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

4

                    S T I P U L A T I O N


                    It is stipulated and agreed by and
between Counsel for the parties hereto that the
deposition of LIEUTENANT DAVID WALLACE, hereby
being taken pursuant to the Federal Rules of Civil
Procedure for all purposes in accordance with law;
                    That the formalities of reading and
signing are specifically reserved;
                    That the formalities of sealing,
certification, and filing are hereby specifically
waived.
                    That all objections, save those as to
the form of the question and responsiveness of the
answer are hereby reserved until such time as this
deposition or any part thereof is used or sought to
be used in evidence.
                         *  *  *  *  *
                    Sandra P. DiFebbo, Certified Shorthand
Reporter, in and for the State of Louisiana,
officiated in administering the oath to the witness
via Zoom.

1          LIEUTENANT DAVID WALLACE, having been

2      first duly sworn, was examined and testified on

3      his oath as follows:

4  EXAMINATION BY MS. LOMMERS-JOHNSON:

5      Q.    Good morning, Mr. Wallace.  Could you let

6  me know what your current rank is?

7      A.    Lieutenant.

8      Q.    Perfect.  Thank you so much.  My name is

9  Hannah Lommers-Johnson, and I work at the MacArthur

10  Justice Center.  For the purposes of today's

11  deposition, I am representing plaintiffs in the

12  Smith, Tennart, AR, and Batiste-Swilley cases.

13  With me today from my office is Miss Moore-O'Neal

14  and Mr. Craig.

15          MS. LOMMERS-JOHNSON:

16              Does everyone else want to introduce

17            themselves for the record?

18          MR. LANSER:

19              Dave Lanser on behalf of the

20            plaintiffs in the Blair Imani case.

21          MR. SCOTT:

22              Joseph Scott for the City of Baton

23            Rouge and assorted individual

24            defendants.

25          MR. FAHRENHOLT:

1          Greg Fahrenholt for Louisiana State

2          Police defendants in five lawsuits.

3    BY MS. LOMMERS-JOHNSON:

4        Q.    Today, this deposition is going to be

5    pursuant to the Federal Rules of Civil Procedure.

6    After it's finished in a little while, after the

7    deposition, we'll ask that you can read and sign

8    the deposition with Mr. Scott.  For today's

9    purposes, the remote oath and sealing and

10   certification and filing are all waived.

11          Lieutenant Wallace, can I ask, do you

12   have any prior deposition experience?

13       A.    Yes, ma'am.

14       Q.    And is that from doing depositions with

15   or on behalf of the Baton Rouge Police Department?

16       A.    In addition to I have a private business.

17   We do motorcycle litigation for motorcycle crashes.

18       Q.    So it does seem like you had a lot of

19   deposition experience before, so I'll whip through

20   this.  I want to go over some of the ground rules

21   for today's deposition so that everything goes

22   smoothly.  As you know, we have a court reporter

23   here today, so just speak up so that she can hear

24   you.  I know it's even harder on Zoom.  Just make

25   sure that even though this deposition is being

1    recorded, you know, nodding of the head is not
2    going to be great on the transcript and try to say
3    yes instead of uh-huh, which is hard for me to
4    remember.  And you agreed today and understand that
5    the oath that you took just now to tell the truth
6    is the same as an oath that would be taken in court
7    to tell the whole truth?
8         A.   Yes, I do.
9         Q.   Today, if anything that I ask is
10   confusing or if my question is too long and
11   winding, and you can't follow it, I would just ask
12   that you ask for clarification rather than trying
13   to answer a question that I've put to you in a
14   confusing way that you can't understand.  Can you
15   agree to that?
16        A.   Yes, ma'am.
17        Q.   We will take breaks over the course of
18   today, like Mr. Scott was referencing. I just ask
19   that if there is a question out on the table, and
20   you need to take a break, please, just answer the
21   question before we go to break.  I also have to ask
22   today is there anything, any medication that you're
23   on or lack of sleep or anything like that, that is
24   a hardship that would contribute to you not being
25   able to fully answer and truthfully answer

1    questions?

2         A.    No, ma'am.

3         Q.    What did you do to prepare for today's

4    deposition?

5         A.    I haven't done much.  Just met this

6    morning with Mr. Scott about an hour prior and just

7    identified some dates that may be significant.

8    That's it.

9         Q.    Did you review any documents in

10   preparation for today's deposition?

11        A.    No, ma'am.

12        Q.    Did you review any video or images in

13   preparation for today's deposition?

14        A.    No, ma'am.

15        Q.    I think this may have been already

16   covered.  Did you speak to any other law

17   enforcement officers in preparation for this

18   deposition?

19        A.    No, ma'am.

20        Q.    Now I'd just like to hear a little bit

21   about your educational background starting with

22   where you went to high school.

23        A.    I went to high school at Live Oak High

24   School in Watson, Louisiana.  It was actually

25   Denham Springs.  Watson is not a city.

1       Q.    Did you graduate from Live Oak High
2    School?
3       A.    Yes, ma'am, I did.  In 1990.
4       Q.    After graduating high school, did you do
5    any further education?
6       A.    No, ma'am.
7       Q.    What year did you first work in law
8    enforcement?
9       A.    1992.
10       Q.    Was that with the Baton Rouge Police
11    Department?
12       A.    Correct.
13       Q.    Can you give me a brief outline of your
14    career at the Baton Rouge Police Department
15    starting in 1992 and up until now?
16       A.    Yes, ma'am.  In 1992, I started as a
17    cadet, because I wasn't old enough to carry a
18    weapon, so I couldn't go through the Academy.  When
19    I was old enough to go to a police academy, I was
20    put into the 57th Basic Academy, which I attended
21    in 1994.  After completing the Academy, I went
22    through the (inaudible) process and spent very
23    little time on the street, and I went into traffic,
24    the traffic unit.  I went into traffic in 1996.
25    During that time, I became an instructor for

```
 1   defensive tactics, radar, LiDAR, Solo motorcycles,
 2   I think SSGT instructor.  I attended some FBI
 3   instructor development courses.  I became a member
 4   of the Special Response Team, SWAT.  I became a
 5   SWAT sniper.  I attended the FBI National Academy
 6   in Quantico, Virginia.  I got promoted through my
 7   tenure in traffic.  I was an officer then I served
 8   as a shift sergeant.  Served as a shift lieutenant,
 9   special operations organizer, special event
10   organizer, and then assistant commander of traffic
11   and made the regular lieutenant, and now I'm
12   assigned to Fourth District as a squad lieutenant,
13   current assignment.
14        Q.    Okay.  Can I ask -- I think you said that
15   you were an SSGT instructor at one point.  Can you
16   tell me what that means?
17        A.    It's defensive tactics.  It goes along
18   with -- we taught the PPCT, and it was a new
19   curriculum for defensive tactics.
20        Q.    And can you -- sorry.  Can you tell me
21   what PPCT means?
22        A.    I think it is pressure point control
23   tactics.  It's a curriculum that we taught to our
24   officers to control individuals, such as hands on.
25        Q.    What year was it that you became a
```

1    lieutenant?

2         A.    I couldn't quote you.  I don't know.

3         Q.    Do you think it was prior to 2016?

4         A.    I think it was around 2016.  I don't know

5    if it was before the incident, the protest.  I

6    don't know.  It was in that time frame.

7         Q.    I think you covered this a little bit,

8    but can you tell me what your current

9    responsibilities are in your current role?

10        A.    Yes, ma'am.  I'm a shift lieutenant at

11   Fourth District day shift.

12        Q.    Who do you currently report up to?

13        A.    Captain Dave Mays.

14        Q.    Do you know who is Captain May's direct

15   supervisor?

16        A.    Yes, ma'am.  It would be Captain Wayne

17   Martin.

18        Q.    Above Captain Wayne Martin, do you know

19   who he directly reports to?

20        A.    It would be Deputy Chief Lawrence.

21        Q.    Does Deputy Chief Lawrence report up to

22   the police chief?

23        A.    Yes, ma'am.

24        Q.    Who reports directly to you in your

25   current role?

1    A.    Shift sergeants.  I have two shift

2    sergeants.

3         Q.    Those are both going to be Fourth

4    District shift sergeants?

5         A.    That's correct.

6         Q.    So most of my questions today are going

7    to focus on the 2016 protests in Baton Rouge,

8    specifically on Saturday, July 9th, and Sunday,

9    July 10th, but right now I want to ask whether you

10   have ever been on duty for or have responded to

11   another protest?

12        A.    No, ma'am.

13        Q.    How did you first hear about the death of

14   Alton Sterling in 2016?

15        A.    Well, as these events play back in my

16   mind, I remember working the Fourth of July and us

17   getting off late, going home exhausted, and maybe

18   waking up to breaking news.  I would assume.  I

19   can't recall how I initially heard.  Maybe the

20   local news.

21        Q.    At what point after you first heard about

22   the death of Alton Sterling were you asked to play

23   a role in the law enforcement response to the

24   protests after Alton Sterling's death?

25        A.    I don't recall the time frame.

1      Q.   Do you remember whether at the time of
2   Alton Sterling's death and at the time of the
3   protests, whether you exchanged any e-mails or text
4   messages with anyone else at the Baton Rouge Police
5   Department?
6      A.   Would you repeat that?
7      Q.   At the time of Alton Sterling's death and
8   the protests occurred, did you exchange any e-mails
9   or text messages with anyone else at BRPD regarding
10  his death or the protests?
11     A.   I don't recall.  I don't know.  I mean,
12  we got to keep in mind this is over five years ago,
13  so my memory is -- there are some events that are
14  very significant and some that, you know, I don't
15  remember.
16     Q.   Very fair.  I guess can you remember at
17  any time in the past year or so reviewing your
18  phone to check to see if you had any text messages
19  back from that time?
20     A.   My phone doesn't store messages that
21  long.  I have it where it automatically deletes
22  just to save storage, so I know that I couldn't
23  have done that.
24     Q.   During the law enforcement response to
25  the protests five years ago, did you communicate

1   with any of your supervisees or supervisors by

2   text?

3        A.    I don't know definitively one way or the

4   other.  It would not be uncommon for me to -- at

5   the time, my boss in the traffic division was

6   Captain Vernon.  I let him know what my duties and

7   responsibilities were, which would have been

8   independent.  That's only speculation, because I

9   couldn't say definitively if I did or not.

10  Something of that nature wouldn't be uncommon.

11       Q.    Now, stepping a little bit back again,

12  I'm wondering if you can describe for me the

13  training that you received at BRPD.

14       A.    I received a wide variety of training.

15  Is there anything in specific you want to target?

16       Q.    Yeah.  Can you generally describe for me

17  -- I know you were originally hired as a cadet and

18  then went through that Academy I think you said --

19       A.    '94.

20       Q.    '94.  After that, was there any regular

21  training that you received?

22       A.    Well, I'm a member of the Special

23  Response Team or SWAT, commonly known.  I would

24  train twice a month, every month, so 24 times a

25  year.  I was on SWAT, I don't know, 15, 16 years.

1    I've gotten off a couple of years.

2              THE COURT REPORTER:

3                   What did you say?

4              THE WITNESS:

5                   I was on SWAT maybe 14, 15, 16

6              years.  I can't recall exactly, but I

7              got off last year, and we would train

8              twice a month.  In addition, when I

9              became a SWAT sniper, we'd train

10             monthly.  So that's three times a

11             month.  Being a member of the Solo

12             motorcycles, which is a specialized

13             division, we did extensive training on

14             motorcycles, and then I did my regular

15             certifications yearly I would be

16             responsible for.

17   BY MS. LOMMERS-JOHNSON:

18        Q.   When did you join SRT?

19        A.   I don't recall the year.  Maybe 2002,

20   2003.  I'm guessing.  My life has just kind of ran

21   together recently.

22        Q.   Do you remember when you joined SRT, did

23   you have to apply or were you nominated or how did

24   that process work?

25        A.   I had to write a -- express my letter of

1    intent to be considered.  I had to do extensive

2    firearms and physical demonstrations.  I went

3    before an oral interview board, and then I was

4    selected by the team captains or leaders of the

5    team.

6         Q.    I guess this is a more specific question

7    about your training, but do you remember being

8    trained specifically on the Louisiana Revised

9    Statutes?

10        A.    Yes, ma'am.  The Academy touched on the

11   RS.

12        Q.    After the Academy, did you ever receive

13   refresher training on the revised statutes?

14        A.    I do recall periods of in-service

15   training which we do yearly on legal updates.

16   Certain statutes or specific statutes I couldn't

17   answer, but I do recall updates on laws.

18        Q.    Either in your regular trainings or in

19   your SRT trainings, did you ever receive specific

20   instruction on the statutes regarding obstruction

21   of a public passageway?

22        A.     In SWAT training, definitively, that

23   passage, I don't recall.

24        Q.    Did you receive any training on

25   responding to protests?

1          A.    I want to say yeah, that we did crowd

2     control trainings.  We was always prepared for

3     dignitary visits or things of that nature.  I do

4     vaguely remember doing some crowd control training

5     prior to this event.

6          Q.    Do you think the crowd control training

7     that you received was SRT training, or do you think

8     that was part of the normal training that other

9     officers received?

10         A.    I believe it would be specific to SWAT.

11    Fortunately, with SWAT members, we were exposed to

12    better training, better -- more in-depth training,

13    more details.

14         Q.    I know it's been a little while, but in

15    terms of the crowd control training that you

16    received, do you remember who the instructor was?

17         A.    No, ma'am.  I couldn't even remember the

18    details of the training.  In my mind, I can

19    remember us maybe doing things, you know, just

20    dealing with preparing for presidential visits or

21    dignitary visits.

22         Q.    Did you receive any specific training on

23    First Amendment rights?

24         A.    In the Academy.

25         Q.    Since the Academy, do you remember

```
 1   receiving any training on First Amendment rights?
 2        A.   Not that I recall, no, ma'am.
 3        Q.   Did you receive any training regarding
 4   the obligation of officers to intervene if they see
 5   another officer committing a constitutional
 6   violation?
 7        A.   In the Academy, I remember it being
 8   touched on.  We do know it is our obligation to
 9   protect everyone.
10        Q.   Is it your understanding that the
11   obligation to intervene when another officer is
12   violating someone's constitutional rights, does
13   that extend to intervening when you see an officer
14   from another law enforcement agency violating
15   someone's constitutional rights?
16        A.   Absolutely.
17        Q.   I think you indicated that you had
18   participated in training other officers at BRPD.
19   Can you tell me approximately when that was?
20        A.   Throughout my career, I've done several
21   classes.  My forte is motorcycles, but I've taught
22   defensive tactics classes.  I've taught for the
23   Academy point intersection, traffic control, and
24   direction.  That was during my tenure as a --
25   before a sergeant.  Well, even as a sergeant, I've
```

1    taught classes for motorcycles.

2         Q.    Do you remember when the last time you

3    taught the defensive tactics courses?

4         A.    No, ma'am.  It was quite awhile ago.

5    it's been awhile since I've taught these classes.

6         Q.    Prior to 2016 would you say?

7         A.    Oh, yes, ma'am.

8         Q.    Did any of the courses that you taught

9    touch at all on responding to protests?

