UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

BLAIR IMANI, ET AL

　　　　PLAINTIFFS


V.　　　　　　　DOCKET NO. 17-cv-00439-JWD-EWD


CITY OF BATON ROUGE, ET AL

　　　　DEFENDANTS



Deposition of LIEUTENANT CHRIS

POLITO, taken on Wednesday, August 25, 2021,

commencing at 1:04 p.m. via videoconferencing.



REPORTED BY:

Lori L. Marino
Certified Court Reporter
　　　　SOUTHERN COURT REPORTERS, INC.
　　　　　　(504) 488-1112

```
 1   APPEARANCES:

 2

 3   MOST & ASSOCIATES
     201 ST. CHARLES AVENUE, SUITE 114 # 101
 4   NEW ORLEANS, LOUISIANA  70170
     TELEPHONE:  (504)  509-5023
 5
     BY:  WILLIAM B. MOST, ESQ.
 6   williammost@gmail.com
     REPRESENTING THE PLAINTIFFS (IMANI V. CITY OF
 7   BATON ROUGE

 8

 9   RODERICK AND SOLANGE MACARTHUR JUSTICE CENTER
     4400 SOUTH CARROLLTON AVENUE
10   NEW ORLEANS, LOUISIANA  70119
     TELEPHONE:  (504) 620-2259
11
     BY:  ERIC A. FOLEY, ESQ
12   eric.foley@macarthurjustice.org
13   BY:  HANNAH LOMMERS-JOHNSON
     hannah.lommersjohnson@macarthurjustic.org
14   REPRESENTING THE PLAINTIFFS (SMITH V. CITY OF
     BATON ROUGE, BATISTE-SWILLEY V. CITY OF BATON
15   ROUGE, AND TENNART V. CITY OF BATON ROUGE

16

17   OFFICE OF THE EAST BATON ROUGE PARISH ATTORNEY
     222 ST. LOUIS STREET, 9TH FLOOR
18   BATON ROUGE, LOUISIANA  70802
     TELEPHONE:  (225) 389-3400
19
     BY:  JOSEPH SCOTT, ESQ.
20   joseph@josephscott.com
     REPRESENTING CITY/PARISH OF BATON ROUGE AND
21   BATON ROUGE CITY POLICE DEPARTMENT OFFICERS

22

23

24

25
                 SOUTHERN COURT REPORTERS, INC.
                       (504) 488-1112
```

```
1    APPEARANCES (CONTINUED):

2

3    BURGLASS & TANKERSLY, LLC
     5213 AIRLINE DRIVE
4    METAIRIE, LOUISIANA  70001
     TELEPHONE:  (504) 836-0408
5
     BY:  GREGORY C. FAHRENHOLT, ESQ.
6    gfahrenholt@burglass.com
     REPRESENTING LOUISIANA STATE POLICE AND
7    INDIVIDUAL STATE POLICE TROOPERS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                  WITNESS INDEX

2

  LIEUTENANT CHRIS POLITO
3 9000 AIRLINE HIGHWAY
  BATON ROUGE, LOUISIANA   70815
4

5
```

```
6 TITLE                              1

7 APPEARANCES                        2

8 WITNESS INDEX                      3

9 AGREEMENT OF COUNSEL               4

10 EXAMINATION BY MR. MOST           5

11 EXAMINATION BY MR. FAHRENHOLT     50

12 WITNESS'S CERTIFICATE             54

13 REPORTER'S CERTIFICATE            55
```

```
14

15

16

17

18

19

20

21

22

23

24

25
              SOUTHERN COURT REPORTERS, INC.
                  (504) 488-1112
```

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

1            S T I P U L A T I O N

2

3            It is stipulated and agreed by and

4  between counsel that the deposition of

5  LIEUTENANT CHRIS POLITO is hereby being taken

6  pursuant to the Federal Rules of Civil

7  Procedure for all purposes in accordance with

8  law;

9            That the formalities of

10  certification and filing are specifically

11  waived;

12            That the formalities of reading and

13  signing are specifically not waived.

14            That all objections, except those as

15  to the form of the question and/or

16  responsiveness of the answer, are hereby

17  reserved until such time as this deposition or

18  any part thereof may be used in evidence.

19

20            *   *   *   *   *   *   *   *

21            LORI L. MARINO, Certified Court

22  Reporter, in and for the State of Louisiana,

23  officiated in administering the oath to the

24  witness.

25

                    SOUTHERN COURT REPORTERS, INC.
                        (504) 488-1112

PROCEEDINGS

1 
2  THE COURT REPORTER:
3      Will counsel, please, identify
4  themselves and their representations
5  and also stipulate that by agreement
6  of all parties, this deposition is
7  being held via videoconferencing, and
8  there is no objection to the witness
9  being sworn in remotely.
10 MR. MOST:
11     Stipulate and agree.
12 MR. SCOTT:
13     Joseph Scott for defendants,
14 yes.
15 MR. FOLEY:
16     Eric Foley for plaintiffs in
17 Tennart v. City of Baton Rouge, Smith
18 v. City of Baton Rouge and
19 Batiste-Swilley v. City of Baton
20 Rouge.  We agree to the stipulation,
21 as well.  Though, I don't think we're
22 actually here to ask any questions.
23 We're just sort of bystanders on this
24 one.
25 MR. FAHRENHOLT:

```
 1              Greg Fahrenholt on behalf of the
 2         Louisiana State Trooper defendants.
 3         We agree to the stipulations.
 4    MR. MOST:
 5              Joe, can we stipulate that this
 6         deposition was properly noticed, and
 7         the court reporter is dually
 8         qualified?
 9    MR. SCOTT:
10              We would stipulate to that.
11                   EXAMINATION
12  BY MR. MOST:
13     Q    Officer Polito, could you give us
14  your full name and title for the record, your
15  rank?
16     A    Chris Polito.  I'm a lieutenant.
17     Q    Lieutenant, and you my need to speak
18  up a little bit for our court reporter, or
19  maybe, even scoot a little closer to the mic
20  if that's possible so she can get a really
21  clean transcript.
22              All right, Lieutenant Polito, have
23  you ever given a deposition before?
24     A    I have.
25     Q    So you understand that you are under
```

```
1   oath here today?
2       A    I do.
3       Q    I think you just said um-huh, but for
4   our court reporter, we'll have to say yes or
5   no so that she can transcribe our answers.  Is
6   that all right?
7       A    Yeah.  I actually said I do, but I
8   will say it a little louder.
9       Q    Well, then, I misheard you, which is
10  an indication that -- we will just try and get
11  it as clear as possible.  Thank you.
12           Lieutenant, is there anything, any
13  illness or medication you're taking or fatigue
14  or anything else that would prevent you from
15  giving us your complete attention and truthful
16  and complete answers today?
17      A    No.
18      Q    Roughly, how many depositions have
19  you done in the past, just approximate?
20      A    Three.
21      Q    So, like those depositions in the
22  past, we can take breaks as needed.  You can
23  take a break.  You can ask to take a break if
24  you need to get a drink of water, use the
25  bathroom, anything you need.  Just let
```

