UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


Docket No. 17-cv-00439-JWD-EWD


BLAIR IMANI, et al

        Plaintiffs

v.


CITY OF BATON ROUGE, et al

        Defendants

* * * * * * * * * * *

30(b)(6)DEPOSITION

OF THE CITY OF BATON ROUGE, through it's

designated representatives, SERGEANT

ORSCINI BEARD, II, LIEUTENANT WILLIAM

CLARIDA and CORPORAL WALLACE BRITTON, given

via videoconferencing in the above-entitled

cause, pursuant to the following

stipulation, before Debra J. Brooks,

Certified Shorthand Reporter in and for the

State of Louisiana, commencing on August 5,

2021.

* * * * * * * * * * *

```
1   APPEARANCES (via videoconferencing):
2   For the Plaintiffs (Imani v. City of Baton
        Rouge)
3
        LAW OFFICES OF WILLIAM MOST
4       Attorneys at Law
        DAVID LANSER, ESQ.
5       201 St. Charles Avenue, Suite 114#101
        New Orleans Louisiana 70170
6       Email: david.lanser@gmail.com
7
    For the Plaintiffs (Smith v. City of Baton
8       Rouge, Batiste-Swilley v. City of
        Baton Rouge, and Tennart v. City of
9       Baton Rouge):
10      RODERICK AND SOLANGE MACARTHUR JUSTICE
        CENTER
11      Attorneys at Law
        JIM CRAIG, ESQ.
12      ERIC A. FOLEY, ESQ.
        MANDISA MOORE-O'NEAL, ESQ.
13      HANNAH LOMMERS-JOHNSON, ESQ.
        4400 South Carrollton Avenue
14      New Orleans, Louisiana 70119
        Email: eric.foley@macathurjustice.org
15
16  For City/Parish of Baton Rouge and Baton
        Rouge City Police Department Officers:
17
        OFFICE OF THE EAST BATON ROUGE PARISH
18      ATTORNEY
        Attorneys at Law
19      JOSEPH SCOTT, ESQ.
        SARAH MONSOUR, ESQ.
20      222 St. Louis Street  9th Floor
        Baton Rouge, Louisiana 70802
21      Email: joseph@josephscott.com
22
23
24
25
```

```
 1    APPEARANCES (via videoconferencing):

 2    For the Plaintiff (Max Geller)

 3          RODNEY & ETTER, LLC
            Attorneys at Law
 4          ROY J. RODNEY, JR., ESQ.
            935 Gravier Street  Suite 2110
 5          New Orleans, Louisiana 70112
            Email: rjr@rodneylaw.com

 6

 7    For Louisiana State Police and Individual
            State Police Troopers:
 8
            MESSRS. BURGLASS & TANKERSLEY
 9          Attorneys at Law
            GREGORY FAHRENHOLT, ESQ.
10          5213 Airline Drive
            Metairie, Louisiana 70001
11          Email: gfahrenholt@burglass.com

12
      REPORTED BY:  Debra J. Brooks
13                  Certified Court Reporter
                    State of Louisiana
14
15               * * * * * * * * *

16               EXAMINATION INDEX

17                                  Page

18    Caption                        1

19    Appearances                    2,3

20    Agreement of Counsel           5

21    EXAMINATION OF:

22    Sergeant Orscini Beard, II      6

23    Lieutenant William Clarida     81

24    Corporal Wallace Britton      137

25
```

```
1              * * * * * * * * * *

2                  EXHIBIT INDEX

3   Sergeant Orscini Beard, II:

4       Exhibit #1 - Notice of Deposition

5       Exhibit #2 - IA History

6       Exhibit #3 - General Order #108

7       Exhibit #4 - General Order #112

8

9   Lieutenant William Clarida:

10      Exhibit #1 - General Order #209

11      Exhibit #2 - General Order #244

12      Exhibit #3 - General Order #291

13

14  Corporal Wallace Britton:

15      Exhibit #1 - Notice of Deposition

16      Exhibit #2 - General Order #135, #135.1,
                     #135.2
17
        Exhibit #3 - General Order #131, #132
18
        Exhibit #4 - Video from July 10 (same as
19                   Exhibit DDDDDDD in
                     consolidated list)
20

21

22

23

24

25
```

```
 1              S T I P U L A T I O N
 2        It is stipulated and agreed by and
 3    between Counsel that the 30(b)(6)
 4    Deposition of SERGEANT ORSCINI BEARD, II,
 5    LIEUTENANT WILLIAM CLARIDA and CORPORAL
 6    WALLACE BRITTON is hereby being taken via
 7    videoconferencing for all purposes
 8    permitted under the Federal Rules of Civil
 9    Procedure, in accordance with law, pursuant
10    to notice.
11        The formalities of reading and signing
12    are specifically not waived, the
13    formalities of sealing and certification
14    are specifically waived, and the party
15    responsible for service of the discovery
16    material shall retain the original;
17        That all objections, except those as
18    to the form of the question and the
19    responsiveness of the answer, are reserved
20    until the time of the trial of the cause.
21                    * * *
22        DEBRA J. BROOKS, Certified Court
23    Reporter in and for the State of Louisiana,
24    officiated in administering the oath to the
25    above named Witness.
```

```
1                    * * *
2              MR. FOLEY:  We have been
3          stipulating there will be no
4          objection to the depositions
5          being taken remotely, there will
6          be no objection to the remote
7          swearing of the Witness.  I
8          assume that's still acceptable,
9          Mr. Scott?
10             MR. SCOTT:  It is.
11             * * * * * *
12  SERGEANT ORSCINI BEARD, II, BATON ROUGE
13  POLICE DEPARTMENT, 9000 AIRLINE HIGHWAY,
14  BATON ROUGE, LOUISIANA, 70815, after having
15  been first duly sworn by the Certified
16  Court Reporter, was examined and testified
17  as follows:
18            E X A M I N A T I O N
19  BY MR. FOLEY:
20      Q.   Thank you, Officer Beard.  My
21  name is Eric Foley.  I'm one of the
22  Attorneys representing the Plaintiffs in a
23  series of cases, Tennart v. City of Baton
24  Rouge, Smith v. City of Baton Rouge and
25  Batiste v. City of Baton Rouge.  And along
```

```
 1   with me here today are Plaintiffs Counsel
 2   from other cases who will be introducing
 3   themselves later with questions.
 4                   MR. FOLEY:  But before we
 5              begin, I wanted to introduce into
 6              the record the Notice of
 7              Deposition for today and I just
 8              want to confirm the topics that
 9              we'll be covering.
10   BY MR. FOLEY:
11        Q.   I'm going to share my screen
12   briefly.  I realize you're sitting pretty
13   far away from the screen.  I don't know if
14   you'll be able to see it.  So if you have a
15   copy in front of you --
16        A.   I can see it.
17        Q.   Okay, great.  So my understanding
18   from previous communications among the
19   parties is that today's 30(b)(6) Deposition
20   is going to cover topics 2a, 2b, 2c, 2d,
21   2f, 2j, 2m, and topic three of the
22   Deposition Notice.  Is that correct?
23                   MR. SCOTT:  That's about
24              right, Eric.  Sergeant Beard is
25              with Internal Affairs and so I
```

```
 1              believe that it is primarily for
 2              bias and discrimination,
 3              professional conduct.  And if you
 4              want to ask him a question that
 5              touches on another area, we will
 6              do our best to answer.  But he is
 7              the best judge of what he knows
 8              and what he can speak to.
 9                   MR. FOLEY:  Okay.  So it's
10              my understanding we'll be leaving
11              the deposition open to cover the
12              remaining topics in the Notice at
13              another setting, is that correct?
14                   MR. SCOTT:  That is correct.
15   BY MR. FOLEY:
16        Q.   I'll cease screen sharing there
17   and I'll begin questioning with, as
18   Mr. Scott just stated, 2b and 2c, Bias and
19   Discrimination, and 2j, Professional
20   Conduct.  Give me just one moment here.
21        Sergeant Beard, I would like to start
22   off today by asking you to walk me through
23   the process of an Internal Affairs
24   investigation.  So assume I'm a citizen and
25   I file a complaint against an officer.
```

```
 1    What process begins?
 2         A.   You can file a complaint via
 3    either telephone call, we have a, on the
 4    brla.gov website, we have a portion where
 5    you can file a complaint via e-mail, you
 6    can write a letter.  Of course, you can
 7    come in person.  You can also make
 8    anonymous complaints.
 9         Q.   Officer Beard, I apologize, I
10    should have made clear as a preface to my
11    question, for the cases we're discussing
12    today, or at least for my questions, the
13    main concern we have is with the events of
14    July 2016 and before.  So, with that in
15    mind, let me rephrase my question.  As of
16    July 9 or July 10, 2016, what would the
17    process have been for a person to file a
18    complaint?
19         A.   What I just said.  Well, what I
20    just recited.
21         Q.   So all those options were
22    available at that time as well?
23         A.   Yes, sir.
24         Q.   So, once a complaint has been
25    filed, what would have been the internal
```

1    procedure in Internal Affairs to handle
2    that complaint?
3         A.    We actually have to look at the
4    complaint to make sure if there is a policy
5    violation.  If there is a policy violation,
6    depending on the category, we have policy
7    violations that are classified as category
8    one, category two, category three.
9    Category one and two can be investigated by
10   an immediate supervisor.  But any category
11   three has to come to Internal Affairs to be
12   investigated.
13        Q.    So you said category one can be
14   investigated by an immediate supervisor.
15   If an immediate supervisor did an
16   investigation, how are their findings
17   recorded and how are they shared with the
18   Internal Affairs department?
19        A.    Normally, they will -- well, we
20   have what you call a supervisory
21   investigation.  They read the officer his
22   Garrity rights, they document their
23   findings, and depending on what the
24   supervisor finds, normally it's left at the
25   district in one of the commander's file

1    cabinets.  They don't necessarily have to

2    contact us.  But anything in category

3    three, they have to contact us.

4         Q.   So, for category one or two then,

5    does Internal Affairs have records of those

6    claims against the officers or only in

7    category three?

8         A.   No, category two and three.  But,

9    like I said, category one is left at the

10   field supervisors.

11        Q.   So, category one, records of

12   category one complaints, would those be

13   included in an officer's personnel file or

14   do those remain with the supervisor?

15        A.   It actually remains in the

16   supervisors.  As far as personnel file, we

17   have what we call Internal Affairs history.

18   That is something that's kept in a

19   database.  But as far as if a supervisor

20   does a supervisory investigation, it's kept

21   with that supervisor.

22        Q.   So let me see if I understand you

23   correctly.  The Internal Affairs database

24   is recording, all one, two, and three

25   categories, are reported in the Internal

1    Affairs database?

2        A.    Yes, because the supervisor has

3    to send us their findings.  But the actual

4    file is left at that supervisor.

5        Q.    And, so, for those claims not

6    investigated by a supervisor, what's the

7    process then?

8        A.    Again, we look at the complaint,

9    we see if there is any type of policy

10   violation.  If there is -- well, let me

11   start, if there isn't any kind of policy

12   violation, we write it on what we call

13   accountability.  We recontact the

14   complainant and advise them, you know, from

15   what you're saying or from what we watched,

16   uh, we don't see any policy violation.

17   Now, if there is a policy violation, then

18   we contact the officer, we give them time

19   to secure representation.  And, at some

20   point, that officer is brought in, he's

21   interviewed, he's audio interviewed.  And

22   the investigator, after gathering all the

23   information from both sides, we complete a

24   report and we send it to the Deputy Chiefs

25   and the Chief.

1       Q.   Does the report that's sent to

2  the Deputy Chief or the Chief, does that

3  contain a recommendation for a finding?

4       A.   Yes, it does.

5       Q.   What would the recommendations

6  be?  I guess the class of recommendations

7  be?

8       A.   It's not really -- basically, we

9  recommend that it be reviewed.  We don't

10  recommend any type of discipline.  We just

11  say, hey, these are our findings, we

12  recommend that you review this.

13       Q.   In previous depositions and a

14  review of IA histories in this case, we've

15  seen outcomes that were categorized as

16  either sustained, unsustained, or

17  exonerated.  Can you explain the basis for

18  a finding of sustained or unsustained or

19  exonerated?

20       A.   Sustained, of course, there was a

21  policy violation.  Not sustained, didn't

22  have enough to go either way.  Basically,

23  maybe policy was violated, maybe policy

24  wasn't.  There's not enough evidence on

25  either side, the complaint or the officer,

1   to just equivocally say, yes, you violated
2   policy.  Exonerated means, basically, it
3   was no policy violation whatsoever.
4        Q.   And who makes that determination
5   between what are sustained, unsustained, or
6   exonerated?
7        A.   The Chief.
8        Q.   So, from our conversation a
9   moment ago, the memo or the findings that
10  are transmitted to the Chief, is there a
11  recommendation from the Internal Affairs
12  division on whether it should be sustained
13  or unsustained or exonerated?
14       A.   Not at all.
15       Q.   So this is just a presentation of
16  the facts, I suppose, there's no opinion
17  included?
18       A.   Correct.
19       Q.   So I think I phrased my question
20  as the process for a citizen's complaint.
21  Is there any difference in how a complaint
22  from a fellow officer or someone from
23  within the department would be handled?
24       A.   No, the same exact way.  They can
25  go on our e-mail, the website, do it

1  through e-mail or write a letter or come in
2  person.
3      Q.   In 2016, did the Internal Affairs
4  division handle any complaints from BRPD
5  officers or employees of the department
6  regarding the Alton Sterling killing?  Were
7  there any complaints lodged by BRPD
8  employees or officers about the conduct of
9  the two officers involved in the Alton
10  Sterling killing?
11     A.   I can't answer that directly --
12          MR. SCOTT:  Just a moment.
13          Eric, I thought this was
14          policies, procedures, and --
15          MR. FOLEY:  My question goes
16          to what policies or procedures
17          were followed if such complaints
18          were made.
19          THE WITNESS:  If an officer
20          did make a complaint, it would be
21          followed up just like a citizen
22          complaint.  But I can't answer if
23          an officer made a complaint
24          against another officer in the
25          year 2016.  But, if so, it would

```
 1              be recorded in our database.
 2    BY MR. FOLEY:
 3         Q.   If a complaint specifically
 4    alleges an act of bias or discrimination,
 5    is there a particular procedure that the
 6    Internal Affairs division follows to
 7    investigate such complaints?
 8         A.   We have, like any other
 9    investigation, whatever the complainant
10    provides us, we look at it, we get the
11    officer's version of what happened and a
12    determination is made.  But we do have
13    policies I can read to you verbatim as far
14    as biased based profiling.
15         Q.   And which number policy are you
16    referring to there?
17         A.   General Order number 108.
18         Q.   And you're referring to the
19    version of Order 108 that would have been
20    in effect in July 2016?
21         A.   Yes, sir.
22         Q.   I think I might have some
23    specific questions on that policy for
24    later.  But, for now, I wanted to ask
25    another question about the broader kind of
```

1  investigative process.  So let's assume
2  that the Deputy Chief or the Chief has
3  found a charge to be sustained or a
4  complaint to be sustained against an
5  officer and orders some sort of remedial
6  training.  Who involved in this process
7  would ensure that such remedial training
8  occurred?
9       A.   The Chief and the four Deputy
10 Chiefs.
11      Q.   Does the Internal Affairs
12 division have any role in tracking the
13 remedial training?
14      A.   No.
15      Q.   Is there any system or process by
16 which Internal Affairs would be notified
17 that a remedial training had been
18 completed?
19      A.   That's, uh, the Training Academy,
20 they are, uh, responsible for any kind of
21 remedial training.  And, yes, they keep a,
22 keep a record, keep records of when an
23 officer has completed any type of remedial
24 training.  But, no, Internal Affairs, we
25 have nothing to do with any type of

1    remedial training or making sure that the

2    training has been completed.

3         Q.   So let me backtrack a bit and

4    just clarify as to what you would be

5    qualified to answer today, Sergeant Beard.

6    So, I understand, you know, we've been

7    asking questions about Internal Affairs,

8    specifically as to bias and discrimination.

9    Would you be able to testify as to the

10   larger policies of bias, discrimination,

11   particularly historically, steps and

12   actions that have been taken to enforce

13   such policies?

14        A.   Can you repeat that?

15        Q.   I understand that here, you know,

16   as we began this discussion, that you're

17   competent to testify as to Internal Affairs

18   policies and procedures.  My question is as

19   to larger issues of discrimination and bias

20   within the department, and particularly the

21   department's response to allegations of

22   discrimination and bias, would you be able

23   to testify to that as well?

24        A.   I can testify that any racial

25   bias (unintelligible) --

1           COURT REPORTER:  I'm sorry,

2           Sergeant Beard, can you -- you

3           said "I can testify that any

4           racial bias --" --

5           THE WITNESS:  Allegation

6           made against a police officer, we

7           keep track of that each year in a

8           database.  But as far as, uh,

9           that's the only answer I have for

10          your question.

11  BY MR. FOLEY:

12      Q.   Maybe it would help if I give you

13  a more concrete example of what I'm

14  thinking of.  So, for example, it was

15  widely reported in the wake of Hurricane

16  Katrina that there were state troopers who

17  had come down to assist BR police with

18  their policing duties in the city in

19  September of 2005 and these state troopers

20  had made complaints of biased policing by

21  one certain Baton Rouge police officer.  So

22  if I had asked you what steps did the

23  department take to evaluate those

24  complaints and was there any remedial

25  action taken by the department, would you

1    be able to comment on that?

2         A.    No, sir, I wasn't assigned to the

3    Internal Affairs division in 2005.

4         Q.    When did you begin your

5    assignment with Internal Affairs?

6         A.    2014.

7         Q.    2014.  Jumping around a bit here,

8    what did you do to prepare to testify

9    today?  I want to clarify that.  I don't

10   want you to tell me about any conversation

11   you had with your Attorneys.  But were

12   there any documents that you reviewed or

13   any other preparation you undertook

14   yourself?

15        A.    Yes, documents were reviewed.

16   But, no, I didn't have conversation with

17   any attorney because I had no clue of what

18   I'd be asked.  But other than reading over

19   documentation, that was it.

20        Q.    So, if I understand correctly,

21   you would be able to testify today to these

22   policies and procedures in Internal Affairs

23   from 2014 forward, is that accurate?

24        A.    That's accurate.

25        Q.    I'm curious to know about

1    specific trainings on bias and
2    discrimination within the department.
3    Would that be a topic that you could
4    address or would that be another person we
5    need to speak to?
6        A.    That would be somebody from our
7    Training Academy that could answer that.
8        Q.    As a related question, I suppose,
9    going back to my question on remedial
10   training, let's assume that you had an
11   officer who had a complaint against him
12   regarding discrimination or bias and some
13   sort of remedial training was ordered as to
14   bias or discriminatory policing.  Does the
15   Internal Affairs division -- I know you
16   said they don't track whether such training
17   has been completed -- who determines which
18   training it is that a person should take
19   among the various trainings that one could
20   do?
21       A.    The Chief.
22       Q.    The Chief.  So the Internal
23   Affairs has no role in selecting a training
24   course or a particular training that a
25   person should do?

1          A.    No, not at all.

2          Q.    So, beginning in 2017, in

3     February of 2017, there were reports from a

4     community group called Together Baton Rouge

5     that had created a report that was widely

6     publicized alleging that there was

7     discriminatory and unequal enforcement of,

8     particularly of drug laws in Baton Rouge,

9     and they conducted a study that analyzed

10    arrests by zip code.  Are you aware of any

11    analysis done by the department of the

12    report by Together Baton Rouge and, if so,

13    what kind of remedial actions would have

14    been taken?

15         A.    I'm unaware, sir.

16         Q.    We've also seen various

17    criticisms over the years of the Brave

18    Program, particularly as it involves

19    departments or divisions of the Street

20    Crimes units.  Are you familiar with

21    complaints lodged against members of the

22    Street Crimes units for discriminatory or

23    biased policing?

24         A.    No, I'm not aware, sir.

25         Q.    Let me ask a more recent

1    question.  In the past, I guess, eight

2    months now, there's been widely reported

3    memos written by Officer Jeremiah Ardoin

4    alleging discriminatory practices and

5    biased policing within the Narcotics

6    division.  So what sort of remedial actions

7    or investigatory action -- well, before --

8    I feel an objection coming so let me

9    clarify.  I don't want you to disclose any

10   criminal investigations into particular

11   officers.  I'm curious about, as a broader

12   policy question, have there been any

13   changes enacted following these

14   allegations?

15              MR. SCOTT:  Those are open

16         investigations and we're not

17         going to comment on that.

18              MR. FOLEY:  Is there a

19         privilege being asserted there?

20              MR. SCOTT:  Yes, we're --

21         you're digging into open, active

22         investigations.  This is

23         ultimately a public record.  And

24         until the BRPD and the DA have

25         completed their review, it's

```
 1              improper.  We cannot allow that.
 2                    MR. FOLEY:  My question
 3              doesn't go to actual individual
 4              officer's criminal culpability.
 5              I'm really concerned only with
 6              the broader question of has there
 7              been any policy changes enacted
 8              by the department in the wake of
 9              these allegations.
10                    MR. SCOTT:  Maybe you should
11              ask that of the policy guy that
12              I'm producing later today.
13                    MR. FOLEY:  Who would that
14              be?
15                    MR. SCOTT:  That's going to
16              be Britt Jones.
17                    MR. FOLEY:  I'm sorry, Brent
18              Jones you said?
19                    MR. SCOTT:  Britt,
20              B-r-i-t-t, I believe.
21                    MR. FOLEY:  All right.
22       BY MR. FOLEY:
23          Q.   Sergeant Beard, let me ask you
24       some questions about the protests of
25       July 2016.  Did your office receive
```

1    complaints alleging biased policing among

2    the officers who, the BRPD officers, who

3    responded to the protests in the wake of

4    the Alton Sterling killing in July 2016?

5         A.    I'd have to look at the database

6    to answer that question.

7         Q.    Do you have access to the

8    database with you today?

9         A.    No.

10        Q.    I want to have you go over with

11   me the sheet that we have seen from the

12   database, not to comment specifically on a

13   particular officer, but just to inform us

14   of what the various fields in the database

15   represent.  Bear with me one moment while I

16   bring up that file.  Sorry about that.  Are

17   you able to see my screen now?

18        A.    Yes.

19        Q.    So, going down the list here, it

20   would be helpful to us if you could explain

21   what each of those fields are.  So,

22   obviously, the Officer I imagine would be

23   the officer against whom the complaint has

24   been filed, correct?

25        A.    Correct.

1    Q.   E-X-P-L-T-R, what would that
2  signify?
3        A.   That is, we used to, years ago --
4  and this probably has been done away maybe
5  15, 20 years ago -- the union had a
6  contract with the department and if you had
7  anything in your jacket (unintelligible) --
8              COURT REPORTER:  I'm sorry,
9        Officer, if you had any what?
10             THE WITNESS:  Prior
11        histories to a set date that the
12        union and the department came
13        into a contract with, it would be
14        expunged.  And that practice is
15        not utilized anymore, but that
16        would have shown what date,
17        month, and year your history was
18        expunged.
19  BY MR. FOLEY:
20       Q.   So when did the practice on
21  expungements change?
22       A.   2006.
23       Q.   So, if I understand you
24  correctly, prior to 2006, it was possible
25  for any offense could be expunged or what

```
1    was the -- what characteristics
2    (unintelligible) would be expunged?
3          A.    I would have to research that.
4    But I do know it was in 2006, because I was
5    actually hired in 2001.  I was still on the
6    streets, but I'd have to research that
7    criteria.  But that box is for the date,
8    month, and the year that the officer
9    expunged his history.
10         Q.    So, post 2006, is there any means
11   for an officer to expunge a claim against
12   them?
13         A.    No, sir.
14         Q.    And then I imagine Day One is the
15   date the claim was made?
16         A.    Yes, sir.
17         Q.    And what is IAD1?
18         A.    That is the file number of the
19   case.
20         Q.    And that file number is unique to
21   an officer?
22         A.    Yes, sir.
23         Q.    And I see a COMP1 and then C1PL1.
24   What do those signify?
25         A.    The COMP1 is the possible policy
```

```
1    violation and the COMPL1 is the individual
2    that lodged the complaint.
3         Q.   So COMPL1 is the complainant.
4    So, in this instance I've got on the screen
5    it's BRPD.  Is that because that was an
6    internal complaint lodged?
7         A.   Yes, sir.
8         Q.   What would it look like if it was
9    not lodged internally?
10        A.   It would have the individual's
11   first and last name.
12        Q.   And then Disposition One, would
13   that field be the three possible
14   dispositions that we discussed earlier?
15        A.   Yes, sir.
16        Q.   So that would be sustained or not
17   sustained or exonerated?
18        A.   Yes, sir.
19        Q.   The next field, Expunged One,
20   would I be correct in understanding that
21   that is no longer used after that 2006
22   policy?
23        A.   Yes, sir.
24        Q.   What would normally go in there,
25   in that field, pre-2006?
```

1      A.    Whatever policy accusation.

2      Q.    So the claim that had been

3 expunged?

4      A.    Can you repeat that?

5      Q.    So, when you say the policy or

6 accusation, that would be the policy or

7 accusation that had been expunged?

8      A.    Yes.

9      Q.    Bear with me for a moment -- dumb

10 question -- so, if there was an expungement

11 letter field, that would be filled in with

12 the date.  And then the Expunged One line,

13 that would have the claim.  What was the

14 actual affect of an expungement if there's

15 still a record in the department of these

16 claims?

17      A.    Just to clear an officer's

18 history.

19      Q.    So, the history would remain in

20 this record, this database, but it would be

21 cleared from somewhere else?

22      A.    No, it would be cleared from the

23 actual officer's history.

24      Q.    I guess I'm confused.  Can you

25 explain further?

1      A.    Okay, that is -- we still use

2  that IA history.  It hadn't been updated,

3  that's why you see expunged.  Prior to

4  2006, again, the union and the department

5  came together and had a contract where an

6  officer -- it had to hit a certain

7  criteria.  It wasn't everything, you know,

8  that was in your history.  It had to hit a

9  certain criteria for it to be expunged.

10  But that's just a -- we use that form and

11  we've used that form since I've been in

12  Internal Affairs.  But the expunged, of

13  course, classes are not even utilized

14  anymore.

15      Q.    Right.  I think I follow you

16  there.  So, if I understand correctly, once

17  an expungement letter was entered, those

18  fields would be cleared entirely of

19  whatever the complaint had been -- well,

20  sorry, the alleged policy violation had

21  been?

22      A.    I'd have to research that.  Like

23  I said, that was prior to me being assigned

24  to Internal Affairs.  I'd have to research

25  that to give you a correct answer.

1    Q.   Okay.  A question here -- I'm
2   scrolling on to the second page -- I notice
3   another disposition here, Disposition 8,
4   Admin Review.  What's the significance of
5   Admin Review?
6    A.   It's like a 'predis'.  The
7   officer is brought in.  He's allowed to
8   have representation.  The Deputy Chief --
9   I'm sorry -- the Chief and the four Deputy
10  Chiefs give him the platform to give his
11  version of whatever alleged policy
12  violation it is.
13   Q.   I think you said earlier
14  'predis', like predisposition?
15   A.   Pre-disciplinary hearing.
16   Q.   Disciplinary, okay.  So, at that
17  point, the Chief or the Deputy Chief hasn't
18  made a determination.  That would be made
19  after the disciplinary hearing, am I right?
20   A.   No, it would be sent across the
21  hall.  We have officer investigations,
22  administrative investigations, or what we
23  call referrals.  Anything -- that
24  particular policy violation is a category
25  three.  So that was made a case and was

1    sent to the Chief and the Deputy Chiefs to

2    review it.

3        Q.   Can you explain what those

4    procedures -- you broke it down into three

5    categories.  You said there would be an

6    officer investigation, administrative

7    investigation, and a referral.  Can you

8    distinguish those for me?

9        A.   Administrative investigation is

10   basically where a detective from Internal

11   Affairs conducts an investigation.  An

12   officer investigation, same thing, an

13   Internal Affairs investigator investigates

14   the case, but it's sent across the hall to

15   the Chief and Deputy Chiefs, but they don't

16   have a pre-disciplinary hearing on it.  And

17   a referral is when we refer a complaint

18   back down to the officer's immediate

19   supervisor.

20       Q.   So, at least, the difference

21   between an officer investigation and

22   administrative investigation is an

23   administrative investigation is an

24   investigation of an employee who is not an

25   actual like POST certified officer, it's

1    like an administrative staff or --
2         A.   No, administrative investigation
3    involves category three complaints and a
4    pre-disciplinary hearing is held.  An
5    officer investigation is where an IA
6    investigator investigates it and it's sent
7    to the Chief and the Deputy Chiefs, but
8    there is no pre-disciplinary hearing for
9    the officer.
10        Q.   So it's really about the severity
11   of the charge, is that the difference
12   between them?
13        A.   That's correct.
14        Q.   So, a category three I believe we
15   talked about earlier, that's the most
16   severe charge, right?
17        A.   Yes, sir.
18        Q.   So that category three is always
19   an admin review?
20        A.   Yes, sir.
21        Q.   And then a category one, like we
22   talked about where it would just be a
23   supervisor investigating, that wouldn't
24   result in a disciplinary hearing.  That's
25   just the supervisor making a determination

```
1   and it going in the file that way?
2        A.   For category one and two.  But we
3   do investigate category two in my office
4   depending on the severity of the actual
5   alleged policy violation.
6        Q.   Can you give me some examples of
7   what a category one and a category two
8   policy violation are?
9        A.   Category one would be
10  punctuality, the wearing of a uniform.
11  Category two would be conduct unbecoming,
12  submission of forms.  Category three, of
13  course, anything criminal, use of force,
14  insubordination.
15       Q.   So, if I heard you correctly, I
16  think for category two you said submission
17  of forms, is that right?
18       A.   Correct.
19       Q.   So, with a category two, would
20  that cover falsification of a form or there
21  being untruthful information in a form?
22       A.   No, that would be that a
23  particular form wasn't turned in in a
24  timely manner.
25       Q.   Okay.  So how would you
```

1    categorize what I just stated as being an
2    untruthful -- a form that was untruthful in
3    some way or that had been falsified?
4         A.   We have -- that would be category
5    three it would fall under, untruthfulness
6    and falsification of documents.
7         Q.   In the wake of the July 2016
8    protests, were there any referrals or admin
9    reviews regarding the falsification or the
10   inclusion of false information in either a
11   probable cause affidavit or arrest report
12   of a protester?
13        A.   I would have to research that
14   information.
15             MR. FOLEY:  I think I may be
16             nearing the end of my questioning
17             for Sergeant Beard.  I ask that
18             we just take five minutes -- I'm
19             sorry.  Yes, Joe?
20             MR. SCOTT:  Should I be
21             lining up my next Officer right
22             now?
23             MR. FOLEY:  I'm going to
24             consult with my co-Counsel if
25             they have anymore.  But I don't

```
 1              know if Dave or Roy might have
 2              questions as well for Officer
 3              Beard.
 4                   MR. LANSER:  I'll have some
 5              questions, yes.
 6                   MR. FOLEY:  I might have one
 7              or two more.  But if we could
 8              take five minutes, and hopefully
 9              even less, I'll consult with my
10              co-Counsel and be assured that
11              there's not any other questions
12              they would like me to address
13              with Officer Beard.
14                   MR. SCOTT:  Okay.
15                   MR. FOLEY:  Thank you.
16              (Off the record)
17                   MR. FOLEY:  I'm ready if
18              everyone else is.  I have one
19              more question for Sergeant Beard.
20  BY MR. FOLEY:
21      Q.   Which is, back in 2019, there was
22  a report in the media and some comment by
23  Myron Daniels in respect to allegations
24  that the police officer's union was making
25  regarding an unequal application of
```

1    Internal Affairs investigations in this
2    case, so white officers, and Officer
3    Daniels commented that that was false and,
4    in fact, there was a disproportionate
5    number of affairs against officers of
6    color; that officers of color made up 35
7    percent of the force, but 41 percent of all
8    investigations in 2018.  So my first
9    question is if there had been any actions
10   taken within the Internal Affairs division
11   to address that disproportionate number of
12   investigations?
13        A.    I'd have to research our
14   database.
15        Q.    Are you aware of any, you know,
16   larger policy discussions within the
17   Internal Affairs division about such a
18   disparity?
19        A.    No, I don't remember having that
20   conversation.
21        Q.    I think that will be all of my
22   questions substantively.  But I would just
23   ask, there have been several points during
24   my questioning where we've reached a point
25   where you said you need to do some research

1    on this question and, also, particularly

2    the previous question I had about

3    complaints filed on, you know, falsified

4    probable cause affidavits or reports of

5    arrests.  I would just ask if you could

6    conduct that research and that we would be

7    able to speak to you again at a later time

8    to find out the results of that.

9        A.    Can I give you my e-mail address?

10                MS. MONSOUR:  No, no,

11            absolutely not.

12                MR. FOLEY:  I would love

13            that, but, unfortunately, that

14            would be highly unethical for me

15            to communicate directly with you.

16                MR. SCOTT:  Eric, can you

17            direct to me the areas that you

18            would like researched.  Let me

19            see what IA can produce.  I'll

20            produce that to you.  And, then,

21            if you feel the need for

22            follow-up, let me know.

