UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

BLAIR IMANI, ET AL.

VERSUS

CITY OF BATON ROUGE, ET AL.

CIVIL ACTION

NO. 17-439-JWD-EWD

RULING AND ORDER

## I.    Introduction

This matter comes before the Court on two dispositive motions.  The first is the *Motion for Summary Judgment* (Doc. 307) filed by the defendants associated with the City of Baton Rouge/Parish of East Baton Rouge (the "City") (collectively, "Defendants").[1]  This motion is opposed by all Plaintiffs.[2] (Doc. 309.)  No reply was filed. The second motion is *Plaintiffs' Motion for Partial Summary Judgment* (Doc. 297) filed by all Plaintiffs as to their First Amendment claims and by eight Plaintiffs[3] as to their claims of false arrest, false imprisonment, and manufacturing of false evidence, (Doc. 297-1 at 3–4).  This motion is opposed by Defendants, (Doc. 310), and Plaintiffs have filed a reply, (Doc. 323). Oral argument is not necessary.  The Court has carefully

---

[1] Defendants include: the City, former Mayor-President Melvin Lee "Kip" Holden, and ex-Baton Rouge City Police Chief, Carl Dabadie, Jr., in his individual capacity, Baton Rouge City Chief of Police in his official capacity (previously Carl Dabadie, Jr., currently Murphy Paul), former Interim Chief Jonny Dunnam, and BRPD officers Jonathon Abadie, William Alexander, Alex Bell, Brandon Blust, Kenny Brewer, James Crockett, Myron Daniels, Jason Dohm, Taylor Giroir, Kirk Grover (incorrectly named "Kirk Glover"), Alan Hamilton, Darren Hunt, Earnest Jones, Earl Lapeyrouse, Alaina Mancuso, Richard McCloskey, Travis Norman, Jeff Pittman, Reab Simoneaux, Jr., Christopher Bryan Taylor, James Thomas, Billy Walker, Mike Walker, David Wallace, Randall Wiedeman, Derrick Williams, Willie Williams, Keith Wilson, and Curtis Wilson.

[2] The remaining Plaintiffs include Blair Imani, Akeem Muhammad, Raae Pollard, Samantha Nichols, Alexus Cheney, Victor Onuoha, Karen Savage, Cherri Foytlin, Alisha Feldman, Antonio Castanon Luna, Nadia Salazar Sandi, Dr. Daniel Liebeskind, Finn Phoenix (C. Gaffney), and Leah Fishbein.

[3] Specifically, Blair Imani seeks partial summary judgment for these discrete claims against William Alexander, Akeem Muhammad  against Travis Norman, Samantha Nichols against Jonathan Abadie, Victor Onuoha against Willie Williams, Cherri Foytlin against Derrick Williams, and Dr. Daniel Liebeskind against Alex Bell. (*Id.*) Each of these Plaintiffs, along with Alexus Cheney and Raee Pollard, also seek partial summary judgment against the City on these claims. (*Id.*)

considered the law, the facts in the extensive record, and the arguments and submissions of the parties and is prepared to rule.

In 1965, the Supreme Court decided two companion cases arising from civil rights demonstrations in Baton Rouge protesting racial segregation and discrimination: *Cox v. Louisiana*, 379 U.S. 536 (1965) ("*Cox I*") and *Cox v. Louisiana*, 379 U.S. 559 (1965) ("*Cox II*"). At the conclusion of the second, the Supreme Court summarized the tensions between freedom and order but concluded that the two were, in our system, inseparable:

> Liberty can only be exercised in a system of law which safeguards order. We reaffirm the repeated holdings of this Court that our constitutional command of free speech and assembly is basic and fundamental and encompasses peaceful social protest, so important to the preservation of the freedoms treasured in a democratic society. We also reaffirm the repeated decisions of this Court that there is no place for violence in a democratic society dedicated to liberty under law, and that the right of peaceful protest does not mean that everyone with opinions or beliefs to express may do so at any time and at any place. There is a proper time and place for even the most peaceful protest and a plain duty and responsibility on the part of all citizens to obey all valid laws and regulations. There is an equally plain requirement for laws and regulations to be drawn so as to give citizens fair warning as to what is illegal; for regulation of conduct that involves freedom of speech and assembly not to be so broad in scope as to stifle First Amendment freedoms, which need breathing space to survive; for appropriate limitations on the discretion of public officials where speech and assembly are intertwined with regulated conduct; and for all such laws and regulations to be applied with an equal hand. We believe that all of these requirements can be met in an ordered society dedicated to liberty. We reaffirm our conviction that freedom and viable government are . . . indivisible concepts.

*Cox II*, 379 U.S. at 574–75 (cleaned up). Now, over half a century later, this Court is asked to again balance these sometimes competing interests in another protester case involving racial divisions in the city of Baton Rouge.

Specifically, in July 2016, Plaintiffs were protesting the killing of Alton Sterling by police officers and their desire for change in the Baton Rouge Police Department ("BRPD"). They marched downtown and were eventually led to the corner of East Boulevard and France Street. Many of the protesters gathered on private property. The police surrounded them on three sides. An hour passed. Officers then moved in to make mass arrests. These Plaintiffs are some of those apprehended demonstrators.

The parties present radically different versions of events. On the one hand, Defendants submit evidence that some protesters intended to block the interstate. Defendants also show proof that the crowd was unruly and were given several orders to disperse throughout the standoff yet failed to do so. Defendants refer to other parts of the record, including videos and photographs, reflecting that Plaintiffs were in the street in violation of the law. According to Defendants, both the officers and the community were in danger.

Conversely, Plaintiffs provide testimony, including that of experts, indicating that the protesters were largely peaceful. Plaintiffs point to the City's own admissions that no Plaintiff was violent and that no Plaintiff failed to comply with orders. Plaintiffs also highlighted the militarized response and overwhelming force of the police in contrast to the unarmed and submissive demonstrators. According to Plaintiffs, there was no danger, except for civil rights violations at the hands of Defendants.

Given the conflicting evidence on many critical issues in this case, and given the differing reasonable conclusions that can be drawn from even undisputed facts in the record, the Court finds that genuine issues of material fact preclude summary judgment in favor of either party on nearly every one of Plaintiffs' claims. This case will largely be decided by a jury drawn from the

community.  And given the fundamental policies implicated by this case—liberty and order—the Court believes this is the best possible outcome.

## II.  Relevant Factual Background

### A.  Events Leading up to East and France

#### 1. Beginning of the Protest at Issue

On July 5, 2016, Baton Rouge police officers shot Alton Sterling to death.  (*Def.'s Resp. Pls.' Statement of Material Facts in Supp. Mot. Partial. S.J.* ("*DRPSMF*") ¶ 1, Doc. 311 at 1.)[4] Throughout the following week, a series of large protests took place about Sterling's killing. (Rule 30(b)(6) Dep. 109:21–110:1, Doc. 292-3.)

On Sunday, July 10, 2016, there was a scheduled march and protest in downtown Baton Rouge. (Pl.'s *Resp. Defs.' Statement Material Facts* ("*PRDSMF*") ¶ 2, Doc. 309-1 at 1.)[5]  There was no permit, but the organizers contacted the BRPD, which treated the event as though it had a permit, assisting with street closures and security. (*Id.*)  That march went from Wesley United Methodist Church, 544 Government Street (between Napoleon Street and St. Charles Street), to the State Capitol, and returned to the church. (*Id.*)

Both sides agree that, on return, the protesters divided. (*See id.* ¶ 3.)  Many protesters got into their vehicles and departed the area. (*Id.*)  Others advanced east down Government Street. (*Id.*)

#### 2. Arrival at East and France

The protesters were redirected off of Government Street, which they had been marching down, and gathered in the intersection of East Boulevard and France Street, within a city block or

---

[4] When the *DRPSMF* is cited by paragraph number to support a particular fact, that fact is undisputed for purposes of this motion. *See* M.D. La. LR 56(c), (g).
[5] Likewise, when the *PRDSMF* is cited by paragraph number to support a particular fact, that fact is undisputed at this time. *See* M.D. La. LR 56(c), (g).

two of two separate entrances to I-110. (*PRDSMF* ¶ 9, Doc. 309-1 at 2.)  BRPD had to block traffic in order to keep the protesters from being hit by cars. (*PRDSMF* ¶ 9, Doc. 309-1 at 2–3.)

Protesters were told to go "toward East Boulevard and France Street, to clear a major thoroughfare for downtown." (*DRPSMF* ¶ 2, Doc. 311 at 1.)  BPRD argues that it did this because of fear the protesters would enter the interstate, as will be explored below. (Doc. 311 at 1.) Elements from BRPD, the East Baton Rouge Parish Sheriff's Office, Louisiana State Police, and the Calcasieu Parish Sheriff's Office responded. (*PRDSMF* ¶ 10, Doc. 309-1 at 3.)  BRPD brought in these re-enforcements and other agencies as well as "the equipment that the officers [were] wearing" and "the footprint of the event" "because of the taxing environment, the heat, to mitigate this." (David Wallace Dep. 123:2–10, Doc. 292-29.)

BRPD sent out people for the protests to photograph and video "agitators, the ones that were being loud or trying to get the crowds to follow them, and then any kind of action that [BRPD] [was] taking [(such as an arrest)] to try to catch that on video." (Keith Wilson Dep. 26:3–26:4, Doc. 298–24.)  The crowd was estimated by some to be made up of hundreds of protesters. (*PRDSMF* ¶ 11, Doc. 309-1 at 3; *see also* Myron Daniels Dep. 177:8–15, Doc. 292-22.)  The photos reflect many people gathered there. (*See* Photos ALK 1928, 1929, 1930; MES 14, 15, 16, 17; MGK 16, 17, 18.)

### B.  Events at East and France

#### 1. Before the Arrests

##### a.  The Protest in Limbo

Both sides agree that, over the course of approximately ninety minutes at East and France, additional police elements arrived and formed lines comprised of Mobile Field Force teams, SWAT, arrest teams, uniformed officers, and Crime Scene officers, forming a three-sided box.

(*PRDSMF* ¶ 16, Doc. 309-1.) Those lines were at the south end of East Boulevard facing north, the north end of East Boulevard facing south, and one line on the east side of East Boulevard facing west. (*Id.*)  Plaintiffs provide the following diagram:



(*See* Curtis Wilson Dep. 21:22–22:7, Doc. 292-11 (confirming accuracy of diagram).)   Some protesters were standing in the yard of Ms. Batiste, and the City had no reason to think that these protesters did not have permission to be there. (*See id.*; Rule 30(b)(6) Dep. 186:12–187:1, Doc. 292-25.)

*b.* <u>BRPD's Concerns about the Interstate</u>

Initially, a BRPD officer spoke to a single protester (purportedly the leader of the group), and that demonstrator said that they were going to enter and block Interstate I-110. (*PRDSMF* ¶ 4, Doc. 309-1 at 1; David Wallace Dep. 102:17–103:21, Doc. 292-29.)  Corporal Alaina Mancuso arrived later and spoke to a protester who confirmed her intention to block the freeway. (*PRDSMF* ¶ 5, Doc. 309-1 at 1.)

Later, an undercover officer reported back to his superiors that some of the protesters in the East and France group had expressed an intent to go onto the interstate. (City's Rule 30(b)(6) Dep. 171:2–23, Doc. 298-7.)  The City testified:

> Q.    Is it the City's position that the officers on the scene had a reasonable belief that if they had allowed these protesters to stay the corner of France, that they would eventually enter the interstate?
>
> A.    It was a known fact, because communication with protesters - - because the intelligence officer in the crowd, we knew exactly what their intentions were.  So yes, sir, it was a fact.

(*Id.* at 160:10–19; *see also* David Wallace Dep. 102:2–16, Doc. 288-4 ("Knowing the location of the interstate, all of those elements and bread-crumbs led us to believe that they were trying to get to the interstate to shut it down. . . .").)

But even this evidence is conflicting.  The undercover officer who reported the intelligence had not surveyed the whole group, and the City conceded that it was "unclear . . . if that reflected the intentions of the entire group." (City's Rule 30(b)(6) Dep. 172:19–23, Doc. 298-7.)  Further, when asked "whether it was two, three, four or more people talking about" entering the highway, the City said on the one hand that "[i]t was a pretty big consensus from our officer relaying the information on what the group was doing," but on the other hand that he could not "put a number on who" and that he would not "say every single person knew exactly what they were doing,

because they might have just been just following them. . . . It sounds like impossible to answer." (*Id.* at 225:18–226:8.)

Evidence is also conflicting as to the instructions given by the police to the protesters about entering the freeway.  The City's representative testified that the protesters were initially told directly by an officer that they would be allowed to enter the interstate highway. (Rule 30(b)(6) Dep. 191:11–192:8, Doc. 292-25.)  That policeman (Brandon Smith) advised the leader, "Well, hold on.  We figured y'all would.  It's dangerous." (David Wallace Dep. 104:2–16, Doc. 292-29). "So, they gave them some stall tactics to where [the police] could get the resources there to mitigate it." (*Id.*)  But a different officer, Alaina Mancuso, told another protester that she could not get on the interstate and that, if she did, she would be arrested. (Alaina Mancuso Dep. 28:5–29:6, Doc. 292-20.)

In any event, the City also based its belief about the demonstrators' intent on other protests occurring around the same time in other cities (many on that day) and the fact that "it was a common practice for protesters to . . . gain attention" in this way. (*Id.* at 267:1–268:17; *see also id.* at 264:10–266:25; Def. Ex. EEEEEE -Hundreds arrested BLM MSNBC (showing a news story containing clips of protesters on various interstates); David Wallace Dep. 102:2–16, Doc. 292-29 (saying the City's intelligence was "consistent with what protesters have done around the nation prior to this event").)   Indeed, a video from the Juvenile Justice Information Exchange produced after the events of the day (and discussed below) also reflects the intent of some protesters to block the interstate.  (*See* Def. Ex. HHHHHH -Juvenile Justice Information Exchange, at 2:05.)

Defendants submit evidence that the protesters' desire to block the interstate "would be a danger both to protesters and for other members of the public." (City's Rule 30(b)(6) Dep. 159:8–

160:1, Doc. 298-7.)  "It's extremely dangerous, especially in that location.  The traffic speeds and it's sort of a blind curve in the interstate there.  It would have been disastrous." (*Id.*)

Ultimately, the protesters never made it to the interstate that day. (Rule 30(b)(6) Dep. 164:9–12, Doc. 292-25.)  But the alleged  "primary concern" for the City and the purported "basis for the arrests of protesters at East and France was the possibility that they might have continued on to the interstate." (*Id.* at 164:13–18.)

*c.*  Danger to the Officers

As will be explained below, the parties hotly dispute the extent to which the officers and community were in danger during this period.  Plaintiffs highlight that the police had a Bearcat, which was an armored vehicle. (*PRDSMF* ¶ 15, Doc. 309-1.)  Further, BRPD had also borrowed a LRAD (Long Range Acoustical Device), which was basically a loud speaker designed to make people so uncomfortable as to leave. (Rule 30(b)(6) Dep. 132:18–133:19, 134:14–17, Doc. 292-25.)  This device was used on the top of the Bearcat, (*id.*), though the parties point to different testimony about whether the device was effective, (*compare id.* at 140:24–142:14, *with id.* at 138:2–7, 142:15–21.)  Finally, Plaintiffs dispute Defendants' characterization of themselves as "vulnerable" given Defendants' body armor, armored vehicle, LRAD, pistols, patrol rifles, ability to deploy tear gas, undercover operatives, helicopter, and "fixed wing airplane" used to provide overhead footage. (*See* Rule 30(b)(6) Dep. 120:1–5, 126:11–127:2, 128:10–17, 214:8–10, 215:20–21, 222:6–8, Doc. 292-25.)

Defendants, on the other hand, say they were waiting for support to arrive before making their move. (*See* Thomas Morse Dep. 42:4–20, Doc. 298-16.)  One officer also testified that "[the officers] started receiving the attacks with the items that were thrown at [them] from that area.  At that point, it was not lawful." (Myron Daniels Dep. 105:16–106:5, Doc. 292-22; *see id.* at 110:15–

9

22 (saying that objects were being thrown from the private property).) That policeman estimated it was "quite a few people or it was more than five." (*Id.* at 178:17–19.) Another officer testified that the protest was not peaceful because "[t]here had been a lot of things thrown from the crowd at officers," along with "things that [were] being yelled and . . . the general atmosphere of the protesters." (Thomas Morse Dep. 51:17–52:3, Doc. 298-16.) Defendants lastly present videos of at least two water battles being thrown at the officers. (Def. Ex. DDDDD - From Finn - VID_20160710_193234661, at 00:10-00:12; Def. Ex. DDDDDDD - Blaze Opposite view of arrest (Antonio & Nadia), at 00:18-00:25.)

### d.  Orders to Disperse

Further, the parties disagree as to when and how often the order was given for the protesters to disperse. Defendants testified that commands to disperse were given throughout this period. (*see, e.g.,* Thomas Morse Dep. 29:20–23, Doc. 298-16 ("I just said to again tell them to disperse, that sort of thing, basically just giving them lots and lots and lots of opportunity and time to leave the area"); *id.* at 35:8–36:15 ("I made that statement ('Where you're standing isn't good enough') numerous times before the 26-minute mark, you know, that hey, you need to leave here. If - - you know, you'll be placed under arrest if you don't leave. I mean, this went on for hours, like, more than a hour."); James Thomas Dep. 78:21–79:7, Doc. 298-19 ("I remember giving - - me and multiple other officers giving loud verbal commands to get out of the roadway.").) Indeed, Sergeant Morse testified:

> As far as communication, numerous, numerous countless, you know, announcements made over the PA. I can't even tell you how many times I was told, hey, tell them one more time they need to leave. Tell them one more time that they -- I mean, over and over and over and over and over again communicating the intentions, like, hey, you need to leave; we're giving you the chance to leave or you're going to be arrested. You need to leave now or you're going to be arrested. You need to leave now or you're going to be arrested.

> So, I mean, as far as communication, I guess there was no, like,
> dialogue as much as of orders being given because there's really no
> way in that circumstance when you have several hundred people, the
> protestors out there outnumbering the police that were out there, I
> don't know of a way where you could have an one-on-one dialogue.
> . . . It's more of an announcement of hey, you need to leave. . . .
> [T]here was no one-on-one dialogue going on[.]

(Thomas Morse Dep. 112:2–113:7, Doc. 298-16.)

Defendants also provide videos in which the officers asked the protesters to disperse. (*See* Def. Ex. SS KMW8273 07-10-16(4), at 00:35-0043, "Please disperse. Please leave the area, or you will be arre . . ." (Audio cut short), time stamp shows July 10, 2016, 5:55 p.m.; ALK East Blvd. DSC_1918, at 00:55-01:15, "You are ordered to disperse or you will be arrested. Everyone in the area . . . will be arrested", time stamp shows July 10, 2016, 5:16 p.m.)

But Plaintiffs highlight that, according to the City's deposition, "there was about an hour's worth of time when protesters were gathered on the property at 602 East Boulevard where they were just standing on the property[.]" (Rule 30(b)(6) Dep. 190:16–23, Doc. 292-25.)  Plaintiffs also refer to the Affidavits of Probable Cause, which say that Plaintiffs were advised by loud speaker to remain on private property and the curb—a fact which Defendants admit but say is incomplete, as it does not refer to the orders to disperse. (*DRPSMF* ¶ 3, Doc. 311.)  Further, Plaintiffs submit photographs showing that they were among the ones on the curb and private property. (*See* Figs. 1 & 2, Doc. 297-1 at 7.)

After that, even though one officer said the streets were cleared, (John Clary Dep. 90:2–9, Doc. 292-19), BRPD declared, "Where you are standing is not good enough." (Myron Daniels Dep. 120:8–10, Doc. 292-22; *see also* John Clary Dep. 91:7–12, Doc. 292-19 ("Q. So you heard the leave now, leave now. Where you are standing is not good enough? A. Yes, sir. Q. So is that the dispersal order that you described? A. Yes, sir. . . . ").)  Plaintiffs submit proof from the City's

30(b)(6) representative that this order should not have issued if the streets were clear. (Rule 30(b)(6) Dep. 33:23–34:3, Doc. 292-25 ("Q. Right. So if people haven't cleared the streets, Baton Rouge Police Department could say: 'That's not good enough.' But if they have moved back on to -- and cleared the streets, Baton Rouge Police Department should not say: 'That's not good enough.' Agreed? A. Agreed.").) Further, according to the City, "any protesters who complies with an order to clear the streets should not be arrested by Baton Rouge Police Department." (*DRPSMF* ¶ 4, Doc. 311 at 1.) "[I]f protesters clear the streets after being given a command to clear the streets, there's not the justification to sweep in and make arrests." (*Id.* ¶ 5.)

### 2. The Arrests

#### a. Generally

The police elements moved slowly, advancing on the yard of 602 East Boulevard and France Street west of East Boulevard, where many protesters had gathered. (*PRDSMF* ¶ 18, Doc. 309-1.) Even as arrests were made in the yard and street, many protesters fled and were not arrested. (*Id.*)

The parties submit dueling charts on the issue of arrest. Plaintiffs' chart, supported by the Rule 30(b)(6) deposition, reflects that the City has no evidence Plaintiffs did not comply with orders or that any Plaintiff engaged in an act of violence. (Rule 30(b)(6) Chart, Doc. 292-1 at 1; Rule 30(b)(6) Dep. 26:19–27:8, Doc. 292-2 ("Q. So then, going to our chart, the first column is 'Does the City have evidence plaintiff didn't comply with orders,' . . . We can truthfully put a 'no' in each of the boxes in this column. Agreed? A. Yes."); *id.* at 36:21–37:4 ("Q. . . . So, just to be clear, you don't see any discrepancies on page one of this chart that are discrepancies from the testimony of the City of Baton Rouge. Agreed? A. . . . I don't see anything on this chart that's a discrepancy from what I testified for the City on this script.").) It is also undisputed that the City's

representative said that "other than the affidavit of probable cause, the City does not have any description of any specific plaintiff's illegal activity." (*DRPSMF* ¶ 12, Doc. 311.)

Moreover, the chart also shows that, with a few exceptions, the City had no knowledge of which officer saw which Plaintiff commit any crime. (Rule 30(b)(6) Dep. 42:21–43:18, Doc. 292-2 (stating that Castanon, Salazar, Feldman, and Fishbein are "the only plaintiffs that . . . the City has any knowledge of which officers allegedly saw and reported each plaintiff committing a crime. Correct? A. That is correct. Q. So, for the remainder of this column I've put in unknown. Would that be accurate? A. Correct.").) Moreover, the City also lacked any knowledge of what officer seized which Plaintiff. (*Id.* at 45:4–9 ("Q. So this column here, which officers laid hands on plaintiff on page two of Imani plaintiff chart, I filled in [Castanon and Savage] and put unknown for the rest. Is that an accurate reflection of the City's testimony? A. Correct.").)

Plaintiffs also submit testimony that the "vast majority of people were on private property" and "outside of the public passages[.]" (Myron Daniels Dep. 122:9–19, Doc. 292-22.) "[T]he whole yard was cleared of protesters . . . [e]ventually," (David Wallace Dep. 90:4–7, Doc. 292-29), even though the City had no reason to think that the protesters standing on the private property at East and France did not have permission to be there, (Rule 30(b)(6) Dep. 186:12–187:1, Doc. 292-25). According to one legal observer for the ACLU, even "[p]rotestors who wanted to leave were not able to do so" because the "police were blocking all surrounding intersections and there was nowhere for people to go." (*North Baton Rouge Matters v. City of Baton Rouge*, No. 16-463-JWD-RLB, Lily Ann Ritter Aff., Doc. 2-9 at 13.)