10        A.    No, ma'am.

11        Q.    I know you've discussed being a member of

12   SRT and SWAT.  Were you a member of the BRPD Mobile

13   Field Force?

14        A.    No, ma'am.

15        Q.    Did you receive any Mobile Field Force

16   training even though you were not a part of Mobile

17   Field Force specifically?

18        A.    Pre or post the incident?

19        Q.    Let's start with pre-2016.

20        A.    I don't recall.  No, ma'am.  If I did, it

21   wasn't significant.  I don't recall.

22        Q.    Did you receive any Mobile Field Force

23   trainings after 2016?

24        A.    Yes, ma'am.  I do recall us reviewing

25   some of the tactics that were utilized by the

```
 1    Mobile Field Force and identified ways that we
 2    could be more effective as a special operation unit
 3    in assisting them in those tasks.  So we did
 4    training not specifically to Mobile Field Force but
 5    maybe SWAT involvement to assist Mobile Field
 6    Force.  We did -- I recall being a role player
 7    pretending to be a protester to help --
 8              THE COURT REPORTER:
 9                   You recall being a what?
10              THE WITNESS:
11                   I recall being a -- during that
12                training pretending to be a protester
13                and swapping roles and responsibilities
14                to assist with training.  Everyone did
15                it.
16    BY MS. LOMMERS-JOHNSON:
17        Q.   Was that training -- was the impetus for
18    that training the 2016 protests and the law
19    enforcement response there?  Is that what you were
20    reviewing in doing the training?
21        A.   Right.  We were -- correct.  In the event
22    that we would have to reorganize, we can build off
23    of our past experiences and be more efficient.
24        Q.   Can you remember what some of those sort
25    of main qualities of review were?
```

1       A.    I think it was more of a SWAT type

2    operation, being conscious of your backdrop in the

3    event you had an individual who was armed or trying

4    to inflict harm on someone else.  If you had to

5    stop them, knowing where they were, being

6    considerate of the direction the crowd is moving,

7    being considerate if you did have to send deadly

8    force, what was behind them, things that a SWAT

9    operator would do every day.

10       Q.    What were some of the main things that

11    were identified as areas where SWAT could improve

12    on assisting with the Mobile Field Force?

13       A.    I wasn't part of the administration for

14    SWAT.  I don't know what their final conclusions

15    were.  I do know that we -- when '16 originated, it

16    was new to us.  A lot of the stuff that we did was

17    -- we generated op orders and expectations off of

18    past experiences, which we had none in protests

19    that I recall.  So the training that followed was

20    just building off of what we recently went through

21    and, as a group, how could we be better or how

22    could we mitigate it safer, easier for everyone.  I

23    don't recall any of the findings or the conclusions

24    of that other than situational awareness, making

25    sure that if you are dealing with an incident,

1    don't get drawn into what your buddy is dealing

2    with.  Have situational awareness of what is going

3    on around you.  As we all know, the gabalong

4    (spelled phonetically) come to Baton Rouge

5    inflicted a lot of harm on it.  Not always what is

6    in front of you is the big picture.  You've got to

7    be conscious of everything around you.

8         Q.   So now what I would like to do is show

9    you a couple of different documents.  These are all

10   documents that we received in discovery from the

11   Baton Rouge Police Department.  I'm just going to

12   ask you if you recognize any of these documents.

13   I'm going to share screen.  Can you see what I've

14   pulled up on my screen?

15        A.   Yes, ma'am.  A PowerPoint.

16        Q.   Yes, exactly.  So I'm going to mark this

17   PowerPoint titled, "Crowd Management" as Exhibit 1

18   for today's deposition.  I'll scroll through it a

19   little bit just to give you an idea of some of the

20   content on here.

21        A.   Can you tell me who the author is of

22   this?

23        Q.   Unfortunately, I do not have access, or I

24   don't know who the author of this is.  We just

25   received it in discovery, so I'm not sure who the

1  author is, but what I would just initially ask you

2  is, do you recognize this PowerPoint as something

3  that you've seen before or been trained on before?

4        A.   No, ma'am.  I do not recall.

5        Q.   So when you received crowd management

6  training, you don't remember this being a part of

7  that training?

8        A.   No, ma'am.

9        Q.   Now I'm going to stop sharing this.  I'm

10  going to pull up a separate document that I'll mark

11  Exhibit 2 for today's purposes, and that is Exhibit

12  seven Ss in the long running alphabetical exhibit

13  list. Share screen again.  Can you see Exhibit 2 on

14  my screen now?

15        A.   Yes, ma'am.  PTG?

16        Q.   Yes.  Do you recognize PTG?

17        A.   No, ma'am.  I do not recognize this

18  document.

19        Q.   Do you know what PTG is, in general?

20        A.    I do not, but we're getting a message

21  that our Internet signal is low, so you are cutting

22  in and out periodically.  I do not recognize this,

23  and I do not know what PTG stands for.

24        Q.   You are cutting out a little bit, but I

25  think what I heard is that you don't recognize what

1    PTG stands for, and you don't recognize this
2    document?
3            A.    Correct.
4            Q.    Scrolling down.  I'm just going to go to
5    Page 4 of this document just to see if any of the
6    content of the actual document is familiar.  On
7    Page 4 of this document, it defines different types
8    of crowds, and going on to Page 5 describes an
9    aggressive crowd and then defines a mob.  Is any of
10   that instruction that you received as part of the
11   crowd management training that you remember?
12           A.    I don't know if -- part of your question
13   you were froze, but I do not recall any of this nor
14   these definitions.
15           Q.    Okay.  Thank you for that.  Now I'm going
16   to pull up just two more of these documents.  This
17   one I think we can whip through.  I'm going to
18   label this as Exhibit 3 for today's deposition.  I
19   know you previously said you didn't recognize the
20   PTG logo, but this specific document identifies
21   itself as a Mobile Field Force and Mobile Tactics
22   Instructional.  And, as I scroll down, I think I'm
23   going to go again to Page 4 of this PowerPoint
24   where it discusses the field force system as being
25   designed to provide a rapid, organized, and

1    disciplined response to civil disorder, crowd

2    control, special events, and natural or manmade

3    disasters.  Does any of the content in this

4    training, is any of this content anything you

5    remember being trained on as a part of the Mobile

6    Field Force training?

7        A.   No, ma'am.  You are still cutting out.

8        Q.   I'm having -- you are freezing up for me

9    a little bit.  I'm wondering -- I'm not sure

10   whether it's my Internet connection or your

11   Internet connection, but I guess I would just ask

12   if the other people on the call, if I'm freezing,

13   or I need to move rooms.  Maybe someone can shoot

14   it to me in the chat.  Dave, if you are there, let

15   me know.

16            THE COURT REPORTER:

17                You seem okay to me.

18            MR. SCOTT:

19                It may be us.

20            THE WITNESS:

21                It must be us.

22            THE COURT REPORTER:

23                I think it is on your end.

24            MR. SCOTT:

25                I will try and shift my operation

```
 1                        here.  If you give me five minutes,
 2                        I'll relocate and see if I've got a
 3                        better spot with the cable connection.
 4              MS. LOMMERS-JOHNSON:
 5                        Yeah.  Let's go off the record.
 6                        {BRIEF RECESS, 10:05-10:10}
 7    BY MS. LOMMERS-JOHNSON:
 8         Q.    I have one more exhibit to show you right
 9    now.  I'm going to mark this as Exhibit 4 for
10    today's deposition.  Can you see Exhibit 4 on my
11    screen?
12         A.    Yes, ma'am.
13         Q.    And this document, Exhibit 4, is titled,
14    "Baton Rouge Police Department Mobile Field Force."
15    It's another PowerPoint.  I'll just advance through
16    a couple of the slides to give you an idea of what
17    is on here.  Do you remember seeing this PowerPoint
18    ever before?
19         A.    No, ma'am.
20         Q.    Now, turning back specifically to 2016,
21    can you tell me what your role was during the
22    protests?
23         A.    During the protests, I was assigned to
24    Operations Command.  Myself and Captain Martin, who
25    was Lieutenant Martin at the time, and we were
```

1    working together.  I was under his command but part
2    of operations.
3        Q.    It's my understanding that you were
4    assistant incident commander for the day shift; is
5    that accurate?
6        A.    Yes, ma'am.
7        Q.    And the day shift, is that Alpha shift or
8    Bravo shift?
9        A.    Technically, it would be Alpha, but it
10   was just from six to 1800 or 6:00 at night.  If you
11   were going to label it, it would be Alpha.  Let me
12   rephrase that.  So that would be a confusing
13   statement, because in the police department, day
14   shift would be considered Alpha, but it was Bravo
15   on SWAT who took out -- who took the day shift
16   because of who was on call during that time.  It
17   typically would be decided as to who would be on
18   what shift.  But Bravo SWAT -- the Bravo team was
19   on days, and Alpha was on dogs.  I was assigned to
20   Bravo.
21       Q.    Okay.  Was that your role for the
22   entirety of the protests or only for particular
23   days?
24       A.    The entirety.
25       Q.    When did you first find out that you were

```
 1    going to be assistant incident commander for the
 2    day shift?
 3         A.   I really don't know in relation to us
 4    organizing.  I know in the infancy stages I was
 5    identified to be in that role, but I don't know
 6    exactly when.  After July 5th that we organized.  I
 7    don't know.
 8         Q.   Do you remember who it was who assigned
 9    you to the role of assistant incident commander?
10         A.   I wouldn't be privy to that.  I was just
11    given an assignment, and I just fulfilled my
12    obligation.  I don't know who -- I know we have
13    many leaders within the organization that would
14    have influence on why I was there.
15         Q.   Was it your understanding that your
16    participation in SRT and SWAT was one of the
17    reasons that you were selected as assistant
18    incident commander?
19         A.   It was most certainly my role as a SWAT
20    operator in conjunction with my past experiences of
21    my traffic was why I was chosen for that role, but
22    they would not have chosen anyone outside of SWAT
23    because of the totality of the event.  You really
24    needed someone who understood the lingo and the
25    mission, so it would not have been anyone outside
```

1    of SWAT chosen for that.

2         Q.   What were you told about your

3    responsibilities as assistant incident commander?

4         A.   Specifically, I don't recall.

5         Q.   Were you familiar with the position and

6    the role and the responsibilities associated with

7    incident commander and assistant incident commander

8    before you stepped into that role?

9         A.   Yes, ma'am.  I have taken classes and

10   understood the roles of organizational -- for

11   organized events, and I do understand the

12   operations, the incident commanders.

13        Q.   I think before you said you were a member

14   of Operations Command. Who else would you say was a

15   member of operations command besides yourself and

16   Wayne Martin?

17        A.   Specifically operations.  I want to say

18   it was Rendy Richard and Steve Wilkinson, which

19   were maybe labeled as scribes.  I feel certain that

20   those individuals were assigned to us for

21   operations.

22        Q.   What did you say?  I only caught the last

23   name, Richard.  What was the first name?

24        A.   Rendy, R-E-N-D-Y, Richard.

25        Q.   What was their role?

1          A.     Once again, it's been five years.  It
2   could have been Joel Callahan, but their roles
3   would have been scribes to document things as we
4   needed, which is consistent with response plannings
5   and organizational.
6          Q.     Was one of your responsibilities as
7   assistant incident commander to communicate orders
8   and direction to officers in the fields?
9          A.     It could have, yes.
10         Q.     What was your primary means of
11   communicating with people who were on the ground in
12   the field?
13         A.     Via police radio.
14         Q.     Did you and Kenneth Wayne Martin divide
15   up the responsibility of communicating via the
16   radio in any way?
17         A.     I don't recall that.  To be honest, I was
18   probably the primary user of the radio, being that
19   I was serving under Captain Martin.  So I would
20   probably be the primary user.  It wasn't a role
21   that we would have reversed or swapped.  I knew my
22   place, and I was facilitating the directive that we
23   identified, and, ultimately, what were responding
24   to.
25         Q.     So if I -- just to make sure I'm

1    understanding you correctly, you all would come to
2    a decision.  That would be the decision of
3    Operations Command, that he had the ultimate say-so
4    over, at least as between the two of you, and you
5    would communicate that on the radio?
6              I think you might be frozen, unless my
7    question was particularly perplexing.
8                   (LOST CONNECTION)
9         Ms. LOMMERS-JOHNSON:
10             Oh, there you are again.  I think we
11             lost you for just about a minute, and
12             now you are on mute.
13        MR. SCOTT:
14             The phone system is down here.  The
15             wireless is unstable.  Even plugging in
16             the Ethernet cable has proved to be
17             unreliable.
18        THE WITNESS:
19             Other than that, we are great.
20        MS. LOMMERS-JOHNSON:
21             I appreciate your efforts
22             nonetheless.  I'll just go back and ask
23             my question again, if that works.
24        THE WITNESS:
25             Yes, ma'am.

1           MR. SCOTT:

2               Please.

3    BY MS. LOMMERS-JOHNSON:

4       Q.   So I just wanted to make sure I was

5    understanding your roles and what you had said.  So

6    please correct me if this is not the case.  It's my

7    understanding from what you just spoke about that

8    in Operations Command, the orders and the

9    communications that you gave over the radio were

10   things that you and Incident Commander Martin had

11   discussed and that he had the ultimate say-so over

12   between the two of you?

13      A.   That would be correct.

14      Q.   I think this has probably been covered

15   already, but during the protests, was Incident

16   Commander Martin the person that you reported

17   directly to?

18      A.   Yes, ma'am.

19      Q.   Who did Incident Commander Martin report

20   directly to?

21      A.   Probably the chief of police, but I would

22   not be able to say for certain, because I don't

23   know.  He would have to answer to Captain Salamoni,

24   which was over Special Operations.  He was over

25   SWAT.  I believe this operation -- I think it would

1    probably be Captain Salamoni.  I'm sorry.  Captain

2    Salamoni then the chief of police.

3        Q.    Who reported directly to you during the

4    Baton Rouge protests in 2016?

5        A.    Well, the officers -- we had a group of

6    officers that were assigned to this event.  They

7    would report every day and give briefings. Sergeant

8    Mike Walker worked in conjunction with us.  He was

9    an incident commander for the SWAT and Mobile Field

10   Force operation in the field.  Daily we would give

11   briefings to supporting elements, such as EMS,

12   other commanders, supervisors, sheriffs, chiefs

13   from other agencies.  We would brief them.  I

14   wouldn't say they report to me, but we would have

15   interaction on a daily basis, but, mainly, the

16   officers, uniform patrol officers, that were

17   assigned to this event and the traffic units as

18   well as SWAT operators, the other SWAT operators.

19       Q.    Specifically for Sunday, July 10th, my

20   understanding is that Myron Daniels was appointed

21   as the area commander for the Downtown area around

22   East and France.  Is that your recollection?

23       A.    Quite possible.  I don't recall

24   specifically.  I do know that the entirety of the

25   SWAT team, Mike Walker would have been most

1    probably giving them direction of that or

2    identified him in that role.  So for me, it would

3    be Mike, and Mike would certainly report back to

4    Myron.

5         Q.    For Saturday, July 9th, I'm wondering if

6    you can recall who the area commander was for the

7    area including Airline and Goodwood?

8         A.    Once again, Mike Walker was our direct

9    contact, which is consistent with the incident

10   command system.  He was incident commander for the

11   ground troops, so he would be the one I would

12   identify if I needed something.  He would be the

13   sole person I would go to.  Now, who delegated

14   beneath him, I couldn't really speak on.  I

15   couldn't recall specifically.