1    Mr. Scott or myself know.  We'll take a break.

2    Although, I will tell you now that it's my

3    practice to ask after each break whether you

4    talked to anyone, what you talked about, even

5    if it's with your attorney and what documents

6    you reviewed during the break.  All right?

7        A    Sure.  Okay.

8        Q    One thing that's quite important, if

9    I ask a question that is unclear or you don't

10   understand my question, will you agree to tell

11   me that that's the case rather than trying to

12   answer it anyway?

13       A    Absolutely.

14       Q    Thank you.

15       A    I agree.

16       Q    Lieutenant, do you know broadly what

17   case or cases you're here for today?

18       A    Something related to 2016 protests.

19       Q    That's right.  So my name is William

20   Most.  I am an attorney, I represent the

21   plaintiffs in the Imani case, which is a

22   little more than a dozen protesters and

23   journalists who were arrested in July 2016.

24   We're joined here today by Eric Foley of the

25   MacArthur Justice Center, who represents

1  plaintiffs in some other related cases;

2  Mr. Fahrenholt, who's an attorney for the

3  State Police Trooper defendants.  All right?

4       A    Sure.

5       Q    You said you have given a couple of

6  depositions.  In those depositions, were you

7  speaking on your own behalf, or were you

8  speaking on behalf of the City of Baton Rouge?

9       A    They were depositions that I was

10 speaking on my own behalf.

11      Q    So that's the most common type of

12 deposition.  What we're doing here today is a

13 little bit different.  It's called a 30(b)(6)

14 deposition; and in a 30(b)(6) deposition, you

15 are here today to speak not on behalf of

16 Lieutenant Polito but on behalf of the City of

17 Baton Rouge itself.  Do you understand that?

18      A    I do.

19      Q    Because a city can't sit down in a

20 room and give testimony so they have to

21 designate someone to speak on their behalf and

22 today, that's you.  Do you understand that?

23      A    I do.

24      Q    So, when I ask you questions today,

25 I'll be asking questions of the City of Baton

SOUTHERN COURT REPORTERS, INC.
(504) 488-1112

1    Rouge, even if I say you; and when you give

2    answers, you'll be giving answers of the City

3    of Baton Rouge.  Do you understand that?

4        A    I do.

5        Q    One situation -- one way a deposition

6    like this is different than a normal

7    deposition is that in a normal deposition, I

8    don't know or I don't recall is a perfectly

9    good answer if it's truthful.  However, in a

10   30(b)(6) deposition, the City has an

11   obligation to provide someone who has

12   investigated and become knowledgable, as

13   knowledgable as the City can be on a given

14   topic; and so just I don't know may not be a

15   sufficient answer.  Although, however, we are

16   going to be touching on the limits of the

17   City's knowledge.  So we may just see what the

18   City knows or doesn't know.  Am I being fairly

19   clear there?

20       A    Oh, I understand.

21       Q    Lieutenant, aside from attorneys, did

22   you talk to anyone to prepare for this

23   deposition?

24       A    No, I have not.

25       Q    Did you talk to an attorney to

```
1   prepare for this deposition?  Don't tell me
2   what you discussed.
3        A    Yes, I did.
4        Q    Approximately, how long did you talk
5   to an attorney to prepare for this deposition?
6        A    For 35, 40 minutes.
7        Q    Did you look at documents to prepare
8   for today's deposition?
9        A    I did.
10       Q    I'll pull up one document, which is
11  designated nine Zs Imani Geller 30(b)(6)
12  topic.  Is this one of the documents you
13  looked at to prepare for today's deposition?
14       A    That is the one.
15       Q    Are there any other documents you
16  looked at to prepare for today's deposition?
17       A    No, sir.
18       Q    I think I'm actually going to print
19  this out so I have it.
20            Since we're doing this deposition via
21  Zoom, I can't see what's on the table in front
22  of you.  Are there any documents on the table
23  in front of you that you can look at in
24  addition to this document, or is this document
25  the only one?
```

SOUTHERN COURT REPORTERS, INC.
(504) 488-1112

1        A      That's the only one.

2        Q      Because this is a Zoom deposition, I

3    can't see who else is in the room with you.

4    Is there anyone in the room with you besides

5    Mr. Scott?

6        A      There is not.

7        Q      Because this is a Zoom deposition, I

8    won't be able to know whether someone tries to

9    communicate with you during the deposition.

10   So will you agree now to tell us if anyone

11   tries to communicate with you during this

12   deposition either by text message, a passed

13   note, hand signals, whispers or anything else?

14       A      Absolutely.

15       Q      I suspect that at certain points

16   during this deposition, Mr. Scott may speak

17   up, and that's all right; but if there's any

18   other way that he tries to communicate with

19   you, will you agree to let us know?

20       A      Sure.

21       Q      So there's two big picture topics

22   that we're going to be taking the City's

23   testimony about today.  One topic is reports

24   of illegal activity during the July 9th and

25   10th protest, including several specific

SOUTHERN COURT REPORTERS, INC.
(504) 488-1112

1    subsections.  Are you prepared to testify

2    about that topic today?

3         A    Yes, on this paper, I can.

4         Q    And then, topic 12 is the arrest of

5    each plaintiff, including several subsections.

6    Are you prepared to testify about that topic

7    today?

8         A    I am assuming it is on this paper.

9    So yes, I am.

10        Q    So the case that -- could you tell us

11   what your job is at the Baton Rouge Police

12   Department?

13        A    Yes.  I am in charge SWAT and Special

14   Operations.

15        Q    Okay.

16        A    Recently.

17        Q    And how long have you been on the

18   BRPD force?

19        A    For the department, a little over 26

20   years.