23                MR. FOLEY:  All right.  With

24            that, I will turn it over to

25            Mr. Lanser I believe said he had

```
 1              some questions.
 2    BY MR. LANSER:
 3         Q.   Good morning, Sergeant Beard.  My
 4    name is Dave Lanser.  I'm one of the
 5    Attorneys for the Plaintiffs in the Blair
 6    Imani case, another case involving the same
 7    period of protests.
 8              MR. LANSER:  First of all,
 9              just to Mr. Scott, just as a
10              point of clarification, Sergeant
11              Beard is here to talk about the
12              Internal Affairs aspect of these
13              topics, but someone else is
14              coming in to talk about the
15              broader policies, is that
16              correct?
17              MR. SCOTT:  I've got
18              somebody lined up who is the
19              accreditation and policy master
20              for BRPD who can talk about the
21              general orders, that process, how
22              they changed, how they're
23              drafted, all that good stuff.  I
24              believe that Sergeant Beard can
25              effectively testify to how BRPD
```

```
 1              handles bias and discrimination,
 2              professional conduct as it
 3              relates to the individual
 4              officers due to his role as an IA
 5              investigator.
 6                   MR. LANSER:  Got it, okay.
 7              I will save most of my broader
 8              questions then for the other
 9              officer.  Thank you.  That's what
10              I thought.  I just wanted to
11              clarify.  Let me -- I'm sorry --
12              give me one second here just to
13              look at my notes.
14    BY MR. LANSER:
15         Q.   Well, actually, one thing, just
16    to follow-up to one thing Mr. Foley said,
17    Sergeant Beard.  I believe -- you went over
18    in detail a little bit about how these IA
19    complaints go into the employee file,
20    correct?
21         A.   Yes.  It's actually saved on
22    their IA history in a database.
23         Q.   Right.  I guess -- and sorry if
24    Mr. Foley asked this already.  If he did, I
25    missed it.  Do those stay on there forever
```

1    or is there some sort of, you know, every

2    five years after a complaint it gets purged

3    from there or is it permanently in the

4    file?

5        A.    For now, it was allowed to purge

6    2006 and above.  But from 2006 to the

7    present day, no, there is no way to expunge

8    any kind of complaint.

9        Q.    So even if there's no substance

10   to it and it's found to be a baseless

11   complaint, it's still in the file and it's

12   just marked as not sustained?

13       A.    No, we have a form called an

14   accountability.  It's documented on that

15   and all our accountabilities are also kept.

16       Q.    Let's see, like I said, I think

17   alot of the questions I had might be better

18   directed to the other officer, but let me

19   just look through here real quick before I

20   let you go.

21       Yes, I did have a question you might

22   be best suited to answer about the bias

23   base profiling general order.  I'm going to

24   share my screen just so I know we're

25   looking at the same thing.  I believe you

1    said you have a copy of this in front of

2    you, correct?

3         A.   I do, correct.

4         Q.   It appears to be the same one on

5    the screen right now?

6         A.   Yes, sir.

7         Q.   Let me see here, I'm going down

8    to page 61 of this exhibit which is -- oh,

9    this exhibit, by the way, has previously

10   been introduced as Exhibit K in our

11   consolidated deposition list.  I'm looking

12   specifically down at section BA, or 5A, I

13   guess, under Administrative Reporting and

14   Corrective Action.  Do you see where I'm

15   referring to there?

16        A.   Yes, sir.

17        Q.   It mentions the Community Affairs

18   unit.  I was just curious.  What is the

19   Community Affairs unit?

20        A.   The Community Affairs unit is our

21   community group.  We have a Community

22   Policing division, but I'm not sure what

23   the Community Affairs -- it should, if it's

24   related to our Community Policing division,

25   it should say Community Policing division.

1   But I can research it and find out what the
2   Community Affairs division is.
3         Q.   So Internal Affairs and the
4   Community Affairs units don't have any
5   interaction?
6         A.   No, sir.
7         Q.   That's fine.  It might be a
8   better question for the other officer being
9   produced today.  Sorry, let me just look
10  over this again.
11        Okay, another thing that might be in
12  your wheelhouse.  I'm going to switch over
13  to General Order 112, Conduct Unbecoming Of
14  An Officer.  I believe you said you were
15  prepared -- or General Discipline, I'm
16  sorry, is the General Order 112.  But a
17  section under here is called -- see if I
18  can find it here -- Conduct Unbecoming Of
19  An Officer.  Are you familiar with this
20  General Order broadly, the discipline
21  order?
22        A.   Yes.  If you keep scrolling
23  down -- keep scrolling, keep scrolling,
24  keep scrolling, scroll, scroll, keep
25  scrolling, keep scrolling -- all right,

1    stop.  No, go up one more page.  I'm sorry,

2    down one more page.  No, go back.  See on

3    the side where you see -- right there.

4        Q.   Yes, 2:12, Conduct Unbecoming Of

5    An Officer, is that --

6        A.   Actually, about six months ago,

7    the actual number changed to 2:11.  We

8    updated policies and added some policies,

9    so the actual number is 2:11 now.

10        Q.   Okay.  But, in 2016, it would

11    have been 2:12 still?

12        A.   Yes, sir.

13        Q.   Can you just sort of explain to

14    us what this, what was then section 2:12,

15    what does this mean?

16        A.   Basically, anything that would

17    bring dishonor or disgrace upon the

18    department.  It could be anything from

19    having a bar fight, using vulgar language

20    directed at a citizen.  It's really broad.

21    It's probably the broadest policy violation

22    in our policies.  It's just a number of

23    things that a sergeant or above has to say,

24    okay, well, this falls under conduct

25    unbecoming.  So it's a very broad policy.

1        Q.   So anyone can make a complaint

2   under that, anyone can make a complaint

3   saying that an officer committed conduct

4   unbecoming of an officer, or is it a

5   sergeant and above witnesses something and

6   they issue that complaint?

7        A.   No, anybody can make a complaint,

8   but it's up for the sergeant or

9   investigator to figure out what the officer

10  did to be labeled conduct unbecoming of an

11  officer.  No, anyone can make a complaint

12  of conduct unbecoming of an officer.

13       Q.   Okay.  And this is, this is two,

14  as in 2:12.  Does that mean it's a category

15  two violation?

16       A.   Yes, it's a category two.

17       Q.   So this is something that would

18  be investigated by Internal Affairs?

19       A.   No, any category one or two can

20  be investigated by an immediate supervisor.

21  But we also investigate category twos.  It

22  just depends on the severity or the

23  accusation of the policy violation.  But,

24  anything in category three, Internal

25  Affairs has to investigate.

1    Q.   So you don't automatically

2  investigate a conduct unbecoming of an

3  officer complaint, but, if it's severe

4  enough, Internal Affairs might?

5    A.   Yes, sir.

6    Q.   I know you said it's broad, a

7  broad category, so it might be tough to

8  nail some of this down.  But just as a way

9  of example, is it -- you mentioned bar

10  fights?

11    A.   I mentioned bar fights because

12  that's (unintelligible) --

13              COURT REPORTER:  Wait, I'm

14          sorry, Sergeant, would you start

15          that over, please?

16              THE WITNESS:  I used bar

17          fight as an example because

18          conduct unbecoming is when you're

19          on duty and off duty.  Anything

20          that would bring, you know, cast

21          a shadow over the department.

22              Another example, I had a

23          complaint not too long ago of

24          conduct unbecoming.  An officer

25          parked a marked unit in a

1           handicap spot.  So, like I said,

2           it's broad.  When I say broad,

3           not broad to where it helps the

4           officer.  It's just so many

5           different things that fall under

6           conduct unbecoming.

7    BY MR. LANSER:

8         Q.   Just as way of an example, would

9    it be potentially -- I'm sure, you know,

10   the specifics dictate this quite a bit --

11   but is it potentially something that would

12   fall under conduct unbecoming of an officer

13   for an officer to disagree with another

14   officer about circumstances of an arrest?

15        A.   I wouldn't see where that would

16   be a policy violation.

17        Q.   What if they voiced that

18   disagreement in front of the arrestee?

19        A.   No, that's comments to advise an

20   arrestee their charges.  And if you have

21   backup, I mean, that's a common practice

22   for most of our officers to hear an officer

23   tell an arrestee what they're being booked

24   for.

25        Q.   I guess what I'm getting at, what

1    if a officer tells an arrestee that, in his

2    opinion, the arrestee's rights are being

3    violated.  Would that be conduct unbecoming

4    of an officer?

5                   MR. SCOTT:  I'm going to

6              object to the form and

7              speculative nature of the

8              question.

9    BY MR. LANSER:

10        Q.   You can still answer.  Do you

11   want me to repeat that, Sergeant Beard?

12        A.    No.  That would be failure to

13   report to a supervisor, because if an

14   officer sees that, you know, in his mind or

15   his opinion that another officer, they

16   don't agree, that would be failure to

17   report to a supervisor, because that

18   officer has a duty to report up the rank if

19   he saw something unethical.

20        Q.   Okay.  Is it possible to violate

21   the provision you just said, failure to

22   report, and violate the conduct unbecoming

23   of an officer at the same time?  It could

24   be both, right?

25                   MR. SCOTT:  Go ahead.

```
 1                  THE WITNESS:  Possibly.  As
 2             far as arrests, I mean,
 3             obviously, a judge -- if this
 4             person was arrested and booked
 5             into jail -- obviously, the judge
 6             saw no PC to allow the arrest.  I
 7             mean, officers have opinions on
 8             alot of different things, but
 9             we're not, so, I mean, I wouldn't
10             see that being a policy violation
11             unless the officer violated the
12             arrestee's civil rights and, you
13             know, that's criminal.
14                  But, no, the scenario you
15             gave me, I don't see where it
16             would violate policy, unless it
17             was something that was illegal or
18             it violated the individual's
19             civil rights.
20   BY MR. LANSER:
21        Q.   Okay.  So just informing the
22   suspect whose been detained or arrested
23   that officer believes their rights are
24   violated is not conduct unbecoming of an
25   officer?
```

1          A.    If it can be proven.

2          Q.    Can you explain that?

3          A.    We'd have to interview the

4    arresting officer, we would have to

5    interview the arrestee, we'd have to

6    interview the officer that's making the

7    complaint.

8          Our investigations are very detailed.

9    We don't -- we don't -- of course, we

10   document conversations, we document

11   interviews.  But we just don't -- even on

12   the citizen's side or the officer's side,

13   we don't just say, well, if you said it

14   happened, it happened.  We conduct

15   thorough, very, very thorough, interviews.

16   So, I mean, like I said, officers disagree

17   alot.

18         Q.    I guess, just to cut to it, the

19   question I'm asking is whether a dis-

20   agreement with another officer in front of

21   someone who's being arrested falls under

22   conduct unbecoming of an officer?

23         A.    I disagree.

24         Q.    Okay.  So that's a "no?"

25         A.    Each case is, I guess, case by

```
1   case basis.  I mean --
2        Q.   Okay.
3              MR. SCOTT:  These are fact
4          intensive questions and the
5          hypotheticals here are nebulous.
6          If there was a specific
7          investigation you were looking
8          for, then --
9              MR. LANSER:  Yes, I'm
10         getting to that.  I was hoping to
11         get some testimony on sort of the
12         scope as part of the policy
13         first.  But I think we're there.
14   BY MR. LANSER:
15       Q.   Just broadly -- I don't want you
16   to get into the specifics of any particular
17   investigation or anything like that -- but
18   are you aware of any IA complaints from
19   July 10, 2016 against a BRPD officer for
20   conduct unbecoming of an officer?
21       A.   I'd have to research that, sir.
22       Q.   So you don't know the ultimate
23   result of any investigations or that you
24   don't know of any investigations?
25       A.   Again, 2010, I'd have to
```

```
 1   research.
 2        Q.   That's all I have on that.  The
 3   only other thing I have for you -- give me
 4   a quick minute to look over my notes here
 5   to see if I'm missing anything.
 6        I believe my other questions would be
 7   better directed to the other officer being
 8   produced on those topics.  So that's all I
 9   have for you.  I appreciate your time,
10   Sergeant Beard.  Mr. Rodney, I believe,
11   who's on the stream here too, I don't know
12   if he has any questions.
13                  MR. RODNEY:  I have a few
14             questions.
15   BY MR. RODNEY:
16        Q.   Sergeant, are you there?
17        A.   Yes, sir.
18        Q.   Can you hear me?
19        A.   Yes, sir.
20        Q.   I'm not sure where the line is
21   with the policy and the fact distinction
22   that the lawyers have been talking about,
23   but I'm going to ask you a few questions.
24   And I'm sure Mr. Scott is capable of
25   dealing with those issues as we get to
```

1    them.  I just want to ask you, first of

2    all, you used a couple of terms during the

3    course of your testimony that I want to

4    clear up and make sure that I understand.

5    There was some point in time where you were

6    talking about who made decisions with

7    regard to IAD investigations and you used a

8    term "the Chief."  Are you referring to the

9    Chief of the Baton Rouge Police Department

10   or the head of the Internal Affairs

11   division?

12        A.   No, Chief Murphy Paul, Jr.

13        Q.   Chief Murphy Paul, Jr.  What is

14   his position?

15        A.   He is the head of the Baton Rouge

16   Police Department.

17        Q.   And who is the head of the IAD?

18        A.   Sergeant Jacque Angelos.

19        Q.   So, whenever you said "Chief,"

20   you're talking about Chief Murphy?

21        A.   Yes, sir.

22        Q.   The other thing you mentioned,

23   the other phrase you used a couple of times

24   in your testimony, you talked about what is

25   in a person's jacket.  What is a jacket?

```
 1        A.   A jacket is, basically, it's a
 2   folder that has your hire date, anything
 3   dealing with human resources, hourly wage,
 4   if you got a letter of accommodation.  And
 5   those jackets are kept in our Accounting
 6   division.  Anything involved is referred to
 7   a file or a case.
 8        Q.   I gotcha.  So, when you talk
 9   about a jacket, you're talking about
10   somebody's personnel record, is that
11   correct?
12        A.   Yes, sir.
13        Q.   Are IAD complaints, do they
14   become a part of a person's jacket?
15        A.   No, sir.  They become a part of
16   an officer's Internal Affairs history.
17        Q.   But the two never really come
18   together in any way?  You can't look in a
19   personnel jacket and see if there's an
20   Internal Affairs history, do I have that
21   right?
22        A.   You have it right, sir.
23        Q.   Why is that?
24        A.   I didn't make the policy on that.
25        Q.   I didn't say you did.  I'm saying
```

1    do you know why that is?

2        A.   No, I can't answer that, sir.

3        Q.   You don't know why there's a

4    separation between a personnel jacket and

5    an officer's disciplinary record?

6        A.   In my opinion, the disciplinary

7    record is kept, for one, it's confidential.

8    It's kept securely in my office.  Personnel

9    jacket, anybody from a mortgage company to

10   the IRS can request a person's human

11   resource jacket.

12       Q.   I gotcha.  So, after an IAD

13   complaint is sustained, does it go into an

14   officer's personnel jacket at that point?

15       A.   No, sir, the two are separated.

16       Q.   Why is it that the sustained

17   accusations don't make it into the

18   personnel record?

19       A.   Non-sustained, sustained, or

20   exonerated are kept securely in my office

21   and we can refer to the case or a file.

22       Q.   And I can understand the non-

23   sustained and the exonerated.  But once you

24   find that someone, in fact, did the thing

25   that they're accused of, violated the

```
 1    policies of the police department, may, in
 2    fact, have committed a crime, why doesn't
 3    that become a part of their personnel
 4    jacket, do you know?
 5                MR. SCOTT:  Roy, you've
 6           asked why they're separate.  He
 7           says he doesn't know.  It's the
 8           same question with a slightly
 9           different phrasing.
10                MR. RODNEY:  It's my last
11           question, Joe, on that point.  I
12           tried to put a sharper point on
13           it.  Are you going to allow him
14           to answer or are you going to
15           object?
16                MR. SCOTT:  Subject to the
17           objection, go ahead and answer if
18           you know the answer.
19                THE WITNESS:  I can't answer
20           that, sir.
21    BY MR. RODNEY:
22         Q.   Sergeant, do you know whether or
23    not Internal Affairs received reports of
24    violations by Baton Rouge police officers
25    as a result of the Alton Sterling protests
```

1    on July 9 or July 10?

2         A.    I'd have to research that, sir.

3         Q.    I heard you say that many times,

4    that you would have to research that.  So

5    does that mean that you don't know whether

6    or not there was a single complaint to IAD

7    as a result of the Alton Sterling protests?

8         A.    Again, sir, I'd have to go back

9    to our database to research that.

10        Q.    I understand.  And I'm not trying

11   to argue with you.

12        A.    I understand.  I can't tell you

13   yes and I can't tell you no.  I want to

14   provide you with correct information.  So

15   I'd have to research it and get back to you

16   at a later time.

17        Q.    Well, just to be clear so we can

18   communicate with each other, I'm not asking

19   how many or what they were about.  I'm

20   asking do you know if there were any at

21   all?  Do you know that?

22        A.    Again, sir, I'd have to research.

23        Q.    So does that mean you don't know?

24        A.    Again, I'd have to research it.

25        Q.    I don't understand your answer as

1    being responsive.  As you sit there right
2    now, do you know whether or not there were
3    any complaints to Internal Affairs from the
4    Alton Sterling protests?  It's not an
5    inditement, Sergeant.  I'm only asking do
6    you know or not know?
7         A.   Again, sir, I'd have to research
8    that.
9         Q.   All right.  I'm going to ask this
10   question one more time in a different way:
11   Do you have any personal knowledge of
12   whether or not there were any Internal
13   Affairs reports that arose as a result of
14   the Alton Sterling protests, any personal
15   knowledge?
16        A.   I'd have to research that again,
17   sir.
18        Q.   Does IAD initiate it's own
19   investigations without a complaint or do
20   you simply respond to complaints?
21        A.   Yes, we are a (unintelligible) --
22             COURT REPORTER:  I'm sorry,
23        say that again.
24             THE WITNESS:  Yes, we are a
25        proactive division and we can

```
 1              initiate an investigation without
 2              a citizen complaint.
 3    BY MR. RODNEY:
 4         Q.   Okay.  So I want you to assume --
 5    and you may actually know -- but I want you
 6    to assume that there were many media
 7    reports of police misconduct during the
 8    aftermath -- during and after the Alton
 9    Sterling protests by the media.  Do you
10    know whether or not the IAD initiated any
11    investigations as a result of media reports
12    of police misconduct during the Baton Rouge
13    protests of Alton Sterling's murder?
14              MS. MONSOUR:  Object to the
15              form of the question.  Please
16              don't characterize it as a
17              murder.
18              MR. RODNEY:  Killing.
19              THE WITNESS:  I'd have to
20              research that, sir.
21    BY MR. RODNEY:
22         Q.   So you don't know whether there
23    were any?
24         A.   I'd have to research.
25         Q.   What proactive measures did the
```

1    Internal Affairs division take as a result

2    of the protests of the Alton Sterling

3    killing?

4         A.   Can you repeat that?

5              MS. MONSOUR:  Object to the

6         form.

7              MR. RODNEY:  Court Reporter,

8         could you repeat that for him,

9         please?

10             (Reporter complies)

11             THE WITNESS:  I don't

12        understand the question.

13   BY MR. RODNEY:

14        Q.   Well, you said -- you testified

15   earlier that you're a proactive department.

16   Am I correct about that?

17        A.   Correct.

18        Q.   I don't want to mischaracterize a

19   thing that you said.  Am I correct about

20   that?

21        A.   Yes, sir.

22        Q.   Okay.  So, if you're a proactive

23   department, I'm asking what proactive

24   investigations did the Internal Affairs

25   department initiate as a result of the

1    Alton Sterling protests?

2        A.    I'd have to research that.    And

3    as far as the policy, you would have to get

4    with Sergeant Britt Jones.    The policy has

5    changed since 2016.    So you'd have to ask

6    him that particular question.

7        Q.    Well, let me ask you, have you

8    investigated any Internal Affairs

9    complaints arising out of the Alton

10   Sterling protests?

11       A.    I'd have to go back and research

12   the database, sir.

13       Q.    So you don't remember?

14       A.    No, I would have to go back and

15   research the database.    Between '16 and

16   this year we've investigated thousands of

17   different cases.    So, no, I can't recall

18   every single case.    And especially five

19   years ago.

20       Q.    I can appreciate that.    At least

21   now I understand to some extent what your

22   response is that you have to research it.

23   Not that I agree, but at least I understand

24   it and I appreciate that.

25           So do you know of any other Internal

```
 1   Affairs officers who have investigated
 2   complaints arising out of the Alton
 3   Sterling protests?
 4        A.   I'm not trying to be
 5   condescending or rude or redundant, but I'd
 6   have to research that, sir.
 7        Q.   That's okay, man, I've been
 8   through the ringer.  You know, just do what
 9   you think is right.
10        Let me ask you a question:  You
11   mentioned there's been some policy changes
12   recently.  Do any of these policy changes
13   involve investigations of police misconduct
14   complaints during protests?
15        A.   Again, you'd have to talk to
16   Sergeant -- or ask that question of
17   Sergeant Britt Jones.  He's over
18   accreditation.
19        Q.   Why can't I ask you?  Do you know
20   of any changes that have occurred to
21   policies?
22        A.   Yes, there have been changes
23   since 2016, but I don't have the policy --
24   the policy book, per se, it's on, online,
25   but -- not online -- but we have, we have
```

```
 1    it on our desktops.  But if you were to
 2    printout the policy and procedures
 3    handbook, it's over 900 pages.  So, I mean,
 4    I'm familiar with the section that I'm
 5    responsible and assigned to.  But you would
 6    have to ask Sergeant Britt Jones.  He's
 7    over accreditation as far as what new
 8    policies have been added.
 9                    MR. SCOTT:  Roy, for today's
10              purposes, I pulled from the 2016
11              policy manual, because I thought
12              that was the focus.  We're not
13              setup to do a side by side
14              comparison with 2021.
15                    MR. RODNEY:  Right.  I'm
16              just asking him some questions
17              (unintelligible) having that done
18              during this examination.  I'm
19              only asking him -- I was just
20              asking more generally.
21    BY MR. RODNEY:
22         Q.   Do you know what the policy
23    changes were about?
24         A.   No, sir.
25         Q.   Okay.  I might be the only one
```

1    who doesn't know this, but I'll ask anyway:
2    Were you at the Alton Sterling protests on
3    July 9 or July 10?
4         A.   No, sir.  Every member of my
5    office was advised to stay in the office.
6    No Internal Affairs investigators were at
7    any protests.  We were all given an order
8    to remain in our office.
9         Q.   Who gave you that order?
10        A.   It would have been at that time
11   Chief Carl Dabadie.
12        Q.   Do you know why he gave you that
13   order?
14        A.   I didn't ask, sir.  He was the
15   Chief.  I worked -- I was working directly
16   for him.  I was given an order and I
17   followed it.
18        Q.   No, look, I understand that
19   completely, that that is how you respond to
20   an order.  And I have no doubt that you
21   would respond professionally to any order
22   given to you.  That's not my question.  My
23   question is do you know why he gave the
24   order?
25        A.   No, sir, I don't.

1      Q.    How long have you been with
2   Internal Affairs?
3      A.    Seven and a half years.
4      Q.    Before that you were where?
5      A.    The Armed Robbery division.
6      Q.    How long were you in Armed
7   Robbery division?
8      A.    Seven years.
9      Q.    And before that?
10     A.    I spent six years in Uniform
11   Patrol.
12     Q.    So would it be fair for me to say
13   you've seen pretty much most of what it is
14   to see as a police officer having been a
15   patrolman in a major felony unit and now in
16   Internal Affairs?  Do you feel that way?
17     A.    Yes, sir.
18     Q.    Okay, all right.  So, in the
19   course of your 20 something years of
20   service, which is appreciated.
21     A.    Thank you.
22     Q.    Have you ever been involved in
23   any issues involving a public protest, you
24   personally?
25     A.    No, sir.

1      Q.   What is the role of Internal

2  Affairs in the Baton Rouge Police Academy,

3  how do y'all interact?

4      A.   We really don't interact.  Of

5  course, if we have a complaint of the use

6  of force, we will contact the Training

7  Academy, get one of the defensive tactics

8  instructors to give his opinion, if there's

9  video, to give his opinion or her opinion

10 or, you know, their thoughts.  But, other

11 than that, we don't interact with the

12 Training Academy.

13     Q.   All right.  So, with regard to

14 the protests, do you know whether or not

15 any of the use of force officers at the

16 Academy were called upon by Internal

17 Affairs to give an opinion as to whether or

18 not the use of force alleged or depicted

19 violated the policies or practices of the

20 Baton Rouge Police Department or the

21 teachings of the Baton Rouge Police

22 Department Academy?

23     A.   Are you referring to a specific

24 case?

25     Q.   I'm referring to any case.  In

```
 1    other words, I can simplify it by saying it
 2    this way:  Do you know whether or not as a
 3    result of the Alton Sterling protests any
 4    use of force officer from the Academy was
 5    asked to provide an opinion to the Internal
 6    Affairs division?
 7         A.   I'd have to research that, sir.
 8         Q.   Who would be responsible for
 9    requesting such opinions from the Academy?
10         A.   The investigating officer assigns
11    that particular case.  Just like any other
12    case, if there's an allegation of use of
13    force, the head investigator has the
14    discretion to contact the Academy staff for
15    their opinion.
16         Q.   Did you hear me?  I think I may
17    have accidentally muted myself.
18                    MR. SCOTT:  You were on mute
19              for a little while there.
20    BY MR. RODNEY:
21         Q.   I asked the question whether or
22    not there was a certain protocol with
23    regard to requesting interviews from the
24    use of force trainers or officers at the
25    Academy?
```

1    A.    There is no protocol.   Each

2    detective in my office conducts their

3    investigation how they see fit.  So, no,

4    there's no protocol.  But if a detective

5    has a case involving use of force, he has

6    the option to, or not to, contact a

7    training staff member.

8         Q.   And he can do that without

9    notifying you or any of his superior

10   officers?

11        A.   Yes, sir.

12        Q.   If he does, in fact, go to the

13   Academy training officer and ask for an

14   opinion, does that opinion have to be

15   relayed to you or his commanding officer?

16        A.   He -- like, for instance, I had a

17   case where -- and just follow me -- where

18   use of force was applied.  I had an Academy

19   instructor, I showed him a portion of the

20   video.  I said "This is where you can start

21   watching the video and this is where you

22   can stop."  He took, on his own time, he

23   watched the entire video.  He e-mailed me

24   back his findings.  So it's documented.  We

25   just don't say "I talked to an Academy

```
 1    instructor" in a report.  It's documented I
 2    talked with this particular Academy
 3    instructor on this particular date and that
 4    is included in a case file that is
 5    presented to the four Deputy Chiefs and the
 6    Chief.
 7         Q.   I guess what I'm getting out of
 8    your testimony -- and maybe it's just me --
 9    but I think this is what generally happens
10    is that the use of force officers at the
11    Academy sort of act as experts with regard
12    to investigations of excessive force by
13    Internal Affairs, is that fair?
14              MR. SCOTT:  Roy, something's
15              gone wrong with your microphone
16              there.
17              MR. RODNEY:  Can you hear me
18              now?
19              MR. SCOTT:  Yes, sir.
20              MR. RODNEY:  Did the Court
21              Reporter hear me?
22              COURT REPORTER:  I think I
23              got it, yes.  It was like the
24              very end of the question was
25              slurred.
```

```
 1                    MR. RODNEY:  Well, that
 2             might just be me.
 3    BY MR. RODNEY:
 4        Q.   Let me try to ask it again.  Is
 5    it fair for me to say, Sergeant, that were
 6    there allegations of excessive force made
 7    to -- made to IAD or by IAD that the use of
 8    force officers at the Academy act as
 9    experts as to whether or not the use of
10    force was reasonable or in compliance with
11    Baton Rouge Police Department policies and
12    practices?
13        A.   Okay -- and I hope I'm answering
14    this correctly.  Again, as far as the
15    training staff in my office, we don't work
16    hand in hand.  There are months when we
17    don't even contact them.  But in the event
18    that we do contact them, we get them to
19    document via e-mail their findings.  Or
20    their opinions, rather.  But it's
21    ultimately up to the Chief of police to
22    decide if excessive force was used or not
23    used.
24        Q.   I get it, but I think we kind of
25    missed each other.  I was simply asking you
```

1    that, when you need expertise on use of

2    force in an IAD investigation, you go to

3    the training officers at the Academy, is

4    that fair for me to say?

5         A.   Yes, sir.

6         Q.   Okay.  So is there a particular

7    form or report that the training officers

8    at the Academy utilize to provide their

9    opinions in cases of alleged excessive

10   force?

11        A.   No, sir, it's done by e-mail.

12        Q.   So, if I wanted to say, okay, I

13   want to see all of the excessive force

14   opinions from the Training Academy in a

15   particular month, is that possible to do

16   that?

17        A.   You'd have to request every use

18   of force for a particular month.  You'd

19   have to, of course, do a request to the

20   Legal division and you'd have to narrow it

21   down to use of force.

22        Q.   Okay.  Are use of force files

23   kept separately in your office somewhere?

24        A.   No, the communication between an

25   investigator and the Academy staff, that

1    e-mail would be in a particular file.  Our

2    files are numbered, of course.  So you

3    would have to ask for a particular file,

4    because that's kind of broad.  And, again,

5    there is no protocol that says we have to

6    use them or we don't have to use them.

7         Q.   Okay.  But there's no record or

8    accumulation of all of the Training Academy

9    use of force officers' opinions outside of

10   a particular investigated file itself?

11        A.   That's correct.

12        Q.   So you don't accumulate those and

13   have all of your opinions in one place?

14        A.   No, it's put in a particular

15   file, because, again, sometimes we use

16   them, sometimes we don't.

17        Q.   I believe I heard you say in your

18   testimony that it's the duty of a Baton

19   Rouge police officer to report any

20   violations of the Baton Rouge police

21   officer policies and practices to IAD, is

22   that correct?

23        A.   No, that's not correct.  If an

24   officer witnesses anything that another

25   officer has done that's unethical, illegal,

```
 1    or possibly violated someone's civil right,
 2    he has the duty to report that to his
 3    immediate supervisor.  And if his immediate
 4    supervisor determines the three categories
 5    that I just named were violated, then it's
 6    sent to my office.
 7         Q.   So an officer does not have the
 8    duty to report directly to IAD any
 9    violations that they witnessed --
10         A.   No, it's --
11         Q.   -- by another Baton Rouge Police
12    Department?
13         A.   No, it's rank and file.  You have
14    to start with your rank.  And, then, again,
15    if a supervisor -- an officer reports
16    something to his supervisor, supervisor
17    deems that it needs to be sent to my
18    office, then we get involved.
19         Q.   Okay.  Well, but can a, like, at
20    one point in your career (unintelligible).
21              COURT REPORTER:  Mr. Rodney,
22         you completely cutout on that
23         question.  You'll have to start
24         over, please.  Your audio is very
25         distorted again.
```

```
 1              MR. RODNEY:  All right.  I
 2         only have a couple more
 3         questions.  Can you hear me now?
 4              COURT REPORTER:  Yes, sir.
 5              MR. RODNEY:  You can?
 6              COURT REPORTER:  Yes, sir.
 7              MR. RODNEY:  Can you hear me
 8         now?
 9              COURT REPORTER:  Yes, sir,
10         we can hear you, but --
11   BY MR. RODNEY:
12        Q.   I asked whether or not a Baton
13   Rouge --
14              MR. RODNEY:  Okay, there is
15         a delay, I see that.  I hear
16         that.  Let's give it a second and
17         then I'll ask the question.
18   BY MR. RODNEY:
19        Q.   My question is can a Baton Rouge
20   police officer report an alleged violation
21   to IAD without going through his superior
22   officer?
23        A.   Yes, sir.
24        Q.   What policy covers that?
25        A.   There is no policy on lodging a
```

```
 1    complaint, to my knowledge.  I mean, if you
 2    want to make a complaint, you can either,
 3    like I said earlier, utilize the e-mail
 4    complaint form on our brla.gov website or
 5    you can write a letter, you can come in
 6    person, you can make a telephone call.  So
 7    nothing says that an officer cannot come to
 8    Internal Affairs before contacting a
 9    supervisor.  But, normally, that's how it
10    is.  But there's no -- nothing says that an
11    officer can't come directly to an Internal
12    Affairs office.
13         Q.   Have you ever had an officer come
14    directly to Internal Affairs without going
15    through his supervisor in your experience?
16         A.   Yes.
17         Q.   Do you know if any -- whether or
18    not that complaint, or complaints, were
19    related to the Alton Sterling protests?
20         A.   I can't answer that, sir.
21         Q.   Why not?
22         A.   Because I'd have to research it.
23         Q.   Because you don't remember?
24         A.   It's not that I don't remember.
25    Again, we've worked -- that was five years
```

1    ago.  To this date, we are three times

2    higher than we were at this time last year.

3    So I'd have to research something that

4    happened six years ago.

5         Q.   But as you stand here today, you

6    don't know whether or not an officer made a

7    complaint arising out of -- made a

8    complaint about another officer that was

9    related to the Alton Sterling protests?  As

10   you sit here now, you don't know that?

11        A.   Again, sir, I'm not trying to be

12   rude or condescending.  I want to give

13   truthful and correct answers.  I'd have to

14   research that.  I can't say yes, I can't

15   say no.

16        Q.   So, when you say that, that means

17   that you're just uncertain about it, is

18   that correct?

19        A.   It would be fair to say I can't

20   recall.

21        Q.   Okay.  I think that might be it.

22   Just give me one second.  All right, that's

23   all the questions I have.  Thank you very

24   much.