Defendants, on the other hand, submits a chart cataloging many of the videos with timestamps showing various Plaintiffs in the roadway or on the sidewalk. (Def. Ex. 1 – Chart of

photos and videos ("Defs.' Chart"), Doc. 310-1.) Defendants rely on this exhibit as evidence that Plaintiffs failed to comply and that the arrests were justified. (*Id.*)

Defendants also point to the City's representative's testimony that, if orders to disperse were given and ignored, that would be evidence of noncompliance. (*See* Doc. 311 at 2 (citing Rule 30(b)(6) 50:7–52:16, Doc. 292-2).)  The City's deponent further stated:

> The problem the guys faced on France Street was -- the crowd -- well, first off, it started as a peaceful march. It was un-permitted. It was led by our traffic division and went to the state capitol and back to a local resident, a local church. And then the crowd or certain members of the crowd decided they wanted to overtake the interstate system. They failed to disperse after given orders. There was limited manpower there to make arrests. Once the manpower got there, the arrests began to be made. It looks like protesters were just hanging out at some unknown person's house with permission, but that wasn't the case at all. They committed the crime. And once the resources got there to make arrests, arrests were made.

(Rule 30(b)(6) Dep. 154:6–22, Doc. 298-7.)

### b.  Details of Specific Arrests

Plaintiffs Blair Imani, Akeem Muhammad, Raae Pollard, Samantha Nichols, Victor Onuoha, Alisha Feldman, Daniel Liebeskind, Finn Phoenix, and Leah Fishbein were arrested in the yard of 602 France Street in the initial push into the yard. (*PRDSMF* ¶ 19, Doc. 309-1.) Photographs and video show Blair Imani, Akeem Muhammad, Raae Pollard, and Samantha Nichols at multiple locations throughout the protest, in the roadway and on sidewalks at various points in time. (*Id.*)

Plaintiff Cherri Foytlin was arrested on France Street at about the same time as the push into the yard. (*Id.* ¶ 20.)  Photographs and video show Cherri Foytlin at multiple locations throughout the protest, in the roadway and on sidewalks at various points in time. (*Id.*)

Some protesters who appeared to be inciting the crowd or otherwise agitating the crowd were arrested within a few blocks, and a few minutes after the push into the yard. (*Id.* ¶ 21.) This fact is undisputed, but Plaintiffs emphasize BRPD's potentially unconstitutional definition of "agitator" which will be discussed below. (*See id.*)

As to Plaintiff Alexus Chaney, Earl Lapeyrouse of the BRPD testified that he remembered her because on the day in question "she was on the scene and was out in the roadway". (E.J. Lapeyrous Dep. 40:7–41:15, Doc. 298-15.) Lapeyrouse remembered she was in the roadway in France Street, but he did not remember at what point in the protest that happened. (*Id.* at 42:10–24.) Lapeyrouse also stated that she and her mother left a child in the car on Government Street while Alexus was protesting and while the mother was somewhere else and that Child Protection was called to get the baby after their arrest. (*Id.* at 43:5–46:5.) Plaintiffs respond by saying that Alexus Cheney was not blocking the roadway, and, even if she was standing in the roadway at one point, the diagram above shows that it was impossible for her to block the roadway when officers had walled off the street on three sides.

As to Plaintiff Karen Savage, James Thomas testified that she was in the roadway, and she "ran off . . . trying to get away, and that's whenever [he] went to assist with . . . placing her into handcuffs" at a McDonalds, which is two blocks from East and France. (James Thomas Dep. 81:8–82:16, Doc. 298-19.) Thomas said he and other officers gave "loud verbal commands to get out of the roadway," and "[s]he refused to multiple times[.]" (*Id.* at 78:18–25.) Thomas also stated she resisted arrest, which made it harder to place handcuffs on her, though she finally complied. (*Id.* at 79:1–5.)

With respect to Plaintiff Savage, Plaintiffs provide no evidence in the *PRDSMF* to rebut this, except to say that Thomas' testimony is "not even internally consistent"; Savage purportedly

"ignored" orders to disperse while at the same time having left the intersection of East and France and moved several blocks away. (Doc. 309-1 at 6.)

Plaintiffs Antonio Castanon Luna and Nadia Salazar Sandi were arrested on the north side of Government Street at Maximillian. (*PRDSMF* ¶ 24, Doc. 309-1 at 6.) They had been at the intersection of East Boulevard and France Street, and they appeared to be "inciting" the crowd. (*Id.*)  Plaintiffs do not dispute this fact, except to say that "inciting" has the same definition of "agitating," which will be discussed below. (*See* Doc. 309-1 at 6.)

### C.  Events After the Arrests

Arrest teams took detainees to a prisoner processing team set up on Government Street, roughly between 10th Street and East Boulevard. (*PRDSMF* ¶ 25, Doc. 309-1 at 7.)  The prisoner processing team used template Affidavits of Probable Cause. (*PRDSMF* ¶ 26, Doc. 309-1 at 7.) The processing officers would sign the affidavits under oath. (Jonathan Abadie Dep. 29:24–30:5, Doc. 292-7.)  The officers were instructed to use the templates and common language, regardless of whether it reflected what actually occurred. (Joe Simoneaux Dep. 131:19–132:6, Doc. 292-17.)

These Affidavits of Probable Cause are significant because an officer needs this affidavit, a summons, or a warrant to arrest someone and to lawfully process them into the jail. (Alaina Mancuso Dep. 11:11–23, Doc. 298-10.)  Thus, Plaintiffs' false arrest and imprisonment claims and manufacturing of evidence claims are tied to these affidavits.

An example of an Affidavit of Probable Cause used in this case is the following:

East Baton Rouge Parish Clerk of Court A07-16-0324 AFFIDAVIT FILED                    Page 1 of

| | | No. _____ , Sec. _____ |
| :---: | --- | --- |
| ☒ | State of Louisiana | ☒ : 19th Judicial District Court |
| ☐ | City of Baton Rouge | ☐ : Baton Rouge City Court |
| | | ☐ : Parish of East Baton Rouge |
| **VERSUS** | | ☐ : State of Louisiana |

*Raae Pollard*
(Name of Defendant)

### Affidavit of Probable Cause

Before me personally appeared the undersigned law enforcement officer(s) who deposed that the following recited facts are true and correct to the best of his knowledge, information and belief, and that based upon these facts, he caused the arrest of the following listed defendant(s) for the listed offense(s).

*2O320-16*    BRPD File No.    *EBR3690054*

*Pollard Raae*
Defendant's Name

| *W* | *F* | *1990* |
| --- | --- | --- |
| Race | Sex | Date of Birth |

Address *New Orleans La*
*Public passage*    Social Security Number

~~Simple Obstruction of a Highway of Commerce~~, Resistin An Officer    LRS 14:~~97~~, 14:108
Charge(s)    Statute/City Code Number
*14.100.1*

**Synopsis of Probable Cause:**

The Affiant stated to the Court that on this 10th day of July, 2016, the Defendant did knowingly and feloniously violate LRS 14:97 Simple Obstruction of a Highway of Commerce in that they intentionally placed themselves in the roadway thus rendering movement there on more difficult and LRS14:108 Resisting an Officer in that the Defendantly actively attempted to prevent their lawful arrest after being placed under arrest. This occurred within the city of Baton Rouge, Parish of East Baton Rouge.

To Wit: On the above listed date numerous Baton Rouge Police Department Officers were assigned to provide security for peaceful protests at and in the vicinity of Baton Rouge Police Department's Headquarters located at 9000 Airline Highway. Protesters assembled at provided parking areas and in surrounding parking lots. Protesters were advised by loud speaker to remain on private property and the on the curb. They were further advised to stay out of the roadway and to not impede the flow of traffic. These announcements were made frequently via loud speakers and by individual Police Officers on the scene. During the protest, the Defendant entered the roadway and was provided another verbal order to exit the lanes of travel. Moments later the Defendant entered the roadway again and was taken into custody by Officers on the scene. After being advised that they were under arrest, the Defendant did actively attempt to prevent being taken into custody and completion of the arrest process.

The Defendant was placed under arrest and verbally advised of their rights as per the Miranda ruling. The Defendant was then transported to the East Baton Rouge Parish Prison and booked accordingly.

*T.C. Walker P10177*
Affiant

Sworn to and subscribed before me this *10* day of *July* , 20 *16*.

_____
Notary Public    *130762*

BRPD08

(Doc. 292-8 at 1.) Plaintiffs say of this affidavit, "Notice the facial inconsistencies: The caption says Ms. Pollard violated R.S. 14:100.1; the synopsis says she violated R.S. 14:97. The synopsis says she 'feloniously' violated, even though both statutes are misdemeanors. The synopsis says the protest was at '9000 Airline Highway,' nowhere near East & France." (Doc. 297-1 at 12 n.59.)

17

Some of the affidavits listed an incorrect address. (*PRDSMF* ¶ 26, Doc. 309-1 at 7.)  Some were corrected by hand, and a third variant had blanks for the officers to fill in with the location and offense. (*Id.*)

 Some of the Affidavits of Probable Cause were executed by officers who had observed the offenses personally, but others were executed by officers without direct personal knowledge. (*Id.* ¶ 27.)  BRPD's Rule 30(b)(6) witness testified that it was "BRPD policy that the arrest team should not stop and have a conversation with the processing team" and that "[t]hey should simply hand off the arrestee and return to the front lines[.]" (Rule 30(b)(6) Dep. 74:12–17, Doc. 292-25; *see also id.* at 59:21–60:2 ("Q. And so if everything is working to . . .the [BRPD's] system, the way officers have been trained, it's not ever going to be the arrest teams who are making the arrests who are filling out the probable cause affidavits? A. Yes."); Mark Dennis Dep. 28:11–29:23, 30:14, Doc. 292-23 (stating that state police officers who made the arrests would not fill out the affidavit and would not necessarily have a conversation with the person who did or explain who the arrestee was and why they were arrested).)

So, for example, Jonathan Abadie, who processed arrestees, testified he was not in eyesight of the protesters, but he could hear everything occurring. (Jonathan Abadie Dep. 11:24–12:3, Doc. 292-7.)  He vaguely spoke with the arresting officer, (*id.* at 14:25–15:4), and said there was no detailed flow of information going from the arresting officer to him, (*id.* at 18:8–13).  Abadie said the information in the affidavit was gathered or given to him at the time by word of mouth. (*Id.* at 32:20–33:20.)  "[G]roups came in and those groups were all detained for the same reasons." (*Id.* at 34:4–15.)  He based the information in the affidavit on the "totality of the circumstances . . . generally told about what the protesters generally [did] that day[.]" (*Id.* at 35:8–22.)  Abadie was

"going on good faith from other officers and the information [he] gathered from them[.]" (*Id.* at 55:1–7.)

Willie Williams, another processer, testified that the protesters were "pretty much in both roadways all around cutting up." (Willie Williams Dep. 16:25–17:6, Doc. 292-24; *see id.* at 20:14–23:9 ("chaos, confusion, cutting up," "acts of violence," and "protesters going haywire").) Williams also based his affidavit on the officer bringing back the arrestee. (*Id.* at 41:18–42:9.) "[I]t came from another officer. I'm going off - - bouncing off of what he did.  If he said this happened, this is him. You have something, you know, in place. Basically, you're supposed to be truthful and you're supposed to be able to believe the fellow officer." (*Id.* at 46:14–20.)  Williams said he was "trusting the officer and doing it in good faith." (*Id.* at 79:1–8.)

But Williams also said he was aware of large protests at East and France and that protesters were standing in that location and obstructing traffic. (*Id.* 74:7–75:15.)   "Based on the circumstances presented that day and [his] knowledge of the events surrounding [his] location, [he] believe[d] the facts that [were] contained in these affidavits [were] true and correct . . . to the best of [his] knowledge." (*Id.* at 75:16–23.)

Officer James Thomas explained his observations to a prisoner processing officer and directed him to sign the affidavit of probable cause on his behalf, leading to an affidavit of probable cause with the arresting officer listed simply as "Thomas." (*PRDSMF* ¶ 27, Doc. 309-1 at 7.)

Some officers whose signature appears to be on some affidavits of probable cause state that they did not sign those affidavits, and the actual person who signed those affidavits is unknown. (*Id.*)  Plaintiff maintains that these signatures were forged. (Doc. 297-2 at 3.)

For some plaintiffs, an intermediary was used between the arresting officers and the officer who signed the Affidavits of Probable Cause.  For example, Officer Jason Dohm testified that

"somehow [Blair Imani] was handed or passed on to where we were standing, and our job was to then escort her by walking her to where the transport team would be." (Jason Dohm Dep. 24:16–23, 36:18–37:5, Doc. 292-10.) Dohm did not see her at all until she was "handed off" or "basically given" to them. (*Id*. at 30:14–21.) Dohm said he "believe[d] she was arrested for the same thing pretty much everybody was out there was arrested for," but he conceded that he did not have "first-hand knowledge" and "personally [did] not know." (*Id*. at 37:21–38:10.) Dohm said he did not have any facts that would have supported probable cause for arresting Imani for resisting an officer that day, and he did not pass on any information to people at the transportation area about why Blair was taken into custody. (*Id.* at 41:4–25.)

Other officers testified similarly about their escorting Plaintiffs to the processing area. (*See, e.g.*, Alaina Mancuso Dep. 25:18–21, Doc. 292-20 (saying her only interaction with officers at the processing station was "dropping people off").) Ultimately, as one Defendant stated, the "Affidavits of Probable Cause[] . . . don't actually show us what happened during the protests[.]" (Joe Simoneaux Dep. 131:14–132:11, Doc. 292-17.)

In any event, the protesters were charged with various misdemeanors, including simple obstruction of a highway, La. R.S. 14:97, simple obstruction of public passages, La. R.S. 14:100.1, and resisting arrest. (*PRDSMF* ¶ 28, Doc. 309-1 at 7.) The district attorney subsequently declined to prosecute Plaintiffs. (*Id.*)

### D. The City's Alleged Content-Based Discrimination and Conspiracy

The City argues that there is no *Monell* liability for any of its conduct, but Plaintiffs list several specific polices that support a finding that the City engaged, as a matter of official policy, in viewpoint discrimination. Plaintiff cite the following as evidence of First Amendment violations and a conspiracy.

First, the City's representative testified that, even if the interstate was inaccessible to the protesters at East and France, and even if it was otherwise peaceful, the protest was a civil disorder based solely on their proximity to the interstate and the intentions of some of the protesters. (Rule 30(b)(6) Dep. 28:2–10, Doc. 292-25.) "[I]t was a civil disorder, because it was not a special event. Our special events are, like, concerts, games, parades. That's special events. That was not a special event. They gathered for a specific purpose. . . . It was a protest purpose." (*Id.* at 28:10–17.) The representative said that it did not fall under the Special Event Policy because "it was a protest for them to speak out against perceived misconduct by the [BRPD.]" (*Id.* at 28:18–24.) Because of this, they fell under the Civil Disorder Policy. (*Id.* at 28:22–29:2.) The City representative further said, "if they had gathered together, say, for a church event or to talk about sales of water skis, that would fall under a special event, . . . [a]nd so because of that, the City . . . treated this group at East and France under General Order 291, rather than the Special Event Policy[.]" (*Id.* at 29:3–12.) According to the City's 30(b)(6) witness, once an assemblage falls under the Civil Disorder Policy, the first supervisor is directed to disperse the crowd, even if it is minor/peaceful in nature. (*DRPSMF* ¶ 16, Doc. 311.)

Second, Plaintiffs also point to the Baton Rouge Policy and Procedure Manual and the fact that the word "Protests" is used only once in the 904-page document, and then in reference to Prisoner Transport Vans: "The vans may also be used in situations where there are or anticipated to be many arrestees, such as civil disturbances, protests, or the service of search and arrest warrants." (Rule 30(b)(6) Dep. 38:14–39:7, Doc. 292-25.) That is the only treatment of the word "Protest" in the entire manual—in the context of anticipating many arrestees. (*Id.* at 39:8–18.)

Third, Plaintiffs also refer again to the fact that the City's representative specifically stated that "BRPD policy to target identified leaders and agitators." (*Id.* at 35:17–19.) Plaintiffs highlight

that BRPD provides in its Civil Disturbance Policy that the definition of "agitators" includes those "Persons encouraging others to upset the status quo to further their cause," which a City Rule 30(b)(6) representative understood to mean "people calling for a serious change" or those who "want to see a major change in the politics of Baton Rouge[.]" (*Id.* at 35:12–25, 37:14–38:13.)

And fourth, Plaintiffs cite the fact that BRPD's Rule 30(b)(6) witness testified that it was "BRPD policy that the arrest team should not stop and have a conversation with the processing team" and that "[t]hey should simply hand off the arrestee and return to the front lines[.]" (*Id.* at 74:12–17.) According to Plaintiffs, that caused the fabrication of false affidavits, as the officers signing them had no basis for the truth of that to which they were swearing.

As to the conspiracy, Plaintiffs also rely upon the testimony of Lieutenant Christopher Taylor. (Doc. 309-1 at 9.) At his deposition, Plaintiffs played an audio clip of David Wallace (one of the shift leads), and Taylor stated:

> Q. Just to repeat what is sounded to me like [Wallace] said, it was, You've got one of the leaders requesting to walk on the sidewalk past France. Someone else responds, It's too late. Then 10-9. Then responds, Too late. Everyone has violated.  Everyone is under arrest. Those who can safely apprehend violators must do so. Primary targets are the white male, red hair, tie-dyed shirt, and everyone else who is violating, which is everybody out there. Does that sound about right?
>
> A. Yes, sir.

(Christopher Taylor Dep. 144:4–22, Doc. 292-21; *see also id.* at 61:19–62:3 (on Wallace's role).) Plaintiffs maintain that the other officers also agreed because they "complied with the order for mass, indiscriminate arrests." (Doc. 309-1 at 9.)

### III.    Rule 56 Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Thus, "[a] movant for summary judgment need not set forth evidence when the nonmovant bears the burden of persuasion at trial." *Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 997 (5th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim.") (emphasis in original)). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Id.* (citing *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 263 (5th Cir. 2002)).

If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . The nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (cleaned up). The non-mover's "burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (cleaned up).

Additionally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) (citing *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998); *Skotak v. Tenneco Resins,*

*Inc.*, 953 F.2d 909, 916 (5th Cir. 1992)). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Id.* (citing, *inter alia*, *Raugas*, 136 F.3d at 458). *See also Nissho–Iwai American Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988) (it is not necessary "that the entire record in the case . . . be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered"); *cf. U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted).

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion. Indeed, even if the moving party comes forward with an abundance of evidence supporting its theory of the case, the nonmoving party may nevertheless defeat the motion by countering with evidence of its own, which, if credited by the fact-finder, would entitle the nonmoving party to a verdict in its favor. Or, the non-moving party can defeat the motion by demonstrating that the evidence tendered by the moving party is itself laced with contradictions of [material] fact.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263–64 (5th Cir. 1991) (cleaned up).

Also important here, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure [(that is, beyond doubt)] all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986); *peradventure*, MERRIAM-WEBSTER'S DICTIONARY (2022), https://www.merriam-

webster.com/dictionary/peradventure (last visited July 13, 2022). *See also Universal Sav. Ass'n v.*

*McConnell*, 14 F.3d 52 (5th Cir. 1993) (unreported) ("Where the summary judgment movant bears

the burden of proof at trial, the summary judgment evidence must affirmatively establish the

movant's entitlement to prevail as a matter of law.").  That is,

> In contrast, if the movant bears the burden of proof on a claim at
> trial, then its burden of production is greater. It must lay out the
> elements of its claim, citing the facts it believes satisfies those
> elements, and demonstrating why the record is so one-sided as to
> rule out the prospect of the nonmovant prevailing. If the movant fails
> to make that initial showing, the court must deny the motion, even
> if the opposing party has not introduced contradictory evidence in
> response.

10A Mary Kay Kane, *Federal Practice and Procedure (Wright & Miller)* § 2727.1 (4th ed. 2022).

Additionally, "cross-motions [for summary judgment] must be considered separately and

should not be interpreted necessarily to mean that judgment should be entered on one of them[.]"

10A Mary Kay Kane, *Federal Practice and Procedure (Wright & Miller)* § 2720 (4th ed. 2022).

This is because "each party, as a movant for summary judgment, bears the burden of establishing

that no genuine dispute of material fact exists and that the movant is entitled to a judgment as a

matter of law." *Id*.

> The fact that one party fails to satisfy that burden on his own Rule
> 56 motion does not automatically indicate that the opposing party
> has satisfied its burden and should be granted summary judgment on
> the other motion. The court must rule on each party's motion on an
> individual and separate basis, determining, for each side, whether a
> judgment may be entered in accordance with the Rule 56 standard.
> Both motions must be denied if the court finds that there is a genuine
> dispute of material fact. But if there is no genuine dispute and one
> or the other party is entitled to prevail as a matter of law, the court
> will render judgment.

*Id.*

## IV.     Discussion of Federal Claims

### A.  Preliminary Issues

#### 1. Defendants' Motion as to Monell

Defendants move for summary judgment on Plaintiffs' *Monell* claims. (Doc. 307-1 at 19–20.)[6]  However, Defendants' briefing on this issue is incomplete; their section on this issue consists of a short paragraph on the general law on *Monell*, a single introductory sentence to a second paragraph, and then an incomplete sentence, with nothing following. (*Id.*)[7]

Plaintiffs respond that, while Defendants included a section on *Monell* liability, they "neglected to include any argument" or analysis. (Doc. 309 at 20.)  Plaintiffs say they "cannot respond to an argument that does not exist." (*Id.*)   After briefly asserting that have a viable *Monell* claim, they urge denial of the motion.

In short, the Court will deny Defendants' motion on this issue. Defendants have failed to develop any meaningful argument on this issue, and that failure constitutes a waiver.  *See JTB Tools & Oilfield Servs., L.L.C. v. United States*, 831 F.3d 597, 601 (5th Cir. 2016) (stating that, "[t]o avoid waiver, a party must identify relevant legal standards and 'any relevant Fifth Circuit cases' " and holding that, because appellant "fail[ed] to do either with regard to its underlying claims, . . . those claims [were] inadequately briefed and therefore waived." (citing, *inter alia, United States v. Scroggins*, 599 F.3d 433, 446–47 (5th Cir. 2010) (noting that it is "not enough to merely mention or allude to a legal theory"))); *see also United States ex rel. Wuestenhoefer v. Jefferson*, 105 F. Supp. 3d 641, 672 (N.D. Miss. 2015) ("This failure to develop the relevant

---

[6] Plaintiffs also move for summary judgment on their *Monell* claims. (Doc. 297-1 at 40.)  Plaintiffs' motion will be addressed below.

[7] The extent of Defendants' argument on this issue is as follows: "Plaintiffs list ten (10) supposed policies as sub-parts to Paragraph 254, at Pages 69-70 of the Third Amended Complaint, followed by three paragraphs of conclusory allegations regarding the "policies, procedures, practices, customs, and usages" as the moving force behind the plaintiffs' alleged injuries. However,". (Doc. 307-1 at 20.)

argument effectively represents a waiver of the point." (citing, *inter alia, El–Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in [a] skeletal way, leaving the court to put flesh on its bones.")); *United States ex rel. Byrd v. Acadia Healthcare Co., Inc.*, No. 18-312, 2022 WL 879492, at *13 (M.D. La. Mar. 23, 2022) (deGravelles, J.) ("Procedurally, the Court could easily find that such skeletal briefing in the original memorandum constitutes waiver." (citing above authorities)). Accordingly, the Court will deny Defendants' motion as to Plaintiffs' *Monell* claims.