16        Q.    Next I'm going to show you another

17   document that is going to be Exhibit 5 for today's

18   purposes.  Can you see Exhibit 5 up on my screen

19   right now?  It is titled, "General Order 244."

20        A.    Yes, ma'am. I have a copy in my hand as

21   well.

22        Q.    Perfect.  Is General Order 244 an order

23   that you're familiar with?

24        A.    It's obviously a part of our policy and

25   procedure manual, but I don't know it without

1    reviewing it. I may know the -- (inaudible.)

2        Q.    I'm sorry.

3            THE COURT REPORTER:

4                What did you say?

5            THE WITNESS:

6                I'm certain I'm privy in under-

7                standing contents once I read it, but

8                just off the top of my head, the

9                subject and the number doesn't mean --

10               I do know that I was given this policy

11               at some point.

12   BY MS. LOMMERS-JOHNSON:

13       Q.    You can go ahead and flip through it a

14   little bit.  I think it's titled, "Planning for

15   Unusual Occurrences."  My question to you is, as

16   you look at it, have you seen this document at some

17   point before?

18       A.    I'm sure it was given to us during my

19   career.  Specifically when or where, I don't know.

20   I do know it was originated effective in '96.  It

21   was just post my Academy.  That's when the majority

22   of these documents would be given, but I do know

23   any time there is an update or one that came in

24   effect, it was disseminated to everyone in the

25   department at some point in time.  I don't know

1  exactly when, though.

2      Q.   As we sort of -- I know you are looking

3  at the paper copy, so I'll scroll down here on this

4  screen.   I'm going to scroll down specifically to

5  Page 4.

6      A.   You like Page 4.

7      Q.   What did you say?

8      A.   You like Page 4.

9      Q.   I know.  The number just calls to me.  On

10  Page 4 of Exhibit 5, sort of in the middle here, it

11  talks about the Incident Command System.  Do you

12  see, either on my screen or on your page where I'm

13  indicating?

14      A.   Yes, ma'am.

15      Q.   And my question about the Incident

16  Command System is what is being described here in

17  this general order, is that what was in place

18  during the Baton Rouge protest response in 2016?

19      A.   That's correct.  That would be the

20  template that we worked under, ICS, which I

21  referred to earlier, the Incident Command System.

22  That's what we would identify, Incident Command,

23  Operations Command, and so forth.

24      Q.   I'm scrolling down.  I apologize.  I

25  apparently was on Page 2 still.  I'm sorry.  Now,

```
 1   scrolling down to the actual Page 4 where it says,
 2   "Command Structure and Organization."  Here I just
 3   want to look at Section C. It says, "It should be
 4   clear that only one person is in charge of the
 5   incident, the IC.  The individual assuming incident
 6   command should be known to all personnel involved
 7   in the event."  My question regarding this section
 8   is whether the incident commander, once they take
 9   command, has complete control or whether they still
10   -- are you still with us?
11        A.   So we have --
12        Q.   I think you are on mute somehow again.
13   There you go.
14        A.   So our computer kicks us off
15   periodically, so we have to reconnect.  You were
16   scrolling to Page 4 when we lost you.
17        Q.   So my question about Page 4 is just this
18   Section C here that says, "It should be clear that
19   only one person is in charge of the incident, the
20   IC."  Here that is referring to the incident
21   commander, right?
22        A.   Yes, ma'am.  That would probably be me
23   during the day shift, more so than Captain Martin,
24   because I was the voice on the radio I'm certain
25   for the majority of the time.
```

1    Q.   I'm curious whether authority from the

2    police chief during an event like this transfers to

3    the incident commander or whether there are still

4    certain things that you have to ask permission from

5    the police chief for?

6    A.   We are working under his authority.  We

7    are working under his direction, his objectives.

8    We do know the rules of engagement and our areas of

9    responsibilities and the things that we can

10   control, since it's manpower or allocation of

11   personnel, things of that nature.  Anything outside

12   of our scope that doesn't -- would be outside of

13   the norm, I'm certain Captain Martin would have had

14   to get approval from the chief.

15   Q.   Now I'm going to stop sharing this

16   document and move briefly to another one that I'll

17   mark as Exhibit 6.  I'll share the screen and ask

18   you if you can see Exhibit 6 on the screen now?  It

19   should be titled, "General Order Number 291, Civil

20   Disorder."

21   A.   Correct.  I have a copy in my hand.

22   Q.   Perfect.  Is this policy in Exhibit 6 one

23   that you are familiar with?

24   A.   Once again, I'm not -- I have not

25   reviewed it.  I see it was originated in '95, which

1    is post my Academy.  I'm certain I was given that

2    general order during my career.

3          Q.    And so at the top, I think it also says

4    that it was reviewed September 1st of 2016, but it

5    was last revised August 1st of 2001.  So would this

6    general order have been in effect during the 2016

7    Baton Rouge protests?

8          A.    Yes, ma'am.

9          Q.    On this document, I'm now going to go

10   down to Section 7.  So this is -- again, I think on

11   Page 4.  Section 7 is titled, "Mass Arrests," and

12   here I think in A, under Mass Arrests, it describes

13   that arrest teams are designated to detain all

14   prisoners until arrival of PPT teams.  I'm

15   wondering whether what is described here is the

16   same process that was used during the Baton Rouge

17   protest response in 2016?

18         A.    Arrest teams are designed to -- I believe

19   it would be pretty consistent with what we did.

20         Q.    And when it says PPT team, can you tell

21   me briefly what that is?

22         A.    Prisoner processing teams.

23         Q.    Am I correct that the prisoner processing

24   team is the group of individuals who was charged

25   with doing paperwork, including the PC affidavits

1    for people who were arrested?

2         A.   Yes, ma'am.  That would be the ones that

3    would ensure all the paperwork was there, every-

4    thing that they need in order to book them and

5    relieve the officers in a timely manner where they

6    can get back on the street and help with the

7    incident.

8         Q.   I'm going to stop sharing this exhibit

9    and go back.  Now I would like to ask you some

10   specific questions about Saturday, July 9th.  You

11   recall being on duty on Saturday, July 9th, during

12   the protest response?

13        A.   Yes, ma'am.

14        Q.   I'll pull up another exhibit.  This is

15   going to be Exhibit 7.  I have a feeling that

16   Mr. Scott might have this in paper form for you as

17   well. I'll share it on my screen.  Can you see the

18   document, Exhibit 7, that is titled, "Baton Rouge

19   Police Department Duty Roster?"

20        A.   Yes, ma'am.

21        Q.   Do you recognize this as a Baton Rouge

22   Police Department duty roster from 2016?

23        A.   That's correct. As a payroll form, not a

24   duty roster.  That's a payroll form that was

25   consistent with the form used in 2016. Duty roster

1   -- I see where it states duty roster, but we would

2   view that as a pay roster.  A duty roster would

3   signify duties and responsibilities, but -- in my

4   mind, but that is consistent with the forms that

5   were used in '16 for payroll.

6       Q.   I'm just going to scroll to the second

7   page where it says this specific hours.  Here by

8   your name for July 9th, I think it says, "Begin

9   time six and end time 21."  Is that your

10  recollection, that on July 9th you worked from

11  about 6:00 AM until about 9:00 PM?

12      A.   I would have to defer to the document.  I

13  couldn't -- I do know we had long days.  I do know

14  that we worked over our allocated hours, especially

15  when things were hectic, but I didn't write that,

16  but I'm pretty certain I worked those hours.  I

17  don't have any reason to believe I didn't.

18      Q.   I think if we go one line down for July

19  10th, it says that you worked from about 6:00 AM to

20  -- and there it's a little bit hard to read, but I

21  think it says -- I think that's 8:00 PM.

22      A.   Yes, ma'am.

23      Q.   And both those days it marks you as at or

24  assigned to EOC command.  Is that your

25  recollection?

1      A.    Yes, ma'am.

2      Q.    Can you tell me what EOC stands for?

3      A.    Emergency Operations Center, which we

4  commonly refer to as MOHSEP, Mayor's Office of

5  Homeland Security and Emergency Preparedness.

6      Q.    When it says this, is this saying that

7  you were assigned in the role to EOC command or is

8  this also referring to you being physically located

9  at EOC or MOHSEP?

10            (LOST CONNECTION).

11         MS. LOMMERS-JOHNSON:

12            Got you back again.  I think you are

13         on mute again.

14         THE WITNESS:

15            We're here.

16  BY MS. LOMMERS-JOHNSON:

17      Q.    Awesome.  When it says that you were at

18  EOC command, is that referring to your role or were

19  you also physically at EOC command for both of

20  those days?

21      A.    EOC command is the same as MOHSEP.  The

22  individuals who fill that out were members of the

23  traffic division, and maybe they couldn't recall

24  MOHSEP, the acronym.  It's also referred to as EOC.

25  It's the same building.

1    Q.    My understanding is that you started your

2 day by getting briefed by the incident commander

3 and assistant incident commander who were going off

4 shift from the night shift.  Is that accurate?

5    A.    So, obviously, you know, the first day we

6 erected, we were those who were organizing,

7 building up, but every night -- when we would

8 arrive in the morning the following day and be --

9 we would get debriefed by those who were relieving

10 as to what unfolded throughout the night and any

11 additional information that may assist us through

12 the day.

13    Q.    Did you ever exchange any written details

14 with the people who were coming off -- leaving

15 their shift when you arrived?

16    A.    Specifically, I don't recall, but I do

17 know that it wouldn't be uncommon for me to give

18 them maybe a list of resources available or maybe

19 op orders that we may have created throughout the

20 day.  I can't say specifically, but that could be

21 possible.

22    Q.    So now I'm going to move to another

23 document.  I think we're on Number 8 right now.

24 I'm going to mark this as Exhibit 8 and share

25 screen.  Can you see this Exhibit Number 8 for

1    today's deposition on the screen now?

2         A.    Yes, ma'am.  Synopsis of MOHSEP.

3         Q.    Perfect.  So these are dated. I'm going

4    to go down, for our purposes, to Page 11 of the

5    MOHSEP synopsis.  This one is titled, "Operational

6    Period, Saturday, July 9, 2016."  I think it

7    indicates it covers from 0600 to 1800 hours.  Is

8    this a document that you recognize either in form

9    or in content?

10        A.    I can't say that I -- I recognize the

11   content.  It was consistent with maybe the work

12   that we did. It might have been something that our

13   scribes would have created, itemizing and

14   identifying what we do throughout the day.

15        Q.    Here it says I think in this, I guess,

16   technically the third paragraph here, it says,

17   "Lieutenant David Ross conducted roll call with

18   uniform patrol at 0600 hours."  I think you had

19   testified previously that you conducted roll call

20   with uniform patrol routinely.  Was that every

21   single day that you did that?

22        A.    As I recall, yes.

23        Q.    What kind of information did you

24   communicate to the members of uniform patrol at

25   roll call?

1          A.    I would relay to them where we came from,

2    incidences that we had throughout the night, where

3    we are in the operation, any current information,

4    and where we intend to go, any directives and what

5    our itinerary -- (inaudible.)

6                    THE COURT REPORTER:

7                         I didn't hear the end of that.  It

8                    wasn't very clear.

9                    THE WITNESS:

10                        Where we intend to move with the

11                   operation.  That would be pretty

12                   consistent with our line of work

13                   information that we are going to give

14                   out.  Anything safety related or

15                   anything pertinent.  The initial was

16                   typically repetitive.  It was just,

17                   obviously, the event was progressive.

18                   Just keep them updated as to where we

19                   are.

20   BY MS. LOMMERS-JOHNSON:

21        Q.    Was the roll call conducted at MOHSEP?

22        A.    That's correct.

23        Q.    I think this document here in the next

24   paragraph indicates that later in the morning, at

25   least on this morning, you conducted a briefing

```
 1    with unified command staff.  Can you tell me who
 2    unified command staff would have been?
 3         A.   Yes, ma'am.  As I testified earlier, that
 4    was a briefing that I would give to all the
 5    supporting elements from -- could be outside
 6    agencies, EMS.  I don't recall if we had our team
 7    members of Exxon (inaudible.)
 8              THE COURT REPORTER:
 9                   I didn't understand you.  I did not
10                   understand you after EMS.  I don't
11                   recall if we had our --
12              THE WITNESS:
13                   I don't recall if we had -- I've
14                   been in several operations, and
15                   sometimes we have Exxon with us.  I
16                   know we had the Department of
17                   Hospitalization, but any of those
18                   members of supporting, whether it was
19                   DPW, whoever was attached, we would
20                   brief them on expectations.  I do know
21                   that we would give briefings on -- get
22                   briefings from the head of the parish
23                   prison.  Anyone who was attached that
24                   was part of an administrative role for
25                   that respected group, I would brief
```

```
1               them on pretty much the same content,
2               where we are, where it pertains to
3               them, where we -- any previous
4               incidences and where we intend to go.
5               That way everyone was consistent on the
6               mission.
7    BY MS. LOMMERS-JOHNSON:
8         Q.   In terms of the people from other law
9    enforcement organizations who were there in an
10   administrative role, can you remember who, from the
11   Louisiana State Police, would normally attend the
12   unified command staff briefings?
13        A.   No, I do not.  I'm sorry.  I wouldn't
14   recall who was there for the state police.
15        Q.   It would just be someone from the state
16   police who was in that administrative role for that
17   day?
18        A.   It could certainly, and it doesn't mean
19   that they were absolutely there.  We didn't conduct
20   roll call.  I do recall the sheriff's office being
21   there, East Baton Rouge Sheriff's Office.  I do
22   recall the state with their roles, but I don't know
23   who filled that gap and whether or not they were
24   there.  For every single one, I couldn't say.  I do
25   know that in addition to our briefings at MOHSEP,
```

```
 1   there were briefings at GOHSEP for other
 2   administrators, sheriffs and so on, as to some of
 3   the similar information.
 4        Q.   Just to make sure I understand, you
 5   remember EBRSO being present for at least some of
 6   the roll call or for at least some of these
 7   briefings?
 8             (LOST CONNECTION)
 9        MS. LOMMERS-JOHNSON:
10             Oh, oh.  I think we froze up again.
11        THE WITNESS:
12             Sorry.  We lost you again.
13   BY MS. LOMMERS-JOHNSON:
14        Q.   I think my last question was just
15   clarifying.  So you remember that EBRSO was present
16   for many of these unified command staff briefings?
17        A.   Yes, ma'am.
18        Q.   And I think you testified that you don't
19   remember who specifically was there from Louisiana
20   State Police or whether they were at every
21   briefing, but you do remember someone from
22   Louisiana State Police being there for the unified
23   command staff briefings on occasion?
24        A.   That is correct.
25        Q.   Did you lead the unified command staff
```

1    briefings every morning as well?

2         A.    Yes, ma'am. Those that were at MOHSEP.

3    Those that were are GOHSEP were conducted by

4    Captain Martin.

5         Q.    Did you ever attend the briefings at

6    GOHSEP that Captain Martin conducted?

7         A.    Yes.

8         Q.    I think going back to one of our previous

9    exhibits.  I'm just going to share that one again.