21        Q    Are you generally familiar that there

22   were protests in Baton Rouge in July of 2016?

23        A    I am.

24        Q    Were you deployed to those protests?

25        A    I was activated, yes.  I was on

                SOUTHERN COURT REPORTERS, INC.
                        (504) 488-1112

1   12-hour shifts with the SWAT team.

2       Q    In particular, are you aware that

3   there was a protest in the vicinity of East

4   and France Streets on July 10, 2016?

5       A    I am aware of it.

6       Q    Were you present in the vicinity of

7   that protest?

8       A    I was not.

9       Q    So the Imani cases that I represent

10  is entirely focused on the protesters in the

11  vicinity of East and France on July 10, 2016.

12  So, if I talk about the East and France

13  protest, will you understand that's the

14  protests I mean?

15      A    Absolutely.

16      Q    Just to roadmap a little bit, you

17  have in front of you what I'll call -- what

18  is -- the file name on it is the topic 10 to

19  12 script.  The document in front of you, can

20  we call it the script?

21      A    Sure.  I'm fine with that.

22      Q    So you've got the script in front of

23  you, and then, what I've also done to try and

24  organize the information that we'll be talking

25  about is I have created a chart, two pages.

1    That is Exhibit ZZZZZZZZ, Imani plaintiff

2    chart.  So, if I talk about the chart will you

3    understand that it's this document that we're

4    looking at on the screen here.

5         A    Sure.

6         Q    So what we're going to do is I'm

7    going to be asking you questions about the

8    information contained in the script, and then,

9    we're going to use it to fill in the chart so

10   that we have sort of an organized compilation

11   of the City's knowledge on these topics.  Does

12   that sounds all right to you?

13        A    Yes.

14        Q    So the first topic to discuss is

15   reports of violence, including but not limited

16   to violence against law enforcement officers.

17   Are you prepared to talk about that topic?

18        A    I am.

19        Q    My understanding is that the script

20   identifies certain sections of depositions and

21   dash camera footage from Officer Corey Edwards

22   as the entirety of the City's knowledge of

23   reports of violence at the East and France

24   protest.  Would you agree?

25        A    Yes.  It's depositions of different

SOUTHERN COURT REPORTERS, INC.
(504) 488-1112

```
1    officers and one of their dash camera footage,
2    correct.
3        Q    None of those excerpts or footage
4    shows any violence by the particular
5    plaintiffs in this case.  Would you agree with
6    that?
7        A    According to the script, no.
8        Q    So I'm going to fill in -- you see on
9    the chart?
10            MR. SCOTT:
11                William, your chart is for you.
12            We've provided our script and agreed
13            that we may have to supplement,
14            because for instance, I don't even
15            have Keith Wilson's depo, and he was
16            the video guy.  So we're not
17            committing to anything apart from the
18            scripts that we've provided and the
19            testimony of Lieutenant Polito.
20   BY MR. MOST:
21       Q    Right.  So I'm going to ask
22   Lieutenant Polito.  So I believe we just
23   covered that we don't have any specific
24   evidence that any particular plaintiff engaged
25   in the act of violence.  Agreed?
```

SOUTHERN COURT REPORTERS, INC.
(504) 488-1112

1       A    Yes.  I have nothing on the script.

2       Q    So I'm going to put nos in this

3    column here, which is other than affidavit of

4    probable cause, does the City have any

5    evidence that plaintiff was violent.  I'm

6    going to put no.

7            MR. SCOTT:

8                William, the charges on the APCs

9            other than the handful that have

10           resisting don't reflect violence, so.

11           MR. MOST:

12               Right.  I agree with you,

13           because you know, they all say

14           resisting arrest.  So I'm saying

15           other than the affidavit of probable

16           cause, the City does not have any

17           evidence that any plaintiff was

18           violent.  So I'm putting no in these

19           columns.  Does that look appropriate

20           to you, Lieutenant?

21           THE WITNESS:

22               Yes.

23    BY MR. MOST:

24       Q    And then, subsection B of topic 10 is

25    any reports of property destruction, and I
                   SOUTHERN COURT REPORTERS, INC.
                          (504) 488-1112

1    don't see anything listed under there.  So I

2    conclude that the City has no evidence of

3    property destruction at the East and France

4    Street protest.  Agreed?

5         A    Yes.  I have nothing on the script

6    about property damage -- property destruction.

7         Q    So it's the City's testimony that the

8    City does not have evidence of property

9    destruction at the East and France protest.

10   Agreed?

11        A    Yes.

12        Q    Then, reports of noise ordinance

13   violation/disturbance of the peace, the City

14   has no evidence of reports of noise ordinance

15   violations or disturbance of the peace except

16   as reflected in the deposition of Curtis

17   Wilson and Officer Lapeyrouse.  Agreed?

18   Specific to the East and France Streets

19   protest.

20            MR. SCOTT:

21                I'm trying to find that.  Wait a

22            minute.  Did I do that wrong?   One

23            second.

24            MR. MOST:

25                Sure.
                SOUTHERN COURT REPORTERS, INC.
                     (504) 488-1112

```
 1              MR. SCOTT:
 2                   It appears that Lieutenant
 3              Polito is looking at the 12/15 script
 4              and not the 12/30 script, and that's.
 5              MR. MOST:
 6                   Let's go off the record briefly.
 7              Off the record.
 8                   (Off-the-record discussion.)
 9              MR. MOST:
10                   Let's go back on the record.
11    BY MR. MOST:
12         Q    So do you see on the first page of
13    the script, Lieutenant, that "B" is a question
14    about reports of illegal activity,
15    including -- oh, we covered property
16    destruction.  Moving on to "C."
17         A    You read noise ordinance.
18         Q    Right.  Do you see that subsection C
19    asks about reports of noise ordinance
20    violations and disturbance of the peace at the
21    East and France protest?
22         A    Yes, I do.
23         Q    The City has no evidence other than
24    as reflected in the deposition of Curtis
25    Wilson or Earl Lapeyrouse that there were any
```

SOUTHERN COURT REPORTERS, INC.
(504) 488-1112

1    noise ordinance violations or disturbance of

2    the peace at the East and France protest.