25                  MR. FOLEY:  This is

```
 1              housekeeping.  I wanted to note
 2              that we introduced the Notice of
 3              Deposition.  I don't remember if
 4              we actually marked it with a
 5              number.  Obviously, it will be
 6              Exhibit #1, but just to be clear.
 7                   COURT REPORTER:  Thank you.
 8                   MR. SCOTT:  Exhibit #2 would
 9              be the IA history.  Exhibit #3
10              would be General Order 108.
11              Exhibit #4 would be General Order
12              112.
13                   COURT REPORTER:  Thank you,
14              sir.
15                   MR. SCOTT:  Greg, any
16              questions?
17                   MR. FARENHOLT:  I have no
18              questions.
19                   MR. SCOTT:  I only have one
20              clarification.
21                   MR. RODNEY:  Before you ask
22              your question, let me say one
23              more thing.  I'd like to reserve
24              my right to redepose this Officer
25              with regard to each and every
```

```
 1            question in which he said that he
 2            might have to research it.  And I
 3            will prepare a list of those
 4            things and send it to you, Joe,
 5            with the hope that that research
 6            and the result of that research
 7            will be provided in the interim.
 8            Thank you.
 9                 MR. LANSER:  Just to be
10            clear, this is Dave Lanser for
11            the Plaintiffs in Imani.  The
12            Imani Plaintiffs reserve those
13            same rights that Mr. Foley and
14            Mr. Rodney asserted there.
15                 MR. SCOTT:  Understood.
16  BY MR. SCOTT:
17       Q.   Sergeant Beard, when IA contacts
18  use of force instructors to get an opinion
19  on a use of force investigation, are the
20  opinions of those instructors binding on
21  Internal Affairs or the Chief in any way?
22       A.   They're just suggestions.  The
23  Chief has the final say as far as use of
24  force goes.
25                 COURT REPORTER:  "Use of
```

```
 1              force --" -- Sergeant Beard, I
 2              know you're directing your
 3              answers to Mr. Scott, but you're
 4              going to have to direct them up.
 5              "They're just suggestions.  The
 6              Chief has the final say as far as
 7              use of force or -- " --
 8                   THE WITNESS:  No, that was
 9              it.
10                   COURT REPORTER:  Thank you.
11                   MR. SCOTT:  Can I go get my
12              next witness?
13                   (Unintelligible)
14                   MR. LANSER:  I think that's
15              a yes.
16                   COURT REPORTER:  Will this
17              be read and sign, sir?
18                   MR. SCOTT:  Yes, ma'am.
19                   MR. CRAIG:  How about if we
20              take about a five minute break?
21              And, Joe, is the next witness the
22              one on arrest procedures?
23                   MR. SCOTT:  Yes.  And I
24              think he can probably also answer
25              your questions about probable
```

1          cause.

2                MR. CRAIG:  But the part

3          that has me just a little bit

4          confused is --

5                COURT REPORTER:  Mr. Craig,

6          excuse me, are we off the record?

7                MR. CRAIG:  Yes, we can be

8          off the record.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    LIEUTENANT WILLIAM CLARIDA, BATON ROUGE

2    POLICE DEPARTMENT, 9000 AIRLINE HIGHWAY,

3    BATON ROUGE, LOUISIANA, 70815, after having

4    been first duly sworn by the Certified

5    Court Reporter, was examined and testified

6    as follows:

7                E X A M I N A T I O N

8    BY MR. CRAIG:

9        Q.    Good morning.

10       A.    Morning.

11       Q.    My name is Jim Craig.  I'm one of

12   the Attorneys for several Plaintiffs in a

13   number of cases related to the July 2016

14   protests in Baton Rouge.  Our cases include

15   Tennart, Smith, Batiste-Swilley, and also

16   two cases, A/R and Travis Day, that are on

17   a slightly different track.  With me in

18   this deposition are my co-Counsel, Eric

19   Foley, Hannah Lommers-Johnson and Mandisa

20   Moore-O'Neal.

21       Could you give us your full name for

22   the record, please, sir?

23       A.    William Clarida, C-l-a-r-i-d-a.

24       Q.    What is your rank, sir?

25       A.    Lieutenant.

1    Q.    And what is your current
2  position, Lieutenant?
3    A.    I'm Assistant Uniform Patrol
4  Commander for the Baton Rouge Police
5  Department.
6    Q.    What are your duties in that
7  position?
8    A.    The Bureau of Uniform Patrol
9  oversees approximately 350 officers every
10  day of the week.  That would entail
11  payroll, that would entail any issues that
12  come to our office as far as complaints, it
13  would entail budgetary issues.  Just pretty
14  much the gambit of whatever would deal with
15  uniform patrol officers comes through my
16  office.
17    Q.    Do the commanders of the various
18  districts of Uniform Patrol, do they report
19  to you?
20    A.    Yes, they do.
21    Q.    And then who do you report to?
22    A.    Presently, I have the Uniform
23  Patrol commander is a gentleman by the name
24  of Wayne Martin.  He's a captain.
25    Q.    Yes, sir.

1          A.    And then above him is the Deputy

2    Chief over Uniform Patrol, Deputy Chief

3    Troy Lawrence.   Then above him would be the

4    Chief of Police.

5          Q.    Thank you.   How long have you

6    been in the position of being Assistant

7    Unform Patrol Commander?

8          A.    October 12 of 2020.

9          Q.    What was your position in 2016,

10   specifically July 2016?

11         A.    Sergeant supervisor in the K9

12   unit.

13         Q.    From that point in 2016, can you

14   just describe your assignments leading up

15   to your current one?

16         A.    You want all of my assignments

17   from July '16 to present?

18         Q.    Yes.  By "assignment," to be

19   clear, I mean positions.

20         A.    I was a sergeant assigned to the

21   K9 unit and that was until I made

22   lieutenant, which was in February of 2018.

23   When I made lieutenant, then I was assigned

24   to a district on Plank Road and that

25   position stayed in effect until I was named

```
 1    as commander of the Realtime Crime Center
 2    in February of 2020.  From that point, from
 3    February 2020 until October of 2020, I was
 4    commander over the Crime Center.  October
 5    12, 2020, I was moved to the Uniform Patrol
 6    Bureau office as assistant commander.
 7        Q.   Got it, thank you.
 8        A.   Yes, sir.
 9        Q.   What is your understanding of
10    what you have been requested to testify
11    about today?
12        A.   It was a little generic.  It
13    dealt with arrest procedure, booking
14    procedure.  As I said, it was somewhat
15    generic, so I'll do the best I can to
16    answer the questions you have.
17        Q.   Did you do anything in particular
18    to prepare to testify on those subjects?
19        A.   I pulled some information from
20    our policy and procedure manual, printed,
21    and have what I would imagine or hopefully
22    you're going to ask questions for.
23        Q.   Great.  Which part of the policy
24    and procedure manual did you pull?
25        A.   Well, there were several pulled
```

```
 1   when I got here.  The three that are not --
 2   or at least I don't see at this point --
 3   deals with planning for unusual
 4   occurrences, booking procedures, trans-
 5   porting of prisoners.
 6        Q.   Those are the three that you did
 7   bring or --
 8        A.   That's the three that I brought
 9   that are -- that were not here.  Everything
10   else that I have use for are here.  I also
11   pulled the Arrests General Order 209, as
12   well as the Use of Deadly Force General
13   Order 131, which is already here.  Oh,
14   also, I pulled the General Order 106, which
15   lists what the mission is of the Baton
16   Rouge Police Department.
17        Q.   Okay.  Well, let me see if -- so,
18   Lieutenant, I am going to screen share.
19   And I'm having a little bit of computer
20   problems today so you might have to bear
21   with me.  But I think -- I think I've got
22   it figured out.  I'm sharing my screen, but
23   I believe you also have this in front of
24   you, General Order 209.
25        A.   Yes.
```

1    Q.    And on the version that you have,

2    Lieutenant, there should be an effective

3    date and a revised date, correct?

4    A.    Correct.

5    Q.    What is the revised date of the

6    version you're looking at?

7    A.    08/02/2006.

8    Q.    Okay.  So I'm going to ask you

9    some questions about this policy.  And I'm

10   going to focus on from the second page of

11   General Order 209 on the section that is

12   Arrests Without A Warrant.

13   A.    Yes.

14   Q.    Do you see that?

15   A.    Yes.

16   Q.    Because the cases that you're

17   testifying in involve the arrests of

18   protesters in 2016 of the killing of Alton

19   Sterling and that was -- I believe all of

20   those arrests were without a warrant.  So

21   I'm going to skip over the part of the

22   policy that deals with arrest warrants.

23   Does that make sense to you?

24   A.    If that's what you'd like, that's

25   fine.

1     Q.   Great.  So can you describe for

2     me what this policy requires in terms of an

3     officer making a misdemeanor arrest without

4     a warrant?

5          A.   Are you asking an opinion or are

6     you asking me to read from the page?

7          Q.   I'm asking you what the policy of

8     the Baton Rouge Police Department is about

9     when an officer can make a misdemeanor

10    arrest without a warrant.

11         A.   "Officers may arrest a person

12    without a warrant when the officer observes

13    the offense, whether it's a misdemeanor or

14    a felony.  Misdemeanor arrests should be

15    made immediately or on close pursuit.

16    Officers may arrest a person -- " -- that's

17    a felony.  I can skip that one if you'd

18    like or I can read it.

19         Q.   No, sir, let's just go with this

20    3A1.

21         A.   3A1, that is the one I just read.

22         Q.   It is indeed.  And what does --

23    what is your understanding of the term

24    "close pursuit" in that section?

25         A.   That's a little generic in

1    regards to the questioning.  Can you be a

2    little more specific?

3        Q.    Well, I'll try.  The policy says,

4    that you just read, says "Misdemeanor

5    arrests should be made immediately or on

6    close pursuit."  I'm assuming we all know

7    what the word "immediately" means.  But

8    "close pursuit," you know, is not a term

9    that most laypeople use.  So I'm assuming

10   that there is -- is there a definition of

11   "close pursuit" or can you give me a

12   description or an example of what "close

13   pursuit" would be?

14       A.    Regarding a list or definition, I

15   don't see one on this page.  Regarding what

16   my concept of it would be regarding

17   something that, if it can't be made in that

18   immediate split second in time, within the

19   timeframe it would take for me to make

20   contact with that person, be it if they are

21   resisting, running, whatever it might be,

22   the pursuit issue is when the arrest would

23   be made.  So within a very close proximity

24   of time to me.

25       Q.    Thank you.  So you see the second

```
 1    point there under Arrest Without a Warrant
 2    says "Officers may arrest a person who has
 3    committed a felony even though the officer
 4    did not witness the crime."  Do you see
 5    where I'm reading from?
 6         A.   Yes.
 7         Q.   I don't see a part, a section
 8    here on whether an officer may arrest a
 9    person for a misdemeanor where the officer
10    did not witness the crime.  Am I missing
11    something?
12         A.   Regarding the verbiage in that
13    particular section three, no, I don't see
14    what you're referencing.
15                   MR. SCOTT:  3A4.
16                   COURT REPORTER:  Mr. Scott,
17              did you say 3A4?
18                   MR. SCOTT:  I did.
19                   COURT REPORTER:  Thank you.
20    BY MR. CRAIG:
21         Q.   He did say that.  Let me ask you
22    a question about 3A --
23         A.   Let me read it first for
24    clarification, please.  "Officers may
25    arrest a person when they have received
```

1    positive and reliable information that

2    another officer from this state has an

3    arrest warrant for the suspect for any

4    offense or an officer of another state or

5    the United States has an arrest warrant for

6    the suspect for a felony offense."

7         Q.   Right.  So, looking at the

8    totality of this section three, Arrest

9    Without a Warrant, this policy does not

10   authorize an officer to make a misdemeanor

11   arrest where the officer did not witness

12   the crime, is that correct?

13        A.   Can you repeat your question,

14   please?

15        Q.   Yes, sir.  Looking at this

16   section of General Order 209, Roman numeral

17   three, Arrest Without a Warrant, this

18   policy does not authorize a Baton Rouge

19   Police Department officer to make an arrest

20   without a warrant for a misdemeanor where

21   the officer did not witness the offense?

22        A.   So you're saying -- your

23   perception of that is that, if I don't

24   witness the actual crime, then I can't make

25   a misdemeanor offense, is that proper?

1        Q.    That's -- I'm asking you that --
2    you're on the right track, Lieutenant.  But
3    my question is whether is it correct that
4    this policy, General Order 209, does not
5    give authority to an officer to make a
6    misdemeanor arrest where the officer did
7    not witness the misdemeanor?
8        A.    In looking at this section, if
9    you're looking for that exact verbiage,
10   you're correct.  I don't see exactly what
11   you're asking for there.  That does not
12   mean that what you're asking for is proper.
13       Q.    Can you explain what you meant at
14   the end of your answer?
15       A.    You're advising, if I understand
16   you correctly -- and I'll repeat it -- is
17   that if I don't witness a misdemeanor crime
18   personally, then I can't make an arrest.
19   Is that correct?
20       Q.    Without a warrant.
21       A.    Without a warrant.  That's not
22   true.
23       Q.    Okay.  So your testimony is that
24   a Baton Rouge Police Department officer
25   can, can, c-a-n, make a misdemeanor arrest

1    without a warrant based on something other

2    than the officer's personal observation?

3        A.    Absolutely.

4        Q.    What is the authority for that?

5    Where is that in Baton Rouge Police

6    Department policy?

7                    MR. SCOTT:  Jim?

8                    MR. CRAIG:  Sir.

9                    MR. SCOTT:  Would you agree

10                that Section 3A incorporates two

11                articles from the Code of

12                Criminal Procedure?

13                    MR. CRAIG:  I mean, it

14                references them, sure.

15                    MR. SCOTT:  Would you mind

16                if I pulled up and showed

17                Lieutenant Clarida articles from

18                the Code of Criminal Procedure?

19                    MR. CRAIG:  No, I don't

20                mind.

21                    MR. SCOTT:  I've already

22                done it.

23                    MR. CRAIG:  You've already

24                done it.  Oh, well, give me just

25                one second so I can pull them up

```
 1           also.
 2   BY MR. CRAIG:
 3        Q.    Let's look at Article 213 of the
 4   Louisiana Code of Criminal Procedure.
 5        A.    I'm looking at it.
 6        Q.    And is it your testimony that
 7   there's something in this Article that
 8   provides authority for a Baton Rouge Police
 9   Department official to make an arrest on a
10   misdemeanor without a warrant where the
11   officer did not observe the offense?
12        A.    Number one: The person to be
13   arrested has committed an offense in his
14   presence and if the arrest is for a
15   misdemeanor.
16           Presence can be that I'm on scene, I'm
17   present, or I was sent somewhere.  Did not
18   say that I had to witness it.
19        Q.    Okay.  Anything else?
20        A.    Number three: The police officer
21   has reasonable cause to believe that the
22   person to be arrested has committed an
23   offense, although not in the presence of
24   the officer.
25        Q.    Okay.  Is there any other
```

1  provision of Article 213 that applies to

2  the question I'm asking you?

3       A.   It's possible that, based upon

4  what I'm reading and trying to get

5  information to you in a timely manner,

6  that's the two that standout that appear to

7  apply.

8       Q.   Let's look for a second at 218.

9  218 refers, Lieutenant, to the method of

10 arrest without warrant.  I'm going to pass

11 over that for now, because that's not

12 really the subject of my current question.

13      So let's look back at General Order

14 209 itself.  And would you agree with me

15 that 3A says "Officers are expected to

16 comply with the following procedures as

17 found in Code of Criminal Procedure

18 Articles 213 and 218?"

19      A.   That is what's printed, yes.

20      Q.   And so that is not -- so what

21 follows from the statement I just read are

22 five particular instances of procedures

23 found in Articles 213 or 218, correct?

24      A.   I didn't look over 218, but based

25 upon 213, it appears as though those five

1    were included in 213.

2        Q.    Right.  And I want to skip over

3    3B, which I think we would agree, if it

4    were important, that 3B and 218 are related

5    to each other.  But I'm really focusing on

6    Article 213.  And my question is -- or I'm

7    focusing on 3A, one through five.  And my

8    question is do you agree that this policy

9    is telling officers to comply with the five

10   procedures listed under it which it says

11   are found in Article 213 or 218?

12       A.    Okay, the way you're speaking --

13   and no disrespect -- but you're speaking in

14   a manner -- I'm trying to follow you --

15   where I'm trying to understand the question

16   you're asking.  You're asking if these five

17   listed in here are listed in Article 213?

18   Did I understand that correctly, sir?

19       Q.    No.  And I appreciate, by the

20   way, I take no disrespect from that.  We

21   usually do a whole song and dance at the

22   beginning of a deposition, which we were

23   trying to skip today for purposes of time.

24   But, basically, if you don't understand my

25   question, I'm very happy for you to tell me

1    so and tell me why.

2        No, Lieutenant, my question is

3    actually -- forget about my previous

4    question.  I'm going to try to ask it a

5    different way.  3A does not say officers

6    should follow Articles 213 and 218 in

7    making arrests without warrants, does it?

8        A.    Listed as 3A, the very first

9    thing is, A: Officers are expected to

10   comply with the following procedures as

11   found in Articles 213 and 218.  That's the

12   first thing.

13       Q.    Right, but it says "the following

14   procedures," doesn't it?

15       A.    Split hairs, but, sure.

16       Q.    I mean --

17       A.    Look, I'm really trying to be

18   respectful, absolutely.

19       Q.    No, no, no, that's fine.

20       A.     But, I mean, if you're going to

21   get into the weeds on a single word like a

22   "and" or a "the," that's fine.  I

23   understand that that's what y'all are

24   doing.  But, at the same time, I'm trying

25   to be productive and assist in answering

1    questions.  So, if you're going to try to
2    catch me on a single word, we can skip to
3    the next question.
4          Q.   No, sir --
5          A.   I'm really trying to be
6    respectful.
7          Q.   Well, I appreciate your effort.
8    But my point is you're here to testify
9    about the policy and the policy is what is
10   in front of us here.
11         A.   And I've read it, I've read it
12   for the letter, and --
13         Q.   Pardon me, sir, would you, would
14   you mind allowing me to finish my question
15   first?
16         A.   Sure.
17         Q.   Because I think that would be
18   helpful.
19         A.   Absolutely.
20         Q.   And my point is I'm trying to
21   find out what this policy does or doesn't
22   authorize and the only way that I can do
23   that is to ask you what the language says
24   and why it says it.  And it's in that
25   context that I'm asking you if, when it

1    says "with the following procedures," that

2    "the following" is talking about the

3    numbers one, two, three, four and five that

4    follow?

5            A.    Correct.

6            Q.    So those are the procedures that,

7    from Article 213, that the Baton Rouge

8    Police Department policy is asking it's

9    officers to follow.

10                    MR. SCOTT:   Jim?

11                    MR. CRAIG:   Sir.

12                    MR. SCOTT:   Can I get a

13            clarification?

14                    MR. CRAIG:   Sure.

15                    MR. SCOTT:   Are you asking

16            him if this 3A, one through five,

17            are the exclusive methods

18            available to BRPD officers?

19                    MR. CRAIG:   I'm asking

20            whether they are what is being

21            referred to as, quote, "the

22            following procedures."

23                    MR. SCOTT:   I think he just

24            answered that in the affirmative.

25                    THE WITNESS:   Which I did

1              advise that the five appear to be

2              included in Article 213, that is

3              correct.

4    BY MR. CRAIG:

5         Q.    Looking down at General Order

6    209, Roman numeral five, Use Of Force To

7    Effect An Arrest, do you see where I'm at?

8         A.    I do.

9         Q.    And Section A says that "a person

10   being arrested has a legal duty to submit

11   to a lawful arrest.  An officer making the

12   arrest has the authority to use reasonable

13   force to overcome any resistance or

14   threatened resistance."  And that

15   references Code of Criminal Procedure

16   Article 220.  Do you see that?

17        A.    Yes, I do.

18        Q.    And then the next section says

19   "This is based upon lawful arrests and

20   would not apply to an arrest found to be

21   unlawful or illegal."  Do you see that?

22        A.    I do.

23        Q.    And, so, do you agree that Baton

24   Rouge Police Department policy affirms the

25   right of a person to resist an unlawful

1   arrest?

2        A.   That's correct.  I answered, sir.

3   Did you hear me?

4        Q.   Yes, I did, I did.  And I

5   appreciate that.  So, in the first page of

6   the General Order 209 it talks about a

7   definition of arrest, do you see that?

8        A.   Are you referencing under

9   Procedures, number one, is that what you're

10   talking about?

11        Q.   Yes, sir.  I don't need you to

12   read it.  I'm just making that point.  I'm

13   directing you to it.

14        A.   Okay.

15        Q.   And both "B" and "C" under

16   Procedures reference the necessity that

17   arrests be based on probable cause, is that

18   correct?

19        A.   Give me a second to read it.  So

20   "B" and "C?"

21        Q.   Yes, sir.

22        A.   That's correct.

23        Q.   What is your understanding of

24   what constitutes probable cause for any

25   given offense?  I guess I'm asking what is

1  the definition of probable cause?

2      A.    Probable cause would be what a

3  reasonable person would believe a crime to

4  have been committed.

5      Q.    Okay.  And that would be -- and

6  that is, the substance of that, the

7  substance of what the probable cause is

8  depends on the offense that the person is

9  being arrested for, correct?

10     A.    You're asking if probable cause

11 changes for each crime --

12     Q.    Yes.

13     A.    -- on the stipulations and what

14 qualifies a crime to have occurred?

15     Q.    Yes, sir, exactly.

16     A.    Sure, yes, I'll agree with that.

17     Q.    With respect to affidavits of

18 probable cause, are you familiar with any

19 written policy of the Baton Rouge Police

20 Department that governs an affidavit of

21 probable cause?

22     A.    Well, being it's a 894 page book,

23 it's possible it's in there.  I don't have

24 every word committed to memory.

25     Q.    Of course not.

1        A.    Yeah.  So, do I have something I

2   can tell you what a general order is right

3   now referencing affidavits?  No, sir, I

4   can't.

5        Q.    Okay.  Whether or not it's in the

6   policy or not, do you know what is -- I'm

7   not asking the policy number -- but do you

8   know what is the policy of the Baton Rouge

9   Police Department concerning the filling

10   out of affidavits of probable cause?

11        A.    I don't know of the general order

12   that it would be listed under.  So, if I

13   were to speak anything whatsoever, other

14   than what basically an affidavit is, I

15   would be incorrect because I would be

16   guessing.

17        Q.    Okay.  And that's a perfectly --

18   I appreciate that answer.  May I just make

19   sure I understand you?  What you're

20   testifying to is that, as we sit here

21   today, given the length of the and the

22   breadth of the Baton Rouge Police

23   Department policy and procedural manual,

24   you don't know where there would be a

25   written policy on affidavits of probable

```
1   cause?
2         A.    I do not know of a specific
3   general order that lists the answer to the
4   question you're having.  Or you're asking,
5   rather.
6         Q.    Okay.
7         A.    That doesn't mean it doesn't
8   exist, it just means I don't know it.
9         Q.    Yes, sir, that's exactly what --
10  that was exactly the distinction I was
11  trying to draw so thank you very much.
12        I'm going to stop screen sharing for
13  now.  I'm going to come back to a different
14  policy, which I think this will be --
15                  MR. CRAIG:  Exhibit #1 to
16             your testimony is General Order
17             209.  Exhibit #2, which I believe
18             you said you might have brought
19             with you today, is General Order
20             244, Planning For Unusual
21             Occurrences.
22  BY MR. CRAIG:
23        Q.    Do you have that, Lieutenant?
24        A.    I have a copy of it, yes.
25        Q.    Excuse me one second.  And what
```

1    aspect of this policy addresses the making

2    of an arrest?

3         A.   It's 17 pages.  It would take me

4    awhile to read it.

5         Q.   Well, maybe I should ask it this

6    way:  Why did you bring this particular

7    policy?  The reason I ask you the question,

8    just so you know, is because I thought I

9    understood you to say that you brought a

10   copy of this policy --

11        A.   I did.

12        Q.   -- as part of your deposition and

13   just wanted to know what in it addressed

14   that issue?

15        A.   "Unusual Occurrences: The policy

16   regarding this is the following procedure

17   will establish leadership guidelines for

18   managing unusual occurrences.  An unusual

19   event may be natural or manmade.  The

20   incident command system, or ICS, defines a

21   command structure that may be used for

22   incidents that require a unified response

23   with other agencies.  This is a critical

24   part of the department's mission."

25        I would, personally, as an opinion,

1   say that the whole protest situation would

2   be considered an unusual occurrence, being

3   that it doesn't happen very often, and it's

4   a manmade thing.  That's why I brought it

5   in the event a question would be asked

6   along those lines.

7        Q.   Okay.

8        A.   Regarding arrest procedure here,

9   I could read it and try to find you

10  something, but nothing is going to come to

11  mind on that.

12       Q.   Right, okay.  Then I will stop

13  screen sharing that.

14            MR. CRAIG:  The next Exhibit

15            I'm going to show you, Exhibit

16            #3, is General Order 291, subject

17            Civil Disorder.

18  BY MR. CRAIG:

19       Q.   Do you have that in front of you

20  or will you need to look at the screen?

21       A.   I don't see it here.

22       Q.   Okay.  I don't know whether you

23  can -- I don't know where your screen is,

24  Lieutenant, and whether what I'm showing

25  you is helpful or not.

```
 1          A.    That's a little bigger, a little
 2     better.
 3          Q.    Yes.  Did you review this
 4     particular general order on Civil Disorder
 5     to prepare to testify about policies on
 6     arrests today?
 7          A.    I did not.
 8          Q.    Are you --
 9                MR. SCOTT:  Jim, it wasn't
10           on your list.
11                MR. CRAIG:  No, I under-
12           stand.  I'm asking in terms of
13           topic 2d, which I thought --
14           which is asking for policies and
15           procedures regarding any of the
16           following topics, "d" being
17           Arrest Procedures.
18     BY MR. CRAIG:
19          Q.    And let me show you the page that
20     I'm interested in, Lieutenant, and we can
21     see whether you have any testimony to help
22     us understand it.  I'm on page four of
23     General Order 291.  It is Roman numeral
24     seven, Mass Arrests.  Do you see that?
25          A.    Yes.  Can you scroll down, scroll
```

1    it down the other way?

2         Q.    Other way, scroll it up.

3         A.    Yes, right there.  Okay.  The box

4    where y'all blocked some of it.

5         Q.    Okay.

6         A.    What question do you have about

7    what section or what letter?

8         Q.    Yes, I'm just asking, right, I

9    was just asking to begin with whether we're

10   on the same page.  I'm talking about the

11   sub-section seven --

12        A.    Okay.

13        Q.    -- on Mass Arrests.

14        A.    What's the date that was

15   originated and what's the date it was

16   updated?

17        Q.    So, looking at the version that

18   was produced to us, the effective date was,

19   you see it, it's November 1, 1995.

20        A.    Yes.

21        Q.    And revised date is August 1,

22   2001.

23        A.    I do see that.

24        Q.    Have you previously had any

25   occasion to look at this general order in

1   particular?

2       A.   I would like to think I looked at

3   every general order at one time or another.

4   Maybe more than once.  I do know it was in

5   the policy and procedure manual.  In terms

6   of content, I can't quote you anything.

7   I'll be glad to look at it and try to

8   decipher it.

9       Q.   Okay.  But in terms of what the

10  policy is and how it's implemented by the

11  Baton Rouge Police Department, other than

12  what's written in black and white here on

13  General Order 291, are you familiar with

14  the policy of the Baton Rouge Police

15  Department?

16      A.   Am I familiar with the policy or

17  am I familiar with that general order?

18      Q.   I'm sorry, I meant the general

19  order.  Thank you.

20      A.   Like I said, at one point or

21  another I'm sure I looked over it.  But in

22  terms of specific content, I'm not going to

23  be able to quote you anything without

24  looking at it.  I can read and make an

25  attempt to explain to you if you have a

1    specific question.

2         Q.   Yes.  Well, I'll ask a couple of

3    questions and we'll see if it's a helpful

4    exercise or not.  My first question is what

5    is the policy of the Baton Rouge Police

6    Department about who has authority to order

7    a mass arrest?

8         A.   That couldn't be a more general

9    question, sir.  I'm sorry.  Who has the

10   authority to authorize a mass arrest?

11        Q.   Yes, sir.

12        A.   I don't know that there's an

13   answer for that.

14        Q.   So if there's --

15        A.   There's no one person that is all

16   being that says you can make a mass arrest.

17   Once again, I completely am not trying to

18   be flippant with you, but you need to be

19   specific with your questioning and I'm glad

20   to try to help.

21        Q.   Sure.  So, in July of 2016, there

22   were a series of large protests about the

23   killing of Alton Sterling by an officer of

24   the Baton Rouge Police Department.  Do you

25   remember that?

1      A.   I do.

2      Q.   And in response to the protests,

3  the Baton Rouge Police Department and other

4  law enforcement agencies called out and

5  deployed law enforcement officers to

6  respond to the group of protesters.  Do you

7  remember that?

8      A.   Yes, sir.

9      Q.   And in the course of the law

10 enforcement response to the protests, just

11 as a for example, on July 10, 2016, a group

12 of law enforcement officers in unison

13 descended on a corner of East and France

14 Boulevards to make an arrest of numerous

15 protesters who were at that time standing

16 on the front yard of a private residence.

17 Are you at all familiar with that?

18     A.   I was not present, no, sir.

19     Q.   Well, that really wasn't my

20 question.  Do you recall the incident,

21 whether you were present or not?

22     A.   There were so many incidents.  If

23 you're asking me to be specific about one

24 thing, no, sir, I can't recall that.  I'm

25 not saying it didn't happen, but there was

1    so much that happened in that timeframe.

2    And let me get on statement, let me get on

3    record, if you don't mind.  I'm going to

4    read the mission of the department and I

5    think this would serve well: The mission of

6    the Baton Rouge Police Department is to

7    serve with the Baton Rouge community to

8    prevent crime and to promote the safety and

9    wellbeing of all.  Safety.

10         Q.   Yes, sir.  And how is that part

11   of the mission statement --

12         A.   Pretty much all of this that

13   you're referencing as far as the question

14   regarding the mass, who authorizes the mass

15   arrests and all that, there is no one

16   person that does that.  It's a

17   collaborative effort in order to keep peace

18   and provide safety for citizens, officers,

19   as well as people who may be committing

20   crimes.  The whole purpose of what we try

21   to accomplish is to maintain order.  And in

22   doing so, if a crime is observed or if it's

23   alleged, then we do what we can to try to

24   preserve safety by taking action.  So

25   you're asking if I remember that specific

1   incident?  Like I said, there were so many

2   things that happened in such a short period

3   of time, I cannot attest, because I did

4   raise my hand and swear that I would tell

5   the truth, which in this case I don't

6   recall.  So, I'm trying to answer

7   questions, but you're trying to pin me down

8   if I remember something and my answer was

9   no, I don't remember that specific thing,

10  no, sir.

11       Q.   Okay.  The purpose of this

12  General Order 291 is to provide guidance to

13  officers in command of the Baton Rouge

14  Police Department in situations of civil

15  disorder, is that correct?

16       A.   That's a question?  It sounded

17  like a statement.

18       Q.   Well, it's a statement and then I

19  asked you "is that correct?"

20       A.   Once again, I have not read the

21  entire general order.  So for me to speak

22  on something that is up on the screen and

23  it's only showing half a page, that's a

24  little vague.  In an overall sense, I would

25  imagine you're probably correct.  Because

```
 1    that's the whole, that's the whole concept
 2    of the policy is to give a guideline on as
 3    many types of incidents or problems or
 4    things that could come up.  That way, an
 5    officer has something actually to refer to.
 6    But, obviously, we know that not every
 7    situation can be written on paper to where
 8    it can be addressed and an answer can be
 9    looked up for that one thing, because
10    everything is fluid.
11         Q.   So is it your testimony that
12    when -- well, let me ask you this: When
13    there are a large number of officers
14    responding to a large number of protesters,
15    that there is no Baton Rouge Police
16    Department policy as to who can give an
17    order for the group of officers to make a
18    mass arrest?
19         A.   You're asking if that's my
20    testimony.  I haven't given any testimony
21    on this.  So that's not my testimony.
22         Q.   Okay.  In a situation where --
23              MR. CRAIG:  Yes, sir?
24              MR. SCOTT:  I'm thinking I
25         need to come up with somebody
```

```
 1            different for your mass arrest
 2            questions, probably somebody from
 3            the July 2016 command staff.
 4                 MR. CRAIG:  Okay.  I would
 5            be inclined to agree with that.
 6                 MR. SCOTT:  Making my list,
 7            mass arrest.
 8                 MR. CRAIG:  Yes, which I
 9            think is within -- in fact, I
10            don't think, I know it's within
11            2d and "e" and others of those
12            parts of topic two.  Let me just
13            look at the rest of my --
14                 MR. SCOTT:  (Unintelligible).
15                 THE WITNESS:  No worries.  I
16            came to try to do the best I
17            could to answer the questions if
18            possible.
19                 MS. MONSOUR:  We appreciate
20            it.
21                 MR. SCOTT:  Yes, sir.
22                 MR. CRAIG:  One second here
23            as I look for other -- here we
24            go.  I am going to then pass the
25            Witness to either Mr. Lanser, who
```

1              represents a different set of

2              Plaintiffs, or Mr. Rodney, who

3              represents a Plaintiff in another

4              case.  Reserving the prerogative

5              to ask follow-up questions after

6              their questions as to the extent

7              they are related to anything that

8              Mr. Lanser or Mr. Rodney may

9              bring up, and also subject,

10             Mr. Scott, to the point that you

11             made that we'll ask a different

12             witness about the mass arrest

13             provisions of General Order 291.

14                   So, Mr. Lanser or Mr.

15             Rodney, whoever wants to go

16             forward.

17                   MR. LANSER:  I'm happy to.

18   BY MR. LANSER:

19       Q.    Lieutenant, as Mr. Craig said, my

20   name is Mr. Lanser, Attorney for Plaintiffs

21   in another case arising out of the same

22   incidents.  I'm going to attempt not to

23   tread on the same territory as Mr. Craig,

24   but I may have some clarifications and that

25   sort of thing.  So, if I'm asking a similar

1  question, I'm not trying to trip you up or

2  anything like that, just looking for some

3  clarification.

4      First of all, going back to general

5  sort of arrest procedures, I know in some

6  circumstances, situations, where, you know,

7  multiple officers may be, may be seizing an

8  individual or bringing them into custody,

9  how is it determined who the arresting

10 officer is or can there be multiple

11 arresting officers?