### 2. Redundant Official Capacity Claims

Defendants also move to dismiss the claims against Jonny Dunnam, who was the interim BRPD Chief of Police and who is sued in his official capacity. (Doc. 307-1 at 3.)  Defendants highlight that the City has also been sued, a fact which makes the claims against Dunnam redundant. (*Id.*)   Plaintiffs do not respond to this argument. (*See* Doc. 309.)

In short, these claims will be dismissed.  First, Plaintiffs have failed to meaningfully oppose the dismissal of the claims against Dunnam or otherwise respond to this argument, so they have effectively waived this issue. *See JMCB, LLC v. Bd. of Com. & Indus.*, 336 F. Supp. 3d 620, 634 (M.D. La. 2018) (deGravelles, J.) (finding that claims could be deemed waived for failure to timely oppose); *Jordan v. Gautreaux*, No. 21-48, 2022 WL 897549, at *15 n.2 (M.D. La. Mar. 25, 2022) (deGravelles, J.) (noting as additional ground for dismissal the fact that claims had not been substantively opposed); *JTB Tools & Oilfield Servs.*, 831 F.3d at 601; *Wuestenhoefer*, 105 F. Supp. 3d at 672.

Second, even if the claim had not been waived, Dunnam would be entitled to dismissal on the merits.  "As to the official capacity claims . . . , courts in this circuit have held that, when the

same official capacity claims are brought against an entity and its municipal officials, the claims against the officials are dismissed as redundant and duplicative." *Jordan*, 2022 WL 897549, at *22 (citing *Zavala v. City of Baton Rouge/Par. of E. Baton Rouge*, No. 17-656, 2018 WL 4517461, at *14 (M.D. La. Sept. 20, 2018) (deGravelles, J.) ("Nevertheless, Zavala's claim in Count One names Dr. Bridges as a defendant only in his official capacity. . . . As that claim is also asserted against the City/Parish and CorrectHealth, it is duplicative and should therefore be dismissed." (citing *Castro Romero v. Becken*, 256 F.3d 349, 355 (5th Cir. 2001) (district court correctly dismissed claims against municipal officers which "duplicate[d] claims against the respective governmental entities themselves"); *Broussard v. Lafayette City-Par. Consol. Gov't*, 45 F. Supp. 3d 553, 571 (W.D. La. 2014) ("When . . . the government entity itself is a defendant in the litigation, claims against specific individuals in their official capacities are redundant, and for that reason, courts in this circuit have found it is appropriate to dismiss them.")))).

Accordingly, the Court finds that the official capacity claims against Jonny Dunnam are redundant to the claims against the City.  As a result, these claims will be dismissed.

### 3. Qualified Immunity

Defendants also invoke qualified immunity as to the individual capacity claims. Consequently, the Court will provide a brief discussion of the relevant standards governing this defense.

"Qualified immunity provides government officials performing discretionary functions with a shield against civil damages liability, so long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006) (citing *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). "In determining whether an official enjoys immunity, we ask (1) whether the plaintiff has demonstrated a violation

of a clearly established federal constitutional or statutory right and (2) whether the official's actions violated that right to the extent that an objectively reasonable person would have known." *Id.* (citing *Hope v. Pelzer*, 536 U.S. 730 (2002)). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

As to the first prong, the Court will provide lengthy discussions on the applicable law for each of these claims below. More need not be said here.

As to the second prong, "[q]ualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (alterations and internal quotation marks omitted)). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

"Although '[the Supreme] Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.' " *Id.* (quoting *White*, 137 S. Ct. at 551 (internal quotation marks omitted)). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *White*, 137 S. Ct. at 551 (internal quotations omitted)).

" 'Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers.' " *Kisela*, 138 S. Ct. at 1153 (quoting *White*, 137 S. Ct. at 552 (internal quotation marks omitted)). "But . . . [a]n officer 'cannot be said to have violated a clearly

established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.' " *Id.* (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779–80 (2014)).

Phrased another way, "[w]hen considering a defendant's entitlement to qualified immunity, [the Court] must ask whether the law so clearly and unambiguously prohibited his conduct that '*every* reasonable official would understand that what he is doing violates [the law].' " *McLin v. Ard*, 866 F.3d 682, 695 (5th Cir. 2017) (citing *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011))). "To answer that question in the affirmative, we must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Id.* (quoting *Morgan*, 659 F.3d at 371–72 (internal quotations omitted) (quoting *al-Kidd*, 563 U.S. at 742)). "Where no controlling authority specifically prohibits a defendant's conduct, and when the federal circuit courts are split on the issue, the law cannot be said to be clearly established." *Id.* (quoting *Morgan*, 659 F.3d at 372).

## B. First Amendment Claims

### 1. Parties' Arguments

#### a. Defendants' Motion (Doc. 307) and Plaintiffs' Opposition (Doc. 309)

Defendants contend that Plaintiffs' reliance on *Cox I* and *Cox II* is misplaced. (Doc. 307-1 at 9.)  In *Cox*, the Supreme Court emphasized that the protests were peaceful, but, here, the "films . . . show a very different presentation and protest." (*Id.*)  According to Defendants, after the scheduled protest, "the good people went home, and the protesters who wanted to shut down the interstate continued east on Government Street to the easy access to I-110 at 10th Street." (*Id.* at 9–10.)  Defendants then quote at length *Cox* to emphasize the government's right to reasonably

regulate speech to allow for passage on public streets. (*Id.* at 10.) Defendants say the evidence "show[s] an unruly mob, with the intent to disrupt local and interstate travel, who engaged in violent acts against law enforcement, not a gentle procession of students led by a pastor." (*Id.*). Defendants analogize to *Adderley v. State of Florida*, 385 U.S. 39 (1966), where the Supreme Court purportedly affirmed arrests for those who blocked the entrance to a prison and who failed to disperse after being warned to do so. (*Id.*) Defendants argue that this analysis resolves the alleged violations of Plaintiffs' First Amendment to free speech, assembly, and press as well as the analogous claims under the Louisiana constitution.

Plaintiffs respond first that questions of fact preclude summary judgment. (Doc. 309 at 3.) "Most saliently," Plaintiffs dispute the characterization of the protest as "violent" or a "riot." (*Id.*) Plaintiffs then highlight testimony from their experts and from Defendants' own Rule 30(b)(6) deponent which demonstrate that the protests were in fact peaceful. (*Id.* at 3–4.) According to Plaintiffs, Defendants' entire argument on the First Amendment issue boils down to their statement that Plaintiffs were not a peaceful protest but an unruly mob that had the intent to disrupt travel and engage in violent acts. (*Id.* at 4.) Defendants' position on *Cox I* and *Cox II* essentially concedes that, had the protests been nonviolent, then they would have been lawful. (*Id.*) Further, Plaintiffs note that the protesters complied by avoiding the interstate and by gathering on the sidewalks. (*Id.* at 4–5.) As to the allegations of violence, Defendants only refer to the "films" and "exhibits" without specifying which specifically shows that the protests were not peaceful. (*Id.* at 5.) Any violence on the video is not done by Plaintiffs but rather by other protesters or Defendants. (*Id.*) Most of the protesters complied with the orders to remain on private property and stand on the curb. (*Id.* at 5–6.) They remained there about an hour before being told that where they were standing "was not good enough" and the order was given to arrest them. (*Id.* at 6.) Plaintiffs'

experts likewise opined that the protest was peaceful and that the police did not have to resort to mass arrests and the use of force. (*Id.* at 7.)  *Adderley* is inapplicable, say Plaintiffs, because the issue in that case was "whether protesters could commit a trespass on State property and continue protesting, which is not alleged here." (*Id.* at 8.)  In any event, Defendants admitted at the Rule 30(b)(6) deposition that there was no evidence that any Plaintiff was violent, no evidence any engaged in illegal activity, and no justification for the arrest beyond the information in the pre-printed Affidavits of Probable Cause. (*Id.* at 8–9.)

> *b.*  Plaintiffs' Motion (Doc. 297), Defendants' Opposition (Doc. 310), and Plaintiffs' Reply (Doc 323)

Plaintiffs argue that they are entitled to summary judgment on their First Amendment claims.  (Doc. 297 at 1.)  They say that BRPD engaged in viewpoint discrimination by applying the Civil Disorder Policy to the protest based solely on the content of the speech—that is, because the protesters were "speaking out 'against perceived misconduct by the Baton Rouge Police Department.' " (*Id.* at 24.)  The fact that the Civil Disorder Policy applied is significant, as that policy allows for the use of force, contemplates mass arrests, and dictates military-style equipment. (*Id.* at 25.)  Most importantly, this policy requires that BRPD officers disperse a crowd, even if it is peaceful. (*Id.*)  Additionally, the City's Rule 30(b)(6) representative admitted that BRPD targeted leaders and "agitators," or those who wanted to see change to Baton Rouge politics. (*Id.* at 26.)  Plaintiffs conclude:

> To sum up: BRPD treated Plaintiffs under its Civil Disorder Policy rather than its Special Event policy explicitly because of the content of their speech. The Civil Disorder policy required officers to take action to disperse Plaintiffs and prevent them from continuing to exercise their right to protest. And BRPD also targeted "agitators" for arrest, which included people who "want to see a major change in the politics of Baton Rouge." The Motion should therefore be granted on First Amendment grounds.

32

(*Id.*)

Plaintiffs also say their case matches *Cox II* precisely. (*Id.* at 43.) "The key to the Court's holding was that Cox had been told he *could* remain in a certain area, and the subsequent dispersal order did not remove the protection accorded appellant by the original grant of permission." (*Id.* at 44 (cleaned up).) "The principle is clear: it is unconstitutional for law enforcement to tell protesters where they can protest, and then arrest them once they go there." (*Id.*)

> So just as in *Cox*, protesters in 2016 were told where they could protest. Just as in *Cox*, the streets were blocked off around the protesters. And just as in *Cox*, the police changed their mind and swept in, saying "Everyone has violated. Everyone is under arrest. Those who can safely apprehend violators must do so." The same result should follow as in *Cox* –a determination that the arrests were unconstitutional.

(*Id.* at 45.)

In response, Defendants begin by incorporating the arguments in their own motion. (Doc. 310 at 9 (citing Doc. 307-1 at 9–14).) Defendants say the protest fell under the "Civil Disorder" policy because of the protester's intention to overtake the interstate and their proximity to several entrances to I-110. (*Id.* at 9.) Defendants assert:

> Plaintiffs present a wholly fictional version of their protest, in which (A) no one intended to disrupt the interstate system, (B) no one understood the commands not only to depart the roadway, but also the commands to disperse and clear the area, (C) despite ample warning and opportunity to depart the area, supported by evidence that many protesters did leave the area, disperse, and were therefore not arrested, that (D) the City had no basis on which to arrest the plaintiffs.

(*Id.*) Defendants rely upon their own chart and evidence that the protesters remained in the street and sidewalk. (*Id.* at 9–10.) Defendants emphasize that the crowd was told to disperse several times and maintain that it was the City's position that the protesters were a riot that had the intent

to block the interstate. (*Id.* at 10–11.)  Again, the City has the right to keep the streets clear, and they did so here. (*Id.*)

Plaintiffs' Reply again hammers the City's admission that it employed the Civil Disorder Policy because the protesters were speaking out against perceived police misconduct by BRPD. (Doc. 323 at 1.)  Here, not a single one of the protesters blocked the interstate, even if some wanted to. (*Id.* at 2.)  Protesters complied with law enforcement's orders to avoid the interstate and go to East and  France. (*Id.*)  They waited on private property an hour before the order was given to arrest the protesters. (*Id.* at 2–3.)  In any event, there is no evidence that any Plaintiff wanted to or tried to go onto the interstate or that there was still this threat after the protest moved to East and France. (*Id.* at 3.)  "Instead, the undisputed evidence shows that Plaintiffs were among the group of protesters who *complied* with police orders to turn away from the interstate, were given permission to protest in a certain area, and were arrested anyway.[ ] That places them squarely within the facts of *Cox*[.]" (*Id.*)  Given the heightened scrutiny involved here, Plaintiffs are entitled to summary judgment.

### 2. *Applicable Law*

#### a. First Amendment Generally

"As applied to the states through the Fourteenth Amendment to the United States Constitution, the First Amendment prohibits the government from making laws that 'abridg[e] the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.' " *San Antonio Firefighters' Ass'n, Loc. 624 v. City of San Antonio*, 404 F. Supp. 3d 1045, 1056 (W.D. Tex. 2019) (quoting U.S. Const. amend. I).

"The scope of [a plaintiff's] first amendment rights depends on the nature of the forum to which he seeks access." *Estiverne v. Louisiana State Bar Ass'n*, 863 F.2d 371, 376 (5th Cir. 1989).

That is, "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Id.* (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983)).

At issue here, "[t]raditional public forums are places which 'by long tradition or by government fiat have been devoted to assembly or debate.' " *Id.* (citing *Cornelius v. NAACP Legal Defense & Educ. Fund.*, 473 U.S. 788, 802 (1985)). "In [these] places . . . , the rights of the state to limit expressive activity are sharply circumscribed." *Perry*, 460 U.S. at 45. "At one end of the spectrum are streets and parks which 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' " *Id.* (quoting *Hague v. CIO*, 307 U.S. 496, 515(1939)). *Cf. San Antonio Firefighters*, 404 F. Supp. 3d at 1059 (describing a "regular public sidewalk[]" as a " 'public thoroughfare' " or a " 'conduit in the daily affairs of the locality's citizens,' " as opposed to walkways with limited purposes that are nonpublic forums (quoting *United States v. Kokinda*, 497 U.S. 720, 727 (1990))).

 "In these quintessential public forums, the government may not prohibit all communicative activity." *Perry*, 460 U.S. at 45. "The level of scrutiny with which [the Court] review[s] a restriction on speech in a traditional public forum turns on whether the restriction is content based or content neutral." *Denton v. City of El Paso, Texas*, 861 F. App'x 836, 839 (5th Cir. 2021).

"A restriction is content neutral if it 'serves purposes unrelated to the content of expression . . . even if it has an incidental effect on some speakers or messages but not others.' " *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). "In contrast, a restriction is content

based if it is based on the specific motivating ideology or the opinion or perspective of the speaker or prohibits . . . public discussion of an entire topic." *Id.* (cleaned up).

" '[T]he crucial first step in the content-neutrality analysis' is determining whether the law is content neutral or content based on its face." *Id.* (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015)). "A restriction on speech is content based 'on its face' if it 'defin[es] regulated speech by particular subject matter.' " *Id.* (quoting *Reed*, 576 U.S. at 163). "When a restriction is content based on its face, the government's purpose is irrelevant." (citing *Reed*, 576 U.S. at 166).

"If the restriction is content based, it receives strict scrutiny: the government 'must show that its [restriction] is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.' " *Id.* (quoting *Perry*, 460 U.S. at 45). "Narrow tailoring requires that the regulation be the least restrictive means available to the government." *Id.* (citing *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000)).

"On the other hand, if the restriction is content neutral, it receives intermediate scrutiny: the government must show that its restriction is 'narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.' " *Id.* (citing *Perry*, 460 U.S. at 45). *See also Moore v. Brown*, 868 F.3d 398, 403–04 (5th Cir. 2017) ("Content-neutral regulations of time, place, and manner of expression in a public forum are permitted when they are narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication." (citing *Serv. Emp. Int'l Union, Local 5 v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010) ("*SEIU*"))). "In the context of intermediate scrutiny, narrow tailoring does not require that the least restrictive means be used. As long as the restriction promotes a substantial governmental interest that would be achieved less effectively without the restriction, it is sufficiently narrowly tailored." *Id*. (citing *SEIU*, 595 F.3d at 596). "Rules that

36

incidentally burden speech are evaluated in terms of their general effect." *Id.* (citing *Baby Dolls Topless Saloons, Inc. v. City of Dallas*, 295 F.3d 471, 485 (5th Cir. 2002)). "But if a substantial portion of the burden on speech does not advance the goals of the rule, the rule is not narrowly tailored." *Id.* (citing *Knowles v. City of Waco*, 462 F.3d 430, 434 (5th Cir. 2006) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989))).

### b.  First Amendment and Protests

The Court finds that this case turns on *Cox I* and *Cox II*.  As previously stated, this pair of decisions involved protests in Baton Rouge over racial segregation. *Cox I*, 379 U.S. at 538–39. The sheriff eventually ordered that the protest be broken up, and the officers used tear gas to disperse the crowd. *Id.* at 544.  Appellants were arrested and convicted of certain crimes. *Id.* at 538.  Given the importance of both decisions, an extensive discussion is warranted.

### i.  *Cox I*

*Cox I* focused on petitioner's arrest for breach of the peace and obstructing public highways, and the Supreme Court found that "Louisiana infringed appellant's rights of free speech and free assembly by convicting him under this [breach of the peace] statute." *Id*. at 545.  The High Court concluded that its "independent examination of the record . . . show[ed] no conduct which the State had a right to prohibit as a breach of the peace." *Id.*

> Appellant led a group of young college students who wished "to protest segregation" and discrimination against Negroes and the arrest of 23 fellow students. They assembled peaceably at the State Capitol building and marched to the courthouse where they sang, prayed and listened to a speech. A reading of the record reveals agreement on the part of the State's witnesses that Cox had the demonstration "very well controlled," and until the end of Cox's speech, the group was perfectly "orderly." Sheriff Clemmons testified that the crowd's activities were not "objectionable" before that time. They became objectionable, according to the Sheriff himself, when Cox, concluding his speech, urged the students to go uptown and sit in at lunch counters. The Sheriff testified that the sole

> aspect of the program to which he objected was "[t]he inflammatory manner in which he [Cox] addressed that crowd and told them to go on up town, go to four places on the protest list, sit down and if they don't feed you, sit there for one hour." Yet this part of Cox's speech obviously did not deprive the demonstration of its protected character under the Constitution as free speech and assembly.

*Id.* at 545–46.

The State maintained that, though the demonstrators began orderly, certain actions such as cheering and clapping "converted a peaceful assembly into a riotous one." *Id.* at 546.  The Supreme Court rejected this argument:

> The record . . . does not support this assertion. It is true that the students, in response to the singing of their fellows who were in custody, cheered and applauded. However, the meeting was an outdoor meeting and a key state witness testified that while the singing was loud, it was not disorderly. There is, moreover, no indication that the mood of the students was ever hostile, aggressive, or unfriendly. Our conclusion that the entire meeting from the beginning until its dispersal by tear gas was orderly and not riotous is confirmed by a film of the events taken by a television news photographer, which was offered in evidence as a state exhibit. We have viewed the film, and it reveals that the students, though they undoubtedly cheered and clapped, were well-behaved throughout.

*Id.* at 546–47.

Lastly, the Supreme Court disagreed with the State's argument that the conviction should be maintained "because of fear expressed by some of the state witnesses that 'violence was about to erupt' because of the demonstration." *Id.* at 550.  "It is virtually undisputed, however, that the students themselves were not violent and threatened no violence." *Id.*

Ultimately, the statute was "unconstitutionally vague in its overly broad scope." *Id.* at 551. The definition of "breach of the peace" "would allow persons to be punished merely for peacefully expressing unpopular views." *Id.*

> Yet, a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it

38

> induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech . . . is . . . . protected against censorship or punishment. . . . There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups. . . . Maintenance of the opportunity for free political discussion is a basic tenet of our constitutional democracy.

*Id.* at 551–52 (cleaned up). For all these reasons, the Court found that "appellant's freedoms of speech and assembly, secured to him by the First Amendment, as applied to the States by the Fourteenth Amendment, were denied by his conviction for disturbing the peace." *Id.* at 552.

As to the obstructing public passages conviction, the appellate was convicted "for leading the meeting on the sidewalk across the street from the courthouse." *Id.* at 553. "There [was] no doubt from the record in this case that this far sidewalk was obstructed, and thus, as so construed, appellant violated the statute." *Id.* The issue before the Court was thus "the right of a State or municipality to regulate the use of city streets and other facilities to assure the safety and convenience of the people in their use and the concomitant right of the people of free speech and assembly." *Id.* at 554 (citations omitted). The Court then explained:

> The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection. One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest. Nor could one, contrary to

39

> traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech or assembly. Governmental authorities have the duty and responsibility to keep their streets open and available for movement. A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations.

> We emphatically reject the notion urged by appellant that the First and Fourteenth Amendments afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech. . . . [I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.

*Id.* at 554–55 (cleaned up).

However, the statute at issue was "as if [it] expressly provided that there could only be peaceful parades or demonstrations in the unbridled discretion of the local officials." *Id.* at 557. "The pervasive restraint on freedom of discussion by the practice of the authorities under the statute is not any less effective than a statute expressly permitting such selective enforcement." *Id.* The High Court explained:

> It is clearly unconstitutional to enable a public official to determine which expressions of view will be permitted and which will not or to engage in invidious discrimination among persons or groups either by use of a statute providing a system of broad discretionary licensing power or, as in this case, the equivalent of such a system by selective enforcement of an extremely broad prohibitory statute.

> It is, of course, undisputed that appropriate, limited discretion, under properly drawn statutes, or ordinances, concerning the time, place, duration, or manner of use of the streets for public assemblies may be vested in administrative officials, provided that such limited discretion is exercised with 'uniformity of method of treatment upon the facts of each application, free from improper or inappropriate considerations and from unfair discrimination and with a systematic, consistent and just order of treatment, with reference to the convenience of public use of the highways.

*Id.* at 557–58 (cleaned up). Because Baton Rouge had "allow[ed] unfettered discretion" to its "local officials in the regulation of the use of the streets for peaceful parades and meetings," the statute was a violation of appellant's freedom of speech and assembly, so his conviction under the statute as applied had to be reversed. *Id.* at 558.

### ii.    *Cox II*

*Cox II* focused on petitioner's conviction under La. R.S. 14:401, which "prohibit[ed] a particular type of conduct, namely, picketing and parading, in a few specified locations, in or near courthouses." 379 U.S. at 560, 562. The Court first considered whether the statute was invalid on its face as an unlawful restriction on First Amendment freedoms. *Id.* at 560. In finding that it was not, the Court explained that the law was "precise" and "narrowly drawn" and that "a State has a legitimate interest in protecting its judicial system from the pressures which picketing near a courthouse might create." *Id*. at 562. The Court wrote:

> A State may adopt safeguards necessary and appropriate to assure that the administration of justice at all stages is free from outside control and influence. A narrowly drawn statute such as the one under review is obviously a safeguard both necessary and appropriate to vindicate the State's interest in assuring justice under law.
>
> Nor does such a statute infringe upon the constitutionally protected rights of free speech and free assembly. The conduct which is the subject of this statute—picketing and parading—is subject to regulation even though intertwined with expression and association. The examples are many of the application by this Court of the principle that certain forms of conduct mixed with speech may be regulated or prohibited.

*Id.* at 562–63. The Court held "that this statute on its face is a valid law dealing with conduct subject to regulation so as to vindicate important interests of society and that the fact that free

speech is intermingled with such conduct does not bring with it constitutional protection." *Id.* at 564.

But, after rejecting certain other challenges to the statute as applied, the Supreme Court found that the convictions must be overturned. *Id.* at 568. Appellants were convicted of demonstrating "near" the courthouse, but the law was unclear on what constitutes "near." *Id.* While officers had discretion to construe that term as "a limited control of the streets and other areas in the immediate vicinity of the courthouse," and while such discretion was proper in their making "determinations concerning the time place, duration, and manner of demonstrations," that was "not the type of unbridled discretion which would allow an official to pick and choose among expressions of view the ones he will permit to use the streets and other public facilities" which were otherwise permissible. *Id.* at 569.