10    So this is Exhibit 8 again.  I just want to scroll

11    down to the bottom of the Saturday, July 9th

12    synopsis.  It looks like one of the issues that may

13    have been addressed at the briefing or at least on

14    this synopsis is issues with processing the number

15    of arrestees.  Do you see where I'm indicating

16    there on the screen?

17         A.    Yes, I do.

18         Q.    My question is do you remember what

19    direction was given to address this problem with

20    the issues of processing arrestees?

21         A.    No, ma'am.  I do not know specifically.

22    I do know we were tasked with some of the numbers

23    during this incident, at some point in time,

24    overwhelmed with the number of arrests and then,

25    also, moving them to secure locations, such as

1    parish prison.  I do know that we had extensive

2    conversation with the warden of the prison in

3    reference to transporting them and housing them and

4    their needs, processing them.

5         Q.   Do you remember any of the steps that

6    were taken to allow for quick processing of a large

7    number of arrestees?

8         A.   I do not.  I don't recall.  No.

9         Q.   Is that the type of thing that would be

10   discussed at either roll call or the unified

11   command staff briefing?

12        A.   No, ma'am.  That would be more of

13   something that Mike Walker would deal with, with

14   the incident command.  Us being operations, we'd

15   oversee the entire operations, the incident of

16   maybe an isolated area.  Each area had its own

17   incident.  That would have been in Mike Walker's

18   area of control.

19        Q.   Then I'm going to quickly move to our

20   next exhibit.  It's going to be Exhibit 9.  Let me

21   share screen again for that one.  Can you see

22   Exhibit 9 on the screen?  It's titled -- the first

23   page is titled, "July 7th, 2016."

24        A.   Correct.  I see it.

25        Q.   Perfect.  I'm just going scroll down to

1    Page 3 where it says July 9th, 2016, and ask you

2    just to glance at the document and the content here

3    on this page.  My first question is whether this is

4    a document that you recognize at all?

5         A.    I know where it came from or most likely

6    came from, but I've never seen it.  I don't recall

7    it.

8         Q.    Can you tell me --

9         A.    During each briefing, we had

10   representatives from MOHSEP, which was members of

11   the Mayor's Office of Homeland Security and

12   Emergency Preparedness, and they would probably

13   take notes of our briefings where this document

14   would have originated from.  So their job would

15   have been to capture the information and put it on

16   a document during the briefing.  That's why it

17   would (inaudible).

18              THE COURT REPORTER:

19                   That's why what?

20              THE WITNESS:

21                   That letter would have had the

22                heading, if you scroll up, Mayor's

23                Office.  That document is -- that would

24                have been something Miss Joanne Morrow

25                or her designee would have created.

```
 1              THE COURT REPORTER:
 2                  Miss who?
 3              THE WITNESS:
 4                  Joanne Morrow.  She was the director
 5              of Homeland Security of that facility
 6              at the time of the incident.
 7  BY MS. LOMMERS-JOHNSON:
 8      Q.   So were you saying that someone from
 9  MOHSEP would attend your briefing and part of the
10  content here would be notes of details learned from
11  the briefings you had given in the morning?
12      A.   Yes, ma'am. Much more elegant than what I
13  just said.
14              THE COURT REPORTER:
15                  I didn't understand that.
16              THE WITNESS:
17                  I was being sarcastic.
18              THE COURT REPORTER:
19                  Can you say that again?
20              THE WITNESS:
21                  She did a good job.
22  BY MS. LOMMERS-JOHNSON:
23      Q.   Specifically here I want to scroll down
24  to Page 4 where there is this note from Warden --
25  it says Warren Grimes.  I think it is referring to
```

1    Warden Grimes.  It says, "All of the information,
2    such as arrest papers and probable cause forms are
3    located on the bus.  The PC must be filled out.  If
4    not, they will be released."  I'm wondering if you
5    remember that being communicated and what exactly
6    that refers to?
7         A.    I don't know who Warren Grimes is.  It
8    could be Warden Grimes, as you alluded to.  I don't
9    know who the warden's name is for BR, but if I read
10   that, I would believe that that is him stating
11   where we can find the paperwork, the arresting
12   papers and the forms, and the directive that was
13   given during the briefing, during his briefing,
14   that they must be filled out, and, if not, they
15   would not be able to properly process them, and the
16   individual or individuals would have been released.
17   That would have came from Mr. Grimes.  I do
18   remember getting briefings from him daily as well
19   or from the warden.
20        Q.    Related to this, my understanding is that
21   at some point preprinted Probable Cause Affidavits
22   were created where the synopsis was typed in, and
23   so the PPT teams would just have to hand write in
24   people's names and identifying information without
25   having to fill in the PC synopsis area of those

 1    forms. Do you remember when that was implemented or
 2    started? Oh, no.  He froze again.
 3                   (LOST CONNECTION)
 4            THE WITNESS:
 5                   We lost you again.
 6    BY MS. LOMMERS-JOHNSON:
 7        Q.    Okay.  I think my last question was
 8    whether you remember when the PC affidavits with
 9    the pretyped synopsis already filled in started
10    being used during the protests?
11        A.    I do not know.  That would not have been
12    anything that I would have had any influence on.
13    During my career, I did very little prisoner
14    processing, so I wouldn't know that.
15        Q.    So moving on.  I think this might be one
16    of the last document exhibits, at least.  And so we
17    are on 10.  So this is going to be Exhibit 10 for
18    today's purposes.  It was previously introduced in
19    an earlier deposition as Exhibit five Ss.  Okay.
20    This is titled, "Operational Orders," and here I
21    would just like to scroll down to Page 10.  Can you
22    see this on my screen?
23        A.    Yes, ma'am.
24        Q.    So here it says, "Date of Operation, July
25    8th, 2016."  I'm wondering if these operations

1  orders are documents that you recognize?

2        A.    I also have a copy in my hand.  Yes. This

3  looks like something that may have been created

4  during our time at MOHSEP.  I would not have

5  created them, but I would have had input in it.

6  This would show what resources we have, identify

7  what our objective or our mission is, any

8  information and how we are going to mitigate it.

9        Q.    And so you didn't specifically create

10 this document, but you and Captain Martin would

11 have had input?

12       A.    Yes.  We would have -- if I recall

13 correctly, Captain Wilkinson would have done the

14 typing, and we would have told him what information

15 to put in for us.

16             THE COURT REPORTER:

17                  The end of your sentence is dropping

18                off. It's very low.

19             THE WITNESS:

20                  If I recall correctly, Captain

21                Wilkinson was one of the scribes, and

22                he would prepare the documents for us.

23                We would give him the content to put in

24                it.

25 BY MS. LOMMERS-JOHNSON:

1      Q.    For this July 8th order, specifically,

2   under the mission, it describes maintaining

3   security around police headquarters.  I think if we

4   scroll further down, it describes, again,

5   protecting police headquarters, as well as human

6   life, citizens, and protesters.  My question here

7   is specifically in the second paragraph, where it

8   says, "If Airline Highway is blocked with

9   pedestrians, uniform patrol officers and arrest

10   teams will be utilized to keep protesters from

11   blocking the roadway and stopping traffic."  Then

12   it says, "Obstructing Public Passageways, 14:1001

13   will be used for charges if arrests are made." Do

14   you recall this being communicated to the uniform

15   patrol officers?

16      A.    Yes, ma'am.

17      Q.    Who was it who came up with the

18   instruction that 14:1001, Obstructing Public

19   Passageways, will be used for charges if arrests

20   are made?

21      A.    That would be Captain Martin, myself,

22   J.D. Leach, Bryan Taylor, would be the individuals

23   that were responsible for this information.

24      Q.    And is this the kind of thing that you

25   would also or that Captain Martin or Captain Leach

1    would communicate to Chief Dabadie?

2         A.   Could you repeat the question?

3         Q.   Is this the type of order or instruction

4    that Captain Leach or Captain Martin or yourself

5    would communicate to Chief Dabadie?

6         A.   I don't know if we would communicate it

7    with Chief Dabadie.  Again, he didn't work

8    underneath us.  Whether or not he was privy to what

9    our directives are -- I'm sure he knew what our

10   goals and objectives are.  We would tell him how we

11   are going to achieve or try to be successful with

12   the obstacles that are in front of us, so he would

13   be briefed on what we're going to do.

14        Q.   I'm sorry.  I didn't mean to cut you off.

15        A.   No.  You didn't. Whether it came from

16   Captain Martin for day shift or Captain Salamoni,

17   I'm sure the chief was -- and I'm surely

18   speculating.  I would only assume we would give him

19   what our directives are.  I didn't give them to

20   him, but I'm sure one would certainly think that

21   the chief was abreast of what is unfolding.

22        Q.   So this operations order was from July

23   8th, but it's my understanding that the direction

24   to use 14:1001, Obstructing Public Passageways, was

25   given on other days as well; is that accurate?

1        A.    Most certainly can be.  It would be

2   pretty consistent.  I really thought the statute we

3   used was simple and aggravated obstruction of a

4   public highway or passage, but I certainly could be

5   wrong, but I don't remember specifically Title

6   14:1001.

7        Q.    So I think I heard you say that the

8   statute that you recall that officers were

9   instructed to use was simple and aggravated

10  obstruction of a public passageway?

11       A.    I'm not -- no.  I'm just saying I thought

12  that was the statutes that we used to mitigate that

13  situation, was simple and aggravated, and the

14  difference between the two statutes would have been

15  the amount of volume of traffic, the speed limits,

16  and the conditions and the locations at the time of

17  which statute.  But I can certainly be wrong.  It's

18  a state statute.  I just don't remember using that

19  one, but it doesn't mean that we didn't.  Once

20  again it was five years ago, and I didn't actually

21  execute the apprehension or arrest of any

22  individual.  So if that information was discussed,

23  it would have been merely passing it on.  It would

24  not have been of significance to me.

25       Q.    I think, also, for 14 -- is 14:97 maybe

1    one that you recall over 14:1001?  Is that what you

2    are referring to?

3        A.    What is LRS 14:97?

4        Q.    Let me -- I should have that somewhere in

5    here.  Okay.  Can you see this on the screen here?

6    Since I'm pulling it up, I should mark it, so I

7    will mark it as Exhibit 11, 14:97, Simple

8    Obstruction of a Highway of Commerce.  Oh, sorry.

9    You are on mute again.

10       A.    One second.  Are you there?

11       Q.    Can you hear me?

12       A.    Yes, ma'am.  We lost you when you asked

13   the question about 14:10001 versus 14:97.

14       Q.    So I pulled up 14:97 really quickly.  We

15   can just call it Exhibit 11.  Is 14:97 what you

16   were referring to?

17       A.    Yes, ma'am.  I recall us using that, that

18   statute for litigation, but I could be wrong.  Once

19   again, that was five years ago.  Now, there is a

20   simple and an aggravated, and the difference was

21   the type of roadway, the amount of traffic

22   expectations.  An interstate would be different

23   from a surface street, so forth.

24       Q.    Would the difference between simple and

25   aggravated obstruction be communicated to the

1  uniform patrol officers in the morning briefing in

2  directing them regarding which statute to use when

3  arresting protesters?

4        A.   Quite possibly, but the uniform patrol

5  officers in the morning had a different directive.

6  They wasn't part of Mobile Field Force, so we had

7  uniform patrol officers as one element for

8  mitigation of a hot zone that we identified.  Then

9  we had Mobile Field Force who would have had

10  individuals attached to them as arrest teams.  Then

11  we had SWAT and tactical operations.  So it quite

12  possibly could have been relayed to them, but their

13  directives were more so around mitigating criminal

14  activity and identifying hot zones.

15        Q.   And the directions about either 14:97 or

16  14:1001, would that have been targeted more towards

17  the SWAT team, SRT, or Mobile Field Force officers?

18        A.   It would have been directly related to

19  Mobile Field Force and those assisting Mobile Field

20  Force.  The arrest teams assisting Mobile Field

21  Force would have been the ones who specifically

22  would have needed that information.

23        Q.   Thank you for that.

24        A.   Yes, ma'am.

25        Q.   We touched on this a little bit earlier,

1    but I just wanted to understand more about what

2    level of communication those of you in operations

3    command had with Chief Dabadie.  Do you remember

4    how he would communicate with you or Captain Martin

5    over the course of the protests?

6         A.   In my capacity, he could have certainly

7    came to MOHSEP and just observed and identified

8    anything that we needed to be successful.  On a

9    daily basis, I don't know.  It could have been

10   phone calls.  It could have been e-mails.  I don't

11   know how Captain Martin -- it wasn't really in my

12   span of control that I recall dealing with him with

13   this incident.

14        Q.   So Chief Dabadie would come in to MOHSEP

15   in person at times but generally it would have been

16   Captain Martin communicating with him either on the

17   phone or e-mail?

18        A.   It most certainly would have been Captain

19   Martin's responsibility in his position to keep

20   communications with the chief.  It would not have

21   been in mine.  I could certainly be getting

22   multiple operations intermixed with the protests.

23   I can't say specifically on any given day Chief

24   Dabadie visited us at MOHSEP.  I'm saying he quite

25   possibly could have, because during some operations

1    in the past or even this one, I do recall him

2    showing up just saying, hey, do you need anything,

3    is there any support you need, how is it going, you

4    know.  Just maybe just letting us know that he is

5    there if we need him, but it would not have been

6    within my span of control.  I didn't deal with

7    that.

8         Q.    Looking back specifically to Saturday,

9    July 9th in 2016, do you remember whether you

10   stayed at MOHSEP for the entirety of the day?

11        A.    I would have, yes.

12        Q.    And from where you were located at

13   MOHSEP, could you see protests at all either in

14   person or from a live stream or video feed of any

15   of the protests?

16        A.    I could never see any of it in person.  I

17   was in a secure facility without any of the outside

18   world, but I would -- there were ways that we saw

19   things that are in real time at our disposal.

20        Q.    Would that have been like a live feed

21   from BRPD cameras?

22        A.    Yes.  It could have been.

23        Q.    Do you remember whether you were able to

24   see a live feed of camera from the area of Airline

25   and Goodwood?

1    A.    Yes.  I do recall seeing real-time
2    footage of that incident or during our operations.
3         Q.    Would seeing the state of affairs on
4    Airline and Goodwood help you and Captain Martin
5    with determining what orders to give the officers
6    on the ground?
7         A.    It would certainly help us understand the
8    perspective of the officers that had to mitigate
9    the incident, and it would enable us to sit back
10   and work up a plan or a directive or a direction
11   that we intend to go.  That live feed would help us
12   with that.
13        Q.    For Saturday, July 9th, do you remember
14   giving or communicating an order to clear the
15   streets?
16        A.    I would say yes.  I don't recall
17   specifically, but I know it would be consistent.
18   Once again, it was five years ago, but that would
19   be something that we would do.
20        Q.    I guess to the extent that you can
21   remember, do you remember, first, Saturday, July
22   9th, what would have precipitated the order to
23   clear the streets?
24        A.    The infiltration of people moving from a
25   lawful assembly to unlawful and blocking the

1    highway or right-of-way would have initiated our
2    response.  I do know that we directed officers on
3    the ground to let them know what was acceptable and
4    what wasn't.  So after we -- that message was clear
5    and concise, and we would have given them every
6    opportunity to comply.  If they failed to do so,
7    our last resort was to make contact.  We certainly
8    rather would have just stood by and did nothing,
9    but at the end of the day, we were forced to do our
10   job.
11        Q.   When the orders to clear the streets went
12   out, that was a signal to the officers on the
13   ground to start effecting arrests? Is that
14   accurate?
15             (LOST CONNECTION)
16             THE WITNESS:
17                  We're back.
18   BY MS. LOMMERS-JOHNSON:
19        Q.   Excellent.  So I think that the last
20   thing that I heard you say was that you only wanted
21   to make contact with protesters as a last resort,
22   and I'm not sure if you heard it, but my next
23   question was whether upon getting the order to
24   clear the streets, whether that was a signal to
25   officers that it was time to start effecting

1    arrests?