3    Agreed?

4        A    Correct.

5        Q    Okay.  Moving onto subsection D,

6    which is reports of efforts to obstruct roads,

7    including but not limited to interstate

8    highways, it's my understanding that the only

9    testimony or the only evidence the City has

10   about reports of efforts to obstruct roads,

11   including but not limited to interstate

12   highways is these particular page ranges from

13   the depositions of David Wallace, Alaina

14   Mancuso and Thomas Morse.  Agreed?

15       A    Correct.

16            MR. SCOTT:

17                William, I would suggest that

18            those are the most specific ones and

19            everything else was just repetitive.

20            I didn't think it was worth listing

21            everybody that said Sarg told me

22            something.  So these are the most

23            specific and on-point ones.

24            MR. MOST:

25                Okay.  Well, we've got the

```
 1              City's testimony on that topic.
 2    BY MR. MOST:
 3        Q     Lieutenant, do you see the next
 4    subsection is reports that plaintiffs or other
 5    protesters did not comply with lawful orders
 6    by police?
 7        A     I do.
 8        Q     Do you see that the -- so the City's
 9    only evidence that plaintiffs or other
10    protesters did not comply with lawful orders
11    by police are these sections of the deposition
12    of Thomas Morse and the deposition of Jeff
13    Pittman.  Agreed?
14        A     Correct.
15        Q     So I'm going to pull those up.
16            MR. MOST:
17                  Joe, do you have a transcript of
18            Morse?
19            MR. SCOTT:
20                  I do.
21            MR. MOST:
22                  Do you have an electronic
23            version or a physical version?
24            MR. SCOTT:
25                  I went and raided my Parish
```

1              Attorney's office this morning before

2              I went to headquarters.

3         MR. MOST:

4              Let's go off the record for a

5         second.

6              (Off-the-record discussion.)

7         MR. MOST:

8              Let's go back on the record.

9    BY MR. MOST:

10        Q    So is this the deposition of Thomas

11   Morse that is referenced here in the script,

12   Lieutenant?

13        A    Yes.

14        Q    So this is one of the two sources of

15   evidence that the City has that plaintiffs did

16   not comply with lawful orders.  Agreed?

17        A    Yes.

18        Q    And the first subsection is page 32.

19   Do you see I'm starting here at page 32?

20        A    I can't see the page number on your

21   screen -- oh, I saw it -- yes, I do see it.

22        Q    So I'm going through this.  Page 32,

23   page 33, it appears to be him testifying about

24   the general situation.  On pages 32 and 33, I

25   don't see the name of any particular

```
 1   plaintiffs.  Tell me if you disagree.

 2       A    I have not seen one yet.

 3       Q    Same with page 34.

 4       A    Nothing yet.

 5       Q    Yes, 35, and then, 36.  I'm seeing

 6   general descriptions of protesters in general

 7   not clearing the street, but I'm not seeing a

 8   description of a particular plaintiff not

 9   complying with a lawful order by police.

10   Would you agree?

11       A    Yes.  I didn't see any specific name.

12       Q    And the second section is 42.  So I'm

13   going to page 40.  Let's do the same thing

14   here, page 40, page 41, 41 to 42.  Similarly,

15   I'm only seeing generic descriptions of

16   protesters; nothing specific to the plaintiff

17   here.  Agreed?

18       A    Yes, no names.  Correct.

19       Q    Then going to page 112, the next

20   subsection is 112 to 113.  I'm looking here.

21   Page 112, and then, 113.  Likewise, I'm only

22   seeing generic descriptions here nothing

23   specific to any plaintiff.  Agreed.

24       A    No.  Correct.  I don't see it, no

25   names.
```

1    Q    So nothing in the sections of Thomas

2    Morse's deposition specifically suggests that

3    any particular plaintiff did not comply with a

4    lawful order.  Agreed?

5    A    Correct.

6    Q    Okay.  Then, the other potential

7    source is the deposition of Jeff Pittman,

8    which I will pull up.  Is this the deposition

9    of Jeff Pittman that the City is describing as

10   one of the other sources of information about

11   plaintiffs failure to comply with lawful

12   orders?

13   A    Yes.

14   Q    Page 62, we're looking at page 62.  I

15   do see the name of one plaintiff here, Blair

16   Imani.  Do you see that?

17   A    I do.

18   Q    It appears that Officer Pittman is

19   asked you don't know the circumstances that

20   led to her arrest specifically, and he says,

21   no, I do not.  Do you see that?

22   A    Correct, I do.

23   Q    And then, other than that, I'm not

24   seeing any specific -- I'm only seeing generic

25   descriptions of protesters, and nothing

1    specific describing any particular plaintiff's

2    failure to comply with lawful orders.  Would

3    you agree in the Jeff Pittman transcript?

4        A    The only one I don't know is Blair

5    Imani, Blair Brown.  That's the only two names

6    I see.

7        Q    Yeah, and those are the same person.

8        A    Correct.

9        Q    So, if those are the same person,

10   you're not seeing anything here describing any

11   specific plaintiffs failure to comply with a

12   lawful order.

13       A    Just Blair Imani.  No description of

14   what that was.  Correct.

15       Q    Right, and for Blair Imani, Pittman

16   specifically says he doesn't know anything

17   about her arrest.  Right?

18       A    Correct.

19       Q    So then, going to our chart, the

20   first column is "Does the City have evidence

21   plaintiff didn't comply with orders," and I

22   think we can put a no in each of these

23   columns, because we've seen no evidence

24   specific to any plaintiff that they failed to

25   comply with a lawful order.  Agreed?

1      A     Blair Imani is the only name I saw.

2      Q     Right, and for Blair Imani, Pittman

3   specifically said he didn't know anything

4   specific about her?

5      A     Correct.

6      Q     We can truthfully put a "no" in each

7   of the boxes in this column.  Agreed?

8      A     Yes.

9      Q     Moving onto topic 12, which is the

10  arrest of each plaintiff, and it's subsection

11  A is any illegal activity committed --

12  allegedly committed by either plaintiff.  Are

13  you prepared to testify about that topic

14  today?

15     A     Yes.

16     Q     I'm seeing on this script, the only

17  basis for the City having any evidence that

18  any plaintiff committed illegal activity would

19  be the affidavit of probable cause or the RAP

20  sheet.  Agreed?