12     A.   You can have more than one

13 officer on a case when an arrest is made,

14 yes, sir.

15     Q.   So there might be multiple

16 arresting officers -- well, let me start

17 with this, is the term "arresting officer"

18 a correct term to be using as the officer

19 of record?

20     A.   You would have an officer who

21 would be primary to a case as far as who

22 would be responsible for the initial case

23 itself.  But you can have additional

24 officers that would be part of that arrest.

25 I'm not sure if that answers your question.

1      Q.    It does, thank you.  I appreciate
2  that.  And which officer -- or is there a
3  specific officer during an arrest who is
4  required to read Miranda warnings?
5      A.    Is there a specific one required,
6  is that what you asked?
7      Q.    Yes.
8      A.    No, it's not -- there is no one
9  officer, officer 1A has to do it, no, sir.
10     Q.    That's my question, thank you.
11     A.    Okay.
12     Q.    Is there any -- what's the point
13  throughout an arrest, throughout the
14  processing and the arrest procedure, where
15  the Miranda warnings should be read, no
16  matter who it is reading them?
17     A.    Generally, when you're going to
18  question a suspect and if there may be
19  incriminating answers, we do it.
20     Q.    Okay.  Are Miranda warnings
21  supposed to be given prior to filling out
22  arrest processing paperwork?
23     A.    Generally, yes, you would do it
24  before, once the person is placed under
25  arrest, that would be correct, you give

1  Miranda.

2       Q.   Is it a problem if Miranda

3  warnings aren't provided to an arrestee?

4       A.   Is there a problem?

5       Q.   Yes.

6       A.   Yeah, there are times that people

7  are arrested where you can't give them

8  Miranda.  Or times when a person may be

9  injured but they're a suspect in something.

10 As far as being a problem, yeah, if you're

11 going to ask a person a question and advise

12 them that they have the right to stop

13 answering and basically anything they say

14 can be used against them, then, you know, I

15 don't see that as an issue.  But, you know,

16 there are times when maybe it wouldn't be

17 even an option.  But, generally, it is good

18 practice to do so, correct.

19      Q.   Yes, I would agree with that.

20 Give me an example, if you don't mind, of a

21 situation where it's not an option to give

22 them a Miranda warning?

23      A.   Well, like I just explained --

24 and this is completely fictitious -- you

25 have a suspect that causes injury to

```
 1   someone based on a really bad crash and you
 2   suspect him to be intoxicated, but maybe
 3   he's unconscious or maybe he's not able to
 4   coherently answer your questions.  Well,
 5   you want to make sure that he has knowledge
 6   and an understanding of what Miranda would
 7   be.  So, at that point, you would probably
 8   choose not to give him Miranda.  So that's
 9   totally fictitious.
10        Q.   Sure, that makes sense.  Just as
11   an aside, can I ask, I see you're looking
12   at your phone.  Are you looking at policy
13   on there?  What are you looking at on your
14   phone?
15        A.   It's not your business what I'm
16   looking at on my phone.
17              MR. SCOTT:  No, that is to
18         say you're not looking at
19         anything related to this
20         litigation.
21              THE WITNESS:  No, I'm trying
22         to run an office that I've
23         been --
24              MR. SCOTT:  Yes, sir.
25              MS. MONSOUR:  He's been
```

```
1              taken away from his job today.
2              THE WITNESS:  And it's a
3       very busy office so I'm trying to
4       kind of handle multiple things at
5       once.
6              MR. SCOTT:  He's not getting
7       any messages from his Counsel and
8       he's not looking at anything
9       related to the litigation.
10             MR. CRAIG:  Yes, but let me
11      be clear about something,
12      Lieutenant.  We didn't ask you to
13      come today.  We served a Notice
14      on the City of Baton Rouge for
15      people with information about
16      particular topics and you were --
17             THE WITNESS:  Hold on, hold
18      on, hold on, hold on --
19             MR. CRAIG:  No, sir, no,
20      sir.  I'm going to finish my
21      statement.  And you're here
22      because of that Notice of
23      Deposition.  It's not personal to
24      you.  And just to be very clear,
25      the Rules of Evidence are
```

```
 1              exceptionally clear that anything
 2              a witness looks at during
 3              testimony can be examined.  So I
 4              would simply say I would advise
 5              you to exercise extreme caution
 6              when you are consulting
 7              something, because we are not
 8              required to accept a
 9              representation about what's on
10              your phone.  So that's my
11              objection for the record and I
12              will turn it back to Mr. Lanser.
13                   MR. SCOTT:  My apologies.  I
14              meant no harm.
15                   MR. LANSER:  That's fine.
16                   THE WITNESS:  If there is a
17              specific question regarding what
18              I have in front of me as far as
19              policy goes, I'm glad to try to
20              answer it for you.  And I'm
21              trying to do the best I can in
22              terms of accuracy and whatever it
23              is, because it's a broad scope,
24              obviously, what I'm looking at.
25                   As far as my personal
```

```
 1              telephone, that's my personal
 2              telephone.
 3                   MR. LANSER:  I understand
 4              that.  But as Mr. Craig
 5              explained, there are Rules of
 6              Evidence we're operating under
 7              today.
 8                   THE WITNESS:  At no point in
 9              time was I told I couldn't bring
10              a phone in here, nor that I
11              couldn't get on it.
12                   MR. SCOTT:  Right.  That's
13              my fault and I accept
14              responsibility for that.  We've
15              dealt with it, we'll move
16              forward.
17                   MR. LANSER:  We'll move
18              forward, that's right.
19     BY MR. LANSER:
20          Q.   All right, where was I?  So I
21     believe we had been discussing one
22     instance, a hypothetical that you gave
23     where an individual might not be given
24     Miranda warnings at the time of arrest
25     because they're not in a state of mind to
```

1    understand or comprehend the warnings, is

2    that fair to say, as a general rule?

3         A.    That's fair to say.

4         Q.    Okay.  As long as the individual

5    is able to comprehend and understand

6    Miranda warnings, are there any circum-

7    stances where they wouldn't be given in

8    that case?

9         A.    As a general rule, we do try to

10   give Miranda.  If it's a juvenile,

11   obviously, we would like the parents to be

12   present and then give them time to consent.

13   But, as a general rule, we do try to give

14   Miranda if it's able to be understood and,

15   like I said, if they can kind of comprehend

16   what you're trying to tell them.

17        Q.    Thank you, that answers my

18   question.

19        A.    Okay.

20        Q.    Again, speaking, you know,

21   general rules, speaking broadly here, do

22   officers, BRPD officers, do they have

23   discretion whether or not to arrest

24   someone?  Or if they see wrongdoing or a

25   law being broken, are they compelled to

1    arrest someone?

2        A.    On misdemeanor type offenses

3    there is a little discretion involved.  For

4    felonies, no, there is really no

5    discretion.  I mean, you're obligated to

6    take action.  Also, that's a little broad,

7    to be honest with you, because, say, I'm

8    not within the scope of my jurisdiction,

9    things of that nature.  So things like that

10   can play into it.

11       Q.    Okay.

12       A.    But as a general rule, if I'm

13   working and I witness a crime, then, yes,

14   I'm going to take action.

15       Q.    Okay.  But for misdemeanors, you

16   would have some discretion whether or not

17   to take action, correct?

18       A.    Depending upon the misdemeanor.

19   If it's any sort of a misdemeanor type

20   crime where a life would be in danger or if

21   it would be a crime of violence, but didn't

22   get to the degree of felony, then, yeah,

23   I'd be expected to take action.

24       Q.    But if you're patrolling around a

25   neighborhood and you see someone jay-

```
 1    walking or something, you aren't compelled
 2    to arrest them on the spot necessarily?
 3         A.   I'm not compelled in regards to
 4    face any sort of punishment and/or a
 5    malfeasance issue.
 6         Q.   Okay.  Would you agree there may
 7    be situations where using your discretion
 8    to effect an arrest might do more harm than
 9    good as far as public safety goes?
10         A.   I'm not sure as far as public
11    safety goes.  I have used discretion in the
12    past on very minor offenses to correct
13    behavior, which is ultimately what any sort
14    of an arrest is for.  An arrest is to
15    change behavior.  And in doing so,
16    sometimes it involves issuing somebody a
17    citation for speeding and/or a misdemeanor
18    crime, issuing a summons can change
19    behavior.  Sometimes it involves putting
20    somebody in jail.  If a warning will
21    suffice and it's a very minor infraction
22    and you feel as though that accomplished
23    the goal, well, then, then that's what you
24    do.
25         Q.   Okay.  Can you sort of elaborate
```

1    what you mean by the goal is to change

2    behavior?

3         A.    I'm going to go back to the

4    mission statement regarding serving the

5    community to prevent crime and promote

6    safety and the well-being of all.  If I can

7    do that and not have to issue somebody a

8    piece of paper and/or put them in jail for

9    something and I have that discretion and it

10   doesn't meet the requirement that I have to

11   take action on something, then I've

12   accomplished my goal.  My goal as a police

13   officer is to serve the citizens of Baton

14   Rouge and do the best I can on a daily

15   basis to do that in a manner to where I

16   don't create issues.  So, having said that,

17   if I can accomplish that without actually

18   having to arrest and/or cite somebody and

19   it falls under those guidelines, then I

20   would do that.  But, obviously, if I were

21   to stop somebody for speeding, give them

22   the warning, feel that the warning would

23   suffice, and the next day I see the person

24   doing the same thing, obviously, my warning

25   the day before went disregarded the next

1    day.  Then, obviously, it may rise to the

2    point of issuing them a citation and/or

3    arrest.  So you just -- there is discretion

4    involved and discretion is kind of broad.

5         Q.   Okay, thank you.  I think that

6    answers my question.  After someone is

7    arrested, what types of paperwork has to be

8    filled out?

9         A.   You broke up.  Can you repeat,

10   please?  You're coming through a little

11   spotty.

12        Q.   Sorry.  My question was after an

13   arrest, what paperwork needs to be filled

14   out to process that arrest?

15        A.    It would depend upon the type of

16   arrest.  If it's a summons, uh, if it's a

17   traffic citation, alot of times the

18   citation itself stands alone.  If it's a

19   misdemeanor arrest where the person is just

20   given a summons on a notice to appear at a

21   later date and it meets that qualification,

22   then it would typically be an initial

23   report, an offense report, a narrative, an

24   arrest page for the person.  If it's

25   somebody that's booked into jail, it's all

```
 1    those things, with the addition of whatever
 2    paperwork is required to processing and
 3    putting a person in jail.  If it's a felony
 4    arrest it adds even more.  It's all those
 5    things and you throw additional paperwork
 6    in regarding if property is taken.  It's
 7    kind of broad.  It just depends upon the
 8    type of arrest.
 9                 MR. LANSER:  A question for
10          Mr. Scott.  I know earlier
11          Mr. Craig and the Lieutenant were
12          discussing affidavits of probable
13          cause a little bit.  It sounds
14          like, is the Lieutenant here to
15          discuss affidavits of probable
16          cause or is that another
17          individual --
18                 MR. SCOTT:  Well, I mean, I
19          had somebody (unintelligible) --
20                 COURT REPORTER:  I'm sorry,
21          Mr. Scott, you had someone do
22          what about the Code of Civil
23          Procedure?
24                 MR. SCOTT:  Pull a Code of
25          Criminal Procedure for me,
```

```
1                because the general orders were
2                referencing the Code of Criminal
3                Procedure.  I'm not in my usual
4                environment so I don't have
5                everything close to hand.  If you
6                want to talk about the pre-
7                printed affidavits of probable
8                cause, I think we need somebody
9                else.  I've been trying to locate
10               someone specific to that.  If we
11               want to talk about how affidavits
12               of probable cause work in every
13               other circumstance, then I can
14               hand the Code of Criminal
15               Procedure to Lieutenant Clarida
16               and he will give it his best
17               shot.
18     BY MR. LANSER:
19          Q.   Let me ask Lieutenant Clarida.
20     Are you prepared, outside of reviewing the
21     Code and regurgitating it to us right now,
22     are you prepared to discuss generally the
23     process for a completed affidavits of
24     probable cause?
25          A.   I'll give it my best shot.  If
```

1   you have a specific question, please ask.

2        Q.   I have several.  I guess what,

3   before we're getting into it though, I just

4   want to make sure you're the best witness

5   to testify on it.  I do appreciate that

6   you're trying to answer what you can.

7        A.   The precursor questions --

8   honestly, if you have a meat and potatoes

9   question, if you want to kinda get to that,

10  maybe I can kinda cut through some of it.

11  Because the precursor stuff -- and you were

12  asking about paperwork, like I said, it

13  depends on the type of arrest.  Yeah, if

14  you book somebody into jail, even if it's a

15  misdemeanor, you have to do an affidavit of

16  probable cause, you have to do a rap sheet,

17  you would have to do multiple things to get

18  that process done based upon our record-

19  keeping, the recordkeeping for the entity

20  that's accepting the prisoner for the

21  district attorney, things of that nature.

22  If you have a meat and potatoes question, I

23  don't want to sit here and waste time, you

24  know, doing all the precursor stuff and

25  then you have a real question.  And,

1    believe me, if you want to go through all

2    those, then, absolutely, we can do that.

3    But I'm really trying to get to what it is

4    y'all are asking.

5         Q.   Right.  So that's what I'm trying

6    to do before getting to the meat and

7    potatoes stuff, if it's going to be

8    fruitless -- we're on the same page -- we

9    don't want to spend time going through it.

10        A.   If it dealt with what was

11   referenced a minute ago regarding any sort

12   of a template type for a PC, then, yes, by

13   no means was I a part of that.  And, you

14   know, if you have a question about that I

15   can try.  But I may not be the best person

16   to get into that with y'all.

17                  MR. LANSER:  Mr. Scott,

18             maybe this is a better way.  If

19             you're planning on providing

20             someone who can speak to the pre-

21             printed Affidavits of Probable

22             Cause, is it fair to say we can

23             also ask them about general

24             affidavits of probable cause

25             procedures?

1           MR. SCOTT:  Yes, I think so

2           (unintelligible) --

3           MR. LANSER:  That's fine.  I

4           understand it's a, you know, it's

5           an in process issue.  I guess I

6           just want to confirm, you know, I

7           don't want the Lieutenant to walk

8           out the door and then it turns

9           out he's the only one who can

10          speak on the broad affidavit of

11          probable cause questions and then

12          we have to bring him back. That's

13          the last thing we want to do.

14          MR. SCOTT:  No, I'm not

15          trying to shut the door on the

16          affidavit of probable cause

17          question.

18          MR. LANSER:  Okay.  So, if

19          someone else can speak to that,

20          maybe we'll wait and ask that

21          person about it.  So, having said

22          that, let me just look at my

23          notes.  I may -- we may be able

24          to move on from my questions.

25          Let me make sure I don't have

1          anything else for you, because I

2          think these questions would be

3          best targeted to that individual.

4          Just give me one minute here.

5          Okay, I believe that's everything

6          I have.  Thank you, Lieutenant.

7          And I'll pass it over to Mr.

8          Rodney.

9               MR. RODNEY:  Yes, good

10          afternoon.  Before I ask any

11          questions, let me get -- I'm a

12          little confused after listening

13          to this for a minute.  This

14          Witness is being presented to

15          respond to what 30(b)(6) topics?

16               MR. SCOTT:  Well, we were

17          talking about arrest procedures,

18          arrest processing, probable

19          cause, and, as we figured out, I

20          was having trouble understanding

21          what the 30(b)(6) topics

22          encompassed.  So I think that

23          he's addressed, at least in part,

24          arrest procedure, arrest

25          processing, probable cause.  I

1          think he's given some useful
2          information on the nature of
3          professional conduct for Baton
4          Rouge Police Department officers.
5          But I wasn't really expecting the
6          mass arrest question and I've got
7          to find somebody better for that.
8          And if the question is affidavits
9          of probable cause in general,
10         well, everybody in Uniform Patrol
11         uses affidavits of probable
12         cause, but to the extent that,
13         you know, Mr. Lanser is drilling
14         down on template or prefilled
15         APCs, Lieutenant Clarida doesn't
16         know that.  So I gotta find
17         somebody else.
18              MR. RODNEY:  And I'm not
19         trying to be cute about it, but
20         just -- this is where I'm
21         confused.  So you're saying that
22         this Officer can talk about
23         probable cause and affidavits,
24         but not about the type of
25         affidavits that were executed in

```
1            connection with the arrest of the
2            Alton Sterling protesters.  Is
3            that what you're saying?
4                 MR. SCOTT:  Pretty much.
5                 MR. RODNEY:  Okay.  If
6            that's what you're saying, then I
7            have no questions.
8                 MR. SCOTT:  Thanks, Roy.
9            I'll come up with somebody
10           different.
11                MR. RODNEY:  Okay.  I just
12           don't want to waste time.  And if
13           he doesn't know anything about
14           these kinds of affidavits, I'm
15           not going to ask him any
16           questions.  Well, maybe one.
17                MR. SCOTT:  Sure.
18  BY MR. RODNEY:
19       Q.   Just to maybe confirm that I'm
20  not going to ask you a whole bunch of
21  questions.  Great, let's do it.  Have you
22  ever served in Internal Affairs?
23       A.   Have I ever been assigned to the
24  Internal Affairs division, is that what
25  you're asking?
```

```
 1          Q.    Yes, that's a good way to do it,
 2     to state it, yes, perfect.
 3          A.    No, sir, I have not.
 4          Q.    Then I don't have any questions.
 5                    MR. CRAIG:  Greg, I'm going
 6                to assume you don't have
 7                questions, but I don't want to.
 8                    MR. FAHRENHOLT:  I do not
 9                have questions for this Witness,
10                thank you.
11                    MR. CRAIG:  Very good.  I
12                have no further follow-up
13                questions unless there are
14                follow-ups from any questions
15                Mr. Scott might ask.
16                    MR. SCOTT:  I think I'm
17                good.
18
19
20
21
22
23
24
25
```

```
 1    CORPORAL WALLACE BRITTON, BATON ROUGE
 2    POLICE DEPARTMENT, 9000 AIRLINE HIGHWAY,
 3    BATON ROUGE, LOUISIANA, 70815, after having
 4    been first duly sworn by the Certified
 5    Court Reporter, was examined and testified
 6    as follows:
 7              E X A M I N A T I O N
 8    BY MS. MOORE-O'NEAL:
 9         Q.   Good afternoon, sir.
10         A.   Hello.
11         Q.   I'm Mandisa Moore-O'Neal.  I'm
12    one of the Attorneys for the Plaintiff in
13    the Tennart, in the Smith, and in the
14    Batiste-Swilley cases.
15         To start with, are you aware that
16    you've been designated to testify as a
17    representative of the BRPD to speak on
18    certain topics?
19         A.   Yes.
20         Q.   That is known as a 30(b)(6)
21    Witness.  And have you ever been designated
22    this in the past?
23         A.   No.
24         Q.   Okay.  What is your understanding
25    of the duties as a representative of the
```

1    BRPD in this deposition?

2         A.    What is my understanding of my

3    duties?

4         Q.    Yes, in this deposition.

5         A.    That question, I would say I'll

6    talk about the facts that I know about and

7    my field of expertise.

8         Q.    Okay, thank you.  Are you able to

9    do just that?

10        A.    Yes.

11        Q.    What did you do to prepare for

12   this testimony?  I don't mean talking with

13   your Attorneys, but anything else that you

14   did to prepare.

15        A.    I reviewed some of our policies.

16   Beyond that, there -- and my normal scope

17   of duties -- there hasn't been any extra

18   preparation.

19        Q.    Which policies did you look over?

20        A.    Policies regarding use of force.

21        Q.    Anything else?

22        A.    No, ma'am.

23               MR. SCOTT:  More than one

24            policy regarding use of force?

25               THE WITNESS:  Well, there

```
 1              are several policies under the
 2              banner of use of force.  For
 3              example, like use of tasers, use
 4              of deadly force, or nonlethal
 5              force.  So I reviewed several
 6              policies under the banner of use
 7              of force.
 8                   MS. MOORE-O'NEAL:  Thanks
 9              for skipping ahead, Joe, but I'm
10              going to get to the specific
11              policies.
12                   MR. SCOTT:  Just trying to
13              get it clear.
14                   MS. MOORE-O'NEAL:  Thank
15              you.  Yes, so, as earlier, Mr.
16              Foley entered Exhibit #1, which
17              was just the Notice.  2a and 2m
18              deal with use of force, as well
19              as some of topic three.  So to
20              start with some terms.
21      BY MS. MOORE-O'NEAL:
22           Q.   You understand that, although
23      we're in 2021, I'll be asking you about
24      policies in effect in July of 2016, right?
25           A.   Yes.
```

1       Q.    How would you define use of force

2   for the purposes of training?

3       A.    Can you be more clear in that

4   question?

5       Q.    So my understanding is that there

6   is use of force, which is broad, and within

7   that there are specific types of force.  So

8   I'm asking how would you define it overall?

9       A.    The definition of use of force is

10  the policies, techniques, methods that are

11  taught to trainees and to veteran officers.

12  Those techniques and policies and methods

13  are taught to protect themselves, to

14  protect others, and also used to effect

15  arrests or to prevent flight or escape or

16  resisting.

17      Q.    Thank you.

18              MS. MOORE-O'NEAL:  I would

19          like to introduce -- and

20          Ms. Brooks, please tell me if

21          Exhibit #5 is the next one.

22              COURT REPORTER:  I'm not

23          keeping track of the numbers,

24          sorry.

25              MR. SCOTT:  We've been using

```
 1              a new sequence of numbers with
 2              each deponent.
 3                   MS. MOORE-O'NEAL:  No
 4              problem.  In that case,
 5              technically, Exhibit #1 was the
 6              Notice.  This would be Exhibit #2
 7              that I'm going to introduce, if
 8              you give me a moment to screen
 9              share.
10    BY MS. MOORE-O'NEAL:
11         Q.   Are you able to see the screen?
12         A.   Yes.
13         Q.   As you see here, I actually have
14    a compilation of General Order 135, then I
15    have 135.1, and last is 135.2.  Now these
16    three generally deal with less lethal
17    force, right?
18         A.   I'm sorry.  Can you repeat that?
19         Q.   Yes, sorry.  These three are
20    often what is called less lethal force,
21    right?
22         A.   Yes.
23         Q.   Thank you.
24                   MS. MOORE-O'NEAL:  I'm also
25              going to introduce Exhibit #3,
```

1           which is General Orders 131 and
2           132.
3    BY MS. MOORE-O'NEAL:
4      Q.   These deal with what is called
5    deadly force, right?
6      A.   Yes.
7      Q.   Now, are there any other policies
8    in the manual that instruct an officer on
9    the appropriate use of force?
10     A.   One does not come to mind other
11   than what I'm looking at here.  If there is
12   one, I can't really recall.  I don't know
13   the entire manual, because it's several
14   general orders.
15     Q.   So it doesn't sound like -- well,
16   no -- is there a general order on use of
17   force overall?
18     A.   Again, I don't remember the
19   manual.  I mean, if there is one, I guess
20   it would be out here with us.
21     Q.   Okay.  Now, I'm going to go back
22   to Exhibit #2 and start with 135.  Now, the
23   first question, are you familiar with this
24   policy, sir?
25     A.   Yes.

```
 1        Q.   Was this policy in effect in July
 2   of 2016?
 3        A.   Last revision of this policy was
 4   June of 2020.
 5                  MR. SCOTT:  Take this one.
 6                  It has a matching revision date
 7                  to theirs.
 8                  THE WITNESS:  Okay.  So I
 9                  have the one that you have on the
10                  screen.
11                  MS. MOORE-O'NEAL:  Okay.
12   BY MS. MOORE-O'NEAL:
13        Q.   So, for discussion, it says --
14   and I don't know if you can see my mouse --
15   under Policies, the fourth paragraph, it
16   says "The use of force should follow a
17   prescribed continuum, physical presence,
18   verbal direction, aerosol subject
19   restraint, soft empty hand control, hard
20   empty hand control, taser, intermediate
21   weapons, and, finally, the appropriate use
22   of deadly force."
23        A.   Yes.
24        Q.   "Officers will demonstrate
25   proficiency in all areas and a record of
```

144

```
 1    proficiency is maintained."  And then, in
 2    Discussions, it compares, it has two
 3    segments.  It says -- I'm sorry, it is
 4    resistant actions of the subject and the
 5    levels of control action of the employee.
 6         Then I'm looking at page two where it
 7    says Levels of Officer Control.  It says
 8    that the level of control used by the
 9    employee will be based upon the level of
10    subject resistance encountered and the
11    amount of force necessary to overcome that
12    resistance.  And then it lists types of
13    resistance under discussion above of
14    subject.  The first is psychological
15    intimidation.
16         A.   Yes.
17         Q.   So where the subject is only, is
18    resisting only via psychological
19    intimidation, what levels of force are
20    acceptable under the BRPD policy?
21         A.   That question depends on what the
22    subject is doing.  It could be, depending
23    upon the situation, it might be verbal
24    direction or it could require that the
25    officer physically move that person
```

145

1   depending upon the situation.  If it's, on

2   the encounter, if it's a consensual

3   encounter.  If it's a traffic stop or an

4   arrest, the officer may also elect to use a

5   taser or aerosol spray.  So that

6   psychological intimidation is, it's

7   basically a level, but it depends on what

8   that person is doing to psychologically

9   intimidate the officer.

10       Q.   Thank you for this information.

11  I'm not sure I was clear and I apologize.

12  I'm a little nervous.  I'm asking about

13  psychological intimidation, which, in the

14  definition, it says nonverbal, and I'm

15  hearing in your response verbal.  So --

16       A.   Well, if you look at the

17  definition where it says clenching fists,

18  assuming a fighting stance, increased

19  muscle tone indicating readiness to fight,

20  an officer looking at that type of body

21  language might feel -- might be in fear of

22  receiving a battery and maybe do something

23  to stop that battery before it starts,

24  which may included striking that person, it

25  might be just using a takedown, it might be

1    tasing that person.  I can't say it's going
2    to be this one, this one, or this one,
3    because there is no mechanical definition
4    of use of force.  There is no mechanical
5    definition of it.  So it depends on what
6    that person is doing and the whole totality
7    of the encounter.  The totality of those
8    circumstances, the officer may elect to use
9    a level of force that is available to him
10   or her, depending on their size, depending
11   upon their age, depending upon their level
12   of knowledge of defensive tactics.  Just
13   because they're taught defensive tactics
14   doesn't mean that they are good at it.  The
15   size of the person, the number of people,
16   and also other things that are available to
17   them, such as aerosol, baton, taser, all
18   those things have to be taken into account
19   when we look at just, okay, if he's sitting
20   there clenching his fists.  Well, what's
21   being said?  What's he being told to do?
22   Or is he, you know, foaming at the mouth?
23   There are so many variables to that one
24   situation that I can't say, well, this one,
25   well, verbal direction would be the way to

1  go, the officer should use verbal

2  direction.  Well, for this situation it

3  might be verbal direction, but for another

4  situation the officer might elect to use a

5  takedown.  So it all depends upon the

6  subject and what they're doing.

7      Q.   So this is fascinating.  So, like

8  at the end of page one, even though like

9  the first part is psychological, even

10  though it's defined as nonverbal, you're

11  saying that nonverbal could still have

12  verbal, like verbal components to it?  Or

13  that like nonverbal still has a threat that

14  would make using larger force necessary?

15      A.   Okay, let me give you an example

16  like this:  If I have a coat on and I'm

17  sitting here with my hand inside my jacket

18  and I'm being told by an officer "Let me

19  see your hands, let me see your hands, let

20  me see your hands" and I won't comply, I'm

21  not talking, but my body language shows

22  what, if you were looking at me and I had

23  my hand concealed inside a jacket, what

24  would you think I was doing?  So an officer

25  might go to lethal force and say "Let me

```
 1   see your hands right now."  Not saying that
 2   he would pull the trigger, but he could
 3   have his gun out to say "Let me see your
 4   hands," because this gesture or if I did
 5   this (indicating), I could be concealing a
 6   weapon.  So this might be what you would
 7   consider psychological intimidation because
 8   of my body language.  So I don't have to be
 9   saying anything, but my actions are
10   displaying that I might have something.  I
11   could be bluffing.  I could be holding a
12   wound, I could be holding a cellphone, or I
13   could be holding a gun.  An officer does
14   not know that.  So what an officer might do
15   is, okay, that's a potential for deadly
16   force that is immediate, so I'm going to go
17   to the level of deadly force until I know
18   it's not a deadly force encounter.
19        Q.   Thank you for that clarification.
20   So, to be clear, BRPD policy allows, say,
21   like the use of taser to respond to a
22   subject that is only exhibiting psycho-
23   logical intimidation?
24        A.   That's a very black and white
25   question and I'm saying that there is gray
```

1   area.  It depends on what is being done.

2   In some cases, yes, that might be allowed.

3   In other cases, no, that's not necessary.

4   If I'm just sitting here at a table with a

5   blank stare on my face, I'm just not

6   listening.  Well, maybe that person should

7   not be tased.  If I'm sitting here acting

8   like I have a weapon, maybe that person

9   needs to be tased because of what is going

10  on.  You can't look at just psychological

11  intimidation and assign a specific behavior

12  of an officer.  It depends on what's

13  happening at that time.

14       Q.   Okay.  When I say "allowed," I'm

15  not saying it mandates, but it has space

16  for it.

17       A.   Yes, the use of force is fluid.

18  It's not trapped in a box to where you're

19  only allowed to do this if this happens.

20       Q.   Earlier, I remember you talking

21  about a gray area, how it's not black and

22  white.  Is that like, mention of a gray

23  area, is it reflected somewhere in this

24  policy or perhaps in another?

25       A.   Not in those words, ma'am.  It's

1    the totality of the circumstances will lead

2    an officer to do what they need to do in

3    order to protect themselves, protect

4    others, effect an arrest, or prevent flight

5    or escape or resistance.  So, what I'm

6    saying is is that even, even the

7    constitution says there is no mechanical,

8    there is no mechanism for this.  It's what

9    is necessary at that time and what is

10   reasonable at that time as it pertains to

11   the totality of the circumstances.

12       So alot of things have to be taken

13   into consideration when you look at use of

14   force.  The officer on scene at that time

15   dealing with that person, what are they

16   perceiving, what are they hearing, what are

17   they being told, what are they feeling, and

18   they're making a decision based on that.

19       Q.   One question I have is you

20   mentioned -- well, first I'll ask this

21   question: How do you train officers to,

22   like, in this fluidity (unintelligible)--

23       A.   How do we train officers?  Okay,

24   so, we use alot of scenario-based training.

25   The scenario-based training that we use

1    moves the officer from a pre-scenario or
2    pre-event.  Like, for example, they're told
3    that they are dispatched to a particular
4    call.  Let's say it's a domestic dispute,
5    okay.  We give them kind of real life what
6    we might get from dispatch.  So we give
7    them limited information for them to go in
8    and start an investigation.  Every
9    scenario-based training that we do there is
10   a component where they attempt to
11   deescalate.  For example, again, with this
12   domestic dispute, you walk into a room and
13   you have a man and woman fighting, they're
14   throwing items at each other or might be
15   pushing each other.  One, they should know
16   that if they're dispatched to this they
17   should request backup, right.  So they go
18   in with another officer, or several
19   officers, and they should start to de-
20   escalate the situation by separating
21   parties.  Isolating one, isolating the
22   other one.  The backup officer plays the
23   role of backup officer.  The primary
24   officer plays the role of primary officer.
25   So, in that, if force needs to be used in

1    these types of scenarios, they should

2    recognize that and be able to respond and

3    should be able to control the situation and

4    use the necessary amount of force to stop

5    the situation or to put it under control

6    and then start deescalating again should it

7    get to that point.

8        Also, there is a post-event component

9    where they have to basically recap what

10   happened, what decisions are they making in

11   the investigation, such as are they going

12   to arrest, are they going to issue a

13   warning for whatever the situation might

14   be, and then they are given a chance to --

15   and then for some scenarios they're given a

16   chance to write a small synopsis or report

17   as if they were in the field.

18       So, to answer your question, how do

19   they work in that fluidity, we try to make

20   the situations as real as possible so they

21   can see how things can escalate and rise

22   and fall and rapidly change throughout the

23   scenario.

24       Q.   Thank you.  Earlier you mentioned

25   "totality of the circumstances."  What all

1    is included in the totality of the

2    circumstances?

3         A.    Everything.  As far as, say, for

4    example, are you familiar with the Graham

5    factors?

6              COURT REPORTER:  I'm sorry.

7         Are you familiar with the what,

8         Officer?

9              THE WITNESS:  Graham

10        factors.

11   BY MS. MOORE-O'NEAL:

12        Q.    No.  Please share what that is.

13        A.    Okay.  So the Supreme Court case

14   Graham versus Connor basically highlighted

15   that an officer can use force based on the

16   severity of the crime, the immediacy of a

17   threat -- what's the other one?  Is a

18   person resisting or is a person in flight.

19   There are several other factors such as,

20   again, going back to the size of the

21   officer, the size of the subject, the

22   number of officers and the number of

23   subjects, the age difference, the gender

24   difference.  Also, things that I may know

25   about the subject.  Say, for example, if

1    I've been dispatched to a certain address
2    where I know that the person who lives
3    there is an ex-golden glove boxer and he
4    loves to fight the police.  So, when I go
5    into the situation, I'll already know that
6    he's fought the police before and he's good
7    at fighting so I might want to bring other
8    officers with me to reduce the chances of
9    me having to go one on one with this
10   person.  So I may elect to use a taser
11   before I put hands on him because he knows
12   something more than I do.  My -- if I'm in
13   shape or if they're in shape.  If I'm hurt
14   during the fight, you know, I might have to
15   elect to go to a higher level of force.  If
16   there's more than one of them and I start
17   losing, I might have to go to a higher
18   level of force.  If there's more of us and
19   we can control it, that keeps the level of
20   force down.  So those are the other factors
21   that can -- I don't know if I kind of got
22   off on a tangent -- but those are the
23   factors that lead to an officer's decision.
24        The time of day makes a difference.
25   Is it light outside, is it dark outside, is

1    it hot, is it cold.  The weather, the

2    terrain, the gravel, are you on ice, are

3    you on water.