Here, officials gave permission to the protesters to demonstrate at that location, and police never suggested to the protesters that "the demonstration be held further from the courthouse than it actually was." *Id* at 569–70. "In effect, appellant was advised that a demonstration at the place it was held would not be one 'near' the courthouse within the terms of the statute." *Id.* at 571. The Supreme Court analogized the case to *Raley v. Ohio*, 360 U.S. 423 (1959), stating:

> As in Raley, under all the circumstances of this case, after the public officials acted as they did, to sustain appellant's later conviction for demonstrating where they told him he could 'would be to sanction an indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State had clearly told him was available to him.' Id., at 426, 79 S. Ct., at 1260. The Due Process Clause does not permit convictions to be obtained under such circumstances.

*Id.* *Cox II* then clarified:

> This is not to say that had the appellant, entirely on his own, held the demonstration across the street from the courthouse within the sight and hearing of those inside, or a fortiori, had he defied an order

42

> of the police requiring him to hold this demonstration at some point
> further away out of the sight and hearing of those inside the
> courthouse, we would reverse the conviction as in this case. In such
> cases a state interpretation of the statute to apply to the
> demonstration as being 'near' the courthouse would be subject to
> quite different considerations.

*Cox II*, 379 U.S. at 571–72.

The High Court then addressed the Sheriff's dispersal order, as the State essentially

"argue[d] that this order somehow removed the prior grant of permission and reliance on the

officials' construction that the demonstration on the far side of the street was not illegal as being

'near' the courthouse." *Id.* at 572. But the Supreme Court rejected this:

> Appellant was led to believe that his demonstration on the far side
> of the street violated no statute. He was expressly ordered to leave,
> not because he was peacefully demonstrating too near the
> courthouse, nor because a time limit originally set had expired, but
> because officials erroneously concluded that what he said threatened
> a breach of the peace. This is apparent from the face of the Sheriff's
> statement when he ordered the meeting dispersed: 'Now, you have
> been allowed to demonstrate. Up until now your demonstration has
> been more or less peaceful, but what you are doing now is a direct
> violation of the law, a disturbance of the peace, and it has got to be
> broken up immediately.' See discussion in No. 24, ante, at 459—
> 462. Appellant correctly conceived, as we have held in No. 24, ante,
> that this was not a valid reason for the dispersal order. He therefore
> was still justified in his continued belief that because of the original
> official grant of permission he had a right to stay where he was for
> the few additional minutes required to conclude the meeting. In
> addition, even if we were to accept the State's version that the sole
> reason for terminating the demonstration was that appellant
> exceeded the narrow time limits set by the police, his conviction
> could not be sustained. Assuming the place of the meeting was
> appropriate—as appellant justifiably concluded from the official
> grant of permission—nothing in this courthouse statute, nor in the
> breach of the peace or obstruction of public passages statutes with
> their broad sweep and application that we have condemned in No.
> 24, ante, at 463—466, authorizes the police to draw the narrow time
> line, unrelated to any policy of these statutes, that would be
> approved if we were to sustain appellant's conviction on this ground.
> Indeed, the allowance of such unfettered discretion in the police
> would itself constitute a procedure such as that condemned in No.

43

> 24, ante, at 463—466. In any event, as we have stated, it is our
> conclusion from the record that the dispersal order had nothing to
> do with any time or place limitation, and thus, on this ground alone,
> it is clear that the dispersal order did not remove the protection
> accorded appellant by the original grant of permission.

*Id.* at 572–73.  The Supreme Court then limited its holding:

> Of course this does not mean that the police cannot call a halt to a
> meeting which though originally peaceful, becomes violent. Nor
> does it mean that, under properly drafted and administered statutes
> and ordinances, the authorities cannot set reasonable time limits for
> assemblies related to the policies of such laws and then order them
> dispersed when these time limits are exceeded. See the discussion in
> No. 24, ante, at 463—466. We merely hold that, under
> circumstances such as those present in this case, appellant's
> conviction cannot be sustained on the basis of the dispersal order.

> Nothing we have said here or in No. 24, ante, is to be interpreted as
> sanctioning riotous conduct in any form or demonstrations, however
> peaceful their conduct or commendable their motives, which
> conflict with properly drawn statutes and ordinances designed to
> promote law and order, protect the community against disorder,
> regulate traffic, safeguard legitimate interests in private and public
> property, or protect the administration of justice and other essential
> governmental functions.

*Id.* at 573–74.  Consequently, the Supreme Court reversed appellants' convictions. *Id*. at 575.

*c.*  <u>Summary</u>

When synthesizing the general First Amendment law with *Cox I* and *II*, certain principles

become clear.  First, individuals cannot "be punished merely for peacefully expressing unpopular

views." *Cox I*, 379 U.S. at 551.  Second, the government has the right place reasonable restrictions

on demonstrations "to keep their streets open and available for movement," *id.* at 554–55, but that

does not allow the City to exercise "unbridled discretion," "selective enforcement," or "invidious

discrimination" against those exercising their rights, *id.* at 557–58.  And third, the State cannot

"convict[] a citizen for exercising a privilege which the State ha[s] clearly told him was available

to him." *Cox II*, 379 U.S. at 571 (cleaned up).  Thus, the government cannot allow an individual

44

to protest at a particular location and then, without justification, revoke the order. *Id.* at 572–74. But the City can do so in the event of a breach of the peace, violence, or riotous behavior. *See id.*

### 3. Analysis

Having carefully considered the matter, the Court will deny both motions with respect to the First Amendment claims. In sum, the record is replete with genuine issues of material fact which preclude summary judgment. The Court will address each motion in turn.

### a. Defendants' Motion

As to Defendants' motion, the Court agrees with Plaintiffs' characterization of Defendants' position: the heart of their motion on this issue is that the protesters acted violently, intended to obstruct the interstate, and were thus unlawful under the *Cox* cases.

But Plaintiffs provide considerable evidence establishing that the protests were in fact orderly, nonviolent, and compliant. At the outset, while there is evidence, highlighted above, that the protesters wanted to march onto the interstate, other evidence contradicts this. For instance, the City conceded in its deposition that the intelligence officer had not surveyed the whole group and that it was "unclear . . . if that reflected the intentions of the entire group." (City's Rule 30(b)(6) Dep. 172:19–23, Doc. 298-7.) The representative also stated that he could not "put a number on who" and that he would not "say every single person knew exactly what they were doing, because they might have just been just following them. . . . It sounds like impossible to answer . . . whether it was two, three, four or more people talking about" entering the highway. (*Id.* at 225:18–226:8.) Thus, there are questions of fact on the protesters' intent to overrun the freeway.

Further, even if the demonstrators did want to enter the interstate, there is some evidence that they were told by police that they could. (Rule 30(b)(6) Dep. 191:11–192:8, Doc. 292-25.) This creates further issues of fact as to whether the picketers engaged in illegal behavior.

Other facts also support a finding that the protesters acted lawfully. Plaintiffs cite the Affidavit of Probable Cause for each plaintiff, which says that BRPD Officers "were assigned to provide security for *peaceful* protests in the vicinity of 500 East Blvd." (*See, e.g.*, Doc. 292-30 (emphasis added).) A representative of the City also testified that "the City does not have evidence of property destruction at the East and France protest." (City's Rule 30(b)(6) Dep. 19:7–11, Doc. 292-2.) And, again, according to Plaintiffs' chart, as verified by the City's deposition, though a few items were thrown, the City has no evidence Plaintiff did not comply with orders or that any Plaintiff engaged in an act of violence. (Rule 30(b)(6) Chart, Doc. 292-1 at 1; Rule 30(b)(6) Dep. 26:19–27:8, 36:14–37:4, Doc. 292-2).) It is also undisputed that the City's representative said that "other than the affidavit of probable cause, the City does not have any description of any specific plaintiff's illegal activity." (*DRPSMF* ¶ 12, Doc. 311.)

Plaintiffs' experts also support their position. Robert Pusins stated in his report, "Based on my review of the numerous videos, still photographs, the Complaint, and several Declarations and other case materials, it is evident that the Plaintiffs were involved in a non-violent protest[.]" (Pusins Report, Doc. 309-2 at 47.) He also opined, "it is my opinion that law enforcement had opportunities to allow the non-violent protesters to exercise their rights associated with assembly and free speech without resorting to mass arrests and uses of force but instead chose to confront, engage and arrest protesters who were in the Batiste yard." (*Id.* at 59.)

Another expert for Plaintiffs, Dr. Peter B. Kraska, Professor of Police and Justice Studies for Eastern Kentucky University, opined, "Compared to the bulk of protests I've witnessed and/or studied, the group that had assembled at the corner of East Blvd. and France Street were extremely compliant, non-violent, non-disruptive, and afraid." (Kraska Report, Doc. 309-3 at 6.) Likewise, he discussed the militarized police presence and found:

> The police commanders of the actual operations treated the protest venue in this case as being so volatile and threatening that they fully activated the most aggressive elements of the Miami-model, deploying riot police with full armor, shields, less-lethal weaponry, and several SRTs donning full paramilitary garb, military-grade weaponry, armored personnel vehicles, and military-grade acoustic weapons. *This approach might be necessary under circumstances where protesters were rioting, destroying property, or endangering other's lives. However, the voluminous evidence reviewed revealed no justification for deploying this militarized response. Instead, it shows a peaceful assembly of Baton Rouge citizens exercising their First Amendment rights.*

(*Id.* at 5 (emphasis added).)

Plaintiffs also submit the considerable evidence, highlighted above, which demonstrates that the City engaged in content-based discrimination. Such evidence includes (1) the City's use of the Civil Disorder Policy rather than the Special Event Policy because "it was a protest for them to speak out against perceived misconduct by the [BRPD]," (Rule 30(b)(6) Dep. 28:2–29–12, Doc. 292-25); (2) the Baton Rouge Policy and Procedure Manual, which associated "protests" only with "many arrestees," (*id.* at 38:14–39:18); (3) the City's targeting of "agitators," and the definition of same as those "[p]ersons encouraging others to upset the status quo to further their cause," those "people calling for a serious change," or those who "want to see a major change in the politics of Baton Rouge," (*id.* at 35:12–25, 37:14–38:13); and (4) the City's policy to have officers "simply hand off the arrestee and return to the front lines" rather than "stop[ping] and hav[ing] a conversation with the processing team," (*id.* at 74:12–17), an approach which led to officers signing affidavits which were untrue or which had no basis in truth.

All of this content-based discrimination meant that "the government must show that its [restriction] is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end," which required that the "regulation [had to] be the least restrictive means available to the government." *Denton*, 861 F. App'x at 839 (cleaned up). With the conflicting evidence on the

peacefulness of the protests, a reasonable jury could find that the City had no other compelling state interest for breaking up the demonstration and arresting Plaintiffs. And even if there was evidence establishing that the protest was violent, reasonable jurors could differ on whether the officers employed the "least restrictive means available" by conducting indiscriminate mass arrests.

Finally, the City's reliance on *Adderley* is misplaced, as that case is easily distinguishable. *Adderley* involved protesters charged with trespassing the curtilage of a jail. *Adderley*, 385 U.S. at 46–48. The Supreme Court emphasized that, unlike *Cox I* and *Cox II*, a jail is not traditionally open to the public, and the demonstrators were charged with trespass, not breach of the peace. *Id.* at 41–42. There was no evidence that this area had ever been used for protests, and the state had the right to enforce its general trespass statute evenhandedly. *Id.* at 46–48. Indeed, the Court stated, "There is not a shred of evidence in this record that this power was exercised, or that its exercise was sanctioned by the lower courts, because the sheriff objected to what was being sung or said by the demonstrators or because he disagreed with the objectives of their protest." *Id.* at 47. This case is, of course, different, since there is ample evidence of the City discriminating on the basis of viewpoint.

In sum, construing the evidence in a light most favorable to Plaintiffs and drawing reasonable inferences in their favor, a reasonable juror could easily conclude that Plaintiffs acted permissibly under *Cox I* and *II* through protests that were peaceful, non-violent, and compliant with police officers. Further, a reasonable juror could likewise find that the City engaged in viewpoint discrimination through its response to the protests, that the City did not have a compelling governmental interest in making the arrests, and that, even if it did, the City did not use the least restrictive means available to it. Consequently, Defendants' motion will be denied.

48

*b.* Plaintiffs' Motion

For similar reasons, Plaintiffs' cross motion will be denied. Viewing the facts in a light most favorable to Defendants and drawing reasonable inferences in their favor, Defendants have presented contrary evidence from which a reasonable jury could conclude that the crowd intended to obstruct the interstate and refused orders to disperse amidst riotous behavior. *See Cox II*, 379 U.S. at 572–74.

Defendants submit testimony and videos showing that the protesters were not peaceful. Again, one officer testified that "[the police] started receiving the attacks with the items that were thrown at [them] from that area. At that point, it was not lawful." (Myron Daniels Dep. 105:16–106:5, Doc. 292-22.) He estimated it was "quite a few people or it was more than five." (*Id.* at 178:17–19.) Another officer testified that the protest was not peaceful because "[t]here had been a lot of things thrown from the crowd at officers," along with "things that [were] being yelled and . . . the general atmosphere of the protesters." (Thomas Morse Dep. 51:17–52:3, Doc. 298-16.) Defendants lastly provide videos of at least two water battles being thrown at the officers. (Def. Ex. DDDDD - From Finn - VID_20160710_193234661, at 00:10-00:12; Def. Ex. DDDDDDD - Blaze Opposite view of arrest (Antonio & Nadia), at 00:18-00:25.)

Additionally, Defendants tender proof that the demonstrators intended to obstruct public passages. Some of these protesters took active measures to block the roadway and prevent the police from entering the intersection of East Boulevard and France Street, where they had gathered. (*PRDSMF* ¶ 13, Doc. 309-1.) Further, though no Plaintiff took part, a group of protesters formed a human chain across East Boulevard to interpose themselves and block the law enforcement advance across France Street. (*Id.*)

Even more important, as explained above, Defendants provide considerable evidence that the protesters intended to enter the interstate, action which would block traffic and endanger the public. Again, one BRPD officer spoke to a purported leader of protesters who said that they were going to enter and block Interstate I-110. (*See PRDSMF* ¶ 4, Doc. 309-1 at 1; David Wallace Dep. 102:17–103:21, Doc. 292-29.) Another officer arrived later and spoke to a protester who confirmed her intention to block the freeway. (*PRDSMF* ¶ 5, Doc. 309-1 at 1.) An undercover officer also reported to his superiors that some of the protesters in the East and France group had expressed an intent to go onto the interstate. (City's Rule 30(b)(6) Dep. 171:2–23, 172:19–23, 224:14–225:5, Doc. 298-7.) As one Rule 30(b)(6) deponent stated:

> Q.    Is it the City's position that the officers on the scene had a reasonable belief that if they had allowed these protesters to stay the corner of France, that they would eventually enter the interstate?
>
> A.    It was a known fact, because communication with protesters - - because the intelligence officer in the crowd, we knew exactly what their intentions were. So yes, sir, it was a fact.

(*Id.* at 160:10–19; *see id.* at 267:1–8.) And all of this happened with the City's knowledge of protesters in other cities engaging in such conduct (and, indeed, that it was a "common practice"). (*Id.* at 265:13–266:3, 267:1–268:17; *see id.* 264:10–266:25; *see also* Def. Ex. EEEEEE -Hundreds arrested BLM MSNBC (showing a news story containing clips of protesters on various interstates); David Wallace Dep. 102:2–16, Doc. 298-21 (saying that City's intelligence was "consistent with what protesters ha[d] done around the nation prior to this event").)

Further, as alluded to above, Defendants submit the video from the advocacy group Juvenile Justice Information Exchange. That video contains a screenshot of text stating:

> Sunday, July 10
>
> Protesters peacefully march on Louisiana State Capitol.

> Later, some gather near the starting point of the march and find officers blocking Government St. in attempts to avoid protesters wishing to block the nearby interstate.
>
> Protesting continues . . .

(Def. Ex. HHHHHH -Juvenile Justice Information Exchange, 2:05.)

Equally important, a City representative testified that its position was that the officers on the scene reasonably believed that a riot was occurring or was about to occur and that the protesters taking over the interstate and blocking the interstate would fit the definition of a riot. (Rule 30(b)(6) Dep. 202:11–22, Doc. 298-7.)  Under Louisiana law,

> A riot is a public disturbance involving an assemblage of three or more persons acting together or in concert which by tumultuous and violent conduct, or the imminent threat of tumultuous and violent conduct, results in injury or damage to persons or property or creates a clear and present danger of injury or damage to persons or property.

La. R.S. 14:329.1.

Ultimately, the City testified to the obvious: "protesters blocking off an interstate highway would be a danger both to protesters and for other members of the public." (City's Rule 30(b)(6) Dep. 159:8–160:1, Doc. 298-7.)  It would have been "extremely dangerous, especially in that location. . . . It would have been disastrous." (*Id.*)

Plaintiffs rely on *Cox II* for the proposition that is "clearly unconstitutional for BRPD to tell a protester he could remain in a certain area, and then subsequently arrest him for failing to disperse." (Doc. 323 at 3 (citing *Cox II*, 379 U.S. at 573).)  While *Cox II* does support this point generally, there are factual and legal problems with Plaintiffs' contention.

Factually, Plaintiffs ignore summary judgment evidence presented by Defendants.  While one officer told the protesters they could enter the interstate, (Rule 30(b)(6) Dep. 191:11–192:8, Doc. 292-25), that officer "gave them some stall tactics to where [the police] could get the

51

resources there to mitigate it," (David Wallace Dep. 104:2–16, Doc. 292-29).  Moreover, that policeman (Brandon Smith) also advised the leader, "Well, hold on.  We figured y'all would.  It's dangerous." (*Id.*)  Thus, Smith's words did not constitute unambiguous permission to enter the highway, and, in any event, given the size of the crowd and the danger, a reasonable juror could easily find his statement highly reasonable and appropriate (indeed, necessary) under the circumstances.

Other facts also support a denial of Plaintiffs' motion.  At least one other officer was instructing at least one other demonstrator not to enter the interstate, (Alaina Mancuso Dep. 28:5–29:6, Doc. 292-20), and the Court can reasonably infer from this that other officers were doing the same.  Further, according to some of Defendants' proof, Plaintiffs themselves were still in the street and sidewalk at various parts of the protest and that they were thus violating the law. (*PRDSMF* ¶ 19–20, 24, Doc. 309-1; E.J. Lapeyrous Dep. 40:7–41:15, Doc. 298-15; James Thomas Dep. 78:18–25; 81:8–82:16, Doc. 298-19.)

Critically, there is also evidence in the record that orders were given to disperse throughout the time the protesters were gathered at East and France and not just the single time Plaintiffs rely upon. (*See, e.g.,* Thomas Morse Dep. 29:20–23, 35:8–36:15, 112:2–113:7, Doc. 298-16; Def. Ex. SS KMW8273 07-10-16(4), at 00:35-0043 ("Please disperse. Please leave the area, or you will be arre . . ." (Audio cut short)); ALK East Blvd. DSC_1918, at 00:55-01:15 ("You are ordered to disperse or you will be arrested. Everyone in the area . . . will be arrested"); Rule 30(b)(6) Dep. 155:6–22, Doc. 298-7 (stating that the crowd "failed to disperse after given orders" and that "once the resources got there to make arrests, arrests were made").)  Thus, unlike *Cox II*, a reasonable jury could conclude that Plaintiffs did not have a prior authorization revoked but were rather told to vacate the area throughout their time on East and France.

Legally, Plaintiffs omit critical language from *Cox II*. As stated above, the High Court qualified that it "merely h[e]ld that, under circumstances such as those present in this case, appellant's conviction [could not] be sustained on the basis of the dispersal order." *Cox II*, 379 U.S. at 573. The Supreme Court specifically clarified:

> Of course this does not mean that the police cannot call a halt to a meeting which though originally peaceful, becomes violent. . .
>
> Nothing we have said here or in [*Cox I*] is to be interpreted as sanctioning riotous conduct in any form or demonstrations, however peaceful their conduct or commendable their motives, which conflict with properly drawn statutes and ordinances designed to promote law and order, protect the community against disorder, regulate traffic, safeguard legitimate interests in private and public property, or protect the administration of justice and other essential governmental functions.

*Id.* at 573–574.

In sum, given the evidence that the protesters were not peaceful and in fact riotous, given their refusal to disperse despite numerous requests to do so, given the evidence of potential violence from the demonstrators, and given some picketers' intent to obstruct the interstate, *Cox II*'s conclusion is distinguishable, particularly when seen from Defendants' facts with reasonable inferences drawn in their favor. That is, a reasonable jury could conclude that Defendants' conduct was necessary to serve the compelling state interests of protecting public safety and ensuring the free flow of traffic and that they employed the least restrictive means to accomplish that end. *See Denton*, 861 F. App'x at 839 (cleaned up). At the very least, the Court cannot say that "the record is so one-sided as to rule out the prospect of the [Defendants] prevailing." Kane, *Wright & Miller*, *supra*, at § 2727.1. As a result, Plaintiffs' motion will be denied.

### C.  First Amendment Freedom of Press

#### *1. Parties' Arguments*

Defendants next turn to the freedom of press claims asserted by Plaintiffs Karen Savage and Cherri Foytlin.  (Doc. 307-1 at 11–12.)  According to Defendants, the exhibits show these Plaintiffs were in the roadway, on the sidewalks, and within feet of the officers as the officers were trying to effectuate arrests and "gain control of the intersection." (*Id.* at 12.)  Defendants maintain that these Plaintiffs were interfering with the policemen's performing their duties and "needlessly increasing the risk of injury to themselves, the officers, and the arrestees." (*Id.*)  Defendants then cite to the latitude Former Chief Dabadie gave from BRPD to reporters who filmed (absent the reporters' "interfering with police work or creating unsafe conditions, which is precisely what is shown by the exhibits"). (*Id.*)  Defendants also rely on the officers' training. (*Id.*)

Plaintiffs respond by saying that "Defendants provide no evidence that Foytlin or Savage actually interfered." (Doc. 309 at 9.)  Plaintiffs say that the specific time stamp on the video of Foytlin merely shows her taking a photo of an arrest before stepping back, and no officer seemed to notice her presence or acknowledge her.  (*Id.*)  The same goes for the other timestamped image of Foytlin.  (*Id.*)  As for Savage, there are no examples of her interfering with the police, and, indeed, Defendants concede on the chart that they have no evidence that these Plaintiffs (or any others) did not comply with orders. (*Id.*)  Plaintiffs acknowledge that there can be reasonable time, place, and manner restrictions, but they say that "Defendants have not suggested that any such restrictions were placed on journalists or communicated to either Foytlin or Savage." (*Id.* at 10.)  In sum, because there is no evidence either of these Plaintiffs interfered with law enforcement, summary judgment should be denied.

## 2. Applicable Law

"The First Amendment protects freedom of speech and freedom of the press." *Turner v. Lieutenant Driver*, 848 F.3d 678, 688 (5th Cir. 2017) (citing U.S. Const. amend. I). "But 'the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw.' " *Id.* (quoting *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978)). "News-gathering, for example, is entitled to first amendment protection, for without some protection for seeking out the news, freedom of the press could be eviscerated, even though this right is not absolute." *Id.* (cleaned up). "The Supreme Court has also recognized a First Amendment right to 'receive information and ideas[.]' " *Id.* (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976) (internal quotation marks omitted)). Further, "there is 'an undoubted right to gather news from any source by means within the law.' " *Id.* (quoting *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978) (internal quotation marks omitted)).