2         A.   It certainly would have been.  Maybe not

3    so much -- it didn't have to be, hey, you have to

4    effect an arrest at our direction, but we do intend

5    to gain compliance at this moment.  We do need

6    these streets cleared.  Certainly, if our presence

7    would have revealed itself, and everybody would

8    have gained compliance and remained in compliance

9    with the orders, we wouldn't have done anything.

10   So merely giving them the direction to clear the

11   roadway would not have necessarily meant arrest

12   everybody in the road.

13        Q.   Would it have been a signal that officers

14   at that point were supposed to advance and make

15   contact with protesters where necessary?

16        A.   Quite possibly, yes.

17        Q.   On the live stream feeds that you did

18   have, could you see arrests being effected?

19        A.   Yes.  We could see images of officers

20   making contact.

21        Q.   Now, I'd like to move on to talk a little

22   bit more about Sunday, July 10th.  When you came on

23   duty on Sunday, July 10th, do you recall whether

24   you were advised of any particular situations by

25   the previous incident commanders?

1      A.   I'm certain I would have been briefed on
2  what occurred on the 9th.  I do recall being
3  briefed that there was a small element that left
4  headquarters and tried to move to the interstate.
5  So you had multiple incidences along U.S. 61 or
6  Airline Highway.  So, yes, I would have been
7  briefed on what occurred the night before.
8      Q.   I'm just going to take us back now to
9  Exhibit 8, which is the synopsis document that we
10  looked at before.  I'll pull that up again, the
11  synopsis document we looked at before.  I'll pull
12  that up again.  I think as part of this document
13  there were some events that you had advance notice
14  of.  So looking down to the Sunday, July 10th rows,
15  there is a number of different things mentioned,
16  one of them being a demonstration and march in the
17  area of Wesley Methodist Church at 544 Government
18  Street.  Do you recall doing any planning in
19  advance to prepare for the law enforcement response
20  to that event?
21      A.   Could you go over what you just said?
22      Q.   Sorry.  Let me blow it up a little bit.
23      A.   There was multiple events.  Yeah, Sunday,
24  the 10th, yeah.
25           MR. SCOTT:

```
 1                    Hannah, is this a Dabadie exhibit?
 2              MS. LOMMERS-JOHNSON:
 3                    Unfortunately, I can't remember off
 4                 the top of my head whether this was
 5                 used in Chief Dabadie's deposition.  If
 6                 I'm lucky, someone from my team will
 7                 text me if it was.
 8              THE WITNESS:
 9                    Miss Johnson, which incident were
10                 you originally referring to?
11              MS. LOMMERS-JOHNSON:
12                    To the last one for Sunday, July
13                 10th, the Wesley Methodist Church.  I
14                 think it describes it as a
15                 demonstration and march next to it.
16      BY MS. LOMMERS-JOHNSON:
17         Q.   I'm wondering whether you did -- you or
18      anyone else in command staff did any preparation
19      for this demonstration.
20         A.   We would have done preparation for the
21      security portion, and the traffic division would
22      have done preparation and documentation for the
23      traffic side of it.  Yes, we would have had
24      preparation for the security aspect of it.
25         Q.   Do you remember what specific steps you
```

1  took to prepare for the security aspect of this

2  demonstration and march?

3       A.   No, ma'am, nothing specific.  Once again,

4  it was five years. Is this the one -- is this the

5  march that left and went up St. Charles Street to

6  the Capitol and then back that led up to the

7  Government Street incident?

8       Q.   That's my understanding.

9       A.   Okay.  Yeah.  I do recall some

10  particulars.  I do know it was a youth group.  I do

11  know that it was an organized -- they were very

12  forthcoming and compliant with everything that we

13  needed for an organized march.  I do recall working

14  on this, yes.  It wasn't spontaneous.  It was

15  planned.

16       Q.   On Sunday, July 10th, were you also

17  located at MOHSEP for the entirety of the day?

18       A.   Correct.

19       Q.   Did you have access to any live feed or

20  video footage of the protests in the Downtown area?

21       A.   That's correct.

22       Q.   I guess specifically that day, at some

23  point, my understanding is that protesters ended up

24  gathering at East and France Street.  Do you recall

25  that?

1    A.    I do.

2    Q.    And there was a specific yard at the

3    intersection of East and France Street that

4    protesters gathered in.  Do you recall that?

5    A.    I believe it was the residence on the

6    west side of East Boulevard and France.

7    Q.    Did you have access via live feed footage

8    or other video imagery of the protests in that yard

9    at East and France?

10    A.    I did.

11    Q.    At what point in the day do you remember

12    protesters gathering around the East and France

13    intersection?

14    A.    Can you repeat that?

15    Q.    At what point in the day do you remember

16    protesters gathering around East and France?

17    A.    At the conclusion of the event.  I don't

18    know specifically what time.  I do know that it

19    ended up there.  I don't recall how it ended up

20    there, but a specific time I do not recall.

21    Q.    What communications did you receive from

22    the officers on the ground about what was occurring

23    at the intersection of East and France?

24    A.    Well, to quote them, I don't recall.  I

25    do know that we had a large group of people that

```
 1   wasn't in compliance.
 2                  (LOST CONNECTION.)
 3             THE WITNESS:
 4                  So I was in a long statement.  I do
 5             recall a large group of people that
 6             wasn't in compliance.  I don't recall
 7             specifically any information that I can
 8             quote, but I do recall their intentions
 9             were to get on the interstate, to block
10             I-110.
11             MS. LOMMERS-JOHNSON:
12                  Okay.  Thank you.  Joe, I have
13             received information from Mr. Foley
14             that the synopsis that I've been
15             referring to as Exhibit 8 was
16             previously used with Chief Dabadie.  We
17             think it's Exhibit 46 or 47 from Chief
18             Dabadie's deposition, to the extent
19             that that's helpful.
20             MR. SCOTT:
21                  I have that here.  Thanks.
22   BY MS. LOMMERS-JOHNSON:
23        Q.   No problem.  Now what I would like to do
24   is ask you some questions about the specific
25   response to the East and France protest.  I'm going
```

```
 1   to play you audio and attempt to share that audio.
 2   This, for today's purposes, will be Exhibit 12.  It
 3   has been previously introduced as Exhibit four Zs.
 4   It's the interop recording.  I know we've been
 5   actually, while I pull this up, we've been going at
 6   it a while now.  I am optimistic that potentially
 7   we can wrap up with my questioning before your
 8   12:30 lunch, Joe.  So I am happy to press on right
 9   now, but I do also want to ask if anyone needs a
10   break before I start with the audio exhibit.
11           MR. SCOTT:
12               We'll power through to 12:30 or
13            thereabouts.
14           MS. LOMMERS-JOHNSON:
15               Okay.  Perfect.
16   BY MS. LOMMERS-JOHNSON:
17       Q.   Now, I'm going to share my audio, so,
18   again, this is Exhibit 11.  I'm just going to play
19   some of the beginning of it here just to make sure
20   you can hear it.
21           MR. SCOTT:
22               Exhibit 12.
23           MS. LOMMERS-JOHNSON:
24               Apologies.  Thank you.  Exhibit 12
25            is interop for today.
```

```
 1                    {AUDIO PLAYED}
 2    BY MS. LOMMERS-JOHNSON:
 3         Q.    Could you hear the Exhibit 12 audio
 4    there?
 5         A.    Yes, ma'am.
 6         Q.    Perfect.  I am going to advance the
 7    audio, if there is no objections to moving through
 8    it rather than playing it in its entirety.  I'm
 9    just going to go straight to minute mark 42:14.
10    Okay. We are going to start at 42:04 and play from
11    here.
12                    {AUDIO PLAYED}
13    BY MS. LOMMERS-JOHNSON:
14         Q.    So what I think was said on the audio
15    was, Officers in uniform units responding.  Once
16    you get your equipment, go ahead and take the front
17    lines.  As soon as we can start effecting arrests,
18    we must do.  Is that accurate?
19         A.    Yes.
20         Q.    And is that your voice on the recording?
21         A.    It is.
22         Q.    When you communicated this portion of the
23    audio, that as soon as we can start effecting
24    arrests we must do so, was that something that
25    Incident Commander Martin agreed with and had been
```

1    discussed with him?

2        A.   Yes.  He would have agreed on it.

3        Q.   Before the decision to begin arresting

4    protesters in the area of East and France was made,

5    did you have any communication with anyone from the

6    Louisiana State Police?

7        A.   Specifically, I wouldn't recall.  You

8    were talking about once they're on the ground or

9    responding, because I would have summoned them from

10   their staging area to respond to assist.  That

11   would have been a request made by me to a specific

12   individual.  I don't recall.

13       Q.   So you would have summoned a contingent

14   from LSP to respond to East and France?

15       A.   Yes.  I do recall them being staged at

16   their headquarters.  We did have agencies staged at

17   our headquarters, but they were one of the elements

18   that were assigned for mitigation, and I would have

19   summoned them to respond to that location to

20   assist.

21       Q.   In terms of whoever was a member of their

22   leadership at East and France, would you have had

23   any communication with their leadership about

24   coordinating officers to move in and start

25   effecting those arrests?

1      A.   I believe it would have all been on the
2  same regular frequency so we all know what is going
3  on.  Yeah, I would have had communication with
4  them.
5      Q.   Did they have -- did LSP at any point
6  that you can remember directly contact you on the
7  radio to report information or communicate about
8  what was going on at East and France?
9      A.   I couldn't recall.  I mean, certainly
10  could have, but I don't recall doing so.
11      Q.   And my understanding about the other law
12  enforcement agencies that were part of the
13  contingent at East and France is that it included
14  LSP, Calcasieu, and EBRSO?  Is that accurate?
15      A.   Quite possibly, yes.
16      Q.   Do you remember any other agencies being
17  there?
18      A.   Our agency.
19      Q.   In addition to BRPD?
20      A.   No, ma'am.
21      Q.   And so now I'm going to go back to
22  Exhibit 12 and advance again to minute mark
23  1:18:49, and I'll play now.
24                {AUDIO PLAYED}
25  BY MS. LOMMERS-JOHNSON:

1       Q.   Is that your voice on the -- apologies.
2  Is that your voice on the audio recording there at
3  1:18:49?
4       A.   Okay.  Miss Hannah, the last thing we
5  heard was Dustin McGinnis saying McGinnis.
6       Q.   Okay.  I'm going to go back.  Let me just
7  rewind it.
8       A.   During lunch we are going to try to get
9  this fixed, this Internet issue fixed, so the next
10  counselor don't have to deal with it.
11       Q.   So I'm going to play it again.
12                  {AUDIO PLAYED}
13  BY MS. LOMMERS-JOHNSON:
14       Q.   Could you hear it this time?
15       A.   Yes.
16       Q.   Is that your voice on the radio there?
17       A.   I couldn't tell if it was mine or Bryan
18  Taylor's.  Would you play it again?
19       Q.   Okay.  So you think it's either your
20  voice or Bryan Taylor's?
21       A.   Yes, ma'am.  Normally, my voice is pretty
22  clear but not clear in disseminating information
23  but understanding who was speaking.  I couldn't
24  tell if it was me or Brian.
25       Q.   Here just jumping in.  Correct me if I

1    get this wrong.  What I think was said at the end

2    was, This is not a peaceful protest anymore.  Your

3    protest is over, and you will be arrested, and then

4    go make arrests whether they are standing in the

5    yard or not.  Is that accurate?

6        A.    That's what I heard, correct.

7        Q.    When this direction was given, did this

8    mean that officers would be advancing into the yard

9    at East and France?

10       A.    Most certainly could, yes.

11       Q.    I think at the beginning of the statement

12   it said, Once LSP has gotten what they need.  Do

13   you remember what was meant by the reference to

14   once LSP has gotten what they need?

15       A.    I don't recall.

16       Q.    I think at some point it was considered

17   -- apologies.  I think at one point there was

18   consideration of whether to use tear gas at the

19   protests at East and France.  Do you remember that?

20       A.    I do recall -- I know we had some wind

21   considerations, some other issues that were

22   deciding factors.

23       Q.    Was the wind consideration part of the

24   reason that ultimately tear gas was not used?

25       A.    Well, we were going to use it as an

```
1    initial mitigating factor.  I don't recall
2    specifically why we didn't use it or if we did or
3    not.  I don't recall.  Wind would be a factor,
4    depending on where our positions are and where our
5    target area is and the gush of the wind, would it
6    have affected houses in the area of those who were
7    not involved in the incident.  There is a lot of
8    deciding factors whether or not we are going to
9    utilize gas.
10        Q.   Do you recall, was it BRPD that had the
11   tear gas or was it LSP that would have been
12   supplying the tear gas?
13        A.   We certainly have our own.  If needed to,
14   we could have deployed, certainly.
15        Q.   And going back --
16        A.   What time was that clip on that radio
17   traffic disseminated?  That last clip that you
18   played.
19        Q.   So that clip was one hour and 18 minutes
20   into the intraop recording.  I think we actually
21   have a log.
22             MR. SCOTT:
23                  We have the mystery log.
24             MS. LOMMERS-JOHNSON:
25                  Yeah.  We have -- let me quickly
```

1          pull up that log just so we can verify

2          if there is a time stamp on the log.

3      MR. SCOTT:

4          Hannah, I'm going to explain to

5          Lieutenant Wallace about the log.

6          We've got a log from LSP, but the

7          coding on the log is really mysterious.

8          It's does not appear to relate to like

9          BRPD unit call numbers.  I've shown it

10         to a number of officers.  They are all

11         like, I don't know what I'm looking at

12         here.  But if we put it up, maybe you

13         will be one who can magically translate

14         it, because it's confusing.

15     THE WITNESS:

16         I'm just trying to get an idea of

17         the time that directive was given as to

18         the reference of it.

19 BY MS. LOMMERS-JOHNSON:

20     Q.   I think that what we have is that the

21 recording start time, according to -- actually, to

22 do this correctly, let me just label this log

23 Exhibit 13.  It's been previously introduced as

24 four Ys in the continuing alphabetical exhibit

25 list. I'm going to share the screen so you can see

1    what I'm looking at.  The log that we have here for

2    the interop from July 10th says that the record

3    time start is 2:54 PM.

4         A.    It says 3:16.

5         Q.    Yeah, that puts us in about the 3:00 to

6    4:00 PM hour for minute mark 1:18.

7         A.    Okay.  Thank you. I thought the incident

8    at Government were later in the day.  They had an

9    organized movement.  Do you have a copy of that

10   permit that was issued for that march?