21     A     And the failure to disperse.

22     Q     Right, but that's a description of

23  what they might have done.  It's not a source

24  of information, like a source of evidence.

25  Right?

1      A    So I'm not honestly sure how to
2  answer that.  I just know the script has the
3  failure to disperse with the LA RS statute and
4  the listed charges on the APC of the RAP
5  sheet.
6      Q    Sure.  So let's take a look at one of
7  those -- one of those APCs and RAP sheets.  So
8  I am looking at Exhibit VVVVVV, Victor Onuoha
9  APC.  Do you see this on your screen?
10      A    I do.
11      Q    On page one, we've got the affidavit
12  of probable cause.  You see that?
13      A    I do.
14      Q    That's got a description, a synopsis
15  of what Victor did that the City alleges was
16  illegal.  Agreed?
17      A    Correct.
18      Q    Then, the second page here, the
19  arrestee information form, that's the RAP
20  sheet.  Is that right?
21      A    That is correct.
22      Q    And the RAP sheet lists the crimes
23  he's being accused of but doesn't have any
24  description of what he did.  Agreed?
25      A    Correct.  Unless -- did they put one?

1    Nope, they didn't.  Okay.

2        Q    I'm looking now at the second to the

3    right most column on page one of our Imani

4    plaintiff chart.  It says, now, other than

5    APC, "Does the City have any description of

6    plaintiff's illegal activity," and so I think

7    we can put no through this column to the

8    extent that there's any description of what

9    they did, it would only be the APC.  Agreed?

10       A    I'd like to confer with my lawyer a

11   second.

12           MR. MOST:

13               Sure.

14                (Brief pause.)

15           THE WITNESS:

16               Sorry.  Just need a

17           clarification, this whole versus the

18           City, because this whole thing how

19           I'm supposed to answer things.

20           MR. MOST:

21               I understand.  It's an usual

22           kind of way of testifying, but it's

23           one the law allows.  So we're doing

24           our best.

25   BY MR. MOST:

                SOUTHERN COURT REPORTERS, INC.
                     (504) 488-1112

1      Q    So, from what I've gathered from your

2    testimony, the only source of information that

3    the City has about any description of any

4    particular plaintiff's illegal activity would

5    be the affidavit of probable cause, and we

6    don't have any other source.  Agreed?

7      A    Let me answer your question on that.

8    Maybe, I'm misunderstanding, when you say a

9    description of illegal activity, you're

10   directing about a specific plaintiff, or are

11   you saying any illegal activity, because my

12   question was in TJ's deposition, he said, hey,

13   we gave them numerous chances to get out the

14   roadway.  I would contend that that's illegal

15   activity.  However, he doesn't give a specific

16   person if that's what your asking.  I'm kind

17   of confused about that.

18     Q    That's fine, and I think that's a

19   good idea.  Why don't we say in the second to

20   right most column, I'll have it say, "Any

21   description of specific plaintiffs illegal

22   activity."

23          MR. SCOTT:

24               William, I'm objecting because

25          he's giving the testimony of the

SOUTHERN COURT REPORTERS, INC.
(504) 488-1112

```
 1                City, and I don't like having his
 2                testimony recharacterized.  I think
 3                you can characterize it in your
 4                pleadings, but I really don't like
 5                your chart, --
 6           MR. MOST:
 7                I hear you.
 8           MR. SCOTT:
 9                -- because it feels like you're
10                recharacterizing his testimony and
11                trying to get him to commit to
12                something that is not necessarily
13                part of his testimony.
14           MR. MOST:
15                I understand, but the chart
16                itself is not his testimony, but I
17                will ask him questions as I fill it
18                in; and his answers will be his
19                answers.  The City's answers will be
20                the City's answers.  We can address
21                the chart as needed subsequently.
22           MR. SCOTT:
23                Okay, so we're just noting my
24                objection to the chart for all
25                purposes.
```

SOUTHERN COURT REPORTERS, INC.
(504) 488-1112

```
 1            MR. MOST:
 2                 That's fine.  We'll have that be
 3            an objection that applies to today's
 4            whole proceeding.
 5            MR. SCOTT:
 6                 Thank you.
 7   BY MR. MOST:
 8        Q    Lieutenant, so, I now have it as
 9   other than the affidavit of probable cause,
10   does the City have any description of any
11   specific plaintiff's illegal activity, and so
12   I think the answer is no.  Agreed?
13        A    Yes.  If you're talking about a
14   specific plaintiff, yes.
15        Q    I can put no in this column, and that
16   would be truthful in every box.  Agreed?
17            MR. SCOTT:
18                 If you go a little further down
19            12, you're probably going to have to
20            change that, but based on the
21            questions posed thus far, I maintain
22            my objection.
23            MR. MOST:
24                 Subject to that objection.
25            Lieutenant I can put no in all the
```

1           boxes in this column.  Agreed.

2           THE WITNESS:

3                Yes.  Correct.

4     BY MR. MOST:

5        Q    The next subsection is the

6     justification for arresting each plaintiff.

7     Are you prepared to testify about that?

8        A    What about B, the circumstances of

9     the arrest?  Do you not have that?

10       Q    We're going to get to that a little

11    bit later, because I've got another chart

12    about which officer saw things and did things.

13       A    I got you, but yes, I'm ready for --

14    I'm sorry.  What did you say it was again, C?

15       Q    Yeah, the justification for arresting

16    each plaintiff.  Do you see that?

17       A    I do.

18       Q    Like before, this represents -- this

19    describes generally a failure to disperse

20    and/or charges referenced on APC or RAP sheet.

21    Do you see that?

22       A    I do.

23       Q    As before, only probable cause

24    affidavit actually has a description of

25    specific conduct.  Agreed?

1      A     The one you showed me, yes.

Sometimes, people will put a small description

2

3   on the RAP.

4      Q     Do you see that this is the RAP sheet

5   for Nadia Salazar?

6      A     I do.

7      Q     No recitation of facts here.  Agreed?

8      A     Correct.

9      Q     This is the RAP sheet for Alisha

10  Feldman.  Do you see this?

11     A     Um-huh (affirmative expression).

12     Q     No recitation of facts here.  It just

13  says see PC.

14     A     Correct.

15     Q     Do you have any reason to think that

16  any of the plaintiffs in this case have any

17  actual recitation of facts in their RAP sheet?