4        Say, for example, you might be

5    fighting a subject because he started

6    fighting with you and you go to use your

7    taser and you are -- and if that person was

8    doused with gasoline -- well, you don't

9    want to use your taser then because they'll

10   catch on fire.  So I might have to go use

11   my hands; I might have to hit the person

12   rather than tase the person.  If I can

13   articulate why I did that, then, you know.

14   So, those are the fluidity of the use of

15   force, the totality of circumstances,

16   everything that's occurring at that moment.

17       Q.   Thank you.  So where is the

18   totality of the circumstances named the

19   Graham factors expressed in the policy?

20       A.   As far as, I don't believe

21   they're expressed in -- because it's case

22   law -- I don't believe they're expressed in

23   the policy.  But they are taught in our

24   defensive tactics program.

25       Q.   So it's a part of the training?

1      A.   It's part of the training, it's
2  part of the class.  It's called Integrated
3  Use of Force.
4      Q.   You said "Integrated --" --
5      A.    Integrated Use of Force.  It's a
6  POST mandated class.
7      Q.   Would you agree that this policy,
8  this fluid policy around use of force,
9  gives the officer alot of discretion in
10 deciding how to respond to a subject?
11     A.   Can you rephrase that?
12     Q.   Yes.  Would you agree that this
13 fluid policy around use of force gives the
14 BRPD officer alot of discretion in choosing
15 how to respond?
16     A.   Again, that is, uh, again, that
17 question is saying does this policy give
18 the officer discretion.  I think it
19 gives the -- allows the officer to
20 investigate and do what they, uh, what is
21 necessary.
22     Q.   So it sounds like the part that
23 you see different is my use of "response?"
24 You would say it gives them, it gives them
25 a discretion to investigate?

1    A.   Well, what gives the officer the

2  discretion is the, is case law.  This

3  actually, you know, restrains an officer

4  from using excessive force.

5    Q.   I want to be sure I understand,

6  like that you don't agree then that this

7  fluid policy gives them alot of discretion

8  in deciding how to respond?

9    A.   I feel like you're kind of taking

10 my words and twisting them.  I think this

11 policy let's an officer know what their

12 limits are.  But within those limits, there

13 is discretion for the officer.

14   Q.   Thank you.  So are the BRPD

15 officers trained in U.S. Supreme Court case

16 law then?

17   A.   They are taught U.S. case law in

18 classes in our use of force and several

19 other classes that highlight case law that

20 has changed policing and investigation.

21   Q.   So, all of this was from me

22 asking, like starting with psychological

23 intimidation.  It says at the bottom of

24 page one that the next level is verbal

25 noncompliance.

1        A.    Uh-huh.

2        Q.    When a subject -- like thinking

3   of what you said earlier -- when a subject

4   is only, you know, resisting only through

5   this, what levels of force are permitted?

6        A.    So I'm looking at where it says

7   verbal response such as which indicates

8   unwillingness to comply with employee's

9   commands and of an arrest or direct verbal

10  threat or direct verbal threat to the

11  employee.

12       So, because there's two things,

13  because if the person is not listening to

14  my command when I let them know that

15  they're under arrest or they verbally tell

16  me, you know, "You touched me and I'll hit

17  you," okay.  So I have verbal non-

18  compliance, but I also have a threat.  So,

19  with verbal noncompliance, again, it

20  depends on what's being said and it depends

21  on what the subject is doing.  I can't say

22  that verbal noncompliance, well, that

23  requires soft empty hand control.  I can't

24  say that.  I can't say it requires hard

25  empty hand control, because I don't know

1    what that person is verbally not, I mean,

2    verbal non-compliance, I don't know what

3    they are doing just by this definition.  It

4    depends on what that subject is doing.

5         If the subject can -- say if I'm just

6    sitting here with my hands down here or

7    where they can be seen and I say "Come with

8    me, you're under arrest" and I say "You

9    touch me and I'll kill you," you haven't

10   had a chance to search me, you haven't had

11   a chance to see if I have a knife or gun or

12   anything on me.  So I can't say, well, I'm

13   going to use soft empty hand control.  That

14   might not require that.  It depends on what

15   that subject is saying and what they are

16   doing.

17        Q.   I heard you say, based on the

18   definition of verbal noncompliance, it's

19   unclear of what they're doing.  Would you,

20   would you alter this definition --

21        A.   Would I --

22        Q.   -- and make it more clear?

23        A.   No, the definition is clear.

24        Q.   Okay.

25        A.   But the thing is it depends on

1    what the person is doing in real life,

2    what's happening.  This is a --

3         Q.    Okay.

4         A.    -- this is a guide, if you will,

5    okay.  You know, if the subject is doing

6    this and you kind of want to be right here.

7    If the subject is doing this, then you want

8    to be right here.  Well, again, there is

9    not just the application of the definition,

10   there are alot of other things that are

11   playing -- that are going on that you might

12   not be able to see or might not be able to

13   be seen at that moment or just sitting here

14   talking about unless you're dealing with a

15   subject in that moment.

16        Q.    Thank you.  I have similar

17   questions in the other four.  Passive

18   resistance.

19        A.    Passive --

20        Q.    Yes.  Like, what, like, you know,

21   if the subject is only, as much as you can

22   tell --

23        A.    Right.

24        Q.    -- using passive resistance, what

25   levels of force are permitted under the

1    BRPD policy?
2         A.   I would not use the word that you
3    used and that's "permitted."  I would use
4    the word that I would say maybe "advised."
5         Q.   What is advised?
6         A.   So, if somebody was passively
7    resisting, so that is they're going limp,
8    they are, you know, they don't want to
9    move, they just, you know, they just lay
10   there, you gonna have to pick me up.  That
11   would probably fall under close to soft
12   empty hand control.  Maybe hard empty hand
13   control depending upon what that person is
14   doing.  So, passive resistance, I'm just,
15   I'm, you know, I'm not fighting you, okay.
16   I'm just, you know, I might be holding onto
17   a tree or something and just saying "I'm
18   not going, I'm not going, I'm not going."
19   So, as I'm trying to use hard empty hand
20   control to pry that person off the tree if
21   they are under arrest.  If they're under
22   arrest, I might be, you know, using some
23   kind of maneuver to bend their arms behind
24   their back.  That might call for a strike
25   to the forearm, something like that, to

1    make them open their arms.  So that's

2    what -- that's what it would -- I won't say

3    require -- but that would probably be more

4    advised.

5         Q.    How is the advice response

6    different for a defensive resistance?

7         A.    It, still, depending upon what is

8    happening, I'm looking at defensive

9    resistance, actions such as pulling,

10   pushing away from the employee.  So the

11   person is trying to run away or just trying

12   to fight the officer's arms away.  So, you

13   know, that might require them having a

14   taser.  That might require them being

15   brought down to the ground by using a

16   takedown.

17        So, I mean, I just had a case where a

18   gentleman was using, under this definition,

19   defensive resistance from an officer, the

20   officer was trying to arrest him and he

21   kept "What are you doing, what are you

22   doing, what are you doing" and pulling his

23   arms away.  The subject was actually

24   tearing his own shirt off.  So he couldn't

25   be handcuffed and I tased him.

1    Q.   So, if the most of the subject is

2    doing is passive -- I mean is defensive --

3    is it advised that an officer strike with

4    their hand or fist?

5    A.   Again, it depends on what is

6    happening at that time.  Defensive

7    resistance, it might require that.  But

8    that is kind of a hypothetical situation.

9    If they're only do this, should an officer

10   do that?  I can't speak to that, because I

11   don't know what that person is -- how

12   they're pushing away, what the crime they

13   committed, what they do, are they a threat

14   to somebody else.  If I don't hit them, if

15   I don't bring them to the ground, if I

16   don't tase them, are they, you know, are

17   they trying to run out into traffic and

18   hurt themselves.  There's alot of factors

19   that I can't say, hey, the officer should

20   do this.  If it's defensive resistance, you

21   should do this.  Again, there is no

22   mechanical applications to this.  It all

23   depends on the totality of the

24   circumstances.

25   Q.   Under this policy, if the subject

1   states that they cannot breathe, what is

2   the response of the officer?

3        A.   Okay, like, give me an example.

4        Q.   Like if an officer is responding

5   based on, say, defensive resistance.  And,

6   in the course of that response, the subject

7   starts, like exclaims "I can't breathe."

8        A.   Is that subject standing up or

9   are they lying in a prone position?  Is

10  someone on top of them?

11       Q.   Lying down and someone is on top

12  of them.

13       A.   Okay.  If that's the case, the

14  officer should immediately, after they've

15  been arrested and handcuffed, they should

16  immediately sit them to their butt and keep

17  them off their stomach, keep them off of

18  their chest.

19       Q.   So what is the training on this

20  policy?

21       A.   So, in our defensive tactics

22  system, we teach prone handcuffing and that

23  requires the officer to straddle the

24  subject.  After they are handcuffed, they

25  are immediately rolled to their, to their,

1   to their side to be searched and then, you

2   know, rolled to the other side to be

3   searched and then rolled to their backside

4   to be stood up.

5        Q.   Thank you.  And are you familiar

6   with First Amendment Activity?

7        A.   No, ma'am.

8        Q.   Okay.  It's many parts of that,

9   but I'm thinking in particular of the right

10  to gather peacefully, right to protest.

11       A.   Okay, yes.

12       Q.   I'm thinking of how does this

13  training apply in that context?

14       A.   I don't understand what you're

15  saying.

16       Q.   So, instead of First Amendment

17  Activity, I'll say crowd control.

18       A.   Okay.

19       Q.   Can you hear me?  I'm sorry.  I

20  was hearing an echo.

21       A.   I can hear you.

22       Q.   Okay.  So in the context of crowd

23  control.

24       A.   If an officer has to arrest

25  somebody?

1          Q.   Yes.  Like, I'm curious.  Like I

2     would imagine, as you said, there are all

3     these factors that would go into what

4     response.  And, so, I would imagine that

5     crowd control, you know, like, having to

6     arrest someone at a like protest is one of

7     the factors to consider, right?

8          A.   In an arrest?

9          Q.   Yes.

10         A.   If you're arresting somebody, the

11    factors really don't, as far as they really

12    don't change.  Tactically they don't change

13    because they're at a protest or they might

14    be at a park or I'm arresting somebody at

15    somebody's house.  Those -- the context

16    didn't change.

17         Q.   Okay.  And if someone --

18              MS. MOORE-O'NEAL:  Pardon

19         me?  Joe, do you need a break?

20              MR. SCOTT:  No, I was just

21         going to see if I could clarify

22         for you.  Would you consider the

23         facts that there's a protest

24         going on to be an environmental

25         factor that falls in the totality

1          of the circumstances?

2                    THE WITNESS:  Yes, there,

3          there is that.  There's probably

4          a potential officer safety

5          hazard, which may change the

6          dynamic.  But as far as prone

7          handcuffing, the, the mechanism

8          or the tactics are the same.  We

9          don't want them to stay, you

10         know, prone for too long.  We

11         want them to get off of their

12         stomach onto their backside so

13         they can be stood up.

14                    MS. MOORE-O'NEAL:  Thank

15         you.

16    BY MS. MOORE-O'NEAL:

17         Q.   Is there like certain training

18    for crowd control and use of force?

19         A.   Specifically, crowd control and

20    use of force, again, use of force, the use

21    of force doesn't change because of the

22    crowd.  It's an added factor that one might

23    choose to use one level of force or another

24    or -- but if I'm going to use a takedown in

25    a private setting in somebody's house and

```
 1    I'm at an event and there's several people
 2    and somebody starts to break the law and
 3    they resist, I use that same takedown.  The
 4    context doesn't change.
 5         Q.   Okay, thank you.  And if someone
 6    who's on foot moves away from a law
 7    enforcement officer who has asked that
 8    person to stop, what -- is that considered
 9    a form of resistance?
10         A.   Yes.
11         Q.   What level would that be?
12         A.   If -- I need more than that,
13    because if I tell -- if I'm arresting
14    somebody or I'm seizing somebody and I tell
15    them to stop and they continue on foot to
16    walk away or run away from me, that's
17    flight.  And that's, that's resisting an
18    officer.
19         Q.   Okay.  How about someone at a
20    protest?
21         A.   That doesn't, that doesn't
22    change.
23         Q.   Okay.
24         A.   If the person has broken the law,
25    has committed a violation, and the officer
```

1   has legal jurisdiction to be there and says

2   "You, sir, you, ma'am, stop" and they

3   continue to move away, whether walking or

4   running, they are resisting an officer.

5        Q.   To make sure I understand, like

6   the policy doesn't share like the type of

7   force that should be used to arrest a

8   protester?

9        A.   What do you mean?  Because when I

10  spoke about it before, I said that there's

11  no mechanism for one particular officer to

12  arrest anybody.  If that person, whether

13  they're a protester or just a -- they're

14  all citizens -- but, whatever they're

15  doing, if they break the law and they're

16  told to stop, just because they're at a

17  protest it doesn't change the, oh, I'm

18  going to use this technique because this

19  person is not at a protest and this person

20  is at a protest.  That doesn't change.  If

21  the person broke the law, then they are

22  able to use force to stop them and arrest

23  them and -- I was going somewhere with

24  that.  Okay, continue with your question.

25  I'm sorry.

1      Q.    That's all right.   I'm also

2   thinking of page three where it talks

3   about, at the top is part one, Reporting

4   Requirements.   When is an officer required

5   to submit a use of force report?

6      A.    They are required any time they

7   have to use force on somebody, which may

8   include controlling them, as it's

9   highlighted.   Or if punch is the case,

10   trying to take a person down I have to grab

11   the person, I have to, you know, put them

12   against the wall, put them on the floor, or

13   just repel somebody away from me, that's

14   when these are required.

15      Q.    And who reviews the report?

16      A.    IA, Internal Affairs, reviews the

17   report.   And then the reports, after they

18   go through IA, it comes to me for training

19   issues.

20      Q.    Okay.

21      A.    If I may clarify -- I'm sorry --

22   if I may clarify, IA looks at the report

23   for policy violation or anything out of

24   order in that way.   I look at it from a

25   training standpoint to see what they could

```
 1   have done better to handle the situation,
 2   if they did right, if they did something
 3   well, or if they did something not good.
 4   That's what my job is.
 5        Q.   So do all the reports that make
 6   it to IA make it to you or is it only
 7   certain ones?
 8        A.   I want to -- I -- I don't know.
 9   I know what IA gives me.  So I don't know
10   how many uses of force that go on daily.
11   That is between that officer and that
12   supervisor to complete that report and that
13   supervisor has to go through IA.  I'm the
14   last one to see it.  So I don't know that
15   somebody has used force until it comes to
16   my desk.  So I don't know if -- your
17   question was do all of them come to me?
18        Q.   Yes.
19        A.   I don't know.  I do know that I
20   have everything that they give me.
21        Q.   So it sounds like some stop at
22   IA?
23        A.   Ma'am, I can't, I can't speak to
24   that.  What I'm saying is that I have no
25   knowledge of how many uses of force occur.
```

1   So I can't say that, okay, 50 use of forces

2   occurred.  I don't -- what I'm saying is I

3   don't want to lie and say, yeah, all of

4   them that go to IA come to me.  And I don't

5   know if they're still sitting in IA for

6   whatever reason.  If 50 uses of force go

7   out in Baton Rouge today and those 50 uses

8   of force go to IA, I don't know how many

9   are being reviewed.  So they might hand me

10  three here, they might hand me a few here,

11  and then I review those.  So I can't say

12  that I know for a fact that every use of

13  force that happens makes it to my desk.

14      Q.   Thank you.

15      A.   I'm confident, I'm confident, I'm

16  confident that that happens.  But I cannot

17  state that I know that for a fact.

18      Q.   And when IA does give them to

19  you, is it like a systematic, like every

20  Friday or something like that, or is it

21  just as they come in?

22      A.   It's kind of random as they come

23  in.  I guess as they -- I don't know what

24  their caseload is.  I know they're very

25  busy.  So when they, when they see these,

1    these -- we call them use of force reports.
2    They're really called response to resistive
3    behavior.  That's what they're called.
4         Q.   Okay.
5         A.   So when those -- and they come to
6    me in a packet.  Sometimes it's this thick
7    (indicating).  And I sit down and I review
8    those.  There are no policy violations so
9    there's not a push for me to finish them.
10   I have some sitting on my desk right now.
11   I just look at them for training purposes
12   and that's -- and, also, I use those, those
13   reports to formulate my in-service training
14   for the next year.
15        So, for example, this year we're doing
16   weapon retention and the year before that
17   we did handcuffing.  I saw a trend of
18   several officers, when they go to handcuff
19   somebody, that's when the subject starts to
20   fight.  So I said, okay, well, because of
21   this, we're going to review handcuffing for
22   the entire year next year for in-service
23   training for veteran officers.
24        Q.   Thank you.  And, you know, just
25   to make sure, you're the only person who

1    receives them, like as far as training?

2    It's not like someone else who is also able

3    to look at them?

4         A.    No, it's me, it's me.

5         Q.    Only you?

6         A.    Yes, ma'am.

7         Q.    If you could -- sorry -- if you

8    could share some examples -- I'm not

9    looking for names or any identifying

10   information, of course -- of some of the

11   use of force reports that you thought

12   indicated the officer needed more training?

13        A.    Honestly, out of all the use of

14   force reports that I get that I looked at

15   last year or this year, there has been I

16   think maybe two where an officer attempted

17   a technique and it didn't work and I'll

18   contact them and look at their body camera

19   footage and see what went wrong and

20   sometimes it might be like, "Hey, when

21   you're dealing with a subject that big,

22   that technique won't work.  You might want

23   to, you know, instead of having them

24   stand-up to handcuff them, you know, make

25   them kneel and -- " -- you know.  So I

 1    think there might have been two incidents
 2    where an officer -- I wouldn't say needed
 3    more training -- but just, you know, "Hey,
 4    next time, you know, try, try this
 5    technique or try this situation."
 6         Q.   And, so, like in those two
 7    situations, was it a one on one, like you
 8    scheduled time with them?  How did that
 9    process of you meeting with them go?
10         A.   Nothing was egregious so it was a
11    phone call.
12         Q.   So it's over the phone.
13         A.   Right.
14         Q.   Thank you.  And you also
15    mentioned, you know, two out of about how
16    many?
17         A.   I think last year we had 200 some
18    response to resistive behavior reports on
19    my desk.
20         Q.   And, so, what happens with the
21    ones like that didn't warrant a phone call?
22         A.   They, if they did right, you
23    know, then they, they -- there was nothing
24    I need to tell them.  I was talking about
25    maybe two cases where I read the report and

1    I just said that seems odd that, you know,

2    this person was under control and they

3    escaped.  So I'll read the -- I'll look at

4    the body camera footage and see what was

5    done or what was said or what happened.

6    And, then, if I needed to, I'd call the

7    officer and say, "Hey, tell me what

8    happened.  What was going on?  How did this

9    happen?"  And they would explain it to me.

10        Q.    Thank you.  I didn't ask this

11   earlier, is this position that you're in

12   now, is it the same position that you were

13   in in July of 2016?

14        A.    No, ma'am.

15        Q.    What was the position that you

16   were in in July of 2016?

17        A.    I was in Uniform Patrol Second

18   Division.

19        Q.    Okay.  Is there someone in

20   July 2016 who has the job that you have

21   now?

22        A.    Yes.

23        Q.    What's that person's name?

24        A.    His name is John O'Donoghue.

25        Q.    I'm sorry, John O'Donoghee or

1    O'Donoghue?

2         A.    O'Donoghue.

3         Q.    Do you know if the reporting

4    requirements were at all changed for the

5    July 2016 protests?

6         A.    I can't speak to that.  I'm

7    not -- I'm not -- I don't know that.  I

8    wasn't -- I wasn't appointed to my position

9    until 2018.

10        Q.    Thank you.  Now I'm going to move

11   to 135.1 Taser.  Do you have it in front of

12   you or can you see?

13        A.    Yes.

14        Q.    Okay.  Are you familiar with this

15   policy?

16        A.    Yes.

17        Q.    And it was also -- nevermind, you

18   answered.  What is the general training on

19   this policy?

20        A.    What do you mean by "general

21   training?"

22        Q.    How do you talk to officers about

23   use of taser?

24        A.    Specifically, what are you asking

25   me?  Because, I mean, it's not like we say,

1    okay, we're going to talk about tasers

2    today.  I mean, what is it that you --

3         Q.   So, as we talked about the

4    earlier policy, I heard you mention like it

5    was some parts, some of it was a little bit

6    more hands-on, you know, like maybe folks

7    that were actually going through real life

8    situations, you know.  Also, I heard you

9    talk about like if some part is a little

10   bit more text heavy, you know, reading or

11   discussion.  I'm just curious like how is

12   taser talked about?  Or is it a mixture of

13   different ways?

14        A.   It's -- our taser class is taught

15   just like our use of force class is taught.

16   There is classroom, which talks about the

17   functionality of the taser, how it was

18   invented, and what it's actually supposed

19   to do, the department policy behind the

20   taser.  And then there's a practical

21   application to using the taser, whether

22   they have to fire two cartridges at a

23   target or two body parts to that target.

24   So they have to be able to be proficient

25   with deploying those cartridges and

1    reloading those cartridges.

2         It also goes hand in hand with our

3    lethal force policy -- well, I don't want

4    to say "policy" -- but lethal force

5    training.  So within our dynamic training

6    there is, you know, the person might deem

7    it necessary, okay, this person is

8    resisting, I'm going to tase them and they

9    go to tase them.  In that same scenario or

10   a given scenario, they might, you know,

11   draw their taser and then they're presented

12   with a deadly force encounter.  Well, what

13   do you do with the taser?  You have to do

14   something with it.  So we address that.

15   How do you transition from taser to deadly

16   force.  How to transition from deadly force

17   to taser.  So there's alot of discussion

18   about the taser.

19        I mean, specifically, is there

20   anything specifically you want to know

21   about the teaching of taser?

22        Q.   Yes.  Are there specific written

23   training materials -- sorry, I'll ask that

24   again.  I hiccupped as soon as I asked it.

25   Are there specific written training

1   materials on the use of taser?

2        A.   I am a use of force instructor

3   and -- or I'm saying use of force

4   instructor -- defensive tactics instructor

5   and an Academy instructor.  I am not a

6   certified taser instructor.

7        If you're asking is there like a step

8   by step if somebody does this, you need to

9   deploy your taser, then, no, that does not

10  exist, because a taser is a compliance tool

11  and it is a use of force tool.  So, given,

12  again, the totality of the circumstances,

13  the officer might elect to use a taser or

14  not use a taser.  The policy states, for

15  example, when they cannot use a taser.

16  That is, for example, somebody is near

17  water.  You don't want to taser them.  They

18  might fall in the water.  You don't want to

19  tase them if they're elevated.  They might

20  fall and hurt themselves.  You don't want

21  to tase them if there's flammable liquids,

22  if there is other electricity.  If you know

23  that they are pregnant, you don't want to

24  tase them.  Children, you know, you don't

25  tase.  Elderly you don't tase.

1          There's also literature or written

2     like -- I'll use the word written training,

3     I guess, about where to aim the taser.  You

4     don't want to go what is called heart to

5     heart.  You know, you don't want the probes

6     to go into the center of the chest.  So we

7     teach to aim on -- we call it the hip

8     chest, which is in the abdomen and the leg

9     if they're facing you.  If they're facing

10    away from you, you want to hit the back,

11    because that's where the -- you get a

12    spread with the taser.  Or, again, what you

13    call a hip chest, where you get half in the

14    torso and half in the leg.  So you kind of

15    split the hemisphere.

16         So they are trained on that and there

17    is teaching, written material on that.  But

18    not as in, again, if a person does this

19    when they resist, then you can tase them.

20         Q.   And you mentioned that there are

21    certified taser instructors?

22         A.   Yes.

23         Q.   Who are they currently?

24         A.   Sergeant Stewart Tate, T-a-t-e.

25    It would also be Corporal Stephen Hardy.

```
 1        Q.    Stephen with a "p-h" or "v"?

 2        A.    I think it's "p-h."

 3        Q.    Okay.

 4        A.    Corporal Mitchell Faust.  I want

 5   to say Corporal Josh Gillich, Gillich.

 6              COURT REPORTER:  Can you

 7        spell that?

 8              THE WITNESS:  Now, the two

 9        master taser instructors are

10        Sergeant Tate and Corporal Hardy.

11   BY MS. MOORE-O'NEAL:

12        Q.    Okay.

13        A.    Those are the ones that actually

14   certify police officers as taser operators,

15   taser users.

16        Q.    Thank you.  And were any of them

17   in that role in July of 2016?

18        A.    Sergeant Stewart Tate.

19        Q.    Okay, thank you.  I'm now turning

20   to on that same page Section 2A where it

21   talks about a decision to use the taser.

22   Is it within the policy to deploy a taser

23   on a protester who is, at most, using the

24   passive resistance against an officer?

25        A.    Ma'am, it depends on what is
```

1    happening at that time, what the person is

2    doing.  If they were told to -- you know,

3    where were they?  Are they in the middle of

4    the street, are they on the side of the

5    road?  So I cannot say that there's a

6    policy allows an officer to do that.

7         When you say "protester," I'm, I'm --

8    what I'm hearing you say is somebody who

9    was protesting but has also broken the law.

10   So are they under arrest?

11        Q.   No, I was just saying protester.

12   But --

13        A.   Then that question would mean can

14   an officer tase a regular citizen and that

15   would be no, if they didn't do anything to

16   break the law.  So whether they're a

17   protester or whether they're just walking

18   out, you know, walking down the sidewalk,

19   an officer, you know, reasonably would not

20   walk up and just tase a person like that.

21   So, but somebody whose broken the law and

22   they are now seized so they're now under

23   arrest and they are resisting, that officer

24   may have cause to tase that person.

25        Q.   So, just to clarify, is it your

1    understanding that a protester is someone

2    who is breaking the law?

3         A.   No, ma'am, that's not what I

4    said.  That is not what I said.  A person

5    has a right to protest, right.  But the

6    First Amendment doesn't give us a right to

7    break the law during a protest.  So, if

8    they have violated some law during that

9    protest.  I am not saying that you can go

10   out and taser protesters and protesters are

11   breaking the law.  If a protester has

12   broken the law -- for example, I made an

13   arrest July 2016.  Somebody broke the law.

14   They were carrying a firearm through the

15   park.  That is a statute.  You cannot carry

16   a firearm through a public park.  I

17   arrested that person.  That person also had

18   marijuana on him.  So they had possession

19   of a firearm with controlled and dangerous

20   substance.  So I am not -- I didn't arrest

21   him because he was protesting.  I arrested

22   him because he violated the law, carrying a

23   firearm, shotgun, through the park, and

24   then he had drugs on him.  If that person

25   would have resisted me I would have used

1    some level of force because of his

2    violation.  But -- I'm sorry -- not because

3    of his violation, because of his resistance

4    after I was arresting him because of his

5    violation.  So please understand --

6         Q.    Thank you for clarifying.

7         A.    -- I am not saying that

8    protesters are breaking the law.  I did not

9    say that.  That is not my statement.

10        Q.    No, I appreciate that.  And in

11   Section 2D, it talks about a warning.  Why

12   is this warning important?

13        A.    Okay, so, I'm looking at

14   "Whenever possible, a warning shall be

15   given to the offender prior to deployment

16   of the taser unless such warning would

17   increase risk of rate of injury to the

18   officer" -- I'm sorry -- "to offender,

19   officer, or others, announcement will be

20   shouted saying "taser, taser, taser" or

21   "taser, taser" or just notifying other

22   officers that a taser appliance will

23   occur."

24        So, how the taser works is, when you

25   deploy it, there is an electrical current

1   that goes into the cartridge.  The

2   cartridge then -- the doors below open and

3   there's a loud pop, okay.  The pop sounds

4   like a muffled gunshot, but it does sound

5   like a little gunshot.  And what we want to

6   do is we want to prevent sympathetic

7   reflexes from other officers who may have

8   lethal cover and when they hear a pop they

9   shoot.  Also, if an officer is, for

10  example, there's another officer there

11  assisting in trying to take the person

12  down.  They are resisting, they're not

13  going down to the ground.  So, that person,

14  you would give a taser warning -- "taser,

15  taser, taser" -- and that let's the officer

16  know move out the way because the officer

17  doesn't want to get hit with the probes.

18      So it's twofold:  One, you want to

19  give warnings to other officers because

20  there are times when, if an officer has non

21  lethal coverage, such as a taser, if the

22  supporting officer or backup officer may

23  have lethal coverage, which means they may

24  have their gun out, and to prevent

25  sympathetic firing, they will shout "taser

1    taser, taser" so the next sound they hear

2    is going to be a taser pop, not a gunshot.

3    So it prevents sympathetic reflex.  And

4    then the other part is to make sure the

5    officers are out of the way so they don't

6    get exposed to the taser.

7         Q.   So, really, the warning is for

8    the officers?

9         A.   The warning is for the officer

10   and the offender.

11        Q.   Now I'm turning to page two.  At

12   the top of page two, section F, part two,

13   F2, where it says it will never be used

14   punitively or for purposes of coercion.

15        A.   Yes, ma'am.

16        Q.   See, I know what "punitive" means

17   and "coercion" means, but I don't actually

18   know like in the context of training.  If

19   you could speak what does it mean in that

20   context?

21        A.   Well, punitive means punishing,

22   right.  So you're not going to use a taser

23   to punish somebody.  So I'm not going to

24   tase somebody because I'm taking the law

25   into my own hands and, you know, or I'm

```
 1    trying to get a confession out of him and I
 2    use the probe and I, you know, and keep
 3    applying or exposing them to the taser.  So
 4    it's kind of point-blank.  I won't, you
 5    know, the taser is not used to interrogate
 6    people and is not used to, you know -- let
 7    me give you another example:  Let's say we
 8    witnessed somebody do a horrible crime.  We
 9    see it happen.  And instead of taser them,
10    they would take them under, into custody
11    and, bringing them to jail, we sit there
12    and hold the taser down and just shock them
13    for a minute and a half.  That's punitive
14    punishment and that would be unconsti-
15    tutional.
16         Q.   What is required regarding
17    removal of the taser probes?
18         A.   What is required?
19         Q.   Yes.
20         A.   Like physical requirement?  Like,
21    you know, what does an officer have on
22    their person or --
23         Q.   Yes.  Then I have a follow-up
24    question.
25         A.   So, if we have a taser
```

1    deployment, we notify our supervisor and we

2    notify headquarters to send EMS, okay.  The

3    reason for that is there may have been an

4    injury that we did not know about, okay.

5    So, if an officer were going to remove the

6    probes, because the officer can remove the

7    probes himself unless they're in a

8    sensitive area.  Then you'll need EMS or a

9    doctor to remove them.

10         Say, for example, I witnessed a young

11   man, he was running, the officer went to

12   tase him and the young man tripped as the

13   tasers were being deployed and the probe

14   went through his earlobe.  So that requires

15   EMS to come out and actually fix that.  But

16   an officer can remove the probes

17   themselves.

18         As a matter of fact, when we do taser

19   exposures for our trainees, they are taught

20   and they have to remove the probes from

21   their own classmates.  So they'll put on

22   gloves, they would have alcohol, they'll

23   clean the area as best they can, remove the

24   probes and dispose of them as they've been

25   taught.  In the field, they will be secured

```
 1    inside the cartridge and put inside a
 2    evidence bag and submitted to evidence.
 3         Q.   Thank you.  I do want to move on
 4    to 135.2.  I have one more question on
 5    taser.  You know, like earlier I mentioned
 6    a protester.  I want to give a little bit
 7    more information and just get your insight.
 8    What about a protester who is crossing the
 9    street and has the right-of-way; so has the
10    green light and is moving away from the
11    area the police told them to move from.
12              MR. SCOTT:  Mandisa, do you
13              want to show that video clip that
14              we watched so many times
15              yesterday?
16              MS. MOORE-O'NEAL:  No.
17              MR. SCOTT:  Because I'm
18              having trouble with your context.
19              I don't know if you're talking
20              about East and France.  I don't
21              know if you're talking about
22              Winterhill or what.
23              MS. MOORE-O'NEAL:  Okay.
24              I'm just asking like crossing the
25              street, has the right-of-way, and
```

1        is leaving per the instructions
2        of the officer.  As far as like
3        as for more context, sir, I'm
4        asking the Witness.
5            MR. SCOTT:  I'm going to
6        object to the form.  If you can
7        answer, you can answer.
8            MS. MOORE-O'NEAL:  It's a
9        hypothet.
10           THE WITNESS:  There's,
11       there's -- I need more of what
12       happened.  That's, that's, uh,
13       you know, that question, a person
14       has the right-of-way and they're
15       crossing the street and they're
16       leaving the area, but I don't
17       know what the orders of that
18       particular protest, what was
19       happening.  Was the protest
20       becoming hostile where they were
21       being told to stay on this side,
22       do not come into the street?  I
23       don't know what was said to the
24       protesters, or whatever.  You
25       know, crossing the street and,

1          you know, they have the
2          right-of-way, were there bricks
3          being thrown at officers?  What
4          was going on at the time when
5          this happened?  And, you know, or
6          should they have been tased.
7          Well, that's -- I can't answer
8          that question because there is
9          not enough to that context or to
10         that situation that I know or
11         that I don't know.
12   BY MS. MOORE-O'NEAL:
13       Q.   I know I said this was the last
14   question on taser, but I have some more.
15   One is like, use of taser, it requires
16   writing a use of force report, right?
17       A.   Yes.
18       Q.   And would you be the person who
19   reviews this or would it go to the
20   certified taser instructor?
21       A.   No, I review it, because it is a
22   use of force.
23       Q.   Okay.  Is there a way that the
24   certified taser instructor would also be
25   involved in the review?  Like would you

1  call the instructor?