"In addition to the First Amendment's protection of the broader right to film, the principles underlying the First Amendment support the particular right to film the police." *Id*. As the Fifth Circuit has explained:

> There is practically universal agreement that a major purpose of the First Amendment was to protect the free discussion of governmental affairs. To be sure, speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people. The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it. Filming the police contributes to the public's ability to hold the police accountable, ensure that police officers are not abusing their power, and make informed decisions about police policy. Filming the police also frequently helps officers; for example, a citizen's recording might corroborate a probable cause finding or might even exonerate an officer charged with wrongdoing.

*Id.* at 690 (cleaned up).

Thus, the Fifth Circuit has "agree[d] with every circuit that has ruled on this question: Each has concluded that the First Amendment protects the right to record the police." *Id.* (citations omitted). That is, "[t]he filming of government officials engaged in their duties in a public place, including police officers performing their responsibilities, fits comfortably within [basic First Amendment] principles." *Id.* (quoting *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011)).

But, "[t]his right . . . 'is not without limitations.' " *Id.* (quoting *Glik*, 655 F.3d at 84). "Like all speech, filming the police may be subject to reasonable time, place, and manner restrictions." *Id.* (cleaned up). "[W]hen police departments or officers adopt time, place, and manner restrictions, those restrictions must be 'narrowly tailored to serve a significant governmental interest.' " *Id.* (quoting *McCullen v. Coakley*, —— U.S. ——, 134 S. Ct. 2518, 2529 (2014) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989))). "That said, to be constitutionally permissible, a time, place, and manner restriction 'need not be the least restrictive or least intrusive means of serving the government's interests.' " *Id.* (quoting *McCullen*, 134 S. Ct. at 2535 (internal quotation marks omitted)).

### 3. Analysis

Having carefully considered the matter, the Court will deny Defendants' motion on this issue. Again, questions of fact preclude summary judgment.

Defendants point to the evidence of Foytlin and Savage in the street and allegedly violating police orders. For example, Plaintiff Cherri Foytlin was arrested on France Street at about the same time as the push into the yard. (*PRDSMF* ¶ 20, Doc. 309-1.) Photographs and video show Cherri Foytlin at multiple locations throughout the protest, in the roadway and on sidewalks at various points in time. (*Id.*) As to Plaintiff Karen Savage, an officer testified that she was given

"loud verbal commands to get out of the roadway" and that "[s]he refused to multiple times." (James Thomas Dep. 78:18–25, Doc. 298-19.)  Defendants also assert that photographs and video show Karen Savage at multiple locations throughout the protest, in the roadway and on sidewalks at various points in time. (*See* Def. Ex. ALK 1908, 1929, 1950, 1999, 2006, 2009, 2031, 2053, 2066.)   They also provide a video of her arrested near the McDonalds. (Def. Ex. DeSavlo East Blvd. protests 7-10-16 (8).)  Further, as highlighted extensively above, the City points to concerns about the interstate being overrun. (*PRDSMF* ¶¶ 4, 5, Doc. 309-1 at 1; City's Rule 30(b)(6) Dep. 171:2–23, 172:19–23, 267:1–268:17, Doc. 298-7.)

This evidence does not, however, entitle Defendants to summary judgment.  At best, these pictures and video show that these Plaintiffs were in the street and on the sidewalk at various points.  They do not definitively show that these Plaintiffs violated orders or any other "reasonable time, place, and manner restrictions" imposed by the police. *See Turner*, 848 F.3d at 690.   To the contrary, Plaintiffs submit their own evidence—again, through the Rule 30(b)(6) Chart and verifying testimony—that (1) the City has no proof that Plaintiffs did not comply with orders, and (2) that, "other than the affidavit of probable cause, the City does not have any description of any specific plaintiff's illegal activity." (Rule 30(b)(6) Chart, Doc. 292-1 at 1; Rule 30(b)(6) Dep. 26:19–27:8, 36:21–37:4, Doc. 292-2; *DRPSMF* ¶ 12, Doc. 311.)  Equally important, the images and video submitted by Defendants do not show that either of these Plaintiffs interfered with police officers, or, at the very least, a reasonable jury could find so.

As a result, construing the evidence in a light most favorable to Plaintiffs and drawing reasonable inferences in their favor, a reasonable juror could easily find that Defendants' decision to prevent Savage and Foytlin from performing their investigative work was not "narrowly tailored

to serve a significant government interest." *Turner*, 848 F.3d at 690.  Consequently, Defendants' motion on this issue will be denied.[8]

### D.  First Amendment Retaliation

#### 1. Parties' Arguments

##### a.  Defendants' Motion (Doc. 307) and Plaintiffs' Opposition (Doc. 309)

Defendants next attack the First Amendment retaliation claims. (Doc. 307-1 at 12.) According to Defendants, the record evidence shows that the protesters intended to shut down the interstate, and the officers stopped them from doing so. (*Id.* at 13.)  Defendants also say demonstrators were given many orders to disperse, but they refused to do so. (*Id.*)  Defendants assert that the officers executing the Affidavits of Probable Cause were within earshot of the dispersal order and had "varying levels of communication with the officers escorting detainees to the processing area." (*Id.*)  They were aware of the circumstances on the ground and "relied on their collective experience and fellow officers to execute the [A]ffidavits of [P]robable [C]ause." (*Id.*)  Defendants point to various violations individual officers observed and some affidavits executed by unknown persons. (*Id.* at 13–14.)  "That system was imperfect, but the general

---

[8] Defendants, in a conclusory way, say in briefing that they "have asserted their defense of qualified immunity through their answer, and [they] respectfully suggest that the evidence presented demonstrates their eligibility for qualified immunity." (Doc. 307-1 at 5.)  Additionally, Defendants mention but do not elaborate upon the fact that *Turner* ruled that the "First Amendment protects the right to record the police" "[h]enceforth" after February 16, 2017, and that the Fifth Circuit specifically found that "there was no clearly established First Amendment right to record the police at the time of Turner's activities" in September 2015 because of "the absence of controlling authority and the dearth of even persuasive authority." (Doc. 307-1 at 11 (citing *Turner*, 848 F.3d at 687).)  Again, "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in [a] skeletal way, leaving the court to put flesh on its bones." *Wuestenhoefer*, 105 F. Supp. 3d at 672 (quoting *El–Moussa*, 569 F.3d at 257).  Consequently, the Court will pass on deciding whether the right to record the police was clearly established at the time of these protests in July 2016.  Any such argument is deemed waived.

conditions and common violations were well known to the officers, and sufficient for a determination of probable cause, which does not require certainty, only probability." (*Id.* at 14.)

Plaintiffs (correctly) respond that the sole basis for Defendants' motion is the absence of probable cause. (Doc. 309 at 11.)  Plaintiffs maintain that "Defendants have not produced one shred of evidence other than the Affidavits of Probable Cause that any Plaintiff failed to comply with orders, threw any object at law enforcement or committed any other act of violence, or even unlawfully blocked the intersection." (*Id.*)  "Defendants' argument seems to be simply that because Plaintiffs were present at East and France, they *must* have violated *some* law, though no violation has been caught on the hours of video footage from the protest." (*Id.*)  Here, the Affidavits of Probable Cause are insufficient because probable cause requires "*some* knowledge" of the arresting officer at the moment of arrest that an offense had been or was being committed. (*Id.* at 11–12.)  But, here, the people executing the Affidavits of Probable Cause had no knowledge of the circumstances of the arrest. (*Id.* at 12.)  Indeed, the officers specifically said that the arrest team should stop having a conversation with the processing team and should instead simply hand over the arrestee, thereby eliminating any "flow of information" from the arresting officer to the officer that signed the affidavit. (*Id.* at 13.)  Consequently, the arresting officer had no basis to arrest the individual other than his participation in an arrest, and that is retaliation. (*Id.*)

As to the retaliatory motive, Plaintiffs rely upon the choice of the Civil Disorder Policy rather than the Special Events Policy. (*Id.* at 13.)  Plaintiffs quote the City's Rule 30(b)(6) deposition, which they say reflects that "Defendants chose to arrest Plaintiffs specifically because they were speaking out 'against perceived misconduct by the Baton Rouge Police Department.' " (*Id.* at 14.)  Plaintiffs then quote Defendants' briefing wherein they say officers have a " 'duty and obligation . . . to prevent' crowds which are 'hostile to law enforcement.' " (*Id.* at 14–15.)

"Defendants have explicitly admitted – and continue to argue – that animus towards law enforcement was a motivating factor in the unlawful arrests and, therefore, the motion should be denied." (*Id.* at 15.)

> b.  Plaintiffs' Motion (Doc. 297), Defendants' Opposition (Doc. 310), and Plaintiffs' Reply (Doc 323)

Plaintiffs maintain that they are entitled to summary judgment on their retaliation claims. (Doc. 297-1 at 27.)   Plaintiffs assert that, with only one exception, the officers testified that no one had been arrested for the crimes for which these protesters were supposedly arrested. (*Id.*) Some officers did not even know these laws existed. (*Id.*)  Many officers said it was not uncommon to find other individuals violating this law, yet they were not arrested; rather, Plaintiffs were arrested only after they objected to police misconduct. (*Id.* at 28.)   The officers also could not remember using preprinted affidavits despite their combined 119 years of service and despite unruly scenes and places like LSU games and Mardi Gras parades.  (*Id.* at 28–29.)  Moreover, this protest is the only time BRPD has ever deployed a LRAD, and they used it without full knowledge of how to operate it. (*Id.* at 29–30.)  Moreover, no officer completed a use of force report following the incident. (*Id.* at 30.)  Lastly, despite numerous lawsuits and investigations into what happened by outside organizations, BRPD has conducted only one investigation, and that was into violating people's rights and wrongfully arresting protesters that had a right to be on the median. (*Id.*)

Defendants' opposition, (*see* Doc. 310), and Plaintiffs' reply, (*see* Doc. 323), echo their other First Amendment arguments summarized above.

### 2. Applicable Law

" '[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). As

the Fifth Circuit has explained, "[t]o prevail on a First Amendment retaliation claim, Plaintiff must demonstrate that (1) he was engaged in constitutionally protected activity, (2) the officers' action caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the officers' adverse actions were substantially motivated against Plaintiff's exercise of constitutionally protected conduct." *Alexander v. City of Round Rock*, 854 F.3d 298, 308 (5th Cir. 2017) (citation omitted).

"But if an officer has probable cause to seize that individual, 'the objectives of law enforcement take primacy over the citizen's right to avoid retaliation.' " *Davidson v. City of Stafford, Texas*, 848 F.3d 384, 391 (5th Cir. 2017) (citing *Allen v. Cisneros*, 815 F.3d 239, 245 (5th Cir. 2016) (quoting *Keenan v. Tejeda*, 290 F.3d 252, 261–62 (5th Cir. 2002))). Thus, "[t]he First Amendment does not entitle a citizen to obstruct traffic or create hazards for others." *Singleton v. Darby*, 609 F. App'x 190, 193 (5th Cir. 2015) (per curiam) (citing, *inter alia*, *Cox*, 379 U.S. at 553–558). "A State may therefore enforce its traffic obstruction laws without violating the First Amendment, even when the suspect is blocking traffic as an act of political protest." *Id.* (citing, *inter alia*, *Cox*, 379 U.S. at 553–558).

In sum, "[a]bsent [ ] a showing [of no probable cause], a retaliatory arrest claim fails." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1725 (2019). "But if the plaintiff establishes the absence of probable cause, then . . . the plaintiff must show that the retaliation was a substantial or motivating factor behind the arrest, and, if that showing is made, the defendant can prevail only by showing that the arrest would have been initiated without respect to retaliation." *Id.* (cleaned up).

But, "[a]lthough probable cause should generally defeat a retaliatory arrest claim, a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Id.* at 1727. "In such cases, an unyielding

61

requirement to show the absence of probable cause could pose a risk that some police officers may exploit the arrest power as a means of suppressing speech." *Id.* (cleaned up). The High Court explained:

> For example, at many intersections, jaywalking is endemic but rarely results in arrest. If an individual who has been vocally complaining about police conduct is arrested for jaywalking at such an intersection, it would seem insufficiently protective of First Amendment rights to dismiss the individual's retaliatory arrest claim on the ground that there was undoubted probable cause for the arrest.

*Id.* Thus, "the no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* at 1727 (citation omitted). "After making the required showing, the plaintiff's claim may proceed in the same manner as claims where the plaintiff has met the threshold showing of the absence of probable cause." *Id.* (citation omitted).

### 3. Analysis

Having carefully considered the matter, the Court will deny both motions on the retaliation claims. Again, questions of fact preclude summary judgment.

#### a. Defendants' Motion

Defendants' motion is easily denied. As Plaintiffs argue, the sole basis of their motion is that there was probable cause to effectuate the arrest. But Plaintiffs have submitted considerable objective evidence that the no-probable-cause requirement should not apply because other similarly situated individuals not engaged in the protected speech were not arrested. *See Nieves*, 139 S. Ct. at 1725. Plaintiffs specifically provide the deposition testimony of many officers who, in their combined experience, could not recall a time where they arrested someone on the charge of obstruction of a highway (La. R.S. 14:97) or obstruction of a public passageway statutes (La. R.S. 14:100.1) enforced. (*See, e.g.*, Jonathan Abadie Dep. 54:9–25, Doc. 292-7 (8 years); Derrick

Williams Dep. 42:3–25, Doc. 292-9 (23 years); Ira Roberts Dep. 47:18-49:5, Doc. 292-16 (23 years).)  Likewise, other officers testified that they could not remember a time prior to July 2016 where a synopsis of probable cause was filled out the way it was for the protests. (*See, e.g.,* Derrick Williams Dep. 66:24–67:4, Doc. 292-9.)  All of this leads to the conclusion that the City discriminated against the protesters and that Plaintiffs can avoid the no-probable-cause requirement.

Further, Plaintiffs have shown that retaliation was "a substantial or motivating factor behind the arrest." *Nieves*, 139 S. Ct. at 1725 (cleaned up).  As explained in the other First Amendment section above, a reasonable juror could look at the use of the Civil Disorder Policy—the facts that it was used because "it was a protest for them to speak out against perceived misconduct by the [BRPD]," (Rule 30(b)(6) Dep. 28:18–24, Doc. 292-25), and the representative's statement that, "if they had gathered together, say, for a church event or to talk about sales of water skis, that would fall under a special event" policy rather than the Civil Disorder Policy, (*id.* at 29:3–12)—and conclude that Plaintiffs were retaliated against by the City based on the content of their speech.

As to the officers, Plaintiffs' chart, cited numerous times above, shows no refusal by Plaintiffs to follow orders and no acts of violence which would necessitate and arrest.  Further, the chart also shows that, with a few exceptions, the City had no knowledge of which officer saw which Plaintiff commit any crime, (Rule 30(b)(6) Dep. 42:21–43:18, Doc. 292-2), or what officer seized what Plaintiff, (*id.* at 45:4–9).  And there is considerable evidence documented above that, for many officers, there was little if any communication between the arresting officers and the officers processing Plaintiffs and thus producing the Affidavits of Probable Cause that would result in their imprisonment. (*See* Rule 30(b)(6) Dep. 74:12–17, 59:21–60:2, Doc. 292-25; Mark Dennis

Dep. 28:11–29:23, 30:14, Doc. 292-23; Jonathan Abadie Dep. 11:24–12:3, 14:25–15:4, 18:8–13, 32:20–33:20, 34:4–15, 35:8–22, 55:1–7, Doc. 292-7; Willie Williams Dep. 46:14–20, 79:1–8, Doc. 292-24.)  Again, it is undisputed that, "other than the affidavit of probable cause, the City does not have any description of any specific plaintiff's illegal activity," (*DRPSMF* ¶ 12, Doc. 311), yet, as one Defendant said, the "Affidavits of Probable Cause[] . . . don't actually show us what happened during the protests,"  (Joe Simoneaux Dep. 131:14–132:11, Doc. 292-17).

In sum, construing the evidence in a light most favorable to Plaintiffs and drawing reasonable inferences in their favor, a reasonable juror could, without difficulty, conclude that Plaintiffs were retaliated against in violation of the First Amendment.  That is, a reasonable jury could find from all of the above evidence (a) that the no-probable-cause rule does not apply, (b) that Plaintiffs established that a substantial motivating factor behind the arrest was retaliation, and (c) that Defendants did not show that the arrest would have occurred without that retaliation.  *See Nieves*, 139 S. Ct. at 1725 (cleaned up).  Defendants' motion is thus denied.

### b.  Plaintiffs' Motion

Plaintiffs' motion is a closer call but ultimately still warrants denial.  Even assuming Plaintiffs had shown, beyond doubt, the absence of probable cause, and even assuming that Plaintiff had proven, beyond peradventure, that retaliation was a "substantial or motivating factor behind the arrest," a reasonable jury could find that Defendants have met their burden of establishing that "the arrest would have been initiated without respect to retaliation." *Nieves*, 139 S. Ct. at 1725; *see also Fontenot*, 780 F.2d at 1194.

This conclusion is warranted from all of the evidence highlighted above addressing Plaintiffs' motion for summary judgment on their First Amendment claims—i.e., the evidence showing that the protesters were not peaceful but rather riotous, that they had the intent to block

the interstate, that these specific Plaintiffs obstructed the street and sidewalk despite numerous reasonable orders to the contrary—and on the officers' good faith reliance on the information provided to them, (Willie Williams Dep. 41:18–42:9, 46:14–20, 79:1–8, Doc. 292-24; Jonathan Abadie Dep. 35:8–22, 55:1–7, Doc. 292-7). For these same reasons, the Court cannot conclude that "the record is so one-sided as to rule out the prospect of [Defendants] prevailing." Kane, *supra*, at § 2727.1.

And, even if the Plaintiffs had established these First Amendment violations, a reasonable jury could find that the officers were entitled to qualified immunity. Given the above facts and the Court's finding that Defendants' conduct could comply with *Cox II*, the Court cannot say that "the law so clearly and unambiguously prohibited [their] conduct that *every* reasonable official would understand that what [they were] doing violate[d] [the law]." *McLin*, 866 F.3d at 695. At the very least, reasonable minds could differ, and, for this additional reason, Plaintiffs' motion will be denied.

### E.  False Arrest, Imprisonment, and Manufacturing of Evidence

#### 1. Parties' Arguments

##### a.  Defendants' Motion (Doc. 307)

Defendants next attack Plaintiffs' false arrest and false imprisonment claims. (Doc. 307-1 at 14.) They say that both of these claims require a finding of probable cause, but, as Defendants have shown, "there was probable cause to believe that the plaintiffs had obstructed a roadway, and that many, though perhaps not all, had resisted arrest." (*Id*. at 15.) Though other charges may be applicable, 20/20 hindsight is not required of officers. (*Id.*) "The question remains whether the officers made reasonable determinations based on what they knew at that time." (*Id.*)

In response, Plaintiffs refer to prior arguments and maintain that their false arrest and imprisonment claims survive. (Doc. 309 at 15.) They contend that, even if more accurate charges applied, Defendants admit that they lacked knowledge of whether Plaintiffs failed to disperse. (*Id.*) Moreover, many Plaintiffs were arrested several blocks away *after complying with the dispersal order*. (*Id.*) Others were arrested on the sidewalk, and they believed they were complying. (*Id.*) Plaintiffs' experts also opine that there was no probable cause. (*Id.* at 15–16.)

        *b.*  Plaintiffs' Motion (Doc. 297)

Eight of the fourteen Plaintiffs move for summary judgment on their claims of false arrest, false imprisonment, and manufacturing evidence against the City and the six individual officers who executed allegedly falsified Affidavits of Probable Cause. (Doc. 297 at 1.) For these Plaintiffs (Imani, Muhammad, Pollard, Nichols, Cheney, Onuoha, Foylin, and Liebeskind), "(1) it is established that their Affidavit of Probable Cause was wholly fabricated, with no communication between the arresting officer and the officer who signed the affidavit, and (2) the City cannot identify any officer who saw them commit any alleged crime." (*Id.*)

Plaintiffs maintain that it is well established that criminal defendants have the right to be free from false or fabricated evidence and that the fabrication of same is a due process violation. (Doc. 297-1 at 31.) According to Plaintiffs, Defendants concede that the probable cause affidavits must contain accurate information and that they must show whether the arrest was justified or a false arrest. (*Id.* at 32.) Here, however, it was BRPD's policy not to transmit information from the arresting officer to the one executing the affidavits, so the latter had no basis to know if the contents were true. (*Id.* at 33.) Indeed, Plaintiffs point out that many officers invoked their Fifth Amendment right when asked if they were committing perjury. (*Id.* at 35.) Plaintiffs then go through the various officers that arrested the Plaintiffs at issue and show that these officers lacked

knowledge of the Plaintiffs' arrests. (*Id.* at 34–38.)  Lt. John Clary, a thirty-six year veteran of the Louisiana State Police, reviewed the Affidavit of Probable Cause for Pollard and said it was a criminal act for BRPD officers to complete false Affidavits and file them in Court, as is submitting a false report. (*Id.* at 38–39.)  Plaintiffs say Defendants concede that, (1) without the signed affidavits, Plaintiffs would be free to go, and (2) Defendants have no evidence of illegal activity other than these manufactured probable cause affidavits. (*Id.* at 39.)

Plaintiffs contend they are entitled to summary judgment. (*Id.*)  Since no officer allegedly witnessed a Plaintiff committing a crime, they satisfy the requirements of a federal and state false arrest claim. (*Id.* at 40.)  Likewise, since probable cause affidavits are required to place someone in East Baton Rouge Parish Prison, and since the officers signed the affidavits without any basis that they were true, Plaintiffs are entitled to relief on their false imprisonment claims. (*Id.*)  Lastly, "by creating a document, signing it under oath without any basis, and submitting it to the court, Defendants met all the elements of the due process violation of manufacturing false evidence." (*Id.*)  Thus, argue Plaintiffs, they should get summary judgment as to each officer who signed the affidavit and the City for whom that policy existed. (*Id.*)

Plaintiffs next assert that, as to Pollard, Savage, and Cheney, their motion should be granted against the City because the signatures on these affidavits were forged and because the City ratified that forgery. (*Id.* at 41.)  Plaintiffs highlight that BRPD did not investigate the matter, even after officers were asked about this. (*Id.* at 42.)  No investigation or administrative review was done on this issue, and no one responded to an officer's complaint about a forgery. (*Id.*)  Further, the forged affidavits were submitted to the 19th Judicial District Court for the Parish of East Baton Rouge and not withdrawn, even after the forgery was discovered. (*Id.* at 43.)  Plaintiffs contend that the City is liable because (1) the City chose not to investigate an issue they believed was a "cause for

investigation;" and (2) the City should be estopped from taking advantage of its failure to investigate, as the City's conduct prevented these Plaintiffs from knowing which BRPD officer signed and fabricated the probable cause affidavits. (*Id.*) "To hold otherwise would allow BRPD to escape liability by (1) having officers anonymously forge documents, (2) choosing not investigate, and (3) resulting in Plaintiffs not having anyone to hold accountable for the forgery." (*Id.*)

In response, Defendants begin by incorporating their own motion on these issues. (Doc. 310 at 11.) Defendants say, "The arrests in this case were for standing in the roadway and resisting arrest, but the primary concern at the command level was the danger of protesters trying to occupy the interstate, which may not have been understood by all of the officers on scene." (*Id*.) Plaintiffs "seize on excess language in the affidavits . . . which does not affect the elements of the offenses charged[.]" (*Id.* at 11–12.) Defendants assert:

> As noted in the factual basis, this was an emergency response. There was no plan, because no one saw it coming, and only the rapid response of officers in the area mitigated this adventure from turning into a tragedy. Mistakes were made, but they were the reasonable mistakes of people engaged in the split-second decision making that is unique to law enforcement. If an officer saw a transport officer bring in a defendant, and mistakenly put the transport officer's name on the affidavit of probable cause, that would be a mistake, but a reasonable one under the totality of the circumstances, and not the perjury or manufacture of false evidence alleged by the plaintiffs.