11        Q.    Unfortunately, I don't have a copy of the

12   permit.

13        A.    I was just wondering.  Three o'clock in

14   the day, certainly that would have been my

15   transmission, but I don't recall having that early

16   in the day.  I'm just trying to sort this out as we

17   go through this as well, but I'm good.  You can

18   continue.

19        Q.    So I think the last recording we played

20   was the -- I'll just go back to the last recording

21   just to make sure I'm on the right page here.  So

22   I'll play this again.  So we're thinking that this

23   is potentially in the 3:00 to 4:00 PM hour,

24   according to this log from LSP.

25                    {AUDIO PLAYED}

```
 1              MR. SCOTT:
 2                   I don't know if you replayed it, but
 3                 we couldn't hear it.
 4              MS. LOMMERS-JOHNSON:
 5                   Okay.  I'll replay it again just
 6                 real quick.
 7                   {AUDIO PLAYED}
 8      BY MS. LOMMERS-JOHNSON:
 9         Q.   So I guess given the timing and hearing
10      the recording again, do you think that this would
11      have been you or Bryan Taylor?
12         A.   It would have been Bryan Taylor.  I think
13      the terminology and dissemination is more
14      consistent with him. I could be wrong, but it just
15      doesn't sound like me.
16         Q.   Do you remember that day, on July 10th,
17      when the determination was made that it was no
18      longer a peaceful protest?
19         A.   Vaguely.
20         Q.   Do you remember why command made that
21      determination?
22         A.   If I recall how the day unfolded, it
23      would have been a determination from the initial
24      intent with the objective laws of the peaceful
25      march and assembly, and how we got to where we were
```

1    and the intentions demonstrated by those that were

2    participating with the knowledge that we've given

3    them every avenue of escape to where they could

4    have left any time they wanted to.  So with that

5    information, we would have determined how we came

6    up with what we needed.

7        Q.   When it was communicated over the radio

8    to all units that it was no longer a peaceful

9    demonstration, what was that meant to signify to

10   the officers on the ground?

11       A.   That we have given them every opportunity

12   to comply.  They have failed to done so, so,

13   unfortunately, we are going to be forced to do our

14   job, to be prepared for contacts and to effect

15   arrests.

16       Q.   Did the officers on the ground know from

17   instruction or briefings that they had received

18   either prior in the day, or on prior days, the

19   significance of the designation that this was no

20   longer a peaceful protest?

21       A.   Oh, yes, ma'am.  They would have known.

22   I'm certain they wished we would have made that

23   call a lot sooner than what we did.

24       Q.   Do you recall whether Chief Dabadie was

25   made aware of the situation with the protest at

1    East and France?

2         A.   I didn't make contact with him or brief

3    him, but I'm certain he was kept abreast of what

4    was going on.

5         Q.   It's my understanding that the other law

6    enforcement agencies that we talked about earlier,

7    Calcasieu, EBRSO, and LSP were brought in to assist

8    with the situation at East and France.  Is that

9    your understanding as well?

10        A.   Yes, ma'am.

11        Q.   Did you help coordinate the staging of

12   those different law enforcement agencies around the

13   intersection of East and France?

14        A.   I wouldn't have gave them specifics. That

15   would have been boots on the ground incident

16   commander that would have done that specifically.

17   I would not have micromanaged that from MOHSEP.

18        Q.   You would have just heard the incident

19   commander on the ground instruct them where to

20   stage?

21        A.   Not necessarily didn't have to hear.

22   Upon their arrival, he could have directed their

23   point of contact to where he needed them to be most

24   beneficial.  It wouldn't have been efficient for us

25   to do it from a remote location, because we don't

1    see everything they see out there.

2        Q.   I'm going to go a little bit back in the

3    audio now to minute mark 45:15.  I'm just going to

4    start it at 45:02.

5                    {AUDIO PLAYED}

6    BY MS. LOMMERS-JOHNSON:

7        Q.   Could you hear that audio there?

8        A.   Yes, ma'am.

9        Q.   So the end statement what I heard is,

10   It's too late.  Everyone has violated and under

11   arrest.  Is that accurate to what you heard as

12   well?

13       A.   Yes, ma'am.

14       Q.   Do you know whose voice that was on the

15   recording?

16       A.   Oh, that was me.

17       Q.   At that point -- so earlier in the

18   recording there I heard someone say one of the

19   protesters is requesting to walk on the sidewalk

20   past France.  Do you recall giving that instruction

21   that that was no longer acceptable?

22       A.   I am referring back to five years ago.

23   It would be impossible for me to recall that

24   specific direction, but I'm pretty convicted in our

25   statement that we made.  I do understand what was

1    unfolding.

2        Q.    At that point -- I guess at that point --

3    sorry, Joe.

4            MR. SCOTT:

5                Sorry.  I was noting the geography

6                of East and France and past France

7                Street down on Mayflower is the second

8                entrance ramp by which you can overtake

9                I-110.

10           THE WITNESS:

11               That's correct.

12   BY MS. LOMMERS-JOHNSON:

13       Q.    So I guess is it -- you said that you

14   could remember sort of what was going on at that

15   point, and at that point you didn't want any of the

16   protesters to walk past France; is that accurate?

17       A.    We do know where those who were

18   participating, how they arrived and where they

19   arrived, where they parked.  There was no one that

20   was within this event that needed to get to the

21   east of us other than those who had ill intent.  So

22   I do understand what was going on at the time, and

23   the directive that was given and the reason why it

24   was given.  We gave them every avenue of escape

25   even to this point.  We never blocked the west side

```
 1    to trap them in.  That was the way they were
 2    parked.  That's the way we staged.  That was the
 3    direction they needed to go back to in order to
 4    dissolve.  So by moving on only got those who had
 5    ill intent to violate the law to get past our
 6    forces, and we didn't want that.
 7         Q.   Now, I'm going to move on.  Jumping in
 8    forward in the audio to 1:24.
 9                   {AUDIO PLAYED}
10    BY MS. LOMMERS-JOHNSON:
11         Q.   I'm going to play here -- here we are at
12    1:24:33.
13         A.   Okay.
14                   {AUDIO PLAYED}
15    BY MS. LOMMERS-JOHNSON:
16         Q.   So there I think we heard a reference to
17    all 15s.  Can you tell me what that refers to?
18         A.   All of those individuals who have been
19    arrested. 15 is an arrestee.
20         Q.   I think on the radio I've been previously
21    informed that it was Myron Daniels who came on the
22    radio to say that 14:1001, Obstruction of Public
23    Passages, would be used to arrest protesters.  Is
24    that what you remember from that day?
25         A.   That's what I just heard.  That was Myron
```

1    reciting the statute.  I didn't hear him give a

2    number, but I did hear him state obstruction of the

3    passage.

4         Q.   That is in line with the previous

5    operational order that we looked at earlier today,

6    to use that statute?

7         A.   Correct.

8         Q.   So here I'm going to jump forward again.

9    I only have a couple more to play for you.  So this

10   one is going to be 1:34:45.  I'll start at 1:34:42

11   on the recording here.

12                 {AUDIO PLAYED}

13   BY MS. LOMMERS-JOHNSON:

14        Q.   So here on the recording -- I guess my

15   first question is did you recognize that voice on

16   the recording?

17        A.   No, ma'am. He made a reference to

18   Calcasieu first.  I would assume it would have been

19   the commander for Calcasieu.

20        Q.   On the recording, when they referred to

21   being ready to push on, they said, I think, ready

22   to push on your command, is it your understanding

23   that "push" here meant to advance on protesters and

24   begin effecting arrests?

25        A.   Quite possibly.

1        Q.    I apologize if you already testified to
2   this earlier, but do you recollect who it was who
3   decided to ask LSP and EBR and Calcasieu to come
4   and assist at East and France?
5        A.    That would have been me.  I could have --
6   That certainly could have came from me.  It could
7   have came from Captain Martin.  It could have came
8   from Mike Walker.  I do know that I identified the
9   situation unfolding on Government Street and made
10  the request for those supporting elements that were
11  already in place.  After conversing with Captain
12  Martin on what I observed, my thoughts, and where
13  we were going to end up, I was given consent from
14  him to get the resources committed.
15       Q.    So you and Captain Martin discussed it,
16  and you got consent from him to call in
17  reinforcements from LSP, BR, and Calcasieu?
18       A.    Yes.
19       Q.    So now I'm going to advance to 1:37.
20                  {AUDIO PLAYED}
21  BY MS. LOMMERS-JOHNSON:
22       Q.    I apologize.  I need to take a step back
23  a little bit.  We'll start at 1:37:14.  Sorry about
24  that.
25                  {AUDIO PLAYED}

1    BY MS. LOMMERS-JOHNSON:

2        Q.    Here on this recording I heard, Go ahead,

3    and then sidewalks are included.  Obstruction of a

4    public passage.  Do you know what the significance

5    of that order was?

6        A.    That was Myron Daniels giving that

7    direction, so I would only be speculating as to

8    what his pure intent was.  I do know that the

9    sidewalks and the roadway is what he was referring

10   to, but I don't know exactly his complete thought

11   process in that statement.

12       Q.    When Myron Daniels gave the ultimate

13   order to engage protesters, you and Captain Martin

14   were aware that the order was being given?

15       A.    Correct.

16       Q.    And then here I just want to take a step

17   back to 1:37 exactly.  To the extent that's

18   possible.  I'll start playing here at 1:36:53.

19                 {AUDIO PLAYED}

20   BY MS. LOMMERS-JOHNSON:

21       Q.    So here I think we hear it being repeated

22   a couple of times, start your push, and then we're

23   moving.  Do you know whose voice said, "Start your

24   push" there?

25       A.    Officer Hasselbeck of the Louisiana State

1    Police.

2         Q.    After officers were given the order to

3    start the push and advance on the yard of

4    protesters, were you able to see that occurring on

5    your live stream or your video footage that you

6    could see?

7         A.    I could see the situation unfolding from

8    their perspective, yes.

9         Q.    Do you remember from what perspective you

10   were watching?  Was it from across East Boulevard?

11        A.    Air support would probably be my best

12   vantage point.

13        Q.    So that was from above?

14        A.    Aerial, yes.

15        Q.    Were you able to see officers enter the

16   yard at the intersection of East and France and

17   begin making detentions?

18              (LOST CONNECTION)

19              THE WITNESS:

20                   We lost you, Miss Hannah.

21   BY MS. LOMMERS-JOHNSON:

22        Q.    Yeah.  You were in a very stoic thinking

23   position.  That fooled me for a second.

24              I think my last question was, from the

25   air support footage that you could see, where you

1    able to see the BRPD officers go into the yard and
2    begin making detentions?
3           A.    Yes, ma'am.
4           Q.    Eventually, my understanding is that the
5    whole yard was cleared of protesters; is that
6    accurate?
7           A.    Eventually, correct.
8           Q.    Do you remember about how long it took to
9    clear the yard?
10          A.    No, ma'am.  I do know it was quite taxing
11   and a huge job for those on the ground, but I do
12   not recall how long.
13          Q.    Okay.  So now I'm going to move -- I
14   think this will be my last clip that we'll play
15   here.  It's going to be at minute mark 1:09. No.
16   We're going to go up to 1:09:55.  I'll start
17   playing here.
18                        {AUDIO PLAYED}
19   BY MS. LOMMERS-JOHNSON:
20          Q.    So here on this recording, can you
21   identify either of the voices?
22          A.    That was Tim Browning.  Captain Tim
23   Browning is the one who says they're lacking
24   paperwork.  The other, Mike Walker key up and
25   Dustin McGinnis at the end.

1      Q.   Do you recall whether anyone from
2  headquarters ended up running them more PC
3  paperwork?
4      A.   I don't recall.
5      Q.   When I think Browning said we just have
6  the rap, what does that mean?
7      A.   The rap sheet that goes along with the
8  arrest. It identifies the arrestee.
9      Q.   Is that the sheet that is titled
10 something like Arrestee Information Sheet?
11     A.   Quite possibly.  I don't have one in
12 front of me.  It's been quite sometime since I have
13 used one, I think.  We might have one here.
14 Affidavit for Probable Cause.  It does have the
15 particulars of an arrestee.  I have one in my hand,
16 an Arrestee Information Form.
17          MR. SCOTT:
18               It's from AR.
19          MS. LOMMERS-JOHNSON:
20               Got you.  Thank you.
21          THE WITNESS:
22               A rap sheet.
23 BY MS. LOMMERS-JOHNSON:
24     Q.   Do you know who at BRPD headquarters
25 would have handled getting those PC affidavit

1    sheets down to the area around East and France?

2        A.   I wouldn't know who the carrier would be.

3    I do recall Sergeant Hutto being tasked with

4    overseeing the processing of those individuals, but

5    I don't recall who would have transported those

6    documents.

7        Q.   I apologize.  I missed the name that you

8    said.  Sergeant --

9        A.   I think, if I recall correctly, Sergeant

10   Hutto was responsible or tasked with the management

11   of the arrestees, to oversee that process.

12       Q.   I think going back to something that we

13   discussed a little bit earlier in the deposition.

14   Let me fly back there in my notes.  I think you

15   said that you had, at times, communicated on your

16   phone with other BRPD officers, but that your phone

17   doesn't store messages.  I am wondering if in 2016

18   you had a phone from BRPD or whether you just used

19   your personal phone?

20       A.   My personal phone.

21       Q.   Do you know if you were ever asked in

22   2015 to save any text messages related to the

23   protesters at all?

24       A.   You said 2015? That was before the

25   incident, before it even occurred.

1        Q.    You're right.   Okay.   I'm going to revise

2   my question.   In either 2017 or 2018, where you

3   ever asked to save your text messages related to

4   the protests?

5        A.    Not that I recall, no, ma'am.

6        Q.    I know you said your phone automatically

7   deletes for storage purposes, but do you know how

8   long it does store messages before deleting them?

9        A.    I don't recall.   I think maybe a month,

10  but I do have a different phone than I had at that

11  time.

12       Q.    That makes sense.

13       A.    Yes, ma'am.

14       Q.    Now I'm just going to ask for a four-

15  minute pre-lunch break.   I'm hoping to just go off

16  the record for a couple of minutes and come back on

17  for 12:15 just for any final questions that I might

18  have, and then after that, we can break.