18     A     So it depends on who your shift

19  Lieutenant was when I was coming up.  Some

20  would have CPC.  Other ones gave it back to me

21  if I didn't write a small narrative on there

22  for the judge.  I couldn't tell you with this

23  other than probably with the number of arrests

24  we had for Friday, Saturday and Sunday, that

25  there was not very many.  So they probably all

1    say CPC or nothing.

2        Q    Then, going back to our chart, this

3    top column to the right, it now says other

4    than description in APC or RAP, does the City

5    have justification for plaintiff's arrest.

6        A    Are you talking about specific

7    plaintiffs again?

8        Q    Right.  Yeah, I can put in specific.

9            Other than description of facts in

10   APC or RAP, does City have justification or

11   specific plaintiff's arrest, and I can put it

12   no for this entire column.  Agreed?

13       A    Yes.  I see nothing for a specific

14   plaintiff.

15       Q    So then, the second column from the

16   left, which now says, other than description

17   of facts in APC or RAP, does the City have

18   evidence a specific plaintiff resisted arrest,

19   that would be the same as the justification

20   for an arrest if they have a resisting arrest

21   charge.  Agreed?

22       A    Again, this is maybe, that Chris and

23   City thing, but it would be in the arrest

24   report.

25       Q    Okay, well, I'll just delete this
                SOUTHERN COURT REPORTERS, INC.
                        (504) 488-1112

1    column, because I think it's worthless.  So

2    we've gone over each of these columns, and

3    we've got a no in each of them, because we

4    made it specific to plaintiffs, and so page

5    one of this chart reflects your testimony here

6    today.  Agreed?

7            MR. SCOTT:

8                    No, sir.  His testimony is his

9            testimony.

10           MR. MOST:

11                   Okay.

12                   Objection noted.

13   BY MR. MOST:

14       Q    Lieutenant, do you see any

15   discrepancies between the way we filled this

16   chart out and your testimony as the City on

17   page one?

18       A    I don't see any discrepancies from

19   whatever the script.  I'm sorry.  Yes.  No, no

20   discrepancies.

21       Q    That was a little confusing.  So,

22   just to be clear, you don't see any

23   discrepancies on page one of this chart that

24   are discrepancies from the testimony of the

25   City of Baton Rouge.  Agreed?

1        A     That's a hard thing for me to wrap

2    around.  I don't see anything on this chart

3    that's a discrepancy from what I testified for

4    the City on this script.

5        Q     Thank you.

6        A     Mind blowing to me, too, that I can

7    be a city.

8        Q     It is an interesting element of the

9    law.

10       A     I would like to give myself a raise.

11       Q     So next, moving on.  So this second

12   page of the chart is, as you can see, it

13   reflects each of the plaintiffs going down on

14   the left; and then, on the top the columns

15   are, which officers saw plaintiff commit any

16   alleged crime, which officers ordered

17   plaintiff's arrest, which officers laid hands

18   on plaintiff, which officers handcuffed or

19   zip tied, transported to processing and signed

20   affidavit of probable cause.  Do you see that

21   there?

22       A     I do.

23       Q     I think -- so I took a stab at

24   filling this in based on the script, and I

25   just want to make sure we've got it right.

                SOUTHERN COURT REPORTERS, INC.
                       (504) 488-1112

```
 1            MR. MOST:
 2                 I'm going to pull up your
 3            correspondence of the 21st, Joe.
 4  BY MR. MOST:
 5     Q    Let's go with the rightmost column
 6  first, which is which officers signed
 7  affidavit of probable cause, which is the last
 8  section, which is are you prepared -- let me
 9  just start over.  Lieutenant, are you prepared
10  to testify as to the officers who notarized
11  the affidavit of probable cause for each
12  plaintiff?
13     A    I am.
14     Q    So, for Blair Imani, I have it as
15  William Alexander.  Is that correct?
16            MR. SCOTT:
17                 This is the chart of notaries
18            and affiants as identified.
19            THE WITNESS:
20                 So this is the City's statement?
21            MR. SCOTT:
22                 Right, but what it does is
23            incorporates this document.
24            THE WITNESS:
25                 City represents that the
```

1          correspondence to plaintiff's counsel

2          dated July 21, 2021 in combination

3          with the depositions of notaries

4          already taken is the City's

5          understanding of who notarized

6          affiants for probable cause.

7     BY MR. MOST:

8          Q     Okay.  Unfortunately, there's a

9     conflict between those two things.  So, for

10    example, and Mr. Scott knows this, for example

11    Reab Simoneaux testified that he did not sign

12    the affidavit of probable cause for Alexis

13    Cheney.  Billy Walker says he did not sign the

14    affidavit of probable cause for Raae Pollard.

15    So, references to those -- just generic

16    reference to those, I don't think are going to

17    solve the problem.  Let's see.  I'm trying to

18    think how we can do this.  We're in agreement

19    that William Alexander signed Blair Imani's

20    affidavit as affiant.  Right?

21         A     Yes.

22         Q     Then, for Akeen Muhammad?

23         A     Travis Norman.

24         Q     Yeah, okay.  Is Travis Norman

25    correct?

```
 1        A     Yes.
 2        Q     Then, for Raae Pollard, we don't know
 3   who it was.  Agreed?
 4        A     Correct.
 5        Q     For Samantha Nichols, it was Jonathan
 6   Abadie agreed?
 7        A     Correct.
 8        Q     For Alexus Cheney, we don't know who
 9   it was.  Agreed?
10        A     Correct.
11        Q     So I've put an unknown there in the
12   chart.
13              For Victor Onuoha it was Willie
14   Williams.  Agreed?
15        A     Willie Williams, correct.
16        Q     For Karen Savage, we don't know who
17   it was.  Agreed?
18        A     James Thomas -- nope.
19        Q     Well, you're asking.  It sounds like
20   you had a question mark there.  Correct?
21        A     Should have put it as a period.  No.
22        Q     We don't know who for Karen Savage.
23   Agreed?
24        A     Correct.
25        Q     For Cherri Foytlin, it was Derrick
```

1    Williams?

2        A    Correct.

3        Q    Alisha Feldman Curtis Wilson.

4        A    Correct.

5        Q    Antonio Castanon Luna, it was Willie

6    Williams?

7        A    Correct.

8        Q    Nadia Salazar Sandi, Jonathan Abadie?

9        A    Correct.

10       Q    Dr. Daniel Liebeskind was Alex Bell?

11       A    Correct.

12       Q    Finn Phoenix also known as Caitlyn

13   Gaffney was Taylor Giroir?

14       A    Correct.

15       Q    Then Leah Fishbein was Curtis

16   Williams.  Agreed?

17       A    Correct.

18       Q    So that's what I have reflected in

19   this rightmost column, page two of Imani

20   plaintiff's chart.  So does this column here

21   reflect the City's testimony about which

22   officers signed the affidavit of probable

23   cause as affiant?