2        A.   If I deemed it necessary to do

3  so.  Or if IA, the IA investigator, went

4  directly to the taser instructor to say,

5  "Hey, look, can you, can you look at this

6  and see what -- tell me what your thoughts

7  are or do you see any violations" or

8  anything like that.

9        But all use of force reports, or as

10 they're called now response to resistive

11 behavior reports, come to me for training

12 purposes.  Master taser instructors can

13 certify me as an instructor and also

14 certify other officers.

15       Q.   So --

16       A.   It is still a use of force, which

17 is --

18       Q.   Your, your area?

19       A.   -- my area as well.

20       Q.   So --

21       A.   If you will, ma'am, they're kind

22 of one and the same.  I don't want to say

23 one and the same.  They're in the same

24 family, okay.  So, if it's a use of force,

25 I will review it, okay.

194

```
 1          As far as being a master taser
 2    instructor, they can teach me to be a taser
 3    instructor.  That's their job.  So they
 4    don't have to actually look at the report
 5    because they have the title master
 6    instructor.  That doesn't give them any
 7    more authority than I would have.
 8          Q.   So it sounds like their role is
 9    really like on the front end, but there
10    isn't really a place in which they would do
11    any sort of review.  That's strictly you?
12          A.   I'm not saying that they would
13    never.  I mean, there may be a time where,
14    depending upon the situation, that they
15    might be called upon to review a case for
16    whatever reason.
17          Q.   Okay.  So the taser reports are
18    included like in that 200 -- or the report
19    that you reviewed?
20          A.   Yes.
21          Q.   Thank you.  Now I would like to
22    move to the third part, 135.2.  You are
23    familiar with this policy?
24          A.   Yes, ma'am.
25          Q.   Do you know if BRPD has specific
```

1   written training materials as far as less

2   lethal impact?

3           A.   That, that, uh, that would be --

4   you would have to go through the Firearms

5   Training unit, because they deal with the

6   bean bag, bean bag rounds, bean bag

7   shotgun.  And there's another one in here.

8   It's mainly talking about bean bag rounds.

9   That is -- that comes from Firearms

10  Training.

11          Q.   And who is the person, like who

12  is somebody there who like is the point

13  person for the Firearms Training unit?

14          A.   As of right now, Sergeant Stewart

15  Tate is the range master.  He was newly

16  appointed about a month ago.

17          Q.   Okay.

18          A.   Also, yes, you can contact also

19  Josh Ellis.  He's been there for a few

20  years now and he can do that.

21          Q.   You said Sergeant Tate is the

22  ranger at arms, is that what you said?

23          A.   I said -- the term I used is

24  range master (unintelligible) --

25          Q.   Range master, thank you.  And who

1  would have been the range master in July of
2  2016?  Because you said he was newly
3  appointed.
4        A.   In 2016, I don't remember.  There
5  have been a few.  The last one before
6  Sergeant Tate was Sergeant Harry, but
7  Harry, Sergeant Harry wasn't a range master
8  at that time in 2016.  I can't remember
9  who.  I want to say -- I'm thinking --
10                MR. SCOTT:  Sergeant Knight.
11            He might be (unintelligible --
12                THE WITNESS:  Sergeant
13            Knight (unintelligible) --
14                COURT REPORTER:  I'm sorry,
15            Mr. Scott, is that you speaking?
16                MR. SCOTT:  I'm sorry, Ms.
17            Brooks.  I believe it was
18            Sergeant Robert Knight.  I might
19            be wrong, because they moved
20            around a couple of times.
21                I'll just point out that no
22            less lethal impact projectiles
23            were used during the 2016
24            protests.
25                MS. MOORE-O'NEAL:  Well, I'm

```
 1              actually moving to a new exhibit.
 2              So good timing.
 3    BY MS. MOORE-O'NEAL:
 4         Q.    Earlier I showed Exhibit #3 and I
 5    want to pull that up, screen share again.
 6    This is General Order 131.  And are you
 7    familiar with this policy?
 8         A.    Yes, ma'am.
 9         Q.    Is there specific written
10    training materials on this policy?
11         A.    When you say "specific written
12    training material," like a manual?
13         Q.    Yes, like a workbook or anything
14    like that.
15         A.    In our defensive tactic system we
16    have two manuals, Vanguard level one and
17    Vanguard level two.  It does talk about
18    deadly force, not how to use deadly force,
19    but the level of deadly force in -- I don't
20    want to use the word authorization to use
21    it -- but if you're faced with deadly
22    force -- say, for example, somebody
23    produces a knife, a gun, and you're
24    authorized to use deadly force.  Alot of
25    the deadly force training or deadly force
```

198

1    policy is also reviewed heavily through the
2    firearms training, because that is -- our
3    deadly force weapon is firearms.  Yes, it's
4    mentioned in the beginning.  Again, there's
5    no like written how to use -- how to shoot
6    a gun or how to use deadly force.  It
7    basically highlights, just like the policy
8    did, like what levels of force there are
9    and what levels of control there are.  So
10   and it mentions the use of deadly force to
11   defend yourself or defend somebody else or,
12   you know, when you have reason to believe
13   that your life is in danger or if they
14   receive grave bodily harm or death.  But
15   there is no, not a manual, like here's your
16   manual on how to use deadly force, it's not
17   like that.
18        Q.   That was my next question.
19   Earlier I was hearing you say like the
20   training isn't on how to use the force,
21   it's just a like, like you said, like the
22   situation.  Where is like, where is the
23   training or what is the training on how to
24   use the force?
25        A.   What do you mean by how to use

1     the force?  How to use deadly force?

2         Q.   Yes.  Like because I was hearing

3     you make a distinction between what the

4     written materials talk about and what it

5     doesn't talk about.  So I understand that

6     the written materials I asked about don't

7     talk about how to use the force, but now

8     I'm curious how do officers learn how to

9     use deadly force?

10        A.   Okay, so, deadly force, when you

11    go to -- when you go to the Firearms unit,

12    you learn how to shoot your weapon.

13        Q.   All right.

14        A.   When you look at the use of

15    deadly force, if you're faced with a deadly

16    force encounter, okay, anything is, is, can

17    be used for deadly force.  For example, if

18    somebody is about to stab me with a knife

19    and I pickup a baseball bat and I smack

20    them upside the head, that is a deadly

21    force encounter and I use that bat,

22    hitting, striking them in the head, that

23    can be considered deadly force.  So the

24    actual tool that you use for deadly force

25    is irrelevant, because the deadly force

200

```
 1   encounter, then you can use deadly force.
 2        Q.   Is there a timeline in the
 3   training?  So, is the, what deadly force
 4   is, you know, like if it's appropriate, is
 5   that first, and then maybe the firearms
 6   training or does it vary?
 7        A.   I don't understand that question.
 8        Q.   So I would imagine in the
 9   training there are some things that must
10   happen first, because an understanding of
11   this is necessary to understand, say, part
12   two or three.  So I'm asking, in the
13   training, is the firearms class something
14   that would come first or is, you know, is
15   the firearms training something that would
16   come first?
17        A.   Just like police work, deadly
18   force is potential in any situation that
19   you involve yourself, okay.  When you get
20   dispatched to a call, the call might be a
21   simple disturbance and you get there and
22   you look for, you know, to handle the
23   situation, but you're also on the lookout
24   for threats.  If a threat presents itself,
25   you have to be aware.  So, if it is deadly
```

1   force, you can respond.  So, in any aspect
2   of our training, in every aspect of our
3   training, there is deescalation and there's
4   also the possibility of deadly force.
5        For example, we do traffic stop
6   training.  How to position yourself, how to
7   position your unit, how to talk to people,
8   where you should stand, how to prevent them
9   from rushing you, cues to look for so you
10  can manage, you know, a traffic stop, you
11  can manage your scene, with the
12  understanding that at any time this person
13  may get hostile which requires me to use
14  some form of deescalation to try to calm
15  the situation down.
16       In another situation, it might go just
17  like what many people call it a typical
18  traffic stop and you issue a ticket and
19  that's it.
20       Another one, they present you with a
21  situation where deadly force is needed.  So
22  a person gets out of the car with a gun and
23  they point it at you, you know.
24       So all these possibilities are taught
25  throughout every aspect of our training.

1   So there's not like, okay, you teach them
2   how to use deadly force first and then you
3   teach everything else.  That's not true.
4   We teach every aspect from the very simple
5   of matters to the world is falling, the
6   world is burning and the sky is falling and
7   everything inbetween.  If you, you know --
8   if I'm using, you know, colloquialisms, or
9   whatever -- it's the whole spectrum of the
10  situation can be very easy or it can be
11  very, very, very difficult.  So we teach
12  them how to control at every aspect.  And
13  part of that control might be the use of
14  deadly force in this particular portion of
15  that training.
16       Q.   Thank you.  Now I'm going to move
17  to General Order 132, 132, Firearms, if
18  that helps.
19              MS. MOORE-O'NEAL:  Yes, Joe?
20              MR. SCOTT:  Do you have an
21         idea of how long we're going to
22         be with Officer Britton for
23         scheduling my other officer?
24              MS. MOORE-O'NEAL:  I would
25         say like I have about -- I mean,

```
 1              I can't speak for Mr. Lanser and
 2              Mr. Rodney, of course.  After I
 3              finish my scheduled questions I'm
 4              going to consult with my team.
 5              But based on what I have, I have
 6              about maybe 15 minutes worth of
 7              questions.  But, again, like
 8              Mr. Lanser and Mr. Rodney.
 9                   MR. SCOTT:  Understood,
10              thank you.
11    BY MS. MOORE-O'NEAL:
12         Q.   Are you familiar with this
13    policy?
14         A.   Yes.
15         Q.   I understand that like you don't
16    necessarily do the firearms training.
17         A.   Right.
18         Q.   But you could -- like you do
19    teach, train on use of force --
20         A.   Yes.
21         Q.   -- which is why I'm asking, but I
22    understand if it's a question.  Does BRPD
23    have specific written training materials on
24    the use of firearms?
25         A.   That would be through the
```

1  Firearms Training unit.

2      Q.   Maybe I asked this already:  Who

3  is in charge of that unit?

4      A.   Right now, Sergeant Stewart Tate.

5      Q.   That's right, okay.  I'm looking

6  at, well, I'm going to scroll to part five,

7  which is in the middle of page three,

8  Carrying and Storage of Weapons.  And I'm

9  going to turn to part five, section D:

10  Employees will not display their weapons

11  unnecessarily or inappropriately or handle

12  them in a careless or imprudent manner.  Is

13  there any application to crowd control?

14      A.   Meaning?  Meaning what?

15      Q.   Meaning like, in the training,

16  are there examples of not displaying it

17  unnecessarily or inappropriately in the

18  context of crowd control?

19      A.   What do you mean by displaying it

20  unnecessarily?

21      Q.   That's what it says here.

22      A.   Right.  It says -- are you -- I

23  mean, are you saying pointing it at

24  somebody?  Are you saying if --

25      Q.   Yes.  As an example, yes,

1  pointing it at somebody.

2       A.    Again, ma'am, that goes back to

3  the totality of the circumstances.  If the

4  officer saw a reason to point their gun at

5  somebody, if they saw a reasonable threat

6  of, uh, to their lives or to the lives of

7  somebody else and they use deadly force,

8  regardless of if it's a crowd or regardless

9  of where it's at, then the officer has the

10 authority to do so.

11      Q.    Well, if they have the authority,

12 then it's not unnecessarily.  Right?

13      A.    Right.  So that question then

14 doesn't make sense.

15      Q.    Okay.  I'll ask it again.  I'll

16 ask a different one.  Are there any

17 instances as to how this section would

18 apply in terms of crowd control?

19      A.    I need you to give me an example,

20 because in unnecessarily or inappropriate-

21 ly, that would mean that an officer did

22 something that was unnecessary or

23 inappropriate.  So is their training on

24 that?  That's, you know, I don't understand

25 the question and --

1      Q.   I'll ask another one.  Is
2  pointing a firearm to intimidate a civilian
3  an appropriate use of a weapon?
4      A.   To intimidate?
5      Q.   Yes.
6      A.   That would be inappropriate for
7  anybody.
8      Q.   So it would be inappropriate for
9  an officer as well?
10      A.   It would be inappropriate if they
11  did it for no reason.  I mean, when you say
12  intimidate, what was said?  What did they
13  do to intimidate -- you know, a firearm is
14  already intimidating.  So if I pointed my
15  firearm at somebody and, for whatever
16  reason, you know, I'm not -- my intention
17  is not to intimidate them.  I see a threat
18  and I'm telling them to comply with my
19  verbal direction because of they're doing
20  something that I perceive as to be a threat
21  to my life.  So I'm just not going to point
22  my weapon and try to scare somebody.  No
23  officer was trained to do that.  So, for it
24  to be inappropriate or intimidating, for
25  the purpose of intimidation, no, but if the

1    officer sees something or perceives a

2    threat.  So I would need to know more about

3    what you're speaking of.

4        Q.   Okay.  At this time I'm done with

5    this Exhibit and I would like to, actually,

6    I just have a few general questions so I'm

7    going to stop screen sharing.

8        Back to the conversation of reports.

9    Do you make any reports of how many uses of

10   force reports you've received?  How is that

11   information kept?

12       A.   Do I monitor how many use of

13   force reports come in?  I have recently

14   just started -- we were -- Sergeant Tate,

15   when he was in the Academy, he was just,

16   again, recently appointed to the Firearms

17   Training unit.  Before that, his assignment

18   was in the Academy where I'm working.  We

19   worked side by side.  And he was asked to

20   produce the number of tasers for that year.

21   Until, until then, there was no -- I just

22   kept them in a file cabinet and, you know,

23   there was no training issue.  They were

24   just in a file cabinet.  If it wasn't a

25   violation of policy, or whatever, then it

```
1   went to IA and I didn't see it until it was
2   done.  So I just recently kept a log of
3   uses of force.  And I have one from last
4   year and I'm keeping a total from this
5   year.
6           Q.   Did any of the use of force
7   reports raise issues that required training
8   or discipline?
9           A.   Discipline, I don't know, because
10  that would have been through IA.  IA would
11  have found the violation that required
12  discipline.  I looked at reports
13  specifically just for training purposes.
14          Q.   And you also mentioned that this
15  practice is relatively new?
16          A.   Yes, I have a spreadsheet with a
17  running total of use of force reports and
18  they're categorized by taser, if it was a
19  hands-on use of baton, use of OC spray,
20  K-9, and, also, if the officer was injured,
21  if the suspect was injured, if the taser
22  failed or if the taser missed.  Just to
23  keep more data on our use of force.
24          Q.   So this tracking started like I
25  think you said in 2019?
```

1        A.    Last year.

2        Q.    Last year, so, 2020.  So tracking

3   -- so this type of tracking didn't occur

4   until 2020?

5        A.    The use of force reports were

6   kept.  If there was a total, it was kept by

7   another division.  Probably IA.  As far as

8   who, how many uses of force were, were --

9   occurred on BRPD, it was not being kept in

10  the Training Academy.  Now, it could have

11  been kept in IA.  I don't know that.

12       Q.    Okay.  Thank you so much.

13              MS. MOORE-O'NEAL:  I am

14              going to ask for a five minute

15              break.  I want to consult with my

16              team, see if they have any

17              additional questions.  Then I'll

18              turn it over to Mr. Lanser or Mr.

19              Rodney.

20              (Off the record)

21              MS. MOORE-O'NEAL:  At this

22              time I have no further questions,

23              but I would like to turn it over

24              to Mr. Lanser or Mr. Rodney.

25              MR. LANSER:  Thank you.

1    BY MR. LANSER:

2        Q.   All right.  Officer Britton, my

3    name is Dave Lanser.  I'm an Attorney for

4    Plaintiffs in the Imani case.  I have a few

5    follow-ups, but it shouldn't take me too

6    long.  I think both Ms. Moore-O-Neal's

7    questioning and your answers have been very

8    thorough.  So thank you to both of you for

9    that.  That is very appreciated.  I just

10   have a few follow-ups, mostly just a couple

11   of clarifications.

12       I believe you said at some point when

13   talking to Ms. Moore-O'Neal, one example of

14   a use of force was controlling a suspect?

15   Did I catch that correctly?

16       A.   Yes.

17       Q.   Can you -- and I'm sorry if we

18   went over this already -- can you explain

19   what you mean by controlling someone?

20       A.   Okay.  So a control might be a

21   takedown, some kind of restraints.  So you

22   might have a, you know, you might be

23   pinning a person to the ground while

24   they're being handcuffed.  It might be, you

25   know, holding onto an arm or trying to, you

 1   know, pull the arms off of a subject or off
 2   of an object.  So it's a control technique
 3   is basically -- it's basically controlling
 4   somebody or a takedown, something like
 5   that.
 6        Q.   Okay.  That's what I figured.  I
 7   just wanted to make sure.  So any use of
 8   force requires a report to be generated, is
 9   that correct?
10        A.   Yes.
11        Q.   So, even controlling an
12   individual in the way that you just defined
13   controlling a suspect, that would require a
14   use of force report, correct?
15        A.   Yes.
16        Q.   And we talked a little bit about
17   the actual reporting and what happens with
18   those reports.  I was curious though, if a
19   report goes on file or, you know -- yes, if
20   a report is on file or a report is made,
21   does it stay on file forever or is that a
22   type of record that only stays on file for
23   a year and then it goes away or that sort
24   of thing?
25        A.   Just like any report that is a

212

1   public record, like, you know, when an
2   officer writes their report, that response
3   to resistive behavior report is attached to
4   it.  So, for what you're asking, as long as
5   that report is there, you know, I guess
6   that report would be there forever.  So
7   that response to resistive behavior would
8   be attached to it.
9       Q.   Okay.
10      A.   Just like a, just like a layman's
11  report or, you know, a victim's
12  notification, or whatever, would be
13  attached to any report that an officer
14  writes for an arrest.
15      Q.   Okay, thank you.  And I apologize
16  if Ms. Moore-O'Neal already asked you this,
17  and I realize you are not in the position
18  you were in -- you're in today in 2016, but
19  do you know if any use of force reports
20  resulted from the July 9th or 10th
21  protests?
22      A.   I have no knowledge of that.
23  That was several years before I was
24  appointed to my position.
25      Q.   Understandable.  Do you know

1    where that would be recorded or who would
2    have knowledge?
3          A.   If it was recorded, it would
4    probably be stored in a file cabinet in the
5    (unintelligible).
6                    COURT REPORTER:  In where?
7                    THE WITNESS:  In training.
8    BY MR. LANSER:
9          Q.   In the Training Academy you said?
10         A.   In the Training Academy, yes.
11         Q.   Switching gears a little bit.  I
12   know you and Ms. Moore-O'Neal spoke a
13   little bit about some of the factors that
14   go into the amount of force that is
15   reasonable.  And I believe some of the
16   factors you mentioned were the size of the
17   individual, the age, whether that person is
18   alone or in a group, that sort of thing.  I
19   just have a couple of specific ones I
20   wanted to ask about.  Does whether the
21   individual is already being controlled by
22   another officer factor into the amount of
23   force that can be used?
24         A.   As I said before, the number of
25   officers and the subjects matter.  Also,

214

1    the level of resistance that person is
2    applying, because that person might be
3    overcoming that officer.  So, just because
4    another officer might be applying, might be
5    applying a control, that doesn't mean that
6    all other officers have to go hands off.
7    It all depends on, again, on the totality
8    of the circumstances.  It's -- people
9    wouldn't understand how hard it is to
10   control somebody who does not want to get
11   arrested.  And sometimes it requires two,
12   three, sometimes four or five officers to
13   restrain somebody.
14        Q.   Okay.  Does the person's gender
15   factor in?
16        A.   Yes.
17        Q.   What about whether -- does the
18   type of equipment, protective gear, that
19   the officer might be wearing factor in?  As
20   an example, if the officer is wearing a
21   helmet or some sort of body armor, would
22   that factor into the amount of force that
23   is reasonable?
24        A.   Uh, it, it could.  It depends on
25   what's happening to that officer and what's

1    happening between him and the subject.

2         Q.   You mentioned, you know, if

3    another officer is, at least, attempting to

4    control someone, that doesn't necessarily

5    mean you can't use force because they might

6    be overcoming them or that sort of thing.

7    If another officer is controlling someone

8    and the individual has submitted to that

9    control and is not resisting, is any amount

10   of force by a second officer appropriate?

11        A.   It all depends.  Listen, when you

12   say the person's not resisting anymore,

13   they submitted to it, it's -- you don't

14   know what that officer is feeling.  That

15   officer might be in control, it might be,

16   for lack of better words, winning, okay.

17   They might be handling the situation so the

18   person still is resisting, because they're

19   tensing, they're, they're not allowing the

20   officer to actually handcuff.  And, so,

21   what may look like to some person, well,

22   they're on the ground, the officer's on

23   top, well, they're not resisting anymore,

24   and they are resisting.  And, so, that

25   requires another officer to assist.  Also,

1    the duration of these encounters.  So, for

2    example, if an officer has to wrestle with

3    one subject, right, then has to get up and

4    immediately wrestle with and arrest another

5    subject, then another subject, well, that

6    officer begins to get tired.  So it's not

7    like, you know, they can keep going.

8    They're not machines so they need help.  If

9    the officer has been fighting one subject

10   for five minutes, it might seem like he's

11   in control, but, you know, he still might

12   need help from other officers.  So, again,

13   it depends on the totality of what's

14   happening.

15        Q.   Okay.  One other factor I wanted

16   to ask about, specifically with regard to

17   takedowns, does whether the individual is

18   standing on pavement versus grass or

19   another soft surface, does that, is that a

20   factor in whether or not a takedown is

21   appropriate?

22        A.   As it pertains to injuring

23   somebody?  As it pertains to -- like in

24   what context?  Because just because

25   somebody might be standing on pavement,

1    that doesn't mean I can't take them down

2    because they're on pavement as opposed to

3    they're on grass so I can take them down.

4         Q.   I'm just wondering -- because,

5    you know, it is a fluid situation and it's

6    a continuum -- I'm just wondering if that

7    moves the needle on the continuum at all,

8    where they're standing.

9         A.   It, it matters when, for example,

10   if they're on like, say -- it could matter,

11   it could matter.  But it doesn't -- just

12   because they're on pavement, that doesn't

13   mean the officer should not use a takedown.

14   Everywhere we go there's going to be

15   pavement, with the exception if we're on

16   the side of the road in gravel, you know,

17   or in, you know, at a park on grass.  If

18   the person is resisting to the point that

19   they require an officer to take them down,

20   the officer should take them down and

21   conduct and effect the arrest.  If they

22   have to, if they can do it standing up,

23   then they can do it standing up, whether

24   it's in grass or, you know, on the

25   pavement.  What I hear you asking is, if

1    they're on pavement, should the officer

2    take them down and --

3         Q.   No.  Yes, just to clarify, I'm

4    not asking that, because I understand every

5    situation is different.  I'm just wondering

6    if it changes the calculation at all.  Like

7    it might be a slightly higher standard

8    someone could get injured from it because

9    they're on pavement versus likely to be

10   injured from it if they're in grass.  Does

11   that make sense?

12        A.   Well, I mean, that would be

13   anywhere.  I mean, if you're on grass

14   you're less likely to get hurt than if

15   you're on pavement.  But, consideration,

16   you know, of, well, I don't want to injure

17   this person because they're on pavement or

18   I'm going to use this, you know, because

19   we're on pavement instead of grass, that

20   doesn't work with, you know, in police

21   work.  When you make a traffic stop, you're

22   on side the road, you're on pavement.  So,

23   if he starts fighting me so I can't take

24   him down because we're on pavement?  That

25   makes no sense.

1          Q.   Right.  And I'm not looking for a

2     bright line rule there or anything.  I was

3     just wondering if it's a consideration and

4     it sounds like the answer is "no."  Or, at

5     least, it's not taught that way, okay.

6          Moving on, if an officer uses force

7     and injures someone, do they have any

8     obligation to provide first aid or any

9     medical assistance, assuming it's safe to

10    do so?

11         A.   Assuming it's safe to do so, they

12    should, they, they are, can provide care to

13    their level of -- I don't want to say

14    expertise -- but to their level of

15    training.  And also request the help -- or

16    request EMS if the person is injured.  If

17    the person asks for EMS for any reason, the

18    officer will call for EMS.  That is part of

19    their due process.

20         Q.   Okay.  And you mentioned the

21    training.  What level of first aid training

22    do officers receive?

23         A.   Basic first aid, basic CPR.  And

24    for -- there is a training for gunshot

25    victims.  We apply tourniquets, apply

220

```
1   pressure bandages and chest seals.  But,
2   beyond that, you know, if somebody has an
3   eviscerated abdomen, there's nothing we can
4   do besides standby and wait for EMS.
5        Q.   Okay.  Is there any, with the
6   first aid training, is that something that
7   gets retrained if they're out of service,
8   like an annual training or anything like
9   that?
10       A.   I believe so.  I don't, I don't
11  know.
12            MR. SCOTT:  Have you ever
13            gotten first aid training in your
14            annual in-service?
15            THE WITNESS:  Outside of --
16            outside a "T" triple "C" and
17            basic, you know, gunshot wound
18            survival, I don't remember.
19            COURT REPORTER:  Corporal
20            Britton, did you say "outside of
21            "T" triple "C?"
22            THE WITNESS:  Yes, it's an
23            acronym.  It is Tactical Combat
24            Casualty Care.
25            COURT REPORTER:  Thank you.
```

```
 1                THE WITNESS:  I believe
 2           that's what that acronym is for.
 3                COURT REPORTER:  Thank you.
 4                MR. LANSER:  (Unintelligible)
 5                COURT REPORTER:  Mr. Lanser
 6           your -- Mr. Lancer, we didn't
 7           hear any of that.  We didn't hear
 8           any of that.  Your audio --
 9                MR. LANSER:  I'm sorry.  Is
10           that better?  Can you hear me
11           now?
12                COURT REPORTER:  Yes.  Can
13           you start over, please?
14  BY MR. LANSER:
15      Q.   I was just saying thank you for
16  trying to answer the first aid question
17  (unintelligible) so we can move on.
18       You did, I believe, mention, briefly
19  you mentioned something about deescalation
20  with Ms. Moore-O'Neal.  Do you know -- and
21  if this is -- if you aren't the person to
22  respond to this, then I'm sure someone else
23  would be.  Do you know if BRPD has a policy
24  on deescalation tactics?
25      A.   Deescalation tactics?  The
```

222

```
 1    tactics, no.
 2         Q.   Just deescalation.
 3         A.   I teach the deescalation class
 4    where there are highlights in learning
 5    tactics and it talks about -- I believe
 6    it's an eight hour, 12 hour course -- but I
 7    teach the course.  We -- they are tested on
 8    it.  In our use of force policy, it
 9    mentions that the officer will seek to
10    deescalate, you know, they will seek to
11    deescalate the situation.
12         Is there an actual general order, like
13    a policy on deescalation?  If there is, I,
14    I don't know.  I would not be surprised if
15    there is.  I just don't know the general
16    order or if it -- I don't see it here on
17    the table.
18         Q.   You mentioned you do train on it
19    though, deescalation?
20         A.   Yes, I teach that.
21         Q.   Great.  What is the subject of --
22    or give us kind of a broad -- we don't need
23    the whole eight hour course -- but if you
24    could give us a broad overview of some of
25    the topics that are covered in that
```

1    deescalation course.

2         A.    So, when an officer arrives on

3    scene, they are arriving at a potential --

4    I use the word hostile scene, okay, where

5    somebody's been affected.  Somebody is

6    either a victim or they're a suspect or

7    they're a witness to something terrible and

8    there are alot of emotions involved.  When

9    an officer gets on scene, we have to

10   understand that those are people that have

11   just experienced something probably

12   terrible and so we have to use active

13   listening skills.  We have to listen to

14   what they have to say.  We have to let them

15   know that they are -- that we are there to

16   help them.

17        We also have to apply the tactics that

18   are highlighted in the class.  I don't know

19   them verbatim, because I'm not looking at

20   them, but we have to teach them how to

21   apply those tactics, uh, and that is, you

22   know, by listening, listening for change in

23   language, trying to get on their level,

24   trying to make connections with them.  And

25   there are ways to do that.  So, as

224

1    officers, arrive at a situation that's

2    rapidly evolving, it might be rapidly

3    escalating.  That means we have to

4    intervene where is that and try to bring it

5    down.  Sometimes we're successful in

6    deescalating that situation.

7        The truth of the matter is, the

8    officer can facilitate deescalation, but

9    it's up to the actual individual on the

10   scene to make the choice to deescalate, to

11   say, okay, I'm going to calm down.  If they

12   choose not to and choose to escalate, the

13   officer has to recognize that and take the

14   next course of action, whatever that might

15   be.

16       Q.   I think you just used the phrase

17   one of the, one of the goals or maybe sort

18   of a sub-tactic that's used is to make a

19   connection with the person, correct?

20       A.   Yes, yes.  Seek their level I

21   think is one of the names of the tactics,

22   seeking their level.

23       Q.   Okay.  Can you explain that a

24   little more?  Just briefly.

25       A.   Showing understanding.  Say, for

225

1    example, you know, we all make some good

2    money and then I have to talk to somebody

3    who is, by definition, poor, they might be

4    homeless.  And that is seeking their level,

5    finding a commonality with this person and

6    saying "Hey, what's going on?  Why are you

7    so upset today?"  "Well, you know, I lost

8    X,Y and Z."  And me saying "Hey, I know

9    what it's like to lose something like that,

10   you know, let me help."  And it's basically

11   finding a commonality between me and that

12   person so they can feel comfortable talking

13   to me.  And that would bring their

14   hostility down and then I can actually

15   help, actually help them, instead of having

16   to yell or fuss or something like that.

17        Q.   Is eye contact an important

18   factor in making a connection with someone?

19        A.   Yes.

20        Q.   That's taught?

21        A.   Yes, appropriate eye contact, not

22   just in glaring, staring down somebody.

23        Q.   Sure.

24        A.   But, you know, making, you know,

25   appropriate eye contact, you know, intent

226

```
 1    eye contact.  But also knowing when to
 2    break eye contact.
 3         Q.   Is it fair to say, considering
 4    that, that if you're wearing face shields
 5    it's much more difficult to make a
 6    connection with someone?
 7         A.   If you're wearing a face shield
 8    is it much more difficult to make a
 9    connection with somebody?
10         Q.   Yes, in a deescalation context.
11         A.   Okay, well, in a situation where
12    you're talking about Mobile Field Force
13    having a face shield on, that is, that is
14    not up to the officer online to try to make
15    a connection and to try to deescalate.
16    They're at a position and at a point where
17    they have to hold a line and they are
18    looking for hostile, hostile people.  And
19    they are trying to protect themselves.
20    That's why they have a face shield on.  So
21    in the context of deescalation in this, you
22    know, deescalation at that moment for that
23    individual officer is not appropriate.
24         Q.   Okay, that was kind of --
25         A.   We're talking about the
```

```
 1   difference between an officer and a subject
 2   in a different setting.  So, you know,
 3   that's, that's like asking a, uh, uh, a
 4   football player is it, you know, is it
 5   appropriate to smile for a camera.  Well,
 6   he's not taking pictures, he's playing
 7   football.  It's a different setting.
 8        Q.   Yes.  That gets into sort of my
 9   next question is whether there's any sort
10   of deescalation tactics that are taught or
11   that are appropriate in a crowd control
12   setting like that?
13        A.   For an individual officer, no,
14   because that requires alot of talking, alot
15   of trying to, you know, reason.  That can
16   happen in -- let me put it like this: That
17   can happen if the officers are given the
18   opportunity to do so in a specific
19   situation where they can pull somebody to
20   the side and talk to them and reason with
21   that one person.  If you're asking me if a
22   lineman on a Mobile Field Force unit can
23   sit there and have a conversation with
24   somebody, that is, that is unreasonable for
25   officer safety.  There's a reason why
```

228

1    they're on a line is because that crowd has

2    gotten to the point where they're starting

3    to go do things that are not safe and,

4    and/or, illegal.  So, at that moment, it's

5    not the time to try to deescalation.

6         There have been times prior to that

7    happening and it happened in 2016 and it

8    happened just recently when we had some

9    demonstrations or protests here in Baton

10   Rouge at the Capital and over here by our

11   headquarters.  And that is, you know, two

12   or three officers will pull what is deemed

13   as -- I don't want to say leader -- but the

14   one that is kind of leading the crowd, pull

15   them to the side and have a conversation

16   with them and have them be a buffer between

17   the police and the crowd.  And that is when

18   the crowd is still, uh, they're still in

19   order, you know, there's no potential for

20   disorder.  When it becomes disorderly,

21   that's when you see Mobile Field Force come

22   out and that's a different tactic.  That's

23   a different frame of event that's

24   happening.