(*Id.* at 12.) The fact that the affidavits had the incorrect location is irrelevant, as that is not required for the simple obstruction of a highway statute. (*Id*. at 12–13.) Defendants contend that Plaintiffs focus exclusively on the protesters' compliance by getting off of Government and ignore the larger danger that they could occupy I-110, after which time "the command staff begins mobilizing blocking forces to prevent this dangerous activity." (*Id.* at 13.) "BRPD never changed its mind or its position – from the first dispersal order from the Bearcat to the final push, the message was to

68

clear the area, disperse, you must leave the area, or you will be arrested." (*Id.*)  Defendants say they were not inconsistent in "waiting for sufficient manpower to be available to effect arrests safely and [in] delay[ing] [to] clear[ ] the crowd[.]" (*Id.*)

In reply, Plaintiffs dispute Defendants' contention that their response was unplanned, as the City has a "literal, written plan: a Special Response Team operation plan specific to the July 10, 2016 protest. (Doc. 323 at 4.)  That written SRT plan detailed where to place units, what equipment and EMS resources to deploy, and even codewords in the event of recall or evacuation." (*Id.*)  That plan involved pre-printed affidavits and mobilized officers. (*Id.*)  Defendants should have sorted those who were committing crimes and those who were not rather than making mass arrests. (*Id.* at 4–5.)

Defendants also fail to dispute that they lacked probable cause and instead only say the officers relied on word of mouth, but "[t]hose generalities do not help them escape liability at all." (*Id.* at 5.)  Plaintiffs here have moved for summary judgment only for those officers who had no specific knowledge as to what any Plaintiff did or did not do. (*Id.* at 6.)  Finally, Defendants cite no case establishing that writing and notarizing a pre-circulated affidavit is a split-second decision entitled to deference. (*Id.*)  In any event, this was not a "happenstance of a chaotic environment that information was not flowing between seizing officer and affidavit-writing officer: it was explicitly BRPD policy, and Defendants do not argue otherwise." (*Id.* at 6–7.)

### 2. *Claims against the Individual Officer Defendants*

#### a. Applicable Law

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' " *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (quoting U.S. Const. amend. IV). A warrantless arrest by a law officer

is unreasonable under the Fourth Amendment if "there is no probable cause to believe that a crime has been or is being committed." *Id.* (citations omitted). Probable cause exists when the "totality of the facts and circumstances" within an officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Glenn v. City of Tyler*, 242 F.3d 307, 313 (5th Cir. 2001) (internal quotation and citation omitted). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck*, 543 U.S. at 152–53 (citations omitted). "[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Id.*, 543 U.S. at 153 (citations omitted). "That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Id.*, 543 U.S. at 153.

"To establish a Fourth Amendment claim for false imprisonment, Plaintiffs must prove: (1) an intent by Defendants to confine them, (2) acts resulting in confinement, (3) Plaintiffs' consciousness of confinement or resulting harm, and (4) the deprivation of a constitutional right, such as the right not to be arrested or detained without probable cause." *Allen v. Normand*, No. 09-2825, 2009 WL 2448253, at *13 (E.D. La. Aug. 7, 2009). A plaintiff must establish that the defendant's misconduct exceeds mere negligence. *Id.*; *see also, e.g., Sanchez v. Swyden*, 139 F.3d 464, 469 (5th Cir. 1998) (actions must go "beyond mere negligence" before tort of false imprisonment "takes on constitutional dimensions"; although plaintiff consistently asserted his innocence and officers were in possession of exculpatory information, there was "considerable debate" about whether plaintiff's appearance matched that of a wanted suspect); *Winfrey v. San Jacinto Cty.*, 481 F. App'x 969, 980 (5th Cir. 2012) (errors or omissions occasioned by "carelessness or run-of-the-mill negligence" do not state a constitutional claim, although those

occasioned by "recklessness" might). "The 'constitutional torts' of false arrest, unreasonable seizure, and false imprisonment require a showing of no probable cause." *Brown v. Lyford*, 243 F.3d 185, 189 (5th Cir. 2001).

Further, "the right of criminal defendants to be free from false or fabricated evidence was well settled by 1959 or earlier". *Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008).  Thus, for example, in *Brown*, the Fifth Circuit held "that the deliberate or knowing creation of a misleading and scientifically inaccurate serology report amounts to a violation of a defendant's due process rights, and that a reasonable laboratory technician in 1984 would have understood that those actions violated those rights." *Id.* (finding no error in denial of qualified immunity on this theory).

Relevant here, under *Franks v. Delaware*, 438 U.S. 154 (1978), "an officer violates the Fourth Amendment by intentionally or recklessly including a false statement in a warrant application." *Nerio v. Evans*, 974 F.3d 571, 577 (5th Cir. 2020).  "Liability under *Franks* requires a certain mindset and certain conduct: an officer must intentionally, or with a reckless disregard for the truth, include a false statement in a warrant application or omit a material fact from it." *Id.* (cleaned up).  There is no liability for "an honest mistake." *Id.* (citation omitted).

*b.*  Analysis

Having carefully considered the matter, the Court will deny both motions.  The Court will address each motion in turn.

First, Defendants' motion is easily denied.  Again, Plaintiffs' chart, as verified by the Rule 30(b)(6) deposition, reflects (1) that Defendants have no evidence that Plaintiffs failed to comply with orders or that any Plaintiff engaged in an act of violence, and (2) that, other than the Affidavits of Probable Cause (which many times were made without personal knowledge), the City does not have any description of any specific Plaintiff's illegal activity. (Rule 30(b)(6) Chart, Doc. 292-1 at

1; Rule 30(b)(6) Dep. 26:19–27:8, 36:21–37:4, Doc. 292-2; *DRPSMF* ¶ 12, Doc. 311.)  Moreover, the chart also shows that, with a few exceptions, the City had no knowledge of which officer saw Plaintiffs commit any crime or of what officer seized Plaintiffs. (Rule 30(b)(6) Dep. 42:21–43:18, 45:4–9, Doc. 292-2.)  A reasonable juror could easily look at this evidence and find that Plaintiffs have created questions of fact on the existence of probable cause so as to preclude summary judgment in favor of Defendants on the false arrest and imprisonment claims.

Plaintiffs' motion is a closer call, but denial is still warranted; while Plaintiffs cite considerable evidence supporting a finding of wrongdoing by the police as to the Plaintiffs at issue, the Court finds that a reasonable jury could conclude, when construing the evidence in a light most favorable to Defendants and drawing reasonable inferences in their favor, that these officers are entitled to qualified immunity.

Plaintiffs cite to the law governing *Franks* liability generally and the prohibition of prophylactically stopping the exercise of First Amendment rights, but Plaintiffs have not provided "controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity," *see McLin*, 866 F.3d at 696 (cleaned up), for the factual situation as presented by Defendants: where officers executed Affidavits of Probable Cause without specific knowledge of the underlying crime but where those officers (1) were aware that protests were taking place, (Willie Williams Dep. 16:25–17:6, 74:7–75:15, Doc. 292-24; *see also* Jonathan Abadie Dep. 11:24–12:3, 35:8–22, Doc. 292-7); (2) knew of the "chaos, confusion, cutting up," and "acts of violence" of protesters and their "going haywire," and knew of the protesters' obstructing traffic at the relevant location, (Willie Williams Dep. 20:14–23:9, 74:7–75:15, Doc. 292-24); (3) then acted on good faith reliance of officers and the information provided to them, (Willie Williams Dep. 41:18–42:9, 46:14–20, 79:1–8, Doc. 292-24; Jonathan

Abadie Dep. 35:8–22, 55:1–7, Doc. 292-7); and (4) did so where there was a risk that the protest would venture onto the interstate, thereby endangering the public and preventing the flow of traffic, all as detailed above.

Even if Defendants were wrong or ignorant about these specific nine Plaintiffs, the Court cannot say that "the law so clearly and unambiguously prohibited [their] conduct that *every* reasonable official would understand that what [they were] doing violate[d] [the law]." *McLin*, 866 F.3d at 695.  And the Court certainly cannot say that the "record is so one-sided as to rule out the prospect of the [Defendants] prevailing" Kane, *supra*, at § 2727.1, or that Plaintiffs are entitled to judgment "beyond peradventure," *see Fontenot*, 780 F.2d at 1194.

In sum, construing the facts from Defendants' perspective (as the Court must do for Plaintiffs' motion), Plaintiffs have failed to provide "controlling authority specifically prohibit[ing] [ ] [D]efendant[s'] conduct" so as to overcome qualified immunity. *See McLin*, 866 F.3d at 695.  At the very least, a reasonable jury could find in Defendants' favor, so Plaintiffs' motion must be denied.

### 3. Claims Against the City

#### a. Applicable Law

"Section 1983 offers no *respondeat superior* liability." *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002). "Municipalities face § 1983 liability 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury. . . .' " *Id.* (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978)). That is, "[a] municipality is liable only for acts directly attributable to it 'through some official action or imprimatur.' " *Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th

Cir. 2001)). "To establish municipal liability under § 1983, a plaintiff must show the deprivation of a federally protected right caused by action taken 'pursuant to an official municipal policy.' " *Id.* (quoting *Monell*, 436 U.S. at 691). The Plaintiff must allege "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Id.* at 541–42 (cleaned up).

As to the first two prongs, "[m]unicipalities can also be liable, in certain situations, for single episodes of conduct that are not part of any pattern of illegality." *Milam v. City of San Antonio*, 113 F. App'x 622, 626 (5th Cir. 2004) (citing *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 405–06 (1997) (summarizing the Court's single-episode cases)). "For example, plaintiffs can hold municipalities liable for single instances of conduct perpetrated by the policymakers themselves; such one-time conduct can represent official 'policy' even though it does not necessarily form part of a plan or rule developed to govern all like occasions." *Id.* (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81, 484–85 (1986) (finding that court of appeals erred in dismissing petitioner's claim against a county when the prosecutor, the relevant final policymaker, "made a considered decision based on his understanding of the law and commanded the officers forcibly to enter petitioner's clinic," and "[t]hat decision directly caused the violation of petitioner's Fourth Amendment rights.")).

"The third prong requires a plaintiff to prove 'moving force' causation." *Valle*, 613 F.3d at 542. "To succeed, 'a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.' " *Id.* (quoting *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)). "That is, 'the plaintiff must demonstrate that a municipal decision reflects

deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision.' " *Id.* (quoting *Brown*, 520 U.S. at 411). "Deliberate indifference is a high standard—'a showing of simple or even heightened negligence will not suffice.' " *Id.* (quoting *Piotrowski*, 237 F.3d at 579).

Additionally, "Plaintiffs must meet a heightened standard of causation in order to hold a municipality liable under § 1983." *Id.* at 546 (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391–92 (1989)). Plaintiffs must show that the municipal policy was the " 'moving force' that caused the specific constitutional violation." *Id.* (citing *Brown v. Bryan Cty, Okl.*, 219 F.3d 450, 461 (5th Cir. 2000)). "In other words, the plaintiff must establish a 'direct causal link' between the municipal policy and the constitutional injury." *Id.* (citing *Brown*, 520 U.S. at 404).

"The Supreme Court has [also] explained that a municipality cannot be liable '[i]f a person has suffered no constitutional injury at the hands of the individual police officer.' " *Bustos v. Martini Club Inc.*, 599 F.3d 458, 467 (5th Cir. 2010) (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). Thus, official capacity "claims fail without an underlying constitutional violation." *Whitley v. Hanna*, 726 F.3d 631, 648–49 (5th Cir. 2013) (citing *Bustos*, 599 F.3d at 467 ("Because [plaintiff] has alleged no constitutional injury attributable to the Officers, [plaintiff] has failed to state a claim that a City policy was the moving force behind a violation of his constitutional rights.")).

Moreover, an authorized policymaker approves a subordinate's decision and the basis for it, such ratification is chargeable to the government entity. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). However, the Fifth Circuit has limited the theory of ratification to "extreme factual situations." *Peterson*, 588 F.3d 838, 848 (5th Cir. 2009) (quoting *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998)).

Further, the Fifth Circuit has "explained that a policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality." *Id.* (citing *Coon v. Ledbetter*, 780 F.2d 1158, 1161–62 (5th Cir. 1986)); *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 169 (5th Cir. 2010) ("Good faith statements made in defending complaints against municipal employees do not demonstrate ratification.").

In *Peterson*, the Fifth Circuit explained:

> In *City of St. Louis v. Praprotnik*, a case on which [plaintiff] relies [and which is the basis of ratification liability], the Supreme Court emphasized that "[s]imply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy. . . ." [485 U.S. 112, 130 (1988)]. Additionally, "the mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority. . . ." *Id. See also Kibbe v. City of Springfield*, 777 F.2d 801, 809 n.7 (1st Cir. 1985) ("The [district] court suggested that the City had ratified defendant Perry's action by clearing him and finding that he had acted in accordance with the police department's policies. We are unconvinced that a failure to discipline Perry or other officers amounts to the sort of ratification from which a jury properly could infer municipal policy.").

588 F.3d at 848 n.2. *See also Milam v. City of San Antonio*, 113 F. App'x 622, 627 (5th Cir. 2004) (quoting to the same propositions from *Praprotnik* and explaining that "[s]uch limitations on municipal liability are necessary to prevent the ratification theory from becoming a theory of *respondeat superior*, which theory *Monell* does not countenance"). Furthermore, the Fifth Circuit has held that "[i]t is nearly impossible to impute lax disciplinary policy to [a governmental entity] without showing a pattern of abuses that transcends the error made in a single case." *Quinn v. Guerrero*, 863 F.3d 353, 365 (5th Cir. 2017) (quoting *Piotrowski*, 237 F.3d at 582) (affirming the district court's dismissal of the plaintiff's excessive force claim against a police department).

*b.* Analysis

Again, Plaintiffs have strong evidence against the City on these claims. This includes the preprinted affidavits themselves (some, relevant here, executed by officers without personal knowledge, and some, also relevant here, executed by officers who say they did not sign the affidavits), (*see PRDSMF* ¶¶ 26–27, Doc. 309-1 at 7); the application of the Civil Disorder Policy for content-based reasons, (Rule 30(b)(6) Dep. 28:2–29:3, Doc. 292-25); and the fact that it was "BRPD policy that the arrest team should not stop and have a conversation with the processing team" and that "[t]hey should simply hand off the arrestee and return to the front lines[,]" (*id.* at 74:12–17). Considering all of this, a reasonable jury could easily find the City liable.

However, when considering the evidence in a light most favorable to the City and drawing reasonable inferences in its favor (as the Court must do on Plaintiffs' motion), for similar reasons cataloged above—the threat of the interstate being overrun, thereby creating a danger to both the protesters and the public and obstruction of traffic; the concern for officer safety (as reflected by the thrown water bottles); and the considerable evidence of Plaintiffs being in the street after numerous orders to disperse, given throughout their demonstration, the Court finds that a reasonable jury could conclude that the City was not deliberately indifferent so as to subject it to *Monell* liability. That is, the Court cannot say that Plaintiffs have established they are entitled to relief "beyond peradventure" or "beyond doubt." *See Fontenot*, 780 F.2d at 1194.

Further, a reasonable jury could find, when looking at the facts from the Defendants' perspective, that this is not the sort of "extreme factual situation[]" that satisfies the requirements for ratification. *See Snyder*, 142 F.3d at 798 (finding that the shooting of a fleeing suspect in the back "hardly [rose] to" such a level, "particularly given the absence of evidence suggesting a culture of recklessness in the NOPD"). *Cf. Grandstaff v. City of Borger*, 767 F.2d 161 (5th

Cir.1985) (finding ratification after officers "poured" gunfire onto a vehicle and killed innocent occupant).  This is particularly true given the facts that (1) the mere failure to investigate does not generally give rise to liability for ratification, *see Peterson*, 588 F.3d at 848 n.2; (2) "[i]t is nearly impossible to impute lax disciplinary policy to [a governmental entity] without showing a pattern of abuses that transcends the error made in a single case," *Quinn*, 863 F.3d at 365, a showing which has not been made here; and (3) "it is hard to see how a policymaker's ineffectual or nonexistent response to an incident, which occurs well *after* the fact of the constitutional deprivation, could have *caused* the deprivation." *Milam*, 113 F. App'x at 628 (cleaned up).

Ultimately, reasonable minds could differ on the City's liability for these claims, and that is exactly why the jury must decide it.   Consequently, Plaintiffs' motion will be denied.

### F.  Search and Seizure

#### *1. Parties' Arguments*

Defendants next move for dismissal of Plaintiffs' claims that Defendants violated their rights to be free from unreasonable search and seizure.  (Doc. 307-1 at 15.)  Defendants assert, "The officers knew that the protest had been going on for an extended time, and the public address system on the BRPD vehicle giving orders to disperse was audible at a long distance. When the plaintiffs were seized, the standoff was over." (*Id.* at 16.)  "Other plaintiffs claim to have been searched for weapons, but no excessive search is pled in the Third Amended Complaint." (*Id.*)

Plaintiffs respond, "Although reasonable suspicion to search is a lower bar than probable cause to arrest, the searches and seizures only occurred *because of* the decision to mass arrest protesters. That should never have occurred and, therefore, the search and seizure was based on the same flawed logic." (Doc. 309 at 16.)

### 2. Applicable Law

"[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot' . . . " *Turner*, 848 F.3d at 690 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968))). "This type of stop is also known as a 'Terry stop.' " *Id.* at 690 n.54.

"The Supreme Court has said repeatedly that when determining whether officers had reasonable suspicion, courts must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *Id.* at 690–91 (cleaned up). Courts consider only the "information available to the officer[s] at the time of the decision to stop a person." *Id.* at 691 (citations omitted). Further, "it is appropriate for the police to take into account the location of the suspicious conduct and the degree of the potential danger being investigated. What is not suspicious in one location may be highly suspicious in another." *Id.* at 692 (cleaned up). "Finally, the Supreme Court has emphasized that courts must allow law enforcement officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (en banc) (cleaned up). But, "in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27.

The Court must "consider each of [the relevant] factors in turn" and "consider whether these factors constitute specific and articulable facts which, when considered along with whatever

reasonable inferences may be drawn from them, would allow a reasonable person to suspect that [the plaintiffs were] engaging in illegal activity." *United States v. Lopez-Moreno*, 420 F.3d 420, 433 (5th Cir. 2005) (citation omitted). The Court must "pay heed to the Supreme Court's admonition not to treat each factor in isolation, but rather to give due regard to the totality of the circumstances." *Id*. (citations omitted).

Additionally, "[o]ne . . . exception to the warrant requirement exists for searches incident to a lawful arrest." *United States v. Ho*, 94 F.3d 932, 935 (5th Cir. 1996) (citing *United States v. Barlow*, 17 F.3d 85, 89 (5th Cir. 1994)). "A warrantless arrest must be based on probable cause." If an officer lacked probable cause, and if the arrest is invalid, that search is unlawful under the Fourth Amendment. *See id.*

Further, the law "permit[s] a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry*, 392 U.S. at 27. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.*

### *3. Analysis*

The Court finds that Defendants' motion is easily denied, for much the same reasons that were given in the preceding sections. Even taking into account the fact that the *Terry* standard is lower than probable cause, there is simply too much conflicting evidence on whether Plaintiffs committed any violations, (*see* Rule 30(b)(6) Chart, Doc. 292-1 at 1; Rule 30(b)(6) Dep. 26:19–27:8, 36:21–37:4, Doc. 292-2; *DRPSMF* ¶ 12, Doc. 311), and what the officers knew and did not

know, (*see, e.g., PRDSMF* ¶¶ 26–27, Doc. 309-1 at 7), to justify summary judgment on any of these claims. Consequently, Defendants' motion will be denied.

### G. Excessive Force

#### 1. Parties' Arguments

Defendants next turn to the excessive force claims. (Doc. 307-1 at 16–17.) Defendants say that "no significant injury was suffered" by Plaintiffs. (*Id*. at 16.) Moreover, there is little causal link between the alleged injuries and officers' conduct. (*Id*.) "The exhibits presented show minimal force being used, without strikes, hard empty hand technique, use of batons or chemical sprays, no Tasers were fired, and no firearms were discharged." (*Id.* at 16–17) The LRAD complained of was ineffective, and the officers gave up on using it. (*Id.* at 17.) Thus, any excessive force claim fails. (*Id*.)

Plaintiffs respond that they need only show more than *de minimis* injury, and they have shown much more than that. (Doc. 309 at 16.) Plaintiffs then quote the injuries described in the operative complaint and say that these injuries are supported by Plaintiffs' experts. (*Id.* at 16–17.) Plaintiffs also dispute Defendants' position that the LRAD was ineffective, as these devices "can cause migraines, sinus pain, dizziness, facial pressure, ringing in ears, sensitivity to noise, tinnitus, and hearing loss and has been found to be a potential basis for an excessive force claim." (*Id*. at 17.) Plaintiffs' expert opines that this device may have caused injury. (*Id.* at 18.)

#### 2. Applicable Law

"To prevail on an excessive force claim, a plaintiff must establish: '(1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.' " *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007) (Dennis, J.) (quoting *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005)). "Excessive force claims

are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.' " *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989), and citing *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (observing that this "area is one in which the result depends very much on the facts of each case")). "Factors to consider include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.' " *Id.* (quoting *Graham*, 490 U.S. at 396). "This list is not exclusive, however, and the Court may examine the totality of the circumstances." *Drumgole v. Frumveller*, No. 14-2827, 2015 WL 2250134, at *8 (E.D. La. May 13, 2015).

As to the first prong, "the plaintiff's asserted injury must be more than *de minimis.*" *Freeman*, 483 F.3d at 416 (citing *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001). "The determination of whether a plaintiff's alleged injury is sufficient to support an excessive force claim is context-dependent and is 'directly related to the amount of force that is constitutionally permissible under the circumstances.' " *Id.* at 416–17 (quoting *Ikerd v. Blair*, 101 F.3d 430, 435 (5th Cir. 1996) and citing *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999) ("In determining whether an injury caused by excessive force is more than de minimis, we look to the context in which that force was deployed.")). "Although a showing of 'significant injury' is no longer required in the context of an excessive force claim, [the Fifth Circuit] do[es] require a plaintiff asserting an excessive force claim to have 'suffered at least some form of injury.' " *Glenn*, 242 F.3d at 314 (quoting *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999)); *see also Keele v. Leyva*, 69 F. App'x 659, 2003 WL 21356063, at *1 (5th Cir. 2003) (unpublished) (per curiam) ("The injury must be more than a *de minimis* physical injury, but need not be significant or

serious." (citing *Gomez v. Chandler*, 163 F.3d 921, 924 (5th Cir. 1999)). Elaborating on this, the

Fifth Circuit said recently:

> "[A]lthough a *de minimis* injury is not cognizable, the extent of
> injury necessary to satisfy the injury requirement is 'directly related
> to the amount of force that is constitutionally permissible under the
> circumstances.' " *Brown v. Lynch*, 524 Fed. Appx. 69, 79 (5th Cir.
> 2013) (quoting *Ikerd v. Blair*, 101 F.3d 430, 434–35 (5th Cir.
> 1996)). "*Any* force found to be objectively unreasonable necessarily
> exceeds the *de minimis* threshold, and, conversely, objectively
> reasonable force will result in *de minimis* injuries only." *Id*.
> (emphasis added) (footnote omitted). Consequently, "only one
> inquiry is required to determine whether an officer used excessive
> force in violation of the Fourth Amendment." *Ikerd*, 101 F.3d at 434
> n.9. In short, "as long as a plaintiff has suffered 'some injury,' even
> relatively insignificant injuries and purely psychological injuries
> will prove cognizable when resulting from an officer's unreasonably
> excessive force." *Brown*, 524 Fed. Appx. at 79 (footnotes omitted)
> (quoting *Ikerd*, 101 F.3d at 434).

*Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017).

As to the second prong—that the injury "resulted directly and only from a use of force that

was clearly excessive," *Freeman*, 483 F.3d at 416—the Fifth Circuit "distinguish[es] between

injuries resulting from excessive force and those resulting from the justified use of force." *Dunn

v. Denk*, 79 F.3d 401, 403 (5th Cir. 1996) (en banc) (citation omitted). "A trier of the fact can

compensate only for injury caused by the use of excessive force. There can be no award for injury

caused by reasonable force." *Id.* Thus, there is no bar to "recovery for aggravation of preexisting

injury caused by the use of excessive force." *Id.*

### 3. Analysis

Having carefully considered the matter, the Court will deny Defendants' motion. The heart

of this motion is that (1) Plaintiffs did not suffer sufficient injury and (2) any injury was not caused

by the police response.

But Defendants readily concede in their recitation of Plaintiffs' interrogatories that all Plaintiffs suffered some emotional stress and trauma arising from the incident, as reflected in the operative complaint. (*See* Doc. 307-1 at 5–9.)  And, again, "*Any* force found to be objectively unreasonable necessarily exceeds the *de minimis* threshold. . . [A]s long as a plaintiff has suffered 'some injury,' even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force." *Alexander*, 854 F.3d at 309 (cleaned up).  Thus, the key question is whether Plaintiffs suffered objectively unreasonable force.

A reasonable jury could find that they did.  Again, the Court must consider the totality of the circumstances in evaluating whether force was excessive, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Deville*, 567 F.3d at 167 (cleaned up).  Here, the crimes were all non-violent misdemeanors, and the City has conceded through Plaintiffs' chart (cited numerous times above) that no Plaintiff engaged in any act of violence.  Thus, questions of fact preclude summary judgment.

This conclusion is bolstered by the testimony of Plaintiffs' experts.  After reviewing the Affidavits of Probable Cause, the BRPD Incident Report, various declarations, and numerous photos and videos, Robert Pusins stated that "[m]any Plaintiffs were injured" and ultimately opined:

> In this case, there is no evidence or reporting in any of the police reports or otherwise that would lead a reasonably trained officer to conclude that each application of force against each Plaintiff was reasonable under the totality of circumstances. The allegations in the Complaint, if true, would be evidence that not only was force used against the Plaintiffs but in many cases as noted, especially involving the intentional tightening of the flex cuffs, the force was retaliatory in nature, was not intended to accomplish a reasonable

84

and legitimate law enforcement objective but was intentionally used with malice designed to injure and cause pain.

Absent any articulable justification for each application of force, I must conclude that the use of force against the noted Plaintiffs was unreasonable, not consistent with generally accepted police practices regarding the use of force and a violation of the BRPD General Order regarding the use of force.

(Pusins Report, Doc. 309-2 at 3, 48–49.)  Likewise, Dr. Kraska, opined, "In sum, there appeared to be no discernable justification for using force on these [protesters] and arresting them." (Kraska Report, Doc. 309-3 at 6.)

Plaintiffs' expert Pusins also focuses on the LRAD as a source of excessive force.  Pusins quotes one publication that explains how "[s]ound cannons are used to emit painful, loud sounds that have the potential to cause significant harm to the eardrums and delicate organs of the ears and/or cause hearing loss." (Pusins Report, Doc. 309-2 at 53 (quoting "Lethal in Disguise, the Health Consequences of Crowd Control Weapons," Physicians for Human Rights, March 2016 ("PHR")).)  Further, "Manufacturer guidelines indicate that sound cannons should only be used from at least a 10-20 metre distance." (*Id.* (quoting PHR, *supra*).)  The article states:

There are very serious concerns about acoustic weapons' high potential to cause serious and permanent injury, such as hearing loss, and the inherent inability of such systems to prevent bystanders and even law enforcement officials from being affected. These concerns are exacerbated by the lack of proper research and evidence about the health effects of acoustic weapons. For these reasons, the use of acoustic weapons in crowd-control situations should be suspended, at least until such concerns are addressed.

(*Id.* (quoting PHR, *supra*).)  Pusins then ties this research to the events in question:

Reasonably well-trained officers know and understand that the sound waves from "alert" feature from a LRAD can cause pain and injury and its target use is indiscriminate in that protesters, bystanders, the media, and even police officers can be exposed to the hazardous effects of the LRAD. The footage of the various

85

recordings of the BRPD using the LRAD shows protesters and police officers in close proximity to the LRAD vehicle.

(*Id.*) He concludes:

> It is my opinion that the use of the LRAD on July 10, 2016 by the BRPD was unreasonable as protesters and police officers were in close proximity to the device and may have suffered pain and injury as a result and that the BRPD does not have a policy or training on the use of the LRAD and potential harmful effects and this is not consistent with generally accepted police practices regarding the use of an LRAD. The BRPD should have a comprehensive LRAD policy that addresses the issues just discussed.

(*Id.* at 54.)

Plaintiffs also provide other evidence that the LRAD led to excessive force. Plaintiffs highlight how "BRPD had not done . . . any training or investigation into the safety use of this LRAD device in a manner to prevent injury," (Rule 30(b)(6) Dep. 142:15–21, Doc. 292-25), and how BRPD had not received any training or instruction before using the device about "how close to someone the device should be safely used." (*Id.* at 138:2–7.) The City's representative did not "have any knowledge as to what decibel level the device was used in less-than-lethal weapon mode on protesters on East and France," and the City did not "know anything about that device, how close to people it could be safely used, at what decibel it could be safely used or at what decibel level it was actually [ ] used on people[.]" (*Id.* at 138:15–139:5.) This testimony bolsters the opinions provided by Pusins.

The City submits contrary evidence. Specifically, the City's representative testified that, because the LRAD was sitting on top of the Bearcat, it was elevated so that the "horrible noise" was projecting over the crowd, "[a]nd that's why it wasn't effective." (*Id.* at 140:24–142:14.) But, ultimately, this is merely a factual dispute that must be resolved at trial.

In sum, considering all of this evidence in a light most favorable to Plaintiffs and drawing reasonable inferences in their favor, a reasonable juror could conclude that excessive force was used against Plaintiffs which caused more than *de minimis* injury.  Consequently, Defendants' motion on these claims will be denied.

### H.  Failure to Intervene

#### 1. Parties' Arguments

Defendants next attack the failure to intervene claims.  (Doc. 307-1 at 17.)  Defendants say that there was no First Amendment violation and therefore no duty to intervene. (*Id.* at 18.) Further, the searches, seizures, and arrests were also supported by probable cause. (*Id*)  Finally, the officers were trained in their duty to intervene. (*Id.*)

Plaintiffs respond that "Defendants argue only that there were no underlying legal violations for officers to intervene against." (Doc. 309 at 18.)  "But as described above, in Plaintiffs' Motion for Summary Judgment, and in both expert reports, there is abundant evidence of Defendants' constitutional violations." (*Id.*)

#### 2. Applicable Law

"[A]n officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983." *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995) (citations omitted). "[A]n officer may be liable under § 1983 under [this] theory of bystander liability where the officer '(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.' " *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (citations omitted).

A Plaintiff must establish that the officer "knows that a fellow officer is violating an individual's constitutional rights," and this logically requires that the officer observe the violation. *See McDonald v. McClelland*, 779 F. App'x 222, 226 (5th Cir. 2019) (per curiam) (finding that plaintiff's bystander liability claim failed as a matter of law because "the uncontroverted evidence [was] that none of the defendant officers saw any other officer kick [the plaintiff]" and because "[b]ystander liability cannot attach if the officer did not know about and acquiesce in the constitutional violation." (citing *Whitley*, 726 F.3d at 647)); *Nowell v. Acadian Ambulance Serv.*, 147 F. Supp. 2d 495, 507 (W.D. La. 2001) (concluding that summary judgment was properly granted with respect to the bystander claim because "there is simply no evidence supporting plaintiff's claim that either defendant used excessive force on plaintiff, observed the complained use of excessive force or allowed plaintiff to be subjected to the use of excessive force, nor is there any evidence that [the officers] had any opportunity to take steps to prevent the alleged use of force, or to intervene to stop it."), *aff'd*, 390 F. App'x 305 (5th Cir. 2010).

Similarly, "liability will not attach where an officer is not present at the scene of the constitutional violation." *Whitley*, 726 F.3d at 646 (citations omitted). However, "[m]ere presence at the scene of the alleged use of excessive force, without more, does not give rise to bystander liability." *Vasquez v. Chacon*, No. 08-2046, 2009 WL 2169017, at *6 (N.D. Tex. July 20, 2009) (citing *Nowell*, 147 F. Supp. 2d at 507); *see also Brown v. Wilkinson Cty. Sheriff Dep't*, 742 F. App'x 883, 884 (5th Cir. 2018) (per curiam) ("[plaintiff] concedes that he was harmed by three inmates and that an officer's mere presence, without more, does not give rise to a bystander liability claim."); *Garrett v. Crawford*, No. 15-261, 2016 WL 843391, at *9 (W.D. Tex. Mar. 1, 2016) ("Simply being present at the scene of the alleged use of excessive force, without more, does not give rise to a cognizable claim for failure to intervene." (citing *Vasquez*, 2009 WL 2169017, at

*6)); *Montgomery v. Hollins*, No. 18-1954, 2019 WL 2424053, at *3 (N.D. Tex. May 8, 2019) ("an officer's 'mere presence at the scene, without more, does not by some mysterious alchemy render him legally responsible under section 1983 for the actions of a fellow officer.' " (quoting *Calvi v. Knox Cty.*, 470 F.3d 422, 428 & n.3 (1st Cir. 2006), *report and recommendation adopted*, No. 18-1954, 2019 WL 2422493 (N.D. Tex. June 10, 2019)).  The officer must have a "reasonable opportunity to realize the excessive nature of the force and to intervene to stop it." *See Hale*, 45 F.3d at 919; *Nowell*, 147 F. Supp. 2d at 507 (same); *Vasquez*, 2009 WL 2169017, at *6 (same) (citing *Hale*, *supra*; *Nowell*, *supra*); *see also Garrett*, 2016 WL 843391, at *9 (describing this as a "necessary inquiry in a failure to intervene claim" (citing *Hale*, *supra*)).

"In resolving whether a plaintiff has sufficiently alleged a bystander liability claim we also consider whether an officer 'acquiesce[d] in' the alleged constitutional violation." *Whitley*, 726 F.3d at 647 (citations omitted); *see also Garrett*, 2016 WL 843391, at *9 (same, citing *Whitley*). As one Court observed;

> In evaluating whether an officer took reasonable measures to protect a suspect, courts have considered both the duration of the alleged use of excessive force by other officers and the location of the suspect relative to the officer against which a claimant seeks bystander liability. *See Morris v. Pierce,* 2008 WL 4287967, at *7 (W.D. La. Sep. 17, 2008) (no bystander liability because no summary judgment evidence to suggest that officer had a reasonable opportunity to intervene in a struggle that lasted 10–15 seconds); *Gilbert v. French,* 2008 WL 394222, at *27 (S.D. Tex. Feb. 12, 2008) (no indication that officers had time to prevent use of excessive force that occurred over the span of a few seconds); *Haggerty v. Texas Southern Univ.,* 2005 WL 2030866, at *4 (S.D. Tex. Aug. 22, 2005) (no bystander liability because officer was several yards away and did not use any force on suspect); *Paternostro v. Crescent City Connection Police,* 2002 WL 34476319, at *11 (E.D. La. Apr. 2, 2002) (summary judgment evidence did not show that officer was in a location from which he could have had a realistic opportunity to prevent the violations of another officer).

*Vasquez*, 2009 WL 2169017, at *6; *see also Garrett*, 2016 WL 843391, at *9 ("In making the determination of whether or not an officer acquiesced to the excessive force, courts consider the duration of the alleged use of force and the location of the suspect in relationship to the observing officer.") (citing *Malone v. City of Fort Worth*, Civ. Ac. No. 09-634, 2014 WL 5781001, at *15–16 (N.D. Tex. Nov. 6, 2014), *appeal dismissed sub nom. Malone v. Tidwell*, 615 F. App'x 189 (5th Cir. 2015)). Thus, "[t]his determination turns on the facts alleged in the complaint and the reasonable inferences that may be drawn from those facts." *Montgomery*, 2019 WL 2424053, at *4 (citing *Garrett*, 2016 WL 843391, at *9–10).

### 3. Analysis

Having carefully considered the matter, the Court will deny Defendants relief. The Court agrees with Plaintiffs' assessment: the sole basis for Defendants' motion is that there is no underlying constitutional violation.[9] But this Court has already concluded that there are numerous questions of fact on each of Plaintiffs' federal claims. As a result, Defendants' motion on this issue will be denied.

### I. Civil Conspiracy

#### 1. Parties' Arguments

Defendants next attack the conspiracy claims. (Doc. 307-1 at 18–19.) Defendants say Plaintiffs' claims are "colorful and hyperbolic, but there is an absence of proof[.]" (*Id* at 19.) Further, J.D. Leach and former Chief Dabadie both testified that there was no conspiracy and that the "supervisory level" defendants were disconnected from the events on the ground. (*Id.*) "The totality of the exhibits and deposition testimony show that this was ordinary police work, an effort

---

[9] The Court notes that all other arguments based on the above bystander liability law have been waived for this motion. *See JTB Tools & Oilfield Servs.*, 831 F.3d at 601; *Wuestenhoefer*, 105 F. Supp. 3d at 672; *Byrd*, 2022 WL 879492, at *13.

to keep peace on the streets of the city, that the plaintiffs were ordered to disperse and refused to do so, resulting in their arrests." (*Id.*)

Plaintiffs respond, "Defendants argue that Plaintiffs' civil conspiracy claims should be dismissed because two Defendants say there was no conspiracy. Two Defendants' contentions are an insufficient basis to deny all civil conspiracy claims." (Doc. 309 at 19.)  Plaintiffs rely on (1) the meetings in the days leading up to the protest to coordinate a response; (2) Defendants' decision to use the Civil Disorder Policy which mandated disbursal; (3) the use of Affidavits of Probable Cause that were written and printed before the protest; (4) the circulation of those affidavits via email to BRPD supervisors and approval of same; and (5) the instruction on the radio that "Everyone has violated. Everyone is under arrest. Those who can safely apprehend violators must do so." (*Id.*)  "Other officers agreed and began making mass, indiscriminate arrests regardless of what protesters were doing and where they were standing." (*Id.*)  Thus, say Plaintiffs, Defendants' motion should be denied.

### 2. Applicable Law

"A conspiracy may be charged under section 1983 as the legal mechanism through which to impose liability on all of the defendants without regard to who committed the particular act." *Hale v. Townley*, 45 F.3d 914, 920 (5th Cir. 1995) (cleaned up).  "To prevail on a conspiracy claim under § 1983, the plaintiffs must show (1) the existence of a conspiracy involving state action and (2) a deprivation of their civil rights in furtherance of the conspiracy." *Plaisance v. Reese*, 353 F. Supp. 2d 735, 738 (E.D. La. 2004).

As to the first, plaintiff must bring forward "facts tending to show that the defendants entered into an agreement to deprive him of his [rights]." *Leggett v. Williams*, 277 F. App'x 498,

501 (5th Cir. 2008).  "[A] conspiracy may be proved by circumstantial evidence." *Mack v. Newton*,

737 F.2d 1343, 1350 (5th Cir. 1984) (citations omitted).  Indeed,

> Since conspiracies . . . are rarely evidenced by explicit agreements,
> the determination of whether a conspiracy existed almost inevitably
> rests on the inferences that may fairly be drawn from the behavior
> of the alleged conspirators. At a minimum, their actions, to support
> a finding of a conspiracy, must suggest a commitment to a common
> end. The circumstances must be such as to warrant a jury in finding
> that the conspirators had a unity of purpose or a common design and
> understanding, or a meeting of minds in an unlawful arrangement.

*Id.* (cleaned up).

But, "a mere scintilla of evidence is insufficient to present a question for the jury." *Id.*

(cleaned up).  Unreasonable inferences, speculation, and conjecture are also inadequate. *See id*.

"Mere conclusory allegations of conspiracy cannot, absent reference to material facts, state a

substantial claim of federal conspiracy under 42 U.S.C.A. § 1983." *Leggett*, 277 F. App'x at 501

(citing *Hale v. Harney*, 786 F.2d 688, 690 (5th Cir. 1986) (internal quotation marks omitted)).

As to the second, "a conspiracy claim is not actionable without an actual violation of

section 1983." *Hale*, 45 F.3d at 920.  Thus, if all members of the conspiracy are entitled to qualified

immunity on the underlying constitutional violation, then a "conspiracy claim is not actionable."

*Id.*

28 U.S.C. § 1985(3), entitled "Depriving Persons of Rights or Privileges," provides:

> If two or more persons in any State or Territory conspire . . . for the
> purpose of depriving, either directly or indirectly, any person or
> class of persons of the equal protection of the laws, or of equal
> privileges and immunities under the laws; . . . in any case of
> conspiracy set forth in this section, if one or more persons engaged
> therein do, or cause to be done, any act in furtherance of the object
> of such conspiracy, whereby another is injured in his person or
> property, or deprived of having and exercising any right or privilege
> of a citizen of the United States, the party so injured or deprived may
> have an action for the recovery of damages occasioned by such
> injury or deprivation, against any one or more of the conspirators.

"Section 1985(3) prohibits conspiracies to deprive any person equal protection of the laws." *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 389 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 1009 (2018), *reh'g denied*, No. 17-892, 2018 WL 1786091 (U.S. Apr. 16, 2018) (citing 42 U.S.C. § 1985(3); *Lockett v. New Orleans City*, 607 F.3d 992, 1002 (5th Cir. 2010)). To establish a claim under § 1985(3), a plaintiff must demonstrate "(1) a conspiracy; (2) for the purpose of depriving a person of the equal protection of the laws; and (3) an act in furtherance of the conspiracy; (4) which causes injury to a person or a deprivation of any right or privilege of a citizen of the United States.' " *Id.* (quoting *Lockett*, 607 F.3d at 1002).

"To state a cognizable claim under § 1985(3), [Plaintiffs] must allege that (1) a racial or class-based discriminatory animus lay behind the conspiracy and (2) the conspiracy aimed to violate rights protected against private infringement." *Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261, 270 (5th Cir. 2001). " 'In this circuit, [courts] require an allegation of a race-based conspiracy' to present a claim under § 1985(3)." *Id.* at 271 (citing *Bryan v. City of Madison*, 213 F.3d 267, 276 (5th Cir. 2000)). Plaintiffs must show "racial animus," or else their § 1985(3) claims fail. *Id.* (affirming dismissal of § 1985(3) claim on Rule 12(b)(6) grounds); *see also Lockett*, 607 F.3d at 1002 (the § 1985(3) "conspiracy must also have a racially based animus").

Like § 1983 conspiracy claims, a party asserting a § 1985(3) claim must demonstrate "an agreement among the alleged co-conspirators." *Body by Cook*, 869 F.3d at 389 (citing *Green v. State Bar of Tex.*, 27 F.3d 1083, 1089 (5th Cir. 1994)). Plaintiffs must do so with specificity, and they may not rely on mere conclusory allegations. *See Holdiness v. Stroud*, 808 F.2d 417, 424 (5th Cir. 1987) (quoted with approval by *Body by Cook*, 869 F.3d at 389–90).

### 3. Analysis

Having carefully considered the matter, the Court will deny Defendants' motion.  Again, questions of fact preclude summary judgment.

Defendants' sole argument is that there is insufficient evidence of an agreement, but Plaintiffs submit proof from which the inference can be drawn that there was in fact a meeting of the minds.  Plaintiffs point to the City's decision to use the Civil Disorder Policy because "it was a protest for them to speak out against perceived misconduct by the [BRPD.]"  (Rule 30(b)(6) Dep. 28:2–24, Doc. 292-25.)  Plaintiffs also refer to the "BRPD policy to target identified leaders and agitators," (*id.* at 35:17–19), the latter of which are defined by BRPD to mean "Persons encouraging others to upset the status quo to further their cause," including those who "want to see a major change in the politics of Baton Rouge." (*Id.* at 35:20–36:3, 38:2–13.) Thus, the use of these policies reflects an agreement by BRPD leadership and officers in their response to the protest.

This agreement is further demonstrated by the fact that pre-printed and pre-drafted Affidavits of Probable Cause were used. (*See, e.g.,* Doc. 307-5.)  These affidavits were also circulated by email, which shows a certain amount of coordination. (*See* Doc. 292-15.)  Again, the inference can be made from this fact that the response was coordinated and orchestrated.

Finally, Defendants' agreement is perhaps shown best by the events leading up to the arrests.  Plaintiffs submit evidence that, after an hour at East and France, BRPD declared, "Where you are standing is not good enough." (Myron Daniels Dep. 120:8–10, Doc. 292-22; *see also* John Clary Dep. 91:7–12, Doc. 292-19 ("Q. So you heard the leave now, leave now. Where you are standing is not good enough? A. Yes, sir. Q. So is that the dispersal order that you described? A.

Yes, sir. . . . ").)  Lieutenant Christopher Taylor also stated in response to an audio clip of David

Wallace (one of the shift leads):

> Q. Just to repeat what is sounded to me like [Wallace] said, it was,
> You've got one of the leaders requesting to walk on the sidewalk
> past France. Someone else responds, It's too late. Then 10-9. Then
> responds, Too late. Everyone has violated.   Everyone is under
> arrest. Those who can safely apprehend violators must do so.
> Primary targets are the white male, red hair, tie-dyed shirt, and
> everyone else who is violating, which is everybody out there. Does
> that sound about right?
>
> A. Yes, sir.

(Christopher Taylor Dep. 144:4–22, Doc. 292-21; *see also id.* at 61:19–62:3 (on Wallace's role).)

None of the above evidence constitutes direct proof of a conspiracy.  But, again, "a

conspiracy may be proved by circumstantial evidence." *Mack*, 737 F.2d at 1350 (cleaned up).

"Since conspiracies . . . are rarely evidenced by explicit agreements, the determination of whether

a conspiracy existed almost inevitably rests on the inferences that may fairly be drawn from the

behavior of the alleged conspirators." *Id.* (cleaned up).  Here, Plaintiffs' submissions, detailed

above, reflect a "commitment to a common end," a "unity of purpose," and a "meeting of minds

in an unlawful arrangement." *Id.* (cleaned up).

In sum, construing all of this evidence in a light most favorable to Plaintiffs and drawing

reasonable inferences in their favor, a reasonable juror could find an agreement on the part of the

City and BRPD officers to deprive Plaintiffs of their constitutional rights, including equal

protection, by making mass arrests and suppressing speech without justification.  Accordingly,

Defendants' motion will be denied.