19            MR. SCOTT:

20                 Okay.

21            {BRIEF RECESS, 12:00-12:15}

22  BY MS. LOMMERS-JOHNSON:

23       Q.    One final question. Take a look at this

24  exhibit.   I'm going to name this Exhibit 14 and

25  trust that Joe will correct me if I'm off on my

```
1    numbering.
2            MR. SCOTT:
3                You are right.
4    BY MS. LOMMERS-JOHNSON:
5        Q.   So Exhibit 14 is this e-mail sent from
6    someone named Casey Rayborn Hicks at EBRSO on
7    Saturday, July 9th, 2016.  It says, "I'm attaching
8    a list of those booked last night and this morning.
9    I'm also attaching a probable cause for each type
10   of charge.  Any booked on this specific charge will
11   have an identical probable cause with a different
12   name."  I'm wondering if this is an e-mail that you
13   received in 2016.
14       A.   No, ma'am.
15       Q.   Do you ever recall receiving a
16   communication of this nature regarding the probable
17   cause for all of the people arrested from anyone
18   from EBRSO in 2016?
19       A.   I would not have been privy to that.
20   That would have been internal within our agency.  I
21   don't recall ever seeing these.
22       Q.   Okay.  I'm going to stop screen sharing
23   now.  That is all the questions that I have for
24   you.  Thank you so much for your patience.  I will
25   pass it to Mr. Lanser, who I know, I think, is
```

 1    going to have some questions before or after lunch.
 2              THE WITNESS:
 3                   Thank you so much.  Sorry about our
 4                technical issues.
 5              MS. LOMMERS-JOHNSON:
 6                   No problem at all.
 7              MR. LANSER:
 8                   Joe, I'll defer to you.  I don't
 9                have a ton more questions.  I don't
10                know if you wanted to take a lunch
11                break now.  I have a few more clips
12                from the radio I want to go over and
13                some other follow-up questions.  It's
14                not extensive.  It's up to you.
15              MR. SCOTT:
16                   I don't know.  I feel like I'm going
17                to get bed sores if I sit in this chair
18                any longer.
19              MR. LANSER:
20                   We can take a break.
21              MR. SCOTT:
22                   My computer time says 12:18 or
23                12:19.  If we came back at one, would
24                that be okay with y'all?
25              MR. LANSER:

```
 1              That's okay with me.  Sound good to
 2          everybody?
 3          MS. LOMMERS-JOHNSON:
 4              Yeah, definitely.  Before you go
 5          off, Dave -- well, I'll stop the
 6          recording now.  I think I should pass
 7          the host of this Zoom to you.
 8          {LUNCHEON RECESS, 12:19-1:00}
 9   EXAMINATION BY MR. LANSER:
10       Q.   Good afternoon now, I guess, Lieutenant
11   Wallace.  My name is Dave Lanser.  I'm one of the
12   attorneys in the Blair Imani case, which is
13   specifically about the July 10th protest.  Like I
14   said, this won't be quite as long as the morning.
15   Miss Lommers-Johnson covered a lot of the material
16   I was hoping to, so we're good to go there.  We'll
17   get right to it.  I'm going to jump right into --
18   back into -- I don't recall which number exhibit
19   this was today, but the interop recording which is
20   Exhibit ZZZZ in the consolidated.  So let me pull
21   that up.
22          MR. LANSER:
23              Mr. Scott, did we lose you again?  I
24          don't see a video.
25              (LOST CONNECTION)
```

```
 1              THE WITNESS:
 2                  Sorry, Mr. Dave.  We lost you.
 3              MR. LANSER:
 4                  I was hoping we would have better
 5                  luck after lunch.  I was too
 6                  optimistic.
 7              MR. SCOTT:
 8                  Information Services sent out an
 9                  advisory that there was power loss at
10                  some critical juncture early this
11                  morning, and that, of course, out of
12                  four BR agencies, the parish attorney's
13                  office still doesn't have a phone
14                  system and has wildly intermittent
15                  Internet.  My apologies.  Next time you
16                  guys can come sit in my conference
17                  room.  It's easy peasy.
18     BY MR. LANSER:
19          Q.   We'll see.  Let's try to get through this
20     as quick as possible.  We can avoid as much of that
21     as we can.  I'm going to -- oh, so I'm going to go
22     through a few more of these clips from the radio
23     communications.  When Miss Lommers-Johnson was
24     doing it, some of the audio wasn't coming through
25     on my end.  If you already heard this part, just
```

1  let me know.  We can move on to the next one.  I
2  apologize if there is some overlap.  I'm going to
3  hit play now at 30 minutes and 48 seconds.
4                    {AUDIO PLAYED}
5  BY MR. LANSER:
6       Q.   The last section there sounded like,
7  Operations to Nelson.  Are they trying to occupy
8  Government?  10-4.  Is that you and Lieutenant
9  Gerrick Nelson? Is that my understanding?
10       A.   Correct.
11       Q.   I couldn't hear you.
12       A.   Yes.
13       Q.   I just wanted to confirm that.  I'm just
14  going to move ahead.  Do you remember what was
15  happening -- this is 30 minutes into that
16  recording, asking about trying to occupy
17  Government.  Do you remember this part of the day?
18  Do you remember what was going on then?
19       A.   To be absolute would be unfair, but to
20  speculate, I would assume as of that point when
21  they were concluding the march --
22            THE COURT REPORTER:
23                I'm sorry.  I can't hear you.  You
24            would speculate.
25            THE WITNESS:

```
 1              To be totally clear would be unfair,
 2              but to speculate, that would be the
 3              moment they were trying to leave St.
 4              Charles and enter Government Street, I
 5              would assume.
 6   BY MR. LANSER:
 7        Q.   I'm going to skip ahead to 32 minutes and
 8   16 seconds.
 9                   {AUDIO PLAYED}
10   BY MR. LANSER:
11        Q.   Okay.  That sounds like they are
12   complying.  They're out of the roadway.  We're
13   going to open Government Street back up.  Did you
14   recognize that voice?
15        A.   That was Gerrick Nelson and myself.  That
16   would concur with my previous statement of St.
17   Charles and Government, because I do recall once
18   the march was about to conclude, they were
19   gathering at St. Charles just before Government
20   Street, which was our first break room, as you
21   would say, something is not right.  After that, we
22   did have a group, an element, that cleared the
23   road, and that was the transmission that Gerrick
24   Nelson was giving there.
25        Q.   He says they're complying when they
```

1    cleared the road?

2         A.   I believe what he said is they are

3    beginning to comply or they're complying in

4    clearing the road at that moment.  Not that it had

5    not been done, but they were doing so or what

6    appeared to be doing so.

7         Q.   So they were told to clear the roadway,

8    and they complied by at least beginning to clear

9    the roadway?

10         A.   That's what I would interpret.

11         Q.   I'm going to go ahead just a couple of

12   minutes to 36 minutes and one second.

13                    {AUDIO PLAYED}

14   BY MR. LANSER:

15         Q.   That sounds like send your team to

16   Government Street by East Boulevard.  We got a

17   group of about 500 traveling eastbound on

18   Government by Channel 9.  We have a feeling they

19   are going to try and occupy 110.  Does that sound

20   right?

21         A.   That's correct.

22         Q.   Was that you speaking?

23         A.   That is, and I recall that.

24         Q.   What do you recall about this point in

25   time?

1       A.   My statement that it appeared that they

2  were complying.  We had a group of people that at

3  the conclusion of the march, they marched on the

4  capitol.  I think St. Charles and Government right

5  across from the final destination.  They kind of

6  gathered there.  That's when they were given the

7  direction they needed to disperse.  The original

8  group who summoned the permit or the walk complied.

9  They went across the street.  They dispersed in

10  their vehicles, went about their merry way.  The

11  other group of the 500, which we later had to

12  contend with, gave the appearance they were

13  complying, but it was really a facade.  They

14  started moving eastbound down Government Street. We

15  monitored their movement from St. Charles past

16  McDonald's, which we gave them the benefit of the

17  doubt that they were all going to McDonald's.  Then

18  Channel 9 is east of McDonald's, and that's when we

19  made the determination that they were going to try

20  to occupy the interstate, that we needed to do what

21  we needed to do to mitigate that.  We had already

22  released the traffic personnel, and I sent them

23  back to their staging area.  So at that moment, I

24  was recontacting the traffic individuals to go and

25  cover, show of force while we organize our Mobile

1   Field Force and other resources to mitigate.

2       Q.   You mentioned you had a -- on the

3   recording, it says, I have a feeling they're going

4   to try and occupy the interstate or something along

5   those lines. Where did that intelligence come from?

6       A.   Well, we got intelligence on the movement

7   from my devices that was giving us a live feed.

8   That along with their actions being consistent with

9   other individuals that we've dealt with in the past

10   with marches.  Their actions wasn't consistent with

11   those that were complying.  Knowing the location of

12   the interstate, all of those elements and bread-

13   crumbs led us to believe that they were trying to

14   get to the interstate to shut it down, which is

15   also consistent with what protesters have done

16   around the nation prior to this event.

17       Q.   You don't know of -- I know you were not

18   physically out there.  Do you know of anyone who

19   heard them chanting about taking the interstate or

20   talking about taking the interstate?  Was that

21   actually overheard or was it just based off of the

22   breadcrumbs, as you put it?

23       A.   When the motorcycle officers responded

24   back, the first officer who made contact with the

25   person who was making the movement or giving the

1   direction confirmed to him that they were going to
2   the interstate.  Prior to that, we didn't have --
3   it was only evidence in formulating or making an
4   educated guess, but it was confirmed once the
5   officers -- the motorcycle officers got back in
6   contact with that group, the individual who was
7   leading the group said, yeah, we're going to the
8   interstate.
9                    (LOST CONNECTION)
10                THE WITNESS:
11                    Mr. David, I don't know where I
12                dropped off, but I said a lot.
13                    {COURT REPORTER READ BACK}
14                THE WITNESS:
15                    Yes.  That's it.
16   BY MR. LANSER:
17        Q.   Was there more to that answer that you
18   were going to add?
19        A.   That's the gist of it.  It was confirmed.
20   Our thoughts were confirmed by the individual who
21   was identified as the leader.
22        Q.   Do you remember who that individual was
23   who was identified as the leader?
24        A.   I do not.  I wasn't out there to identify
25   them, but Officer Brandon Smith is the officer that

1   contacted them.

2       Q.   Officer Brandon Smith.  So he is the

3   motorcycle officer you mentioned?

4       A.   That's correct.

5       Q.   So Officer Brandon Smith had a

6   conversation with someone he identified as the

7   leader, and they said, we're taking the interstate?

8       A.   Yeah.  He asked him are y'all going to

9   the interstate, and it was told to me that the

10  individual replied yes.  And he said, "Well, hold

11  on.  We figured y'all would.  It's dangerous."  So

12  they gave them some stall tactics to where we could

13  get the resources there to mitigate it.  And the

14  individual -- they struck up a small bond, which

15  stalled their movement and allowed us to get

16  resources in place.

17      Q.   Brandon Smith is a BRPD officer?

18      A.   That's affirmative.

19      Q.   Let's move on to the next.  I'll hit play

20  at 39 minutes and 14 seconds.

21                 {AUDIO PLAYED}

22  BY MR. LANSER:

23      Q.   This one again refers to their leader.

24  Do you know if that's the same leader?

25      A.   I wouldn't know.  That's a different

1    individual.  That's Lorenzo Coleman I'm speaking
2    to.
3        Q.    Lorenzo Coleman and Brandon Smith, are
4    they part of the same squad or anything or are they
5    unrelated?
6        A.    Lorenzo rode motorcycles for a while, but
7    I do believe during this incident he was part of
8    the street crimes.  So he would have been a part of
9    a quick reaction force.
10       Q.    Moving ahead.  I'm going to hit play at
11   43 minutes and 51 seconds.
12                    {AUDIO PLAYED}
13   BY MR. LANSER:
14       Q.    That last part there sounded like Claron
15   Honore saying there is a Caucasian male with a tie-
16   dyed shirt and red hair in the front.  He's the one
17   directing them which way to walk.  It sounded like
18   your voice saying, 10-4.  That would be the first
19   one we arrest.  Is that all accurate?
20       A.    Yes, sir.
21       Q.    Do you have any idea if this Caucasian
22   male with red hair and a tie-dyed shirt is the
23   leader from before?
24       A.    It's been five years, as I alluded to
25   earlier, but I do believe it was a black male with

1    a bull horn. What was the time difference between

2    the conversation that we just identified with

3    Lorenzo Coleman and Honore?  What was the time

4    span? 45 minutes?

5         Q.   Yeah, approximately.  It's 39 minutes, 15

6    seconds with Lorenzo Coleman, and 43 minutes and 58

7    seconds with Honore.

8         A.   I couldn't say definitively, but if I

9    recall correctly, Brandon Smith -- and the reason

10   why I say this is because post the incident, I

11   wrote a letter for his acts which helped us in

12   being successful.  And if I recall, the individual

13   that he held up was a black male, so I wouldn't

14   think it was the same people.

15        Q.   There were potentially two different

16   leaders, I guess.  What was this letter you wrote

17   to Brandon Smith or about Brandon Smith?

18        A.   I wrote a letter of commendation just

19   identifying his actions during that incident, being

20   intuitive and helping stall those who had ill

21   intent, because we had minimum to no resources

22   before he made contact with that large mob, or that

23   large group.  He was able to develop a relationship

24   in a cordial manner and stall them until we got

25   resources there to mitigate it.  That was an

1    internal letter that I wrote to the chief with

2    hopes of him receiving an award for his actions.

3         Q.   Do you know if he did receive an award?

4         A.   I don't know.

5              THE COURT REPORTER:

6                   You said I don't know?

7              THE WITNESS:

8                   I don't recall, but there was so

9                 many actions post that event that were

10                duly notable that his was just everyday

11                work at the end of it.

12   BY MR. LANSER:

13        Q.   I'm going to jump ahead a couple of

14   minutes further.  Not even a full minute further at

15   44 minutes and 19 seconds.

16                   {AUDIO PLAYED}

17   BY MR. LANSER:

18        Q.   That sounds like you again saying any

19   unit that can effect the arrest of the white male

20   with the red hair and tie-dyed shirt snatch him up.

21   We have charges on him.  Does that sound right?

22        A.   Yes, sir.

23        Q.   Do you know what those charges were?

24        A.   I couldn't recite them offhand. That

25   certainly would have been something I could have

```
 1    relayed to the individuals if they come in contact
 2    with them.
 3         Q.   You don't recall specifically those
 4    charges?
 5         A.   To be honest with you, I don't recall a
 6    white male in a tie-dyed shirt.
 7         Q.   Okay.  Moving ahead again.  A little bit
 8    further this time.  Moving to 56 minutes and 35
 9    seconds.
10                   {AUDIO PLAYED}
11    BY MR. LANSER:
12         Q.   That sounded like you again saying,
13    Operations to Louisiana State Police Mobile Field
14    Force.  We need you on France and South 10th.  Move
15    west on France to East Boulevard.  Have your arrest
16    elements.  Start effecting arrests.  Does that
17    sound about what you said?
18         A.   Yes, sir.  That's what I said.
19         Q.   That's you directing the state police
20    Mobile Field Force to do that?
21         A.   Yes, sir.
22         Q.   Do you know -- so this is 12 minutes or
23    so after the last one we listened to. Oh, no.  Did
24    we lose you again?  I think we did.
25                   (LOST CONNECTION)
```

```
 1            MR. LANSER:

 2                  We will wait for them to reconnect

 3             again.

 4            THE WITNESS:

 5                  Mr. Dave, we lost you.

 6    BY MR. LANSER:

 7        Q.   What I was saying was this is about 12

 8    minutes or so after the last recording we listened

 9    to.  Do you remember sort of what changed from that

10    last recording to this one that would have LSP

11    start effecting arrests?

12        A.   I couldn't say definitively.  With the

13    time span, it's just so long ago.  I don't recall

14    giving that direction.  It was me, but I don't

15    recall it.

16        Q.   We don't want you guessing.  I'm going to

17    move forward just a bit to 57 minutes and 41

18    seconds.

19                  {AUDIO PLAYED}

20    BY MR. LANSER:

21        Q.   The last part was Mobile Field Force for

22    LSP moving.  If you can get the uniformed guys to

23    line up for the second line of arrests.  Did you

24    recognize that voice at all?

25        A.   Yes.
```

1      Q.    Who was that?

2      A.    Tim Browning.

3      Q.    Moving forward a couple of minutes, just

4  to one hour and 44 seconds.  We're just about done

5  with these.  Don't worry.