24       A    I don't --

25            MR. SCOTT:

```
 1              Objection.
 2         MR. MOST:
 3              Great.
 4    BY MR. MOST:
 5      Q    Then, going to the leftmost column,
 6    which is which officer saw plaintiff commit
 7    any alleged crime, which you can see is our
 8    topic 12 E, identification of officers
 9    involved in arrest of plaintiffs, including
10    officers who allegedly saw and reported each
11    plaintiff committing crime.  Do you see that?
12      A    I do.
13      Q    Are you prepared today to talk about
14    that topic?
15      A    Yes.
16      Q    I want to make sure my chart here is
17    accurate.  I have --
18         MR. SCOTT:
19              It's not.  Sorry.
20    BY MR. MOST:
21      Q    Tammy Cheney is not on the chart, but
22    she is no longer a plaintiff.  Antonio
23    Castanon is the Alan Hamilton.  Is that the
24    City's testimony?
25      A    It is.
```

```
 1      Q    Nadia Salazar is Alan Hamilton, as
 2  well?
 3      A    Yeah.  Is it Salazar or Savage?
 4      Q    Nadia Salazar.  Karen Savage is James
 5  Thomas?
 6      A    Correct.
 7      Q    Alisha Feldman is Curtis Wilson?
 8      A    Correct.
 9      Q    Leah Fishbein is also Curtis Wilson.
10      A    Correct.
11      Q    That's the only plaintiffs that you
12  have -- that the City has any knowledge of
13  which officers allegedly saw and reported each
14  plaintiff committing a crime.  Correct?
15      A    That is correct.
16      Q    So, for the remainder of this column
17  I've put in unknown.  Would that be accurate?
18      A    Correct.
19      Q    So this leftmost column on page two
20  of Imani's plaintiff chart, which officer saw
21  any plaintiff commit any alleged crime, does
22  this match the City's testimony?
23      A    It does.
24      Q    I'm just going to delete this column,
25  because we've got reference to deposition
```

1  transcripts we don't have.  So I'm just going

2  to delete it.

3          So, moving onto the officers who

4  originally laid hands on each plaintiff to

5  detain them, are you prepared to testify today

6  about that topic?

7      A    I am.

8      Q    I see on your script it says you've

9  got three specific plaintiff's names, and

10  then, it says the City cannot state who

11  initially laid hands on any other plaintiff.

12  Agreed?

13     A    Yes.  Well, three specific names,

14  Louisiana State Police and what you just said,

15  correct.

16     Q    So for Antonio Castalan Luna, it's

17  most likely Alan Hamilton.

18     A    Correct.

19     Q    Then, Richard McCloskey and/or James

20  Thomas -- I'm sorry.  For Karen Savage, it's

21  Richard McCloskey and/or James Thomas?

22     A    Correct.

23     Q    Max Geller is not one of the

24  plaintiffs in this case, so I'm not going to

25  go there; but for the others, Blair Imani and

1    all the others, except Karen Savage and

2    Antonio Castanon, it's unknown.  Agreed?

3         A    That is correct.

4         Q    So this column here, which officers

5    laid hands on plaintiff on page two of Imani

6    plaintiff chart, I filled in those two and put

7    unknown for the rest.  Is that an accurate

8    reflection of the City's testimony?

9         A    Correct.

10         Q    Then, moving on to the next

11    subsection, which is officers who used hands

12    cuffs or zip ties to restrain each plaintiff,

13    are you prepared to testify today about that

14    topic?

15         A    I am.

16         Q    Setting aside Max Geller, because

17    he's not a plaintiff in my case, we've got

18    five plaintiff's names, and the rest are

19    unknown.  Agreed?

20         A    Correct.

21         Q    So, for Imani, it's Pittman and Dohm?

22         A    Correct.

23         Q    Samantha Nichols, it's Alaina

24    Mancuso.

25         A    Sammy Nichols, the same?

```
 1        Q     Yes.

 2        A     Alaina Mancuso, correct.

 3        Q     Karen Savage, it's James Thomas?

 4        A     Correct.

 5        Q     And then, for Alisha Feldman and Leah

 6   Fishbein, it's Curtis Wilson.  Agreed?

 7        A     Correct.

 8        Q     So, this column, which officer

 9   handcuff or zip tied plaintiff, on page two of

10   Imani plaintiff chart, does this accurately

11   reflect the City's testimony?

12        A     It does.

13        Q     Then, which officers transported each

14   plaintiff to processing station, are you

15   prepared to testify today about that topic?

16        A     I am.

17        Q     We have the name of five individual

18   plaintiffs, and then, the remaining plaintiffs

19   would be unknown.  Agreed?

20        A     Agree.

21        Q     So, for Imani, it's Pittman, Dohm,

22   Brewer?

23        A     Correct.

24        Q     Nichols and Foytlin, it's Mancuso.

25        A     Correct.
```