25        Q.   Okay.  So, by the time Mobile

229

```
 1    Field Force is on scene, deescalation is in
 2    the rearview window?  Not appropriate at
 3    that point?
 4         A.    Uh, yes.
 5         Q.    Okay.  That might be all the
 6    questions I have for you.  Let me just
 7    review my notes here, make sure I'm not
 8    missing anything.
 9         Actually, I do want to ask you
10    something.  Let me find this document real
11    quick.  What I'm going to show you is a
12    video from July 10, 2016.
13              MR. LANSER:  I believe it's
14              already been introduced in these
15              consolidated depositions.  I
16              don't know.
17              Mr. Scott, maybe you know.
18              I don't know what exhibit number
19              we're up to for this particular
20              deposition.
21              MR. SCOTT:  Four.
22              MR. LANSER:  So this will be
23              Exhibit #4.  In the consolidated
24              deposition list it's seven "D"s.
25              Let me share my screen.  Give me
```

1          one minute just to pull this up.
2    BY MR. LANSER:
3        Q.    And I'm going to show you -- let
4    me just preface this by saying this will be
5    a scene from the July 10 protest somewhere
6    around Government and Maximillian Street.
7    And I won't ask you to comment, you know,
8    specifically on whether the use of force is
9    appropriate, but I am just generally going
10   to ask you if it's a use of force and
11   whether or not this is the type of thing
12   that a report should have been generated
13   about.
14        But bear with me for a minute.  My
15   computer is being very slow right now.  It
16   is loading though.  I'm sorry, it usually
17   doesn't take this long.  I'm sharing my
18   screen.  This is going to be a little low
19   quality just because of the Internet
20   connection issues I'm having today.  But
21   we'll give it a shot.  Can you see the
22   video?
23        A.    Yes.
24        Q.    I'm going to hit Play just for a
25   few seconds and let's see how well this

231

```
 1   works.
 2                  (Viewing video).
 3   BY MR. LANSER:
 4        Q.   It's a little grainy.  Were you
 5   able to see what happened there though?
 6        A.   Yeah.  Can you replay it?  It was
 7   choppy as well.
 8        Q.   Yes, let me try it again.
 9                  (Viewing video).
10   BY MR. LANSER:
11        Q.   Is that any better?
12        A.   No.
13        Q.   Actually --
14        A.   But I can see that there's two
15   officers -- or several officers and two
16   subjects being arrested.  Looks like
17   they're being handcuffed on the ground.
18        Q.   Were you able to see the takedown
19   that happened?  I know it's not the best.
20        A.   I did not.  It was choppy.  But
21   it's real choppy.  Like every five seconds
22   I'll see another image and it's not a fluid
23   video.
24        Q.   Okay.  Let me see -- well, if
25   it's not working, it's not working.  Let's
```

1   do this, that's pretty much all I have for

2   you anyway.  I'm going to pass it over to

3   Mr. Rodney and -- actually, wait, here we

4   go, this is what I was waiting for, okay.

5        So I think part of the choppiness is

6   because I was trying to show it in the

7   online version, but let me try it now.  I

8   have the downloaded version now.  Again,

9   apologies, this is taking long, I know.

10  Okay, so, this is the same Exhibit.  Let me

11  share my screen.

12                 (Viewing video).

13  BY MR. LANSER:

14       Q.   Okay, can you see it now?

15       A.   Yes.

16       Q.   Can you see that?

17       A.   Yes.

18       Q.   Okay.  I'm going to try sharing,

19  playing this again.  I think this will be a

20  little higher quality.  If not, we'll move

21  on.  Thank you for your patience though.

22  I'm hitting Play now.

23                 (Viewing video).

24  BY MR. LANSER:

25       Q.   Okay.  Was that clearer?

1      A.   No.  I mean, I can kind of -- I
2  can kind of see what happened, but is it
3  clear?  No.  It's really choppy and it's,
4  you know, I see a still image of, you know,
5  an officer, you know, on top of somebody
6  trying to handcuff him or officers trying
7  to handcuff two subjects on the ground.
8      Q.   We can move on.  Is it, generally
9  speaking though, is it fair to say if a
10 takedown occurs during an arrest, a use of
11 force report should result from that?
12     A.   Yes.
13     Q.   All right, I'll pass it on to Mr.
14 Rodney then.  Thank you.  Sorry that took
15 so long, but I appreciate your time.
16     A.   Thank you.
17            MR. LANSER:  Mr. Rodney,
18        it's all you.
19            MR. RODNEY:  Thank you.
20 BY MR. RODNEY:
21     Q.   Can you hear me?
22     A.   Yes.
23     Q.   Tell me your name again.  We've
24 been at this so long, I haven't heard it in
25 awhile.  Tell me again your name.

1      A.    Wallace Britton.

2      Q.    Officer Britton, you've been

3  going at this for quite some time.  Do you

4  need to take a little break or what?

5      A.    I'm fine.

6      Q.    You are?

7      A.    Yes.

8      Q.    Okay.  All right.  So I

9  understand that, at the time of the Alton

10  Sterling protests, you were not in your

11  current position, is that correct?

12      A.    Yes, sir.

13      Q.    At that time, what position were

14  you in?  I know you may have answered this,

15  but just jog my memory.

16      A.    I was in Uniform Patrol at Second

17  District.

18      Q.    After Uniform Patrol, what job

19  did you have after that?

20      A.    I went to the Training Academy.

21      Q.    How long were you at Uniform

22  Patrol?

23      A.    I was in Uniform Patrol at that

24  time -- 2016 -- I was in Uniform Patrol for

25  four years.

235

```
 1        Q.    And when did you go to the
 2   Training Academy?
 3        A.    2018.
 4        Q.    And you've been there ever since?
 5        A.    Yes, sir.
 6        Q.    Any interim appointments or
 7   assignments?
 8        A.    You mean like inbetween Uniform
 9   Patrol and the Academy?
10        Q.    Exactly.
11        A.    No, sir.
12        Q.    What made you go to the Training
13   Academy?
14        A.    I like, I value training.  I can
15   teach.  I was a lifelong martial artist.  I
16   grew up teaching martial arts.  I grew up
17   coaching.  And coaching and policing is
18   something that I love to do and I believe I
19   could teach people how to do it.
20        Q.    Okay.  And why were you qualified
21   to be selected to this position?
22        A.    Alot of it was my work ethic,
23   attention to detail, my -- I'm also, before
24   I was into -- I think it's the question you
25   were asking me, you said in the interim
```

1    positions.  I am an FTO, which is a field

2    training officer, which means I'll be

3    teaching a rookie that's, you know, sitting

4    right beside me.  At the same time, I was a

5    defensive tactics instructor under Mr., at

6    the time, Sergeant John O'Donoghue, who was

7    the defensive tactics coordinator here.  I

8    was an adjunct instructor.  I'm also a

9    range safety officer so I help with

10   firearms.  I'm not a certified instructor

11   of firearms, but I'm there for some

12   instruction and also just to make sure that

13   the people that are on the firing line are

14   safe.  So I have alot of -- I wear alot of

15   hats in leadership and my ability to teach.

16   My physical abilities in using defensive

17   tactics is what qualified me for this

18   position.

19        Q.   Okay.  So what's your current

20   position called?

21        A.   Academy instructor.

22        Q.   Did you have to test into that?

23        A.   No, sir, I just interviewed for

24   it.

25        Q.   So you actually did some training

1   at the Academy before you obtained your

2   current position of Academy instructor?

3        A.   Right, I was involved with

4   training as an adjunct instructor.  So, for

5   example, I was a defensive tactics

6   instructor certified in SSGT, which is the

7   system that we use.  So I would teach -- I

8   would -- I would assist with new academies

9   and also I would teach and assist with

10  in-service training for defensive tactics,

11  as well as scenario-based training for

12  tasers, scenario-based training for

13  defensive tactics and throughout

14  in-service.

15       Q.   And this was in addition to your

16  work as a patrol officer?

17       A.   Yes, sir.

18       Q.   And you worked under Sergeant

19  O'Donoghue?

20       A.   He was the defensive tactics

21  coordinator and an Academy instructor.  So

22  there are several adjunct instructors who

23  are officers who assist, just like I did.

24  That is, they would come in -- if not,

25  Sergeant O'Donoghue would have to teach

1   every in-service and teach, you know, every

2   Academy.  So we have instructors who assist

3   him with that and that's the role I have.

4   So he wasn't my direct line supervisor, but

5   he was the coordinator for defensive

6   tactics instructors.

7        Q.   Okay.  And let's get the spelling

8   of his name correct for the record.  How is

9   his name spelled?

10       A.   O apostrophe D-o-n-o-, uh,

11  -u-g-h?  Something like that.

12       Q.   What's his first name?

13       A.   John.  He's Lieutenant O'Donoghue

14  right now.

15       Q.   So he's still with the

16  department?

17       A.   Yes, sir.

18       Q.   Who is the head Academy

19  instructor?

20       A.   Right now it's Lieutenant Jeff

21  Williams.  I believe O'Donoghue is O

22  apostrophe D-o-n-o-g-h-u-e.

23       Q.   Who is the head of the Academy at

24  the time that Sergeant O'Donoghue was the

25  defensive tactics instructor?

239

1      A.   I believe that was, at the time,

2  it was Lieutenant J.D. Leach.  He is

3  Captain Leach.  He was promoted to captain.

4      Q.   Would he have been the defensive

5  tactics -- would he have been -- I'm

6  sorry -- the head of the Academy during

7  2016?

8      A.   I believe he was the Academy

9  director in 2016.

10      Q.   Now you're an Academy instructor

11  and you teach the defensive tactics, is

12  that correct?

13      A.   Yes, sir.

14      Q.   Are there any other Academy

15  instructors who teach defensive tactics?

16      A.   Yes, sir.  Sergeant Thomas Morse

17  and Corporal Joshua Gillich.

18           COURT REPORTER:  Is it

19      Gillett or Gillich?

20           THE WITNESS:  It's spelled

21      Gillich, but it's pronounced

22      Gillett.

23           COURT REPORTER:  Can you

24      spell it for me, please?

25

1    BY MR. RODNEY:

2         Q.    How do you spell Gillich?

3         A.    It's G-i-l-l-i-c-h.   It's

4    pronounced Gillett.

5         Q.    What's his first name?

6         A.    Joshua.

7         Q.    And what's his rank?

8         A.    Corporal.

9         Q.    And you mentioned there was one

10   other defensive tactics instructor.

11        A.    Sergeant Stewart Tate.

12        Q.    Stewart?

13        A.    Yes, sir.

14        Q.    Tate.   Were any of them at the

15   Academy on or before the year 2016?

16        A.    I know for a fact Sergeant Tate

17   was.   He was, at the time, was Corporal

18   Tate.   And I believe, if I'm not mistaken,

19   I believe Sergeant Morse was.   At the time,

20   it was Corporal Morse.   That's M-o-r-s-e.

21        Q.    Okay.   So why weren't they picked

22   to come to the deposition as opposed to

23   you?

24        A.    Because I'm the defensive tactics

25   coordinator.   I run all the instructors.

241

1   That was my position when I entered.

2         Q.   So you're an Academy instructor,

3   but you're sort of subtitled defensive

4   tactics instructor?

5         A.   Coordinator.

6         Q.   Coordinator?

7         A.   Yes.

8         Q.   Now, which one of these

9   instructors or titles is most responsible

10  for teaching the use of force?

11        A.   That would be me.

12        Q.   So you're the person at the

13  Academy right now with the most

14  responsibility for teaching about the use

15  of force, is that correct?

16        A.   Yes.

17        Q.   In teaching -- and if these

18  questions have already been answered, you

19  know, look, let's not waste time, just let

20  me know.  Or you've got a capable lawyer,

21  Joe, he'll let me know.  I may have -- I'm

22  getting up in age -- I may have slipped a

23  few questions.  I wouldn't say not at all,

24  but maybe missed it in some way or the

25  other.

242

1       So, as the defensive tactics
2   coordinator, what course materials do you
3   use to teach defensive tactics?
4       A.   The materials I use come from our
5   defensive tactics system.  It's called
6   SSGT.  I also use POST mandated material
7   that is mandated for us to teach one of
8   those classes.  It's called Integrated Use
9   of Force.  There are several other classes
10  that include use of force and deescalation,
11  maybe not under those titles.  But there's
12  POST mandated material and also material
13  from SSGT manuals.
14      Q.   What does SSGT stand for?
15      A.   SSGT is Strategic Self-Defense --
16  I'm sorry -- I can't talk -- Strategic
17  Self-Defense and Gunfighting Tactics.
18      Q.   And gunfighting?
19      A.   Gunfighting tactics, yes.
20      Q.   Are there any other course
21  materials besides SSGT and POST mandated
22  materials regarding integrated use of
23  force?
24      A.   No, sir.
25      Q.   Does the Academy have a manual on

1  the use of force?

2      A.   Like a manual that says "use of

3  force?"

4      Q.   Yes.  Well, like a book that you

5  give to the recruits that contains the

6  information about the use of force.  Is

7  there a book, a textbook, that is provided?

8      A.   Not a textbook, but our POST

9  mandated material is given to them.  They

10  have study guides.  They are tested on the

11  material.  The class is in lecture form.

12  Our defensive tactics classes or courses

13  are done on the mat for practical

14  application as well as a manual, the SSGT

15  manuals, that are given to them.  But not a

16  textbook that says "use of force."

17      Q.   Okay.  Do you know whether or not

18  any -- well, let me just back off for a

19  second.  Are there any links or online

20  references that you use to teach the use of

21  force at the Academy?

22      A.   Meaning like if I pull something

23  off the Internet to teach use of force?

24      Q.   Well, like -- well, yes, that

25  would be included.  But, also, just sort of

244

1    a bibliography of links or digital

2    resources that the recruits are expected to

3    study or review?

4          A.   In our POST material, there may

5    be a link to a video that might highlight a

6    situation.  But nothing like a -- how you

7    mentioned it -- just like a list of links

8    for them to go look at.

9          Q.   Is there a syllabus for the

10   course dealing with the use of force?

11         A.   Yes.

12         Q.   And what is that syllabus called?

13         A.   It's our POST material, our

14   classes that we teach.  You said

15   "syllabus," I meant to say -- what I meant

16   to say is a lesson plan.  And that lesson

17   plan has topics of discussion, they have

18   guided practice, which is whoever is

19   instructing would guide them on what

20   they're supposed to do.  There is -- I'm

21   losing my train of thought.

22         Q.   Hey, wait, wait, wait.  You've

23   been going at this awhile.  Are you sure

24   you don't need a break?

25         A.   Well, I'll finish this thought

1    and if we need to we can take a break.

2         Q.   I don't need to.  I just don't

3    want you to feel as though, you know,

4    you're tired or you're at a disadvantage

5    or you have to struggle to answer these

6    questions because you're fatigued.

7         A.   No, what I'm saying is that we

8    have a lesson plan.

9         Q.   Okay.

10        A.   And in those lesson plans there

11   is group activities, there's guided

12   practice, there might be a video, there's

13   process questions.  And at end of that

14   section of instructions there is a study

15   guide.  And from that study guide is where

16   we derive our tests on that section of

17   instruction.

18        Q.   Now, so, in other words, with

19   regard to course materials or study

20   materials, you use information, written

21   information, from the SSGT, some POST

22   mandated materials, a use of force lesson

23   plan, and a study guide as the materials

24   that are used with regard to teaching use

25   of force at the Academy, is that correct?

1        A.    Yes.

2        Q.    Are there any other materials

3    that are used?

4        A.    Not that I can recall, no.

5        Q.    Do you use any --

6        A.    Besides the policy and general

7    orders.

8        Q.    Okay.  So we add the policies and

9    general orders to that list.  And, now, do

10   you use any real life videos, media, news

11   reels, things like that?

12       A.    Yes.

13       Q.    Who selects or curates these news

14   reels or media that you use?

15       A.    Some of it is from the POST

16   material that we get.  It'll say show this

17   video and relate to that video.  Or if, for

18   example, I know of a video that I'm

19   familiar with that might be highlighting a

20   section of that material that I'm covering,

21   that I might show that video.  It's up to

22   the instructor.  What we try not to do is

23   we don't take away from what is POST

24   mandated.  We have to teach that.  But we

25   can, you know, if there's a second video

247

1    that we can show or another case study that

2    we can introduce that will kind of help

3    drive the point home, we can do that as the

4    instructor.

5        Q.   During the course of your tenure

6    at the Academy, have you used any video or

7    images from the Alton Sterling protests as

8    part of your teaching materials?

9        A.   No.

10       Q.   Have you used any portions of the

11   George Floyd video, which was, you know,

12   internationally distributed as part of your

13   case studies or teaching at the Academy?

14       A.   No, I hadn't.

15       Q.   Have you used -- what news reels

16   or videos regarding use of force from

17   police activities that you have used at the

18   Academy that might be familiar to the jury

19   or the judge in your teachings?

20       A.   I've -- we've used -- his name --

21   Hudspeth in Shreveport.

22       Q.   Yes.

23       A.   We've used that one.  What's the

24   other one, the one from Alabama?  Or from

25   Georgia?  I don't know the names of them,

248

1    but when I pull up my YouTube I can find

2    it, but I don't know name of it right

3    offhand.  But it was an officer that

4    basically encountered a deranged man who

5    was killed by rifle fire in Georgia.  And

6    we've used some BRPD videos that have, you

7    know, that have highlighted vehicle

8    pursuits.  But, specifically, off the top

9    of my head, there's -- I can't say, oh,

10   yeah, we use this particular case.

11        Q.   I represent a gentleman by the

12   name of Max Geller who was arrested in

13   the -- what?

14        A.   I remembered the one from

15   Georgia, his name was (unintelligible).

16   That was the officer that was killed.

17             COURT REPORTER:  Dean

18        Keller?  Did you say Dean Keller?

19             THE WITNESS:  No, his last

20        name I believe was Dinkheller,

21        Dinkheller.

22             COURT REPORTER:  I'm still

23        not getting what you're saying.

24             THE WITNESS:  I believe his

25        last name was Dinkheller,

1           D-i-n-k-h-e-l-l-e-r.

2                COURT REPORTER:   Thank you.

3           Sorry, Mr. Rodney.

4                MR. RODNEY:  No, it was very

5           helpful.   Thank you.

6    BY MR. RODNEY:

7        Q.   The videos that you've mentioned

8    I believe all involved injuries or

9    situations where the officers were injured

10   or killed, am I correct?

11       A.   Not all of them, no, sir.  Not

12   the Hudspeth one.

13       Q.   Okay.  Have you used any other

14   videos where, well, involving protests or

15   mass demonstrations in your teachings?

16       A.   I don't recall any videos.  I

17   don't recall any videos, no, sir.

18       Q.   Now, how has these materials

19   changed since 2016?  In other words, are

20   there any materials that may have been used

21   in 2016 that are no longer being used under

22   your regime, under your leadership at the

23   Academy, or are there any that you have

24   added that were not used before 2016?

25       A.   I can't speak to what was used in

1    2016 because I wasn't present in the

2    classroom when those videos were being

3    shown.  So the ones like what I'm teaching,

4    there's another class that I teach, it's

5    called procedural justice, which shows not

6    just, you know, police on defense, but

7    policemen conduct.

8         Q.   Yes.

9         A.   So some of the images that we've

10   shown are from like the -- I believe the

11   one that was in Carolinas.  I believe it's

12   Walter Scott?

13        Q.   Yes.

14        A.   We showed images from the one in

15   Chicago where the young man was walking

16   away from the police and was shot.  We

17   talked about -- there was another one in

18   Carolina where a guy was being pulled by

19   the gas station, officer asked him for his

20   drivers license, the guy goes into his

21   vehicle to get his drivers license and the

22   officer panics and shoots him.  And the man

23   survives and, but the officer named was

24   wrong in what he did and was, of course,

25   sent to prison.  So --

1    Q.   Now -- I didn't mean to cut you

2    off.

3         A.   No, go ahead.

4         Q.   Some of these written materials,

5    like the SSGT and some of the POST mandated

6    materials, they preceded your tenure at the

7    Academy.  In other words, you know that

8    these materials were being used prior to

9    your arrival, is that fair for me to say?

10        A.   Yes.

11        Q.   Now, are these materials gathered

12   in some sort of a binder and given to the

13   recruits?  How do they obtain this list of

14   references?

15        A.   When you say "list of

16   references," you're talking about the

17   videos I mentioned?

18        Q.   I'm talking about all of the

19   things that go into what you've described

20   as the course materials, which I understand

21   to be the SSGT, some POST mandated

22   materials, particularly with regard to

23   integrated use of force, the policies and

24   general orders, certain references and

25   links to media and news reels.

```
1          A.    The trainees are given a binder.
2     The binder is about this thick (indicating)
3     and in that binder --
4                    MR. SCOTT:  You gotta give
5               them inches.
6                    THE WITNESS:  Okay.  So the
7               binder is about, what, what,
8               five inches thick.
9                    MS. MONSOUR:  Six, six.
10                   THE WITNESS:  Yes.  It's a
11              thick binder and it has the
12              materials that they need for
13              their entire tenure inside the
14              Academy.  Those classes that are
15              mandated are in that binder,
16              along with their study guides.
17    BY MR. RODNEY:
18         Q.    And is there also a table of
19    contents for that binder?
20         A.    I believe so, yes, sir.
21         Q.    Does the binder have a name?  A
22    title?
23         A.    It's their, it's their, their,
24    their Academy binder.
25         Q.    Gotcha.
```

1          A.    It's -- I don't have a name for

2    it, you know, it's their police binder.   I

3    don't -- we can actually construct our own

4    when I was in the Academy.   So, when we

5    were in class, the instructors, who may be

6    Academy staff or they may be adjunct

7    instructors, and they would pass out their

8    material.   That material might be a

9    printout of their PowerPoint with a note,

10   with note sections on side of it, and we

11   have to take those materials and, you know,

12   we write our notes and then put them in

13   that binder and they all have to be in

14   order.   Now we just give them the binder.

15   Of course, those study guides are empty.

16   As far as like the answers and all that

17   other stuff, they have to fill those in.

18   They still have to read the material and

19   follow along.   As far as activity, I can

20   say "Turn to this page and, you know, do

21   this case study and you have ten minutes"

22   and they work in their groups to do that

23   case study and they come back and we

24   discuss it and put it on paper or flip

25   chart paper.

1       Q.    Are those materials considered to
2   be confidential?
3       A.    What do you mean by confidential?
4   Like is that --
5       Q.    In other words, not to be
6   distributed, copied, or anything like that?
7       A.    Right.  They need to protect
8   that, that information.
9       Q.    So is there any penalties for a
10  recruit losing his binder?
11      A.    That is taken up with the
12  director of training.
13      Q.    What do you mean?
14      A.    If there's any penalty, that
15  would go through the director of training.
16  Say, for example, if the trainee lost their
17  binder, they would have to report to the
18  director of training for that.
19      Q.    That's considered an infraction
20  in a way?
21      A.    Yes, sir.
22      Q.    All right.  So, now, you
23  mentioned that you have some certifications
24  in martial arts, is that correct?
25      A.    Yes, sir.

1    Q.   So what's your martial art?

2    A.   I received a fourth degree black

3    belt in Taekwondo and a purple belt in

4    Jiu-Jitsu and I'm also a kickboxer.

5    Q.   And do y'all teach some of the

6    tactics from any of those martial arts in

7    the Academy instructions on use of force?

8    A.   Only from the SSGT manual.  I

9    only teach them techniques from the SSGT

10   manual.

11   Q.   So, when a recruit graduates from

12   the Academy, he doesn't have a full

13   certification in any of the marital arts

14   such as the ones that you mentioned?

15   A.   No, I don't, I don't train them

16   in martial arts.

17   Q.   And they don't get any kind of

18   recognition or certification or basic belt

19   or anything like that as a result of --

20   A.   No, sir.

21   Q.   Okay.

22   A.   No, sir.

23   Q.   All right.  Now, my understanding

24   from a limited knowledge of martial arts,

25   just enough to be completely dangerous to

1   myself, that there is a sort of a code of

2   conduct or sort of morality that is

3   attached to the study of all of these

4   martial arts.  Is that fair for me to say?

5        A.   Yes.

6        Q.   And do you teach anything from

7   those codes or -- let's see if a better

8   word -- anything from those codes or

9   standards with regard -- or morals -- from

10  those particular martial arts in the

11  Academy?

12       A.   No, sir, I do not teach martial

13  arts in the Academy.  So, I mean, there is

14  a level of morality and a level of

15  professionalism that has to be conveyed.

16  But I want to make it clear that I'm not

17  teaching, you know, something that I

18  learned from my Taekwondo class when I was

19  teaching that.  I'm teaching police

20  officers how to be professional police

21  officers.

22       Q.   I understand.  But, you know, for

23  example -- and, you know, don't laugh at me

24  when I ask you about this, because I know

25  that you're a black belt in this study --

1    but I understand, for example, in Taekwondo

2    there are certain tenets.  You're familiar

3    with those, am I right?

4         A.   Yes.

5         Q.   So you don't teach any of these

6    tenets that may be associated with martial

7    arts as part of your Academy training, do

8    you?

9         A.   Sir, not as in, you know -- when

10   we recite the tenets, those tenets are

11   courtesy, integrity, perseverance,

12   self-control, courtesy -- I mean, and, and,

13   you know, those tenets in Taekwondo --

14        Q.   And indomitable spirit.

15        A.   Indomitable spirit, thank you.  I

16   do not come out and teach that.  Do I teach

17   courtesy?  Yes, I do teach courtesy.  Do I

18   teach integrity?  Yes, I do teach

19   integrity.  Do I teach self-control?  Do I

20   teach that?  Yes, I do, but not in the

21   context of Taekwondo.  Those same tenets

22   can be found in police work.  Those are the

23   same, you know, and, so, I teach them

24   from -- it's built into our materials.  So

25   I teach them from that aspect.  But I do

```
1     not teach -- I don't get up and teach the
2     tenets of Taekwondo.  I teach professional-
3     ism which incorporates those tenets, but
4     not from a martial arts standpoint.
5         Q.   So have you ever watched any of
6     the videos of the Baton Rouge police
7     conduct at the George Floyd protests?
8         A.   Did I watch the videos of the
9     Baton Rouge police conduct after the George
10    Floyd protests?
11        Q.   At the George Floyd protests.
12        A.   No, sir, I have not seen any of
13    those videos.
14        Q.   Neither July 9th or the 10th?
15             MR. SCOTT:  Roy, I think
16             you're talking about the Alton
17             Sterling protests and not George
18             Floyd.
19             MR. RODNEY:  I'm sorry,
20             Alton Sterling.  Sorry about
21             that.
22             THE WITNESS:  No, sir, I
23             have not seen any of those
24             videos.
25
```

1   BY MR. RODNEY:

2        Q.   Just to be clear, that was my

3   fault, you haven't seen any of the videos

4   of the Baton Rouge Police Department

5   conduct during the Alton Sterling video,

6   during the Alton Sterling protests?

7        A.   No, sir, I haven't seen -- I

8   haven't seen not one single video, sir.

9        Q.   Okay.  Have you been asked to

10  review any of the use of force at the Alton

11  Sterling protests by the Baton Rouge Police

12  Department?

13       A.   No, sir, I was not, I was not in

14  a position to do so.

15       Q.   Do you know whether or not any of

16  the current instructors -- Mr. Morse,

17  Sergeant Morse, Corporal Gillich, or

18  Sergeant Tate -- whether they've been asked

19  to review any of those videos?

20       A.   No.  Corporal Gillich was not in

21  the Academy at that time and I do not know

22  if Sergeant, at the time Corporal Morse, or

23  Corporal Tate were asked to review

24  anything.  I don't know.

25       Q.   What about Sergeant O'Donoghue or

1    now Lieutenant Williams or now Captain
2    Leach, whether they have been asked to
3    review any of it?
4        A.    I do not know if they were asked
5    to review anything.
6        Q.    What does the Academy teach now
7    with regard to the application of knee to
8    neck restraints on civilians?
9        A.    We do not teach that.  That is
10   not an approved technique.  That is not
11   something that we condone or teach.
12       Q.    When you were at the Academy, did
13   they teach that?
14       A.    No, sir.
15       Q.    Do you know whether or not the
16   Academy has ever taught the use of knee to
17   neck restraint?
18       A.    Since my tenure as a trainee
19   officer and in '12 when I came through,
20   that has never been taught since I've been
21   here.
22       Q.    What about when you were in the
23   Academy?
24       A.    Never been taught since I --
25   that's what I mean, when I was a trainee

1    inside the Aca -- when I was a new recruit

2    in the Academy, that was never taught.  And

3    it's never been taught since I've been

4    here.  As long as I've been here, it's

5    never been taught.

6              MR. SCOTT:  Mr. Rodney, can

7              I to refer you to the deposition

8              of Chief Carl Dabadie who stated

9              that in over 30 years of --

10             MR. RODNEY:  Wait, wait,

11             wait, wait, wait, I don't need

12             you to testify, Joe.

13             MR. SCOTT:  (Unintelligible).

14             MR. RODNEY:  I'm going to --

15             I'm going to ask the questions as

16             to what this Witness knows.  I

17             was at the Chief's deposition.

18             I'm very much aware of what his

19             testimony is.  And I know you're

20             only trying to help, but I would

21             ask that you not do that.

22             MR. SCOTT:  Yes, sir.

23             MR. RODNEY:  Thank you, sir.

24   BY MR. RODNEY:

25        Q.   So, well, I know you don't teach

1    it, but what is the Academy's position with

2    regard to the use of that type of

3    restraint?

4        A.   What is the position?  We don't

5    condone it.  It is not taught.  It is not

6    allowed.

7        Q.   So is it considered a violation

8    of the Baton Rouge Police Department policy

9    and procedures?

10        A.   As far as policy, I have not seen

11    policy where it says -- in our less lethal

12    policy it says that neck restraints are not

13    to be used except for in a deadly force

14    encounter.

15        Q.   And what is a deadly force

16    encounter?

17        A.   So a deadly force encounter is

18    where an officer perceives that he or she

19    may lose their life, somebody else might

20    lose their life, they're protecting

21    somebody else, or they are in fear of grave

22    bodily harm.

23        Q.   Would you agree with me that

24    passive and defensive resistance could

25    never rise to the level of a deadly threat?

263

1          A.   I cannot agree with you on that.

2     That's, that's, that's -- those types of

3     encounters are rapidly evolving and

4     sometimes are irreversible.  So I can't say

5     that passive resistance will not rise to

6     the level of deadly force.

7          Q.   That's not what I asked you.  I

8     asked you and what I meant to ask you is

9     whether or not defensive resistance could

10    be considered a deadly threat?

11         A.   Can defensive resistance be a

12    deadly threat?

13         Q.   Yes.  Let's go back over it so

14    that we're clear, because we, somewhere

15    along the line of this question, somebody

16    made a wrong turn.  Probably me.

17         I think that what you were saying is

18    that the use of neck restraints is not

19    condoned except in a narrow circumstance,

20    is that correct?

21         A.   Right, I said a deadly force

22    encounter.  If it's a deadly force

23    encounter like a chokehold or not, we don't

24    use chokeholds to restrain.  Chokeholds are

25    only for -- and we don't teach them -- but

1   only in a deadly force encounter or deadly

2   force situation.

3       Q.   And, by definition, I think you

4   would agree with me that defensive

5   resistance is not a deadly force encounter,

6   am I correct?

7       A.   By definition, it is probably not

8   a deadly force encounter.  But, again, it

9   all depends on what that person is doing.

10  In this definition, pulling away or pushing

11  away, attempting to flee or get away from

12  the employee.  But where are they fleeing

13  to?  Are they fleeing to get to a weapon?

14  You know, so I can't say that this, by this

15  definition, that it cannot be a deadly

16  force encounter.  It could potentially be a

17  deadly force encounter, depending upon

18  what's happening and what's in the room,

19  what's in the area, what's in their car.

20  Things that are not known.  There's too

21  many variables to say it can or cannot be.

22      Q.   Well -- and I understand that.

23  And I understand that a situation that

24  could evolve into something that could be

25  deadly based upon any number of

```
 1   circumstances.  But in a static situation
 2   where the resistance fits the definition
 3   under General Order 135 of defensive
 4   resistance, that cannot be a deadly force
 5   encounter in and of itself.
 6        A.   Okay.
 7        Q.   Is that correct?  Do you agree
 8   with me on that?
 9        A.   Yes.
10        Q.   Okay.  Now, I understand that you
11   receive use of force reports, is that
12   right?
13        A.   Yes, sir.
14        Q.   And there's been alot of
15   questioning, very good questioning, I heard
16   earlier about this.  So I just want to
17   clear up a couple of things with regard to
18   this.  Every officer who uses force is
19   required to make a Response to Resistance
20   Behavior Report, is that correct?
21        A.   Yes.
22        Q.   And when did that policy begin?
23        A.   Exactly when, sir, I do not know.
24        Q.   Has it always been in effect
25   since you've been on the force?
```

1      A.   I believe so, with some
2  revisions.  So I can't say.  I would have
3  to look at the actual policy to see the
4  revision date and make sure that, verbatim,
5  what you're saying is that for every use of
6  force they have to fill out a report.  If
7  that was before me or, you know, when I was
8  a patrol officer or -- I know it is right
9  now with me here, that if they have to use
10 force on somebody, they have to fill out a
11 Response to Resistive Behavior Report.
12     Q.   But it's your belief that it was
13 in effect at the time you became a police
14 officer?
15     A.   Yes.
16     Q.   All right.  So all -- and this is
17 where I got a little confused -- all
18 Response to Resistance Behavior Reports
19 have to come to the Academy's defensive
20 tactics coordinator for review?
21     A.   For training review, yes, sir.
22     Q.   What is a training review versus
23 just a review?
24     A.   So Internal Affairs will review
25 the reports to see if there is any policy

267

1    or law violations.

2        Q.    Yes.

3        A.    I review them to see if the

4    techniques that they used were appropriate

5    for that person or that situation.  If they

6    used good judgment in that situation as far

7    as the use of defensive tactics or the use

8    of their techniques.  If it was a, if it

9    showed any cowardice or showed any, you

10   know, lack of control of the situation that

11   allowed them to get to a position where

12   they had to use force, then I would, you

13   know, counsel that officer on those issues.

14       Q.    What is the purpose of your

15   reviewing these Response to Resistance

16   Behavior Reports?

17       A.    The purpose is to make the

18   officer better, to make sure that they are

19   doing the things right and that they're, if

20   need be, they need to be improved or make

21   some improvements, that's what that purpose

22   is for.