V.    **Discussion of State Law Claims**

  A.  **Louisiana Constitution**

Defendants move to dismiss the Louisiana constitution claims to the same extent as the federal claims. (Doc. 307-1 at 20.)  Plaintiffs argue they should be denied for the same reasons they previously argued. (Doc. 309 at 20.)

In short, the Court agrees with the parties.  Under the Louisiana Constitution, "[n]o law shall curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish his sentiments on any subject, but is responsible for abuse of that freedom." La. Const. art. I, § 7.  The Fifth Circuit has recognized that "Louisiana's constitutional protection of free speech mirrors that of the First Amendment, so separate determinations of the state and federal claims are unnecessary." *Heaney v. Roberts*, 846 F.3d 795, 802 n.2 (5th Cir. 2017).

Likewise, "[i]n Louisiana, the right to privacy ensures that '[e]very person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy.' " *Bagley v. Kolb*, No. 19-10, 2021 WL 3376830, at *16 (W.D. La. Aug. 3, 2021) (quoting La. Const. art. I, § 5). "Although the Louisiana Supreme Court has not articulated a clear standard for state constitutional claims alleging excessive force, 'Louisiana federal district courts have noted that principles embodied in the Fourth Amendment have been incorporated into Article I, Section 5 of the Louisiana Constitution.' " *Id.* (quoting *Shepherd v. City of Shreveport*, No. 14-2623, 2018 WL 1513679, at *10 (W.D. La. Mar. 27, 2018) (citing *Todd v. City of Natchitoches*, 238 F. Supp. 2d 793, 798–99 (W.D. La. 2002))). Further the Western District has also "held that absent more precise guidance from the Louisiana Supreme Court, the 'Fourth Amendment standards control the analysis of alleged infringements on the constitutional right to privacy.' " *Id.* (quoting *Tucker v. City of Shreveport*, No. 17-1485, 2019 WL

961993, at *11 (W.D. La. Feb. 27, 2019), *rev'd on other grounds*, 998 F.3d 165 (5th Cir. 2021)). Thus, in *Bagley*, the Western District granted and denied summary judgment on plaintiff's state law constitutional claims to the same extent as it did the federal claims. *See id.*

Accordingly, because the Court has denied summary judgment as to Plaintiffs' § 1983 claims, the Court will likewise deny summary judgment as to the corresponding claims under the Louisiana Constitution.

### B.  IIED and NIED

#### 1. Parties' Arguments

Defendants then turn to Plaintiffs' intentional infliction of emotional distress ("IIED") and negligent infliction of emotional distress ("NIED") claims. (Doc. 307-1 at 20–21.)  Defendants say that "the officers preparing the affidavits of probable cause believed at the time that they were conducting themselves within the boundaries of the law, and at least some of the affidavits of probable cause were prepared by officers with knowledge of the violations[.]" (*Id.* at 21.) Defendants further contend, "Several plaintiffs have alleged brief counseling, and a few have claimed longer periods of counseling for emotional trauma, anxiety, and so forth, but few if any have tried to show any causation linking the supposed trauma and distress to the conduct of the defendants." (*Id.*)  Defendants maintain that they lack the intent to inflict emotional distress and rather sought to clear the roadways. (*Id.*)  According to Defendants, their actions do not rise to the level of "extreme and outrageous," and it is not "atrocious and utterly intolerable in a civilized community." (*Id.* at 22.)

Plaintiffs respond that "Defendants do not know much about Plaintiffs' emotional injuries. That is because they declined to notice any Plaintiff for deposition." (Doc. 309 at 20.)  Only Raae Pollard was deposed, and BRPD asked her no questions. (*Id.*)  While Defendants concede that

several Plaintiffs received therapy, "most Plaintiffs have not yet testified or been deposed – and so they have not had any opportunity to 'show' causation." (*Id.* at 21.)  In any event, there is evidence in the record reflecting Raee Pollard's emotional distress. (*Id.*)  Plaintiffs conclude, "Defendants conducted no deposition questioning of Plaintiffs whatsoever about their emotional distress. They now try to point to the absence of evidence as evidence of absence. Defendants' motion should be denied." (*Id.*)

### 2. Applicable Law

Under Louisiana law, Plaintiff must establish the following to recover for IIED: "(1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct." *White v. Monsanto Co.*, 585 So. 2d 1205, 1209 (La. 1991).

As to the first  requirement, "[t]he conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* "Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. Persons must necessarily be expected to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind." *Id.*

As to the second element, "[t]he distress suffered must be such that no reasonable person could be expected to endure it. Liability arises only where the mental suffering or anguish is extreme." *Id.* at 1210 (citations omitted).

As to the final prong, "[l]iability can arise only where the actor desires to inflict severe emotional distress or where he knows that such distress is certain or substantially certain to result

from his conduct." *Id*. (citation omitted). "The conduct must be intended or calculated to cause severe emotional distress and not just some lesser degree of fright, humiliation, embarrassment, worry, or the like." *Id.*

As to the NIED claims, "[g]enerally, a defendant will not be held liable under Louisiana law where its conduct is merely negligent and causes only emotional injury unaccompanied by physical injury." *Molden v. Georgia Gulf Corp.*, 465 F. Supp. 2d 606, 614 (M.D. La. 2006) (citing *Moresi v. State, Dept. of Wildlife and Fisheries*, 567 So. 2d 1081, 1096 (La. 1990)). "In *Moresi*, the Louisiana Supreme Court considered whether a plaintiff could recover for mental disturbances caused by a defendant's ordinary negligence when the mental disturbance was unaccompanied by physical injury, illness, or other physical consequences." *Id.* (citing *Moresi*, 567 So. 2d at 1095). The *Moresi* "court refused to allow recovery for mental anguish absent a physical injury except in 'special circumstances.' " *Id.* (quoting *Moresi*, 567 So. 2d at 1096).

"To date, the Louisiana courts have identified only four instances in which recovery is allowed for mental anguish without physical injury." *Id.* "These instances all involve 'the especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serve as a guarantee that the claim is not spurious.' " *Id.* (quoting *Moresi*, 567 So. 2d at 1096). While four categories are provided, the one relevant here is:

> A plaintiff may recover damages for a defendant's infliction of emotional distress based on a separate tort involving physical consequences to the person or property of the plaintiff, such as an assault or a battery, false imprisonment, trespass to land, nuisance or the invasion of the person's right to privacy. [*Moresi*, 567 So. 2d at 1095.]

*Id.* at 614.[10]

---

[10] The other three categories are:

"When a plaintiff does not fall into one of [these] four categories, the plaintiff must prove the 'claim is not spurious by showing a particular likelihood of genuine and serious mental distress arising from special circumstances.' " *Id.* (quoting *Bonnette v. Conoco, Inc.*, 837 So. 2d 1219, 1235 (2003)). "If the plaintiff is unable to meet this standard, recovery for mental distress is not allowed absent physical injury." *Id.*

### 3. Analysis

Having carefully considered the matter, the Court will grant the motion in part and deny it in part. Specifically, the Court will dismiss the IIED claims but finds that the NIED claims survive.

As to the IIED claims, Plaintiffs complain that Defendants have not engaged in sufficient discovery to determine what injuries Plaintiffs suffered, but that is not their burden. Again, "[a] movant for summary judgment need not set forth evidence when the nonmovant bears the burden of persuasion at trial." *Wease*, 915 F.3d at 997 (citing *Celotex*, 477 U.S. at 323). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Id.* (citation omitted). Thus, Defendants did not need to engage in discovery concerning Plaintiffs' injuries;

---

A defendant's intentional infliction of emotional distress will also support an award for mental anguish damages. [*White*, 585 So. 2d 1205.]

Furthermore, when the plaintiff is a direct participant in the accident causing the emotional injury, and the defendant owes a direct, specific statutory duty to the plaintiff to refrain from the specific conduct that causes the accident, damages for the infliction of emotional distress may be awarded, even absent physical injury. [*Clomon v. Monroe City School Board*, 572 So. 2d 571, 586 (La. 1990); *Guillory v. Arceneaux*, 580 So. 2d 990 (La. App. 3 Cir. 1991).]

Finally, a bystander may recover an award for infliction of emotional distress where the bystander either views the accident or injury causing event or comes upon the accident before a substantial change. [*Lejeune v. Rayne Branch Hospital*, 556 So. 2d 559, 570 (La. 1990). *See also* La. Civ. Code art. 2315.6 (codifying *Lejeune*).

*Molden*, 465 F. Supp. 2d at 614–15.

rather, it was incumbent on Plaintiffs to bring forward summary judgment evidence showing there is a genuine issue for trial. *See Matsushita Elec. Indus.*, 475 U.S. at 586–87.

Plaintiffs have largely failed to do so.  Elsewhere in their brief, Plaintiffs rely on the operative complaint to describe Plaintiffs' injuries, but that cannot defeat summary judgment.  *See* 10A Mary Kay Kane, *Federal Practice and Procedure (Wright & Miller)* § 2722 (4th ed. 2022) ("Because the summary-judgment motion is designed to pierce the formal allegations of the pleadings, it normally is not made or opposed on the basis of the pleadings alone."); *see also* 10A Mary Kay Kane, *Federal Practice and Procedure (Wright & Miller)* § 2739 (4th ed. 2022) ("Rule 56 was amended in 1963 to add language in what then was subdivision (e) that explicitly stated that an opposing party could not rest upon mere allegations or denials in its pleading. . . . Thus, the practice prescribed by the amendment now is applied throughout the federal courts[.]"); 1963 Advisory Committee Note to Rule 56(e) ("The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial. The Third Circuit doctrine, which permit[ed] the pleadings themselves to stand in the way of granting an otherwise justified summary judgment, [wa]s incompatible with the basic purpose of the rule." (quoted with approval by Kane, *supra*, at § 2739)).  Further, Defendants have provided a description of interrogatory responses seeking information about medical treatment. (Doc. 307-1 at 5–9.)  But the Court has reviewed this material and finds that none of it reflects the kind of severe and extreme emotional damages required for an IIED claim.

While Plaintiffs do submit evidence as to Raae Pollard, that testimony does not meet her burden.  Pollard stated that her emotional distress damages included "depression, loss of appetite, weight loss, and social isolation" as well as an effect on her willingness to participate in future protests or demonstrations. (Raae Pollard Dep. 38:19–39:10, Doc. 298-18.)  But Pollard could not

101

say whether these problems still affect her today. (*Id.*)   Even considering the evidence in a light most favorable to Plaintiff, the Court cannot say that  "[t]he distress suffered [is] such that no reasonable person could be expected to endure it" or that "the mental suffering or anguish is extreme." *See White*, 585 So. 2d at 1210 (citations omitted).

For all these reasons, the Court finds that Plaintiffs have not demonstrated a genuine issue of material fact on their IIED claims.  Consequently, they will be dismissed.

However, the Court will deny the motion with respect to the NIED claims.  As stated above,

> A plaintiff may recover damages for a defendant's infliction of emotional distress based on a separate tort involving physical consequences to the person or property of the plaintiff, such as an assault or a battery, false imprisonment, trespass to land, nuisance or the invasion of the person's right to privacy.

*Molden*, 465 F. Supp. 2d at 614 (citing *Moresi*, 567 So. 2d at 1095).  As established elsewhere in this ruling, Plaintiffs have viable claims for assault, battery, and false imprisonment. Therefore, Defendants' motion on this issue will be denied.

### C.  Assault and Battery

#### 1. Parties' Arguments

As to the assault and battery claims, Defendants assert:

> Under the circumstances presented, where the officers have been pelted with bottles and stones, the large numbers of protesters whose status as armed or unarmed is unknown, the possibility of being separated and outnumbered in a physical conflict, and the officers not using weapons, whether lethal or non-lethal, all indicate a reasonable use of force.

(Doc. 307-1 at 23.)

Plaintiffs respond that there is only evidence of two bottles thrown and that nothing was thrown by Plaintiffs. (Doc. 309 at 21.)  Further, there is no evidence to suggest that the protesters were armed or that any officer believed them to be so. (*Id.*)  To the contrary, the pictures of

102

Plaintiffs being arrested show them surrounded by law enforcement officers. (*Id*. at 21–22.) Additionally, the "nature of the offense" was a non-violent misdemeanor, and Defendants did not know the "character of the arrestee" other than that they were protesters. (*Id.* at 22.) The "exigency of the moment" is "highly disputed." (*Id.*)  In sum, "[w]hether the amount of force used in these arrests was reasonable is better left up to the finder of fact. Defendants' motion should be denied." (*Id.*)

### 2. Applicable Law

Louisiana Code of Criminal Procedure Article 220 provides, "A person shall submit peaceably to a lawful arrest. The person making a lawful arrest may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained." La. Code Crim. Proc. art. 220. "The use of force by law enforcement officers must be tested by the 'reasonable force' standard established by this article. The test precludes 'clearly inappropriate force.' " *Kyle v. City of New Orleans*, 353 So. 2d 969, 972 (La. 1977) (quoting La. Code Crim. Proc. art. 220, Official Revision Comment (b)).

"The use of force when necessary to make an arrest is a legitimate police function." *Id.*  "But if the officers use unreasonable or excessive force, they and their employer are liable for any injuries which result." *Id.* (citations omitted); *see also Penn v. St. Tammany Par. Sheriff's Off.*, 2002-0893 (La. App. 1 Cir. 4/2/03), 843 So. 2d 1157, 1161 (stating that excessive force transforms authorized use of force into a battery). "Whether the force used is reasonable depends upon the totality of the facts and circumstances in each case." *Kyle*, 353 So. 2d at 973. "A court must evaluate the officers' actions against those of ordinary, prudent, and reasonable men placed in the same position as the officers and with the same knowledge as the officers." *Id.* "The degree of force employed is a factual issue." *Id.* (citations omitted).

The Louisiana Supreme Court has explained further:

> Several factors to be considered in making this determination are the known character of the arrestee, the risks and dangers faced by the officers, the nature of the offense involved, the chance of the arrestee's escape if the particular means are not employed, the existence of alternative methods of arrest, the physical size, strength, and weaponry of the officers as compared to the arrestee, and the exigencies of the moment.

*Kyle*, 353 So. 2d at 973 (citations omitted).

Ultimately, "excessive force claims under both federal and Louisiana law turn on whether the use of force was objectively reasonable given the totality of the circumstances. This has been widely recognized by [the Fifth Circuit], Louisiana federal district courts, and the Louisiana Supreme Court." *Shepherd on behalf of Est. of Shepherd v. City of Shreveport*, 920 F.3d 278, 286 (5th Cir. 2019) (collecting cases).

### 3. Analysis

Having carefully considered the matter, the Court will deny Defendants' motion, largely for the same reasons the federal excessive force claims survive. In short, questions of fact preclude summary judgment.

Construing the evidence in a light most favorable to Plaintiffs and drawing reasonable inferences in their favor, a reasonable jury could easily conclude that the force used in this case was excessive. Again, the officer's vulnerability to the protesters is in question, given Defendants' body armor, armored vehicle, LRAD, pistols, patrol rifles, and the ability to deploy tear gas, (*see* Rule 30(b)(6) Dep. 120:1–5, 126:11–127:2, 128:10–17, 214:8–10, Doc. 292-25), in addition to their undercover operative, helicopter, and "fixed wing airplane" for overhead footage, (*id.* at 215:20–21, 222:6–8). All of this contrasts strongly to the extensive evidence, discussed above, that these protests were peaceful. (*See, e.g.,* Kraska Report, Doc. 309-3 at 6; Pusins Report, Doc.

309-2 at 47.)  Further, each of the offenses at issue were minor misdemeanors, thereby decreasing the need for force.  The officers cannot complain of the arrestees escaping, as the officers (at least ostensibly) wanted the crowd to disperse.

In sum, looking at the totality of the circumstances from the facts presented by Plaintiffs, a jury could find that the arresting officers employed "clearly inappropriate force" to the protesters. Consequently, Defendants' motion will be denied.

### D.  False Imprisonment

Defendants incorporate their previous arguments about false imprisonment. (Doc. 307-1 at 23.)  Plaintiffs do the same. (Doc. 309 at 22.)

"Under Louisiana law, '[f]alse arrest and imprisonment occur when one arrests and restrains another against his will without a warrant or other statutory authority. Simply stated, it is restraint without color of legal authority.' " *Elphage v. Gautreaux*, 969 F. Supp. 2d 493, 514 (M.D. La. 2013) (quoting *Kyle v. City of New Orleans*, 353 So. 2d 969, 971 (La. 1977)). "[I]f police officers act pursuant to statutory authority in arresting and incarcerating a citizen, they are not liable for damages for false arrest and imprisonment." *Id*. (quoting *Kyle*, 353 So. 2d at 971). *See also* La. Code Crim. Proc. arts. 213 (describing circumstances of warrantless arrest), 215.1 (describing circumstances of *Terry* stop).

This Court's analysis to Plaintiffs' § 1983 false imprisonment and false arrest claims applies with equal force to the state law claims.  *See Elphage*, 969 F. Supp. 2d at 515 (citing *Harrison v. State Through Dept. of Pub. Safety and Corr.*, 97-1086 (La. 12/1/98); 721 So. 2d 458, 462–63); *O'Dwyer v. Nelson*, 310 F. App'x 741, 745 n.4 (5th Cir. 2009) (finding that, because Fourth Amendment principles underpin Louisiana law relating to false arrests, the Fourth Amendment inquiry was applicable to both O'Dwyer's federal and state law claims (citing

*Harrison*, 721 So. 2d at 462–63)). *See also Curran v. Aleshire*, 67 F. Supp. 3d 741, 754 (E.D. La. 2014) (dismissing federal and state false arrest, false imprisonment, and malicious prosecution claims as *Heck*-barred).  Accordingly, for the same reasons highlighted above, the Court will deny Defendants' motion on the state law false imprisonment claims.

### E.  Malicious Prosecution

Defendants urge that Plaintiffs' malicious prosecution claim should be dismissed because there was probable cause to arrest Plaintiffs. (Doc. 307-1 at 23.)  Plaintiffs respond that, for the same reasons given earlier, there was no probable cause for the arrests, so Defendants' motion should be denied. (Doc. 309 at 23.)

The elements of a Louisiana state law malicious prosecution claim are:

> (1) the commencement or continuance of an original criminal or civil judicial proceeding; (2) its legal causation by the present defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; and (6) damage conforming to legal standards resulting to plaintiff.

*Lemoine v. Wolfe*, 2014–1546 (La. 3/17/15), 168 So. 3d 362, 367 (citation omitted).  Here, Defendants attack only the fourth requirement.

Because this Court has already determined that a reasonable juror could find the absence of probable cause, Plaintiffs have created questions of fact on their malicious prosecution claims. Consequently, Defendants' motion will be denied.

### F.  Negligence

#### 1. Parties' Arguments

Defendants next assert that they are entitled to summary judgment on the negligence claim. (Doc. 307-1 at 23–24.) Defendants contend:

> The officers were faced with an unprecedented event, had reliable information, known to all, of an impending attempt to take over the interstate. With hundreds of protesters lining the streets, over an hour of trying to convince them to depart, and the generally nominal injuries claimed by plaintiffs, the defendants herein cannot be seen as negligent.

(*Id.*)

Plaintiffs respond first by noting inconsistencies in Defendants' position, such as their saying the situation was unexpected while at the same time maintaining that the protesters' general tactic of overrunning the interstate was well-known. (Doc. 309 at 23.)  In any event, Defendants fail to argue the specific elements of a negligence claim, but the facts as pled do establish same. (*Id.*)  Plaintiffs assert:

> Although there is a dispute regarding the extent of harm suffered by Plaintiffs, parties seem to agree that there was *some* injury. Parties also agree that Defendants owed a duty of care to Plaintiffs. And clearly, injuries caused by use of force, arrest, and other violations would fall within the scope of risk of violating that duty. The question of whether the duty was breached relies on several disputed facts, including the amount of injuries suffered, whether Defendants had probable cause to arrest Plaintiffs, and other issues at the core of this case. Many of those questions are better decided by the finder of fact and, therefore, the motion should be denied.

(*Id.*)

### 2. *Applicable Law*

"The duty-risk analysis is the standard negligence analysis employed in determining whether to impose liability under" Article 2315. *Lemann v. Essen Lane Daiquiris, Inc.*, 2005-1095 (La. 3/10/06); 923 So.2d 627, 632–33 (citing *Mathieu v. Imperial Toy Corp.*, 94-0952 (La. 11/30/94); 646 So. 2d. 318, 321). Under this analysis, a plaintiff must prove five separate elements:

> (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's

> injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element).

*Id.* at 633 (citing *Fowler v. Roberts*, 556 So. 2d 1, 4 (La. 1989), *reh'g granted on other grounds and original opinion reinstated as supplemented*, 556 So. 2d at 13 (La. 1990)). "A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability." *Id.* (citing *Mathieu*, 646 So. 2d at 326).

### 3. Analysis

Having carefully considered the matter, the Court will deny the motion, for the reasons given by Plaintiffs. Defendants seem to argue that they breached no duty and that, if they did, Plaintiffs suffered only nominal injuries. As to the latter, the Court already determined in the excessive force section that Plaintiffs suffered some injury, even if they were minor.

As to the breach element, there are simply too many questions of fact, detailed throughout this ruling, to find in favor of Defendants. A reasonable jury could easily find that these Defendants failed to act as reasonably prudent officers under the circumstances. Consequently, Defendants' motion will be denied.

### G.  Vicarious Liability and Indemnity

Defendants lastly seek dismissal of the vicarious liability and indemnity claims. (Doc. 307-1 at 24–25.) Defendants argue that, because Plaintiffs cannot establish an underlying tort, there can be no respondent superior liability. (*Id.* at 25.) As to indemnity, Defendants argue that Plaintiffs' position echoes its vicarious liability claim. (*Id.*).

Plaintiffs respond that the sole basis for Defendants' argument on vicarious liability is the absence of an underlying tort. (Doc. 309 at 24.) Since Plaintiffs have met their burden on the other claims, Defendants' motion should be denied here. (*Id.*) Further, "Defendants do not offer any

argument to find summary judgment on indemnity beyond claiming that it is a restatement of vicarious liability." (*Id.*)

Turning to the law, "[a]t common law, the Latin phrase *respondeat superior* ("let the master answer") denotes the employer's liability for the employee's tort committed in the course and scope of employment." 1 Frank L. Maraist, et al., *Louisiana Tort Law* § 13.02 (2021). "The foundation of *respondeat superior* is the employee's tort. Thus, where the employee was not guilty of a tort, the employer cannot be vicariously liable." *Id.* "Louisiana Civil Code Article 2320 codifies the concept, providing, in part: [']Masters and employers are answerable for the damage occasioned by then-servants and overseers, in the exercise of the functions in which they are employed [.]['] " *Id.*

As to the indemnity claim, the Court agrees with Plaintiffs; Defendants' position rests entirely on the lack of an underlying tort.

For all of the above reasons, the Court finds that Plaintiffs have demonstrated questions of fact on nearly all of their claims. Consequently, Defendants' motion to dismiss the vicarious liability and indemnity claims will be denied.

## VI. Conclusion

Accordingly,

**IT IS ORDERED** that the *Motion for Partial Summary Judgment* (Doc. 297) filed by all Plaintiffs is **DENIED**.

**IT IS FURTHER ORDERED** that the *Motion for Summary Judgment* (Doc. 307) filed by Defendants is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** in that the following claims are **DISMISSED WITH PREJUDICE:** (1) Plaintiffs' claims against

interim BRPD Chief of Police Jonny Dunnam in his official capacity, and (2) Plaintiffs' claims for

intentional infliction of emotional distress.  In all other respects, Defendants' motion is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>July 14, 2022</u>.


_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**