6      A.    You're fine.  Bringing back memories.

7              {AUDIO PLAYED}

8  BY MR. LANSER:

9      Q.    So what I heard there and, as has been

10 previously identified, I believe that was Officer

11 Brandon Blust saying the big instigator on

12 Government and East is going to be a black male

13 wearing a white button-up shirt, black tie, gray

14 vest, khaki pants, and a tan fedora.  Then you

15 respond, as soon as you can get a small element,

16 effect an arrest of him.  Does that all sound

17 right?

18     A.    Yes, sir.

19     Q.    Is this the black male you were talking

20 about earlier who you understood to be their

21 leader?

22     A.    I wouldn't know.  It was impossible for

23 me to know.  I didn't identify him or get a

24 description prior to.

25     Q.    When you say it's impossible for you to

```
 1   know, do you mean in that moment, because you were
 2   not on the scene or just because it's been five
 3   years?
 4        A.   Both.  With the information that I was
 5   given, I couldn't identify him then or now.
 6        Q.   Then one more clip.  I'm jumping way
 7   ahead here.  One hour, 44 minutes, and 49 seconds.
 8                    {AUDIO PLAYED}
 9   BY MR. LANSER:
10        Q.   Did you recognize either of those voices?
11        A.   Could you replay that?
12        Q.   Yes.
13                    {AUDIO PLAYED}
14                THE WITNESS:
15                    That's Reab Simoneaux, the girl
16                voice, and the male -- I don't know who
17                the Walker is.  If you play it again, I
18                might be able to tell.
19   BY MR. LANSER:
20        Q.   I'll try it one more time.  Is it
21   potentially Billy Walker?  Does that sound right?
22        A.   Yep.  That makes sense.
23        Q.   Do you know what they're talking about
24   here with check that vehicle from -- that last
25   female says there is a child in the car.  Then
```

1   Simoneaux says I do.  I got the child and a dog.

2   Do you know what situation they're talking about

3   there?

4          A.   No, sir.

5          Q.   You don't recall anything about a child

6   and a dog being found in a car?

7          A.   I can't recall.

8          Q.   That's it for the recordings.  I do just

9   have a few follow-up questions on some of what was

10  covered by Miss Lommers-Johnson.  I want to go back

11  to -- you two were talking about the training you

12  received.  Let me know if I've got this right.  I

13  know you two went over the general orders for civil

14  disorder and unusual occurrences.  My understanding

15  is you received some training on that in the

16  Academy, right?

17         A.   I think I stated they were postmarked or

18  originated post my Academy, so I would not have

19  received them in my Academy training, but I'm

20  certain that it was presented to me during my

21  career.

22         Q.   I see.  So they were likely presented to

23  you at some point post Academy.  Was it part of

24  your retraining or continuing training that you

25  have to do every year? Do you remember?

1    A.    I wouldn't be able to determine.  I don't

2    know.

3         Q.    But for each of those --

4         A.    The policy manual is accessible to me,

5    and it is my obligation to stay abreast of all of

6    the policies in there.  If they have a policy

7    change or a creation, they disseminate it to

8    everyone.  So I'm sure I would have gotten it early

9    on in my career.  Whether or not I remember over 30

10   years -- I don't remember when, how, or why.

11        Q.    Just based on how that works when they

12   update the policy and procedure manual, you would

13   have certainly received a notice that it was

14   updated or whatever, but you wouldn't have

15   necessarily have been trained on it?

16        A.    Certainly.  So in '95, everything was

17   done by paper and disseminated by hard copy so they

18   would have sent it out through the chain of command

19   and maybe had us sign a duty roster stating we

20   received it.  And then it was updated in what we

21   refer to as the Blue Book back then.

22        Q.    You don't recall any specific like

23   training sessions on either of those?

24        A.    I do not.

25        Q.    Then same sort of thing.  Just trying to

```
 1   clarify what you've already gone over a little bit.
 2   I'm not trying to trip you up or anything.
 3        A.   Oh, you're fine.  I expect you to try and
 4   trip me up.  That's your job.
 5        Q.   I believe you said you also -- in the
 6   Academy, you received some training on First
 7   Amendment rights, correct?
 8        A.   I'm sure we went over the amendments.
 9   That would be something that we would have gone
10   over in the Academy.  The rights of, you know,
11   citizens.  Those that we are sworn to protect.
12        Q.   Yeah.  Do you remember anything
13   specifically about the rights of the press or
14   media?
15        A.   Nothing specific, but I do know that we
16   have limitations.  We don't speak to the media.
17        Q.   Lost him again. I'm almost done.
18                   (LOST CONNECTION)
19                   THE WITNESS:
20                       We don't speak to the media, but we
21                     do allow them room to do their job as
22                     long as it doesn't interfere with our
23                     investigation.  That was stressed to us
24                     in the Academy, but rights and other
25                     things, we don't -- I don't recall
```

```
 1              that.
 2   BY MR. LANSER:
 3        Q.   What sort of -- what goes into how you
 4   identify, and maybe this just might be, you know,
 5   up to each individual officer.  I don't know if
 6   this is something that there is a procedure for or
 7   anything like that.  Is there any sort of training
 8   or procedure on how do you identify like the leader
 9   of a protest or identify certain individuals of
10   interest at a protest?
11        A.   Well, with those who are on the scene,
12   including myself and operations, our involvement
13   with the protesters have been minuscule.  I think
14   prior to this event, they had the abortion rally on
15   Jamestown, which was in the early nineties before
16   this, and none of us were there.  I think in order
17   for us to identify, there is no class or no
18   definition for utilizing the scheme of past
19   experiences to help us identify those who were
20   giving energy, direction, and guidance to any group
21   of individuals.
22        Q.   Sure.  That sounds right.  What about
23   identifying agitators?  Is there any -- do you have
24   any guidance on how to identify agitators in a
25   crowd?
```

1          A.    Once again, I think real world

2    experiences and schemes that's formed over the

3    years would be how we would identify and maybe

4    relay to somebody what we think their roles are.

5          Q.    Did you receive any training about

6    deescalation procedures in a crowd environment?

7          A.    I do recall in the Academy us -- and I

8    think a lot of our information was formatted off of

9    the abortion incident that they had in the early

10   nineties, but we did -- part of our curriculum was

11   dealing with individuals who were noncompliant but

12   not aggressive.  So I guess that would be dealing

13   with groups of people and protesters and those

14   types of people.

15         Q.    What were those specific procedures?

16         A.    Just soft and hand control techniques on

17   gaining compliance with pressure points.  That was

18   through our PPCT, pressure point control tactics

19   curriculum that was taught in the Academy when I

20   came through.  So you have active, aggressive, and

21   passive.  There's different types of levels of

22   resistance.

23         Q.    Have you ever heard of something called

24   the Miami Model of Policing Protests?

25         A.    No, sir.

1        Q.   Have you ever heard of a Supreme Court

2   case with the name Cox, C-O-X, versus Louisiana?

3        A.   No, sir.

4        Q.   If I told you it's a case from the

5   sixties about some Baton Rouge protesters, and it

6   was found that the police violated their First

7   Amendment rights, would that ring a bell at all?

8        A.   No, sir.

9        Q.   So you don't think you have been trained

10   on that in the Academy or anywhere else?

11        A.   I quite certainly could have.  We were

12   given tons of information.

13        Q.   I know you had mentioned earlier BRPD

14   updated a lot their procedures based on what

15   happened in July 2016; is that right?

16        A.   Can you repeat that, Mr. David?

17        Q.   I believe what you mentioned earlier was

18   BRPD updated a lot of their policies and procedures

19   with these sorts of events following July 2016.

20        A.   I do know that we have analyzed and

21   reviewed our actions and reactions to that

22   incident, and we did streamline.  I do know we had

23   a meeting with the district attorney post the

24   incident on some issues that we identified, and we

25   debriefed, so if it came back to Baton Rouge, our

```
 1    area, that we'd have a better response plan.  How
 2    to better assist Mobile Field Force, things of that
 3    nature.  We like to critique ourselves and do the
 4    best job possible.
 5         Q.   Sure.  Yeah.  With all of that in mind
 6    and with the benefit of being able to look back on
 7    it, is there anything you would have done
 8    differently in your role on July 10th, 2016?
 9              MR. SCOTT:
10                   Dave, I'm objecting here.  You're
11                   asking him to speculate.  I let you
12                   slide on the remedial efforts, but I
13                   got to draw a line somewhere.
14              MR. LANSER:
15                   Objection has been noted.
16    BY MR. LANSER:
17         Q.   You can still answer.
18              MR. SCOTT:
19                   You can answer. I've preserved the
20                   record.
21              THE WITNESS:
22                   I think, as individuals, any time we
23                   respond to a spontaneous incident that
24                   is new to us, we can always get better,
25                   and that certainly applied to us.  At
```

1      this event, we could have had forces on
2      the ground on Government Street that
3      prevented them from gaining so much
4      ground.  Again, this close to the
5      interstate and being on France Street
6      and Government.  We could have
7      certainly mitigated that sooner.
8          We could have been more streamlined
9      in effecting the arrests and processing
10      the individuals, having hydration areas
11      there and cool-off places and cool-down
12      tents.  There is several things that we
13      could have done differently, better,
14      more efficient on both sides.  So it
15      would be a disjustice to say, oh, we
16      are handling this perfect.  We need to
17      do the same thing again.  That wouldn't
18      be a true statement.
19   MR. LANSER:
20          Sure.  That's all the questions I
21      have, so I appreciate it.  Thank you.
22          Hannah, do you have anything else?
23      Otherwise, we can kick it over to Joe
24      and Greg.
25   MS. LOMMERS-JOHNSON:

```
1                    I don't have anything else.
2              MR. FAHRENHOLT:
3                    I have no questions.
4              THE WITNESS:
5                    I went in, in 1996, and I left out
6                 in 2017 or 2018.
7              THE COURT REPORTER:
8                    Did you ask him a question, because
9                 I didn't hear the question?
10             MR. SCOTT:
11                   Oh, I asked him how long he had been
12                in the traffic division.
13             THE WITNESS:
14                   21 or 22 years.
15     EXAMINATION BY MR. SCOTT:
16         Q.   Have you ever written citations for
17     obstruction of a roadway?
18         A.   I believe I have.
19         Q.   How about for obstruction of public
20     passages?
21         A.   I don't recall public passages.
22                   (LOST CONNECTION)
23             MR. LANSER:
24                   I thought we were going to get
25                through it without one more frozen.  So
```

1                      close.
2       BY MR. SCOTT:
3              Q.    We were looking at the MOHSEP synopsis,
4       Exhibit 8.  There is a typo.  Is there a time
5       associated with the march from Wesley Methodist
6       Church?
7              A.    Yes, sir.  That march would have occurred
8       from 1400 to 1900 hours.
9              Q.    We were taking a look at the interop log
10      and estimated that those communications, for
11      instance, at one hour 18 would be 3:15 in the
12      afternoon, according to the log.  How does that
13      comport with the Summary of Actions from MOHSEP?
14             A.    That would be impossible.
15             Q.    So those communications would be after
16      1900 hours?
17             A.    What communications?
18             Q.    On the interop about the break-away
19      group.
20             A.    Yes, sir.  That would have been closer to
21      1900 or afterwards that would have occurred.
22                   MR. LANSER:
23                        Mr. Scott, real quick.  As a point
24                   of clarification, I would mention we
25                   have -- I don't think we confirmed ever

```
 1              that the log starts at the same time
 2              the recording starts.
 3         MR. SCOTT:
 4              Right.  I'm just --
 5         MR. LANSER:
 6              Those times are kind of
 7              hypothetical, but, yes, understood.
 8         MR. SCOTT:
 9              Because everybody is asking when did
10              they get there, and we're actually
11              getting closer to pinning it down for
12              you.
13         MR. LANSER:
14              Yeah.  I just wanted to mention
15              that.  I appreciate it.
16  BY MR. SCOTT:
17       Q.   There is a statement on the interop that
18  this is not a peaceful protest.  Was that statement
19  made as a call for the police to start being rough
20  with the protesters?
21       A.   Oh, absolutely not.
22       Q.   What about the command, we're ready to
23  make a push on your order?  Is that any kind of
24  call to play extra rough with the protesters?
25       A.   No, sir.  That's police lingo for moving
```

1    forward.

2        Q.    There were a bunch of questions about why

3    we brought in reinforcements and LSP, sheriff,

4    Calcasieu.  What was the purpose of getting all of

5    those reinforcements in there?

6        A.    Well, one is because of the taxing

7    environment, the heat, to mitigate this, the

8    equipment that the officers are wearing, our

9    personnel as well as the footprint of the event.

10   Those officers were needed for mitigation.

11       Q.    Is the incident command part of the

12   standard SRT and SWAT training?

13       A.    Yes, sir.  The ICS system is common for

14   any complex event.

15            MR. SCOTT:

16                 That's all my questions.

17            THE WITNESS:

18                 Thank you.

19            MR. SCOTT:

20                 Any follow up from the plaintiffs?

21            MR. LANSER:

22                 Not for me.

23            MS. LOMMERS-JOHNSON:

24                 None from us either.

25                 [End of deposition, 1:40]

```
 1                    WITNESS CERTIFICATE
 2
 3
 4
 5              I, LIEUTENANT DAVID WALLACE, have
 6   read or have had the foregoing testimony read to me
 7   pursuant to Rule 30(e) of the Federal Rules of
 8   Civil Procedure and do hereby certify that to the
 9   best of my ability and understanding, it is a true
10   and correct transcription of my testimony.
11
12
13   Please check one:
14
     _____Without corrections
15
16
     _____With corrections (see errata sheet)
17
18
19
20   _____    _____
     LIEUTENANT DAVID WALLACE          Date
21
22
23
24
25
```

1                C E R T I F I C A T E

2

3                This certification is valid only for
a transcript accompanied by my original signature
4   and original required seal on this page.

5                I, SANDRA P. DIFEBBO, Certified
Court Reporter, in and for the State of Louisiana,
6   as the officer before whom this testimony was
taken, do hereby certify that LIEUTENANT DAVID
7   WALLACE, after having been duly sworn by me upon
authority of R.S. 37:2554, did testify as
8   hereinbefore set forth in the foregoing 124 pages;

9                That the testimony was reported by
me in stenotype, was prepared and transcribed by me
10  or under my personal direction and supervision, and
is a true and correct transcript to the best of my
11  ability and understanding;

12               That the transcript has been
prepared in compliance with transcript format
13  guidelines required by statute or by rules of the
board, that I have acted in compliance with the
14  prohibition on contractual relationships as defined
by Louisiana Code of Civil Procedure Article 1434
15  and in rules and advisory opinions of the board;

16               That I am not related to Counsel or
to the parties herein, nor am I otherwise
17  interested in the outcome of this matter.

18

19

20

21  _____
Sandra P. DiFebbo,
22  Certified Shorthand Reporter

23  Date:  _____

24

25