SOUTHERN COURT REPORTERS, INC.
(504) 488-1112

1      Q    For Feldman and Fishbein, it's Curtis
2   Wilson.  Agreed?
3      A    (No audible response.)
4      Q    For Feldman and Fishbein, it's Curtis
5   Wilson.  Agreed?
6      A    Correct.
7      Q    This column, which officer
8   transported plaintiff to processing, on the
9   second page of the Imani plaintiff chart, does
10  this accurately reflect the City's testimony?
11     A    It does.
12     Q    I'm just going to try and delete this
13  blank column.
14          I'm putting at the top according to
15  the City of Baton Rouge.  Okay, so looking at
16  this page of the second page of the Imani
17  plaintiff chart, we've gone through each of
18  these columns.  Do you see any discrepancies
19  here between what's on this page and the
20  testimony of the City of Baton Rouge as you've
21  given it?
22     A    Do not.
23          MR. SCOTT:
24               Same objection.
25          MR. MOST:
                   SOUTHERN COURT REPORTERS, INC.
                        (504) 488-1112

```
 1            Sure.  Then, I'm just going to
 2       pdf that so we have it in pdf form.
 3       MR. SCOTT:
 4            William, did I see on that
 5       document that there's a third page,
 6       or did you eliminate that third page?
 7       MR. MOST:
 8            Now, I'm going to pull it up in
 9       its pdf form.  Do you see this?  I've
10       now taken that document and turned it
11       into a pdf.  It's two pages long.
12       THE WITNESS:
13            I do.
14       MR. MOST:
15            Yes, Joe.
16       MR. SCOTT:
17            It's okay.  It's just that when
18       it was still in Word --
19       MR. MOST:
20            I can't hear you.
21       MR. SCOTT:
22            When it was still in Word, it
23       appeared to have three pages.
24       MR. MOST:
25            Strange.  Ms. Marino, can you
```

SOUTHERN COURT REPORTERS, INC.
(504) 488-1112

1           hear him?

2           THE COURT REPORTER:

3                 Yes, I can hear him fine.

4           MR. MOST:

5                 Can you hear me now?

6           MR. SCOTT:

7                 Yes.  I heard you earlier.

8    BY MR. MOST:

9        Q    Lieutenant, do you see now what I

10   pulled up here is a pdf version of the chart

11   that we looked at together?

12       A    I do.

13          MR. MOST:

14                Those are the questions that I

15          have for you.  MacArthur or Greg

16          Fahrenholt, would you like to ask any

17          questions?

18          MR. FOLEY:

19                No.  Subject to our agreement

20          with Joe that we'll hold our

21          questions on these two topics to a

22          later date for the MacArthur

23          plaintiffs on both the July 9th and

24          July 10th plaintiffs.

25          MR. FAHRENHOLT:

```
 1              I have a couple of questions.
 2              If you could scroll up to the top of
 3              page one of your chart.  I might have
 4              a few questions about that.
 5                        EXAMINATION
 6  BY MR. FAHRENHOLT:
 7      Q    Lieutenant, do you see the question
 8  on this chart, does the city have evidence
 9  that plaintiff didn't comply with orders?  Do
10  you see that question?
11      A    I do.
12      Q    Are you aware that, I believe it was
13  Captain Leach, during the course of this
14  30(b)(6) depositions, was shown some video
15  clips in which Baton Rouge police officers
16  could be heard giving orders to the crowd to
17  disperse.  Are you aware of that?
18      A    I am not.
19      Q    If you were aware that orders had
20  been given to the crowd to disperse, would
21  that be evidence that plaintiffs did not
22  comply with orders?
23          MR. MOST:
24              Objection to the form.
25  BY MR. FAHRENHOLT:
```

1          Q    You can answer the question.

2          A    Sorry, can you go back to the pdf

3    page or whatever we were talking about?  It's

4    kind of like the ones we changed at the end.

5    I don't have any specific evidence on the

6    script of a certain plaintiff.  I don't think

7    it means that there was none.  It's different

8    depositions and different things, but the

9    script that I'm going by I have no specific

10   plaintiff information.

11         Q    You saw in the deposition transcript

12   of Mr. Morse, as was put on the screen, that

13   he testified that he gave orders to protesters

14   to disperse.  Correct?

15         A    I did see that, correct.

16         Q    Would that be evidence that orders

17   were given?

18         A    Again, I think it's evidence that

19   orders were given, and it's just I don't have

20   a specific person in front of me on the

21   script.  I believe the deposition showed that

22   there was orders given.

23         Q    If the plaintiffs were present at the

24   time the orders were given and the plaintiffs

25   did not disperse or leave the area, would that

SOUTHERN COURT REPORTERS, INC.
(504) 488-1112

1  be evidence that the plaintiffs didn't comply

2  with orders?

3          MR. MOST:

4              Objection to the form.

5  BY MR. FAHRENHOLT:

6      Q    You can answer.

7      A    Still answer, right?  If the

8  plaintiffs were in the street or violating the

9  law when they were told to remove themselves

10  and they did not do that, then, yes.

11     Q    If the plaintiffs were told not to

12  just leave the street but to leave the area

13  entirely, and they didn't do so, could that be

14   evidence that the plaintiffs didn't comply

15  with orders?

16     A    Correct.

17         MR. FAHRENHOLT:

18             That's all I have.

19         MR. SCOTT:

20             Of course, we have a transcript

21         backlog.  We've agreed to reserve

22         some amendment when those transcripts

23         come through, because that would also

24         be known to the City, but I just

25         don't have it in a format that I can

1          isolate at the moment.

2     MR. MOST:

3          Sure.  Just to be clear, Joe,

4     I'm not agreeing in advance to any

5     amendment to the City's testimony,

6     but I'm certainly willing to meet and

7     confer, because I want things to be

8     as accurate as possible.

9     MR. SCOTT:

10          Of course.

11     MR. MOST:

12          All right.  Then, I think that's

13     all the questions I have for you.

14     I'm going to pause the recording, and

15     we can go off the record.

16          (Whereupon, the deposition was

17     conclude at 2:15 p.m.)

18

19

20

21

22

23

24

25

SOUTHERN COURT REPORTERS, INC.
(504) 488-1112

1              WITNESS CERTIFICATE

2

3

4          I, LIEUTENANT CHRIS POLITO, do

5   hereby certify that the foregoing testimony

6   was given by me, and that the transcription of

7   said testimony, with corrections and/or

8   changes, if any, is true and correct as given

9   by me on the aforementioned date.

10

11

12

13

DATE SIGNED            LIEUTENANT CHRIS POLITO

14

15

16

17          Signed with corrections as noted.

18

19          Signed with no corrections noted.

20

21

22

23

24

25

              SOUTHERN COURT REPORTERS, INC.
                   (504) 488-1112

C E R T I F I C A T E

I, LORI L. MARINO, Certified Court Reporter, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that LIEUTENANT CHRIS POLITO,  after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 54 pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board; that I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

Dated this 13th day of September, 2021.

LORI L. MARINO, CCR
CCR #87069
STATE OF LOUISIANA

SOUTHERN COURT REPORTERS, INC.
(504) 488-1112