23       Q.    And what are the range of actions

24   you can take as a result of your review of

25   a Response to Resistance Behavior Report?

```
 1        A.    What can I do?

 2        Q.    What can you do?

 3        A.    I can counsel --

 4        Q.    What powers, what powers do you

 5   have with regard to --

 6        A.    I cannot mandate an officer to do

 7   anything.  I can counsel them, I can make

 8   suggestions.  If I decide -- if I knew that

 9   this officer needed to come in and actually

10   be trained -- like, say, for example, I

11   need to have one on one with this officer.

12   I would go through my chain of command,

13   have my lieutenant submit to their

14   supervisor that this officer needs to come

15   for, you know -- up to the Chief or however

16   high it goes -- I would make that

17   suggestion to my lieutenant and my

18   lieutenant would go through his chain of

19   command to make sure that officer had

20   training with me.

21        Q.    I got that.

22        A.    Just like if, for example, if I

23   was training, if an officer shoots subpar,

24   he may have a passing score, but they have

25   to shoot subpar.  To prevent that officer
```

1    from, you know, from declining, they are

2    mandated and required to come to training.

3    And that order is sent from the range

4    master up to the Chief and that officer has

5    to go to the range -- I don't know what the

6    specific times are -- but they have to go

7    to the range a number of times and actually

8    shoot an approved score before they're

9    released from remedial training.

10        Q.   And what about an officer who

11   utilizes force and has to fill out a report

12   and you find that there are aspects of his

13   actions that require him to meet or counsel

14   with you, how is that handled?

15        A.   Just like I said, if I deem that

16   necessary -- I have not deemed that

17   necessary for any officer as of yet.  But

18   if I deemed it necessary, I would go

19   through my chain of command and have that

20   officer meet with me or meet with an

21   instructor and they would get, you know,

22   make them, you know, up to par.  But that

23   hasn't happened.  I haven't had to do that.

24        There was a situation of an officer

25   that performed poorly in the field.  This

1    was not my doing, I didn't call this, I
2    didn't make this happen.  But, however, the
3    powers that were, her supervisor and the
4    people that are paid more than me, mandated
5    that she come to training with, at the time
6    we had the Academy, and they put her
7    through remedial training through defensive
8    tactics until she was able to demonstrate
9    that she knew what to do and was competent
10   in her abilities.
11        Q.   Is there a name for this sort of
12   remedial training?
13        A.   Just remedial training.
14        Q.   How many use of force reports
15   have you received during your tenure at the
16   Academy?
17        A.   Hundreds.
18        Q.   Would you say more than 500 or
19   less than 500?
20        A.   Probably 500 or more, give or
21   take.  Last year we had 200 Use of Force
22   Reports come.  So, in the last three years,
23   probably around about 600.
24        Q.   So you think they -- would it be
25   fair for me to say they average maybe 200

1  or more a year?

2        A.   That is a fair assessment just

3  based off of what I had last year.

4        Q.   And in the 600 or more reports

5  you've received regarding the use of force,

6  you did not see one situation in which an

7  officer may have benefited from a remedial

8  action?  Or remedial training?

9        A.   No, sir.

10       Q.   Did you say "no?"

11       A.   No, I didn't see not one that

12 would have benefited from that or -- and

13 the reason why is because every officer has

14 to go through use of force training every

15 year in-service anyway.

16       Q.   I gotcha.

17       A.   There is a, as I stated before, I

18 know of two instances where officers had --

19 I want to choose my words correctly,

20 because I don't want to make it seem like

21 an officer did something wrong because they

22 didn't.  They just could have done

23 something better.  And I called them and

24 asked them about the case, what they did,

25 what they thought, what was the climate,

1   and kind of got a better understanding from

2   the officer's point of view and then kind

3   of gave them some counseling and some

4   direction as to how they could have handled

5   it better and -- but there were only two

6   cases where that's happened.

7        Q.   So does teaching of the use of

8   force at the Academy, is that part of the

9   defensive tactics course or is it it's own

10  course?

11       A.   It is -- it is it's own course,

12  but it is incorporated.  I can't teach

13  defensive tactics without teaching use of

14  force, because it's part of it.  I'm

15  teaching you how to strike and control and

16  takedown and handcuff, which is all part of

17  using force.  So I have to kind of marry

18  the two together.

19       Q.   Have you ever provided a copy of

20  the course materials, the entire binder or

21  any part of the binder, to Counsel for the

22  City of Baton Rouge with respect to these

23  cases that we're deposing you in today?

24       A.   I'm not familiar with the cases

25  we're speaking of today.

1        Q.    Let me make it even easier then.
2   Have you ever provided the Academy binder
3   to Mr. Scott or any other lawyer for the
4   City of Baton Rouge?
5        A.    I've been asked to submit our
6   manuals to our legal representation.  As
7   far as the Academy binder, that would
8   probably be asked by -- asked of a
9   lieutenant to submit that, because he's in
10  charge of all the Academy material.  But as
11  far as the defensive tactics manuals, I've
12  been asked to submit that for other cases.
13       Q.    Have you ever had occasion to
14  review the Louisiana State Police Academy
15  materials with regard to the use of force?
16       A.    No, sir.
17       Q.    Have you ever attended any
18  courses or classes at the Louisiana State
19  Police Academy?
20       A.    No, sir.
21       Q.    What training have you received
22  in the handling of protests or large crowds
23  of citizens?
24       A.    In the Academy there is a class
25  taught by the commanders of Mobile Field

1   Force that classify what is called Mobile

2   Field Force.  I also teach a class called

3   Civil Unrest, which talks about how --

4   what's the difference between a

5   demonstration and a riot, what's the

6   difference between a protest and a riot or

7   unruly crowd.  We talk about the use of

8   Mobile Field Force and how they're

9   deployed, what their purpose is, how Mobile

10  Field Force works, how Mobile Field Force

11  works with the special response team or

12  SWAT team.  How the arrest team works with

13  Mobile Field Force if there's, not just a

14  crowd, but, you know, agitators in the

15  crowd.  So I reviewed this material for

16  every class that I've taught.

17       I'm also a member of Mobile Field

18  Force.  I was a member of Mobile Field

19  Force as of 2018.  I wasn't on Mobile Field

20  Force in 2016.

21       Q.   What is the review process for

22  the Academy's defensive tactics training?

23  Is there some review or certifications that

24  the Academy itself -- or standards, I'm

25  sorry -- that the Academy itself has to

1    meet?

2          A.    They are tested.    There is a

3    written test and there's a practical

4    application test, a practical examination I

5    guess you could say, where they have to

6    demonstrate proficiency in the techniques.

7    And we also put them through scenario-based

8    training where they have to utilize those

9    techniques.

10         Q.    These are the recruits you're

11   talking about?

12         A.    Yes, sir.

13         Q.    Okay, then I may have misstated.

14   I'm talking about the program itself, the

15   entire Academy.    What standards do you have

16   to meet and what organizations or processes

17   of review does the Academy have to go

18   through?

19         A.    The Academy?

20         Q.    Yes.

21         A.    I myself, I just was recently

22   recertified as an instructor of SSGT.

23   Active certifications last three years.    I

24   just got back from a conference, matter of

25   fact, this week.    So I've -- every three

```
 1   years is when I go recertify and the
 2   instructors are to recertify every three
 3   years.
 4        Q.   Who recertifies you?
 5        A.   The founder of SSGT.  His name is
 6   Johnny Lee Smith.
 7        Q.   Are there any other organizations
 8   that are involved in certifying or
 9   reviewing the methods or teachings of the
10   Academy?
11        A.   No, sir, unless, unless Louisiana
12   POST audits our training, like they come
13   and sit in on a class.  But there is no
14   other certifying body that would handle
15   that.
16        Q.   So how do you know that what
17   you're teaching at the Academy meets the
18   highest standards of your profession?
19        A.   Meet -- okay, how do I know
20   that --
21        Q.   Yes.  How does the Academy know
22   that it's teachings and courses meets the
23   highest standards for teaching police
24   recruits?
25        A.   The SSGT system is based on the
```

1    principle that the techniques work on most

2    people, for most people, most of the time.

3    There's no guarantees in any system.  The

4    system that we use is the most practical

5    because it has applications of defensive

6    tactics that incorporate the ground.

7    There's a high percentage of altercations

8    or bodies that end up on the ground.  We

9    try to teach the officers that we're not

10   grapplers, we not Jiu-Jitsu players, we're

11   not martial artists, we are officers.  We

12   have to get to our feet.

13        Q.   I get it.  I understand.  But

14   what I'm asking you is how do you determine

15   whether or not what you're teaching is the

16   best things to teach?  Is there any sort of

17   a review or certification or grading of the

18   Academy and it's courses?

19        A.   What I'm hearing you ask is

20   who -- who says that what we're doing is

21   the best?

22        Q.   Yes, who judges what you're doing

23   as to whether it's good or not?

24        A.   There, there, there is nobody

25   that makes that judgment.  It's --

1     Q.    Okay.  So how do you know what

2     you're doing is the best thing to do and

3     the best way to teach courses?

4         A.    We, we -- this system has been

5     vetted and comparing it to other systems

6     that have been taught and other systems

7     that are available.

8         Q.    Who does that vetting?

9         A.    The instructors, the --

10        Q.    Outside of the Baton Rouge Police

11    Department system itself, who reviews your

12    teaching methodology and practices?

13        A.    No one.

14        Q.    No one?

15        A.    Besides POST, Louisiana POST.

16    But we don't bring in somebody else and say

17    to -- we don't bring anybody else to grade

18    us on that, no.

19        Q.    Give me one second, please.

20    Sorry about that.  I'm almost finished.

21        So, if I understand your testimony,

22    there is no umbrella organization or

23    national organization that judges or grades

24    the Academy itself as to it's, it's

25    instruction, is that correct?

```
1           A.   No.  That would be a question
2      for -- excuse me -- that would be a
3      question for Professional Standards,
4      because CALEA would make that
5      determination.
6           Q.   Who is CALEA?  Forgive me.
7           A.   That is -- forgive me, but I
8      can't -- it's a, it's a certifying body for
9      the police department.
10                    COURT REPORTER:  Do you know
11               how it's spelled, sir?
12                    THE WITNESS:  What is it?
13               C-A-L-E-A.  It's an acronym
14               for --
15                    COURT REPORTER:  I'll look
16               it up online, thank you.
17      BY MR. RODNEY:
18           Q.   All right.  So CALEA is one
19      organization that would provide a review of
20      your standards and practices.  Do you know
21      of any other?
22           A.   Again, that's a question for
23      Professional Standards, because they would
24      deal with those certifying bodies.
25           Q.   Well, have your courses ever been
```

1    audited by anyone else?

2         A.    No, sir.

3         Q.    Well, how are you graded?  How do

4    you know you're doing a good job?

5         A.    Uh --

6         Q.    Well, let me rephrase it, because

7    that's not really fair.  I want to rephrase

8    it differently.  How do you receive

9    feedback in response as to the job that

10   you're doing?

11        A.    I receive feedback from my --

12   from SSGT, from the SSGT founder.  Every

13   conference that we go to there is a review,

14   a test, or testing.  And I don't know if

15   it's -- I don't want to sound like I'm

16   trying to come off like I'm bragging -- but

17   the last two conferences I've been to, 2018

18   and the one I just came from, I received

19   topnotch master instructor.

20        Q.    Congratulations.

21        A.    Thank you.

22        Q.    Now, do you know whether or not

23   the Academy has received similar accolades

24   or how it's been graded --

25        A.    No, sir.

1       Q.    -- overall?

2       A.    That's a question for

3   Professional Standards if there has been

4   some kind of review like that.

5       Q.    So you wouldn't know if the

6   Academy as a whole got an "A" or an "F" or

7   anything like that in terms of a review?

8       A.    No, sir, I would not know that.

9       Q.    Have you ever been involved in

10  any discussions as to the adequacy of the

11  teaching of the use of force at the

12  Academy?

13      A.    Have I been involved in

14  discussions of the adequacy?

15      Q.    Yes.

16      A.    No, sir.

17      Q.    Have you ever been in any

18  discussions on how to improve the teaching

19  of the use of force at the Academy?

20      A.    With exception to improving the

21  training?

22      Q.    Yes.

23      A.    There has been some discussion on

24  improving training, which, of course, would

25  improve the officer's response in the

1    field, and that was the incorporation of
2    scenario training during in-service.
3    Before, in-service was just kind of like we
4    would meet on defensive tactics day or DT
5    day and review alot of the materials, alot
6    of the techniques.  But what we started
7    doing collectively is we started
8    incorporating scenario-based training.  At
9    the end of this year, say, for example,
10   October, I will construct a lesson plan to
11   go into 2022 and it would incorporate two
12   or three scenarios.  And what we found is
13   that the officers retain the material a
14   little bit better, they're more engaged.
15   And I've been seeing in our use of force
16   reports -- not so much use of force
17   reports -- but the reports attached to
18   those, the actual officers' reports, they
19   are referring back to those techniques as
20   they are using them in the field.  So, it's
21   actually, you know, they're actually
22   retaining the material and remembering it.
23   Every now and then I get a call about a
24   specific technique they didn't remember the
25   name of.  So I know that they are using it

1  and I know that they are retaining the
2  information.
3       Q.   I just have a couple more
4  questions.  Do you teach the course at the
5  Academy that deals with the Mobile Field
6  Force?
7       A.   I do not, no, sir.
8       Q.   Who teaches that course?
9       A.   That would be the commander of
10  Mobile Field Force.
11      Q.   So there's no course at the
12  Academy that deals with the Mobile Field
13  Force?
14      A.   Yes, but we have an adjunct
15  instructor come in and teach that course
16  for us.
17      Q.   Who is that adjunct instructor?
18      A.   That is the commander of the
19  Mobile Field Force.  At the time, in 2016,
20  I don't remember who that was.  And I think
21  we just had another command change just
22  recently and I don't know who that person
23  is.
24      Q.   Who grades or reviews the course
25  that is taught by the commander of the

284

1    Mobile Field Force?

2         A.   After they teach the course, they

3    have a, you know, questions, study

4    questions, that --

5         Q.   No, no, I'm not talking about the

6    recruits.  I'm talking about the

7    instructor.  Who reviews the instructor's

8    performance as a teacher of the Mobile

9    Field Force course?

10        A.   That is overseen by the director

11   of training.  How this works is the Academy

12   instructors are certified by POST to teach.

13   We are present in those classes that are

14   POST mandated.  So, we, for example, if

15   armed robbery is the class that's being

16   taught that day or for those two hours, we

17   are present in class and can actually teach

18   the material that is armed robbery.

19   However, what we'll do is we'll bring in

20   the armed robbery detective or the armed

21   robbery commander as an adjunct instructor.

22   They're not POST certified, but they're

23   there to facilitate that instruction.

24        Q.   I can understand that.

25        A.   And, so, as Mobile Field Force,

285

1    as Mobile Field Force commander, you know,

2    none of the Academy instructors are, you

3    know, we're not -- we're not -- I won't say

4    at liberty -- but, you know, we wouldn't do

5    it justice teaching that Mobile Field

6    Force, because they actually teach the guys

7    in the class.  There's a practical -- we

8    will actually put the recruits in formation

9    and actually go through Mobile Field Force

10   formations and how it moves.  And, so, the

11   commander kind of facilitates all that.

12        Q.   Okay.  And who grades or reviews

13   the instructions of the adjunct teachers

14   who come into the Academy from their

15   respective units and departments?  Who

16   reviews that?

17        A.   The, the, it's, it's overseen by

18   the director of training.

19        Q.   But do they get a grade?

20        A.   No, there's no grading system,

21   no, sir.

22        Q.   Do you get a grade for what you

23   teach?

24        A.   No, sir, I --

25        Q.   Do you have an annual, do you

1    have an annual review?

2        A.    I do have, I do have an annual

3    review.  I just had it.

4        Q.    Who does your annual review?

5        A.    We have two -- well, we had two

6    sergeants.  We do have two sergeants in the

7    Academy now.  And the reviews come from the

8    lieutenant and it is done by those two

9    sergeants.

10       Q.    And -- go ahead.

11                COURT REPORTER:  I'm sorry,

12            I missed the end of that.

13                MR. RODNEY:  That's my

14            fault.

15   BY MR. RODNEY:

16       Q.    Go ahead.

17       A.    Sergeant Morse did my review.

18   The year before that, Lieutenant Williams

19   did my review.

20       Q.    As part of your review, do you

21   get a grade or a number?

22       A.    We, it's -- yes, a number.

23       Q.    What's the number?  How does the

24   number system work?

25       A.    I think it's, like it's a one,

```
 1    two, or three.  Three, four being superior,
 2    one for being acceptable, two for being
 3    above average.  And I'm kind of spit-
 4    balling that.  That's a, you know --
 5         Q.   So did you get the highest grade?
 6         A.   It averaged about 2.75.
 7         Q.   So why didn't you get the highest
 8    grade?
 9         A.   It's not just my teaching, it's
10    overall.  So it's performance, it's, it's,
11    appearance, it's --
12         Q.   I've only been with you an hour,
13    I can't imagine you not getting the highest
14    grade, and I want to know why you didn't
15    get it.
16         A.   I was graded harshly, sir.
17         Q.   I understand that.  The person
18    who preceded you, Sergeant O'Donoghue, who
19    graded his performance?
20         A.   That would be the director of
21    training.  I believe that was Lieutenant
22    Williams at the time.
23         Q.   Did you replace him because of
24    poor performance --
25         A.   No, sir.
```

1      Q.   -- on his part?

2      A.   No, sir.

3      Q.   How do you know that?

4      A.   Personally, if I can speak

5   personally, I hold Sergeant O'Donoghue,

6   Lieutenant O'Donoghue, in the highest

7   regard.  He was a mentor to me.  When I

8   came through the Academy as a young rookie,

9   he was Academy staff.  I learned alot from

10  him.  As far as defensive tactics,

11  Lieutenant O'Donoghue is a Jui-Jitsu black

12  belt.  He's been in martial arts for a long

13  time and he has the highest of standards

14  that I can only hope to be.  So I know it

15  wasn't poor performance.  He moved from his

16  position to another position in Financial

17  Crimes and is now a commander in our SBU.

18      Q.   Do you know whether he came --

19  the Academy came under any criticism during

20  his tenure as the defensive tactics

21  coordinator?

22      A.   I cannot say that, no, sir.  I

23  wouldn't believe it if that, if that was

24  said.

25      Q.   Have you been part of any

1    improvement plan for the Academy itself?

2        A.    No, sir.

3        Q.    Do you know whether or not the

4    Academy uses any outside consultants to

5    review the teachings and performance of

6    Academy instructors?

7        A.    No, sir.  That would be a

8    question for Lieutenant Williams.

9        Q.    All right.  That might be it.  I

10   appreciate your great patience.

11       A.    Thank you, sir.

12       Q.    Just give me one second, please.

13             MR. RODNEY:  Let me just

14             say, to the extent that we have

15             not received the course materials

16             that were described by the

17             instructor today and all of the

18             SSGT materials, the POST mandated

19             materials, the study guides, any

20             syllabus, any media or news

21             reels, anything other than the

22             policies and general orders that

23             have already been produced, I

24             would call for their production.

25             I would ask to have the

```
 1                  opportunity and reserve the right
 2                  to have the opportunity to reopen
 3                  this deposition with regard to
 4                  any of those materials.  But with
 5                  that, I have no further
 6                  questions.  Yes?
 7                       MR. SCOTT:  Can I get a
 8                  clarification here?
 9                       MR. RODNEY:  Yes, sir, of
10                  course.
11                       MR. SCOTT:  Do you want the
12                  2016 materials?
13                       MR. RODNEY:  Yes.
14                       MR. SCOTT:  Or do you want
15                  the current materials?  Because I
16                  don't think the current materials
17                  are necessarily the same as 2016.
18                       MR. RODNEY:  I would like to
19                  start with 2016, Joe.  I'm sure
20                  that will satisfy all of my
21                  curiosities.
22                       MR. SCOTT:  I believe I've
23                  asked for it before, but I'll try
24                  again.
25                       MR. RODNEY:  Yes, sir.  And
```

```
 1              that would include, of course,

 2              any references to videos, links,

 3              realtime crimes and examples used

 4              by the instructors during that

 5              timeframe as well.  So, thank you

 6              so much, and that will be it for

 7              me.

 8                   COURT REPORTER:  Can I ask,

 9              if anybody has else has any other

10              questions, that we just take a

11              short break, please?  Or are we

12              done?

13                   MS. MOORE-O'NEAL:  I have a

14              couple of questions so I'm fine

15              to take a break.  It's like two.

16                   MR. LANSER:  I think we

17              should take five.

18                   COURT REPORTER:  That would

19              be great, thank you.

20                   (Off the record)

21   BY MS. MOORE-O'NEAL:

22        Q.   I'm curious if you have a copy of

23   the materials in your possession -- I don't

24   mean right now -- but if you have a copy of

25   the training materials?
```

```
 1        A.   I can obtain one.  But when you
 2   say "the training materials," you're
 3   talking about like the classes that we
 4   teach, all that --
 5        Q.   Yes.
 6        A.   -- it's on our training drive in
 7   our computer.  I can -- and for the classes
 8   that I teach, I create PowerPoints as
 9   talking points and, I mean, I can obtain
10   those.
11        Q.   And is that something that could
12   be shared with your Attorney?
13        A.   I believe so, if it's --
14        Q.   And just to make sure --
15             MS. MOORE-O'NEAL:  Sorry.
16             You were answering, Joe, I'm
17             sorry.
18             MR. SCOTT:  Yes.  So we're
19             going to start the quest for
20             historical training materials and
21             see how we do.
22             MS. MOORE-O'NEAL:  Okay.
23             MR. SCOTT:  And if I find
24             anything, I'll evaluate it with
25             the training staff and the other
```

```
 1              members of my unit and figure out
 2              what we can release.  And if
 3              there's any reason that we can't
 4              release it or that we have to
 5              release it subject to some kind
 6              of protective order or
 7              confidentiality.
 8                   MS. MOORE-O'NEAL:  Okay.
 9                   MR. RODNEY:  Okay, then -- I
10              trust you, Joe -- but let's
11              expand that search to include any
12              of the use of force reports on
13              any of the Plaintiffs in these
14              cases.  I think I can speak for
15              everyone, unless they already
16              have them.  I certainly don't
17              have it in Max Geller.
18                   MR. SCOTT:  That's kind of
19              on my list, Roy.
20                   MS. MOORE-O'NEAL:  I agree.
21              And, Joe, the purpose of me
22              asking if the Witness has it is
23              to see if maybe it would be
24              easier to have him do a search,
25              you know, if he --
```

```
 1                   MR. SCOTT:  Right.  But he's
 2              already told us that he got to
 3              the Academy in 2018.  And, so, I
 4              have absolute faith that he can
 5              find things from 2018 to the
 6              present, but I don't know what
 7              happened before he got there.
 8                   MR. RODNEY:  He knows where
 9              the secret vault is.  I can tell.
10   BY MS. MOORE-O'NEAL:
11        Q.    I have a couple more questions.
12   I understand that you were not like in the
13   position now that you were in 2016.  But
14   I'm curious if you're aware if BRPD
15   Training Academy used scenario-based
16   training on use of force in 2016 or before?
17        A.    Yes, in Training Academy, yes.
18        Q.    Okay.  What about any in-services
19   on use of force in 2016?
20        A.    Yes, that is about around the
21   time when we started actually using
22   scenario-based training in our in-service.
23        Q.    Okay.  Thank you.
24                   MS. MOORE-O'NEAL:  Dave?
25                   MR. LANSER:  Yes.
```

1            Hopefully, I just have a quick

2       one.

3   BY MR. LANSER:

4       Q.   Let's see here -- okay, just a

5   follow-up a bit about the use of force

6   reports again.  I'm curious if there's any

7   scenario (unintelligible) had to write a

8   use of force report might be suspended?

9       A.   I'm sorry?

10      Q.   What if there's a scenario -- let

11  me ask it a little more directly.  Let's

12  say there's, you know, if a civil disorder

13  is occurring, does that -- does the fact

14  that law enforcement is responding to a

15  civil disorder suspend the requirement to

16  file a use of force report?

17      A.   That is a question for the

18  commanders at that time.  As a patrol

19  officer, I, I was not privy to that

20  information.  If we were told, you know,

21  because of the nature of the situation that

22  was happening if a use of force report had

23  to be filed or -- I don't know that.  That

24  was up to the Chief and command staff at

25  that time.

1      Q.   So, basically, if there's an
2  incident commander, the incident commander
3  could suspend the requirement?  Is that my
4  understanding?
5      A.   I can't answer that question
6  because I don't know who would make that
7  decision.  But that decision was not -- you
8  know, if there's a decision to be made of
9  suspending the writing of use of force
10 reports because, for lack of, you know, for
11 the sake of understanding, there's alot of
12 uses of force going on.
13     Q.   Yes.
14     A.   And so it's suspended because of
15 just the nature of the situation.  I don't
16 know if that decision was made or who would
17 make that decision.  That would probably be
18 a question for the Chief or the Chief at
19 that time to answer.
20     Q.   Okay.  Do you know of any --
21              COURT REPORTER:  Mr. Lanser,
22          your audio is really -- it's
23          coming in and out.
24              MR. LANSER:  Is that better?
25          Can you hear me better?

```
 1              COURT REPORTER:  Yes, at
 2         this moment.  "Do you know of
 3         any -- " --
 4  BY MR. LANSER:
 5      Q.   I was asking if you knew of any
 6  specific times where there was a suspension
 7  of the need to file a use of force report
 8  or is this just a hypothetical that you're
 9  envisioning?
10      A.   That would be a hypothetical.
11  There's not that I know of for -- I've
12  never known that to happen.
13      Q.   Okay.
14      A.   I'm not saying it didn't happen
15  or wouldn't happen, but I, I, I don't know
16  that information.
17      Q.   Yes, I understand.  Is there a
18  mechanism for the incident commander to do
19  that sort of thing or is this all just, you
20  know, you want to make sure --
21      A.   That's up to the captains and
22  lieutenants and commanders that have been
23  trained to do so.  I don't know.
24      Q.   Okay.  I think you mentioned to
25  Mr. Rodney earlier, did you say that you
```

```
 1   taught a course about civil unrest versus
 2   riots?
 3        A.   Right.  So the name of the course
 4   is Civil Unrest and it covers
 5   demonstrations, the difference between, you
 6   know, demonstrations, protests, and riots
 7   and, you know, things of that nature.
 8               MR. LANSER:  I guess a quick
 9          question just to Mr. Scott, I
10          know -- I don't believe Officer
11          Britton's been offered to speak
12          on crowd control and that sort of
13          thing.
14               MR. SCOTT:  I had someone
15          else in mind for that.  But, you
16          know --
17               MR. LANSER:  If the person
18          you had in mind could speak
19          specifically to 2016 procedures,
20          that would probably be better.  I
21          was just wondering.  I just want
22          to make sure he's not being
23          offered for that topic before we
24          run from it or if you plan on
25          offering someone else.
```

```
 1              MR. SCOTT:  I was planning
 2         on offering someone else who I
 3         believe had more relevant 2016
 4         experience.
 5              MR. LANSER:  Okay.
 6              MR. SCOTT:  If the group is
 7         not satisfied with the responses
 8         of the person that I've
 9         designated, then we can recall
10         Corporal Britton to talk about
11         the course he teaches now.
12              MR. LANSER:  Okay.  That
13         sounds fair.  And I believe that
14         wraps up my questions for you,
15         Officer Britton.  I appreciate
16         your time.  I know it was a long
17         afternoon.
18              Mr. Scott, one other
19         thing --
20              MR. RODNEY:  I have a couple
21         of questions.
22              MR. LANSER:  Oh, sorry, go
23         ahead, Roy.
24   BY MR. RODNEY:
25       Q.   I just have a couple more
```

1    questions.  Officer Britton, can you hear

2    me?

3         A.   Yes, sir.

4         Q.   You keep a log on use of force

5    reports, right?

6         A.   Yes, sir.

7         Q.   What's that called?

8         A.   What is it called?

9         Q.   Yes.  What's it called?  What's

10   your log called?  Does it have a name?

11        A.   No, sir, it's just I have a file

12   cabinet where I keep all the use of force

13   reports by month.

14        Q.   And were there use of force

15   reports in that file cabinet that preceded

16   you?

17        A.   Those have long been boxed up and

18   stored.

19        Q.   Where are they stored?

20        A.   They are in a box in a room in

21   the Training Academy somewhere.  If you're

22   looking --

23        Q.   What's that room, what's that

24   room called?

25        A.   Uh, the room.  There's no --

1      Q.    Let me cut to the chase.  Let me

2   cut to the chase.  If I had to go find an

3   old use of force report, how would I do it?

4      A.    Probably contact IA.

5      Q.    No, I'm talking about the ones

6   from the Academy; the ones that were sent

7   to the Academy.  How would I find the ones

8   sent to the Academy, where would I look?

9      A.    You would have to dig through

10  boxes to find it.  That's why I said a

11  better record would be kept in IA.

12     Q.    I appreciate it, but I'm still

13  focused on the Academy.  So I would have to

14  dig through boxes.  Where are the boxes?

15     A.    They're in a room, in a big room

16  with boxes in them of reports and

17  paperwork.

18     Q.    What's that room called?

19     A.    There's no name for the room.

20     Q.    Where's the room located?

21     A.    It is inside, it's inside the

22  building.  It's, it's close to our offices.

23     Q.    Come on, I'm trying to get you

24  out of here.  Where's the boxes?

25     A.    I don't know how to answer that

```
 1    question.
 2         Q.   Just tell me, are they first
 3    floor, second floor, a certain hallway,
 4    next to the restroom?  Tell me where they
 5    are.
 6         A.   They're on the first floor in a
 7    file room.  There is, in that room, there's
 8    file cabinets from every -- I don't want to
 9    say every -- but Academies that preceded me
10    on officers when they were in the Academy.
11    There is use of force reports in boxes
12    stacked up --
13         Q.   And who is responsible for that
14    room and the filings in it?
15         A.   There is not one person that's
16    responsible for that, it's --
17         Q.   Who's the clerk of the works, you
18    know, the person that you go through to
19    find something?  Everybody has one of
20    those.  Who's that person?
21         A.   Well, if you're looking for a
22    secretary that we have, that's --
23         Q.   It doesn't matter what their
24    title is, just a person who's most
25    knowledgeable about that record room.
```

```
1        A.    That's kind of all of us.  We, we
2   know where it's at.  If somebody calls and
3   says, hey, look I need records on this, our
4   secretary, Eden Miller, can find it.  If
5   it's something that has to be, like an
6   actual piece of paper, then we'll go look
7   into the files ourselves if we need to.
8        Q.    So you would go to Eden Miller?
9        A.    Yes.
10        Q.    Okay, that's all the questions I
11   had.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                WITNESS CERTIFICATE

 2

 3           I, ORSCINI BEARD, II, have read

 4    or have had the foregoing testimony read to

 5    me pursuant to Rule 30(e) of the Federal

 6    Rules of Civil Procedure and/or Article

 7    1445 of the Louisiana Code of Civil

 8    Procedure and do hereby certify that, to

 9    the best of my ability and understanding,

10    it is a true and correct transcription of

11    my testimony.

12

13

14    Please check one:

15

16    _____Without corrections

17    _____With corrections (see errata sheet)

18

19

20

21    _____  _____

22    Name                         Date

23

24

25
```

```
1              WITNESS CERTIFICATE

2

3              I, LIEUTENANT WILLIAM CLARIDA,

4   have read or have had the foregoing

5   testimony read to me pursuant to Rule 30(e)

6   of the Federal Rules of Civil Procedure

7   and/or Article 1445 of the Louisiana Code

8   of Civil Procedure and do hereby certify

9   that, to the best of my ability and

10  understanding, it is a true and correct

11  transcription of my testimony.

12

13

14  Please check one:

15

16  _____Without corrections

17  _____With corrections (see errata sheet)

18

19

20

21  _____  _____

22  Name                         Date

23

24

25
```

1              WITNESS CERTIFICATE

2

3              I, CORPORAL WALLACE BRITTON, have

4    read or have had the foregoing testimony

5    read to me pursuant to Rule 30(e) of the

6    Federal Rules of Civil Procedure and/or

7    Article 1445 of the Louisiana Code of Civil

8    Procedure and do hereby certify that, to

9    the best of my ability and understanding,

10   it is a true and correct transcription of

11   my testimony.

12

13

14   Please check one:

15

16   _____Without corrections

17   _____With corrections (see errata sheet)

18

19

20

21   _____    _____

22   Name                            Date

23

24

25

```
 1              C E R T I F I C A T E
 2
 3         I, Debra J. Brooks, a Certified
    Court Reporter in and for the State of
 4  Louisiana, #81003, as the officer before
    whom this testimony was taken, do hereby
 5  certify that SERGEANT ORSCINI BEARD, II,
    LIEUTENANT WILLIAM CLARIDA and CORPORAL
 6  WALLACE BRITTON, after having been by me
    first duly sworn upon authority of R.S.
 7  37:2554, did testify as hereinabove set
    forth in the foregoing 303 pages.
 8
           That this testimony was reported by me
 9  in the stenotype reporting method, was
    prepared and transcribed by me or under my
10  personal direction and supervision, and is
    a true and correct transcript to the best
11  of my ability and understanding; that the
    transcript has been prepared in compliance
12  with transcript format guidelines required
    by statute or by the rules of the board;
13
           That I have acted in compliance with
14  the prohibition on contractual
    relationships, as defined by the Louisiana
15  Code of Civil Procedure Article 1434 and in
    rules and advisory opinions of the board;
16
           That I am not related to counsel or to
17  the parties herein, nor am I otherwise
    interested in the outcome of this matter;
18
           This certification is valid only for a
19  transcript accompanied by my original
    signature and original required seal on
20  this page.
21
22
23         _____
           Debra J. Brooks
24         Certified Court Reporter
25
```